UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON COUNTS, et al,

               Plaintiff,                      Case No. 16-cv-12541

v.                                       Honorable Thomas L. Ludington

GENERAL MOTORS, LLC,

               Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS**

On June 7, 2016, nine plaintiffs filed a 442-page complaint alleging deceptive advertising, breach of contract, and fraudulent concealment claims under the laws of thirty states against Defendant General Motors ("GM"). ECF No. 1. Fundamentally, Plaintiffs allege that GM installed a "defeat device" in the 2014 Chevrolet Cruze Diesel which results in significantly higher emissions when the vehicle is in use compared to when it is being tested in laboratory conditions. Plaintiffs purport to bring suit on behalf of a putative class of other 2014 Chevrolet Cruze Diesel buyers. On October 3, 2016, Defendant filed a motion to dismiss which argues that Plaintiff's suit should be dismissed because Plaintiffs lack standing to bring suit, the claims are preempted by the Clean Air Act, the primary jurisdiction doctrine mandates deference to an EPA investigation of the claims, and Plaintiffs have failed to state a claim upon which relief can be based. ECF No. 12. For the reasons stated below, that motion will be granted in part.

**I.**

When considering a motion to dismiss, the plaintiff's adequately pleaded factual allegations must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the veracity of the factual allegations in Plaintiffs' Complaint is to be assumed.

**A.**

Plaintiffs' complaint names nine plaintiffs: Jason Counts, Donald Klein, Oscar Zamora, Brandon Stone, Jason Silveus, John Miskelly, Thomas Hayduk, Joshua Hurst, and Joshua Rodriguez. Compl. at ¶ 20–44, ECF No. 1. The complaint alleges that each Plaintiff is similarly situated. All bought a Chevrolet Cruze[1] which was allegedly equipped with a "defeat device" that resulted in significantly increased emissions when tested during normal driving as compared to when tested in laboratory settings. Plaintiffs further allege that they purchased the vehicle on the "reasonable, but mistaken, belief that [the] vehicle was a 'clean diesel' as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy." *See id.* at ¶¶ 20, 23, 26, 27, 30, 33, 36, 39, 42. Further, Plaintiffs allege that they "selected and ultimately purchased [their] vehicles[s], in part, because of the Clean Diesel system, as represented through the advertisements and representations made by GM." *Id.* Finally, Plaintiffs allege that if GM had disclosed the true details of the clean diesel system design or indicated that the 2014 Chevrolet Cruze actually "emitted pollutants at a much higher level than gasoline vehicles do," they "would not have purchased the vehicle, or would have paid less for it." *Id.*

Defendant General Motors designs, markets, manufactures, and distributes automobiles, including those marketed under the Chevrolet brand, worldwide. *Id.* at 46. GM designed and manufactured the 2014 Chevrolet Cruze Diesel. *Id.* GM also developed and disseminated the advertising campaign for the vehicle. *Id.*

**B.**

---

[1] The allegations for Jason Silveus do not specify that he bought a "Diesel" Chevrolet Cruze or the model year of the vehicle. *Id.* at ¶ 30. Otherwise, each Plaintiff is alleged to have bought a new or used 2014 Chevrolet Cruze Diesel.

According to Plaintiffs, diesel engines offer increased torque, low-end power, drivability, and fuel efficiency compared to gasoline engines. *Id.* at ¶ 4. However, those advantages are offset by the dirtier, more harmful, emissions which diesel engines produce. *Id.* Specifically, diesel combustion creates oxides of nitrogen (NOx), a "toxic pollutant" that "contributes to nitrogen dioxide, particulate matter in the air" and certain health problems. *Id.* at ¶ 54. Generally speaking, the "greater the power and fuel efficiency" of the diesel engine, "the dirtier and more harmful the emissions." *Id.* at ¶ 54.

Because of the pollutants produced by diesel combustion, the Environmental Protection Agency has promulgated regulatory standards (pursuant to the Clean Air Act) which govern, among other things, the amount of NOx that diesel engine vehicles can produce. *Id.* at ¶ 56. GM, and other vehicle manufacturers, must obtain certifications that a new vehicle complies with EPA (and certain state) regulations before introducing the vehicle into the stream of commerce. *Id.*

When it designed the 2014 Chevrolet Cruze Diesel, GM sought to feature all the advantages of diesel engines while minimizing the emission of harmful pollutants. *Id.* at ¶¶ 60– 62. By creating the "Cruze Clean Turbo Diesel" engine, GM apparently built a powerful, efficient, diesel engine that was environmentally-friendly. *Id.* Plaintiffs allege that GM marketed the 2014 Chevrolet Cruze as a "Clean Diesel" vehicle that was "environmentally friendly and fuel efficient." *Id.* at ¶ 63. In their complaint, Plaintiffs include several images that GM disseminated during the advertising campaign. *See id.* at ¶¶ 65–68. Those images include the words "clean diesel," indicate that the "Clean Turbo Diesel" engine "improves performance while decreasing emissions," and state that "[a]dvanced emissions-scrubbing technologies make today's diesels run clean." *Id.* In one especially relevant image, GM advertised that "[t]he

turbocharged engine in Cruze Clean Turbo Diesel [sic] generates at least 90% less nitrogen oxide and particulate emissions when compared to previous-generation diesels." *Id.* at ¶ 68. Plaintiffs also cite numerous advertisements and public statements promulgated by GM which assert GM's commitment to high quality standards and environmental responsibility. *Id.* at ¶¶ 69–72.

### C.

All parties agree that GM received a certification of compliance with the relevant regulations from the EPA prior to releasing the 2014 Chevrolet Cruze Diesel. However, Plaintiffs allege that, despite that certification and GM's "clean diesel" advertising campaign, the 2014 Chevrolet Cruze Diesel was equipped with a "defeat device" which triggered the Cruze Clean Turbo Diesel functions when the vehicle was being tested, but deactivated the system when the vehicle was actually in use. *Id.* at ¶¶ 73–75.

Specifically, Plaintiffs allege that multiple reports and tests indicate that GM vehicles equipped with "clean diesel" systems "emit far more pollution on the road than in lab tests." *Id.* at ¶ 73. In one alleged study that was conducted by "TNO" at the direction of the Dutch Ministry of Infrastructure, real-world testing indicated that the "GM Opel emits NOx at levels much higher than in controlled dynamometer tests and  much higher than the 'Euro 6 Standard,' which is less stringent than the U.S. standard." *Id.* at ¶ 74. The TNO study, which was released in May 2015, found that "on average [the GM Opel] vehicles were at eight times the [European] limit." *Id.* at ¶ 75. Although the study involved European vehicles, Plaintiffs allege that the "core technologies of the Opel design are substantially similar to the Chevy Cruze." *Id.* In one particularly relevant portion of the TNO report that Plaintiffs quote, TNO states: "'In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions.'" *Id.* at ¶ 79.

- 4 -

Plaintiffs also allege that the British Department of Transportation released a study in April 2016 which reached similar conclusions. *Id.* at ¶ 80. This study stated that "[r]eal world emissions of [GM's Opel] vehicles were found to be approximately 750 mg/km and 400 mg/km for the Insignia and Mokka, respectively. These emissions are well above the Euro 6 standard of 80 mg/km." *Id.* A study conducted by the French Ministry of the Environment arrived at similar conclusions. *Id.* at ¶ 81. Likewise, Emissions Analytics, an U.K. company which has conducted testing on many European vehicles, found that the large disparity between real world emissions and laboratory emissions meant "'that fuel economy on average is one quarter worse than advertised.'" *Id.* at ¶ 82. However, Plaintiffs do not allege that the quoted statement from Emissions Analytics was specifically applicable to GM's European vehicles, much less diesel engines generally.

Plaintiffs also allege that testing by the Institute for Transport Studies, a U.K. organization, and by the German Federal Department of Motor Vehicles, found that certain GM vehicles were not in compliance with European NOx emissions standards. *Id.*at ¶¶ 83, 85. The testing by Germany has led to a "'voluntary' recall of 630,000 vehicles in Europe, including GM vehicles." *Id.* at ¶ 85. Plaintiffs allege that after it became public that Volkswagen had utilized a defeat device in some of its vehicles, GM halted production of the Chevrolet Cruze. *Id.* at ¶ 86.

