UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON COUNTS, et al,

                Plaintiffs,                    Case No. 16-cv-12541

v.                                         Honorable Thomas L. Ludington

GENERAL MOTORS, LLC,
ROBERT BOSCH GMBH, and
ROBERT BOSCH, LLC,

                Defendants.
_____/

**ORDER DENYING ROBERT BOSCH LLC'S MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED CLASS ACTION COMPLAINT**

On June 7, 2016, nine plaintiffs (including first-named Plaintiff Jason Counts) filed a 442-page complaint framing a putative class-action and alleging deceptive advertising, breach of contract, and fraudulent concealment claims under the laws of thirty states against Defendant General Motors ("GM"). ECF No. 1. Fundamentally, Plaintiffs allege that GM installed a "defeat device" in the 2014 Chevrolet Cruze Diesel which results in significantly higher emissions when the vehicle is in use compared to when it is being tested in laboratory conditions.

GM filed a motion to dismiss on October 3, 2016, which contended that Plaintiffs' suit should be dismissed because Plaintiffs lack standing to bring suit, their claims are preempted by the Clean Air Act, the primary jurisdiction doctrine mandates deference to an EPA investigation of the claims, and Plaintiffs have failed to state a claim upon which relief can be granted. ECF No. 12. The motion was granted in part and denied in part. ECF No. 21. The Court held that Plaintiffs had standing, that their claims were not preempted by the Clean Air Act (CAA), and that the primary jurisdiction doctrine was inapplicable. The Court also held that Plaintiffs had not stated a claim for fraudulent misrepresentation based on statements GM made in its advertising campaign.

However, the Court found that Plaintiffs had stated a claim for fraudulent concealment in that they had sufficiently alleged that GM had actively concealed the existence of the defeat device and had exclusive knowledge of the device. Plaintiffs did not oppose dismissal of their breach of contract claims.

After GM's motion to dismiss was denied in part, Plaintiffs' counsel initiated another lawsuit involving similar allegations but different diesel vehicles and naming GM as a Defendant. *In re Duramax Litigation*, Case No. 17-cv-11661. That complaint also named Bosch, a German company, as a Defendant and alleged that certain electronic devices supplied by Bosch to GM enabled the defeat devices.

A series of discovery motions were addressed in *Counts*, substantial discovery was exchanged, and the scheduling order was modified. On February 20, 2018, GM and Bosch's motions to dismiss were denied in the *Duramax* case. Case No. 17-cv-11661, ECF No. 61. The Court concluded that Plaintiffs had plausibly stated a Racketeer Influenced and Corrupt Organizations Act (RICO) claim against both GM and Bosch. *Id.*; 18 U.S.C. § 1961 *et seq.*

On April 6, 2018, Plaintiffs filed a motion for leave to file an amended complaint. ECF No. 82. In Plaintiffs' proposed first amended complaint, they sought to join Robert Bosch GmbH and Robert Bosch LLC (collectively, "Bosch") as Defendants, add a RICO claim against all three Defendants, and add Bosch as Defendants to Plaintiffs' state law claims. In opposing that motion, GM argued that Plaintiffs had actual or constructive notice of Bosch's involvement with GM's diesel vehicle production since at least the filing of the complaint in the *Duramax* litigation and concluded, apparently, that there was no basis to include Bosch as a Defendant. GM argued that Plaintiffs' true motivation behind amending the complaint was the Court's denial of GM's (and Bosch's) motion to dismiss a similar RICO claim in the *Duramax* litigation. GM argued that this

"wait-and-see" approach is disfavored and should not be rewarded. Finally, GM argued that allowing the amendment would prejudice GM by substantially delaying the resolution of the case and dramatically altering the "landscape of the litigation." Def. Resp. Br. at 18, ECF No. 86.

The Court granted the motion to amend and to join Bosch. ECF No. 93. The Court found that the delay in filing the motion was reasonable because Plaintiffs sought to include corroborating information learned during discovery which they believed would strengthen and particularize their allegations against Bosch. Those allegations were predicated on internal and confidential material from GM and Bosch which would not have been available to Plaintiffs prior to discovery. Similarly, the Court found that it was reasonable for Plaintiffs to await the Court's decision in *Duramax* regarding the viability of the RICO claims before seeking leave to amend, because that approach conserved judicial resources rather than wasting them. Finally, the Court found that granting leave to amend would cause no prejudice to Defendants, other than the "prejudice" that is inherent in defending complex commercial litigation. On June 11, 2018, Plaintiffs filed their First Amended Class Action Complaint ("amended complaint"). ECF Nos. 94–95.

