# Exhibit C

## (REDACTED VERSION OF DOCUMENT TO BE SEALED)

# Exhibit 36
# (Submitted Under Seal)

Page 254

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

JASON COUNTS, et al.,          )

individually, and on behalf  )

of THEMSLEVES AND ALL        ) C.A. No.

OTHERS similary situated,    ) 1:16-cv-12541-TLL-PTM

   Plaintiffs,              )

 vs.                          )

GENERAL MOTORS LLC, ROBERT   )

BOSCH GMBH, and ROBERT       )

BOSCH LLC,                   )

   Defendants.               )

     PART II of the videotaped videoconference

deposition of JUSTON SMITHERS, called for

examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken on

the 21st day of May, 2020, at the hour of

11:00 a.m.


* * * HIGHLY CONFIDENTIAL * * *


Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

---

Page 255

1   REMOTE APPEARANCES:
2     HAGENS BERMAN SOBOL SHAPIRO LLP
        BY:  MR. GARTH WOJTANOWICZ
3       1301 Second Avenue
        Suite 2000
4       Seatle, Washington  98101
        (206) 623-7292
5       garthw@hbsslaw.com
6         - and -
7     CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
        AGNELLO, PC
8     BY:  MR. JAMES E. CECCHI
        5 Becker Farm Road
9       Roseland, New Jersey 07068
        (973) 994-1700
10      jcecchi@carellabyrne.com
11        - and -
12    SEEGER WEISS LLP
      BY:  MS. SHAUNA ITRI
13      55 Challenger Road, 6th Floor
        Ridgefield Park, New Jersey  07660
14      (973) 639-9100
        sitri@seegerweiss.com
15        Representing the Plaintiffs;
16
        KIRKLAND & ELLIS LLP
17    BY:  MS. RENEE D. SMITH
          MR. JEFFREY S. BRAMSON
18        MS. KATE WARNER
19      300 Norh LaSalle Street
        Chicago, Illinois  60654
20      (312) 862-2000
        renee.smith@kirkland.com
21      jeffrey.bramson@kirkland.com
        kate.warner@kirkland.com
22        Representing General Motors LLC;
23
24
25

---

Page 256

1   REMOTE APPEARANCES (continued):
2     CLEARY GOTTLIEB STEEN & HAMILTON LLP
      BY:  MR. DAVID E. BRODSKY
3       One Liberty Plaza
        New York, New York  10006
4       (212) 225-2000
        dbrodsky@cgsh.com
5
          - and -
6
      McQUAIDE BLASKO
7     BY:  MR. STEVEN S. HURVITZ
        811 University Drive
8       State College, Pennsylvania  16801
        (814) 238-4926
9       sshurvitz@mqblaw.com
          Representing Robert Bosch GMBH and
10        Robert Bosch LLC.
11
12            * * * * *
13
14
15
16
17
18
19
20
21
22
23    Also Present:  Mr. Travis Jewell - Videographer
24        Mr. Donald Eklund
25        Mr. David Anderson

---

Page 257

1                 I N D E X
2   WITNESS                 EXAMINATION
3   JUSTON SMITHERS
4     By Mr. Brodsky              261
5     By Ms. Smith (further)      403
6
7
8
9            E X H I B I T S
10  NUMBER     IDENTIFICATION           PAGE
11  Exhibit 36   Analyzing On-Road Emissions   279
12      Of Light-Duty Vehicles
13      With Portable Emission
14      Measurement Systems (PEMS)
15  Exhibit 37   On-Road and Chassis       301
16      Dynamometer Evaluations of
17      Emissions from Two Euro 6
18      Diesel Vehicles
19  Exhibit 38   CAFEE In-Use Emissions      302
20      Testing of Light-Duty
21      Diesel Vehicles in the
22      United States
23  Exhibit 39   AECD Documentation Bates   336
24      GMCOUNTS000096434-96523
25

---

Page 258

1            E X H I B I T S
2   NUMBER     IDENTIFICATION           PAGE
3   Exhibit 40   MY14 Chevy Cruze Diesel     378
4      LUZ - Final Report UHC
5   Exhibit 41   Deposition Transcript of    420
6      Andrew S. Barren
7   Exhibit 42   Catalyst Test Services      427
8      LLC Standard Operating
9      Procedure
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 259

1    THE VIDEOGRAPHER:  We are now on the record.
2  Participants should be aware that this proceeding
3  is being recorded, and as such, all conversations
4  held will be recorded unless there's a request and
5  agreement to go off the record.  Private
6  conversations and/or attorney-client interactions
7  should be held outside the presence of the remote
8  interface.
9        A link to the recording will be available
10  to all parties to the case for up to 90 days from
11  today's date provided the requesting party has
12  purchased a certified copy of the transcript.
13        This is the remote video recorded
14  deposition or Juston Smithers, volume 2 being taken
15  on Thursday, May 21, 2020.  The time is now 16:01
16  in the UTC time zone.  We are here in the matter of
17  Counts, et al. v. General Motors LLC, et al.  My
18  name is Travis Jewell, remote video technician on
19  behalf of U.S. Legal Support located at 200 West
20  Jackson, Chicago, Illinois.  I'm not related to any
21  party in this action nor am I financially
22  interested in the outcome.
23        At this time will the court reporter, Gina
24  Luordo on behalf of U.S. Legal Support please enter
25  the statement for remote proceedings into the

Page 260

1  record.
2    THE COURT REPORTER:  The attorneys
3  participating in this deposition acknowledge that I
4  am not physically present in the deposition room
5  and that I will be reporting this deposition
6  remotely, pursuant to Federal Rule of Civil
7  Procedure 29.  They further acknowledge that, in
8  lieu of an oath administered in person, the witness
9  will verbally declare his testimony in this matter
10  is under penalty of perjury.  The parties and their
11  counsel consent to this arrangement and waive any
12  objections to this manner of reporting.
13        Please indicate your agreement by stating
14  your name and your agreement on the record.
15    MR. WOJTANOWICZ:  This is Garth Wotjanowicz for
16  plaintiffs.  We agree.
17    MR. BRODSKY:  David Brodsky for Robert Bosch
18  LLC.  We agree.
19    MS. SMITH:  This is Renee Smith on behalf of
20  General Motors LLC.  We agree.
21
22
23
24
25

Page 261

1        JUSTON SMITHERS,
2  having been previously duly sworn, was examined and
3  testified as follows:
4        EXAMINATION
5  BY MR. BRODSKY:
6    Q.  Mr. Smithers, do you understand you're
7  still under oath?
8    A.  Yes.
9    Q.  Okay.  I think we can proceed.  Good
10  morning, Mr. Smithers.
11    A.  Good morning.
12    Q.  Yesterday you testified about your
13  reliance on data collected at temperatures outside
14  the written specified operating conditions of your
15  PEMS equipment.  Do you recall that testimony?
16    A.  I recall reviewing --
17    THE COURT REPORTER:  I'm sorry.  Could you
18  repeat that answer?  There was some interference.
19  I'm sorry about that.
20    THE WITNESS:  Yeah.  No problem.  I recall
21  reviewing the temperatures where we ran the test
22  and the temperature limits of the equipment.
23  BY MR. BRODSKY:
24    Q.  And in that connection, you claim that you
25  operated the equipment in consultation with the

Page 262

1  manufacturer and that they felt comfortable with
2  what you were doing.  Do you recall that testimony?
3    A.  I do.
4    Q.  The manufacturer that you discussed this
5  with is Sensors, Inc.  That's the manufacturer of
6  the PEMS testing equipment?
7    A.  It is.
8    Q.  Who at Sensors, Inc. did you have that
9  discussion with?
10    A.  I would have to ask one of my engineers,
11  but I would like to make a point of clarification
12  that I think is relevant, and that is the PEMS
13  equipment that you listed yesterday that we went
14  through that has the ambient temperature limitation
15  was all stored inside of the passenger compartment
16  of the car, and so it was at a comfortable
17  temperature for the drivers.  So it was not at
18  temperatures of the outside ambient air.
19    Q.  Do you have a record of what the
20  temperatures were in the compartment?
21    A.  I don't, but I assume that my operators
22  were running it at comfortable temperatures
23  probably somewhere between 65 and 70 degrees.
24    Q.  So you didn't have the conversations with
25  Sensors, Inc. that you referred to yesterday?

JUSTON SMITHERS Volume II          Highly Confidential                    May 21, 2020

Page 263

1     A.   We did have conversations, and those
2   conversations related to the exhaust flow meter,
3   which is outside of the car.  That has no lower
4   ambient temperature specification that I'm aware
5   of, but they did have some condensation issues in
6   the flow tube, and those were resolved in
7   discussion with Sensors, Inc.
8     Q.   Before we get to the condensation issue,
9   I'm referring to the conversations that you said
10  you had with the manufacturer.  And am I to
11  understand that you did not personally have those
12  conversations?
13    A.   My engineers had the conversations with
14  Sensors.
15    Q.   Which engineers?
16    A.   It would have been Max or Thomas most
17  likely.
18    Q.   Do you know for sure?
19    A.   I don't know which of the two.
20    Q.   Were the conversations in person?
21    A.   Over the phone.
22    Q.   Most likely?
23    A.   Most likely.
24    Q.   Do you know for sure?
25    A.   I don't.

Page 264

1     Q.   Did the engineers take notes of the
2   conversations?
3     A.   I'm not sure.
4     Q.   And your testimony yesterday was that the
5   manufacturer felt comfortable with what you were
6   doing.  Do you know what that means, or what does
7   that mean that they felt comfortable?
8     A.   They felt that their system would perform
9   properly in the conditions where we were running
10  it.
11    Q.   Did they assure you that the data you
12  collected in those conditions would be accurate and
13  reliable?
14    A.   I'd have to go back and ask Max exactly
15  the words that were said, but they gave us a good
16  degree of comfort that their systems would work
17  properly at the temperatures we were testing.
18    Q.   And again, you didn't have those
19  conversations, so what you're testifying to is
20  based on conversations you had with Max or, I think
21  you gave a second name, Thomas?
22    A.   Right.
23    Q.   Now, you did say that when operating
24  conditions below 14 degrees Fahrenheit, your team
25  had some problems with condensation, correct?

Page 265

1     A.   Right.
2     Q.   What does that mean?
3     A.   You can get condensation inside of the
4   flow tube of the exhaust flow meter, and I don't
5   recall specifically if this was related to the
6   Cruze or one of the other vehicles.  In fact, I'm
7   merely confident it did not relate to the Cruze
8   because the Cruze has a horizontal orientation, and
9   that actually eliminates the condensation issue.
10  So as I'm thinking about it now, I believe that was
11  only in cases where the exhaust flow meter had a
12  vertical orientation, which is not the Cruze.
13    Q.   So your reference to a condensation issue
14  yesterday with regard to the Cruze was mistaken?
15    A.   Yes.  After I thought about the different
16  vehicles we've tested at low temperature, that was
17  not an issue with the Cruze.
18    Q.   Okay.  Yesterday we talked about the SC03
19  test that was run at the TRC on March 19, 2018.  Do
20  you remember that testimony?
21    A.   I do.
22    Q.   And you said that the test was
23  noncompliant because the TRC didn't have the right
24  solar array, correct?
25    A.   Right.

Page 266

1     Q.   Besides that attempted SC03 test on
2   March 19th, did you run any other SC03 test on the
3   Cruze test vehicle?
4     MR. WOJTANOWICZ:  Object to the form.
5     THE WITNESS:  I believe we tried to simulate
6   one on the road if my memory serves, but I don't
7   recall specifically.
8   BY MR. BRODSKY:
9     Q.   Did you identify that attempt in your
10  report?
11    A.   No.  We didn't think it was particularly
12  illustrative or relevant.
13    Q.   Did you provide any data about that
14  attempted test?
15    A.   That data is included in the data that was
16  supplied.
17    Q.   Could you tell me where -- what date that
18  attempted test occurred?
19    A.   September 7, 2018.

