# Exhibit E

## (REDACTED VERSION OF DOCUMENT TO BE SEALED)

# Exhibit 37
# (Submitted Under Seal)

Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MICHIGAN

3   JASON COUNTS, et al.,        )

4   individually, and on behalf   )

5   of THEMSLEVES AND ALL         ) C.A. No.

6   OTHERS similary situated,      ) 1:16-cv-12541-TLL-PTM

7     Plaintiffs,             )

8   vs.                   )

9   GENERAL MOTORS LLC, ROBERT    )

10  BOSCH GMBH, and ROBERT         )

11  BOSCH LLC,                 )

12    Defendants.             )

13         The videotaped videoconference deposition

14  of KIRILL LEVCHENKO, Ph.D., called for examination

15  pursuant to the Rules of Civil Procedure for the

16  United States District Courts pertaining to the

17  taking of depositions, taken on the 19th day of

18  May, 2020, at the hour of 9:05 a.m.

19

20       * * * HIGHLY CONFIDENTIAL * * *

21

22

23  Reported by:  Gina M. Luordo, CSR, RPR, CRR

24  License No.:  084-004143

25  APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Confidential                    May 19, 2020

---

Page 2

```
 1    REMOTE APPEARANCES
 2       HAGENS BERMAN SOBOL SHAPIRO LLP
         BY:  MR. PETER A. SHAEFFER
 3       455 Nor h Cityfront Plaza Drive
         Suite 2410
 4       Chicago, Illinois  60611
         (708) 628-4949
 5       petersh@hbsslaw.com
 6          - and -
 7       CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
            AGNELLO, PC
 8       BY:  MR. JAMES E. CECCHI
         5 Becker Farm Road
 9       Roseland, New Jersey 07068
         (973) 994-1700
10       jcecchi@carellabyrne.com
11          - and -
12       SEEGER WEISS LLP
         BY:  MR. CHRISTOPHER AYERS
13       55 Challenger Road, 6th Floor
         Ridgefield Park, New Jersey  07660
14       (973) 639-9100
         cayers@seegerweiss.com
15
            - and -
16
         McQUADE BLASKO
17       BY:  MR. STEVEN S. HURVITZ
         811 University Drive
18       State College, Pennsylvania  16801
         (814) 238-4926
19       sshurvitz@mqblaw.com
            Representing the Plaintiffs;
20
21
22
23
24
25
```

Page 3

```
 1    REMOTE APPEAREANCES (continued):
 2       KIRKLAND & ELLIS LLP
         BY:  MS. RENEE D. SMITH
 3          MR. JEFFREY S. BRAMSON
         300 Nor h LaSalle Street
 4       Chicago, Illinois  60654
         (312) 862-2000
 5       renee smith@kirkland.com
         jeffrey.bramson@kirkland.com
 6
            - and -
 7
         DYKEMA GOSSETT PLLC
 8       BY:  MR. MICHAEL P. COONEY
         400 Renaissance Center
 9       Detroit, Michigan  48243
         (313) 568-6955
10       mcooney@dykema.com
            Representing General Motors LLC;
11
12       CLEARY GOTTLIEB STEEN & HAMILTON LLP
         BY:  MR. LARRY C. WORK-DEMBOWSKI
13       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
14       (202) 974-1588
         lwork-dembowski@cgsh.com
15          Representing Robert Bosch GMBH and
            Robert Bosch LLC.
16
17               * * * * *
18
19
20
21
22
23    Also Present:  Mr. Travis Jewell - Videographer
24          Mr. Donald Eklund
25          Mr. David Anderson
```

Page 4

```
 1               I N D E X
 2    WITNESS              EXAMINATION
 3    KIRILL LEVCHENKO, Ph.D.
 4       By Mr. Work-Dembowski         6
 5       By Ms. Smith              227
 6
 7            E X H I B I T S
 8    NUMBER      IDENTIFICATION        PAGE
 9    Exhibit 1   Expert Report of Kirill    15
10            Levchenko October 28,
11            2019
12    Exhibit 2   Supplemental Expert Report  18
13            Of Kirill Levchenko
14            February 5, 2020
15    Exhibit 3   Verdict and Set lement    35
16            Summary
17    Exhibit 4   Levchenko v. DCI Resorts,   36
18            Inc. Case Summary
19    Exhibit 5   Profile Page          70
20    Exhibit 6   How They Did it:  An     112
21            Analysis of Emission
22            Defeat Devices in
23            Modern Automobiles
24    Exhibit 7   E-mail Chain         187
25    Exhibit 8   Software Documentation    207
```

Page 5

```
 1       THE VIDEOGRAPHER:  We are now on record.  The
 2    participants should be aware that the proceeding is
 3    being recorded, and as such, all conversations held
 4    will be recorded unless there's a request and
 5    agreement to go off the record.  Private
 6    conversations and/or attorney-client interactions
 7    should be held outside the presence of the remote
 8    interface.  A link to the recording will be
 9    available to all parties to the case for up to
10    90 days from today's date provided the requesting
11    party has purchased a certified copy of the
12    transcript.
13       This is the remote video recorded
14    deposition of Kirill Levchenko being taken on
15    Tuesday, May 19, 2020.  The time is now 14:05 in
16    the UTC time zone.  We are here in the matter of
17    Counts, et al. v. General Motors, et al.
18       My name is Travis Jewell, remote video
19    technician on behalf of U.S. Legal Support located
20    at 200 West Jackson, Chicago, Illinois.  I am not
21    related to any party in this action, nor am I
22    financially interested in the outcome.  At this
23    time will the reporter, Gina Luordo on behalf of
24    U.S. Legal Support please enter the statement per
25    remote proceedings into the record.
```

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020

Page 6

1    THE COURT REPORTER:  The attorneys
2    participating in this deposition acknowledge that I
3    am not physically present in the deposition room
4    and that I will be reporting this deposition
5    remotely, pursuant to Federal Rule of Civil
6    Procedure 29.  They further acknowledge that, in
7    lieu of an oath administered in person, the witness
8    will verbally declare his testimony in this matter
9    is under penalty of perjury.  The parties and their
10   counsel consent to this arrangement and waive any
11   objections to this manner of reporting.
12        Please indicate your agreement by stating
13   your name and your agreement on the record.
14        MR. WORK-DEMBOWSKI:  This is Larry
15   Work-Dembowski on behalf of Bosch LLC.  I confirm
16   that we agree with that arrangement.
17        MR. SHAEFFER:  This is Peter Shaeffer on behalf
18   of the firm, Hagens Berman Socol Shapiro here
19   representing the plaintiffs, and I confirm that we
20   agree to that arrangement.
21        MS. SMITH:  This is Renee Smith on behalf of
22   General Motors LLC, and I also agree to that
23   arrangement.
24             (Whereupon, the witness was
25             sworn.)

Page 7

1         KIRILL LEVCHENKO, Ph.D.,
2    having been first duly sworn, was examined and
3    testified as follows:
4         EXAMINATION
5    BY MR. WORK-DEMBOWSKI:
6    Q.  Good morning, Dr. Levchenko.  My name is
7    Larry Work-Dembowski.  I am one of the attorneys
8    representing Robert Bosch LLC in this case.  I'm
9    going to be asking you a number of questions today,
10   and later in the day one of the lawyers for General
11   Motors may also have some questions for you.
12        Before we get into the heart of the
13   matter, I'm just going to go over some preliminary
14   information.  As you know, we are using a remote
15   video system for today's deposition, and with all
16   things technological, there is a chance that there
17   may be a technical glitch or problem at some point
18   during the day.  If it happens that either you or I
19   or someone else in the participant group here loses
20   their audio or video connection, we ask that you
21   just be patient, and we will go off the record and
22   try to get that resolved as quickly as possible.
23        Do you understand that?
24   A.  Yeah.
25   Q.  If you have any difficulty at all seeing

Page 8

1    me or hearing me during the course of the day,
2    please speak up as soon as the difficulty arises so
3    we can address it.
4    A.  Okay.  And I believe Peter Shaeffer has my
5    cell phone number in case the problem is on my end
6    and you need to call me.
7    Q.  Very good.  Thank you.
8        Are you able to hear me well now?
9    A.  Yes.
10   Q.  Are you able to see me clearly?
11   A.  Yes.
12   Q.  In front of you, can you see the window –
13   you said you can see the video where I'm speaking.
14   Can you also see the Box.com interface where
15   exh bits will be shown?
16   A.  I haven't accessed it yet.  Would you l ke
17   me to do that now?
18   Q.  Yes.  Please have that open in front of
19   you.  Please let me know when you have it open.
20   A.  I have an e-mail from Rachel Reynolds
21   inviting me to collaborate on Boxes.  Is that the
22   link?
23   Q.  That should be it.
24   A.  I don't – it's asking me to create an
25   account.

Page 9

1    Q.  Did you not do this beforehand?
2    A.  No.  I – I assumed you wouldn't want me
3    to open that stuff until the deposition.
4    MS. SMITH:  Should we go off the record?
5    MR. WORK-DEMBOWSKI:  We'll go off the record to
6    deal with this.  This, I think, falls under the
7    category of a technical issue.
8    THE WITNESS:  Well, also, in order for me to
9    access it, I have to accept the terms of service.
10   MS. SMITH:  Does everyone agree we can go off
11   the record?
12   MR. SHAEFFER:  Yeah, we can go off the record.
13   THE VIDEOGRAPHER:  We are going off the video
14   record.  The time is now 14:12 UTC.
15             (Whereupon, a short break was
16             taken.)
17   THE VIDEOGRAPHER:  We are back on the video
18   record.  The time is 14:20 UTC.  Go ahead.
19   MR. SHAEFFER:  So Dr. Levchenko has signed up
20   for his Box account.  He is under the understanding
21   that these terms and conditions will apply for the
22   purposes of today's deposition only and not moving
23   forward after today's deposition, and any sort of
24   provision l ke the indemnification clause will be
25   the respons bility of plaintiffs' counsel.  So he

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL HIGHLY Confidential                    May 19, 2020

Page 10

1  signed up, and he's ready to proceed.
2      MR. WORK-DEMBOWSKI:  All right.
3  BY MR. WORK-DEMBOWSKI:
4      Q.  Dr. Levchenko, you now have on a display
5  in front of you the interface for the Box.com where
6  exh bits will be displayed when we come to them?
7      A.  That's right.
8      Q.  And you said that you had received some
9  training on the interface that we're using.  When
10 did you receive that training?
11     A.  Yesterday.
12     Q.  How much time did you spend receiving
13 training on the interface?
14     A.  About 45 minutes.
15     Q.  Do you have any questions about how to use
16 the video interface at this time?
17     A.  No.
18     Q.  Will you please describe the computer
19 equipment that's in front of you for today's
20 deposition?
21     A.  I have a laptop in front of me, which is
22 what I'm using to access Zoom as well as Box, and I
23 have another computer in front of me that I'm
24 currently not using for anything, but if you needed
25 me to look at a document, I could use.

Page 11

1      Q.  Is it a separate computer or just a
2  separate monitor?
3      A.  A separate computer.
4      Q.  Is there anyone else in the room with you?
5      A.  No.
6      Q.  Is there any software running on either of
7  your computers other than what is needed for the
8  video interface and the Box.com interface?
9      A.  I have a browser open to access Box, and I
10 have Zoom open.  Those are the only applications.
11     Q.  Will you agree that during your deposition
12 today, you will not use any other software such as
13 e-mail or instant messaging to receive messages?
14     A.  I agree to that.  If you ask me to open a
15 PDF, I will, obviously, use a PDF reader.
16     Q.  Do you have any other monitors or screens
17 in the room with you?
18     A.  I have my cell phone next to me.
19     Q.  We sent you a physical box.  Do you have
20 that box with you?
21     A.  I have it right here.
22     Q.  Have you opened that box?
23     A.  No.
24     Q.  Would you please open it at this time?
25     A.  There's numbered envelopes.

Page 12

1      Q.  Perfect.  I was going to say in the box,
2  you'll find numbered envelopes.
3          As we proceed today at various points,
4  I'll ask you to open envelopes identified by their
5  number.  Will ask you agree, please, just to be
6  patient and only open envelopes as I ask you to?
7      A.  Sure.  I agree.
8      Q.  And it may be that we won't use all of
9  those envelopes, and I'd ask that you agree that if
10 there are any envelopes we don't open, you can
11 leave them sealed.
12     A.  Okay.  Would you l ke me to mail them back
13 to you?
14     Q.  And at the end of the day, would you
15 please mail everything back?
16     A.  Sure.  I will do that.
17     Q.  We can coordinate with plaintiffs' lawyers
18 to make all of the shipping happen.
19     A.  Okay.
20     Q.  Dr. Levchenko, have you ever been deposed
21 before?
22     A.  No.  I'm setting the envelopes aside on
23 the corner of the table.
24     Q.  Thank you.
25     A.  I have not been deposed before.

Page 13

1      Q.  As you may have been told, the court
2  reporter is making a stenographic record of
3  everything that you and I say, and it is important
4  for her record that we not speak over each other.
5  So will you agree to let me finish my questions
6  before you start speaking?
7      A.  Yes.
8      Q.  And I will agree to let you finish your
9  answers before I start speaking.
10         For purposes of the stenographic record,
11 it's also important that your answers be verbal.
12 So please answer with words, yes or no instead of a
13 nod or a shake of your head.  Will you agree to do
14 that?
15     A.  Yes.
16     Q.  You understand that you are giving
17 testimony under oath today, correct?
18     A.  I do.
19     Q.  And you understand that your oath obliges
20 you to testify truthfully?
21     A.  I do.
22     Q.  You understand that your testimony here
23 today has the same effect as if you were testifying
24 in a court of law?
25     A.  I do.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                    May 19, 2020

Page 14

1    Q.  If I ask a question and you don't
2   understand it, please let me know that you don't
3   understand, and I will try to rephrase it, okay?
4    A.  Okay.
5    Q.  If I ask a question and you do not ask me
6   for clarification, it will be assumed that you
7   understood my question.  Do you understand that?
8    A.  I do.
9    Q.  Are there any circumstances that would
10  affect your ability to testify truthfully and
11  completely today?
12   A.  No.
13   Q.  Depositions are not an endurance exercise.
14  If you need a break at any point during the day,
15  please say so.  We can take a break when you need
16  with the one caveat that we should not take a break
17  while a question is pending.  Do you understand
18  that?
19   A.  I do.
20   Q.  Dr. Levchenko, what opinions are you
21  offering in this case?
22   A.  I'm offering the opinions outlined in the
23  report

Page 15

8    Q.  Do you have any other opinions that you
9   are intending to offer in this case?
10   A.  Only the opinions in my report.
11   Q.  Do you believe that you are an expert with
12  respect to each of those opinions?
13   A.  Yes.
14   Q.  Would you please open the envelope in
15  front of you that's labeled No. 1, and I'm going to
16  ask my colleague to post in the shared folder on
17  Box tab 1, which will now become Exhibit
18  Levchenko 1.
19   A.  I have in front of me what looks to be my
20  expert report.
21   Q.  As you said, this document, which is now
22  Exhibit Levchenko 1, is your expert report in this
23  case dated October 28, 2019 as corrected on May 12,
24  2020; is that correct?
25   A.  That's what it says on the front, yes.

Page 16

1    Q.  As we go through the day today, I'll refer
2   to this document as your first report.  If I use
3   that term and you don't understand which document
4   I'm taking about, let me know, and we'll make sure
5   that we're looking at the right document.  Does
6   that make sense?
7    A.  Understood.
8    Q.  You signed the original version of your
9   report on October 28, 2019, correct?
10   A.  Yes.
11   Q.  You made a correct -- excuse me?
12   A.  Nothing.
13   Q.  You made a correction to your first report
14  on May 12, 2020 to fix a typo; is that right?
15   A.  That's correct.
16   Q.  Would you please turn to Page 18 in your
17  first report?
18   A.  Okay.
19   Q.  Is that your signature on Page 18 of your
20  report?
21   A.  It is.
22   Q.  And you applied that signature on May 12,
23  2020?
24   A.  Through my counsel.  This is a digital
25  image of my signature.

Page 17

1    Q.  In October of 2019 before you applied your
2   signature to your report, did you review the
3   original version of the report to verify its
4   accuracy?
5    A.  Can you repeat that?
6    Q.  Sure.  In October of 2019 before you
7   applied your signature to your report, the original
8   version of your report, did you review it for
9   accuracy?
10   A.  I did.
11   Q.  And did you review the corrected version
12  of your first report to verify its accuracy before
13  you applied your signature again in May of 2020?
14   A.  I reviewed the corrected portion, and I
15  assumed the rest is the same.
16   Q.  Are there any changes that you believe
17  should be made to your first report today?
18   A.  No, other than what's in the supplemental
19  report, which -- and changes modified the
20  conclusion to include the model year '15 vehicles.
21   Q.  Any other changes to your first report?
22   A.  No.
23   Q.  In preparing for today's deposition, did
24  you read your first report?
25   A.  Yes.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                May 19, 2020

Page 18

1     Q.   Appended to your first report, sir,
2  attached to the back of it are three appendices.  I
3  believe in the hard copy in front of you, they have
4  tabs that are labeled A, B and C.
5     A.   That's right.
6     Q.   Nothing in any of the appendices to your
7  first report changed when you made the corrected
8  version of your first report last week on May 12th;
9  is that correct?
10    A.   That's correct.
11    Q.   We can set that aside just for the moment
12 and please open envelope No. 2, and I'll ask my
13 colleague to post tab 2 to the shared folder on
14 Box.com.  Yes, sir, envelope 2.
15    A.   I have it opened.
16    Q.   This is your supplemental expert report in
17 this case dated February 5, 2020, correct?
18    A.   That's right.
19    Q.   As we go through the day today, I will
20 refer to this document as your supplemental report.
21 If you don't understand what document I'm referring
22 to when I say that, please let me know, and we'll
23 clarify to make sure you're looking at the correct
24 document.
25          Will you please turn to Page 3 of your

Page 19

1  supplemental report?
2     A.   Okay.
3     Q.   Is the signature on Page 3 your signature?
4     A.   It is.
5     Q.   Did you apply your signature to your
6  supplemental report on February 5, 2020?
7     A.   Yes.
8     Q.   Did you review your supplemental report to
9  verify its accuracy before signing it?
10    A.   I did.
11    Q.   Are there any changes that you believe
12 should be made to your supplemental report?
13    A.   No.
14    Q.   Did you read your supplemental report in
15 preparing for today's deposition?
16    A.   I did.
17    Q.   On the back of your supplemental report,
18 there is an exhibit.  It's labeled Exhibit 1.  It
19 comes after Appendix B.  Do you see that?
20    A.   Yeah.
21    Q.   I believe in the hard copy in front of
22 you, it may have a tab C?
23    A.   Yeah.  I have it.
24    Q.   And that exhibit to your supplemental
25 report is a copy of your first report, the original

Page 20

1  version of your first report, correct?
2     A.   Yes.
3     Q.   Just so the record is clear, the original
4  version of your first report is what is exhibited
5  through the supplemental report, and that original
6  version still has the typo that you fixed in your
7  May 2020 corrected first report?
8     A.   Yes, that's correct.
9     Q.   Your supplemental report from February did
10 not replace your first report, correct?
11    A.   No.
12    MR. SHAEFFER:  Objection.  Vague and ambiguous.
13 BY MR. WORK-DEMBOWSKI:
14    Q.   Your supplemental report only added more
15 analysis to the first report, correct?
16    A.   That's correct.
17    Q.   And your first report remains the
18 statement of your opinions in this case?
19    A.   Yes.
20    Q.   Have you conducted any additional analysis
21 on the matters addressed by your first report or
22 your supplemental report since you signed them?
23    A.   No.
24    Q.   Are these reports, that is, your first
25 report and your supplemental report, a complete

Page 21

1  statement of your opinions in this case and the
2  bases for those opinions?
3     A.   Yes.
4     Q.   Are there any bases for your proffered
5  opinions that are not contained in these reports?
6     A.   I don't believe so.
7     Q.   Do you intend to offer any opinions in
8  this case that are not in these reports?
9     A.   I do not.
10    Q.   Did anyone assist you in the preparation
11 of your reports in this case?
12    A.   Yes.
13    MR. SHAEFFER:  Just I will caution the witness
14 not to reveal any communications with counsel
15 during the preparation of the report.
16    THE WITNESS:  Understood.
17 BY MR. WORK-DEMBOWSKI:
18    Q.   So I'm not asking for you to reveal any
19 confidential or privileged communications.  My
20 question is just the fact of whether anyone
21 assisted you in the preparation of your report; yes
22 or no?
23    A.   Yes.
24    Q.   Who?
25    A.   The plaintiffs' counsel.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                May 19, 2020

Page 22

1  Q.  Who are the individuals in particular?
2  A.  I may not have all of them, but Peter
3  Shaeffer and Jessica.  I'm not sure what her last
4  name was.
5  Q.  Anyone else?
6  A.  There may have been others.  I don't
7  recall right now.
8  Q.  Without revealing privileged
9  communications, please descr be what they did to
10  assist you in preparing your report.
11  A.  They provided me a Word document template
12  that I should use, and they reviewed my report for
13  grammar and content.
14  Q.  What do you mean when you say they
15  reviewed it for content?
16  A.  They gave me feedback on my conclusions
17  and the wording and the things I was saying in the
18  report.
19  Q.  Did they help you form your opinions in
20  this case?
21  MR. SHAEFFER:  Objection.  Vague and ambiguous.
22  And again, I'll just caution to answer this
23  question without getting into the details of our
24  communications.  I'm struggling to think how he can
25  answer this question without doing that, but –

Page 23

1  MR. WORK-DEMBOWSKI:  It's a yes or no question.
2  THE WITNESS:  I would say the opinions in the
3  reports are my own.
4  BY MR. WORK-DEMBOWSKI:
5  Q.  What was your role in preparing the
6  reports?
7  A.  I wrote the reports.
8  Q.  Did you draft the entire reports yourself?
9  A.  Well, as I mentioned, I was provided a
10  template.  So there were parts of the report, I
11  believe some of the initial boilerplate text, that
12  was provided for me.
13  Q.  Can you open your first report, please?
14  A.  The corrected or the uncorrected one?
15  Q.  The corrected, so Exh bit Levchenko 1.  On
16  Page Roman Numeral little I, there's a table of
17  contents.
18  A.  Uh-huh.
19  Q.  Can you identify any sections that are
20  listed on the table of contents that were written
21  by someone other than you?
22  A.  I think parts of the intro were provided
23  as part of the template and maybe background,
24  again, just the heading, but the substantive
25  elements of the report are all my own work.

