# Exhibit G
## (REDACTED VERSION OF DOCUMENT TO BE SEALED)

# Exhibit 6
# (Filed Under Seal)

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MICHIGAN

2

                    - - - - -

3

4     JASON COUNTS, DONALD KLEIN,   C.A. NO.
      OSCAR ZANORA, DEREK LONG,      1:16-CV-12541-TLL-PTM

5     HASSAM HIRMIZ, JASON SILVEUS,
      JOHN MISKELLY, THOMAS HAYDUK,

6     CHRISTOPHER HEMBERGER and
      JOSHUA RODRIGUEZ, individually

7     and on behalf of all others similarly
      situated,

8               Plaintiffs,

9
                -against-

10

11    GENERAL MOTORS LLC, ROBERT
      BOSCH GMBH, and ROBERT

12    BOSCH, LLC, et al.,
                Defendants.

13

                    - - - - -

14

                 HIGHLY CONFIDENTIAL

15

                    - - - - -

16

17    VIRTUAL VIDEOTAPED DEPOSITION OF RYAN HARRINGTON

18                NATICK, MASSACHUSETTS

19              Wednesday, July 22, 2020

20

21                    VOLUME 1

22

23    REPORTED BY:

24    ROBIN CLARK, RPR, CLR

25

HIGHLY CONFIDENTIAL

Page 2

1      Virtual Videotaped Deposition of RYAN
2    HARRINGTON, taken by Plaintiffs, pursuant to notice,
3    commencing at 10:12 a m., by and before Robin L.
4    Clark, Registered Professional Reporter and Notary
5    Public in and for the Commonwealth of Pennsylvania.
6         - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    REMOTE APPEARANCES, continued:
2
3
     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
4    BY:  PATRICK SWIBER, ESQ
     DAVID BRODSKY, ESQ
5    RENEE GRIFFIN, ESQ
     2000 Pennsylvania Avenue, N W
6    Washington, D C  20006
     202-947-1588
7    pswiber@cgsh com
     dbrodsky@cgsh com
8    rgriffin@cgsh com
          For the Defendant Robert Bosch
9    LLC
10
     ALSO PRESENT REMOTELY:
11
     STEVEN HURVITZ, ESQ
12
     JOELLE ROSEN
13
     HOWARD BRODSKY, VIDEOGRAPHER
14
     JUSTON SMITHERS
15
16        - - - - -
17
18
19
20
21
22
23
24
25

Page 3

1    REMOTE APPEARANCES:
2
     HAGENS BERMAN SOBOL SHAPIRO, LLP
3    BY:  GARTH WOJTANOWICZ, ESQ
     STEVE BERMAN, ESQ
4    1301 Second Avenue, Suite 2000
     Seattle, Washington 98101
5    206-623-7292
     garthw@hbsslaw com
6    steve@hbsslaw com
          For the Plaintiffs
7
8
     CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
9    AGNELLO, P C
     BY: JAMES E  CECCHI, ESQ
10   ZACH BOWER, ESQ
     5 Becker Farm Road
11   Roseland, New Jersey 07068
     973-997-1700
12   jcecchi@carellabyrne com
     zbower@carellabyrne com
13        For the Plaintiffs
14
     SEEGER WEISS, LLP
15   BY:  SHAUNA ITRI, ESQ
     1515 Market Street, Suite 1380
16   Philadelphia, Pennsylvania 19102
     215-564-2300
17   sitri@seegerweiss com
          For the Plaintiffs
18
19   KIRKLAND & ELLIS, LLP
     BY:  RENEE D  SMITH, ESQ
20   JEFFREY S  BRAMSON, ESQ
     300 North LaSalle
21   Chicago, Illinois 60654
     312-862-2000
22   rdsmith@kirkland com
     jeffrey bramson@kirkland com
23        For the Defendant General
     Motors LLC
24
25

Page 5

1         I N D E X
2    WITNESS                          PAGE
3    RYAN HARRINGTON
        BY MR. WOJTANOWICZ:            11
4
5         E X H I B I T S
6    NUMBER     DESCRIPTION          MARKED
7    Harrington
8    Exhibit 1    Expert Report of Ryan      17
                  Harrington
9
     Exhibit 2    Chevrolet Cruze Diesel     268
10                Discussion with EPA & CARB
                  9/13/16 Document Bates
11                GMCOUNTS0000851587 TO 51607
12   Exhibit 3    Application for            287
                  Certification 2015 Model
13                Year Document Bates
                  GMCOUNTS000812193 to
14                GMCOUNTS000812238
15   Exhibit 4    Certification Summary      287
                  Information Report Bates
16                GMCOUNTS000222607 to
                  000222624
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 22

1  vehicle control theory and he supported me in
2  many, many cases related to diesel engine,
3  diesel engine control and emissions.
4      Q.  What about David Anderson, what was
5  his role in assisting you?
6      A.  So David is a Ph.D mechanical
7  engineer with a lot of experience in diesel
8  after treatment systems, so, you know, he kind
9  of brought in some general support and then
10  also assisted in the analysis of some of Mr.
11  Smithers' data, the PEMS reports and then the

15  role?
16      A.  So she was the project manager on
17  the project.  She helped kind of, me kind of
18  make sure that everything was getting done and,
19  you know, kind of on a timely basis and then
20  provided some input on testing and other
21  aspects.
22      Q.  And then Peter, I can't read my own
23  handwriting, Peter, is it Lillo?
24      A.  Lillo, yes.
25      Q.  What was his role?

Page 23

1      A.  So he was the Ph.D mechanical
2  engineer that performed the vehicle inspection.
3      Q.  And did he do anything else
4  significant in connection with your work in
5  this case?
6      A.  Most of it had to do with the
7  vehicle inspection and looking at the ECM data
8  and helped, you know, kind of analyze the
9  findings from the inspection.
10      Q.  And that inspection you're
11  referring to, is that the inspection that
12  Defendants conducted of the diesel Cruze and
13  the gas Cruze vehicle that were used in the
14  testing that Mr. Smithers reported on?
15      A.  That is correct.
16      Q.  And Jeffrey Willard [sic], what was
17  his role?
18      A.  Jeffrey Wishart.
19      Q.  I'm sorry, Wishart.
20      A.  So he was also at the inspection
21  looking at the PEMS equipment.  I believe he
22  did the drive of the vehicle and most of his
23  focus was on the PEMS equipment and testing.
24      Q.  Did he have any role beyond the
25  vehicle inspection that you were talking about

Page 24

1  in your work in this case?
2      A.  He helped with some of the analyses
3  of, you know, kind of the PEMS setup and PEMS
4  protocols in the regulatory environment kind of
5  best practices related to PEMS testing.
6      Q.  And what is Mr. Wishart's
7  credential or specialty, do you know?
8      A.  So I think his -- he has got a
9  Ph.D.  It's in engineering mechanics or
10  mechanical engineering.  He's worked with PEMS
11  equipment in his prior work, fuel efficiency,
12  plug-in hybrid vehicles.  I'm trying to think,
13  most of his work was kind of in the electric
14  vehicle plug-in hybrid emissions realm with
15  vehicles from an inspection and testing
16  capability.
17      Q.  And Matthew Pooley, what was his
18  role?
19      A.  So he helped, he's a Ph.D in
20  electrical engineering and computer science.
21  So he assisted myself and David Anderson
22  looking through the control strategy and Mr.
23  Levchenko's report.
24      Q.  And what about Sri Danthurthi?
25      A.  Danthurthi, so she helped with

Page 25

1  quality checking the report, so just verifying
2  some of the calculations and the numbers and
3  making sure the footnotes and everything lined
4  up.
5      Q.  Are all the people that you have
6  identified, been able to identify as people
7  assisting you in preparing the report, are they
8  all employees of Exponent?
9      A.  Yes.
10      Q.  Did you retain any outside
11  consultants in order to help you with the work
12  that you did in this case?
13      A.  I didn't retain any outside
14  support.  The Analysis Group supports Kirkland
15  and Ellis and the client and I had some
16  interactions with their staff.
17      Q.  And who did you interact with on
18  their staff?
19      A.  Andrea Okie, Kris Comeaux, and
20  Kerri Leonhardt.
21      Q.  And for what purpose were you
22  dealing with them?  Why were you talking to
23  them?
24          MS. SMITH:  I'm just going
25  to -- I'm so sorry, I'm just going to

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1    object and you can say if they provided
2    facts or data or did actual work in
3    connection with your report, but other
4    than that, I would just caution to not
5    respond regarding communications you
6    may have had with them, which I don't
7    think is what Garth is asking, but I
8    just want to be careful.
9         MR. WOJTANOWICZ:  Hold on,
10    Renee, I would like to ask for a
11    clarification.  Are you indicating that
12    you believe that discussions between
13    Mr. Harrington and the Analysis Group
14    are subject to attorney-client
15    privilege or work product?
16         MS. SMITH:  I believe it is
17    subject to at least the work product
18    privilege and as Mr. Shaeffer said in
19    an email, that the communications
20    between people who he may be working
21    with may be privileged.  He can talk
22    about just pursuant to Rule 26, he can,
23    obviously, say if facts or data was
24    provided to him, but the actual
25    communications he's having with them,

Page 27

1    yes, I will say are privileged and
2    protected --
3    BY MR. WOJTANOWICZ:
4         Q.   Well, let me rephrase my question.
5    Were you communicating with the Analysis Group
6    in order to obtain facts or data that you were
7    using in connection with the analysis performed
8    for your report?
9         A.   I'm sorry, I think I lost track of
10    everything.  Could you restate the question?
11         Q.   Sure.  Were you communicating with
12    the Analysis Group in order to obtain facts or
13    data for purposes of performing the analysis
14    described in your report?
15         MS. SMITH:  Garth, let me
16    clarify the objection and instructions
17    so we're on the same page, is he can
18    disclose if Analysis Group provided
19    facts or data, the substance of the
20    communications, what they were about, I
21    would instruct not to answer.  But he
22    can certainly provide information if
23    they provided facts or data that he
24    relied upon in forming his opinions in
25    this case or considered.

Page 28

1    THE WITNESS:  Okay.  So the
2    Analysis Group did look at some of Mr.
3    Smithers' data and did some data
4    analyses on that looking at routes and
5    things like that and how to kind of put
6    together the data that Mr. Smithers
7    provided.  So they provided some of
8    that to which my staff at Exponent
9    reviewed and we basically redid all of
10    it and then did kind of a QC to make
11    sure that we were correctly
12    interpreting --
13         THE STENOGRAPHER:  And did
14    kind of what, wait a minute, there was
15    a glitch, you did kind of what?
16         THE WITNESS:  So we checked
17    the data and used -- and made sure that
18    our analyses and compiling of Mr.
19    Smithers' data was consistent with the
20    Analysis Group just to double check
21    that we were all looking at the data
22    correctly and understood it correctly.
23    BY MR. WOJTANOWICZ:
24         Q.   Was the additional analysis
25    performed by the Analysis Group done according

Page 29

1    to your instruction or specification?
2         A.   Yes, so I had worked with them and
3    my staff had worked with them to instruct them
4    on what we were looking to do and, you know,
5    provided guidance as to what type of analysis
6    we were planning to do.
7         Q.   And what type of data or analysis
8    did they provide you with?
9         A.   So, again, as I mentioned, it was
10    the data that Mr. Smithers had provided, so his
11    routes and his segments, some of the Excel
12    files and the presentation materials that he
13    provided, you couldn't always glean all the
14    information out, so it was looking to compile
15    all of that so that we could, you know, kind of
16    double check his analyses and then understand
17    how they were put together so that we could
18    then analyze them ourselves.
19         Q.   So you're referring to data that
20    Mr. Smithers provided, but presumably, Analysis
21    Group did something with that data rather than
22    just giving you what Mr. Smithers already
23    produced, so what was the product, the work
24    product that they gave you?
25         MS. SMITH:  Sorry, again, I

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 34

1    BY MR. WOJTANOWICZ:
2       Q.   And describe the documents for me,
3    would you please?
4       A.   They would have been light-duty or
5    heavy-duty regulations from the code of federal
6    regulations, so documents that are online that
7    the EPA and CARB would have been putting out.
8       Q.   Did the Analysis Group provide any
9    summary or analysis relating to those
10   regulations that they provided to you?
11      A.   There wasn't a separate analyses.
12   I think from time to time, they provided on the
13   report, provided some input on some of those
14   things that I had asked them to do and provided
15   some edits --
16           MS. SMITH:  Yeah, I'm just
17      going -- I'm sorry to interrupt, I just
18      want to caution you that in terms of
19      any of the substance of draft reports,
20      things like that, I would just caution,
21      it's fine, he can answer the question
22      that Garth just asked, but I just want
23      to caution that the draft reports are
24      and communications related thereto, we
25      would maintain the privilege on.

Page 35

1           MR. WOJTANOWICZ:  It didn't
2      sound like you were done with your
3      answer there.  Do you want to continue?
4           THE WITNESS:  Could you ask
5      the question again?  I can't remember
6      what the question was.
7           MS. SMITH:  I'm sorry, I
8      apologize for interrupting.
9    BY MR. WOJTANOWICZ:
10      Q.   I was asking whether the Analysis
11   Group provided any analysis or commentary
12   relating to the regulatory documents that they
13   sent to you?
14           MS. SMITH:  Okay.  I'm going
15      to instruct not to answer.  To the
16      extent there is commentary, he can
17      disclose if Analysis Group provided or
18      did work or facts or data upon which
19      Mr. Harrington relied.
20           THE WITNESS:  So, again,
21      they provided some input into the
22      report, but I don't remember separate
23      analyses that they had done or
24      communicated.
25

Page 36

1    BY MR. WOJTANOWICZ:
2       Q.   Did the Analysis Group draft any
3    sections of your report?
4       A.   I had set forth the outline of the
5    report and kind of the structure of it and then
6    at my direction, my staff helped me draft some
7    of it.  I think the Analysis Group did assist
8    in drafting a few parts of it or kind of
9    augmenting some of what we had and then my
10   staff or myself reviewed all of that.
11      Q.   What sections of the report did the
12   Analysis Group help to draft?
13      A.   I mean, I can't remember the exact
14   specifics, but I think in the appendices,
15   there's some discussion of the regulatory
16   requirements and testing.  So if there was some
17   input from the Analysis Group, it would have
18   been mostly in those sections.
19      Q.   Aside from information in the
20   appendices relating to regulatory requirements
21   are there any other sections of the report that
22   you can recall the Analysis Group helping to
23   draft?
24      A.   I don't remember them helping draft
25   any of those sections.  They might have

Page 37

1    provided some input on, you know, how -- if
2    some sections didn't read very well and
3    provided some thoughts there, but --
4           MS. SMITH:  Yeah, I'm going
5      to instruct not to answer and just to
6      be careful, like, in terms of
7      commentary he's asking, in terms of
8      wording, you can answer, if Analysis
9      Group did -- actually provided
10      analysis, data, facts upon which you're
11      relying.
12   BY MR. WOJTANOWICZ:
13      Q.   For the sections that the Analysis
14   Group helped to draft, did you rely upon their
15   expertise in these areas in order to determine
16   whether that information should be included in
17   your report?
18           MS. SMITH:  One more second.
19      Hold on.
20           THE WITNESS:  I took their
21      information --
22           MS. SMITH:  Hold on, one
23      second, sorry.  Okay.  You may answer.
24      Sorry, I just wanted to check.
25           THE WITNESS:  So, again, as

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1   I stated, I reviewed the information or
2   my staff reviewed the information that
3   was provided, but Exponent used our
4   expertise and my expertise to form, you
5   know, the opinions based on that
6   information.
7   BY MR. WOJTANOWICZ:
8       Q.   So you formed your opinions using
9   your own expertise, but in doing so, you
10  considered this information provided to you
11  from the Analysis Group, correct?
12              MS. SMITH:  Objection, form.
13              THE WITNESS:  So some of the
14      analyses or documents they provided, I
15      considered, but my opinions and my
16      analyses were done by myself or my
17      staff.
18              MR. WOJTANOWICZ:  Okay.
19      Renee, I would ask that General Motors
20      produce the documents between the
21      Analysis Group and Mr. Harrington as
22      part of the materials that he
23      considered in connection with forming
24      his opinions in this case.
25              MS. SMITH:  Yeah, I believe

Page 39

1       all facts and data which he considered
2       were produced, but we will double
3       check.
4   BY MR. WOJTANOWICZ:
5       Q.   Did you have email communications
6   with the Analysis Group regarding the -- we're
7   not asking for the content of those
8   communications at this point, did you have
9   email communications or phone communications
10  with the Analysis Group regarding the sections
11  of the report that they drafted?
12      A.   Can you ask the question again?
13      Q.   Sure.  Did you have telephone or
14  email communications with the Analysis Group
15  regarding the sections of the report that they
16  drafted?
17      A.   I believe there was some
18  communication with them.
19      Q.   And was the purpose of that
20  communication to consider their -- the basis
21  for the statements that they made that you were
22  considering putting inside your report?
23              MS. SMITH:  Objection, form.
24              THE WITNESS:  So it was more
25      of a coordination role to make sure

Page 40

1       that we knew the documents were coming.
2       There might have been a clarifying
3       statement here or there, but most of it
4       was in the report.
5   BY MR. WOJTANOWICZ:
6       Q.   And what did you do to -- you said
7   that you relied on your own expertise or the
8   expertise of people within Exponent to -- with
9   respect to the parts of the report that were
10  drafted by the Analysis Group.  What did you do
11  in order to verify those sections using your
12  own expertise?
13              MS. SMITH:  Objection, form.
14              THE WITNESS:  So as is
15      typical even with stuff that's drafted
16      by Exponent, we always have another
17      individual read over of the documents,
18      read over of the report, check all the
19      references, check all the calculations,
20      so and any part of the report, my staff
21      and then myself is another QC who goes
22      through the report, reads it all, looks
23      at the analyses, double checks the work
24      for accuracy.
25

