# Exhibit 2
## (REDACTED VERSION OF DOCUMENT TO BE SEALED)

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2
                        - - - - -
3
4      JASON COUNTS, DONALD KLEIN,     C.A. NO.
       OSCAR ZANORA, DEREK LONG,       1:16-CV-12541-TLL-PTM
5      HASSAM HIRMIZ, JASON SILVEUS,
       JOHN MISKELLY, THOMAS HAYDUK,
6      CHRISTOPHER HEMBERGER and
       JOSHUA RODRIGUEZ, individually
7      and on behalf of all others similarly
       situated,
8              Plaintiffs,
9
                  -against-
10
11     GENERAL MOTORS LLC, ROBERT
       BOSCH GMBH, and ROBERT
12     BOSCH, LLC, et al.,
               Defendants.
13
                        - - - - -
14
                  HIGHLY CONFIDENTIAL
15
                        - - - - -
16
17     VIRTUAL VIDEOTAPED DEPOSITION OF RYAN HARRINGTON
18                NATICK, MASSACHUSETTS
19              Wednesday, July 22, 2020
20
21                      VOLUME 1
22
23     REPORTED BY:
24     ROBIN CLARK, RPR, CLR
25

HIGHLY CONFIDENTIAL

Page 2

1 Virtual Videotaped Deposition of RYAN
2 HARRINGTON, taken by Plaintiffs, pursuant to notice,
3 commencing at 10:12 a m., by and before Robin L.
4 Clark, Registered Professional Reporter and Notary
5 Public in and for the Commonwealth of Pennsylvania.
6 - - - - -

Page 3

1 REMOTE APPEARANCES:
2
  HAGENS BERMAN SOBOL SHAPIRO, LLP
3 BY: GARTH WOJTANOWICZ, ESQ
  STEVE BERMAN, ESQ
4 1301 Second Avenue, Suite 2000
  Seattle, Washington 98101
5 206-623-7292
  garthw@hbsslaw com
6 steve@hbsslaw com
       For the Plaintiffs
7
8
  CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
9 AGNELLO, P C
  BY: JAMES E CECCHI, ESQ
10 ZACH BOWER, ESQ
  5 Becker Farm Road
11 Roseland, New Jersey 07068
  973-997-1700
12 jcecchi@carellabyrne com
  zbower@carellabyne com
13       For the Plaintiffs
14
  SEEGER WEISS, LLP
15 BY: SHAUNA ITRI, ESQ
  1515 Market Street, Suite 1380
16 Philadelphia, Pennsylvania 19102
  215-564-2300
17 sitri@seegerweiss com
       For the Plaintiffs
18
19 KIRKLAND & ELLIS, LLP
  BY: RENEE D SMITH, ESQ
20 JEFFREY S BRAMSON, ESQ
  300 North LaSalle
21 Chicago, Illinois 60654
  312-862-2000
22 rdsmith@kirkland com
  jeffrey bramson@kirkland com
23       For the Defendant General
  Motors LLC
24
25

Page 4

1 REMOTE APPEARANCES, continued:
2
3
  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
4 BY: PATRICK SWIBER, ESQ
  DAVID BRODSKY, ESQ
5 RENEE GRIFFIN, ESQ
  2000 Pennsylvania Avenue, N W
6 Washington, D C 20006
  202-947-1588
7 pswiber@cgsh com
  dbrodsky@cgsh com
8 rgriffin@cgsh com
       For the Defendant Robert Bosch
9 LLC
10
  ALSO PRESENT REMOTELY:
11
  STEVEN HURVITZ, ESQ
12
  JOELLE ROSEN
13
  HOWARD BRODSKY, VIDEOGRAPHER
14
  JUSTON SMITHERS
15
16       - - - - -

Page 5

1             I N D E X
2 WITNESS                          PAGE
3 RYAN HARRINGTON
   BY MR. WOJTANOWICZ:              11
4
5         E X H I B I T S
6 NUMBER      DESCRIPTION         MARKED
7 Harrington
8 Exhibit 1   Expert Report of Ryan   17
              Harrington
9
   Exhibit 2   Chevrolet Cruze Diesel  268
10              Discussion with EPA & CARB
               9/13/16 Document Bates
11              GMCOUNTS0000851587 TO 51607
12 Exhibit 3   Application for         287
               Certification 2015 Model
13              Year Document Bates
               GMCOUNTS000812193 to
14              GMCOUNTS000812238
15 Exhibit 4   Certification Summary   287
               Information Report Bates
16              GMCOUNTS000222607 to
               000222624

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 22

1  vehicle control theory and he supported me in
2  many, many cases related to diesel engine,
3  diesel engine control and emissions.
4      Q.  What about David Anderson, what was
5  his role in assisting you?
6      A.  So David is a Ph.D mechanical
7  engineer with a lot of experience in diesel
8  after treatment systems, so, you know, he kind
9  of brought in some general support and then
10  also assisted in the analysis of some of Mr.
11  Smithers' data, the PEMS reports and then the

14      Q.  And Sarah Parker, what was her
15  role?
16      A.  So she was the project manager on
17  the project.  She helped kind of, me kind of
18  make sure that everything was getting done and,
19  you know, kind of on a timely basis and then
20  provided some input on testing and other
21  aspects.
22      Q.  And then Peter, I can't read my own
23  handwriting, Peter, is it Lillo?
24      A.  Lillo, yes.
25      Q.  What was his role?

Page 23

1      A.  So he was the Ph.D mechanical
2  engineer that performed the vehicle inspection.
3      Q.  And did he do anything else
4  significant in connection with your work in
5  this case?
6      A.  Most of it had to do with the
7  vehicle inspection and looking at the ECM data
8  and helped, you know, kind of analyze the
9  findings from the inspection.
10      Q.  And that inspection you're
11  referring to, is that the inspection that
12  Defendants conducted of the diesel Cruze and
13  the gas Cruze vehicle that were used in the
14  testing that Mr. Smithers reported on?
15      A.  That is correct.
16      Q.  And Jeffrey Willard [sic], what was
17  his role?
18      A.  Jeffrey Wishart.
19      Q.  I'm sorry, Wishart.
20      A.  So he was also at the inspection
21  looking at the PEMS equipment.  I believe he
22  did the drive of the vehicle and most of his
23  focus was on the PEMS equipment and testing.
24      Q.  Did he have any role beyond the
25  vehicle inspection that you were talking about