Finally, Plaintiffs allege that they have tested the Chevrolet Cruze "using a Portable Emissions Measurement System." *Id.* at ¶ 87. According to Plaintiffs, that testing revealed that the Cruze was noncompliant with U.S. emissions standards during highway driving (especially speeds over 70 miles per hour), stop-and-go driving, temperatures below 50° fahrenheit, and temperatures over 85° fahrenheit. *Id.*

**D.**

Besides the potential environmental impacts of the NOx emissions, Plaintiffs allege that GM's misrepresentations inflicted certain other damages on Plaintiffs. First, Plaintiffs allege that, if GM is forced to alter the 2014 Chevrolet Cruze vehicles to make them compliant with U.S. emissions standards, vehicle performance will be substantially downgraded. *Id.* at ¶ 90. Because the vehicles "will no longer perform as they did when purchased and as advertised," the vehicles' value will be diminished and owners will be forced to "pay more for fuel." *Id.* Second, Plaintiffs allege that GM "charged more for its diesel car than a comparable gas car." *Id.* at ¶ 91. According to Plaintiffs, if they had "known of the higher emissions at the time they purchased or leased their [Cruze], they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles." *Id.* at ¶ 92.

**II.**

Defendant is moving for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Rule 12(b)(1) provides the means by which a party may assert lack of subject-matter jurisdiction as a defense. "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994)). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.* However, a "factual attack challenges the factual existence of subject matter jurisdiction." *Id.* In that case, "the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015). Regardless, "the plaintiff bears the

burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert*, 517 F.3d at 439. The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

Federal Rule of Civil Procedure 9(b) provides a heightened pleading standard for claims of fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id*.  As explained by the Sixth Circuit in *Frank v. Dana Corp*. 547 F.3d 564 (6th Cir. 2008), claims of fraud must meet the following requirements:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. at 569 (citation omitted).  At a minimum, a claimant must allege "the time, place and contents" of the alleged fraud.  *Id*.

**III.**

- 7 -

GM bases its motion to dismiss on four grounds. First, GM argues that Plaintiffs lack Article III standing. Second, GM argues that Plaintiffs claims are preempted by the Clean Air Act. Third, GM argues that Plaintiff's claims should be stayed under the primary jurisdiction doctrine. Finally, GM argues that Plaintiffs have failed to state a claim upon which relief can be based. GM's arguments will be addressed in turn, starting with standing because it is a "threshold question in every federal case." *Miller v. City of Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010) (quoting *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir.1987)).

## A.

Defendant argues that Plaintiffs lack Article III standing because they have not alleged a concrete and particularized injury and because they are asserting claims arising under the law of states where none of the named Plaintiffs reside or bought their vehicle. Article III, § 2 of the United States Constitution limits federal court jurisdiction to "Cases" and "Controversies." The Supreme Court has interpreted Art. III, § 2 as creating the doctrine of standing, which provides that federal jurisdiction exists only if the dispute is one "which [is] appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). For standing to exist, three elements must be satisfied: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61(1992). Injury in fact exists when the plaintiff has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Id.* at 560 (citations omitted). Causation exists if the injury is one "that fairly can be traced to the challenged action of the defendant." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976). The redressability requirement is satisfied if the plaintiff's injury is "likely to be redressed by a favorable decision." *Id.* at 38.

- 8 -

**1.**

GM argues that Plaintiffs' allegations of damages are generalized and speculative. According to Defendant, Plaintiffs' "complaint focuses on vehicle makes they do not own (Opel and Vauxhall) that are manufactured, sold and marketed by different entities exclusively in Europe, not the United States." Mot. Dismiss at 13, ECF No. 12. Defendants argue that Plaintiffs have not plausibly alleged that GM vehicles are in noncompliance with European regulatory standards, much less U.S. regulatory standards. Defendants further assert that Plaintiffs' alleged damages are based on "*speculative* future injuries" that rest on "multiple contingencies." *Id.* at 16. Specifically, Defendants characterize Plaintiffs' alleged damages as follows: Because certain European vehicles purportedly exceed European emission standards, the diesel Chevrolet Cruze likewise must exceed U.S. emission standards. Because the Cruze exceeds emissions standards, GM may have to recall the vehicle in the future and alter the engine to ensure compliance. If that is done, the Plaintiffs argue, their vehicles will have decreased performance and fuel efficiency, meaning their vehicles will be worth less. Finally, Defendants argue that Plaintiffs' allegations regarding environmental and health harms caused by increased emissions are generalized grievances which, because suffered by the public at large, cannot establish standing.

Plaintiffs characterize their injury in fact allegations differently. Rather than relying on environmental harms or noncompliance with government regulation, Plaintiffs assert an overpayment theory. That theory is explained as follows: GM promised a clean diesel engine—including "at least 90% less nitrogen oxide and particulate emissions"—but actually delivered a vehicle that turns off its emissions reduction system when in use. GM charged more for the diesel Chevrolet Cruze model than a comparable gasoline model and Plaintiffs chose the diesel model based at least in part on its "clean diesel" features. Accordingly, Plaintiffs allege that

GM's misrepresentations resulted in their overpaying for a vehicle because the vehicle did not work in the way GM promised it would.

In response, GM admits that overpayment can constitute an Article III injury, but assert that Plaintiffs' theory requires, when challenged by a motion to dismiss, that they plausibly allege the falsity of the representations. According to GM, Plaintiffs have not plausibly alleged that "GM made actionable *false* statements about Diesel Cruze emissions or that any plaintiffs saw and relied to their detriment on misrepresentations about the vehicles' emissions." Def. Reply Br. at 12, ECF No. 18. GM presents an alternative explanation for the diesel model's higher price: the increased power and fuel efficiency that diesel engines feature.

If Plaintiffs were alleging that they are entitled to relief based on the 2014 Chevrolet Cruze Diesel's noncompliance with EPA emissions regulations or the environmental harms caused by increased NOx emissions, they would lack standing. Absent allegations that Plaintiffs actually use a defined location which has been "affected by the challenged activity," alleged environmental harms do not establish standing. *Lujan*, 504 U.S. at 566. A plaintiff cannot establish standing by merely alleging that they use or are part of a "continuous ecosystem" which is adversely affected by the challenged behavior. *Id.* at 565. Plaintiffs' environmental allegations lack a specific geographic nexus and are thus insufficient to create standing. Likewise, Plaintiffs' allegations that the 2014 Chevrolet Cruze Diesel is in noncompliance with EPA regulations does not establish standing. Generally speaking, a citizen does not have standing to sue an entity for legal or regulatory violations which do not directly impact the citizen. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 223 (1974) (holding that citizens cannot "call on the courts to resolve abstract questions"). By itself, GM's alleged noncompliance with EPA regulations does not constitute a sufficiently particularized injury to establish Plaintiffs' standing.

- 10 -

Plaintiffs, however, are not relying on either of those theories to establish standing. Rather, Plaintiffs allege that GM misrepresented that the 2014 Chevrolet Cruze was a "clean diesel" vehicle and that, in reliance on those misleading representations, they overpaid for the vehicle. An economic injury can suffice to furnish Article III standing. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 524 (6th Cir. 2015) (finding that standing existed in a class action because the plaintiffs alleged that the defendant falsely advertised to every purchaser of a health product and because there was no reason to purchase the product "except for its promised digestive health benefits"); *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013) (finding that allegations that the plaintiffs purchased a product in reliance on the defendant's misrepresentations established a cognizable injury); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) (finding that standing existed where plaintiffs alleged that they paid more for the product than they otherwise would have because the defendant "made deceptive claims and failed to disclose the system's limitations"). Plaintiffs' allegations that they overpaid for the vehicle[2] based on GM's representations constitute economic injury sufficient to establish Article III standing.

### i.

First, GM argues that Plaintiffs have not suffered an economic injury because they have not alleged that GM actually engaged in deceptive behavior. That argument is without merit. The Complaint describes, in detail, numerous studies and reports from European authorities finding that GM vehicles are noncompliant with European emission regulations, despite meeting those regulations when tested in laboratory settings. Importantly, the Complaint also alleges that Plaintiffs have tested a Chevrolet Cruze themselves and found that emissions were significantly

---

[2] Plaintiffs also allege that they may not have purchased the Cruze at all but for GM's misrepresentations.

higher than represented (given the regulatory standards the Cruze is purportedly in compliance with). GM makes much of the fact that the European studies involved different vehicles and that some of the studies expressly stated that the findings should not be interpreted to stand for the legal proposition that the vehicles were not in compliance with emission regulations. GM also emphasizes that Plaintiffs did not specifically allege that the Cruze they tested was the 2014 diesel model. But Plaintiffs' assert that GM's vehicles share common designs, including engines. That is plausible: common sense compels the conclusion that GM does not start anew each time it designs a vehicle.