Defendant Bosch now moves pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6) for dismissal of the amended complaint. ECF No. 108. Defendant GM filed a notice of joinder/concurrence in the motion. ECF No. 109. In the motion, Bosch argues that Plaintiffs fail to allege: 1) that their injuries were "by reason of" a RICO violation by Bosch; 2) that they suffered a cognizable RICO injury; 3) that Bosch engaged in a pattern of racketeering activity; 4) that Bosch participated in the conduct of a RICO enterprise; and 5) the existence of a conspiracy to violate RICO. Plaintiffs contend that the Court has already rejected these arguments in *Duramax*. Bosch responds that it does not seek to relitigate the Court's holding in *Duramax*, but rather seeks to

"address deficiencies with Plaintiffs' complaint that were either not before the Court when it decided those earlier motions or that were not fully addressed in those proceedings." Mot. at 1, ECF No. 108. Moreover, Bosch argues that the "law of the case" doctrine does not apply because the Court has not yet addressed the viability of Plaintiffs' RICO claims in this case.

## I.

### A.

Under Rule 12(b)(1), a party may assert lack of subject-matter jurisdiction as a defense. "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994)). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.* However, a "factual attack challenges the factual existence of subject matter jurisdiction." *Id.* In that case, "the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc*., 790 F.3d 641, 647 (6th Cir. 2015). Regardless, "the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

### B.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert*, 517 F.3d at 439. The pleader need

not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

### C.

Federal Rule of Civil Procedure 9(b) provides a heightened pleading standard for claims of fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* As explained by the Sixth Circuit in *Frank v. Dana Corp.* 547 F.3d 564 (6th Cir. 2008), claims of fraud must meet the following requirements: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 569 (citation omitted). At a minimum, a claimant must allege "the time, place and contents" of the alleged fraud. *Id.*

### D.

The Racketeer Influenced and Corrupt Organizations Act establishes bases for both criminal and civil suits. A RICO civil suit may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962 provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct

or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.* at § 1962(c). In other words, a party advancing a civil RICO claim must establish their right to sue and then further allege the following elements: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

## II.

As Bosch correctly underscores, the doctrine of the law of the case does not apply to Plaintiffs' RICO claim because the Court addressed the viability of the RICO claim in *Duramax*, and not in this case. Bosch suggests that this Court's opinion in *Duramax*, much like any other district court precedent, only constitutes persuasive (not controlling) authority. This too is true. As a practical matter, however, this case is a companion case to *Duramax*, and arises out of substantially similar facts. Moreover, the Court's opinion on the viability of a RICO claim in this context has not changed since February of this year when the Court denied GM and Bosch's motion to dismiss the *Duramax* plaintiffs' RICO claim. Thus, absent a change in applicable law, a novel argument, or a meaningful factual distinction between the allegations in *Duramax* and the allegations in the present case, the result will be the same.

### A.

Bosch argues that Plaintiffs fail to allege that they suffered a cognizable RICO injury.[1] Plaintiffs may assert a RICO claim only if they can identify an injury to their "business or property

---

[1] The Court will discuss Defendant's arguments in a different order than they were presented. It seems intuitive to first discuss whether Plaintiffs have alleged a cognizable RICO injury, then discuss whether Plaintiffs have alleged a RICO violation (i.e. whether Bosch engaged in a pattern of racketeering activity; whether Bosch participated in the conduct of a RICO enterprise; whether

by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In so limiting the scope of RICO standing, Congress exhibited an intention to exclude "personal injury—that is, an injury 'to a person, such as a broken bone, a cut, or a bruise' or a 'bodily injury.'" *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564 (6th Cir. 2013) (quoting Black's Law Dictionary 857 (9th ed. 2009)). Similarly, a RICO injury must be concrete, not intangible or speculative. *See Saro v. Brown*, 11 F. App'x 387, 389 (6th Cir. 2001); s*ee also Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (explaining that RICO plaintiffs must identify a "reasonable and principled basis of recovery" which is "not based upon mere speculation and surmise"); *Short v. Janssen Pharm., Inc.*, No. 1:14-CV-1025, 2015 WL 2201713, at *3 (W.D. Mich. May 11, 2015) ("Short must, at a minimum, show some direct, pecuniary injury to his own pocket that is unrelated to the claimed personal injury.").

In *Reiter v. Sonotone Corp*., the Supreme Court interpreted § 4 of the Clayton Act, which authorizes "[a]ny person who shall be injured in his business or property" by reason of an antitrust law violation to bring suit. 442 U.S. 330, 337 (1979). The Supreme Court held that "where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under § 4." *Id.* at 342. That holding did not involve the RICO statute, but the Sixth Circuit has held that "Reiter's common-sense observation about §4 applies with equal logical force to § 1964(c)." *Jackson*, 731 F.3d at 564.