Page 267

Page 269



Page 271



15  your engineer cleared in 2020 contrary to your
16  instructions. Do you remember testifying about
17  that?
18      **A.**  Yes.
19      **Q.**  Did either your engineer, Max Shank or you
20  document the DTCs that were present on the Cruze
21  before he cleared them?
22      **A.**  I believe he did. He documented that it
23  was the urea tank heater DTC.
24      **Q.**  How did he document that?
25      **A.**  He may have put it in an e-mail to me, or

Page 273

1   he often keeps a Word document with vehicle history
2   in each vehicle's folder. So I would have to look
3   and see how he documented it.
4       **Q.**  Did you produce that material to
5   plaintiffs' counsel?
6       **A.**  I don't believe it was asked for.
7       **Q.**  Well, I believe it was. In any event,
8   we're asking for it now. Are you prepared to
9   testify that that one DTC was the only DTC that he
10  cleared?
11      **A.**  Correct.
12      **Q.**  Did you ask him that specifically?
13      **A.**  Max told me that was the only -- Max said
14  here's the DTC that is on the vehicle right now,
15  and I told him okay, don't do anything with it.
16  For some reason, he decided to do it. I mean, if I
17  had to be absolutely certain, I suppose I could go
18  ask him and say hey, are you absolutely certain
19  that it was the only one, but, you know, if there
20  was another code, he would have brought it up.
21      **Q.**  And during the entire time that the
22  vehicle was in your possession, were there other
23  DTCs that were cleared?
24      **A.**  No. The only time we ever saw a MIL
25  activated was on the dyno, which was further

Page 274

1   indication that we felt those fault codes were
2   spurious.
3       **Q.**  And that was the NOx sensor alert that you
4   testified about yesterday?
5       **A.**  Correct.
6       **Q.**  And was that the only alert that you saw
7   on the dyno?
8       **A.**  Correct, and that alert was never seen on
9   the road.
10      **Q.**  Yesterday you made a brief reference to
11  the European Real Drive Emissions standard which
12  requires a PEMS testing. Do you remember that that
13  was in response to Ms. Smith's questioning?
14      **A.**  I do.
15      **Q.**  And you're familiar with the European RDE
16  legislation's concept of a conformity factor?
17      **A.**  Generally familiar with how they run their
18  RDE test, yes.
19      **Q.**  The conformity factors increase the
20  emissions standards for PEMS testing above the
21  standards for laboratory dyno testing, correct?
22      **A.**  Right.
23      **Q.**  And initially the conformity factor under
24  the European legislation was 2.1, correct?
25      **A.**  Okay.

Page 275

1      **Q.**  You know that?  You're familiar with that?
2      **A.**  I don't actually.  I don't know about
3  their conformity factors.
4      **Q.**  The conformity factor initially was 2.1,
5  and that means that a car may emit 2.1 more times
6  during a PEMS test as compared to a test under dyno
7  lab conditions, correct?
8      **A.**  Correct, but you have to contextualize the
9  European situation, which is they have vehicles of
10  very large diesel population that are many factors
11  above the standards and a much bigger NOx problem
12  as a result than we have here in the U.S.  I think
13  they're further behind in the sophistication of
14  their dynamometer cycles.  Their dynamometer cycles
15  don't cover nearly as much territory as we do here
16  in the U.S.
17      And so I believe that relatively high
18  allowance per the conformity factor was a
19  recognition of the fact that it's a completely
20  different vehicle population with a completely
21  different situation and completely different set of
22  regulations.
23      **Q.**  Isn't it also a recognition of the fact
24  that there are uncertainties in the PEMS testing
25  system, and the reproducible conditions of the dyno

Page 276

1  lab do not exist in PEMS tests?
2      MR. WOJTANOWICZ:  Object to the form.
3      THE WITNESS:  I don't believe that's the case
4  at all.  I believe PEMS testing is reproducible,
5  and I don't believe PEMS testing has uncertainties.
6  It's used by academics.  It's used by regulatory
7  agencies, and it's a very common and
8  well-established piece of equipment.  There are
9  studies that show the accuracy of that equipment.
10  I believe I referenced one of them in my paper.
11  BY MR. BRODSKY:
12      **Q.**  So you're not aware that the European
13  legislature or legislatures themselves have
14  recognized the uncertainties in PEMS testing, and
15  that's why -- one of the reasons why they
16  introduced the concept of a conformity factor?
17      MR. WOJTANOWICZ:  Object to the form.
18      THE WITNESS:  So uncertainty in testing is a
19  different -- so you have to parse this out into two
20  pieces.  So one is is there an uncertainty in how
21  the system measures the emission.  Is the number
22  you're getting from the tailpipe a true and
23  accurate representation of the number that's coming
24  out of the engine, and the answer to that is
25  absolutely it's a true and accurate representation

Page 277

1  of the number coming out of the engine.  And I
2  reference the study that shows that.
3      The uncertainty or variability, I think
4  would be a better term, comes from how you run the
5  test.  So certainly if you run tests with higher
6  aggressiveness or lower aggressiveness uphill,
7  downhill, etcetera, those are going to produce more
8  variability than in the dyno environment, which is
9  always the same expect test with no hills, no
10  changing conditions.  So I believe if you run a
11  dynamometer -- I'm sorry, a PEMS test over and over
12  in the same types of conditions, you can
13  demonstrate quite a high level of repeatability,
14  and that's what we've done here.
15  BY MR. BRODSKY:
16      **Q.**  All right.  So the 2.1 compliance factor
17  is attributable to the variability in PEMS testing
18  as compared to dyno testing, correct?
19      MR. WOJTANOWICZ:  Object to the form.
20      THE WITNESS:  To be honest with you, I'm not
21  that familiar with the basis of the conformity
22  factor in Europe.  I suspect it has something more
23  to do with the more significant issues with
24  emissions cheating that they have in Europe than we
25  have here, and I don't -- I don't know and have not

Page 278

1  researched the background of the basis of the
2  conformity factor.  I can only go back and cite
3  studies which I think are more relevant than the
4  opinion of the European legislature that shows
5  there is a good correlation between PEMS
6  measurements and dynamometer measurements, and one
7  of those studies is in my report.
8  BY MR. BRODSKY:
9      **Q.**  Which study is that?
10      **A.**  Footnote 30, On-Road and Chassis
11  Dynamometer Evaluations of Emissions from Two Euro
12  6 Diesel Vehicles, SAE 2014 01-2826.  It shows
13  10 percent agreement between PEMS and the chassis
14  dynamometer.  I should also note that, again, PEMS
15  is used in the end use compliance program in the
16  United States, and it's also used by regulators
17  extensively and that GM itself used PEMS data to
18  present to Air Resources Board.
19      **Q.**  Mr. Smithers, you cited a number of
20  articles in your report, did you not?
21      **A.**  I did.
22      **Q.**  And one of them was cited at Page 27,
23  footnote 31, the Weiss, et al. article?
24      **A.**  Okay.
25      **Q.**  Let's mark that as an exhibit.  It's tab

Page 279

1  16 in your -- it should be separately reproduced in
2  your box.  This is one of the articles that you
3  relied on and cited?
4      MR. WOJTANOWICZ:  David, can you hold on one
5  second?  It's just now coming up.
6      MR. BRODSKY:  Yep.
7      MR. WOJTANOWICZ:  Okay.  I've got it.  Thank
8  you.
9  BY MR. BRODSKY:
10     Q.  Mr. Smithers, this is one of the articles
11  that you cited and relied upon?  One of the studies
12  I should say.
13     A.  For the RPA calculation, yes.
14     Q.  Turn to Page 45, please.  Toward the
15  bottom, the authors write the following:  On-road
16  emissions testing with PEMS allows covering a large
17  variety of driving conditions and is typically
18  characterized by a high degree of randomness and
19  limited repeatability.  The variability in road,
20  weather and traffic conditions as well as the
21  driver's behavior attribute to every on-road PEMS
22  test quasi-unique characteristics.  Do you see
23  that?
24     A.  I do.
25     Q.  Did I read that correctly?

Page 280

1      A.  You did.
2      Q.  You can put that aside.
3      A.  Well, I'd like to comment on that.  So --
4      Q.  Well, you don't get to comment on it.  You
5  get to answer my questions, sir, and I'm going to
6  have another question for you.
7      A.  The repeatability --
8      Q.  Sir -- sir, just wait for my next
9  question, please.
10     A.  Okay.
11     Q.  Did you do any of the PEMS test drives
12  yourself?
13     A.  I did not.
14     Q.  You used drivers to do the tests?
15     A.  Engineers.
16     Q.  And how many different engineers did you
17  use?
18     A.  Three.
19     Q.  Who were they?
20     A.  Max Shank, Thomas Carson and -- yeah, and
21  then Bill Rimkus in this case.
22     Q.  I think we established that Bill Rimkus
23  did the PEMS test in 2016; is that correct?
24     A.  Yeah.
25     Q.  So all the PEMS testing in 2018 and '19

Page 281

1  were done by Mr. Shank and Mr. Carson?
2      A.  Yeah.
3      Q.  And they're both employees of your firm?
4      A.  They are.
5      Q.  Do they have any training on the
6  conducting of test drives?
7      A.  Training by me, yes.
8      Q.  How did you train them?
9      A.  I asked them to drive within a certain
10  parameter of speed and acceleration and looked at
11  the data afterward to ensure that they drove within
12  those parameters, and they did.
13     Q.  So was that training independent of the
14  PEMS testing you did?
15     A.  The instruction to them was here are the
16  average speeds and the types of accelerations we
17  are trying to hit and go out with the PEMS testing
18  and run the tests, and let's analyze the speeds and
19  RPAs that you hit based upon my instructions.  And
20  they were able to rather easily meet the criteria
21  of the tests that I laid out for them, which were
22  driving -- city driving with an attempt to get 20
23  to 25 miles an hour average speed.
24         That was something they were able to do
25  just as experienced drivers.  I don't think there's

Page 282

1  any particular unique qualification that's required
2  to drive a car, especially for someone that's been
3  driving for many years.  And then there were
4  instructions to maintain at a highway speed
5  60 miles an hour steady with soft accelerations if
6  they were required.  And that data was all
7  presented, and the drive parameters were certainly
8  within my expectations.
9      Q.  Prior to them doing the actual PEMS
10  testing, did they receive any training on how to
11  conduct these tests?
12     A.  They received training on how to operate
13  the PEMS equipment.
14     Q.  Did they receive any training on how to
15  drive the cars prior to actually doing the driving
16  on the PEMS test?
17     A.  As I mentioned, I don't believe any
18  special training is required for an experienced
19  driver.  The instructions were maintain these
20  average speeds, accelerate softly, and we'll check
21  the data and see if you're able to hit those
22  targets, and they were.  And I believe that's
23  sufficient training.
24     Q.  So the answer to my question is no, they
25  didn't -- prior to doing the tests, they did not

Page 283

1  receive any training in conducting PEMS tests?
2      A.  No.
3      MR. WOJTANOWICZ:  Object to the form.  Asked
4  and answered.
5      THE WITNESS:  The answer to your question is
6  not no, they didn't receive any training in
7  conducting PEMS tests.  They received training in
8  the PEMS equipment, and they are trained drivers.
9  Those are the qualifications for someone to run a
10  PEMS test.
11  BY MR. BRODSKY:
12      Q.  They're trained drivers did you say?  How
13  are they trained drivers?
14      A.  You didn't go through driver's training
15  when you learned to drive a car?
16      Q.  Is that the training that they had, their
17  high school driver's ed class?  That's the training
18  you're referring to when you say they're trained
19  drivers?
20      A.  And over 10 years of experience on the
21  road with a clean driving record.  We're not --
22  we're not -- we're not talking about a
23  sophisticated and difficult operation.  You're
24  simply trying to hit a certain target set of speeds
25  and a certain set of target accelerations.  And if

Page 284

1  you can do that, then you're qualified to do that.
2  That is not difficult for a driver.
3      Q.  Okay.  Did they ever do PEMS tests before
4  this?
5      A.  Each of them has worked extensively with
6  gas analyzers that are very similar to PEMS gas
7  analyzers.  And so to use a PEMS system was really
8  just a simple application that they had been doing
9  for many years.
10      Q.  That's interesting, but maybe you can
11  answer my question.  Did they ever do a PEMS test
12  before this; yes or no?
13      MR. WOJTANOWICZ:  Object to the form.
14      THE WITNESS:  I don't recall the sequence of
15  who worked on vehicles before the Cruze, so I -- I
16  don't recall.
17  BY MR. BRODSKY:
18      Q.  You referred to Mr. Shank and Mr. Carson
19  as engineers.  What kind of engineering training do
20  they have or engineering background?
21      A.  Thomas Carson has a chemical engineering
22  degree, and I believe Max Shank has an
23  environmental science degree with a lot of
24  specialty in test measurement equipment, and Bill
25  Rimkus has a master's in mechanical engineering.