Page 24

1  Q.  So portions of the introduction were
2  written by someone else?
3  MR. SHAEFFER:  Objection.  Misstates prior
4  testimony.
5  THE WITNESS:  I will say again I was provided a
6  template.  I don't recall exactly which elements
7  were in it, but it laid out the overall structure
8  of the document.  All of the substantive components
9  of the report are my own work.
10  BY MR. WORK-DEMBOWSKI:
11  Q.  Can you look at paragraph 3 of your first
12  report on Page 2.  Did you write paragraph 3?
13  A.  I believe paragraph 3 was something that,
14  you know, was part of a template.
15  Q.  Can you identify any other portions of
16  your first report that were part of the template
17  provided to you?
18  A.  I believe paragraph 6, I may have – some
19  of the wording may have been provided, maybe
20  paragraph 10.  Paragraph 33, I may have been
21  provided a template or – by counsel, the wording
22  of paragraph 34, although, I filled in the
23  individual bullet points.
24  Q.  Was – for your supplemental report, were
25  you also provided a template by counsel?

Page 25

1  A.  I don't recall exactly, but I can look at
2  the paragraphs and tell you if it's something I
3  wrote or not.
4  Q.  Do you recall writing your supplemental
5  report?
6  A.  Yes.
7  Q.  Did the template that you received from
8  counsel also include the appendices to either of
9  your reports?
10  A.  I wrote the appendices for the original
11  report and the supplemental report.  I believe when
12  it was put together and provided to you, they did
13  the assembling, but the contents of the appendices
14  are all my own work.
15  Q.  When were you first contacted by
16  plaintiffs' lawyers about working on this case?
17  A.  I don't remember the exact date.
18  Q.  Do you remember whether it was before
19  July 7, 2016?
20  A.  I'm not absolutely sure, but I think it
21  was probably after that date.
22  Q.  Was it in 2017?
23  A.  Again, I don't remember the exact date.
24  Q.  Do you remember the year?
25  A.  I don't, but if you'd l ke, I can look up

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL     Highly Confidential                    May 19, 2020

Page 26

1   my -- check my e-mail and see when the first
2   contact was.
3        Q.   Do you remember whether it was before or
4   after April of 2018?
5        A.   I'm sorry.  I don't.
6        Q.   How about August of 2018?
7        MR. SHAEFFER:  Objection.  Asked and answered.
8        MR. WORK-DEMBOWSKI:  I didn't ask him about
9   August.
10       THE WITNESS:  August?  I believe it was before
11  August.
12  BY MR. WORK-DEMBOWSKI:
13       Q.   You believe it was before August of 2018?
14       A.   Yeah.  August is when I moved to Illinois,
15  and I believe at that time, I had already been
16  retained, but again, to answer these questions with
17  absolute certainty, I would have to check my
18  e-mail.
19       Q.   Who first contacted you about working on
20  this case?
21       A.   I don't remember the specific person.
22       Q.   Was it somebody that you had worked with
23  before?
24       A.   Again, I don't remember the specific
25  person.  I believe it may have been Jessica

Page 27

1   Thompson if that name is -- if that's the correct
2   name, but if you'd like an answer with absolute
3   certainty, I can check my e-mail and tell you.
4        Q.   Is Jessica Thompson someone that you had
5   worked with before working with her on this case?
6        A.   No.
7        Q.   How long was it after your first contact
8   until you informed plaintiffs' counsel of the
9   opinions that you were prepared to render in this
10  case?
11       A.   I don't know.  I don't remember exactly
12  when they first contacted me.
13       Q.   Do you remember approximately how much
14  time passed between when they first called you and
15  when you told them what you were prepared to
16  offer --
17       A.   It was several months.
18       Q.   Other than this case, are you currently
19  engaged to work on any matters by the Hagens Berman
20  law firm either as a testifying expert or as a
21  consultant?
22       A.   No.
23       Q.   What about any of the other law firms that
24  are representing plaintiffs in this matter?
25       A.   I don't know all the law firms.

Page 28

1        Q.   Okay.  How about Sommers Schwartz?
2        A.   No.
3        Q.   Seeger Weiss?
4        A.   No.
5        Q.   Carella Byrne Cecchi?
6        A.   No.
7        Q.   Hilliard Munoz Gonzalez?
8        A.   No.
9        Q.   Are you currently engaged to work on any
10  diesel emissions case other than this case?
11       A.   Yes.
12       Q.   Which case?
13       A.   I don't -- I believe I'm still retained
14  for some case -- some Vo kswagon cases that are not
15  part of the class action.
16       Q.   Any others?
17       A.   I -- I don't think so.  I've worked on
18  some in the past, but I believe that they're
19  complete.
20       Q.   Did you testify as an expert in any of
21  those other cases?
22       A.   No.
23       Q.   Did you provide written opinions in any of
24  those other cases?
25       A.   I've provided some written documents.  I

Page 29

1   don't know if, by opinion, you have some technical
2   sense in mind or not.
3        Q.   Do you know whether the written documents
4   you provided in those other cases were produced to
5   the opposing parties?
6        A.   I don't know.  I'm sorry.
7        Q.   Do you know whether they were submitted to
8   the court?
9        A.   I don't.
10       Q.   Do you have any business or professional
11  relationships with any of the lawyers for
12  plaintiffs in this case other than your retention
13  in this case?
14       A.   No.
15       Q.   You billed plaintiffs $500 per hour for
16  your work in this litigation, correct?
17       A.   That's right.
18       Q.   Is there anyone who has worked for you or
19  with you who is also being paid for his or her time
20  in connection with this case?
21       A.   No.
22       Q.   There are no research assistants?
23       A.   No.
24       Q.   No graduate students?
25       A.   No.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                May 19, 2020

Page 30

1   Q.  No support staff?
2   A.  No.
3   Q.  No consultants?
4   A.  No.
5   Q.  How much have you been paid to date for
6   the work you've done in connection with this case?
7   A.  I don't know.  I can check.
8   Q.  Do you have an approximate?
9   A.  Let me – if you don't mind, I'll ask
10  Peter.  Is that privileged, or should I answer?
11  MR. SHAEFFER:  The amount you've been paid is
12  not privileged, but only answer if you know.
13  THE WITNESS:  It's, I believe, upwards of
14  20,000.
15  BY MR. WORK-DEMBOWSKI:
16  Q.  What is the total amount of time, whether
17  you've billed it or not, that you've spent on this
18  matter to date?
19  A.  I don't know.
20  Q.  Do you expect to receive any additional
21  compensation in connection with this case beyond
22  what you've been paid already?
23  A.  I expect to be compensated for any other
24  services on an hourly basis.
25  Q.  How much of your annual income last year

Page 31

1   derived from work that you did in matters related
2   to litigation?
3   A.  I couldn't tell you the exact number, but
4   it was less than half certainly.
5   Q.  So what about for the year before?
6   A.  Less than half again.
7   Q.  And the year before that?
8   A.  I – yeah, in all years, it was less than
9   half.
10  Q.  Was it less than a quarter?
11  A.  I'm sorry.  I would have to check the
12  exact numbers.
13  Q.  How many lawsuits have you testified in
14  before this case?
15  A.  This is my first time testifying.  I
16  should say I have testified in court once before.
17  Q.  Can you please explain the case in which
18  you testified in court once before?
19  A.  It was my divorce and child custody
20  hearing.
21  Q.  So other than testifying, how many times
22  have you offered a report as an expert witness as
23  you have in this case?  Have you ever done that
24  before?
25  A.  I worked on an IP case.  I don't know

Page 32

1   whether – whether what I produced was – I believe
2   it was an expert report.
3   Q.  In general terms, can you describe what
4   that IP case was about?
5   A.  It was about a software security
6   mechanism.
7   Q.  Did it relate to automobiles?
8   A.  No.
9   Q.  Did it relate to emissions?
10  A.  No.
11  Q.  Did you work on behalf of the plaintiff or
12  the defendant in that IP case?
13  A.  To be honest, I'm not sure.  It was – I
14  don't know which – who was plaintiff or defendant.
15  It was research on prior art for a patent, so I
16  don't know whether that would make them the
17  plaintiff as a challenger or the defendant.
18  Q.  Did any of the work that you did on the IP
19  case have relevance to the opinion that you're
20  offering in this case?
21  A.  No.
22  Q.  Have you ever been engaged as a consultant
23  by an automobile manufacturer?
24  A.  No.
25  Q.  Have you ever worked for an automobile

Page 33

1   manufacturer?
2   A.  No.
3   Q.  Have you ever worked for an automotive
4   parts supplier?
5   A.  No.
6   Q.  Have you ever refused to offer an expert
7   opinion in any case?
8   A.  I've turned down offers to work as a
9   consultant or expert.
10  Q.  Why?
11  A.  Either because of my own time constraints
12  or I was not interested in the subject matter.
13  Q.  Have you ever turned down offers to work
14  in connection with automobiles?
15  A.  Yes.  I – yes.
16  Q.  What offers have you turned down in
17  connection with automobiles?
18  A.  I've been contacted by some law firms
19  representing plaintiffs in emissions-related
20  matters.
21  Q.  How many times has that happened?
22  A.  I would say at least once, probably more.
23  Q.  And why did you turn down those offers?
24  A.  Time constraints.
25  Q.  Any other reasons?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                    May 19, 2020

Page 34

1    A.   Not that I can think of right now.
2    Q.   What was the nature of the opinions that
3    you were being asked to render by the law firms
4    that approached you about automotive cases?
5    A.   It would have been a plaintiff's side.
6    They didn't specify clearly what exactly they were
7    looking for.
8    Q.   Do you remember the names of any of the
9    law firms that approached you?
10   A.   No, but if that's important, I can look
11   those up.
12   Q.   Has a court ever evaluated your
13   qualifications as an expert?
14   A.   I don't know.
15   Q.   Has a court ever evaluated your
16   methodologies?
17   A.   No, not to my knowledge.
18   Q.   Has a court ever evaluated your opinions?
19   A.   Not to my knowledge.
20   Q.   You were a plaintiff in a case involving a
21   vehicle accident once, correct?
22   A.   I don't remember that.
23   Q.   You don't remember a case that involved
24   someone named Eckhart?
25   A.   No.

Page 35

1    Q.   I'm going to ask my colleague to post
2    tab 19 onto Box.  This will become Levchenko
3    Exhibit 3.
4    Mr. -- Dr. Levchenko, I ask you to look at
5    the Box.com screen and refresh it.  Once Exhibit 3
6    is up, you can open it on your screen.
7    A.   I don't see it yet.
8    Q.   You might need to press the refresh button
9    on the address bar of your browser.
10   A.   I'm refreshing.  It's not there yet.  I
11   see Exhibit 1 and 2, though.
12   Q.   What about now?
13   A.   I'll keep refreshing.
14   MR. SHAEFFER:  Sorry.  Can we go off the record
15   for just one second?
16   MR. WORK-DEMBOWSKI:  Sure.
17   THE VIDEOGRAPHER:  Going off the video record.
18   The time is now 14:56 UTC.
19          (Whereupon, a short break was
20          taken.)
21   THE VIDEOGRAPHER:  We are back on the video
22   record.  The time is now 15:11 UTC.  Go ahead.
23   BY MR. WORK-DEMBOWSKI:
24   Q.   Dr. Levchenko, the document that has been
25   marked as Exhibit Levchenko 3 is a published report

Page 36

1    about a litigation involving someone named Kirill
2    Levchenko versus someone named John Eckhart
3    involving an automobile.  Is this case about you?
4    A.   Should I open the exhibit?
5    Q.   Yes, please.
6    A.   I only see two pages, but none of that
7    looks right.  I've never been in any case like
8    this.
9    Q.   Were you a plaintiff, a named plaintiff in
10   a class action against a company called DCI
11   Resorts, Inc.?
12   A.   That sounds familiar.  I don't remember
13   if -- I don't recall it being a class action,
14   though.
15   Q.   Okay.  I'm going to ask my colleague to
16   post tab 20.  This will become Exhibit Levchenko 4.
17   And if you can just wait a moment and then refresh
18   your Box interface, the exhibit should be available
19   to you momentarily.
20   A.   Okay.  I see it.  Would you like me to
21   open it?
22   Q.   Please open Exhibit Levchenko 4.  This is
23   complaint from a case captioned Levchenko v. DCI
24   Resorts, Inc.
25   A.   Yeah, this I remember.  Yeah.  That is me

Page 37

1    in this.
2    Q.   Okay.  So you were the named plaintiff in
3    this case about DCI Resorts, Inc.?
4    A.   That's correct.
5    Q.   This DCI resorts case was about receiving
6    unauthorized telephone calls, correct?
7    A.   I believe so, yeah.
8    Q.   What was the resolution of the case?
9    A.   I believe that my attorneys dropped it
10   because they didn't see a way forward.
11   Q.   Did you receive any compensation in
12   connection with this case?
13   A.   No.
14   Q.   By this case, I mean the DCI Resorts case.
15   A.   Understood.  I did not.
16   Q.   You know that your lawyers in the DCI
17   Resorts case also represented plaintiffs in some
18   diesel emissions cases, don't you?
19   A.   I do not.  Are you talking about Kazerouni
20   Law Group?
21   Q.   Hyde & Swigart in particular.
22   A.   I did not know that.
23   Q.   Has Hyde & Swigart approached you about
24   offering expert opinion about any diesel emissions
25   case?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL     HIGHLY Confidential                May 19, 2020

| | Page 38 |
|---|---|

1    A.  Not to my recollection.
2    Q.  Have you discussed this case with any of
3  your lawyers from the DCI Resorts case?
4    A.  Sorry.  Which is this case?
5    Q.  I'm sorry.  The present case about the
6  diesel –
7    A.  No.  No.
8    Q.  Have you ever been a plaintiff in any
9  lawsuit other than Levchenko v. DCI Resorts?  And I
10  don't need to get into any family law issues.
11    A.  I know there was a small claims case where
12  I was the plaintiff.
13    Q.  What was the small claims about?
14    A.  It was a telemarketing prerecorded phone
15  call case.
16    Q.  What court was that in?
17    A.  San Diego small claims court.
18    Q.  What was the resolution of that case?
19    A.  Actually, there were two cases.  One I
20  settled with the defendants, and then the other we
21  appeared in the small claims court.  And I don't
22  know the technical terms, but I lost.
23    Q.  You were the plaintiff in both of those
24  cases; is that correct?
25    A.  Yes.

| | Page 39 |
|---|---|

1    Q.  Have you ever been a defendant in any
2  lawsuit?
3    A.  Not to my recollection.  Again, family
4  law, I don't know whether I was – which side I was
5  in.
6    Q.  Have you ever had your work criticized in
7  court filings?
8    A.  Not to my knowledge.
9    Q.  Have you ever been accused of defrauding
10  someone?
11    A.  Not to my knowledge.
12    Q.  Have you ever been accused of committing a
13  crime?
14    A.  Not to my knowledge.
15    Q.  What did you do to prepare for today's
16  deposition?
17    A.  I reread my statements, my report and
18  appendices.
19    Q.  Anything else?
20    A.  That's the main thing.  Are there specific
21  things you're asking about?  I'm not sure.
22    Q.  How much time did you spend preparing for
23  today's deposition?
24    A.  In total, several hours, but I would say
25  less than – maybe less than 20.

| | Page 40 |
|---|---|

1    Q.  Did you meet with anyone to prepare
2  remotely or otherwise?
3    A.  I met with plaintiffs' counsel.
4    Q.  Who did you meet with?
5    A.  Peter Shaeffer and I believe some of the
6  others present on this call.  I don't remember the
7  exact set of people present.
8    Q.  Do you remember how many people were
9  present?
10    A.  It was myself, Peter and, perhaps, one or
11  two others.
12    Q.  Was there anyone present other than
13  yourself and the lawyers, anyone who is not a
14  lawyer?
15    A.  Present during preparation?
16    Q.  Yes.
17    A.  No, there was no one else present.
18    MR. WORK-DEMBOWSKI:  Thank you.  Can we pause a
19  moment until we can get that background noise
20  resolved.
21    THE VIDEOGRAPHER:  Going off the video record?
22    MR. WORK-DEMBOWSKI:  We can continue.
23  BY MR. WORK-DEMBOWSKI:
24    Q.  How long, Dr. Levchenko, did your
25  preparation discussion with the lawyers last?

| | Page 41 |
|---|---|

1    A.  It was probably six, maybe a little more.
2  Six hours, maybe a little more.
3    Q.  Was it all in one session, or was it
4  broken up in multiple sessions?
5    A.  In multiple sessions.
6    Q.  Over how many days?
7    A.  I don't remember the exact number, but at
8  least three, maybe four.
9    Q.  When?
10    A.  There was one session early on when I
11  think the deposition was scheduled earlier before
12  it got moved to this current date and several more
13  recent within the last, let's say, two, three
14  weeks.
15    Q.  Have you spoken with anyone other than
16  plaintiffs' lawyers about your deposition?
17    A.  I have not.
18    Q.  Have you spoken with Mr. Smithers about
19  your deposition?
20    A.  No.
21    Q.  Did you review any documents other than
22  your reports in preparing for today's deposition?
23    MR. SHAEFFER:  I will just caution the witness
24  not to discuss any documents that you reviewed with
25  counsel during preparation sessions.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential          May 19, 2020

Page 42

1    THE WITNESS:  Could you -- may I call you Larry
2    or Mr. Dembowski?  Could you restate your question?
3    BY MR. WORK-DEMBOWSKI:
4        Q.  You can call me Larry.
5        Did you review any documents other than
6    your written reports in preparing for today's
7    deposition?  It's a yes or no question.
8        A.  Peter, is that something that I should
9    answer?
10       MR. SHAEFFER:  It's a yes or no question.
11   Don't discuss the details of any documents that we
12   would have discussed during our prep sessions.
13       THE WITNESS:  Yes.
14   BY MR. WORK-DEMBOWSKI:
15       Q.  The documents that you reviewed in
16   preparing for today's deposition, did they include
17   any documents that are not cited in your reports?
18       A.  Not to my knowledge.
19       Q.  Would you please explain what your
20   assignment was in this matter?
21       THE WITNESS:  Peter, is that privileged?
22       MR. SHAEFFER:  No.  It's potentially vague in
23   terms of assignment.  Kirill, I will -- if there is
24   a potential privileged answer that you will give, I
25   will make an objection.  So unless you hear from

Page 43

1    me, I think it's -- you can go ahead and answer.
2        THE WITNESS:  Okay.  I was asked to investigate
3    two potential cycle beating strategies.
4    BY MR. WORK-DEMBOWSKI:
5        Q.  You were pointed to the particular
6    strategies and asked to evaluate them, right?
7        A.  I was asked to look into two specific
8    strategies, you know, by name.  By pointed, I'm not
9    sure what you mean.
10       Q.  Okay.  You were not asked to evaluate the
11   entirety of the software of the diesel Chevy Cruz,
12   correct?
13       A.  That's correct.
14       Q.  And you were not asked to review any other
15   potential defeat devices or cycle beating devices
16   on the diesel Chevy Cruze aside from the two that
17   you mentioned?
18       MR. SHAEFFER:  I will -- I'm going to caution
19   Mr. Levchenko not to disclose communications about
20   other potential issues he was asked to look into in
21   terms of his work in this case.
22       THE WITNESS:  I'm following the advice of
23   Mr. Shaeffer.  I won't answer.
24   BY MR. WORK-DEMBOWSKI:
25       Q.  So were you asked to look at other