Page 41

1   BY MR. WOJTANOWICZ:
2       Q.   Have you spoken -- you're aware
3   that there are other experts who have submitted
4   reports in this case on behalf of Defendants
5   Bosch and GM?
6       A.   That's my understanding.
7       Q.   Have you reviewed any other expert
8   reports submitted on behalf of Defendants?
9       A.   No, I have not.
10      Q.   Do you know who Nick Molden is?
11      A.   I'm aware of who he is, but I don't
12  know him.  I haven't seen anything from him.
13      Q.   So you've not reviewed the report
14  that he submitted in this case?
15      A.   I have not.
16      Q.   And have you spoken with
17  Mr. Molden?
18      A.   I have not.
19      Q.   Have you, and when I say "you,"
20  has -- do you know whether any of the staff
21  working under your direction for purposes of
22  preparing this report have reviewed Mr.
23  Molden's report?
24      A.   No, they have not.
25      Q.   Has anyone working under your

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 54

1 THE WITNESS: Not that I can
2 remember.
3 BY MR. WOJTANOWICZ:
4 Q. So you've already testified that
5 the Analysis Group helped you by writing some
6 sections of the report and appendices. Did any
7 others at Exponent write any of the -- or help
8 you by writing sections of the report?
9 MS. SMITH: Objection, form,
10 compound. Misstates his testimony.
11 THE WITNESS: So I mentioned
12 the key staff that helped me draft the
13 report. There were a few others that
14 may have supported or done some QC of
15 the report, but I can't remember who
16 would have done what or all their names
17 at this point.
18 BY MR. WOJTANOWICZ:
19 Q. Were there sections of the report
20 that you personally consider yourself to be the
21 principal drafter of?
22 A. So I set forth the outline, the key
23 points, the summaries and the opinions and then
24 I typically start at all the different sections
25 and then others kind of filled in based on my

Page 55

1 direction.
2 Q. Did anyone other than people at
3 Exponent and people at the Analysis Group draft
4 any sections of the report or the appendices?
5 A. No.
6 Q. Did the lawyers representing GM or
7 Bosch draft any sections of the report?
8 A. They didn't draft any of it, no.
9 Q. Was any part of the report,
10 including the appendices, copied in whole or in
11 part from work that you had performed or
12 Exponent performed for purposes of another
13 case?
14 MS. SMITH: Objection, form.
15 THE WITNESS: So I've done
16 work on similar cases and so some of
17 the kind of base materials may have
18 been pulled from some other reports or
19 other analyses we've done on similar
20 cases where it's kind of, you know,
21 background material or appendices.
22 BY MR. WOJTANOWICZ:
23 Q. What do you mean by base materials?
24 A. It's kind of like the base research
25 on regulations or how diesel engine

Page 56

1 after-treatment systems operate.
2 Q. So, for example, if you turn to
3 your report, Exhibit No. 1, near the back, and
4 it gets kind of difficult because the pages
5 aren't totally sequential through the
6 appendices, but there's Appendix D, Overview of
7 Diesel Vehicle Emissions. Is this one of the
8 sections that was derived in whole or in part
9 from work that you had performed in other
10 diesel cases?
11 MS. SMITH: I just want to
12 just caution Mr. Harrington to the
13 extent the work is as a consulting
14 expert and has not been disclosed, I
15 just want to be careful not to waive
16 any privilege that he may have, that
17 other companies may have or other
18 entities may have.
19 THE WITNESS: You said
20 Appendix D, which page?
21 BY MR. WOJTANOWICZ:
22 Q. Well, Appendix D starts at page 1
23 of Appendix D, but it's after the very end of
24 your reliance materials section. There's no
25 other way really to -- so after page C60, which

Page 57

1 is page 60 of Appendix C.
2 A. Yeah, we had a problem with the
3 page number on the pdfs, so they're by
4 sections. So you're asking about Appendix D,
5 was there a particular page you were talking
6 about in Appendix D?
7 Q. No, I'm asking whether Appendix D
8 was derived in whole or in part from work that
9 you performed in other cases?
10 MS. SMITH: Same objection.
11 I just caution not to get into the
12 substance of anything where you were an
13 undisclosed expert or consultant.
14 THE WITNESS: There are
15 likely parts of that that could have
16 been pulled from another report.
17 BY MR. WOJTANOWICZ:
18 Q. Do you know what report or what
19 report in what case parts of this analysis may
20 have been pulled from?
21 MS. SMITH: And I'm just
22 going to say, same instruction and to
23 the extent any of that is confidential
24 or you're concerned it's confidential,
25 I would just caution you on how to

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1  answer.  And, Garth, just so you know,
2  I have no idea, so if it is or it is
3  not, but I just want to be careful
4  here.
5        THE WITNESS:  So I don't --
6  there was some of the reports that were
7  privileged, still confidential, but I
8  believe there's some that were not in
9  relation to some Volkswagen cases that
10  some of this information or some of the
11  text could have come from in the
12  report.
13  BY MR. WOJTANOWICZ:
14     Q.  Were those -- so you referred to
15  some Volkswagen cases.  Were those Volkswagen
16  cases relating to diesel emissions?
17     A.  They were.
18     Q.  And you say you're not sure whether
19  some of this analysis shown in Appendix D was
20  derived or taken from reports submitted in
21  these Volkswagen emission cases?
22     A.  See, I don't know if they -- were,
23  how much they were changed, but -- and I would
24  have to go through it you know, line by line to
25  completely answer it, but some of the text and

Page 59

1  some of the images look like they were pulled
2  from that report.
3     Q.  And were those -- was that a report
4  that was issued under your name?  Were you the
5  person issuing this report in those cases that
6  you believe may or may not be the source of
7  some of the information in Appendix D?
8        MS. SMITH:  Objection, form.
9        THE WITNESS:  So yes, I was
10  the named expert and the me is I don't
11  know if things, you know, I can't
12  remember on some of these if they
13  changed a little bit, but there was for
14  sure some of this text or portions of
15  it that came from those other reports.
16  BY MR. WOJTANOWICZ:
17     Q.  We'll go through your list of cases
18  later.  Do you think that if you hear the name
19  of the case you'll recognize it as being
20  potentially the source of some of the
21  information contained in Appendix D?
22        MS. SMITH:  Objection, form.
23        THE WITNESS:  I should be
24  able to to do that.
25

Page 60

1  BY MR. WOJTANOWICZ:
2     Q.  I'm going ask you the same kind of
3  set of questions for Appendix E, which follows
4  Appendix D and Appendix D is about 12 pages
5  long, so not too much further down the line.
6  So my question is simply whether you believe
7  any of the analysis contained in Appendix E was
8  copied or derived from work contained in
9  another report submitted for purposes of a
10  different case?
11        MS. SMITH:  Object to form.
12        THE WITNESS:  So in Appendix
13  E, it does look like there is, you
14  know, some of the summaries of
15  emissions and tier two emissions came
16  from some of those other reports I
17  wrote --
18        THE STENOGRAPHER:  And what?
19  Wait a minute, emissions and what?
20        THE WITNESS:  It's omissions
21  and standards, I can't remember if
22  that's what I was going to say, but the
23  emissions and standards summaries,
24  portions of that came from other
25  reports or another report.

Page 61

1  BY MR. WOJTANOWICZ:
2     Q.  And is that, again, do you believe
3  that's from Volkswagen diesel emissions cases
4  as well or are you referring to a different
5  case or cases than we were talking about with
6  respect to Appendix D?
7        MS. SMITH:  Objection, form.
8        THE WITNESS:  The same
9  Volkswagen cases.
10  BY MR. WOJTANOWICZ:
11     Q.  Did you conduct any vehicle tests
12  on your own in connection with your report in
13  this case?
14        MS. SMITH:  Objection, form.
15        THE WITNESS:  Could you
16  restate the question?
17  BY MR. WOJTANOWICZ:
18     Q.  Did you conduct any vehicle
19  emissions tests in connection with your work in
20  this case?
21     A.  So at the inspection, we analyzed
22  or we looked at the vehicle in the PEMS unit,
23  drove the vehicle, but there was no testing of
24  the emission system.
25     Q.  So you said you're referring to the

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1   inspection of the Cruze diesel and gasoline
2   test vehicles in this case, correct?
3       A.   Correct, we analyzed the vehicle
4   and assessed the vehicle, but we didn't do any
5   PEMS testing looking at the emissions of the
6   vehicle.
7       Q.   Were you present at the vehicle
8   inspection?
9       A.   I was not.
10      Q.   So and is it your understanding
11  that the PEMS equipment that was used in
12  connection with testing those vehicles was
13  available at that vehicle inspection --
14      A.   Correct.
15      Q.   -- correct?  But at that time,
16  neither you nor anyone working under your
17  direction attempted to perform an actual PEMS
18  test using that equipment, correct?
19          MS. SMITH:  Objection, form.
20          THE WITNESS:  That is
21      correct.  We couldn't drive the vehicle
22      off of our property, because the
23      vehicle wasn't registered and the
24      vehicle had active MIL lights and some
25      other maintenance issues, so we were

Page 63

1       unable to do any testing.
2   BY MR. WOJTANOWICZ:
3       Q.   The fact that you couldn't drive
4   the vehicle off the property would not prevent
5   you from actually hooking up and driving the
6   vehicle with the PEMS equipment active, would
7   it?
8           MS. SMITH:  Objection, form.
9           THE WITNESS:  No, we could
10      have, but with the condition of the
11      vehicle and, you know, driving around
12      the test track would have been
13      difficult to do any kind of, you know,
14      on-road testing had, you know, there
15      wasn't as much as value especially
16      given the condition of the vehicle.
17  BY MR. WOJTANOWICZ:
18      Q.   Aside from the vehicle inspection
19  that people working under your direction
20  attended, you have not conducted any PEMS
21  testing of any Cruze vehicles for purposes of
22  this report, correct?
23      A.   That is correct.
24      Q.   Have you ever performed emissions
25  testing on any Cruze vehicle for any purpose?

Page 64

1       A.   No, I have not.
2       Q.   Did you -- in determining how you
3   were going to perform your analysis in this
4   case, did you consider conducting PEMS testing
5   on a vehicle, the Cruze vehicle for this case?
6           MS. SMITH:  Objection, form.
7           THE WITNESS:  When I was
8       first retained, you know, I was trying
9       to understand the testing that
10      Mr. Smithers had done and as I got into
11      it and realized some of the methodology
12      issues and the issues with the vehicle,
13      there seemed to be so many issues with
14      the vehicle that at that point it
15      didn't seem necessary to do any
16      additional testing.
17  BY MR. WOJTANOWICZ:
18      Q.   So did you determine fairly early
19  on in your review of the case that you didn't
20  feel you needed to conduct any vehicle testing
21  on your own, correct?
22          MS. SMITH:  Objection, form.
23          THE WITNESS:  It evolved
24      over time, you know, there was some
25      tighter deadlines and as things got

Page 65

1       extended, obviously, as I continued to
2       evaluate the data by Mr. Smithers and
3       his testing on the timelines, you know,
4       I continued to evaluate that, but
5       given, you know, early assessments and
6       then the continued assessment, but it
7       didn't change my opinion of that.
8   BY MR. WOJTANOWICZ:
9       Q.   So I believe that the primary
10  reason you stated for deciding you didn't want
11  or need to conduct any emissions testing on a
12  Cruze vehicle for this case was that you had
13  identified what you thought were issues with
14  the Cruze test vehicles, correct?
15          MS. SMITH:  I'm just going
16      to object -- sorry, objection, form.
17      And objection to the extent you're
18      calling for a legal conclusion about
19      what would be needed or not needed to
20      do for this case.
21          THE WITNESS:  Could you
22      restate the question or read it back?
23  BY MR. WOJTANOWICZ:

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

19   BY MR. WOJTANOWICZ:
20       Q.  So in your opinion, the data that
21   you were able to review from testing performed
22   by General Motors was sufficiently reliable for
23   you to rely on that date for purposes of
24   rendering your opinion in this case?
25             MS. SMITH:  Objection, form.

Page 67

1             Objection, misstates his testimony.
2             THE WITNESS:  So again, that
3         was a piece of it, right, so there was
4         some testing that was done there, but
5         there was some testing on additional
6         vehicles through the in-use program,
7         there was the certificate of conformity
8         data, so there was not just, you know,
9         one set of data or one vehicle tested,
10        there was multiple data and information
11        available for multiple vehicles.
12   BY MR. WOJTANOWICZ:
13       Q.  Okay.  So there was General Motors
14   testing data you were able to review relating
15   to its application in obtaining a certificate
16   of conformity for the Cruze vehicles, correct?
17             MS. SMITH:  Objection, form.
18             THE WITNESS:  That is
19        correct.
20   BY MR. WOJTANOWICZ:
21       Q.  And based on your review, is your
22   opinion that data was sufficiently reliable for
23   you to use it in rendering your opinions in
24   this case?
25             MS. SMITH:  Objection, form.

Page 68

1   Misstates testimony, vague.
2             THE WITNESS:  So that data
3         in addition to the other data and
4         testing that GM needed to do to develop
5         a program.
6   BY MR. WOJTANOWICZ:
7       Q.  But you felt that that testing was
8   sufficiently reliable for you to use it in
9   rendering your opinions in this case; that's
10  correct, right?
11            MS. SMITH:  Objection, form.
12            THE WITNESS:  So that
13        testing was reliable in addition to the
14        other information that was available.
15  BY MR. WOJTANOWICZ:
16      Q.  Okay.  But I'm trying to -- I want
17  to separate these.  You said you had three
18  sources of the testing information that you
19  reviewed and relied on, one of them, the
20  certificate of conformity testing and data,
21  in-use testing data,
23      A.  Correct.
24      Q.  So the certificate of conformity
25  data, taking it by myself, did you consider

Page 69

1   that data sufficiently reliable for you to use
2   it in connection with rendering the opinions in
3   your report?
4       A.  So that data was reliable because
5   it was backed up by testing, you know, during
6   the development of the diesel Cruze and the
7   scrutiny of the EPA and the potential scrutiny
8   and audits that the EPA could have conducted on
9   that vehicle or some other vehicle.
10      Q.  What about the in-use testing data
11  that you referred to, did you consider that
12  testing data to be sufficiently reliable for
13  you to use it in connection with rendering the
14  opinions stated in your report?
15      A.  So I considered it reliable
16  information.  I believe they tested, was it six
17  or seven, seven vehicles which was the results
18  were submitted to the EPA and CARB and my
19  understanding, it was reviewed by them.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

24   BY MR. WOJTANOWICZ:
25       Q.   Now, you wouldn't have relied on

Page 71

1   the data if you believed that it was -- that
2   the tests were improperly conducted or the data
3   wasn't reliable, would you?
4           MS. SMITH:  Objection, form.
5           THE WITNESS:  Sorry, go
6       ahead.
7           MS. SMITH:  Go ahead, sorry.
8           THE WITNESS:  All right.  So
9       could you clarify the statement, if I
10      knew what about the data?
11  BY MR. WOJTANOWICZ:

21       Q.   Is it your practice to include or
22  rely upon faulty or false data in rendering
23  expert opinions in litigation?
24          MS. SMITH:  Objection, form.
25          THE WITNESS:  You said

Page 72

1       relying upon faulty data?
2   BY MR. WOJTANOWICZ:
3       Q.   Yes.
4       A.   If I know it's faulty, I will
5   investigate it and caveat what I know about it
6   and provide some context if I find something
7   that's unexpected about the data.

17      have been going for a little more than
18  an hour, I think now would be a good
19  time to take a short break before we
20  move on.  Is that okay?
21          MS. SMITH:  Yes, that's
22  fine.  Thank you.
23          THE VIDEOGRAPHER:  The time
24  is 11:26.  We are off the record.
25          - - - - -

Page 73

1       (A recess was taken at this time.)
2           - - - - -
3           THE VIDEOGRAPHER:  The time
4   is 11:43.  We're on the record.
5   BY MR. WOJTANOWICZ:

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 78

1 and others, some emails about, you
2 know, some questions they were asking
3 about the PEMS data, so that's some of
4 the information that I saw.
5 BY MR. WOJTANOWICZ:
6    Q. The bottom line is you don't know
7 how deeply the EPA dug into any of this testing
8 data other than the fact that this data was
9 given to it, right?
10       MS. SMITH: Objection, form.
11 Misstates testimony.
12       THE WITNESS: So that
13    information is typically not made
14    public. So I didn't see anything
15    specific to that, you know, exactly
16    what they did in relation to that data
17    that was submitted.
18 BY MR. WOJTANOWICZ:
19    Q. Is it your opinion that any
20 information submitted to the EPA is inherently
21 reliable because of the potential scrutiny that
22 it's subject to?
23    A. Could you restate that question?
24    Q. Is it your opinion that any
25 information or data submitted to the EPA is

Page 79

1 inherently more reliable just because it's
2 submitted to the EPA?
3    A. I don't know if you can say it is
4 inherently more reliable, but you're submitting
5 it to an entity that has to look into it and,
6 you know, or an OEM knows that that data and
7 those test results can be audited by the EPA,
8 so there's definitely increased scrutiny on the
9 data and what's going to be done with it.
10    Q. Have you ever conducted personally
11 a PEMS tests on the vehicle?
12    A. I have not conducted PEMS testing.
13 I've conducted FTP testing, but not PEMS
14 testing. And I've conducted a lot of on-road
15 fuel economy testing, which has some of the
16 inherent variability with PEMS testing.
17    Q. But specifically with respect to
18 PEMS testing for purposes of analyzing diesel
19 vehicle emissions, you have never conducted a
20 test like that, correct?
21       MS. SMITH: Objection, form.
22       THE WITNESS: I have not
23    conducted PEMS testing. Again, I've
24    conducted FTP testing for emissions and
25    conducted on-road testing, which PEMS

Page 80

1 is really kind of the combination of
2 the two of those is using a PEMS unit
3 to do on-road testing of emissions.
4 BY MR. WOJTANOWICZ:
5    Q. Again, I am not asking about the
6 other kinds of tests you may or may not have
7 performed, I'm asking you specifically about
8 PEMS testing for purposes of analyzing diesel
9 vehicle emissions. So if you can answer my
10 question, please. Have you ever conducted a
11 PEMS test for the purpose of analyzing diesel
12 vehicle emissions?
13       MS. SMITH: Objection, form.
14       THE WITNESS: I think I
15    answered that, but I said I had not
16    conducted PEMS testing. I provided
17    some context to the other testing, but
18    I think I clearly stated I hadn't
19    conducted PEMS testing on a diesel
20    vehicle.
21 BY MR. WOJTANOWICZ:
22    Q. Have you ever conducted a PEMS tes
23 for purpose of analyzing emissions on a
24 gasoline vehicle?
25    A. I have not.