Page 24

1  in your work in this case?
2      A.  He helped with some of the analyses
3  of, you know, kind of the PEMS setup and PEMS
4  protocols in the regulatory environment kind of
5  best practices related to PEMS testing.
6      Q.  And what is Mr. Wishart's
7  credential or specialty, do you know?
8      A.  So I think his -- he has got a
9  Ph.D.  It's in engineering mechanics or
10  mechanical engineering.  He's worked with PEMS
11  equipment in his prior work, fuel efficiency,
12  plug-in hybrid vehicles.  I'm trying to think,
13  most of his work was kind of in the electric
14  vehicle plug-in hybrid emissions realm with
15  vehicles from an inspection and testing
16  capability.
17      Q.  And Matthew Pooley, what was his
18  role?
19      A.  So he helped, he's a Ph.D in
20  electrical engineering and computer science.
21  So he assisted myself and David Anderson
22  looking through the control strategy and Mr.
23  Levchenko's report.
24      Q.  And what about Sri Danthurthi?
25      A.  Danthurthi, so she helped with

Page 25

1  quality checking the report, so just verifying
2  some of the calculations and the numbers and
3  making sure the footnotes and everything lined
4  up.
5      Q.  Are all the people that you have
6  identified, been able to identify as people
7  assisting you in preparing the report, are they
8  all employees of Exponent?
9      A.  Yes.
10      Q.  Did you retain any outside
11  consultants in order to help you with the work
12  that you did in this case?
13      A.  I didn't retain any outside
14  support.  The Analysis Group supports Kirkland
15  and Ellis and the client and I had some
16  interactions with their staff.
17      Q.  And who did you interact with on
18  their staff?
19      A.  Andrea Okie, Kris Comeaux, and
20  Kerri Leonhardt.
21      Q.  And for what purpose were you
22  dealing with them?  Why were you talking to
23  them?
24          MS. SMITH:  I'm just going
25      to -- I'm so sorry, I'm just going to

Page 34

1  BY MR. WOJTANOWICZ:
2      Q. And describe the documents for me,
3  would you please?
4      A. They would have been light-duty or
5  heavy-duty regulations from the code of federal
6  regulations, so documents that are online that
7  the EPA and CARB would have been putting out.
8      Q. Did the Analysis Group provide any
9  summary or analysis relating to those
10 regulations that they provided to you?
11     A. There wasn't a separate analyses.
12 I think from time to time, they provided on the
13 report, provided some input on some of those
14 things that I had asked them to do and provided
15 some edits --
16         MS. SMITH: Yeah, I'm just
17     going -- I'm sorry to interrupt, I just
18     want to caution you that in terms of
19     any of the substance of draft reports,
20     things like that, I would just caution,
21     it's fine, he can answer the question
22     that Garth just asked, but I just want
23     to caution that the draft reports are
24     and communications related thereto, we
25     would maintain the privilege on.

Page 35

1         MR. WOJTANOWICZ: It didn't
2     sound like you were done with your
3     answer there. Do you want to continue?
4         THE WITNESS: Could you ask
5     the question again? I can't remember
6     what the question was.
7         MS. SMITH: I'm sorry, I
8     apologize for interrupting.
9  BY MR. WOJTANOWICZ:
10     Q. I was asking whether the Analysis
11 Group provided any analysis or commentary
12 relating to the regulatory documents that they
13 sent to you?
14         MS. SMITH: Okay. I'm going
15     to instruct not to answer. To the
16     extent there is commentary, he can
17     disclose if Analysis Group provided or
18     did work or facts or data upon which
19     Mr. Harrington relied.
20         THE WITNESS: So, again,
21     they provided some input into the
22     report, but I don't remember separate
23     analyses that they had done or
24     communicated.
25

Page 36

1  BY MR. WOJTANOWICZ:
2      Q. Did the Analysis Group draft any
3  sections of your report?
4      A. I had set forth the outline of the
5  report and kind of the structure of it and then
6  at my direction, my staff helped me draft some
7  of it. I think the Analysis Group did assist
8  in drafting a few parts of it or kind of
9  augmenting some of what we had and then my
10 staff or myself reviewed all of that.
11     Q. What sections of the report did the
12 Analysis Group help to draft?
13     A. I mean, I can't remember the exact
14 specifics, but I think in the appendices,
15 there's some discussion of the regulatory
16 requirements and testing. So if there was some
17 input from the Analysis Group, it would have
18 been mostly in those sections.
19     Q. Aside from information in the
20 appendices relating to regulatory requirements,
21 are there any other sections of the report that
22 you can recall the Analysis Group helping to
23 draft?
24     A. I don't remember them helping draft
25 any of those sections. They might have

Page 37

1  provided some input on, you know, how -- if
2  some sections didn't read very well and
3  provided some thoughts there, but --
4          MS. SMITH: Yeah, I'm going
5      to instruct not to answer and just to
6      be careful, like, in terms of
7      commentary you're asking, in terms of
8      wording, you can answer, if Analysis
9      Group did -- actually provided
10     analysis, data, facts upon which you're
11     relying.
12 BY MR. WOJTANOWICZ:
13     Q. For the sections that the Analysis
14 Group helped to draft, did you rely upon their
15 expertise in these areas in order to determine
16 whether that information should be included in
17 your report?
18         MS. SMITH: One more second.
19     Hold on.
20         THE WITNESS: I took their
21     information --
22         MS. SMITH: Hold on, one
23     second, sorry. Okay. You may answer.
24     Sorry, I just wanted to check.
25         THE WITNESS: So, again, as

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 46

1  selected by Kirkland and Ellis and provided to
2  you, correct?
3      A.  It came from Kirkland and Ellis.
4      Q.  So your staff didn't tell Kirkland
5  and Ellis, generate a list of Bates numbers and
6  ask Kirkland and Ellis, please give us these
7  Bates numbers?
8          MS. SMITH:  Objection.
9      Objection.  I'm going to instruct not
10     to answer on any communications with
11     Kirkland and Ellis.  Hold on, let me
12     just see the question.  Object to form.
13     Objection, misstates his testimony.  He
14     didn't say every document in that list
15     was something provided by counsel.
16 BY MR. WOJTANOWICZ:
17     Q.  Mr. Harrington, do you recall the
18 question?
19     A.  No, if you could repeat it, that
20 would be great.
21     Q.  I'm asking whether the list of
22 documents that you reviewed or considered shown
23 in Appendix C, was that a list of documents
24 that you specifically requested to review in
25 connection with your analysis in this case?