Likewise, Plaintiffs' failure to specifically allege that they tested a 2014 Diesel Cruze is not fatal to their assertion of standing. The Complaint, read in its entirety, is unmistakably making allegations about the 2014 Diesel Cruze. In many paragraphs of the Complaint, Plaintiffs refer to the vehicle as the "Cruze" without specifying its year and model. To punish Plaintiffs for using shorthand at times in their Complaint would elevate form over substance. At the motion to dismiss level, plausible factual allegations are assumed to be true. Here, Plaintiffs have referenced and described multiple studies which found that GM vehicles that share engine technology with the Cruze produce significantly higher emissions than represented. That is enough to raise a plausible allegation that GM's promises of "Clean Diesel" and "90% less nitrogen oxide and particulate emissions" were deceptive. Likewise, the alleged disparity between emissions during laboratory testing and emissions during real-world testing makes Plaintiff's allegations of the existence of a "defeat device" plausible. If Plaintiffs' claims are challenged at summary judgment, they will be required to produce sufficient *evidence* to demonstrate genuine issues of fact, but that standard is not now applicable. At this stage, GM's attempts to challenge the methodology or conclusions of the studies have no traction.

- 12 -

GM also argues that Plaintiffs do not have standing because they did not plausibly allege that Plaintiffs saw and relied upon specific advertisement or other false statements in deciding to buy the Cruze. But GM has not established that Plaintiffs must actually plead reliance in order to establish standing. The Plaintiffs suffered financial injury because they paid a price for the Diesel Cruze that included a premium for its clean diesel technology. *See* Compl. at ¶ 91 ("Plaintiffs and members of the class paid a premium for a diesel Cruze, as GM charged more for its diesel car than a comparable gas car. Depending on the trim level, the premium was as much as $2,400."). In *Muir v. Playtex Prod., LLC*, the court held that plaintiffs had standing even though they did not allege injury based on the actual performance of the product or identified which less expensive product they would have purchased absent the "purported misrepresentations." 983 F. Supp. 2d 980, 987 (N.D. Ill. 2013). The district court held that "[Plaintiff's] standing was established at the time of purchase, regardless of whether he later was dissatisfied with the [product] and regardless of whether he would have purchased a substitute product." *Id.*

When the economics of the transaction are analyzed, this outcome is logical. The clean diesel features of the Cruze were an important component of the vehicle, as evidenced by GM's advertising campaign which featured the clean diesel system. That system elevated the apparent value of the vehicle. Even if Plaintiffs did not specifically choose the Cruze because of its clean diesel system, they paid more for the vehicle because it included the system. If the system did not actually provide any value to the vehicle, then Plaintiffs suffered financial injury through overpayment regardless of whether they relied on GM's alleged misrepresentations. Had the true functionality of the clean diesel system been public knowledge, the Cruze's fair market value would have been lower, and the Plaintiffs would have paid a lower price. As recognized in *Muir*,

- 13 -

that is enough to furnish standing. *See also In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ('"The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children.").

**ii.**

GM does not specifically argue that Plaintiffs lack standing because they have not established that GM's alleged conduct is traceable to Plaintiffs' injury or that ruling for Plaintiffs would not redress their injury. However, on December 12, 2016, GM filed a notice of supplemental authority, ECF No. 19, identifying a decision by the District Court for the District of New Jersey dismissing a substantially similar suit against Mercedes-Benz. *See In re Mercedes-benz Emissions Litig.*, No. CV 16-881 (JLL)(JAD), 2016 WL 7106020, at *1 (D.N.J. Dec. 6, 2016). Like in the present case, the plaintiffs in the *Mercedes-Benz Emissions Litigation* were alleging breach of contract, fraudulent concealment, and state consumer protection statute violations by Mercedes-Benz because their "clean diesel" vehicles employed a defeat device. The court found that the plaintiffs had adequately alleged an injury in fact because they "plausibly pled that the products received did not live up to the claims made by Defendants." *Id.* at *4.

However, the court found that the alleged injury was not "fairly traceable" to the defendant's conduct. *Id.* at *6. Specifically, the court faulted the plaintiffs' complaint for not alleging the "'general type or medium of advertising to which they were [personally] allegedly exposed.'" *Id.* at *8 (quoting *In re Gerber Probiotic Sales Practices Litig.*, No. CIV.A. 12-835 JLL, 2013 WL 4517994, at *6 (D.N.J. Aug. 23, 2013). The court went on:

> For example, Plaintiffs have not alleged that they actually viewed any category of advertisements—i.e., Defendants' website, press releases, etc.—that contained the alleged misrepresentations. Accordingly, the Court finds that the [consolidated

- 14 -

amended complaint] does not contain sufficient facts to allege that Plaintiffs'
injuries were fairly traceable to any of Defendants' representations.

*Id.* (internal citations omitted).

In *Gerber*, the court found that the plaintiffs had standing to assert a false advertisement

claim regarding claims made on the product's label, but not based on the "overall marketing

campaign." *In re Gerber Probiotic Sales Practices Litig.*, 2013 WL 4517994, at *6. The court

further reasoned:

> [N]o Plaintiff alleges even the general type or medium of 'advertising' to which
> they were allegedly exposed. Nor do Plaintiffs otherwise allege facts as to how
> misrepresentations in the 'advertising' caused their injuries. Therefore, the
> [consolidated amended complaint] does not contain sufficient facts to allege that
> the injuries which resulted to Plaintiffs were fairly traceable to any of Gerber's
> representations other than those on the Products' labeling.

*Id.*

GM does not argue in this case that Plaintiffs have not alleged facts plausibly

demonstrating traceability. However, because standing is a threshold question that can be raised

*sua sponte* by the Court, traceability will be briefly addressed.

The decision in *Mercedes-Benz Emissions Litigation* is incompatible with existing Sixth

Circuit and Supreme Court precedent. In *Wuliger v. Manufacturers Life Ins. Co.*, the Sixth

Circuit explicated the kind of "causation" which plaintiffs must allege to establish traceability:

> [T]he causation requirement in standing is not focused on whether the defendant
> 'caused' the plaintiff's injury in the liability sense; the plaintiff need only allege
> 'injury that fairly can be traced to the challenged action of the defendant, and not
> injury that results from the independent action of some third party not before the
> court.'

567 F.3d 787, 796 (6th Cir. 2009) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26,

41–42 (1976)). "Proximate causation is not a requirement of Article III standing." *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1394 (2014). Thus, the traceability

- 15 -

analysis does not focus on whether the plaintiff has alleged facts sufficient to show that the defendant's conduct caused the plaintiff's injury for purposes of liability. Rather, "[t]he causation requirement of the constitutional standing doctrine exists to eliminate those cases in which a third party and not a party before the court causes the injury." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004).

*Mercedes-Benz Emissions Litigation* and *Gerber* blur this distinction between proximate causation and traceability. The question for standing purposes is not whether Plaintiffs' relied on GM's advertising campaign such that they would not have purchased the vehicle but for GM's "clean diesel" marketing. Rather, the question is whether it was GM's conduct, not a third party's conduct, which caused Plaintiffs' alleged injury. Here, GM has not tried to argue that Plaintiffs' alleged injuries were the result of a third party's actions. According to Plaintiffs, GM installed a "defeat device" in the Chevrolet Cruze. That defeat device means the Cruze's emissions are significantly higher than advertised (and significantly higher than a reasonable consumer would expect). This alleged disparity between what the Cruze was represented to be and what it actually is, as discussed above, sufficient to constitute an injury in fact. Even if the Plaintiffs did not specifically rely on the "clean diesel" advertising in choosing to buy the Cruze, they paid a price, determined the market, which relied upon GM's representation that the vehicle included a fully functional "clean diesel" system. In other words, GM's false advertising created an artificially high market price that Plaintiffs paid. Plaintiffs' overpayment can thus be traced directly to GM's alleged actions.[3] The named Plaintiffs have alleged facts sufficient to create standing at the motion to dismiss stage.

**2.**

---

[3] GM's arguments about reliance are undoubtedly relevant to the question of whether Plaintiffs have plausibly alleged facts upon which claims for false advertisement, fraudulent concealment, and consumer protection law violations can be based. But that inquiry is distinct from the Article III standing analysis.

While the named Plaintiffs have standing, the Complaint also seeks to bring a class action against GM.[4] The nine named Plaintiffs are residents of Arizona,[5] California, Florida, Maryland, Michigan, New York, Ohio, and Texas. GM argues that the claims in the Complaint arising under other state laws should be dismissed because the named Plaintiffs do not have standing to bring those claims.