Bosch takes issue with the three types of injuries identified by Plaintiffs: 1) "future attempted repairs, future additional costs, decreased performance of the vehicle, and diminished

---

there was a conspiracy to violate RICO). Finally, the Court will discuss whether Plaintiffs have sufficiently alleged a causal connection between the violation and the injury.

value of the vehicle," 2) harm caused from "unwittingly driv[ing] vehicles that were polluting in volumes and manners a reasonable consumer would not expect," and 3) "[o]verpayment for [Subject] Vehicles" because the "price for the vehicles was artificially inflated" by a "diesel premium of $2,400." Mot. at 19 (citing Compl. ¶¶ 28-37, 219, 284). With respect to future attempted repairs, future costs, and diminished future performance or value, this Court held in *Duramax* that such injuries are too speculative to constitute a cognizable RICO injury. *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1071 (E.D. Mich. 2018). With respect to "unwittingly driv[ing]" polluting vehicles, this Court previously held (in *Counts*) in its order granting GM's motion to dismiss in part that such environmental harms are insufficient to support Article III standing under *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61(1992). Order at 10, ECF No. 21. This Court did hold in *Duramax*, however, that overpayment for the vehicles constitutes a cognizable RICO injury:

> Plaintiffs' first alleged injury clearly suffices to create RICO standing. Plaintiffs contend that they "paid a premium of nearly $9,000, as GM charged more for its Duramax engine than a comparable gas car." Con. Am. Compl. at 115. Plaintiffs thus identify a specific payment attributable directly to the vehicle component at issue which they opted to purchase on the basis of fraudulent conduct. This is cognizable out-of-pocket injury: "[T]he price of the [Duramax engine-equipped vehicle which Plaintiffs] bought was artificially inflated by reason of [Defendants' fraudulent] conduct." *Reiter*, 442 U.S. at 342. *See also Jackson*, 731 F.3d at 564; *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008). Accepting Plaintiffs' allegations as true, the fraud (and thus overcharge) occurred at the time the purchase was made. *See Bailey*, 992 F. Supp. 2d at 579. Unlike in *Bridgestone* (where only some tires exhibited the defect), the alleged injury occurred every time a Duramax vehicle was purchased. The amount by which Plaintiffs overpaid is not contingent on a future occurrence or on the vagaries of the free market. It occurred and became determinable at the moment the Plaintiffs paid a premium for a vehicle component which did not work as had been represented. Plaintiffs experienced a financial property loss at that moment, which distinguishes the present case from others where the overpayment or diminution in value had not yet occurred. *Compare Bridgestone*, 155 F. Supp. 2d at 1093 & n.26; *Gelt*, 27 F.3d at 769, with *Bailey*, 992 F. Supp 3d at 580–81. This is a cognizable RICO injury.

*Duramax*, 298 F. Supp. 3d at 1071.

Similarly, Plaintiffs in this case allege that they paid a diesel premium of $2,400 because the price of the vehicle was inflated by Defendants' fraudulent conduct (conduct which will be discussed below). Compl. ¶ 284. Bosch nevertheless asks the Court to revisit its holding, citing to the *Ignition Switch* litigation. Mot. at 21 (citing *See Ignition Switch*, 2016 WL 3920353, at *7, 16). As noted in the *Duramax* opinion, the *Ignition Switch* opinion does appear to support a conclusion contrary to the conclusion reached by this Court. This Court nevertheless rejected the *Ignition Switch* litigation, as explained fully in *Duramax*. *Duramax*, 298 F. Supp. 3d at 1072. That explanation still obtains. Notably, the *Ignition Switch* is an unreported district court opinion from another circuit which relied heavily on the Second Circuit's opinion in *McLaughlin v. American Tobacco Co*., 522 F.3d 215 (2d Cir. 2008).

Recently, two other district courts have rejected the injury analysis in both *Ignition Switch* and *Mclaughlin* and have held that overpayment due to deceptive conduct may constitute a RICO injury. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig*., 295 F. Supp. 3d 927, 959 (N.D. Cal. 2018) (rejecting the defendants' reliance on *Ignition Switch* and *Mclaughlin* and noting that "when a plaintiff alleges that he or she overpaid for a good or service because of anticompetitive or deceptive conduct, the Supreme Court's decision in *Reiter* and the Ninth Circuit's decision in *Canyon County* support that such an injury is one to property not merely expectation interests. Those decisions bind this Court; *McLaughlin* and [*Ignition Switch*] do not.") (internal citations and quotations omitted); *Nemet v. Volkswagen Group of America, Inc*., No. 3:17-cv-04372-CRB, Dkt. No. 5374 (N.D. Cal.) ("Bosch relies on certain out-of-circuit decisions in which courts have held that when consumers do not receive the benefit of their bargain the injury they suffer is one to their expectation interests, not to their business or property as RICO requires . . . As the district court in *Chrysler* recently noted, the Supreme Court's decision in *Reiter* and the

Ninth Circuit's decision in *Canyon County* support the opposite: that when a plaintiff alleges that

he or she overpaid for a good or service because of anticompetitive or deceptive conduct, . . . such

an injury is one to property, not merely expectation interests. The Court therefore does not follow

*McLaughlin* and [*Ignition Switch*] here.") (internal citations and quotations omitted).