Page 285

1      Q.  Prior to running these tests, did any of
2  these people work for any other testing firms?
3      A.  Bill Rimkus runs his own testing firms.
4  He's been running catalyst testing for a good
5  portion of his career using gas analyzers very
6  similar to what's in the PEMS system.  I'm less
7  familiar with Thomas Shank's background, although
8  he's done -- he's worked with a wide variety of
9  measurement equipment as any engineer would.
10      Q.  I think you just confused the two.  You
11  said Thomas Shank.
12      A.  Sorry, Thomas Carson.  And then Max Shank
13  has worked with a huge variety of measurement
14  equipments, and of course, understand that they did
15  receive formal training from the manufacturer who
16  flew out and trained them on the system.  And given
17  their backgrounds and their capabilities, the use
18  of this equipment was not much of a stretch from
19  what they've done for many years.
20      Q.  How long has Mr. Shank worked for you?
21      A.  Two to three years.
22      Q.  And where did he work before working for
23  you?
24      A.  I don't recall the name of the firm.
25      Q.  How about Mr. Carson, how long has he

Page 286

1  worked for you?
2      A.  Same, about a couple years.
3      Q.  And what did he do before?
4      A.  I'd have to look at his resumé.  I don't
5  recall.
6      Q.  Okay.  The drives themselves just had the
7  driver in the car.  There was no passenger,
8  correct?
9      A.  Correct.
10      Q.  And as I understand it, there was no
11  written protocol for how the drives were to be
12  conducted; is that right?
13      A.  There is a written protocol for how we run
14  the test, but the drives themselves, I told them
15  how I wanted them to drive.  And looking through
16  the data, they were able to easily match the
17  requirements of what I wanted them to do.
18      Q.  Was there a written protocol for how the
19  drives were to be conducted?
20      MR. WOJTANOWICZ:  Object to the form.  Asked
21  and answered.
22      THE WITNESS:  I believe I answered the
23  question.
24  BY MR. BRODSKY:
25      Q.  You didn't.  Was there a written protocol

Page 287

1  for how the drives are to be conducted?
2      A.  I believe I answered the question.
3      MR. WOJTANOWICZ: Objection.
4  BY MR. BRODSKY:
5      Q.  Sir, was there a written protocol for how
6  the drives are to be conducted; yes or no?  It's a
7  simple question.
8      MR. WOJTANOWICZ: Objection.  Asked and
9  answered.  Juston, you can answer if you're able.
10     THE WITNESS:  As I did, there's a written
11  protocol for how the PEMS equipment is supposed to
12  be used in each of the tests, but my instructions
13  for how to drive the vehicle were verbal.
14  BY MR. BRODSKY:
15     Q.  There was nothing in writing telling the
16  drivers where to drive, was there?
17     A.  No.  We -- we did not concern ourselves
18  much with the specific route.  What we wanted to
19  hit was certain route types, so flat roads, hilly
20  roads, hot temperatures, low temperatures, and the
21  data show that they were able to do that with a
22  high degree of accuracy.  So the fact that, you
23  know, they didn't receive written instructions,
24  they appear to have taken the verbal instructions
25  and were able to nail exactly what I was looking

Page 288

1  for.  So I don't think the absence of written
2  instructions was an issue.
3      Q.  When you gave the oral instructions to
4  these two men, did you do it each time they went
5  out on a test drive?
6      A.  No.  They have a general sense of what
7  we're looking for in the data, and, you know, a
8  certain number of miles and certain conditions that
9  they want to hit, and they would follow those on
10  their own.  Then I would often analyze data and say
11  hey, I want to take a look at this area a little
12  bit more.  Can you give me more driving of this
13  style in these ambient conditions so I can see
14  what's going on here?
15     Q.  And is there any written record whatsoever
16  of the oral instructions that you gave the drivers?
17     A.  There doesn't need to be because there's a
18  record of what they actually did on the drive,
19  which is the important metric.  So no, there's no
20  written oral record because it was an oral
21  instruction, so there wouldn't be any written
22  record.
23     Q.  Well, there could be notes that you took.
24  Did you take any notes?
25     A.  But there's a --

Page 289

1      Q.  Sir, just answer my question.  Did you
2  take notes of the oral instructions?
3      MR. WOJTANOWICZ: David, I'm going to ask you
4  to stop badgering the witness, please.  You don't
5  need to berate him or yell at him.  You can ask him
6  civil questions.  That's the way this deposition
7  should go, okay?
8      MR. BRODSKY:  Yes, and he should be responsive
9  to the questions rather than giving speeches.
10  BY MR. BRODSKY:
11     Q.  It's a simple question.  Did you take
12  notes of the instructions that you gave the
13  drivers?
14     A.  I did not.
15     Q.  Okay.  Thank you.
16     A.  I just wanted to make a clarification that
17  the actual test results are a written record of
18  the -- of the test.  I mean, there's no more
19  accurate record of what was done in the test than
20  the actual test results themselves.
21     Q.  I'm asking about the instructions given,
22  not the results obtained.  You understand there's a
23  difference between those two things, don't you?
24     A.  I'm trying to answer your questions as
25  thoroughly as I can.  I apologize.

Page 290

1      Q.  Now, did you do any research on what
2  typical driving patterns look like in the United
3  States?
4      A.  No.  The goal of the test was to try and
5  simulate the patterns of the FTP-75 and the
6  patterns of the highway fuel economy test within
7  reason so that we could compare the PEMS results to
8  those tests.  Bear in mind that those -- those
9  tests themselves are derived from studies of
10  driving patterns in the United States, and that's
11  referenced in my report.
12     Q.  So your goal was to simulate the driving
13  patterns of the FTP-75 and the highway fuel economy
14  test, correct?
15     A.  The goal was to drive in a manner that was
16  reflective of those two cycles.
17     Q.  You did not select your test routes based
18  on whether they're consistent with typical driving
19  patterns, correct?
20     MR. WOJTANOWICZ: Object to the form.
21     THE WITNESS:  In many ways they're one in the
22  same.  I mean, it was somewhat fortuitous that
23  driving around in the local urban area tended to
24  yield a driving pattern that was very similar to
25  the FTP-75, and I suppose that is no surprise

Page 291

1  because the FTP-75 itself was derived from
2  real-world data.
3  BY MR. BRODSKY:
4      Q.  But other than seeking to replicate or
5  simulate the FTP-75 and highway fuel economy test,
6  you did nothing to try to study what typical
7  driving routes or driving patterns are in the U.S.,
8  correct?

20      Q.
21  was made to drive the vehicles with conservative
22  soft accelerations, correct?
23      A.  Correct.
24      Q.  And you weren't in the car monitoring the
25  accelerations, right?

Page 292

1      A.  I don't need to be.  I have the data
2  afterward.
3      Q.  You made this point in your report because
4  aggressive accelerations can materially increase
5  NOx tailpipe emissions, correct?
6      A.  Right.
7      Q.  And you claim that you conducted the tests
8  with careful control over driving aggressiveness,
9  correct?
10      A.  Right.
11      Q.  And the way you back up that claim is with
12  an after-the-fact calculation using something
13  called relative positive acceleration or RPA,
14  correct?
15      A.  Right.
16      Q.  And that RPA is a formula that takes speed
17  times acceleration for each second of the drive and
18  divides by the mile driven?
19      A.  It's been a while since I've done the
20  calc, but yeah, the general idea is to characterize
21  the acceleration over a period of time.
22      Q.  Okay.  And it gives you an average measure
23  across a given test trip, correct?
24      A.  Correct.
25      Q.  So it leads to a single value for the

Page 293

1  entire test drive, correct?
2      A.  Right.
3      Q.  The calculation does not lead to a value
4  about how aggressive the driver was during any
5  given moment of the test drive, correct?
6      A.  Right.
7      Q.  And the calculation doesn't tell you how
8  often during the test drive a driver might have
9  been aggressive, correct?
10      A.  Well, it does because it's an average.  So
11  it does give you some information.  If it's driven
12  aggressively often, then the average will be high.
13      Q.  Correct, but it doesn't tell you how often
14  during a test drive the driver might have been
15  aggressive because it's just giving you an average
16  of the entire drive, correct?
17      A.  No.
18      MR. WOJTANOWICZ:  Object to the form.
19      THE WITNESS:  We use RPA consistent with how
20  it's been used by other researchers.
21  BY MR. BRODSKY:
22      Q.  That's not what I asked.  I'm asking about
23  the way RPA is measured because it's an average of
24  an entire trip.  It doesn't tell you how often
25  during that trip the driver might have been

Page 294

1  aggressive; isn't that right?
2      MR. WOJTANOWICZ:  Object to the form.
3      THE WITNESS:  It doesn't, however, my drivers
4  were instructed very carefully not to be aggressive
5  in their driving, and the traces are all presented,
6  the driving traces in the PowerPoint presentations
7  that defendants received, and I don't believe any
8  of them demonstrate any kind of aggressive driving.
9  So while yes, those numbers could have some
10  aggressive driving in them, a careful review of the
11  driving traces shows that that was not the case.
12      Every conceivable effort was made to not
13  drive aggressively, and the drivers were very
14  carefully instructed not to drive aggressively to
15  keep the results conservatively low.  So while yes,
16  it is true that you could have a low average number
17  that has periodic spikes that are high, if you
18  wanted to review the data to look at those spikes,
19  I think you would find in the data that there
20  weren't any.
21  BY MR. BRODSKY:
22      Q.  Have you done that?
23      A.  I did that when I went through each of the
24  data files.  So I can see -- in those PowerPoints,
25  you can see the vehicle trace through the entire

Page 295

1  segment of each segment that I analyze, and if I
2  saw an aggressive acceleration, I would flag it.
3      Q.  Okay.  So RPA isn't the only available
4  metric for evaluating aggressiveness in a test
5  drive, correct?
6      A.  I suppose there are other ways you could
7  look at it, but that's an accepted methodology that
8  was accepted by West Virginia University.  It's
9  also the accepted methodology for the Real Driving
10  Emissions test parameters in Europe.
11      Q.  Well, actually Europe has another metric
12  that's relied upon; isn't that correct?
13      A.  Right.
14      Q.  What's it called?
15      A.  It's the multiple of speed and RPA.
16      Q.  It's referred to as v*a(pos) at 95, isn't
17  it?
18      A.  It is, and in fact, if you look at the
19  plots of RPA, this is essentially what they're
20  looking at.  You're looking at the RPA at different
21  speeds.  So that number v*a(pos) yields the same
22  results of this plot, which is over a range of
23  speeds.  The range of RPAs is about the same as
24  what you see, for example, in this plot, the
25  FTP-75.

Page 296

1      So it does -- our methodology does
2  consider the speed and the RPA in the same way that
3  the RDE regulation considers the multiple.  It's
4  just two ways of looking at the same thing.
5      Q.  Let's -- let's get some of this on the
6  record.  So v*a(pos) at 95 calculates
7  aggressiveness using the 95th percentile speed of
8  positive acceleration for each second within a test
9  drive, correct?
10      A.  My understanding of v*a(pos) is that it's
11  the multiple of RPA and speed for a given time.
12      Q.  Well, it doesn't calculate the way RPA
13  does.  It doesn't calculate an average across the
14  entirety of the drive, correct?
15      A.  It's instantaneous.
16      Q.  So it allows you to analyze aggressiveness
17  at any given point in time during the drive,
18  correct?
19      A.  It does the same way that this plot that I
20  have here also does the same.
21      Q.  Okay.  And v*a(pos) at 95 allows you to
22  identify if a driver was very aggressive in some
23  parts of a drive, but less aggressive in other
24  parts, correct?
25      A.  As does this plot.

Page 297

1      Q.  And v*a(pos) at 95 allows you to compare
2  the aggressiveness during the same part of two
3  different test drives along the same route, right?
4      A.  Right, as does this plot.
5      Q.  And finally, v*a(pos) at 95 allows you to
6  assess whether aggressiveness at a given point of
7  time correlates to an emissions spike at that same
8  point in time, correct?
9      A.  Yes, as does this plot.
10      Q.  So I take it you didn't calculate v*a(pos)
11  at 95 for your various test drives; is that right?
12      A.  No.  We followed West Virginia
13  University's methodology, which was to look at
14  RPA --
15      Q.  You have the data --
16      A.  -- but we looked at RPA over various
17  speeds, which is what you see in Figure 8-2 and
18  Figure 8-3.
19      Q.  Okay, but you did have the data that would
20  have allowed you to calculate v*a(pos) at 95 if you
21  wished to?
22      A.  We do.
23      Q.  Now, it's true, is it not, that the
24  emissions measured by PEMS equipment can vary from
25  one drive to the next even involving the same

Page 298

1  vehicle?
2      A.  Just as with a dynamometer, yes.
3      Q.  And emissions measured by PEMS equipment
4  can be affected by many different variables,
5  correct?
6      A.  Just like a dynamometer, yes.
7      Q.  So I just want you to confirm that these
8  are among the variables that can affect the outcome
9  of a PEMS test, the grade of the road?
10      A.  Yes.  Yes.
11      Q.  The condition of the road surface, yes?
12      A.  To an extent.
13      Q.  How much the road curves, can that have an
14  effect on the PEMS result?
15      A.  To a very minor extent.
16      Q.  Weather conditions can affect the PEMS
17  test, correct?
18      A.  To the extent that they change the way the
19  vehicle is behaving, certainly.
20      Q.  Right.  So if it's very windy, that can
21  have an effect, correct?
22      A.  Right.
23      Q.  Ambient temperature at the time of the
24  test, that can have an effect?
25      A.  Yes.