Page 44

1    strategies other than the two that you address in
2    your report?
3        MR. SHAEFFER:  So I will caution him again.
4    You can -- you can answer the question to the
5    extent you don't reveal the specifics of those
6    communications you would have had with plaintiffs'
7    counsel.
8        THE WITNESS:  I don't recall being asked to
9    look at any specific mechanisms.
10   BY MR. WORK-DEMBOWSKI:
11       Q.  Were you asked to look broadly for other
12   potential cycle beating or defeat device strategy
13   in the Chevy diesel Cruze?
14       MR. SHAEFFER:  Objection.  Vague and ambiguous.
15       THE WITNESS:  I was not instructed one way or
16   another regarding other defeat devices.
17   BY MR. WORK-DEMBOWSKI:
18       Q.  Did you look for any other defeat devices
19   or cycle beating strategies in the diesel Chevy
20   Cruz?
21       MR. SHAEFFER:  Objection.  Asked and answered.
22       THE WITNESS:  I looked at the documentation for
23   potentially other things that could be a cycle
24   beating strategy.
25

Page 45

1    BY MR. WORK-DEMBOWSKI:
2        Q.  And you did not identify any, correct?
3        MR. SHAEFFER:  Objection.  Misstates prior
4    testimony.
5        THE WITNESS:  I wouldn't say it so
6    conclusively.  Nothing jumped out at me, so I
7    focused on the ones that plaintiffs asked me to
8    look at.
9    BY MR. WORK-DEMBOWSKI:
10       Q.  And you're not offering any opinion in
11   this litigation about any other potential cycle
12   beating or defeat device strategies in the diesel
13   Chevy Cruz, correct?
14       A.  That's correct.
15       Q.  You were not asked to evaluate the EDC17
16   control unit as such, were you?
17       MR. SHAEFFER:  Objection.  Vague and ambiguous.
18       THE WITNESS:  I was asked to evaluate the
19   EDC17, but as you say, not as a whole, but
20   specifically with an interest in defeat devices.
21   BY MR. WORK-DEMBOWSKI:
22       Q.  And you understand -- excuse me.  I didn't
23   mean to interrupt you.
24       A.  I'll stop here.
25       Q.  You understand that the EDC17 is the brand

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                    May 19, 2020

Page 46

1  name for an onboard computer for diesel vehicles,
2  right?
3      A.  That's right.
4      Q.  The EDC17 itself, the computer is not what
5  you're alleging is a defeat device, correct?
6      A.  I am referring -- by defeat device, and
7  again, I'm not using it in the technical sense a
8  car use would it, but let's say cycle beating
9  devices are embedded in the EDC17 code
10  post-cal bration parameters.
11     Q.  That's specific for the diesel Chevy
12  Cruze, correct?
13     A.  My conclusions are about the model years
14  '14 and '15 diesel Chevy Cruz vehicles.
15     Q.  You do not have an opinion that every
16  EDC17 in the world is somehow improper, do you?
17     A.  That is not the opinion offered in my
18  report.
19     Q.  The EDC17 is just a computer, right?
20     A.  It -- I don't know what you mean by just a
21  computer.  So it is a computer.  It has software
22  that was programmed into it by the manufacturer and
23  has calibration parameters.  It also has actuators
24  that control vehicle behavior as well as sensors.
25  So it's different from the computer in front of me,

Page 47

1  but it is a computer in the sense that it has the
2  same basic fundamental organizing principles.
3      Q.  What you believe to be the problems in
4  this case are in the specific software that was in
5  the Chevy Cruze vehicles and not the EDC17 computer
6  as such; is that right?
7      A.  The problems identified or the cycle
8  beating strategies were part of the software that
9  was programmed into the computer.  So whether you
10  consider the software that has been programmed into
11  the former to be part of the computer or not would
12  be the distinguishing thing to -- in your question.
13  I would consider it to be part of the system.
14     Q.  And that's part of the system specific to
15  the diesel Chevy Cruze?
16     A.  That's right.
17     Q.  A different EDC17 in a different vehicle
18  may have different software, correct?
19     A.  That's correct.
20     Q.  Who decided which two strategies you would
21  review for your analysis?
22     A.  I don't know.
23     Q.  Did anyone instruct you about what
24  methodology to use in evaluating those strategies?
25     A.  I don't recall a specific methodology

Page 48

1  being told or instructed about.
2      Q.  Before you began your analysis, you were
3  told that the two strategies you were to look at
4  were potential cycle beating strategies, correct?
5      A.  Peter, is that privileged?
6  MR. SHAEFFER:  I think the fact of being
7  informed about two potential cycle beating
8  strategies is not privileged, but I will instruct
9  you not to get into any sort of mental impressions
10  of counsel or any of our work product in answering
11  this question.
12     THE WITNESS:  Okay.  The specific cycle beating
13  strategies in my report were named by counsel.
14  BY MR. WORK-DEMBOWSKI:
15     Q.  And you were told that they were potential
16  cycle beating strategies?
17     A.  I think that's maybe skirting close to
18  what Peter was alluding to, but I would say
19  generally there was a suspicion there might be.
20     Q.  And you were told that these were
21  suspected to be potential cycle beating strategies?
22     A.  I wouldn't put it in those strong terms.
23  I believe it was more open-ended can you take a
24  look at these.
25  MR. SHAEFFER:  Again, I would caution again not

Page 49

1  to get into the mental impressions of counsel in
2  answering these questions.  I think they've been
3  asked and answered that he was told to review the
4  cycle beating strategies.
5  BY MR. WORK-DEMBOWSKI:
6      Q.  You were asked to confirm that they were,
7  in fact, cycle beating strategies in your opinion,
8  correct?
9      A.  No, not correct.
10     Q.  What were you asked to do?
11     A.  I think as Peter said and as I've said, I
12  was asked to specifically look into these potential
13  mechanisms.  I was not instructed as to whether
14  they were or were not cycle beating strategies.
15     Q.  In your report, you wrote that you were
16  asked to review two potential cycle beating
17  strategies.  When was the first time you heard them
18  referred to as potential cycle beating strategies?
19     A.  I don't remember.
20     Q.  Was it before you analyzed them?
21     A.  I think the term cycle beating, I'm sure,
22  came up before I wrote my reports and before I
23  began my analysis.
24     Q.  Would you please explain what you mean by
25  the term cycle beating strategies?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL — Highly Confidential                May 19, 2020

Page 50

1    A.  I mean a mechanism that allows the vehicle
2  to perform more favorably with respect to emissions
3  on an emissions test cycle than it would under
4  similar conditions in real-world driving.
5    Q.  And what's the basis for that
6  understanding of cycle beating?
7    A.  The basis is accounts in popular media and
8  my reading of, I guess, various articles.  I don't
9  remember exactly what.  It's hard to pinpoint a
10 specific document.
11   Q.  Can you cite any government regulation for
12 that definition of cycle beating?
13   A.  I know that there are some government
14 regulations that define legally a defeat device,
15 but I couldn't cite those to you.  And the meaning
16 I'm using is not a precise legal meaning as
17 described there.  It's the meaning that I gave you
18 earlier.
19   Q.  You mentioned that you have this
20 understanding from reading articles.  What articles
21 contain the definition of cycle beating that you
22 just mentioned?
23   A.  I don't have an exact article I could
24 point you to.
25   Q.  Can you cite any authority for that

Page 51

1  definition?
2    A.  So the definition that I'm using is,
3  again, the one I gave you.  So that's the operating
4  meaning.  Now, where I came up with that definition
5  is based on accounts, I believe, of the Volkswagon
6  diesel emissions scandal where the term cycle
7  beating first became known to me.
8    Q.  Do you consider yourself an expert in what
9  is and what is not cycle beating?
10   MR. SHAEFFER:  Objection.  Object to form.
11   THE WITNESS:  I consider myself an expert on
12 software systems and when a cycle beating mechanism
13 is implemented in software.  I consider myself an
14 expert in those kinds of mechanisms.
15 BY MR. WORK-DEMBOWSKI:
16   Q.  Do you consider yourself an expert in what
17 is and is not cycle beating?
18   A.  Not with respect to the precise legal
19 definition.
20   Q.  Only with respect to the definition that
21 you gave which does not come from any authority,
22 correct?
23   MR. SHAEFFER:  Objection.  Misstates prior
24 testimony.
25   THE WITNESS:  I did not cite a specific

Page 52

1  authority where that definition was derived from.
2  I simply stated that that's the definition I'm
3  using in my analysis.
4  BY MR. WORK-DEMBOWSKI:
5    Q.  In your opinion, does -- for a mechanism
6  to be cycle beating, does it have to make the
7  difference between whether a vehicle passes or
8  fails an emissions certification test?
9    MR. SHAEFFER:  Object to form.
10   THE WITNESS:  Could you repeat that?  I want to
11 make sure I understand your question.
12 BY MR. WORK-DEMBOWSKI:
13   Q.  In your opinion for a mechanism to be
14 cycle beating, does it have to make the difference
15 between whether a vehicle passes or fails an
16 emissions certification test?
17   MR. SHAEFFER:  Same objection.
18   THE WITNESS:  No.  I think under my definition,
19 I would say that it would help the vehicle pass it.
20 It may not be necessarily the decisive thing.  It
21 may contribute to the vehicle passing.
22 BY MR. WORK-DEMBOWSKI:
23   Q.  But if a vehicle would pass the
24 certification testing either way whether the
25 mechanism engages or not, you would still consider

Page 53

1  it cycle beating?
2    MR. SHAEFFER:  Object to form.
3    THE WITNESS:  If the mechanism I described
4  never engages or never has any effect, then I would
5  not consider it to be -- again, on any emissions
6  test, I would not consider it to be a cycle beating
7  mechanism.
8  BY MR. WORK-DEMBOWSKI:
9    Q.  And if the -- is a cycle beating mechanism
10 the same as a defeat device?
11   MR. SHAEFFER:  Object to form.
12   THE WITNESS:  Defeat device has a precise legal
13 meaning.  In my report, I use the definition I gave
14 you earlier.
15 BY MR. WORK-DEMBOWSKI:
16   Q.  So you are not rendering an opinion that
17 either of the mechanisms you describe in your
18 report is a defeat device?
19   A.  I'm not rendering a legal opinion.
20   Q.  You're not rendering an opinion that
21 either of the mechanisms that you describe in your
22 report is a defeat device?
23   A.  I'm not rendering a legal opinion as to
24 whether the mechanisms I describe, which I describe
25 as cycle beating mechanisms or mechanisms that

KIRILL LEVCHENKO, PH.D., Highly Confidential                    May 19, 2020

Page 54

1  would contribute to a vehicle performing better on
2  cycles, meets the legal definition of a defeat
3  device. I'm not operating under the legal
4  definition because I'm not a lawyer.
5      Q.  I think that's a yes, but I'm going to
6  repeat the question. It's a yes or no question.
7          You are not offering an opinion that the
8  two mechanisms you describe in your reports are
9  defeat devices?
10     MR. SHAEFFER:  Objection.  Asked and answered.
11     THE WITNESS:  I believe my conclusions imply
12 certain conclusions that you would have to draw on
13 a legal basis.  So in order for me to answer it yes
14 or no, I would have to refer to the legal
15 definition, and that's not something I'm doing.
16         So again, to put it another way, the
17 opinions I'm offering have implications on the
18 questions you are asking.  So I would hesitate to
19 say no because that would misstate the nature of my
20 opinions.
21 BY MR. WORK-DEMBOWSKI:

Page 55

Page 56

Page 57

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL — Highly Confidential                    May 19, 2020

Page 58

4   you performed in this case if you had not been
5   asked to do so by plaintiffs' counsel?
6       MR. SHAEFFER: Objection. Vague and ambiguous.
7       THE WITNESS: I would not be able to do this
8   analysis without the documents made available to
9   me.
10   BY MR. WORK-DEMBOWSKI:
11      Q. Have you ever analyzed the software for
12   any diesel vehicle and not found cycle beating
13   strategies?
14      A. I don't remember all of the vehicles I
15   looked at, but there are certainly ones that I
16   looked at where I didn't find something.
17       MR. SHAEFFER: And I would also --
18       MR. WORK-DEMBOWSKI: I'm sorry, Peter?
19       MR. SHAEFFER: I would caution Dr. Levchenko in
20   answering these questions not to reveal specifics
21   of any consulting work where there would be
22   potential privilege involved or confidentiality
23   involved.
24       THE WITNESS: Understood.
25

Page 59

1   BY MR. WORK-DEMBOWSKI:
2      Q. Have you -- can you tell me what vehicles,
3   diesel vehicles you've analyzed where you found no
4   cycle beating strategies?
5      A. I couldn't tell you that.
6      Q. How many have there been?
7      A. How many of --
8      Q. How many diesel vehicles have you analyzed
9   and found no cycle beating strategies?
10      A. I don't -- I don't have that answer for
11   you. I'm sorry. I don't remember how many
12   different pieces of software I looked at.
13      Q. Was it more than one?
14      A. I've certainly looked at more than one
15   piece of software or documentation.
16      Q. For how many vehicle models have you
17   looked at the software documentation for diesel
18   vehicles?
19      A. I would say more than 10, but I would
20   hesitate to give an exact number.
21      Q. How many of those were in the context of
22   the article that you worked on about Volkswagon and
23   Fiat Chrysler?
24      A. I don't remember the exact number.
25      Q. Was it anything other than what you did in

Page 60

1   this case? Let me clarify that question.
2       Have you analyzed the software for the
3   emissions controls on any diesel vehicle models
4   other than what you've analyzed for this case and
5   what you've looked at for the article that you
6   worked on related to Volkswagon and Fiat Chrysler
7   vehicles?
8      A. Yes.
9      Q. How many?
10      A. I don't know the exact number.
11      Q. Approximately?
12      A. More than five.
13      Q. More than 10?
14      A. I'm not sure.
15      Q. Of those five or more than five, outside
16   of the context of this litigation and the
17   Volkswagon and Fiat Chrysler article, how many
18   times did you find no cycle beating mechanisms in
19   the software?
20      A. I don't know, and the issue is some of
21   them I only looked at a little bit. Some of them I
22   only skimmed documentation looking for similar
23   kinds of things. So I don't want my answer to be
24   interpreted as definitively being yes or no.
25      Q. Do you have a standard methodology that

Page 61

1   you use when you look at the software for these
2   types of vehicles?
3      A. Yes. There is a methodology I follow.
4   It's the same as outlined in this report.
5      Q. And you applied that same methodology to
6   these other software documentations for other
7   diesel vehicles, and you found no cycle beating
8   mechanisms?
9       MR. SHAEFFER: Objection. Misstates prior
10   testimony.
11       THE WITNESS: In this particular case, I had
12   access to documentation, technical files, A2L files
13   and so on. So the files I looked at for other
14   vehicles are different from what I looked at here.
15   BY MR. WORK-DEMBOWSKI:
16      Q. And how did you apply the same
17   methodology?
18      A. Same methodology as --
19      Q. I asked you if you apply the same
20   methodology when you look at these types of
21   software, and you said that you applied the same
22   methodology as described in your report when you
23   looked at other pieces of software. And I'm trying
24   to understand how you did that when you now say you
25   did not have the same types of documentation. I'm

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential          May 19, 2020

Page 62

1  trying to understand the methodology that you used.
2  Please explain.
3      A.  Got it.  So the methodology described
4  requires access to certain kinds of documentation
5  and technical files.  When those are available,
6  when they have been in prior situations, I use the
7  exact methodology described here.  In cases where
8  that's not available as in the case of the How They
9  Did It article, there's some overlap in
10  methodology, for example, how I look at the
11  software documentation, but some of the elements
12  that went into this report were simply not possible
13  in the How They Did It article.
14      Q.  Why have you analyzed the software for
15  other vehicles other than in this litigation and in
16  the How They Did It article?  For what purpose?
17      A.  Other than those?  So in some cases
18  because I was interested in answering the question
19  whether or not there are cycle beating mechanisms
20  in them.  In other cases, it was part of a
21  consulting contract.
22      Q.  Was it as part of your work at the
23  university?
24      MR. SHAEFFER:  Objection to form, but you can
25  answer.

Page 63

1      THE WITNESS:  Yeah, some of that was part of
2  the work.  It was part of the How They Did It work.
3  BY MR. WORK-DEMBOWSKI:
4      Q.  Okay.  Aside from the How They Did It
5  work, has your analysis of software documentation
6  outside of the context of this litigation and
7  outside of the context of the How They Did It
8  article, was that part of your work at the
9  university as a professor?
10      A.  No.
11      Q.  Have you reported or published the results
12  of your analysis of the software in any diesel
13  vehicles aside from the How They Did It article and
14  what you've done in this litigation?
15      A.  Not publicly.  As I mentioned, some of my
16  work was part of a consulting agreement where there
17  was a written product.  I don't know what the
18  attorneys did with it.
19      Q.  Was any of that consulting work done for
20  someone that was not lawyers or a law firm?
21      A.  No.
22      Q.  Would you like to take a short break?
23  We've been going for a little while.
24      A.  You can keep going.
25      Q.  Dr. Levchenko, what is the field in which

Page 64

1  you believe you are an expert for purposes of this
2  case?
3      A.  Cyberphysical systems.
4      Q.  Do you believe that you're an expert in
5  the field of automotive engineering?
6      A.  No.
7      Q.  You have no training or experience in the
8  field of automotive engineering, do you?
9      A.  That's correct.
10      Q.  You are not an expert in diesel
11  technology, are you?
12      A.  I'm not an expert in diesel technology.
13      Q.  You have no training or experience in the
14  field of diesel technology?
15      A.  That's correct.
16      Q.  You're not an expert on emissions laws or
17  regulations, correct?
18      A.  That's correct.
19      Q.  You have no training or experience in the
20  field of emissions laws or regulations?
21      A.  That is correct.
22      Q.  You're also not an expert in the field of
23  diesel emissions technology, correct?
24      A.  Correct.
25      Q.  You have no training or experience in the

Page 65

1  field of diesel emissions technology?
2      A.  I want to be careful about the term
3  experience because, you know, my work would
4  certainly qualify as experience, but if you mean
5  prior to the How They Did It article, then no.
6      Q.  You're not an expert in chemistry?
7      A.  No.
8      Q.  You're not an expert in physics?
9      A.  No.
10      Q.  You're not an expert in thermodynamics?
11      A.  No.
12      Q.  You're not an expert in consumer
13  expectations?
14      MR. SHAEFFER:  Objection.  Vague as to
15  expectations.
16      THE WITNESS:  To the extent I understand what
17  that means, no.
18  BY MR. WORK-DEMBOWSKI:
19      Q.  You're not an expert in consumer
20  decision-making?
21      A.  Correct.
22      Q.  Would you please get your first report,
23  it's Exhibit Levchenko 1, and turn to Appendix A?
24      A.  Okay.
25      Q.  Appendix A to your first report is your

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL
HIGHLY Confidential                                    May 19, 2020

Page 66

1  CV, correct?
2     A.  Yes.
3     Q.  Is it current?
4     A.  The list of students has changed, but
5  otherwise, it's current.
6     Q.  Does your CV reflect a complete and
7  accurate description of your educational and
8  professional background?
9     A.  Yes.
10    Q.  Do you have any changes or corrections or
11 updates to it aside from the list of current
12 students?
13    A.  No.
14    Q.  You included in your CV in this case all
15 of the background information that you thought
16 would be relevant to understand your expertise to
17 testify as an expert in this case, correct?
18    MR. SHAEFFER:  Object to form, but you can
19 answer.
20    THE WITNESS:  I have a list of selected
21 publications, I think.  Some of my other work also
22 forms part of my expertise.
23 BY MR. WORK-DEMBOWSKI:
24    Q.  Do you have any other work related to
25 diesel emissions that you did not include on your

Page 67

1  CV that you believe would be relevant to your
2  expertise in this case?
3     A.  Not to diesel emissions.  The work I was
4  referring to is work on software analysis, which is
5  what the task was in this case.
6     Q.  You hold a B.A. degree in mathematics and
7  computer science, correct?
8     A.  That's correct.
9     Q.  B.A. stands for bachelor of arts?
10    A.  Yes.
11    Q.  It's not a bachelor of science?
12    A.  It is not.
13    Q.  You received your B.A. in 2001?
14    A.  Correct.
15    Q.  During your undergraduate studies working
16 towards your B.A. degree, did you take any courses
17 on automotive engineering?
18    A.  No.
19    Q.  Did you take any courses as an
20 undergraduate related to diesel vehicles?
21    A.  No.
22    Q.  Did you take any courses as an
23 undergraduate related to vehicle emissions or
24 defeat devices?
25    A.  No.