Page 81

1    Q. Have you ever designed test route
2 for purpose of running a PEMS test to analyze
3 emissions on a diesel or gasoline vehicle?
4       MS. SMITH: Objection, form.
5       THE WITNESS: I have not
6    designed a route for PEMS testing.
7    I've done, again, fuel economy testing
8    for on road commissions and fuel
9    economy, not a PEMS testing route.
10 BY MR. WOJTANOWICZ:
11    Q. Have you ever hooked up or set up a
12 PEMS unit on a vehicle for purposes of
13 emissions testing?
14    A. I have not.
15    Q. Have you ever hooked up -- or let
16 me rephrase this. Have you ever directed that
17 a PEMS unit be attached to a vehicle and then
18 test it on a dynamometer for purposes of
19 assessing whether the PEMS was accurate or not?
20       MS. SMITH: Objection, form.
21       THE WITNESS: I have not.
22 BY MR. WOJTANOWICZ:
23    Q. Have you ever designed a testing
24 program using a PEMS unit for purposes of
25 analyzing diesel or gas vehicle emissions?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1      A.   I have not.
2      Q.   Have you received any formal
3   training in using a PEMS analyzer?
4      A.   Again, not a PEMS analyzer, I've
5   done other emissions analytics, but not a
6   specific PEMS unit.
7      Q.   Have you received, for example, any
8   informal training, like attended a seminar or a
9   demonstration by a manufacturer of a PEMS unit
10  to learn how the PEMS unit works?
11         MS. SMITH:  Objection, form.
12         THE WITNESS:  I have not.
13  BY MR. WOJTANOWICZ:
14     Q.   Was the use of a PEMS unit the part
15  of any aspect of your formal education?  I know
16  we'll go into that later, but have you had any
17  classes or formal university training that
18  relates specifically to the use of a PEMS unit?
19     A.   When I went to school, PEMS units
20  weren't typically in use or hadn't been very
21  widespread in use.
22     Q.   Okay.  So the answer is no, there
23  weren't any classes offered at the time you
24  were in school that related to how to set up or
25  use a PEMS unit?

Page 83

1      A.   Not specific to a PEMS unit, no.
2   It was on-road testing in itself.
3      Q.   In connection with your work on
4   this case, have you spoken with any PEMS unit
5   manufacturers regarding the proper use of PEMS
6   equipment?
7      A.   I have not.  Jeff Wishart who works
8   for me has done some PEMS testing and been a
9   part of PEMS testing, so I had spoke to him
10  about some the aspects of it.
11     Q.   But you personally did not reach
12  out to, for example, Sensors, Inc. in order to
13  ask them about how their PEMS unit that they
14  manufacture works, did you?
15     A.   I did not reach out to them.
16     Q.   Did you ask Mr. Wishart to do that
17  for you?
18     A.   I can't remember if he had
19  looked -- he looked into some of their manuals
20  and I can't remember if he called to clarify a
21  few different aspects, but I know he'd reviewed
22  their manuals and there may have been a phone
23  call, but I can't remember for sure.
24     Q.   Did you ask him to call the
25  manufacturer to get additional information

Page 84

1   about how the Sensors, Inc. PEMS unit works?
2          MS. SMITH:  Objection, form.
3          THE WITNESS:  I don't
4   remember if I asked him to call or if I
5   had asked him some questions and he
6   thought it was -- he needed to clarify
7   it with them, I can't remember the
8   exact specifics of the conversation.
9   BY MR. WOJTANOWICZ:
10     Q.   You're aware, aren't you, that
11  Sensors, Inc. was the manufacturer of the PEMS
12  unit that Mr. Smithers used in his testing
13  program?
14     A.   Yes, the Semtech unit, yes.
15     Q.   Have you personally reviewed the
16  user's manuals or the manuals for the Semtech
17  PEMS unit?
18         MS. SMITH:  Objection, form.
19         THE WITNESS:  I can't say
20  that I reviewed every aspect of it, but
21  I did review the materials and some of
22  the owner's manual pieces of that
23  Semtech unit.
24  BY MR. WOJTANOWICZ:
25     Q.   What parts of the owner's manual do

Page 85

1   you recall reviewing?
2      A.   There was the discussion of
3   operating PEMS temperatures.  I think some of
4   the setup pieces, but it was a while ago, so I
5   can't remember the exact sections.
6      Q.   Have you ever testified as an
7   expert witness in a case about PEMS testing
8   other than the testimony you're providing right
9   now in this case?
10     A.   I have got to think if any of that
11  was confidential and privileged.  I don't
12  believe it is in relation to some of the other
13  cases that we had mentioned before, I had
14  testified to some of the results of some PEMS
15  testing.
16     Q.   In what cases?
17     A.   Those would have been the
18  Volkswagen cases.
19     Q.   And were you testifying with
20  respect to PEMS testing conducted by Exponent
21  or by someone else?
22         MS. SMITH:  Objection, form.
23         THE WITNESS:  It would have
24  been by Volkswagen and West Virginia
25  University.

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1   BY MR. WOJTANOWICZ:
2       Q.  So in that case, you were able to
3   analyze some PEMS test results conducted by
4   Volkswagen on its own vehicles; is that
5   correct?
6       A.  And West Virginia's PEMS testing,
7   correct.
8       Q.  And the West Virginia PEMS testing,
9   was that a study done by some people at West
10  Virginia University related to diesel vehicle
11  emissions using analyzed using a PEMS setup?
12      A.  That is correct.
13      Q.  And you provided deposition
14  testimony is that case; is that correct?
15      A.  That is correct.
16      Q.  Did you or anyone under your
17  direction perform PEMS testing with respect to
18  that Volkswagen case where you offered
19  testimony relating to PEMS testing?
20      A.  No.
21      Q.  Did you issue a written report in
22  that case?
23      A.  Yes.
24      Q.  And you said then you provided
25  testimony that was deposition testimony?

Page 87

1       A.  Correct.
2       Q.  Was there a trial?  Did you give
3   any trial testimony?
4       A.  I did not.
5       Q.  Okay.  Any other case that you are
6   aware of or that you recall in which you
7   provided testimony regarding PEMS testing?
8       A.  No, there was -- it's, obviously,
9   in my appendix, there was some arbitrations
10  that were related to Volkswagen that would have
11  been the similar opinions, but I think that was
12  all confidential, but it's very similar to the
13  other reports that I mentioned.
14      Q.  Okay.  And we'll go through those
15  later, but and I was just trying to, for the
16  purpose of fairness, those are cases that you
17  provided testimony, like, where you actually
18  gave deposition or trial testimony; is that
19  correct?
20      A.  Deposition or arbitration
21  testimony, correct.
22      Q.  Okay.  In all of those cases, did
23  you also provide written reports that related
24  to your opinions regarding PEMS testing?
25      A.  Yes, there should have been a

Page 88

1   written report.  The California arbitration
2   cases are a little bit different, but the other
3   ones had a full report with them.
4       Q.  Have you ever been asked to conduct
5   PEMS testing on a vehicle for purposes other
6   than litigation?  And to the extent that you
7   are -- were asked as a consulting expert, I
8   don't know the substance, I want to know
9   whether you have been asked to actually just
10  conduct a PEMS testing for purposes other than
11  the litigation?
12      A.  I can't recall a request like that.
13      Q.  Have you ever been asked to
14  interpret or analyze the validity of PEMS
15  testing data for purposes other than
16  litigation?
17      A.  Not off the top of my head, I can't
18  recall a request like that.
19      Q.  And then a slight variation on
20  these questions and, again, without wanting to
21  know the substance, have you ever conducted
22  PEMS testing for purposes of litigation where
23  you were not disclosed as a testifying expert?
24      A.  No.
25      Q.  Have you ever been in a situation

Page 89

1   where you directed other people to conduct PEMS
2   testing for you for purposes of litigation
3   where you were working under the auspices of
4   being a consultant, not a testifying expert?
5       A.  No.
6       Q.  Did you conduct any tests on PEMS
7   equipment, meaning any tests analyzing how PEMS
8   equipment works in connection with your work in
9   this case?
10      MS. SMITH:  Objection, form.
11      THE WITNESS:  Could you ask
12  the question again?
13  BY MR. WOJTANOWICZ:
14      Q.  Sure.  Did you personally, let's
15  start personally, did you personally conduct
16  any tests of PEMS equipment in connection with
17  your opinions in this case?
18      A.  Other than what was done at the
19  inspection, which wasn't testing of the system
20  per se, no.
21      Q.  So you weren't present at the
22  inspection, correct?
23      A.  I think I've stated that before,
24  that's correct.
25      Q.  So then it's true, isn't it, that

23 (Pages 86 - 89)

Page 90

1  you have not conducted any testing on PEMS
2  equipment for purposes of this opinion
3  personally?
4       A.   That is correct.
5       Q.   Now, you're aware that during the
6  vehicle inspection of the test Cruze vehicles
7  in this case, that the PEMS units were present
8  at the inspection and available for inspection
9  as well, correct?
10           MS. SMITH:  Objection, form.
11           THE WITNESS:  Correct.
12  BY MR. WOJTANOWICZ:
13       Q.   Are you aware that those machines
14  were not tested or analyzed during that
15  inspection?
16           MS. SMITH:  Objection, form,
17       foundation.
18           THE WITNESS:  They were
19       what?
20  BY MR. WOJTANOWICZ:
21       Q.   Are you aware that those machines
22  were not tested or analyzed during those
23  vehicle inspections?
24       A.   My understanding, they were
25  inspected, but they were not, yes, tested,

Page 91

1  during the inspection.
2       Q.   Are you aware that the machines
3  were not even turned on by the people
4  conducting the inspection?
5           MS. SMITH:  Objection, form.
6           THE WITNESS:  I can't
7       remember exactly, but that seems
8       consistent with my understanding.
9  BY MR. WOJTANOWICZ:
10       Q.   Did you ask the people attending
11  that inspection under your direction to perform
12  any tests on the PEMS units?
13       A.   No, I had asked them, given the
14  time that we had, to just inspect the vehicle
15  and the PEMS equipment, but because we weren't
16  going to be doing any PEMS testing, it was
17  limited to just inspecting the vehicle -- or
18  the vehicle and the PEMS plumbing, anything
19  kind of visual that would have been
20  problematic.
21       Q.   So you just asked them to do a
22  visual inspection of the PEMS equipment that
23  was present at the inspection?
24       A.   To do what was possible during the
25  day to look at those vehicles, or to look at

Page 92

1  the PEMS equipment, that's correct.
2       Q.   Are you aware of the process by
3  which the PEMS units can be calibrated to
4  determine if they're measuring the correct
5  amount of gas?
6       A.   So my understanding is that the
7  exhaust flow meter is calibrated by the Semtech
8  unit itself and then before and after the test,
9  you need to do a zero and span gas test, which
10  is not something that Mr. Smithers stated in
11  his report and we tried to track down if that
12  information exists, but that wasn't mentioned
13  in his report, but he did say he calibrated
14  them before and after, but I never saw anything
15  about the span or zero gas that he used.
16  BY MR. WOJTANOWICZ:
17       Q.   And you didn't instruct the people
18  attending the inspection on your behalf to
19  perform a zero and span test, did you?
20       A.   That's my understanding, I don't
21  remember asking them to do them.
22       Q.   Why not?
23       A.   Because we weren't -- we weren't
24  doing testing, so, you know, we could have
25  looked at the calibration at that point, but

Page 93

1  that wouldn't have told us anything about the
2  calibrations or how the system was operating
3  when Mr. Smithers was doing his testing.
4       Q.   Other than requesting a visual
5  inspection of the PEMS units, did you ask the
6  people attending the inspection on your behalf
7  to conduct any other inspection or analysis of
8  the PEMS equipment used in Mr. Smithers'
9  testing?
10       A.   At this point, I can't recall any
11  other requests that I would have made at that
12  point.
13       Q.   Regarding that inspection, did you
14  personally design or specify what actions were
15  to be taken during the vehicle inspection?
16       A.   Yes, so I had talked to Peter and
17  Jeff about what we were looking to do during
18  the inspection, some of the things to look at,
19  and then, you know, used some of their input as
20  well having done work and especially with
21  Peter's doing quite a few vehicle inspections,
22  we talked through what we would need to look at
23  and do during that inspection.
24       Q.   Did you generate like a written
25  protocol for what the inspection procedures

24 (Pages 90 - 93)

Page 94

1    were supposed to be?
2        A.   So my memory is that it was verbal.
3    There may have been a protocol, but for some
4    reason, I can't remember if there was one.
5    There was one I know when I think it was shared
6    with you, you know, talking about what was
7    going to be done at the inspection.  That was
8    something that, you know, was written down
9    about what was going to be done during the
10   inspection at kind of a high level.
11       Q.   So that protocol, you're referring
12   to the protocol agreed to among the parties for
13   what things could be inspected and what kind of
14   notice needed to be provided; is that correct?
15           MS. SMITH:  Objection, form.
16           THE WITNESS:  That's
17       correct.
18   BY MR. WOJTANOWICZ:
19       Q.   Aside from that, you're not aware
20   of any other written protocol detailing the
21   steps that you wanted to have taken during this
22   vehicle inspection?
23       A.   Since it was a one-day test, and
24   you know, just an inspection, or one-day
25   inspection, we weren't doing testing, I believe

Page 95

1    it was all verbal, but I would have to go back
2    and see if something was documented, but I
3    don't remember off the top of my head.
4        Q.   You say you weren't doing testing,
5    but the people working for you did actually
6    take both vehicles out for test drives; isn't
7    that right?
8        A.   Correct.  So a good clarification,
9    so there was test drives, there wasn't
10   emissions testing being done that day.
11       Q.   So where are the written protocols
12   for how the people working for you at that
13   inspection were supposed to conduct those test
14   drives?
15       A.   So, again, I can't remember if they
16   were documented or they weren't.  So if they
17   were, I can try to find them, but I can't
18   remember at this point.
19       Q.   Okay.  If they were, would you have
20   cited them in your report as among the
21   materials you relied on in rendering your
22   opinions in this case?
23       A.   Yes, unless I had forgotten about
24   them, but typically, we would have, so we can
25   go back and see if there is something.

Page 96

1        Q.   Were you aware that as part of the
2    vehicle inspection protocol you referred to
3    earlier, the parties were supposed to exchange
4    any information that they gleaned during the
5    course of the inspection?
6            MS. SMITH:  Objection.
7        Objection.  That protocol speaks for
8        itself and to the extent that it calls
9        for a legal conclusion and foundation
10       on what was required and agreed to
11       among the attorneys.
12           MR. WOJTANOWICZ:  You can
13       answer.
14           THE WITNESS:  Can you ask
15       the question again?
16   BY MR. WOJTANOWICZ:
17       Q.   Were you aware that the protocol,
18   the inspection protocol we referred to earlier
19   called for the parties to exchange information
20   they gleaned during the course of that
21   inspection?
22           MS. SMITH:  Same objection.
23           THE WITNESS:  It has been a
24       while since I read it.  I vaguely
25       remember something about, yeah, the

Page 97

1        information needed to be exchanged, but
2        I don't remember the specifics that was
3        listed in there.
4    BY MR. WOJTANOWICZ:
5        Q.   Do you know whether all of the
6    information that the people working under your
7    direction obtained from that inspection was
8    provided to Plaintiffs in this case?
9            MS. SMITH:  Objection, form,
10       foundation.
11           THE WITNESS:  That's my
12       understanding.
13   BY MR. WOJTANOWICZ:
14       Q.   Did you provide all of the
15   information that the people working for you
16   gathered at that inspection to counsel for that
17   purpose or for any purpose?
18       A.   That's my understanding.
19       Q.   Were you aware that there were --
20   no, let me back up a little bit.  How, if at
21   all, did you learn about what happened in
22   the course of that vehicle inspection?
23       A.   I talked to Peter and Jeff about
24   what they had found, had run through kind of
25   some of their findings and then asked them to

HIGHLY CONFIDENTIAL

Page 98

1  draft those sections kind of outlining what the
2  findings were for the report.
3      Q.   Peter and Jeff, you're referring to
4  Peter Lillo and Jeff Wishart?
5      A.   Yes, sorry, correct.
6      Q.   So there was, you had a verbal
7  exchange with those two individuals regarding
8  what they observed during the course of the
9  inspection, correct?
10     A.   Correct.
11     Q.   Did they summarize their findings
12  for you in any way?
13     A.   So the summaries are what's in the
14  report.
15     Q.   So other than the sections that you
16  asked them to draft in the report related to
17  the inspection, there were no other summaries
18  that they made for you of what they observed
19  during the inspection?
20         MS. SMITH:  Objection, form.
21         THE WITNESS:  Yeah, that's
22      my memory is that everything was just
23      drafted into the report.
24  BY MR. WOJTANOWICZ:
25     Q.   Now, I mean, this report doesn't

Page 99

1  have Jeffrey Lillo -- I'm sorry, I'm mixing
2  them up.  It doesn't have Peter Lillo's name on
3  it, does it?
4         MS. SMITH:  Objection, form.
5         THE WITNESS:  Sorry.  It
6      does not.
7  BY MR. WOJTANOWICZ:
8      Q.   It doesn't have Jeffrey Wishart's
9  name on it, does it?
10     A.   That's correct.  Again, as I stated
11  in the beginning, so everything was done at my
12  direction and I had staff help draft certain
13  sections of the report.
14     Q.   And so because ultimately this
15  report is intended to reflect your professional
16  opinion and your engineering judgment, in order
17  to do that, you had to rely on the information
18  that Peter and Jeff put into the draft that
19  they made summarizing what they observed during
20  the inspection; isn't that right?
21         MS. SMITH:  Objection, form.
22         THE WITNESS:  So I
23      considered the information they gleaned
24      and their expertise coupled with my own
25      expertise, that's correct.