Page 47

1          MS. SMITH:  Objection, form.
2      Objection, misstates prior testimony
3      about what Exhibit C is -- or Appendix
4      C is.
5          THE WITNESS:  Mr.
6      Wojtanowicz, could you ask the question
7      again?  I got lost again.
8          MR. WOJTANOWICZ:  Would you
9      please read back the question, court
10     reporter?
11         - - - - -
12     (Whereupon, the reporter read back
13     as requested.)
14         - - - - -
15         THE WITNESS:  So those are
16     the documents that were provided to me
17     or documents that my staff and I had
18     found during the course of our
19     analyses.
20 BY MR. WOJTANOWICZ:
21     Q.  When you say that you found
22 documents during the course of your analyses,
23 how would you find documents?
24     A.  So I think the documents towards
25 the tail end, so the documents that weren't

Page 48

1  produced, EPA regulations and things along
2  those lines were things that my staff had put
3  together.
4      Q.  Okay.  So you didn't -- you did
5  not -- let me back up.  How did you review the
6  documents that were provided to you that are
7  reflected with Bates numbers here, the
8  documents produced in this case?
9          MS. SMITH:  Objection, form.
10         THE WITNESS:  So when we
11     received the reports, I instructed my
12     staff and at my direction went through
13     the documents.  I'm pretty sure we went
14     through every one of them or at least
15     go through almost every one of them to
16     see kind of what we had and then, you
17     know, kind of understood where the
18     documents were.  And then I worked with
19     them to pull those together and
20     understand kind of what were the most
21     important documents and the documents
22     that I would rely upon.
23 BY MR. WOJTANOWICZ:
24     Q.  Did you believe that there were
25 additional documents that you needed in order

Page 49

1  to perform a complete analysis for this case?
2          MS. SMITH:  Objection, form.
3          THE WITNESS:  You said
4      documents that I thought I needed.
5      Could you restate the question?
6  BY MR. WOJTANOWICZ:
7      Q.  Were there additional documents
8  that your review of the documents provided to
9  you -- let me rephrase.  Based on your review
10 of the documents provided that were produced in
11 this case, did you any at time believe that
12 there were additional documents likely to be in
13 the document productions that you needed to
14 review to perform your analysis?
15     A.  Not that I can recall.  You know,
16 anything that was in Mr. Smithers' report or
17 things that I used for my analyses, I don't
18 remember missing anything.  I think there was
19 enough information there to support my
20 opinions.  So I don't remember anything
21 additional that was needed.
22     Q.  Was there any information that you
23 requested to assist you in your analysis that
24 you did not receive?
25         MS. SMITH:  Objection, form.

13 (Pages 46 - 49)

Page 70

24  BY MR. WOJTANOWICZ:
25     Q.  Now, you wouldn't have relied on

Page 71

1   the data if you believed that it was -- that
2   the tests were improperly conducted or the data
3   wasn't reliable, would you?
4         MS. SMITH:  Objection, form.
5         THE WITNESS:  Sorry, go
6   ahead.
7         MS. SMITH:  Go ahead, sorry.
8         THE WITNESS:  All right.  So
9   could you clarify the statement, if I
10  knew what about the data?
11  BY MR. WOJTANOWICZ:

21     Q.  Is it your practice to include or
22  rely upon faulty or false data in rendering
23  expert opinions in litigation?
24        MS. SMITH:  Objection, form.
25        THE WITNESS:  You said

Page 72

1   relying upon faulty data?
2   BY MR. WOJTANOWICZ:
3      Q.  Yes.
4      A.  If I know it's faulty, I will
5   investigate it and caveat what I know about it
6   and provide some context if I find something
7   that's unexpected about the data.

17  have been going for a little more than
18  an hour, I think now would be a good
19  time to take a short break before we
20  move on.  Is that okay?
21        MS. SMITH:  Yes, that's
22  fine.  Thank you.
23        THE VIDEOGRAPHER:  The time
24  is 11:26.  We are off the record.
25        - - - - -

Page 73

1   (A recess was taken at this time.)
2        - - - - -
3        THE VIDEOGRAPHER:  The time
4   is 11:43.  We're on the record.
5   BY MR. WOJTANOWICZ:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL

Page 74

[redacted lines 1-9]

10  Q.  You don't have any information, do
11  you, about what level of scrutiny the EPA gave
12  to the testing data contained in GM's
13  certificate of conformity, do you?
14         MS. SMITH:  Objection, form.
15         THE WITNESS:  So you said, I
16     don't have any insider data, what is
17     the question?
18  BY MR. WOJTANOWICZ:
19  Q.  I said you don't have any
20  information regarding the level of scrutiny the
21  EPA subjected the data related to General
22  Motors certificate of conformity for the Cruze
23  vehicles, do you?
24  A.  I don't have any evidence of, you
25  know, exactly what they did.  I'm aware of

Page 75

1  their procedures and how they operate and some
2  of the new procedures they've implemented since
3  the Volkswagen notice of violation that they
4  have done some additional checks and analyses
5  of their own on data coming in.
6  Q.  To be clear, the certificate of
7  conformity for the Cruze vehicles at issue in
8  this case was issued before the Volkswagen
9  notice of violation, correct?
10         MS. SMITH:  Objection, form.
11         THE WITNESS:  The
12     certificate of conformity data would
13     have been submitted prior to that,
14     correct.
15  BY MR. WOJTANOWICZ:
16  Q.  You also don't know to what extent
17  the EPA examined the in-use testing data that
18  General Motors provided to it for the Cruze
19  vehicles, correct?
20         MS. SMITH:  Objection, form.
21         THE WITNESS:  Which in-use,
22     the IUVP data, which in-use testing are
23     you referring to?
24  BY MR. WOJTANOWICZ:
25  Q.  Well, what in-use data did you

Page 76

1  consider and rely upon in giving your opinions
2  in this case?
3         MS. SMITH:  Objection, form.
4         THE WITNESS:  So IUVP data,
5     which is required to do in-use testing
6     on vehicles and put it on a dyno and
7     rerun, so in the certification tests
8     with the information that I looked at
9     that was submitted to the EPA and I
10    think on one of them where there was a
11    maintenance issue, some additional
12    information was communicated to the
13    EPA.
14  BY MR. WOJTANOWICZ:
15  Q.  Is there other in-use testing data
16  that you considered in connection with your
17  opinions in this case?
[redacted]
                                    I wasn't sure
20  how you were using the word in-use testing, but
21  the regulatory in-use testing, which is done on
22  a dyno is what I was referring to.
23  Q.  Okay.  Thanks for the
24  clarification.  So with respect to the IUVP
25  in-use testing data GM provided to the EPA, you