"Threshold individual standing is a prerequisite for all actions, including class actions." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). In *Fallick*, the Sixth Circuit explained that a "potential class representative must demonstrate individual standing vis-as-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action." *Id.* Once the purported class representative has demonstrated standing personally, then the Federal Rule of Civil Procedure 23 certification analysis is to be conducted. *Id.* However, in *Ortiz v. Fibreboard Corp.*, the Supreme Court held that class certification issues were, in that case, "'logically antecedent' to Article III concerns." 527 U.S. 815, 831 (1999) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)). Thus, the Court held that the Rule 23 certification analysis should be conducted first, though in keeping with Article III's limits on standing. *Id.*

In *In re Auto. Parts Antitrust Litig.*, the court faced the issue now presented here. 29 F. Supp. 3d 982, 999 (E.D. Mich. 2014). In that case, the defendants argued that the plaintiffs did not have standing to "pursue claims in states where they do not reside." *Id.* at 999–1000. Having previously found that the named plaintiffs had personal standing to bring claims, the *Auto Parts* Court postponed the question of whether the named plaintiffs had standing to bring claims in states where a named plaintiff did not reside until the class certification stage of proceedings. *Id.* at 1000.

---

[4] At this time, Plaintiffs have not requested that the class be certified.
[5] Mr. Stone, the Arizona resident, bought his Cruze in Illinois. Every other named Plaintiff bought their vehicle in their state of residence.

This bifurcation of the standing inquiry is sensible. Having determined that the named Plaintiffs have standing in their individual capacity, the question of whether the named Plaintiffs have standing to bring claims on behalf of the unnamed class members is analytically subsequent to the class certification analysis. Admittedly, Sixth Circuit law regarding this question is unsettled. The Sixth Circuit has not directly addressed this issue, and district courts for the Eastern District of Michigan have reached different conclusions. Like the *In re Auto. Parts Antitrust Litig.* Court, the *Hoving v. Transnation Title Ins. Co.* Court distinguished between the question of whether the named plaintiff had standing to assert claims on his own behalf from the question of whether that plaintiff could bring claims on behalf of unnamed class members. 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008) ("The defendant has not seriously challenged the plaintiff's standing to assert his claims arising from the alleged overcharge on his own refinancing transaction. The question whether he has standing to proceed as a class representative will be subsumed in the class certification decision."). However, in both *Anger v. Accretive Health, Inc.* and *In re Packaged Ice Antitrust Litig.*, the courts addressed standing prior to class certification and dismissed all claims which arose under the law of states where no named plaintiff resided. No. 14-CV-12864, 2015 WL 5063269, at *5 (E.D. Mich. Aug. 27, 2015); 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011). *See also Kaatz v. Hyland's Inc.*, No. 16 CV 237 (VB), 2016 WL 3676697, at *5 (S.D.N.Y. July 6, 2016) (noting the "'growing consensus'" that "class certification is logically antecedent to standing when, as here, class certification is the source of the potential standing problems").

For several reasons, the cases which defer the standing inquiry regarding the claims advanced on behalf of unnamed class members until class certification provide the best approach. It is axiomatic that Article III standing is a predicate to federal jurisdiction. Likewise,

a potential class representative cannot manufacture standing merely by attempting to bring a class action. *Fallick*, 162 F.3d at 423. Accordingly, it makes no sense to completely postpone the standing inquiry until after all the discovery has finished. If, at that point, the Court were to find that standing did not exist, then the case would have proceeded for months, at considerable expense to the parties, before a Court without jurisdiction. That outcome is unacceptable, but that danger is not present here. In this case, the individual Plaintiffs have standing to bring claims on their own behalf, and that is enough for the Plaintiffs to proceed to discovery.

It is true that deferring the question of standing for purpose of rule 23 may subject GM to discovery on all claims, including those which Plaintiffs have standing to bring only if the class is certified. However, that is acceptable for two reasons. First, the crux of Plaintffs' claims (and thus the crux of the discovery sought) center on design decisions made centrally by GM. If GM designed a "defeat device" for the Chevrolet Cruze, every Chevrolet Cruze will presumably have that device, regardless of where it was manufactured or sold. Thus, the deferred class certification analysis will not result in significantly greater discovery expenses for GM. Plaintiffs will seek substantially the same information regardless of whether they are asserting claims only on their own behalf or on behalf of a class. Second, Plaintiffs have adequately pleaded facts in their Complaint which plausibly meet the requirements for maintaining a class action. *See* Compl. at¶¶ 102–110. *See also Timoneri v. Speedway, LLC*, 186 F. Supp. 3d 756, 762 (N.D. Ohio 2016) (explaining that a court may engage in a review of the complaint to determine if the class action allegations are clearly defective) (citing *Pilgrim v. Universal Health Card., LLC*, 660 F.3d 943, 949 (6th Cir. 2011)). There are undoubtedly many 2014 Chevrolet Cruze Diesel owners, and Plaintiffs allege that each experienced injury from the same deception on GM's part: the "defeat device." Plaintiffs and the unnamed class members appear to have all been injured in

the same way, and Plaintiffs seem situated to adequately represent the class. Likewise, it is plausible, given the similarity of the factual issues and the number of potential plaintiffs, that a class action is the best way to adjudicate this controversy.[6]

In short, the Plaintiffs have standing to bring claims on their own behalf. The question of whether they may bring claims on behalf of the unnamed class members is an issue that is properly addressed via a motion for class certification. Accordingly, that question and the accompanying standing issue will be deferred until the class certification analysis is conducted.

**B.**

Next, GM argues that Plaintiffs' claims must be dismissed because they are preempted by § 209 of the Clean Air Act (CAA), 42 U.S.C. § 7401 *et. seq.* Section 209 of the CAA reads as follows:

> No State or any political subdivision thereof shall adopt or attempt to *enforce any standard relating to the control of emissions* from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

U.S.C. at § 7543(a) (emphasis added).

GM's argument for preemption begins by characterizing Plaintiffs' allegations as asserting that "(i) the Cruze's emissions levels exceed 'EPA emission requirements,' and (ii) the Cruze employs an unlawful 'defeat device' to conceal its violations of emission standards." Mot. Dismiss at 21 (citing Compl. at ¶¶ 126, 78). GM then argues that Plaintiffs' claims all constitute attempts to "enforce standards *relating to* the control of emissions," in violation of § 7543(a).

---

[6] Even though Plaintiffs' class action allegations are not so clearly defective as to require striking the class action allegations *sua sponte*, Plaintiffs may face hurdles to class certification. *See, e.g., Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 948–49 (6th Cir. 2011) (refusing to "allow a nationwide class covered by the class of different states" because the variations in the governing law would dwarf any common factual issues and thus defeat predominance).

(emphasis added). In support of that argument, GM cites *Morales v. Trans World Airlines, Inc.*, where the Supreme Court held that the Airline Deregulation Act of 1978, 49 U.S.C. § 1301 *et. seq.*, preempted all state actions "having a connection with or reference to" airline rates, routes, and services. 504 U.S. 374, 384 (1992). The Airline Deregulation Act of 1978 included a section expressly preempting "any law, rule regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." *Id.* at 383 (citing 48 U.S.C. § 1305(a)(1)). The Supreme Court explained that the words "'relating to' . . . express a broad pre-emptive purpose."

In response, Plaintiffs cite *Merrick v. Diageo Americas Supply, Inc.*, where the Sixth Circuit rejected the argument that the CAA preempted state common law nuisance claims. 805 F.3d 685, 694 (6th Cir. 2015). In particular, Plaintiffs emphasize the *Merrick* Court's reminder that "there is a strong presumption against federal preemption of state law," especially when the federal legislation encroaches on areas that the states have "traditionally occupied." *Id.* Plaintiffs argue that their claims are not preempted because "(1) fraud and consumer protection act claims are not 'standards relating to the control of emissions'; and (2) plaintiffs' suit does not 'attempt to enforce' emission-related standards." Pl. Resp. Mot Dismiss at 26.

**1.**

To the extent Plaintiffs are seeking damages based solely on GM's alleged violations of the CAA, those claims are preempted. *Beshear v. Volkswagen Grp. of Am., Inc.*, No. 16-CV-27-GFVT, 2016 WL 3040492, at *4 (E.D. Ky. May 25, 2016) ("Any such attempt by states or private parties to seek damages or other remedies based on alleged violations of the CAA is strictly prohibited in light of the broad sweep of the CAA, and thus state common law tort claims

premised on the failure to meet CAA standards are preempted.").[7] As the *Beshear* Court explained, "state law cannot be used as the sole basis for determining whether emissions levels are impermissible." *Id.*

However, Plaintiffs argue that their claims are not attempts to enforce emissions "standards" as that word is used in § 7543(a). In advancing this argument, Plaintiffs attempt to draw a distinction between emissions "requirements" and emissions "standards." This distinction is central to Plaintiffs' attempt to distinguish the Supreme Court's opinion in *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992). In *Cipollone*, the Supreme Court held that the Federal Cigarette Labeling and Advertising Act preempted certain state common law damages actions. *Id.* The relevant statutory language in *Cipollone* reads as follows: "No *requirement* or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." 15 U.S.C. § 1334(b) (emphasis added).