Finally, Bosch takes issue with the overpayment theory by identifying what they suggest

is an internal inconsistency in the *Duramax* opinion:

> This Court in Duramax found that "overpayment" for the "vehicle component at
> issue" conferred RICO standing. See 298 F. Supp. 3d at 1071-72. But, in
> considering a related theory of RICO injury, the Court also noted that the Duramax
> plaintiffs' "contention that they 'would have paid substantially less' [for their
> vehicles had they known of the higher emissions] appears to be premised on some
> approximation of what the new market value for the vehicles would have been" and
> that "[d]etermining what that decrease in value would have been seems hopelessly
> speculative." Id. at 1071 (emphasis added). Plaintiffs' "overpayment" theory
> requires the same speculation, because it too is nothing more than a claim that
> Plaintiffs "would have paid substantially less" for the Subject Vehicles under
> different circumstances. See Compl. ¶ 284 ("Plaintiffs would not have paid a diesel
> premium of $2,400, if proper disclosures had been made."). Nor is the speculation
> rendered concrete by attaching the $2,400 number to it, because the $2,400 figure
> is itself the product of Plaintiffs' speculation. Plaintiffs declare $2,400 to be the
> price difference between a "diesel Cruze" and a "comparable gas car," Compl. ¶
> 217, but they also concede – as they must – that there are many differences between
> diesel and gas vehicles other than NOx emissions: "diesel engines generally
> produce greater torque, low-end power, better drivability, and much higher fuel
> efficiency" than gasoline engines, id. ¶ 4. Plaintiffs thus fail to allege a supposed
> "diesel premium" attributable to NOx emissions performance, the subject of the
> claimed fraud.

Mot. at 21-22. Contrary to Bosch's assertion, the allegation that GM charged an artificially inflated

premium for the vehicles is distinct from Plaintiffs allegation that they "would have paid

substantially less" for the vehicles had they known of the alleged defeat device. The reason the

Court found that the former allegation was sufficiently concrete was not because the Plaintiffs

attached a specific dollar amount to it ($9,000 in *Duramax*, and $2,400 in this case). Rather, the

former allegation is more concrete because it is not premised on Plaintiffs' subjective willingness

- 10 -

to pay or on the hypothetical new market value for a "dirty" diesel engine (the product as allegedly delivered) as opposed to a "clean" diesel engine (allegedly a non-existent product). Rather, it is premised on a premium that *GM itself* allegedly charged for a diesel engine knowing that it would not perform as represented. This is a cognizable RICO injury.

**B.**

Bosch contends that Plaintiffs fail to allege that Bosch engaged in a pattern of racketeering activity. Pursuant to § 1961(d), a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." Plaintiffs must allege that each Defendant engaged in two predicate acts of racketeering activity. *See Kerrigan v. ViSalus, Inc.*, 112 F.Supp.3d 580, 605 (E.D. Mich. 2015). *See also Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 358 (8th Cir. 2011); *Guaranteed Rate, Inc. v. Barr*, 912 F.Supp.2d 671, 684 (N.D. Ill. 2012).

Here, as in *Duramax*, the Plaintiffs alleged predicate acts of mail and wire fraud. As the Court noted in *Duramax*,

> To state a claim based on mail or wire fraud, the Plaintiffs must allege the following three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so. *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997) ). The Plaintiffs must allege that Defendants possessed the "specific intent to deceive or defraud." *Frost*, 125 F.3d at 354. The "scheme to defraud must involve 'misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' " *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979) ). The Plaintiffs need not show "actual reliance," but the Plaintiffs must demonstrate that the misrepresentations or omissions were "material." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003). Specific intent to defraud or deceive exists if "the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *Id.* at 488.

Importantly, "[a] defendant may commit mail fraud even if he personally has not used the mails." *Frost*, 125 F.3d at 354 (citing *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir.1994) ). "A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *Id.* In other words, there is no requirement that the defendant have actually intended that the mails (or wire) be used. *Id.* And, further, " '[t]he mailings may be innocent or even legally necessary.' " *Id.*(quoting *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988) ). The use of the mails " 'need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.' " *Id.* (quoting *Oldfield*, 859 F.2d at 400).

"When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Heinrich*, 668 F.3d at 404 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) ).

*In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1083 (E.D. Mich. 2018).

Bosch argues that Plaintiffs have alleged no facts that allow the Court to infer that Bosch specifically intended to defraud them. Mot. at 23. Rather, Bosch contends that Plaintiffs have offered nothing more than conclusions and unfounded allegations. Mot. at 23-24. To the contrary, Plaintiffs allege that Bosch "actively participated in the development of the defeat device." Am. Compl. ¶ 165, ECF No. 94. Plaintiffs allege that the EDC17 "controls every parameter that is important for effective, low-emission combustion." *Id.* ¶ 167. Plaintiffs further allege that the EDC17 is equipped with a defeat device, that Bosch "exerts near-total control" over the EDC17, and that the EDC17 is designed "to prevent customers, like GM, from making significant changes on their own." Compl. ¶¶ 147, 248.