Page 299

1      Q.   Barometric pressure can have an effect?
2      A.   At a given elevation, the changes in
3   barometric pressure are fairly negligible, but if
4   you're talking about bariatric pressure as a result
5   of going to a high elevation, I suppose that can
6   modify it.
7      Q.   Yes.  Whether it's sunny or rainy could
8   have an effect, correct?
9      A.   On the emissions results?
10     Q.   Yes.
11     A.   Very small.  I'm not sure what the effect
12  would be.
13     Q.   How about traffic conditions, that can
14  have an effect, correct?
15     A.   Certainly.
16     Q.   And I think we've already established that
17  the driver's behavior, driving style can have a
18  major effect on the PEMS result?
19     A.   Right.
20     MR. WOJTANOWICZ:  Object to the form.
21  BY MR. BRODSKY:
22     Q.   So all of the conditions that we've just
23  talked about cannot be exactly replicated from one
24  drive to another; isn't that true?
25     A.   And that's the reason we conduct so many

Page 300

1   tests in very similar conditions so that we can
2   show repeatability so we don't rely on any one test
3   in any given condition.  We do dozens of tests in
4   the same condition to approach an average of an
5   answer.  So that's how we deal with variability.
6      Q.   Right.  I understand that's how you deal
7   with it.  I was just asking you to confirm that
8   there are -- there is variability because of all
9   these parameters that can't be repeated from one
10  drive to another, and that's a true statement,
11  correct?
12     MR. WOJTANOWICZ:  Object to the form.
13     THE WITNESS:  There is varying degrees of
14  variability.  Some of the parameters that you
15  mentioned would have a negligible effect, and some
16  of them could have some effect.  It really depends
17  on the situation.
18  BY MR. BRODSKY:
19     Q.   Did you repeat any of your tests using the
20  same conditions?  Did you try to replicate your
21  tests using the same conditions?
22     A.   Absolutely, but we define same conditions
23  as, say, for example, vehicles on a flat road
24  traveling at 60 miles an hour with an ambient
25  temperature between 75 and 85 degrees Fahrenheit,

Page 301

1   and we ran several of those tests.
2      Q.   Did you perform a dyno test using your
3   PEMS equipment to verify the reliability of its
4   results?
5      A.   We did not.
6      Q.   Some of the articles that you cited and
7   relied upon, the studies, I should say, that you
8   cited and relied upon, did exactly that, correct?
9      A.   I'm not sure what --
10     Q.   Look at --
11     A.   There's a study that I referenced before.
12     Q.   Yeah.  If you look at tab 14, which is one
13  of the studies that you cite in your report and
14  turn to Page 2.
15     A.   Okay.
16     Q.   Do you see under work scope?  It's the
17  second bullet point.  The authors write following
18  PEMS-manufactured supported installation of their
19  system on the SCR vehicle, a correlation between
20  the on-board and the lab-based emissions
21  measurement systems was undertaken.
22     Did I read that correctly?
23     A.   Where are you in the document?
24     Q.   I'm on Page 2.  The heading is work scope,
25  and I just read the second bullet point.

Page 302

1      A.   Okay.  Yeah.
2      Q.   And then further on in the study on
3   Page 7, they go through the details of that
4   correlation test, correct?
5      A.   Yes.
6      Q.   So the people that ran this study used a
7   dynamometer to verify the accuracy and reliability
8   of their PEMS equipment, correct?
9      A.   Okay.
10     Q.   Is that true?
11     A.   It would appear so.  I believe they were
12  doing a comparison between the two.
13     Q.   And if you look at tab 15, which is the
14  West Virginia study that you've referenced several
15  times, and I'm going to ask you about Page 50.
16     A.   Uh-huh.
17     Q.   And you see --
18     MR. WOJTANOWICZ:  Can you hold on one second
19  please, David?  The exhibit is just getting up.
20     MR. BRODSKY:  Yeah.  Just let me know.
21     MR. WOJTANOWICZ:  Okay.  You said you're on
22  Page 50?
23     MR. BRODSKY:  Yes.
24     MR. WOJTANOWICZ:  Okay.  Thank you.
25

Page 303

1  BY MR. BRODSKY:
2      Q.  There the -- there were three vehicles
3  tested, and they took one of those vehicles and
4  hooked up their PEMS equipment to it, ran the PEMS
5  equipment on a dyno and compared the results to the
6  dyno results to verify the accuracy of their PEMS
7  equipment, correct?
8      A.  It looks like it.
9      Q.  Were there any issues with your PEMS
10  equipment during the testing other than you talked
11  about the condensation issue, but then you said you
12  didn't think that dealt with the Cruze.  So
13  focusing on the PEMS equipment that you used during
14  the testing on the Cruze, were there any issues
15  that arose during your testing?
16      A.  Other than normal maintenance, no.
17      Q.  If the PEMS weather probe measured above
18  60 degrees centigrade at any point, would you
19  question that temperature result?
20      A.  If the PEMS weather probe was well above
21  what I believe to be the ambient temperature at the
22  time, I would.
23      Q.  And did that ever happen?
24      A.  Not that I'm aware of.
25      Q.  Did your team monitor for diagnostic

Page 304

1  trouble codes during the PEMS testing?
2      A.  They monitored for a malfunction indicator
3  lamp, the check engine light coming on.
4      Q.  Okay.  I think I asked you this yesterday,
5  but if I did, I apologize.  You know that DTC codes
6  can come on even without the MIL light lighting up,
7  correct?
8      A.  I think our assumption, which, I believe,
9  I hope, was a reasonable engineering assumption is
10  that, you know, this car is designed to meet the
11  emissions standards up to 150,000 miles.  We
12  followed practices very similar to what, for
13  example, is in the Code of Federal Regulations for
14  in-use testing where they simply require
15  manufacturers to ensure that maintenance was
16  performed and that one scan of the OBD is run
17  before the test is run.
18          I think the notion that the vehicle's
19  emission control systems are so frail that they
20  need to be constantly checked over the period of an
21  8,000-mile test when the car is only 16,000 miles
22  old, in our engineering judgment, just seemed
23  unusual and unlikely.  So we felt it was sufficient
24  and perfectly justifiable in our engineering
25  experience to check for fault codes once and wait

Page 305

1  for the MIL to come on if there's an indication of
2  any other issue.
3      Q.  And again, the one time that you checked
4  for fault codes was when?
5      A.  We checked for fault codes when we
6  received the vehicle and then again when the MIL
7  came on during the time of the dyno testing and
8  then when the MIL came on for the fault right
9  before the inspection.
10      Q.  Okay.  And yesterday you referred to some
11  time zone or time signature problems on the
12  equipment.  Did you record the actual time of the
13  PEMS tests at all given that the time signature
14  wasn't right?  Is there some way?
15      A.  If we cared about the exact time that the
16  test started, which I haven't found a reason to use
17  it yet, we could figure out what the offset is and
18  manually change all of those date entries.  We know
19  what the offset is, but the time --
20      Q.  What is the offset?
21      A.  I'd have to go back and ask the
22  manufacturer what the offset is, but those numbers
23  could be adjusted if we wanted to.  I haven't found
24  a reason to care too much about the time that the
25  test started.

Page 306

1      Q.  So other than applying some offset that
2  you're given from the manufacturer, you don't have
3  any other independent record of the time that the
4  tests were conducted?
5      A.  Good question.  I don't think so, but
6  again, those times can be adjusted, and we have the
7  record.
8      MR. WOJTANOWICZ:  David, we've been going for
9  about an hour.  Can we take a short break, please?
10      MR. BRODSKY:  Absolutely.  How long do you
11  need?
12      MR. WOJTANOWICZ:  I think five minutes would be
13  good.
14      MR. BRODSKY:  Okay.
15      THE VIDEOGRAPHER:  Going off the video record.
16  The time is now 17:03 UTC.
17          (Whereupon, a short break was
18          taken.)
19      THE VIDEOGRAPHER:  We are back on the video
20  record.  The time is now 17:11 UTC.  Go ahead.
21  BY MR. BRODSKY:
22      Q.  Mr. Smithers, yesterday there was some
23  testimony about the placement of your temperature
24  probe and how relevant the temperature readings
25  were given that placement.  Do you remember that --

Page 307

1    **A.**  I do.
2    **Q.**  -- discussion?
3         Did you account for any potential
4    differences between the ambient air temperature at
5    the height of your probe and the ambient air
6    temperature at the height of the intake grill?
7    **A.**  No, because the goal -- as I stated
8    yesterday, the goal of the environmental
9    temperature is to try to capture the true
10   environmental temperature, and far away from the
11   road is the place you would want to do that.
12   **Q.**  And just a couple of follow-ups from the
13   testimony that you gave earlier today about
14   conditions of PEMS testing.  Did you document
15   whether any given PEMS test was conducted in sunny
16   conditions?
17   **A.**  Generally speaking, we did not.
18   **Q.**  Did you document whether any given PEMS
19   test was conducted in cloudy conditions?
20   **A.**  No.  We looked at the temperature alone.
21   **Q.**  And you didn't document whether any given
22   PEMS test was conducted in windy conditions, did
23   you?
24   **A.**  No.
25   **Q.**  And did you account for any potential

Page 308

1    differences between your PEMS measurements on
2    cloudy days versus sunny days?
3    **A.**  We did not.
4    **Q.**  Did you account for any potential
5    differences between measurements when it was windy
6    versus when it was still?
7    **A.**  We believed that running tests in a lot of
8    different directions on a lot of different days,
9    that the effects of wind would average themselves
10   out.  And that's consistent, in fact, with how a
11   coast down, for example, would be performed to
12   develop a road load model for a vehicle.
13   **Q.**  Okay.  So the answer is you didn't account
14   for any potential differences between windy and
15   still days for the reason you just said, correct?
16   **A.**  I believe my answer was a little
17   different.  I believe that yes, we accounted for
18   the fact that you have variability in wind by
19   running, one, a large variety of tests in different
20   directions to cancel out the effects of the wind,
21   which is, in fact, the same procedure that's used
22   to develop a road load model for a coast down.
23   **Q.**  Got it.  Thank you.
24        I'd like to direct your attention to an
25   exhibit that was marked yesterday.  It is

Page 309

1    Exhibit 23.  It's the list of your PEMS testing
2    files.
3    **A.**  Okay.
4    **Q.**  So there are 60 data files here, and from
5    those 60 data files, you generated 681 test
6    segments, correct?
7    **A.**  I don't recall the number of segments off
8    the top of my head, but that seems reasonable.
9    **Q.**  Why don't we just refer to your report
10   just so you can be satisfied that that's the right
11   number.  If you look at Page 30 of your report,
12   you'll see that you tested the Cruze in city
13   conditions over 1,825 miles, and that produced 278
14   segments; is that right?
15   **A.**  Yeah.
16   **Q.**  And then on Page 32, you report that you
17   tested the Cruze over 6,236 highway driving miles,
18   and that produced 403 segments, correct?
19   **A.**  Yeah.
20   **Q.**  So 403 plus 278 is 681, correct?
21   **A.**  Yeah.
22   **Q.**  Okay.  So if we can agree that you had
23   reported 681 segments, correct?
24   **A.**  Yes.
25   **Q.**  Now, those segments that you created are

Page 310

1    not of equal length, are they?
2    **A.**  In some cases, they are.  In some cases,
3    they aren't.
4    **Q.**  Nowhere in your report did you describe
5    what methodology you used for deciding when one
6    test segment ends and another test segment starts;
7    is that right?
8    **A.**  I believe we described -- let's think.  I
9    don't know that we said explicitly, but the
10   segments were divided up so that when a change in
11   condition would come, that would generate a new
12   segment.  So for example, if the vehicle hit a road
13   grade, it accounts for speed that would represent a
14   new segment, and so the data was analyzed as a
15   separate segment.
16   **Q.**  Is there anything in your report that
17   explains when one segment starts and another one --
18   when one segment ends and another one starts?
19   **A.**  I believe in the report, it describes the
20   segments being broken up into data with similar
21   characteristics.
22   **Q.**  Can you point me to that?
23   **A.**  So for example, a number of my analyses
24   will say exactly what segments were included in the
25   analysis.