Page 68

1     Q.  As an undergraduate, did you do any
2  research on any of those topics I just mentioned?
3     A.  No.
4     Q.  You also hold a Ph.D. in computer science,
5  correct?
6     A.  That's correct.
7     Q.  Did you earn a master's degree between
8  your undergraduate and your Ph.D.?
9     A.  There's, I'd say, an implied master's that
10 is granted if you leave before obtaining a Ph.D.
11 So if I were to not have completed my Ph.D., I
12 would have a master's degree, but since I've
13 completed it, it's just a Ph.D.
14    Q.  You received your Ph.D. in 2008, correct?
15    A.  Yes.
16    Q.  During your work towards your Ph.D., did
17 you take any courses on automotive engineering?
18    A.  I took classes on – a course on software
19 engineering, which would have bearing on automotive
20 engineering to the extent that software is involved
21 in how a vehicle operates.
22    Q.  Was any aspect of the course on software
23 engineering that you took specifically related to
24 automobile?
25    A.  Not specifically to automobiles.

Page 69

1     Q.  During your Ph.D. work, did you take any
2  courses related to diesel vehicles?
3     A.  No.
4     Q.  During your Ph.D. work, did you take any
5  courses related to vehicle emissions or defeat
6  devices?
7     A.  No.
8     Q.  During your Ph.D. work, did you do any
9  research on automobiles, diesel vehicles, vehicle
10 emissions or defeat devices?
11    A.  No.
12    Q.  During your Ph.D. work, did you teach any
13 classes on any of those topics?
14    A.  No.
15    Q.  Do you have any degrees besides your Ph.D.
16 and B.A. that are listed on your CV?
17    A.  Not to my knowledge.
18    Q.  I want to tak a little bit about your
19 work experience.  You currently are an associate
20 professor of electrical and computer engineering at
21 the University of Illinois Urbana-Champaign,
22 correct?
23    A.  That's correct.
24    Q.  And according to your CV, you've had that
25 position since the fall of 2018; is that right?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                    May 19, 2020
HIGHLY Confidential

Page 70

1    A.  That's correct.
2    Q.  In your report, it says that you've been
3  at the University of Illinois Urbana-Champaign
4  since the fall of 2019.  Which is correct?  That's
5  in paragraph 7 of your first report.
6    A.  2018 is correct.
7    Q.  2018?
8    A.  Yeah.  I mean, both are technically
9  correct, but the CV is --
10    Q.  When you started there is 2018; is that
11  correct?
12    A.  Correct.
13    Q.  Would you please open envelope No. 3, and
14  I'll ask my colleague to -- yes, No. 3.  Thank you,
15  to post tab 3 on Box.com.  This is Exhibit
16  Levchenko 5 for the record.
17       Do you recognize the document that's been
18  posted as Exhibit Levchenko 5?
19    A.  It looks like the page from the EC -- my
20  home department describing who I am and my research
21  interests.
22    Q.  It's your profile page from the University
23  of Illinois website, correct?
24    A.  Yes.
25    Q.  Do you have any reason to believe that

Page 71

1  your profile page for the University of Illinois
2  website is inaccurate?
3    A.  I have no reason to believe that.
4    Q.  This page states that your research
5  interests are cyberphysical system security,
6  network security, e-crime and internet service
7  abuse, correct?
8    A.  That's correct.
9    Q.  Is that a complete and accurate list of
10  your research interests?
11    A.  Those are my primary research interests.
12  I have other research interests, but they wouldn't
13  fall into this primary category.
14    Q.  The first item on that list, cyberphysical
15  system security, can you explain what you mean or
16  what is meant by security in this context?
17    A.  Yeah.  So security is a subdiscipline of
18  computer engineering or computer science that
19  analyzes how systems would behave in an adversarial
20  setting.  So this is an analysis of how might
21  somebody try to abuse or cause a system to behave
22  differently.  Now, usually by that, we mean an
23  attacker, somebody who might try to hack into your
24  thermostat or nuclear power plant.
25       In the case of diesel emissions cheating,

Page 72

1  the attacker is effectively the person developing
2  the software.  They're causing the system to behave
3  differently from how it's stated or advertised to
4  behave.
5    Q.  In what other context have you analyzed
6  system security by looking at the inherent way that
7  the software operates rather than looking at an
8  external attack?
9    A.  I'm not sure -- I'm not sure what you
10  mean.
11    Q.  Maybe I misunderstood the thing that you
12  just said.  You said that in the subdiscipline of
13  computer engineering or computer science that is
14  security, typically -- well, you didn't use the
15  word typically, but it often analyzes how somebody
16  might abuse or cause a system to behave
17  differently, and usually by that, you mean an
18  attacker or somebody who might try to hack in?
19    A.  That's right.
20    Q.  And you drew a distinction to the software
21  in this case which you analyzed from the way that
22  it operates by its own nature.  Is that a fair
23  description?
24    A.  Yes.
25    Q.  You're not analyzing in this case how

Page 73

1  someone might hack into the software --
2    A.  That's correct.
3    Q.  -- of the diesel Chevy Cruze?
4    A.  Yeah, that's correct.  My analysis is not
5  about an external attacker manipulating the
6  vehicle.
7    Q.  So in what other contexts in your work on
8  system security have you analyzed the inherent
9  features of software rather than how the system
10  might be attacked externally?
11    A.  Well, all analysis is about the system
12  inherently under certain conditions, but I think --
13  I think you're asking something else, so perhaps,
14  you could restate your question.
15    Q.  What other analyses of system security
16  have you done in what other field, what other
17  products that did not relate to external attacks,
18  but instead, related to the internal inherent
19  functioning of the software?
20    A.  Yes.  So automotive defeat devices or
21  cycle beating mechanisms are the only case where
22  the attacker is not somebody external, but
23  effectively somebody who is building the system.
24  That's one of the unique and interesting
25  characteristics and something we highlight in the

KIRILL LEVCHENKO, PH.D., Highly Confidential                May 19, 2020

Page 74

```
1   How They Did It article.
2        Q.   That is unique to automotive software?
3        A.   It's unique to diesel emissions evasion.
4   At least that's the case where we've identified
5   that happening for sure.  There are other areas
6   where there are similar incentives and that those
7   things could happen.
8        Q.   Diesel emissions are the only field in
9   which you've conducted that sort of analysis?
10       MR. SHAEFFER:  Objection.  Misstates prior
11  testimony.
12       THE WITNESS:  No.  We've looked at other kinds
13  of systems where a similar dynamic may exist.
14  BY MR. WORK-DEMBOWSKI:
15       Q.   What other kinds of systems?
16       A.   So we looked briefly at televisions that
17  have an Energy Star certification where the
18  manufacturer may have an incentive to effectively
19  cheat on the Energy Star testing to make the TV
20  look like it has lower emissions or lower power
21  consumption than it would when the consumer takes
22  it home.  That was a brief cursory analysis that we
23  did roughly in the How They Did It time frame.
24       Q.   When you say we, who are you -- who are
25  we?
```

Page 75

```
1        A.   I'm sorry.  This is academically.  In this
2   case, it was -- it was just me.
3        Q.   Did you apply any of the same methodology
4   in analyzing television software as you've used in
5   this case?
6        A.   Conceptually, yes, but in this case, I
7   relied more heavily on the software documentation,
8   whereas, in the television set, I looked at looking
9   purely at the software.  So there was no
10  documentation.  Does that make sense?
11       Q.   In your job at the University of Illinois,
12  do you teach any courses related to automotive
13  engineering?
14       A.   No.
15       Q.   Any courses related to diesel vehicles?
16       A.   No.
17       Q.   Any courses related to vehicle emissions?
18       A.   No.
19       Q.   Any courses related to cycle beating
20  strategies?
21       A.   No.
22       Q.   Any courses relating to defeat devices?
23       A.   No, and I don't think there are such
24  courses anywhere.  At least, I hope not.
25       Q.   When we were looking at your CV a moment
```

Page 76

```
1   ago, you commented that you have a list of students
2   on your CV.  Without needing to go into the names
3   of any of those individuals, have any Ph.D.
4   students whose work you have overseen in the past
5   or whose work you currently oversee, have any of
6   them done research or work related to diesel
7   vehicles?
8        A.   Well, one of the students is a coauthor on
9   the How They Did It article, so obviously, he
10  worked on that.  And there was a master's student
11  who is not listed here that I advised who didn't
12  work on diesel emissions specifically, but worked
13  on general automobile security questions.
14       Q.   Who was the student who was a coauthor on
15  the How You Did It article, How They Did It
16  article?
17       A.   Guo Li.
18       Q.   Is that G-u-o, L-i?
19       A.   That's correct.
20       Q.   He's listed No. 1 in your CV?
21       A.   That's correct.
22       Q.   Any others?
23       A.   There were other students who are authors
24  on the article who are not my students.
25       Q.   Any other of your students that have done
```

Page 77

```
1   work on diesel vehicles?
2        A.   Not to my knowledge.
3        Q.   I'd like to come back to your professional
4   experience at the University of California San
5   Diego.
6        A.   Okay.
7        Q.   So I'm looking at the first page of your
8   CV.  Your first position at the University of
9   California San Diego is listed as an assistant
10  research scientist?
11       A.   That's correct.
12       Q.   And you held that position from 2011 until
13  2017?
14       A.   That's correct.
15       Q.   And then your title changed to associate
16  research scientist; is that correct?
17       A.   Yeah, that's correct.  It's just a
18  promotion.  It's the same kind of job.
19       Q.   Okay.  What is the difference between an
20  assistant research scientist and an associate
21  research scientist at the University of California
22  San Diego?
23       A.   It's just simply part of the promotion
24  letter, so -- ladder.  So after however many years,
25  I don't remember exactly, put together a file, and
```

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                    May 19, 2020
                              Highly Confidential

Page 78

1  you get letter writers.  And if the various
2  committees decide that you are up to the standards
3  of that university, you're promoted to associate.
4  It's similar to the professor ladder except it's a
5  separate kind of track of research scientist.
6      Q.  Did any of your work while you were at the
7  University of California San Diego, aside from
8  anything you did on the How They Did It article,
9  relate to diesel technology?
10     A.  Only to diesel technology as far as it
11 involves computer systems that control the behavior
12 of the diesel vehicle, but not diesel combustion,
13 for example.
14     Q.  Diesel emissions?
15     A.  Not diesel emissions.
16     Q.  Did any classes that you taught while you
17 were at the University of California San Diego
18 relate to diesel emissions?
19     A.  Not to diesel emissions.
20     Q.  Did they relate to diesel technology more
21 generally?
22     A.  Yes, because diesel technology today is
23 controlled by a computer.  And so pretty much
24 everything I do has to do with computers from the
25 intro class I teach on how computers work to the

Page 79

1  computer security classes that we analyze software
2  for how it might be used.  So all of that has to do
3  with diesel engines today because diesel engines
4  today are controlled by a computer.
5      Q.  But nothing else specific to diesel
6  engineering?
7      A.  Nothing specific to what there is outside
8  of the computer system.
9      Q.  Did any of the classes that you taught at
10 University of California San Diego relate to defeat
11 devices?
12     A.  No.
13     Q.  Did any of the courses that you taught at
14 University of California San Diego relate to cycle
15 beating strategies?
16     A.  No.
17     Q.  You -- what did you do between earning
18 your Ph.D. in 2008 and starting at University of
19 California San Diego in 2011?
20     A.  I was a post-doc and then a position
21 called a project scientist, which is similar to a
22 research scientist, but, you know, different for
23 technical academic reasons.
24     Q.  Was that also at the University of
25 California San Diego?

Page 80

1      A.  That's correct.
2      Q.  Did your work in those positions include
3  work on diesel technology?
4      A.  Same answer as before to the extent that
5  diesel technology today is about computer control.
6  My work in the past has to do with computer control
7  and computer security.
8          MR. WORK-DEMBOWSKI:  I'm going to suggest we
9      take a break.
10         MR. SHAEFFER:  That works.
11         THE VIDEOGRAPHER:  Going off the video record.
12     The time is now 16:15 UTC.
13             (Whereupon, a short break was
14             taken.)
15         THE VIDEOGRAPHER:  We are back on the video
16     record.  The time is now 16:32 UTC.  Go ahead.
17 BY MR. WORK-DEMBOWSKI:
18     Q.  Welcome back, Dr. Levchenko.
19         In the field of automotive engineering,
20 what is the difference between software coding and
21 cal bration?
22     A.  So the code is the program code.  That's
23 the instructions that the computer, the ECU will be
24 executing.  Cal brations are the values that it
25 will use in the calculation itself.  So -- well,

Page 81

1  I'll leave it at that.
2      Q.  Is it fair to say that software code can
3  be written in a way that allows engineers to
4  determine the values that the code uses for
5  calculations?
6      A.  Well, the documentation would be the thing
7  that the engineers would refer to.
8      Q.  But the code is written in a way that the
9  engineers can instruct the code to behave one way
10 or another?
11     A.  Yes.
12     Q.  And cal bration is the term that's used
13 for the process of determining the values the code
14 uses; is that correct?
15     A.  Yes.  That is my understanding.
16     Q.  Is it also your understanding that
17 cal bration can be determinative of vehicle
18 behavior?
19     A.  Yes.
20     Q.  And the same software function calibrated
21 in different ways can produce different results in
22 vehicle behavior, correct?
23     A.  Correct.
24     Q.  Some code could be cal brated in a way
25 that it does nothing at all?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                  May 19, 2020

Page 82

1    A.  Correct.
2    MR. SHAEFFER:  Object to the form.
3  BY MR. WORK-DEMBOWSKI:
4    Q.  Calibration is more than just fine tuning
5  of a vehicle, right?
6    MR. SHAEFFER:  Object to the form.
7    THE WITNESS:  I would agree with that.
8  BY MR. WORK-DEMBOWSKI:
9    Q.  Have you ever performed software coding
10 work for an automobile?
11   A.  No.
12   Q.  Have you ever written software relating to
13 emissions controls on a vehicle?
14   A.  No.
15   Q.  Have you ever performed calibration of
16 software for an engine control unit for a vehicle?
17   A.  I'm sorry.  Regarding the previous
18 question, I want to clarify that.  I have written
19 software to do the work that I've done on
20 emissions, but it's not software that went into a
21 vehicle.  If you could repeat your question.
22   Q.  Have you ever performed calibration of
23 software for an automobile?
24   A.  No.  Actually, I just remembered something
25 else.  I apologize.  You were asking about my

Page 83

1  students.  I believe one of my students has done
2  some work on automobiles independent of my research
3  with him.  I think his father owns a company that
4  involves engines, but he was not involved in this
5  work.
6    Q.  Have you overseen any of his work related
7  to automobiles?
8    A.  No.
9    Q.  Can you explain the process by which
10 emissions control software for a diesel passenger
11 vehicle is calibrated?
12   A.  That's -- that's not something that I -- I
13 should say no.  I could not explain it to you.
14   Q.  I'm sorry.  I think I interrupted you.
15   A.  I could not explain the full process to
16 you.
17   Q.  Can you explain any part of the process?
18   A.  Yeah.  I can explain the part that
19 concerns the -- you know, how the values are
20 introduced and what role they play.  What I can't
21 tell you is exactly what's going on in every
22 engineer's mind and what decisions they're making
23 in every specific case during calibration.
24   Q.  Please explain how the values are
25 introduced.

Page 84

1    A.  Yeah.  So there's specialized software for
2  doing that.  There's several ways, but at the
3  lowest technical level, the binary image that's
4  going to go into the engine, the specific values,
5  the calibration values are inserted into that.  And
6  by inserted, I mean places where they would be --
7  where the code would call upon them.  The specific
8  values are written to those places, so sort of a
9  fill-in-the-blank type of thing.
10   Q.  What tools do calibrators use to calibrate
11 software for diesel vehicles?
12   A.  I don't know the full tool set that
13 they -- that they would use.  I know they've used
14 software called Inca, which is also what I use to
15 analyze the calibration data in this case.
16   Q.  What else?
17   A.  What else -- what else did I use, or what
18 else do engineers use?
19   Q.  What other tools do engineers use?
20   A.  In the calibration process, there's some
21 software that I mentioned in my report that they
22 use, a tool called Hex2Bin, which is for converting
23 between formats, but those are all the specific
24 tools that I know they use for sure.
25   Q.  What training do calibrators receive

Page 85

1  before they perform calibration work on diesel
2  vehicles?
3    MR. SHAEFFER:  Object to the form.
4    THE WITNESS:  I don't know.
5  BY MR. WORK-DEMBOWSKI:
6    Q.  How is calibration tested?
7    A.  I don't know.
8    Q.  How long does the process of calibrating
9  the emissions control software on a diesel
10 passenger vehicle take?
11   A.  My understanding from the data that I used
12 in the report is that it takes months.
13   Q.  How many months?
14   A.  I don't know exactly.
15   Q.  Do you know how long the calibration of
16 the emissions control software on the diesel Chevy
17 Cruze took?
18   A.  No.
19   Q.  Do you understand that emissions control
20 systems have many different functionalities that
21 could affect the emissions that come out of the
22 tailpipe?
23   MR. SHAEFFER:  Objection.  Vague and ambiguous.
24   THE WITNESS:  I'm sorry.  Could you restate?
25 I'm trying to put together what you're asking.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                    May 19, 2020
HIGHLY Confidential

Page 86

BY MR. WORK-DEMBOWSKI:
1
2    Q.   Do you have an understanding of whether
3    the emissions control systems on diesel passenger
4    vehicles have multiple functionalities that can
5    affect the emissions that come out of the tailpipe?
6        MR. SHAEFFER:  Same objection.
7        THE WITNESS:  Yes.
8    BY MR. WORK-DEMBOWSKI:
9        Q.   Do you understand that the multiple
10   functions in diesel emissions control systems are
11   interrelated with each other?
12       A.   I would agree with that statement.
13       Q.   And do you understand that the calibration
14   of one aspect of the emissions controls could
15   affect the performance of other aspects of the
16   emissions controls as well as other aspects of the
17   vehicle's behavior?
18       MR. SHAEFFER:  Object to the form.
19       THE WITNESS:  I would agree with that.
20   BY MR. WORK-DEMBOWSKI:
21       Q.   And you would agree that a calibrator must
22   consider the effect of any calibration change on
23   the overall system performance, correct?
24       MR. SHAEFFER:  Same objection.
25       THE WITNESS:  I – I don't know what

Page 87

1    instructions calibrators receive when they do their
2    job.
3    BY MR. WORK-DEMBOWSKI:
4        Q.   You don't know what a calibrator has to
5    consider when performing calibration?
6        A.   I don't know the exact factors they
7    consider.
8        Q.   You don't know any of the factors they
9    consider?
10       MR. SHAEFFER:  Objection.  Misstates prior
11   testimony.
12       THE WITNESS:  I would disagree with that
13   statement.
14   BY MR. WORK-DEMBOWSKI:
15
16
17
18
19
20
21
22       Q.   What other factors are you aware of as an
23   expert in this case that calibrators take into
24   consideration when they calibrate diesel emission
25   software?

Page 88

1        A.   I would think they consider whether it
2    satisfies the particular goals of the calibration
3    to make the vehicle function in a particular way.
4    That's a general statement, but I couldn't give you
5    all the specific factors or a checklist.
6        Q.   Dr. Levchenko, can you explain what an SCR
7    catalyst looks like?
8        MR. SHAEFFER:  Object to the form.
9        THE WITNESS:  It's – it's a part of the
10   emissions, but I couldn't draw one for you if
11   that's what you're asking.
12   BY MR. WORK-DEMBOWSKI:
13       Q.   Do you know what an SCR catalyst is made
14   out of?
15       A.   I don't know its composition.
16       Q.   Do you know what materials are used in
17   manufacturing an SCR catalyst?
18       A.   I don't know that.
19       Q.   Would you please get your first report and
20   turn to Page 6.  This is Exhibit Levchenko 1.
21   Let's turn to Page 6, paragraph 11.
22       A.   Okay.
23       Q.   You wrote in paragraph 11 that the ECU is
24   a specialized computer that is responsible for
25   controlling nearly all aspects of engine operation.