Page 100

1  BY MR. WOJTANOWICZ:
2      Q.   And the two ways that you were able
3  to determine what they had gleaned and their
4  expertise were the verbal conversation you had
5  with them and the information that they put
6  into the draft report; isn't that right?
7      A.   That is correct.
8      Q.   Are you aware that there were other
9  people at the vehicle inspection associated
10  with other parties -- parties other than
11  Exponent and other than Plaintiffs?  In other
12  words, there were third-parties' experts, for
13  lack of a better term, present at the vehicle
14  inspection?
15         MS. SMITH:  Objection, form.
16         THE WITNESS:  You said third
17      parties?  I guess, I'm not sure who
18      you're talking about.
19  BY MR. WOJTANOWICZ:
20     Q.   Okay.  Let me just rephrase this.
21  Is it your understanding that there were
22  consultants or experts associated with Bosch,
23  the Defendant Bosch in this case that were also
24  present at the inspection?
25         MS. SMITH:  Objection, form.

Page 101

1         THE WITNESS:  My
2      understanding is that Bosch had some
3      representatives there.  I don't
4      remember exactly who they were, but I
5      was aware that Bosch had some
6      representatives there.
7  BY MR. WOJTANOWICZ:
8      Q.   Were you aware that General Motors
9  also had some representatives there who were
10  not employees of Exponent?
11         MS. SMITH:  Objection, form.
12         THE WITNESS:  I don't
13      remember General Motors
14      representatives, no, I don't remember
15      who they were.
16  BY MR. WOJTANOWICZ:
17     Q.   Did you speak with anyone other
18  than Peter and Jeff from Exponent about what
19  was observed or what data was gleaned from the
20  vehicle inspection?
21         MS. SMITH:  I'm just going
22      to instruct not to answer to the extent
23      it would reveal substance of
24      communications with counsel.
25         THE WITNESS:  Discussions of

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 110

1  for you, Peter and Jeff, with instructions
2  about the speeds that they should achieve
3  during the course of the test drive of the
4  diesel test vehicle?
5      A.  I don't remember a specific
6  discussion other than, you know, drive some,
7  stop and go, and some high speed driving, but
8  it wasn't a prescriptive profile, no.
9      Q.  And these were oral instructions,
10  it wasn't a written protocol for how to conduct
11  these tests?
12      A.  That's correct.  It was more of a
13  test drive, not an actual emissions test.
14      Q.  Okay.  Did you provide Peter and
15  Jeff with instructions about the duration of
16  time as opposed to length and distance that
17  they should conduct their test drive of the
18  diesel test vehicle?
19          MS. SMITH:  Objection, form.
20          THE WITNESS:  Again, since
21      we weren't doing any affirmative
22      testing, I don't think there was any
23      specifics about the amount of time to
24      drive the vehicle.
25

Page 111

1  BY MR. WOJTANOWICZ:
2      Q.  Did you instruct Peter and Jeff
3  with respect to the length of time, distance,
4  that the gas test vehicle should be driven?
5          MS. SMITH:  Objection, form.
6          THE WITNESS:  No, if I
7      remember correctly, it was the same
8      instructions for the diesel or
9      something similar to it.
10  BY MR. WOJTANOWICZ:
11      Q.  Did you give them specific
12  instructions not to use an active OBD logger
13  during their test drive of the gas test
14  vehicle?
15      A.  I don't remember a discussion about
16  that.
17      Q.  Setting aside the inspections that
18  were done by Peter and Jeff for you on the gas
19  and diesel test vehicles, did you or anyone
20  working under your direction conduct any other
21  inspections of Cruze vehicles in connection
22  with your work in this case?
23      A.  Sorry, something popped up and
24  blurred part of your question there.  Could you
25  restate it?

Page 112

1      Q.  Sure.  I'm just asking aside from
2  the inspections of the test vehicles we have
3  been discussing, have you or anyone working
4  under your direction conducted any other
5  inspection of a Cruze vehicle in connection
6  with your work in this case?
7      A.  No.
8      Q.  Have you ever inspected any other
9  Cruze vehicle for any other purpose?
10      A.  Not that I can recall.
11      Q.  So you identified earlier, you said
12  that Jeff Wishart had experience with PEMS
13  testing, correct?
14      A.  He had been part of system PEMS
15  testing, that's correct.
16      Q.  Is there anyone else who was
17  working on, among the people assisting you in
18  your work in this case, that to your knowledge
19  has experience with PEMS testing?
20      A.  There's others that have done
21  emissions testing, but specific to PEMS, I do
22  not believe so.
23      Q.  For purposes of your opinions in
24  this case to the extent that you are relying on
25  inputs from your team, is it fair to say Jeff

Page 113

1  Wishart is the one whose experience you were
2  drawing on to reach your opinions in this case?
3          MS. SMITH:  Objection, form.
4          THE WITNESS:  So in part,
5      some of his information, myself and my
6      staff have done some work looking at
7      PEMS data, understanding, you know,
8      best practices with PEMS data, how it
9      has been conducted and, again, you
10      know, PEMS data is really the
11      culmination of dyno testing with
12      on-road testing, so the same principles
13      apply.  But as it relates to PEMS, Jeff
14      would have been the one with the
15      experience.
16  BY MR. WOJTANOWICZ:
17      Q.  Is there anybody else who assisted
18  you in this case whose experience with PEMS
19  testing you relied on in reaching your opinions
20  in this case?
21      A.  No.
22      Q.  What's your understanding of Jeff
23  Wishart's educational background?
24      A.  So he has a Ph.D from Arizona State
25  University.  I believe it's in either

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  mechanical engineering or engineering
2  mechanics.
3      Q.  Do you have any idea what his work
4  background is, where he has worked before
5  Exponent?
6      A.  He worked at Intertek for a time, I
7  think on electric vehicle and plug-in vehicle
8  testing and where he did some PEMS testing.
9  And he worked for a couple of other energy
10 providers and then he was an adjunct professor
11 at Arizona State University.  I can't remember
12 the exact -- or which department it is, but
13 there's classes on vehicles and energy that he
14 teaches.
15     Q.  I'm a little confused.  You said
16 that he worked for an electrical and plug-in
17 vehicle manufacturer; is that right?
18     A.  I'm sorry, at Intertek, he did some
19 test on plug-in hybrid and hybrid vehicles, so
20 vehicle testing and emissions testing.
21     Q.  So hybrid vehicles as well, not
22 just full electric vehicles?
23     A.  I believe so, that is correct, but
24 I would have to double check on that, but I
25 thought it was plug in, hybrid, and electric

Page 115

1  vehicles.
2      Q.  Okay.  Unless I'm way off track
3  here, I don't see why a person would do a PEMS
4  test on a full electric vehicle.  That's not
5  something that would be done, correct?
6      A.  Correct.
7      Q.  How long has he been with, has Mr.
8  Wishart been with Exponent?
9      A.  I think it is between a year and a
10 half, I think a year and a half, something like
11 that.  Year and a half to two years.
12     Q.  Do you know whether Mr. Wishart has
13 performed any PEMS tests during the time that
14 he has been at Exponent?
15     A.  I don't know if he's actually
16 conducted PEMS testing while at Exponent.
17     Q.  Do you know approximately for how
18 long Mr. Wishart worked at Intertek?
19     A.  I don't have his CV in front of me.
20 Going off memory I thought it was between two
21 and four years, something like that.
22     Q.  Do you have an understanding of
23 approximately how long Mr. Wishart has been
24 working as an engineer in this field?
25     A.  I think most of his work was either

Page 116

1  in vehicles or in the energy space.  I think
2  it's between 10 or 15 years, including some of
3  his academic roles.
4      Q.  Do you know approximately how old
5  he is just to get a sense of how long he has
6  been out in the workforce as opposed to just
7  being in school?
8          MS. SMITH:  Objection, form.
9          THE WITNESS:  Actually, I do
10     not know how old he is.  And I guess I
11     could go back and look at when he
12     graduated, but I don't know how old he
13     is.
14 BY MR. WOJTANOWICZ:
15     Q.  Can you ballpark it, does he appear
16 to be under 40, under 50?
17         MS. SMITH:  Objection, form.
18         THE WITNESS:  If I had to
19     guess, he's probably in his thirties or
20     forties.
21 BY MR. WOJTANOWICZ:
22     Q.  What training has Mr. Wishart had
23 in conducting PEMS tests?
24     A.  I don't know if I can remember the
25 testing he's had.  I believe he had worked with

Page 117

1  one of the manufacturers prior to coming to
2  Exponent and I think he's had some either
3  training or some work with a manufacturer at
4  some point during his time at Exponent.
5      Q.  A manufacturer of what?
6      A.  A manufacturer of a PEMS unit.
7      Q.  Is it your understanding you
8  believe that he actually worked for one of the
9  manufacturers of PEMS units?
10     A.  No.  Did I state that?
11     Q.  That was what I understood.  That's
12 why I was asking the clarifying question.
13     A.  Sorry.  No, no, he had interacted
14 with or had some training with a manufacturer
15 of a PEMS unit, he hadn't worked for them.
16     Q.  All right.  So you believe that he
17 may have received some training from one of the
18 PEMS unit manufacturers.  Do you know the
19 nature of that training?
20     A.  I don't.  He's out in our Phoenix
21 office and I can't remember the specifics of
22 when or where that was, but we had a
23 conversation a while ago about some of the
24 training that he had been doing and
25 conversations he's had, but I don't remember

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1 the specifics.
2 Q. Do you know how many PEMS tests Mr.
3 Wishart has done?
4 A. I do not.
5 Q. Do you have any sense of scale? Is
6 it, you know, has he done five, ten, a
7 thousand?
8 A. I would say in the single to double
9 digit range.
10 Q. And what's your basis for giving me
11 that estimate, if you have one?
12 A. In talking to him about some of the
13 prior work that he had at Intertek that's, you
14 know, kind of an estimate from what I remember
15 from those discussions and different programs
16 he was on.
17 Q. Did Mr. Wishart write any parts of
18 the report that specifically discuss PEMS
19 testing either by General Motors or by Mr.
20 Smithers?
21 MS. SMITH: Objection, form.
22 THE WITNESS: I don't know
23 if he drafted those sections. He might
24 have provided input on those sections,
25 but I don't remember. I can't remember

Page 119

1 exactly if he added to those sections
2 about GM's PEMS testing or not.
3 BY MR. WOJTANOWICZ:
4 Q. Did Mr. Wishart summarize for you
5 the procedures that he followed during the
6 times that he was conducting PEMS testing?
7 MS. SMITH: Objection, form.
8 THE WITNESS: Again, I think
9 we talked about this before. He and I
10 had a verbal discussion, I don't know
11 if he had a procedure that he drafted
12 for that day. I can't remember.
13 BY MR. WOJTANOWICZ:
14 Q. Did Mr. Wishart identify for you
15 any written protocols that he believes should
16 govern the conducting of a PEMS test?
17 MS. SMITH: Objection, form.
18 THE WITNESS: Again, we
19 weren't doing PEMS testing that day. I
20 know we had talked about, you know,
21 some of the stuff that was in the
22 user's manual, but I don't remember a
23 specific protocol that he had drafted.
24 BY MR. WOJTANOWICZ:
25 Q. You know, you testified that in

Page 120

1 some other cases relating to Volkswagen, you
2 have given testimony regarding PEMS tests and
3 written reports regarding PEMS tests. Was Mr.
4 Wishart also assisting you in those cases?
5 A. I believe most of those reports
6 were written prior to Dr. Wishart becoming an
7 employee of Exponent. So I don't think he
8 drafted any of it. There may have been some of
9 the later reports that he was, when he was
10 employed that I may have asked him to look at a
11 few things, but I think most of the drafting
12 was done prior to him coming on board.
13 Q. Now, since you've never conducted a
14 PEMS test yourself, are you relying on the
15 experience of Mr. Wishart in order to
16 substantiate your opinions regarding whether
17 Mr. Smithers' PEMS tests were conducted
18 appropriately?
19 MS. SMITH: Objection, form.
20 THE WITNESS: So I
21 considered, you know, input from Dr.
22 Wishart, but my analyses is based on
23 other PEMS testing that I've looked at,
24 documented papers about PEMS testing,
25 information about West Virginia, how

Page 121

1 the EPA uses PEMS testing, and how the
2 European Commission has used PEMS
3 testing, so collectively, I considered
4 all that information.
5 BY MR. WOJTANOWICZ:
6 Q. Okay. To the extent that you
7 considered Mr. Wishart's input, you did that in
8 the form of some verbal communications,
9 correct?
10 A. Verbal communications and then he
11 assisted drafting the sections on some of the
12 PEMS testing and the inspections -- on the
13 inspection.
14 Q. Okay. And so he communicated to
15 you his input regarding the sufficiency of the
16 PEMS testing described in your report by
17 helping to draft some of the sections for you
18 to consider whether that belonged in your
19 report or not, correct?
20 MS. SMITH: Objection, form.
21 THE WITNESS: It was based
22 on the conversations we had and, you
23 know, my observations from what he had
24 provided and then provided him some
25 direction about what observations I had

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1  from his reporting on what was
2  conducted at the scene during the
3  testing -- or during the inspection and
4  feedback that he had gleaned from
5  looking at different PEMS testing
6  protocols.
7  BY MR. WOJTANOWICZ:
8      Q.  Did you conduct any dynamometer
9  tests on any Cruze diesel vehicles for the
10 purposes of your analysis here?
11     A.  I did not.
12     Q.  Did anyone working under your
13 direction perform any dynamometer tests on
14 Cruze vehicles for this case?
15     A.  No, they did not.
16     Q.  Do you know -- are you aware of any
17 third party or any dynamometer tests on Cruze
18 vehicles being performed for purposes of this
19 case other than any one that may have been
20 performed by you or actually someone else at
21 Exponent?
22        MS. SMITH:  Objection, form.
23        THE WITNESS:  Sorry, am I
24     aware of anybody else who has done dyn
25     testing?

Page 123

1  BY MR. WOJTANOWICZ:
2      Q.  Correct, on the Cruze vehicles at
3  issue here.
4      A.  I'm not aware of anybody at
5  Exponent, obviously, Mr. Smithers did some dyno
6  testing at TRC, but other than that, I'm not
7  aware of any additional testing.
8      Q.  Did you consider conducting
9  dynamometer testing on any Cruze vehicles for
10 your analysis here?
11        MS. SMITH:  Objection, form.
12        THE WITNESS:  Not really.
13     Again, you know, as I was getting into
14     the analyses and understanding the
15     allegations and the data that Mr.
16     Smithers had provided and then looking
17     at the time constraints initially, that
18     there wasn't likely going to be time to
19     do it, but the more I got into it, and
20     I realized, you know, kind of the
21     issues with Mr. Smithers' methodology,
22     the vehicles he tested, I didn't see
23     how the dyno testing would have added
24     much more to the information than that
25     already had and to the opinions that I

Page 124

1  can glean from the produced materials
2  in Mr. Smithers' data.