Page 77

1  don't have any specific information about the
2  level of scrutiny the EPA applied to that
3  information, do you?
4         MS. SMITH:  Objection, form.
5         THE WITNESS:  I don't -- I'm
6     sorry.
7         MS. SMITH:  Objection, form.
8         THE WITNESS:  I don't have
9     specific knowledge of what they did in
10    that case.  I know procedurally what
11    they do and how the EPA operates in
12    reviewing the data, but I didn't see
13    evidence exactly what EPA did in that,
14    with that data.
15  BY MR. WOJTANOWICZ:
16  Q.  And you don't have any evidence
17  about the level of scrutiny the EPA applied to
18  the PEMS testing data that it provided to the
19  EPA relating to the Cruze diesel vehicles,
20  correct?
21         MS. SMITH:  Objection, form.
22         THE WITNESS:  So typically
23     that data is not made public.  I know
24     with the PEMS data, I believe there was
25     some communication with Byron Bunker

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1 and others, some emails about, you
2 know, some questions they were asking
3 about the PEMS data, so that's some of
4 the information that I saw.
5 BY MR. WOJTANOWICZ:
6 Q. The bottom line is you don't know
7 how deeply the EPA dug into any of this testing
8 data other than the fact that this data was
9 given to it, right?
10    MS. SMITH: Objection, form.
11    Misstates testimony.
12    THE WITNESS: So that
13    information is typically not made
14    public. So I didn't see anything
15    specific to that, you know, exactly
16    what they did in relation to that data
17    that was submitted.
18 BY MR. WOJTANOWICZ:
19    Q. Is it your opinion that any
20 information submitted to the EPA is inherently
21 reliable because of the potential scrutiny that
22 it's subject to?
23    A. Could you restate that question?
24    Q. Is it your opinion that any
25 information or data submitted to the EPA is

Page 79

1 inherently more reliable just because it's
2 submitted to the EPA?
3    A. I don't know if you can say it is
4 inherently more reliable, but you're submitting
5 it to an entity that has to look into it and,
6 you know, or an OEM knows that that data and
7 those test results can be audited by the EPA,
8 so there's definitely increased scrutiny on the
9 data and what's going to be done with it.
10    Q. Have you ever conducted personally
11 a PEMS tests on the vehicle?
12    A. I have not conducted PEMS testing.
13 I've conducted FTP testing, but not PEMS
14 testing. And I've conducted a lot of on-road
15 fuel economy testing, which has some of the
16 inherent variability with PEMS testing.
17    Q. But specifically with respect to
18 PEMS testing for purposes of analyzing diesel
19 vehicle emissions, you have never conducted a
20 test like that, correct?
21    MS. SMITH: Objection, form.
22    THE WITNESS: I have not
23    conducted PEMS testing. Again, I've
24    conducted FTP testing for emissions and
25    conducted on-road testing, which PEMS

Page 80

1    is really kind of the combination of
2    the two of those is using a PEMS unit
3    to do on-road testing of emissions.
4 BY MR. WOJTANOWICZ:
5    Q. Again, I am not asking about the
6 other kinds of tests you may or may not have
7 performed, I'm asking you specifically about
8 PEMS testing for purposes of analyzing diesel
9 vehicle emissions. So if you can answer my
10 question, please. Have you ever conducted a
11 PEMS test for the purpose of analyzing diesel
12 vehicle emissions?
13    MS. SMITH: Objection, form.
14    THE WITNESS: I think I
15    answered that, but I said I had not
16    conducted PEMS testing. I provided
17    some context to the other testing, but
18    I think I clearly stated I hadn't
19    conducted PEMS testing on a diesel
20    vehicle.
21 BY MR. WOJTANOWICZ:
22    Q. Have you ever conducted a PEMS test
23 for purpose of analyzing emissions on a
24 gasoline vehicle?
25    A. I have not.

Page 81

1    Q. Have you ever designed test route
2 for purpose of running a PEMS test to analyze
3 emissions on a diesel or gasoline vehicle?
4    MS. SMITH: Objection, form.
5    THE WITNESS: I have not
6    designed a route for PEMS testing.
7    I've done, again, fuel economy testing
8    for on road commissions and fuel
9    economy, not a PEMS testing route.
10 BY MR. WOJTANOWICZ:
11    Q. Have you ever hooked up or set up a
12 PEMS unit on a vehicle for purposes of
13 emissions testing?
14    A. I have not.
15    Q. Have you ever hooked up -- or let
16 me rephrase this. Have you ever directed that
17 a PEMS unit be attached to a vehicle and then
18 test it on a dynamometer for purposes of
19 assessing whether the PEMS was accurate or not?
20    MS. SMITH: Objection, form.
21    THE WITNESS: I have not.
22 BY MR. WOJTANOWICZ:
23    Q. Have you ever designed a testing
24 program using a PEMS unit for purposes of
25 analyzing diesel or gas vehicle emissions?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1  A. I have not.
2  Q. Have you received any formal
3  training in using a PEMS analyzer?
4  A. Again, not a PEMS analyzer, I've
5  done other emissions analytics, but not a
6  specific PEMS unit.
7  Q. Have you received, for example, any
8  informal training, like attended a seminar or a
9  demonstration by a manufacturer of a PEMS unit
10  to learn how the PEMS unit works?
11      MS. SMITH: Objection, form.
12      THE WITNESS: I have not.
13  BY MR. WOJTANOWICZ:
14  Q. Was the use of a PEMS unit the part
15  of any aspect of your formal education? I know
16  we'll go into that later, but have you had any
17  classes or formal university training that
18  relates specifically to the use of a PEMS unit?
19  A. When I went to school, PEMS units
20  weren't typically in use or hadn't been very
21  widespread in use.
22  Q. Okay. So the answer is no, there
23  weren't any classes offered at the time you
24  were in school that related to how to set up or
25  use a PEMS unit?