There appears to be little statutory or historical support for Plaintiffs' distinction between "standards" or "requirements" in the CAA context. *See Hancock v. Train*, 426 U.S. 167, 167 (1976) (noting that "emission standards" and "emissions requirements" were used interchangeably when the CAA was drafted). That said, the CAA and the Cigarette Labeling and Advertising Act are different statutes and thus the text of each must be interpreted separately. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 446 (2005).

The Supreme Court has directly addressed the meaning of "standard" in § 209(a). In *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004), the Supreme Court reasoned:

---

[7] To the extent Plaintiffs rely on the CAA's citizen suit provision, 42 U.S.C. § 7604(e), that provision is trumped by the "preemptive intent of § 209(a)." *See Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 578 (S.D.N.Y. 2011).

> The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine. To meet them the vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions. This interpretation is consistent with the use of "standard" throughout Title II of the CAA (which governs emissions from moving sources) to denote requirements such as numerical emission levels with which vehicles or engines must comply or emission-control technology with which they must be equipped.

*Id.* (internal citations omitted).

Thus, to the extent Plaintiffs are suing GM for manufacturing a vehicle that emits "more than a certain amount of [NOx or particulate emissions]" in violation of EPA regulations or that is not equipped with properly functioning and federally required "emission-control technology," their claims are preempted by the CAA.

**2.**

However, Plaintiffs also separately argue that their claims are not preempted by the FAA because they are not dependent on a "finding that GM violated federal emissions requirements." Pl. Resp. Mot. Dismiss at 31. In support of that argument, Plaintiffs rely primarily on two cases. First, Plaintiffs cite *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236 (D.N.J. July 29, 2015). In *Caterpillar*, the plaintiffs were bringing breach of warranty, breach of implied warranty, and violation of consumer protection law claims against Caterpillar for alleged engine defects which prevented the engines "from operating without continually derating and/or shutting down." *Id.* at *11. The plaintiffs were not alleging that the engines "failed to conform to" EPA emissions standards. *Id.* As the *Caterpillar* Court explained, "the alleged failure is not a failure to perform as an EPA-compliant engine, but a failure to perform as an engine at all." *Id.* The court held that plaintiffs' claims were not preempted by the CAA:

> Plaintiffs' claims which seek enforcement of express and implied warranties for defects in the Engines' emissions systems, as well as those based on consumer fraud and negligent design, are hardly comparable to efforts by state and local governments to adopt or enforce emissions standards or to require additional certifications or inspections prior to sale. . . . Plaintiffs' claims here do not require a showing that Caterpillar's Engines either did or did not comply with emissions standards. Nor is this a recall case in which vehicles allegedly fail to conform to federal emissions standards.

*Id.* at *11–12.

The Court made two further observations:

> Plaintiffs [do not] contend that they were harmed by the failure of their Engines to comply with applicable emissions standards. . . . [Likewise,] Plaintiffs' claims would have no effect on the applicable emissions standards and therefore could not lead to the chaotic patchwork of state standards which Congress intended to avoid in this area.

*Id.* at *12.

Second, Plaintiffs cite *In re Volkswagen "Clean Diesel" Litigation*, No. CL-2016-9917, Opinion Letter (Va. Cir. Ct. Aug. 30, 2016). That lawsuit involved claims of fraud, consumer protection act violations, lemon law violations, and breaches of warranty brought against Volkswagen and arising out of Volkswagen's ongoing "defeat device" scandal. Like here, the defendant in *Volkswagen* argued that the plaintiffs' claims were preempted under the Clean Air Act. The *Volkswagen* Court found that the plaintiffs' fraud and consumer protection claims were not preempted:

> On their face, Plaintiffs' fraud and [Virginia Consumer Protection Act] claims do not rely on emissions violations or enforcement to make out their claims. Instead Plaintiffs' claims rely upon allegedly false promises of compliance, efficiency, and new technology; or concealment of the fact that compliance testing was being circumvented.

*Id.* at 8 (distinguishing *Jackson* because the plaintiffs in that lawsuit were seeking to recover for injuries from the alleged noncompliance itself.). The *Volkswagen* Court continued:

> Plaintiffs' lack of reliance on emissions standards is further revealed when one considers whether Plaintiffs even need to assert lack of compliance in raising their fraud and [Virginia Consumer Protection Act] claims. Plaintiffs point to advertising materials and news releases promising not only compliance with regulations, but also describing new technologies developed by [the defendant] and offering improved fuel economy. Plaintiffs also point to [the defendant's] public statement that it had been dishonest to consumers in such advertising. As such, and although emissions compliance or lack thereof may be further proof of deceit, *it is the deceit about compliance*, rather than the need to enforce compliance, that is the gravamen of Plaintiffs' claims.

*Id.* at 8–9 (emphasis added).

After rejecting Volkswagen's arguments that the plaintiffs' fraud and consumer protection violation claims should be dismissed as preempted, the *Volkswagen* Court found that the plaintiff's lemon law, breach of warranty, and public nuisance claims were preempted because "the basis for the breach or nuisance is violation of the federal emissions standards." *Id.* at 9.

GM attempts to distinguish *Volkswagen* by arguing that the EPA had already found that Volkswagen was in noncompliance with the CAA, because Volkswagen had admitted that the "defeat device" existed, and because Volkswagen had admitted to being "dishonest" in its advertising. But none of those difference, even if assumed to be true, undermine the *Volkswagen* Court's analysis. Plaintiffs' claims do not directly depend on proof of noncompliance with federal emissions standards, meaning the EPA's findings are not directly relevant. Further, Plaintiffs have alleged that GM utilized a "defeat device" in the Chevrolet Cruze and thus made misrepresentations about emissions levels in its advertising. Because those factual allegations must be accepted as true when considering a motion to dismiss, there is no functional difference between the EPA finding of noncompliance and an allegation of noncompliance. Rather, the gravamen of Plaintiffs' claims, like in *Volkswagen*, focus on "the deceit about compliance, rather

than the need to enforce compliance."[8] According to Plaintiffs, GM promised "clean diesel" based on the Cruze's cutting-edge "Cruze Clean Turbo Diesel" technology. But that technology allegedly does not work as promised and thus does not deliver "clean diesel."

For similar reasons, *Caterpillar* is instructive. Plaintiffs' claims do not "require a showing that [the Cruze] either did or did not comply with emissions standards" nor are Plaintiffs seeking a recall. *Caterpillar, Inc.*, 2015 WL 4591236 at *11–12. An adverse result for GM in the lawsuit might have broader implications for GM's relationship with the EPA, but it would not affirmatively establish that the Cruze is noncompliant with EPA regulations. Plaintiffs are not attempting to tighten emissions regulations or introduce separate state emissions regulations. If they were, a "chaotic patchwork of state standards" might result. *Id.* at *12. Rather, Plaintiffs are attempting to hold GM responsible for what Plaintiffs allege are false representations about certain technology in the Cruze. This distinction sets this lawsuit apart from, for example, *In re Office of Attorney Gen. of State of N.Y.*, where the New York Attorney General was investigating certain heavy-duty diesel engine manufacturers for utilizing "defeat devices." 269 A.D.2d 1, 3 (2000). The court found that the Attorney General's investigation was preempted by the CAA because the investigation was, in effect, trying to hold the manufacturers responsible for purposely circumventing EPA regulations. *Id.* at 10. In other words, the Attorney General's only interest was enforcing federal regulations. An action by a state attorney general focused on punishing vehicle manufacturers for purposely circumventing federal regulation is

---

[8] In fact, Plaintiffs' allegations about GM's advertisements focus mainly on whether the Cruze was truly a "clean diesel" vehicle and environmentally friendly. Thus, Plaintiffs' claims might most fairly be construed as alleging deceit about the Cruze's emissions generally, and not necessarily in the context of EPA regulations. Although a reasonable customer would likely assume that the Cruze was in compliance with EPA regulations, that customer might also reasonably conclude, based on GM's advertisements, that the Cruze's emissions were far below the legal limit. If Plaintiffs show that the Cruze is noncompliant with EPA emissions regulations, that would substantiate their claims of misrepresentations. But Plaintiffs can prove that GM misrepresented the level of emissions produced by the Cruze without proving regulatory noncompliance. Proof of noncompliance strengthens Plaintiffs' claims, but it is not required for success.

substantially different from a suit by private consumers who allege that a vehicle manufacturer misrepresented the functionality and effectiveness of certain technology.

In short, Plaintiffs' claims are not, as GM contends, contingent on proving that GM is in noncompliance with EPA emissions regulations. There can be no doubt that proving noncompliance would bolster Plaintiffs' claims, but Plaintiffs need not make that showing to prevail. Accordingly, Plaintiffs' claims are not preempted by the FAA.