Bosch contends that its alleged act of supplying the EDC17 for the subject vehicles is insufficient to raise an inference that Bosch had the specific intent to defraud Plaintiffs, because the EDC17 or similar device is present in every modern automobile engine. Mot. at 24–25 (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*, MDL No. 2672,

2017 WL 4890594, at *2 (N.D. Cal. Oct. 30, 2017) ("***The EDC17 is not inherently a tool for deceit***; it is widely used by automakers that operate modern diesel engines.") (emphasis in original). Simply put, every modern vehicle may indeed have an EDC17 or a similar system, but not all EDC17's are necessarily designed and equipped with defeat devices, as is alleged here. As this Court noted in *Duramax*, Bosch's specific intent to defraud customers "can be inferred from the nature of the alleged conduct. The way in which EDC17 interacted with the Duramax engine is inherently deceptive. The alleged purpose of the device is to provide the perception of reduced emissions while avoiding the reality of reduced emissions." *Duramax*, 298 F. Supp. 3d at 1083.

Bosch contends that "unlike in *Duramax*, Plaintiffs here allege only scant facts about how the alleged 'defeat device works,' and none that supports the conclusory assertion that Bosch LLC *knew* that the Subject Vehicles contained these unspecified defeat devices." Mot. at 25 (emphasis in original). Bosch underscores paragraphs 126-148 of the *Duramax* complaint, in which the plaintiffs set forth details concerning testing that was performed on the subject vehicles. Bosch contends that no such details are present here. Those allegations were unnecessary to sustain the plaintiffs' RICO claim in *Duramax*, and indeed were entirely absent from the Court's discussion of predicate acts of racketeering activity. Thus, their absence from the current amended complaint is of no significance. The allegations set forth above are sufficient to raise an inference that Bosch knew that the subject vehicles contained the defeat devices. The amended complaint alleges that Bosch designed the EDC17 containing the defeat device and had exclusive control thereof. *See* Am. Compl. ¶¶ 148, 165, 167, 248. As stated in *Duramax*, "Defendants cannot reasonably argue that the deceptive nature of EDC17 was unanticipated or unintended, and even if they do, that argument should be resolved only by a jury. Plaintiffs have plausibly alleged that the purpose of

EDC17 was deception, and so Defendants' protestations that it has an innocent and lawful purpose are non-cognizable at the pleading stage." *Duramax*, 298 F. Supp. 3d at 1083.

Bosch also argues that Plaintiffs have failed to allege the predicate acts of mail or wire fraud because Plaintiffs have identified no actionable misrepresentation or omission by Bosch. Bosch argues that, in order to proceed under an omission theory, Plaintiffs must allege the existence of an independent legal duty to disclose information. In *Duramax*, the Court surveyed the applicable authority and found no such requirement. *Id.* at 1085. Although the defendants did identify some non-controlling precedent in support of their position that a fraudulent omission theory requires an independent duty to disclose, the Court concluded that the more recent and better reasoned cases supported the opposite conclusion. *Id.* That conclusion still obtains.

Bosch now cites to *Jamieson*, which Bosch contends conclusively establishes that fraud by omission requires an affirmative duty to disclose information. Mot. at 28 (citing *United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005) (reviewing conviction for conspiracy to commit mail fraud). Not so. In fact, the Sixth Circuit rejected Jamieson's contention that the trial court should have instructed the jury concerning a "duty to disclose." *United States v. Jamieson*, 427 F.3d at 415 ("*Even if* the trial court's refusal to give the 'duty to disclose' instruction was error, the error must be considered harmless.") (emphasis added). Thus, the Sixth Circuit did not affirmatively state that the failure to give the "duty to disclose" instruction was erroneous. In fact, the Sixth Circuit shied away from doing so (perhaps due to the lack of precedent on point, as this Court noted in *Duramax*).

The Sixth Circuit found that the district court's instruction "adequately guards against the jury finding that a simple omission, independent of any other statements encouraging trust and confidence in the defendant, can constitute fraud." *Id.* This dicta suggests that, in the Sixth

Circuit's opinion, a "simple omission" on its own cannot constitute fraud. Contrary to Bosch's contention, however, this dicta does not rise to the level of a "holding" that "something more than a 'simple omission' is required before that omission is actionable as mail or wire fraud." Mot. at 28. No such holding is present in *Jamieson*, and even the dicta in *Jamieson* is unsupported by any citation to controlling law.

Even if such a holding could be derived from *Jamieson*, it would not warrant a conclusion contrary to the one reached in *Duramax*. The "simple omission" alleged in this case is not "independent of any other statements encouraging trust and confidence in the defendant." *Jamieson*, 427 F.3d at 415. Rather, the factual predicates giving rise to the scheme to defraud include affirmative misrepresentations concerning the operation of the emissions technology, the importance of which was explained in *Duramax*:

> If Plaintiffs were relying on these advertisements as the basis for its claim of fraud, then Defendants' arguments regarding puffery and duty to disclose would become relevant. However, these representations do not constitute the fraudulent scheme; they merely further it. The level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle. GM's extensive advertising which emphasized the low emissions and environmentally-friendly nature of its "clean diesel" engine underscores its understanding of that fact. Thus, regardless of whether these advertisements would be actionable on their own, they were material to the scheme. The advertisements urged consumers to buy Duramax vehicles *because* they were environmentally friendly even though the Defendants had purposefully worked together to obfuscate the true level of emissions. Plaintiffs have specifically identified a number of communications that were "reasonably calculated to deceive persons of ordinary prudence and comprehension." The communications themselves may not have been demonstrably fraudulent, but they were intended to increase the likelihood that consumers would purchase Duramax vehicles because they produced emissions at a low level, when in fact the true level of emissions was much higher. The nondisclosure of the true operation of the Duramax engine was material precisely because GM worked so hard to convince consumers that it was a "clean diesel" engine.