Page 311

1     Q. Okay, but there's nowhere -- unless I
2  missed it, there's nowhere in your report where you
3  describe what the methodology was that you used for
4  starting a segment or ending a segment?
5     A. No. A segment is just simply a set of
6  conditions where, you know, things are not
7  changing. The speed profile is not changing. The
8  RPA is not changing, etcetera.
9     Q. Do you have a written description of the
10 methodology that you used for deciding when one
11 segment ends, another one starts?
12    A. I used my engineering judgment based on
13 when the conditions would change. So each of those
14 PowerPoint files, for example, you can see when you
15 go from one PowerPoint slide to the next, for
16 example, you might see speed change, or you might
17 see the introduction of a road grade. So if any of
18 those variables change, I would create a new file.
19 So I didn't feel like I needed written instructions
20 for something that was merely to me intuitive.
21    Q. Okay. So in other words, there is no
22 written description of the methodology, correct?
23    A. Correct.
24    Q. You said that you used your engineering
25 judgment to decide when to start a segment or end a

Page 312

1  segment. Were you also given instructions by
2  plaintiffs' counsel in that regard?
3     A. No.
4     Q. When you decided and applied your
5  engineering judgment as to when a segment would
6  start and when it would stop, you, obviously, had
7  all the data from the test drives in front of you,
8  correct?
9     MR. WOJTANOWICZ: Object to the form.
10    THE WITNESS: I just went along file by file
11 and would divide things up. So you know, for
12 example, I would see variable speed. I would have
13 that as a variable speed segment on a flat road.
14 If I saw that then the condition changed to
15 variable speed on a hill, that would be a new
16 segment. If the segment then changed or the data
17 then changed to a steady speed at 60 miles an hour
18 on a flat road, that would represent a new segment.
19 If that flat road then became a hill, that would
20 represent a new segment.
21    And the point is that we can then analyze
22 the data for segments that share common features,
23 which is a more sophisticated way of looking at the
24 data than some of the studies that preceded what we
25 did where they simply would drive the vehicle on a

Page 313

1  route.
2     Q. And when you were dividing these tests up
3  into segments, you had the NOx emission results,
4  correct?
5     MR. WOJTANOWICZ: Object to the form.
6     THE WITNESS: I would -- I would get a NOx
7  emission result for a particular segment, yes.
8  BY MR. BRODSKY:
9     Q. But even before you divided the trip up
10 into segments, you had the NOx emission results
11 from the entire trip, correct?
12    A. Correct. And so one thing that's also
13 important to consider is that every segment that
14 was driven on this vehicle and tested with PEMS is

Page 315



19   **Q.**  It's not your position that modeling
20   environmental temperature is inherently unreliable
21   or improper, is it?
22   **A.**  No.  Modeling -- a proper temperature
23   model could be a useful tool.
24   **Q.**  And it's not your position that hardware
25   sensors are inherently more reliable than model

Page 316

1   temperatures, is it?
2   **A.**  I would say a hardware sensor properly
3   located generally would be more accurate than a
4   model depending on how it's set up.
5   **Q.**  What's -- what's your basis for that
6   statement?
7   **A.**  Years of experience using sensors.
8   Generally speaking, you'd like to avoid using a
9   model if you can and measure the variable that
10   you're interested in.  Modeling only comes in when
11   you can't measure the variable that you're
12   interested in.
13   **Q.**  Do you have any more concrete backup for
14   that claim other than just saying your years of
15   experience?
16   **A.**  I'm not sure how much more concrete I can
17   make it.  I've been trained in the design of
18   chemical facilities and reactors and have, for
19   example, come up with my own models of -- for
20   example, in our design of our hydrocarbon SCR
21   system at my old company, Cleaire, we wanted to
22   know the internal temperature of the SCR system.
23       So the SCR system was comprised of two
24   bricks in a can.  And in order to design the
25   system, we wanted to know what is the internal

Page 317

1   temperature of the catalyst for purposes of proper
2   injection of the hydrocarbon over the surface of
3   the catalyst.
4       The preferred method would have been to
5   drill a hole in the side of the casing of the
6   system and run a thermal couple into that catalyst
7   brick.  However, because of hardware limitations,
8   that wasn't practical, and so instead, we developed
9   a temperature model to interpolate the temperature
10   between the measured inlet and measured outlet
11   temperature of the catalyst head.
12       And so generally speaking, again, a direct
13   measurement, of course, with a piece of equipment
14   that's reliably measuring the thing directly is
15   more desirable than a modeled temperature.
16   **Q.**  So you claim that the Cruze's
17   environmental temperature model results in readings
18   that are 4 and a half degrees Fahrenheit higher
19   than your PEMS temperature measurement in city
20   driving and 2.9 degrees Fahrenheit higher in
21   highway driving; is that correct?  That's at
22   Page 91 of your report.
23   **A.**  Yeah.  That's what we measured.
24   **Q.**  And you've already said that model
25   environmental temperature isn't inherently

Page 318

1   unreliable.  So you accept that some margin between
2   the actual ambient temperature and the model
3   temperature is to be expected, correct?
4       MR. WOJTANOWICZ:  Object to the form.
5       THE WITNESS:  That's a mischaracterization of
6   testimony.  I didn't say that a model temperature
7   is unreliable.  I said that generally direct
8   measurement is more reliable.  That doesn't mean
9   the model is inherently reliable.  So I believe
10   that misstates what I said.
11       And furthermore, if you look at the
12   temperature of the gasoline Cruze, they're able to
13   accurately measure the ambient temperature in that
14   vehicle.  So clearly, it's within GM's capability
15   to obtain a proper environmental temperature.
16   BY MR. BRODSKY:
17   **Q.**  The procedure for the SC03 test is
18   conducted at 95 degrees Fahrenheit, correct?
19   **A.**  Correct.
20   **Q.**  And the regulations allow for a margin of
21   more than 5 percent -- I'm sorry, 5 degrees
22   Fahrenheit for the testing environment, correct?
23   **A.**  Okay.
24   **Q.**  Do you know that to be true?
25   **A.**  I don't believe it's that high, but I



Page 319

1  would have to go look at the regs.
2      **Q.**  Would you like me to show you the regs?
3      **A.**  I'll take it for -- take your word for the
4  moment.
5      **Q.**  Okay.  I think the wording of the regs is
6  the ambient temperature is 35 degrees Celsius plus
7  or minus 3 degrees Celsius.  So I was using the
8  Fahrenheit version to say 5 degrees or so.
9      **A.**  Okay.
10     **Q.**  So the SC03 procedure acknowledges that
11 the exact temperature measurements and conditions
12 aren't always attainable, correct?
13     MR. WOJTANOWICZ:  Object to the form.
14     THE WITNESS:  I would say that they give you a
15 margin around which to hit the target temperature.

Page 321

3  BY MR. BRODSKY:
4      **Q.**  I'm not talking about a particular case.
5  I'm talking about just the fact that NOx emissions
6  could be higher above 95 degrees.  Is that in and
7  of itself evidence of a defeat device?
8      MR. WOJTANOWICZ:  Asked and answered.
9      THE WITNESS:  I believe the regulators would
10 consider high NOx emissions at that level
11 potentially a defeat device.
12 BY MR. BRODSKY:
13     **Q.**  Really?  In and of itself just having NOx
14 emissions higher at that temperature, in and of
15 itself, is a defeat device?
16     **A.**  It could potentially be.  Again, the
17 context is important.  You can't answer that
18 question without context.
19     **Q.**  Okay.
20     **A.**  That's why I say in the context of this
21 case, which is the only important context,
22 operation above 95 degrees Fahrenheit is the result
23 of a defeat device.
24     **Q.**  And you would agree that soot and
25 particulate matter can negatively affect engine

Page 323

1    performance as a general matter?
2        **A.**  Be more specific with your question.
3        **Q.**  If the engine generates soot and
4    particulate matter, that can negatively affect its
5    performance?
6        MR. WOJTANOWICZ:  Object to the form.
7        THE WITNESS:  All engines generate soot and
8    particulate matter, and it doesn't necessarily
9    impact their performance.
10   BY MR. BRODSKY:
11       **Q.**  But soot and particulate matter can affect
12   a diesel engine's performance, correct?
13       **A.**  All --
14       MR. WOJTANOWICZ:  Object to the form.
15       THE WITNESS:  -- diesel engines generate soot
16   and particulate matter without an effect to their
17   performance.  They can, but I would need more
18   context with the question.  What are you asking
19   specifically?
20   BY MR. BRODSKY:
21       **Q.**  I'm asking is it the case that soot and
22   particulate matter can negatively affect the
23   engine's performance?
24       MR. WOJTANOWICZ:  Object to the form.
25       THE WITNESS:  And without any concrete

Page 324

1    examples, I suppose yes, in theory, they can.



Page 325

21   BY MR. BRODSKY:
22       **Q.**  So do you claim that the EPA requires
23   emissions controls to be as effective for
24   controlling NOx at ambient temperatures above
25   100 degrees Fahrenheit as they would at lower



Page 327

1  temperatures?
2    A.  That's their stated policy

17  BY MR. BRODSKY:
18    Q.  What -- what's the standard for NOx under
19  the FTP test?
20    A.  In this case, 70 milligrams per mile at
21  full useful life.
22    Q.  Okay.  What's the standard under the SC03
23  test?
24    A.  I don't recall off the top of my head.
25    Q.  It's about double 70, isn't it?

Page 329

1    A.  I don't recall off the top of my head.
2    Q.  It's more than the FTP standard, isn't it?
3    A.  I believe it is.
4    Q.  Isn't it true that regulators don't expect
5  cars to perform the same under non-FTP standards
6  than they do under FTP standards?
7    MR. WOJTANOWICZ:  Object to the form.
8  BY MR. BRODSKY:
9    Q.  They're different standards for different
10  tests.  Doesn't that tell you that regulators
11  expect vehicles to perform differently under
12  non-FTP standards than they do under FTP standards?
13    A.  I guess I'm not understanding your
14  question.  It's a little bit vague.
15    Q.  It's pretty clear that you're not
16  understanding my question.  Let me say it one more
17  time.
18    MR. WOJTANOWICZ:  Objection.  You don't need to
19  add commentary to the questions here.  You're
20  entitled to ask him questions.
21  BY MR. BRODSKY:
22    Q.  Isn't it the case that regulators don't
23  require vehicles to perform the same under non-FTP
24  standards or under non-FTP conditions as they do
25  under FTP conditions?

Page 330

1    A.  So the regulators have come up with a
2  variety of test -- dynamometer test schedules as
3  you alluded to, and I believe the expectation is
4  that when the vehicle is operating in conditions
5  substantially similar to that particular test, that
6  the emissions would be on road indicative of what
7  you saw on that particular test.
8    Q.  And when the conditions are different, the
9  expectation is that the emissions are going to be
10  different, correct?
11    A.  Correct.
12    MR. WOJTANOWICZ:  Object to the form.

JUSTON SMITHERS Volume II          Highly Confidential                    May 21, 2020



| Page 335 | Page 337 |
| --- | --- |



Page 339



JUSTON  SMITHERS Volume II          Highly Confidential                    May 21, 2020

Page 343                                          Page 345





Page 347

Page 349

23     MR. WOJTANOWICZ:  We've been going about an
24  hour.
25

Page 350

1  BY MR. BRODSKY:
2     Q.   You also did an after --
3     MR. BRODSKY:  I'm just getting to the good
4  part.  Okay.  We'll take a break.
5     MR. WOJTANOWICZ:  I'm just trying to get -- two
6  things.  One, it's about an hour, and two, we'll
7  see if we can adjust Juston's low bandwidth issue
8  or at least try troubleshoot that because I think
9  we've got a lag happening here.  Can we take
10  10 minutes here to give us time to see if we can --
11     MR. BRODSKY:  Okay.  Why don't we -- we'll take
12  a 10-minute break then.
13     MR. WOJTANOWICZ:  Is it okay if we take
14  10 minutes then?
15     MR. BRODSKY:  Yeah.  Yeah.
16     THE VIDEOGRAPHER:  We're going off the video
17  record.  The time is now 18:12 UTC.
18            (Whereupon, a short break was
19             taken.)
20     THE VIDEOGRAPHER:  We are back on the video
21  record.  The time is now 18:23 UTC.  Go ahead.
22  BY MR. BRODSKY:
23     Q.   Okay.  Mr. Smithers, we had talked earlier
24  about the calculation you did of average engine-out
25  NOx mass flow.  You also did a calculation of the

Page 351

1   car's SCR conversion efficiency, correct?
2       A.  Correct.
3       Q.  Okay.  You waited for a long time there.
4   I thought maybe the lag had returned.  Can you hear
5   me?
6       A.  I answered right away.
7       Q.  I think the lag is back.  Let's keep
8   going, but --
9       A.  I'll dial in with the mobile.
10      THE VIDEOGRAPHER:  Do you want to go off the
11  video record?
12      MR. BRODSKY:  Let's go off the record for a
13  second.
14      THE VIDEOGRAPHER:  Going off the video record.
15  The time is now 18:24 UTC.
16          (Whereupon, a short break was
17          taken.)
18      THE VIDEOGRAPHER:  We are back on the video
19  record.  The time is now 18:27 UTC.  Go ahead.
20  BY MR. BRODSKY:
21      Q.  Mr. Smithers, we had previously talked
22  about your calculation of engine-out NOx mass flow.
23  You also did an after-the-fact calculation of the
24  car's SCR conversion efficiency, correct?
25      A.  Yes.