Page 89

1    Did I read that correctly?
2        A.   I'm sorry.  Are you referring to Page 11
3    or paragraph 11?
4        Q.   Page 6, paragraph 11.
5        And your question again if you don't mind?
6        Q.   Sure.  In paragraph 11 of your first
7    report, you wrote the ECU is a specialized computer
8    that is responsible for controlling nearly all
9    aspects of engine operation.  Did you write that?
10       A.   Yes.
11       Q.   What aspects of engine operation does the
12   ECU not control?
13       A.   I'm not an engine expert, so I don't know
14   what all the aspects of engine operations there
15   are.
16       Q.   In paragraph 11, you describe various
17   aspects of things that the ECU can control.  Where
18   did the information come from that you wrote in
19   paragraph 11?
20       A.   It comes from the software documentation
21   as well as the reference book that I mentioned here
22   called Diesel Engine Management Systems and
23   Components, Bosch professional automotive
24   information.
25       Q.   Were you aware – I'm sorry.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL — HIGHLY Confidential                    May 19, 2020

Page 90

1   A.   I was going to say 2014 edition.
2   Q.   Were you aware of any of the information
3   in paragraph 11 before you worked on this case?
4   A.   Yes.
5   Q.   Which parts of the information in
6   paragraph 11 were you aware of before you worked on
7   this case?
8   A.   I had read parts of the book I mentioned
9   prior to this case, and I've looked at software
10  documentation prior to this case, so all of them.
11  Q.   So in point A of paragraph 11, you wrote
12  that the ECU controls the timing and amount of fuel
13  injected into the cylinder which determines the
14  amount of energy released in combustion and the
15  characteristics of the combustion process.  Did you
16  write that?
17  A.   Yes.
18  Q.   How does injecting more fuel into the
19  cylinder affect the characteristics of the
20  combustion process?
21  A.   I'm not an automotive engineer, so I
22  couldn't answer that question.
23  Q.   Well, do you know what – how injecting
24  less fuel into the cylinder affects the combustion
25  process?

Page 91

1   MR. SHAEFFER:  Objection.  Asked and answered.
2   THE WITNESS:  I'm not – I'm not an automotive
3   engineer, so I wouldn't be able to give you a
4   detailed answer.
5   BY MR. WORK-DEMBOWSKI:
6   Q.   Do you have any opinion about what amount
7   of fuel you would expect to be injected into the
8   cylinder on a vehicle l ke the Chevy diesel Cruze?
9   A.   I do not.
10  Q.   Does the amount of fuel that you would
11  expect to be injected into the cylinder change
12  across different driving conditions?
13  MR. SHAEFFER:  Object to the form.
14  THE WITNESS:  Yes.
15  BY MR. WORK-DEMBOWSKI:
16  Q.   How?
17  A.   Well, the fuel – the amount of fuel
18  injected is not constant all of the time.  So
19  depending on how fast you're going, acceleration
20  and so on, the amount of fuel will change.
21  Q.   That's because in different driving
22  conditions, the car needs different behavior,
23  correct?
24  A.   Yes.
25  Q.   How about injection timing, how does

Page 92

1   injection timing affect the characteristic of the
2   combustion process?
3   A.   I'm not – I'm not a diesel engineer, so I
4   couldn't give you an authoritative answer on that.
5   Q.   Would you expect that injection timing
6   would change in different driving conditions?
7   A.   This is outside of the scope of my report,
8   so I don't know.
9   Q.   Well, it's written in your report, and
10  that's why I'm asking you about it.
11  A.   You're asking specifically about how it
12  would change.  I'm just saying that this is an
13  element that is controlled by an engine control
14  unit.
15  Q.   And what impact does injection timing have
16  on emissions?
17  A.   I know it does have an impact, but I'm not
18  a – I'm not an engineer.  It's outside of the
19  scope of this report, so I couldn't answer that
20  question.
21  Q.   So you did not analyze the injection
22  timing for purposes of your analysis in this case?
23  A.   That's correct.
24  Q.   Even though injection timing has an impact
25  on emissions?

Page 93

1   A.   I don't know.  So I should say – let me
2   back up.  I did not analyze injection timing in
3   this case.
4   Q.   In point B, you wrote that the ECU
5   controls the position of the throttle valve which
6   determines the amount of fresh air used in
7   combustion.  Did you write that?
8   A.   I did.
9   Q.   How does changing the amount of fresh air
10  used in combustion alter vehicle performance?
11  A.   Again, outside of the scope of the report,
12  I don't know.
13  Q.   Under what driving conditions would you
14  expect higher amounts of fresh air to be needed in
15  combustion?
16  A.   Generally speaking, the greater the demand
17  for torque, the more air would be consumed in order
18  to combust the fuel.  That's a very general
19  characterization.
20  Q.   In point C of paragraph 11, you wrote that
21  the ECU controls the position of the EGR valve,
22  which determines the amount of exhaust gas diverted
23  back into the cylinder air intake.  Did you write
24  that?
25  A.   I did.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                    May 19, 2020

Page 94

1    Q.  What is the cylinder air intake?
2    A.  That's the air that's going to go into the
3    cylinder.
4    Q.  What's the cylinder?
5    A.  The cylinder is where the combustion
6    happens.
7    Q.  What is the role of the cylinder air
8    intake in the function of the engine?
9    A.  It provides the air for the combustion of
10   the engine.
11   Q.  In point D of paragraph 11, you wrote that
12   the ECU controls the amount of DEF injected into
13   the exhaust before entering the SCR catalyst, which
14   determines how much of the NOx is converted into
15   nitrogen gas and water vapor before leaving the
16   tailpipe.  Did you write that?
17   A.  I did.
18   Q.  What is DEF?
19   A.  Diesel exhaust fluid.
20   Q.  It's commonly called DEF, right?
21   A.  I don't know what it's commonly called.
22   Q.  What are the components of DEF?
23   A.  Again, I don't know.  I can tell you it
24   has a chemical that helps to reduce the amount of
25   NOx.

Page 95

1    Q.  Do you know what that chemical is?
2    A.  I couldn't tell you for sure.
3    Q.  Is the amount of NOx conversion only
4    controlled by the amount of DEF injected into the
5    exhaust?
6    A.  My understanding is that it is not.
7    Q.  Are there other factors that can affect
8    the conversion rate?
9    A.  I don't know, but I would expect there
10   are.
11   Q.  Do you know what those other factors are?
12   MR. SHAEFFER:  Objection.  Asked and answered.
13   THE WITNESS:  I don't.
14   BY MR. WORK-DEMBOWSKI:
15   Q.  You don't know what any of them are?
16   MR. SHAEFFER:  Same objection.
17   THE WITNESS:  Again, I don't know what the
18   factors are and how they affect exactly the NOx
19   conversion.
20   BY MR. WORK-DEMBOWSKI:
21   Q.  Let's move on to paragraph 12 on that same
22   page of your first report.
23   You wrote because EGR and SCR are two of
24   the primary mechanisms used to control the emission
25   of NOx, the ECU plays a critical role in

Page 96

1    controlling vehicle emissions.  Did you write that?
2    A.  I did.
3    Q.  What's your basis for that statement?
4    A.  Basis is my understanding of these systems
5    based on the software documentation and the Diesel
6    Engine Management book.
7    Q.  Any other bases?
8    A.  Not that I can recall.
9    Q.  What factors influence the effectiveness
10   of the EGR system?
11   A.  I don't know.
12   Q.  Does barometric pressure affect -- excuse
13   me.
14   Does barometric pressure influence the
15   effectiveness of the EGR system?
16   A.  I don't know.
17   Q.  Does environmental temperature?
18   A.  I don't know.
19   Q.  Does engine coolant temperature?
20   A.  I don't know.
21   Q.  Does the temperature of the exhaust?
22   A.  I don't know.
23   Q.  Does humidity?
24   A.  I don't know.
25   Q.  What about soot buildup?

Page 97

1    A.  I don't know.
2    Q.  What about the composition of the fuel
3    that's been burned in the engine?
4    A.  I don't know.
5    Q.  Do you know any factor that influences the
6    effectiveness of the EGR system?
7    A.  Well, one factor is how the -- how much
8    the EGR valve is opened.
9    Q.  Anything else?
10   A.  That will determine how much exhaust gas
11   is recirculated.  I can't name you any other
12   specific factors.
13   Q.  Okay.  Well, you talked also in that
14   sentence about the SCR system.  What factors
15   influence the effectiveness of the SCR system?
16   A.  Certainly the amount of diesel exhaust
17   fluid injected.
18   Q.  Anything else?
19   A.  I can't name any others.
20   Q.  What about the temperature of the SCR
21   catalyst?
22   A.  I don't know.
23   Q.  What about the temperature of the diesel
24   exhaust fluid?
25   A.  I don't know.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Confidential                    May 19, 2020

Page 98

```
 1      Q.  How about the composition of the diesel
 2  exhaust fluid?
 3      A.  I don't know.
 4      Q.  What about ambient temperature?
 5      A.  I don't know.
 6      Q.  Exhaust mass flow?
 7      A.  I don't know.
 8      Q.  The age of the catalyst?
 9      A.  I don't know.
10      Q.  Anything else?
11      A.  Anything else what?
12      Q.  Is there anything else that influences the
13  effectiveness of the SCR system to your knowledge?
14      A.  I don't know.
15      Q.  On the same page, paragraph 13, and again,
16  this is in your first report, paragraph 13, you
17  wrote EGR offers a complex set of trade-offs, and
18  you refer to the figure that's at the top of the
19  next page, Page 7.  The figure at the top of Page 7
20  includes three graphs, right?
21      A.  Uh-huh.  Yes.
22      Q.  Thank you.  These graphs are illustrative,
23  correct?
24      A.  Yes.
25      Q.  They are not based on data from the diesel
```

Page 99

```
 1  Chevy Cruze vehicles that are at issue in this
 2  case, are they?
 3      A.  Not to my knowledge.
 4      Q.  Can you please explain what the top graph
 5  in the figure on Page 7 shows?
 6      A.  So the top one shows the amount of the
 7  specific chemicals shown or labeled with each curve
 8  emitted as a function of exhaust gas recirculation.
 9      Q.  What does CO mean in the top graph on
10  Page 7?
11      A.  I'm sorry.  Could you repeat?
12      Q.  What does CO mean in the top graph in the
13  figure on Page 7?
14      A.  I believe it refers to carbon monoxide.
15      Q.  Do you know?
16      A.  I don't know for sure.
17      Q.  What does HC stand for in the top graph on
18  Page 7?
19      A.  I believe it refers to hydrocarbons.
20      Q.  Do you know?
21      A.  I don't know for sure.
22      Q.  What does NOx stand for in the top graph
23  on Page 7?
24      A.  Nitrogen oxides.
25      Q.  That one you know?
```

Page 100

```
 1      A.  I know it, yes.
 2      Q.  Do you know whether there are regulatory
 3  emissions standards in the United States for carbon
 4  monoxide?
 5      A.  I do not.
 6      Q.  Do you know whether or not there are
 7  regulatory emissions standards in the United States
 8  for hydrocarbons?
 9      MR. SHAEFFER:  Object to the form.
10      THE WITNESS:  I do not.
11  BY MR. WORK-DEMBOWSKI:
12      Q.  Do you know whether there are regulatory
13  emissions standards in the United States for
14  nitrogen oxides?
15      MR. SHAEFFER:  Same objection.
16      THE WITNESS:  My understanding is there are.
17  BY MR. WORK-DEMBOWSKI:
18      Q.  You do not have an opinion about what a
19  reasonable level of emissions of hydrocarbons is,
20  do you?
21      MR. SHAEFFER:  Object to the form.
22      THE WITNESS:  I don't know what the legal
23  limits are for hydrocarbons, hydrocarbon emissions.
24  BY MR. WORK-DEMBOWSKI:
25      Q.  I'm not asking about the legal limits.  Do
```

Page 101

```
 1  you have an opinion of what a reasonable level of
 2  emissions is for hydrocarbons?
 3      MR. SHAEFFER:  Same objection.
 4      THE WITNESS:  I don't have a personal opinion
 5  on that.
 6  BY MR. WORK-DEMBOWSKI:
 7      Q.  Do you have an opinion about what a
 8  reasonable level of emissions is for carbon
 9  monoxide?
10      MR. SHAEFFER:  Object to the form.
11      THE WITNESS:  I do not have a personal opinion
12  on that.
13  BY MR. WORK-DEMBOWSKI:
14      Q.  Do you have an opinion about what a
15  reasonable level of emissions is of NOx?
16      MR. SHAEFFER:  Object to the form.
17      THE WITNESS:  I don't have an opinion -- a
18  personal opinion on how much NOx should be emitted.
19  BY MR. WORK-DEMBOWSKI:
20      Q.  Do you have an expert opinion?
21      A.  I'm sorry.  Say again.
22      Q.  Do you have an expert opinion of how much
23  NOx should be emitted?
24      MR. SHAEFFER:  Object to the form.
25      THE WITNESS:  You're saying the word should,
```

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020

Page 102

1  and that could have several meanings.  So I don't
2  know what the legal limits are.  I don't have a
3  personal opinion about how much NOx should be
4  emitted.
5  BY MR. WORK-DEMBOWSKI:
6      Q.  What do you mean when you say a personal
7  opinion?
8      A.  I mean I don't have a number in mind as I
9  go about my day how much NOx cars should emit.
10     Q.  Do you have an opinion as an expert in
11  this case about that?
12     A.  I do not have an expert opinion on the NOx
13  limits, but there's a legal NOx limit, and you're
14  saying the word should, which suggests some kind of
15  a personal judgment.  It's two different meanings.
16  I don't have an opinion on the legal limits.
17  BY MR. WORK-DEMBOWSKI:
18     Q.  Let's take a look again at the figure on
19  Page 7, the middle graph.  Can you please explain
20  what the middle graph is in the figure on Page 7?
21     A.  Particulate emissions.
22     Q.  Please explain what the graph --
23     A.  I'm sorry.  It's a function of particulate
24  emissions.  It shows the -- I believe, the size,
25  but I don't know for sure, as a function of exhaust

Page 103

1  gas recirculation.
2      Q.  Do you know whether there are regulatory
3  emissions standards that govern the size of
4  particulate emissions in exhaust from diesel
5  passenger vehicles in the United States?
6      MR. SHAEFFER:  Object to the form.
7      THE WITNESS:  I don't know.
8  BY MR. WORK-DEMBOWSKI:
9      Q.  Do you know whether there are regulatory
10  emissions standards in the United States of any
11  kind that relate to particulate emissions in the
12  exhaust from diesel passenger vehicles?
13     MR. SHAEFFER:  Same objection.
14     THE WITNESS:  I don't know what the emissions
15  standards are for particulate emissions.
16  BY MR. WORK-DEMBOWSKI:
17     Q.  Do you have an opinion on what reasonable
18  levels of particulate emissions are from diesel
19  passenger vehicles?
20     MR. SHAEFFER:  Object to form.
21     THE WITNESS:  I don't have an opinion on and
22  I'm not offering a legal opinion on the legal
23  limits on it.  I don't have a personally held
24  opinion on particulate emissions.
25

Page 104

1  BY MR. WORK-DEMBOWSKI:
2      Q.  Do you have any opinions about what is a
3  reasonable particulate size --
4      MR. SHAEFFER:  Same objection.
5  BY MR. WORK-DEMBOWSKI:
6      Q.  -- in the emissions from diesel passenger
7  vehicles?
8      MR. SHAEFFER:  Apologies.  Same objection.
9      THE WITNESS:  I do not.
10  BY MR. WORK-DEMBOWSKI:
11     Q.  You recognize that balancing the
12  trade-offs among these different types of
13  emissions, carbon monoxide, hydrocarbons and NOx
14  can be a complex task, correct?
15     A.  Correct.
16     Q.  And in your work for this case, you were
17  only asked to look at software related to controls
18  for NOx emissions, correct?
19     A.  I don't recall the exact tasking, but the
20  context of diesel emissions is -- it's about NOx
21  emissions.
22     Q.  Why is that?
23     A.  It's what the -- my prior work has been on
24  in the How They Did It article, and that's what the
25  cases seem to be about.  I mean, again, this is

Page 105

1  cases described in the popular media about what --
2  what is diesel emissions cheating and so on.
3      Q.  Do you have an understanding of why the
4  focus is on NOx when it comes to diesel vehicles?
5      A.  I don't have an opinion on that.
6      Q.  You were not asked in this case about
7  possible trade-offs between NOx emissions and the
8  other emissions that are identified in the figure
9  on Page 7 of your first report; is that correct?
10     A.  I was not specifically asked to look at
11  emissions of these other things you mentioned.
12     Q.  And you don't have any opinion -- you're
13  not offering any opinion about the trade-off
14  between NOx emissions and the other emissions
15  identified on Page 7?
16     A.  That's correct.  I'm not offering such an
17  opinion.
18     Q.  Does the complex set of trade-offs for EGR
19  work differently in different vehicle models?
20     A.  I would imagine so, but I don't know.
21     Q.  Does the complex set of trade-offs for EGR
22  work differently in different operating conditions?
23     A.  I don't know.
24     Q.  Does the complex set of trade-offs for EGR
25  work differently at different altitudes?

Page 106

1    A.  I don't know.
2    Q.   Does the complex set of trade-offs for EGR
3   work differently at different ambient humidity
4   levels?
5    A.  I don't know.
6    Q.   Does the complex set of trade-offs for EGR
7   work differently at different ambient temperatures?
8    A.  I don't know.
9    Q.   Do you know why a vehicle manufacturer
10  might want to use less EGR at high ambient
11  temperatures?
12       MR. SHAEFFER:  Object to the form.
13       THE WITNESS:  I don't know.
14  BY MR. WORK-DEMBOWSKI:
15   Q.   Does avoiding soot formation play a role
16  in that decision?
17   A.  Maybe.  I don't know.
18   Q.   What negative effects could soot buildup
19  have on vehicle performance?
20   A.  I don't know.
21   Q.   Moving on in your report to the next
22  paragraph, No. 14, you wrote here that the ECU
23  functions by collecting data from sensors
24  throughout the vehicle, calculating an appropriate
25  response and sending signals to actuators.  Did you

Page 107

1   write that?
2    A.  I did.
3    Q.   You refer to a figure that's on the next
4   page, Page 8, correct?
5    A.  That's right.
6    Q.   Looking at the figure at the top of
7   Page 8, what role does the air mass sensor play in
8   vehicle performance?
9    A.  I don't know.
10   Q.   How about the role of the boost pressure
11  sensor?
12   A.  I don't know.
13   Q.   Do you know what the lambda oxygen sensor
14  is?
15   A.  I don't know.
16   Q.   Do you know where the lambda oxygen sensor
17  is located in the model year 2014 diesel Chevy
18  Cruze?
19   A.  I do not.
20   Q.   Do you know where it's located in the 2015
21  diesel Chevy Cruze?
22   A.  I do not.
23   Q.   Do you know if it exists in the 2014 and
24  2015 diesel Chevy Cruze?
25   A.  I don't know.