Page 125

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 134

```
 1   BY MR. WOJTANOWICZ:
 2       Q.   And I want to call your attention
 3   back to a statement that you made earlier and
 4   tell me if I'm summarizing this correctly.  I
 5   believe that you said that in the testing data
 6   that you received from -- regarding Mr.
 7   Smithers' PEMS tests that you do not have zero
 8   and span data for the test segments that he
 9   ran.  Was that what you testified?
10       A.   His report didn't mention how he
11   did his calibration data, was it on span gas
12   data.  There was some information in the Excel
13   files.  Some of it was missing.  Some of it was
14   there.  We tried to understand that, but we
15   couldn't come up with anything conclusive, but
16   my statement was related to what was defined in
17   his report.
18       Q.   So you're aware his report did
19   indicate that they regularly calibrated the
20   PEMS equipment during the course of their
21   testing campaign.  Do you recall that?
22       A.   He mentioned that he calibrated it,
23   but didn't expand on what was done.
24       Q.   And the test data files that were
25   provided to you by counsel for General Motors,
```

Page 135

```
 1   those included data using the zero and span
 2   testing for every test segment, didn't it?
 3       A.   There was some missing data in one
 4   of the cells and I can't recall exactly, but
 5   there was some information in some of the other
 6   cells about zero and span gas, but we couldn't
 7   conclusively determine what was done there,
 8   because there was a missing cell or some -- I
 9   can't remember, there was a note about zero
10   span gas not used, but then in another spot, it
11   was there, so we weren't able to conclusively
12   determine if he used it or not, but there was
13   some information in there.
14       Q.   So it's not your testimony, is it,
15   that Mr. Smithers failed to conduct zero and
16   span testing or calibrations on the PEMS units,
17   that's not what you're testifying to?
18           MS. SMITH:  Objection, form.
19           THE WITNESS:  I'm not
20       testifying that he didn't do it, I just
21       couldn't confirm it and what was in the
22       report didn't provide any insight, so
23       we were left with trying to figure and
24       interpret the data in there.
25
```

Page 136

```
 1   BY MR. WOJTANOWICZ:
 2       Q.   Going back, we were discussing your
 3   background, if any, in computer programming,
 4   computer science, kind of when we went to break
 5   there, so let me just ask you again, you don't
 6   have any degrees in computer programming or
 7   computer science, do you?
 8       A.   I do not have degrees in those
 9   areas.
10       Q.   Have you had any training in
11   computer science or computer programming?
12       A.   As part of my undergraduate and
13   graduate study, we had to do computer
14   programming.  And in my graduate program, we
15   had to look at engine controls and evaluate
16   vehicles on dynos and look at engine controls
17   and how sensor inputs were used for vehicle
18   control.
19       Q.   So is it fair to say that the
20   computer science or computer programming
21   classes you had as an undergraduate were sort
22   of supplemental or in conjunction with your
23   general engineering classwork, it wasn't a
24   specified emphasis in computer science?
25       A.   So, yeah, I don't have a degree in
```

Page 137

```
 1   computer science.  My work in computer science
 2   is related to the vehicle level control and
 3   some of my work with calibrations and then
 4   loading calibrations on vehicles, and the
 5   applied use of control theory for mechanical
 6   and engine controls.
 7       Q.   Did you personally -- did you
 8   examine the software coding for the EDC or
 9   electronic diesel control in the Cruze
10   vehicles?
11       A.   I'm sorry, I missed that first
12   part.
13       Q.   Software code for the EDC.
14       A.   I examined some parts of it and
15   then I examined Dr. Levchenko's report.
16       Q.   Did you have someone at Exponent or
17   elsewhere examine the computer code for you?
18       A.   So Dave Anderson and Matt Pooley
19   had looked into that and looked at Dr.
20   Levchenko's analysis of some of that code.
21       Q.   So you said earlier that Matt
22   Pooley is an Exponent employee, he has a Ph.D
23   in engineering and computer science or
24   something to that effect; is that a fair
25   summary?
```

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1            MS. SMITH: Objection, form.
2            THE WITNESS: Yes, that's my
3    recollection.
4 BY MR. WOJTANOWICZ:
5      Q. What about David Anderson, is he
6 also a computer scientist?
7      A. I believe he's a mechanical
8 engineer that spent quite a bit a time with
9 controls for engines and after-treatment
10 systems.
11      Q. So is it fair to say that Dave
12 Anderson and Matt Pooley performed the direct
13 analysis of the software code at your
14 direction?
15      A. At my direction and with my input,
16 we reviewed it. They did some deeper dives
17 when I asked for some additional information to
18 be gleaned from Dr. Levchenko's report.
19      Q. And how did they convey from what
20 they learned to you? Was it oral? Was it in
21 writing?
22      A. It was oral and then it was the
23 drafting of the text in those areas. So I
24 would talk to them about their findings and
25 then they drafted it up or drafted up the

Page 139

1 observations for the report.
2      Q. Did they summarize their findings
3 for you in any way other than putting it in a
4 draft report?
5      A. My recollection is it was all done
6 in the report.
7      Q. Because you didn't do the direct
8 analysis of the software code yourself in its
9 entirety, you had to rely on their analysis in
10 your consideration of the software issues
11 mentioned in your report; is that true?
12            MS. SMITH: Objection --
13            THE WITNESS: So it was --
14 sorry, go ahead, Renee.
15            MS. SMITH: Just objection,
16 form.
17            THE WITNESS: So it was at
18 my direction and with my input. I did
19 rely on some of their findings and then
20 reevaluated what they had done and
21 walked through the findings with them
22 and did some of my own review of Dr.
23 Levchenko's report.
24 BY MR. WOJTANOWICZ:
25      Q. So I would like you to turn back to

Page 140

1 Exhibit 1, which is the copy of your report.
2 And I will go through some of the items in your
3 CV, which is at Appendix A following the body
4 of your report.
5      A. Okay. I'm there.
6      Q. Okay. First of all, is your CV, is
7 this the most up-to-date version of the CV that
8 you have?
9      A. Yes, this is the most up-to-date
10 one.
11      Q. And is everything accurate in here
12 to the best of your knowledge?
13      A. Yes.
14      Q. I would like to go through your
15 prior work experience. You've been at
16 Exponent since 2017; is that correct?
17      A. That is correct.
18      Q. Describe for me in general what you
19 primarily do at Exponent.
20      A. So I'm a principal at Exponent. My
21 role is to work with clients, understand their
22 needs, develop new work, whether it be, you
23 know, kind of consulting work or expert
24 testimony. So my work is really, you know,
25 working with clients and helping understand how

Page 141

1 I might be able to help them from a consulting
2 perspective in areas of vehicle engineering,
3 whether it's engines and controls, advanced
4 driver-assistance systems, automated vehicles,
5 government regulations.
6      Q. What percentage of your work would
7 you say since you joined Exponent relates to
8 providing expert testimony or expert consulting
9 services, whether or not it leads to the
10 generation of a report or not?
11      A. I would say kind of over the
12 three-plus years, something around kind of
13 50/50. Fifty percent in consulting, 50 percent
14 expert witness.
15      Q. With respect to your consulting
16 work, what percentage of your consulting work
17 relates to vehicle, diesel vehicle emissions?
18      A. So specifically diesel vehicles, on
19 the consulting side, I can't think of any work
20 in that area.
21      Q. Do you do any -- then what
22 percentage of your consulting work relates to
23 gasoline vehicle emissions?
24      A. I'm sorry, I missed it, was it on
25 the consulting side or the expert testimony

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1   side?
2       Q.   On the consulting side.
3       A.   So of that 50 percent, I would say
4   a third to half of that relates to gasoline
5   vehicles, engines.
6       Q.   No, I'm specifically asking
7   regarding gasoline vehicles, and maybe you said
8   this and I misheard you, gasoline vehicle
9   emissions.
10      A.   Oh, sorry.  On the emissions side,
11  there's some attributes of what I do that's
12  related to emissions, it's not the primary
13  piece, so I would say a smaller fraction of
14  that 50 percent is related to gasoline vehicle
15  emissions.
16      Q.   And is that because a portion of
17  your work relates to fuel economy and there is
18  some cross, sort of some relationship between
19  fuel economy and emissions?
20      A.   Yeah, and a gasoline engine
21  performance kind of in general, yes.
22      Q.   So while some of your consulting
23  work may bear on issues that relate to
24  emissions, none of it really is focused
25  specifically on measuring or controlling

Page 143

1   emissions in gasoline vehicles; is that a fair
2   statement?
3       A.   I think that's a fair statement.
4       Q.   So does that kind of -- and to the
5   extent that we haven't -- what are the subject
6   matters that make up the bulk of your
7   consulting work at Exponent since you have been
8   there?
9       A.   So kind of fuel economy, government
10  regulatory analyses, engine failures, recalls,
11  and consulting related to advanced
12  driver-assisted systems or automated vehicles.
13      Q.   And what percentage of your
14  consulting work is done for automobile
15  manufacturers, if you can generalize?
16      A.   I would say of that consulting
17  work, 75 percent is for automotive
18  manufacturers.
19      Q.   Is GM among the companies that has
20  retained you for consulting work?
21      A.   No.
22      Q.   The 25 percent that remains of the
23  consulting work that is for somebody other than
24  auto manufacturers, what kind of companies are
25  those, if you can summarize for me?

Page 144

1       A.   They would be more in the tech
2   sector, I would call it.
3       Q.   Are these generally companies who
4   might manufacture components for vehicles, but
5   not an entire vehicle?
6       A.   I would say that's a fair
7   generalization.
8       Q.   Is it fair to say that they're all
9   related to the automobile industry, even if
10  they're not manufacturers, per se?
11          MS. SMITH:  Object to form.
12          THE WITNESS:  I would have
13      to go back and look for sure to see if
14      I'm missing something, but I think
15      that's a correct assessment.
16  BY MR. WOJTANOWICZ:
17      Q.   And of the roughly 50 percent of
18  your work at Exponent that has been related to
19  litigation-related work, what percentage of
20  that litigation-related work relates to diesel
21  vehicle emissions?
22      A.   I would say, like, a third to maybe
23  half, somewhere in there, it's kind of, it's
24  hard to say because it fluctuates, but I would
25  say a third to half is related to diesel

Page 145

1   emissions.
2       Q.   And what percentage relates to fuel
3   economy issues, if any?
4       A.   I would say 10, 15 percent,
5   somewhere in there.
6       Q.   And is there -- can you summarize
7   for me what the remaining, you know, whatever
8   35 to 40 or 50 percent of your time spent on
9   litigation-related matters, what the subject
10  matters are?
11      A.   Yeah, so it would be failures of
12  components in gasoline engines, failure to
13  recalls related to transmissions, then kind of
14  broadly some of the more emerging technologies,
15  like advanced driver-assistance systems
16  vehicles or automated vehicles.
17      Q.   Is it fair to say that all of the
18  work that you've done on the litigation side is
19  representing defendants in automobile-related
20  litigation?
21          MS. SMITH:  Objection, form.
22          THE WITNESS:  To date, it
23      has been on the defense side, yes.
24  BY MR. WOJTANOWICZ:
25      Q.   The diesel emissions-related work

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 158

1  worse than the fuel economy listed.  There was
2  an offset, I think, around 10 percent that on
3  average, even though EPA and DOT got closer, it
4  wasn't always a perfect match that there was
5  typically a 10 percent offset and that was due
6  to things like wind resistance, maintenance on
7  the vehicle that couldn't be captured
8  completely on cycle.
9      Q.  During the course of your analysis
10 of the dynamometer testing results submitted in
11 connection with your work on the CAFE
12 standards, did you ever identify any
13 dynamometer testing results submitted by an OEM
14 that you believed were false or inaccurate?
15         MS. SMITH:  Objection, form.
16         THE WITNESS:  No.
17     Typically, the data I saw was at a
18     higher kind of aggregate level and I
19     didn't see anything where there was --
20     you know, it was more at the aggregate
21     level.
22 BY MR. WOJTANOWICZ:
23     Q.  Did you do an analysis to determine
24 why there historically had been a significant
25 difference between the reported fuel economy

Page 159

1  for purposes of compliance with CAFE standards
2  and the actual on-road fuel economy experienced
3  by consumers?
4      A.  You said -- I guess if you could
5  read the question back, the first part, the
6  specific nature of it.
7         MR. WOJTANOWICZ:  Sure.
8         Would the reporter please read it back?
9             - - - - -
10        (Whereupon, the reporter read back
11        as requested.)
12            - - - - -
13        THE WITNESS:  So, again,
14     that was at the higher level of looking
15     at what were some of the conditions
16     that were outside of the test procedure
17     that could be -- could influence fuel
18     economy in the real world, so there was
19     some, you know, kind of the broader
20     studies about environmental conditions,
21     hills, and things like that.  There
22     wasn't a deep dive into the specific
23     aspects.  The EPA had done quite a bit
24     of that over time and there was kind of
25     an analysis of if that adjustment

Page 160

1      factor needed to be corrected or
2      adjusted.
3  BY MR. WOJTANOWICZ:
4      Q.  Okay.  It sounds like you were
5  describing to me what the EPA had done to
6  analyze those factors, but I'm asking whether
7  you specifically conducted any analyses related
8  to identifying the reason for the discrepancy
9  between dynamometer testing results and
10 real-world results relating to CAFE standards?
11        MS. SMITH:  Objection, form.
12        THE WITNESS:  So my work was
13     with the EPA, I didn't conduct specific
14     testings or specific analyses at that
15     point trying to pinpoint the exact
16     differences, no.
17 BY MR. WOJTANOWICZ:
18     Q.  Okay.  Did you at any point?
19     A.  I think I worked with our economist
20 who looked at kind of -- it has been a long
21 time since I've had to think about this or do
22 anything with it.  There was some, like,
23 household survey studies that had information
24 about fuel economy that we had to look at as it
25 related to some of the work the EPA had done,

Page 161

1  but I can't remember the specifics offhand.
2      Q.  In your position as senior engineer
3  at the Department of Transportation, did you
4  have any responsibility for on-road testing to
5  assess the real-world performance of fuel
6  economy for vehicles?
7         MS. SMITH:  Objection, form.
8         THE WITNESS:  Actual vehicle
9     testing, no.  I had led some work with
10    Argonne National Labs who was doing
11    some simulation work on -- you know,
12    part of the reason it's hard to
13    evaluate technology is that they don't
14    exist, so there isn't dyno work or
15    on-road data, so the DOT contracted
16    with Argonne National Labs to do some
17    testing and some of that was testing
18    for on-cycle testing, but there was
19    some testing about kind of off-cycle
20    testing as well to understand where
21    there might be differences or gaps.  So
22    I would have led and informed some of
23    that work, but that was in simulation,
24    not physical vehicle testing.
25

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 178

1     MR. WOJTANOWICZ: I was just
2  about to suggest that we take our lunch
3  break now, so.
4     MS. SMITH: Perfect, and
5  could you stay on for one second after
6  we go off the record to just discuss
7  some general scheduling?
8     MR. WOJTANOWICZ: Is that to
9  me or to --
10    MS. SMITH: To everyone,
11  sorry.
12    THE VIDEOGRAPHER: The time
13  is 2:09. We're off the record.
14    - - - - -
15  (A recess was taken at this time.)
16    - - - - -
17    THE VIDEOGRAPHER: The time
18  is 2:53. We are on the record.
19  BY MR. WOJTANOWICZ:
20    Q. All right. Mr. Harrington, a few
21  more questions about your CV here. Next, I
22  wanted to ask you about your publications,
23  there are quite a few of them listed there. I
24  don't want to belabor this by going through
25  each of them. Can you tell me whether any of

Page 179

1  these publications relate to emissions testing
2  for diesel vehicles?
3    A. So the third from the bottom, the
4  Corporate Average Fuel Economy effects
5  modeling, so that deals with gasoline and
6  diesel vehicle, fuel economy and CO2 emissions.
7  It's not specific to diesel vehicle emissions
8  testing, but it relates to diesel vehicle, CO2
9  and fuel economy performance. And the same
10  with the one just above it the "Corporate
11  Average Fuel Economy Effects and Modeling
12  System Documentation."
13    THE STENOGRAPHER: Can you
14    slow down a little bit when you're
15    reading, please?
16    THE WITNESS: I'm sorry. So
17    there's two that are related to fuel
18    economy and CO2 emissions from gasoline
19    and diesel vehicles. It would be the
20    third from the bottom and the fourth
21    from the bottom in my list.
22  BY MR. WOJTANOWICZ:
23    Q. Those are on page 4 of the last
24  page of your CV?
25    A. It's page 3. You said

Page 180

1  publications, correct?
2    Q. You know you're right, I slid over
3  into presentations. I apologize.
4    A. No worries.
5    Q. Okay. Yeah. So the first one of
6  those that you referenced, that is -- it says
7  "Corporate Average Fuel Economy Compliance and
8  Effects Modeling System Documentation." Can
9  you describe for me what that publication is?
10    A. Sure. The work that I did on fuel
11  economy standards, in order for the DOT and
12  EPA to -- or the DOT specifically to promulgate
13  fuel economy regulations, it has to evaluate
14  the feasibility of technologies and the fuel
15  economy standards. So, again, as I mentioned,
16  my role was to look at the assumptions related
17  to emerging fuel saving and CO2 reducing
18  technologies and so that documentation was a
19  separate piece of all the regulatory documents
20  that I helped write, but I wasn't a named
21  author, because they're federal documents, but
22  that report was how the modeling system worked,
23  the assumptions that were in it, and a lot of
24  the assessments that I had made were documented
25  in that document as they relate to gasoline and

Page 181

1  diesel vehicle fuel economy and CO2 emissions
2  and related technologies.
3    Q. But that publication did not
4  address the proper way to conduct PEMS testing,
5  did it?
6    A. There was not a discussion of PEMS
7  testing that I can recall in that document.
8    Q. And that publication did not
9  discuss the proper way to conduct dynamometer
10  testing for emissions testing, did it?
11    A. Not that I recall.
12    Q. Did that publication address the
13  proper way to -- the proper way to evaluate
14  data relating to emissions testing?
15    MS. SMITH: Objection, form.
16    THE WITNESS: I believe that
17    had some discussion of the on-road
18    adjustment as it relates to fuel
19    economy standards, if I recall
20    correctly.
21  BY MR. WOJTANOWICZ:
22    Q. What's the on-road adjustment as it
23  relates to fuel economy --
24    A. So from the difference between a
25  test cycle and kind of the average on-road fuel

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1 economy, that delta between what was tested and
2 versus kind of the average on-road fuel economy
3 performance of vehicles out in the fleet.
4 Q. And then the next stated
5 publication, it looks like it has essentially
6 the same title "Corporate Average Fuel Economy
7 Compliance and Effects Modeling System
8 Documentation." Was that publication related
9 to the prior one that we just discussed?
10 A. So they're, in essence, you know,
11 the same or similar document, the one you just
12 mentioned was for the 2012 through 2016 model
13 year rule and the first one that you had stated
14 was the 2017 to 2025 model year rule, so the
15 same document, but for two different documents
16 rule makings and time periods.
17 Q. What was your role in -- and there
18 was some coauthors that you had with both of
19 those publications, correct?
20 A. Correct.
21 Q. What was your role with respect to
22 drafting those publications?
23 A. So I drafted the sections that were
24 related to the technology assumptions that went
25 into the model and how we addressed the fleet

Page 183

1 of vehicles that were used to model an overall
2 fleet of vehicles going forward.
3 Q. Any other parts that you drafted?
4 A. It has been a while since I looked
5 at those. Those are the two main parts that I
6 would have been responsible for. I might have
7 provided input to some other sections, but I
8 can't think of them right now.
9 Q. And other than those two that you
10 just identified, none of the other publications
11 listed here relate to emissions compliance
12 testing in any way, correct?
13 A. That is correct.
14 Q. Your CV also lists a number of
15 presentations. It says "Selected Invited
16 Presentations," does that mean you've given
17 more presentations than the ones that you have
18 listed here?
19 A. Yeah, there was some other -- where
20 I wasn't invited to speak, it was kind of
21 lesser roles, and I couldn't remember all of
22 them, so these are the main ones where I was
23 selected and invited to speak on a particular
24 topic.
25 Q. And what sorts of occasions have