Page 83

1  A. Not specific to a PEMS unit, no.
2  It was on-road testing in itself.
3  Q. In connection with your work on
4  this case, have you spoken with any PEMS unit
5  manufacturers regarding the proper use of PEMS
6  equipment?
7  A. I have not. Jeff Wishart who works
8  for me has done some PEMS testing and been a
9  part of PEMS testing, so I had spoke to him
10  about some the aspects of it.
11  Q. But you personally did not reach
12  out to, for example, Sensors, Inc. in order to
13  ask them about how their PEMS unit that they
14  manufacture works, did you?
15  A. I did not reach out to them.
16  Q. Did you ask Mr. Wishart to do that
17  for you?
18  A. I can't remember if he had
19  looked -- he looked into some of their manuals
20  and I can't remember if he called to clarify a
21  few different aspects, but I know he'd reviewed
22  their manuals and there may have been a phone
23  call, but I can't remember for sure.
24  Q. Did you ask him to call the
25  manufacturer to get additional information

Page 84

1  about how the Sensors, Inc. PEMS unit works?
2      MS. SMITH: Objection, form.
3      THE WITNESS: I don't
4  remember if I asked him to call or if I
5  had asked him some questions and he
6  thought it was -- he needed to clarify
7  it with them, I can't remember the
8  exact specifics of the conversation.
9  BY MR. WOJTANOWICZ:
10  Q. You're aware, aren't you, that
11  Sensors, Inc. was the manufacturer of the PEMS
12  unit that Mr. Smithers used in his testing
13  program?
14  A. Yes, the Semtech unit, yes.
15  Q. Have you personally reviewed the
16  user's manuals or the manuals for the Semtech
17  PEMS unit?
18      MS. SMITH: Objection, form.
19      THE WITNESS: I can't say
20  that I reviewed every aspect of it, but
21  I did review the materials and some of
22  the owner's manual pieces of that
23  Semtech unit.
24  BY MR. WOJTANOWICZ:
25  Q. What parts of the owner's manual do

Page 85

1  you recall reviewing?
2  A. There was the discussion of
3  operating PEMS temperatures. I think some of
4  the setup pieces, but it was a while ago, so I
5  can't remember the exact sections.
6  Q. Have you ever testified as an
7  expert witness in a case about PEMS testing
8  other than the testimony you're providing right
9  now in this case?
10  A. I have got to think if any of that
11  was confidential and privileged. I don't
12  believe it is in relation to some of the other
13  cases that we had mentioned before, I had
14  testified to some of the results of some PEMS
15  testing.
16  Q. In what cases?
17  A. Those would have been the
18  Volkswagen cases.
19  Q. And were you testifying with
20  respect to PEMS testing conducted by Exponent
21  or by someone else?
22      MS. SMITH: Objection, form.
23      THE WITNESS: It would have
24  been by Volkswagen and West Virginia
25  University.

22 (Pages 82 - 85)

Page 110

1  for you, Peter and Jeff, with instructions
2  about the speeds that they should achieve
3  during the course of the test drive of the
4  diesel test vehicle?
5     A.  I don't remember a specific
6  discussion other than, you know, drive some,
7  stop and go, and some high speed driving, but
8  it wasn't a prescriptive profile, no.
9     Q.  And these were oral instructions,
10 it wasn't a written protocol for how to conduct
11 these tests?
12    A.  That's correct.  It was more of a
13 test drive, not an actual emissions test.
14    Q.  Okay.  Did you provide Peter and
15 Jeff with instructions about the duration of
16 time as opposed to length and distance that
17 they should conduct their test drive of the
18 diesel test vehicle?
19          MS. SMITH:  Objection, form.
20          THE WITNESS:  Again, since
21    we weren't doing any affirmative
22    testing, I don't think there was any
23    specifics about the amount of time to
24    drive the vehicle.
25

Page 111

1  BY MR. WOJTANOWICZ:
2     Q.  Did you instruct Peter and Jeff
3  with respect to the length of time, distance,
4  that the gas test vehicle should be driven?
5          MS. SMITH:  Objection, form.
6          THE WITNESS:  No, if I
7    remember correctly, it was the same
8    instructions for the diesel or
9    something similar to it.
10 BY MR. WOJTANOWICZ:
11    Q.  Did you give them specific
12 instructions not to use an active OBD logger
13 during their test drive of the gas test
14 vehicle?
15    A.  I don't remember a discussion about
16 that.
17    Q.  Setting aside the inspections that
18 were done by Peter and Jeff for you on the gas
19 and diesel test vehicles, did you or anyone
20 working under your direction conduct any other
21 inspections of Cruze vehicles in connection
22 with your work in this case?
23    A.  Sorry, something popped up and
24 blurred part of your question there.  Could you
25 restate it?

Page 112

1     Q.  Sure.  I'm just asking aside from
2  the inspections of the test vehicles we have
3  been discussing, have you or anyone working
4  under your direction conducted any other
5  inspection of a Cruze vehicle in connection
6  with your work in this case?
7     A.  No.
8     Q.  Have you ever inspected any other
9  Cruze vehicle for any other purpose?
10    A.  Not that I can recall.
11    Q.  So you identified earlier, you said
12 that Jeff Wishart had experience with PEMS
13 testing, correct?
14    A.  He had been part of system PEMS
15 testing, that's correct.
16    Q.  Is there anyone else who was
17 working on, among the people assisting you in
18 your work in this case, that to your knowledge
19 has experience with PEMS testing?
20    A.  There's others that have done
21 emissions testing, but specific to PEMS, I do
22 not believe so.
23    Q.  For purposes of your opinions in
24 this case to the extent that you are relying on
25 inputs from your team, is it fair to say Jeff

Page 113

1  Wishart is the one whose experience you were
2  drawing on to reach your opinions in this case?
3          MS. SMITH:  Objection, form.
4          THE WITNESS:  So in part,
5    some of his information, myself and my
6    staff have done some work looking at
7    PEMS data, understanding, you know,
8    best practices with PEMS data, how it
9    has been conducted and, again, you
10   know, PEMS data is really the
11   culmination of dyno testing with
12   on-road testing, so the same principles
13   apply.  But as it relates to PEMS, Jeff
14   would have been the one with the
15   experience.
16 BY MR. WOJTANOWICZ:
17    Q.  Is there anybody else who assisted
18 you in this case whose experience with PEMS
19 testing you relied on in reaching your opinions
20 in this case?
21    A.  No.
22    Q.  What's your understanding of Jeff
23 Wishart's educational background?
24    A.  So he has a Ph.D from Arizona State
25 University.  I believe it's in either

29 (Pages 110 - 113)

Page 138

1  MS. SMITH: Objection, form.
2  THE WITNESS: Yes, that's my
3  recollection.
4  BY MR. WOJTANOWICZ:
5  Q. What about David Anderson, is he
6  also a computer scientist?
7  A. I believe he's a mechanical
8  engineer that spent quite a bit a time with
9  controls for engines and after-treatment
10  systems.
11  Q. So is it fair to say that Dave
12  Anderson and Matt Pooley performed the direct
13  analysis of the software code at your
14  direction?
15  A. At my direction and with my input,
16  we reviewed it. They did some deeper dives
17  when I asked for some additional information to
18  be gleaned from Dr. Levchenko's report.
19  Q. And how did they convey from what
20  they learned to you? Was it oral? Was it in
21  writing?
22  A. It was oral and then it was the
23  drafting of the text in those areas. So I
24  would talk to them about their findings and
25  then they drafted it up or drafted up the