## C.

GM further argues that Plaintiffs' claims should be stayed and referred to the EPA pursuant to the primary jurisdiction doctrine. "The doctrine of primary jurisdiction arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency." *United States v. Haun*, 124 F.3d 745, 749 (6th Cir. 1997). The application of the doctrine is not determined by any "ready formula," but courts generally inquire into "whether the purposes of the doctrine, including uniformity and accuracy gained through administrative expertise, will be especially furthered by invocation in the particular litigation." *Id.* at 750. If the doctrine is applicable, then the "court proceedings are stayed so as to give the parties reasonable opportunity to "refer" the matter to an agency by seeking an administrative ruling." Of course, federal courts have a "'virtually unflagging obligation' to exercise the jurisdiction given them" absent a "compelling and legitimate reason" to decline to exercise jurisdiction. *Id.* at 952 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).

Given Plaintiffs' articulation of their claims, there is no merit to GM's request to stay this case under the primary jurisdiction doctrine. As already explained, Plaintiffs' allegations that the Cruze does not comply with EPA regulations is a factor in alleging that GM made misrepresentations about the emissions technology in the Cruze. But Plaintiffs are not asking this

Court to affirmatively determine that the Cruze is in noncompliance with emissions regulations. There is no danger of regulatory inconsistency here. To be sure, Plaintiffs' allegations, if proven, would suggest that the Cruze does not actually comply with EPA regulations. But as GM repeatedly argues, Plaintiffs allegations, even if proven, do not actually establish noncompliance. *See, e.g.,* Mot. Dismiss at 13 (dismissing Plaintiffs' references to European tests on European vehicles as unreliable because conducted on different vehicles and under different regulatory standards); 27 ("The complaint does not allege any plausible basis for questioning the EPA's certification."); 29 n.13 (explaining that the testing Plaintiffs allegedly conducted does not comply with EPA-certification testing standards). There is no doubt that many of the technical factual questions implicated by Plaintiffs' claims are solidly within the EPA's expertise. But federal courts must frequently adjudicate disputes involving complicated technical claims, particularly in the field of products liability. Simply put, mere technical complexity is not a "compelling and legitimate" reason for a federal court to decline jurisdiction. *McCarthy v. Madigan*, 503 U.S. at 146.

More importantly, the EPA does not have the power to address Plaintiffs' claims or remedy their alleged damages. Even if this lawsuit were stayed, referred to the EPA, and the EPA concluded that GM was in violation of regulatory standards, the EPA could not compensate Plaintiffs for their overpayment. *See Spears v. Chrysler, LLC*, No. 3:08 CV 331, 2011 WL 540284, at *7 (S.D. Ohio Feb. 8, 2011) ("Plaintiffs' request for monetary damages and medical monitoring, [fall under] the province of the courts, rather than the EPA, and thus, staying the litigation under the primary jurisdiction doctrine is inappropriate."). Of course, the Court could reopen Plaintiffs' case at that time, but the EPA's finding would only marginally advance Plaintiffs' claims. Given the limited relevance of an EPA decision on the Cruze's regulatory

compliance to Plaintiffs' claims and the significant delay a stay would produce, invocation of the primary jurisdiction doctrine would be inappropriate.

**D.**

Finally, GM argues that Plaintiffs have not adequately pleaded facts that state claims for breach of contract, fraudulent misrepresentation, or consumer protection law violations. Plaintiffs admit that their breach of contract claims are deficient and do not oppose dismissal of those claims. *See* Resp. Mot. Dismiss at 1 n.3 ("Plaintiffs do not oppose dismissal of their breach of contract claims and concede that, at a minimum, amending is necessary."). Accordingly, Plaintiffs' breach of contract claims will be dismissed without prejudice. Plaintiffs' fraudulent concealment and consumer protection claims will be addressed in turn.

Neither party makes a colorable effort to individually address the validity of Plaintiffs' fraudulent concealment (or consumer protection violation) claims on a state-specific basis. Rather, each attempts to "raise" certain state-specific arguments by referencing appendices attached to their briefing. *See* Appendix A, B, and C, ECF No. 12, Exs. 3, 4, and 5; Appendix A and B, ECF No. 16, Exs. 1, 2. The parties' scattershot effort to raise arguments and defenses by simply citing to dozens, if not hundreds, of state court cases will not be addressed. The Local Rules for the Eastern District of Michigan specify page lengths for briefs. *See* Local Rule 7.1(d)(3). In recognition of the complex issues of law implicated by Plaintiffs' claims, the Court doubled the page limit for the parties' briefing. ECF No. 8. Despite the clear delineation of page limits in the Local Rules and the Court's permissive expansion of that limit, these unusual techniques appear to be an attempt by the parties to circumvent the page limits. Courts are not responsible for combing through appendices in an attempt to *sua sponte* raise and resolve legal arguments which the parties have not briefed. The appendices do not directly raise legal

arguments, and thus those cases and arguments will not be systematically addressed by the Court.[9]

**1.**

Plaintiffs' fraudulent misrepresentation and fraudulent concealment claims will be considered first. GM first argues that Plaintiffs' fraudulent concealment claims should be dismissed because Plaintiffs have not adequately pleaded that GM has concealed a material fact about the Cruze's emissions technology, has not specifically alleged reliance on that omission, and has not alleged that GM had a duty to disclose the material fact.

**i.**

The threshold question is the level of pleading specificity required for Plaintiffs' fraud claims. The parties agree that Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies because Plaintiffs' fraudulent concealment claim, by definition, involves fraud. However, the parties disagree about the level of specificity required by 9(b) when dealing with fraudulent omissions. In *Frank v. Dana Corp*. 547 F.3d 564 (6th Cir. 2008), the Sixth Circuit explained that claims of fraud must meet the following requirements: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. at 569 (citation omitted). Plaintiffs attempt to temper those heightened requirements by citing *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir. 1988). In *Michaels*, the Sixth Circuit cautioned that 9(b)'s particularity requirement should be "read in harmony" with Rule 8's more

---

[9] There is one exception: GM specifically argues that Plaintiffs' consumer protection violation claim is noncognizable under Ohio law because a class action claim under that act can be brought only if Plaintiffs allege that GM had prior notice their conduct was deceptive or unconscionable. *See Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1055 (N.D. Ohio 2014) However, Plaintiffs claims have not yet been certified as a class action. The elements for an individual claim under the relevant Ohio law do not require prior notice. *See id*. at 1057. Accordingly, this legal argument is not yet ripe for resolution. If Plaintiffs' suit is certified as a class action, this argument may be reasserted.

- 30 -

lenient pleading standard. According to the *Michaels* Court, "the purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Id.*

In *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, the Sixth Circuit clarified the breadth of the holding in *Michaels*. 501 F.3d 493, 505 (6th Cir. 2007). Specifically, the Court explained that the plaintiff in *Michaels* had specifically pleaded all necessary elements of its claim. *Id.* When that is the case, then the plaintiff has provided particularized facts sufficient to provide the defendant fair notice, and additional specificity is not required. *See id.*

Plaintiffs next argue that omission-based fraud claims should be held to a lower pleading standard. However, Plaintiffs do not provide any Sixth Circuit support for this assertion. Rather, they cite Ninth Circuit and District of New Jersey cases. *See, e.g., MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014); *Corson v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:12-CV-08499-JGB, 2013 WL 10068136, at *5 (C.D. Cal. July 18, 2013); *Feldman v. Mercedes-Benz USA, LLC*, No. 2:11-CV-00984 WJM, 2012 WL 6596830, at *10 (D.N.J. Dec. 18, 2012*); Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007) (holding that, in a fraudulent concealment case where the plaintiff is alleging "a failure to act," less specificity in pleading is required because "the plaintiff cannot point out the specific moment when the defendant failed to act"). The Sixth Circuit has recently addressed the argument that, in some contexts, 9(b)'s particularity requirement is "relaxed." In *United States v. Walgreen Co.*, the Sixth Circuit held that "[w]e have no more authority to 'relax' the pleading standard established by Civil Rule 9(b) than we do to increase it." No. 16-6232, 2017 WL 359661, at *2 (6th Cir. Jan. 25, 2017). The court continued: "To the extent the words of Civil

Rule 9(b) need elaboration, . . . the most that can be said is that 'particular' allegations of fraud may demand different things in different contexts." *Id.*

Despite the lack of Sixth Circuit corroboration, the cases Plaintiffs cite carry some weight. If a plaintiff's theory for relief involves a failure to act, then requiring the plaintiff to specifically identify the point in time when the defendant should have acted may be unduly burdensome. At the same time, 9(b)'s particularity requirements clearly apply to all elements of a claim premised on information and acts which Plaintiffs could reasonably identify. *See Walgreen Co.*, 2017 WL 359661 at *2; *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993). In considering whether Plaintiffs have stated a claim for fraudulent concealment, the difficulty of obtaining proprietary GM information or pinpointing the point in time when a fraudulent omission occurred will be taken into account. But there can be no doubt that, in general, 9(b)'s particularity requirements apply to Plaintiffs fraudulent concealment claims.