*Duramax*, 298 F. Supp. 3d at 1084.

Here, Plaintiffs allege that the EDC17 is equipped with a defeat device, that Bosch "exerts near-total control" over the EDC17, and that the EDC17 was designed "to prevent customers, like GM, from making significant changes on their own." Compl. ¶¶ 147, 248. Plaintiffs also allege that Bosch and GM worked together to develop and implement a specific set of software algorithms in the Affected Vehicles to reduce emissions in testing environments but not on the road. *Id.* ¶ 158. Bosch also allegedly engaged in marketing and lobbying efforts in the United States to get regulators to approve "clean diesel." ¶ 42. *Id.* Bosch allegedly took these actions with knowledge of the engine's true operation, and under circumstances where its alleged co-conspirator had actively marketed the engine's emissions reduction capability. For the same reasons discussed in *Duramax* and above, these constitute sufficient predicate acts to give rise to RICO liability.

## C.

Additionally, Bosch argues that Plaintiffs do not plead a plausible claim that Bosch participated in the conduct of the alleged enterprise by either "making decisions on behalf of the enterprise or by knowingly carrying them out." Mot. at 30–31 (citing *Duramax*, 298 F. Supp. 3d at 1086).

In *Reves v. Ernst & Young*, the Supreme Court addressed the requirement that a RICO defendant "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting § 1962(c)). The Court explained:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the

phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.
*Id.*

"[L]iability [under § 1962(c) ] depends on showing that the defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just their *own* affairs." *Id.* at 185, 113 S.Ct. 1163. "Although *Reves* does not explain what it means to have some part in directing the enterprise's affairs, subsequent decisions from our sister circuits have persuasively explained that it can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).

In *Duramax*, this Court concluded that the plaintiffs had adequately alleged that Bosch

participated in the conduct of a RICO enterprise:

> Plaintiffs' allegations characterize EDC17 as performing an inherently deceptive function. Thus, the operation of EDC17 is the apparent heart of the fraudulent enterprise and, because Bosch bears primary responsibility for programming EDC17, it "knowingly carried...out" core aspects of the alleged enterprise.

*Duramax*, 298 F. Supp. 3d at 1087. The same allegations are present here concerning Bosch's

primary responsibility for programming the EDC17, as detailed above. Accordingly, Plaintiffs'

allegations are adequate. Bosch's argument for distinguishing *Duramax* is not persuasive. Bosch

argues that:

> Unlike in Duramax, Plaintiffs have incorporated documents into the Complaint that demonstrate there was no fraudulent enterprise between GM and Bosch LLC. See Compl. ¶¶ 149-58. Such documents show nothing more than back-and-forth between manufacturer and supplier during an ongoing development process. See, e.g., Compl. ¶ 156 (citing GMCOUNTS000023551, an email chain in which a GM employee circulated an innocuous meeting agenda among GM and Bosch engineers). And as discussed above, intent cannot be inferred simply by supplying the EDC-17. Supra p. 24-25.
>
> Many months and tens of thousands of documents into discovery, Plaintiffs cannot cite even one document demonstrating that Bosch LLC knowingly carried out the supposed objectives of the alleged RICO enterprise. Unable to support their weighty allegations, Plaintiffs instead resort to a familiar and defective crutch: "information and belief." See Compl. ¶¶ 156 (referencing an unremarkable document but alleging "[o]n information and belief, discussions at these regular meetings included developing and concealing defeat devices for the [Subject] Vehicles."), 157 (similar, but alleging "[o]n information and belief, AECD

disclosures drafted by Bosch GmbH and Bosch LLC were deceptive and false when submitted by GM to regulators.").

*Id.*

Bosch contends that the documents incorporated by reference in Plaintiffs' complaint "show nothing more than back-and-forth between manufacturer and supplier during an ongoing development process." Therefore, Bosch concludes that the documents "demonstrate that there was no fraudulent enterprise between GM and Bosch LLC." This conclusion does not follow. Failing to affirmatively demonstrate the alleged fraudulent enterprise does not establish the absence of a fraudulent enterprise.

Bosch criticizes Plaintiffs for failing to identify documentary evidence demonstrating Bosch's participation in the RICO enterprise after receiving tens of thousands of documents from Defendants. Bosch overlooks the procedural posture of this case. Plaintiffs are under no obligation at the pleading stage to identify documentary evidence substantiating their claims. The fact that they attempted to do so, successfully or not, is not fatal to their claims, nor does their attempt to do so create an obligation that did not otherwise exist. Bosch contends that "at this stage of the case, Plaintiffs can no longer claim that 'the relevant facts lie exclusively within the knowledge and control of' GM and Bosch LLC." Mot. at 32. The implication is that Plaintiffs should face a higher pleading burden at this stage because they have had the benefit of discovery before filing an amended complaint. Neither Rule 8(a) nor 9(b) makes such a distinction.