Page 352

1       Q.  And you took your calculated upstream NOx
2   mass flow measured over a specific distance and
3   compared it to the downstream NOx value measured by
4   your PEMS machine over that same distance, correct?
5       A.  Correct.
6       Q.  And I want to turn you to paragraph 199
7   and Figure 10-33 of your report.  It's on Page 81.
8   And those summarize the SCR efficiency calculation
9   that you did for your city driving tests, correct?
10      A.  Paragraph 199?
11      Q.  Paragraph 199 and Figure 10-33.
12      A.  Yes.
13      Q.  Okay.  And in reporting those results, you
14  filtered out active regenerations, hot starts and
15  cold starts, correct?
16      A.  Right.
17      Q.  Did you filter out anything else?
18      A.  No.  Hot starts, cold starts and active
19  regions tend to drive the emissions up.
20      Q.  You didn't filter out tests with extremely
21  high ambient temperatures or extremely low ambient
22  temperatures?
23      A.  I don't believe I did in these plots.
24      Q.  And you didn't filter out tests with steep
25  road grades?

Page 353

1       A.  I don't believe we did in this test or in
2   this data set.
3       Q.  How would your results change if you
4   filtered out tests with ambient temperatures
5   outside the FTP range?
6       MR. WOJTANOWICZ:  Object to the form.
7       THE WITNESS:  I would have to rerun the
8   analysis.

22      Q.  In paragraph 200 and Figure 10-35 is
23  similar in that it shows the SCR efficiency
24  calculations that you did during your highway
25  tests, correct?

Page 354

1       A.  Correct.
2       Q.  And there you filtered out active
3   regenerations?
4       A.  I believe we did.
5       Q.  And this time for this paragraph in this
6   figure, you did not filter out hot starts or cold
7   starts, correct?
8       A.  I don't believe there were any.  I think
9   that's why we didn't filter them out.
10      Q.  You didn't filter out tests with extremely
11  high ambient temperatures or extremely low ambient
12  temperatures?
13      A.  We did not.
14      Q.  And you didn't filter out any results with
15  steep road grades?
16      A.  I don't believe we did.
17      Q.  How would your results change if you
18  filtered out tests with ambient temperatures
19  outside the HWFET range?
20      A.  I'd have to rerun the analysis.
21      MR. WOJTANOWICZ:  Object to the form.
22      THE WITNESS:  The point of these plots is to
23  show the relative commonness of high SCR
24  efficiency, SCR efficiency above, say, 90 percent.
25  So --



**Page 355**

1  BY MR. BRODSKY:
2    **Q.** So paragraph 199, which is the city
3  driving paragraph, refers to your calculated
4  conversion efficiency during city driving and says
5  that 41 percent of the tests had conversion
6  efficiencies of less than 80 percent. Do you see
7  that?
8    **A.** Right. Yeah.
9    **Q.** What -- what constitutes a test?
10   **A.** A segment in that case.

**Page 357**

8    **Q.** You do concede that the temperature of a
9  catalyst greatly affects its conversion efficiency?
10   **A.** To a point.
11   **Q.** On Page 15 of your report, you included a
12 graph --
13   **A.** Yes.
14   **Q.** -- that shows the relationship between
15 exhaust inlet temperature and NOx conversion
16 efficiency, correct?
17   **A.** I did.
18   **Q.** And this graph shows three different kinds
19 of catalysts?
20   **A.** Yeah.
21   **Q.** And the Cruze has a copper Z-like
22 catalyst, correct?
23   **A.** It does.
24   **Q.** So meaning that -- that's the blue line in
25 this chart, correct?

**Page 358**

1    **A.** Right. Yep.
2    **Q.** Okay. So your summary of city driving
3  data, and it's at Page 81 if you want to refer to
4  it, but your summary says that 84 percent of your
5  tests showed inlet temperatures to the SCR of
6  between 200 and 350 degrees Celsius, correct?
7    **A.** Right.
8    **Q.** And expected efficiencies for a copper
9  Z-like catalyst varies significantly in that
10 temperature range, don't they?
11   **A.** I'd like to point you to the last page of
12 my report, Page 132, where we studied the effect of
13 SCR temperature on the SCR conversion efficiency.
14   **Q.** Hang on one second.
15   MR. WOJTANOWICZ: What page did you say? I'm
16 sorry.
17   THE WITNESS: 132 of my expert report. You'll
18 see a plot that we ran during testing on the FTP.
19 This is the inlet temperature of the SCR, and the
20 circled area is the area of concern. In that area,
21 the average temperature was 196.1 Celsius, and the
22 average NOx reduction was 94.5 percent showing that
23 this catalyst is capable of very high conversion
24 efficiencies at temperatures of 196.1 and above.
25



Page 359

```
 1   BY MR. BRODSKY:
 2      Q.   So what's the relevance of the chart on
 3   Page 15 of your report, which shows that a copper
 4   Z-like catalyst at 200 degrees Celsius could have a
 5   conversion efficiency as low as 75 percent?
 6      A.   It was general informational to show that
 7   this is the general window where these catalysts
 8   are active, and it wasn't meant to be -- most of
 9   this section is background section.  It wasn't
10   meant to be interpreted as exactly specific to this
11   vehicle, but we did consider that, and that's why
12   we ran the test.  So above 196 degrees, we expect a
```

Page 361

Page 362



Page 363

Page 365

| Page 367 | Page 369 |
|----------|----------|





Page 375                                     Page 377



| Page 379 | Page 381 |
| --- | --- |



Page 383

Page 385



Page 387                                    Page 389

Page 391

Page 393



Page 395



14     **Q.**  I want to go back to something you said
15  earlier.  I think it was today.  You said that your
16  drivers received PEMS training directly from the
17  manufacturer; is that right?
18     **A.**  Right.
19     **Q.**  When was that PEMS training?
20     **A.**  Bill received training when we got the
21  unit, and that lasted a few days with one of their
22  engineers.  And then when we hired Max and Thomas,
23  they also received training from Sensors, Inc., and
24  I don't recall that date.
25     **Q.**  And that was in-person training?

Page 397

1     **A.**  It was.
2     **Q.**  I think you said someone flew in on both
3  occasions?
4     **A.**  Yes.
5     **Q.**  And were there any written
6  memorializations of that training?
7     **A.**  We went through the written documentation
8  of the procedures that Sensors goes through to
9  operate their PEMS system.  So we followed their
10  written procedures.
11     **Q.**  But is there anything memorializing that
12  that training occurred?
13     **A.**  I'm sure we could go back and look at
14  receipts and things like that or calendar events if
15  we really doubted that that took place.
16     **Q.**  We do want you to do that.  We're entitled
17  to that.
18     **A.**  Okay.
19     **Q.**  Were there any written notes of that event
20  or any of those events of the training sessions?
21     **A.**  I would have to go and ask those guys for
22  whatever notes they took.
23     **Q.**  Were there e-mails setting up the training
24  sessions?
25     **A.**  Potentially.

Page 398

1     **Q.**  We request all of that material, all the
2  material surrounding these supposed training
3  sessions.
4         Once the sessions occurred, what did you
5  do to ensure that the PEMS equipment was actually
6  used properly?
7     **A.**  They followed the procedures in the PEMS
8  document, and there was a set of QA/QC data that's
9  stored in the PEMS equipment before and after
10  operation so you can validate that the test was run
11  properly.  We also maintained the equipment per the
12  manufacturer's schedule.  We maintained the roughly
13  monthly 10-point calibrations, which I believe
14  you've been supplied with, calibrated with gases
15  that were according to the spec.
16         Our 10-point gas divider was calibrated
17  according to the spec on the -- at the frequency
18  recommended by the manufacturer.  The PEMS units
19  themselves were calibrated on a semiannual basis, I
20  believe, or, perhaps, annual basis, whatever the
21  manufacturer spec is.  The Sensor's weather probe
22  is calibrated on an either semiannual or annual
23  basis.  The exhaust flow meters are calibrated on a
24  semiannual basis.
25         So these units are all checked to ensure

Page 399

1  they are compliant and accurate. And then we
2  follow the procedures in Sensor's manual to make
3  sure we run the test properly. And the data that
4  validates whether the test was run properly is
5  stored with the file when we generate a test file.
6      Q.  And do you create a record documenting the
7  calibrations when they're done?
8      A.  It's created electronically when you run a
9  calibration.
10     Q.  And that data is still available?
11     A.  That data has been produced to you.
12     Q.  When -- when you first were told or maybe
13  I ask it this way.
14         When were you first told that you were
15  under an obligation to collect documents for
16  production in this case?
17     A.  Good question. A couple years ago maybe.
18     Q.  And were you also told you were under an
19  obligation to retain documents?
20     A.  I don't remember specifically, but I don't
21  really get rid of documents other than scratch
22  pieces of paper that we get rid of in the ordinary
23  course of business.
24     Q.  So did you get rid of scratch pieces of
25  paper that were relevant to the Cruze test?

Page 400

1      MR. WOJTANOWICZ: Object to the form.
2      THE WITNESS: Might be a back-of-the-envelope
3  calculation on something that later ends up in a
4  spreadsheet and throw away the scratch piece of
5  paper that I had the idea on. That's consistent
6  with the company's document retention policy.
7  BY MR. BRODSKY:
8      Q.  Does it have a document retention policy
9  when you're engaged in litigation that's separate
10  from its normal policy?
11     A.  Good question. We tend to hold onto just
12  about everything, so -- unless it's truly just kind
13  of a hey, I've got an idea, I'm going to scratch it
14  out on a piece of paper, does it make any sense,
15  no, chuck it, or yeah, I'm going to do something
16  with this. All right. Then I'll probably start
17  working in Excel and memorialize it and then throw
18  the scratch piece of paper away.
19         When we take handwritten notes, it's
20  usually just items that you need to get done in
21  each day, and those are -- those are -- you throw
22  those away on a regular basis just because there's
23  nothing substantive in there.
24     Q.  So what did you do to collect the
25  documents that you were told you needed to collect

Page 401

1  for production in this case?
2      A.  I asked everyone for their handwritten
3  notes. There weren't many just because just about
4  everyone in this environment works in computers.
5  Data entry is in a computer. Notes are in
6  computer. I take notes in computers now. I don't
7  even handwrite notes hardly at all anymore.
8  Everything is kept in a common location so it's
9  fairly easy to find documents that are related to
10  any particular case.
11     Q.  And who is it that you asked to collect
12  documents from?
13     A.  My staff.
14     Q.  Who in particular?
15     A.  Anyone I thought would have documents. So
16  it would have been Brad, Max, Thomas, potentially
17  Martin.
18     Q.  Okay. And then you collected all those
19  documents physically and then turned them over to
20  counsel for the plaintiffs?
21     A.  Well, most of them were electronic, and if
22  they weren't electronic, they were scanned. So
23  they were handed over in the scanned form.
24     Q.  And who did that work?
25     A.  Who did what work?

Page 402

1      Q.  The collection, physical collection and
2  the scanning.
3      A.  All of us did.
4      MR. BRODSKY: All right. Thank you,
5  Mr. Smithers. I'm going to hand you over to
6  Ms. Smith at this point.
7      THE WITNESS: Okay.
8      MS. SMITH: You know what, can we go off the
9  record for five minutes?
10     MR. WOJTANOWICZ: Sure.
11     THE VIDEOGRAPHER: Going off the video record.
12  The time is now 20:18 UTC.
13         (Whereupon, a short break was
14         taken.)
15     THE VIDEOGRAPHER: We are back on the video
16  record. The time is now 20:26 UTC. Go ahead.
17         FURTHER EXAMINATION
18  BY MS. SMITH:
19     Q.  Good afternoon, Mr. Smithers. Renee Smith
20  on behalf of General Motors LLC again, and I just
21  have a few follow-up questions for you.
22     A.  That's good.
23     Q.  You are not opining that gasoline vehicles
24  and diesel vehicles should have the same NOx
25  emissions, correct?