Page 108

1    Q.   What is the glow plug control unit?
2    A.  I don't know.
3    Q.   What would happen if I took the glow plug
4   control unit off a diesel Chevy Cruze?
5        MR. SHAEFFER:  I'm going to object to this line
6   of questioning as outside the scope of the opinions
7   offered in this report, but you can answer.
8        THE WITNESS:  I don't know.
9        MR. WORK-DEMBOWSKI:  Peter, that was a coaching
10  objection.  I would appreciate it if you would not
11  make those.
12       MR. SHAEFFER:  I can't make beyond the scope
13  objections?
14       MR. WORK-DEMBOWSKI:  You can object to the
15  form, and you move on.
16  BY MR. WORK-DEMBOWSKI:
17   Q.   Dr. Levchenko, have you ever driven a
18  diesel passenger car?
19   A.  If I have, I don't have a specific memory
20  of that.
21   Q.   Have you ever been inside a diesel
22  passenger car?
23   A.  Yes.
24   Q.   When?
25   A.  I mean, a couple years ago probably.  I

Page 109

1   know I have some friends who have diesel cars, so I
2   have ridden in those cars.
3    Q.   Do you remember what model car it was?
4    A.  No.
5    Q.   Have you ever been in a Chevrolet Cruze
6   diesel vehicle?
7    A.  No, not to my knowledge.
8    Q.   How does the combustion process in a
9   diesel engine differ from the combustion process in
10  a gasoline engine?
11       MR. SHAEFFER:  Object to the form.
12       THE WITNESS:  Well, again, my report is not
13  really about combustion, but this question I can
14  answer based on -- my knowledge is that it's
15  ignited by -- in a gasoline engine, combustion is
16  initiated by a spark.  That is not the case in a
17  diesel engine.
18  BY MR. WORK-DEMBOWSKI:
19   Q.   Any other differences?
20   A.  There are other differences, too, but
21  that's the one -- the most obvious one that comes
22  to mind.
23   Q.   Does the combustion process in a diesel
24  engine produce more NOx on average than the
25  combustion process in a gasoline engine?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                              May 19, 2020
Highly Confidential

Page 110

1    MR. SHAEFFER:  Object to form.
2    THE WITNESS:  Again, this is outside of my
3  report.  I've been asked to look at the software of
4  these vehicles, not compare diesel and gasoline
5  engines, but I can tell you based on my prior
6  knowledge that that is the case.  And again, this
7  is a very general statement.
8  BY MR. WORK-DEMBOWSKI:
9    Q.   That was a very long response to a yes or
10  no question.  I'm going to try my question again.
11    Does the combustion process in a diesel
12  engine produce more NOx on average than the
13  combustion process in a gasoline engine?
14    MR. SHAEFFER:  Same objection.
15    THE WITNESS:  I believe in general, that
16  statement is correct.  Now, looking at specific
17  vehicles is a different thing.
18  BY MR. WORK-DEMBOWSKI:
19    Q.   Do you know why that is?
20    MR. SHAEFFER:  Same objection.
21    THE WITNESS:  I don't know exactly why.
22  BY MR. WORK-DEMBOWSKI:
23    Q.   Maybe we can turn to something that's a
24  little closer to your wheelhouse.
25    What is the processor chip that's in the

Page 111

1  ECU used on the model year 2014 diesel Chevy Cruze
2  vehicle?
3    A.   I don't know the exact model.  My
4  understanding is that the EDC17 uses an Infineon
5  processor.  I don't remember the exact model
6  number.
7    Q.   Do you know if it's the same for the 2014
8  and 2015 diesel Chevy Cruze?
9    A.   I do not.
10    Q.   Do you know what the rated processing
11  speed of the chip in the EDC17 in the diesel Cruze
12  vehicles is?
13    A.   I don't recall that right now.
14    Q.   Do you know how much RAM the ECU used in
15  the 2014 and 2015 diesel Cruze vehicles has?
16    A.   I don't recall that right now.  I'm sure
17  I've seen it somewhere.
18    Q.   Do you know what percentage of the
19  available RAM is used in normal operation by the
20  ECU in the model year 2014 diesel Chevy Cruze?
21    MR. SHAEFFER:  Object to the form.
22    THE WITNESS:  I do not.
23  BY MR. WORK-DEMBOWSKI:
24    Q.   How about in the 2015?
25    MR. SHAEFFER:  Same objection.

Page 112

1    THE WITNESS:  I do not.
2    MR. WORK-DEMBOWSKI:  I'm at a bit of a breaking
3  point here.  We could take a break for lunch if
4  that would work, or we can go ahead and plow
5  forward a little longer.
6    MR. SHAEFFER:  Sorry.  15 more minutes would be
7  about an hour.  Do you have a 15-minute chunk, or
8  would it probably take more time than that?
9    MR. WORK-DEMBOWSKI:  I have a feeling it's
10  going to take more time than that.
11    MR. SHAEFFER:  I would -- I would recommend
12  maybe we just break for lunch then and come back.
13    MR. WORK-DEMBOWSKI:  That would be my
14  preference.  How long should we break for?
15    THE VIDEOGRAPHER:  We're going off the video
16  record.  The time is now 17:12 UTC.
17    (Whereupon, a lunch break was
18    taken.)
19    THE VIDEOGRAPHER:  We are back on the video
20  record.  The time is now 18:02 UTC.  Go ahead.
21  BY MR. WORK-DEMBOWSKI:
22    Q.   Welcome back, Dr. Levchenko.  Would you
23  please find the envelope labeled No. 6 that we sent
24  to you, and I will ask my colleague to post tab 6
25  so that it becomes Levchenko Exhibit 6 on the

Page 113

1  Box.com interface.
2    Exhibit 6 is a copy of one of the articles
3  that's on your list of publications, right?
4    A.   Uh-huh.  Yes.
5    Q.   This is the article titled How They Did
6  It:  An Analysis of Emission Defeat Devices in
7  Modern Automobiles, correct?
8    A.   Yes.
9    Q.   You're listed as one of the seven authors
10  of this article?
11    A.   That's right.
12    Q.   How was the order of the authors decided
13  for how they're listed at the top of the article?
14    A.   It was a rather complicated way of doing
15  this kind of thing.  So it's usually first students
16  in order of contribution.  Then usually post-docs
17  and other contributors and then faculty usually in
18  kind of reverse order.  Basically the last author
19  would be the advisor of the first author.  In this
20  case, the order got rearranged by the first author
21  who was submitting it.  Basically that's the author
22  order, students first, faculty last.
23    Q.   And Mr. Li you said was your student,
24  correct?
25    A.   That's right.  He is a student of myself

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                    May 19, 2020
                    Highly Confidential

Page 114

1  and Stefan Savage.
2      Q.   What about Felix Domke?
3      A.   He's not a student.  He's an independent
4  packer in Germany who had some early work on
5  Volkswagon defeat devices.  So we ended up
6  partnering with him to work on this paper.
7      Q.   What was your role in writing this paper,
8  Exhibit 6?
9      A.   So I supervised my student, and I wrote
10 parts of the introduction, background and really
11 parts of Section 4 describing the defeat devices,
12 describing the Volkswagon defeat device.  My German
13 colleagues did most of the work on Section 5 and 6.
14 Then again, our side, my student and myself and my
15 colleague worked on some of the analysis of the
16 PDFs.
17     Q.   When you say analysis of the PDFs, what do
18 you mean?
19     A.   So this is what's shown in Table 2, I
20 believe.  I think it's -- I believe it's mentioned
21 in -- it's referenced in Section 6, but I don't
22 have it exactly.  This is an analysis of the
23 various software manuals much like the one that I
24 was using for this and which systems used the
25 signal, the acoustic condition signal for the

Page 115

1  Volkswagon defeat device.
2      Q.   What else did you do?
3      A.   I mean, those are in rough outline the
4  parts I worked on.  I don't remember exactly.
5  Usually with a paper like this, it's a team effort.
6  We all go through all parts of it.  So some people
7  certainly make primary contributions to some parts,
8  but we're all looking over all of it.
9      Q.   Who came up with idea of performing the
10 analysis that is described in this article,
11 Exhibit 6?
12     A.   So there are several analyses done here.
13 There's analysis of the software manuals that, you
14 know, illustrate what the defeat device is.  So
15 that's something that we came up with.  There is
16 the -- the curves themselves, this is the specific
17 test cycles where, I believe, identified first by
18 Felix, and then my German colleagues worked on
19 that.
20          There's the curve diff analysis, which is
21 a tool for extracting this information.  That's my
22 German colleagues.  The PDF analysis, as I already
23 mentioned, was our side, yeah.
24     Q.   How did you get involved with this group
25 to prepare this article?

Page 116

1      A.   So when -- when this story first broke of
2  Volkswagon emissions cheating, we -- we knew that
3  the systems were software systems, that basically
4  all of the stuff amounted to software.  We had some
5  experience -- some of my colleagues had experience
6  working with vehicles.  We all had experience doing
7  reverse engineering and security analysis.
8          So we got curious and thought well, how
9  much can we find out about this because this was an
10 unusual case.  This is a -- as I mentioned already,
11 in computer security, we deal with adversarial
12 relationships, and here the adversary is, in
13 effect, the manufacturer.  They're trying to
14 conceal a feature or cause the system to behave
15 differently at kind of back door.
16          So it was very interesting for us in that
17 regard, and so we started looking at it.  This was
18 myself, my student and my colleague, Stefan Savage.
19 And at some point, we came to know that my German
20 colleagues were also working on a similar problem,
21 so we ended up working together on it.
22     Q.   Did you call them, or did they call you?
23     A.   It was at a conference.  You know, at a
24 conference, we're just milling about, you know,
25 what are you working on, what am I working on.  We

Page 117

1  realized we were both working on a similar thing.
2      Q.   And how did Felix Domke get into that
3  conversation?
4      A.   He is somebody my German colleagues had
5  talked to.  I don't know how that contact was
6  initiated, but by the time we partnered with Moritz
7  and Thorsten, he was sort of part of the German
8  team.
9      Q.   Is there anything in the article that is
10 Exhibit 6 that you disagree with?
11     A.   I don't think so.  It's been a while, but
12 certainly I've never disagreed with any specific
13 thing in this article.
14     Q.   Do you stand behind the methodology that's
15 discussed in the article?
16     A.   I do.
17     Q.   Is there anything that you would change
18 about the work that was done for the article?
19     A.   No, I don't think so.  I mean, we can
20 always make something better, but there's nothing
21 that I would change in the methodology.
22     Q.   The article is titled Emission -- An
23 Analysis of Emission Defeat Devices in Modern
24 Automobiles.  What definition of defeat devices do
25 you understand is reflected in this article?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020

Page 118

1    A.  So at the time we wrote it, we were not
2  operating with the legal definition.  In our
3  earlier questioning, I made it a point to say that
4  defeat devices has a specific legal meaning.  At
5  the time we wrote this article, we mean it in
6  the – in the – not in the legal sense, but in the
7  common sense, but at the time, of course, also what
8  was inside the Volkswagon vehicles was already
9  called a defeat device by the EPA.
10       But to answer your question, the
11  definition is similar to or the same as what I'm
12  using.  I'll try to go through the article and find
13  how we specifically define it, but it's the same
14  idea, something that allows a vehicle to behave one
15  way during an emissions test differently.  During
16  regular driving, they're substantially similar
17  conditions.

Page 119

10    Q.  Okay.  And the definition that you used in
11  the paper, what's the source for that definition?
12    A.  I'd have to look through the paper.  I
13  don't remember if we cited a specific source or
14  whether we referred to – or offered a general
15  definition under which we would be operating.
16    Q.  On Exhibit 6 on Page 1 towards the bottom
17  left, the second paragraph after the label
18  introduction, the text says at the heart of the
19  scandal is Volkswagon's use of a defeat device
20  defined by the EPA as any device that reduces the
21  effectiveness of the emission control system under
22  conditions which may reasonably be expected to be
23  encountered in normal vehicle operation and use
24  with exceptions for starting the engine, emergency
25  vehicles and to prevent accidents.

Page 120

1       Is it your understanding that that is the
2  definition of defeat device that you and your
3  coauthors used in the article that is Exhbit 6?
4    A.  Yeah, it is.  I think what's missing from
5  this definition is how it performs on a test cycle.
6  I believe that's part of the – also part of the
7  EPA definition.  Again, I'm not going there, but
8  that is a general description for somebody who has
9  not heard of the term defeat device or might not
10  know what it means.
11    Q.  Well, the majority of that definition I
12  just read is in quotation marks.
13    A.  Yeah, it is.
14    Q.  Is it your understanding that that is a
15  direct quotation from the EPA definition?
16    A.  That is what I believe to be the case,
17  yeah.
18    Q.  Is that a complete definition of a defeat
19  device?
20    A.  It's not a complete definition.  So the
21  definition I've used in my report has to do with
22  the difference between performance during a test
23  cycle versus normal driving let's say.  So this
24  definition that you quoted does not address that
25  particular issue, but I believe in general spirit,

Page 121

1  it is the same.
2    Q.  And what's the basis for that belief?
3    A.  I was one of the authors of the article.
4  When we wrote it, that is what we meant.
5    Q.  But you didn't write that in the article?
6    A.  You mean that phrase?
7    Q.  You didn't write any different definition
8  in the article, sir.
9    A.  We were defining it.  Again, this was not
10  a legal definition.  We're offering – we're giving
11  a layperson's definition for what a defeat device
12  would be for the reader of this article.
13    Q.  Okay.  Can you turn to Page 5 of
14  Exhbit 6.  At the bottom right-hand corner of
15  Page 5, there's a footnote No. 1.  Is that the
16  definition of defeat device that you used when
17  writing this article?
18    A.  So again, the definition that we use is
19  informal.  That is the quote, obviously from the
20  U.S. Code of Federal Regulations.  That is, I
21  believe, the legal definition of a defeat device.
22  When we were writing this paper, we're not
23  examining the Volkswagon defeat device with respect
24  to the specific legal definition, but using the
25  legal definition to illustrate the general idea of

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL — Attorney Confidential          May 19, 2020

Page 122

1  what we mean.  The basic elements of what I'm
2  ta king about are present there, which is are you
3  modifying the behavior, and this behavior is not
4  present or is not observed during an emissions
5  test.
6      Q.   The article, so this is Exh bit 6, the How
7  They Did it article, discusses what's described as
8  new static analysis firmware forensics techniques
9  that allow the user to automatically identify known
10  defeat devices and confirm their function.  Is that
11  correct?
12     A.   That sounds right.  I'm not sure which
13  part I'm reading from.
14     Q.   Look at the first page of your articles.
15  It's the left-hand column, second paragraph of the
16  abstract, the second sentence.
17     A.   I see it.  Yes.
18     Q.   So there was new static analysis firmware
19  forensic techniques that were created for this
20  article, correct?
21     A.   That's correct.
22     Q.   The static analysis tool is what the
23  article calls curve diff, correct, c-u-r-v-e,
24  d-i-f-f?
25     A.   That's correct.

Page 123

1      Q.   And that static analysis tool can be run
2  across firmware images, right?
3      A.   That's correct.
4      Q.   When you and your coauthors wrote this
5  article, you only analyzed firmware images from
6  Vo kswagon and Chrysler Fiat vehicles, correct?
7      A.   Let me check.  We have this on a table.
8  To be honest, I see the model, the vehicle models.
9  I don't know if all of them are Volkswagon brands,
10  but in general, the analysis that we did was about
11  a Vo kswagon vehicle and a Chrysler Fiat vehicle.
12     Q.   You did not analyze the software of the
13  Chevy Cruze diesel vehicles at issue in this case
14  for purposes of the article in Exhibit 6?
15     A.   That's correct.
16     Q.   The How They Did It article was presented
17  in 2017 at the IEEE Symposia on Security and
18  Privacy, correct?
19     A.   That's correct.
20     Q.   You're not the person who presented it,
21  though?
22     A.   No.
23     Q.   Moritz Contag presented it?
24     A.   That's correct, the first author.
25     Q.   Why didn't you present it?

Page 124

1      A.   In our field, usually it's the first
2  author who's usually a student who does the
3  presentation.
4      Q.   Did you attend this symposium?
5      A.   I did.
6      Q.   Did you attend Mr. Contag's presentation
7  of this article?
8      A.   To be honest, I don't remember.
9      Q.   Are you aware that in his presentation at
10  the symposium, Mr. Contag told the audience that
11  what you can do now is to take a firmware image,
12  put it into a verification system, and two minutes
13  after you get out results of whether the car is in
14  compliance or not?
15     MR. SHAEFFER:  Object to the form.
16     THE WITNESS:  Sorry.  Are you asking me whether
17  I know that he said that or not?
18  BY MR. WORK-DEMBOWSKI:
19     Q.   Do you recall whether he said that or not?
20     A.   I don't recall.
21     Q.   Do you agree with that statement?
22     A.   I would say it's -- the tool is specific
23  to the Vo kswagon defeat device, not to all
24  possible defeat devices or cycle beating
25  mechanisms.

Page 125

1      Q.   So you did not use the same verification
2  tool on the diesel Cruze for this case as you used
3  in writing the How They Did It paper; is that
4  correct?
5      A.   Yeah, that's correct.  I want to be clear
6  that the curve diff tool is a static analysis tool,
7  but it's designed to look specific for the VW
8  defeat device and specifically the use of the
9  curves that they used.  That's why it's called
10  curve diff.  And the way we use the tool in the
11  paper is to do a longitudinal analysis of, I
12  believe, several hundred firmware images to
13  understand how the defeat device evolved with time.
14         That is not the tasking for this report.
15  For this report, I was asked to look at two
16  specific model years, so there's really no reason
17  to use curve diff on this.
18     Q.   Just to make sure I'm clear and I
19  understand your answer, you did not analyze any
20  firmware images from the diesel Chevy Cruze using
21  curve diff?
22     A.   That's correct.
23     Q.   Have you ever applied the curve diff tool
24  to vehicles from any other manufacturer?
25     A.   No, and I wouldn't because it's, again,

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL — Highly Confidential                May 19, 2020

Page 126

1  designed specifically for VW defeat device.  We
2  didn't use curve diff for the Fiat Chrysler, Fiat
3  500X.
4      Q.  When you – can you please turn to Page 3
5  of the article.  In the left-hand column near the
6  bottom, there's a paragraph that starts with bold
7  letters SCR.
8      A.  Okay.
9      Q.  The final sentence in that paragraph says
10 that except for results reported in Table 2, this
11 paper does not cover defeat devices that manipulate
12 SCR.  Did you write that?
13     A.  I don't remember who wrote that specific
14 sentence.
15     Q.  Is it a correct statement?
16     A.  I believe so.
17     Q.  And you ta ked about Table 2 earlier.  I
18 believe you said you were involved in the assembly
19 of Table 2; is that correct?
20     A.  Yeah.
21     Q.  If you could turn to Page 14, please,
22 that's where Table 2 is.  Are you on Page 14?
23     A.  I am.
24     Q.  Can you please explain which of the
25 results in Table 2 relate to SCR?

Page 127

1      A.  I believe the SCR FFC module has to do
2  with SCR.
3      Q.  And how many of the models or versions
4  that you looked at as reflected in Table 2 include
5  SCR FFC?
6      A.  I see two.
7      Q.  Is it fair to say that SCR technology was
8  not the focus of the How They Did It article?
9      MR. SHAEFFER:  Objection to form.
10     THE WITNESS:  The focus of the How They Did It
11 article were – I believe the vehicles had – well,
12 no.  The NSC was in the Fiat.  Actually, no.  Let
13 me backtrack.
14         So the main focus was really on the
15 detection mechanism to detect the test cycle.  That
16 mechanism was used throughout the ECU to alter the
17 behavior of multiple systems.  So the article
18 certainly applies to the SCR, whatever the behavior
19 modification was in the SCR system as much as to
20 any other system.
21 BY MR. WORK-DEMBOWSKI:
22     Q.  You referred to the focus being really on
23 the detection mechanism, and I'd like to follow up
24 on that.  If you could turn to Page 5, please, in
25 the article, in the right-hand column, there's a

Page 128

1  Roman Numeral 4 defeat devices?
2      A.  Uh-huh.
3      Q.  And under that, the second sentence of it
4  says conceptually a defeat device has two
5  components, monitor, determine if observed
6  conditions rule out an emissions test and
7  modify/alter vehicle behavior when not under test.
8      A.  Uh-huh.
9      Q.  Do you agree with those statements?
10     A.  That's the definition we used for this
11 article.  Since writing that, I believe the
12 definition of a cycle beating mechanism is broader.
13 It doesn't have that explicit detection signal.
14 The Volkswagon one had a specific signal which told
15 you if you were being tested or not.  So this
16 definition really, I would say, is more narrow and
17 applies to the Vo kswagon defeat device that we
18 were analyzing.
19     Q.  So is it not your opinion that every
20 defeat device has these two components that are
21 listed in your article?
22     A.  That is correct.
23     Q.  In this case, you do not have an
24 opinion – it is not your opinion, excuse me, that
25 the diesel Chevy Cruze contains the first element

Page 129

1  of monitoring to identify when the vehicle is being
2  tested; is that correct?
3      MR. SHAEFFER:  Object to the form.
4      THE WITNESS:  I would say that there is no
5  explicit signal as there was in the Vo kswagon case
6  as either zero or 1 based on whether or not the ECU
7  thinks it's going through a test cycle or not.  How
8  you can – there's no explicit signal, but then how
9  you characterize determining where a ruling out an
10 emissions test is – you know, can be applied more
11 or less strictly.  So I wouldn't say that the
12 mechanisms I descr bed in the report absolutely do
13 not fit that definition, but I will say there is no
14 signal as there was with the VW defeat device.
15 BY MR. WORK-DEMBOWSKI:
16     Q.  There's no signal in the diesel Chevy
17 Cruze that identifies when the vehicle is or is not
18 on a test.  Is that what you're saying?
19     MR. SHAEFFER:  Objection.  Asked and answered.
20     THE WITNESS:  I did not find such a signal.
21 BY MR. WORK-DEMBOWSKI:
22     Q.  Did you look for one?
23     A.  I think I probably did, but I don't
24 remember the – that specific process.
25     Q.  You used the word a few minutes ago the –

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL  Highly Confidential                    May 19, 2020

Page 130

1   I think you said the acoustic signal or maybe the
2   acoustic function signal.
3       A.  Acoustic condition.
4       Q.  Acoustic condition.  Excuse me.
5           Do you understand the acoustic condition
6   to be a name for the Volkswagon cycle detection
7   function?
8       A.  Yeah.  And to be honest, my understanding
9   is it was created by Bosch.  So I wouldn't give --
10  to Vo kswagon, so it was the work of Bosch.
11      Q.  I'm sorry.  You were moving paper on your
12  microphone.
13      A.  My apologies.  I believe the acoustic
14  condition was created by Bosch, not Vo kswagon.
15      Q.  You understand that another word for this
16  acoustic condition is the acoustic function?
17      A.  I believe that is another word that we see
18  used.
19      Q.  And the German name for that,
20  Akust kfunktion, does that sound familiar to you?
21      A.  That sounds right, yeah.  It's one word.
22      Q.  Did you look for the acoustic function in
23  the software for the diesel Chevy Cruze?
24      A.  I don't remember.  If I did, I didn't find
25  it.  No, I don't remember.