Page 184

1 you spoken where you weren't invited to speak?
2 A. I can't recall which ones I
3 wasn't -- usually, I'm invited to speak. I
4 think there was a few where I offered to speak,
5 but typically, I get invited to speak at
6 different conferences or different topic areas.
7 Q. Are any of the -- do you know
8 whether any of the presentations that you have
9 not listed where you offered to speak, did any
10 of them relate to diesel vehicle emissions?
11 A. I guess the presentations that
12 might not have been on there, when I was at
13 Cummins, I think I mentioned this before, I had
14 to go out and work with fleets about upcoming
15 changes to the vehicles due to regulations, so
16 I had to present on those topics to some of our
17 clients and customers. So those probably were
18 not listed on here, talking to some fleets or
19 potential customers of Cummins engines, so that
20 related to heavy-duty vehicles and engines.
21 Q. Any other presentations that are
22 not listed here that relate to diesel vehicle
23 emissions?
24 A. Internally to the DOT and EPA, I
25 gave quite a few presentations to senior

Page 185

1 officials, White House staff, as relates to
2 fuel economy standards and greenhouse gas
3 emissions, which include diesel vehicles and
4 technology. And it looks like the National
5 Academy of Sciences Committee Meeting is on
6 here, so that one is actually listed that's the
7 third from the bottom under presentations.
8 Q. Okay. Have you given any
9 presentations that relate to any diesel vehicle
10 emissions cheating allegations?
11 A. No.
12 Q. Have you given any presentations
13 that relate to PEMS testing or how to conduct
14 PEMS testing?
15 A. Not that I can recall.
16 Q. Have you given any presentations
17 regarding the proper way to conduct a
18 dynamometer testing?
19 A. Not that I can recall, no.
20 Q. There's a presentation listed at
21 the bottom of page 3 of your CV, the very
22 bottom is where it starts "The Future of
23 Vehicle Fuel Efficiency & Emissions Policies."
24 It says you were a panelist at a meeting of
25 Motor & Equipment Manufacturers Association.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 306

1  well.
2      Q.   There's also some time components
3  there that you need to have achieved a
4  prescribed speed within a certain period of
5  time, like a deadline within the testing
6  period; is that right?
7      A.   So it's part of that plus or minus
8  2-mile-an-hour curve, yeah, you have to follow,
9  you have to follow that trace and if you,
10  obviously, are lagging or ahead in speed, you
11  won't complete the test in the right time
12  period.
13      Q.   So there's some leeway for a driver
14  to have an influence on the outcome of an
15  emissions test on a dynamometer by either being
16  a little bit higher or a little bit lower on
17  speed and a little bit earlier or a little bit
18  late on time, as long as they can stay within
19  the acceptable parameters, correct?
20          MS. SMITH:  Objection, form.
21          THE WITNESS:  There is some,
22      just like there is vehicle-to-vehicle
23      variation, there's some
24      driver-to-driver variation, but the way
25      the regulations and the tests are

Page 307

1      written, it tries to minimize that to a
2      quantity that's not, you know, overly
3      influential in the overall results, but
4      there is some variability there.
5  BY MR. WOJTANOWICZ:
6      Q.   And what kind of analysis of driver
7  aggressiveness did you do for purposes of
8  determining whether you could rely on these CoC
9  tests and figures here?
10          MS. SMITH:  Objection, form.
11      Objection, misstates what his opinions
12      are.
13          THE WITNESS:  So I don't
14      remember doing any analyses and I don't
15      remember seeing data on that.
16  BY MR. WOJTANOWICZ:
17      Q.   Did you calculate -- do you know
18  what V times A underscore POS at 95 refers to?
19      A.   Can you repeat that again?
20      Q.   Sure.  There's a sort of, I guess
21  it's a calculation called the VA POS at 95,
22  which is representative of the V times A
23  underscore P-O-S or POS and the at sign, 95,
24  are you familiar with that measurement?
25          MS. SMITH:  Are you

Page 308

1  referring to a specific page of this or
2  are you just asking him that?
3          MR. WOJTANOWICZ:  I'm just
4  asking him.
5          MS. SMITH:  Okay.  Are you
6  sure you're saying it right?
7          THE WITNESS:  Is there a --
8  I'm not remembering seeing something
9  like that, but I'm not sure.  Is there
10  a document that that's in?
11  BY MR. WOJTANOWICZ:
12      Q.   No, I'm asking if you are familiar
13  with that calculation, apparently, the answer
14  to that is no.  You're not familiar with the VA
15  POS at 95 calculation?
16          MS. SMITH:  Objection, form.
17      Objection, you are not showing the
18      document.  I'm not sure the way you're
19      even describing the signs is something
20      that's comprehensible.  So objection.
21          THE WITNESS:  There's the
22      relative positive -- is it relative
23      positive acceleration that you are
24      talking about?  Hearing what you said,
25      I don't remember seeing that, that

Page 309

1      metric or that number or equation that
2      you're referencing.
3  BY MR. WOJTANOWICZ:
4      Q.   Relative positive acceleration is
5  something else, let me ask you this, did you
6  calculate the relative positive acceleration
7  for the CoC test results presented here?
8      A.   I don't remember calculating that,
9  no.
10      Q.   Okay.  The VA POS at 95 measurement
11  is defined sometimes as the 95th percentile of
12  the products of instantaneous speed and
13  positive acceleration.  Does that ring any
14  bells?
15          MS. SMITH:  Objection, form.
16          THE WITNESS:  It does not.
17  BY MR. WOJTANOWICZ:
18      Q.   Okay.  It's safe to say then you
19  did not conduct that particular calculation on
20  the testing data relating to this CoC testing
21  that you cite in your report?
22      A.   Looking at the 95th percentile,
23  looking at the confidence interval, no, I did
24  not calculate that for these runs.
25      Q.   So you didn't believe for purposes

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 319

1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
2

                          - - - - -
3
4      JASON COUNTS, DONALD KLEIN,    C.A. NO.
       OSCAR ZANORA, DEREK LONG,      1:16-CV-12541-TLL-PTM
5      HASSAM HIRMIZ, JASON SILVEUS,
       JOHN MISKELLY, THOMAS HAYDUK,
6      CHRISTOPHER HEMBERGER and
       JOSHUA RODRIGUEZ, individually
7      and on behalf of all others similarly
       situated,
8                     Plaintiffs,
9
                      -against-
10
11     GENERAL MOTORS LLC, ROBERT
       BOSCH GMBH, and ROBERT
12     BOSCH, LLC,
                     Defendants.
13
                          - - - - -
14
                     HIGHLY CONFIDENTIAL
15
                          - - - - -
16
17       VIRTUAL VIDEOTAPED DEPOSITION OF RYAN HARRINGTON
18                 NATICK, MASSACHUSETTS
19                 Thursday, July 23, 2020
20
                         VOLUME 2
21
22
23     REPORTED BY:
24     ROBIN CLARK, RPR, CLR
25

HIGHLY CONFIDENTIAL

Page 320

1      Virtual Videotaped Deposition of RYAN
2  HARRINGTON, taken by Plaintiffs, pursuant to notice,
3  commencing at 10:12 a.m., by and before Robin L.
4  Clark, Registered Professional Reporter and Notary
5  Public in and for the Commonwealth of Pennsylvania.
6         - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 322

1  REMOTE APPEARANCES, continued:
2
    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
3      BY:  DAVID BRODSKY, ESQ
    PATRICK SWIBER, ESQ
4      RENEE GRIFFIN, ESQ
    2000 Pennsylvania Avenue, N W
5      Washington, D C  20006
    202-947-1588
6      dbrodsky@cgsh.com
    pswiber@cgsh com
7      rgriffin@cgsh com
        For the Defendant Robert Bosch
8      LLC
9
10  ALSO PRESENT REMOTELY:
11      STEVEN HURVITZ, ESQ
12      HOWARD BRODSKY, VIDEOGRAPHER
13      JUSTON SMITHERS
14      ALI KRAL, TECHNICIAN
15         - - - - -
16
17
18
19
20
21
22
23
24
25

Page 321

1  REMOTE APPEARANCES:
2
    HAGENS BERMAN SOBOL SHAPIRO, LLP
3      BY:  GARTH WOJTANOWICZ, ESQ
    STEVE BERMAN, ESQ
4      JESSICA THOMPSON, ESQ
    1301 Second Avenue, Suite 2000
5      Seattle, Washington 98101
    206-623-7292
6      garthw@hbsslaw com
    sberman@hbsslaw com
7      jthompson@hbsslaw com
        For the Plaintiffs
8
9      CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
    AGNELLO, P C
10      BY: JAMES E  CECCHI, ESQ
    ZACHARY BOWER, ESQ
11      5 Becker Farm Road
    Roseland, New Jersey 07068
12      973-997-1700
    jcecchi@carellabyrne com
13      zbower@carellabyrne com
        For the Plaintiffs
14
15      SEEGER WEISS, LLP
    BY:  SHAUNA ITRI, ESQ
16      1515 Market Street, Suite 1380
    Philadelphia, Pennsylvania 19102
17      215-564-2300
    sitri@seegerweiss com
18          For the Plaintiffs
19
20      KIRKLAND & ELLIS, LLP
    BY:  RENEE D  SMITH, ESQ
    KATE WARNER, ESQ
21      300 North LaSalle
    Chicago, Illinois 60654
22      312-862-2000
    rdsmith@kirkland com
23      kate warner@kirkland com
        For the Defendant General
24  Motors LLC
25

Page 323

1          I N D E X
2  WITNESS               PAGE
3  RYAN HARRINGTON
    BY MR  WOJTANOWICZ:    327, 676
4      BY MS  SMITH:        649
5
6         E X H I B I T S
7  NUMBER     DESCRIPTION      MARKED
8  Harrington
9  Exhibit 5    Dyno HP Coefficient    333
    Determination Bates
10      GMCOUNTS000852163 to 852211
11  Exhibit 6    Privately-Owned Vehicle    341
    Work Order Bates
12      GMCOUNTS000852050
13  Exhibit 7    Privately-Owned Vehicle    346
    Work Order Bates
14      GMCOUNTS000851986 to 851987
15  Exhibit 8    Driver's Checklist Bates    346
    GMCOUNTS000852149 to 852150
16
    Exhibit 9    Calculator Document Bates    362
17      GMCOUNTS000852229
18  Exhibit 10    HWFET Chart    373
19  Exhibit 11    Email dated 5/16/19 Bates    400
    GMCOUNTS000852424
20
    Exhibit 12    Email String Bates    407
21      GMCOUNTS000852421 TO 852422
22  Exhibit 13    07_GM Diesel PEMS    428
    Evaluation - MY14 Cruze
23      Bates GMCOUNTS000379567 to
    379574
24
    Exhibit 14    Deposition of Sarah Funk    449
25
    Exhibit 15    Chevrolet Cruze Diesel    467

2 (Pages 320 - 323)

HIGHLY CONFIDENTIAL

Page 336

1    the HWFET test results for these in-use testing
2    vehicles?
3         A.  I don't remember analyzing those.
4    I think the focus was just on the FTP.
5         Q.  Okay.  So you didn't consider it
6    important to look at all of the available test
7    results for these in-use test vehicles before
8    you considered and used them in your analysis?
9              MS. SMITH:  Objection, form.
10             THE WITNESS:  So, again, I
11        focused on the FTP, because that's the
12        test where Mr. Smithers had a test
13        result that, you know, wasn't expected.
14   BY MR. WOJTANOWICZ:

[redacted]

9         Q.  Okay.  How did GM inspect the
10   vehicles that it was using for the test in
11   order to determine that they were mechanically
12   sound?
13        A.  So there's some information on here
14   about tire pressure being set, odometer miles,
15   and things along those lines.  I don't remember
16   seeing much information on other aspects of the
17   vehicle.
18        Q.  Did you review any written
19   procedures for which components and elements of
20   the vehicles were to be examined before the
21   testing procedure?
22        A.  I looked for those.  I thought
23   there was a few notes in here, but I wasn't
24   able to find a lot of information on that.
25        Q.  Did you conduct any additional

Page 338

1    investigation to try to ascertain exactly what
2    GM did to examine these vehicles before it ran
3    the tests?
4         A.  I wasn't able to find anything
5    else, so no.
6         Q.  Did you ask for additional
7    information from General Motors about what they
8    did to inspect these vehicles before they ran
9    the tests?
10        A.  I did not.  Again, my focus was on
11   Mr. Smithers' results and how his procedure
12   went.  I wasn't asked to go back and validate
13   everything that GM had done.  But all these
14   tests are, you know, the reason these tests are
15   done in-use and dyno testing is that anybody
16   can repeat them and they can be done at
17   multiple labs.  So these types of tests you
18   follow the Federal Test Procedure to run these
19   tests so they're repeatable and can be compared
20   against each other.
21        Q.  But they're only repeatable if you
22   know precisely what was done for each test;
23   isn't that true?
24        A.  So that's why the Federal Test
25   Procedure is there is that if you follow that

Page 339

1    and then you can have repeatable results, which
2    is what EPA takes in from OEMs and their own
3    testing to make comparisons.
4         Q.  So you didn't feel that it was
5    necessary in order to rely upon this data to
6    know what, if anything, was done to determine
7    if there were any mechanical or other issues
8    with the vehicles that were being tested?
9         A.  Again, my focus was on Mr.
10   Smithers' test.  You know, the one, the one
11   vehicle that tested above the limit, there was
12   documentation that the MIL light activated just
13   after the test for, I believe, an exhaust
14   manifold bolt that was loose and caused an
15   exhaust leak.  So that was one that had a
16   documented maintenance issue.
17        Q.  Well, I'm asking you a different
18   question.  You put in your report a table
19   summarizing all these test results from the
20   in-use testing.  You compared these tests to
21   the tests that Mr. Smithers conducted.  So I'm
22   asking you whether you considered it important
23   to know how those vehicles were inspected prior
24   to being tested for purposes of relying on
25   these test results in your report.

6 (Pages 336 - 339)

HIGHLY CONFIDENTIAL

Page 340

```
1        MS. SMITH: Objection, form,
2    compound.  Asked and answered.
3        THE WITNESS: So, again, my
4    focus is on Mr. Smithers' testing.  You
5    know, I compared these results as part
6    of my consideration, but my opinions
7    are based on the procedures that he had
8    done on the vehicle that he had that
9    showed above the limit with no
10   additional analyses on his part to
11   understand why his vehicle was not
12   compliant.
13   BY MR. WOJTANOWICZ:
14       Q.  Mr. Harrington, that answer was not
15   responsive to my question. I'm going to ask
16   you again to respond to the question I'm
17   actually asking you, which is, before you put
18   in your report a summary and relied upon the
19   test results from this in-use testing, did you
20   feel it was important to understand how the
21   vehicles were inspected for mechanical problems
22   prior there being tested?
23       MS. SMITH: Objection, form.
24   Objection, asked and answered.
25       THE WITNESS: I looked at
```

Page 341

```
1    the data that I had to see what was
2    there and reviewed the information that
3    was there, but I did not ask for
4    additional information.
5    BY MR. WOJTANOWICZ:
6        Q.  Okay.  I'm going to introduce
7    another exhibit now, I guess I can try to do it
8    electronically, but at the same time if my
9    colleagues could email it for me, please, it's
10   going to be tab number five in my private
11   exhibit folder and this will be introduced as
12   Exhibit No. 6, I believe.
13       - - - - -
14       (Privately-Owned Vehicle Work Order
15   Bates GMCOUNTS000852050 marked
16   Harrington Exhibit 6 for
17   identification.)
18       - - - - -
19       THE WITNESS: So for me,
20   which exhibit will it be?  Will it be
21   five for me as well?
22       MR. WOJTANOWICZ: It will be
23   tab five in that box, yes.
24       THE TECHNICIAN: I'm on the
25   line if you have issues.  Thank you.
```

Page 342

```
1        MS. SMITH:  We still just
2    don't have the folder, so if people
3    could email it again.  Oh, I got it.
4    Thank you.
5        THE TECHNICIAN:  You have
6    the folder now, Renee?
7        MS. SMITH:  No, I have the
8    email.
9        MR. BRODSKY:  This doesn't
10   need to be on the record.
11       - - - - -
12   (Discussion was held off the record.)
13       - - - - -
14       MS. SMITH:  Why don't we do
15   this off the record?  For now, let's
16   just do the email and then we can play
17   around with this.  Thank you.
18       MR. WOJTANOWICZ:  Okay.  It
19   appears that my ability to introduce
20   them online is still not back up.
21       THE TECHNICIAN:  I can do
22   so.  Let me do that for you, please.
23   It's number six as introduced as --
24   it's number five introduced as number
25   six, correct?
```