Page 139

1  observations for the report.
2  Q. Did they summarize their findings
3  for you in any way other than putting it in a
4  draft report?
5  A. My recollection is it was all done
6  in the report.
7  Q. Because you didn't do the direct
8  analysis of the software code yourself in its
9  entirety, you had to rely on their analysis in
10  your consideration of the software issues
11  mentioned in your report; is that true?
12  MS. SMITH: Objection --
13  THE WITNESS: So it was --
14  sorry, go ahead, Renee.
15  MS. SMITH: Just objection,
16  form.
17  THE WITNESS: So it was at
18  my direction and with my input. I did
19  rely on some of their findings and then
20  reevaluated what they had done and
21  walked through the findings with them
22  and did some of my own review of Dr.
23  Levchenko's report.
24  BY MR. WOJTANOWICZ:
25  Q. So I would like you to turn back to

Page 140

1  Exhibit 1, which is the copy of your report.
2  And I will go through some of the items in your
3  CV, which is at Appendix A following the body
4  of your report.
5  A. Okay. I'm there.
6  Q. Okay. First of all, is your CV, is
7  this the most up-to-date version of the CV that
8  you have?
9  A. Yes, this is the most up-to-date
10  one.
11  Q. And is everything accurate in here
12  to the best of your knowledge?
13  A. Yes.
14  Q. I would like to go through your
15  prior work experience. You've been with
16  Exponent since 2017; is that correct?
17  A. That is correct.
18  Q. Describe for me in general what you
19  primarily do at Exponent.
20  A. So I'm a principal at Exponent. My
21  role is to work with clients, understand their
22  needs, develop new work, whether it be, you
23  know, kind of consulting work or expert
24  testimony. So my work is really, you know,
25  working with clients and helping understand how

Page 141

1  I might be able to help them from a consulting
2  perspective in areas of vehicle engineering,
3  whether it's engines and controls, advanced
4  driver-assistance systems, automated vehicles,
5  government regulations.
6  Q. What percentage of your work would
7  you say since you joined Exponent relates to
8  providing expert testimony or expert consulting
9  services, whether or not it leads to the
10  generation of a report or not?
11  A. I would say kind of over the
12  three-plus years, something around kind of
13  50/50. Fifty percent in consulting, 50 percent
14  expert witness.
15  Q. With respect to your consulting
16  work, what percentage of your consulting work
17  relates to vehicle, diesel vehicle emissions?
18  A. So specifically diesel vehicles, on
19  the consulting side, I can't think of any work
20  in that area.
21  Q. Do you do any -- then what
22  percentage of your consulting work relates to
23  gasoline vehicle emissions?
24  A. I'm sorry, I missed it, was it on
25  the consulting side or the expert testimony

HIGHLY CONFIDENTIAL

Page 150

1  group, typically, was more on the connected and
2  automated vehicle front.
3      Q.  And the issues that were rising in
4  connection with the connected and automated
5  vehicle front, that wasn't implicating specific
6  connected automated vehicle control of
7  emissions; is that true?
8      A.  No, I mean, there was some
9  discussion and analyses of the impact of
10 connected and automated vehicles on emissions
11 from the transportation system and fuel
12 economy, but not only specific to emissions.
13     Q.  Did any of the work that you did as
14 division chief on the connective and automated
15 technology --
16     A.  You know, I hate to do this to you.
17 I have somebody next door to me in an office
18 that is speaking loudly and I am hoping that
19 doesn't get picked up.  Could we take a quick
20 break, so I can inform them?  It is distracting
21 me and I'm hoping it's not providing some
22 feedback to all of you.
23          MR. WOJTANOWICZ:  We can't
24     hear it, but that's fine, yeah.
25          MS. SMITH:  Yeah.

Page 151

1          THE WITNESS:  Okay.  Hold on
2     one second.
3          THE VIDEOGRAPHER:  The time
4     is 1:35.  We're off the record.
5          - - - - -
6     (A recess was taken at this time.)
7          - - - - -
8          THE VIDEOGRAPHER:  So the
9     time is 1:36 and we're on the record.
10 BY MR. WOJTANOWICZ:
11     Q.  Mr. Harrington, did any of the work
12 that you performed as division chief from 2012
13 to 2017 involve conducting dynamometer testing
14 on diesel vehicles?
15     A.  It didn't involve testing on dyno.
16 My work, obviously, on fuel economy standards
17 and helping to set those standards is, you
18 know, the test results from the OEMs is what
19 feeds into the fuel economy standards, so there
20 was that work, but I didn't do specific
21 dynamometer testing.
22     Q.  I'm just going to try to limit it
23 now to just your time as division chief, you
24 know, in case if that makes a difference, if
25 you're referring back to a different time.

Page 152

1  While you were division chief, did your work
2  involve conducting any dynamometer testing on
3  diesel or gas vehicles?
4      A.  It did not.  When I was division
5  chief, I also did some work on fuel economy
6  standards, which is why I mentioned, so I still
7  did some work on CAFE, but during the time as
8  division chief, it wasn't related to
9  dynamometer testing or conducting dynamometer
10 testing.
11     Q.  Now, describe for me, if you would,
12 your responsibilities while you are a senior
13 engineer at the Department of Transportation
14 from 2007 through 2012.
15     A.  When I first started, I worked,
16 like, six months or a year on accident
17 avoidance technology or advanced
18 driver-assistance systems and accident
19 avoidance technologies, but then most of the
20 time was working as an engineer on the
21 Corporate Average Fuel Economy standards.  So
22 at that time, the DOT in coordination with the
23 EPA and the California Air Resources Board
24 promulgated many rule makings related to fuel
25 economy and CO2 emissions.  And my role, the

Page 153

1  Volpe Center developed a model that the DOT
2  used in coordination with EPA in their modeling
3  to develop the scenarios and the analyses that
4  were done to help set the standards.  And so my
5  work was to develop the assumptions about what
6  technology was available, the efficacy, what
7  type of fuel consumption reductions could be
8  gleaned from it, cost, availability, what
9  constraints there might be about bringing that
10 technology out on an individual vehicle and at
11 the fleet level, and so my role was setting up
12 those assumptions about what fuel economy and
13 greenhouse gas-reducing technologies were
14 available and what would be projected out into
15 the future and I had to present that to senior
16 officials at EPA, CARB, the White House, and
17 explain the rationale for the assumptions that
18 went into that.  And so that was the most of
19 what I had done as a senior engineer, working
20 on those CAFE standards.
21     Q.  Did any part of that work relating
22 to the CAFE standards as a senior engineer
23 involve conducting dynamometer testing on
24 vehicles to measure emissions?
25     A.  So it didn't require direct