### ii.

First, GM argues that "Plaintiffs do not allege facts sufficient to show that their claim that the diesel Cruze violates EPA emission standards is plausible." Mot. Dismiss at 34. GM asserts that if Plaintiffs' allegations regarding emissions levels are not pleaded with specificity, then there were no material facts for GM to fraudulently conceal.

To begin with, GM's representation of Plaintiffs' burden is inaccurate. Plaintiffs's claims do not depend on and thus Plaintiffs need not allege facts indicating that the Cruze violates EPA emissions standards. Rather, Plaintiffs must allege with particularity facts showing that GM fraudulently concealed or misrepresented that the functionality and effectiveness of the Cruze's "clean diesel" system was substantially lower than a reasonable customer would expect, given the representations made in GM's advertising campaign. Although Plaintiffs' Complaint does not

- 32 -

contain an overabundance of particular facts supporting this point, it contains enough to meet 9(b)'s standards. Plaintiffs allege that they have tested a Cruze and found that, when in normal use, the Cruze produces emissions at levels substantially higher than the federal standard. Compl. at ¶ 87. Plaintiffs do not allege who tested the Cruze, when it was tested, or whether the Cruze tested was a 2014 diesel model. But Plaintiffs do include details about the conditions of the test and the degree by which the Cruze exceeded federal standards. Plaintiffs further allege that different European authorities have conducted six different tests of (among other makes) GM vehicles that revealed significantly higher emissions than expected, given regulatory standards. *Id.* at ¶¶ 74–85. Plaintiffs admit that none of the vehicles tested were the 2014 Chevrolet Cruze, but they do allege that the technologies in the European vehicles are substantially similar to the "clean diesel" technology in the Cruze. *Id.* at ¶ 75. As explained above, it is plausible that GM reuses certain core technologies across different vehicles it manufactures. The uniformity of the European testing and its consistency with Plaintiffs' own testing suffices to allege, with particularity, that the Cruze produces emissions at a level significantly higher than a reasonable consumer would expect.

### iii.

Next, GM argues that Plaintiffs have not pleaded with specificity that they relied on GM's omissions regarding the Cruze's emissions technology to their detriment. As GM notes, the "complaint contains no allegations that any specific plaintiff relied on or even read any particular misleading advertisement or omission." Mot. Dismiss at 36. At best, Plaintiffs allege that they were influenced by GM's pervasive "clean diesel" advertising campaign.

In response, Plaintiffs argue that they need not demonstrate individualized reliance on specific advertisements to show that they relied, to their detriment, on GM's misrepresentations.

Plaintiffs cite *Affiliated Ute Citizens of Utah v. United States*, where the Supreme Court held in the securities fraud context that because the claim involved "primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." 406 U.S. 128, 153 (1972). Rather, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54. Other courts have adopted this reasoning in the common law and statutory fraud contexts. *See Varacallo v. Massachusetts Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000) (holding that the plaintiffs did not need to "offer direct proof that the entire class relied on defendant's representation that omitted material facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued"). *See also Murray v. Sevier*, 156 F.R.D. 235, 249 (D. Kan. 1994) (explaining in the class certification context that common questions predominated in fraud claims because "reliance could arguably be demonstrated by showing that the misrepresented and/or omitted information would have been material to the members" in making their decision); *Adams v. Little Missouri Minerals Ass'n*, 143 N.W.2d 659, 683 (N.D. 1966) (inferring inducement and reliance on the fraudulent nondisclosures from the circumstances); *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971) (finding that, if "material misrepresentations were made to the class members, . . . an inference of reliance would arise as to the entire class").

In its reply brief, GM does not attempt to distinguish or undermine these cases. Thus, it appears that—in at least California, New Jersey, North Dakota, and Kansas—individualized reliance does not necessarily need to be pleaded. Perhaps other states are not so permissive, but because GM has not specifically raised that argument, the Court will not *sua sponte* analyze the elements of fraudulent concealment from each state's law that Plaintiffs purport to sue under.

- 34 -

Plaintiffs' claims will not be dismissed for failure to plead individual reliance on specific advertisements.

### iv.

However, even under the cases that Plaintiffs cite, they must allege that the alleged misrepresentations could have been relied upon by a reasonable consumer in making their decision. *See, e.g., Affiliated Ute Citizens of Utah*, 406 U.S. at 153 ("All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."). This is, of course, self-evident: if no reasonable person would have relied on the alleged misrepresentations to their detriment, then the misrepresentations cannot be actionable.

GM argues that the advertisements which Plaintiffs rely on to substantiate their fraudulent misrepresentations claims are non-actionable "puffery." "Opinion and puffery encompass a 'sales [person's] talk in promoting a sale' and statements that serve 'to 'hype' [a] product beyond objective proof.'" *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 501 (6th Cir. 2014) (quoting *Van Tassel v. McDonald Corp.*, 407 N.W.2d 7–8 (Mich. App. Ct. 1987)). Statements of cleanliness convey "inherently subjective" concepts and thus "constitute[] nonactionable opinion[s]." *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013). Likewise, promises of efficiency and reliability "cannot form the basis for a fraud claim." *Ram Int'l Inc. v. ADT Sec. Servs., Inc.*, No. 11-10259, 2011 WL 5244936, at *6 (E.D. Mich. Nov. 3, 2011), aff'd, 555 F. App'x 493 (6th Cir. 2014).

Generally speaking, the more general the assertions, the more likely they are to be considered puffery. *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990). Likewise, when the assertions make specific representations, especially

numerically quantifiable representations, courts are much more likely to find the representations actionable. *Id.* However, simply containing numbers is not enough, by itself, to make a statement actionable under a fraud theory. For example, in *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, the court held that the claims that certain crash avoidance systems are "99% more effective" than protective systems and that a "driver is 100 times more likely to benefit from crash avoidance capabilities . . . than from its crash-survival capabilities" were nonactionable puffing. 966 F. Supp. 1525, 1531 (E.D. Mo. 1997), aff'd sub nom. *Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999). *See also Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*, 242 F. Supp. 302, 308–09 (N.D. Ill. 1965) (holding that statements like "far brighter than any lamp ever before offered for home movies" and "'the beam floods an area greater than the coverage of the widest wide angle lens" were puffery, but that statements promising "35,000 candlepower and 10-hour life" were actionable).

In *Tietsworth v. Sears, Roebuck & Co.*, the court held that the claim "would save the consumer energy and water (purportedly using at least 47% less water and 53% less energy)" was puffery despite being apparently numerically quantifiable. No. 5:09-CV-00288 JFHRL, 2009 WL 3320486, at *7 n. 5 (N.D. Cal. Oct. 13, 2009). The court explained that the statement was puffery because "the statement does not indicate how much water or energy should be consumed by the Machine and makes no verifiable comparison to any identifiable competitive machine or model." *Id.* If a consumer could not reasonably believe that "there is a test behind the claim," the assertion is puffery. *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. at 1531.

To be sure, there is a "slippery slope on the continuum between numerical claims that imply independent corroboration and numerical claims involving mere puffery." *Avon Prod.,*

*Inc. v. S.C. Johnson & Son, Inc.*, No. 94CIV3958(AGS), 1994 WL 267836, at *7 (S.D.N.Y. June 15, 1994) (holding that the claim that a product was "100 times" better than a competitor's was puffery). For example, in *Southland Sod Farms v. Stover Seed Co.*, the Ninth Circuit held that the phrase "50% Less Mowing" was actionable non-puffery. 108 F.3d 1134, 1145 (9th Cir. 1997). The Ninth Circuit based that conclusion on two points. First, the statement was not puffery because the advertisement expressly stated that the claim was based on tests conducted by the advertising company. *Id.* Second, the court explained that, even though the advertisement did not compare the product to a specific competitor by name, there "need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act." *Id.* (internal citations omitted). Here, Plaintiffs are not suing under the Lanham Act, and it is unclear whether direct comparisons are also unnecessary in other false advertising contexts.