Moreover, this documentary evidence is not properly before the Court's consideration on a 12(b)(6) motion.[2] A court generally cannot look beyond the face of the Plaintiff's complaint when adjudicating a motion to dismiss for failure to state a claim unless the court converts the

---

[2] If the current evidentiary record affirmatively disproves the Plaintiffs' claims, as Bosch contends, Bosch presumably would not hesitate to move for summary judgment.

motion into a motion for summary judgment after proper notice is given to the parties. However, a district court can consider such documents without converting the motion into one for summary judgment where two conditions are met: 1) the documents are referred to in the complaint, and 2) are central to the claims contained therein. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

Here, the documents are referred to in the complaint. However, Bosch offers no explanation as to how "an email chain in which a GM employee circulated an innocuous meeting agenda among GM and Bosch engineers" is central to Plaintiffs' claim. In fact, Bosch's characterization of the document cuts the opposite way, suggesting that it has no evidentiary value at all. That document, though potentially illustrative of some alleged communication between GM and Bosch, is by no means central to Plaintiffs' claim that Bosch participated in the conduct of a RICO enterprise. Plaintiffs' claim does not rise or fall based on that alleged correspondence. Rather, the salient allegations are those discussed above concerning Bosch's role in programming the EDC17, the device at the heart of the fraudulent enterprise. *See Duramax*, 298 F. Supp. 3d at 1087.[3]

Before addressing the remaining arguments advanced by the motion to dismiss, it is worth emphasizing a point made by Bosch in opposing their joinder and now criticizing Plaintiffs' information and belief pleading. Rule 8(a) and, in this circumstance, rule 9(b) are not the only rules governing the pleadings. Pursuant to Federal Rule of Civil Procedure 11(b), by presenting a pleading to the Court Plaintiffs are certifying that to the best of their "knowledge, information, and belief, formed *after an inquiry reasonable under the circumstances* . . . the factual contentions

---

[3] Bosch also argues briefly that Plaintiffs fail to plead the existence of a RICO conspiracy because they fail to plead intent or a substantive RICO violation. Because the Court disagrees with Bosch's conclusions on those two points (as discussed above), the Court also disagrees with Bosch's conclusion as to the RICO conspiracy.

have *evidentiary* support." (emphasis added). Of course, the rule applies with equal force to "the denial of factual contentions." Fed. R. Civ. P. 11(b)(4). Because Plaintiffs have the benefit of substantial discovery that was previously only available to General Motors, their duty of inquiry extends to that discovery. It is reasonable to expect a thorough review of the discovery furnished thus far and that the amended complaint reflects a candid appraisal of the evidentiary basis for the allegations. To the extent Plaintiffs are being cavalier with their "information and belief" pleading solely to survive the 12(b)(6) motion, they risk sanctions. *See* Fed. R. Civ. P. 11(c).

### D.

Bosch argues that Plaintiffs fail to allege that their injuries were "by reason of" a RICO violation. Mot. at 10 (quoting 19 U.S.C. 1964(c)). The RICO proximate causation analysis is closely related to (even subsumed in) the statutory standing analysis. The Supreme Court has "held that a plaintiff's right to sue...required a showing that the defendant's violation not only was a 'but for' cause of his injury but, was the proximate cause as well." *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311. The plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Importantly, the causation inquiry must focus on the alleged link between the "predicate acts" and the asserted injury. Plaintiffs must show that each defendant's wrongful conduct was a "substantial and foreseeable cause of the injury and the relationship between the wrongful conduct and the injury is logical and not speculative." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013) (quotations omitted).

In *Duramax*, this Court held as follows:

> Plaintiffs have plausibly alleged that Bosch's joint activities with GM were a substantial factor contributing to their injury. EDC17 is the means by which Plaintiffs were injured. According to Plaintiffs, Bosch 'exerts near-total control' over the customization of EDC17, eliminating the possibility that GM programmed the functionality which enables use of defeat devices without Bosch's knowledge. *See* Con. Am. Compl. at 94–95. Plaintiffs thus plausibly allege that Bosch

developed the vehicle component which has caused Plaintiffs' injury, that Bosch was aware of the deception that component would inevitably contribute to, and that Bosch was aware that consumers would pay a premium for vehicle capabilities that the component would not deliver.

*Duramax*, 298 F. Supp. 3d at 1076. Similarly, Plaintiffs in this case allege that Bosch "actively participated in the development of the defeat device." Compl. ¶ 165, ECF No. 94. Specifically, Plaintiffs allege that the EDC17 "controls every parameter that is important for effective, low-emission combustion." *Id.* ¶ 167. Plaintiffs further allege that the EDC17 is equipped with a defeat device, that Bosch "exerts near-total control" over the EDC17, and that the EDC17 is designed "to prevent customers, like GM, from making significant changes on their own." Compl. ¶¶ 147, 248. Plaintiffs have sufficiently alleged that Bosch's programming of the EDC17 was a substantial and foreseeable cause of their injury.