Page 403

1     MR. WOJTANOWICZ:  Renee, hold on.  The audio is
2  pretty bad, Renee.  I don't know if there's
3  something you can do.
4     THE VIDEOGRAPHER:  Do you want to go off the
5  video?
6     MR. BERMAN:  Let's go off video a second.
7     THE VIDEOGRAPHER:  Going off the video record.
8  The time is 20:27.
9            (Whereupon, a short break was
10            taken.)
11    THE VIDEOGRAPHER:  Back on the video record.
12  The time is now 20:31 UTC.  Go ahead.
13  BY MS. SMITH:
14    Q.  Good afternoon, Mr. Smithers.  Sorry for
15  the interruption.
16       Are you testifying that the Cruze diesel
17  should have the same NOx emissions as the Cruze
18  gasoline vehicle?
19    A.  I think that there's two parts to that
20  answer.  The first part is, and maybe you guys are
21  getting tired of me referencing this section, but
22  I'll go to paragraph 251 of my report.  And again,
23  I think this guidance is useful because it's been
24  around since the '70s.  As early as 1972, EPA
25  states that it is the intent of the Clean Air Act

Page 404

1  that the vehicles designed -- I'm sorry.  Vehicles
2  be designed, built and equipped so that when
3  they're being used by the motoring public,
4  emissions will be reduced to the extent indicated
5  by the prescribed standards during the period of
6  their useful life.  So when they're being used by
7  the motoring public, emissions will be reduced to
8  the extent indicated by the prescribed standards.
9       So in this case, the Cruze diesel is
10  certified to a Tier 2 Bin 5 standard, which is
11  slightly higher than the Tier 2 Bin 4 standard of
12  the Cruze gasoline.  They're very close.  So based
13  on those two facts and EPA's policy, I would
14  testify that yes, I would expect the emissions
15  performance of those vehicles to be true to the
16  standards to which they were certified.
17    Q.  There are several things in there.  You
18  testified that it should be true to the prescribed
19  standards, right?
20    A.  Right.
21    Q.  Okay.  And prescribed standards for the
22  Chevy Cruze diesel vehicle at that time was Tier 2
23  Bin 5, correct?
24    A.  Correct.
25    Q.  And that meant that on the FTP

Page 405

1  certification cycle, the NOx emissions standard was
2  70 milligrams per mile, correct?
3    A.  Correct.
4    Q.  And the prescribed standard for the
5  gasoline Cruze at the time was Tier 2 Bin 4,
6  correct?
7    A.  Yep.
8    Q.  And that meant that the NOx emissions on
9  the FTP certification cycle would be no higher than
10  40 milligrams per mile, correct?
11    A.  Correct.
12    Q.  One second.  I'm doing a calculation here.
13  The standard for the Cruze diesel was not slightly
14  higher in terms of NOx emissions than the gasoline
15  vehicle, was it?
16    A.  In the context --
17    MR. WOJTANOWICZ:  Object to the form.
18    THE WITNESS:  -- of the emissions that we
19  measured, I'm sorry to say that it is.
20  BY MS. SMITH:
21    Q.  I'm sorry.  I'm asking you if the standard
22  for NOx emissions for the diesel vehicle was
23  slightly higher than the gas vehicle?  Is that what
24  you're testifying that that's slightly higher?
25    A.  Yeah.  So in the context of the emissions

Page 406

1  that we're talking about, I do believe that is only
2  a slight increase.
3    Q.  You believe that 40 versus 70 is only a
4  slight increase?
5    A.  Given that the --
6    Q.  That's all I want to know.  I just want to
7  know is that -- is that -- you're testifying that a
8  70-milligram-per-mile differentiation over 40
9  milligrams per mile is just slightly higher?
10  That's what you're going to --
11    MR. WOJTANOWICZ:  Renee, he was -- Renee,
12  please don't interrupt the witness.  He was about
13  to answer the question.
14  BY MS. SMITH:
15    Q.  Do you want to hear my question again?  I
16  didn't mean to interrupt you.
17    A.  No.  I think -- yeah, I get your point.
18  It's 30 milligrams higher.  It's 75 percent higher
19  than 40, and you could look at it that way that
20  it's a much higher standard.  However, when you
21  look at the emissions that you get in the Cruze
22  diesel, on average, the emissions from the Cruze
23  diesel in city conditions is 4.1 times that
24  standard.
25       Let me find the number so I don't

Page 407

1  misspeak.  The average is 288, and for the
2  gasoline, it's 16.  In highway conditions, the
3  average is 220, and for the gasoline, it's 3.  So
4  the difference between the standards in this case
5  is in the noise and the difference between the real
6  world emissions, and that's my point.
7      Q.  Okay.  My question to you is just is the
8  standard for emissions for the gasoline vehicle
9  significantly lower than for the diesel vehicle?
10  That's all I want to know.
11      A.  It is lower than the diesel vehicle.
12      Q.  Thank you.
13          I want to ask you some questions about
14  road grade calculations if I could.
15      MR. WOJTANOWICZ:  Hold on, Renee.  Can I ask is
16  this -- this is a redirect here.  The scope of this
17  examination should be, you know, topics that were
18  brought up and that you couldn't have done on your
19  direct examination.
20      MS. SMITH:  This is not actually redirect.
21  This is actually -- he passed the witness back to
22  me.  You guys haven't asked questions yet.
23      MR. WOJTANOWICZ:  But you already passed the
24  witness over to Bosch.  You don't get to toggle
25  back and forth.

Page 408

1      MS. SMITH:  You know what, actually, I reserved
2  the right to ask additional questions when
3  Mr. Brodsky was done.  And if you want me to come
4  up with reasons where I'm saying things are
5  relevant to things that he discussed with
6  Mr. Brodsky, I'm very capable of doing it.  There
7  is no deposition protocol in this case, nowhere in
8  the rules that would prevent when there's time left
9  over me from continuing some questions.  I will be
10  very short.  I promise you.
11      MR. WOJTANOWICZ:  Okay.  I'm not going to waive
12  our objections, but you know, we'll see where this
13  goes.
14      MS. SMITH:  And I will say you'll see they
15  all -- every single thing I'm asking about is
16  related to things that he discussed with
17  Mr. Brodsky, okay?
18  BY MS. SMITH:
19      Q.  So to calculate segment level grade, is it
20  correct you took the difference between the
21  elevation level at the start of a segment and the
22  elevation level at the end of a segment?
23      A.  Correct.
24      Q.  And you took the difference between the
25  GPS altitude of the first second and the GPS

Page 409

1  altitude of the last second and divided by the
2  distance traveled for the segment?
3      A.  Yes.
4      Q.  Is it correct you don't provide any data
5  for drive time on road grade, just the highway
6  mileage?
7      A.  Time can be calculated from that.
8      Q.  But you don't calculate it, do you?
9      A.  I don't recall if I do or not.
10      Q.  In paragraph 129 of your report --
11      MR. WOJTANOWICZ:  Can you repeat that?  I'm
12  sorry.  I didn't get the number.
13      MS. SMITH:  I'm sorry.  It's 129.
14      MR. WOJTANOWICZ:  Thank you.
15      MS. SMITH:  Page 45 and 46.
16      THE WITNESS:  Okay.
17  BY MS. SMITH:
18      Q.  You write that less than 20 percent of the
19  highway mileage analyzed is flat.  Roughly
20  40 percent of highway mileage in the United States
21  has a grade of 1 percent or more, and roughly
22  20 percent of highway mileage has a grade of
23  2.0 percent or more.
24          Based on that distribution, it would,
25  therefore, be expected that the emissions from the

Page 410

1  Cruze diesel would be over six times the HWFET
2  emission standard 20 percent of the time; is that
3  correct?  Did I read that correctly?
4      A.  Which paragraph are we looking at?
5      Q.  It's 129, and it carries over to Page 46.
6  Actually, the paragraph I'm asking about is on
7  Page 46, the second sentence, less than 20 percent.
8      A.  Okay.  Yeah.
9      Q.  Okay.  Is it correct that just because
10  20 percent of the road grades in the U.S. had over
11  2.0 percent, that does not mean that 20 percent of
12  all driving time is also over that grade; is that
13  correct?
14      A.  No.  This is a rough first approximation.
15  You would have to look at driving patterns to know
16  for sure.
17      Q.  Okay.  And you have no data about driving
18  time on road grades above 2.0 percent, correct?
19      A.  I haven't taken that data, no.
20      Q.  And you didn't consult any such data when
21  designing the PEMS routes, correct?
22      A.  I did not.
23      Q.  You have no data about driving time on
24  road grades below zero percent, do you?
25      A.  On road grades below zero percent?

Page 411

1     Q.  Correct.
2     A.  Well, they would be the same as the road
3  grades above.
4     Q.  In terms of driving time?
5     A.  You're asking me about the time going down
6  grade?
7     Q.  Correct.
8     A.  I don't have data on vehicle populations
9  going down these highways, so no.
10     Q.  And you didn't consult such data when
11  designing the PEMS routes, correct?
12     A.  I designed the PEMS routes to closely
13  mimic the patterns of driving in the certification
14  test cycles.
15     Q.  Is the answer no, you did not consult such
16  data when designing the PEMS route?
17     MR. WOJTANOWICZ:  Object to form.
18  BY MS. SMITH:
19     Q.  I'm sorry.  Is it correct you did not
20  consult data about driving time on road grade below
21  zero percent when designing the PEMS routes?
22     MR. WOJTANOWICZ:  Object to the form.
23     THE WITNESS:  Correct.
24  BY MS. SMITH:
25     Q.  And is it correct that by your own

Page 412

1  numbers, roughly 80 percent of highway mileage in
2  the United States has a grade of 2.0 percent or
3  less?
4     A.  Correct.
5     Q.  And Figure 9-16, which is on Page 46 of
6  your report, do you see that there?
7     A.  Yeah.
8     Q.  That figure purports to depict road grades
9  on controlled access highways in the United States,
10  correct?
11     A.  Right.
12     Q.  And the figure does not show any negative
13  road grade, right?
14     A.  It's in a plot of absolute road grade.
15     Q.  Is it correct it does not show negative
16  road grades?
17     A.  It's a plot of absolute road grade.
18     Q.  Does that depict negative road grades or
19  not?
20     A.  Well, anything that's called an uphill in
21  the other direction is a downhill.  So yes, it
22  shows you both uphill and downhill.
23     Q.  And so it -- the map captures both
24  negative and positive road grade; is that fair?
25     A.  Any -- any hill is a positive road grade

Page 413

1  in one direction and a negative road grade in the
2  other direction.  So yes, it captures both.
3     Q.  So the road grades listed are an absolute
4  value of those grades.  That is, for example, a
5  1.3 percent road grade could be a positive or
6  negative; is that correct?
7     A.  Correct.
8     Q.  As you sit here today, can you tell us
9  with any degree of certainty what percentage in the
10  U.S. -- excuse me.
11     What percentage of roads in the U.S. have
12  a road grade at or above 1.0 percent?
13     A.  I believe it's here in my report.  Roughly
14  40 percent of highway mileage in the United States
15  has a grade of 1 percent or more.
16     Q.  Is that positive or negative?
17     A.  It's both.
18     Q.  You told Mr. -- I believe you told
19  Mr. Brodsky that the impact of the AECDs must be
20  quantified as part of a certification process.  Do
21  you remember that testimony?
22     A.  I do.
23     Q.  And I think you referred to the EPA
24  advisory circular, which is an official guidance
25  document?

Page 414

1     A.  Yes.
2     Q.  Could you tell us what is the EPA circular
3  that you were referring to?
4     A.  I believe it's EPA Circular 24-3 in that
5  case.
6     Q.  Was that the only authority that you were
7  relying on for that statement?
8     MR. WOJTANOWICZ:  Object to the form.
9  BY MS. SMITH:
10     Q.  Let me restate it.
11     Is that EPA circular the only source for
12  your statement that AECDs must be quantified?
13     A.  In this -- in the context of this report,
14  yes.
15     Q.  Do you know whether any OEM provides
16  quantified NOx emissions levels in its
17  certification disclosures that go with the AECDs?
18     A.  I have not seen other OEM disclosures in
19  full, so I can't comment.
20     Q.  Have you seen any from any OEM in the
21  United States that quantifies NOx emissions levels
22  in its certification disclosures?
23     MR. WOJTANOWICZ:  Object to the form.  Asked
24  and answered.



Page 415

Page 417

1    you?
2        A.   I believe I've identified well within my
3    area of expertise a series of defeat devices that
4    manipulate the emissions results on those cycles.
5    I have not made any prognostication in any of the
6    things that I've said about intent.  I'm merely
7    saying that the data presented does not represent
8    an accurate picture of the emissions from those
9    AECDs.
10       Q.   You are not testifying here that General
11   Motors manipulated anything, are you?
12       A.   General Motors manipulated, in cooperation
13   with Bosch, the emissions results from the test
14   cycles.
15       Q.   Are you saying General Motors intended to
16   do that manipulation?
17       A.   I am.
18       Q.   Is that a core part of your opinion?
19       A.   It's a part of my opinion.