Page 131

1       Q.  Were you asked to look for the acoustic
2   function in the diesel Chevy Cruze?
3       A.  I don't believe so.
4       Q.  In your opinion, would any reasonable
5   investigation into the software of the diesel Chevy
6   Cruze reveal that the acoustic function is used
7   there?
8       MR. SHAEFFER:  Object to the form.
9       THE WITNESS:  I'm not entirely sure what you're
10  asking.
11  BY MR. WORK-DEMBOWSKI:
12      Q.  Well --
13      A.  Are you asking me if it's present?
14      Q.  If someone made a reasonable investigation
15  into the software of the diesel Chevy Cruze, would
16  they find the acoustic function?
17      MR. SHAEFFER:  Same objection.
18      THE WITNESS:  It would depend what they're
19  looking for, but certainly if they were looking for
20  something I ke this, they ought to be able to find
21  it.
22  BY MR. WORK-DEMBOWSKI:
23      Q.  If it were there?
24      A.  Yeah.
25      Q.  And if it's not there, they would be able

Page 132

1   to find that it's not there, correct?
2       A.  I would think so, yeah.
3       Q.  Have you read the complaint in this case?
4       A.  No.
5       Q.  In the How They Did It article, you also
6   descr be what's called a defeat device in a Fiat
7   vehicle?
8       A.  That's right.
9       Q.  If you turn to Page 9, you understand, and
10  I think the paper says this, the Fiat 500X contain
11  what amounts to a defeat device in the logic
12  governing NSC regeneration.  Do you recall that?
13      A.  That sounds right.
14      Q.  You're not opining that the diesel Cruze
15  has the same defeat device in it as the Fiat 500X,
16  right?
17      A.  Correct.
18      Q.  The article also describes a homologation
19  demand block defeat device in the Fiat cars.
20          It's not your opinion that the diesel
21  Chevy Cruze has the homologation demand block
22  defeat device that the Fiat cars had?
23      A.  I did not find that.
24      Q.  Did any of the alleged defeat devices that
25  you identified in the software of the Fiat Chrysler

Page 133

1   vehicles in the How They Did It paper appear in the
2   software of the diesel Chevy Cruze?
3       A.  I did not -- I did not find them in the
4   Chevy Cruze.
5       Q.  In this case, you had access to software
6   documentation for the diesel Chevy Cruze vehicles,
7   right?
8       A.  That's correct.
9       Q.  You also had access to A2L files?
10      A.  Yes.
11      Q.  In the How They Did It article, it's noted
12  that having A2L files would significantly simplify
13  the analysis; is that right?
14      A.  Yes.
15      Q.  And your analysis was made simpler in this
16  case because you had access to those files,
17  correct?
18      A.  That's correct.
19      Q.  Can you turn to Page 5, please.  This is
20  Page 5 in Exh bit 6.  There are a couple of terms
21  that appear on this page in a few places that I
22  would I ke to ask you about.
23          So first of all, in the left-hand column
24  up at the top of the first sentence, there is a
25  reference to function sheets making their way into

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential          May 19, 2020

Page 134

1  something that's called the automobile performance
2  tuning community.
3     A.  Uh-huh.  Yes.
4     Q.  Is automobile performance tuning
5  community, are those words that you put into the
6  article, or did somebody else write that?
7     A.  I don't remember, but I agree with that
8  statement.
9     Q.  Do you have an understanding of what the
10  automobile performance tuning community is?
11    A.  Yes.
12    Q.  What is it?
13    A.  It's individuals who I ke to modify the
14  behavior of their vehicle by changing the software
15  because ultimately all of vehicle behavior or most
16  of it is based on software.  So they modify the --
17  I generally believe only the cal bration values to
18  change how the vehicle behaves.
19    Q.  Is this a common practice?
20    A.  I don't know how common it is.  I know
21  there are people who do it.
22    Q.  Is tuning legal?
23    MR. SHAEFFER:  Object to -- object to the form.
24    THE WITNESS:  I don't know.  That would be a
25  legal question.

Page 135

1  BY MR. WORK-DEMBOWSKI:
2     Q.  Is tuning common among diesel vehicle
3  owners?
4     A.  Again, I'm sorry.  I don't know how common
5  it is with which vehicles.
6     Q.  Well, how does tuning affect vehicle
7  performance?
8     A.  My understanding is that it depends on the
9  specific thing you're tuning, and there are
10  different ways people tune it.  So I would assume
11  or at least from what I have seen increases
12  performance.
13    Q.  And how does tuning affect emissions
14  performance?
15    A.  Again --
16    MR. SHAEFFER:  Object to the form.
17    THE WITNESS:  -- in a very general sense, some
18  tuning may make the vehicle perform worse with
19  respect to emissions, but I can't tell you that
20  that is true for all tuning.
21  BY MR. WORK-DEMBOWSKI:
22    Q.  In your academic work on computer
23  security, have you looked into tuning?
24    MR. SHAEFFER:  Object to the form.
25    THE WITNESS:  Only in this article.

Page 136

1  BY MR. WORK-DEMBOWSKI:
2     Q.  Are you aware of there being a tuning
3  community of Chevy Cruze diesel owners?
4     MR. SHAEFFER:  Same objection.
5     THE WITNESS:  I'm not aware of that.  I haven't
6  looked for that.
7  BY MR. WORK-DEMBOWSKI:
8     Q.  Are you aware of whether there are tuning
9  enthusiasts for Chevy Cruze diesel vehicles?
10    MR. SHAEFFER:  Same objection.
11    THE WITNESS:  I don't know anything about a --
12  what the -- I should say I don't know if there is a
13  Chevy Cruze tuning community or what they do.  I
14  did not look for that.
15  BY MR. WORK-DEMBOWSKI:
16    Q.  Near the end of this article, you and your
17  coauthors wrote that tracking data flow -- I'm
18  sorry.  This is on Page 16 of the article, the left
19  column roughly across from references 8 and 9.
20  There's a sentence there that begins still
21  tracking.  Still tracking the data flow in the code
22  and analyzing whether certain sensor conditions
23  influence the exhaust gas recirculation or other
24  subsystems related to emission control might enable
25  the detection of such passive devices.

Page 137

1     A.  I'm sorry.  Could you -- could you tell
2  me where that -- I'm not seeing it.  Which
3  paragraph?
4     Q.  It is the second paragraph in the left
5  column on Page 16.  It begins about two-thirds of
6  the way down.  It's across from the numbers 8 and 9
7  in the reference.
8     A.  I see it.
9     Q.  You see it now?  Okay.
10        So this sentence talks about tracking data
11  flow related to EGR to enable the detection of
12  passive devices, and it says as part of future
13  work, we plan to study the viability of such an
14  approach and evaluate if we can detect Fiat's
15  defeat device in an automated manner.
16        Do you know if anyone did that planned
17  future work?
18    A.  Not to my knowledge.
19    Q.  But you did not do that planned future
20  work?
21    A.  Not for the way it's descr bed in using
22  data flow.
23    Q.  Sitting here today, can you identify
24  anyone who has used or implemented the techniques
25  that you and your coauthors developed in the

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential          May 19, 2020

Page 138

1  article that's Exhibit 6?
2     A.  I don't know who has applied the work.  I
3  would have to look at the citations of the article.
4     MR. WORK-DEMBOWSKI:  I'd l ke to just take a
5  one-minute break, please.
6     THE VIDEOGRAPHER:  Okay.  Going off the video
7  record.  The time is now 18:41 UTC.
8              (Whereupon, a short break was
9              taken.)
10    THE VIDEOGRAPHER:  We are back on the video
11  record.  The time is now 18:50 UTC.  Go ahead.
12  BY MR. WORK-DEMBOWSKI:
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

Page 140

Page 141

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential        May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                May 19, 2020





KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020



May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., Highly Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Confidential                May 19, 2020



Page 174

Page 175

Page 176

```
1      cycle beating mechanism?
2          A.  If a mechanism systematically provided
3      better performance during a test, yes, I would.
4          Q.  Even if the difference that better
5      performance makes no difference on whether the
6      vehicle passes or fails the test?
7          A.  I think you've asked this question before,
8      and so my answer is even if a mechanism does not by
9      itself make the difference, if it helps the vehicle
10     reduce emissions during a test, gives you different
11     results during real-world driving, that could be a
12     contributing factor to passing a test, and I would
13     consider that in my definition to be cycle beating.
14     Again, my definition is that it simply alters the
15     performance during an emissions test to be more
16     favorable.
17         Q.  What do you mean by a contributing factor
18     to passing a test?
19         A.  I mean it would have an effect on
20     emissions.  So if you're testing for vehicle
21     emissions and if the mechanism that you've added
22     made the vehicle perform better with respect to
23     emissions and this is a systematic thing, not just
24     once in a particular test, then I would consider
25     that to be something that fits my definition.
```

Page 177

```
1      Again, the definition is simply that it causes the
2      vehicle to behave more favorably with respect to
3      emissions during a test than it would otherwise.
4          Q.  Does your opinion that this is a cycle
5      beating mechanism depend on there being no
6      engineering justification for the change other than
7      testing?
8          A.  My opinion is based on how the behavior
9      manifests during a test versus other conditions.
10
11
12
13
14
15
16         Q.  But you have no information and no opinion
17     as to whether this mechanism caused the diesel
18     Cruze to be able to pass a test or not?
19         A.  I don't know what happened on any specific
20     test that you may be referring to.
21         Q.  And your opinion would not change if the
22     difference of NOx emissions was very small, was so
23     small that it would not change whether the vehicle
24     passed or failed a test; is that fair?
25         MR. SHAEFFER:  Object to the form.
```

Page 175

```
11         Q.  Let's assume – so okay.  Does your
12     opinion that this is a cycle beating mechanism
13     depend on the mere presence of a difference in
14     behavior even if that difference in behavior did
15     not make a significant change in the amount of NOx
16     emitted?
17         MR. SHAEFFER:  Objection to form.
18         THE WITNESS:  I'm not sure what you mean by
19     significant and all of these things.  So you're
20     asking a vague question.
21     BY MR. WORK-DEMBOWSKI:
22         Q.  Let's assume hypothetically that the
23     difference in behavior that you described results
24     in a difference in tailpipe NOx emissions of 0.1
25     milligrams.  Would you still consider that to be a
```

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                            May 19, 2020

Highly Confidential

Page 178

1    THE WITNESS: So, you know, at some point, if
2    the mechanism has absolutely no effect, then, you
3    know, it doesn't have an effect on the cycle.  Now,
4    at what point do you consider what amount you
5    consider to be statistically significant?  That's
6    not something that's in my opinion.  My opinion –
7    BY MR. WORK-DEMBOWSKI:
8        Q.  Well, you're the one who has defined a
9    cycle beating mechanism, and I'm trying to identify
10   what it is that you actually consider a cycle
11   beating mechanism.
12       If a – all other things equal, if the
13   only difference is the operation or non-operation
14   of this mechanism and the vehicle still passes the
15   cycle, still passes the test, is that a cycle
16   beating mechanism –
17   MR. SHAEFFER:  Object to the form.
18   BY MR. WORK-DEMBOWSKI:
19       Q.  – under your definition?
20       A.  So – I'm sorry, Peter.  Go ahead.
21   MR. SHAEFFER:  I just want to – Larry, you cut
22   off Dr. Levchenko for his last question.  So I
23   would just ask that you let him finish his answer
24   before you ask your next question.
25

Page 179

1    BY MR. WORK-DEMBOWSKI:
2        Q.  I certainly did not mean to interrupt you.
3    I apologize for that.
4        A.  It's all right.  So the definition that
5    I'm using in the report does not specify a
6    particular amount, and I think that's what you're
7    getting at.  So the definition simply talks about
8    the fact that it does have a systemic effect.  It's
9    not based on a specific number.
10       Q.  I understand that answer.  Let me – let
11   me try the question a little differently.
12       A.  Sure.
13       Q.  Not in terms of a specific number, but in
14   terms of whether the mechanism operates to such an
15   extent that the vehicle would pass or fail with or
16   without the mechanism operating.  So the operation
17   of the mechanism is the only thing that allows the
18   vehicle to pass the test.
19       A.  Okay.  And your question is whether that's
20   cycle beating by my definition?
21       Q.  Yes.
22       A.  Is that right?
23       Q.  Yes.
24       A.  So the definition, again, is just more
25   favorable performance.  I don't quantify the exact

Page 180

1    amount.  My report doesn't talk about the exact
2    effect specifically on a – on NOx emissions during
3    a particular driving scenario.  The report does
4    talk about generally the effect of reducing it or
5    reducing EGR, increasing NOx emissions.  I'm not
6    using in this definition a specific number or
7    amount.
8        Q.  Cycle beating, the term cycle beating
9    refers to a cycle, and it also refers to beating.
10   If the cycle is not beaten, that is, if the
11   operation of the mechanism does not impact whether
12   the vehicle passes the cycle, do you still consider
13   it in your expert opinion to be cycle beating?
14       A.  I would consider it such if it alters the
15   behaviors, again, systematically to produce lower
16   emissions during the cycle than under similar
17   circumstances.  It's – the definition that I'm
18   using does not talk specifically about passing or
19   specific NOx thresholds or anything like that.
20   Simply saying it reduces it in a systematic way
21   consistently on the test versus real driving.
22       Q.  What do you mean by similar circumstances?
23       A.  Circumstances that would have some of the
24   same parameters that except for the – except for
25   the three factors I mention that contribute to –

Page 181

1    three factors that contribute to the cycle beating
2    device based on temperature.  So this is
3    specifically the ones – I'm looking through my
4    report.  Let me find those, the low pass filtering,
5    remembered model temperature, vehicle speed, so
6    conditions that would not trigger those specific
7    behaviors, but are otherwise similar.
8        So what my report is saying is that the
9    combination of these specific conditions that I
10   talk about causes the vehicle to behave more
11   favorably than under conditions where these things
12   were not triggered.
13       Q.  And if those conditions were all met while
14   a consumer was driving their vehicle on the road,
15   the behavior of the diesel Cruze would be exactly
16   the same, correct?
17       A.  Under similar conditions, yes.  These
18   conditions will – can kick in during normal
19   driving as far as I know.
20   MR. SHAEFFER:  Larry, you've been going for
21   about an hour.  Are you at a good stopping point?
22   MR. WORK-DEMBOWSKI:  Sure.  Let's take a break
23   for five or 10.
24   THE VIDEOGRAPHER:  Going off the video record.
25   The time is now 19:48 UTC.

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential          May 19, 2020



Page 182
1        (Whereupon, a short break was
2        taken.)
3     THE VIDEOGRAPHER:  We are back on the video
4  record.  The time is now 20:00 UTC.  Go ahead.
5  BY MR. WORK-DEMBOWSKI:

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., HIGHLY Confidential                    May 19, 2020





KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                    May 19, 2020



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL — Highly Confidential          May 19, 2020



Page 218

Page 220

Page 219

Page 221

```
21       MR. WORK-DEMBOWSKI:  I would l ke to take a
22   break.
23       MR. SHAEFFER:  That's fine with us.  10 minutes
24   okay?
25       MR. WORK-DEMBOWSKI:  I think 10 minutes is
```

Page 222

1  perfect.
2      THE VIDEOGRAPHER:  Going off the video record.
3  The time is now 21:00 UTC.
4          (Whereupon, a short break was
5          taken.)
6      THE VIDEOGRAPHER:  We're back on the video
7  record.  The time is now 21:15 UTC.  Go ahead.
8  BY MR. WORK-DEMBOWSKI:
9      Q.  Dr. Levchenko, are you familiar with
10 something called an FTP 75 test?
11     A.  Yes.
12     Q.  FTP 75 test is an emissions test that's
13 conducted on a chassis dynamometer, correct?
14     A.  That's my understanding.
15     Q.  And it consists of a specified set of
16 parameters and driving curve that's supposed to be
17 conducted, and emissions measurements are taken.
18 Is that your understanding?
19     A.  That is.
20     Q.  I'd like to pose a hypothetical.  I'd like
21 you to assume that someone took a 2015 diesel Chevy
22 Cruze and put it through a fully proper and
23 compliant FTP 75 test.  That is to say the test
24 meets all the regulatory requirements for
25 temperature settings on the dynamometer,

Page 223

1  preconditioning, everything done according to spec.
2  Do you understand that hypothetical?
3      A.  Yes.
4      Q.  Now, assuming that the vehicle fails the
5  test, fails the FTP 75 test in terms of producing
6  more NOx emissions than are provided for under the
7  federal FTP 75 standard, do you understand that
8  part of the hypothetical?
9      A.  I don't know the exact amount that would
10 be involved, but I understand your hypothetical
11 generally.
12     MR. SHAEFFER:  I just want to object to the
13 form of the question.
14 BY MR. WORK-DEMBOWSKI:
15     Q.  So the hypothetical is that the diesel
16 Chevy Cruze undergoes an FTP 75 test and generates
17 a higher amount of NOx emissions than are provided
18 for under the federal FTP 75 standard.
19     My question for you, Dr. Levchenko, is
20 whether anything in your analysis in this case
21 could explain the reason why such a vehicle would
22 fail the FTP 75 test?
23     MR. SHAEFFER:  Object to the form.
24     THE WITNESS:  Again, this is a question that
25 has a lot of details.  I don't know why that

Page 224

1  specific vehicle would fail this test.  A lot of
2  different factors that could go into it.  So I
3  certainly – so my report or really no report could
4  answer the question about this specific instance.
5  BY MR. WORK-DEMBOWSKI:
6      Q.  Would any of the software mechanisms
7  described in your report explain that kind of a
8  failure on an FTP 75 test?
9      MR. SHAEFFER:  Object to the form.
10     THE WITNESS:  The mechanisms I described
11 could – could be the cause, but again, it would
12 have to depend on the specific test.  I mean, the
13 mechanisms I describe would cause increased NOx
14 emissions under various conditions, which I outline
15 in my report.  A particular vehicle failing a test
16 is a lot to do with the vehicle.
17 BY MR. WORK-DEMBOWSKI:
18     Q.  The software mechanisms addressed in your
19 report all existed in the diesel Chevy Cruze
20 vehicles that were used for certification testing
21 by General Motors, correct?
22     A.  I believe they were used in production
23 here because that's what was represented to me.  I
24 assumed those are also the vehicles tested, but I'm
25 not sure of the exact testing process.