Page 343

```
1        MR. WOJTANOWICZ:  Correct.
2    BY MR. WOJTANOWICZ:
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL



47

15        Q.   And can you point to any document
16   in your report that you cited that actually
17   does contain any detailed instructions for
18   mechanical or electronic inspection of the
19   vehicles prior to testing?
20        A.   I don't remember a document that's
21   referenced in my report with that information,
22   no.
23        Q.   But any documents that you did
24   review and rely on would be cited in your
25   report, correct?

8 (Pages 344 - 347)

HIGHLY CONFIDENTIAL

Page 356

1  would be then on your internal?
2        MR. WOJTANOWICZ: Yeah, it
3  would be what I'm referring to is tab
4  number three and it's Exhibit 5 is the
5  first one introduced today.
6        THE WITNESS: The Bates
7  number on the very first page, could
8  you repeat that again?
9        MR. WOJTANOWICZ: Yeah, the
10  number on the first page,
11  GMCOUNTS852163.
12        MS. SMITH: Is it the one
13  you emailed today, Garth?
14        MR. WOJTANOWICZ: Yes.
15        THE WITNESS: Okay. I have
16  found that document.
17        MS. SMITH: Got it. Thank
18  you, sorry.
19  BY MR. WOJTANOWICZ:
20    Q.   All right. So on page, are you at
21  page 198?
22    A.   Let me get to 198. Okay.
23    Q.   Do you see there in the middle of
24  the page it says "Truck Driver Monitoring
25  Report"?

Page 357

1    A.   Yes.
2    Q.   And this particular report relates
3  to the HWFET, correct?
4    A.   That's my understanding, yes.
5    Q.   And then it says the limits are
6  plus or minus 2 miles per hour, 1.0 seconds; is
7  that right?
8    A.   Correct.
9    Q.   So is it your understanding that
10  the leeway allowed for a driver operating the
11  HWFET test is to stay within 2 miles per hour
12  of the prescribed speed and to achieve those
13  speeds within one second of the prescribed time
14  at which those speeds should be achieved?
15    A.   That's my understanding.
16    Q.   And it says there were no
17  violations during this test, right?
18    A.   Correct.
19    Q.   Did you have access to the
20  underlying test data for the HWFET and FTP-75
21  tests that were run on these in-use testing
22  vehicles?
23    A.   I did not look at them. They may
24  have been there, but I don't remember analyzing
25  those.

Page 358

1    Q.   But when it says no violations,
2  this test, that simply means that the driver
3  stayed within the leeway allowed by those plus
4  or minus 2 miles per hour and one second
5  parameters, correct?
6    A.   Yes, the software and realtime
7  evaluates how the driver is doing compared to
8  the profile and at the end of the test it will
9  tell you whether he had violations or not.
10    Q.   Did you calculate the RPA for each
11  of the in-use tests conducted on these
12  vehicles?
13    A.   Again, I wasn't going back and
14  revalidating all of this work, so I did not go
15  calculate the RPA for these tests.
16    Q.   Nor did you calculate the VA
17  positive calculation that we discussed
18  yesterday?
19    A.   That's correct.
20    Q.   Did you review the QA/QC data for
21  each test?
22    A.   I don't remember going back to the
23  QA/QC data.
24    Q.   Explain for the record, if you
25  would, what is QA/QC data?

Page 359

1    A.   It's quality assurance, quality
2  control, which is a generic engineering term,
3  so it's going back and doing some checks on
4  whether or not you stayed within specified
5  limits or if things were done properly.
6    Q.   Do you know how the vehicles were
7  preconditioned for every test cycle for these
8  in-use tests?
9    A.   I don't remember looking through
10  those. Obviously, there's a prescribed way
11  that it needs to be done, but I didn't see the
12  verification of how those were done.
13    Q.   Did you examine the maintenance
14  records for each of the vehicles that GM used
15  for these in-use testing -- tests?
16    A.   I looked where I could find the
17  tire pressures, but I don't remember analyzing
18  the maintenance results for these vehicles.
19    Q.   Do you remember seeing any -- you
20  don't cite any maintenance records in your
21  report, did you have access to any maintenance
22  records for any of these testing vehicles?
23        MS. SMITH: Objection, form.
24        THE WITNESS: I'm not aware
25  of them, no.

11 (Pages 356 - 359)

HIGHLY CONFIDENTIAL

Page 360

1   BY MR. WOJTANOWICZ:
2       Q.  Do you know whether GM inspected
3   any maintenance records for the vehicles that
4   it used for its in-use testing?
5       A.  I don't have that information, no.
6       Q.  So I would like you to turn back to
7   Exhibit No. 1 in your report and the chart at
8   page 17.
9       A.  Okay.
10      Q.  So you compiled this chart based on
11  documents that you reviewed in this case,
12  correct?
13      A.  Correct.
14      Q.  Those documents are cited in
15  footnotes down below?
16      A.  That is correct.
17      Q.  And basically it just identifies
18  the vehicle by V.I.N. number and also by a sort
19  of identifying number that GM assigned to it
20  for purposes of its test; is that right?
21      A.  That's my understanding of the
22  numbers, yes.
23      Q.  It shows the date of the tests, the
24  mileage that GM recorded for the vehicle, and
25  then it has a couple of results in the last two

Page 361

1   columns, correct?
2       A.  Correct.
3       Q.  Now, the first column shows FTP --
4   well, let me back up.  What this is summarizing
5   are just the FTP-75 results that GM recorded
6   for these vehicles, right?
7       A.  That's correct.
8       Q.  As we established earlier, you
9   didn't examine or include the HWFET results?
10      A.  That is correct.
11      Q.  Now, the first, or the second to
12  last column shows the FTP NOx score without
13  adjustment factors and then the one after that
14  shows it with adjustment factors.  So my
15  question is, the adjustment factor basically is
16  a number that gets added to a sort of raw score
17  in order to account for additional NOx that a
18  vehicle will tend to produce because of the
19  regeneration cycles that it will go through in
20  the real world, but that aren't shown on the
21  certification cycles?
22          MS. SMITH:  Objection, form.
23          THE WITNESS:  So it's an
24  additive factor not just for the
25  real world, but GM had to do testing to

Page 362

1   see how frequently the DPF would regen
2   and then there's a calculation that
3   developed the upward adjustment factor
4   and that's what has been added to the
5   first column to get that second column.
6   BY MR. WOJTANOWICZ:
7       Q.  Okay.  At this point, I would like
8   you to pull out tab number ten and I would like
9   to introduce, if Ali would for me, please, and
10  or whoever sending emails for me, tab number
11  ten, which will be an Exhibit --
12          THE TECHNICIAN:  It will be
13  Exhibit No. 9.  Your exhibit has been
14  introduced.  Thank you.
15          - - - - -
16      (Calculator Document Bates
17  GMCOUNTS000852229 marked Harrington
18  Exhibit 9 for identification.)
19          - - - - -
20          MR. WOJTANOWICZ:  So wait a
21  second for Renee and David to receive
22  see the email.
23          MS. SMITH:  Yeah, I don't
24  have it yet, but I'll yell as soon as
25  it gets here.

Page 363

1           MR. BRODSKY:  I'm able to to
2   pull it up on the screen.  So I'm good,
3   thanks.
4           MS. SMITH:  I received the
5   email.
6   BY MR. WOJTANOWICZ:
7       Q.  Mr. Harrington, Exhibit No. 9, or
8   maybe you're still looking for it?
9       A.  Nope, I've got it.
10      Q.  And that's the document
11  GMCOUNTS85229, correct?
12      A.  That's what I have.

12 (Pages 360 - 363)

HIGHLY CONFIDENTIAL



Page 368

Page 370

Page 369

Page 371

22      Q.  So I would now like to introduce
23   and this one is going to have to be --
24   Mr. Harrington, the next exhibit, I don't have
25   a paper copy for you, so I'll ask Ali to

14 (Pages 368 - 371)

Page 380

1　going to be removed by the emissions system of
2　the diesel Cruze has done its work, correct?
3　　　A.　Could you state that again?
4　　　Q.　The leak that was identified came
5　in a point in the emissions system that is
6　after the FCR system, after the entire exhaust
7　treatment system has done its work and anything
8　that would pass that point is ultimately
9　heading to the tailpipe, correct?
10　　　　MS. SMITH:　Objection, form.
11　　　　THE WITNESS:　So a leak in
12　　　an exhaust after-treatment system can
13　　　suck air in and it can expel exhaust
14　　　out and then that NOx sensor also is
15　　　part of the feedback loop, it helps the
16　　　emissions system understand how it's
17　　　performing from a NOx perspective, so
18　　　there's potential impacts for how the
19　　　system is operating and the exhaust
20　　　that's measured -- or the exhaust
21　　　emissions that are measured at the
22　　　tailpipe.
23　BY MR. WOJTANOWICZ:
24　　　Q.　Move to strike that as
25　nonresponsive.  I asked you a simple question.

Page 381

1　The leak that you identified came after the
2　emissions control system in terms of the
3　physical layout of the vehicle, correct?
4　　　A.　So it didn't come after the control
5　system.  It came at the last point in the
6　control system for the emissions system.
7　　　Q.　It was past the last NOx sensor,
8　correct?
9　　　A.　It was at the last NOx sensor.
10　　　Q.　Now, what did you do to analyze
11　whether that leak was -- one of the things that
12　could happen with a leak developing at that
13　point is that NOx and other emitants or other
14　exhaust could be leaking out of that, correct?
15　　　A.　So there's pulsation in the exhaust
16　after -- or exhaust system, so some exhaust can
17　leave and other times air can come into the
18　system.
19　　　Q.　If exhaust is leaving, then that's
20　actually going to reduce the amount of tailpipe
21　NOx that's being measured either by a dyno
22　system or by a PEMS system, correct?
23　　　A.　Right, it could impact that NOx
24　reading.
25　　　Q.　I mean, if it's letting exhaust

Page 382

1　out, it's going to be letting out everything
2　that's in that exhaust, including NOx, correct?
3　　　A.　It could, yes.  However, it's going
4　to impact or could impact the NOx sensor
5　reading and impact how the vehicle is operating
6　and the vehicle's understanding of how much
7　tailpipe NOx is coming out in the SCR
8　efficiency.  So it could impact the emissions
9　system and the control system.
10　　　Q.　But you didn't do any analysis to
11　see whether, A, whether the system was actually
12　sucking in any air at any given time, did you?
13　　　A.　Not during the inspection and I
14　didn't do an analyses, that's, you know, Mr.
15　Smithers -- it's Mr. Smithers' testing, I
16　wasn't aware of the testing and didn't evaluate
17　whether or not there was an impact of that leak
18　on his results in the operation of that
19　vehicle.
20　　　Q.　Now, going back to -- do you recall
21　at page 56 of your report, if you would turn
22　there, please, quickly.
23　　　A.　Okay.
24　　　Q.　Actually, let me go back for a
25　second.  Do you know in fact whether the leak

Page 383

1　in the emissions system that was detected
2　during the vehicle inspection in fact impacted
3　any test results?
4　　　A.　I don't have evidence of when that
5　exhaust leak occurred, so I can't determine the
6　impact, but it's a -- having a known
7　maintenance issue on a vehicle, you know, can
8　impact the operation of the vehicle and Mr.
9　Smithers did not perform a leak test, so it's
10　unclear when that leak test developed or when
11　that leak developed.
12　　　Q.　And just to be clear, GM didn't
13　perform any leak tests on its test vehicles for
14　purposes of in-use testing, did it?
15　　　A.　They listened for leaks, so they
16　did perform a leak test.
17　　　Q.　You don't know in fact whether Mr.
18　Smithers or anyone else performing the PEMS
19　testing or the dyno testing also listened for
20　leaks, do you?
21　　　A.　I don't -- there was no evidence
22　that the leak test was performed and I thought
23　there was a discussion in Mr. Smithers'
24　deposition that he did not check for leak
25　tests, but I can't remember exactly how that

17 (Pages 380 - 383)

HIGHLY CONFIDENTIAL



Page 388

1          A.   So you said between the first and
2      the second?
3          Q.   Correct.
4          A.   I didn't do that math, but you're
5      saying it's greater than 12 percent?
6          Q.   Yes.
7          A.   Doing the math in my head, it looks
8      like it is greater than 12 percent.
9          Q.   But you didn't reject either of
10     those test results for purposes of your
11     analysis in this case, did you?
12             MS. SMITH:  Objection, form.
13             THE WITNESS:  So, again,
14         those were considered.  What I was here
15         to do was to evaluate Mr. Smithers'
16         vehicle, which had a vehicle that was
17         over the certification limit, over the
18         standard, had an exhaust leak, had an
19         open recall, had documentation that
20         didn't define some of the maintenance
21         records in the report.  So there was
22         many, many red flags with this vehicle
23         in addition to having a result that
24         wasn't similar to the other tests for
25         in-use.

Page 389

1      BY MR. WOJTANOWICZ:

19 (Pages 388 - 391)

HIGHLY CONFIDENTIAL

Page 396

15      Q.   And it's not of concern to you if
the vehicle achieves a score, a NOx value on
the test, that is very near but not quite above
the certification standard, that's not a
concern to you, right?
20          MS. SMITH:  Objection, form.
21          THE WITNESS:  You know, it's
reasonable to look at that, but it's
still, you know, underneath the
standard and there's -- the standard is
there for a reason and it met that.  It

Page 397

1      met the standard.
2  BY MR. WOJTANOWICZ:
3      Q.   Okay.  But you've drawn the line in
4  anything above the certification standard, in
5  your view, the results indicate some problem
6  with the vehicle and you've got to discount
7  those results?
8          MS. SMITH:  Objection, form.
9      And misstates his testimony.
10          THE WITNESS:  So a
11      reasonable and robust engineering
12      analyses would understand why that was
13      and that's the concern here is it's a
14      red flag that would -- a typical
15      engineer would try to understand why
16      that was.  I didn't see any evidence
17      that Mr. Smithers did anything other
18      than state that he thought it was close
19      enough.  However, there was a NOx
20      sensor that was replaced right at that
21      time, so, you know, of a result like
22      that, in a typical robust engineering
23      would require additional analyses to
24      understand, you know, why that
25      unexpected result was observed.

Page 398

1  BY MR. WOJTANOWICZ:
2      Q.   And you have attempted to be
3  reasonable and robust in rendering your
4  engineering opinions as outlined in your
5  report, haven't you?
6      A.   I've tried to, yes.

20      Q.   So you didn't feel the need to
21  apply these same reasonable and robust
22  engineering standards to your own reliance on
23  the test data cited in the summary table on
24  page 17?
25          MS. SMITH:  Objection, form.

Page 399

1      Misstates his testimony.
2          THE WITNESS:  Again, I
3      considered these data, but my focus was
4      on Mr. Smithers' vehicle and the known
5      maintenance issues at the time of the
6      inspection.
7  BY MR. WOJTANOWICZ:
8      Q.   I'm now going to introduce another
9  exhibit.  Let me see if I can do this directly.
10  Could you remind what exhibit number we're on,
11  please, court reporter?
12          THE TECHNICIAN:  You're on
13      Exhibit 10.
14          MR. WOJTANOWICZ:  So the
15      next one is 11.
16          THE TECHNICIAN:  Which tab
17      would you like?
18          MR. WOJTANOWICZ:  That is
19      tab number four, please.  Yeah, I tried
20      it, it's not working.
21          THE TECHNICIAN:  Okay.  One
22      moment, please.
23          MS. SMITH:  Garth, did you
24      say it is loaded up or you're having
25      difficulty?

21 (Pages 396 - 399)

HIGHLY CONFIDENTIAL



Page 400

1      MR. WOJTANOWICZ:  We're not
2   able to.
3      THE TECHNICIAN:  Exhibit 11,
4   tab number four, thank you.
5      MS. SMITH:  I've got it.
6      - - - - -
7   (Email dated 5/16/19 Bates
8   GMCOUNTS000852424 marked Harrington
9   Exhibit 11 for identification.)
10      - - - - -
11   BY MR. WOJTANOWICZ:
12      Q.  So Mr. Harrington, you're opening
13   up envelope number four there?
14      A.  Yes, I am.

22 (Pages 400 - 403)

HIGHLY CONFIDENTIAL



```
23        Q.  Now, I would like to introduce the
24   next exhibit, which is tab number 11.  It will
25   be Exhibit No. 12.
```

Page 407

```
 1        THE TECHNICIAN:  Your
 2   exhibit has been introduced.  Please
 3   refresh your screens.  Thank you.
 4        MS. SMITH:  That works for
 5   me.  It's a miracle it's working.
 6        - - - - -
 7        (Email String Bates
 8   GMCOUNTS000852421 TO 852422 marked
 9   Harrington Exhibit 12 for
10   identification.)
11        - - - - -
12   BY MR. WOJTANOWICZ:
13        Q.  Do you have that in front of you,
14   Mr. Harrington?
15        A.  I do.
```

23 (Pages 404 - 407)

HIGHLY CONFIDENTIAL



24 (Pages 408 - 411)

HIGHLY CONFIDENTIAL

26 (Pages 416 - 419)

HIGHLY CONFIDENTIAL

Page 440

1  understanding how you are meaning
2  spirit.
3  BY MR. WOJTANOWICZ:
4      Q.   Okay.  Have you never heard that
5  phrase before?
6      A.  I've --
7          MS. SMITH:  Objection, form.
8          THE WITNESS:  I've heard the
9  phrase -- sorry.
10          MS. SMITH:  Go ahead.
11          THE WITNESS:  I've heard the
12  phrase, but I don't know there's an
13  exact definition of it.
14          MS. SMITH:  Garth, when
15  you're done with this document, if it's
16  a good breaking point, that would be
17  great.
18  BY MR. WOJTANOWICZ:
19      Q.   Okay.  I'm just reviewing my notes
20  to see if I asked what I wanted about this.
21  One second, please.  You know, I would go back,
22  please to page 4 of this document so we can put
23  it away were we're done here

Page 442

21  This is a good time to take a break,
22  please.
23          THE VIDEOGRAPHER:  The time
24  is 12:54.  We are off the record.
25          - - - - -

32 (Pages 440 - 443)

HIGHLY CONFIDENTIAL

Page 444

1        (A recess was taken at this time.)
2                - - - - -
3              THE VIDEOGRAPHER:  The time
4        is 1:08.  We're on the record.
5   BY MR. WOJTANOWICZ:



33 (Pages 444 - 447)

HIGHLY CONFIDENTIAL

19        Q.  Okay.  Now, one of the things, you
20    recall that one of the things that you have
21    indicated that you believe Mr. Smithers did was
22    to not properly select a test route.  Is that
23    part of your opinion?
24        A.  So his testing and test -- well,
25    there isn't a single test route.  I don't think

Page 451

1    he had test routes.  I don't know how he
2    selected the routes.  He drove them and then
3    segmented them, but there's not an actual test
4    route that he did repeatedly.  It's just a
5    bunch of testing that he then segmented into
6    different segments and analyzed.
7        Q.  But one of the things that's
8    implicit in your criticism of Mr. Smithers is
9    that it's important to, you believe that it's
10   important to select a proper test route in
11   order to conduct PEMS testing as accurately as
12   you can.  Is that a fair summary of your
13   opinion?
14            MS. SMITH:  Objection, form.
15            THE WITNESS:  So when you
16       test something, you need to consider
17       the different influences that influence
18       the results from that test route or
19       that segment and consider things like
20       air conditioning use and hills and
21       temperature and things like that.
22   BY MR. WOJTANOWICZ:
23       Q.  And so part of your -- part of your
24   opinion in this case is that the route selected
25   is one of those things that influence or could

34 (Pages 448 - 451)

HIGHLY CONFIDENTIAL



Page 452

1    influence the results on a PEMS test; is that
2    true?
3        A.   The routes and then what seems to
4    be somewhat arbitrary segmentation by Mr.
5    Smithers.  So his test routes were conducted,
6    but then they segmented them up to do his
7    analyses, so he wasn't actually analyzing
8    routes.
9        Q.   Okay.  But again, I'm going to ask
10   you again, because I'm trying to get you to
11   answer whether it's part of your opinion that
12   the selection of the route is one of the
13   considerations that you believe is important
14   for accurate PEMS testing?
15             MS. SMITH:  Objection, form.
16             THE WITNESS:  It can be the
17        selection of the route or when you do
18        that the route that you evaluate it in
19        the context of what the route really
20        is.
21   BY MR. WOJTANOWICZ:

HIGHLY CONFIDENTIAL

Page 456



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL



37 (Pages 460 - 463)

HIGHLY CONFIDENTIAL



38 (Pages 464 - 467)

HIGHLY CONFIDENTIAL



39 (Pages 468 - 471)

HIGHLY CONFIDENTIAL



40 (Pages 472 - 475)

HIGHLY CONFIDENTIAL

41 (Pages 476 - 479)

HIGHLY CONFIDENTIAL



42 (Pages 480 - 483)

HIGHLY CONFIDENTIAL



43 (Pages 484 - 487)

HIGHLY CONFIDENTIAL

| Page 488 | Page 490 |
|---|---|