Page 154

1  dynamometer measurements, but in order to
2  comply with the CAFE regulations, OEMs have to,
3  original equipment manufacturers have to
4  conduct dyno testing to understand how they
5  perform relative to the fuel economy standards
6  and so part of setting the standards is
7  evaluating the five-cycle testing that EPA does
8  for fuel economy testing and that the OEMs have
9  to follow when they comply with the EPA and DOT
10 regulations, and then look at on cycle what
11 they get versus what that means for the kind of
12 the real world or on road as it relates to fuel
13 economy and greenhouse gas standards.
14      Q.  So in connection with your work on
15 the CAFE standards, you considered dynamometer
16 testing data that was provided to you from
17 OEMs, fair?
18      A.  And the relationship that that has
19 to on road emissions and on road fuel economy.
20      Q.  But you didn't have to conduct any
21 of your own or you did not conduct any of your
22 own dynamometer testing on vehicles as part of
23 that job, correct?
24      A.  I did network to the EPA's lab and
25 worked with their engineers who had conducted

Page 155

1  some of the testing and evaluated that data as
2  we were thinking about what assumptions could
3  be made about the fuel economy and greenhouse
4  gas-reducing technologies.
5       Q.  So there were some people at the
6  EPA that were conducting dynamometer testing of
7  vehicles and you considered that data in
8  connection with your work helping to develop
9  the CAFE standards?
10      A.  Correct.
11      Q.  But you didn't sort of either
12 design or run those dynamometer testing
13 programs, you just considered the data, right?
14      A.  That's correct.
15      Q.  And the same goes with the OEM data
16 from dynamometer testing that was submitted to
17 the EPA, you considered those results in
18 conjunction with other information, but you
19 didn't design, implement, or run those
20 dynamometer testing for the OEM programs, did
21 you?
22      A.  That's correct.
23      Q.  And for that OEM testing,
24 dynamometer testing, you weren't present during
25 those test runs on a dynamometer, they just

Page 156

1  submitted the data to you after it was done,
2  right?
3       A.  That's correct.
4       Q.  With respect to the EPA testing,
5  dynamometer testing that you referred to, were
6  you actually there during the dynamometer
7  testing process?
8       A.  No, I would review the results with
9  EPA after the fact.
10      Q.  Okay.
11      A.  I had visited their labs a few
12 times and saw their equipment and talked to
13 them about the work we were doing, but I wasn't
14 there during the testing.
15      Q.  During the course of your review
16 of -- let me back up a second.  So you said
17 that you considered the dynamometer testing
18 results in conjunction with additional
19 information related to real-world performance,
20 fuel economy performance; is that correct?
21      A.  Yeah.
22      Q.  And how was the real-world fuel
23 economy performance of the vehicles measured?
24      A.  I'm trying to remember back to the
25 analyses, it was called the on-road fuel

Page 157

1  economy gap.  And I'm trying to remember the
2  exact data that was used by the EPA and DOT to
3  develop kind of an offset to show that the
4  emissions were typically higher or the CO2
5  emissions and the fuel economy -- CO2 emissions
6  were higher, fuel economy was lower on road
7  than during the testing.  I think there was
8  some fleet studies that the EPA had done in the
9  past that we had evaluated.
10      Q.  So you are aware that there are
11 studies out there that indicate that under the
12 CAFE standards on-road or real-world fuel
13 economy performance tends to be significantly
14 lower than the performance measured in the
15 certification tests?
16      A.  As you said, the on-road fuel
17 economy and fuel consumption go in different
18 directions, so you said fuel economy is lower
19 on road?
20      Q.  Correct.
21      A.  So in the past, it had been there
22 was a bigger difference.  The way that EPA had
23 implemented five-cycle testing, that data is
24 now closer.  So on-road people can get better
25 than the fuel economy listed and, you know,

HIGHLY CONFIDENTIAL

Page 218

1  reflected in your report?
2      A.  I believe, yes, everything, the
3  analyses that was done is in the report.
4      Q.  Were there any tests that you
5  conducted or that were conducted under your
6  direction in connection with reaching the
7  opinions stated in the report that aren't
8  referenced in here?
9      A.  You said tests?
10     Q.  Sure, tests.
11     A.  Tests, no.
12     Q.  What about any analyses, are there
13 formal studies or analyses that you conducted
14 in connection with reaching your opinions that
15 are not referenced in the report?
16     A.  No, I can't think of anything, you
17 know, the analyses evolved over time, but as
18 they evolved, it's all in here, so I can't
19 think of any analyses that are not represented.
20     Q.  And does the report, to the best of
21 your ability, contain a complete statement of
22 the reasons for the opinions that you have
23 reached in this case?
24     A.  Yes, I believe it has got a
25 thorough discussion of the bases for those

Page 219

1  opinions.
2      Q.  Is there anything that you feel
3  needs to be added to the report in order to
4  make it a complete statement of your opinions
5  and the reasons for those opinions?
6      A.  I can't think of anything that
7  needs to be added, no.
8      Q.  Anything you can think of that
9  needs to be changed?
10     A.  There was a few small little typos
11 that I found as I reread it in preparation for
12 this, but they're pretty small changes.
13     Q.  Other than typos, do you think
14 there's anything about the report that needs to
15 be changed in order to make it a complete and
16 accurate statement of your opinions and the
17 reasons for those opinions?
18     A.  No, other than the few typos that I
19 think are pretty easy to square, there's
20 nothing that needs to be added.
21     Q.  Have you changed any of your
22 opinions since you submitted the report?
23     A.  No.
24     Q.  Aside from the documents you
25 referred to earlier that you got yesterday from

Page 220

1  Plaintiffs' counsel, have you reviewed any new
2  materials relating to the case since drafting
3  your report?
4      A.  No.
5      Q.  Have you conducted any additional
6  testing relating to the vehicles or the
7  analyses for this case since you issued your
8  report?
9      A.  No.
10     Q.  Have you done any new analyses of
11 GM's testing data since you've issued your
12 report?
13     A.  No.
14     Q.  Have you made any additional
15 calculations relating to GM's analysis?
16     A.  No.  I think I just went back and
17 double checked some numbers and things like
18 that, but nothing new.
19     Q.  Same questions for the Smithers
20 report, have you conducted any new or
21 additional analyses of his report since you
22 issued yours?
23     A.  No.
24     Q.  And you haven't conducted any new
25 analyses or calculations relating to Mr.