In their Complaint, Plaintiffs include the advertisements on which they base their claims. Plaintiffs cite GM's representations about the "high-quality" and "safety" of its vehicles. Those assertions are inherently subjective and cannot form the basis of a fraud action. Likewise, Plaintiffs allege that GM advertised its "Turbocharged Clean Diesel" engine. Compl. at ¶¶65–67. As discussed above, statements regarding cleanliness are nonactionable puffery, especially when nothing about the statement is quantifiable. Advertisements which boasted of the Cruze's "more efficient combustion" and improved "performance" are likewise nonquantifiable.

The only advertisement which Plaintiffs produce that contains anything approaching a specific, numerically quantifiable statement is found in paragraph 68 of the Complaint. That advertisement states that the "turbocharged engine in Cruze Clean Turbo Diesel [sic] generates at least 90% less nitrogen oxide and particulate emissions when compared to previous-generation

diesels." *Id.* at ¶ 68. The advertisement further represents that "Cruze Diesel emissions are below strict U.S. environmental standards." *Id.*

Although it is a close question, the stronger argument is that these statements are not actionable. The claim regarding 90% less emissions, although it includes a statistic, is not quantifiable by itself. Unlike claims about candlepower or battery life, assertions that a product has "90% less emissions" raises the question: 90% less than what? GM's advertisement purports to compare the Cruze's emissions' to "previous-generation diesels," but that generic statement offers no guidance. "[P]revious-generation diesels" might, for example, mean GM's past diesel vehicles, all diesel vehicles made by any manufacturer prior to the Cruze's release, or all diesel vehicles produced prior to a certain date. Like the statements in *Smith-Victor Corp.* and *Tietsworth*, this claim about emissions "makes no verifiable comparison to any identifiable" competitor's product. 2009 WL 3320486, at *7 n. 5. Further, GM does not specifically assert in the advertisement that this claim was based on testing. One might argue that some type of testing is implicitly assumed by the language, but the advertisement's level of generality further supports a finding of puffery. And, as already stated, although direct comparisons to a competitor's product are not necessary in the Lanham Act context, Plaintiffs are not bringing Lanham Act claims.[10]

When one considers how Plaintiffs might attempt to prove the falsity of the claim in the advertisement, the reasons why it should not be actionable become apparent. The Complaint includes no data about the level at which "previous-general diesels," however that phrase is defined, produced emissions. Further, the Complaint does not even allege that the Cruze *does not*

---

[10] Lanham Act claims for false advertising are brought by aggrieved *competitors*, not consumers. Perhaps direct comparisons should not be required for false advertising claims made by consumers either. But Plaintiffs have not made that argument. Even if they had, the lack of a direct comparison simply reflects the advertisement's high level of generality.

generate 90% less emissions than previous diesel vehicles. At best, Plaintiffs repeatedly assert that the Cruze produces substantially more emissions on the road than when being tested in laboratory conditions. But the Cruze might simultaneously produce more emissions than expected when being driven and still produce, in total, 90% less emissions than previous-generation diesels. Even when read in the most generous light possible, Plaintiffs' Complaint does not directly allege the falsity of GM's representation about the Cruze's emissions levels in comparison to previous generations. If the representation in the advertisement was sufficiently specific and quantifiable to be actionable, the means by which Plaintiffs plan to prove the falsity of the statement would be easier to discern (and likely alleged in the complaint).

The only remaining representation upon which Plaintiffs might base their fraud claim is that "Cruze Diesel emissions are below strict U.S. environmental standards." Compl. at ¶ 68. However, if Plaintiffs are suing GM solely for producing a vehicle that produces emissions in noncompliance with EPA regulations, then the suit is preempted by the CAA. As discussed above, Plaintiffs' suit is not preempted if they can recover without necessarily needing to prove noncompliance with EPA regulations. But if Plaintiffs are relying solely on GM's claims that the Cruze complies with EPA standards to make out their fraud claims, then "the basis for the [claim] is violation of the federal emissions standards," and the suit is preempted. *In re Volkswagen "Clean Diesel" Litigation*, No. CL-2016-9917 at *9.

### v.

However, to the extent Plaintiffs base their claims on GM's (allegedly) fraudulent concealment of the alleged "defeat device," as opposed to affirmative misrepresentations, they have adequately alleged particularized facts to support that theory. To state a claim for "silent fraud," the plaintiff must establish a duty to disclose. *MacDonald v. Thomas M. Cooley Law*

- 39 -

*Sch.*, 724 F.3d 654, 665 (6th Cir. 2013). Typically (and as reflected in the cases Plaintiffs cite for the proposition that omissions can create fraudulent misrepresentations), a duty to disclose arises when the plaintiffs make an inquiry of the defendant. *Id.* If the plaintiff receives a response that omits material information, silent fraud may have occurred. *Id.* Plaintiffs do not allege that they asked GM about the "defeat device," the "clean diesel" system, or the Cruze's emission levels.

Plaintiffs argue that a duty to disclose can also arise when the defendant has "exclusive knowledge of material facts not known to the plaintiff" or if there was active concealment of material facts. Resp. Mot. Dismiss at 46. It appears that under the law of some states, including California, exclusive knowledge of a defect and/or active concealment of that defect is sufficient to create a duty to disclose. *Digby Adler Grp., LLC v. Mercedes-Benz U.S.A., LLC*, No. 14-CV-02349-TEH, 2015 WL 5138080, at *2 (N.D. Cal. Sept. 1, 2015). *See also, e.g., Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So. 2d 1288, 1293 (Ala. 1993) (active concealment enough for recovery for fraudulent concealment); *VanBooven v. Smull*, 938 S.W.2d 324, 328 (Mo. Ct. App. 1997) (similar); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) (similar). Some states, like Michigan, appear to require "fiduciary or confidential" relationships for concealment to be actionable. *See In re Ford Motor Co. Speed Control Deactivation Switch Prod. Liab. Litig.*, No. MDL 1718, 2007 WL 2421480, at *8 (E.D. Mich. Aug. 24, 2007).

However, GM has not attempted to parse the different state standards for the duty to disclose in its briefing. Rather, GM simply argues that Plaintiffs have not alleged any facts which show that GM had exclusive knowledge of the "defeat device" or "actively concealed" it. That is not true. If Plaintiffs' allegations are true, GM installed a "defeat device" on the Cruze. The only plausible purpose of such a device is to create the appearance of low emissions without the reality of low emissions. If GM were not attempting to deceive regarding the level of emissions

- 40 -

produced by the Cruze, the alleged "defeat device" would not exist. This is sufficient to constitute active concealment. Further, GM had exclusive knowledge of the alleged device. This alleged device was clearly meant to be secret. GM cannot reasonably argue that Plaintiffs could have discovered the device's existence prior to purchasing the vehicle. *See Johnson v. Harley-Davidson Motor Co. Grp., LLC*, No. 2:10-CV-02443 JAM, 2011 WL 3163303, at *4 (E.D. Cal. July 22, 2011). GM was "in a superior position to know," if not the only entity with the knowledge, of the "defeat device." *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1096 (N.D. Cal. 2007).

In short, a duty to disclose arises in at least some states when the defendant actively conceals a material fact or has exclusive knowledge of that fact. Plaintiffs have sufficiently alleged that GM actively concealed and had exclusive knowledge of the alleged "defeat device." Other states may have different prerequisites for a duty to disclose. However, GM has not made any nonconclusory arguments that Plaintiffs' allegations of active concealment and exclusive knowledge are legally insufficient to constitute fraudulent concealment under the law of specific states. The Court will not raise legal defenses on GM's behalf.

In short, Plaintiffs do not state a claim for fraudulent misrepresentations to the extent they rely upon the affirmative statements GM made in its advertising for the Cruze. However, Plaintiffs have made an initial showing that GM had a duty to disclose the existence of the "defeat device" and GM has not demonstrated that Plaintiffs' claims are insufficient under the law of specific states. Plaintiffs' claims of fraudulent concealment will not be dismissed at this stage.

**2.**

- 41 -

To the extent Plaintiffs' state consumer protection law claims also rely on the statements GM made in the Cruze advertisements, Plaintiffs have not stated a claim. However, Plaintiffs also assert that their consumer protection law claims are based on GM's failure to disclose the existence of the "defeat device." GM does not argue that this theory is noncognizable as a consumer protection law claim (or at least, makes no arguments that were not also advanced against Plaintiffs' fraudulent concealment claim and rejected). GM has not, at this stage, demonstrated that Plaintiffs have failed to state claims for consumer protection law violations.

## IV.

Accordingly, it is **ORDERED** that Defendant General Motor's Motion to Dismiss, ECF No. 12, is **GRANTED in part.**

It is further **ORDERED** that Plaintiffs' Breach of Contract claims are **DISMISSED without prejudice.**


Dated: February 14, 2017                          s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 14, 2017.

                    s/Michael A. Sian
                    MICHAEL A. SIAN, Case Manager