Bosch argues as follows in its motion to dismiss:

This Court in Duramax sustained plaintiffs' RICO claim on the understanding that it was "not primarily premised on proof of violation of EPA regulations" and that "alleg[ations] that the [defendants] intended to deceive regulators" were not essential to the plaintiffs' RICO claim. *See* 298 F. Supp. 3d at 1088. That premise is not viable here, and for that reason the RICO claims here fail. The Complaint makes clear that the allegations regarding EPA and CARB are central to the claim and that the EPA and CARB are the "direct victims." *See* Compl. ¶¶ 160-61. ("[I]n order ***to obtain the COCs necessary to sell their vehicles***, ***GM*** did not disclose, and ***affirmatively concealed from government regulators***, the presence of the test-detecting and performance-altering software code that it developed with Bosch . . . . ***Because the COCs were fraudulently obtained*** . . . **the [Subject] Vehicles** were never covered by a valid COC, ***and thus were never legal for sale***.") (emphasis added), 163 ("GM hid . . . facts from the EPA, CARB and other state regulators, and consumers, and it continued to sell and lease the [Subject] Vehicles despite their ***illegality*** and with the complicity of Bosch"), 242 (The alleged enterprise's "direct purpose was ***to deceive the regulators*** and the public")

Mot. at 10-11. As Bosch acknowledged, this Court concluded in *Duramax* that the plaintiffs' RICO claim was not premised on proof of violation of EPA regulations. Bosch contends that "this premise is not viable here," however, due to certain allegations in Plaintiffs' complaint that

supposedly demonstrate that the EPA and CARB, and not Plaintiffs, were the "direct victims" of any alleged RICO activity. Yet these identical allegations were also present in the complaint at issue in *Duramax*. Compl. ¶¶ 164-165, ECF No. 18 (Case No. 17-cv-11661). For the same reasons identified in *Duramax*, Plaintiffs' RICO claim in this case is not dependent on proof of a violation of EPA regulations.

Bosch's argument here is also somewhat out of place. The argument centers around alleged regulatory violations and their importance to sustaining Plaintiffs' RICO claims. Yet Bosch raises this discussion in section A of its brief, which purports to address causation. It is unclear how the two topics relate. In *Duramax*, the Court determined that the Plaintiffs' RICO claims were not dependent on proof of a regulatory violation. The Court made this determination in response to the defendants' argument that the EPA's extensive regulatory scheme provided the exclusive remedy to redress violations of the CAA, thereby precluding plaintiffs' RICO claim. The Court found that argument to be without merit, and to be largely coterminous with the defendants' argument that plaintiffs' state law claims are preempted by the CAA. The discussion in that opinion had nothing to do with causation.

Bosch now advances the same argument by raising it in the context of the causation requirement. Bosch suggests that Plaintiffs' allegations concerning fraud on the EPA and CARB somehow undermine the causal relationship between the RICO violation and Plaintiffs' injury. According to Bosch, those allegations demonstrate that the EPA and CARB are the "direct victims" of Bosch's conduct. Even if the EPA and CARB are direct victims, the conclusion Bosch reaches does not follow. There is no reason why Bosch's conduct cannot have multiple "direct victims," including EPA, CARB, and the Plaintiffs. Bosch's discussion is non-responsive to the

allegations in the Complaint concerning the injuries sustained by Plaintiffs, not the EPA or CARB, and the causal connection between those injuries and the RICO violation.

As explained in *Duramax*,

> Plaintiffs' RICO claim is not primarily premised on proof of violation of EPA regulations and thus is cognizable. The alleged common purpose at the heart of the RICO scheme is the deception of consumers. The alleged injury is overpayment by consumers. The identified predicate acts of mail and wire fraud involve communications to consumers. Admittedly, Plaintiffs also allege that the RICO Defendants intended to deceive regulators and made fraudulent mail and wire communications to regulators. But neither of those allegations are essential to Plaintiffs' RICO claim. Accordingly, they are best construed as collateral matters that are only peripherally related to the regulatory concerns advanced by EPA regulations.

*In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1088 (E.D. Mich. 2018). In other words, the allegations concerning regulatory violations are collateral allegations which are unnecessary to sustain Plaintiffs' RICO claim. Bosch concludes that this is somehow fatal to Plaintiffs' RICO claim. This conclusion does not follow logically. When faced with a motion to dismiss under rule 12(b)(6), the Court is to consider whether the Plaintiffs have pled *sufficient* facts to sustain their claim, not whether they have pled more facts than necessary.

**III**.

Accordingly, it is **ORDERED** that the motion to dismiss, ECF No. 108, is **DENIED**.

Dated: October 23, 2018                                   s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 23, 2018.

s/Kelly Winslow
KELLY WINSLOW