Page 416

1    BY MS. SMITH:
2        Q.   Mr. Smithers, I move to strike that as
3    nonresponsive, and I'm going to just ask this
4    question.
5            Can you identify any OEM who provides
6    actual numeric NOx levels in its AECD
7    disclosures --
8        MR. WOJTANOWICZ:  Object to the form.
9        THE WITNESS:  General Motors.
10   BY MS. SMITH:
11       Q.   -- with respect to emissions measures?
12       A.   General Motors supplied the SC03 in its
13   AECD as representative of one of their AECDs.  They
14   supplied the cold CO as representative of another
15   one of their AECDs.
16       Q.   I'm asking do they disclose -- quantify
17   the NOx emissions level impacted by the AECDs?
18       A.   Those tests produce NOx emissions levels.
19       Q.   And are those disclosed?
20       A.   The tests are disclosed, yes.
21       Q.   Are the emissions levels disclosed?
22       A.   Such as they are manipulated, yes.
23       Q.   Okay.  You understand you're here
24   testifying as an expert, right?  You're not
25   testifying as an expert on companies' intent, are

Page 419

Page 421





Page 423

Page 425

```
 6        The question is while you were at Cleaire,
 7   is it correct there would be issues that would come
 8   up while you were developing things; yes or no?
 9        A. I'm sorry. I hadn't finished --
10        Q. I withdrew the question.
11        A. -- answering your previous question.
12        Q. I withdrew it. It's gone.
13           I'm just asking whether --
14        A. The question you're asking now, I did not
15   get to complete my answer.
16        Q. Okay. I'm withdrawing that question.
17           So my question is while you were at
18   Cleaire, were there issues that would come up in
19   development sometimes?
20        A. Yes.
21        Q. And would you, as part of your -- as part
22   of your job, address those issues?
23        A. I would, and I would ensure that those
24   issues didn't make it into the final production
25   software, which wasn't the case for General Motors.
```

JUSTON  SMITHERS Volume II          Highly Confidential                    May 21, 2020

Page 427

1      Q.   Move to strike as nonresponsive.
2          All I want to know is when you were at
3   Cleaire, if there were issues that came up in
4   development, would sometimes tweaks be made to
5   address those issues?
6      A.   Yes.
7      Q.   Do you recall Mr. Brodsky asking you some
8   questions about the test drivers?
9      A.   I do.
10     Q.   And is it correct there was a standard
11  operating procedure for the test drivers?
12     A.   To operate the PEMS equipment, yes.
13     Q.   Can we pull up tab 64?
14     A.   Do I have that?
15     Q.   I apologize.  I apologize.
16     MS. SMITH:  Travis, if you could pull up
17  tab 64, and it will be Exhibit 41.
18     MR. WOJTANOWICZ:  It should be 42 next.
19     MS. SMITH:  I apologize.  Exhibit 42.
20  BY MS. SMITH:
21     Q.   Exhibit 42, is that the standard operating
22  procedure for the test drivers?
23     A.   This was the one used by Bill Rimkus.  He
24  had taken the most essential features of Sensors's
25  official test procedure and made himself a

Page 428

1   checklist so he could go through the test procedure
2   that way.
3      Q.   If you could look, please, at the second
4   page of Exhibit 42 under notes.
5      A.   Yeah.
6      Q.   They're -- on numbered note 3, it says
7   write down notes of the beginning, slash, end of
8   mileage, temp, location and time for each test.
9      A.   Yeah.
10     Q.   Did I read that correctly?
11     A.   Yeah.
12     Q.   Would that have been followed in this
13  case?
14     A.   I believe he did.
15     Q.   Okay, but we don't have such notes that
16  have been produced.
17     A.   We have produced his notes.
18     Q.   What about make -- and so those -- this
19  protocol applied only to Mr. Rimkus, not the
20  drivers?
21     A.   We -- we probably implemented this program
22  or something similar when the new drivers came on.
23     Q.   But there aren't notes for those new
24  drivers?
25     A.   Those guys tended to make notes in the

Page 429

1   actual test file if there was something out of the
2   norm, which was my request to them not to write it
3   down.
4      Q.   Have those notes -- would those notes that
5   are in the test file been produced to us?
6      A.   Yes.
7      Q.   Back to the circular that you referenced
8   earlier about the impact of AECDs, was that
9   circular just for heavy-duty vehicles?
10     A.   No.  They made it very clear in the
11  circular.  They say in the 1998 letter while the
12  guidance specifically addresses issues arising in
13  the context of heavy-duty diesel engines using
14  retarded injection timing for NOx control,
15  manufacturers of other vehicles or engines should
16  use the discussion of AECDs related to on-board
17  computers and electronic controls during the
18  certification process and compliance with the
19  prohibition against defeat devices because the same
20  regulatory and statutory requirements concerning
21  AECDs and defeat devices apply to these
22  manufacturers and to manufacturers of heavy-duty
23  diesel engines.
24         So they made it pretty explicit that the
25  guidance, though the context of that particular

Page 430

1   guidance was specific to an issue with heavy-duty
2   providers, that it was broadly applicable to
3   everyone.
4      MS. SMITH:  I believe that's all the questions
5   I have right now.  Thank you very much again for
6   your time, Mr. Smithers.
7      THE WITNESS:  Thank you.  I appreciate it.
8      MR. WOJTANOWICZ:  We would like to take a break
9   before we go off the record, please.
10     MS. SMITH:  Of course.
11     THE VIDEOGRAPHER:  Going off the video record.
12  The time is now 21:06.
13         (Whereupon, a short break was
14          taken.)
15     THE VIDEOGRAPHER:  We are back on the video
16  record.  The time is now 21:11 UTC.  Go ahead.
17     MR. WOJTANOWICZ:  This is Garth Wotjanowicz
18  representing plaintiffs.  We have no questions for
19  Mr. Smithers, and so we close the deposition.
20     MS. SMITH:  Thank you.  We just want to remind
21  if we could have this deposition marked as highly
22  confidential, please.
23     THE VIDEOGRAPHER:  Anything else before we go
24  off the video record?
25     THE WITNESS:  Thank you for your time.

Page 431

```
 1        MS. SMITH:  Thank you, all.
 2        THE VIDEOGRAPHER:  This concludes today's
 3   deposition.  The time is now 21:12 UTC.
 4        (FURTHER DEPONENT SAITH NAUGHT.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 432

```
 1        UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF MICHIGAN
 3   JASON COUNTS, et al.,       )
 4   individually, and on behalf )
 5   of THEMSLEVES AND ALL       ) C.A. No.
 6   OTHERS similarly situated,  ) 1:16-cv-12541-TLL-PTM
 7      Plaintiffs,              )
 8      vs.                      )
 9   GENERAL MOTORS LLC, ROBERT  )
10   BOSCH GMBH, and ROBERT      )
11   BOSCH LLC,                  )
12      Defendants.             )
13        I, JUSTON SMITHERS, being first duly
14   sworn, on oath say that I am the deponent in the
15   aforesaid deposition taken on May 21, 2020; that I
16   have read the foregoing transcript of my
17   deposition, consisting of pages 1 through 431
18   inclusive, and affix my signature to same.
19   _____
              JUSTON SMITHERS
20
21   Subscribed and sworn to
     before me this _____ day
22   of _____, 2020
23
     _____
24   Notary Public
25
```

Page 433

```
 1   STATE OF ILLINOIS  )
 2              )  SS:
 3   COUNTY OF C O O K  )
 4        I, GINA M. LUORDO, a notary public within
 5   and for the County of Cook County and State of
 6   Illinois, do hereby certify that heretofore,
 7   to-wit, on May 21, 2020, remotely appeared before
 8   me JUSTON SMITHERS, in a cause now pending and
 9   undetermined in the United States District Court,
10   Eastern District of Michigan wherein JASON COUNTS,
11   et al. are the Plaintiffs, and GENERAL MOTORS LLC,
12   et al. are the Defendants.
13        I further certify that the said JUSTON
14   SMITHERS was first duly sworn to testify the truth,
15   the whole truth and nothing but the truth in the
16   cause aforesaid; that the testimony then given by
17   said witness was reported stenographically by me in
18   the presence of the said witness, and afterwards
19   reduced to typewriting by Computer-Aided
20   Transcription, and the foregoing is a true and
21   correct transcript of the testimony so given by
22   said witness as aforesaid.
23        I further certify that the signature to
24   the foregoing deposition was not waived by counsel
25   for the respective parties.
```

Page 434

```
 1        I further certify that the taking of this
 2   deposition was pursuant to notice and that there
 3   were present at the deposition the attorneys
 4   hereinbefore mentioned.
 5        I further certify that I am not counsel
 6   for nor in any way related to the parties to this
 7   suit, nor am I in any way interested in the outcome
 8   thereof.
 9        IN TESTIMONY WHEREOF:  I have hereunto set
10   my hand and affixed my notarial seal this 1st day
11   of June, 2020.
12
13
14
15
16   _____
17   NOTARY PUBLIC, COOK COUNTY, ILLINOIS
18   LIC. NO. 084-004143
19
20
21
22
23
24
25
```

*Counts, et al. v. General Motors LLC, et al., Case No. 1:16-cv-12541 (E.D. Mich.)*
U.S. Legal Support

## ERRATA SHEET – Volume I

Deponent: Juston Smithers
Deposition Date: May 20, 2020
Court Reporter: Gina M. Luordo, CSR, RPR, CRR.

The following corrections should be made to the transcript of my deposition taken on May 20, 2020:

Page   Line   Change

Page 21, line 23 – Should be "Mondial" instead of Mondale.

Page 28, line 3 – "diesel imaging control" should be "diesel emission control"

Page 30, line 7 – "long mile" should be "Longmile"

Page 30, line 11 – "saving" should be "saying"

Page 39, line 10 – "Tom" is "Tom Cackette"

Page 41, lines 13-14 – "Cases Hirz" is "KC Hur"

Page 41, line 21 – "Hirz" should be "Hur"

Page 106, line 1 – "euphemist" should be "euphemistic"

Page 144, line 12 – "max" should be "NOx"

Page 144, line 17-18 – "by the pounds of equipment" should be "by the PEMS equipment"

Page 161, line 3 – "ABL" should be "AVL"

Page 166, line 9 – "ADL" should be "AVL"

Page 168, line 25 – "Energy 44" should be "44 Energy"

Page 169, line 16 – "2008" should be "2018"

Page 171, line 2 – "chest" should be "test"

Page 173, line 15 – "MI" should be "M1"

- 1 -

010611-11/1323347 V1

Page 182, Line 15 – "Shank" should be "Schenk"

Page 195, line 13 – "form" should be "perform"

Page 196 line 10 and 11 – "Shank" should be "Schenk". "Sandiz" should be "Sendiz". "McHardy" should be "MacHardy"

Page 203, line 1 – "2006" should be "2016"

## ERRATA SHEET – Volume II

Deponent: Juston Smithers
Deposition Date: May 21, 2020
Court Reporter: Gina M. Luordo, CSR, RPR, CRR.

The following corrections should be made to the transcript of my deposition taken on May 21, 2020:

Page   Line   Change

Page 265, line 7 – "merely" should be "fairly"

Page 272, line 19 – "Shank" should be "Schenk"

Page 277, line 9 – "expect" should be "exact"

Page 280, line 20 – "Shank" should be "Schenk"

Page 284, line 22 – "Shank" should be "Schenk"

Page 285, line 3 – "firms" should be "firm"

Page 285, line 12 – "Shank" should be "Schenk"

Page 285, line 12 – "equipments" should be "equipment"

Page 285, line 20 – "Shank" should be "Schenk"

Page 287, line 10 – "did" should be "said"

Page 299, line 4 – "bariatric" should be "barometric"

Page 317, line 6 – "thermal couple" should be "thermocouple"

Page 324, line 23 – "EGR rate" should have been "soot buildup". I misspoke.

Page 327, line 24 – "1952" should be "1972". Line 25 "1974 should be 1972"

Page 331, line 3 – "regulators" should be "GM"

Page 331, line 16 – "kilometers per hour" should be "miles per hour"

Page 337, line 14 – "lower" should be "molar"

Page 338, line 11 – "confuse" should be "could use"

Page 343, line 10 – "EMT" should be "VMT"

Page 343, line 22 – "miles" should be "percent"

Page 352, line 19 – "regions" should be "regens"

Page 357, line 21 – "copper z-like" should be "copper zeolite"

Page 358, line 8-9 – "copper z-like" should be "copper zeolite"

Page 359, line 4 – "copper z-like" should be "copper zeolite"

Page 363, line 7 – "increase" should be "decrease"

Page 377, line 3 – "that's" should be "that"

Page 388, line 7 – "examples" should be "exceptions"

Page 407, line 5 – "in the noise and the difference" should be "in the noise compared to the difference"

I, Juston Smithers, declare under penalty of perjury that the foregoing is true and correct.

_____          7/1/20
Juston Smithers                                        Date

STATE OF (California        )
                                          )
COUNTY OF Alameda        )

Before me the undersigned, a Notary Public in and for their respective county and state, personally appeared Juston Smithers, and acknowledged the execution of this instrument this 1ST day of JULY, 2020.

DANIEL ORONA
COMM. #2266196
Notary Public - California
Alameda County
My Comm. Expires Dec. 4, 2022

Notary Public Signature
Printed Name: Daniel Orong

DANIEL ORONA
COMM. #2266196
Notary Public - California
Alameda County
My Comm. Expires Dec. 4, 2022

In and for the State of _California_

My County of Residence: _Alameda._

My Commissions Expires: _12 / 04 / 2022_

- 4 -

010611-11/1323347 V1