Page 225

1      Q.  Do you have any reason to believe that the
2  software mechanisms were not present in the
3  vehicles that General Motors used for certification
4  testing?
5      A.  I have no reason to believe that.
6      Q.  Now, assume, you can just assume this,
7  that when General Motors conducted FTP 75 testing
8  for certification of the diesel Cruze vehicles,
9  they all passed by significant margin.  Do you
10 understand that?
11     A.  I understand.
12     Q.  Can you accept it as a hypothetical if
13 that helps?
14     A.  Yeah.
15     MR. SHAEFFER:  Object to the form.
16 BY MR. WORK-DEMBOWSKI:
17     Q.  And so I'll ask again any of software
18 mechanisms addressed in your reports explain why
19 another diesel Cruze vehicle would fail a similar
20 FTP 75 test?
21     MR. SHAEFFER:  Objection to form.
22     THE WITNESS:  Yeah.  I mean, just to be clear,
23 a vehicle can pass.  It can also fail for lots of
24 different reasons.  It could be that the mechanisms
25 might have been involved.  It could be a defect.  I

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                          May 19, 2020
HIGHLY Confidential

Page 226

1  don't know.  I couldn't tell you why a specific
2  vehicle would or would not.  It certainly could
3  contribute to it.
4  BY MR. WORK-DEMBOWSKI:
5      Q.  Are you saying that the mechanisms
6  described in your reports could contribute to
7  higher NOx emissions during an FTP 75 test?
8      A.  I -- I did not analyze the FTP 75, but in
9  general, the mechanisms alter the behavior of the
10  vehicle with respect to emissions mechanisms.  The
11  analysis talks about SC03.  I did not consider how
12  it would behave on the FTP 75.  So I don't have an
13  answer to that.
14      MR. WORK-DEMBOWSKI:  At this time I'm ready to
15  pass the witness to General Motors.  I'd like to
16  reserve the right to ask follow-up questions if
17  needed.
18      MS. SMITH:  Thank you.  This is Renee Smith
19  representing General Motors.  If we could take
20  maybe a -- go off the record for a moment, I would
21  appreciate it.
22      MR. SHAEFFER:  Sure.
23      THE VIDEOGRAPHER:  Going off the video record.
24  The time is now 21:22.
25

Page 227

1          (Whereupon, a short break was
2          taken.)
3      THE VIDEOGRAPHER:  We're back on the video
4  record.  The time is now 21:46 UTC.  Go ahead.
5      MS. SMITH:  Good afternoon Dr. Levchenko.  We
6  talked a little bit earlier, but my name is Renee
7  Smith, and I represent General Motors LLC.  I just
8  have a few additional questions for you.
9          EXAMINATION
10  BY MS. SMITH:
11      Q.  You have a Ph.D. in computer science and
12  engineering from the University of California,
13  correct?
14      A.  Yes.
15      Q.  And I believe several times throughout
16  this deposition, you said your focus is on the
17  software analysis, correct?
18      A.  That's correct.
19      Q.  You're not an automotive engineer,
20  correct?
21      A.  I'm not an automotive engineer.
22      Q.  And you're not offering opinions about
23  automotive engineering, correct?
24      A.  Well, to the extent that the opinions I
25  offer are about automotive engineering, they are,

Page 228

1  but obviously, just the software aspects of it.
2      Q.  Several times during this deposition when
3  you said that, it's really a question for an
4  automotive engineer, correct?
5      A.  Yeah.
6      Q.  And in your expert report, Exhibit 1, you
7  discussed two potential cycle beating strategies,
8  which we talked about throughout the day, but just
9  so you have it in front of you, two potential cycle
10  beating strategies, and this is paragraph 1.
11      A.  Okay.
12      Q.  And you described the cycle beating
13  strategies as potential cycle beating strategies;
14  is that correct?
15      A.  That's correct.
16
17
18
19
20
21
22
23
24
25

Page 229



KIRILL LEVCHENKO, PH.D., CONFIDENTIAL                    May 19, 2020
                              HIGHLY Confidential

Page 230

1

2

3

4      Q.  And you're not opining that General Motors
5  intended to use either of these as a cycle beating
6  strategy, are you?
7      A.  I – I don't know what the role of General
8  Motors is exactly.  I don't know what General
9  Motors's intent was.
10     Q.  And you're not offering an opinion that if
11 there were any cycle beating strategies that
12 General Motors even knew about it, correct?
13     MR. SHAEFFER:  Object to the form.
14     THE WITNESS:  My opinion does not discuss what
15 GM knew or did not know.
16 BY MS. SMITH:
17     Q.  You haven't read a single deposition of
18 any engineer from GM, have you?
19     A.  That's correct.
20     Q.  You haven't read a single deposition of
21 any former or current GM employee, correct?
22     A.  Correct.
23     Q.  If we could please turn to Exhbit 6,
24 which is your article.
25     A.  Okay.

Page 231

1      Q.  The article is How They Did It:  An
2  Analysis of Emissions Defeat Devices in Modern
3  Automobiles, correct?
4      A.  Yes.
5      Q.  That's an exhbit that you discussed with
6  counsel for Robert Bosch LLC earlier today,
7  correct?
8      A.  Yes.
9      Q.  And in the abstract in Exhbit 6, the very
10 first line says modern vehicles are required to
11 comply with a range of environmental regulations
12 limiting the level of emissions for various
13 greenhouse gases, toxins and particulate matter,
14 correct?
15     A.  Yes.
16     Q.  And that's accurate, correct?
17     A.  That's my understanding, yes.
18     Q.  And if you – Exhbit 6 on the first page,
19 the second column to the right, the second full
20 paragraph –
21     A.  I'm sorry.
22     Q.  I'm sorry.  The second full paragraph in
23 the right-hand column.
24     A.  Okay.
25     Q.  In that paragraph in the article on which

Page 232

1  you are a coauthor, it states meeting modern
2  emissions standards is one of the main challenges
3  faced by car manufacturers as emissions standards
4  become more stringent.  Did I read that correctly?
5      A.  Yes.
6      Q.  And is that a true and accurate statement
7  that meeting modern emissions standards is one of
8  the main challenges faced by car manufacturers?
9      A.  I would not – I would not say that with
10 absolute certainty.  This is an introductory
11 paragraph to give the reader a general sense.  I
12 think in a more technical sense, I don't know what
13 exactly is the main challenge faced by auto makers.
14     Q.  Would you agree that the sentence that
15 emissions standards have become more stringent is
16 accurate?
17     A.  That's my understanding.
18     Q.  And if you – also, on Exh bit 6, Page 3,
19 if you could please go to that.
20     A.  Yeah.
21     Q.  And in the right-hand column under
22 subheading B, emission test cycles and emission
23 standards, do you have that?
24     A.  Yes.
25     Q.  The first sentence states an emission test

Page 233

1  cycle defines a protocol that enables repeatable
2  and comparable measurements of exhaust emissions to
3  evaluate emission compliance.  Did I read that
4  correctly?
5      A.  Yes.
6      Q.  And why is it important that there be
7  repeatable measurements of exhaust emissions?
8      MR. SHAEFFER:  Object to the form.
9      THE WITNESS:  I think generally as an
10 engineering principle, you want people to be able
11 to perform the test independently and specifically
12 for auto manufacturers to be able to do the test,
13 but I don't know the exact rationale that went into
14 the rule making.
15 BY MS. SMITH:
16     Q.  Is it fair to say that you – just as an
17 engineer, that it's very important to have things
18 be repeatable; is that correct?
19     A.  As a general principle, yes.
20     Q.  And is it correct that that goes to
21 whether a test result is reliable?
22     MR. SHAEFFER:  Object to the form.
23     THE WITNESS:  I hesitate to characterize
24 something as not reliable because it couldn't be
25 repeated, but – so I wouldn't characterize an

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Highly Confidential                May 19, 2020

Page 234

1  emissions test as unreliable if there was a
2  difficulty repeating them.
3  BY MS. SMITH:
4     Q.  And I apologize.  I was unclear.  I wasn't
5  speaking in terms of emissions tests, just as a
6  general principle of science and engineering.
7  For -- one of the factors that could be considered
8  in reliability is whether something is repeatable,
9  correct?
10    A.  Yeah, that's probably fair to say.  Again,
11 this is just very general terms.
12    Q.  Right.  Science 101, right?
13    MR. SHAEFFER:  Object to the form.  You can
14 answer.
15    THE WITNESS:  Oh, yeah.  I mean, repeatability
16 of experiments is a desirable property in science
17 and engineering.
18 BY MS. SMITH:
19    Q.  And you were asked a number of questions
20 about defeat device.  I'm sure you recall those
21 questions, some of them; is that correct?
22    A.  Yes.
23    Q.  And you testified that defeat -- you are
24 not using a precise legal meaning when you discuss
25 defeat device; is that correct?

Page 235

1     A.  That's correct.
2     Q.  Because you're not a lawyer, correct?
3     A.  I'm not a lawyer.
4     Q.  If we could look at Exhbit 6, which is
5  your article again, please.  That article does use
6  a precise definition for defeat device, correct?
7     A.  It cites the precise definition.  I
8  wouldn't characterize the article as meeting all of
9  the legal requirements that you would for defeat
10 device.  So we cite the definition, but we're,
11 obviously, not lawyers.  So we're using it in a
12 general understanding.
13    Q.  Exhbit 6 was -- if you turn to Page 16 of
14 Exhbit 6, which is your article, could you please
15 turn to the section that says acknowledgments?  Do
16 you have that in front of you?
17    A.  Yes.
18    Q.  It says part of this work was supported by
19 European Research Council, ERC, under the European
20 Union's Horizon 2020 research and innovation
21 programme, Grant Agreement No. 64011-Bastion and
22 that this work was funded, in part, by the National
23 Science Foundation through grant NSF-1646493; is
24 that correct?
25    A.  I don't know if the numbers are exactly

Page 236

1  right, but that is -- that's what it says.
2     Q.  And what is the European Research Council,
3  if you know?
4     A.  I do not.  Those acknowledgments are from
5  my German colleagues.
6     Q.  Do you know what the National Science
7  Foundation is?
8     A.  Sorry.  That acknowledgment is mine.  The
9  European ones are theirs.
10    Q.  And what is the National Science
11 Foundation?
12    A.  It's a government entity, which, in this
13 particular case, awards research funding to
14 universities and researchers like myself.
15    Q.  And that was one of the funders of the
16 article that is marked as Exhibit 6, correct?
17    A.  Of the work, yeah.
18    Q.  And the reports that you did in this
19 litigation were not funded by any foundations; is
20 that correct?
21    A.  That's correct.
22    Q.  They were funded by lawyers, correct?
23    A.  I'm paid for by the law firms, yeah.
24    Q.  And in article 6, which was funded by
25 these foundations, there's the definition at

Page 237

1  Page 1, the left-hand column.  At the heart of the
2  scandal is Volkswagon's use of a defeat device,
3  defined by the EPA is any device that reduces the
4  effectiveness of the emission control system under
5  conditions which may reasonably be expected to be
6  encountered in normal vehicle operation and use
7  with exceptions for starting engine, emergency
8  vehicles and to prevent accidents; is that correct?
9     A.  I'm sorry.  Where -- where are you reading
10 that from?
11    Q.  I apologize.  It's Page 1 under the
12 introduction.
13    A.  Yeah.
14    Q.  The second paragraph.
15    A.  Okay.  Yeah, I see it.
16    Q.  And do you see that in the second
17 paragraph, there's a definition of defeat device
18 that is defined by the EPA; is that correct?
19    A.  It's a fragment of the definition.  It's
20 not the entire definition.
21    Q.  Exactly.  So if we turn to Page 5 of
22 Exhbit 6.  And Page 5 of Exhbit 6 under Roman
23 Numeral IV, do you see defeat devices?
24    A.  Yes.
25    Q.  And I believe you told counsel for Robert

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Attorneys' Confidential                    May 19, 2020

Page 238

1  Bosch LLC that Section 4 was one of the sections
2  that you personally worked on for this paper; is
3  that correct?
4      A.  Yes.
5      Q.  And in Section 4, there is a precise
6  definition, and that's at footnote 1; is that
7  correct?
8      A.  I don't know whether that's the complete
9  definition, but it's, I believe, part of the full
10 definition.
11     Q.  And in this article, which was funded by
12 foundations, this article states more precisely,
13 the U.S. Code of Federal Regulations defines a
14 defeat device as an auxiliary emission control
15 device, an AECD, that reduces the effectiveness of
16 the emission control system under conditions which
17 reasonably may be expected to be encountered in
18 normal vehicle operation and use unless, one, such
19 conditions are substantially included in the
20 federal emission test procedure; two, the need for
21 the AECD is justified in terms of protecting the
22 vehicle against damage or accident; three, the AECD
23 does not go beyond the requirements of engine
24 starting; or four, the AECD applies only for
25 emergency vehicles.  Did I read that correctly?

Page 239

1      A.  Yes.
2      Q.  And is that the more precise definition
3  that was included in the article you coauthored at
4  Exhibit 6?
5      A.  I believe so, yes.
6      Q.  And when you made opinions regarding
7  potential cycle beaters, did you determine whether
8  those conditions were substantially included in the
9  federal emission test procedure?
10     A.  So my report does not talk about that.  I
11 do talk about the SC03, but it doesn't talk about
12 the other tests.
13     Q.  So you have not -- you have not offered an
14 opinion as to whether the conditions that you have
15 described as potential cycle beaters are
16 substantially included in a federal emission test
17 procedure, correct?
18     MR. SHAEFFER:  Objection.  Asked and answered.
19     THE WITNESS:  So let me -- let me look
20 carefully at the exact wording.  I want to make
21 sure I answer your question correctly.  So the
22 conclusion with respect to SC03 that's in the
23 report, obviously, talks about an emissions test,
24 and it says that during the high-temperature
25 emissions test, the vehicle will produce lower

Page 240

1  emissions than the test under otherwise similar
2  circumstances.
3      So I believe that some of that meaning is
4  included in the AECD definition, but again, I'm not
5  here to try to interpret the legal definition of
6  the AECD.
7  BY MS. SMITH:
8      Q.  And you also are not offering an opinion
9  as to whether or not the conditions that you point
10 out are or are not substantially included in the
11 federal emission test procedure, right?  That's
12 just not part of your opinion, correct?
13     A.  I certainly don't use those terms.
14     Q.  And likewise, you don't offer an opinion
15 as to whether the need for the AECD or other
16 condition is justified in terms of protecting the
17 vehicle against damage or accident, correct?
18     A.  I do not offer that opinion.
19     Q.  Have you reached an opinion on whether any
20 of these conditions are justified in terms of
21 protecting the vehicle against damage or accidents?
22     A.  No.
23     Q.  And in fact, you would not be qualified to
24 do so, correct?
25     MR. SHAEFFER:  Object to the form.

Page 241

1      THE WITNESS:  I'm not sure what the exact
2  question you're asking is.  Certainly some of the
3  analysis that I'm doing could be used to answer
4  that question, but I'm not qualified to make a
5  legal determination with respect to that particular
6  point.
7  BY MS. SMITH:
8      Q.  Let me clarify.  I'm not asking legal.  I
9  just want to know from an automotive engineering
10 perspective, would you be qualified to opine on
11 whether these conditions are justified in terms of
12 protecting the vehicle against damage or accident?
13     A.  I would agree with that.
14     Q.  You're not qualified; is that correct?
15     A.  Yeah.  It would require consideration of
16 factors that are outside of my report and outside
17 of what I'm -- what my analysis is about.
18     Q.  And you also didn't determine, in forming
19 your opinions regarding these potential cycle
20 beating conditions, whether the AECD goes beyond
21 the requirements of engine starting, did you?
22     A.  That was not an opinion I offered.
23     Q.  And you did not do an analysis to
24 determine if, in fact, the conditions went beyond
25 the requirements of engine starting, correct?

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL Confidential                    May 19, 2020

Page 242

1   A.  That's correct.
2   Q.  Have you reviewed General Motors's AECD
3   submission for the 2014 or 2015 Chevrolet Cruze
4   diesel vehicles?
5   A.  I've read parts of it.
6   Q.  You're not offering an opinion that those
7   disclosures are inaccurate, are you?
8   A.  Again, I think that would be more of a
9   legal opinion about what would be considered an
10  accurate disclosure or not.  I will say that with
11  respect, again, to my findings with respect to the
12  outside air temperature, I don't believe that -- I
13  don't recall the disclosures describing exactly how
14  the modeled air temperature is manipulated.
15  Q.  As you sit here today, is there anything
16  in those AECD disclosures that you opine is not
17  accurate?
18  A.  I don't offer an opinion on the accuracy
19  of the AECDs.  However, the opinion I do offer may
20  have bearing on the accuracy of those.
21  Q.  But you will not -- I just want to get the
22  answer to this one question.
23      You will not be offering an opinion that
24  anything in General Motors's AECD disclosures for
25  the 2014, 2015 model year Chevy Cruze diesel

Page 243

1   vehicles were inaccurate?
2   MR. SHAEFFER:  Objection.  Asked and answered.
3   THE WITNESS:  Again, I'm not offering an
4   opinion on the legal matter of whether there were
5   inaccuracies in it; however, my findings do have
6   implications on the accuracy of the disclosures.
7   BY MS. SMITH:
8   Q.  Dr. Levchenko, this will be so close --
9   this will be over so fast if you can say are you
10  going to be offering an opinion that anything in
11  General Motors's AECD disclosures is inaccurate?
12  Will you be offering that specific opinion?
13  MR. SHAEFFER:  Same objection.
14  THE WITNESS:  Not that specific opinion, but
15  again, I do want to emphasize that the opinion I do
16  offer does have implications for the accuracy of
17  the disclosures.
18  BY MS. SMITH:
19  Q.  Okay.  You testified about Exhibit 7 quite
20  a bit, which is the ████████ e-mail.  Do you
21  recall being asked about that e-mail?
22  A.  Yes.
23  Q.  And do you have any reason to believe that
24  anyone from General Motors ever saw or received
25  that e-mail before this litigation?

Page 244

1   A.  I have no reason -- I have no basis to
2   conclude one way or another.
3   MS. SMITH:  Could we go off the record for just
4   one moment?  I want to make sure I'm done, but if
5   you can give me one second.
6   MR. SHAEFFER:  Sure.
7   THE VIDEOGRAPHER:  Going off the video record.
8   The time is now 22:08.
9       (Whereupon, a short break was
10      taken.)
11  THE VIDEOGRAPHER:  We are back on the video
12  record.  The time is now 22:09.
13  MS. SMITH:  Dr. Levchenko, thank you for the
14  time this afternoon.  I don't have any more
15  questions at this time.  Thank you.
16  MR. SHAEFFER:  And I would just like to go off
17  the record for just a couple minutes, and Kirill,
18  if you want to get to our breakout room.
19  THE VIDEOGRAPHER:  Going off the video record.
20  The time is now 22:10.
21      (Whereupon, a short break was
22      taken.)
23  THE VIDEOGRAPHER:  Back on the video record.
24  The time is now 22:14 UTC.  Go ahead.
25  MR. SHAEFFER:  So we don't have any questions

Page 245

1   for Dr. Levchenko.
2   MR. WORK-DEMBOWSKI:  I don't have any further
3   questions, Dr. Levchenko.  Thank you for your time
4   today.
5   MS. SMITH:  Thank you so much.
6   MR. SHAEFFER:  And we're going to reserve our
7   signature on the transcript.
8   MS. SMITH:  Thank you.
9   THE VIDEOGRAPHER:  Anything else before we go
10  off the video record?
11  MR. SHAEFFER:  I don't believe so.
12  MS. SMITH:  No.
13  THE VIDEOGRAPHER:  Going off the video record.
14  The time is now 22:14.
15      (FURTHER DEPONENT SAITH NAUGHT.)
16
17
18
19
20
21
22
23
24
25

KIRILL LEVCHENKO, PH.D., CONFIDENTIAL - Highly Confidential                May 19, 2020

Page 246

1        UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF MICHIGAN
3    JASON COUNTS, et al.,        )
4    individually, and on behalf   )
5    of THEMSLEVES AND ALL        ) C.A. No.
6    OTHERS similary situated,   ) 1:16-cv-12541-TLL-PTM
7       Plaintiffs,              )
8       vs.                      )
9    GENERAL MOTORS LLC, ROBERT   )
10   BOSCH GMBH, and ROBERT       )
11   BOSCH LLC,                   )
12      Defendants.              )
13       I, KIRILL LEVCHENKO, Ph.D., being first
14   duly sworn, on oath say that I am  he deponent in
15   the aforesaid deposition taken on May 19, 2020;
16   that I have read the foregoing transcript of my
17   deposition, consisting of pages 1 through 245
18   inclusive, and affix my signature to same.
19       _____
         KIRILL LEVCHENKO, Ph.D.
20
21   Subscribed and sworn to
     before me this _____ day
22   of _____, 2020
23
     _____
24   Notary Public
25

Page 247

1    STATE OF ILLINOIS  )
2                       )  SS:
3    COUNTY OF C O O K  )
4        I, GINA M. LUORDO, a notary public within
5    and for the County of Cook County and State of
6    Illinois, do hereby certify that heretofore,
7    to-wit, on May 19, 2020, remotely appeared before
8    me KIRILL LEVCHENKO, Ph.D., in a cause now pending
9    and undetermined in the United States District
10   Court, Eastern District of Michigan wherein JASON
11   COUNTS, et al. are the Plaintiffs, and GENERAL
12   MOTORS LLC, et al. are the Defendants.
13       I further certify that the said KIRILL
14   LEVCHENKO, Ph.D. was first duly sworn to testify
15   the truth, the whole truth and nothing but the
16   truth in the cause aforesaid; that  he tes imony
17   then given by said witness was reported
18   stenographically by me in  he presence of the said
19   witness, and afterwards reduced to typewriting by
20   Computer-Aided Transcription, and the foregoing is
21   a true and correct transcript of the testimony so
22   given by said witness as aforesaid.
23       I further certify that the signature to
24   the foregoing deposition was not waived by counsel
25   for the respective parties.

Page 248

1        I further certify that the taking of this
2    deposition was pursuant to notice and that there
3    were present at the deposition the attorneys
4    hereinbefore mentioned.
5        I further certify that I am not counsel
6    for nor in any way related to the parties to this
7    suit, nor am I in any way interested in the outcome
8    thereof.
9        IN TESTIMONY WHEREOF:  I have hereunto set
10   my hand and affixed my notarial seal  his 29th day
11   of May, 2020.
12
13
14
15
16       _____
17       NOTARY PUBLIC, COOK COUNTY, ILLINOIS
18       LIC. NO. 084-004143
19
20
21
22
23
24
25