```
 7    BY MR. WOJTANOWICZ:
 8         Q.   What's your evidence that
 9    regulators here in the United States use or
10    require calibration of a PEMS unit against the
11    dynamometer?
12              MS. SMITH:  Objection, form.
13              THE WITNESS:  So it's listed
14         in my report.  It might take a second
15         to find it.  I believe it's in the
16         appendices.  Sorry, it's taking me a
17         second.  So on page -- well, it's in
18         Appendix E, page 27, at the bottom of
19         the second paragraph, it says
20         "Moreover, PEMS equipment verification
21         against laboratory equipment is also
22         regulated within the United States with
23         PEMS measurements are being used to
24         verify heavy duty not to exceed
25         compliance" and there's a footnote 558
```

44 (Pages 488 - 491)

HIGHLY CONFIDENTIAL

Page 492

1     that points to a CFR PEMS calibration
2     and verifications.
3  BY MR. WOJTANOWICZ:
4     Q.  Okay.  So that was in the context
5  of the heavy-duty truck PEMS testing that's
6  part of the regulatory structure in the United
7  States, correct?
8     A.  Correct.  That's the only -- the
9  PEMS testing that's regulated in the U.S.
10  Again, as I stated before, there's no PEMS
11  testing for light-duty vehicles.

Page 494

4  BY MR. WOJTANOWICZ:
5     Q.  Now, you indicated that there's
6  variability and you discussed that a few times.
7  In your experience, is the only variability
8  demonstrated by a PEMS equipment compared to
9  dynamometer results in the upward direction?
10  In other words, is it your opinion that the
11  only difference you're likely to get between a
12  PEMS result and a dynamometer result is that
13  it's going to be worse?
14        MS. SMITH:  Objection, form.
15        THE WITNESS:  No, go for it.
16        MS. SMITH:  Go ahead, sir.
17        THE WITNESS:  No, it's
18     possible that it could be lower.  If
19     you look at the information for the
20     European Commission and EPA, their
21     conformity factors or their adjustment
22     factors are always in the upward
23     direction showing there's more
24     variability with the -- a combination
25     of the PEMS equipment and the on-road

Page 495

1     testing.  So the way the regulators
2     have looked at it is always in the
3     upward direction, but under certain
4     directions, it's possible that it could
5     show better emissions, but that's not
6     something that the regulators have
7     considered.
8  BY MR. WOJTANOWICZ:
9     Q.  Are you aware that the RDE,
10  European RDE standards requires for PEMS
11  testing one continuous trip consisting of
12  urban, rural, and motorway segments?
13        MS. SMITH:  Objection, form.
14        THE WITNESS:  My
15     understanding is that --
16        MS. SMITH:  Sorry, go ahead.
17        THE WITNESS:  That's my
18     understanding.
19  BY MR. WOJTANOWICZ:
20     Q.  Okay.  And is it your understanding
21  that those segments are determined -- whether
22  you're in a particular segment is determined by
23  the speed of the vehicle at any given time?
24     A.  I can't remember the specifics of
25  that.  I can't remember the segmentation, so.

45 (Pages 492 - 495)

HIGHLY CONFIDENTIAL

Page 498

1    BY MR. WOJTANOWICZ:
2         Q.   And would you agree that when a car
3    is being driven less aggressively, that's
4    likely to have a downward impact on the NOx
5    emissions going out at any given time?
6         A.   It could influence emissions.
7    Typically, it would be less, but again, it
8    depends on the specific test conditions and
9    engine and after-treatment operation, but
10   typically, it would be lower.
11        Q.   Okay.  Are you aware that the RDE
12   requires urban driving, the urban driving
13   segment of a test to comprise 29 to 44 percent
14   of the total, the rural part of the drive is
15   supposed to be 23 to 43 percent, and motorway
16   is supposed to be 23 to 43 percent of the total
17   miles of the test route?
18             MS. SMITH:  Objection, form,
19        compound.
20             THE WITNESS:  I don't have
21        those foots memorized.  Is there a
22        document you're referencing?
23   BY MR. WOJTANOWICZ:
24        Q.   No, you cite and rely upon the RDE
25   and I'm assuming that you have some familiarity

Page 499

1    and expertise in it.  If you don't recall right
2    now, I will just represent to you that those
3    are the standards.  Do you have any reason to
4    disagree?
5             MS. SMITH:  Objection, form.
6             THE WITNESS:  Obviously, I
7        haven't seen them, but I will for
8        purposes of this go with your
9        representation.
10   BY MR. WOJTANOWICZ:

46 (Pages 496 - 499)

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



Page 504

5      MR. WOJTANOWICZ:  Okay.
6   Well, we can take a lunch break now.
7   Should we go 40 minutes; is that okay?
8      MS. SMITH:  You know, can we
9   go 45, sorry?
10     MR. WOJTANOWICZ:  Sure.
11     MS. SMITH:  So that takes us
12  to three Eastern, I think; is that
13  right?
14     MR. WOJTANOWICZ:  Yeah, that
15  would be noon Pacific, three Eastern.
16     THE VIDEOGRAPHER:  It's
17  2:14.  We are off the record.
18      - - - -
19  (A recess was taken at this time.)
20      - - - - -
21     THE VIDEOGRAPHER:  The time
22  is 3:02.  We're on the record.
23  BY MR. WOJTANOWICZ:
24     Q.  Okay.  Mr. Harrington, I would like
25  to go back briefly to your report, page 23,

Page 505

1   Exhibit 1.
2      A.  Okay.

Page 506

19     Q.  But you have no basis for knowing
20  why the EPA may not have taken any enforcement
21  action, do you?
22     MS. SMITH:  Objection, form.
23     THE WITNESS:  I don't have
24     any information on the decision-making
25     on their end of it and I didn't see any

Page 507

1      action.
2   BY MR. WOJTANOWICZ:
3      Q.  So you don't know if EPA decided
4   not to take an enforcement, because, for
5   example, they lacked the manpower to do so, you
6   have no idea?
7      MS. SMITH:  Objection, form.
8      THE WITNESS:  I can't
9      speculate on what they did.
10  BY MR. WOJTANOWICZ:

48 (Pages 504 - 507)

HIGHLY CONFIDENTIAL



49 (Pages 508 - 511)

HIGHLY CONFIDENTIAL



50 (Pages 512 - 515)

HIGHLY CONFIDENTIAL

Page 524

1    that could have significant impacts on
2    emissions?
3        A.   I guess it depends on how you run
4    your test and how you set it up.
5        Q.   Okay.
6        A.   I guess, for example, you could
7    test in very, very cold and very hot
8    temperatures that are not consistent with how
9    typical driving is done.  You could
10   overemphasize cold and hot testing.
11       Q.   Now, if you're trying to determine
12   how a vehicle performs specifically in the
13   realm of specifically when outside temperatures
14   were hot, for example, wouldn't it make sense
15   to actually run more tests in those conditions
16   in order to try and get a complete picture of
17   how the vehicle behaved under those conditions?
18       A.   Like I said, it depends on the
19   intent.  If you're trying to understand how
20   something operates at a particular temperature,
21   there could be some value in that.  So I guess
22   it depends how you then caveat your results.
23           I would also highlight that if
24   you're going to understand the impact of
25   temperature, not documenting how the air

Page 525

1    conditioner was used and having no record of
2    that and no information that you've told to
3    your drivers, that's a variable that can have
4    an impact on emissions if it is uncontrolled.
5    So in all of the testing that Mr. Smithers has
6    done, I saw no evidence and he stated he
7    didn't, he thought that it was with the A/C on,
8    but he wasn't sure, so it's, you know, he may
9    have been trying to understand how the impact
10   of high temperatures, but he had a variable
11   that was uncontrolled and not defined.
12       Q.   Do you have an understanding that
13   drivers in the real world driving vehicles
14   around when it's warm outside, they tend to
15   turn on their air conditioner, don't they?
16       A.   I can't speak to what people
17   typically do or what everybody would do, but
18   some people might roll the window down, some
19   people might use the air conditioner, which is
20   why the EPA has a specific test for high
21   temperature and air conditioning use, the SCO3.
22       Q.   Are you aware of any circumstances
23   in which GM has informed people buying the
24   Cruze vehicles that they shouldn't use their
25   air conditioners?

Page 526

1        A.   Just in any setting?
2        Q.   Yeah, does GM tell people who
3    bought these Cruze vehicles that they shouldn't
4    use their air conditioners to avoid polluting
5    the environment?
6        A.   I've not seen any documentation by
7    GM instructing drivers what to do with their
8    air conditioning.

53 (Pages 524 - 527)

HIGHLY CONFIDENTIAL



14      Q.  When you're conducting engineering

15   analyses for purposes other than litigation, do

16   you simply rely upon whatever data happens to

17   be presented to you or do you try to determine

18   what data you need in order to provide a

19   professional and thorough engineering analysis?

20         MS. SMITH:  Objection, form.

21         THE WITNESS:  Could you

22     state the question again?

23   BY MR. WOJTANOWICZ:

24      Q.  When you are performing engineering

25   analyses for purposes other than litigation, do

54 (Pages 528 - 531)

HIGHLY CONFIDENTIAL

Page 536

1 again, it's hard to make those comparisons.
2 And you'd have to look really look through it.
3 But at the end of the day, there's still issues
4 with the vehicle, you know, issues that were
5 observed that could have influenced it, so it
6 calls into question the reliability of that
7 testing.
8     Q.  And, again, those supposed issues
9 with the vehicle you identified were at the
10 vehicle inspection, which occurred a
11 significant amount of time after the actual
12 PEMS tests were conducted, correct?
13     A.  So my understanding is that, you
14 know, the recall was still active starting in
15 2016.  There was a dyno test that was done in
16 between or in the middle of the testing that
17 showed results above the certification under
18 the standard, the 70 milligrams per mile, so
19 something was not normal with the vehicle at
20 that point or there was something that was
21 worth considering that was well prior to the
22 inspection.
23     Q.  You referred to a recall and you
24 refer to software updating in your report, but
25 you say that they should have updated the

Page 537

1 software, correct?
2     A.  There was an open recall on the
3 upstream NOx sensor, that's correct.
4     Q.  Okay.  Now, if some of the testing
5 had been done prior to the recall, then if they
6 had actually performed the recall, then the
7 testing that they had done prior to the recall
8 would not be replicable, would it?
9     A.  It may not have been replicable.
10 One thing that Mr. Smithers could have done was
11 retest under similar conditions, we would have
12 done a dyno testing at the very beginning which
13 would have been good.  He could have checked
14 that against new testing or he could have rerun
15 some of his routes under similar conditions to
16 see if there was any difference, but I didn't
17 see any evidence that he did anything to
18 understand or try to even understand the
19 difference if he would have applied it.  He
20 just did not apply the recall.
21     Q.  Okay.  So what did you do to
22 understand what the difference would have been
23 if you had applied the recall?
24     A.  I didn't do anything.  My
25 understanding that the recall mentioned a MIL

Page 538

1 light had something to do with the emissions
2 system, but I don't know if there would have
3 been any impact, however, having an active
4 recall and an emissions system component,
5 you're trying to replicate vehicles that are
6 on-road that are getting that recall, it seems
7 like it would be good engineering practice to
8 update the vehicle to have it under the same
9 conditions that the vehicles were in after the
10 recall and on-road.
11     Q.  And there's also a software update
12 that was issued during the time that the
13 vehicle was being tested, correct?
14     A.  That's my understanding, yes.
15     Q.  And, again, had Mr. Smithers
16 installed that software update, wouldn't there
17 have been an issue with tests run before the
18 update and after the update no longer being
19 comparable or having the tests before not being
20 replicable?
21     MS. SMITH:  Objection, form.
22     THE WITNESS:  You know, I
23     don't know what the impact would be.
24     There could be a difference, but not
25     understanding that difference, you

Page 539

1     know, leaves some question about his
2     vehicles' representativeness to the
3     other vehicles on the road that have
4     that recall.
5 BY MR. WOJTANOWICZ:
6     Q.  Okay.  But you didn't do anything
7 to analyze what emissions impact installing or
8 not installing that recall had, did you?
9     A.  No, I did not.
10     Q.  And General Motors, who presumably,
11 you know, on whose behalf you're offering
12 testimony in this case, and who presumably
13 knows the impacts of all of the software and
14 hardware changes it makes to the emissions on
15 its vehicles, they didn't provide you with any
16 information to tell you exactly what the
17 emissions impact would be for installing that
18 software update, did they?
19     MS. SMITH:  Objection, form.
20     THE WITNESS:  I haven't seen
21     any information on the impact on those
22     vehicles, no.
23 BY MR. WOJTANOWICZ:
24     Q.  And General Motors, whose counsel
25 provided you all of the information that you

56 (Pages 536 - 539)

HIGHLY CONFIDENTIAL



Page 540

1   relied on for purposes of your opinion, didn't
2   provide you with any information specifying the
3   emissions impact of performing the recall on
4   the sensor that you mentioned earlier?  They
5   didn't do that either, did they?
6       A.  I'm sorry, I lost track of the
7   question.
8       Q.  You were recalling or discussing a
9   recall earlier that was not performed on the
10  vehicle.  General Motors nor did its counsel
11  provide you with any information outlining the
12  specific emissions impacts of performing that
13  recall, did they?
14      A.  I have not seen any information on
15  the impact of that recall.
16      Q.  I would now like to mark --
17  or actually, we'll go back to tab number 16,
18  Exhibit 15.
19          THE TECHNICIAN:  By the way,
20      Garth, you've been given the ability to
21      introduce your own exhibits now.  I
22      troubleshot over lunch.
23          MR. WOJTANOWICZ:  Okay.
24      Great, thank you.
25          THE TECHNICIAN:  So if you

Page 541

1       try the next time, we'll go from there.
2       Thank you.
3           - - - - -
4   BY MR. WOJTANOWICZ:

57 (Pages 540 - 543)

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

Page 552

9    for Mr. Smithers' testing, don't you?
10                MS. SMITH:  Objection, form.
11                THE WITNESS:  Some of that
12        data.  Again, there's some missing data
13        about air conditioner use and other
14        aspects, but some of that information
15        about temperature and things like that
16        are present.
17   BY MR. WOJTANOWICZ:
18        Q.   Okay.  So you could repeat the test
19   routes, because there was GPA [sic] data for
20   Mr. Smithers' tests, correct?
21                MS. SMITH:  Objection, form.
22                THE WITNESS:  There's GPA
23        data?
24   BY MR. WOJTANOWICZ:
25        Q.   You have GPA information in the

Page 553

1    test results provided by Mr. Smithers that
2    would allow you to replicate every single test
3    run that he did, don't you?
4                MS. SMITH:  Objection.
5                THE WITNESS:  I don't know
6        what GPA data is.
7    BY MR. WOJTANOWICZ:
8        Q.   I'm sorry, you're right.  GPS, I'm
9    mixing the letters here, it's another, you
10   know.  Sorry, GPS data that would allow you to
11   replicate the routes that Mr. Smithers
12   provided?
13        A.   There are certain aspects that we
14   could replicate.  There's, obviously, not all
15   information was there and it's hard to do
16   complete repeatability testing with PEMS,
17   because there's some variability, but there was
18   GPS information and that --
19        Q.   Pardon me.  You also have, you have
20   information that allows you to know what the
21   temperature was, what the speed of the vehicle
22   was, and you've got the GPS data also allows
23   you to assess the elevation of the vehicle at
24   any given time, correct?
25        A.   You know, again, there was

Page 554

1    potential issues with the temperature probe
2    measurement that I mentioned that there was
3    some anomalies, so there would be some
4    uncertainty there and uncertainty about the
5    weight or exactly how the driver was driving,
6    but there would be some information from the
7    GPS vehicle speed and other things to allow
8    some form of repeatability, but there's,
9    obviously, vehicle condition and other things
10   would make it difficult to replicate completely
11   Mr. Smithers' data or Mr. Smithers' testing.

7        Q.   Mr. Smithers did provide
8    maintenance records and inspection records for
9    when the vehicle was purchased and as I said,
10   the DTC information is included in the testing
11   data, isn't that relevant to the state of
12   health of the vehicle?
13                MS. SMITH:  Objection, form.
14        And foundation.
15                THE WITNESS:  Again, the
16        DTCs, that data was not listed.  It was
17        listed for the gasoline vehicles, but
18        interestingly enough, it wasn't listed
19        for the diesel vehicle.  It's not clear
20        why it was recorded for one vehicle but
21        not the other.  And there were some
22        maintenance records, but as has been
23        evidenced throughout this, there was
24        not all the records.  There was -- his
25        report didn't mention the NOx sensor

60 (Pages 552 - 555)

HIGHLY CONFIDENTIAL





79 (Pages 628 - 631)