Page 221

1  Smithers' report?
2      A.  No, not that I can think of.
3      Q.  And at the time that you submitted
4  your report, you had had an opportunity to
5  review, obviously, Mr. Smithers' written
6  report, correct?
7      A.  Correct.
8      Q.  And you did review that report?
9      A.  Yes.
10     Q.  You had also an opportunity to
11 review Mr. Smithers' deposition testimony; is
12 that correct?
13     A.  That's correct.
14     Q.  Did you review that yourself or did
15 you have someone do it for you?
16         MS. SMITH:  Objection, form.
17         THE WITNESS:  A little bit
18     of both, I reviewed good chunks of it
19     and then I had a few other people -- or
20     had somebody else review it as well.
21 BY MR. WOJTANOWICZ:
22     Q.  I would like you to turn to
23 Section 5.1.1 on page 11.  This is the section
24 where you describe in general terms some
25 emission control systems that are used in the

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 246

1  your rate is the rate that Exponent charges for
2  you is $450 an hour?
3      A.  That is correct, in 2020.
4      Q.  Was it less in 2019?
5      A.  Yeah, I believe it was 435 in 2019.
6      **Q.  Okay.  How many hours did you spend**
7  **working on and generating the report that you**
8  **filed in this case, you personally?**
9      **A.  I think it's in the, like, 350-hour**
10 **range, something like that.**
11     Q.  And then you listed a number of
12 people who assisted you in the preparation of
13 this report, you wrote sections of the report.
14 Who among them do you think has spent the most
15 time, spent the most time generating the
16 report?
17         MS. SMITH:  Objection, form.
18         THE WITNESS:  So off memory,
19     I would say Carmine Senatore, Sarah
20     Parker, and Dave Anderson were the
21     primary folks who helped me draft the
22     report.
23 BY MR. WOJTANOWICZ:
24     Q.  Can you give me a ballpark of how
25 many hours you believe they spent helping draft

Page 247

1  the report?
2      A.  So is that drafting and all the
3  analyses up to that point?
4      Q.  Yes.
5      A.  So that it's less clear, I would
6  say, like, 14-, 1500 hours, somewhere in there
7  between the three of them.
8      Q.  So you think on average maybe 450
9  or 500 hours into the working on the case for
10 generating a report for Carmine Senatore, David
11 Anderson, and Sarah Parker?
12     A.  Yeah, I would say it might be a
13 little bit higher for some of them, but it's
14 somewhere in that range.
15     Q.  Is there anybody else among the
16 people that assisted you who you think have
17 even more hours than that that they spent
18 working on generating the report?
19     A.  No.
20     Q.  Do you know what the total amount
21 that Exponent has billed in connection with
22 this case is?
23     A.  What do you mean by billed, hours?
24     Q.  Yeah, I assume Exponent bills,
25 issues bills to Kirkland and Ellis based on the

Page 248

1  amount of time that it spent working on the
2  case, correct?
3         MS. SMITH:  Objection.
4         THE WITNESS:  Yeah, so --
5         MS. SMITH:  Sorry.
6     objection, foundation.
7         THE WITNESS:  When you said
8     "billing," is that the number of hours
9     billed, is that what you're asking?
10 BY MR. WOJTANOWICZ:
11     Q.  Yes, how many hours, let's start
12 there, how many hours has Exponent billed on
13 this matter?
14     A.  I think up to the report 2,000,
15 2100 hours, something like that.
16     Q.  So you think that Exponent billed
17 approximately 2100 hours up until the time that
18 the report was issued?
19     A.  I think that's a pretty fair
20 assessment -- or a fair estimate, yeah.
21     Q.  And since you've issued the report,
22 you've probably spent some more time preparing
23 for deposition, attending today, but you
24 haven't billed for that yet, right?
25     A.  Correct.

Page 249

1      Q.  How do the hourly rates of the
2  people that helped you out compare to your
3  hourly rate of $450 an hour, are they higher,
4  lower, same, all over the place?
5         MS. SMITH:  Objection, form.
6         THE WITNESS:  I think
7     everybody is lower.
8  BY MR. WOJTANOWICZ:
9      Q.  Okay.  I'm going to go back to kind
10 of discussing the subject matter found in
11 Section 5.1.1 on your report, just the general
12 overview.  Moving onto the selective catalytic
13 reduction system.  Now, that system works
14 essentially by spraying urea or DEF, which is
15 also known as diesel exhaust fluid or DEF,
16 D-E-F, spraying that in controlled amounts onto
17 a component containing a catalyst that reacts,
18 that reacts along with the urea and the
19 incoming NOx to essentially neutralize the NOx.
20 Is that a fair summary?
21     A.  It reduces the NOx, yes, over a
22 catalyst using DEF or urea.
23     Q.  Okay.  Because there's a -- the
24 catalyst basically facilitates a reaction
25 between the urea and the NOx that converts that

63 (Pages 246 - 249)

Page 266

Page 268

1  page number?
2      Q.  Page number 14 that's on the slide
3  and the Bates page number ends with 600.
4      A.  Yes, 600.  Okay.

11  BY MR. WOJTANOWICZ:
12      Q.  I would like you to, if you can
13  pull out the -- I'm not exactly sure if the
14  documents you got are in envelopes or folders
15  or whatever, pull out the one that is numbered
16  19, if you would, please.  Everyone else will
17  hopefully have that available to them in the
18  exhibit share folder now.
19          MR. BRODSKY:  So this is
20      Exhibit 2?
21          MS. SMITH:  Yeah, you know,
22      hold on one second, let me just make
23      sure it's refreshing, hold on one
24      second.  Yes.
25          - - - - -

Page 267

1      (Chevrolet Cruze Diesel Discussion
2      with EPA & CARB 9/13/16 Document Bates
3      GMCOUNTS0000851587 TO 51607 marked
4      Harrington Exhibit 2 for
5      identification.)
6          - - - - -
7  BY MR. WOJTANOWICZ:
8      Q.  Okay.  So yes, this has been
9  introduced as Exhibit No. 2.  And for the
10  record, this is a document with the Bates
11  numbers beginning GMCOUNTS851587 and continuing
12  through 51607.  Take a look a moment to look at
13  this and see if you recognize the document as
14  the one you just referred to?
15      A.  Okay.
16      Q.  Do you recognize it?
17      A.  Yes.
18      Q.  Okay.  This is one of the documents
19  you reviewed in connection with your report in
20  this case, isn't it?
21      A.  Correct.
22      Q.  And if you turn to the slide number
23  414 which is the Bates numbers ending 600, do
24  you see that slide?
25      A.  Let me get to it.  What was the

Page 269

HIGHLY CONFIDENTIAL



Page 270

Page 271

Page 272

Page 273