***Unpublished Authorities***

1. *Design Basics, LLC v. Deshano Cos., Inc.*, 2012 WL 4340784 (E.D. Mich. Sept. 21, 2012).

2. *Dow Corning Corp. v. Weather Shield Mfg, Inc.*, 2011 WL 2490962 (E.D. Mich. June 22, 2011).

3. *Dow v. Rheem Mfg. Co.*, 2011 WL 4484001 (E.D. Mich., Sept. 26, 2011).

4. *Everlight Elecs. Co., LTD. v. Nichia Corp.*, 2014 WL 4707053 (E.D. Mich. Sept. 22, 2014).

5. *Express Energy Servs. Operating, L.P. v. Hall Drilling, LLC*, 2015 WL 3743795 (E.D. Ohio June 15, 2015).

6. *Faryniarz v. Nike, Inc.*, 2002 WL 1968351 (S.D.N.Y. Aug. 23, 2002).

7. *Flebotte v. Dow Jones & Co., Inc.*, 2000 WL 35539238 (D. Mass. Dec. 6, 2000).

8. *FTC v. DIRECTV, Inc.*, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018).

9. *In re 5-Hour Energy Mktg. and Sales Pracs. Litig.*, 2017 WL 2559615 (C.D. Cal. June 7, 2017).

10. *In re Motel 6 Secs. Litig.*, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997).

11. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2020 WL 6688912 (N.D. Cal. Nov. 12, 2020).

12. *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726 (N.D. Cal. June 13, 2014).

13. *Miami Valley Fair Hous. Ctr., Inc. v. Preferred Living Real Estate Invs., LLC*, 2018 WL 4690790 (S.D. Ohio Sept. 28, 2018).

14. *Miller v. Thane Int'l, Inc.*, 2005 WL 5957833 (C.D. Cal. Mar. 3, 2005).

15. *Next Week Rover Pipeline LLC v. 1.23 Acres of Land*, 2019 WL 989280 (E.D. Mich. Mar. 1, 2019).

16. *Oracle Am., Inc. v. Google Inc.*, 2012 WL 4017808 (N.D. Cal. 2012).

17. *Orthofix Inc. v. Lemanski*, 2015 WL 12990115 (E.D. Mich. Sept. 29, 2015).

18. *Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*, 2018 WL 626355 (E.D. Tex. Jan. 30, 2018).

19. *Rover Pipeline, LLC v. 1.23 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude)*, 2018 WL 3322995 (E.D. Mich. July 6, 2018).

20. *SEC v. Bankatlantic Bancorp, Inc.*, 2013 WL 12009694 (S.D. Fla. Nov. 14, 2013).

21. *Shanks v. Jarrow Formulas, Inc.*, 2019 WL 4398506 (C.D. Cal. Aug. 27, 2019).

22. *Smith v. Old Dominion Freight Line, Inc.*, 2016 WL 7422683 (W.D. Ky. Dec. 22, 2016).

23. *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 264701, (N.D. Cal. Jan. 17, 2020).

24. *Taylor v. Certainteed Corp.*, 2003 WL 25695244 (E.D. Mich. Oct. 9, 2003).

25. *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 2014 WL 1233081 (S.D. Ohio Mar. 25, 2014).

26. *Wheeler Peak, LLC v. L.C.I.2, Inc.*, 2010 WL 611011 (D. N.M. Jan. 31, 2010).

2012 WL 4340784
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Northern Division.

DESIGN BASICS, L.L.C., Plaintiff,
v.
DESHANO COMPANIES, INC.; Deshano Homes, Inc.; Deshano Lumber Comkpany; Deshano Construction Company; County–Wide Builders, Inc.; and Michigan Custom Homes, Defendants.

No. 10–14419.
|
Sept. 21, 2012.

**Attorneys and Law Firms**

John E. Gannon, Lambert, Leser, Isackson, Cook & Giunta, Bay City, MI, for Plaintiff.

Gary C. Rogers, Jeremy J. Burchman, Fraser Trebilcock Davis & Dunlap, P.C., Lansing, MI, for Defendants.

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION TO EXCLUDE DEFENDANTS' EXPERT AND DENYING IN PART**

THOMAS L. LUDINGTON, District Judge.

***1** Vernon Reed was retained by Defendants to review the materials in this case and offer his opinion about the architectural issues. Mr. Reed concluded Plaintiff Design Basics, LLC's homeplans are mass-produced, ordinary, and commonplace, and that they do not deserve copyright protection. Mr. Reed came to four concrete conclusions: (1) any similarities between the Plaintiff's and Defendants' floorplans are not an indication of copyright infringement because Plaintiff's plans are not copyrightable; (2) there is no artistic craftsmanship elements contained in the Plaintiff's floor plans; (3) Plaintiff's elevations are entitled only to "thin" copyright protection; (4) there is not substantial similarity between Plaintiff's and Defendants' designs after filtering out the non-original elements.

Currently before the court is Plaintiff's motion to exclude Mr. Reed as an expert in this case. For the reasons that follow, Plaintiff's motion as to Mr. Reed's four conclusions is granted. Mr. Reed's opinions concerning the differences between Plaintiff's and Defendants' floor plans, pages twenty-two through thirty of his report, will not be excluded.

**I**

Vernon Reed received his Bachelor's Degree in Architecture from the University of Arkansas in 1958. Defs.' Resp. Ex. 2., ECF No. 61. He has been involved with architecture in one way or another since that time. As Plaintiff does not object to his qualifications to testify concerning architectural matters, a lengthy discussion of his credentials will not be provided. Suffice it to say, Mr. Reed is qualified to testify concerning architectural issues under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Mr. Reed produced a thirty-one page report concerning this case. Eight pages relate to "A Short History of Architecture" and "The American Institute of Architects and the Copyright Laws." Defs.' Resp. Ex. 2. Mr. Reed then spent thirteen pages analyzing the current state of copyright law, and how it does and does not apply to Plaintiff's designs and to architectural plans more broadly. *Id.* Finally, nine pages examine the similarities and differences between Plaintiff's and Defendants' designs, and lists the conclusions Mr. Reed drew from that information. *Id.*

Plaintiff filed a motion to exclude Mr. Reed's report, claiming he is unqualified to provide the opinions he does concerning copyright law, and its applicability in this case. Mr. Reed's evaluation of the differences between the various designs, contained at the end of his report, is well within his experience as an architect. However, Mr. Reed's evaluation of the copyright laws, his attempt to apply them to the facts of this case, and therefore his resulting conclusions, are not within his expertise, and

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

will be excluded.

## II

Under *Daubert* and its progeny, district courts must exercise a gatekeeping role in screening the reliability of expert testimony to keep "junk science" away from juries. *Thomas v. Novartis Pharmaceutical Corp.,* 443 F. App'x 58, 60 (6th Cir.2011) (citing Daubert, 509 U.S. 113). Consistent with this directive, the Federal Rules of Evidence provide:

> ***2** A witness who his qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. This rule gives district courts "broad discretion to determine whether a putative expert's testimony would be inadmissible junk science or instead would be falling within the 'range where experts might reasonably differ.' " *Thomas,* 443 F. App'x at 60 (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Architects are experts within the scope of Rule 702. *See* Fed.R.Evid. 702 advisory committee's note ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e .g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). "An expert must possess a verifiable expertise in the subject matter for which he or she seeks to testify." *Wheeler Peak, LLC v. L.C.I.2, Inc.,* 2010 WL 611011 (D.N.M.2010); *see also* Fed.R.Evid. 702. The expert is also "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Life Wise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir.2004).

## III

In this case, Mr. Reed has wandered afield from his area of expertise instead of confining his opinions to his architectural knowledge. It is therefore appropriate to exclude his testimony and opinions concerning issues outside of his architectural qualifications, and also where he based his opinions on the incorrect legal framework.

Other courts have allowed expert testimony from architects in copyright infringement cases. In *Nelson–Salabes Inc. v. Morningside Holdings,* 2001 WL 419002 at *5 (D.Md. Feb.16, 2001), *rev'd in part on other grounds,* 284 F.3d 505 (4th Cir.2002), the court upheld the use of expert testimony in an architectural copyright action. The plaintiff's expert testified that the defendants' design contained numerous design elements that were substantially similar to the design elements in plaintiffs design. *Id.*

In *Chirco v. Charter Oak Homes, Inc.,* 2003 WL 25697322, *3 (E.D.Mich. June 23, 2003), the plaintiff offered expert testimony concerning the substantial similarity between two competing architectural designs. The court noted that the expert, who held a master's degree in architecture and was a tenured professor on the topic, was "well qualified by knowledge, skill, experience, training and education." *Id.*

***3** Particularly relevant to the analysis here, the court in *Chirco* did not allow the highly qualified expert to stray from the bounds of his expertise. "Defendants also argue that [the expert] has not opined on originality, protected features, and copyright infringement. However, as noted by plaintiffs, these are copyright issues, legal issues and legal terms, on which the Court, not [the expert], will instruct the jury." The court noted that this architectural expert was properly limited to "opinions as to architectural similarity...." *Id.*

Defendants' expert Mr. Reed, although less qualified than the expert in *Chirco,* attempts to do much more. He notes in his report, "It is clear from the language of the laws governing the copyright of architecture that the common building blocks of a house *or its plans* are not copyrightable." Defs.' Resp. Ex 2 (emphasis added). Here, Mr. Reed attempts to opine on copyright law, which is not his specialty, and he is incorrect. The Copyright Act maintains that houseplans can be copyright protected based on the design as a whole. An "architectural work" is defined to include "the *overall form,* as well as the *arrangement and composition of spaces and elements in the design,* but does not include individual standard features." 17 U.S.C. § 101 (emphasis added). The legislative history concerning the 1990 Architectural

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

Works Copyright Protection Act ("AWCPA") supports this conclusion. "Contrary to the Committee's report accompanying the 1976 Copyright Act with respect to industrial products, the aesthetically pleasing overall shape of an architectural work could be protected under this bill." H.R.Rep. No. 735 (1990), *reprinted in* 1990 U . S.C.C.A.N. 6935, 6951. "Creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotected elements into an original, protectible[1] whole." *Id.* at 6949. Courts have held that house plans may deserve copyright protection. *See Frank Betz Associates, Inc. v. Signature Homes, Inc.,* 2010 WL 1373268, *3 (M.D.Tenn. Mar.29, 2010); *Frank Betz Associates, Inv. v. J.O. Clark Const., LLC.,* 2010 WL 4628203, *6 (M.D.Tenn. Nov.5, 2010).

Further, Mr. Reed states that only "highly unique artistic expressions" deserve copyright protection. Defs.' Resp. Ex. 2. Again, he is incorrect. It is black-letter law that courts accept as protected "any work which by the most generous standard may arguably be said to evince creativity." 1–2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.08 (2012). To qualify for copyright protection, a work must be original—it must possess "at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The work need not be "particularly novel or unusual." *Mattel, Inc. v. Goldberger Doll Mfg. Co.,* 365 F.3d 133, 135 (2d Cir.2004). "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist,* 499 U.S. at 345 (citation and internal quotation marks omitted). The house need not be Frank Lloyd Wright's Robie House in Chicago to be protectable.

***4** Mr. Reed discusses in his report that no mass market housing plans can be copyright protected, that these plans only deserve protection against "identical copying." Defs.' Resp. Ex. 2. This assertion simply cannot be squared with the language of the Copyright Act and the relevant cases on point. Indeed, it is likely the court in *Chirco* did not allow the architectural expert to opine on issues of copyright law for similar reasons.

Mr. Reed's first and third conclusions can, and should, be excluded on this basis. The fact that he determined Plaintiff's floorplans "are not copyrightable" renders his conclusion on this point outside his expertise, unreliable, irrelevant, and unhelpful to the trier of fact. Similarly, his conclusion that Plaintiff's elevations are only entitled to "thin copyright protection" is not within his expertise, and should not be presented to the jury.

Mr. Reed's second opinion, that there is no artistic craftsmanship in Plaintiff's plans, is wholly irrelevant. Artistic craftsmanship is not something that the law requires for architectural works to receive copyright protection. It is only required of pictorial, graphic, and sculpture works under 17 U.S.C. § 102(5). The AWCPA specifically removed architectural works from this analysis. "In each case, the courts must be free to decide the issue upon the facts presented, free of the separability conundrum presented by the useful articles doctrine applicable for pictorial, graphic, and sculptural works." 1990 U.S.C.C.A.N. at 6952. Regardless, Mr. Reed imposes such a requirement in his revolutionary "four step analysis" to determining if architectural works deserve copyright protection. Defs.' Resp. Ex. 2. This opinion should be excluded.

Finally, Mr. Reed's fourth opinion, that the design plans at issue are not substantially similar after excluding non-original forms, should also be kept from the jury. The analysis does not conform with the law as Mr. Reed failed to consider the houseplans as a whole. Defs.' Resp. Ex. 2. "Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements. For example, while color is not protectible, the manner in which an artist selects, coordinates, and arranges color may be." *Sturdza v. United Arab Emirates,* 281 F.3d 1287, 1296 (D.C.Cir.2002). The fact that Mr. Reed did not consider Plaintiff's floorplans as a whole, because he does not believe the plans deserve copyright protection, is fatal to his analysis. Accordingly, this opinion lacks the requisite reliability and relevance under Rule 702.

However, pages twenty-two through thirty of Mr. Reed's report are just the kind of expert analysis that is appropriate. Although he "found no protectable elements," that actually may have helped to constrain his analysis to the proper bounds. Instead of opining about the law, Mr. Reed simply "point[s] out the obvious differences" between the plans. Recognizing how floorplans are dissimilar, by a qualified architectural expert, is just the type of opinion courts have deemed useful to the trier of fact. As such, this section of Mr. Reed's report should not be excluded.

## IV

***5** Based on the foregoing, Mr. Reed's opinions and testimony are excluded, except for pages twenty-two through thirty of his report, dealing with the differences between Plaintiff's and Defendants' floorplans.

It is **ORDERED** that Plaintiff's motion is **GRANTED** in part, and **DENIED** in part.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4340784

Footnotes

1 Between "protectable" and "protectible," "The first is preferred." Bryan A. Garner, *Garner's Dictionary of Legal Usage,* 725 (Oxford Univ. Press 3d ed.2011). We use the latter only to maintain accurate citations.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2490962
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Northern Division.

DOW CORNING CORPORATION, Plaintiff/Counter–Defendant,
v.
WEATHER SHIELD MANUFACTURING, INC., SNE Enterprises, Inc., and Peachtree Doors and Windows, Inc., Defendants/Counter–Plaintiffs.

No. 09–10429.
|
June 22, 2011.

**Attorneys and Law Firms**

Mary C. Dirkes, Michael V. Kell, Howard & Howard, Royal Oak, MI, for Plaintiff.

Mark R. Smith, Nantz, Litowich, Grand Rapids, MI, for Defendants.

***OPINION AND ORDER CANCELING HEARING AND DENYING PLAINTIFF'S MOTION TO EXCLUDE DR. G. FRED WILLARD***

THOMAS L. LUDINGTON, District Judge.

***1** On February 4, 2009, Plaintiff Dow Corning Corporation ("Dow Corning" or "Plaintiff") filed a complaint against Weather Shield Manufacturing, Inc., SNE Enterprises, Inc. and Peachtree Doors and Windows, Inc. (collectively, "Weather Shield" or "Defendants") alleging breach of contract and unjust enrichment [Dkt. # 1]. Plaintiff alleges that it entered into a contract with Defendants on March 22, 2004, which Defendants breached by failing to repay Plaintiff for a loan made to purchase glazing equipment, for failing to purchase Plaintiff's silicone sealant for its window and door manufacturing operations until August 31, 2008, and for using the glazing equipment with products other than Plaintiff's. Plaintiff also alleges that Defendants have been unjustly enriched by using the glazing equipment without having fully paid its purchase price.

On July 2, 2010, Plaintiff filed a motion to exclude the testimony, report, and opinions of Dr. G. Fred Willard because he is not qualified to render an expert opinion regarding the window/door industry due to his lack of requisite knowledge, skill, training, education and experience, because his testing methodology is unreliable, and because his testimony and opinions will not assist the trier of fact [Dkt. # 22]. Defendants filed a response on July 30, 2010 [Dkt. # 27]. Plaintiff filed a reply on August 6, 2010 [Dkt. # 28]. The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. E.D. Mich. LR 7 .1(e)(2). For the reasons provided herein, Plaintiff's motion to exclude the testimony, report, and opinions of Dr. Willard will be denied.

**I**

The facts of this case have been provided in the Court's opinion and order directing supplemental briefing [Dkt. # 39] and the Court's order granting in part and denying in part Plaintiff's motion for summary judgment [Dkt. # 44].

**II**

Dr. Willard, Ph.D., from CAS–MI Laboratories ("CAS–MI") has been retained by Weather Shield as an expert in the instant case. Dr. Willard offered three opinions in this matter, two regarding the plasticity characteristics of InstantGlaze and a third regarding the alleged failure of InstantGlaze to cure on a sample window sash obtained from a home in Houston, Texas.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

### A

Dr. Willard holds a bachelors and doctorate degree in chemistry. Since 1978 he has worked in technical positions with industry leaders in polymer chemistry including Owens Corning Fiberglass, General Electric Plastics, General Electric Specialty Chemicals, Chemir/Polytech Laboratory and, more recently, CAS–MI Laboratories, LLC. Dr. Willard is an expert in polymers of which silicone is a subset. Importantly, Dr. Willard is a SIX SIGMA[1] trainer with expertise relating to the issue of variability within manufacturing processes. Dr. Willard has been qualified as an expert on numerous occasions and has testified at both trial and in deposition as set forth in his CV.

### B

***2** Dr. Willard's three primary opinions in this case are as follows:

1. The Dow Corning InstantGlaze I and II products were not appropriate for industrial use.

> Industrial processes require a certain amount of consistency in the materials used due to the automated equipment employed and the speed of processing. The InstantGlaze products were not consistent batch to batch nor some times even drum to drum. The inconsistency in the InstantGlaze products was verified in the laboratory. Samples were found to be inconsistent within a drum based on FTIR analysis, and Shore A hardness values varied widely from 21.3 to 67.3 compared to a reported typical value of 60. This inconsistency in the InstantGlaze products then resulted in the loss of window manufacturing efficiency due to the need for constant manual adjustments in the processing line such as temperature changes in the product application, larger or smaller beads to be applied, head location changes, nozzle adjustments, and nozzle temperature adjustments. In turn, these adjustments lead to more material costs, equipment costs, and testing costs. Needless to say, optimum window and door products were not being produced while these adjustments to the process were being made which lead to testing failures and field failures.

Dow Corning claims that they manufactured to sales specifications. The sales specifications however only included two properties: appearance and plasticity. Appearance indicated that the product was clear. Plasticity values, a measure of stiffness, were defined as a range from 0.85 to 1.25 for InstantGlaze I. This range was proposed by Dow Corning even though Weather Shield wanted a more narrow range of 0.94 to 1.06 which was beyond Dow Coming's capabilities. The plasticity range suggested by Dow Corning was very broad was mostly achieved by lot selection, or even drum selection. These sales specifications were not provided to Weather Shield early on so as to guide their selection and evaluation process but were provided more recently after issues were found. Even then, many lots of InstantGlaze only had an appearance value listed under their sales specification sheet with no plasticity value. Usually plasticity values were only supplied when requested by Weather Shield.

> In the beginning Weather Shield was provided only typical properties which stipulated among other properties green strength and Shore A hardness. The required green strength was not achieved and the Shore A hardness was variable. Again inconsistency in the InstantGlaze materials resulted in properties far removed from the typical properties.

> The industrial manufacturing of windows and doors requires a tight range of tolerances on component properties such as glazing properties, especially on those properties such as plasticity that directly affect processing. It is not possible to maintain tight processing control in window manufacturing, as most quality systems require, when a component such as the glazing material has such variability within itself. It is a frustrating and expensive experience to constantly make process adjustments to accommodate such a component. Therefore, InstantGlaze I and II do not fit the requirement for industrial materials.

2. Variability in the plasticity of the InstantGlaze I and II products resulted in non-uniform and inconsistent bead application leading to field failures.

> ***3** (a) Application of a thick bead resulted in too little squeeze out.

> When the glaze was too stiff (low plasticity), it

would not penetrate into corners leaving voids. Also, the thick glaze resulted in a thick bead being applied. The thick bead did not allow the window glass to squeeze out enough glaze leaving the glass too high in the frame. Also, grills used to simulate divided glass (SDLs) were too high in the window frame and would not fit properly. These issued then had to be corrected manually.

(b) Application of a thin bead resulted in too much squeeze out.

When the glaze was too thin (high plasticity), the glaze bead would squeeze out and not support the window glass leading to and the use of glazing shims to support the glass. Also, the thin glaze bead allowed window glass to sink in too far and then the SDLs were too low and would not fit properly. Corrections had to be made manually. Sometimes the SDLs would pop off in the field.

3. InstantGlaze I and II failed to completely harden which lead to field failures and increased liability of leaky windows into the future.

A failed window recovered from the field indicated voids near corners and a drip along two edges. The defective window was shipped, sold, installed, and then failed in the field after relatively short period of time. Laboratory testing on this defective window determined that the glazing was still tacky and appeared uncured. These observations further illustrate the Weather Shield complaint that the InstantGlaze never really cures. The concern is that there might be many more such windows still in the field.

CONCLUSION

Within a reasonable degree of scientific certainty, it appears that the InstantGlaze products were not suitable as industrial products due to wide variability in plasticity (stiffness) and lack of cure.
Def.s' Resp. to Pl.'s Mot. To Exclude Expert Ex. 14.

**III**

The standard for the admissibility of expert testimony is set forth in the Federal Rules of Evidence. *Saginaw Chippewa Indian Tribe of Mich. v. Granholm,* 690 F.Supp.2d 622, 634 (E.D.Mich.2010). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of a opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witnesses apply the principles and methods reliably to the facts of the case.

The trial judge has a "gatekeeping" role with respect to expert testimony, not only for testimony based on scientific knowledge, but also for testimony based on technical and other specialized knowledge. *Kuhmo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The proponent of the testimony must establish its admissibility by a preponderance of proof. *Daubert,* 509 U.S. at 592 n. 10. An expert's opinion must be supported by "more than subjective belief and unsupported speculation" and should be supported by "good grounds," based on what is known. *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800–01 (6th Cir.2000) (citations omitted). The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. *Id.* An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. *Id.*

***4** No matter which guidelines or factors are applied, "the key question remains the same: Does the expert possess 'special knowledge' that will aid the trier of fact in determining a fact in issue, and is the proposed testimony the product of sufficient research that was conducted pursuant to reliable methods?" *Saginaw Chippewa Indian Tribe of Michigan,* 690 F.Supp.2d at 635. Determination of the initial qualifications of an expert to provide testimony is within the discretion of the district court. *Mannino v. Int'l Mfg. Co.,* 650 F.2d 846, 849 (6th Cir.1981). "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determinations." *Kumho Tire Co., Ltd., et al. v. Carmichael et al.,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143

L.Ed.2d 238 (citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

## IV

Dow Corning argues that Dr. Willard and his opinions do not satisfy *Daubert* and, as a result, his testimony, report, and opinions should be excluded. As a threshold examination, a court must inquire whether a proposed expert is qualified to render an opinion. *Isely v. Capuchin Province,* 877 F.Supp. 1055, 1063 (E.D.Mich.1995) (stating that qualification of witness by virtue of education and training is the "initial foundational requirement"). Merely proffering a qualified expert is not enough. Once the proposed expert has satisfied the foundational threshold of establishing personal background qualifications as an expert, the expert must then "provide further foundation testimony as to the validity and reliability of his theories." *Berry v. Crown Equip. Corp.,* 108 F.Supp.2d 743,749 (E.D.Mich.2000).

The expert opinion testimony must be reliable and relevant. *Cook v. Am. S.S. Co.,* 53 F.3d 733, 737–38 (6th Cir.1995), *abrogated on other grounds by G.E. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Berry,* 108 F.Supp.2d at 749. In order to be deemed reliable, the testimony must be offered by someone qualified by virtue of "knowledge, skill, experience, training, or education," and must relate to "scientific, technical, or other specialized knowledge." F.R.E. 702; *Cook,* 53 F.2d at 738. Even opinion testimony based on valid scientific or technical knowledge offered by a bona fide expert is still not admissible unless such evidence will "assist the trier of fact." F.R.E. 702; *Cook,* 53 F.3d at 738.

### A

Federal Rule of Evidence 702 admits expert testimony if the evidence will assist the trier of fact, and if the witness is qualified as an expert. *Glaser v. Thompson Med. Co., Inc.,* 32 F.3d 969, 971 (6th Cir.1994). It is the trial court's responsibility under Federal Rule of Evidence 104(a) to make a preliminary finding of fact as to "whether the witness' 'knowledge, skill, experience, training or education' are such as to qualify him or her to testify as an expert at all." *Cook,* 53 F.3d at 738 (citation omitted). The gatekeeping function mandates "intensive scrutiny" of expert qualifications in addition to scrutiny of proposed scientific theories. *Rice v. Cincinnati, New Orleans & Pac. Ry. Co.,* 920 F.Supp. 732, 736–37 (E.D.Ky.1996). The trial court must determine whether the expert's training and qualifications relate to the subject matter of the proposed testimony. *Smelser v. Norfolk S. Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997), *abrogated on other grounds by G.E. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Berry,* 108 F.Supp.2d at 749. The court is to examine "not the qualifications of the witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser,* 105 F.3d at 303; *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994). A proper foundation for a technical expert demonstrates "firsthand familiarity" with the subject of the testimony. *Berry,* 25 F.3d at 1350.

***5** Dow Corning argues that Dr. Willard does not have the requisite experience to qualify as an expert. Specifically, Dow Corning contends that he lacks "firsthand familiarity" with the use of hotmelt silicone sealants in the manufacture of windows and doors, nor does he have "firsthand familiarity" with the use of hot-melt silicone sealants in the manufacture of any other product. Dow Corning notes that Dr. Willard does not have any education relating to silicone chemistry, nor any education relating specifically to sealants and adhesives, and he does not consider himself an expert in silicone chemistry. Pl.'s Mot. to Exclude Expert Ex. C. In its reply, Dow Corning also asserts that Dr. Willard being a SIX SIGMA trainer is irrelevant here because that training is not related to the window manufacturing industry.

Dow Corning further asserts that Dr. Willard's work experience is unhelpful. Dr. Willard does not have experience at any company using hot-melt adhesives or sealants, silicone-based or otherwise, in window manufacturing applications. He has not authored any publications or articles, received any patents, or any awards relating to sealants and adhesives in a window manufacturing application. His only testimony regarding window failures allegedly was not related to the issues in the instant case. He also has not participated in or observed the manufacture of a window or door with one exception twenty years ago and has not used InstantGlaze in the manufacture of a window or door.

Dow Corning also notes that Dr. Willard is unfamiliar with the American Architectural Manufacturers Association ("AAMA"), a group of window

manufacturers and various other entities that prescribe a set of specifications for materials used in window manufacturing. Dr. Willard is also unfamiliar with whether others in the window manufacturing business use InstantGlaze and admitted that he has no firsthand knowledge of the effect that a given range of plasticity may have on the window manufacturing process. Dow Corning asserts that Dr. Willard is not an industry expert and falls far short of possessing a "firsthand familiarity" with InstantGlaze and its use in the industry. Dow Corning contends that because of this, and based on Dr. Willard's own deposition testimony, Dr. Willard does not possess the requisite knowledge, skill, experience, training, or education to render expert opinions regarding InstantGlaze.

Weather Shield responds that Dr. Willard does, however, have an understanding regarding how windows and doors are manufactured, having researched the issue in connection with both litigation and on behalf of a former employer. Willard Dep. 60, 77–78, June 4, 2010. Dr. Willard has also worked with silicone based products throughout his career. Willard Dep. 72–75. Weather Shield asserts that the absence of published works relating specifically to hot-melt silicones and the application of such sealants to windows and doors does not preclude Dr. Willard from testifying, *e.g., In re Noecker,* 472 Mich. 1, 691 N.W.2d 440 (2005), because his qualifications have to be measured in light of whether they qualify him to answer the specific questions at hand, *Smelser,* 105 F.3 d at 303 (6th Cir.1997); *see also Kumho Tire Co.,* 526 U.S. at 156 ("The trial court ha[s] to decide whether this particular expert [h]as sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.").

***6** In this case, Dr. Willard will be called as an expert witness to testify that the variability of the plasticity in the InstantGlaze supplied by Dow Corning rendered it unfit for industrial use which Weather Shield will then argue served to breach Dow Corning's express warranty. Weather Shield asserts that Dr. Willard does not have to establish the chemical reasons for the variation of the Dow Corning product—which Weather Shield submits would be impossible because Dow Corning's has declined to share any information regarding the properties of the product—but only that the variability itself fell outside an acceptable range of variation thus being unsuitable for industrial use which Weather Shield asserts violates Dow Corning's warranty. Dr. Willard is an expert in all phases of plastics including testing, processing and formulation, Willard Dep.70, and, by virtue of his wide background in materials and long experience in the polymer industry, is well familiar with acceptable variations in products, Willard Dep. 95–96. Furthermore, by virtue of his experience as a SIX SIGMA trainer, Weather Shield contends that he is competent to testify that the variations in the Dow products are outside the acceptable range.

Weather Shield notes that Dow Corning's own expert, Jeffrey Jansen of Stork Technimet, Inc., is unfamiliar with hotmelt silicone sealants, Jansen Dep. 10, has not observed windows and doors being manufactured, Jansen Dep. 9, and likewise does not consider himself to be an expert in silicone chemistry, Jansen Dep. 13. Mr. Jansen admits that one need not be an expert in silicone chemistry to do the tests performed by both he and Dr. Willard. Jansen Dep.12–13. Dow Corning refutes this in its reply, stating that Jansen does not offer opinions beyond his area of expertise. Dow Corning also notes that in his deposition, Mr. Jansen stated that in order to render an opinion of the suitability for use of InstantGlaze, one should have some expertise in the manufacturing of windows and doors and have an expertise in silicones, which Dr. Willard does not.

With respect to plasticity Weather Shield contends that Dr. Willard has sufficient education and training in material properties to support his opinions. Willard Dep. 71. Despite Dow's assertion to the contrary, Dr. Willard knows details of plasticity as demonstrated in his deposition. Materials with a low plasticity will compress more readily and have a lower green strength. Willard Dep. 124–27. Dow Corning's employee concurs. Gordon Dep. 24–25; Rubis Dep. 24. Material with a higher plasticity has a better green strength but is thicker (stiffer) and will not compress as much. Willard Dep. 125, 139. Dow Corning's employee concurs. Rubis Dep. 24. Weather Shield contends that Dr. Willard's mistake in his report and deposition in calling the stiff material "low plasticity" and the soft material "high plasticity" does not impact the fact he knows the material properties and how they impacted Weather Shield's production of windows and doors. The "stiff" materials did not flow as well, left voids in the corners and resisted compression leading to less squeeze out, Willard Dep. 125, 138–139, and the "thinner" or "softer" materials flowed too readily and did not resist compression leading to too much "wet out" and the glass not being supported by the material, Willard Dep. 124–127. As a result, Weather Shield asserts that Dr. Willard has a sufficient background to assist the jury in understanding the issues.

**B**

**1**

***7** Dow Corning contends that even if Dr. Willard is preliminarily qualified by education or experience to render expert opinions in this case, Weather Shield cannot satisfy its burden of demonstrating that Dr. Willard's testimony is reliable. Reliability has been described as the "First and universal requirement" for the admissibility of expert opinion evidence. *Cook,* 53 F.3d at 737. In assessing reliability, the trial court must focus on the soundness of the expert's methodology." *Smelser,* 105 F.3d at 303.

First, Dow Corning alleges that although Dr. Willard's opinions relate to InstantGlaze I and II, he did not test or even view these products but instead tested InstantGlaze WS, the lot-selected InstantGlaze agreed upon by the parties. Pl.'s Mot. to Exclude Expert Exs. C, M. Dow Corning contends this makes Dr. Willard's methodology wholly unreliable.

Second, Dow Corning contends that Dr. Willard did not conduct a plasticity test, claiming he could not do so because it was an internal Dow Corning test and he did not have any wet samples. Dr. Willard allegedly testified, however, that if he had new material as a control with a stated plasticity value, he could have adjusted conditions in his lab until he obtained the stated value and from there could analyze the samples provided by Weather Shield. Dow Corning alleges that it offered to provide sealant samples for Dr. Willard to conduct any tests he believed relevant, but Dr. Willard instead elected not to test for plasticity even though it is Weather Shield's chief complaint. Dow Corning contends that this too reflects a poor methodology.

Third, Dow Corning emphasizes that Dr. Willard acknowledged that his test results may not be representative of the InstantGlaze actually used by Weather Shield. Dr. Willard allegedly confirmed with Weather Shield's counsel that he was given barrels that were set aside because the product did not work. Pl.'s Mot. to Exclude Expert Ex. C. Dr. Willard found it unnecessary to test new samples because it would not demonstrate what was occurring during the relevant time frame. *Id.* Dow Corning asserts that this logic renders all of Dr. Willard's testing irrelevant and calls into question the validity of his conclusions. Dr. Willard allegedly concedes that he has no way of knowing whether the testing data in his report from the three "bad" barrels is indicative of testing data that he would have obtained had he tested every other barrel of InstantGlaze that Weather Shield used. *Id.* Furthermore, Dr. Willard agreed that it is possible that the three barrels were so "bad" that none of the other barrels used would have the same testing characteristics. *Id.*

Fourth, Dow Corning challenges Dr. Willard's method for extracting test samples. According to Dow Corning, Dr. Willard wants to typically test from the top, middle and bottom of the barrel. When picking up a barrel and pouring something out of it, the material will "slosh around" and potentially destroy any layers. To avoid this, Dr. Willard instructed Weather Shield to introduce a piece of electrical conduit into each barrel. If done properly, the material at the top of the barrel should push to the top of the conduit, with the middle and bottom layers being reflective of the respective areas of the barrel. Dr. Willard concedes that this sampling method is "not a perfect science." *Id.* Moreover, Weather Shield could only extract sampling from the barrel containing 1199 product because the InstantGlaze material in the other two barrels were too hard and would not flow into the conduit. Dr Willard thought that the samples may have collected on the outside of the conduit and Weather Shield probably left it there, and pulled the conduit out as fast as possible. Dr. Willard concedes this modified sampling was even less than perfect. *Id.*

***8** Dr. Willard allegedly noted that one would expect the Shore A hardness value to be higher on the samples taken from the top of the drum because InstantGlaze is a moisture-cure product and the top of the barrel would be exposed to more moisture. Dow Corning alleges that, despite obtaining inverted testing values, Dr. Willard still did not find anything wrong with his product samplings. Furthermore, Dr. Willard did not know how the barrels were being stored but did acknowledge that the samples he tested were likely out of shelf life. Dr. Willard allegedly did not believe that expired material would impact his Shore A hardness testing, but it may have impacted the FTIR analysis.

Fifth, Dr. Willard conducted a test to determine the degree of cure but realized after the test that he could not utilize the data for cure purposes because he is not an expert in silicone chemistry, but instead could only deduce that there was some contamination in the window from Houston. Dow Corning alleges that even then, Dr. Willard did not know what effect, if any, the contamination may have had. Although Dr. Willard noted that there appeared to be differences in the FTIR/ATR data, he could not opine as to whether such purported differences were significant and could not opine what impact, if any, such differences may cause. Despite this,

Dow Corning asserts that Dr. Willard relied on the FTIR analysis in opining that the InstantGlaze products were not consistent from batch to batch.

Sixth, Dow Corning asserts that Dr. Willard searched for the wrong answers. Dr. Willard's lab determined that the 1199 sample contained tin and that the InstantGlaze samples did not. According to Dr. Willard, the lack of tin may explain why the InstantGlaze on the Houston window did not harden. Pl.'s Mot. to Exclude Expert Ex. C. However, Dow Corning uses a titanium catalyst in InstantGlaze as opposed to tin but because Dr. Willard misunderstood the product and did an improper comparison to 1199 product, he searched for something that wasn't there. Dow Corning contends this further demonstrates the flaws in Dr. Willard's testing methodology.

Seventh, Dow Corning asserts that Dr. Willard offered no opinions regarding 1199 product but included a low number for 1199 when comparing the InstantGlaze range of Shore A hardness values. Dr. Willard admitted in his deposition that this was a mistake. Dow Corning contends this shows Dr. Willard admitting that his testing methodology was unsound.

Eighth, Dow Corning contends that Dr. Willard's opinions are speculative. In relying on the Houston window, Dr. Willard opined that inconsistency in the InstantGlaze led to the need for constant manual adjustments to the processing line, leading to testing and field failures. Dr. Willard allegedly admitted, however, that he does not know the history of that particular window so he cannot definitively correlate the adjustments being made to a field failure.

Finally, Dow Corning alleges that Dr. Willard did not independently verify or investigate the facts and issues. Dr. Willard did not talk to anyone at Weather Shield other than in-house and outside counsel, resulting in his knowledge of the underlying facts of the instant case coming only from counsel. He also only read one Weather Shield deposition and was not provided copies of the two Dow fact depositions. Dr. Willard chose to rely only on documents selected by Weather Shield's counsel.

***9** Furthermore, Dow Corning alleges that Dr. Willard did not personally observe any issues that Weather Shield complained about relating to InstantGlaze. Dr. Willard has never been to the Weather Shield facilities and has never seen application of InstantGlaze in Weather Shield's manufacturing process. Because of this, Dr. Willard cannot rule out other causes for Weather Shield's alleged problems that may not be related to InstantGlaze's plasticity, such as equipment problems or operator errors. Dr. Willard also did not confirm the capabilities of the operators, but instead assumed Weather Shield's operators were well-trained.

Dr. Willard also acknowledged that insufficient bead size could lead to failure but did not investigate the amount of bead used by Weather Shield. He also did not compare the alleged material, equipment and testing costs incurred by Weather Shield with the cost-savings of using InstantGlaze. For the reasons stated above, Dow Corning argues that it is impermissible and unfair to permit Dr. Willard, without independent verification and investigation, to simply report Weather Shield's claims under the cloak of being an expert. Dow Corning asserts that Dr. Willard's testing methodology is suspect and has "gaping holes." In its reply, Dow Corning notes that Weather Shield's arguments, provided below, address application of the procedures and the accuracy of results whereas Dow Corning is challenging the actual testing methodology itself. Because Dr. Willard's methodology fails to demonstrate the soundness required of an expert, Dow contends that his opinions should be excluded.

**2.**

Weather Shield asserts that, pursuant to Federal Rule of Evidence 703, an expert can rely upon data from a variety of sources in rendering an expert opinion. Specifically, the rule provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible should not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Weather Shield asserts that Dr. Willard obtained the information upon which he bases his opinions from a variety of sources including documents supplied by counsel, documents exchanged during discovery, tests he

performed, deposition transcripts and the pleadings filed by the parties. Def.s' Resp. to Pl.'s Mot. to Exclude Expert Ex. 14. Weather Shield alleges that Dr. Willard's background information related to the case is several inches thick. Accordingly, Dr. Willard had ample information from key participants in the manufacturing process to understand not only the specific problems encountered by Weather Shield in the manufacturing process, but Dow Corning's response to Weather Shield's complaints. While Dow Corning asserts that Dr. Willard was required to independently verify or investigate the facts and issues, Weather Shield alleges that is not required by Federal Rule of Evidence 703 and Dow Corning advances no authority to the contrary. Weakness in the factual basis of an expert witness' opinion simply bears on the weight of the evidence, not its admissibility. *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993); *see also* *Pretzer v. Otto Bock Healthcare,* 2010 WL 726953 (E.D.Mich.2010). In fact, many experts render opinions based solely upon hypotheticals presented by counsel, a practice recognized under the rule. *See* F.R.E. 703 1972 Advisory Committee Notes. Weather Shield contends Dr. Willard did far more than that which is evidenced by his extensive file and by his analysis of the facts. Consequently, Dow Corning's assertion that Dr. Willard could or should have done more than he did is nothing but a jury argument about the weight of the evidence. Weather Shield contends that Dow Corning may thus challenge any shortcomings in cross examination but it is not a basis upon which to preclude Dr. Willard from testifying.

***10** Dow Corning also argues that Dr. Willard's testimony should be precluded on the basis that it is not based on reliable principals or methods. Arguments about "the specific application of the procedure used or questions about the accuracy of the test results do not render the scientific theory and methodology invalid or destroy their general acceptance. These questions go to the weight of the evidence, not the admissibility." *United States v. Bonds,* 12 F.3d 540, 563 (6th Cir.1993) (citing *Daubert,* 509 U .S. at 594–95; *Quiet Tech, DC–8, Inc. v. Hurel–Dubois U.K. Ltd.,* 326 F.3d 1333, 1343 (11th Cir.2003). Weather Shield contends that an examination of the facts reveals that Dr. Willard's test methods and procedures were reliable.

Dr. Willard was initially retained to test InstantGlaze material of the vintage utilized by Weather Shield in the manufacturing process to determine whether the InstantGlaze met Dow Corning's published specification. Willard Dep. 21. Dr. Willard allegedly encountered a number of road blocks, some of which were purportedly erected by Dow Corning and some of which were the result of the passage of time, which interfered with the task.

First, it was discovered that the InstantGlaze product had a shelf life of apparently one year making any testing of 2006 and 2007 vintage InstantGlaze problematic because it could be expected that the product had chemically changed. Block Dep. 92; Willard Dep. 36. Second, it was determined that neither party had unopened samples of 2006 and 2007 InstantGlaze so that it could be tested in whatever stage of cure existed with respect to the out of date product. Willard Dep. 55. Third, even if materials existed that were not out of shelf life and were not opened, it would reveal nothing about the make up of the product so that Dr. Willard could compare the product that did exist against the Dow Corning "recipe" for the product to determine if it met its own specifications.[2] Willard Dep. 23, 52–54. Fourth, Dow took the position that the only relevant characteristics of its product were its appearance and its plasticity as set forth in its product certification analysis. Willard Dep. 52–55. Dr. Willard then determined that because Dow Corning used its own corporate test method (as opposed to the standard ASTM test) to determine plasticity, and given the fact there were no appropriate samples from the 2006 and 2007 timeframe, it was impossible for him to do testing to determine whether the product fell within the plasticity range at the time it was being used by Weather Shield. (Willard Dep. 35). Weather Shield asserts that given the fact that Dow Corning itself admitted there to be a range in the plasticity of the materials, thus rendering unnecessary any testing to prove as a fact that there was a range of plasticity in the materials, Dr. Willard undertook instead to determine whether there were variations between the samples of the stored material and the InstantGlaze used to assemble windows that had been removed from homes by Weather Shield. The windows had been removed because the InstantGlaze had run out onto the glass prompting complaints by the homeowners. Dr. Willard also determined to test the samples from the two barrels of InstantGlaze that had been retained by Weather Shield in order to determine whether in addition to differences between the barrels and the tested windows, there were also differences in the barrels themselves which would compound the variation in the plasticity range that Dow Corning admitted was inherent from batch to batch in its manufacturing process.

***11** The tests performed by Dr. Willard included fourier transform infrared spectroscopy (FTIR) attenuated total reflections (ATR), modulated differential scanning calorimetry (MDSC), inductively coupled plasma (ICP), pyrolysis gc (MS), and Shore A hardness tests. The FTIR/ATR tests utilize light as a means of identifying

materials. Lipp Dep. 9. These tests are routinely performed by Dow Corning employees, Lipp Dep. 7–9, as well as Dow Corning's outside expert, Jeffrey Jansen. They are well recognized in the industry. Both Dow Corning's employee and Jeffrey Jansen agree that Dr. Willard properly acknowledged that silicone is a component of InstantGlaze. Lipp Dep. 31. While Dow Corning's employee criticized Dr. Willard's specific testing techniques due to his failure to eliminate stray light, Lipp Dep. 35, he did concede that Dr. Willard made the correct decision in determining that the material under investigation did include silicone, Lipp Dep. 39, 48, 54. Mr. Lipp also agreed with Dr. Willard's conclusion that the samples of InstantGlaze that had run onto the window glass demonstrated some problems not found in the drum samples taken from Weather Shield. Lipp Dep. 49. Specifically, Mr. Lipp concluded that there was some form of saturated hydrocarbon in some of the samples. Lipp Dep. 49, 55. Another Dow Corning employee, Glenn Gordon, testified that saturated hydrocarbons include solvents such as methanol, isopropyl alcohol, toluene and butanol. Gordon Dep. 55. Given the concurrence of Dow Corning's own employees with Dr. Willard's conclusions, Weather Shield contends that Dow Corning cannot argue that Dr. Willard's test methods were inappropriate or unreliable.

Weather Shield also argues that Dow Corning is trying to "have its cake and eat it too." First, Dow Corning refused to provide Dr. Willard—and even its own expert—any information regarding the chemical composition of InstantGlaze. Willard Dep. 3, 52–54; Jansen Dep. 29–30. Consequently, Dr. Willard performed tests to determine some of the chemical elements of the InstantGlaze. He identified tin in a sample of the 1199 Dow Corning product and knew from his own experiences that it may be used as a catalyst in the curing process. He then tested the InstantGlaze that had dripped onto the glass for the presence of tin and, finding none, concluded that the absence of tin could be an explanation for the InstantGlaze having dropped onto the glass. Def.s' Resp. to Pl.'s Mot. to Exclude Expert Ex. 14; Willard Dep. 158–165. Weather Shield argues that Dr. Willard cannot be faulted for finding a potential explanation for the difference in performance and then taking steps to rule it in or rule it out. If, in fact, titanium was used by Dow Corning as the catalyst, Block Dep. 97, then Dow Corning has an explanation that would refute any conclusions Dr. Willard reached regarding the absence of tin. However, Weather Shield argues that this does not undermine the validity of the process he used to find an explanation.

***12** Shore A hardness is a measurement of the hardness of the material at full cure. Rubis Dep. 43, 65–67. If Shore A hardness varies from sample to sample by more than an expected amount, the variance is due to a difference in the materials tested. Willard Dep. 106. Since Dr. Willard had no other material to test, Weather Shield contends that he cannot be criticized for testing what was available to him. Dow Corning asked its own expert to evaluate Shore A hardness and the Dow Corning employees who testified admit that Shore A hardness is an appropriate test to determine characteristics of the material. Rubis Dep. 43, 65–67. Shore A hardness is also utilized as one of the typical properties of the InstantGlaze material for consideration by users of the material. Def.s' Resp. to Pl.'s Mot. to Exclude Expert Exs. 1 and 2. Weather Shield asserts that the criticism regarding the samples used goes to the weight to be afforded to Dr. Willard's conclusions regarding Shore A hardness and not whether such testing was appropriate or admissible. *United States v. Bonds, supra.*

Dow Corning also criticizes Dr. Willard's testing or samples that had been set aside because the materials did not work. Willard Dep. 35. Since Weather Shield's complaint relates to the fact the material was variable with some materials working within acceptable tolerances and some not, Weather Shield argues that there was nothing wrong with testing the materials that did not work in an effort to determine what was deficient with them.

Finally, Weather Shield contends that Dr. Willard's testimony, report and opinions are admissible because Dr. Willard has applied the principles and methods reliably to the facts of the case. As set forth above, Dr. Willard performed the same type of testing and analysis as routinely performed by Dow Corning's own internal staff and as performed by Dow Corning's outside expert. While some of his tests may not have been performed with the specific protocols utilized by Dow Corning's experts, they nevertheless produced results with which the Dow Corning experts concurred showing reliable application of the principles and methods utilized by Dr. Willard.

Weather Shield's notes that the task in this case is to show that the products supplied breached Dow Corning's express representations concerning the commercial application of its product. As noted above, Weather Shield plans to do so through, among other things, utilization of Dow Corning's own product literature and information demonstrating the variation in plasticity from batch to batch of the InstantGlaze material. Dr. Willard is able to testify as an expert that the variation itself was the product feature that caused a breach of the express warranty. Weather Shield alleges that it is not required to demonstrate the specific chemistry explanation for the

variation from batch to batch of the InstantGlaze material. Weather Shield asserts that this is particularly true where, as is the case here, Dow Corning has allegedly refused to give Weather Shield any information regarding the product formula or how InstantGlaze is made. Weather Shield contends that it is apparent that Dow Corning itself cannot explain why there are variations in plasticity from batch to batch otherwise they would have been more successful in controlling the variation.

### C

***13** Expert testimony is admissible only if it will assist the trier of fact. F.R.E. 702. Courts have framed the inquiry as "whether expert testimony improperly addresses matters within the understanding or common knowledge of the average juror or invades the province of the jury." *United States v. Thomas,* 74 F.3d 676, 684 n. 6 (6th Cir.1996), *abrogated on other grounds by G.E. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). As stated by the court in *Berry,* "[i]f everyone knows [something], then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " 25 F.3d at 1350 (citation omitted).

Dow Corning contends that Dr. Willard's testimony cannot be considered expert testimony because his opinions are premised on limited facts from documents provided by Weather Shield's counsel. Furthermore, Dr. Willard did not verify facts, speak directly with Weather Shield employees who used InstantGlaze and did not fully investigate the Houston residence that provided the sample. He also has no knowledge of InstantGlaze other than the tests he performed for the instant case, which provided inconclusive results, and has not investigated the industry's use of InstantGlaze.

Additionally, although Dr. Willard criticizes the variability in plasticity, Dow Corning asserts that he has no firsthand knowledge of the effect a given range of plasticity may have on the manufacturing process but instead he said he could "only rely on the information that was provided to him." Pl.'s Mot. to Exclude Expert Ex. C. Dr. Willard conceded that expert testimony is not needed to support his opinion about the failure of the Houston window to fully cure. Dr. Willard only demonstrated that there was something wrong with the window and he agreed that anyone could examine the window and realize something was wrong. If expert testimony will not be of any assistance, as Dow Corning contends it would not be here, the jury should be permitted to reach its own conclusions.

Weather Shield disagrees. In its claim against Dow Corning, Weather Shield alleges that Dow Corning breached its warranty to Weather Shield by furnishing InstantGlaze that was not commercially useable by Weather Shield. Weather Shield asserts that it intends to prove this breach of warranty in two ways. First, Weather Shield intends to present the testimony of its manufacturing personnel who will explain the problems encountered by Weather Shield with the use of the InstantGlaze product. This will involve the testimony of several individuals and the introduction of numerous documents that will establish the ongoing problems encountered by Weather Shield in its efforts to use the InstantGlaze product. Second, Weather Shield intends to present the testimony of Dr. Willard to establish that its problems in the manufacturing process were the result of variations in the plasticity of the InstantGlaze material and that these variations were beyond those that could be reasonably expected in connection with an industrial product.

***14** Based on Dr. Willard's onion provided above, Weather Shield contends that the information from Dr. Willard will assist the jury as the trier of fact to understand the basis of Weather Shield's breach of contract claim so as to determine whether the contract was breached by Dow Corning. Accordingly, this element of Federal Rule of Evidence 702 will be met by the presentation of Dr. Willard's testimony.

## V

Dow Corning has not demonstrated that Dr. Willard is unqualified to offer expert testimony about the problems in the manufacturing process presented by the variations in plasticity of the InstantGlaze material, or that the opinions Dr. Willard intends to provide are irrelevant or unreliable. More importantly, Dr. Willard's opinions, while clearly subject to challenge in some respects, are reasonably reliable and will be helpful in determining the ultimate issue in this case. The concerns Dow Corning raises with Dr. Willard's testimony is most properly addressed by challenging the weight of Dr. Willard's testimony as evidence at trial. Consequently, Dr. Willard's opinions are admissible under Federal Rule of Evidence 702, and should be considered and weighed

appropriately.

**VI**

Accordingly, Plaintiff's motion to exclude the testimony, report, and opinions of Dr. Fred G. Willard [Dkt. # 22] is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2490962

Footnotes

1 SIX SIGMA seeks to improve the quality of process outputs by identifying and removing the causes of defects (errors) and minimizing variability in manufacturing and business processes. Notably, Dow Corning utilized SIX SIGMA in its efforts to control the variability of the plasticity of the InstantGlaze materials and had conducted internal "brainstorming" sessions to reduce the variability of the plasticity of the InstantGlaze so that its customers could "reliably repeatably use it in their plants" (Block Dep. 52:1–25, June 9, 2010) which was something that all manufacturers hope to achieve (*Id.*).

2 Dow Corning notes in its reply that discussion of its "recipe" is not at issue and is thus a red herring.

End of Document © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4484001
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Northern Division.

Lowren DOW, Plaintiff,
v.
RHEEM MANUFACTURING COMPANY, Robertshaw Controls Company, Invensys Control Systems, Defendants,
Michigan Farm Bureau General Insurance, Plaintiff,
v.
Rheem Manufacturing Company, Robertshaw Controls Company, Invensys Control Systems, Defendants.
Lowren Dow, Plaintiff,
v.
Rheem Manufacturing Company, Robertshaw Controls Company, Invensys Control Systems, Defendants.

Nos. 09–13697–BC, 10–10753–BC, 11–10647–BC.
|
Sept. 26, 2011.

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT ALAN KASNER AND WILLIAM WOEHRLE, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING RHEEM'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DISMISSING DOW'S CLAIMS IN HIS SECOND ACTION WITH PREJUDICE, DENYING OTHER MOTIONS AS MOOT, AND DISMISSING CASES WITH PREJUDICE**

THOMAS L. LUDINGTON, District Judge.

***1** On September 17, 2009, Plaintiff Lowren Dow ("Dow") filed a complaint (09–13697 ECF. No. 1) invoking the Court's diversity jurisdiction, alleging claims based on products liability, negligence, gross negligence, willful disregard, and breach of implied and expressed warranties against Defendants Rheem Manufacturing Company ("Rheem"), Robertshaw Controls Company ("Robertshaw") and Invensys Control Systems ("Invensys Controls") (collectively, "Defendants").[1] Dow's claims arise from an explosion that occurred on July 16, 2007, as a result of an alleged faulty water heater that he also alleges was designed, manufactured, sold, and supplied by Rheem, and equipped with a control valve manufactured by Robertshaw. Dow alleges that the control valve had a defective pilot safety, which is intended to shut off gas to the main burner of the unit if the pilot is extinguished. When Dow attempted to light the pilot, the residence exploded, causing burns over 98% of his body.

On February 23, 2010, approximately five months after Dow filed his complaint, Michigan Farm Bureau General Insurance ("Michigan Farm Bureau") filed a complaint (10–10753 ECF No. 1) against the same Defendants alleging similar claims. In contrast to Dow's personal injury action, however, Michigan Farm Bureau's subrogation action is brought to recover for property damage on behalf of its insured, William Harmon, Dow's grandfather, who was the owner of the residence where the water heater exploded. Michigan Farm Bureau seeks to recover $133,674.65.

On July 20, 2010, the Court granted in part Defendants' motion to consolidate and consolidated the cases through resolution of dispositive motions. On June 21, 2010, Plaintiffs filed a motion to compel production of valves for testing and examination. Plaintiffs sought to compel the production of the Robertshaw valve that allegedly caused the explosion in this case (the "*Dow* valve"), and a valve referred to as "the *Bispo* valve" that allegedly caused an explosion that is the subject of litigation in federal court in Oregon. In response, Defendants asserted that the *Dow* valve has continually been available to Plaintiffs, but they opposed Plaintiffs' proposed "destructive" testing of both valves and expressed concerns regarding whether the discovery in this case could be used in the *Bispo* case.

Between October 4, 2010 and December 27, 2010, twenty-eight motions were filed in case number 09–13697 and thirteen motions were filed in case number 10–10753. The Court requested that the parties meet and confer to consensually address as many pretrial issues as possible,

and further requested that both sides communicate any unresolved issues to the Court. Counsel for both parties subsequently informed the Court that they were unable to resolve any pending issues.

A hearing was held on June 3, 2011, and the parties' addressed Robertshaw's motion to exclude the testimony of Plaintiffs' designated experts William Woehrle (09–13697 ECF. No. 137; 10–10753 ECF No. 41), Alan Kasner (09–13697 ECF. No. 139; 10–10753 ECF No. 38), and Timothy Dunn (09–13697 ECF. No. 114; 10–10753 ECF No. 30), Robertshaw's motion to strike the expert reports of Gary Koch, William Woehrle, and Timothy Dunn (09–13697 ECF. No. 83; 10–10753 ECF No. 23), Rheem's motion for partial summary judgment (09–13697 ECF. No. 117; 10–10753 ECF No. 33), and Robertshaw's motion for summary judgment (09–13697 ECF. No. 139; 10–10753 ECF No. 43). For the reasons provided herein, Robertshaw's motions to exclude the testimony of Alan Kasner and William Woehrle will be granted, Rheem's motion for partial summary judgment will be granted, Robertshaw's motion for summary judgment will be granted in party and denied as moot in part, and the remaining pending motions will be denied as moot.

## I. Facts

***2** Dow rented the single-family residence at 2020 Cat Lake Road in Mayville, Michigan from his grandfather, William Harmon. Dow's girlfriend, Stephanie Brooks, lived at the residence as well. The homeowner's insurance policy identified Harmon as the insured.

The water heater at issue in this case was located in the basement of the residence. Harmon purchased the water heater on April 7, 2006 at Self Serve Lumber in Caro, Michigan. The water heater was a 40 gallon 34,000 BTU Richmond Integra propane fired water heater bearing Model No: 6G40–34PF and Serial No: RMLP10055–11946 and having a date code identifying it as manufactured in Mexico sometime in the month of October, 2005. The water heater was designed, manufactured, sold and supplied by Rheem and was originally equipped with a Robertshaw control valve Model No: 220RLPTSPC, bearing a manufacturing date code of 05–40 made sometime between October 9 and October 14, 2005 in Mexico for use in water heaters. On August 7, 2006, Rheem supplied Harmon with a replacement water heater control valve to replace the original control valve which was allegedly not working. The replacement control valve was a Robertshaw Model No: 220RLPTSP–C, made in Mexico, and bearing a manufacturing date code of 06–28 meaning that it was manufactured sometime between July 9th and July 15, 2006.

Dow arrived home after work on July 16, 2007 and noticed that he was unable to get hot water in the shower. He went to the basement to light the pilot light of the water heater which had extinguished. Upon attempting to light the pilot light, there was an explosion causing significant personal injury to Dow and damage to the residence.

When the explosion occurred on July 16, 2007, the sight glass covering the water heater's pilot light had been broken out. Defendants contend that the sight glass was broken in order for someone to use a butane lighter rather than the piezoelectric igniter attached to the gas control valve. The water heater had previously been connected to a large propane tank, but had been connected to a smaller tank in the yard as of the day of the explosion. The electric ignitor provided for igniting the pilot light was also not attached, but there was no physical evidence demonstrating that it became detached as a result of the explosion. Plaintiffs have not clarified certain facts of the case, which include who installed the water heater, who resided at the house, who called Rheem's customer service to inquire as to a replacement valve, how the water heater pilot light was re-lit, or which propane tank the water heater was connected to prior to the explosion.

## II. The Control Valve

The Robertshaw control valve at issue incorporates a spring loaded "safety magnet" located in the inlet chamber that is designed to stop the flow of gas in the event of a pilot outage. When the pilot is extinguished, the charge to an electromagnet is interrupted and the safety magnet closes. In the closed position, a nitrile rubber "seal" or "gasket" on the end of the safety magnet closes against an inlet opening, stopping the flow of gas through the opening. The rubber gasket is attached to the safety magnet with a metal retainer button. The outer diameter of the retainer button is greater than the inner diameter of the rubber gasket. The rubber gasket stretches over the retainer button and fits into a groove beneath it. In order for the gasket to dislodge during use, it would be necessary to apply a force to it that is greater than the

retaining force created by the button. In the instant case there was a leak in the Robertshaw gas control valve that occurred as a result of the rubber gasket dislodging from the safety magnet and lodging in the inlet opening, preventing the safety magnet from closing the inlet when there was a pilot outage. The contested issue at this juncture is whether there was a design or manufacturing defect that caused the rubber gasket to dislodge from the safety magnet or whether over-pressurization of the gas due to misuse of the gas regulator caused the rubber gasket to dislodge.

## III. Summary of Pending Motions

***3** There are currently thirty motions pending in *Dow v. Rheem et al.* and twelve motions in *Michigan Farm Bureau Insurance v. Rheem et al.* Robertshaw has filed five motions challenging Plaintiffs' experts' reports and testimony (09–13697 ECF Nos. 83, 121, 134, 137, 206; 10–10753 ECF Nos. 23, 36, 38, 41), one motion to dismiss (09–13697 ECF No. 132; 10–10753 ECF No. 37) and one motion for summary judgment (09–13697 ECF No. 139; 10–10753 ECF No. 43). Rheem has filed three motions challenging Plaintiffs' experts' reports and testimony (09–13697 ECF Nos. 87, 114, 115; 10–10753 ECF Nos. 24, 30, 31) and one motion for summary judgment (09–13697 ECF No. 117; 10–10753 ECF No. 33). Dow has filed five motions challenging Defendants' experts (09–13697 ECF Nos. 85, 122, 123, 124, 133) and seven motions for summary judgment (09–13697 ECF Nos. 125, 126, 127, 128, 129, 130, 131). The remaining pending motions are requests for leave to file multiple motions (09–13697 ECF No. 120), for leave to file joinder (09–13697 ECF No. 141), to allow filing of a late response (09–13697 ECF No. 173), to strike a reply brief (09–13697 ECF No. 179), for leave to file excess pages (09–13697 ECF Nos. 180, 190) and for leave to file supplemental briefing (09–13697 ECF No. 205; 10–10753 ECF No. 63). This opinion and order focuses on Robertshaw's motion to exclude the testimony of Alan Kasner (09–13697 ECF No. 134) and William Woehrle (09–13697 ECF No. 137), Robertshaw's motion for summary judgment (09–13697 ECF No. 139) and Rheem's motion for partial summary judgment (09–13697 ECF No. 117).[2]

## IV. Discussion

### A. Robertshaw's Motion to Exclude the Testimony of Alan Kasner

#### 1. Dr. Kasner's Opinion

Dr. Kasner has offered his opinion that the *Dow* valve developed a leak because the sealing gasket in the magnetic safety assembly jammed between the safety magnet assembly plunger and the body of the valve. Dr. Kasner contends that this failure was foreseeable, since gasket adhesion to mating surfaces is a known phenomenon. More specifically, he contends that the specifications for the gasket were inadequate given significant variations in nitrile polymer chemical structure, rubber formulation, and consequent part performance. The presence of three different formulations of gasket rubber and the discrepancy of the parts with the drawings provided demonstrated, in Dr. Kasner's opinion, that managerial control over the lower tier Orkli supplier by Robertshaw was inadequate. Dr. Kasner concluded that the Robertshaw control valve was defective because the manner in which the sealing gasket attached to the plunger of the magnet assembly. He further opined that the deficiency of the magnet assembly was a direct cause of the failure of the Robertshaw control valve, since gasket detachment allowed propane gas to leak out, accumulate in the absence of a burning pilot light, and cause an explosion upon ignition. Dr. Kasner concluded that the pre–1994 design of Robertshaw's magnet assembly, which incorporated crimping of the gasket in the safety magnet assembly plunger, is superior and would have prevented valve failure and the occurrence of the accident in this case.

#### 2. Dr. Kasner's Deposition

***4** At his deposition, Dr. Kasner conceded that he had not done any testing or analysis to measure the degree of adhesion between the rubber gasket and the metal seat or whether the adhesion, if any existed, was sufficient to dislodge the gasket. ECF No. 134 Ex. 4 at 14–15, 40. Dr. Kasner asserted that any testing done in this regard would be meaningless because one could not duplicate the exact

conditions because there are too many unknown variables to permit such testing, including temperature, duration of contact between the gasket and seat, the formulation of the nitrile rubber, the roughness of the metal comprising the seat, as well as other variables. *Id.* at 38.

Dr. Kasner instead relied on a known phenomena that he suggested could be tested according to an ASTM test method as the basis for his opinion that the rubber gasket may adhere to the metal seat. ECF No. 134 Ex. 5 at 17, 20; Ex. 4 at 16, 38–39. Dr. Kasner did not, however, perform the standardized ASTM test for adhesion of gasket materials to metal surfaces. ECF No. 134 Ex. 4 at 75–77. Moreover, in order for the rubber gasket to be dislodged by adhesion to the seat, the adhesion force acting on the top surface of the rubber gasket would have to overcome not only the retention force of the button retainer, but also the corresponding adhesion forces acting on the bottom of the rubber gasket which would resist dislodgement. *Id.* at 22. Dr. Kasner did not quantify the adhesion force on the back of the rubber gasket that would resist dislodgement. *Id.* at 19–21.

Dr. Kasner also contends that the molybdenum coating on the rubber gasket would tend to reduce the adhesion between the rubber gasket and the backing flange that would resist dislodgement. *Id.* There was also observable molybdenum present on the top surface of the gasket that contacted the seat. Dr. Kasner did some surface testing of the back of the rubber gasket, but did not do any quantitative testing on the critical top surface. *Id.* at 22. He instead surmised that the molybdenum was rubbed off to some degree by contact with the seat based on his visual approximation. *Id.* (noting that he would not want to call his visual observations an "estimate"). At his deposition, Dr. Kasner conceded that there was no physical evidence demonstrating that the rubber gasket stuck to the seat. *Id.* at 39–40

**3. Legal Standard**

Determinations on the admissibility of expert witness testimony are made pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In *Daubert,* the Supreme Court held that scientific evidence proffered by an expert must be "relevant to the task at hand" and must rest "on a reliable foundation." *Daubert,* 509 U.S. at 597; *see also Surles v. Greyhound Lines, Inc.,* 474 F.3d 288, 294 (6th Cir.2007) (interpreting *Daubert* ). The Supreme Court subsequently affirmed in *Kumho Tire* that *Daubert'* s principles apply more generally to all expert testimony admissible under Rule 702. *Kumho Tire,* 526 U.S. at 148; *see also Surles,* 474 F.2d at 294 (interpreting *Kumho Tire* ). The principles outlined in *Daubert* and *Kumho Tire* have since been incorporated into Rule 702, which now permits qualified experts to offer expert opinions where (l) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702; *see also Surles,* 474 F.3d at 294–95 (interpreting Fed.R.Evid. 702).

***5** " 'In short, under *Daubert* and its progeny, a party proffering expert testimony must show by a "preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469, 478 (6th Cir.2008) (quoting *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir.2000)). Thus, district courts play the role of "gatekeeper" whereby they must evaluate the relevance and reliability of proffered expert testimony with "heightened care." *Surles,* 474 F.3d at 295.

Federal Rule of Evidence 702 governs expert testimony based on "scientific, technical, or other specialized knowledge." Fed.R.Evid. 702. As the Supreme Court in *Daubert* noted, Rule 702 establishes a standard of "evidentiary reliability" or "trustworthiness." *Daubert,* 509 U.S. at 590 n. 9. District courts, therefore, must determine whether "the principles and methodology underlying the [proffered expert's) testimony itself are valid." *Pride,* 218 F.3d at 577. This reliability inquiry focuses "solely on the principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 594–95.

Expert testimony may not be based on mere speculation, *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800–01 (6th Cir.2000), and assumptions must be supported by evidence in the record. *See Sigler,* 532 F.3d at 481–82; see *also Rose v. Truck Ctrs., Inc.,* No. 09–3597, 2010 U.S.App. LEXIS 16396, at *17,2010 WL 3069613 (6th Cir. Aug. 6, 2010). Indeed, an expert's conclusions regarding causation must have an established factual basis and cannot be premised on mere supposition. *McLean,* 224 F.3d at 801.

Several factors are to be considered in determining

whether a proffered expert's testimony is reliable: (1) the testability of the expert's hypotheses, (2) whether the expert's methodology has been subjected to peer review and publication, (3) the known or potential rate of error with respect to the expert's methodology, and (4) whether the methodology is generally accepted in the scientific community. *Daubert,* 509 U.S. at 593–94. "[C]ourts interpreting *Daubert* have considered testability of the expert's theory to be the most important of the four factors, and this is especially true in cases involving allegations of defect in product design, as opposed to cases involving medical and pure scientific theories, which will be subjected to rigorous peer review." *Berry v. Crown Equip. Corp.,* 108 F.Supp.2d 743,754 (E.D.Mich.2000). Thus, where "the proffered expert has performed no reliable testing of his theory, courts, including the Sixth Circuit, have routinely precluded the witness from offering an expert opinion." *Id.*

**4. Dr. Kasner's Foundation for His Primary Opinion Regarding Causation**

Dr. Kasner's primary opinion is that the rubber gasket was dislodged as a result of adhering to the seat. Robertshaw does not challenge the foundation of Dr. Kasner's opinion based on his credentials in the fields of material and polymer science, but instead contends that his opinion should be excluded because it is not based on "scientific knowledge," and will not assist the trier of fact in understanding and addressing the relevant issues.

***6** As previously noted, Dr. Kasner conceded at his deposition that there is no physical evidence that the rubber gasket stuck to the metal seat. In the absence of such physical evidence, Dr. Kasner must have some other basis to support his opinion in order for it to be admissible. *See, e.g., Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221–22 (9th Cir.1995) (holding in a design defect product liability suit that plaintiff's expert opinion could not defeat summary judgment because it was not reliable in the absence of physical evidence supporting the alleged defect theory); *Dan's Hydraulics, Inc., v. Colony Ins. Co.,* 417 F.Supp.2d 601,610 (D.Del.2006) (While experts do not have to eliminate "all possible causes" of the plaintiffs injury, speculative expert opinions "based upon no physical evidence and no testing" are not admissible); *cf. Glanzman v. Uniroyal, Inc.,* 892 F.2d 58, 60–61 (9th Cir.1989) (upholding verdict based on expert opinion that had basis in the evidence). Robertshaw emphasizes that Dr. Kasner has not, and cannot, identify any documented instance of a rubber gasket sticking to an inlet seat in any gas control valve, let alone such an occurrence with a Robertshaw control valve. He likewise has not identified any literature suggesting that such an incident has, or could have, occurred.

More importantly, Dr. Kasner has not conducted any testing, demonstration or analysis to demonstrate that "adhesion" occurred in this case, the magnitude of such adhesion, or that it caused the rubber gasket to dislodge. Indeed, Dr. Kasner repeatedly concedes that it is impossible to measure these forces because there are too many unknown variables that affect how much adhesion takes place. ECF No. 134 Ex. 4 at 14–15. Robertshaw asserts that Dr. Kasner has not employed any methodology in reaching his opinion, let alone employed a reliable methodology. More specifically, Robertshaw notes that Dr. Kasner did not conduct any testing or analysis to determine whether the rubber gasket in a Robertshaw valve could stick to the metal seat under any circumstance nor did he determine that the magnitude of any gasket adhesion would be greater than the button retention force resisting gasket dislodgement. ECF No. 134 Ex. 4 at 19–21. Dr. Kasner cannot articulate the range of such forces as he has not conducted the standardized test for adhesion that he identified in his report. ECF No. 134 Ex. 4 at 75.

Robertshaw characterizes Dr. Kasner's opinions as assumptions and speculative suppositions upon which he concluded that because adhesion of rubber to metal *can* occur as a general phenomenon, that it *did* occur in this case. Robertshaw asserts that this conclusions is premised on a series of unwarranted assumptions that remain unproven by any testing done by Dr. Kasner, the testing done by others, or the relevant literature in the field. Dr. Kasner's opinion, therefore, is an impermissible *ipse dixit,* unconnected to existing facts and circumstances of this case. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."); *see also Meemic Ins. Co. v. Hewlett–Packard Co.,* No. 09–10155, 2010 U.S. Dist. LEXIS 46990, at *22,2010 WL 1949750 (E.D.Mich. May 13, 2010) (An expert's "conclusions must be connected to the existing data by more than the ipse dixit of the expert.").

***7** It is well-established that an expert must utilize in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 177

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

(6th Cir.2009), and Robertshaw contends that the methods and principles used by Dr. Kasner in developing his gasket adhesion and dislodgement theory fall well short of the rigor demanded in the field. *See, e.g., Childs v. Gen. Motors Corp.,* No. 95–0331,1998 U.S. Dist. LEXIS 10991 at *9, 11–12,1998 WL 414719 (E.D.Pa. July 22, 1998) (finding an expert's testimony inadmissible in a design defect product liability suit because there was "no physical evidence" of the alleged design failure, the expert could not "replicate by experiment his theory of design defect," and the expert had relied only on "general metallurgical principles" and "basic laws of physics").

Plaintiffs, however, respond by noting that it is undisputed that the leak in the Robertshaw control valve was caused by the separation of the rubber seal from the safety magnet causing a propane gas leak to occur when the safety magnet closed upon the weakening of the force of the magnet from the electrical thermocouple. Plaintiffs submit that there are only two potential causes for this condition to occur: (1) overpressurization causing gasket removal or (2) dislodgment of the gasket because it has insufficient strength to resist the forces necessary to cause removal due to its design and manufacture. Dr. Kasner did not perform his own testing to determine whether overpressurization occurred, but relied upon the testing conducted by Dunn. Dunn determined that 80 psi pressure was unable to cause removal or dislodgement of the rubber seal and that the propane pressure delivered to the *Dow* water heater control valve's piping system was measured at no more than merely 1 /3 psi. Dunn concluded that, based on this testing, overpressurization had not occurred. There was also no evidence of overpressurization occurring prior to the explosion that occurred on July 16, 2007.

Dr. Kasner then determined that it took anywhere from 1.8 to 3 ounces of force to create displacement of the rubber seal. ECF No. 50 Ex. 1. The precise cause of displacement for any individual defective control valve unit would be a function of various individual factors, as discussed above. Plaintiffs emphasize that neither of Robertshaw's experts have conducted any testing that would "rule in" overpressurization as a cause of this rubber seal's displacement to contradict Dunn's "ruling out" of overpressurization as the cause of the displacement and Robertshaw's experts have not "ruled out" insufficient strength of the seal as the cause in this circumstance. Plaintiffs contend that this is an appropriate basis for an expert opinion pursuant to *Best v. Lowe's Home Centers, Inc.* 563 F.3d 171 (6th Cir.2009) (recognizes differential diagnosis, a method by which a physician determines what disease process caused a patient's symptoms by considering all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history, as "an appropriate method for making a determination of causation for an individual instance of disease"). Plaintiffs also note that Robertshaw would not allow destructive testing on the control valve at issue in this case, and the fact that Dr. Kasner did not conduct testing on that precise valve should not be considered.

***8** Plaintiffs also submit that Dr. Kasner's methodology is the product of reliable principles and methods. Dr. Kasner compared the *Dow* control valve with the *Bispo* and *Poirier* valves, as well as with other Robertshaw control valves made twenty-five to fifty years ago. Based on this comparison, Dr. Kasner concluded that the *Bispo, Poirier* and the control valve at issue in the instant case all failed because of nitrile rubber seal displacement.

Plaintiffs explain that in coming to his conclusions, Dr. Kasner compared the dimension and weight of the rubber seals for the *Bispo, Poirier* and *Dow* valves along with exemplar valves and those designed and manufactured prior to the present design. Shore–A hardness measurements of the gaskets were then conducted. Microscopic examination of the rubber seals was then conducted which revealed contact imprints caused by the plunger tip spring load imparted against the sharp edge of the metal seat showing permanent deformation. The examination revealed that the "sharp notch" imparted from the seat on to the rubber seal wore through the lubricant coating exposing the darker rubber underneath. A comparative analysis was conducted between the *Dow* valve seal and the *Poirier* valve seal, and the *Poirier* valve reflected that it had not been exposed to any pressure over 1/3 psi as well. The seal's contact with the seat was similar with both the *Dow* and *Poirier* seals. Dr. Kasner then requested a Fourier Transform Infrared Spectroscopy (FTIR) to identify the base rubber material of the seal, which determined that the *Dow* rubber seal was nitrile rubber with chemical composition similar, but not identical, to that of *Poirier* and a 1994 exemplar control valve seal. The *Bispo* seal was determined to be a different composition. Non-destructive Attenuated Total Reflectance (ATR) sampling was then performed at the request of Kasner on the *Dow, Poirier, Bispo* and 1994 exemplar gasket. All testing was conducted pursuant to standardized testing ASTM D–3677 and determined the different formulations of the seals.

Dr. Kasner also performed testing at his own facilities involving exemplar units, during which he determined that the nominal spring force of the safety magnet contacting the rubber seal against the metal seat was

between 0.91 lb force to 0.96 force lb force. Without the sharpness of the magnet seat's dimensions, which would increase psi, the nominal compressive stress was 17.4 to 18.3 psi. Based upon ASTM F607, "Standard Test Method For Adhesion of Gasket Materials To Metal Surfaces," his methodology, and experience, Dr. Kasner concluded that the contact force penetrating the molybdenum disulfide lubricant was sufficient to overcome the 1.8 ounce force necessary to unseat the seal. In other words, he was satisfied that it had been proven that overpressurization could not have occurred to cause this removal, and that the alternate theory of removal or displacement must be implicated.

***9** Robertshaw replies that Plaintiffs do not address the fact the Dr. Kasner did not conduct any testing to demonstrate that the rubber seat could stick and become dislodged, did not identify any documented instance of such an occurrence in any gas control valve, and did not address the fact that Dr. Kasner has not identified any scientific literature suggesting that such sticking could or did occur. Plaintiffs instead submit that Dr. Kasner's opinion is that the rubber seat dislodged as a result of insufficient strength. Robertshaw argues that this is not the opinion that was articulated in his report or at his deposition. Because Plaintiffs' response does not address the deficiencies in Dr. Kasner's opinion that Robertshaw has identified, Robertshaw submits that Plaintiffs have conceded that Dr. Kasner's opinion as to causation is inadmissible. Indeed, Robertshaw notes that Plaintiffs' response admits that "[t]he precise cause of displacement for any individual defective control valve unit would be a function of various individual factors including the chemical makeup of the nitrile rubber seal, the amount of displacement of the lubricant, the size of the button intended to secure the rubber seal [and] the transference force imparted on the shaft." ECF No. 150 at 7. This affirms Robertshaw's assertion that Dr. Kasner has not considered any of the relevant factors and has admitted that the unknown variables are too numerous to test his supposition. Robertshaw also emphasizes that both William Woehrle and Timothy Dunn defer to Dr. Kasner on the issue of causation, and thus Dr. Kasner is the only designated witness addressing the issue of causation.

Moreover, Robertshaw argues that Dr. Kasner's "ruling out" theory is insufficient to "rule in" his alternate theory of adhesion absent any evidence to support his theory. Dr. Kasner relies on Dunn's testing to rule out over-pressurization as the cause of the rubber gasket becoming dislodged but did not participate in the testing. Additionally, Dr. Kasner was unaware that Dunn testified in *Bispo* that, based on his testing, the rubber gasket dislodged as a result of over-pressurization. In particular, Dunn's testing did not indicate any adhesion of the rubber seal to the seat, and the noncomprehensive reports of testing by others do not provide a sufficient foundation for Dr. Kasner's opinion regarding adhesion. Plaintiffs' assertion that Dr. Kasner's theory would be supported by destructive testing that Robertshaw's engineering consultant would not agree to is similarly unavailing, according to Robertshaw, and demonstrates precisely why Dr. Kasner's testimony should not be permitted.

### 3. Conclusion

"[C]ourts interpreting *Daubert* have considered testability of the expert's theory to be the most important of the four factors, and this is especially true in cases involving allegations of defect in product design[.]" *Berry,* 108 F.Supp.2d at 754. Thus, where, as here, "the proffered expert has performed no reliable testing of his theory, courts, including the Sixth Circuit, have routinely precluded the witness from offering an expert opinion." *Id.* (citing *Pride,* 218 F.3d at 581 (finding summary judgment in favor of the product liability defendant was proper where plaintiff's only expert's theory was unsupported by reliable testing); *Smelser v. Norfolk S Ry. Co.,* 105 F.3d, 299, 304–05 (6th Cir.1997) (concluding where plaintiff's expert failed to perform any testing on the alleged defective seatbelt, the expert's opinion should have been excluded); *Cook v. Am. SS Co.,* 53 F.3d 733,739 (6th Cir.1995) ($100,000 judgment in favor of plaintiff vacated where the district court permitted an expert qualified in testing and failure analysis to offer an opinion that a marine rope had failed from exposure to a torch, where the only "test" performed by the expert was to visually examine the frayed end of the alleged defective line with the naked eye and under a low power microscope); *Stanczyk v. Black & Decker, Inc.* 836 F.Supp. 565, 567 (N.D.Ill.1993) (defendant's motion in limine to exclude expert testimony granted where plaintiffs' expert offered "no testable design to support his concept.")).

***10** The fact that Dunn opines that he has "ruled out" one theory is insufficient to satisfy the expert witness reliability requirements for Dr. Kasner's testimony. *Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171 (6th Cir.2009), which addresses differential diagnosis in a medical expert context, does not provide adequate support that an expert may "rule in" one theory of causation where another expert has "ruled out" an alternative theory of causation. Dr. Kasner admittedly was unable to

conduct any testing to verify that the gasket dislodged as a results of adhering to the seat and that Dunn was purportedly able to “rule out” overpressurization as the cause of the gasket dislodgment does not, in turn, provide an adequate foundation upon which Dr. Kasner’s opinion may rest. Dr. Kasner’s proposed testimony is not based upon sufficient facts or data, is not the product of reliable principles and methods, and is unsupported by reliable testing. Moreover, Dr. Kasner’s testimony would not be helpful in determining the ultimate issue in this case. Accordingly, Dr. Kasner’s primary opinion as to causation fails the expert witness reliability requirements under Rule 702, *Daubert,* and *Kumho Tire,* and will be excluded.

**5. Dr. Kasner’s Ancillary Opinions Regarding Alternative Designs**

Dr. Kasner also offers an opinion regarding the sufficiency of the design of the safety magnet, in particular the attachment method for the rubber gasket, and he discussed alternative designs that might provide greater resistance to dislodgement. However, in the absence of any admissible opinion from Dr. Kasner regarding the adhesion forces that allegedly caused the rubber gasket to dislodge in the subject Dow valve, any opinion he might have regarding alternative designs is irrelevant. In other words, Dr. Kasner’s design defect theory is dependent on his unproven assumption that adhesion can, and did, occur in the *Dow* valve such that the plunger assembly must be redesigned to overcome that adhesion. If adhesion did not occur, or cannot be proven, then Robertshaw contends that Dr. Kasner’s design defect theory must fail, including his proposed alternative designs. Moreover, Robertshaw argues that Dr. Kasner lacks a proper foundation to support any conclusion that his proposed alternative designs are feasible or that they would have prevented the rubber gasket from dislodging in this case.

Dr. Kasner offers five ways to improve the safety magnet’s design, labeling each proposed alternative design “safe, feasible and practical.” Dr. Kasner did not conduct testing or otherwise demonstrate their purported safety, feasibility, or practicality. First, based on “simple mechanics,” he suggests that Robertshaw should increase the size of the diameter of the retaining button from 0.421″ to 0.472.″ 09–13697 ECF No. 139 Ex. # 5 at 18; Ex. # 4 at 98–99. Robertshaw emphasizes that Dr. Kasner, however, (1) has not tested a 0.472–inch button to quantify what difference, if any, a 0.051″ increase would have, (2) admits that an increased button size is not the preferred approach, and (3) declines to suggest that a 0.472–inch button would have prevented the leak or explosion. 09–13697 ECF No. 139 Ex. # 4 at 42.

***11** Second, Dr. Kasner suggests that Robertshaw should remove the bevel on the back side of the retaining button that is in contact with the rubber gasket, indicating that removing the bevel would reduce the likelihood of “gasket slip.” 09–13697 ECF No. 139 Ex. # 5 at18; Ex. # 4 at 99, 180–81. He has not, however, performed any testing to prove his hypothesis, and he admits that the button bevel was not a primary cause but was, instead, just “a contributor.” 09–13697 ECF No. 139 Ex. # 4 at 102.

Third, Dr. Kasner suggests that Robertshaw should increase the thickness of the rubber gasket from 0.0384–inch to “just under” 0.049–inch—the size of the gap between the retaining button and the backing flange—indicating that doing so “would make it more difficult for the gasket to be detached.” 09–13697 ECF No. 139 Ex. # 5 at7, 18. Dr. Kasner, relying solely on “basic mechanics,” offers this opinion without quantifying the effect, if any, that gasket thickness has on the force required to dislodge the gasket. 09–13697 ECF No. 139 Ex. # 4 at 43. He concedes that, ultimately, the utility of the proposed increase of less than 0.0106–inch gasket thickness would be, at best, “[v]ery minimal[ ].” 09–13697 ECF No. 139 Ex. # 4 at 173.

Fourth, Dr. Kasner suggests that Robertshaw should use a permanent epoxy adhesive between the back surface of the gasket and the backing flange, indicating that a permanent adhesive would ensure retention of the gasket on the plunger “as long as the bond holds.” 09–13697 ECF No. 139 Ex. # 5 at 18; Ex. # 4 at 102–03. Robertshaw submits that it is not a profound concept that an adhesive works until its bond fails, and Dr. Kasner admits that such an epoxy adhesive could, in fact, fail. 09–13697 ECF No. 139 Ex. # 4 at 103. Dr. Kasner does not test his permanent adhesive theory in any way or demonstrate that such an alternative would function properly in the valve or would not be prone to other failure modes.

Finally, Dr. Kasner suggests that Robertshaw should crimp or swage[3] the rubber gasket between the backing flange and the retaining button during assembly. 09–13697 ECF No. 139 Ex. # 5 at 18. Identifying this design, one allegedly utilized in pre–1994 Robertshaw valves, as “the simplest and most reliable way of improving the design,” Dr. Kasner suggests that it would

"h [o]ld the gasket securely, making it extremely resistant to removal." 09–13697 ECF No. 139 Ex. # 5 at 18. Dr. Kasner has not, however, done any testing or analysis of the pre–1994 allegedly "crimped" design. Additionally, although a lab assistant expressed some difficulty in removing the rubber gasket from a sixteen-year-old safety magnet, the gasket can be removed and, when removed, it is apparent that the older gas control valve is not crimped but has a similar design to the one at issue in this case. Even assuming crimping can be done, Dr. Kasner admits that crimping the gasket creates a local stress point but he does not address whether the local stress point would affect the function of the plunger other than to say, without any scientific support or actual testing, that he believes that a crimped gasket exposed to 100,000 cycles of loading "should pass the testing without problems." 09–13697 ECF No. 139 Ex. # 4 at 105–07. Further, Dr. Kasner cannot identify any gas control valve sold today containing a magnet assembly with a crimped rubber gasket. *Id.* at 107. Robertshaw construes this suggestion as Dr. Kasner effectively rendering defective every gas control valve presently on the market.

***12** In sum, Robertshaw argues that Dr. Kasner's opinions on proposed design alternatives are inadmissible due to their dependence for relevance on his unreliable adhesion theory. Additionally, Robertshaw argues that the proposed alternative design opinions are themselves unreliable under 702 and *Daubert,* and, therefore, inadmissible because there is no physical evidence suggesting that any of the proposed alternatives would have prevented dislodgement of the rubber gasket. Dr. Kasner has done no testing or analysis to quantify in any way the effect of making the proposed changes in the design of the safety magnet, nor has he identified any relevant literature, or other scientific community opinion accepting of his opinion that the safety magnet's current design constitutes a design defect. His opinion that the current design is defective is based entirely on suppositions that have no basis in the established facts of the case. Further, Dr. Kasner does not address any potential limitations or problems that his proposed alternatives may present but instead assumes without any scientific support that the design is defective. Robertshaw believes that such an opinion cannot reliably inform the trier of fact in this case and requests that the Court exclude Dr. Kasner's ancillary opinion.

Plaintiffs argue that Dr. Kasner's testing was sufficient to support his suggestions for alternative designs. Semi-quantitative elemental analysis was conducted on an energy dispersive x-ray spectrometer (SEM–EDS). The testing determined the presence of molybdenum disulfide, a well-known dry lubricant used to prevent adhesion of rubber to metal surfaces, on the *Bispo, Poirier* and *Dow* gaskets but not the 1994 exemplar. The 1994 exemplar gasket revealed the presence of graphite, another well known dry lubricant used to prevent sticking of rubber to metal. Previous microscopic analysis, Plaintiffs emphasize, determined that the "sharp notch" of the metal seat cut through the lubrication on the *Dow* rubber seal.

Microscopic analysis conducted on September 23, 2010 at Stork Technimet in Wisconsin revealed sharp notches imparted to the rubber seal from the machining of the metal seat. A similar notch was found imparted onto the *Poirier* rubber seal. An exemplar control valve revealed no sharp notch existing on the metal seat. In his deposition, Dr. Kasner introduced his opinion that the sharpness of the notch of the metal seat was an additional contributing factor to the seal removal. ECF No. 150 Ex. 2 at 137–38. He believed that the notch was a manufacturing defect because it was not observed in an exemplar control valve. He concluded that if there is a specification within the Robertshaw's prints and specifications requiring a flat contour to the seat as it is seen in the exemplar gasket, then the condition seen in the *Dow* valve is a manufacturing defect. Should Robertshaw have no specification for the contour of the metal seat, then he concluded that the condition is a design defect. Whether the condition is a design or manufacturing defect is dependent upon materials that have not yet been produced by Robertshaw but Dr. Kasner noted in his report that he could supplement the report once the appropriate information had been furnished by Robertshaw.

***13** As noted above, Dr. Kasner's primary opinion regarding adhesion is inadmissible under Rule 702 and *Daubert.* Because his suggestions regarding feasible alternative designs are untested and unsubstantiated in addition to the fact that they rely on his opinion that the *Dow* valve was defective due to adhesion of the gasket to the seat of the control valve, his ancillary opinions will be excluded as well.

### B. Robertshaw's Motion to Exclude the Testimony of William Woehrle

Robertshaw has also filed a motion to exclude the expert testimony of William Woehrle because Mr. Woehrle is not qualified to render expert opinions regarding the design and performance of the Dow control valve and lacks a proper foundation for his proffered opinion

regarding the alleged failure mode of the valve. Mr. Woehrle obtained a Bachelor of Science degree from Michigan State University in 1966, majoring in physics. He then spent twenty-five years at Uniroyal, working briefly as a development engineer before ascending into various management positions. Among other things, Mr. Woehrle oversaw Uniroyal's tire testing department. In 1992, Mr. Woehrle left Uniroyal and opened a company, Automotive Engineering Management Services, Inc., that was engaged in automotive tire testing services on behalf of Ford, General Motors and other automotive manufactures. In 2005, Mr. Woehrle started his current business, Tire Forensic Investigations. Mr. Woehrle holds himself out as a tire expert, and apart from this case, his litigation consulting has been limited to cases involving alleged tire failures. ECF No. 137 Ex. 1 at 34. Mr. Woehrle has no experience in the design or performance of gas control valves or their component parts.

Robertshaw first challenges Woehrle's "design defect" opinion that the rubber gasket was dislodged as a result of adhering to the seat of the control valve and that the safety magnet design is defective. At the June 3, 2011 hearing, counsel for Plaintiffs stated that he would "not be asking any testimony of Mr. [Woehrle] with regard to the ultimate opinion of design defect causing this explosion." Hr'g Tr. at 46. Robertshaw's motion to exclude Woerhle's testimony pertaining to design defect will be, as a result, granted.[4]

**C. Robertshaw's Motion for Summary Judgment**

**1. Standard of Review**

A motion for summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party asserting that a fact cannot be proven or is genuinely disputed must support the assertion by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(B). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the opposing party fails to raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson,* 477 U.S. at 250.

***14** The court must view the evidence and draw all reasonable inferences in favor of the nonmoving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. The application of Rule 56 extends to employment-related cases, and courts have granted summary judgment for employers in disability discrimination and retaliation cases. *See e.g. Walsh v. United Parcel Serv.,* 201 F.3d 718, 724 (6th Cir.2000) (affirming summary judgment on a disability claim); *Canita v. Yellow Freight System, Inc.,* 903 F.2d 1064 (6th Cir.1990) (affirming summary judgment on a retaliation claim).

**2. Plaintiffs' Design Defect Theory**

In order to prevail on their product liability negligence, express warranty, and implied warranty claims, Plaintiffs must prove "a causal connection" between their alleged defect theory and the resultant explosion. *Wendorf v. JLG Indus.,* 683 F.Supp.2d 537,548 (E.D.Mich.2010) (quoting *Skinner v. Square D Co.,* 445 Mich. 153, 159, 516 N.W.2d 475 (1994)). "[T]he burden to prove a defect and a causal connection to the injury always remains with the plaintiff. The defendant never has the burden to prove a non-defect." *Sylvania v. Ford Motor Co.,* No. 275578,2008 Mich.App. LEXIS 2071, at *11,2008 WL

4646140 (Mich.Ct.App. Oct. 21, 2008). Robertshaw contends that Plaintiffs can offer no competent evidence that the rubber gasket adhered to the metal seat in fact or that it did so because it was defective and thus cannot establish the product liability claims.

While circumstantial evidence can establish causation if it facilitates reasonable inferences of causation, mere speculation or impermissible conjecture cannot. *Thompson v. Carollton Twp. Police Dep't,* Nos. 283772 & 283285, 2009 Mich.App. LEXIS 1252, at * 18 (Mich. Ct.App. June 2, 2009) (citing *Skinner,* 445 Mich. at 163–64, 516 N.W.2d 475); *Kaminski v. Grand Trunk W. R.R. Co.,* 347 Mich. 417, 422, 79 N.W.2d 899 (1956). Therefore, a product liability causation theory "must have some basis in established fact." *Skinner,* 445 Mich. at 164, 516 N.W.2d 475. "[A] basis in only slight evidence is not enough." *Id.* Further, even if a causation theory is factually supported, the theory is insufficient if it is, "at best, just as possible as another theory." *Id.* Thus, "the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id.* at 164–65, 516 N.W.2d 475.

***15** Plaintiffs must thus establish their theory that the rubber gasket dislodged from the plunger as a result of adhesion with substantial evidence. *Id.* at 164, 516 N.W.2d 475. Plaintiffs' only support for their defect theory comes from Dr. Kasner's anticipated testimony. As discussed above, Dr. Kasner's testimony will be excluded. Where actual evidence of a plaintiff's theory is "speculative," summary judgment should be entered in favor of the defendant. *See, e.g., Kenkel v. Stanley Works,* 256 Mich.App. 548, 561, 665 N.W.2d 490 (2003). When, as here, the analytical gap between the evidence and the inferences to be drawn on the ultimate issue is too wide, a jury should not be asked to speculate on the issue of causation. *Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1360–61 (6th Cir.1992), cert. denied, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992). In other words, where a plaintiff's theory is not sufficiently supported by evidence, the Court should "prohibit the case from proceeding to the jury" and enter summary judgment for the defendant. *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 972 (6th Cir.1994). Because Plaintiffs are unable to provide substantial evidence to establish their theory that the rubber gasket dislodged from the plunger as a result of adhesion and that it did so because it was defective, their products liability claims against Robertshaw and Rheem based on design defect will be dismissed.

### 3. Plaintiffs' Claims Under Michigan's Product Liability Law

Plaintiffs also allege state law claims against Robertshaw and Rheem under Mich. Comp. Laws § 600.2946(2). Because each of these claims is predicated on an allegation that a defect in either the design or manufacture of the gas control valve injured Plaintiffs, they are all "product liability actions" governed by Mich. Comp. Laws § 600.2945, et seq. *See Ryan v. Brunswick Corp.,* 454 Mich. 20, 27 n. 8, 557 N.W.2d 541 (1997), *overruled on other grounds by Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) ("Products liability claims in Michigan are based on a single statute, MCL 600.2946[.]"); *Hershey v. Black & Decker,* No. 276572, 2008 Mich.App. LEXIS 1919, at *2,2008 WL 4414242 (Mich.Ct.App. Sept. 30, 2008) ("MCL 600.2946(2), adopted in 1995, now governs product liability actions predicated on a 'production' defect."); *Irrer v. Milacron, Inc.,* 484 F.Supp.2d 677,687 (E.D.Mich.2007) ("Michigan's tort reform legislation 'displaced the common law." ') (quoting *Greene v. A.P. Prods., Ltd.,* 475 Mich. 502, 507–508, 717 N.W.2d 855 (2006); *Nordman v. OMGA S.p.A.,* No.1:05–cv–30, 2006 U.S. Dist. LEXIS 70842, at * 10–11 (W.D.Mich. Sept. 29, 2006); *Mut. Ins. Co. of Am. v. Royal Appliance Mfg. Co.,* 112 F. App'x 386,389 (6th Cir.2004).

Pursuant to Michigan's product liability statute, plaintiffs in product liability actions must demonstrate that the product is "defective." *Prentis v. Yale Mfg. Co.,* 421 Mich. 670,683 (1985). To do so, they must establish that (1) the valve was "not reasonably safe" at the time it left Robertshaw's control, and (2) a "practical and technically feasible alternative" was available that would have prevented the harm without (a) "significantly impairing the usefulness or desirability of the product to users" and (b) "creating equal or greater risk of harm to others." *See* Mich. Comp. Laws § 600.2946(2); *see also Sylvania,* No. 275578 at * 11 (citing Mich. Comp. Laws § 600.2946(2)); *Ghrist v. Chrysler Corp.,* 451 Mich. 242, 249, 547 N.W.2d 272 (1996); *Gregory v. Cincinnati, Inc.,* 450 Mich. 1, 11–13, 538 N.W.2d 325 (1995)). Where a plaintiff fails to show each of these statutory elements, "the manufacturer or seller is not liable[.]" Mich. Comp. Laws § 600.2946(2).

***16** The first element Plaintiffs must prove is that the Robertshaw gas control valve was "not reasonably safe" at the time it left Robertshaw's control. Mich. Comp. Laws § 600.2946(2). This first statutory element reflects the common law for claims predicated on breach of implied warranty. *See Hershey,* 2008 Mich.App. LEXIS 1919, at *3 (finding that the first § 600.2946(2) element "is consistent with a claim predicated on implied

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

warranty."). As a general rule, an implied warranty claim focuses on the condition of the product. *Sundberg v. Keller Ladder,* No. 00–10117–BC, 2001 U .S. Dist. LEXIS 18390, at *15,2001 WL 1397290 (E.D.Mich. Nov. 8, 2001) (citing *Prentis,* 421 Mich. at 692, 365 N.W.2d 176). When alleging an implied warranty cause of action, the plaintiff must show that (1) the product in question was defective when the defendant sold or otherwise placed it in the stream of commerce, and (2) that the defect caused his injury. *Id* at * 17, 365 N.W.2d 176 (citing *Hollister v. Dayton Hudson Corp.,* 201 F.3d 731, 737 (6th Cir.2000)). "A product is defective if it is not reasonably fit for its intended, anticipated, or reasonably foreseeable use." *Id.* (citing *Gregory,* 450 Mich. at 34, 538 N.W.2d 325). Even under an implied warranty theory, when causation has not been sufficiently shown, "the identification of the specific defect is required." Auto *Club Grp. Ins. Co. v. All–Glass Aquarium Co, Inc.,* No. 08–15205,2010 U.S. Dist. LEXIS 52051,2010 WL 2232242 (E.D.Mich. May 27, 2010) (emphasis added) (Ex. # 17) (citing *Paquin v. Control Chief Corp.,* No. 2:06–cv–252, 2009 U.S. Dist. LEXIS 37718 at *23–24 (W.D.Mich. Apr. 29, 2009) (demonstration of specific defect required where there was more than one possible explanation for the subject product's failure); *Istvan,* No. 08–12507 at *6 (granting summary judgment when multiple factors could have led to a motorcycle crash).

Defendants argue that Plaintiffs have not presented any evidence that the Robertshaw gas control valve was defective, i.e., not reasonably safe at the time it left Robertshaw's control. Plaintiffs have not, and cannot, identify any physical evidence, testing, or expert literature that demonstrates that the Robertshaw gas control valve can, much less did, adhere to the seat and fail to overcome the alleged force of adhesion during the valve's intended, anticipated, or reasonably foreseeable use. Rather, they rely only on Dr. Kasner's opinion that the gasket could adhere to the seat and be pulled off under unspecified conditions. Dr. Kasner's testimony, however, will be excluded.

Under Michigan law, merely because "an injury results from use of a [product] does not *ipso facto* mean that the [product] is defective." *Owens v. Allis–Chalmers Corp.,* 83 Mich.App. 74, 79, 268 N.W.2d 291 (1978), *aff'd* 414 Mich. 413, 326 N.W.2d 372 (1982). Indeed, "the Supreme Court [of Michigan] has repeatedly noted that manufacturers and sellers are not insurers, and they are not absolutely liable for any and all injuries sustained from the use of their products." *TIG Ins. Co. v. Carrier Corp.,* No. 216793,2000 Mich.App. LEXIS 2179, at *6 (Mich.Ct.App.2000).

***17** In design defect cases, "the Michigan Supreme Court has adopted a 'pure negligence, risk-utility test' to determine whether a manufacturer should be held liable for a defectively designed product." *Miller v. Ingersoll–Rand Co.,* 148 F. App'x 420, 423 (6th Cir.2005) (citing *Prentis,* 421 Mich. at 691, 365 N.W.2d 176). The risk-utility test requires the trier of fact "to consider the alternatives and risks faced by the manufacturer in designing the product and to determine whether in light of certain factors 'the manufacturer exercised reasonable care in making the design choices it made.' " *Croskey,* 532 F.3d at 516 (citing *Prentis,* 421 Mich. at 688, 365 N.W.2d 176). Under Michigan's risk-utility test, a plaintiff must prove all of the following elements:

(1) that the severity of the injury was foreseeable by the manufacturer;

(2) that the likelihood of the occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product;

(3) that there was a reasonable alternative design available;

(4) that the alternative available design was practicable;

(5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and

(6) that the omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe.

*Id.* (citing Hollister, 201 F.3d at 738). This is a "heavy burden" on the plaintiff. *See, Sundberg,* No. 00–10117–BC at *16; *see also Norton v. Hamilton Beach/Proctor–Silex, Inc.,* No. 2:04–cv–40376, 2009 U.S. Dist. LEXIS 27322, at *56–57,2009 WL 884129 (E.D.Mich. Mar. 30, 2009).

Robertshaw does not dispute that certain feasible alternatives to the design of the *Dow* valve exist because it has produced alternative designs in years past. However, in applying the risk-utility test under Mich. Comp. Laws § 600.2946(2), it is not sufficient for a plaintiff merely to propose possible alternative feasible designs nor is it sufficient "that a plaintiff merely show that an alternative design would have reduced the risk of harm." *Hershey,* No. 276572 at *6. Instead, a plaintiff must "prove that his or her particular injury would have been prevented by the alternative design." *Hershey,* No. 276572 at *7. Robertshaw submits that Dr. Kasner's report, which includes a short list of proposed design

modifications, is insufficient to satisfy the burden of proof because Dr. Kasner does not have a background or experience in the design of gas control valves for residential water heaters. Dr. Kasner, as well as Woehrle, propose an alternative crimped gasket design similar to that allegedly used in a prior Robertshaw magnet assembly, but neither has established that the proposed design alternative would have prevented Plaintiffs' injuries nor have they done any comparative testing or analysis to determine whether the alterative design would prevent the alleged adhesion of the rubber gasket to the metal seat. Plaintiffs also contend that the original Robertshaw control valve made between 1955 and 1995 did not have one incident of safety magnet seal dislodgement causing explosion but do not offer an evidentiary support for this assertion. Plaintiffs also do not offer any evidence to support their contention that the pre–1995 Robertshaw control valve would have prevented the injury that occurred in this case. The testimony of Dr. Kasner and Woehrle will be excluded, as the Court previously discussed, and Plaintiffs have not offered any additional evidence to support their contention that a more feasible design alternative exists that would have prevented this particular injury.

***18** Even assuming *arguendo* that Plaintiffs have proven that their proposed alternatives would have prevented their injuries, that alone cannot get Plaintiffs' claims to the jury. Not only must Plaintiffs prove that the proposed alternative design would have prevented their injuries, they must also prove that the alternative would have done so without (1) significantly impairing the usefulness or desirability of the product to users and (2) without creating equal or greater risk of harm to others. Mich. Comp. Laws § 600.2946(2). Robertshaw asserts that Plaintiffs' experts propose alternative designs without considering (1) effect the proposed change would have on the usefulness or desirability of the product or (2) whether the proposed alternative would create equal or greater risk of harm to others. With Dr. Kasner and Woehrle's testimony being excluded, and Dunn and Koch offering no opinion as to what affirmatively caused the rubber gasket to become dislodged, Plaintiffs have no admissible opinion testimony to explain what caused the gasket to dislodge. Robertshaw argues that, as a result, Dunn and Koch cannot testify as to what alternative design would prevent such dislodgment.

Indeed, there is no evidence advanced related to the potential impairment of usefulness or desirability of the product at issue, or its possible risk of harm to others. Plaintiffs generally assert that the pre–1995 Robertshaw valve was a safer design but offer no evidentiary support for their contention. As such, Plaintiffs' claims fail to satisfy the requirements of Mich. Comp. Laws § 600.2946(2), and summary judgment is appropriate. *See, e.g., Strauch v. Raymond Corp.,* No. 254224, 2005 Mich.App. LEXIS 3297, at *6,2005 WL 3556107 (Mich.Ct.App. Dec. 29, 2005) (finding summary disposition appropriate where plaintiff failed to establish a prima facie case of design defect because plaintiff's expert testified that a different design would have prevented the plaintiff's injuries but failed to demonstrate that any of the suggested alternatives would be safer or would not impair the usefulness or desirability of the product).

**4. Plaintiffs' Claims for Gross Negligence and Willful Disregard**

Plaintiffs allege, in support of their gross negligence and willful disregard claims, that Robertshaw had actual knowledge of pilot safety valve failures on Robertshaw Control valves prior to the subject incident. Pl.'s Compl. par. 52. In particular, Plaintiffs rely on three allegedly similar incidents identified over a ten year period involving similar types of safety magnet in which a rubber seal dislodged from the safety magnet: *Bispo; Poirier;* and *Loy. Bispo* is the only other incident with a complete investigation and, in that case, Robertshaw notes that there was evidence that the water heater owner improperly connected the valve to a mobile home propane gas tank without a proper regulator, resulting in over-pressurization. Plaintiffs contend that the issue is not what caused the seal dislodgment in the other incidents, but the fact that dislodgment should not occur under any circumstance and that Robertshaw was aware of three other explosions due to seal dislodgment. Plaintiffs argue that they do not have any burden to establish the number of incidents required to create actual notice to satisfy the requirements for gross negligence and willful disregard claims; all that is required is that a defendant have actual knowledge of a product defect and that there be a substantial likelihood that the defect could cause the injury that is the basis of the action. Plaintiffs contend they have satisfied both requirements to create a genuine issue of material fact in the instant case.

***19** As previously discussed, Robertshaw agrees with Plaintiffs' expert, Timothy Dunn, that the failure of the safety magnet valve in the *Bispo* case occurred due to misuse of the gas control valve due to over-pressurization. The facts and circumstances of the dislodgment in the other two allegedly similar incidents, *Loy* and *Poirier,* are

unestablished because formal discovery was not conducted. Robertshaw did not examine the *Poirier* valve until July 2008, a year after the incident in the instant case. ECF No. 139 Ex. # 24 at 233. Robertshaw argues that no evidence of the *Poirier* matter could thus support a claim for gross negligence or willful disregard because Robertshaw lacked knowledge of the incident prior to the *Dow* explosion. To the extent the Court would find these incidents admissible, Robertshaw contends that, at best, Plaintiffs can show one prior incident, *Bispo,* that Robertshaw had knowledge of, in which Plaintiffs' own expert concluded that the rubber gasket dislodged due to misuse of the valve resulting in over-pressurization.

The two primary gas valve manufacturers in the United States, Robertshaw and White–Rodgers, use safety magnets in which the rubber seal is attached to the safety magnet in a substantially similar fashion. ECF No. 139 Ex. # 25 at 178–80. Robertshaw has sold over 40 million gas control valves with the same safety magnet component at issue in the instant case. *Id.* at 216. The valve is designed and manufactured pursuant to nationally accepted standards including ANSI, and Robertshaw and its customers, such as Rheem and other water heater manufacturers, subject the gas valves to extensive quality control testing. Robertshaw contends that to accept Plaintiffs' argument, a finding would be required that the valve design used in tens of millions of water heaters throughout the United States is not only defective, but so inherently dangerous that its manufacture and sale constitutes reckless and willful conduct intended to cause harm.

Robertshaw acknowledges that Michigan state courts have generally not addressed the magnitude of other similar incidents in the context of a claim of gross negligence or willful disregard. The United States Courts of Appeals for the Sixth and Eleventh Circuits, however, have addressed the issue. In *Clutter v. Karshner,* No. 99–4307, 2001 U.S.App. LEXIS 19094,2001 WL 1006155 (6th Cir. Aug. 20, 2001), the plaintiff was injured while driving a stock car when he lost control of his vehicle and left the racetrack at the third turn. Applying Ohio law, the Sixth Circuit held that the racetrack owners' conduct was not wanton because it was undisputed that the majority of incidents that had occurred at turns three and four resulted in little or no injury. Similarly, in *Richards v. Michelin Tire Corp.,* 21 F.3d 1048 (11th Cir.1994), the plaintiff's decedent was killed when attempting to mount a tire. His death was caused by an explosion when he "mismatched" a 16–inch tire with a 16.5–inch rim. In the ensuing lawsuit, the plaintiff alleged claims of wanton design and wanton failure to warn. On appeal, the court found that evidence of four prior mismatches out of thirteen to fifteen million 16–inch tires was simply too remote to constitute a wanton failure to warn. *Id.* at 1058.

***20** Robertshaw argues that these cases demonstrate that mere knowledge of a potentially dangerous condition alone are insufficient to create a jury question as to whether a defendant is grossly negligent or acted with wanton indifference. Instead, Robertshaw contends that the evidence of the instant case suggests that, at most, it was aware of two prior incidents of a rubber gasket dislodging from a magnet assembly out of approximately four million valves manufactured per year. The two allegedly similar incidents out of 40 million gas control valves in a ten-year period is an insufficient basis on which to hold Robertshaw liable for gross negligence and/or willful disregard and Robertshaw requests that summary judgment be granted as to these claims.

In Michigan, gross negligence in a product liability case is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." Mich. Comp. Laws § 600.2945(d). "[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence. Rather, a plaintiff must adduce proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.' " *Maiden v. Rozwood,* 461 Mich. 109, 122, 597 N.W.2d 817 (1999). Defendants had knowledge of three dissimilar incidents where a water heater with a Robertshaw control valve exploded out of tens of millions of Robertshaw control valves does not equate to willful or wanton conduct that is so reckless as to "demonstrate a substantial lack of concern for whether injury results" and summary judgment on Plaintiffs' gross negligence claim is appropriate. This is not to say that knowledge of a set number of incidents necessarily results in imposing, or not imposing, liability; indeed, there is no evidence that Robertshaw was aware of a defect resulting in a possibly dangerous component of the control valve at the time Dow's water heater exploded.

The statutory "actual knowledge" exception for a willful disregard claim provides:

> "In a product liability action, if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge and the manufacture or distribution of the product, then Sections 2946(4), 2946a, 2947(1)(2)(4), and 2948(2) do not apply."

Mich. Comp. Laws § 600.2949A. Plaintiffs make broad

claims and present evidence that they claim support their willful disregard claims. Plaintiffs fail, however, to explain how this evidence shows (1) that Robertshaw actually knew—based on the scientific, technical, or medical information reasonably available at the time its product left its control as required under Mich. Comp. Laws § 600.2948(3)—that the product was defective such that there was a substantial likelihood that the defect would cause the injuries Plaintiffs complain about here, and (2) that Robertshaw willfully disregarded that actual knowledge. The statutory "actual knowledge" exception sets a high threshold that Plaintiffs simply do not meet and summary judgment on Plaintiffs' willful disregard claim is appropriate.

**D. Rheem's Motion for Partial Summary Judgment**

***21** Rheem has also filed a motion for partial summary judgment of Plaintiffs' claims concerning Rheem's alleged "independent fault" in the instant case-fault that does not relate to the design or manufacture of the *Dow* control valve. In particular, Rheem seeks summary judgment on Plaintiffs' service department claim, Plaintiffs' claim that Rheem failed to provide adequate warnings and instructions, Plaintiffs' claim that Rheem failed to fulfill a continuing duty to warn, instruct and/or correct its water heater and/or subject control valve, Plaintiffs' claim that Rheem did not remove the water heater and/or the subject control valve from the marketplace in a timely fashion; and any claims for other conditions of defect and/or breaches that may be ascertained during discovery. Rheem contends that Plaintiffs have abandoned all but the service department claim by not disclosing any expert opinions to support these allegations, and that the time for disclosing the opinions has passed.

In negligence actions, "the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Moning,* 400 Mich. at 443, 254 N.W.2d 759 (quoting Prosser, Torts (4th ed.), § 53, p. 324). In other words, "the standard of care is always the care which a person of reasonable prudence would exercise under the circumstances as they existed." *Antcliff v. State Emp. Credit Union,* 414 Mich. 624, 631–32, 327 N.W.2d 814 (1982). Michigan requires expert testimony to assist the jury in determining the applicable standard of care where the issues presented are "not within the ken of the average lay person." *Matzinger v. Three R's Forest Products,* No. 249612, 2005 WL 473797 (Mich.Ct.App. March 1, 2005) (holding that expert testimony was required to establish the standard of care for conducting preventive maintenance inspections on a commercial vehicle); *see also Lawrenchuk v. Riverside Arena, Inc.,* 214 Mich.App. 431, 435–36, 542 N.W.2d 612 (1995) (affirming summary disposition for defendant because plaintiff did not present expert testimony in favor of her theory that defendants' premises was negligently designed).

Rheem submits that for Plaintiffs to prevail on their service department claim, they must prove that the decision by Rheem's technical support and customer service department to send Mr. Harmon a replacement control valve was unreasonable under the circumstances. Plaintiffs have not offered any expert testimony that would assist the trier of fact in determining what is reasonable for a product manufacturer like Rheem to do "under the circumstances." Mr. Dunn's report provides no substantive opinion regarding the applicable standard of care, but provides his concluslory opinion that he is "critical of the actions taken by Rheem Technical Service Department for not meeting the standard of care." Rheem argues that what may constitute "reasonable" practice with respect to a product manufacturer's decisions to send out replacement parts and conduct its customer service operations is not within the knowledge of the average juror, and must be supported by expert testimony. This is especially true where Rheem's "decision" implicates technical issues regarding the installation and operation of liquefied petroleum gas systems.

***22** Rheem contends that Plaintiffs' "abandoned claims" require expert testimony as to the specific standard of care applicable to a manufacturer's alleged failure to warn and postmanufacture conduct with respect to its products. Michigan Compiled Laws § 600.2948(3) provides:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a failure to provide adequate warnings or instructions, a manufacturer or seller is not liable unless the plaintiff proves that the manufacturer knew or should have known about the risk of harm based on the scientific, technical, or medical information reasonably available at the time the specific unit of the product left the control of the manufacturer.

Michigan's product liability statutes require that Plaintiffs support their claims relating to Rheem's alleged failure to provide adequate warnings or instructions with expert testimony to establish the "scientific" or "technical" information reasonably available at the time the water heater left Rheem's control. Plaintiffs have not provided any expert testimony on these issues and summary judgment on the "abandoned claims" is therefore

appropriate.

Moreover, Plaintiffs have not offered any expert testimony to establish that Rheem's "independent fault" was a cause-in-fact of the incident. "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Craig v. Oakwood Hosp.,* 471 Mich. 67, 86–87, 684 N.W.2d 296 (2004). A theory on cause in fact "must have some basis in established fact." *Skinner v. Square D Co.,* 445 Mich. 153, 164, 516 N.W.2d 475 (1994).

Though "plaintiffs may show causation circumstantially, the mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation." *Id.* at 163, 516 N.W.2d 475. To satisfy this burden, a plaintiff is required to "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Id.* at 165, 516 N.W.2d 475. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.* (citation omitted). In other words, there "must be substantial evidence which forms a reasonable basis for the inference of negligence. There must be more than a mere possibility that unreasonable conduct of the defendant caused the injury. We cannot permit the jury to guess ....“ *Id.* at 166, 516 N.W.2d 475 (citation omitted).

Though not always required, expert testimony on causation is necessary, where the claim presents "technical issues that are beyond the common experience and understanding of the common juror." *Schaendorf v. Consumers Energy Co.,* No. 281001, 2009 WL 563904, at *7–8 (Mich.Ct.App., March 5, 2009). Plaintiffs have not offered any expert evidence indicating that Rheem's alleged independent fault caused the subject incident. Dunn Dep. 35–16, 175. Further, the average juror is not capable, without the aid of expert testimony, of determining whether Rheem's actions, through its technical support and customer service department or otherwise, were "but-for" causes of the incident. Such a determination necessarily requires an understanding of several technical issues regarding the installation, maintenance, and operation of the subject water heater, the replacement control valve, and liquefied petroleum gas systems in general. An average juror does not possess this type of specialized knowledge, and Plaintiffs have not offered any support for a cause-in-fact theory with regard to their independent fault allegations against Rheem. Similarly, Plaintiffs have not offered any expert testimony that any of the activities complained of in the "abandoned claims" had a causal connection to the explosion.

***23** Plaintiffs conceded at the June 3, 2011, hearing that they do not contend that Rheem's independent actions are a proximate cause of the explosion. Hr'g Tr. 8–11. Plaintiffs explain that their claims against Rheem have been made because Robertshaw believes that Rheem's actions may have been a proximate cause of the explosion. Hr'g Tr. 11 ("Whether or not [the instructions furnished with the replacement control valve are] a proximate cause is the issues. There's a fight between Rheem and Robertshaw"). That Robertshaw has an alternate theory of proximate cause is insufficient to create a genuine issue of material fact regarding Plaintiffs' independent claims against Rheem. As a result, Plaintiffs' claims of independent fault against Rheem will be dismissed.

**D. Dow's Claims in his February 16, 2011 Complaint are Barred by Res Judicata**

After Dow's injury on July 16, 2007, his mother, Jackie Dow, filed a petition for appointment of guardian of incapacitated individual with the Tuscola County Probate Court on August 30, 2007, stating that Dow lacked sufficient understanding or capacity to make or communicate informed decisions due to physical illness or disability. On September 18, 2007, the Tuscola County Probate Court ("Probate Court") appointed Mrs. Dow to be Lowren's full legal guardian and assume "care, custody, and control" of Lowren, "together with all authority and responsibilities granted and imposed by law." 09–13697 ECF No. 132 Ex. 1. Mrs. Dow indicated in her annual report to the Probate Court on August 13, 2009 that the guardianship was still necessary and should be continued. 09–13697 ECF No. 132 Ex. 4. On February 2, 2010, Mrs. Dow petitioned the Probate Court to terminate the guardianship, stating that Lowren had regained the mental and physical faculties required to "Care for his own affairs" and "make all necessary legal decisions." 09–13697 ECF No. 132 Ex. 5. The Probate Court granted Mrs. Dow's petition on February 24, 2010. 09–13697 ECF No. 132 Ex. 6. On November 19, 2010, Robertshaw filed a motion to dismiss Dow's suit for lack of capacity. 09–13697 ECF No. 132.

Dow filed a three-page response brief to Defendants' motion to dismiss on December 3, 2010. 09–13697 ECF

No. 149. Dow generally alleged that Defendants' motion should be denied because lack of capacity is an affirmative defense that was not advanced as required in their first responsive pleading. Alternatively, Dow submitted, with little explanation and no citation to legal authority, that correcting any procedural filing deficiency should relate back to the filing of the original complaint. Dow also emphasized that he was declared incompetent because he was in an induced coma while in the hospital and his only subsequent limitation was use of his hands. Dow did not give any attention to Federal Rule of Civil Procedure 17 in his response brief.

Dow then filed a second lawsuit based on the same factual allegations and requesting relief for the same legal claims on February 16, 2011. 11–10647 ECF No. 1. On its face, the complaint was filed outside the applicable statute of limitations period unless a tolling provision applies. Robertshaw and Rheem filed a motion to dismiss this complaint as time-barred by the applicable statute of limitations. 11–10647 ECF Nos. 10, 13. In its June 1, 2011, order, the Court noted that Federal Rule of Civil Procedure 17(a)(3) provides that the "real party in interest" may ratify an action within a reasonable time to avoid dismissal of an action for failure to prosecute in the name of the real party in interest. It was unclear at that juncture whether Dow had ratified the filing of the complaint on his behalf in case number 09–13697 under Rule 17(a). The Court ordered supplemental briefing on the question.

***24** Dow filed a supplementary brief on June 8, 2011, 09–13697 ECF No. 210, that, as Defendants characterized it, "addresses a wide range of issues that have already been briefed." ECF No. 211. Robertshaw's brief was filed on June 13, 2011, and asserted that neither Dow's nor his guardian's ratification of the initial filing can be inferred by his later efforts "pressing his lawsuit." ECF No. 210 at 17. Case number 11–10647 will be dismissed, however, because the claims are barred by res judicata.

Res judicata, i.e., the preclusive effect of a judgment, encompasses two distinct doctrines: claim preclusion and issue preclusion. *Taylor v. Sturgell,* 553 U.S. 880, 891–93, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). Claim preclusion "forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.' " *Id.* (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)); *see also Dodrill v. Ludt,* 764 F.2d 442, 443 (6th Cir.1985). When a previous judgment upon which the defendant bases a res judicata argument was issued by a federal court on a federal question, it is necessary to look to federal law to determine the judgment's preclusive effect. *Hamilton's Bogarts, Inc., v. Michigan,* 501 F.3d 644, 650 (6th Cir.2007). "Res judicata applies when (1) there is a final decision on the merits of the first action by a court of competent jurisdiction; (2) the second action involves the same parties, or their privies, as the first; (3) the second action raises an issue actually litigated or which should have been litigated in the first action; and (4) there is identity of claims." *Walker v. General Tel. Co.,* 25 F. App'x 332, 336 (6th Cir.2001); *see Sanders Confectionery Prod., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 480 (6th Cir.1992).

The Court's summary dismissal of Plaintiffs' claims in 09–13697 and 10–10753 is a final decision on the merits. *Nathan v. Rowan,* 651 F.2d 1223, 1226 (6th Cir.1981) (Noting that an order granting summary judgment under Federal Rule of Civil Procedure 56 is a final decision on the merits for purposes of res judicata). Moreover, Dow's second lawsuit involves identical parties and identical claims to those in his first lawsuit and are barred by res judicata.

## V

Accordingly, it is **ORDERED** that Defendants' motion to exclude the testimony of Alan Kasner (09–13697 ECF No. 134; 10–10753 ECF No. 38) is **GRANTED.**

It is further **ORDERED** that Defendants' motion to exclude the testimony of William Woehrle (09–13697 ECF No. 137; 10–10753 ECF No. 41) is **GRANTED.**

It is further **ORDERED** that Defendants' motion for summary judgment (09–13697 ECF No. 139; 10–10753 ECF No. 43) is **GRANTED.** Rheem's motion for leave to join in Robertshaw's motion for summary judgment (09–13697 ECF No. 141; 10–10753 ECF No. 45) is also **GRANTED.**

It is further **ORDERED** that Rheem's motion for partial summary judgment (09–13697 ECF No. 117; 10–10753 ECF No. 33) is **GRANTED.**

***25** It is further **ORDERED** that Plaintiffs' claims in case numbers 09–13697 and 10–10753 are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that Dow's claims in case number 11–10647 are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the remaining pending motions in case number 09–13697 (ECF Nos. 83, 85, 87, 114, 115, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 173, 179, 180, 190, 205, 206) are **DENIED AS MOOT.**

It is further **ORDERED** that the remaining pending motions in case number 10–10753 (ECF Nos. 23, 24, 30, 36, 37, 55, 56, 63) are **DENIED AS MOOT.**

It is further **ORDERED** that Defendants' motion to dismiss (11–10647 ECF No. 10) is **DENIED AS MOOT.**

This resolves all pending issues and closes the cases.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4484001, 86 Fed. R. Evid. Serv. 881

Footnotes

1 Robertshaw filed an answer on behalf of itself and Invensys Controls. ECF No. 7. Robertshaw asserts that Invensys Controls is not a corporate entity but an assumed name under which Robertshaw has done business. This issue has not yet been resolved. *See also* ECF No. 9. (noting that non-defendant Invensys PLC is a parent company to Robertshaw).

2 Rheem has filed a notice of joinder in Robertshaw's motions to exclude the testimony of Alan Kasner (09–13697 ECF. No. 134; 10–10753 ECF No. 40) and William Woehrle (09–13697 ECF No. 138; 10–10753 ECF No. 42), as well requested leave to file a notice of joinder in Robertshaw's motion for summary judgment (09–13697 ECF. No. 141; 10–10753 ECF No. 45).

3 The term "swage" is used interchangeably with the word "crimp" in the industry, according to Dr. Kasner. ECF No. 139 Ex. 4 at 105.

4 Robertshaw also filed motions to strike the expert reports of Koch, Woehrle and Dunn. ECF Nos. 83, 87. These motions are now moot as a result of the Court's conclusions on the motions discussed in this opinion and order.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4707053
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

EVERLIGHT ELECTRONICS CO., LTD., and Emcore Corporation, Plaintiffs/Counter–Defendants,
v.
NICHIA CORPORATION, and Nichia America Corporation, Defendants/Counter–Plaintiffs,
v.
Everlight Americas, Inc., Defendant.

Civil Action No. 12–cv–11758.
|
Signed Sept. 22, 2014.

**Attorneys and Law Firms**

A. Michael Palizzi, Miller, Canfield, Detroit, MI, for Plaintiffs/Counter-Defendants.

***ORDER DENYING EVERLIGHT'S DAUBERT[1] MOTION TO PRECLUDE THE EXPERT TESTIMONY OF NICHIA'S TECHNICAL AND DAMAGES EXPERT [# 312], AND GRANTING IN PART AND DENYING IN PART NICHIA'S MOTION TO EXCLUDE THE TESTIMONY OF EVERLIGHT'S TECHNICAL AND DAMAGES EXPERTS [# 314]***

GERSHWIN A. DRAIN, District Judge.

## I. INTRODUCTION

***1** Everlight Electronics Co., Ltd. (hereinafter "Everlight") filed the instant action seeking a declaratory judgment of non-infringement, invalidity and unenforceability of Nichia Corporation's (hereinafter "Nichia") patents, the '925 Patent and the '960 Patent. Nichia filed Counterclaims against Everlight for direct and indirect infringement of its patents-in-suit.

Presently before the Court are the following motions: (1) Everlight's *Daubert* Motion to Preclude the Expert Testimony of Dr. Uwe Happek, Dr. E. Fred Schubert, and John C. Jarosz, filed on June 30, 2014; (2) Nichia's Motion to Exclude the Expert Testimony of Dr. Eric Bretschneider and W. Christopher Bakewell, also filed on June 30, 2014.

These matters are fully briefed and a hearing was held on September 12, 2014. For the reasons that follow, the Court will deny Everlight's *Daubert* Motion to Preclude the Expert Testimony of Dr. Happek, Dr. Schubert and Mr. Jarosz, and will grant Nichia's Motion to Exclude some of the Expert Testimony of Dr. Eric Bretschneider, and will deny Nichia's Motion to Exclude the testimony of W. Christopher Bakewell.

## II. LAW & ANALYSIS

### A. Everlight's *Daubert* Motion

#### 1. Dr. Schubert

Everlight moves to exclude the infringement opinions and testimony of Dr. Schubert, a tenured professor in the Department for Electrical, Computer, and Systems Engineering at Rensselear Polytechnic Institute. Dr. Schubert has significant expertise in the field of LED technology and has published various works in the field of LEDs. Everlight does not move to exclude Dr. Schubert's infringement opinions based on qualification or relevance. Rather, Everlight's complaints with respect to Dr. Schubert's expert opinions center upon his purported failure to provide a detailed limitation-by-limitation analysis demonstrating how each Accused Product infringes the asserted claims. Upon consideration of the parties' oral and written submissions, and Dr. Schubert's Opening Expert Report, the Court concludes there is no legitimate basis to invoke its gatekeeping role to exclude Dr. Schubert's infringement opinions.

A party offering an expert's opinion bears the burden of

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

establishing the admissibility of such opinion by a preponderance of the evidence. *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 344, 251 (6th Cir.2001). Expert testimony is admissible only if it satisfies the requirements of Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

***2** Fed.R.Evid. 702. The district court must determine whether the expert's testimony meets three requirements: (1) the expert witness must be qualified by "knowledge, skill, experience, training or education," (2) the proffered testimony is relevant and "will assist the trier of fact to understand the evidence or to determine a fact in issue," and (3) the testimony is reliable in that it is based on scientific, technical or other specialized knowledge. Fed.R.Evid. 702; *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 529 (6th Cir.2008).

As to the third requirement, the *Daubert* court set forth the factors to be considered in determining whether to admit expert testimony as reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The factors include: (1) whether the expert's theory has been tested; (2) whether the expert's theory "has been subjected to peer review and publication;" (3) whether there is a "known or potential rate of error" and "standards controlling" the particular technique and whether it has been generally accepted within the pertinent community. *Id.; see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The factors are neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case. *Kumho Tire,* 526 U.S. at 141. As such, the trial court has broad latitude to determine whether these factors are reasonable measures of reliability in a particular case. *Id.* at 153; *see also In re Scrap Metal,* 527 F.3d at 529 (noting that the test for reliability is " 'flexible,' and the *Daubert* factors do not constitute a definitive checklist or test and may not be dispositive in every case.") "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). However, "rejection of expert testimony is the exception, rather than the rule ...." *In re Scrap Metal,* 527 F.3d at 530.

In his opening report, Schubert indicated that due to the "large number of products at issue" he split all of the Accused Products into three groups sharing common features and provided representative claim charts for each group of asserted claims and an Analysis Chart identifying the complete list of Accused Products with phosphor information for each Accused Product, along with the specific patent claims infringed and the supporting documentation for each product. *See* Dkt. No. 326, Ex. J., Expert Report of E. Fred Schubert.

As to the ′925 Patent, Schubert explained:

> 204. Claims 1–3, 5–9, and 23 of the ′925 Patent relate to LEDs using a nitride compound semiconductor and a phosphor including a garnet fluorescent material. The Everlight Accused Products accused of infringing claims 1–3, 5–9, and 23 of the ′925 Patent include at least one YAG or TAG-based phosphor. Products with only TAG-based phosphors are accused under the doctrine of equivalents. Set forth below are representative claim charts for the asserted claims, including an element-by-element analysis of exemplary YAG and TAG-based Accused Products for each of these claims. The infringement analysis set forth below applies to all of the YAG and TAG-based Accused Products. My Analysis Chart identifies the complete list of the YAG and TAG-based Accused Products identified to date, as well as the specific claims asserted and the supporting documentation for each product.

***3** *Id.* at 77–82, ¶ 204. Schubert similarly described his infringement opinions concerning all of the Accused Products accused of infringing claims 1, 2, 4 and 8–13 of the ′960 Patent. *See id.,* at 93–11, ¶ 213.

Contrary to Everlight's assertions, Scubert's expert report and Analysis Chart provide a detailed limitation-by-limitation analysis for all of the Accused Products. For example, Schubert's representative claim charts regarding the ′ 925 Patent state that the Accused Products include LEDs with the common features of (1)

YAG or TAG-based phosphors, (2) combined with a nitride compound (InGaN) semiconductor chip, and provide corresponding exemplary product information. A review of his Analysis Chart demonstrates that for each Accused Product falling within this group, Schubert provides the name and type of phosphor used, as well as the name of the semiconductor chip used, all of which are of type "InGaN."

Additionally, the Court finds no merit with respect to Everlight's claim that Dr. Schubert's infringement opinions are conclusory. For instance, Everlight complains that Dr. Schubert's Analysis Chart fails to provide any explanation on phosphor concentration or how it was measured for the Accused Products with respect to the products Dr. Schubert grouped in the "All Increasing Concentration Accused Products" group. To the contrary, Dr. Schubert provided a detailed analysis of phosphor concentration with respect to this group of Accused Products in his expert report:

> All Increasing Concentration Accused Products show a phosphor concentration that increases from the surface of a resin that contains the phosphor toward the light emitting component, or the concentration of phosphor increases from the light emitting component toward the resin surface infringe claim1.
>
> For example, the SEM cross-sectional for the EHP–A09CT31 H–PU5/5670/TR sample shows that concentration of the phosphor increases from the surface of the resin towards the blue-light emitting InGaN-based LED chip. Ex. 78. Technical Analysis Report of EHP–A09CT31H–PU5/5670/TR.

*See id.* 96–97. Moreover, Dr. Schubert's Analysis Chart indicates the test results for each Accused Product in this group.

Lastly, the Court rejects Everlight's argument that Dr. Schubert's methodology is unreliable based on the fact that he did not check all of the boxes in the chart himself and one purported inconsistency with respect to a line item out of hundreds of thousands of entries. Such issues go to the weight to be accorded Dr. Schubert's testimony, not to its admissibility. As such, based on the foregoing considerations, the Court denies Everlight's request to exclude Dr. Schubert's infringement opinions.

**2. Dr. Happek**

Here again, Everlight does not move to exclude Dr. Happek's testimony based on lack of qualification or irrelevance, rather Everlight challenges the reliability of Dr. Happek's infringement conclusions. Dr. Happek is a tenured Professor of Physics at the University of Georgia specializing in LED technologies, including phosphor technology and analysis. Everlight argues that Dr. Happek did not participate in, supervise, or observe the experiments upon which he offers opinions. Rather, he relied on Technical Analysis Reports prepared by the litigation consulting firm, TAEUS International Corporation ("TAEUS"), in conjunction with another outside laboratory, Insight Analytical Labs ("IAL"), which performed the testing on the Accused Products. Everlight maintains that Dr. Happek did not receive the raw data nor verify what he did receive contained all of the testing results. Everlight complains that Dr. Happek is nothing more than a conduit for hearsay evidence prepared by TAEUS and IAL. Lastly, Everlight asserts that it has been prevented from assessing the qualifications or methodologies used because Nichia failed to disclose TAEUS and IAL as experts as required under the Federal Rules of Civil Procedure.

***4** Everlight's criticisms contravene the record. Contrary to Everlight's arguments, Dr. Happek testified that IAL performed the experiments under his supervision and following his protocol. *See* Dkt. No. 326, Ex. D, Happek Dep. Tr. at 263, 279–80. He also had access to the raw data on a server maintained by TAEUS. *Id.* at 287. Dr. Happek was not required to supervise the ministerial work involved in actually preparing and imaging each sample. *Astra Aktiebolag v. Andrx Pharms. Inc.,* 222 F.Supp.2d 423, 491–92 (S.D.N.Y.2002). Everlight's own authority, *Therasense, Inc. v. Becton, Dickinson and Co.,* Nos. 04–02123, 04–03327, 04–03732, 05–03117, 2008 WL 2323856, at *2 (N.D.Cal. May 22, 2008) supports Dr. Happek's reliance on IAL and TAEUS. The *Therasense* court explained:

> To be sure, there will be times when an expert can work directly with client representatives to run tests and to develop facts and reasonably rely on the results in expressing an opinion at trial. For example, if an expert chooses not to conduct a copper-zinc test himself, he might supervise qualified professionals employed by the client to do so.

*Id.*

Lastly, Everlight's protestations concerning an inability to test the methodologies and qualifications of TAEUS and IAL appear disingenuous considering it has been on notice that Dr. Happek was relying on these firms since December of 2013, at the time Everlight could have sought discovery from these entities.

Based on the foregoing considerations, the Court does not

find Everlight's challenges to be appropriate for Rule 702 *Daubert* purposes, rather Everlight's arguments go to the weight to be afforded to Dr. Happek's analysis and conclusions, not its admissibility. As such, Everlight's request to exclude the testimony of Dr. Happek is denied.

**3. Mr. Jarosz**

Everlight seeks to exclude Mr. Jarosz's lost profits and reasonable royalty damages opinions arguing that Mr. Jarosz failed to use reliable methodologies. Mr. Jarosz opines that Nichia is owed $4.6 to $6.8 million in lost profits damages, as well as a reasonable royalty of 5% for the sales Nichia cannot receive lost profits damages on. Mr. Jarosz calculated the total patent damages to be $5,898,379.00.

Mr. Jarosz is an economist and Managing Principal of Analysis Group, Inc., an economic, financial and strategy consulting firm that provides research and analysis in a variety of business litigation and regulatory settings. Mr. Jarosz specializes in intellectual property valuation, monetary relief assessment and the economics of commercial success. Everlight first argues that Mr. Jarosz's lost profits opinions do not adequately demonstrate demand for the patented products because Nichia's LED products are not sufficiently similar to the Accused Products in terms of price or performance.

When an expert is called to opine on damages, his or her testimony must be rooted in "sound economic and factual predicates." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed.Cir.2002). The test for lost profits is set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978). Under *Panduit,* the patentee must show: (1) Demand for the patented products; (2) absence of non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of lost profit. *Id.* at 1156. The patent owner must show that "but for" the infringement, it would have made the infringer's sales." *BIC Leisure Prods., Inc. v. Windsurfing Int'l Corp.*, 1 F.3d 1214, 1218 (Fed.Cir.1993).

***5** Mr. Jarosz reached his lost profits conclusions by relying on the *Panduit* factors, beginning with his analysis of the demand for products practicing Nichia's technology. Mr. Jarosz ultimately concluded that Nichia would have made 22.5% to 37% of the Accused Product sales made by Everlight in the United States. Jarosz also assessed Nichia's manufacturing capabilities.

Everlight complains that Mr. Jarosz failed to consider the types of LED products offered by the parties and the prices at which those products are sold. While Mr. Jarosz's analysis with respect to price differences could be stronger, that goes to weight rather than admissibility. Mr. Jarosz considered the types of LED products sold by the parties and further analyzed the extent to which the parties compete for sales of white LEDs. *See* Dkt. No. 326, Ex. N., Mr. Jarosz Initial Report at 4–6, 17–19, 20–21, 60; Ex. O, Mr. Jarosz Fourth Report at 3–6.

Everlight primarily relies on *BIC Leisure Prods., Inc. v. Windsurfing Int'l Corp.* in support of its position. 1 F.3d 1214 (Fed.Cir.1993). The *BIC Leisure* patentee sold high-end surfboards that fell within the classification for competition level surfboarders and manufactured using the less efficient "rotomolding process." *Id.* at 1216. The accused products were low-end, entry level surfboards made using the more efficient "blowmolding process." *Id.* The *BIC Leisure* court ultimately concluded that the patent owner failed to show "but for" causation because the infringer's "entry level" surfboards were different in terms of price, product characteristics and marketing channels. *Id.* at 1219.

Here, Everlight maintains that Mr. Jarosz's conclusions run afoul of the holding in *BIC Leisure* because Mr. Jarosz failed to consider that the parties' products are not sufficiently similar in price and product characteristics. While the Court concludes that Mr. Jarosz's conclusions with respect to the pricing disparities could have been more detailed considering there is factual support in the record suggesting that the prices of the Accused Products are 40% less than Nichia's lowest priced products, the instant matter is nonetheless distinguishable from *BIC Leisure* because the products in *BIC Leisure* were so different in terms of price and manufacturing process, they could not be competitors for the same sales. Here, the parties products are not so extremely different. The record shows that Nichia and Everlight directly compete for sales.

Everlight's challenges concerning Mr. Jarosz's reliance on worldwide white LED market data and his non-infringing alternatives opinions are inappropriate at this stage of the proceedings and should be raised during cross examination, not through Rule 702. Because the Court is also denying Nichia's *Daubert* Motion with respect to Mr. Bakewell's testimony, Everlight will be permitted to put on its own damages theory to the jury. Everlight's request to exclude Mr. Jarosz's expert testimony concerning lost profits damages is denied.

***6** Everlight further complains that Mr. Jarosz's

reasonable royalty analysis is impermissibly based on non-comparable portfolio license agreements. Everlight maintains that Mr. Jarosz's conclusion that a reasonable royalty is 5% rests on flawed reasoning because it relies on licenses that grant rights far greater than the patents-in-suit.

The Federal Circuit has instructed that agreements that contain licenses to the patents-in-suit, are "highly probative." *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 695 F.3d 51 (Fed.Cir.2012) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace.") *Id.* (citing *ResQNet.com, Inc. v. Lansa,* 594 F.3d 860 (Fed.Cir.2010)).

Everlight's reliance on *ResQNet* is misplaced because "none of the [*ResQNet* ] licenses even mentioned the patents in suit or showed any other discernible link to the claimed technology." *ResQNet,* 594 F.3d 870. Here, each of the 16 agreements relied upon by Mr. Jarosz is directed to at least one of the patents-in-suit or directed to the claimed LED technology. Moreover, the licenses at issue in *ResQNet* were "re-bundling" licenses which included licenses to a number of other items like software, source code, training and marketing services. While it is true that none of the sixteen (16) agreements relied on by Mr. Jarosz are directed solely to the ′925 Patent, they are related to the ′925 Patent family. As such, the Court cannot conclude that Mr. Jarosz's testimony will not assist the jury. Everlight's criticisms concerning the relevance of the sixteen (16) licensing agreements should be raised during cross examination; they do not support outright exclusion of the subject testimony.

The cases of *Dataquill Ltd. v. High Tech Computer Corp.,* 887 F.Supp.2d 999 (S.D.Cal.2011) and *NetAirus Techs., LLC v. Apple, Inc.,* No. 10–03257, 2013 U.S. Dist. LEXIS 184514 (C.D.Cal. Oct. 23, 2010), relied on by Everlight likewise fail to support Everlight's position. The *Dataquill* and *NetAirus Techs* courts excluded the expert testimony not solely because it was based on "portfolio" license agreements, but also because it was based on agreements that had significant differences between the licensing parties and the litigation parties, as well as substantial differences between the licensed technology and the patented technology at issue in the cases. *NetAirus,* 2013 U.S. Dist. LEXIS 18514, at *19–21 (finding the license agreements were directed to a pool of standard essential patents directed to a different standard than the asserted patents); *Dataquill,* 887 F.Supp.2d at 1023–24 (finding that the subject HTC agreements were licenses from other "industry heavyweights," rather than licensors more similarly situated to the patentee, and the agreements also covered a range of varying technologies that was broader than the asserted patent).

***7** Everlight's remaining arguments concerning Mr. Jarosz's opinions on the nexus between Nichia's commercially successful products and the claimed invention are without merit. Mr. Jarosz was entitled to rely on Schubert's expert opinion that the embodiments practice the patents-in-suit. *Apple Inc. v. Motorola Inc.,* 757 F.3d 1286, 1321 (Fed.Cir.2014) ("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device."). Moreover, Everlight provides no authority for its claim that Mr. Jarosz was required to perform an element by element comparison of the embodiments and the claims of the patents-in-suit. Here again, Everlight's challenges are premature and inappropriate for Rule 702 gatekeeping purposes. Therefore, based on the foregoing considerations, the Court declines to exclude Mr. Jarosz's reasonable royalty opinions.

### B. Nichia's *Daubert* Motion

#### 1. Dr. Bretschneider's Non–Infringement Opinions Regarding the "Nitride Compound Semiconductor" Claim Limitation of the ′925 Patent

In the present motion, Nichia does not attack Dr. Bretschneider's opinions concerning the semiconductor limitation based on purported lack of qualification or lack of relevance. Rather, Nichia seeks to exclude Dr. Bretschneider's opinions based on his purported unreliable methodology. Dr. Bretschneider possesses a Ph.D in Chemical Engineering and is a member of the University of Florida Department of Chemical Engineering Advisory Board. Dr. Bretschneider indicates in his report that he has experience with MOCVD hardware design, MOCVD process development, LED package design and design of LED lighting fixtures.

Nichia argues that Dr. Bretschneider's conclusions that the Accused Products do not satisfy the nitride semiconductor limitation because they contain dopants or impurities should be excluded because Dr. Bretscheider failed to apply this Court's claim construction. *See Quality Edge v. Rollex Corp.,* No. 1:10–cv–278, 2013

U.S. Dist. LEXIS 90773, *39–40, 2013 WL 3283639 (W.D.Mich. Jun. 28, 2013). Conversely, Everlight argues that Dr. Bretschneider's opinions faithfully applied the Court's claim construction. Everlight maintains that Dr. Bretschneider's "opinions are not premised on the presence of 'dopants;' they are premised on Nichia's flawed testing techniques, or EDX testing which only detects elements present at a fraction of a percent or more."

Expert testimony should be precluded when it does not rest on a reliable foundation and is not "relevant to the task at hand." *Daubert,* 509 U.S. at 597. *An expert should not be permitted to offer* testimony on infringement or validity that does not follow the court's claim construction ruling. *LP Matthews LLC v. Bath & Body Works, Inc.,* 458 F.Supp.2d 198, 210 (D.Del.2006) ( "to the extent that the court's claim construction and related decisions are inconsistent with the opinions expressed in their respective expert reports, such opinions will not be admitted at trial.").

***8** Claim 1 of the ′925 Patent states in relevant part:

> A light emitting device, comprising a light emitting component ...; wherein said light emitting component comprises a nitride compound semiconductor represented by the formula $In_iGa_jAl_kN$ where ... i+j+k = 1 ....

The Court construed the light-emitting component claim limitation to mean: "[C]omprises a nitride compound semiconductor represented by the formula $In_i Ga_jAl_kN$, where i is greater than or equal to zero, j is greater than or equal to zero, and k is greater than or equal to zero and where i plus j plus k equals one." *See* Dkt. No. 129 at 14. The Court further opined that the "semiconductor materials contain dopants or impurities as described in examples 1, 9 and 11 of the ′925 Patent." *Id.* at 13.

Contrary to Nichia's argument, Dr. Bretschneider's opinion concerning the semiconductor limitation does not contravene this Court's claim construction. Dr. Bretschneider expressly stated that he relied on this Court's claim construction in his report. Moreover, the Court tends to agree with Everlight that Dr. Bretschneider's opinion challenges Nichia's EDX testing, which did not detect the presence of Indium in the Accused Products, despite the fact that Dr. Schubert opined that Indium is present in the Accused Products. As such, Dr. Bretschneider opined that "[i]f the relatively low level of indium in the accused products is significant in the context of the ′925 claims, then other elements at the same or higher levels would also be significant."

Here, Nichia merely disagrees with Dr. Bretschneider's application of the Court's claim construction to his analysis of the Accused Products. Such challenges are a matter for the jury during cross examination because "the application of the Court's claim construction to the accused products is a question of fact for the jury." *Tesco Corp. v. Weatherford Int'l Inc.,* 750 F.Supp.2d 780, 796 (S.D.Tex.2010); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 763 F.Supp.2d 671, 695 (D.Del.2010) ("The implications of the Court's constructions are matters on which the parties' experts may opine, and may disagree."). As such, the Court declines to exclude Dr. Bretschneider's opinions concerning the nitride semiconductor limitation.

**2. Dr. Bretscheidner's Opinions Regarding Enablement of the Markush Group Phosphor Limitations in the ′925 Patent**

Nichia argues that Dr. Bretschneider's opinions regarding enablement of the Markush group phosphor limitation should be excluded because: (1) Dr. Bretschneider is not an expert in phosphor synthesis and (2) his opinions concerning enablement are legally irrelevant.

Nichia first asserts that Dr. Bretschneider's education and experience in the general field of chemical engineering is insufficient as a matter of law to qualify him to offer opinions concerning phosphor synthesis. Dr. Bretschneider has never held a single position or published any papers relating to phosphor synthesis and he has never synthesized a garnet phosphor. As such, Dr. Bretschneider lacks the "special skill, knowledge or experience" concerning phosphor synthesis and therefore cannot be qualified as an expert on this topic. The Court, in performing its gatekeeper role, should also limit expert testimony to the area of the expert's expertise. *Sundance, Inc. v. Demonte Fabricating Ltd. .,* 550 F.3d 1356, 1363 (Fed.Cir.2008).

***9** In support of its theory that Dr. Bretschneider is unqualified to offer expert opinion on phosphor synthesis, Nichia points to the fact that Dr. Bretschneider's opinions directly contradict the opinions of Everlight's other expert, Dr. Martin Wilding, whom Dr. Bretschneider acknowledged is more qualified in the field of garnet phosphor synthesis. Specifically, Dr. Wilding opined that one of ordinary skill in the art could have synthesized garnet phosphors as described in Example 8 of the ′925 Patent. However, Dr. Bretschneider opined that Example 8 could not have been made by a person of ordinary skill in the art at the time of the invention. Nichia maintains that Dr. Bretschneider's disagreement with Dr. Wilding

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

without providing any reasoning for the disagreement shows that Dr. Bretschneider's testimony will be both unhelpful and unreliable.

Nichia also argues that even if this Court were to permit Dr. Bretschneider to testify concerning enablement of the Markush group, his opinion should be precluded because it is legally irrelevant. First, Dr. Bretschneider's assertion that claims 1 and 23 of the ′925 Patent are not enabled because GAG, LAG, and YIG cannot be formed as garnet structures is irrelevant because the unambiguous claim language excludes compositions that do not form garnets. Claim 1 of the ′925 Patent recites a light emitting device comprising a phosphor that contains a "garnet fluorescent material." Dr. Bretschneider admitted that this limitation excludes compositions that do not form a garnet fluorescent material. As such, his opinion that these compositions do not form garnets is legally irrelevant to the enablement analysis because it is based on compositions outside the scope of the claims.

The Court tends to agree with Nichia and concludes that Dr. Bretschneider's enablement opinion concerning the Markush group claim limitation must be excluded. Dr. Bretschneider's expertise in the broad field of chemical engineering does not qualify him to opine and offer testimony in all areas of the chemical engineering field. *Shreve v. Sears, Roebuck & Co.,* 166 F.Supp.2d 378, 392 (D.Md.2001) ("[A]n expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering. Unless he is to testify only to general engineering principles that any mechanical engineer would know, the engineer must posses 'some special skill, knowledge or experience,' concerning the particular issue before the court.") (internal citation omitted). While Dr. Bretschneider is trained as a chemical engineer and has experience in the general area of semiconductors and LEDs, he does not possess the requisite "special skill, knowledge or experience" concerning phosphor synthesis. *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999) (excluding testimony of engineer with no specialized experience or expertise evaluating automobile manufacturing processes or the strength of plastic automobile components). Therefore, Dr. Bretschneider's opinions concerning enablement of the Markush group claim limitation are inadmissible and the Court will grant Nichia's *Daubert* Motion with respect to Dr. Bretschneider's enablement opinions related to the Markush group claim limitation only.

### 3. Mr. Bakewell's Opinions Regarding Lost Profits Damages

***10** Nichia seeks to exclude Mr. Bakewell's opinion that lost profits damages are inappropriate in this case. Specifically, Mr. Bakewell opines that Nichia and Everlight operate in different segments of the market-Everlight in the low power level market and Nichia in the higher power market-thus there is an absence of direct competition for the "lost sales" owing to Everlight's purported infringement. Mr. Bakewell is a Managing Director of Duff & Phelps, LLC, an international consulting firm specializing in financial advisory services. Mr. Bakewell is primarily responsible for providing consulting services involving valuation and related issues in connection with technology-rich business and intellectual property. Mr. Bakewell earned a B.S. degree from Bradley University in Illinois and earned an MBA degree from the University of Maryland. He also is an Accredited Senior Appraiser in Business Valuation.

Nichia does not challenge Mr. Bakewell's qualifications nor does Nichia argue that Mr. Bakewell's anticipated testimony is irrelevant. Rather, Nichia asserts that Mr. Bakewell's analysis is unreliable. Nichia maintains that Mr. Bakewell's opinions do not rely on objective data and are unreliable because there is no "standard" governing how to properly categorize products by power levels.

Similar to Everlight's arguments challenging Mr. Jarosz's testimony, Nichia's arguments with respect to Mr. Bakewell's lost profits opinions are more appropriate for cross examination and not this Court's gatekeeping function under Rule 702. Both parties have confused credibility and accuracy of the competing experts' damages opinions with their reliability. *See In re Scrap Metal,* 527 F.3d at 529. Nichia's arguments demonstrate that entitlement to, and the amount of, lost profits damages is an issue with numerous unresolved factual issues. It would be inappropriate for this Court to "exclude [either Mr. Jarosz's or Mr. Bakewell's] testimony on the ground that the court believes one version of the facts and not the other." *Id.* (citing Fed.R.Evid. 702 advisory committee's note, 2000 amend.) (noting that a reliable expert opinion is supported by "appropriate validation" and the court's role is not to determine whether the opinion is correct but whether it "rests upon a reliable foundation, as opposed to ... unsupported speculation.")

Upon review of Mr. Bakewell's Rebuttal Report, the Court cannot conclude his opinions lack the requisite reliable foundation. In reaching his conclusion that lost profit damages are not appropriate in this case, Mr. Bakewell looked at not only the power levels, but also the

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

application in which the LED is used. *See* Dkt. 325, Ex. 16 at ¶¶ 78–85. Mr. Bakewell's opinions are not based solely on a report authored by Strategies Unlimited ("SU"), which defined low, mid and high power LEDs is incorrect. In addition to relying on Nichia's documents, Mr. Bakewell also relied on a 2012 industry report from YOLE Development. Nichia cannot dispute the SU and YOLE Development industry reports are relied on by damages experts since Nichia's own damages expert relies on industry reports prepared both by SU and YOLE Development.

***11** Mr. Bakewell analyzed both Nichia's products and the Accused Products. He opined that 72.5% of the Accused Product sales were attributable to the sale of a particular type of LED—an SMD type B LED—sold in applications such as handheld device keypads, on/off indicators and control indicators. He further concluded that Nichia makes virtually no sales in these applications, rather Nichia's sales are predominantly in indoor lighting, automotive instrument panels, automotive lighting, and signboard advertisement. Mr. Bakewell also relied in part on Nichia's documents which identified key competitors in various applications. Moreover, there is record evidence that Mr. Bakewell did not arbitrarily select a definition for low power LEDs as Dr. Bretschneider confirmed that this definition of low power was reasonable.

Lastly, Nichia's complaints that Mr. Bakewell only analyzed a subset of the Accused Products are appropriate for cross-examination on accuracy and the weight to be accorded to Mr. Bakewell's conclusions. Rule 702 exclusion is inappropriate under the circumstances. Thus, Nichia's Motion to Exclude Mr. Bakewell's lost profits damages opinion is denied.

### 4. Mr. Bakewell's Opinions Concerning Reasonable Royalty Damages

Nichia also seeks to exclude Mr. Bakewell's opinions concerning reasonable royalty damages. First, Nichia asserts that Mr. Bakewell's use of the Entire Market Value Rule ("EMVR") is divorced from the facts of the case and contrary to precedent. Specifically, Mr. Bakewell opines that the inventive aspects of the patents-in-suit are directed towards the improvements relating to the phosphor. Conversely, Nichia asserts that both the phosphor and the LED chip are integral to the claimed combinations of the patents-in-suit, therefore neither can be characterized as an "unpatented component." Nichia maintains that by ignoring the LED component recited in the claims, Mr. Bakewell does not comply with the Federal Circuit's requirement of tying damages to the claimed invention.

The Federal Circuit has explained that:

> Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest saleable patent-practicing unit.' The entire market value rule is a narrow exception to this general rule.

*LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed.Cir.2012). The exception to the traditional requirement that royalties be based on the "smallest saleable unit" is the "entire market value rule." *Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1268 (Fed.Cir.2013). The entire market value rule exception is only available when the patentee demonstrates that "the patented feature drives the demand for an entire multi-component product ...." *Laser Dynamics,* 694 F.3d at 67. It is not enough to merely show the patented technology is "valuable, important or even essential to" the use of the product. *Id.* at 68.

***12** Here, Mr. Bakewell relied on Dr. Bretschneider to conclude that the smallest salable unit relates only to a portion of the LED package, specifically the use of a garnet phosphor to alter the wavelength of the prior art blue LED. "Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device." *Apple Inc. v. Motorola Inc.,* 757 F.3d 1286, 1321 (Fed.Cir.2014). While Mr. Bakewell should have explained in detail the basis for Dr. Bretschneider's opinion in this regard, this does not automatically require exclusion. Here, there is a question of fact as to whether the patented features drive demand for the entire LED package. A complete LED package contains other features such as electrical, optical, thermal and mechanical components that are not related to the inventive aspects of the patents-in-suit. While Nichia and Mr. Jarosz disagree with Mr. Bakewell's and Dr. Bretscheneider's conclusion that the inventive aspect of the patents-in-suit relate to the addition of a garnet phosphor to the prior art blue LED, and raise some compelling arguments concerning the factual bases upon which the opinions rely, such issues go to the weight to be accorded to the testimony as opposed to its reliability.

Next, Nichia complains that Mr. Bakewell's reliance on

the 2002 Nichia–Osram Settlement Agreement renders his opinion unreliable because he failed to properly account for the circumstances giving rise to the 2002 agreement. Under the terms of the agreement, OSRAM agreed to pay a $1 million lump sum payment for the use of the ′925 Patent's technology. As such, Mr. Bakewell opines that a reasonable royalty to compensate Nichia "is no more than $1 million from the date of the hypothetical negotiation (i.e., April 2006) through the statutory lives of the patents-in-suit."

Nichia argues that it was error for Mr. Bakewell to only consider this one agreement, when the parties produced fifty-five (55) license agreements in this case and Mr. Jarosz found sixteen (16) to be directly relevant to the hypothetical negotiation, and further concluded the remaining thirty-nine (39) agreements provided some, but lesser relevance to the hypothetical negotiation. Specifically, Mr. Bakewell opined that: "[A] 2002 agreement between Nichia and OSRAM includes a unique provision that focuses on the ′925 patent, even ascribing a specific value to the ′925 patent and related rights. It is highly probative of a reasonable royalty in this case ."

In his report, Mr. Bakewell explains that he reviewed all of the license agreements produced by the parties, but found the OSRAM settlement agreement was the only relevant agreement to the hypothetical negotiation. Mr. Bakewell delineates in detail his reasons for concluding the other agreements are inappropriate for the hypothetical negotiation. While Nichia disagrees with Mr. Bakewell's conclusions in this regard, its disagreement does not mean his analysis is unreliable. Moreover, Mr. Bakewell did not ignore the fact that the OSRAM settlement agreement was a global resolution of numerous lawsuits. Rather, he expressly noted this factor, as well as discussed other considerations for evaluating the $1 million lump sum payment in relation to the patents-in-suit, including differences in market share between Everlight and OSRAM, the relevant damages period in this case compared to the OSRAM agreement and consideration of the ′960 Patent.

***13** Nichia relies on *AVM Technologies, LLC v. Intel Corp.,* 927 F.Supp.2d 139 (D.Del.2013), where the court excluded expert damages testimony that was based on one litigation settlement agreement. *Id.* at 140. However, the expert in *AVM Technologies* was relying on a single litigation settlement agreement that did not involve the same patent at issue in the *AVM Technologies* case. *Id.* As such, the court concluded that: "Whereas multiple settlement agreements might show a pattern, a single settlement agreement on a different patent without any analysis of the settlement context is not a reliable method for calculating damages." *Id.* at 144. *AVM Technologies* is also distinguishable because the expert failed to explain why other license agreements were irrelevant. *Id.* This is unlike the instant matter where Mr. Bakewell explained his reasoning for excluding all of the parties' licensing agreements save for the OSRAM agreement.

Here again, Nichia's arguments are not appropriate for Rule 702 gatekeeping purposes, rather they go to the weight to be accorded to Mr. Bakewell's reasonable royalty conclusions. Therefore, the Court likewise declines to exclude his reasonable royalty opinions.

## III. CONCLUSION

For the foregoing reasons, Everlight's *Daubert* Motion to Preclude the Expert Testimony of Dr. Happek, Dr. Schubert and Mr. Jarosz [# 312] is DENIED.

Nichia Defendants' Motion to Exclude the Expert Testimony of Eric Bretschneider and W. Christopher Bakewell [# 314] is GRANTED IN PART AND DENIED IN PART.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4707053

Footnotes

1 *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

End of Document © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3743795
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

EXPRESS ENERGY SERVICES OPERATING, L.P., Plaintiff,
v.
HALL DRILLING, LLC, et al., Defendants.

No. 2:14–cv–204.
|
Filed June 15, 2015.

**Attorneys and Law Firms**

Karl W. Koen, Monica F. Ramirez, Gauntt, Earl, Binney & Koen, L.L.P., Dallas, TX, Adam C. Smith, McDonald Hopkins LLC, Jerome W. Cook, Michael L. Snyder, McDonald Hopkins Co LPA, Cleveland, OH, Douglas J. Schockman, Stephen Charles Findley, Freund Freeze & Arnold, O Judson Scheaf, III, Mcdonald Hopkins, Columbus, OH, for Plaintiff.

Bruce Eugene Smith, Geiger, Teeple, Robinson & McElwee, Brent Allen Barnes, Geiger, Teeple, Robinson & McElwee, PLLC, Alliance, OH, Christopher L. Hamb, Robinson & McElwee PLLC, Charleston, WV, Stephen F. Gandee, Charleston, WV, for Defendants.

***OPINION AND ORDER***

GREGORY L. FROST, District Judge.

***1** This matter is before the Court for consideration of the following filings:

(1) a motion for summary judgment (ECF No. 79) filed by Express Energy Services Operating, L.P. ("Express Energy"), a memorandum in opposition (ECF No. 86) filed by Hall Drilling, LLC and Hall & Ross Resources ("the Hall Companies"), and a reply memorandum (ECF No. 102) filed by Express Energy;

(2) a motion to strike (ECF No. 88) filed by Express Energy, a memorandum in opposition (ECF No. 105) filed by the Hall Companies, and a reply memorandum (ECF No. 109) filed by Express Energy;

(3) a motion to exclude expert opinions (ECF No. 101) filed by Express Energy, a memorandum in opposition (ECF No. 107) filed by the Hall Companies, and a reply memorandum (ECF No. 111) filed by Express Energy;

(4) a motion to strike (ECF No. 103) filed by the Hall Companies, a memorandum in opposition (ECF No. 108) filed by Express Energy, and a reply memorandum (ECF No. 112) filed by the Hall Companies; and

(5) a motion to strike (ECF No. 106) filed by Express Energy, a memorandum in opposition (ECF No. 110) filed by the Hall Companies, a combined reply memorandum and motion to strike (ECF No. 113) filed by Express Energy, a memorandum in opposition (ECF No. 114) filed by the Hall Companies, and a reply memorandum (ECF No. 134) filed by Express Energy.

The Court shall address each motion in turn.

**I. Background**

The Hall Companies are in the oil and gas business.[1] As part of their business activities, they own or operate two oil and gas wells, designated as Hercher South No. 1H Well and Hercher South No. 2H Well, both of which are located in Monroe County, Ohio. Beginning in November 2013, the Hall Companies entered into a contract with Express Energy that called for Express Energy to furnish labor, materials, machinery, and supplies in connection with the drilling and use of these wells.

When a dispute arose regarding the wells, detailed below, Express Energy filed suit to recover amounts allegedly due under the contract. Express Energy asserts claims for breach of contract, on account, and *quantum meruit,* and originally sought foreclosure of a mechanics' lien on mineral interests and related property interests. The Hall Companies in turn assert counterclaims for breach of contract, negligence, and fraud in connection with Express Energy's alleged improper testing of a pipe. The

Hall Companies allege that the services provided by Express Energy included running well casing at the Hercher South No. 1H Well and performing "Torq–Tek" testing.

Events surrounding this testing serve as the basis for the parties' dispute. On November 9, 2013, Express Energy torqued together 396 joints of casing at the Hercher South No. 1H Well, while a third party drove the torqued joints down the previously drilled well. The process involved joining 396 pipes, approximately 40 feet in length, with joints between each pipe. Express Energy Torq–Tek tested each joint before the corresponding section of pipe was driven into the well. When a joint failed the Torq–Tek test, Express Energy was required to take the joint apart and re-make the joint so that it would pass the test. The Hall Companies allege that, although joint 216 failed the Torq–Tek test, Express Energy's employee indicated that the joint had been properly made up and that the casing team should proceed with the next joint. Express Energy completed all 396 joints.

***2** On November 10, 2013, the pumping of concrete to seal and hold the well casing in place commenced. Joint 216 allegedly failed during this process. The well casing was removed one section at a time, until it was determined that joint 216 had separated. The remainder of the casing—joints one through 215—remained in the ground, with the top of the remaining casing at a depth of approximately 7,500 feet. After several failed efforts to reattach the joints, the Hall Companies hired a company, Baker Hughes, to use a "harpoon" or "cut and pull spear" to puncture the top section of joint 215 and unscrew it from the pipe joint beneath it. Baker Hughes was able to remove joint 215 from the well on November 14, 2013.

After the Hall Companies allegedly failed to pay Express Energy in accordance with a contract, Express Energy filed a lawsuit in the Court of Common Pleas in Monroe County, Ohio. Of the claim initially asserted, three remain: breach of contract, action on account, and quantum meruit. (ECF No. 1 ¶¶ 21–41.) The Hall Companies subsequently removed the action to this Court in February 2014 and pursue counterclaim damages for what they contend is Express Energy's impropriety. (ECF No. 1.) The Hall Companies assert three counterclaims: breach of contract, negligence, and fraud. (ECF No. 13 ¶¶ 23–44.) Express Energy has filed a motion for summary judgment on the counterclaims (ECF No. 79), and both sides have filed multiple motions to strike related to that summary judgment motion and to a possible trial (ECF Nos. 88, 101, 103, 106, 113). The parties have completed briefing on the motions, which are ripe for disposition.

## II. Miscellaneous motions

### A. Motion to strike expert opinions of Michael G. Burns, PE (ECF No. 88)

Express Energy seeks to preclude the Hall Companies from using Michael G. Burns, PE as an expert and asks this Court to strike an affidavit submitted by Burns. Express Energy asserts that the Hall Companies failed to properly and timely identify Burns as an expert.

Review of the docket indicates that, on October 9, 2014, the Magistrate Judge previously ordered:

> The reports of primary experts must be produced no later than November 3, 2014; the reports of rebuttal experts must be produced no later than December 19, 2014. All discovery must be completed no later than January 30, 2015.

(ECF No. 61, at Page ID # 409.) It is undisputed that the Hall Companies did not produce Burns and his expert report until January 19, 2015.

The Hall Companies argue that they properly and timely produced Burns, however, because he is simply a rebuttal expert to respond to Dr. Robert S. Carbonara, a witness that Express Energy produced as one of its rebuttal experts by the December 19, 2014 deadline. To support this contention, the companies direct the Court to Federal Rule of Civil Procedure 26. That rule provides in relevant part:

> Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
>
> ***3** ...
>
> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

Fed.R.Civ.P. 26(a)(2)(D)(ii). The Hall Companies contend that Burns falls within this rule.

The Magistrate Judge's October 9, 2014 Order is silent in regard to witnesses intended to rebut a rebuttal expert. The Hall Companies argue that this means that the default

provision of Rule 26(a)(2)(D)(ii) applies, which means that their identification of Burns and production of his report were proper and timely. This approach tracks the majority view on what to do when a scheduling order is silent on the issue: a scheduling order's "failure to set a deadline for the disclosure of rebuttal expert witness reports does not mean that rebuttal expert witness reports are not permitted. It simply means that rebuttal expert witness reports must be submitted within the period set forth in Rule 26(a)(2)(D)(ii)." *Teledyne Instruments, Inc. v.* Cairns, at *17 (collecting case supporting the majority rule); *see also Hennigan v. Gen. Elec. Co.,* No. 0911912, 2014 WL 4415954, at *1 (E.D.Mich. Mar.25, 2014) (following *Teledyne* holding). The Court agrees with the majority approach and concludes that the Hall Companies properly and timely identified Burns and produced his expert report.

This is not to say that the motion to strike is wholly without merit. Express Energy argues that Burns has exceeded the scope of rebutting the report and opinions of Dr. Carbonara by opining on issues beyond metallurgical opinions. Because he is a rebuttal expert, Burns can properly rebut Dr. Carbonara by responding to the content of that expert witness' report and opinions. But as a rebuttal expert, Burns cannot exceed the scope of simply responding to Dr. Carbonara and the metallurgical issues. Any opinions offered that exceed this limited scope are impermissible.

The Court **GRANTS IN PART** and **DENIES IN PART** the motion to strike Burns. (ECF No. 88.)

**B. Motion to exclude expert opinions of Michael Chamberlain (ECF No. 101)**

Express Energy seeks to preclude Michael Chamberlain from serving as an expert witness on behalf of the Hall Companies. Express Energy argues that such exclusion is warranted because the Hall Companies failed to provide an expert report from Chamberlain as required by Federal Rule of Civil Procedure 26(a)(2)(B). The Hall Companies in turn assert that Chamberlain did not need to produce an expert report because he is a hybrid witness under Rule 26(a)(2) (C), which means that the produced summary of Chamberlain's anticipated testimony was sufficient.

This Court agrees with Express Energy that Chamberlain cannot provide expert opinion testimony. At the time of the underlying events, Chamberlain was not employed by the Hall Companies, he was not on site for the events in question but became involved only after the casing separated, and he offers opinions based on his subsequent review of information. Despite all of this, the Hall Companies offer Chamberlain as an expert to provide an expert opinion. The scope, substance, and source of his opinions, however, push him into Rule 26(a)(2)(B), not Rule 26(a)(2)(C). Chamberlain was not exempt from the report requirement.

***4** Previously, this Court held that "under the circumstances of this case, a reasonable person *would* have anticipated litigation by the time [a hired company] speared joint 215 from the well and *should* have known that joint 215 may be relevant to the litigation." (ECF No. 82, at Page ID # 750.) The Court also explained that the when the Hall Companies "inspected and photographed joint 215 after it had been speared from the well ... they should have known at that time that joint 215 would be relevant to future litigation." (*Id.* at Page ID # 751.) Similarly, the facts support that a reasonable person would have anticipated litigation when Chamberlain was dispatched to the well site following the casing failure and should have known that his opinions would be relevant to any litigation. Chamberlain was not actually involved in the events giving rise to this litigation, but was instead part of the after-the-fact contingent. His function was to decide what happened and why, which are the core issues involved in this action. Chamberlain was thus recruited by the Hall Companies to provide his expert opinion-first, to them, and subsequently, in this litigation.

Chamberlain's function is notable. It places him in the category of "an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony." *Call v. City of Riverside,* No. 3:13–cv–133, 2014 WL 2048194, at *5 (S.D.Ohio May 19, 2014) (quoting *Downey v. Bob's Discount Furniture Holdings, Inc.,* 633 F.3d 1, 6 (1st Cir.2011)). In other words, it places him under Rule 26(a)(2)(B). *See id.* (recognizing that Rule 26(a)(2)(C) is limited to experts who are involved in the events giving rise to the litigation). *See also Ulbrick v. UBR Prods.,* No. 08–cv–13764, 2011 WL 500034, at *4 (E.D.Mich. Feb.8, 2011) (holding that an after-the-fact expert falls under Rule 26(a)(2)(B), regardless of whether the expert was compensated). Consequently, Chamberlain falls into the category of an excluded expert in regard to events preceding his involvement. In regard to those events with which he was actually involved and onward, he is a fact witness who could also offer expert opinion solely as to those events.

The Hall Companies argue that if Chamberlain falls under Rule 26(a)(2)(B), the failure to produce an expert report was substantially justified and harmless. This contention

seeks to invoke the safety valve included in Federal Rule of Civil Procedure 37(c)(1). That rule provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed.R.Civ.P. 37(c)(1). But given the role that Chamberlain played in the underlying proceedings, this Court cannot accept that the Hall Defendants' position on his status was substantially justified.

***5** The Hall Companies have also not met their burden of proving harmlessness. It is well settled that a Rule 26(a)(2)(B) expert report " 'must "set forth facts" and, in doing so, outline a line of reasoning arising from a logical foundation.' " *R.C. Olmstead, Inc. v. CU Interface, LLC,* 606 F.3d 262, 271 (6th Cir.2010) (quoting *Brainard v. Am. Skandia Life Assurance Corp.,* 432 F.3d 655, 657 (6th Cir.2005)). Such a report " 'must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.' " *Id.* (quoting *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 742 n. 6 (7th Cir.1998)). The Chamberlain summary produced falls far short of what would have been contained in an expert report, precluding deeming the failure to produce harmless. *See id.* at 272 (holding that production of a deficient summary instead of an expert report was not harmless).

The Court **GRANTS** the motion to exclude Chamberlain as an expert witness on alleged causation and negligence that occurred prior to his involvement. (ECF No. 101.) In light of the failure to produce a report, Chamberlain can offer testimony from his personal knowledge, such as what he saw at the well site and the remediation effort in which he took part. He can also testify as to what Express Energy did while he was involved and what it means. But

Chamberlain cannot offer an opinion on the meaning of his observations at the well site or the meaning of the Torq–Tek data as they relate to Express Energy's conduct prior to his involvement; pre-involvement causation and negligence are off limits.

### C. Motion to strike affirmative defense (ECF No. 103)

On February 23, 2015, Express Energy filed a notice that it is asserting the affirmative defense set forth in Ohio Revised Code § 2307.23. (ECF No. 85.) That statute provides:

> [I]t is an affirmative defense for each party to the tort action from whom the plaintiff seeks recovery in this action that a specific percentage of the tortious conduct that proximately caused the injury or loss to person or property or the wrongful death is attributable to one or more persons from whom the plaintiff does not seek recovery in this action. Any party to the tort action from whom the plaintiff seeks recovery in this action may raise an affirmative defense under this division at any time before the trial of the action.

Ohio Rev.Code § 2307.23(C). Relying on this language, Express Energy indicates that it will request that the jury complete interrogatories on the counterclaims indicating what percentage of tortious conduct, if any, proximately caused injury or loss to the Hall Companies that is attributable to each person or entity from whom the Hall Companies do not seek recovery in this case.

The Hall Companies seek to strike Express Energy's notice on the grounds that because it is untimely, Express Energy has waived the affirmative defense. The notice was untimely, the Hall Companies argue, because Express Energy did not assert it until after the extended discovery deadline of January 30, 2015, and the July 8, 2014 deadline to amend the pleadings. Additionally, the Hall Companies assert that Express Energy was required to raise the affirmative defense in its answer to the counterclaims pursuant to Federal Rule of Civil Procedure 8, which provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Fed.R.Civ.P. 8(c)(1).

***6** Express Energy counters that the state statute provides for raising the affirmative defense "at any time before the trial of the action." The company also insists that, even if Rule 8(c)(1) trumps the statute, it should be allowed to raise the affirmative defense because the Hall Companies have been on notice that Express Energy would pursue an empty chair defense and point the finger at non-parties.

This Court disagrees with Express Energy. It is well settled that "[i]n federal diversity actions, state law governs substantive issues and federal law governs procedural issues." *Legg v. Chopra,* 286 F.3d 286, 289 (6th Cir.2002). Thus, "state law defines the nature of defenses"; in other words, state law governs whether a defense is an affirmative defense. *Roush v. Stone,* No. 2:08–cv–141, 2010 WL 3037003, at *2 (S.D.Ohio Aug.2, 2010). But "[t]he question of whether [a party has] waived [a] defense by failing to assert it in a timely manner is governed by federal law." *Id.* (citing

*Montgomery v. Wyeth,* 580 F.3d 455, 468 n. 7 (6th Cir.2009)). Under federal law, the " '[f]ailure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense." *Id.* (quoting *Horton v. Potter,* 369 F.3d 906, 911 (6th Cir.2004)). This general rule is subject to the qualification that " '[a] defendant does not waive an affirmative defense if the defense is raised at a time when plaintiff's ability to respond is not prejudiced.' " *Id.* (quoting *R.H. Cochran & Assoc., Inc. v. Sheet Metal Workers Int'l Assoc.,* 335 F. App'x 516, 519 (6th Cir.2009).

Here, the Ohio statute's "at any time" language is unquestionably procedural, not substantive, and its application in no way promotes forum shopping or runs afoul of similar concerns that might favor importing the procedural rule into this federal case. Express Energy could and should have raised the affirmative defense at the time required by Rule 8(c)(1), and it failed to do so. The federal rules do not promote hide-the-ball litigation, and Express Energy incurs the consequences of failing to adhere to the rules.

Additionally, permitting reliance on the affirmative defense now would be prejudicial to the Hall Companies. The companies argue that prejudice exists if the notice is not stricken because the discovery deadline has passed and, consequently, they cannot adequately address the affirmative defense. Express Energy rejects this contention on the grounds that the Hall Companies have long been on notice that Express Energy might look to non-parties to evade some or all liability. But service of a third-party subpoena in discovery and disclosure of an expert witness's opinion pointing at another entity does not necessarily mean that Express Energy is pursuing an empty chair defense. Moreover, Express Energy's argument that the Hall Companies would not have conducted discovery anyway draws too speculative an inference to support the conclusion of no prejudice. The fact that the Hall Companies apparently elected to conduct limited discovery in particular areas does not invariably mean that they would have continued to do so on the § 2307.23(C) affirmative defense. Litigation strategy varies for a multitude of reasons.

***7** The Court **GRANTS** the motion to strike. (ECF No. 103.)

### D. Motion to strike Hall affidavit paragraphs (ECF No. 113)

Express Energy seeks to strike nine paragraphs from an affidavit by Michael Hall that the Hall Companies attached to a memorandum in opposition to Express Energy's final motion to strike. (ECF No. 110, at Page ID # 2409–414.) Hall stated in previous deposition testimony that he was not an expert on the Torq–Tek system but had had the process and resulting data explained to him by Michael Chamberlain. Express Energy argues that Hall should therefore be precluded from offering the interpretation and opinions on the Torq–Tek data that he offers in the nine paragraphs at issue.

The Hall Companies disagree. They first argue that Express Energy has failed to identify specifically which portions of the nine paragraphs are contradictory, but this argument is of little weight. The briefing makes clear that Express Energy seeks to strike all of the Torq–Tek content. The Hall Companies next argue that there are no direct contradictions between Hall's deposition testimony and his affidavit. They dispute that simply because Hall is not an expert means that he cannot testify on his understanding of and opinions concerning the testing information.

There is no inconsistency between the depositions and the affidavit. Express Energy's issue with Hall goes more to his qualifications to offer an expert opinion as opposed to the affidavit disagreeing with the deposition. This raises concerns of admissibility and weight rather than of inconsistency. As such, the specific inconsistency premise upon which Express Energy purports to base its motion to strike is not well taken. *See Carson v. Ford Motor Co.,* 413 F. App'x 820, 821 n. 1 (6th Cir.2011) ("On summary judgment, the district court should not refuse to consider a statement contained in an affidavit that is not directly contradicted by prior deposition testimony."); *Yanovich v. Zimmer Austin, Inc.,* 255 F. App'x 957, 963 (6th Cir.2007) (recognizing that in the absence of a direct contradiction between a prior deposition and a subsequent affidavit, a district court should not strike the affidavit unless it tries to create a sham fact issue). Moreover, given the analysis below on the final motion to strike, any inconsistency between Hall's deposition and his affidavit simply does not matter.

The Court **DENIES** the motion to strike the nine paragraphs from Hall's affidavit. (ECF No. 113.)

### E. Motion to strike the Hall Companies' hybrid experts (ECF No. 106)

Express Energy seeks to strike the opinions and testimony of four hybrid experts offered by the Hall Companies:

Michael Hall, John Calkins, Audie Miller, and Glenn Carter. Each witness is apparently offered for the purpose of testifying about the cause of the casing separation and their opinion of the Torq–Tek testing. Express Energy asserts that all four witnesses admitted in their depositions that they lacked knowledge about the Torq–Tek software used during the casing run and that they lack the qualifications and specialized knowledge to provide a causation opinion. Thus, Express Energy concludes, the Court should exclude each witnesses' testimony as inadmissible under Federal Rule of Evidence 702 and the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

***8** The United States Supreme Court held in *Daubert* that the Federal Rules of Evidence had superseded the "general acceptance" test of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), and that Rule 702 requires that trial judges perform a "gate-keeping role" when considering the admissibility of expert testimony. *Daubert,* 509 U.S. at 597. The relevant Federal Rule of Evidence is Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Further, the Supreme Court has made clear that Rule 702 applies not only to scientific testimony, but also to other types of expert testimony based on technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The trial court's gate-keeping role is two-fold. First, the Court must determine whether the proffered testimony is reliable. *See Daubert,* 509 U.S. at 590. The reliability assessment focuses on whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.* The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief. *Id.* Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir.1994).

In *Daubert,* the Supreme Court set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable. They are:

> (1) whether the theory or technique has been tested;
>
> (2) whether the theory or technique has been subjected to peer review and publication;
>
> (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and
>
> (4) whether the theory or method has been generally accepted by the scientific community.

*Daubert,* 509 U.S. at 593–94. *See also Deal v. Hamilton Cnty. Bd. of Ed.,* 392 F.3d 840, 851 (6th Cir.2004). The Supreme Court subsequently stressed in *Kumho Tire* that in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of these *Daubert* factors when doing so will help determine that expert's reliability. *Kumho Tire,* 526 U.S. at 150. The test of reliability is a "flexible" one, however, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *Id.* (quoting *Daubert,* 509 U.S. at 593); *see also Ellis v. Gallatin Steel Co.,* 390 F.3d 461, 470 (6th Cir.2004). The particular factors will depend upon the unique circumstances of the expert testimony involved. *See* Kumho Tire Co., 526 U.S. at 151–52.

***9** The second prong of the gate-keeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue, that is, whether the opinion is relevant to the facts at issue. *See Daubert,* 509 U.S. at 591–93. This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial. *See United States v. Bonds,* 12 F.3d 540, 555 (6th Cir.1993). Thus, an expert's testimony is admissible under Rule 702 if it is predicated upon a reliable foundation and is relevant.

The United States Supreme Court and courts of appeals have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that area of expertise or that are not founded on a reliable methodology. *See, e.g., Kumho Tire Co., Ltd.,* 526 U.S. at 154–55 (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); *Weisgram v. Marley Co.,* 169 F.3d 514, 518 (8th Cir.1999) (holding that a city fire captain, although qualified as an expert on fire investigation and therefore qualified to testify as to his opinion that a fire started in the entryway and radiated to

a sofa, was not qualified to testify as to his unsubstantiated theories of a malfunction that might have caused the fire); *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1317–19 (11th Cir.1999) (proposed expert testimony of pathologist not permitted upon basis of unreliable methodologies in silicon breast implant case); *Cummins v. Lyle Indus.,* 93 F.3d 362, 371 (7th Cir.1996) (industrial engineer not permitted to render an expert opinion regarding the adequacy of warnings, the adequacy of an instruction manual, and the feasibility of alternative designs for a trim press).

The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. The judge's role is simply to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Wellman v. Norfolk & W. Ry. Co.,* 98 F.Supp.2d 919, 923–24 (S.D.Ohio 2000).

Against this backdrop, Express Energy directs this Court to deposition testimony in which each of the four witnesses admits that he is not an expert on Torq–Tek software and technology. Express Energy asserts that, as a result, these witnesses fail to qualify as experts who can opine on causation. The Hall Companies in turn argue that the Court should permit their hybrid witnesses to testify because they have extensive experience in the oil and gas industry that qualifies them under *Daubert* and Rule 702. In their reply memorandum, Express Energy disagrees, drawing a distinction between experience in the oil and gas industry and specialized knowledge or familiarity with the Torq–Tek system.

***10** The oil and gas industry is one in which experience is often the best if not the primary teacher. The undersigned grew up in the industry and worked well sites for years. The targeted witnesses' experience certainly qualifies them to opine on industry standards regarding running a well casing and how crews should perform the tasks and procedures involved at the well site. The fact that these witnesses lack sufficient knowledge to opine on the Torq–Tek testing software, metallurgy, or the engineering of downhole events only disqualifies them from offering expert opinions on those narrow, particularized areas of concern. These witnesses remain able to testify on general industry standards for running a well casing and whether the events here met or failed to meet those standards. To the extent that the witnesses' testimony on industry standards might spill over into the otherwise precluded topics, the overlap is a weight and not an admissibility issue. For example, although the witnesses can opine on whether there was proper tightening here in conjunction with industry standards, they cannot opine on whether the interpreted Tor–Tek data supports or refutes their opinion.

The Court **GRANTS IN PART** and **DENIES IN PART** Express Energy's motion to strike the Hall Companies' hybrid experts. (ECF No. 106.)

## III. Summary judgment motion

### A. Standard involved

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir.2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 234 (6th Cir.2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie,* 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad,* 328 F.3d at 234–35 (quoting *Anderson,* 477 U.S. at 251–52).

**B. Discussion**

Express Energy argues that it is entitled to summary judgment on all three of the Hall Companies' counterclaims because the Hall Companies cannot prove the causation element of each claim. This Court disagrees.

***11** In their first counterclaim, the Hall Companies assert that Express Energy breached a contract to perform various duties, including the obligation to provide proper Torq–Tek testing. To prevail on this claim, the Hall Companies must prove (1) the existence of a contract, (2) performance by the Hall Companies, (3) breach by Express Energy, and (4) damage or loss to the Hall Companies as a result of the breach. *See Asset Mgmt. One LLC v. U .S. Nat'l Ass'n,* 569 F. App'x 438, 441 (6th Cir.2014). Assuming for the sake of argument only that a contract exists, Express Energy targets the causation component of the fourth element.

In their second counterclaim, the Hall Companies assert that Express Energy was negligent in regard to its Tork–Teq examination and consequent approval of the well casing that subsequently failed. To prevail on this claim, the Hall Companies must prove that (1) Express Energy owed the Hall Companies a duty of care, (2) Express Energy breached that duty, and (3) the breach proximately caused the Hall Companies' injury. *Mid–Continent Ins. Co. v.Coder,* 563 F. App'x 422, 427 (6th Cir.2014) (citing *Lang v. Holly Hill Motel, Inc.,* 122 Ohio St.3d 120, 122, 909 N.E.2d 120, 122–23 (2009)). Express Energy targets the causation component of the third element.

Finally, in their third counterclaim, the Hall Companies assert that Express Energy made fraudulent representations regarding the results of the Tork–Teq testing performed on the well casing. To prevail on this claim, the Hall Companies must prove:

> "[1] a representation or, where there is a duty to disclose, concealment of a fact, [2] which is material to the transaction at hand, [3] made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, [4] with the intent of misleading another into relying upon it, [5] justifiable reliance upon the representation or concealment, and [6] a resulting injury proximately caused by the reliance."

*Starkey v. JPMorgan Chase Bank, NA,* 573 F. App'x 444, 447 (6th Cir.2014) (quoting *Lee v. Countrywide Home Loans, Inc.,* 692 F.3d 442, 449 (6th Cir.2012); internal quotation marks omitted). Express Energy targets all of these elements while emphasizing that the Hall Companies cannot prove that it caused the casing joints to separate.

Given the foregoing, the core issue in this litigation is whether acts or omissions by Express Energy were the proximate cause of the casing separation. Express Energy contends that it is entitled to summary judgment because none of the Hall Companies' experts can testify to a reasonable degree of scientific certainty or reliability as to the proximate cause of the casing separation. Instead, Express Energy asserts, the experts offer up a multitude of possible explanations for the separation, some of which the company contends are unreliably based on different counts of how many joints were involved.

***12** Under Ohio law, "the expression of probability is a condition precedent to the admissibility of expert opinion regarding causation" and "it relates to the competence of such evidence and not its weight." *Stinson v. England,* 69 Ohio St.3d 451, 455, 633 N.E.2d 532, 537 (1994). This means that an expert opining on causation must be able to express his or her opinion in terms of a sufficient probability-in other words, more than a fifty percent likelihood of causation. *See id.*

Review of the evidence indicates that the Hall Companies have produced sufficient expert testimony on causation to evade summary judgment. Steve Taylor, an expert for the Hall Companies, testified that although he had insufficient information from which he could pinpoint how the casing joints specifically separated, he was able to conclude that any of three separate reasons for the separation were the result of the joint not being fully made up. Reviewing his deposition testimony, Taylor later stated in an affidavit:

> I identify for the different causes given that all of them occur only when a joint is improperly screwed together. Hence, while the exact combination and sequence of events is unknown because it occurred deep inside the well, the order and combination is irrelevant to cause of the separation event—i.e. [,] an improperly screwed-together connection made-up by Express.

(Taylor Aff. ¶ 9, ECF No 86–1, at Page ID # 802.) This testimony, expressed to a reasonable degree of certainty, contradicts Express Energy's proposition that the Hall Companies cannot offer an expert who has conclusively opined on the cause of the casing separation. Taylor also explained that the joint count varied from expert to expert because they were counting or defining joints differently, with the end result being that all of the experts were still talking about the same point in the casing, regardless of the number each assigned to it. In other words, everyone agrees that joint # 216 is where the connection failed.

The central issue in this litigation is whether Express Energy caused or failed to prevent the separation. This

echoes the inquiry in *Jahn v. Equine Services, PSC,* 233 F.3d 382, 390 (6th Cir.2000) ("The central issue in this case is whether Equine Services caused or failed to prevent Night Passage's untimely demise."). The Sixth Circuit recognized in *Jahn* that "[i]n order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Id.* Similar to the experts in *Jahn,* Taylor has identified what he believes to be the probable cause of the injury based on his count of the pipe casings. This is enough.

The Court is cognizant that other expert testimony points to other causes. But it is well settled that "[c]ourts may not resolve credibility disputes on summary judgment." *Dawson v. Dorman,* 528 F. App'x 450, 452 (6th Cir.2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Given that weighing of the evidence is not permitted at this juncture and that the mere existence of a contrary opinion does not undercut Taylor's opinion for summary judgment purposes, the Court must conclude that the Hall Companies have presented sufficient evidence of causation to survive summary judgment. There is a genuine dispute over a material fact that leads to trial.

***13** This reasoning precludes summary judgment on the negligence counterclaim. The breach of contract counterclaim thus logically also survives. *See In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 908–09 (6th Cir.1982). Finally, Express Energy cannot obtain summary judgment on the fraud counterclaim. Evidence suggests that Express Energy misrepresented its services and test results and that the Hall Companies relied on those misrepresentations. Summary judgment is not warranted.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to strike Burns (ECF No. 88), **GRANTS** the motion to exclude Chamberlain as an expert witness on causation and negligence that occurred prior to his involvement (ECF No. 101), **GRANTS** the motion to strike an affirmative defense (ECF No. 103), **GRANTS IN PART** and **DENIES IN PART** the motion to strike the Hall Companies' hybrid experts (ECF No. 106), **DENIES** the motion to strike Hall affidavit paragraphs (ECF No. 113), and **DENIES** the motion for summary judgment (ECF No. 79).

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.3d, 2015 WL 3743795

Footnotes

1 There are three defendants/counter claimants in this action: Hall Drilling, LLC, variously identified in the briefing as either a West Virginia limited liability company or a Delaware limited liability company; Hall Drilling, LLC, an Ohio limited liability company; and Hall & Ross Resources, identified as an Ohio partnership. For ease of reference, the Court shall refer to these entities collectively.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1968351
United States District Court, S.D. New York.

# Deborah A. FARYNIARZ, M.D., Plaintiff, v. NIKE, INC., Defendant.

No. 00 Civ. 2623(NRB).
|
Aug. 23, 2002.

**Synopsis**

After jogger fell while running and injured her wrist, jogger brought products liability action against shoe manufacturer, alleging negligent design of shoe caused her fall and injury. On manufacturer's motion in limine to exclude expert's testimony, the District Court, Buchwald, J., held that: (1) biomechanics expert's proposed rebuttal testimony, criticizing methodology used by shoe manufacturer's expert to determine that jogger's fall while running could not have been caused by shoe, was admissible; (2) although expert could testify that jogger's shoes had long laces and stiff pull-tab, he could not testify to any conclusions based on those facts, i.e., that jogger could have tripped and injured herself while running because of laces and stiff pull-tab, as conclusions were not supported by verifiable tests; (3) manufacturer did not need to offer expert testimony to argue that jogger's expert's testimony, as to causation of jogger's injury, was unreliable, rather expert's failure to test his theory justified court's exclusion of testimony; (4) expert could testify that there existed various designs for shoe, but because he could not testify as expert regarding cause of jogger's fall, he also could not offer testimony as to what alternate designs could have prevented fall; and (5) evidentiary hearing was not necessary to determine motion to exclude expert's testimony.

Motion granted in part, and denied in part.

**Attorneys and Law Firms**

James P. Kreindler, Jacqueline James, Kreindler & Kreindler, New York, New York, for Plaintiff.

Stephen D. Straus, Gerard Benvenuto, Traub Eglin Lieberman Straus, Mid–Westchester Executive Park, Hawthorne, New York, for Defendant.

MEMORANDUM AND ORDER

BUCHWALD, J.

***1** Deborah Faryniarz, M.D., ("plaintiff") brings this products liability action alleging that Nike, Inc., ("defendant") defectively designed its Air Certitude shoes by making the laces too long and by placing a rigid "pull-tab" near the top of the heel of the shoe. Plaintiff has alleged that this design defect caused her to fall while running on April 8, 1999, causing a wrist injury that will impair her career as an orthopedic surgeon. She seeks damages for pain and suffering and future lost wages. Defendant has filed a motion in limine to exclude the testimony of Keith Williams, Ph.D., plaintiff's proposed biomechanical expert, pursuant to Fed.R.Evid. 702. For the reasons discussed below, defendant's motion is granted in part and denied in part.

*BACKGROUND*

The facts of this case are discussed in our April 8, 2002, Memorandum & Order denying defendant's motion for summary judgment. 2002 WL 530997, at *1. Plaintiff maintains that she fell when her right shoelace became caught on the raised leather pull-tab on her left shoe. Each party has put forward expert testimony relating to whether it is possible for plaintiff's shoelaces to have become caught in the manner she described. Defendant filed this motion on June 10, 2002, and it was fully briefed on July 17, 2002. In a telephone conference held July 25, 2002, we asked plaintiff to submit a supplemental affidavit setting forth specifically what her expert intended to testify to at trial in order for us to properly determine whether his testimony was admissible. In response to our request, plaintiff submitted a declaration from its expert, Keith Williams, on August 14, 2002.

Keith Williams is an Associate Professor at the University of California at Davis, where he teaches Biomechanics and Kinesiology.[1] He received a Ph.D. in Biomechanics from Pennsylvania State University in 1980. He has

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

published numerous articles in the field, and has been retained in more than a dozen lawsuits, several of which have involved footwear design. Biomechanics is a interdisciplinary field requiring training in several different scientific fields.[2] Therefore conclusions based on biomechanic must be based on technical data and tested.

Williams' proposed testimony as set out in his supplemental declaration can be divided into three types of testimony: critiques of the experiment designed by defendant's expert, Dr. Mark Grabiner; conclusions based on his observations and experience regarding the feasibility of plaintiff's theory of causation; and theories of alternate designs that Nike could have implemented to prevent the accident.

*DISCUSSION*

I. Standard for Expert Evidence

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

***2** In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court mandated that the trial judge perform a "gatekeeping" function in assessing the admissibility of expert evidence under Rule 702. Such a task involves ensuring that the expert evidence is both relevant and reliable.[3] There is no question that Williams' testimony, if reliable, is relevant. In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court applied the Daubert analysis to expert testimony by non-scientists, such as the testimony offered in this case.

Despite the Second Circuit's inclusive standard for expert testimony, a trial court should not abandon its gatekeeping role and rely only upon cross-examination to expose any flaws in a proposed expert's testimony where the expert's methodology is untestable. *Colon v. BIC USA, Inc.,* 199 F.Supp.2d 53, 78 (S.D.N.Y.2001). Proposed expert testimony may be admissible for certain purposes but not for others. *See, e.g., Colon,* 199 F.Supp.2d at 65; *Nemir v. Mitsubishi Motors Corp.,* 200 F.Supp.2d 770, 772–73 (E.D.Mich.2002).

Expert testimony cannot be based on an expert's unfounded assertion. *General Electric Co. v. Joiner,* 522 U.S. 136, 145, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (holding that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). If expert testimony purports to be based on scientific or technical principles, it must be testable. *See Deimer v. Cincinnati Sub–Zero Products, Inc.,* 58 F.3d 341, 345 (7th Cir.1995). *See also Daubert* 509 U.S. at 590 (stating that expert testimony must be based on "what is known.") Speculation and conjecture are inappropriate uses of expert testimony. *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,* 37 F.3d 804, 824 (2d Cir.1994), *overruled on other grounds, Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996).

II. Dr. Williams' Proposed Testimony

As Dr. Williams' proposed testimony covers several topics, we will address each in turn.

*A. Testimony about Grabiner's Study*

Williams intends to testify regarding the flaws in Dr. Grabiner's running simulations using the Air Certitude shoes in question. Plaintiff's counsel has expressed his intention to offer this portion of Williams' testimony to rebut Grabiner's testimony, based on his simulations, that plaintiff could not have fallen in the manner she has asserted. An expert can critique the methodology of the study of another expert without conducting an experiment of his own. *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94–95 (2d Cir.2000) (holding that expert need not have personally collected the data on which she relied). William's lengthy discussion of the flaws of Grabiner's study are admissible, and he can testify to his opinion that an accurate study would not be feasible. Williams'

testimony as to the problems with Grabiner's simulations is admissible as rebuttal to Grabiner's expected testimony that this is testable and that accident could not have occurred.

*B. Testimony Regarding Feasibility of Plaintiff's Testimony*

***3** Dr. Williams stated that "I am confident that the plaintiff's running pattern could have caused the shoe on the right foot to pass close enough to the shoe on the left foot during swing so that the lace could have caught" the pull-tab. Jacqueline James Decl., Ex. 4, Williams Decl. at ¶ 22. Williams' testimony on this topic is based on his experience and observations and his brief interactions with the shoes, which consisted of looking at the shoes from a variety of angles and poking and prodding them. Decl. of Steven Straus, Ex. G., Keith Williams Dep. at 83. Williams' conclusion that plaintiff could have fallen in the manner she alleges is not predicated upon any scientific or technical analysis of either the plaintiff or the shoes in question. Instead, Williams states that "[m]y opinion is based on experimental studies I have done over the past 25 years that have examined running mechanics for a variety of runners, with a variety of footwear, and in varying conditions and speeds." Williams Supp. Decl. at ¶ 34. Moreover, plaintiff claims that Williams relied on Nike's own specifications and the "generally accepted" fact that "a protruding material may catch on a long shoelace." Pl. Opp. Mem. at 17.

According to Williams' own statements, his conclusions regarding causation are incapable of being tested or challenged. This is precisely the type of evidence Rule 702 was intended to exclude. *Pretter v. Metro North Commuter Railroad Co.,* 206 F.Supp.2d 601, 603–04 (S.D.N.Y.2002) (granting motion to exclude testimony of an expert purporting to testify on the grounds that his reliance on a "brief and casual visual inspection" of plaintiffs' work environment and "plaintiffs' own vague, conclusory and self-serving statements" consisted of "imprecise methodology and inadequate investigation" and therefore lacked "precision, reliability, and falsifiability."). Plaintiff cites *Cacciola v. Selco Balers, Inc.,* 127 F.Supp.2d 175, 180–81 (E.D.N.Y.2001), for the proposition that testimony "may also rest on the personal knowledge or experience of the engineer." *See also Kumho Tire* at 153–54. (allowing observation-based data). However, the court in *Cacciola* excluded the proposed expert testimony on the grounds that "[t]he opinion which he would express rests upon unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation." *Id.* at 183. The case law strongly suggests that Williams' conclusions are insufficiently trustworthy to permit him to testify on the causation issue. *See Stone v. 866 3rd Next Generation Hotel, LLC,* No. 99 Civ. 4780, 2002 WL 1046706, at *3–4 (S.D.N.Y. May 22, 2002) (rejecting testimony where there was no data, testing methodology, or empirical evidence and therefore no means of measuring the reliability).

While plaintiff correctly argues that an expert may rely on his experience as the basis for his opinion, that expert must explain how that experience leads to his proffered conclusion and why it provides a sufficient basis for it. *See Nemir,* 200 F.Supp.2d at 774. We do not question that Williams can testify as a lay witness, under Fed.R.Evid. 701, to the fact that he poked and prodded the shoes and to his observations of the shoes' condition. *See Colon* 199 F.Supp.2d at 80 (permitting witness to testify to observations of the physical condition of the allegedly defective product but not to the fact that the product had been tampered with). However, Rule 701 testimony does not extend to technical conclusions. Plaintiff may not cloak non-technical evidence, which does not meet the *Kumho Tire* standard, or non-scientific evidence, which does not meet the *Daubert* standard, in expert garb. In sum, Williams can testify to the fact that plaintiff's shoes had long laces and a stiff pull-tab, but he cannot testify to any conclusions based on these facts as they are not supported by verifiable tests.

***4** Finally, despite plaintiff's claims to the contrary, Nike does not need to offer expert testimony to argue that Williams' testimony is unreliable. Pl. Opp. Mem. at 11. *See Brooks v. Outdoor Marine Corp.,* 234 F.3d 89, 92 (2d Cir.2000) (explicitly rejecting the contention that a party must use expert testimony to challenge its opponent's proffered expert testimony under *Daubert* and *Kumho Tire* ). In *Brooks,* the Second Circuit went on to state that "[t]he failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony." *Id.* Therefore, Williams cannot use his testimony that plaintiff's causation theory is untestable as the basis for his conclusion that the very same theory is credible.

*C. Testimony About Alternative Designs*

Williams stated that there are numerous alternate designs that Nike could have implemented to prevent the accident. Williams Supp. Decl. at ¶ 12. This testimony is based on his general knowledge of shoe design accumulated

through many years of involvement in the shoe industry. While this knowledge is not scientific and could potentially be offered by a shoe salesman, Williams does have sufficient knowledge of the industry to be permitted to testify to the presence of various lacing schemes and pull-tab placements in different shoe models. However, because Williams cannot testify as an expert regarding the cause of plaintiff's fall, it follows that he cannot offer testimony as to what alternate designs could have prevented the fall.

*D. Hearing Unncessary*

Although defendants requested a *Daubert* hearing, it is not necessary to hold an evidentiary hearing for every motion to exclude testimony under Rule 702. *See* Margaret A. Berger, "The Supreme Court's Trilogy on the Admissibility of Expert Testimony," *Reference Manual on Scientific Evidence* 29 (2d ed. Fed. Judicial Center 2000). Having asked the plaintiff to present a declaration setting forth her expert's direct testimony, we have determined that cross-examination by the defendant would not be useful in reaching our determination on the specific issues presented. Accordingly, we find that a pretrial hearing on this issue is not necessary.

*CONCLUSION*

For the reasons discussed above, defendant's motion to exclude plaintiff's biomechanics expert is granted in part and denied in part. Plaintiff's expert may testify to the flaws in the design of Dr. Grabiner's test and as to the availability of alternate lacing systems and pull-tab designs on the shoe market. He may not testify to his conclusions as to what caused plaintiff to fall, nor whether any of his proposed alternate designs would have prevented the incident.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1968351, Prod.Liab.Rep. (CCH) P 16,505

Footnotes

1 Williams' qualifications are drawn from his curriculum vitae. Decl. of Jacqueline James, Ex. 2.

2 According to the web pages of several programs offering degrees in Biomechanics, the curriculum includes courses in biology, chemistry, physics, statistics, and engineering. *See, e.g.,* Stanford University Biomechanical Engineering Division, *MSE: BME Degree Requirements, at* http://www.stanford.edu.group/biomech/msebme.html (last visited August 14, 2002); Occupational and Industrial Orthopedic Center, *Courses in Ergonomics and Biomechanics, at* http://www.oioc.org/er_cou.htm (last visited August 14, 2002).

3 Factors that may be considered in determining the reliability of an expert's reasoning include whether the expert's theory can be tested, whether there has been peer review or publication, the existence of known or potential error rates and standards governing the technique's operation, and whether there has been general acceptance of the methodology in the scientific community. *Daubert,* 509 U.S. at 593–94.

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 35539238
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Janice FLEBOTTE, Patricia Jez, Robert Miklasiewicz, and Gloria Gay, Plaintiffs
v.
DOW JONES & COMPANY, INC., Defendant

No. Civ.A. 97–30117–FHF.
|
Dec. 6, 2000.

**Attorneys and Law Firms**

Michael O. Shea, Law Office of Michael O. Shea, Wilbraham, MA, for Plaintiffs.

Dennis M. Duggan, Jr., Donna Y. Porter, Nixon Peabody, LLP, Boston, MA, Mark H. Burak, Robert M. Shea, Morse, Barnes–Brown & Pendleton, P.C., Waltham, MA, for Defendant.

*MEMORANDUM AND ORDER*

FREEDMAN, Senior J.

I. INTRODUCTION

***1** This employment discrimination case involves a 1994 reduction in workforce by the defendant, Dow Jones & Company, Inc. ("defendant"). The plaintiffs, employees of the defendant who were terminated in 1994, allege age discrimination pursuant to Massachusetts General Laws, chapter 151B. The parties now move to exclude their opponents' statistical expert evidence.

II. FACTS

The defendant operates a customer relations department in Chicopee, Massachusetts with a call center for customer service requests and complaints. In 1994, the defendant staffed its call center with three classifications of employees. First, the "Customer Service Representative/Phone" ("CSR/phone") employees handled incoming customer calls. The defendant employed both full-and part-time CSR/phone employees. Part-time employees generally worked twenty-five hours per week or less and, typically, worked five three-hour shifts between 7:00 a.m. and 10 a.m. Second, the defendant also employed individuals in the position of "Customer Service Representative/Special Handling" ("CSR/special handling"). The individuals in these positions generally handled written customer correspondence, correspondence with corporate accounts, and occasionally handled overflow telephone calls. Additional training is usually required to transfer from a CSR/phone position to a CSR/special handling position because the latter position requires written communications skills and involves more complicated problems. The third and final employee classification in the call center was "Customer Service Representative II" ("CSR II"), which had responsibilities similar to those of CSR/phone employees.

Between 1989 and 1994, the defendant maintained within its call center an "Intensive Care Unit" ("ICU") to handle repeat consumer complaints. The ICU was staffed by a supervisor, four full-time customer service representatives ("CSRs"), and three part-time CSRs. The plaintiffs to this action were employed as full-time CSRs in the ICU. In November 1994, the defendant eliminated the ICU and its full-time employees, including the plaintiffs, as part of a nationwide reduction-in-force aimed at balancing its budget. The elimination of the ICU was only one of many actions taken by the defendant to reduce its 1995 budget.

III. DISCUSSION

A. *Defendant's Motion to Exclude Plaintiffs' Expert*

*Statistical Evidence*

The plaintiffs seek to admit the expert testimony of Dr. Craig L. Moore ("Dr.Moore") and Dr. George W. Cobb ("Dr.Cobb"). The defendant now moves to exclude plaintiffs' statistical expert evidence as inadmissible under Fed.R.Evid. 702 on the following grounds: (1) the statistical data did not take account of the defendant's nondiscriminatory explanation for elimination of the ICU; (2) the plaintiffs' experts did not compare similarly situated employees; (3) this Court has already rejected the statistical expert evidence as not probative of age discrimination; and (4) the prejudicial effect of the plaintiffs' statistical evidence outweighs its probative value. In addition, the defendant contends that the evidence is inadmissible because statistical data has little probative value in disparate treatment cases, and the plaintiffs' statistical experts conclude only that the elimination of the ICU had a disparate *impact* on older workers, while only the disparate *treatment* claims remain.

***2** Dr. Moore conducted various statistical tests on a pool of 128 employees of the defendant in Chicopee, all of whom work in customer service and whose duties involve use of the telephone. Although he stated that a valid statistical study must be conducted only with a group of employees who are "similarly situated with regard to skill, effort, and responsibility," various differences are apparent among the employees included in his sample group. Defendant's Motion to Exclude Plaintiffs' Statistical Expert Evidence, Exhibit A, at 1. For instance, some employees were part-time and others were full-time. Some were supervisors and others non-supervisors. Finally, customer service employees with various levels of experience were also included in the sample. He concluded that the results of his tests provided data that "clearly shows that older workers were adversely impacted" by the defendant's termination decisions. *Id.* at 3.

Dr. Cobb's analysis compared the plaintiffs with 112 employees in Chicopee. Although Dr. Cobb did not include supervisory employees in four of his eight statistical tests, he apparently included both full-time and part-time employees in the sample group. In addition, his tests included non-supervisory employees with three position titles: (1) CSR/special handling; (2) CSR/phone; and (3) CSR II. He concluded that "the chance is less than 1 in 100 that an age-blind decision about terminations would produce a difference as large as the one that actually resulted from the decision at Dow Jones." Defendant's Motion to Exclude the Plaintiffs' Expert Statistical Evidence, Exhibit B, at 45.

1. Admissibility of Plaintiffs' Statistical Evidence Under Fed.R.Evid. 702

The defendant articulates two primary arguments for excluding the plaintiffs' statistical expert evidence under Rule 702. First, it contends that Dr. Moore and Dr. Cobb did not account for the defendant's nondiscriminatory explanation for terminating the plaintiffs—that it intended to reduce costs by eliminating full-time ICU employees. The inclusion of part-time employees and those not employed in the ICU in their analyses, the defendant complains, renders their results flawed and not probative of discriminatory intent. Second, it argues that Drs. Moore and Cobb did not analyze similarly situated employees. By including in their study part-time employees, those employed outside the ICU, and special handling CSRs, they thus rendered their analyses flawed.

The plaintiffs counter that their experts did not fail to consider relevant variables. Inclusion of part-time employees in the studies, the plaintiffs argue, was appropriate because part-time employees were considered for termination by the defendant. In addition, the plaintiffs contend that the employees included in the study differ only slightly with regard to job training and responsibility and therefore are, for the purposes of their analyses, interchangeable.

"In *Daubert,* [the Supreme] Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "Reliability" of scientific knowledge is determined by assessing a non-exclusive list of factors including: (1) whether it has been tested; (2) whether it has been peer reviewed or published; (3) the known or potential rate of error; and (4) whether it has received "general acceptance" within a relevant scientific community. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 further requires the Court to evaluate the relevance of the proffered reasoning or methodology by assessing whether it can reasonably be applied to the facts at issue. *Id.* at 591. The purpose of the gatekeeper requirement in *Daubert* is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152. Nevertheless, Rule 702 must be interpreted and applied in concert with "the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert,* 509 U.S. at 588

(quotations omitted).

***3** In general, statistical expert evidence suitably designed to address a material issue will be held admissible under the Federal Rules of Evidence. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 86 (2000) (most statistical methods "are capable of producing useful results when carefully and appropriately applied," and therefore "generally satisfy important aspects of the 'scientific knowledge' requirement articulated in *Daubert* ....") Moreover, statistical analyses need not include all measurable variables to be admissible. *See, e.g., Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). In *Bazemore,* the Supreme Court stated:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence of discrimination. Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

*Id.* at 400. The First Circuit has recently echoed this approach, stating that "[statistical] analyses are admissible even in disparate treatment cases unless they are so incomplete as to be inadmissible as irrelevant." *McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals,* 140 F.3d 288, 303 (1st Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *see Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1338–39 (1st Cir.1988).

In this case, the defendant does not challenge the reliability of the particular statistical tests employed by the plaintiffs' experts, such as the "simple t test" and the "rank sum test." Instead, the defendant questions the relevance of the analyses used to the specific facts at issue in this case, and contends that the statistical tests used were executed so poorly that they were unreliable, and thus inadmissible. The Court concludes, however, that the proffered statistical evidence survives the *Daubert* inquiry. Although the disputed statistical analyses may be subject to the various flaws indicated by the defendant, such imperfections affect their probative value rather than their admissibility. *See Adams v. Ameritech Services, Inc.,* C.A. Nos. 98–1056, 98–2259, 98–2307, 98–2426, 98–2522, 2000 WL 1578314, at *12–13 (7th Cir. Oct.23, 2000) (in age discrimination case, failure of statistical analysis to take into account or control for non-age related variables goes to weight, not admissibility); *Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1129 (6th Cir.1998) (in age discrimination case for termination arising in context of company restructuring, statistical analysis that included positions unaffected by the reorganization held admissible). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

***4** The defendant's first contention, that the plaintiffs' statistical evidence must be excluded because it fails to account for the defendant's nondiscriminatory explanation regarding alleged statistical disparities, presents the Court with a close question. The defendant explains that the sole criterion for termination during its reduction in force was whether an employee worked full-time in the ICU.[1] Dr. Moore and Dr. Cobb's inclusion in their analyses of employees whose positions were unaffected by the layoffs, argues the defendant, renders their analyses unreliable and, thus, inadmissible. The argument is persuasive, and courts that have considered this precise question are divided. *Compare Doan v. Seagate Technology,* 82 F.3d 974, 979 (10th Cir.1996) *cert. denied,* 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997) (in age discrimination action arising out of reduction in force, statistical analysis excluded because it failed to compare similarly situated employees and ignored fact that only certain employees subject to terminations), *with Scott,* 160 F.3d at 1129 (statistical analysis showing that age of employees terminated was greater than age of those whose positions were retained held admissible although sample included employees whose positions not jeopardized by reduction in force). Based upon the First Circuit's instruction that statistical studies are admissible unless they are so incomplete as to be irrelevant, however, the Court concludes that the failure to account for the defendant's nondiscriminatory explanation for the terminations does not affect the admissibility of the proposed statistical evidence. *See McMillan,* 140 F.3d at 303. "[W]hile the statistics were not as probative as they perhaps may have been, they do reveal some startling age comparisons between persons occupying positions that were eliminated and those unaffected by the reorganization." *Scott,* 160 F.3d at 1129.

The Court also rejects the defendant's additional argument that the plaintiffs' experts compare employees who are not similarly situated by equating full-time employees with part-time employees, phone CSRs with special handling CSRs, and ICU employees with non-ICU employees.[2] It is true that there exist clear differences between these groups of employees in terms of responsibility and training. For instance, part-time employees are not identically situated with full-time employees, as they "work fewer hours and receive less

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

pay and fewer benefits." *Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1155 (7th Cir.1997). Nevertheless, the Court concludes that the differences cited by the defendant do not provide a sufficient distinction to warrant exclusion of the disputed evidence. *See Adams,* 2000 WL 1578314, at *2, 11, 13 (statistical evidence that compared 13 different job titles among vice-presidential salary range held admissible although different job titles signified varying levels of responsibility). Here, too, the Court is guided by the First Circuit's instruction that issues related to the "reliability of [statistical] analysis affect[s] not the *admissibility* of [the] testimony, but the *weight* which the jury might choose to give to it." *Freeman,* 865 F.2d at 1338–39 (in age discrimination action for wrongful termination, statistical evidence regarding departure rates for high-ranking employees admissible although pool of employees analyzed included both voluntary and involuntary departures).

***5** The defendant cites to numerous cases in which courts determined that proposed statistical analyses were entitled to zero weight because they compared employees who were not similarly situated. However, the differences between the employees compared by plaintiffs' experts in this case are not so stark as are the differences between employees in the cited cases. *See, e.g., Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1456 (10th Cir.1994) (statistical evidence not probative of discrimination where defendant company's policy was to terminate lowest-rated employees, and plaintiff "ranked last in the departmental ranking for her labor grade"). For instance, in *Sheehan v. Daily Racing Form, Inc. .,* 104 F.3d 940, 942–43 (7th Cir.1997), *cert. denied,* 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997), the statistical analysis was ruled inadmissible in part because it compared the plaintiff, who was the newspaper's assistant editor and "number two man," with an employee sample in which only two of seventeen employees were supervisors, and included "unionized workers with no supervisory responsibilities." *Id.* at 941, 942. By contrast, the employees included in Dr. Moore and Dr. Cobb's samples, like the plaintiffs, all worked in the customer services area. In addition, like the plaintiffs, the vast majority of these employees worked exclusively on the telephone, with no supervisory responsibilities. Accordingly, the relatively minor differences between the employees used in the plaintiffs' statistical study do not require that the evidence be ruled inadmissible.

The defendant's remaining citations are to cases in which courts excluded statistical expert evidence that shared the purported flaws of the plaintiffs' experts in this case and, *in addition,* were permeated by other problems. *See Munoz v. Orr,* 200 F.3d 291, 301 (5th Cir.2000), *cert. denied,* 531 U.S. 812, 121 S.Ct. 45, 148 L.Ed.2d 15 (2000) (statistical expert evidence excluded where it failed to control for other explanatory variables, expert demonstrated impermissible bias and mistakenly stated that statistical analysis could identify cause of numerical disparities); *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 202–03 (2d Cir.1999), *cert. denied,* 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999) (in age discrimination case, statistical study excluded where it relied upon a "misleading age grouping that impermissibly skews the data"); *Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir.1999), *cert. denied,* 120 S.Ct. 2699 (2000) (statistical analysis inadmissible where it failed to account for nondiscriminatory explanations of disparity and was based on a statistically insignificant sample); *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746–47 (10th Cir.1991) (same). "Taken cumulatively," the multiple infirmities with the proffered evidence in these cases led to a conclusion that it was unreliable. *Munoz,* 200 F.3d at 302. Such is not the case here.

The defendant also argues that this Court has already rejected the plaintiffs' statistical expert evidence as not probative of age discrimination. In its Memorandum and Order dated June 10, 1999, the Court stated:

> ***6** Much of [the plaintiffs'] evidence does not strike the Court as significant. The plaintiffs' statistical evidence does not tend to prove the reduction in force at Dow Jones disproportionately affected older employees, as many CSRs and supervisors older than the plaintiffs did not suffer termination as part of the reduction in force.

*Flebotte v. Dow Jones & Co.,* 51 F.Supp.2d 36, 42 (D.Mass.1999). Contrary to the defendant's suggestion, the Court's order concluded neither that the plaintiffs' statistical evidence was entitled to zero weight nor that it was inadmissible on the ground of relevance. Indeed, the Court ultimately denied the defendant's motion for summary judgment only because all of the evidence considered together, including the statistical evidence, established a genuine issue of material fact with respect to pretext. *See Flebotte,* 51 F.Supp.2d at 44 ("the plaintiffs' evidence *as a whole* suffices to establish a genuine issue of fact with respect to pretext....") (Emphasis added). Therefore, it is apparent that the Court's commentary on the limited probative value of the plaintiffs' statistical evidence was not intended to mean that it must be excluded from evidence at trial.

Finally, the Court rejects the defendant's argument that the prejudicial effect of the plaintiffs' expert reports outweighs its probative value, and should therefore be excluded pursuant to Fed.R.Evid. 403. *See Adams,* 231 F.3d 414, 2000 WL 1578314 at *13. "Normally the

balancing process contemplated by that rule is best undertaken at the trial itself." *Id.* Based on the limited but important role the plaintiffs' statistical evidence can play at trial, the Court declines to rule at this time that such evidence will be unduly prejudicial to the defendant. However, "if the case goes forward to a trial, [the Court] will be free to re-weigh the admissibility question under Rule 403 and come to a fresh conclusion ." *Id.*

2. Use of Statistical Evidence in Disparate Treatment Case

The defendant's argument that statistical data has little probative value in disparate treatment cases is also without merit. The First Circuit has consistently held that statistics are relevant in disparate treatment cases even though they carry less probative value than in a disparate impact case. *See McMillan,* 140 F.3d at 303. Accordingly, statistical analyses are admissible in disparate treatment cases unless they are "so incomplete as to be inadmissible as irrelevant." *Id.* at 303. The Court concludes, based on the discussion regarding the admissibility of the plaintiffs' statistical expert evidence under the *Daubert* standard, that the reports of Dr. Moore and Dr. Cobb are not inadmissible as irrelevant, although they may contain flaws.

The defendant also contends that the statistical evidence is not relevant to this case because Drs. Moore and Cobb conclude only that the elimination of the ICU had a disparate impact on older workers, a conclusion that is not relevant to a case alleging disparate treatment. However, Dr. Moore's affidavit dated July 13, 2000 responds that the analyses presented have probative value in evaluating a claim of disparate treatment. He contends that statistical evidence in support of the claim that older workers were disproportionately affected by the elimination of the ICU may be probative of a claim of disparate treatment. Thus, Dr. Moore does not concede, as the defendant suggests, that his analysis is not useful in evaluating a claim of disparate treatment. Accordingly, the Court concludes that the defendant's argument does not affect the admissibility of the disputed statistical evidence.

B. *Plaintiffs' Motion to Exclude the Testimony of Defendant's Statistical Expert Evidence*

***7** The defendant seeks to admit the expert testimony and joint report of Dr. David S. Evans ("Dr.Evans") and Dr. Christopher Erath ("Dr.Erath"). Dr. Evans and Dr. Erath's joint report concluded that "Dow Jones made a decision to eliminate a unit and all full-time employees within it; therefore, in this case, statistics can play no role in assessing adverse impact by age because all such employees were terminated." Plaintiffs' Motion in Limine to Exclude the Testimony and Opinion Evidence of Mr. Evans and Mr. Erath, Exhibit 1, at 3. The defendant's experts offered a secondary conclusion that if statistical analyses were conducted despite the elimination of the ICU, such analyses do not support the contention that older workers were adversely impacted in the termination process. Drs. Evans and Erath intended to use only full-time customer service employees assigned to the telephones in their statistical analysis. During Dr. Erath's deposition, however, he admitted that the analysis included CSR II employees, who did not use the telephone as part of their responsibilities.

The plaintiffs move to exclude the testimony of the defendant's statistical experts on the following grounds: (1) both of the defendant's experts violated Fed.R.Civ.P. 26(a)(2)(B) by conducting tests not submitted with the report; (2) Dr. Evans violated Fed.R.Civ.P. 26(a)(2)(B) by failing to personally prepare his expert report; (3) Dr. Erath's statistical analysis relied upon incorrect factual assumptions; and (4) the defendant's experts lack the credentials in statistics to be qualified as experts in that field.

1. Fed.R.Civ.P. 26 Violations

The plaintiffs first argue that Dr. Erath violated Rule 26(a)(2)(B) by conducting several tests but not including them in the report. The defendant contends that the rule requires no such disclosure.

Fed.R.Civ.P. 26(a)(2)(B) provides, in pertinent part:

> Except as otherwise stipulated or directed by the court, the [initial disclosure] shall, with respect to a witness who is retained ... to provide expert testimony in the case ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions....

"A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness or information not so

disclosed.” Fed.R.Civ.P. 37(c)(1). “Because the defendant seeks to strike the designation of the expert witness, the Court considers the motion as one for sanctions, pursuant to Fed.R.Civ.P. 37(c).” *Marek v. Moore,* 171 F.R.D. 298, 299 (D.Kan.1997).

The Court concludes that the plaintiffs’ argument is based upon an interpretation of Rule 26(a)(2)(B) that is, at best, strained. The plain language of Rule 26(a)(2)(B) merely requires disclosure of a “written report stating the testimony the witness is expected to give during direct examination, together with the reasons therefor.” Fed.R.Civ.P. 26(a)(2)(B) advisory committee’s note. In addition, the primary purpose of Rule 26(a)(2) is “to require disclosure of expert testimony sufficiently in advance of trial so that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.” *Mounger v. Goodyear Tire & Rubber Co.,* No. 99–2230–JWL, 2000 WL 1466198, at *1 (D.Kan. Sept.22, 2000). Therefore, neither the plain language of the rule nor its purpose compels disclosure of every calculation or test conducted by the expert during formation of the report. *See Villalba v. Consol. Freightways Corp. of Delaware,* No. 98–C–5347, 2000 WL 1154073, at *11 (N.D.Ill. Aug.14, 2000). Indeed, the defendant’s expert disclosure provided the plaintiffs with a fair opportunity to adequately prepare a rebuttal to the defendant’s expert testimony. Accordingly, the Court rejects the plaintiffs’ argument that Drs. Erath and Evans violated Rule 26(a)(2)(B) by conducting several tests not contained in their reports.

***8** The plaintiffs also argue that Dr. Evans did not comply with the requirement of Rule 26(a)(2)(B) that the written report be “prepared and signed by the witness” because he did not personally prepare the statistical report.[3] The defendant counters that Dr. Erath’s assistance in the preparation of Dr. Evans’ report does not constitute noncompliance with the rule.

Although Dr. Evans was unable to recall specifically the process by which the expert report submitted jointly by himself and Dr. Erath was drafted, he was able to describe how it was probably compiled based upon how his expert reports are usually produced. He testified in his deposition that Dr. Erath ordinarily supervised the input of the data and the statistical analysis, and wrote the first draft of the report. He added that the calculations were done by Dr. Erath or by one of the researchers on his staff. Drs. Evans and Erath typically discussed the report, and Dr. Evans subsequently made appropriate changes to it. Dr. Evans also specifically testified that he reviewed and relied upon various data for his analysis in this case, and that he and Dr. Erath collaborated in deciding which groups of employees to analyze.

Rule 26(a)(2)(B) states that expert reports must be prepared and signed by the expert witness. Although the advisory committee’s note provides that others may assist in the preparation of such reports, it is generally accepted that the rule requires the expert to “substantially participate in the preparation of his report.” *Manning v. Crockett,* No. 95–C–3117, 1999 WL 324715, at *3 (N.D.Ill. May 18, 1999). In addition, “the final report must be that of the expert.” Coquillette, Daniel R. et. al., Moore’s Federal Practice 3d § 26.23 [4]. The few reported cases interpreting Rule 26(a)(2)(B) indicate that the preparation and signing requirement is designed to ensure that expert reports express “what the expert has freely authorized and adopted as his own and not merely for appeasement or because of intimidation or some undue influence by the party or counsel that has retained him.” *Marek,* 171 F.R.D. at 302.

In this case, the Court concludes that the defendant’s experts’ report complied with the threshold requirements of Rule 26(a)(2)(B). Although he received help from Dr. Erath as well as from other research assistants, Dr. Evans formulated the initial opinion, reviewed the source information, reviewed the draft report, and prepared and signed the final report. There is no bar to an expert relying on this type of assistance from others during the preparation of a report. *See United States v. Dalide,* 227 F.3d 385, 392 n. 6 (6th Cir.2000). A contrary ruling would mean that an expert could never be assisted by more junior colleagues in the preparation of an expert report without the potential of being precluded from testifying. The Court declines the plaintiffs’ invitation to read Rule 26(a)(2)(B) in a manner that would compel such a result.

2. *Reliability of Dr. Erath’s Statistical Report Under Daubert*

***9** The plaintiffs next argue that Dr. Erath’s expert statistical report is unreliable under *Daubert* because it compares employees who are not similarly situated. Specifically, the plaintiffs complain that Dr. Erath’s statistical analysis compared customer service employees who used the telephone in their usual responsibilities with those who did not so utilize the telephone. The defendant counters that the plaintiffs attack a secondary conclusion of Drs. Evans and Erath, but do not address their primary opinion that no statistical analysis is appropriate in this case.

The Court concludes that the plaintiffs' argument is without merit. First, it does not address the reliability of the defendant's experts' primary conclusion that statistical analysis is not appropriate in this case. Second, the dissimilarities among employees analyzed in the defendant's experts' statistical report are so slight that they affect only the weight, not the admissibility, of the statistical data. *See Adams,* 231 F.3d 414, 2000 WL 1578314, at *12–13. This conclusion, moreover, is consistent with our ruling that the plaintiffs' statistical expert evidence is admissible despite similar dissimilarities among employees analyzed in the data pool.

3. Qualifications of Defendant's Experts

Finally, the plaintiffs argue that Drs. Evans and Erath are unqualified to provide expert testimony in the field of statistics because their training occurred primarily in the field of economics.[4] The defendant contends that its experts are abundantly qualified to testify as statistical experts in this case, as they apparently have in numerous cases before.

Fed.R.Evid. 702 requires the trial court to "determine whether the putative expert is qualified by knowledge, skill, experience, training, or education." *Mitchell v. United States,* 141 F.3d 8, 14 (1st Cir.1998) (quotations omitted). The curriculum vitae submitted by both proposed experts indicates that they have been qualified as statistical experts in sex and age discrimination cases on many prior occasions. In addition, the plaintiffs make no credible argument that Drs. Evans and Erath are unqualified to testify based upon their knowledge, experience, or training. That their education was in the field of economics is not, by itself, sufficient to justify exclusion of the witnesses from trial. Accordingly, the Court rejects the plaintiffs' final argument.

The plaintiffs also attack Dr. Erath's evidence on damages. The Court will take this motion under advisement and address it when it addresses the defendant's Memorandum to Exclude Plaintiffs' Damages Expert Evidence. In addition, the Court determines that the plaintiffs' additional arguments are frivolous and do not warrant further consideration.

IV. CONCLUSION

Accordingly, the Court DENIES the defendant's motion to exclude the plaintiffs' statistical expert evidence, and DENIES the plaintiffs' motion to exclude the defendant's statistical expert evidence. Finally, the Court DENIES the plaintiffs' motion to file a supplementary memorandum in support of their opposition to defendant's motion to exclude their statistical expert evidence.

***10** It is So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 35539238

Footnotes

1 The plaintiffs, on the other hand, contend that part-time employees were subject to termination. For the purposes of this discussion only, the Court assumes, but does not now decide, that only full-time employees were subject to the defendant's reduction in force.

2 The defendant's additional argument that Patricia Jez, a supervisory employee, was incorrectly compared with non-supervisory employees, was rendered moot by this Court's decision to grant summary judgment to the defendant on Jez's claim.

3 The plaintiffs also argue that the defendant's experts violated Rule 26 by failing to sign their expert reports. This contention is inaccurate, as both experts signed their reports. Accordingly, the Court does not address this argument further.

4 The plaintiffs' additional argument that Drs. Evans and Erath are unqualified because they were not familiar with the "rank sum" test or the "standard deviation test" is not only frivolous, but misleading. The record clearly reflects that, when asked, both experts demonstrated familiarity with both concepts. Accordingly, the Court does not address this argument further.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3911196
United States District Court, N.D. California.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
DIRECTV, INC., et al., Defendants.

Case No. 15-cv-01129-HSG
|
Signed 08/16/2018

**Attorneys and Law Firms**

Dean Graybill, David C. Shonka, Federal Trade Commission, Washington, DC, Eric David Edmondson, Boris Yankilovich, Emily Cope Burton, Erika Ruth Wodinsky, Evan Rose, Jacob Adam Snow, Karen Goff, Kerry O'Brien, Lin Wang Kahn, Matthew David Gold, Federal Trade Commission, San Francisco, CA, Faye Chen Barnouw, Kenneth Hatheway Abbe, Raymond Edward McKown, Stacy Rene Procter, Federal Trade Commission, Los Angeles, CA, for Plaintiff.

Chad Samuel Hummel, Bridget Santorelli Johnsen, Sidley Austin LLP, Mark Douglas Campbell, Loeb & Loeb LLP, Los Angeles, CA, Katie Dolan-Galaviz, Peter D. Marketos, Reese Marketos LLP, Jeffrey Mark Tillotson, Tillotson Law, Dallas, TX, Benjamin Milton Mundel, Sean Christopher Griffin, Sidley Austin LLP, Washington, DC, Clayton S. Friedman, Michael Yaghi, Sidley Austin LLP, Costa Mesa, CA, Leslie R. Chaggaris, Reese Marketos LLP, Dallas, TX, Ryan M. Sandrock, Sidley Austin, LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT ON PARTIAL FINDINGS; FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Re: Dkt. No. 396

HAYWOOD S. GILLIAM, JR., United States District Judge

***1** On March 11, 2015, the Federal Trade Commission ("FTC") brought this action alleging that Defendants DIRECTV and DIRECTV, LLC (collectively, "DIRECTV" or "Defendant") violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as well as the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq. See* Dkt. No. 1 ("Compl."). A court trial was held in August 2017. At the close of the FTC's presentation of its case-in-chief, DIRECTV moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, on the ground that the FTC failed to prove essential elements of its claims. Dkt. No. 396. Based on the evidence presented at trial, the arguments of the parties and the applicable law, the Court **GRANTS IN PART** DIRECTV's motion. This memorandum opinion will constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and (c).

## I. BACKGROUND

### A. Allegations

In this action the FTC challenges DIRECTV's advertisement campaign for and sale of its subscription satellite television services. The FTC commenced its investigation in April 2010 when it served DIRECTV with a civil investigative demand. The FTC then filed the complaint in this action in March 2015. *See* Compl. In the complaint, the FTC sought equitable relief, including a permanent injunction and equitable monetary relief. *Id.* at 11 ("Prayer for Relief").

The FTC contends that from 2007 to the time of trial, DIRECTV failed to adequately disclose in its advertising certain terms of purchase for its satellite television services, in violation of § 5 of the FTC Act. In particular, the FTC alleges that DIRECTV failed to adequately disclose that: (1) the introductory discounted price only lasts 12 months, after which the subscriber is charged the then-prevailing rate; (2) the subscriber is subject to a 24-month commitment period; (3) a subscriber who cancels before the end of the commitment period is assessed an early cancellation fee of $20 per month for the remaining months in the commitment period; and (4)

subscribers receive a free premium channel package (*e.g.*, HBO, Starz, Cinemax, and Showtime) for three months, but must affirmatively cancel these premium channels before the end of the three-month period to avoid monthly charges (the "premium channel negative option"). *See id.* ¶¶ 12–14. The FTC further contends that DIRECTV failed to clearly and conspicuously disclose the premium channel negative option on its website, and that it also failed to obtain express informed consent before charging consumers, in violation of ROSCA. *See id.* ¶¶ 35–42.

Based on these claims, the FTC seeks restitution in the amount of $3.95 billion. Dkt. No. 362 ("Tr. Vol. 1") at 33:5–16 (transcript of FTC's opening statement).

### B. **Procedural Posture**

This matter was tried to the Court, sitting without a jury, from August 14, 2017, to August 25, 2017. After the close of the FTC's case-in-chief, DIRECTV moved orally for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c). The Court suspended the trial before DIRECTV presented its defense to allow DIRECTV to file its motion, as well as the parties' respective proposed findings of fact and conclusions of law. *See* Dkt. No. 390 ("Tr. Vol. 10") at 1708:25–1713:6.

## II. LEGAL STANDARD

***2** Under Rule 52(c):

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). Thus, the Rule "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence." *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1031 (9th Cir. 1996). In doing so, the Court draws its own conclusions as factfinder and need not draw any inferences in favor of the non-moving party. *See Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006). As the plaintiff, the FTC bears the burden of proof and must prove each element of its case by a preponderance of the evidence. *United States v. F/V Repulse*, 688 F.2d 1283, 1284 (9th Cir. 1982). The Court should grant the motion if it becomes apparent that plaintiff has failed to carry an essential burden of proof. *Cf. EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010) ("The rule's objective is to 'conserve[ ] time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would not be different even if those additional facts were established.' ").

## III. JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b). Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c)(2), and (d), and 15 U.S.C. § 53(b).

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. **The Parties**

The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, which prohibits certain methods of negative option marketing on the Internet. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, and to seek injunctive relief for violations of the FTC Act and ROSCA. 15 U.S.C. § 53(b).

DIRECTV is a provider of subscription satellite television services.[1] Each of DIRECTV's subscription packages offers a varying selection of channels, equipment, and video quality. *See, e.g.*, Ex. 172 (letter describing several available subscription packages). Over time, the terms of DIRECTV's subscription packages, including the price for each package, have changed periodically. *See* Ex. 76 (summary of subscription offers between 2008 and 2015, citing trial exhibits describing the terms of each package), Ex. 617 (2014 "New Customer Offer Timeline" graphic showing offer terms between 2008 and 2013).

***3** DIRECTV's subscription television services are a "considered purchase," such that consumers generally "go through anywhere between [a] 45- to 90-day process" when deciding whether or not to purchase. Dkt. No. 367 ("Tr. Vol. 2") at 308:16–309:4 (Bentley). The complexities of the product stem from the "sheer number of different tradeoffs and decisions that need to be made" regarding the packages, "advanced receiver, size of the hard drive, movies to save," number of rooms, and whether advanced receivers were required in each room. Tr. Vol. 2 at 294:19–295:1 (Bentley); Dkt. No. 371 ("Tr. Vol. 4") at 643:10–11 (Guyardo) (DIRECTV is a "high involvement" and "complex" purchase). Consumers who wish to subscribe to DIRECTV must proceed through a lengthy and detailed subscription process, either on the phone with a DIRECTV representative or on the web. *See* Tr. Vol. 2 at 302:1–310:14 (Bentley); Tr. Vol. 4 at 661:20–662:19 (Guyardo); Dkt. No. 372 ("Tr. Vol. 5") at 792:18–21 (Chen).

DIRECTV acquires subscribers using multiple sales channels that are broadly categorized as either "Direct Sales" or "Indirect Sales." Tr. Vol. 4 at 667:3–668:9 (Guyardo); Ex. 9 at 44. Direct Sales involves customers who subscribe either by phone through one of DIRECTV's toll free numbers or on the DIRECTV website, directv.com. Tr. Vol. 2 at 298:19–25 (Bentley). The majority of Direct Sales subscribers complete their sign up over the phone, and only a small percentage subscribe on the web. Dkt. No. 389 ("Tr. Vol. 9") at 1441:23–1442:15 (Leever).

Indirect Sales are made through a number of third-party channels. Ex. 9 at 44. These include Consumer Electronics (consumer electronics and other big box stores like Walmart or Best Buy that sell DIRECTV in their stores, Tr. Vol. 2 at 299:10–23 (Bentley) ); Telco (partnerships with telephone companies that sell DIRECTV services on their networks in addition to phone and internet services, Tr. Vol. 2 at 299:2–5 (Bentley) ); National Strategic Partners (national third-party dealers, Tr. Vol. 2 at 300:3–7 (Bentley) ); Local Strategic Partners (local third-party dealers, Tr. Vol. 2 at 300:9–14 (Bentley) ); and Multi-Dwelling Units (multi-unit buildings that contract with DIRECTV to make the service available to residences). Ex. 9 at 44.

Many third-party providers, including Telco partners, used their own advertising tactics. *See* Tr. Vol. 2 at 225:21–226:20, 300:15–301:1 (Bentley); Dkt. No. 388 ("Tr. Vol. 8") at 1328:20–23 (Pratkanis) (referring to Costco tactic). Third-party providers also had offers that were different from Direct Sales offers. Tr. Vol. 2 at 299:6–9 (Bentley). For example, Telco partners offered bundles with their telephone and Internet services and DIRECTV's television services, and the Telco partners would offer such services, including DIRECTV's, using their own sales network and cross-selling to their existing customers. Tr. Vol. 2 at 300:15–301:1 (Bentley). Likewise, there were over two thousand National Strategic Partners that would create and place their own advertising for DIRECTV. Tr. Vol. 2 at 225:21–226:20 (Bentley).

B. **The Challenged Advertisements**

Between 2007 and the time of the trial, DIRECTV advertised its subscription television service through several different media. DIRECTV aired television commercials, *see*, *e.g.*, Exs. 472–478; disseminated tens of thousands of different print advertisements through newspapers and direct mailings, Dkt. 386 ("Tr. Vol. 6") at 933:20–21 (Erdem) (over 40,000 ads); published over 150 different Internet banner ads, Ex. 1161; and used its website (directv.com), which was revised several times during this period, Tr. Vol. 9 at 1448:12–20 (describing website redesigns).

i. **Television Commercials**

DIRECTV advertised on television in nationally-broadcast 30-second and one-to-two-minute ads about DIRECTV called "direct response television." Tr. Vol. 2 at 220:8–11 (Bentley). All television ads prompted consumers to call 1-800-DIRECTV and/or visit directv.com. *Id.*

ii. **Print Advertising**

***4** DIRECTV's print advertising has generally included three broad categories: freestanding inserts disseminated with Sunday newspapers (also known as Sunday Circulars), Alternative Media, and Solo Mail.

a. Sunday Circulars

Sunday Circulars are multi-page advertisements inserted into the Sunday newspaper. Tr. Vol. 2 at 312:7–9 (Bentley); Ex. 9 at 60. DIRECTV has circulated approximately 200–300 different types of freestanding newspaper inserts per month. Tr. Vol. 2 at 231:7–10 (Bentley).

The number of consumers who called DIRECTV in response to a Sunday Circular is "extremely small." Tr. Vol. 5 at 883:6–17 (Gieselman). By way of example, in response to a Sunday Circular distributed to 7 million consumers in or around August 2013, only three one hundredths of a percent (.03%) of the people who received the Sunday Circular called DIRECTV, and only 32% of the people who called ultimately subscribed to DIRECTV during the call. Tr. Vol. 5 at 879:21–883:18 (Gieselman); Ex. 384 at 7.

b. Alternative Media

Alternative Media includes "hundreds of different tactics" that generally are provided to consumers with material or advertisements from other (and often many other) companies. Tr. Vol. 2 at 223:22–224:2, 224:9–13, 313:22–314:10, 315:17–316:17 (Bentley); Ex. 9 at p. 59. Alternative Media advertisements are comprised of newspaper-delivered inserts, shared mail or co-op mailings, mail inserts, or directories. Tr. Vol. 2 at 223:22–224:13 (Bentley); Ex. 9 at p. 59.

DIRECTV sent out "anywhere from 2[00] to 300 [Alternative Media] tactics every month" in multiple channels of distribution. Tr. Vol. 2 at 312:5–6, 321:6–10 (Bentley) ("there may be 300 different creative versions of [Alternative Media] in a single month ..."); Ex. 9 at 59. Alternative Media is high-volume, low-return marketing that targets the same households week after week. Tr. Vol. 2 at 320:21–321:10, 322:18-323:16 (Bentley) (one alternative media advertisement disseminated 10 million pieces to generate approximately 300 subscriptions).

c. Solo Mail

Solo Mail is a multipage letter sent in a standard envelope to targeted, credit pre-approved households. Tr. Vol. 2 at 311:23–312:9, 315:9–16, 321:2–10 (Bentley); Ex. 9 at 58. DIRECTV would use predictive models to determine which households to target. Tr. Vol. 2 at 321:11–19 (Bentley). DIRECTV generally sent 15 to 18 million Solo Mail letters per month. Tr. Vol. 2 at 320:12–16 (Bentley).

iii. **Banner Ads**

Banner ads are animated images that appear on third-party websites. Tr. Vol. 5 at 801:3–6 (Chen). When a consumer clicks on the banner ad, she is routed to directv.com. *Id.*

iv. **directv.com**

Consumers may subscribe to DIRECTV's satellite television services through directv.com. Few consumers who enter DIRECTV's web flow complete the purchase on the website. *See, e.g.*, Tr. Vol. 5 at 794:13–18 (Chen) (rate of subscription for prospects who entered the website and placed a package in their cart ranged between 6.5 and 8.9%.); Ex. 1146 at 1.

Based on unique toll-free numbers on the website and available data regarding visits to directv.com, out of all subscriptions arising from a customer who visited directv.com, approximately 70% of those consumers called a toll-free number and completed their subscription with a telephone customer service representative. Tr. Vol. 2 at 305:14–25 (Bentley).

C. **The FTC Failed to Prove a Violation of Section 5(a) of the FTC Act as to Any of Defendant's Print, Television or Electronic Banner Advertisements**

***5** Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). A practice is deceptive in violation of § 5(a) if: (1) "there is a representation, omission, or practice"; (2) that "is likely to mislead consumers acting reasonably under the circumstances"; and (3) "the representation, omission, or practice is

material." *F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). Even if it contains some truthful disclosures, a representation still "may be likely to mislead by virtue of the net impression it creates." *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006); *see also Gill*, 265 F.3d at 956 (evaluating the "overall 'net impression' " of the representations). And failure to disclose material information may cause an advertisement to be false or deceptive within the meaning of the Act even where the advertisement does not state false facts. *Simeon Management Corp. v. F.T.C.*, 579 F.2d 1137, 1145 (9th Cir. 1978). Actual deception is not required for a Section 5 violation. *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212, 214 (9th Cir. 1979).

Here, the FTC does not contend that any of the over 40,000 advertisements it purports to challenge contained affirmatively false representations. *See* Dkt. No. 337 (FTC's section of joint pretrial statement) at 34 ("Because, in a failure to disclose case, the deception does not turn on literal falsity, the FTC need not demonstrate that reasonable consumers are likely to take away some false message about [the] advertised offer."); Dkt. No. 412 (transcript of argument on motion for partial findings) at 23 ("This is an omission case, not a falsity case."). Nor does the FTC contend in any systematic or detailed way that the advertisements *entirely* omitted the information it claims was necessary to ensure that the statements in the advertisements were not misleading. *See* Tr. Vol. 1 at 8:3–7 (FTC's opening statement) ("When you look at the advertisements, you will see disclosures, *if they exist at all*, flashing briefly on the screen, hidden behind hyperlinks, buried in fine print, or obscured by dense paragraphs of legal text.") (emphasis added). Instead, the FTC's theory is that Defendant's advertisements were likely to mislead reasonable consumers because, in its view, critical details of Defendant's offer were not disclosed prominently enough. Tr. Vol. 1 at 15:10–13 ("In this case we are talking about omissions; omissions by inadequately disclosing material terms after the advertised price has been prominently featured in DIRECTV's advertisements.")

The FTC fails to meet its burden as to Defendant's print, television and electronic advertisements for at least two reasons. First, as to the very small number of advertisements actually analyzed by its expert witnesses, the FTC failed to establish that there was any misleading "net impression," or even to identify clearly what it claims the net impression was. Neither a facial review of these advertisements nor the FTC's extrinsic evidence established that these materials are likely to mislead a reasonable consumer. Second, the FTC also failed to articulate what common net impression is conveyed by the over 40,000 challenged advertisements (which spanned several different formats), or to explain how and why that impression would be likely to mislead a reasonable consumer.

i. **The FTC's Theory**

In the complaint, the FTC framed its allegation with regard to the two-year requirement as follows:

> In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of Defendants' subscription service, Defendants have represented, directly or indirectly, expressly or by implication, that their programming packages can be purchased by paying the advertised monthly prices, typically for a twelve-month period.
>
> ***6** In numerous instances in which Defendants have made the representation set forth in Paragraph 28 of this Complaint, Defendants have failed to disclose, or to disclose adequately, to consumers certain material terms and conditions of the offer, including but not limited to:
>
> > A. The mandatory two-year agreement period, which carries an early cancellation fee, for the subscription service; and
> >
> > B. The significantly higher price for programming packages, typically $25 to $45 per month higher, during the mandatory second year of the consumer's agreement.
>
> This additional information would be material to consumers in deciding to purchase Defendants' subscription services.

Compl. ¶¶ 28–29.

As to the premium channel offer terms, the FTC alleged that:

> In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of Defendants' subscription service, Defendant have represented, directly or indirectly, expressly or by implication, that consumers could obtain certain premium channels for free for a certain period of time, typically three months.
>
> In numerous instances in which Defendants have made

the representation set forth in Paragraph 31 of this Complaint, Defendants have failed to disclose, or disclose adequately, to consumers the material terms and conditions related to the costs of the offer, including:

A. That Defendants automatically enroll consumers in a negative option continuity plan with significant charges;

B. That consumers must affirmatively cancel the negative option continuity plan before the end of the trial period to avoid charges;

C. That Defendants use consumers' credit or debit card information to charge consumers for the negative option continuity plan; and

D. The costs associated with the negative option continuity plan.

Compl. ¶¶ 31–32.

In its pretrial statement, the FTC articulated its theory this way: "DIRECTV's advertisements consistently create an overall 'net impression' that the company's service may be obtained for substantially less than consumers ultimately must pay over the course of their mandatory 24-month contract." Dkt. No. 337 at 3. Now, in its opposition to the motion for judgment on partial findings, the FTC frames its theory as being based on the principle that "prominently advertising a half-truth while omitting or hiding qualifying material information renders the *net impression* of the advertisements misleading." Dkt. No. 401 at 2 and n.2 (emphasis in original) (citing *F.T.C. v. AMG Svc's, Inc.*, 29 F.Supp.3d 1338, 1351 (D. Nev. 2014) and *Cyberspace.com*, 453 F.3d at 1201).

ii. **Net Impression Analysis**

In assessing whether the FTC has met its burden of establishing liability under § 5(a), the Court must first determine what "net impression" the advertisements at issue create, so that it can then decide whether this net impression was likely to mislead reasonable consumers. *See AMG Svc's, Inc.*, 29 F.Supp.3d at 1368 n.9 (explaining that "the FTC Act requires the court to determine what 'net impression' the [allegedly misleading] loan note creates"); *F.T.C. v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048, 1063 (C.D. Cal. 2012), *aff'd* 642 Fed. Appx. 680 (9th Cir. 2016) ("District courts consider the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading."). In determining what net impression an advertisement creates, the Court considers the face of the advertisement, and may also consider extrinsic evidence. *See Commerce Planet*, 876 F.Supp.2d at 1062–78 (considering face of advertisements as well as extrinsic evidence in assessing whether net impression was misleading; "[a]lthough a facial examination of the sign-up pages sufficiently demonstrates that the website marketing of [company] was misleading to a reasonable consumer, the Court may consider extrinsic evidence as corroborating evidence").[2]

***7** Generally, the FTC can succinctly describe its position as to what the net impression is and explain why that net impression is likely to mislead in its view. *See F.T.C. v. Johnson*, 96 F.Supp.3d 1110, 1139–1140 (D. Nev. 2015) (describing FTC's position that "a consumer proceeding through the website pages would have a net impression that they were getting a free CD for a minimal shipping and handling or download fee," while in truth "the sites collected preliminary information without informing the consumer that they would be enrolled in a core membership with a negative option and additional upsell memberships with negative options").

In attempting to determine the net impression of the advertisements at issue, the Court is confronted with an immediate challenge: the FTC's evidence spans at least four tiers, which together encompass tens of thousands of discrete advertisements used by DIRECTV over an eight-year period.

First, the FTC's expert witness, Dr. Tülin Erdem, conducted an online survey based on a print advertisement from 2013. Exs. 2374, 2375 (survey URL); Ex. 244 (underlying advertisement); Tr. Vol. 6 at 928:3–934:6.

Second, Dr. Erdem testified that she chose this print advertisement for her survey based on a review of 116 advertisements used by DIRECTV between 2007 and 2015, and said she found the chosen ad to be "sufficiently representative." Tr. Vol. 6 at 934:7–21, 956:3–977:20, 996:17–997:10; Dkt. No. 393.[3] Dr. Erdem claimed that the results of her survey could be generalized to draw conclusions about other print advertisements beyond the one she tested. Tr. Vol. 6 at 956:8–957:10, 986:1–995:21. Another of the FTC's expert witnesses, Dr. Anthony Pratkanis, testified similarly that the characteristics of two print advertisements, Exhibits 238 and 273, were generalizable to "hundreds" of other advertisements he reviewed. Tr. Vol. 8 at 1251:21–1266:3.

Third, the FTC introduced a total of approximately 228 print advertisements, 17 television commercials, and 33 electronic banner ads into evidence. Dkt. No. 401-1 (FTC's proposed findings of fact and conclusions of law) at ¶¶ 41, 46, 50, 54, 56, 59, 62–63 (listing exhibit numbers of admitted exhibits in each category). Witnesses testified regarding approximately 47 of these exhibits. A large number—approximately 231—were introduced by stipulation without live witness testimony. Dkt. No. 391.

Fourth, and finally, a much larger number of advertisements that were disseminated during the period for which the FTC claims DIRECTV customers are entitled to restitution—over 39,000—were never introduced into evidence at all. Tr. Vol. 6 at 933:20–21; *cf.* Dkt. Nos. 360-1, 363-1, 364-1, 368-1, 369-1, 376-1, 381-1, 382-1, 383-1, 392-1, 391, 395, 415 (lists of exhibits admitted at trial and by stipulation).

All told, the FTC's theory of the case thus requires the Court to attempt to determine the "net impression" of more than 40,000 advertisements, across print, television, and electronic formats. Simply to state this fact is to highlight the extraordinary ambition—and daunting challenges—inherent in the FTC's theory. The district court in *Johnson* noted similar challenges in that case, where the FTC "ask[ed] the Court to draw conclusions as to all of Defendants' sites, presented to the Court or not, based on the exhibits presented and [its expert's report]":

> ***8** Immediately the Court is confronted with a problem. As previously mentioned, the FTC has provided over one-hundred exhibits of grant websites and the expert report from [expert]. However, for the purposes of summary judgment, the Court cannot rely solely on the representations of the FTC and their expert as to what the websites represent.... In its briefing, the FTC picks examples of claims from across its grant website exhibits to suit their arguments. It is not clear to the Court, however, whether the FTC's examples are representative of the grant website experience as a whole.... The Court cannot adopt the FTC's approach of using selected examples of claims picked from across the entire universe of the FTC exhibits, seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites.

*Johnson*, 96 F.Supp.3d at 1118, 1121.

The challenges described by the *Johnson* court are substantially multiplied here, given the enormous number of advertisements at issue, the diversity of format of those advertisements, and the varying nature of the representations made in the advertisements over time.

Accordingly, the Court will proceed here in two stages. First, the Court will examine the single print advertisement analyzed by Dr. Erdem to determine whether the net impression created by that advertisement would be likely to mislead consumers acting reasonably under the circumstances. Second, the Court will consider whether, even if the net impression of this advertisement was misleading, that impression can be generalized (1) to any of the other advertisements in evidence or (2) to tens of thousands of other advertisements, the vast majority of which were never admitted in evidence, spanning an eight-year period across different media.

iii. **Print Advertisements**

a. Analysis of print advertisement tested by Dr. Erdem (Ex. 244)[4]

1. Facial review

Exhibit 244, which Dr. Erdem used as the basis for her web-based survey, is a one-page advertisement with the heading "Best Offer Ever" in gold, silver and yellow letters against a blue background:




Ex. 244.[5]

As would be expected for a complex multi-option product like a satellite television subscription, the advertisement contains a large amount of information about various programming packages, pricing and equipment options, product quality and installation logistics. Roughly the middle third of the advertisement describes three tiers of programming packages: the Entertainment Package, the Choice Package and the Xtra Package. Each package includes a different number of channels and a different number of on demand titles. Each package also includes HBO, Starz, Showtime and Cinemax "free for three months."

The text box for each package includes a price "for 12 months" "after instant savings." In each instance, that price is crossed out by a red line, and a lower price appears in white text against a red circle with the phrase "Act Now!" at the top. So, for example, the crossed-out price for the Entertainment Package is $29.99/month, and the "Act Now!" price is $24.99/month. The price in the red bubble has a caret next to it, which directs the viewer to the following bolded text in the first line of a section of disclosures in black text against a white background at the bottom of the page: "**BILL CREDIT/PROGRAMMING OFFER: IF BY THE END OF PROMOTIONAL PRICE PERIOD(S) CUSTOMER DOES NOT CONTACT DIRECTV TO CHANGE SERVICE THEN ALL SERVICES WILL AUTOMATICALLY CONTINUE AT THE THEN-PREVAILING RATES.**"[6] Because most of the text in the disclosure box is not bolded, not in all capital letters, and not partially underlined, this information stands out visually. *See* Ex. 1119 (FTC ".com Disclosures" guidance) at 17 ("A disclosure in a color that contrasts with the background emphasizes the text of the disclosure and makes it more noticeable."). The text in the disclosure box is smaller than most of the text in the advertisement, though type in different sizes, fonts and colors is used throughout the ad. The next line in the disclosure box lists the current non-promotional package price for each option (for example, the non-promotional price at the time for the Entertainment Package was $54.99 per month).

***9** Bolded text in black print against a white background immediately below the three boxes describing the packages explains that "**ALL DIRECTV OFFERS REQUIRE 24-MONTH AGREEMENT.* ***" This same bolded language appears again in smaller text (again black against a white background) in the bottom third of the advertisement, below three smaller boxes describing installation details, HD DVR features and options for bundling TV, internet and phone service. The two asterisks direct the viewer to the following bolded text in the disclosure box at the bottom of the page: "**24-MONTH AGREEMENT: EARLY CANCELLATION WILL RESULT IN A FEE OF $20/MONTH FOR EACH REMAINING MONTH.**" Again, this information is one of the few pieces of text in the disclosure section that is bolded, in all capital letters and partially underlined, making the information stand out visually.

Near the bottom of the page, above the disclosure section, large text says "Upgrade to DIRECTV! Call 1-866-951-9617 or visit directv.com."

Based on its facial review of Exhibit 244, the Court finds that the net impression a reasonable consumer would take away from this advertisement is that a promotional price applies for 12 months, that a 24-month agreement is required, that an early cancellation fee of $20 per month will apply if the customer cancels before the end of the 24-month period, that services will continue at the end of any promotional period at the then-applicable regular rate unless the customer contacts DIRECTV to change the services, and that the customer needs to call a toll-free number or go to DIRECTV's website to subscribe. These provisions are adequately disclosed throughout the advertisement, and while the ad contains a substantial amount of information, a reasonable consumer would understand that this is because subscription satellite

television service is a complex product with a number of options for price, level of service, package features and other components. *See* Tr. Vol. 2 at 308:16–309:7 (subscribing to satellite television services involves a large "number of different tradeoffs and decisions that need to be made," making subscribing a "considered purchase") (Bentley); Tr. Vol. 9 at 1439:14–24 (testimony of former DIRECTV executive Karen Leever that satellite television services are "a complex product" requiring customers to make a number of decisions to customize their package). Because the advertisement adequately discloses the details that the FTC claims were omitted due to a lack of prominent disclosure, the net impression of the advertisement on its face would not be likely to mislead a reasonable consumer.[7]

2. Extrinsic evidence

The Court further finds that none of the extrinsic evidence introduced by the FTC meets its burden of showing that Exhibit 244, or any of the other print, electronic or television advertisements analyzed by the FTC's experts, would be likely to mislead a reasonable consumer.

a. Expert Testimony

*1. Dr. Erdem*

***10** The primary extrinsic evidence upon which the FTC relies in support of its claim is a web-based survey conducted by Dr. Tülin Erdem, a professor of business administration and marketing at New York University. Tr. Vol. 6 at 902:19–21. Dr. Erdem described her assignment as "evaluating whether DIRECTV's website and print advertisements clearly and conspicuously disclosed certain items about the contract, price terms, et cetera." *Id.* at 910:17–20. Dr. Erdem testified that "in order to evaluate this hypothesis whether they are indeed clear and conspicuous or not, I had to look at the baseline understanding as well as whether it can be improved with some targeted modifications." *Id.* at 910:22–25.

Dr. Erdem created a web-based survey to test this hypothesis, using the actual print ad as a control stimulus and creating a modified test version of the ad as a comparative stimulus. *Id.* at 927:1–929:25, 936:23–937:22.[8] In the modified version, Dr. Erdem changed the manner in which certain information regarding price and subscription terms appeared in the ad. *Id.* at 936:23–937:22. She then asked survey respondents a number of questions, and concluded that her modified version of the ad increased "consumer understanding" of these terms. *Id.* at 912:8–913:20.

Dr. Erdem's survey suffers from several flaws that essentially negate its probative value as to the central issue in the case: whether DIRECTV advertisements' are likely to mislead reasonable consumers based on the net impression they create.

First, Dr. Erdem's survey was designed to test consumers' comprehension of certain terms and to determine whether their understanding could be enhanced with minor modifications to DIRECTV's disclosures. *See id.* at 926:20–927:24, 963:2–24, 1010:1–15. But saying that changing the presentation of certain information may result in better recollection of that information simply does not support the conclusion that the information was likely to mislead as presented in its original form. Dr. Erdem acknowledged that she did not perform a deception study, or do any copy testing to determine "what is the overall impression of the consumer from the ad." *See id.* at 965:2–19, 990:1–22. While the FTC suggests that deception studies are only relevant in Lanham Act cases, *see id.* at 1013:14–14:10, it never explains why. Dr. Erdem's generic testimony about principles of "shrouding" also failed to establish that the ad was likely to mislead a reasonable consumer. *See id.* at 924:10–13 ("[F]ine print is a classic example of that kind of shrouding or a practice that makes cognitive load of consumers high, and a majority of consumers don't read the fine print."). Accordingly, the questions asked and answered by Dr. Erdem's survey provide little, if any, support for the FTC's claim that the tested advertisement (Ex. 244) would be likely to mislead a reasonable consumer. *Compare Commerce Planet*, 878 F. Supp. 2d at 1068 (expert's testimony focused on whether most customers would understand negative option and continuity program subscription aspects of website; analysis "focuse[d] on what the user can perceive and what the user should do").

***11** Moreover, Dr. Erdem acknowledged that as part of her survey results, she grouped participants who responded that they didn't "know" about specific terms together with those who responded that they didn't

"recall" or "remember" the terms. Tr. Vol. 6 at 966:6–968:11. The FTC argues that this approach "is the right one for a deceptive-omission case, where consumers are misled in part *as a result* of their lack of knowledge." Dkt. No. 401 at 14 (emphasis in original). But the FTC's argument fails to recognize that Dr. Erdem's survey did not test, and therefore cannot establish, *why* a consumer responded that he or she did not know or recall the terms. Because Dr. Erdem did not ask follow-up questions or have subcategories for responses, she acknowledged that she did not know whether these survey participants saw the key terms but just could not recall what they had seen in the print advertisement earlier, or whether they had the wrong impression about these terms based on the advertisements. Tr. Vol. 6 at 966:22–968:19, 970:2–16 (Erdem). Accordingly, this characteristic of Dr. Erdem's survey further supports the Court's conclusion that the results lack substantial probative value on the question of whether Exhibit 244 was likely to mislead a reasonable consumer.

Finally, the Court finds that given the centrality of the disclosures in the text at the bottom of the ad to the issues in this case, Dr. Erdem's web study did not adequately replicate the experience of a prospective customer viewing the ad in paper form, as it was actually distributed. Defendant introduced a hard copy of the advertisement in its original paper form. Ex. 2026A. With the paper version in hand, a prospective customer could review those disclosures simply by looking at the bottom of the page. By contrast, in Dr. Erdem's survey, the survey taker had to scroll down the screen to see those disclosures (in other words, the disclosures were not visible unless the survey taker scrolled down). Tr. Vol. 6 at 973:7–15 (Erdem). Further, the Court's personal comparison at trial of the paper and electronic survey versions of the ad reflected that the disclosure text in the survey version was substantially less clear and legible than the paper copy. *Compare* Ex. 2026A *with* Ex. 2371 (URL link for survey).[9] The fact that respondents could "zoom [in] on any part," Tr. Vol. 6 at 975:2–4 (Erdem), does not remedy this problem, nor does it matter that none of the participants in Dr. Erdem's pretest said that the text was not legible, Tr. Vol. 6 at 1013:1–3. Survey participants were not asked if they could read the disclosure block, Tr. Vol. 6 at 1015:6–11, and the Court finds that it would not be apparent to a participant that the specific content of the disclosure block could be relevant (in fact, crucial) to the survey exercise.

For all of these reasons, the Court finds that Dr. Erdem's survey has little to no probative value on the question of whether the 2013 advertisement admitted as Exhibit 244 was likely to mislead a consumer acting reasonably under the circumstances.

*2. Dr. Pratkanis*

The Court finds Dr. Pratkanis' "social influence analysis" to be similarly unpersuasive on the question of whether a reasonable consumer likely would be misled by Defendant's advertisements. Dr. Pratkanis acknowledged that he did no copy testing or other empirical testing of how consumers perceive Defendant's advertisements. Tr. Vol. 8 at 1291:13–1293:12. He also did not analyze Defendant's advertisements to determine their net impression, or do any content analysis that would support the conclusion that his conclusions were generalizable to all of the ads at issue over the eight-year period at issue. Tr. Vol. 8 at 1304:6–1306:24, 1311:6–1315:24.

Instead, Dr. Pratkanis testified that general principles of social influence such as "throwing the lowball" and "free gift" can increase the "likelihood" that someone would make a purchase. Dr. Pratkanis' "fundamental finding" was that DIRECTV employed a "lowball" initial offer to get consumers to later agree to a less desirable offer. *Id.* at 1249:12–1250:8. During his testimony, Dr. Pratkanis discussed two print ads: another variant of the one-page "Best Offer Ever" flyer from 2013 (Ex. 238) and a 2014 two-page advertisement headed "Get 2 YEARS OF SAVINGS" (Ex. 273).

***12** Exhibit 238 describes the Entertainment Package, and has a slashed-out price of $29.99 "FOR 12 MONTHS," next to the notation "With 24-mo. agreement.* *" A red bubble just above the slashed-out price contains large white text reading "ACT NOW! $24.99/MO." with a caret. As with Exhibit 244, the print ad Dr. Erdem tested, the caret and asterisks refer the viewer to a disclosure section of black text against a white background that occupies approximately the bottom one-third of the advertisement. The text in the disclosure section that corresponds to the caret begins in the first line of that section, and contains the following bolding, underlining and capitalization: **"BILL CREDIT/PROGRAMMING OFFER: IF BY THE END OF PROMOTIONAL PRICE PERIOD(S) CUSTOMER DOES NOT CONTACT DIRECTV TO CHANGE SERVICE THEN ALL SERVICES WILL AUTOMATICALLY CONTINUEAT THE THEN-PREVAILING RATES."** Later text in that line lists the "current prices" of each package. The text in the disclosure section that corresponds to the asterisks is bolded and in all capital

letters, and says **"24-MONTH AGREEMENT: EARLY CANCELLATION WILL RESULT IN A FEE OF $20/MONTH FOR EACH REMAINING MONTH."**

Exhibit 273, like Exhibit 244, describes three different packages. It contains the same red bubble price format, slashed-out prices, and references to the disclosure section via carets and asterisks. The formatting and content of the disclosures described above with regard to Exhibit 244 (including underlining, bolding and capitalization) is identical in Exhibit 273, except that the Court assumes that this was a two-sided advertisement, such that the second page of text and the disclosure section would appear on the back of the piece.[10]

For the reasons described in its analysis of Exhibit 244 above, the Court finds based on a facial review that neither Exhibit 238 nor Exhibit 273 creates a net impression that would be likely to mislead a reasonable consumer.

Moreover, the Court accords minimal weight to Dr. Pratkanis' opinions in light of this determination that the advertisements at issue were not facially deceptive. Dr. Pratkanis' general testimony regarding the "likelihood of the impressions that [a consumer] would take," Tr. Vol. 8 at 1347:1–1348:8, is unpersuasive for several reasons. First, while Dr. Pratkanis testified, for example, that a consumer would "have a tendency and a likelihood" to perceive the slashed-out price as the "real price or the regular price," he acknowledged doing no study or survey to determine whether customers in fact held that belief. *Id.* at 1314:8–1315:15. Nor did Dr. Pratkanis do any empirical testing of any advertisement, *id.* at 1301:4–8, survey customers to ask what messages they took away from ads, *id.* at 1303:16–1304:24, or do a content analysis of any advertisements, *id.* at 1305:11–1306:4. Dr. Pratkanis has performed this kind of testing in other instances, but did not do so here because the FTC did not ask him to. *Id.* at 1303:16–1304:24.

Similarly, Dr. Pratkanis conceded that he could not measure how purported "lowball" representations would affect consumers' understanding:

> Q: But likelihood is what? Is it more likely than not? Does that mean more than 50 percent who sign up don't know?
>
> A: It would be an increase over base rate.
>
> Q: Do you know what the base rate is?
>
> A: No.

Tr. Vol. 8 at 1312:2–6.

Third, as Defendant points out, the "lowball theory" also does not map well to FTC's theory in this case, because that theory presumes that consumers *do* understand the price that they will pay before the time of purchase. *Id.* at 1320:12–1321:12; *see id.* at 1348:4–8 (agreeing with the Court's statement that "if they are exposed to the true terms up front there can't be a lowball by definition"). Here, the Court has found that the true terms are adequately and accurately disclosed in the advertisements Dr. Pratkanis testified about. For at least these reasons, the Court finds that nothing in Dr. Pratkanis' testimony persuasively supports the FTC's contention that the print advertisements at issue in this case created a misleading net impression in violation of the FTC Act.

3. The Cases Upon Which the FTC Relies Reinforce the Conclusion That the Agency Failed to Meet Its Burden of Proof

***13** The cases the FTC relies upon in support of its argument that these advertisements (and, by extension, the thousands of others at issue in this case) were misleading by omission are readily distinguishable. In those cases, the courts found that advertisements created a misleading impression, even when the relevant information was technically disclosed in some form, because the overall presentation would lead a reasonable consumer to conclude that the terms were materially different than the true terms.

For example, in *Cyberspace*, the defendants mailed millions of solicitations offering internet access to individuals and small businesses. 453 F.3d at 1198. The solicitations included a check, usually for $3.50, addressed to the recipient and referencing the recipient's phone number on the "re" line. *Id.* The check was "attached to a form resembling an invoice designed to be detached from the check by tearing at the perforated line." *Id.* "The back of the check and invoice contained small-print disclosures revealing that cashing or depositing the check would constitute agreement to pay a monthly fee for internet access, but the front of the check and the invoice contained no such disclosures." *Id.* Under those circumstances, the Ninth Circuit readily rejected defendants' argument that "the fine print notices they placed on the reverse side of the check, invoice, and marketing insert preclude liability" under the FTC Act. *Id.* at 1200. This was because the "mailing created the deceptive impression that the $3.50 check was simply a

refund or rebate rather than an offer for services," and gave the "overall impression that the check resolves some small, outstanding debt." *Id.* at 1200–1201.

Similarly, in *AMG Services*, defendants' loan note contained two sets of representations: a Truth In Lending Act ("TILA") box, and additional fine print disclosures. 29 F.Supp.3d at 1366. The TILA box "represent[ed] that borrowers [were] obligated to repay a *fixed* sum equal to the principal plus a single finance charge." *Id.* (emphasis added). But terms in the fine print "contradict[ed] the terms disclosed in the TILA box," in that the repayment amount was *not* fixed, the borrower was automatically enrolled in a ten pay-period "loan renewal" plan that imposed multiple finance charges, and the "renewal plan" increased the borrower's cost of credit from $90 to $675. *Id.* at 1367. Given these contradictions, the court had no trouble concluding that "[i]t requires no citation of authority to demonstrate that the 'net impression' of a boldfaced representation, which states that the borrower is responsible to repay a fixed sum, is misleading when the fine print indicates that the boldfaced sum is not fixed." *Id.* at 1368; *see also id.* at 1351 (finding that "the net impression of the Loan Note Disclosure is likely to mislead borrowers acting reasonably under the circumstances because the large prominent print in the TILA Box implies that borrowers will incur one finance charge while the fine print creates a process under which multiple finance charges will be automatically incurred unless borrowers take affirmative action"); 1373 (recommending that summary judgment be granted because "the representation [was] clearly misleading and the defendant relie[d] exclusively on the fine print to correct the misrepresentation").

*Johnson* also illustrates the usual type of representation found to create a misleading net impression. In that case, the FTC argued that a consumer reviewing defendant's website "would have the net impression that they were getting a free CD for a minimal shipping and handling or download fee," but failed to inform the consumer "that they would be enrolled in a core membership with a negative option and additional upsell memberships with negative options." 96 F.Supp.3d at 1139–1140. Essentially, the FTC argued that "the disclosures were presented in a way that made consumers unlikely to expect them (because the claims 'free' and 'risk free' were so prominent) and were unlikely to see them (because the disclosures were inadequate or non-existent)." *Id.* at 1140. The court agreed, finding it clear that the sites did not advertise a membership program, and concluding that customers would be likely "to believe that they are ordering a CD for a one-time fee and would not have reason to believe they were enrolling in membership programs with monthly charges." *Id.* at 1145. The Court noted that "[i]nformation about the trial memberships, and their associated costs, [was] hidden in disclosures that consumers would be justified in believing they did not have to examine closely." *Id.* at 1146.

***14** Significantly, however, the *Johnson* court noted that the circumstances before it were different than a squarely-presented offer regarding subscription services like the one at issue in this case:

> [T]here is a significant distinction between sites that clearly offer subscription-based or membership-based services to a consumer with a trial period and negative option, on one hand, and sites that offer to ship a product for a one-time payment with a bundled membership trial period and negative option on the other. In the first situation, the consumer is made aware of an ongoing obligation for use of the seller's service. Generally speaking, Defendants are correct that a consumer's failure to cancel their membership in that situation would be the fault of the consumer. The Court's concern in this case is that the sites do not clearly offer a membership program.... That is a significantly different situation from one in which a consumer willingly receives the benefit of a subscription or membership program and forgets to cancel.

*Id.* at 1141-42.

*Cyberspace* and *AMG Services* also do not support the FTC's argument as to the probative weight of Dr. Erdem's analysis, Dkt. No. 401 at 14, and the critically different facts of those cases highlight the weakness of the government's evidence in this case. The Ninth Circuit's comment in *Cyberspace* that the defendant's proffered survey "did not probe whether the notices were sufficiently conspicuous to draw the survey subjects' attention in the first place," 453 F.3d at 1201, addressed a circumstance in which (1) the supposed disclosure was on the back of what appeared to be a check; and (2) the misleading impression was that a reasonable consumer would not understand that by cashing the check she would be enrolling in a subscription service. *Id.* at 1200–1201. Similarly, as explained above, the deception in *AMG Services* was that the net impression made by the advertisements at issue fundamentally and comprehensively contradicted the true terms of the offered loan. In contrast, here Dr. Erdem's survey treated respondents who did not recall the terms being studied the same as those respondents who said they did not know what the terms were, without providing any persuasive basis for concluding that either answer reflected a misleading net impression. *See* Tr. Vol. 6 at 966:22–970:16.

In sum, the facts in this case are plainly different from those in cases in which the FTC has successfully established that a misleading net impression existed. Nothing in one part of Exhibit 244 (or Exhibits 238 or 273) contradicts any other part of the advertisement. The advertisement makes plain that it essentially describes an "offer for services," *Cyberspace* at 1200, accurately describes (within the limitations of a one- or two-page flyer) the terms of the offer, and invites an interested consumer to follow up to select a specific package and subscribe through a phone- or website-based process. The Court finds it self-evident that this case bears no resemblance to cases in which a defendant represents in an advertisement that the consumer will receive a benefit (like the check in *Cyberspace*, the fixed interest rate in *AMG Services*, or the free CD in *Johnson* ), only to turn around and impose a concealed and unwanted burden (like the hidden subscriptions and requirements in each of those cases). *Compare* Ex. 1119 (FTC ".com Disclosures" guidance) at 18 ("Consumers who are trying to complete a task and obtain a specific product or service may not pay adequate attention to a disclosure that does not relate to the task at hand. This can be problematic if, for example, an advertiser is selling a product or service together with a negative option trial *for a different product or service.*") (emphasis added).

***15** Nor has the FTC shown that this advertisement was a "deceptive door opener," in which DIRECTV "induce[d] first contact through deception, even if the buyer later becomes fully informed before entering the contract." Dkt. No. 401-1 at 146 (*citing* *Resort Car Rental Sys., Inc. v. F.T.C.*, 518 F.2d 962, 964 (9th Cir. 1975) ). In *Resort Car Rental*, defendant used the slogan "Dollar-A-Day" for its car rental business, but apparently charged more than that. *Id.* Under those circumstances, the Ninth Circuit agreed with the FTC that "the trade name, 'dollar-a-day' by its nature has a decisive connotation for which any qualifying language would result in a contradiction in terms." *Id.* That principle is inapplicable here, because (1) the Court has found that nothing in Exhibit 244 (or Exhibits 238 or 273) contradicts the true terms of DIRECTV's provision of services; and (2) for a complex product like subscription satellite television services, a reasonable consumer would understand the limitations of how information is presented in a one- or two-page flyer. *See* Tr. Vol. 2 at 243:2–23, 311:11–317:11 (testimony of Brad Bentley that the amount of "real estate" in a particular form of advertisement affects the layout of information included, but that "we made sure all the offer details were available on each piece").

Consistent with these observations, the Court finds that the FTC has failed to establish that Exhibit 244, or Exhibits 238 or 273, would be likely to mislead a reasonable consumer.

b. Even had the FTC shown that these examples created a misleading net impression, it failed to show how that impression is generalizable to hundreds or thousands of additional advertisements.

1. Expert Testimony

Dr. Erdem and Dr. Pratkanis' testified about the detailed content of only three advertisements. Dr. Erdem's survey concerned a single 2013 print advertisement, which she chose as the basis for her test after reviewing a set of nearly 120 DIRECTV ads culled by her staff. Tr. Vol. 6 at 989:12–25. She did not conduct any copy or content analysis, *id.* at 989:18–22, but rather reviewed this small set of advertisements "across different denominations like the content, the language, the fine print, whether it was a circular, etc." and "decided [the 2013 advertisement] was sufficiently representative." *Id.* at 956:3–957:10. According to Dr. Erdem, the advertisements "typically" had fine print, a promotional price, and package choices. *Id.* at 996:6–13. She further testified that "the single page format was easier to adopt for an online survey." *Id.* at 957:6–7. In this way, the advertisement was chosen, at least in part, because of the limitations of the survey methodology and not because the advertisement itself was the most representative.

Even if the Court had found, contrary to the analysis above, that Exhibit 244 was likely to mislead a consumer acting reasonably under the circumstances, Dr. Erdem presented no persuasive explanation in support of her assertion that this single 2013 print advertisement was somehow representative of even the advertisements she reviewed, let alone the universe of 40,000 or more advertisements at issue in this case.[11]

The Court finds that the several years' worth of advertisements accused by the FTC in this case took different forms and depended on the specific offer in place at the time. *See* Ex. 617 (timeline of offers). The ads contain everyday low pricing or promote introductory pricing for 12 months; require no commitment or state that a 24-month agreement is required; have no premium


© 2020 Thomson Reuters. No claim to original U.S. Government Works.

channel offer or offer premium channels free for 3 months; explain rebate credits (when rebates were in effect) or, later, the instant rebate prices; and disclose additional terms about equipment pricing, packages, and cancellation in other areas and the disclosure block. *See, e.g.*, Exs. 78, 84, 85 (2007); Exs. 92, 95 (2008); Ex. 113 (2009); Exs. 124, 139 (2010); Exs. 172, 2014 (2011); Exs. 175, 178/2707, 185 (2012); Exs. 203, 209, 212, 217 (2013); Ex. 281 (2014).[12] Indisputably, there is substantial variation in DIRECTV's print advertising with respect to, among other things, tactics, page count, content, and the frequency, placement, and manner of disclosures in the ads Dr. Erdem reviewed. *Compare*, *e.g.*, Ex. 2026A (paper copy of single page ad used in Erdem study, described above), *with* Ex. 2707 (original four-page Sunday Circular of Ex. 178 with no slashed out pricing; disclosing "FOR 12 MONTHS" and "2-year" agreement immediately under each price point; and disclosing first and second-year savings in large font on inside left page and again, in red, on back cover), *with* Ex. 124 (advertising "50% OFF FOR ONE YEAR!" at top and side; disclosing promotional price is "FOR 12 MONTHS" in red bubble), *with* Ex. 92 (two-sided advertisement disclosing promotional price is "FOR 12 MONTHS" with the "Reg." package price in red bubbles on front and back), *with* Ex. 172 (four-page direct mail letter disclosing "FOR 12 MONTHS" and "2-yr agreement" immediately under each price point; disclosing first and second-year savings in second paragraph of first page, and under each promotional price on later pages; disclosing value of premium channels next to premium channel copy), *with* Ex. 209 (four-page ad disclosing promotional price is "FOR 12 MONTHS" 12 times on front and back covers; disclosing first and second-year savings under each package on back cover; disclosing value of free premium channels next to premium channel copy on inside right page), *with* Ex. 113/2011A (slashing out regular package price rather than prior promotional price), *with* Ex. 139/2013A (advertising "PACKAGES START AT $29.99 Everyday Low Price" without promoting any specific package or premium channels). This variation among DIRECTV's ads precludes generalizing Dr. Erdem's survey results to the relative handful of print ads she reviewed, let alone to the some 40,000 she did not.[13]

***16** Contrary to the FTC's claim, neither DIRECTV nor the Court is suggesting that the FTC had to introduce all of the more than 40,000 advertisements into evidence. *See* Dkt. No. 401 at 15. But the FTC *does* have to explain why conclusions about a handful of advertisements can be applied to derive a uniform net impression for an extremely large number of others that vary significantly in format, content and emphasis. The FTC simply cannot meet this burden by characterizing the advertisements at a high level of generality and asserting that conclusions regarding one advertisement apply uniformly to tens of thousands of others. *See* Dkt. No. 401-1 (FTC's proposed findings of fact and conclusions of law) at ¶¶ 82-91 (referencing inclusion of "some type of 'call to action' " in advertisements, as well as general thematic and formatting consistency); Tr. Vol. 6 at 956:16–20 (Erdem) ("[T]he common denominations were some kind of promotional package—I mean, premium channels package and promotional price, some kind of call to action, we call these kind of ads call to action ads, and the templates were similar."). The Court does not find Dr. Erdem's opinion that she would "expect no differences" in the empirical test results across all of the dramatically different types of advertisements at issue in this case, Tr. Vol. 6 at 996:21-997:10, to be persuasive or adequately supported. The Court similarly finds unpersuasive and inadequately supported Dr. Pratkanis' assertion that his conclusions about Exhibits 238 and 273 can be generalized to a broader universe of Defendant's advertisements.

2. Other Extrinsic Evidence

The Court also finds that none of the other extrinsic evidence relied upon by the FTC meets its burden of establishing that any of Defendant's advertisements was likely to mislead a reasonable consumer.

a. Eye Tracking Studies

The FTC introduced evidence that in 2010, DIRECTV contracted with Realeyes North America, a market research firm, to perform eye tracking studies on four DIRECTV advertising circulars. Hellstrom Depo. 9:19–23; Ex. 705 at 1–2.[14] DIRECTV engaged Realeyes to help its team understand how consumers read circulars. Ex. 378 at 31; Ex. 408. During this study, participants were shown a DIRECTV print advertisement on a large computer screen. Tr. Vol. 7 at 1221:8 (Hellstrom Depo. at 25:25–26:07); Ex. 718 at 16. Realeyes then tracked participants' "eye gaze data" for 30 to 90 seconds, aggregated that data, and created a "heat map" to show where participants focused their "visual attention" on DIRECTV's advertisement. Tr. Vol. 7 at 1221:8

(Hellstrom Depo. at 62:16-63:12); Ex. 718 at 16; Ex. 720 at 3.

The four DIRECTV ads tested by Realeyes were each four-page circular ads. Each of the circular ads was comprised of three components—a front cover, a two-page inside spread, and a back cover. Hellstrom Depo. 51:12–16. Realeyes conducted individual tests of all three components of each circular ad (twelve tests in all), and generated a report for each test. Hellstrom Depo. 50:24–51:16; Exs. 708, 709, 710, 713, 714, 715, 718, 719, 720, 723, 724, 725. Each report contained a bar graph called "Attention Allocation," as well as heat maps. *See, e.g.*, Ex. 708. DIRECTV prepared an internal document called "Heat Mapping Research: Learnings & Recommendations" which presented the results of the Realeyes eye tracking studies. Ex. 408.

These eye tracking studies are not persuasive on the relevant issue: whether the studied advertisements, or any of Defendant's advertisements, were likely to leave a reasonable consumer with a misleading net impression. These types of studies do not measure consumer sentiment, persuasion, or understanding of an advertisement. Tr. Vol. 8 at 1339:24–1340:5 (Leever); *see also id.* at 1339:15–23 (Pratkanis) (answer to question "And you can't measure any miscomprehension or any wrong impression from an ad based on an eye tracking study?" was "Generally, that's correct. It might give you some input into understanding that, but in general that's correct."). The fact that study participants' eyes may be more drawn to bright colors and pictures than to written details during a simulation test conducted on a computer simply does not provide persuasive support for the FTC's claim that advertisements describing a multifaceted offer for a plainly complex product like subscription satellite television services were misleading.[15]

b. RIO – Subscriber Call Data

***17** DIRECTV's RIO customer service database includes a note field where the agent writes down information about a customer's telephone call. Tr. Vol. 8 at 1280:14–1281:9 (Pratkanis). DIRECTV developed proprietary text-mining software that goes through the note field and assigns a primary tag to the call, corresponding to the primary reason for the phone call. (*Id.*). There are about 1,120 different primary tags. Tr. Vol. 8 at 1281:10–12 (Pratkanis).

Dr. Pratkanis analyzed the RIO data by selecting 17 primary tags he characterized as encompassing claims by customers, at the fourth and thirteenth months of service, expressing surprise, confusion, or dislike over bill increases. Tr. Vol. 8 at 1281:17–1282:10 (Pratkanis). The 17 tags fall into four categories: billing, 24-month commitment, early cancellation fee, and possible remedies for a price increase. *Id.* Dr. Pratkanis's RIO analysis was based on a random sample drawn from the RIO database. Tr. Vol. 8 at 1285:12–23 (Pratkanis).

Dr. Pratkanis opined that spikes in the RIO data at months 4 and 13 "would confirm the kind of things you would expect if the free gift as a negative option is not fully disclosed." Tr. Vol. 8 at 1282:19–1283:3. But as Dr. Pratkanis recognized, month 4 is when subscribers wishing to cancel their premium packages because the free period ended would naturally call to do so. *Id.* at 1336:5–7. And in month 13, "one possibility" is that subscribers call to explore other package options once their introductory pricing ends. *Id.* at 1336:8–15. Critically, Dr. Pratkanis did no content analysis to identify callers at these stages who called because they claimed to have been misled about the conditions of their subscriptions. *Id.* at 1336:17–24. While Dr. Pratkanis said he excluded tags like "cancel premiums" or "cancel HBO" from his analysis, *id.* at 1348:18–1349:6, the Court finds the RIO analysis to be unpersuasive evidence of consumer deception given Dr. Pratkanis' understandable inability to determine anything about why subscribers were *actually* calling in the months characterized as "spikes."

c. Customer Experience Steering Committee Documents

The Court also heard evidence regarding findings made by DIRECTV's "Customer Experience Steering Committee" ("CX Committee"). The CX Committee was a cross-functional group of DIRECTV executives led by Rasesh Patel. Tr. Vol. 2 at 274:16–20 (Bentley), Tr. Vol. 6 at 1020:4–6 (Patel). The evidence showed that the CX Committee was created in 2012 as part of a "company-wide focus" to "improve the customer experience." Tr. Vol. 6 at 1025:4–7 (Patel). The initiative focused on both current and prospective DIRECTV customers. Tr. Vol. 6 at 1027:16–18 (Patel). The CX Committee reviewed customer research and satisfaction data and operational data. Tr. Vol. 6 at 1029:19–1030:2 (Patel). The CX Committee's goal was to "identify customer pain points ... and then really prioritize the ones

that were most meaningful in terms of impact.” Tr. Vol. 6 at 1030:7–9 (Patel). The CX Initiative was “very self-critical” and “discerning” in identifying “every opportunity ... to improve the customer experience.” Tr. Vol. 6 at 1052:18–24 (Patel). By 2013, the CX Committee had identified numerous customer “pain points,” which it categorized and prioritized in a “Customer Pain Points—Review and Prioritization” discussion document dated May 7, 2013. Tr. Vol. 6 at 1031:8–22 (Patel); Ex. 589. The CX Committee identified a number of these as “top recommended pain points” based on the “degree of impact” a particular pain point might have on metrics such as customer satisfaction, call volume, and numerous other dimensions. Tr. Vol. 6 at 1043:10–18 (Patel); Ex. 589 at 7. The CX Committee initiative lasted three years, until 2015. Tr. Vol. 6 at 1029:3–7 (Patel).

***18** Nothing about the CX Committee materials introduced at trial persuasively supports the FTC’s claim that Defendant’s advertisements misled millions of customers between 2007 and 2015 (or were likely to do so). Instead, Mr. Patel credibly testified that the CX Committee engaged in a good-faith and comprehensive effort to evaluate DIRECTV’s operations, identify potential problem areas and recommend improvements. The evidence at trial established that a number of such improvements were implemented. For example, in October 2012, DIRECTV moved from an offer requiring customers to redeem a rebate via mail or online to an “instant” rebate. Ex. 617 at 5. This policy ensured that every customer would receive the discounted price starting with the first month’s bill, and addressed an issue noted by the CX Committee. Tr. Vol. 2 at 293:11–21 (Bentley). This change resulted in an $80 million reduction in revenue each year. *Id.* at 294:3–11 (Bentley). As another example, around the same time, DIRECTV adopted a “Simplified Bill” that incorporated a number of changes with the goal of making the bill easier to understand. Ex. 569. And third, another pain point that the CX Committee identified was that customers were unable to refuse the premium channel promotional offer at the point of sale or request a future cancellation date for premium channels. Ex. 589 at 4–9. In response to this pain point, DIRECTV implemented changes to its premium offer policies and processes so that customers could decline the premium channel offer at the point of sale, or at any specified future date without having to remember to call to cancel on the last day of the trial period. Tr. Vol. 7 at 1053:1–11 (Patel).

Mr. Patel also credibly explained that if consumers believed that the terms in DIRECTV’s advertisements did not match the terms disclosed when they sought to subscribe, that feeling of deception would have been reflected in the findings of the CX Committee and in DIRECTV’s data collected on pain points, consumer research, sales calls, closing rates, activation rates, and churn. Tr. Vol. 8 at 1047:3–10451:9 (Patel). The evidence did not support the FTC’s theory in this regard. DIRECTV’s “churn rate” (the rate at which customers leave DIRECTV’s platform) stayed constant at approximately 1.5% from 2007 to 2013. Tr. Vol. 4 at 650:20–651:7 (Guyardo); Ex. 991 at 5. DIRECTV improved its market share from 2008 to 2013, when “the DIRECTV subscriber base grew by 3.5 million subscribers ... while all of [DIRECTV’s] other competitors combined only grew by 400,000.” Tr. Vol. 4 at 651:22–652:5 (Guyardo); Ex. 991 at 6. A subscriber’s average time on the platform has also steadily increased over time. The average customer now stays with DIRECTV for “close[ ] to seven years”—years after the initial 24-month commitment period. Tr. Vol. 2 at 347:8–18 (Bentley).[16] Finally, DIRECTV’s Net Promoter Score increased over time from 16 to 34 and from “second best in the industry to best in class in the industry.” Tr. Vol. 7 at 1077:16–20 (Patel).[17]

DIRECTV’s investment of substantial resources in analyzing its operations, candidly identifying areas for improvement, and following through on a number of improvements does not support a finding that the company violated the FTC Act. If anything, this evidence further underscores how this case is very unlike the straightforward deception cases upon which the FTC purports to rely.

d. Other Evidence

Finally, none of the FTC’s other evidence persuasively met its burden of proof of showing that DIRECTV’s print advertisements were likely to deceive a reasonable consumer. The FTC’s attempt to rely almost entirely on pretrial deposition testimony regarding a large number of exhibits never even discussed at trial is telling, and does not account for the detailed and credible trial testimony that substantially undercut its position. *See* Dkt. No. 401-1 at ¶¶ 411–453 (citing virtually no trial testimony). Moreover, the FTC’s approach appears to have been to seize on language superficially helpful to its case in documents, while consistently ignoring pivotal context showing the actual meaning of the evidence.

***19** For example, the FTC called DIRECTV executive Brad Bentley in its case-in-chief, and asked him a number

of questions about a study prepared by McKinsey consultants as part of the CX Committee project. Tr. Vol. 2 at 279:17–282:5 (Bentley); Ex. 573 (July 10, 2012 "discussion document" slide deck). FTC counsel focused on a slide called "NPS drops early—opportunity to improve selling and on-boarding." Tr. Vol. 2 at 279:17–282:5 (Bentley); Ex. 573 at 18. Government counsel suggested that the slide showed that "33 percent of DIRECTV customers felt misled during the sign-up process." Tr. Vol. 2 at 281:4–9. But on redirect, Mr. Bentley made clear that because this exercise surveyed customers in the first 90 days of their subscriptions, this figure had nothing to do with the issues that are the basis of the FTC's complaint: second-year pricing, 24-month commitment or early cancellation fees. *Id.* at 288:15–289:14. Moreover, Mr. Bentley persuasively explained that the biggest complaint among onboarding customers at this time was the first month's bill not aligning with the customer's expectations, an issue DIRECTV addressed by replacing its mail-in rebate model with an automatic instant rebate model. *Id.* at 291:13–294:14 (customers reported feeling misled in survey because, although they "had to redeem [their] rebate" in order to obtain the introductory price, "oftentimes consumers wouldn't redeem [the rebate] quick[ly] enough for it to be reflected on the first month bill.").

iv. **Conclusion**

The evidence at trial conclusively established that the FTC failed in its case-in-chief to meet its burden of proving a Section 5 claim based on any of DIRECTV's non-website advertisements. The FTC's ambition in attempting to show that over 40,000 advertisements were likely to deceive substantially exceeded the strength of its evidence: this case did not involve the type of strong proof the Court would expect to see in a case seeking nearly $4 billion in restitution, based on a claim that all of DIRECTV's 33 million customers between 2007 and 2015 were necessarily deceived. Tr. Vol. 1 at 34:3–16 (FTC's opening statement). Because the FTC definitively failed to prove its case as to Defendant's non-website advertisements, the motion for judgment on partial findings is **GRANTED** as to the FTC's Section 5 claims to the extent they are based on those advertisements.

D. **The Court Will Defer Judgment With Regard to the Claims Based on the Website**

For now, the Court reaches a different conclusion with regard to the Section 5 and ROSCA claims based on the various iterations of Defendant's website. While the FTC's case as to the websites was far from overwhelming, the Court finds it appropriate to defer a determination on these claims until after the close of the evidence.

i. **Website version tested by Dr. Erdem (Exs. 1052, 2033 and 2371)**

Dr. Erdem conducted an online survey based on a modified mockup version of the August 2013 version of DIRECTV's website (known as the "Old Flow"). Ex. 2371; Tr. Vol. 6 at 929:1–11, 937:23–938:8; Tr. Vol. 4 at 683:17–684:4; Tr. Vol. 9 at 1448:1–20 (Poling-Hiraldo and Leever). Dr. Erdem testified that she used the August 2013 Old Flow version of the website because she understood that this was the only interactive live version the FTC was able to recover. Tr. Vol. 6 at 938:2–5. FTC expert witness Dr. Nathan Good prepared the "UX" (or user experience) version of the August 2013 Old Flow that Dr. Erdem used as the basis for the treatment stimulus. Tr. Vol. 1 at 114:8–20, 121:8–25 (Good). A number of the links that were live on the actual website were not live in Dr. Good's UX version (meaning that nothing would happen when those links were clicked). *Id.* at 114:16–20, 121:8–126:14; *see also generally* Ex. 1052.

Dr. Erdem claimed that the results of her survey could be generalized to draw conclusions about other versions of the website beyond the one she tested. Tr. Vol. 6 at 956:3–957:15, 986:1–995:25. She testified that she would "expect" the results to be the same for other versions of the website, but she did not test any other versions. Tr. Vol. 6 at 1003:16–23.

In the Old Flow, to complete a purchase, consumers would navigate through a landing page, programming package selection page, receiver selection page, a shopping cart page, and several checkout pages. *See* Ex. 1045; *see also* Ex. 2033 at .pdf p. 2 (Landing Page), 5–8 (Programming Package Selection Page), 28 (Receiver Selection Page), 47–49 (Shopping Cart Page), 107 (Checkout Page: Installation Address), 111 (Checkout Page: Account Info), 112 (Checkout Page: Billing Address), and 121–123 (Confirmation Page).

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

***20** Based on a facial review of the Old Flow, the Court cannot say conclusively at this stage that the FTC has failed to prove that this version of the website could create a net impression that was likely to deceive a consumer acting reasonably under the circumstances. In the Old Flow, on the landing page of the website, near the introductory discounted price, DIRECTV disclosed that the discounted price was for 12 months and required a 24-month agreement, *see* Ex. 2033 at 1; Dkt. No. 370 ("Tr. Vol. 3") at 510:7–10 (Poling-Hiraldo). However, other significant details only became visible if the prospective customer moused over a small info hover, labeled only "Offer Details," at the bottom of the landing page under the "View All Packages" button. *See* Ex. 2033 at 2 (disclosures that all offers require a 24-month agreement, the amount of the discount for the first 12 months, and the $20/month early cancellation fee appeared only behind info hover).




When a prospective customer clicked the "View All Packages" button and provided her zip code, she would move to the package selection page. *Id.* at 3–4. On that page, near the introductory discounted price, DIRECTV disclosed that the discounted price was for 12 months with a 24-month agreement, and disclosed the regular package price, *see* Ex. 2033 at 4.




On the bottom of each of the package selection page, receiver selection page, and cart page, DIRECTV disclosed that all offers require a 24-Month Agreement, next to a blue "Additional Offer Details" hyperlink, *see* Ex. 2033 at 7, 48, 92; Tr. Vol. 3 at 511:17–512:11 (Poling-Hiraldo).




Again, however, significant details appeared only if a prospective customer clicked the blue "Additional Offer Details" link on the package selection page, receiver selection page, and cart page. Clicking this link led users to a light box (i.e., a textbox overlay that appeared on the same page and dimmed the background, Tr. Vol. 1 at 84:10–14 (Stahl); Tr. Vol. 3 at 451:10–15 (Mandel) ) containing a long list of details about the offer, including that the customer had to call to change or cancel the premium channels after three months or be charged the then-prevailing rate; the regular cost of the premium channels for three months; the regular package prices; the 24-month agreement; and the $20/month early cancellation fee, *see* Ex. 2033 at 23-26; Tr. Vol. 3 at 512:12–513:25 (Poling-Hiraldo). While this box is titled

"Additional Information," much of this information is actually central to a potential customer's ability to evaluate and understand the terms of the subscription.




At the top of the shopping cart page, DIRECTV disclosed the regular package price in black, and the first year discount immediately underneath it, in green, as a bill credit labeled for "Months 1-12," *see* Ex. 2033 at 50. On the cart page, immediately next to the package, the website included blue language reading "What is my agreement?" *Id.* at 49. A prospective customer who clicked on this language would see a box reading "You agree to maintain DIRECTV service with any base package of $29.99/mo. or above for 24 consecutive months." *Id.*; Tr. Vol. 3 at 514:23–515:12, 516:15–21 (Poling-Hiraldo).[18]




***21** At the top of the Cart, next to the "Package & Programming" header, DIRECTV provided a "View Monthly Cost" tab that opened a chart showing all costs for each of the 24 months in six month blocks, including that the regular price of the premium channels would be billed starting in month four, and that the regular package price would be billed starting in month 13, *see* 2033 at 78–79; Tr. Vol. 3 at 514:1–22, 518:17–519:4 (Poling-Hiraldo).

In the Cart, under a "Premium Channels" header, DIRECTV disclosed the regular price of the premium channels in black, and immediately underneath them, in green, a bill credit labeled: "FREE for 3 months: HBO, SHOWTIME, STARZ, and Cinemax", *see* Ex. 2033 at 59. Again, the disclosure that the customer must call to cancel the premium channels after three free months or be charged the then-prevailing rate only appeared if the prospective customer moused over an info hover next to the premium channel bill credit in the shopping cart on the cart page. *See* Ex. 2033 at 58; Tr. Vol. 3 at 517:10–20 (Poling-Hiraldo).




Finally, on the checkout page of the Old Flow, before the consumer could place an order and transmit financial information to DIRECTV, the consumer was required to affirmatively click the orange button affirming: "I Accept. Submit My Order." Ex. 2033 at 111. Next to the orange button was a blue hyperlink labeled "By clicking 'Submit Order' I agree to these Terms & Conditions." *Id.* Clicking on this link brought up a light box that detailed the 24-month agreement and the $20/month early cancellation fee. *See* Ex. 1021 at 124-25; Tr. Vol. 3 at 519:5–15 (Poling-Hiraldo).




It was technically possible for a consumer to proceed through the entire purchase process without ever clicking or hovering over any of the hyperlinks or symbols described above. *See* Ex. 1060 at 0:01–5:20, Ex. 1069 at 0:01–5:21; Tr. Vol. 9 at 1482:22–1483:3, 1513:11–1514:15 (Leever).

ii. **Section 5**

Based on a facial review of the Old Flow website, as well as the evidence introduced at trial, the Court will defer a finding as to what net impression that website would leave with a consumer acting reasonably. The manner in which some key terms were presented behind hyperlinks, info hovers and tool tips leaves the Court unable to conclude at this stage that judgment on partial findings is appropriate. The Court likewise defers this analysis as to the other versions of the website placed in evidence by the FTC.[19]

iii. **ROSCA**

***22** ROSCA prohibits certain methods of negative option marketing on the Internet. A "negative option feature" is "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence

or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w). ROSCA prohibits charging consumers for goods or services in Internet transactions through a negative option feature, unless the seller "provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information." 15 U.S.C. § 8403(1). Additionally, ROSCA requires sellers to obtain a "consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction." *Id.* § 8403(2).

Consistent with the above discussion of the Old Flow, the Court will defer ruling on this claim until the close of the evidence. The Court is not in a position to conclude on the record presented thus far that the FTC cannot meet its burden, given the manner in which information about the negative option feature appeared on the website behind hyperlinks, info hovers or tool tips. This decision to defer ruling until the close of the evidence applies to all versions of the website in existence in 2011 or later that were introduced in evidence by the FTC.[20]

E. **Remedy**

Because the Court has granted Defendant's motion for partial findings to the extent the FTC's case is based on anything other than Defendant's website, the scope of the maximum potential recovery in this case has been substantially curtailed.[21] Even in the event the FTC might eventually be able to prevail on what remains of the case (a question the Court need not answer at this stage), the Court believes that there are a number of problems with the FTC's equitable relief theories that suggest it will have difficulty meeting its burden of providing an adequate basis for the relief it seeks.

The Ninth Circuit has held that § 13(b) of the FTC Act empowers the Court to award "any ancillary relief necessary to accomplish complete justice, including restitution" and injunctive relief. *Commerce Planet*, 815 F.3d at 598 (*citing* *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) ). This holding was premised on the principle that "[t]he equitable jurisdiction to enjoin future violations of § 5(a) carries with it the inherent power to deprive defendants of their unjust gains from past violations...." *Commerce Planet*, 815 F.3d at 599. The Ninth Circuit has adopted a two-step approach to determining the amount of unjust gains. Under the first step, "the FTC bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *Commerce Planet*, 815 F.3d at 603. In *Commerce Planet*, the Ninth Circuit held that unjust gains in a case like that one are "measured by the defendant's net revenues (typically the amount consumers paid for the product or service minus refunds and chargebacks), not by the defendant's net profits." *Id.* If the FTC makes this showing, at the second step "the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains." *Id.* at 604. "[T]he purpose of such an award is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction." *Id.* at 603 (quotation omitted).

Here, the Court has significant questions about the FTC's ability to prove that the amount it seeks in restitution reasonably approximates the Defendant's unjust gains, even if it prevails to some extent with regard to its Section 5 claim based on the website. Expert witness Dr. Daniel Rascher testified in support of the FTC's claim that $3.95 billion represents "a reasonable estimate (under *Commerce Planet* ) of the unjust gains DIRECTV collected from consumers." Dkt. 337 at 11. To calculate this amount, Dr. Rascher examined customer billing data for certain types of programming packages identified by the FTC. Tr. Vol. 10 at 1552:5–10, 1554:11–17. He then calculated an estimate of unjust gains related to second year pricing, Tr. Vol. 10 at 1599:09–1600:07 ($3.68 billion); Ex. 1321, and the premium channel offer, Tr. Vol. 10 at 1605:12–16 ($268 million); Ex. 1322.[22]

***23** Dr. Rascher testified that he calculated DIRECTV's "unjust gains" based on the assumption that "*all* DIRECTV subscribers ... thought they would pay the same amount in the second year as they paid in the first," Tr. Vol. 10 at 1630:15–20 (emphasis added), and that he applied "that same kind of presumption" with respect to unjust gains for the premium channel offer, *id.* at 1681:11–25. He thus presumed that all DIRECTV subscribers in his approximation of unjust gains were misled, and that they were all misled in the same way. Dr. Rascher testified that he was instructed that the FTC would prove what DIRECTV customers "thought" or "believed" their deal with DIRECTV to be and thus supply the core predicate for his analysis. Tr. Vol. 10 at 1616:13–18, 1618:08–25 (Rascher). Dr. Rascher testified that the FTC advised him that he could "presume reliance," which he said he then "operationalized" as a presumption that all subscribers purchased DIRECTV service with the "expectation" that the second-year price would be the same as the first year price (and he adopted similar presumptions as to the other terms at issue). Tr. Vol. 10 at 1554:5–1556:6.

The Court acknowledges the Ninth Circuit's holding that once the FTC proves a defendant made widely-disseminated material misrepresentations, it is "entitled to a presumption that all consumers who purchased [defendant's product] did so in reliance on the misrepresentations." *Commerce Planet*, 815 F.3d at 604 (*citing F.T.C. v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993) ).[23] But here, the Court believes the FTC has an uphill climb to prove its "expectation" theory, because it will be difficult to establish based on the presentation of various terms in several different iterations of Defendant's website that a reasonable consumer uniformly would expect to pay the same price in year two that she paid in year one, as Dr. Rascher assumed. *See* Tr. Vol. 10 at 1555:08–16 (to determine the price that a customer would pay in the but-for world, Dr. Rascher simply used the price the customer had paid in the first year based on the billing data). In other words, Dr. Rascher simply presumed that customers had an expectation that they would pay the same introductory price for two years, based only on an instruction from the FTC. *Id.* at 1618:08–25, 1667:02–09 (Rascher). The Court believes that this issue, and the breadth of the FTC's interpretation of the "presumption of reliance," creates a significant possibility that at the close of the evidence the FTC will be unable to establish a reasonable approximation of damages, or that its approximation will be substantially or even entirely rebutted by the Defendant. In any event, the Court will confront this concern if the FTC is able to prove liability as to what remains of its case.[24]

## V. CONCLUSION

Accordingly, the Court **GRANTS IN PART** Defendant's motion for judgment on partial findings. To the extent the motion is not granted, the Court declines to enter judgment until the close of the evidence.

The Court **SETS** a case management conference for September 4, 2018 at 2:00 p.m. to discuss (1) a schedule and plan for completing what remains of the trial; and (2) whether the parties believe that renewed settlement discussions would be productive in light of the Court's findings and conclusions.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 3911196, 2018-2 Trade Cases P 80,489

Footnotes

1 DIRECTV was acquired by AT&T Inc. on July 24, 2015. *See* Dkt. No. 337 at 17.

2 Defendant contends, citing two out-of-circuit district court cases, that "courts have consistently held that, where it is not reasonably clear from the face of the advertisement that reasonable consumers take away the alleged implied false message, extrinsic evidence is required to prove deception." Dkt. No. 396 at 6 (*citing United States v. Bayer Corp.*, 2015 WL 5822595 at *11 and *13 (D.N.J. Sept. 24, 2015) and *F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F.Supp.2d 1167, 1193 (N.D. Ga. 2008) (internal quotation marks omitted) ). Neither the Ninth Circuit nor any district court in this circuit has construed the requirements of the FTC Act in the manner Defendant urges, and the Court does not find these cases persuasive on this issue.

3 Dr. Erdem testified that she reviewed "exactly 116 print ads" in detail. Tr. Vol. 6 at 934:22–935:2. At the Court's request, the parties submitted a stipulation listing the trial exhibit number for each of the items reviewed by Dr. Erdem, which included 119 print advertisements. Dkt. No. 393.

4 This exhibit was admitted by stipulation. Dkt. No. 391. The parties' joint exhibit list describes it as "2013 print ad, offer ends 10/02/2013, 'Best Offer Ever.' " Dkt. No. 353-1 at 34.

5 The Court notes for clarity of the record that the reproduction of Exhibit 244 in this order is substantially smaller than the actual size of the advertisement as it was distributed to potential consumers in paper form. *See* Exhibit 2026A (paper version of the advertisement measuring approximately 8.5″ by 11″). The resolution of the original Exhibits 244 and 2026A is also substantially clearer than the resolution of the reproduction in this order. The Court has inserted a reproduction of Exhibit 244 simply to provide context for this order's narrative description of the advertisement's content.

6 Brad Bentley, who has served as a sales and marketing executive at DIRECTV and then at its parent company AT&T for 17 years, referred to the section at the bottom of the advertisement as the "offer details" section. Tr. Vol. 2 at 217:9–230:25, 238:23–239:3, 265:22–266:3.

7 As noted above, Exhibit 244 disclosed the then-current promotional price for each package. The FTC argues that “no DIRECTV print ad in evidence stated the actual price a consumer would pay during the second year of the 24-month contract because the regular price is subject to change.” Dkt. No. 401 at 6. The uncontradicted evidence at trial explained why: DIRECTV could not know in advance what the second-year price would be, because it had to take into account consistent increases in its own cost structure before it could set that figure. *See* Tr. Vol. 3 at 406:20–407:6 (Bentley). DIRECTV’s costs to obtain content rose from 8 to 10 percent annually over a three year period, but the company could only pass on a 3 to 5 percent increase to its customers for business reasons. *Id.* at 331:1–333:5 (Bentley). The evidence at trial also established that annual price increases occur across the pay television industry. *Id.* at 333:12–20.

8 FTC counsel used a slide deck as a demonstrative visual aid during Dr. Erdem’s testimony. *See, e.g.*, Tr. Vol. 6 at 938:22–24 (referring to “slide 47”). The FTC submitted the slide deck as “Attachment A” to its proposed findings of fact, and Dr. Erdem’s control and test versions of the Exhibit 244 print advertisement as “Attachment B” to that filing. Dkt. Nos. 401-2 and 401-3. However, the FTC never actually introduced the control and test stimuli in evidence, which it appears to recognize by attempting to submit this material as an “attachment” to its proposed findings. *See* Dkt. No. 401-2 at 44 (depicting “Modifications to Original DIRECTV Print Ad” by showing original and treatment versions side by side, and referencing “Trial Exhibit 913”). Exhibit 913 was not offered for admission at trial, nor was it included in any of the parties’ stipulations. Accordingly, the Court bases its analysis on the testimony Dr. Erdem offered at trial and the Court’s recollection of the demonstrative slides, and rejects the FTC’s apparent (and unacknowledged) attempt to supplement the record after the close of the evidence.

9 Because all that was entered in evidence was the URL links, rather than an actual electronic copy of the survey, it is unclear how the FTC intends to preserve the evidence presented at trial for the record.

10 No witness testified to how this exhibit, which was admitted by stipulation, *see* Dkt. No. 391, was laid out in the document potential DIRECTV customers actually saw.

11 The evidence at trial established that this single 2013 advertisement would have resulted in only about 300 subscriptions, and even fewer activations. Tr. Vol. 2 at 323:13–16 (Bentley).

12 As one example of the FTC’s tendency to gloss over pertinent details, counsel in opening statement highlighted an advertisement from 2007 and asked “Where does it say what the higher second year price will be?” Tr. Vol. 1 at 11:12–13 (referencing and displaying Ex. 84). But the evidence ultimately established, without contradiction, that this offer did not require a two-year commitment, and that it contained standard rather than promotional pricing. Tr. Vol. 2 at 345:3–25 (comparing Ex. 84 to Ex. 617 (timeline of offers) ) (Bentley).

13 This conclusion applies with even more force to the television commercials. Those commercials plainly differ in content, purpose, approach and format from print ads, and often relied primarily on overt humor to attract viewers’ attention and interest them enough to call a toll-free number or visit the website to learn more. *See* Tr. Vol. 5 at 872:7–875:7 (testimony of former DIRECTV executive Jon Gieselman explaining that commercials focused on different main messages, with the main “proof points” being “technology superiority, programming superiority [and] customer service superiority”); Ex. 443 (television commercial featuring a talking horse discussing benefits of DIRECTV); Tr. Vol. 2 at 260:13–18, 266:4–16 (the purpose of DIRECTV’s advertisements was to “create some interest and start a dialogue by motivating the consumers to pick up the phone and call DIRECTV or to go on the DIRECTV website,” which is colloquially known as the “call to action” in DIRECTV’s advertising) (Bentley).

14 The FTC played excerpts of Mr. Hellstrom’s deposition at trial. Dkt. No. 387 (“Tr. Vol. 7”) at 1221:5–8.

15 This conclusion applies equally to the “click-tracking studies” introduced by the FTC. *See, e.g.,* Ex. 347; Tr. Vol. 8 at 1340:6–9 (Pratkanis). A survey participant’s response to an invitation to “click on the three parts of the [advertisement] that are most compelling to you,” Ex. 347 at slide 30, simply is not probative of whether the advertisement was likely to leave a reasonable consumer with a misleading net impression.

16 DIRECTV witnesses testified that, due to upfront “subscriber acquisition costs” approaching $1,000 per subscriber, the company does not break even until, on average, a customer remains on the platform for 28 to 30 months. Tr. Vol. 2 at 330:3–6 (Bentley); Tr. Vol. 8 at 881:25-882:2 (Gieselman). This means that it is “absolutely paramount” to DIRECTV’s business model to retain the average customer for longer than the break-even point. Tr. Vol. 2 at 347:24–348:14 (Bentley).

17 “Net Promoter Score,” or “NPS,” is a calculation of promoters (consumers who are satisfied or would recommend a service) minus detractors (consumers who are dissatisfied or would not recommend a service), the sum of which measures customer satisfaction. Tr. Vol. 3 at 363:12–364:11 (Bentley); Ex. 571 at 2. NPS is not a metric unique to DIRECTV; rather, it is a “self-critical” standardized metric that can be compared within and across industries. Tr. Vol. 3 at 364:6–11 (Bentley).

18 DIRECTV referred to this mechanism as a "tool tip." A tool tip is a method DIRECTV used to disclose additional information on the same webpage when the consumer clicked on a prompt or icon signaling there was additional information (e.g., a blue "i" enclosed in a circle). Tr. Vol. 3 at 515:24–25, 516:7–11 (Poling-Hiraldo). Unlike a hyperlink, a tool tip does not redirect a user to another webpage. *Id.* at 516:7–11.

19 DIRECTV's web flow underwent two major redesigns during the relevant time period. The design that existed until late 2009 was referred to as the "Wizard Flow." In late 2009, the Old Flow replaced the Wizard Flow, and the "New Flow" completely replaced the Old Flow in 2014. Tr. Vol. 4 at 683:17–684:4 (Poling-Hiraldo); Tr. Vol. 9 at 1448:12–20 (Leever). The New Flow was publically split-tested with the Old Flow from January to July of 2014. During that period, some consumers were directed to the Old Flow, and some were directed to the New Flow. Tr. Vol. 9 at 1493:7–1494:2 (Leever). After more than a year of development, the New Flow took over 100% of prospect traffic in July 2014. Tr. Vol. 9 at 1486:21–1487:5 (Leever). The Wizard Flow, Old Flow, and New Flow differed significantly with respect to, among other things: the design and layout of information (e.g., whether the packages were presented vertically or horizontally); the number and placement of hyperlinks, tool tips, or info hovers that DIRECTV used to disclose information about its offers and product; and the icons and prompts signaling those hyperlinks, tool tips, or info hovers. *Compare* Ex. 1000 (9/4/09 Wizard Flow), *with* Ex. 2033 (8/13 Old Flow), *with* Ex. 1065 (9/17/15 New Flow); *see also* Tr. Vol. 9 at 1448:22–1451:21 (Leever). DIRECTV's web flow designs also differed with respect to the flow of webpages. For example, in the New Flow, between the package selection step and the receiver selection step, the consumer was directed to a "Choose add-on packages" step that was not in the Old Flow. At the top of this step, DIRECTV provided information and disclosures regarding the free premium channels offer. *See* Ex. 1065 at 10:58–11:14 (9/17/15 capture).

20 ROSCA was enacted on December 29, 2010.

21 *See* Tr. Vol. 9 at 1441:23–1442:15 (only approximately 20% of direct sales subscribers either subscribed via DIRECTV.com or subscribed via a phone number that indicated they started the subscription process on the website) (Leever).

22 Dr. Rascher had never previously testified in a false advertising case before this trial. Tr. Vol. 10 at 1608:9–11.

23 Defendants cite the Second Circuit's decision in *F.T.C. v. Verity Int'l*, 443 F.3d 48, 69 (2d Cir. 2006), in support of its argument that no presumption of reliance applies here. Dkt. No. 396 at 23. The Ninth Circuit has never adopted the reasoning of *Verity*, and in fact distinguished that case in an unpublished memorandum disposition. *See F.T.C. v. Publishers Bus. Svcs.*, 540 Fed. Appx. 555, 556–557 (9th Cir. 2013) (reversing as inconsistent with Ninth Circuit law district court's holding, relying in part on *Verity*, that defendants' gain rather than consumers' loss was proper measure of equitable damages).

24 The Court will also have to consider whether injunctive relief is warranted, and assess the appropriate measure of recovery under ROSCA if the FTC proves that claim.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2559615
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

# IN RE 5-HOUR ENERGY MARKETING AND SALES PRACTICES LITIGATION

Case No. ML 13-2438 PSG (PLAx)
|
Filed 06/07/2017

**Proceedings (In Chambers): Order DENYING Plaintiffs' Motion for Class Certification and GRANTING IN PART and DENYING IN PART Defendants' Motions to Exclude Plaintiffs' Experts**

Philip S. Gutierrez, United States District Judge

***1** Before the Court is Plaintiffs Marc Adler, Michael Casey, David Ellis, William Forrest, Ilya Podobedov, Cody Soto, and Donna Thompson's motion for class certification, **Dkt. # 159**, and Defendants Innovation Ventures, LLC; Living Essentials, LLC; Manoj Bhargava; and Bio Clinical Development, Inc.'s motions to exclude experts Patrick T. Ronaldson and Colin B. Weir, Dkts. # **206, 209, 217, 219**. The Court finds the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local R. 7-15. After thoroughly considering the arguments in the papers, the Court DENIES Plaintiffs' motion for class certification, and GRANTS IN PART and DENIES IN PART Defendants' motions to exclude Plaintiffs' experts.

## I. Background

### A. Procedural Background

On August 4, 2011, Plaintiffs Ilya Podobedov, Jordan Moussouros, and Richard N. James filed this putative class action against Defendants Innovation Ventures, LLC; Living Essentials, LLC; Manoj Bhargava; and Bio Clinical Development, Inc. in the Central District of California. *See Complaint*, *Podobedov v. Living Essentials, LLC*, CV 11-6408 PSG (PLAx) (C.D. Cal.), Dkt. # 1. In June 2013, the Judicial Panel on Multidistrict Litigation centralized a number of cases related to the marketing and sale of 5-hour ENERGY ("5HE") and assigned the matter to this Court for consolidated pretrial proceedings. *See* Dkt. # 1. On January 24, 2017, the Court issued an order granting in part and denying in part Defendants' motion for summary judgment. Dkt. # 191. Plaintiffs now move for class certification on some of the remaining claims,[1] and Defendants have moved to exclude Plaintiffs' experts, Colin B. Weir and Patrick T. Ronaldson. *See* Dkts. # 159, 206, 209, 217, 219.

### B. Factual Background

Plaintiffs are consumers in six states who purchased 5-hour ENERGY ("5HE") products, including 5-hour ENERGY and 5-hour ENERGY Extra Strength,[2] between March 1, 2008 and their entry into this case. *See Plaintiff's Notice of Motion* 1:4–24. They allege that Defendants deceptively and misleadingly marketed 5HE as "five hour energy" or providing "hours of energy" when 5HE provides only a few minutes of energy at most. *See Order Granting in Part and Denying in Part Summary Judgment* 2. Throughout the class period, every label of 5HE displayed the name of the product, "5-hour ENERGY," and a claim that the product provides "hours of energy." *Motion for Class Certification* 1:4–5.

***2** Plaintiffs propose certification of six separate statewide classes:

> All persons who purchased 5HE products, including 5HE and 5HE Extra Strength, on or after March 1, 2008 in California. This class is represented by Plaintiffs Ilya Podobedov[3] and Cody Soto who first filed their Complaint in the Central District of California.

> All persons who purchased 5HE products, including 5HE and 5HE Extra Strength, on or after March 1, 2008 in Missouri. This class is represented by Plaintiff William Forrest who first filed in the Eastern District of Missouri.

> All persons who purchased 5HE products, including 5HE and 5HE Extra Strength, on or after March 1,

2008 in New Mexico. This class is represented by Plaintiff David Ellis who originally filed in the District of New Mexico.

All persons who purchased 5HE products, including 5HE and 5HE Extra Strength, on or after March 1, 2008 in New Jersey. This class is represented by Plaintiff Marc A. Adler who originally filed in the District of New Jersey.

All persons who purchased 5HE products, including 5HE and 5HE Extra Strength, on or after March 1, 2008 in New York. This class is represented by Plaintiff Podobedov who originally filed the New York claims in the Central District of California.

All persons who purchased 5HE products, including 5HE and 5HE Extra Strength, on or after March 1, 2008 in Pennsylvania. This class is represented by Plaintiffs Donna A. Thompson and Michael R. Casey who originally filed in the Western District of Pennsylvania.

Plaintiffs allege claims for violations of state consumer protection laws, breach of express warranty, breach of the implied warranty of merchantability, and intentional misrepresentation and concealment of fact. Specifically, they plead the following claims:

1. **California**: (1) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*; (2) violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; (3) violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (4) breach of express warranty; (5) breach of implied warranty of merchantability; and (6) intentional misrepresentation and concealment of fact.

2. **Missouri**: (1) violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Ann. Stat. §§ 407.020 *et seq.*, and (2) intentional misrepresentation and concealment of fact.

3. **New Jersey**: (1) violation of the New Jersey Fraud in Sales or Advertising of Merchandise Law (the "New Jersey Fraud Statute"), N.J. Stat. Ann. §§ 56:8-1 *et seq.*; (2) violation of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act (the "New Jersey Warranty Act"), N.J. Stat. Ann. §§ 56:12-14 *et seq.*; (3) breach of express warranty; (4) breach of implied warranty of merchantability; (5) intentional misrepresentation and concealment of fact.

4. **New Mexico**: (1) violation of the New Mexico Unfair Practices Act ("UPA"), N.M. Stat. Ann. §§ 57-12-2 *et seq.*; (2) breach of implied warranty of merchantability; and (3) intentional misrepresentation and concealment of fact.

***3** 5. **New York**: (1) violation of the New York Deceptive Trade Practices Act ("DTPA"), N.Y. Gen. Bus. Law §§ 349 *et seq.*, and (2) intentional misrepresentation and concealment of fact.

6. **Pennsylvania**: (1) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201-2 *et seq.*; and (2) intentional misrepresentation and concealment of fact.

## II. Discussion

### A. Evidentiary Objections to Plaintiffs' Experts

Before addressing the merits of the certification motion, the Court must consider Defendants' evidentiary objections to Plaintiffs' experts, Patrick T. Ronaldson and Colin B. Weir. The Ninth Circuit has approved of a rigorous application of *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), in evaluating class certification motions. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2001).

Under Federal Rule of Evidence 702 and *Daubert*:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness had applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *see also United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. In conducting this preliminary assessment, the

trial court is vested with broad discretion. *See, e.g.*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJBx), 2007 WL 935703, at *3 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)). "In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Semantelli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998). On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiffs' claims; instead, the testimony must be relevant in assessing "whether there was a common pattern and practice that could affect the class as a whole." *Ellis*, 657 F.3d at 983.

*i. Patrick T. Ronaldson*

Patrick T. Ronaldson is Plaintiffs' expert on the physiological effects of 5HE. Ronaldson is currently an assistant professor in the Department of Pharmacology at the University of Arizona College of Medicine. *Smith Decl.*, Ex. 19 (Ronaldson Decl.), Att. A. Ronaldson holds a BS in pharmacology from the University of Toronto, and a Ph.D. in pharmaceutical sciences from the Leslie Dan Faculty of Pharmacy at the University of Toronto. *Ronaldson Decl.*, ¶¶ 4–5. His expertise is in the areas of neuropharmacology, drug delivery, drug transporter biology, pharmacokinetics, drug-drug interactions, and the effect of disease mechanisms on drug efficacy and toxicity. *Id.* ¶ 13.

***4** Ronaldson opines that 5HE does not (1) provide five hours of energy, which Ronaldson defines as "caloric" energy, (2) 5HE's B-vitamins and amino acids are not the basis of the increased energy and alertness that consumers feel after consuming 5HE, and (3) 5HE results in the same "crash" typically attributed to other caffeine products. *Id.* ¶ 70. Based on information about the number of calories in 5HE and the demographic characteristics of the average 5HE consumer, Ronaldson estimates that 5HE provides no more than 3.4 minutes of caloric energy to the average male consumer and 3.7 minutes of caloric energy to the average female consumer. *Id.* ¶ 27.

Defendants argue that Ronaldson's declaration is unreliable to the extent that Ronaldson claims expertise in how the ordinary consumer would use the term "energy." *Defendants' Motion to Exclude the Expert Opinion Testimony of Patrick T. Ronaldson* 1:11–22 ("Dr. Ronaldson's opinion is what the word 'energy' means *to him* judged 'from the perspective of a pharmacologist.' Dr. Ronaldson does not opine (nor is he qualified to opine) as to how the word 'energy' as used on the Product label is interpreted by the ordinary consumer, either alone or taking the entire label into consideration."); *see also Vazquez Decl.*, Ex. L (Riley Report), at 1, Ex. X (Kennedy Deposition, 51:6-10) (opining that defining energy in terms of caloric value is inconsistent with consumer expectations).

Although the Court finds Ronaldson qualified to testify as an expert on the physiological effect of 5HE, the Court agrees with Defendants that Ronaldson's declaration cannot be used as evidence that there is only one meaning of the term "energy." "Energy" is a commonly understood term, and the trier of fact does not need assistance defining "energy" because it is not a matter that is beyond ordinary competence and experience. *See United States v. Seschillie*, 310 F.3d 1208, 1212 (9th Cir. 2012) ("A district court does not abuse its discretion when it refuses expert testimony where the subject does not need expert 'illumination' and the proponent is otherwise able to elicit testimony about the subject.") (quoting *United States v. Ortland*, 109 F.3d 539, 545 (9th Cir. 1997)). The Court is therefore skeptical of the claim that a fact finder needs help defining the term.

Accordingly, the Court STRIKES those portions of Ronaldson's declaration that discuss the meaning of the term "energy" according to a pharmacologist. However, the Court ADMITS Ronaldson's declaration to the extent that Ronaldson opines on the physiological effects of a bottle of 5HE on the average 5HE consumer.

*ii. Colin B. Weir*

Colin Weir is Plaintiffs' damages expert. Weir is Vice President of Economics and Technology, Inc. ("ETI"), a research and consulting firm specializing in economics, statistics, regulation, and public policy, where he has worked for ten years. *Corrected Smith Decl.*, Dkt. # 180, Ex. 21 (Weir Decl.), Att. A (Statement of Qualifications), at 1. Weir holds an MBA from Northeastern University, and a BA in Business Economics from the College of Wooster. *Id.* Weir has consulted and submitted testimony

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

in a variety of consumer and wholesale products cases, calculating damages related to household appliances, herbal remedies, food products, electronics, and computers. *Id.* at 3–8.

Weir opines that it is possible to determine damages in this case on a class-wide basis by determining the amount of "underfill" in each bottle of 5HE. *Id.* ¶¶ 8, 11-13. Using Ronaldson's calculation that 5HE provides only 3.7 minutes of caloric energy, Weir calculates that the bottles are "underfilled" by approximately 296.3 minutes of caloric energy (300 minutes in five hours minus 3.7 minutes). *Id.* ¶ 12. Defendants attack the reliability of Weir's declaration on multiple grounds, but their principal objection appears to be that Weir's damages model does not comport with Plaintiffs' theory of liability in this case, and so violates the principles set forth in *Comcast v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

***5** Because the issue of whether Weir has put forward a workable model to assess damages on a class-wide basis is closely intertwined with the Rule 23(b) predominance analysis, the Court declines to address the reliability of Weir's methodologies in a *Daubert* motion, and instead accepts Weir's expert report and testimony for the limited purpose of deciding the predominance issue. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) ("As respects Ugone's criticism that the methodology does not satisfy the requirement articulated in *Comcast*—i.e., that damages may be capable of measurement on a classwide basis—this does not affect the *admissibility* of Weir's opinions." (internal citations omitted)); *accord Forth Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 130 (S.D.N.Y. 2014) (whether damages can be assessed "on a class[-]wide basis [is a] question that is properly considered as part of the Rule 23(b) issue of whether questions common to the class predominate over individual issues, not to the validity of [the expert's] methods as a matter of admissibility of his expert testimony under the Federal Rules of Evidence.").

Accordingly, the Court DENIES Defendants' motion to exclude the Weir declaration, and admits Weir's declaration for the narrow purpose of determining whether Plaintiffs have met their class certification burden under Rule 23.

B. Class Certification

"The class action is an 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *Wal-Mart Stores, Inc. v. Dukes et al.*, 564 U.S. 338, 348–49 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "In order to justify a departure from that rule, 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.' " *Id.* (citing *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

In a motion for class certification, the burden is on plaintiffs to make a prima facie showing that class certification is appropriate, *see In re Northern Dist. of Cal. Dalkon Shield IUD Liab. Litig.*, 693 F.2d 847, 854 (9th Cir. 1982), and the Court must conduct a "rigorous analysis" to determine the merit of plaintiffs' arguments, *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Plaintiffs must be prepared to "prove" that there are "*in fact*" sufficiently numerous parties or that common questions exist, and frequently this will require some "overlap with the merits of the plaintiff's underlying claim." *See Dukes*, 564 U.S. at 350. Rule 23 does not, however, grant the court license to "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1194-95 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *See id.* (citing *Dukes*, 564 U.S. at 351 n.6).

Federal Rule of Civil Procedure 23 governs the structure of class certification motions in federal court. Rule 23(a) ensures that the named plaintiffs are "appropriate representatives of the class whose claims they wish to litigate." *See Dukes*, 564 U.S. at 349. Plaintiffs must satisfy all of Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b). *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011) (describing Rule 23(b) requirements).

In this motion, Plaintiffs move for certification under Rule 23(b)(3). Rule 23(b)(3) requires the Court to find that (1) "questions of law or fact common to class members predominate over any questions affecting only individual class members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). The dual requirements of Rule 23(b)(3) are commonly known as "predominance" and "superiority."

***6** Because Plaintiffs' bid for class certification fails conclusively at the predominance inquiry, the Court focuses its class certification analysis on predominance

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

alone. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Aschem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (Posner, J.). It is "far more demanding" than the commonality requirement of Rule 23(a). *See Aschem*, 521 U.S. at 623–24.

Here, the predominance element is not satisfied because individual questions predominate over common questions. Two issues in particular concern the Court. First, Plaintiffs have not carried their burden of showing that reliance and causation are subject to common proof. Plaintiffs offer little evidence of the materiality of the alleged misstatements on the 5HE label, and no evidence that consumers understand the term "energy" in uniformly the same way. Second, Plaintiffs' proposed damages model does not comport with Plaintiffs' theory of liability in this case and so violates predominance under *Comcast.* The Court first discusses reliance and causation, and then turns to the proposed damages model.

*i. Reliance and Causation*

Reliance and causation are critical components of establishing liability under all of Plaintiffs' causes of action.[4] Thus, to establish predominance under Rule 23(b)(3), courts typically require that plaintiffs demonstrate that reliance and causation are subject to common proof. *See In re ConAgra Foods, Inc.*, 302 F.R.D. at 576.

In the causes of action at issue in this case, reliance and causation are susceptible to common proof only if the state law at issue follows a "reasonable person" standard for assessing the materiality of the misstatement. In such states, a misstatement is material if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409–10 (S.D.N.Y. 2015); *see also Shein v. Canon U.S.A., Inc.*, No. CV 08-7323 CAS (Ex), 2010 WL 3170788, at *7 (C.D. Cal. Aug. 10, 2010). If a statute uses a reasonable person standard, it is more likely to be subject to common proof because the inquiry into materiality is objective. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409–10; *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 490 (C.D. Cal. 2012) (recognizing that the reasonable consumer test is "ideal for class certification because [it] will not require the court to investigate class members' individual interaction with the product"). "Reasonable consumer" statutes entitle plaintiffs to a class-wide inference of causation if the plaintiffs can show that the manufacturer's representations were material. *See In re ConAgra Foods, Inc.*, 302 F.R.D. at 571. Similarly, such reasonable consumer laws entitle plaintiffs to a class-wide inference of reliance if plaintiffs show (1) that uniform misrepresentations were made to the class, and (2) that the misrepresentations were material. *Shein*, 2010 WL 3170788, at *7; *see also Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009).

***7** Plaintiffs have shown, and Defendants do not dispute, that the state consumer laws remaining in this case follow a reasonable consumer standard and so a class-wide inference of reliance and causation is available to Plaintiffs. *See, e.g.*, *Cole v. Asurion Corp.*, 267 F.R.D. 322, 328 (C.D. Cal. 2010) ("Class relief is available on [UCL, FAL, and CLRA] claims 'without individualized proof of deception, reliance, and injury.' "); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 669 (C.D. Cal. 2014) (California express warranty claim); *In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (California common law fraud); *Glen v. Fairway Indep. Mortg. Corp.*, 265 F.R.D. 474, 480–81 (E.D. Mo. 2010) (MMPA); *Boswell v. Panera Bread Co.*, 311 F.R.D. 515, 531 (E.D. Mo. 2015) (Missouri common law fraud); *Elias v. Ungar's Food Prod., Inc.*, 252 F.R.D. 233, 239, 251 (D.N.J. 2008) (New Jersey Fraud Statute and Breach of Express Warranty); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 513 (D.N.J. 1997) (New Jersey common law fraud); *Guidance Endodontics, LLC v. Dentsply Int'l Inc.*, 749 F. Supp. 2d 1235, 1258 (D.N.M. 2010) (New Mexico UPA); *Daye*, 313 F.R.D. at 169 n.12 (New Mexico common law fraud); *AIG Aviation Ins. v. Avco Corp.*, 709 F. Supp. 2d 1124, 1132 (D.N.M. 2010) (New Mexico breach of express warranty); *Ackerman v. Coca-Cola Co.*, No. CV 09-0395 JG (RMLx), 2010 WL 2925955, at *15 (E.D.N.Y. July 21, 2010) (New York DTPA); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409–10 (S.D.N.Y. 2015) ("Materiality under Section 349 of the GBL is an objective inquiry; a deceptive act is defined as one likely to mislead a reasonable consumer acting reasonably under the circumstances."); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (New York common law fraud); *Oslan v. Collection Bureau of Hudson Valley*, 206 F.R.D. 109, 112 (E.D. Pa. 2002) (Pennsylvania UTPCPL).

Nonetheless, although Plaintiffs have shown that a class-wide presumption of reliance and causation is *available* for all their claims, they have not shown that they are *entitled* to the presumptions because they have not made a sufficient showing that the statements on the 5HE label were material to the class. *See Jones v. ConAgra Foods, Inc.*, No. C 12-1633 CRB, 2014 WL 2702726, at *15–16 (N.D. Cal. June 13, 2014); *see also In re ConAgra Foods, Inc.*, 302 F.R.D. at 567–68. A misrepresentation is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157. As the Ninth Circuit concluded in *Stearns v. Ticketmaster*, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance [and causation] 'would vary from consumer to consumer' and the class should not be certified." *Jones*, 2014 WL 2702726, at *15–16 (citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022–23 (9th Cir. 2011)); *see also In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 156–57.

The evidence of materiality of the "five hour energy" statement on the 5HE bottle in this case is limited. Plaintiffs rely heavily on the opinion of 5HE's former marketing director, Carl Sperber, who testified at his deposition that 5HE was named so that it would "educate" consumers in a "few words" about "what the product was" and "what they could expect from it." *Smith Decl.*, Ex. 14 (Sperber Depo.). Sperber's deposition does not convince the Court that materiality is subject to common proof because the deposition addresses only how 5HE perceived its own branding techniques, and not how consumers reacted to the product name or the alleged misstatements on the 5HE label. Although Sperber generally asserts that "front labels" are important to consumers, Sperber provides no information to suggest that the representations on the 5HE label are material to consumers or that the representations factored into the consumers' decision to purchase the product. *Id.* Moreover, although some named Plaintiffs stated that they purchased 5HE because they believed it would provide them with five hours of caloric energy, *see Mot.* 5:1–18, *Reply* 8, Plaintiffs do not provide any consumer surveys that suggest that this belief is common across the class.

***8** In contrast, Defendants' evidence suggests that the representations are not material to most or even a substantial portion of the class. Defendants' expert, Michael J. Riley, conducted a consumer online survey of 5HE consumers. *Vazquez Decl.*, Ex. L (U.S. Consumer Online Survey Report, attached as exhibit to report of Michael Riley). The survey found that only 2.2 percent of 5HE consumers attributed their initial purchase decision to 5HE's "marketing efforts." *Vazquez Decl.*, Ex. L, at 2. Riley also concluded that "marketing efforts" had little effect on subsequent purchases, which were primarily driven by consumer satisfaction or dissatisfaction with the product. *Id.* Moreover, in the survey, consumers listed numerous reasons for making their initial purchase of 5HE, including staying awake or focused; because it was recommended; out of curiosity; as an alternative to energy drinks or coffee; because of its location on the checkout counter; small size and convenience, price, promotions, discounts, free sampling and flavor; because it is sugar free, has zero carbohydrates and four calories; and because of its vitamins and nutrients. *Vazquez Decl.*, Ex. L (Riley Report) at 32 (listing 5HE Consumer Online Survey Report results).

Courts have refused to certify a consumer protection class where plaintiffs make such a limited showing of class-wide materiality. In *Jones*, for example, Judge Breyer declined to certify a class of consumers who had purchased Pam cooking spray products, Hunt's tomato products, and Swiss Miss hot cocoa products, and who alleged that they were deceived by the products' "All Natural" label. 2014 WL 2702726, at *1. The court reasoned that evidence of materiality was lacking because plaintiffs provided only the conclusory declaration of an expert who stated that "reasonable consumers would rely on [the] label to identify products that are natural." *See* 2014 WL 2702726, at *15 ("[The expert] did not explain *how* the challenged statements, together or alone, were a factor in any consumer's purchasing decisions. She did not survey any customers to assess whether the challenged statements were in fact material to their purchases, as opposed to, or in addition to, price, promotions, retail positioning, taste, texture, or brand recognition."). Similarly, in *In re ConAgra Foods*, Judge Morrow declined to certify a class when the evidence of materiality was "in conflict." 302 F.R.D. at 576–77. Judge Morrow faulted plaintiffs for failing to adduce any survey evidence of consumer reactions to the "100% Natural" label or any evidence that consumers understood the "100% Natural" label to indicate that the product would be GMO-free. *Id.*

The same faults permeate the evidence here. Absent a consumer survey or other market research to indicate how consumers reacted to the "five hour energy," or "hours of energy" statements, and how they valued these statements compared to other attributes of the product and the energy supplement market generally, Plaintiffs have not offered sufficient evidence of materiality across the class. *See*

*Pierce-Nunes v. Toshiba Am. Information Sys., Inc.*, No. CV 14-7242 DMG (KSx), 2016 WL 5920345, at *9 (C.D. Cal. June 23, 2016) (finding no common proof of materiality where defendants introduced evidence that consumers purchased TVs for a variety of factors, including their own research, the influence of sales people, comparison shopping, or recommendations from family, friends, or co-workers).

Predominance also fails for lack of a common definition for the term "energy." Where plaintiffs fail to establish a controlling definition for a key term in an alleged misstatement, courts have found that materiality is not susceptible to common proof. *See Pierce-Nunes*, 2016 WL 5920345, at *7 (finding predominance not satisfied where plaintiffs could not establish a common meaning for the term "LED TV"); *Pelayo v. Nestle USA, Inc.*, No. 13-5213 JFW (AJWx), 2013 WL 5764644, at *4–5 (C.D. Cal. Oct. 25, 2013) (discussing lack of common understanding of the term "all natural" that is shared by reasonable consumers); *Jones*, 2014 WL 2702726, at *15 ("[E]ven if the challenged statements were facially uniform, consumers' *understanding* of those representations would not be."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 508 (S.D. Cal. 2013) (denying class certification where plaintiffs failed to show that "all natural" had any kind of uniform definition among the class). In these cases, some plaintiffs have even shown a specific rate of acceptance of the proposed definition of a disputed term in the consumer marketplace. *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1112–13 (C.D. Cal. 2015) (presuming materiality where "37.1 percent and 41.5 percent of respondents who viewed the advertisement believed it conveyed an overall safety message"); *Oshana v. Coca-Cola Co.*, 2005 WL 1661999, at *9 (N.D. Ill. July 13, 2005) (presumption of materiality applied where 24 percent of consumers "would behave differently" without the misrepresentation).

***9** Here, the meaning of the term "energy" is disputed, and Plaintiffs have offered no evidence of a common definition of "energy" among a substantial number of consumers. Plaintiffs argue that "energy" means "caloric energy," and they offer the declaration of their expert, a leading pharmacologist, who attests that energy is scientifically understood to mean caloric energy. *See Smith Decl.*, Ex. 19 (Ronaldson Decl.), ¶ 19. Plaintiffs also point out that the U.S. Food and Drug Administration defines "energy" as caloric energy for dietary supplements. *See Reply* 8. Even with these proffered definitions, however, Plaintiffs still offer no evidence that the majority of consumers, or even a substantial group of consumers, define "energy" as caloric energy or believe that "energy" means only one thing. *See Vazquez Decl.*, Ex. Y.

In response, Defendants argue that consumers define "energy" more broadly to encompass subjective feelings of energy and an increased ability to perform tasks. *Vazquez Decl.*, Ex. O (Kennedy Report, at 6–13). Defendants point to the definition of energy in a "psychological sense," which includes "alertness, arousal, or fatigue," and energy as in "mental energy" or "the ability and motivation to perform mental tasks," such as vigilance and sustained attention. *Id.*, Ex. P (Kennedy Report, at 8–9). Defendants point out that people do not typically associate the term "energy" with the feeling you get after a high-calorie meal, *Opp.* 4:14–16, and they argue that Plaintiffs' definition of energy is excessively narrow, given that each bottle of 5HE explicitly stated that it contained only four calories and it would thus be unreasonable for a consumer to believe that "energy" meant only "caloric energy."

At this point, the Court need not resolve the dispute among the parties about the appropriate definition of the term "energy." It is enough to say that Plaintiffs have offered no evidence that any one definition of energy prevails among all consumers. Without a common definition or common understanding of the term, the Court cannot conclude that materiality is susceptible to common proof.

In sum, the Court concludes that individual issues predominate over common issues. The element of predominance is not satisfied because Plaintiffs have not shown that they are entitled to a class-wide presumption of materiality, and thus, cannot establish reliance or causation with common proof. Without a market survey documenting consumer preferences, Plaintiffs have not shown that the "five hour energy" representation is material to consumers as compared to other factors, including the positioning of the product at the retail location, the product's value as an alternative to coffee, and the relatively small size of the bottle. Plaintiffs also have not shown that there is a prevalent definition of "energy" in the market. Without such evidence, Plaintiffs cannot show an entitlement to a class-wide presumption of materiality.

Although Plaintiffs' motion to certify a class under Rule 23(b)(3) fails on these grounds alone, there are additional predominance problems with Plaintiffs' proposed damages model that the Court turns to now.

*ii. Damages*

To satisfy Rule 23(b)(3), plaintiffs must show that "damages are capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1433. Under *Comcast*, Plaintiffs must additionally show that their proposed damages models match their theory of liability in the case. *Id.* ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."). The Ninth Circuit rule that damage calculations do not defeat certification does not relieve Plaintiffs of the requirement of putting forth a damages model that ties the theory of liability to damages. *See Lindell v. Synthes USA*, No. 11-2053, 2014 WL 841738, at *14 (E.D. Cal. Mar. 4, 2014) ("So long as the damages can be determined and attributed to a plaintiff's theory of liability, damage calculations for individual class members do not defeat class certification.").

***10** Plaintiffs offer two methods for calculating damages. First, Plaintiffs propose a statutory damages model for the New York and Pennsylvania classes based on the statutory amounts available under New York and Pennsylvania's consumer protection laws. *See Reply* 10:3–15 & 10 n.9; *Weir Decl.*, ¶ 28. Defendants do not take issue with this statutory damages model, and for this reason, it is not discussed further here. *See id.* The second damages model proposes to calculate damages in California, Missouri, New Jersey, and New Mexico based on Colin Weir's theory that 5HE is "underfilled" with caloric energy. Because this second damages model is divorced from Plaintiffs' theory of liability, the Court concludes that this second damages model does not satisfy *Comcast* and is further reason why Plaintiffs' motion to certify the California, Missouri, New Jersey, and New Mexico classes fail predominance.

Weir's underfilled theory calculates damages in two steps. First, Plaintiffs' expert, Ronaldson, estimates the amount of caloric energy in 5HE and concludes that 5HE's four calories provide as much as 3.7 minutes of caloric energy. *See Weir Decl.*, ¶¶ 8, 11. With this estimate, Weir divides the 3.7 minute estimate of actual caloric energy by the five hours of allegedly promised caloric energy. *Id.* ¶ 12. From these calculations, Plaintiffs estimate that each bottle of 5HE is only 1.3 percent filled (3.7 minutes divided by 300 minutes) or 98.7 percent underfilled. *Id.* To account for the "value" received from the other ingredients in 5HE, such as caffeine, folic acid, B6, and sucralose, Weir adjusts the "underfilled" amount by the cost of these other ingredients. *Id.* ¶ 29. Weir, for example, estimates that the cost of 200 mgs of caffeine in each bottle of 5HE is $0.00269. *Weir Decl.*, Tbl. 2. Based on these calculations, Weir estimates that damages in this case will total $1.436 billion. *Id.* ¶ 27.

The proper measure of damages in a consumer class action case is typically restitution. *See, e.g.*, *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 694 (2006). Restitutionary relief is an equitable remedy, and its purpose is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003); *see also Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 (2000). "The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Colgan*, 135 Cal. App. 4th at 700. Restitution is "determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Brazil v. Dole Packaged Foods, LLC*, No. CV 12-1831, 2014 WL 2466559, at *15 (N.D. Cal. May 13, 2014); *see also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d at 1118 ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." (citing *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *2 (N.D. Cal. May 23, 2014) (calculating damages as the price paid less the value received), class decertified, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014))). This measure typically requires some understanding of the value of the goods as received by the consumer. *See In re ConAgra Foods*, 300 F.R.D. at 578–79.

In this case, Plaintiffs' "underfilled" model is not an adequate measure of restitution because the model does not accurately account for the value that consumers receive from 5HE, even excluding the limited value of the "caloric energy." *See Opp.* 13:26–14:5. As Defendants point out in their papers, 5HE's caffeine content alone may be sufficient to justify much of the price of 5HE, given that consumers typically pay several dollars for a cup of coffee with similar caffeine content. *Defendants' Mot. to Exclude Weir* 2:27–3:4. Yet, Plaintiffs do not account for the value of the caffeine, vitamins, and minerals in 5HE, or even the relative convenience of the small 5HE bottle compared to other energy supplements. Plaintiffs only account for the cost of 5HE's ingredients to the manufacturer. Defendants are correct that the "cost" of the ingredients is not the same as the value of the ingredients to the consumer, and so this measure is not an

adequate proxy consumer value or restitution. *See Hughes v. The Ester C Co.*, 317 F.R.D. 333, 355–56 (E.D.N.Y. 2016).

***11** Plaintiffs also fail to distinguish the Ninth Circuit cases that have struck down damages models in similar circumstances for failing to account for other factors that may drive consumer preferences. *See, e.g.*, *Brazil*, 2014 WL 2466559, at *15–16 (finding damages model insufficient under *Comcast* because it "does not take into account 'any factors that may cause consumers to prefer [the product] ... such as brand loyalty or quality differences' "); *Algarin*, 300 F.R.D. at 460 (finding damages model insufficient for failure to account for price differences attributable to "higher quality ingredients," "selection of 'flavors,' " and research and development costs). Plaintiffs' argument that they do not need to provide a "complex price-premium damages model" is neither here nor there because, regardless of whether Plaintiffs' provide a price-premium model or not, they still must be able to account for consumer preferences and the relative value that consumers ascribe to different aspects of the product. *See Reply* 11:16–23.

The showing that Plaintiffs must make is well illustrated in Judge Morrow's companion opinions in *In re ConAgra Foods. See* 302 F.R.D. 537 (2014); 90 Supp. 3d 919 (2015). There, the court did not approve of plaintiffs' damages model until plaintiffs proved that they could isolate the specific "price premium" for the term "100% Natural," as plaintiffs defined it to mean "non-GMOs." *See* 90 F. Supp. 3d at 1023. To prevail, plaintiffs had to show that consumers paid a "price premium" for an oil that was free of non-GMOs versus an oil that had GMOs. *Id.* The court ultimately approved a damages model that combined hedonic regression and conjoint analysis, and was informed by consumer surveys that established the "relative value" of certain of the product features. *Id.* at 1025. Plaintiffs' damages model here falls short of that approved in *ConAgra Foods.* Even if Plaintiffs' are correct that caloric energy is the dominant definition of "energy," Plaintiffs must account for the value of other features of 5HE if they are to isolate the specific premium paid for five hours of caloric energy. Without consumer surveys ascribing a relative value to each of 5HE's features, it is hard to see how Plaintiffs will do this here.

Judge Walter's recent approval of the underfilled theory in *Martin v. Monsanto Co.*, EDCV 16-2168 JFW (SPx), Dkt. # 51, 2017 WL 1115167 (C.D.Cal. 2017), does not convince the Court that such a theory is appropriate here, given *Martin*'s distinguishable facts and theory of liability. In *Martin*, plaintiffs alleged that Monsanto sold RoundUp Concentrates that did not make the number of gallons of solution promised when following the instructions on the back label. *Id.* at 10. There, the underfilled theory was appropriate because plaintiffs alleged that Monsanto sold them less RoundUp than they promised. *See id.* at 9–11. Here, Plaintiffs' theory is distinguishable because Plaintiffs do not allege that they received less 5HE than expected; rather, they allege that 5HE did not perform as expected, or that the ingredients were deficient. When the performance of a product is at issue, the calculation of value is not as simple as when the product is underfilled because, with a performance issue, the plaintiff must account not only for how the product actually performed but also whether the consumer valued other aspects of the product. In contrast, when the issue is only how much of the product the consumer received, few would contest that the consumer received no value from the product that they did not get. In this way, Plaintiffs' attempt to analogize to *Martin* is overly simplistic and ultimately unconvincing.

In sum, the Court is not convinced that the damages model proposed in this case adequately matches Plaintiffs' theory of liability. The Court finds the deficit in Plaintiffs' damages model an additional ground for denying class certification, at least as it applies to the proposed classes in California, Missouri, New Jersey, and New Mexico, where statutory damages are not available.

III. Conclusion

***12** Plaintiffs have failed to demonstrate that common issues predominate over individual inquiries, and so class certification is not appropriate under Rule 23(b)(3).

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2559615

Footnotes

1 Some of the surviving causes of action contained claims based on off-label representations and claims that 5HE did not result in a crash. An example of an off-label representation is a claim in a television commercial that 5HE provides, "A powerful blend of B Vitamins for energy," "5-hour ENERGY's blend of vitamins and amino acids gives you hours of smooth energy," and "5-hour

ENERGY doesn't jack you up with sugar, caffeine, and herbal stimulants. Instead, it's packed with stuff that's good for you—B-vitamins, amino acids, and enzymes." *See Consolidated First Amended Class Action Complaint* ¶¶ 47–50, 53–55. Plaintiffs' motion for class certification makes no mention of these statements or Plaintiffs' claim under the federal Magnuson-Moss Warranty Act, and Defendants point out the apparent abandonment of these claims in their Opposition. *See Opp.* 5 n.5. Although the Court does not dismiss these claims, as Defendants' urge, the Court does not consider the statements as part of Plaintiffs' class certification order because they are not argued in Plaintiffs' motion.

2 Plaintiffs have not had an opportunity to revise their motion for class certification since the Court granted in part and denied in part Defendants' motion for summary judgment. Although Plaintiffs' motion for class certification asks the Court to certify a class based on decaffeinated 5HE, the Court dismissed all decaffeinated-related claims in its summary judgment order. *See* Dkt. # 191, at 19. The Court therefore does not address any claims based on decaffeinated 5HE.

3 Plaintiff Podobedov is the lead Plaintiff for both the California and New York classes. Podobedov purchased 5HE in California, Nevada, and New York. *See Podobedov et al. v. Innovation Ventures et al.*, CV 11-6408 PSG (PLAx).

4 In its Order granting in part and denying in part Defendants' motion for summary judgment, the Court recognized that some states impose a less rigorous standard for proving the element of reliance. *See* Dkt. # 91, at 13–16 (recognizing that some states had adopted a more liberal "exposure" standard). This finding in no way changes the outcome here. In the summary judgment order, the Court was primarily concerned with whether Plaintiffs had presented proof of reliance; here, the Court's only concern is whether reliance is amenable to common proof.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 154011
United States District Court,
S.D. New York.

# In re MOTEL 6 SECURITIES LITIGATION.
REDTAIL LEASING, INC., individually and on behalf of all others similarly situated, Plaintiffs,
v.
Hugh THRASHER, et al., Defendants.
Robert J. ROSENER, individually and on behalf of all others similarly situated, Plaintiffs,
v.
Hugh THRASHER, et al., Defendants.

Nos. 93 Civ. 2183 (JFK), 93 Civ. 2866 (JFK).
|
April 2, 1997.

**Attorneys and Law Firms**

Sachnoff & Weaver, Chicago, IL, (Jonathan S. Quinn, John W. Moynihan, of counsel), Lawrence Walner & Associates, Chicago, IL, (Lawrence Walner, of counsel), Robin J. Oahana, Chicago, IL, (Robin J. Oahana, of counsel), Susman, Buehler & Watkins, Chicago, IL, (Charles R. Watkins, of counsel), Chicago, IL, Pollack & Greene, L.L.P., New York City, (Alan M. Pollack, of counsel), for Plaintiffs.

Nagler & Associates, Beverly Hills, CA, (Lawrence H. Nagler, Robert M. Zaab, of counsel), for Jonathan Hirsh.

*OPINION AND ORDER*

KEENAN, District Judge.

***1** Before the Court is Defendant Jonathan Hirsh's motion to dismiss, pursuant to Fed. R. Civ. Pro. 12(b)(6), Plaintiffs' Securities Exchange Act claims, New York General Business Law claim, and common law fraud and unjust enrichment claims. For the reasons stated below, the Court grants Defendant's motion in part and denies Defendant's motion in part.

*Background*

Plaintiffs allege a nationwide insider trading scheme by persons who possessed material, nonpublic information concerning the proposed acquisition of Motel 6, L.P., a Dallas-based national chain of owner-operated economy motels, by Accor, S.A. ("Accor"), a French-based company.[1] Plaintiffs were the holders of call options on Motel 6 securities. Plaintiffs assert that Defendants were part of a conspiracy to trade on highly sensitive inside information about tender offer negotiations occurring in New York between Motel 6's largest shareholder, Kohlberg Kravis Roberts & Company ("KKR"), and Accor. Defendant Hugh Thrasher ("Thrasher") was executive vice-president of Motel 6 in charge of communication at the time of the tender offer negotiations. Thrasher allegedly tipped Carl V. Harris ("Harris") about the tender offer negotiations in May 1990. Am. Compl. ¶¶ 94–95. Harris then allegedly told nine others, including Defendant Jeffrey Sanker. Am. Compl. ¶¶ 97–99, 110–12, 121, 125, 162, 177–180. Jeffrey Sanker allegedly tipped Defendant Jonathan Hirsh, who then purchased Motel 6 call options. Am. Compl. 168–169. Plaintiffs claim Hirsh realized illegal profits of at least $29,262 from these transactions in his personal securities accounts. Am. Compl. ¶ 169. Hirsh also allegedly entered into a partnership with Defendant Lee Rosenblatt to trade Motel 6 securities through Rosenblatt's securities account and split the illegal profits. Pursuant to that partnership, these Defendants realized profits of about $360,000, of which Defendant Hirsh received $180,000. Am. Compl. ¶¶ 170–74. Hirsh is also alleged to have tipped Defendant Roger Odwak. Am Compl. ¶¶ 175–76.

Plaintiffs further contend that the scheme to trade on inside information also included a conspiracy to cover-up the alleged tipping and trading activity through fraud, perjury, money laundering, the widespread dissemination of inside information, and the willful failure to disclose material facts. Am. Compl. ¶¶ 69, 87, 164, 189, 200, 201, 206–07, 212, 224.

*Discussion*

A motion to dismiss for failure to state a claim should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The factual allegations set forth in the complaint must be accepted as true, *see Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990), and the Court must view the allegations in the light most favorable to the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

***2** As a preliminary matter, the Court will not readdress arguments addressed or decided in the July 5, 1995 Opinion and Order denying a motion to dismiss the RICO claims by Defendants Chammah, Kuznetsky, Schor, Thrasher, and Darrell Sandy Marsh. The Court assumes the readers' familiarity with that decision. Additionally, the Court notes that in his reply papers Defendant Hirsh raised an argument regarding Plaintiffs' failure to specifically allege their losses for RICO standing. In that Hirsh did not raise this argument in his papers in support of the motion to dismiss, and Plaintiffs did not have a chance to address the argument, the Court declines to address the issue raised for the first time in reply papers.

A. The Securities Exchange Act Claims

Defendant Hirsh argues that the Securities Exchange Act claims must be dismissed because the Amended Complaint fails to allege that Plaintiffs' trades were contemporaneous with those of Hirsh.

The Second Circuit has held that only those investors who trade contemporaneously with the inside trader have standing to sue on an insider trading claim. *See Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94–95 (2d Cir.1981). Defendant argues that Plaintiffs have not adequately pleaded contemporaneous trading because the Amended Complaint does not specifically allege the dates of the purchases and sales of Hirsh and Plaintiffs to demonstrate contemporaneous trading. Defendant therefore contends that the Plaintiffs have not demonstrated standing and the federal securities law claims must be dismissed.

In the September 16, 1996 decision granting Plaintiffs' motion for class certification, this Court addressed the issue as to the adequacy of Plaintiffs' allegations that they traded contemporaneously with the Defendants. Several Defendants had argued that the Plaintiffs did not have standing because they "pleaded the bare legal conclusion that they traded 'contemporaneously' with defendants but only plaintiff Redtail has specified in the Amended Complaint what it traded and when." Defs. Joint Mem. in Supp. of Class Cert. at 20. Addressing this argument, the Court stated:

> Defendants also argue that the proposed class representatives are inadequate because the proposed representatives, especially Hull Trading, are not contemporaneous sellers of securities and therefore lack standing ... The Court disagrees. The Court finds that a motion to dismiss and not a motion for class certification would have been the proper vehicle to raise this argument. The Court nevertheless finds that Plaintiffs adequately alleged the standing of the proposed representatives such that they would have survived a pre-discovery motion to dismiss: any more detailed examination of the representative Plaintiffs' contemporaneous trading status before discovery and the development of the record would be premature. Defendants are of course free to reassert their argument under the contemporaneous trading rule after discovery as a defense to liability.

***3** *In re Motel 6 Securities Litigation,* 1996 WL 531819, at *2 (S.D.N.Y. Sept.18, 1996). This holding is equally applicable to the argument Defendant Hirsh makes here.

B. The RICO Claims

Defendant argues that the RICO claims must be dismissed because the Amended Complaint fails to plead (1) a causal connection between the RICO violation and Plaintiffs' injury, and (2) the required pattern of racketeering activity.

1. RICO's Proximate Cause Requirement

Defendant asserts that the RICO claims are governed by common law concepts of proximate cause, which are narrower than the proximate cause requirement for a § 10(b) insider trading claim based upon material omissions brought by contemporaneous traders on a public market. Defendant recognizes that for this particular type of §

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

10(b) securities fraud claim a plaintiff need not demonstrate contractual privity or actual reliance on a defendant's omissions of material inside information. The contemporaneous trading requirement serves as a proxy for contractual privity in a § 10(b) claim, and consequently, a plaintiff need not show actual reliance on the omission for standing in such an insider trading action. However, the RICO proximate cause requirement means that a plaintiff must prove both transaction and loss causation, which requires actual reliance, and therefore Defendant argues that Plaintiffs must show a direct relationship between the fraud-doing defendant and the RICO plaintiff. Insofar as Plaintiff has not adequately alleged privity with Defendant Hirsh or actual reliance on his material omission, Defendant contends that the RICO claims based on securities fraud cannot survive because Plaintiff has not adequately met the RICO proximate cause requirement. Defendant makes the argument that "since reliance—which is required under RICO, is *not* required under § 10(b) as broadly read to permit insider trading claims by contemporaneous traders on a public market, such claims are not actionable under RICO." Defs. Mem. in Supp. at 9.

The Supreme Court has held that where a material omission serves as the basis for the § 10(b) claim,

> positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor [would] have considered them important in the making of this decision.

*Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *see also* *dupont v. Brady,* 828 F.2d 75, 78 (2d Cir.1987) (stating that for a § 10(b) and Rule 10b–5 claim, "in instances of total non-disclosure, ... it is of course impossible to demonstrate reliance" and finding that reliance may be presumed where the plaintiff proves that the facts withheld are material in the sense that a reasonable investor would have considered them important (quoting *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975))). Once a plaintiff shows the materiality of the omission for a § 10(b) claim, and thus reliance, defendant can avoid liability by proving by a preponderance of the evidence that disclosure of that information would not have altered plaintiff's investment decision. *See* *duPont,* 828 F.2d at 78. In the instant case, Plaintiffs have adequately pleaded reliance to support a § 10(b) and Rule 10b–5 claim. The Court does not accept Hirsh's view that Plaintiffs, contemporaneous traders on a public market, alleging insider trading claims as a predicate act in a RICO action must show actual reliance on the omission and privity beyond that required for the § 10(b) claim. The Supreme Court, and this Circuit, have recognized that actual reliance need not be proved for a § 10(b) insider trading claim based on material omissions and brought by contemporaneous traders because it is near impossible to prove such reliance. To accept Defendant's argument—requiring proof of actual reliance for such § 10(b) nondisclosure claims which are pleaded as RICO predicate acts—would necessitate application of a standard of proof for such claims that the Supreme Court and this Circuit abandoned as unworkable. This Court declines to impose an actual reliance requirement for § 10(b) omission claims pleaded as predicate acts in RICO actions.

2. RICO Continuity Requirement

***4** Defendant Hirsh argues that in considering whether the RICO pattern requirement is met, including whether continuity is sufficiently alleged, the Court must separately evaluate the pattern of racketeering acts by each defendant. Hirsh contends that Plaintiffs have not sufficiently pleaded that he engaged in a pattern of racketeering activity because Plaintiffs do not adequately plead that he engaged in two predicate acts which represent a threat of continuity. Therefore, Hirsh argues that the RICO claims must be dismissed as against him. Hirsh also makes an argument that while Plaintiffs make general conspiracy allegations, Plaintiffs have not alleged a RICO conspiracy because (1) they make no claim under 18 U.S.C. § 1962(d), which is the exclusive means for asserting a RICO conspiracy claim, and (2) Plaintiffs' conspiracy allegations are too conclusory.

The Court finds that Plaintiffs have adequately pleaded a pattern of racketeering activity by Hirsh. Plaintiffs have alleged that the twenty-four Defendants, including Hirsh, were part of a RICO conspiracy to trade on material, nonpublic information concerning Motel 6 and that this scheme included a continuing conspiracy to conduct illegal acts to cover-up the alleged tipping and insider trading activity concerning Motel 6. Plaintiffs have sufficiently pleaded that Defendant Hirsh participated in two predicate acts: Hirsh made illegal trades on inside information, utilizing mail or wire transmission to execute those trades, Am. Compl. ¶¶ 169, 194; Hirsh knowingly disclosed the inside information to Rosenblatt with the expectation of benefit and with knowledge that Rosenblatt would trade on that information, Am. Compl. ¶ 170; and Hirsh agreed to pay and paid Sanker for the tip, Am. Compl. ¶ 174. Whether these acts establish a threat of continued racketeering activity depends on the facts of each case, *H.J., Inc. v. Northwestern Bell Tele. Co.,* 492

U.S. 229, 242, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989), and "external facts may ... provide evidence of the requisite threat of continuity...." *United States v. Kaplan,* 886 F.2d 536, 542–543 (2d Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). The Court need not examine one defendant's actions in isolation when considering continuity.

The allegations concerning Hirsh's activities indicate that Hirsh was aware that the insider trading was not limited to him, that others were involved in the tipping and trading, including a Motel 6 insider, and that the information was disseminated to many others who would trade on it. Plaintiffs allege a RICO conspiracy based upon close personal and business relationships among the Defendants. The Amended Complaint contains factual allegations that Defendants conspired to cover up the insider trading scheme through fraud, perjury, money laundering, the widespread dissemination of inside information, and the willful failure to disclose facts that they were under a legal duty to disclose. Am Compl. ¶¶ 69, 87, 164, 189, 200, 201, 206–07, 212, 224. Defendant Hirsh is specifically alleged to have played a role in this widespread dissemination of inside information by tipping Rosenblatt and Odwak. Am. Compl. ¶¶ 170–175. In the July 5, 1995 decision, the Court viewed the allegations in the light most favorable to Plaintiffs and found that Plaintiffs had adequately pleaded continuity. The allegations concerning Hirsh's insider trading, his extending the conspiracy by disseminating information to others, his willingness to engage in the illegal actions of the conspiracy, and the close relationships among the Defendants, is enough at the pleading stage for this Court to find the same continuity. with respect to Hirsh that this Court found in the July 5, 1995 decision. The Court gives Plaintiffs the benefit of the doubt on 12(b)(6) motions. Viewing the allegations in the light most favorable to the pleaders and drawing all reasonable inferences in their favor, the Court will deny Hirsh's motion to dismiss the RICO claims. Defendant Hirsh, however, may reassert these arguments and put the Plaintiffs to their proof in a post-discovery motion.

***5** The Court also finds that Plaintiffs have adequately pleaded a RICO conspiracy claim. The heading of the very first claim cites 18 U.S.C. § 1962(d) and includes allegations of violations of that statute. The Court also finds that Plaintiffs' factual allegations sufficiently support the conspiracy claim against Defendant Hirsh. This Circuit has stated:

> [To demonstrate a RICO conspiracy, the plaintiff must show] that the defendant agree[d] to commit the substantive racketeering offense [here, Section 1962(b) and (c) ] through agreeing to participate in two predicate acts, ... that he [knew] the general nature of the conspiracy and that the conspiracy extend[ed] beyond his individual role.

*United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). In addition, those "two predicate crimes" must, as with every other RICO violation, constitute a pattern of racketeering activity. *United States v. Ruggiero,* 726 F.2d 913, 923 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). The Plaintiffs "need not prove that a conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy." *United States v. Rastelli,* 870 F.2d at 828. As discussed above, Plaintiffs adequately pleaded that Hirsh engaged in two predicate acts which constituted a pattern, and the factual allegations support a conclusion that Hirsh knew the nature of the conspiracy and that the conspiracy extended beyond his role.

C. New York General Business Law Claim

Plaintiffs' New York General Business Law § 349(a) claim against Defendant Hirsh is dismissed for the same reasons this Court dismissed this claim against Defendants Chammah, Kuznetsky, Schor, Thrasher and Marsh in the July 5, 1995 Opinion and Order. *See In re Motel 6 Securities Litigation,* 1995 WL 431326, *6–7 (S.D.N.Y. July 20, 1995).

D. Common Law Fraud Claim

Defendant argues that because a common law fraud claim requires privity and actual reliance, and the Amended Complaint does not allege direct dealings between the Plaintiffs and Hirsh or any facts which demonstrate direct reliance on the omissions, the fraud claim must be dismissed. This Court agrees to the extent that Plaintiffs have failed to alleged facts to support a claim that they directly relied on Defendants' omissions.

Common law fraud claims must be supported by factual allegations demonstrating plaintiff's actual, direct reliance on the misrepresentation or omission. *See Golden Budha Corp. v. Canadian Land Co.,* 931 F.2d 196, 202 (2d Cir.1991); *Turtur v. Rothschild Registry Int'l. Inc.,* 1993 WL 338205, at *6 (S.D.N.Y. Aug.27, 1993); *see also Aniero Concrete Company, Inc. v. New York City Construction Authority,* 1997 WL 3268, at *13 (S.D.N.Y.

Jan.3, 1997) ("The elements of fraudulent concealment under New York law are: a relationship between the contracting parties that creates a duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance, and damage."). Consequently, common law fraud claims

> ***6** are distinct from actions brought under the federal securities laws, which "permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market."
>
> Common law fraud cases such as the present one are therefore to be distinguished from cases that involved a fraud on the market theory or other theories in which reliance on a material omission is presumed to have existed and which are applicable primarily in the context of federal securities fraud claims arising under section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

*Turtur,* 1993 WL 338205, at *7 (citations omitted); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 241–47, 108 S.Ct. 978, 988–91, 99 L.Ed.2d 194 (1988) (observing that actions under § 10(b) and Rule 10b–5 are distinct from common law deceit and misrepresentation claims and are designed to add to the protections provided investors by common law). Plaintiffs contend that for a common law fraud claim based on an "omission" theory, reliance is presumed upon a showing that the omissions were material and that the defendant had a duty to disclose. Pls. Mem. in Opp. at 23 (citing *Pollack v. Laidlaw Holdings, Inc.,* 1995 WL 261518, at *11 (S.D.N.Y. May 3, 1995)). Rather, this is the standard for showing reliance under a § 10(b) or Rule 10b–5 securities fraud claim based on a fraud on the market theory, not common law fraud, and the sole case Plaintiffs cite for this proposition discussed reliance under § 10(b)—not common law fraud. *See Pollack,* 1995 WL 261518, at *11. Common law fraud claims do not enjoy a presumption of reliance once a material omission and duty to speak have been sufficiently pleaded. *See Turtur,* 1993 WL 338205, at *7 ("Because common law fraud claims must be supported by a showing of direct reliance on the misrepresentation or omission, they are distinct from actions brought under the federal securities laws, which 'permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market.' "); *Schultz v. Commercial Programming Unlimited Inc.,* 1992 WL 396434, at *4 (S.D.N.Y.1992) (stating that "this Court will not permit Schultz to circumvent the [reliance] requirement by infusing the fraud on the market theory into his common law fraud action" and dismissing the common law fraud claim). Certainly, Plaintiffs have alleged facts to support a claim of reliance in their § 10(b) and Rule 10b–5 causes of action for insider trading based on a fraud on the market theory. However, where Plaintiffs' factual allegations focus solely on an insider trading conspiracy that perpetrated a fraud on the market, and Plaintiffs have alleged no connection to the Defendants other than the fact that Plaintiffs traded on the market contemporaneously with Defendants, Plaintiffs have not alleged facts to support a claim of actual, direct reliance on Defendants' omissions. In that Plaintiffs have failed to plead facts to support the direct reliance element of the common law fraud claim, the Court grants Defendant Hirsh's motion to dismiss the common law fraud claim. *Cf., In re 3COM Securities Litigation,* 761 F.Supp. 1411, 1419 (N.D.Cal.1990) (finding that Plaintiff adequately pleaded a 10b–5 claim, but dismissing common law fraud claim because Plaintiff had not adequately pleaded actual reliance).

E. Common Law Unjust Enrichment Claim

***7** Defendant assets that under New York law, unjust enrichment is a quasi-contract claim and therefore requires direct dealing between the parties to submit to the quasi-contract. In that Plaintiffs allege no such privity, direct dealings or actual relationship with Hirsh, Defendant argues that the unjust enrichment claim must be dismissed.

Plaintiffs counterargue that privity is not a required element of an unjust enrichment claim. In support of their position that privity is not an express requirement of the claim, Plaintiffs correctly point out the elements required:

> In order to recover for unjust enrichment under New York law, a plaintiff must show that (1) defendant was enriched, (2) enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution.

Pls.' Mem. in Opp. at 24 (citing *Violette v. Armonk Associates, L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995)); *see also Dolmetta v. Unitak Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983).

This Court agrees with Defendant Hirsh's contention, that an unjust enrichment claim requires some type of direct dealing or actual, substantive relationship with a defendant. While the elements of the unjust enrichment claim quoted by Plaintiffs do not explicitly spell out such a requirement, those elements imply a more substantive relationship, or greater connection, between a defendant and plaintiff than Plaintiffs have alleged in this case. The requirements that a defendant be enriched at plaintiff's expense and that good conscience necessitate that

defendant make restitution to plaintiff, clearly contemplate that a defendant and plaintiff must have had some type of direct dealings or an actual, substantive relationship.

In the instant case, Plaintiffs do not allege any direct dealings or actual, substantive relationship with Defendants other than a "contemporaneous" trading relationship. Plaintiffs claim that they sold their Motel Six shares or call options during the period in which Defendants purchased Six shares and options based upon material inside information regarding the impending acquisition of Motel Six by Accor. Plaintiffs contend that they would not have sold those shares or options had they known about the impending acquisition and that Defendants were unjustly enriched at Plaintiffs' expense in purchasing shares of Motel Six at the same time Plaintiffs sold their shares. These factual allegations do not sound in the quasi-contract common law claim of unjust enrichment. Without factual allegations that Plaintiffs had a more substantive connection to the Defendants beyond a contemporaneous trading relationship, Plaintiffs have not alleged facts to support a claim that Defendants were unjustly enriched at the Plaintiffs' expense and that Defendants should make restitution to Plaintiffs. *Cf. Martes v. USLIFE Corp.,* 927 F.Supp. 146, 149 (S.D.N.Y.1996) (holding that an unjust enrichment claim lies only where the defendant possesses money or received a benefit which defendant should not retain because it belongs to the plaintiff, and dismissing the unjust enrichment claim because defendant received nothing that belonged to plaintiff or had no contractual or other relationship with plaintiff). Therefore, the Court grants Defendant Hirsh's motion to dismiss the unjust enrichment claim.

*Conclusion*

***8** For the reasons stated above, the Court denies Defendant Hirsh's motion to dismiss the RICO and Securities and Exchange Act claims, and grants the motion to dismiss the New York General Business Law claim, and common law fraud and unjust enrichment claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 154011, Fed. Sec. L. Rep. P 99,454, RICO Bus.Disp.Guide 9255

Footnotes

1 The Court has also discussed the facts underlying this action in *In re Motel 6 Securities Litigation v. Thrasher,* No. 93–2183, 1995 WL 431326 (S.D.N.Y. July 20, 1995). That decision addressed a prior motion to dismiss by certain other Defendants in this action and provides a background against which this Court bases this decision.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6688912
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

# IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
This Order Relates to: Nemet

Dkt. Nos. 7673, 7697, 7699, 7706
|
No. 3:17-cv-4372-CRB
|
MDL No. 2672 CRB (JSC)
|
Signed 11/12/2020

**Synopsis**
**Background:** Vehicle owners filed class actions against vehicle manufacturer, alleging that manufacturer's installation of devices designed to cheat on emission tests constituted breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws. Manufacturer moved to exclude expert testimony.

**Holdings:** The District Court, Charles R. Breyer, Senior District Judge, held that:

[1] manufacturer did not have burden to prove damages;

[2] owners had burden to show evidence of their injury;

[3] conjoint analysis did not reliably estimate market price premium specifically for low emissions;

[4] conjoint analysis was not methodologically sound; and

[5] depreciation and injury analysis that lacked starting point from which to calculate decline in value for low emissions was not reliable.

Motion granted.

West Headnotes (11)

**[1] Federal Courts**

A federal court has a duty to examine its own jurisdiction, and thus whether plaintiffs have standing to sue in federal court. U.S. Const. art. 3, § 2, cl. 1.

**[2] Federal Courts**

To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to defendants' conduct, and (3) that their injury will likely be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[3] Federal Courts**

To establish injury in fact, as required for standing, plaintiffs must demonstrate that they suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

**[4] Federal Courts**

To have standing, plaintiffs bear the burden of proof to establish that they suffered an injury in fact with the manner and degree of evidence required at the successive stages of the litigation. U.S. Const. art. 3, § 2, cl. 1.

**[5] Federal Courts**

At the pleading stage, general factual allegations may suffice to establish standing, but at summary judgment, plaintiffs must provide some evidence of specific facts to establish injury. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b), 56.

**[6] Evidence**

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For potentially relevant expert evidence, trial judges act as "gatekeepers" and exclude unreliable evidence offered by experts. Fed. R. Evid. 402, 702.

**[7] Evidence**

Manufacturer challenging whether owners suffered any damages at all, given that vehicle owners sold their vehicles or had their leases terminate before manufacturer's fraud became public, did not have burden to prove damages, in class actions against vehicle manufacturer alleging that manufacturer's installation of devices designed to cheat on emission tests constituted breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws.

**[8] Evidence**

Vehicle owners had burden to show evidence of their injury, in class actions against vehicle manufacturer alleging that manufacturer's installation of devices designed to cheat on emission tests constituted breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws.

**[9] Evidence**

Conjoint analysis that measured demand-price difference between vehicles with engines that met emission standards only during testing and engines that met NOx standards before and during testing did not reliably estimate market price premium specifically for low emissions, and therefore it was not admissible expert opinion in class actions against vehicle manufacturer alleging that manufacturer's installation of devices designed to cheat on emission tests constituted breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws, since such analysis did not actually calculate market price premium, it did not isolate low emissions premium, and starting range contained facially nonsensical data. Fed. R. Evid. 702.

**[10] Evidence**

Conjoint analysis to measure demand-price difference between vehicles with engines that met emission standards only during testing and engines that met NOx standards before and during testing was not methodologically sound, and therefore it was not admissible expert opinion in class actions against vehicle manufacturer alleging that manufacturer's installation of devices designed to cheat on emission tests constituted breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws, since analysis had been based on interviews consisting of standardless "free form" conversations. Fed. R. Evid. 702.

**[11] Evidence**

Depreciation and injury analysis that lacked starting point from which to calculate decline in value for low emissions was not reliable, and therefore it was not admissible expert opinion in class actions against vehicle manufacturer alleging that manufacturer's installation of devices designed to cheat on emission tests constituted breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws, since emissions premium could not be calculated reliably. Fed. R. Evid. 702.

**ORDER EXCLUDING EVIDENCE AND DISMISSING CASE FOR LACK OF JURISDICTION**

CHARLES R. BREYER, United States District Judge

***1** This case involves a putative class of automobile consumers who bought or leased cars without receiving a feature for which they paid, but who then unwittingly sold or

returned the same cars without giving that feature for which they were compensated.

These consumers purchased or leased then parted with cars that they thought produced low emissions. In actuality, Volkswagen had misled them, and everyone else, about the emissions. As the Court has explained, it is possible that Volkswagen's fraud injured these consumers if the amount they paid for low emissions they did not get was greater than the amount they later received for low emissions they did not give. See Order re First MTD (dkt. 5374) at 21.

Plaintiffs have now submitted expert evidence purporting to prove their injuries. But the evidence is either irrelevant, unreliable, or both. The Court thus grants Defendants' motion to exclude the evidence and denies Plaintiffs' motions to exclude Defendants' expert evidence. Without any injury Plaintiffs lack standing, which means the Court lacks jurisdiction and must dismiss this case.[1]

## I. BACKGROUND

The Court has previously described Volkswagen's fraud:

> Over the course of six years, Volkswagen sold nearly 500,000 Volkswagen– and Audi-branded TDI "clean diesel" vehicles, which they marketed as being environmentally friendly, fuel efficient, and high performing. Consumers were unaware, however, that Volkswagen had secretly equipped these vehicles with a defeat device that allowed Volkswagen to evade United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures. Specifically, the defeat device produces regulation-compliant results when it senses the vehicle is undergoing testing, but operates a less effective emissions control system when the vehicle is driven under normal circumstances. It was only by using the defeat device that Volkswagen was able to obtain Certificates of Conformity from EPA and Executive Orders from CARB for its TDI diesel engine vehicles. In reality, these vehicles emit nitrogen oxides ("NOx") at a factor of up to 40 times over the permitted limit.

In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 15-md-02672-CRB (JSC), 2016 WL 6248426, at *1 (N.D. Cal. Oct. 25, 2016).

This lawsuit involves a putative class of consumers with whom VW has not settled: those who owned or leased an affected car but who resold the car or exited the lease before September 18, 2015, when the public learned that Volkswagen had been selling diesel cars in the United States since 2009 that were equipped with defeat devices.

Volkswagen contended that these consumers lacked standing because they were not injured by Volkswagen's fraud. See Order re First MTD at 1. The Court rejected many of Plaintiffs' injury theories, but held that Plaintiffs had adequately pleaded several theories:

> [1] For all Plaintiffs, it is plausible that they overpaid for the class vehicles when they paid a premium for a low-emission vehicle and (in the case of former owners) only received a portion of that premium back through resale because of depreciation, or (in the case of former lessees) did not recover that premium.
>
> ***2** [2] Former owners were also plausibly injured when they paid inflated financing fees for the class vehicles [tied to their overpayment for low emissions], but former lessees were not plausibly injured by paying lease acquisition and lease termination fees [with no relationship to any overpayment for low emissions].
>
> [3] If there was no "clean diesel" premium, former owners were not plausibly injured just by purchasing the class vehicles [because they were made whole when they resold their cars], but former lessees plausibly were [because they did not resell their cars and were plausibly injured when they paid money to lease vehicles that they plausibly would not have leased but-for the emissions fraud]—although the amount of their injury may be difficult to determine.

Id. at 21. The Court acknowledged that it "may be challenging for Plaintiffs to prove the amount that they paid specifically for low emissions. And it is doubtful that Plaintiffs' overpayment would have been equivalent to the entire cost of the package if the package also included features that Plaintiffs received" like strong fuel economy and better driving performance. Id. at 10–11.[2] Although only the "low emissions" premium's decline in value "would be a concrete injury," and proving that injury may be difficult or impossible, the Court held that it would be "premature" to dismiss Plaintiffs' Complaint at the pleading stage. Id. at 11.

To streamline adjudication of the question whether Plaintiffs have standing, the Court directed the parties to select specific plaintiffs for whom Plaintiffs would "be required to offer proof of damages before the case proceeds further." Order re Second MTD (dkt. 6864) at 3. The Court explained that after evidence of damages had been submitted, the

Court would "consider whether the evidence is admissible, whether the methodologies offered to prove damages can be used to calculate damages on a class-wide basis, and whether the trier of fact could reasonably conclude that the identified damages are recoverable under the relevant causes of action." Id. The parties selected four plaintiffs: Angela Matt Architect, Inc. (Angela Matt), a former Audi lessee; Bradley Conner, a former Volkswagen lessee; Ingrid Salgado, a former Volkswagen owner; and Michael Skena, a former Volkswagen owner. See Submission re Proof of Damages (dkt. 7673 at 9-11).

**a. Plaintiffs' Submission on Proof of Damages**

On August 28, 2020, Plaintiffs submitted their Proof of Damages, see Submission re Proof of Damages, and supporting reports, see Gaskin Report (dkt. 7673-4); Stockton Report (dkt. 7673-5); Weir Report (dkt. 7673-6).[3]

Plaintiffs' Submission begins with several legal contentions aimed at broadening the damages question. They argue that the correct measure of damages is the amount Plaintiffs paid for their cars less the fair market value of those cars at the time of sale, and "need not account for benefits received after the purchase," that is, the vehicles' inflated resale or residual value. See Submission re proof of Damages at 12, 14–16. Plaintiffs then argue that if the Court considers any "offset or reduction" to the initial overcharge damage, "it is VW's burden to prove the amount of the reduction." Id. at 16–17.

***3** To prove their injuries, Plaintiffs present evidence from their experts, who calculate the "fair market value" of the class vehicles "at the time of sale." Id. at 19. Plaintiffs' experts employ varying analyses to calculate these damages for the selected plaintiffs.

First, Plaintiffs present a "conjoint analysis" conducted by experts Steve Gaskin and Colin Weir. This analysis (unlike others presented by Plaintiffs) attempts to quantify the low emissions premium that Plaintiffs paid. Id. at 23. Mr. Gaskin constructed a survey by identifying eight vehicle attributes, then asking respondents to choose between different configurations of attributes at different prices. Id. at 25; see also Gaskin Report ¶ 14. To reference the low emissions premium, the survey compared option (1): engines with software designed to detect if the vehicle is undergoing emissions tests, that would meet emissions standards during testing but emit levels of NOx up to 35 times the federal legal standard during normal driving, for which the manufacturer "may eventually offer a free update that reduces the level of NOx emissions during normal driving, but the update may somewhat degrade the fuel economy and performance of the vehicle";[4] with option (2): engines that would meet emissions standards during both testing and normal driving. See id. at 26–27. Based on consumers' responses to these prompts and a regression analysis, Mr. Gaskin estimated the difference in value "due to a change from 'Diesel engine that meets NOx emission standards both during testing and normal driving' to 'Diesel engine that only meets NOx emission standards during testing.' " Id. at 28; see also Gaskin Report ¶ 60. Depending on the price of the vehicle, Mr. Gaskin found overpayment percentages varying from 8.5% to 60.5%. See Gaskin Rpt. Exhibit K (dkt. 7707-13). Mr. Gaskin picked the lowest number (i.e., the "most conservative") "just to be safe." Gaskin Tr. (dkt. 7707-2) 176:11–21. Accordingly, Mr. Gaskin found that value declined by 8.5% in vehicles with the defeat device. Gaskin Report ¶ 63. Using this figure, Mr. Weir then calculated damages for each selected Plaintiff. Id. at 28-29. At this stage, he did not consider the effects of resale or depreciation. See id.

Second, Plaintiffs present various additional analyses from their expert Edward Stockton, including:

-a "diminished value proxy analysis" that examines the decline in market prices for class vehicles after the emissions fraud was revealed to calculate the magnitude of overpayment at the time of initial purchase. Id. at 29–32;

-a "TDI Premium" analysis that attempts to measure the premium paid for the "bundle of attributes" offered in all TDI vehicles by (1) comparing TDI vehicle prices to gasoline vehicle prices, and, alternatively, (2) using a regression analysis to "isolate the value that the market places on the TDIs compared with similar gasoline vehicles." Id. at 32–35;

-a "retail replacement" analysis that calculates damages based on "the value of a remedy that would have been available had VW disclosed the defeat device immediately upon the sale of the Subject Vehicles." Id. at 35; and

***4** -an "additional indirect overpayment effects" analysis that estimates additional indirect costs associated with the initial overpayment, including interest expense and increased taxes. Id. at 37–38.

Third, near the end of their submission, Plaintiffs present a damages theory that accounts for depreciation. Mr. Weir

and Mr. Stockton calculated the selected plaintiffs' vehicles' overall depreciation rates between the time of acquisition and the time of disposal. Id. at 38. Mr. Weir measured depreciation by the percentage of purchase price recovered at resale and multiplied this rate by the initial overpayment as determined by the conjoint analysis. Id. at 39-40. Mr. Stockton performed a substantially similar analysis, but also applied it to lessees, and used both an "individual method" (examining individual transaction information to determine vehicle depreciation) and a "market-based method" (using industry information and the vehicles' mileage). Id. at 41-42.

**b. Defendants' Response and Evidence**

Defendants have responded to Plaintiffs' submission, see Response to Submission (dkt. 7706), and submitted accompanying expert declarations and deposition transcripts, see Exhibits (dkt. 7707-1–7707-20).

Defendants argue that Plaintiffs have the burden of showing they were injured despite the inflated resale and residual value of their cars, and that Plaintiffs failed to carry this burden because their experts "did not measure any emissions premium or calculate whether and by how much it depreciated." Response to Submission at 4.

Defendants also move to exclude Plaintiffs' expert evidence, arguing that Plaintiffs' experts' methodologies are unreliable. Id. at 5. In support, Defendants have submitted expert reports from Professors Peter Rossi and Lorin Hitt. See Rossi Rpt. (dkt. 7707-10); Hitt Rpt. (dkt. 7707-11).

As most relevant here, Rossi opines that Mr. Gaskin and Mr. Weir's reports are unreliable for the following paraphrased reasons:

-Plaintiffs' experts have not shown that low emissions decline in value, unlike other aspects of a vehicle that are subject to wear.

-Mr. Gaskin's conjoint analysis is not applicable to used vehicles, so it does not calculate what Plaintiffs received for low emissions when they resold their vehicles (or when their lease payments were lower due to increased residual values).

-A conjoint survey measures only consumer demand and cannot calculate an "overpayment" because it does not measure supply-side factors that are necessary to calculate market price. "Willingness to Pay" (WTP) is not equal to market price.

-The conjoint survey does not isolate a low emissions premium because it required respondents to account for the vague chance of a manufacturer "update" and an unspecified resulting harm to fuel economy and performance.

-The survey is flawed because (1) the sample includes owners of both gasoline and diesel-powered vehicles, (2) the sample size is inadequate, and (3) more than half of respondents were female but the vast majority of diesel owners are male.

-Neither Mr. Gaskin nor Mr. Weir measured the margin of statistical error in their damages estimates.

-Mr. Gaskin's WTP-based overpayment calculation resulted in wildly varying overpayment percentages, showing unrealistic sensitivity to base price.

***5** -Mr. Gaskin's analysis produced irrational results that show its unreliability. For example, it indicates that certain consumers would be willing to pay over $9,000 for a navigation system in a $16,000 car and that VW is a price-premium brand compared to Audi.

-Mr. Gaskin did not include the right vehicle attributes in the survey or properly determine how those features should be described to consumers.

-The assumption that an overpayment percentage (e.g., 8.5%) can be applied in a uniform fashion to all years, makes, and models of vehicles is unsupported by any data or economic argument.

Rossi Rpt. at 4–7, 27–31, 44.

As most relevant here, Professor Hitt opines that Mr. Stockton and Mr. Weir's analyses are unreliable for the following paraphrased reasons:

-Mr. Stockton does not attempt to measure any low emissions premium.

-Plaintiffs' depreciation analysis assumes without support that a vehicle's overall rate of depreciation can be applied to measure the depreciation of the alleged emissions premium.

-Because empirical evidence shows that diesel vehicles generally depreciate more slowly than comparable gasoline

vehicles, diesel-specific attributes (such as the level of NOx emissions) depreciate differently, and may not depreciate at all.

Hitt Rpt. at 6–7, 43, 92–93.

**c. Plaintiffs' Motions to Exclude**

Plaintiffs have moved to exclude portions of these reports. See Mot. to Exclude Rossi (dkt. 7699); Mot. to Exclude Hitt (dkt. 7697). Plaintiffs argue that one of Professor Rossi's main points—that Mr. Gaskin's WTP analysis did not calculate a projected market price—is irrelevant. Mot. to Exclude Rossi at 1–2. Plaintiffs argue that because "the only thing that should change in the but-for world is the "harmful act," keeping the "quantity supplied of the Vehicles" the same, such that WTP reflects market price, is proper. Id. at 6. Plaintiffs also argue that Professor Hitt's depreciation arguments assume that a "premium" can depreciate, even though only assets can depreciate. Mot. to Exclude Hitt at 3–9.

## II. LEGAL STANDARD

**[1]** The Court has a duty to examine its own jurisdiction, see, e.g., B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999), and thus whether Plaintiffs have standing to sue in federal court, see Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (explaining that standing is jurisdictional because without it, there is no Article III case or controversy).

**[2]** **[3]** **[4]** **[5]** To have standing, Plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to Defendants' conduct, and (3) that their injury will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish the first of these elements, Plaintiffs must demonstrate that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130). Plaintiffs bear "the burden of proof" to establish that they suffered an injury in fact "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561, 112 S.Ct. 2130. At the pleading stage, "general factual allegations ... may suffice." Maya v. Centex Corp., 658 F.3d 1060, 1068 (9th Cir. 2011). But at summary judgment, Plaintiffs must provide some evidence of "specific facts" to establish injury. Id. (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 n.3, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)).

***6** **[6]** Determining whether Plaintiffs have provided some evidence of their injury, may require the Court to determine whether Plaintiffs' evidence is admissible. Under Rule 402 of the Federal Rules of Evidence, "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402.[5] For potentially relevant expert evidence, trial judges act as "gatekeepers" and exclude unreliable evidence offered by experts. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under Rule 702 of the Federal Rules of Evidence, expert evidence is admissible only if

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

## III. DISCUSSION

**[7]** Here, the Court must determine whether Plaintiffs have provided any admissible evidence of an injury based on Plaintiffs' submission, Defendants' expert reports and motion to exclude, and Plaintiffs' motions to exclude. In some respects, Plaintiffs disregard (or seek to relitigate) issues decided in the Court's prior orders—that is, the Court's rejection of damages theories unrelated to a low emissions premium and that premium's depreciation. Where Plaintiffs do attempt to prove damages under the Court's previously approved theories, their analyses are unreliable and thus inadmissible.[6]

**a. Which Party Must Prove Injury?**

**[8]** To begin, the Court rejects Plaintiffs' attempt to resurrect previously rejected damages theories by shifting the burden to Defendants to prove any "offset" in damages. The burden is on Plaintiffs to show evidence of their injury. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130. The Court's prior order requiring Plaintiffs "to offer proof of damages"—and not requiring Defendants to prove the absence of damages—

is consistent with this principle. Order re Second MTD at 3. Plaintiffs argue that when a party raises a mitigation of damages defense, that party has the burden of proof. See Submission re Proof of Damages at 16. But Defendants do not raise a mitigation defense—they challenge whether, given that Plaintiffs sold their vehicles or had their leases terminate before Volkswagen's fraud became public, Plaintiffs suffered any damages at all.

Thus, Plaintiffs' argument that they need not calculate the difference between what they paid and what they later received for low emissions fails for the reasons explained in the Court's prior order. Consider a counterfeit Louis Vuitton purse, sold as authentic for $1,000 and later resold as authentic for $800. Was the first purchaser harmed? Maybe. If a known inauthentic purse would have cost $100 and resold for $80, then the first purchaser would have recouped all but $20, instead of all but $200, upon resale. In that sense, the first purchaser was injured to the tune of $180. If the first purchaser could provide evidence of the authentic and counterfeit purses' relative depreciation, the first purchaser could prove an injury. Note that the first purchaser's initial overpayment of $900 is plainly larger than any injury—were the first purchaser awarded $900 after reselling the purse for $800, the first purchaser would get a significant windfall.

***7 [9]** The present controversy is more complicated than the Louis Vuitton example for several reasons. Authenticity is a single variable that the first purse buyer did not receive and later did not give. But here, Plaintiffs paid a premium for some features they did receive (better fuel economy and driving performance) and another feature they did not (low emissions). This makes the low emissions premium and its depreciation more difficult to isolate and measure. Moreover, it is easier to measure relative depreciation between authentic and counterfeit purses because there are established markets for both (in New York City, for example, a person could buy an authentic purse on Fifth Avenue or a knockoff purse on Canal Street). Here, the market for vehicles that are identical but-for the low emissions feature is hypothetical and less easily observable.

The difficulty of proving an injury is no reason to reject it at the motion to dismiss stage. See Order re First MTD at 11. But it is also no reason to accept a theory of injury untethered to the harm that Plaintiffs experienced. Therefore, Plaintiffs' expert evidence is admissible only to the extent it could reliably show Plaintiffs' damages given their vehicles' inflated resale or residual values.

**b. Plaintiffs' Evidence**

The Court excludes Plaintiffs' conjoint analysis and depreciation analyses as unreliable under Rule 702 of the Federal Rules of Evidence; the Court excludes Plaintiffs' other analyses as irrelevant under Rule 402 of the Federal Rules of Evidence.

**1. Conjoint Analysis**

As discussed above, Mr. Gaskin's Conjoint Analysis measured a demand-price difference between vehicles with engines that meet emission standards only during testing —and which allow the engine to emit levels of NOx up to 35 times the federal standard—and engines that meet NOx standards before and during testing. See Submission re Proof of Damages at 12, 14–16. Such an analysis could conceivably account for the premium that Plaintiffs paid for low emissions.

But as conducted, Mr. Gaskin's analysis could not reliably estimate the market price premium "specifically for low emissions." Order re First MTD at 10–11. Professor Rossi persuasively critiques every aspect of Mr. Gaskin's analysis. See Rossi Rpt. (dkt. 7707-10). But several aspects of Mr. Gaskin's analysis stand out as flawed even to the untrained eye. Each provides an independent reason to exclude the evidence as unreliable.

First, Mr. Gaskin does not actually calculate a market price premium; he examines only what consumers say they would be willing to pay for certain vehicles. As Defendants point out, this ignores the "supply" part of the supply/demand curve. See Rossi Rpt. ¶ 18. "[D]istrict courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations." MacDougall v. Am. Honda Motor Co., No. 17-1079 JBG, 2020 WL 5583534, at *6 (C.D. Cal. Sept. 11, 2020) (collecting cases). Calculating a premium by comparing (1) the actual price of vehicles sold with defeat devices to unwitting consumers, and (2) consumers' willingness-to-pay for vehicles with the defeat device (as opposed to the market price of vehicles with the defeat device) is comparing apples and oranges. And presuming that Defendants would have sold the same number of cars, at the exact price that consumers would have been willing to pay, is not a way to reliably incorporate supply-side considerations. See In Re General

Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 239 (S.D.N.Y. 2019) (rejecting a similar argument because it "would mean that a given product is supplied by the manufacturer in the same quantity no matter what the price is" and because it would be "highly unlikely" that a vehicle manufacturer "would have wanted to sell the same amount of cars at the price implied by [the] but-for analysis") (citation omitted).

***8** Second, Mr. Gaskin did not isolate a low emissions premium because the information provided to respondents required them to consider certain vague effects going beyond low emissions. Mr. Gaskin instructed respondents that, for engines that produced low emissions only during testing, the vehicle manufacturer may "eventually offer a free update that reduces the level of NOx emissions during normal driving, but the update may somewhat degrade the fuel economy and performance of the vehicle." Gaskin Rpt. ¶ 49. Thus, Mr. Gaskin invited respondents to consider a potential reduction in other performance measures under vague circumstances that might or might not arise. See Rossi Rpt. ¶ 60. It is impossible to know how much this affected responses.[7]

Third, the results of Mr. Gaskin's analysis indicate that his methodology was not reliable. Mr. Gaskin's results suggest that certain consumers value a $2,000 navigation system in a $16,000 vehicle at $9,000, and that VW is a premium brand compared to Audi.[8] Further, Mr. Gaskin calculated radically different "overcharge" percentages depending on the price of the vehicle (ranging from 8.5% to 60.5%). An overpayment ratio might sensibly vary depending on price, see Gaskin Reply ¶ 24, but a range that resembles 'somewhere between almost nothing and almost everything' is facially unrealistic. Merely picking the lowest number in that range does not remove doubt.

**[10]** Finally, Mr. Gaskin's conjoint analysis suffers from other apparent methodological flaws. Conjoint analyses usually use "a pretest to ensure that questions on the final survey are not confusing [or] misleading, and accurately measure respondent preferences." MacDougall, 2020 WL 5583534, at *7. Here, Mr. Gaskin's pretest consisted of "interviews ... with 20 respondents to ensure that they 'did not have difficulty with the questions and instructions; that they understood the choice exercise they were asked to perform; that they looked at all or almost all of the features in making their choices; that they did not think the questions were leading or biased; and that they felt the features were evenly presented.' " Submission re Proof of Damages at 25 n.52 (quoting Gaskin Rpt. ¶ 35). But these interviews consisted of "free form" conversations and were not standardized. Gaskin Tr. 232:9–22. Thus, any pretesting measured respondents' impressions of the survey in a highly informal manner. And Plaintiffs have not offered a persuasive response to the sampling/representativeness problems identified by Professor Rossi.

Therefore, Plaintiffs' conjoint analysis is unreliable and inadmissible under Rule 702 of the Federal Rules of Evidence.

**2. Depreciation**

**[11]** Without a reliably calculated emissions premium, Plaintiffs' depreciation analysis is useless because it lacks a starting point from which to calculate a decline in value for low emissions. But even accepting an initial 8.5% emissions premium, Plaintiffs' approach to depreciation is not reliable, and this is equally fatal to their attempt to prove injury.

***9** Plaintiffs assume that the value of an emissions premium declines at the same rate as the overall vehicle. That is plainly wrong. Car features and characteristics are likely to affect depreciation to different degrees. Indeed, Mr. Gaskin's report for Plaintiffs implies that certain vehicle attributes may depreciate more than others. Mr. Gaskin acknowledged that "consumers shopping for used vehicles consider a wide variety of factors that are irrelevant to a new-car purchase (for example, mileage, accident history, and condition)." Gaskin Rpt. ¶ 48 n.32. Unlike characteristics such as these, low emissions might hold a relatively stable value over a vehicle's lifetime compared to features that naturally wear down. That means the low emissions premium may play less of a role in vehicle depreciation than, say, accumulated mileage. If so, then the consumer who purchased a car for $25,000 while paying $4,000 for low emissions and then resold a car for $20,000 while receiving $4,000 for low emissions was not harmed by Volkswagen's fraud. The opposite may also be true, but Plaintiffs' analysis does not account for these possibilities at all.

Plaintiffs take issue with the word "depreciation" with respect to a non-physical feature like low emissions. Mot. to Exclude Hitt at 3–9. But here, "depreciation" is simply shorthand for the changing value that consumers might place on low emissions. Plaintiffs must show how this value changes to prove damages, and they do not purport to do so.

**3. Mr. Stockton's Analyses**

Mr. Stockton's other analyses are not relevant to any of the damages theories approved by the Court. Indeed, Mr. Stockton testified at his deposition that he did not attempt to calculate a low emissions premium. See Stockton Tr. (dkt. 7707-1) at 64:7–15. Given that Mr. Stockton did not tailor his analyses to the pertinent damages theories, it is no surprise that they do not tend to prove damages under those theories.

For example, Mr. Stockton's "diminished value proxy analysis" examines the decline in market prices for class vehicles after the emissions fraud was revealed to calculate the magnitude of overpayment at the time of initial purchase. See Submission re Proof of Damages at 29–32. It principally relies on the effects of disclosure, including brand effects, even though Plaintiffs resold their cars before disclosure. The pertinent market value does not rely on the public's reaction to news that vehicles were fraudulent. Customers still in possession of their fraudulent vehicles at the time of disclosure were harmed by that reaction. Plaintiffs were not.

Similarly, Mr. Stockton's "retail replacement" analysis calculates damages based on "the value of a remedy that would have been available had VW disclosed the defeat device immediately upon the sale of the Subject Vehicles." Id. at 35. This analysis has nothing to do with the emissions premium. Mr. Stockton's "TDI Premium" analysis purports to measure the premium paid for the "bundle of attributes" offered in all TDI vehicles. Id. at 32–35. But Plaintiffs were required to submit evidence of "the amount of the premium that was specifically for low emissions," not the amount that covered the full bundle of additional TDI vehicle features—some of which Plaintiffs received. Order re First MTD at 14. Finally, Mr. Stockton's "additional indirect overpayment effects" analysis estimates additional damages associated with any overcharge at the time of purchase, including interest expenses and increased taxes. Submission re Proof of Damages at 37–38. An analysis like this could be relevant (indeed, it resembles the financing costs theory of liability previously approved by the Court); if Plaintiffs presented evidence of a low emissions premium, there could be indirect but concrete financial harms associated with that premium. But Mr. Stockton's "indirect overpayment effects" analysis relies on Mr. Stockton's other overpayment analyses, which do not purport to measure a low emissions premium.[9]

***10** Thus, Mr. Stockton's analyses are inadmissible as irrelevant under Rules 401 and 402 of the Federal Rules of Evidence.

*

For the foregoing reasons, the Court grants Defendants' motion to exclude Plaintiffs' expert evidence. The Court denies Plaintiffs' motions to exclude the opinions of Professors Rossi and Hitt.

**c. Jurisdiction**

As the parties acknowledged at oral argument, discovery has concluded for both sides. The Court now determines that Plaintiffs have not submitted any admissible evidence that they suffered an injury. It is no longer to premature to dismiss Plaintiffs' claims on that basis. Indeed, because Plaintiffs lack standing, the Court lacks jurisdiction and must dismiss Plaintiffs' claims.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to exclude Plaintiffs' expert evidence, DENIES Defendants' motions to exclude Plaintiffs' expert evidence, and DISMISSES this case for lack of jurisdiction. This constitutes a final order and the clerk is instructed to close the file for case 17-cv-04372-CRB.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 6688912

Footnotes

1 This order amends the Court's previously filed order (dkt. 7769) to correct two typographical errors. The orders are substantially the same.

2 Plaintiffs do not dispute that they received certain features in exchange for the overall premium they paid for diesel vehicles relative to gasoline vehicles.

3 Plaintiffs' experts have also reponded to Volkswagen's experts' reports. See Gaskin Reply (dkt. 7673-7); Stockton Reply (dkt. 7673-9); Weir Reply (dkt. 7673-8).

4 This option noted that there would be no physical indications of the software and that the survey respondents would be "unaware" that their vehicles have it. Submission re Proof of Damages at 26.

5 Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence ... and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b).

6 One theory did not depend on a low emissions premium: Lessees were plausibly injured even in the absence of such a premium because they did not resell their cars and paid money to lease vehicles that they plausibly would not have leased but-for the emissions fraud. But Plaintiffs have not attempted to quantify this injury, which the Court previously noted would be exceedingly difficult to prove. See Order re First MTD at 21.

7 The Court is also skeptical that survey respondents could reliably determine how much they would pay for a vehicle containing a defeat device given certain phrasing in the survey. See Submission re Proof of Damages at 26. Consumers were told that they would "be unaware" that their vehicle had the emissions cheating software. Id. This is a confusing and arguably imponderable prompt, akin to asking a person how much they would pay for a car that displays an offensive bumper sticker that the person will never notice or learn about.

8 Mr. Gaskin's response is not persuasive. He accounts for such anomalies by taking the most conservative estimate in his range. See Gaskin Reply ¶ 25. But the point is that Mr. Gaskin's starting point—the range—contains facially nonsensical data. Arbitrarily picking the most conservative figure from an unreliably determined range does not make the result more reliable.

9 Although Plaintiffs have not raised this issue, the time value of money could give rise to a concrete injury. Plaintiffs' injury could comprise not only the difference between what they paid and what they received for low emissions, but also the interest that they could have earned on the money they overpaid between the time of purchase and the time of disposal. But this would still require Plaintiffs to reliably calculate their initial overpayment for low emissions, and they have not done so.

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2702726
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Levi JONES, et al., Plaintiffs,
v.
CONAGRA FOODS, INC., Defendant.

No. C 12–01633 CRB
|
Signed June 13, 2014

**Attorneys and Law Firms**

Ben F. Pierce Gore, Pratt & Associates, San Jose, CA, Ananda N. Chaudhuri, Frank Karam, Keith M. Fleischman, Fleischman Law Firm, New York, NY, Brian K. Herrington, David Malcolm McMullan, Jr., Katherine B. Riley, John W. (Don) Barrett, Don Barrett, P.A., Lexington, MS, Carol Nelkin, Jay P. Nelkin, Stuart M. Nelkin, Nelkin & Nelkin, P.C., Houston, TX, Charles F. Barrett, Charles Barrett, P.C., Nashville, TN, David Shelton, David Shelton, PLLC, J. Price Coleman, Coleman Law Firm, Richard Barrett, Law Offices of Richard R. Barrett, PLLC, Oxford, MS, Dewitt Marshall Lovelace, Sr., Valerie Lauro Nettles, Lovelace Law Firm, P.A., Miramar Beach, FL, for Plaintiffs.

Allen Brooks Gresham, II, Laura E. Coombe, McGuirewoods LLP, Los Angeles, CA, Angela M. Spivey, McGuirewoods LLP, Atlanta, GA, Joan Shreffler Dinsmore, McGuirewoods LLP, Raleigh, NC, Benjamin Todd Diggs, Douglas Mayer Schwab, Hogan Lovells U.S. LLP, San Francisco, CA, Robert B. Hawk, Stacy R. Hovan, Hogan Lovells U.S. LLP, Menlo Park, CA, Robin Eve Wechkin, Hogan Lovells U.S. LLP, Issaquah, WA, for Defendant.

**ORDER DENYING MOTIONS FOR CLASS CERTIFICATION**

CHARLES R. BREYER, UNITED STATES DISTRICT JUDGE

***1** This is a putative consumer class action about allegedly deceptive and misleading labels on three types of food products. This district has seen a flood of such cases,[1] in which plaintiffs have challenged, with varying degrees of success, marketing claims on everything from iced tea to nutrition bars. This Order does not—and, given their multiformity, could not—speak to the merits of all such cases. It addresses only whether Plaintiffs have met their burden in this case. In this case, Plaintiffs have moved to certify three separate classes under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3)—one for each type of food product at issue. Because the Court finds that Plaintiffs have failed to meet several of the requirements of Rule 23, it DENIES all three pending motions.

## I. BACKGROUND

On April 2, 2012, Plaintiffs Levi Jones, Christine Sturges, and Edd Ozard,[2] on behalf of themselves and others similarly situated, filed a class action suit alleging that Defendant ConAgra's website and products—including Hunt's tomato products, PAM cooking spray products, and Swiss Miss hot cocoa products—contain deceptive and misleading information. *See generally* Compl. (dkt. 1). They filed a First Amended Complaint on July 2, 2012. *See generally* FAC (dkt. 27). On December 17, 2012, this Court granted in part Defendant's Motion to Dismiss the FAC. Order Granting In Part MTD (dkt. 91).

On January 15, 2013, Plaintiffs filed a Second Amended Complaint, alleging (1) unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code section 17200 ("UCL"), (2) misleading, deceptive, and untrue advertising in violation of California Business and Professions Code section 17500 ("FAL"), (3) violations of the Consumers Legal Remedies Act ("CLRA"), and (4) restitution based on unjust enrichment. *See* SAC (dkt. 95) ¶¶ 255–321. Plaintiffs sought to certify a PAM cooking spray class in December of 2013, but the Court directed Plaintiffs to move for class certification of all three product lines at the same time. *See* Minutes (dkt. 183). Plaintiffs have now done so. *See generally* PAM Mot. (dkt. 128); Hunt's Mot. (dkt. 189); SM Mot. (dkt. 190). This Order addresses all three motions, breaking out discussion by product group.

### A. Hunt's

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

As to Hunt's, Plaintiffs seek to certify a class under Rule 23(b)(2) and Rule 23(b)(3) of "All persons in the state of California who, from April 2, 2008, until the date of notice, purchased a Hunt's® canned tomato product bearing the label statement '100% Natural' or 'Free of artificial ingredients & preservatives' but which contained the following ingredients: citric acid and/or calcium chloride." Hunt's Mot. at i. There are seven segments of Hunt's tomato products: diced tomatoes, crushed tomatoes, stewed tomatoes, whole tomatoes, tomato sauce, tomato puree, and tomato paste. SAC ¶ 8; Nagle Decl. (dkt. 203) Ex. A at 21. There are also numerous varieties and sizes (as well as multi-packs) of each segment. *See* Opp'n to Hunt's Mot. (dkt. 202) at 3 (asserting as an example that there were 16 flavor varieties of diced tomatoes). Plaintiff Levi Jones purchased diced tomatoes and tomato sauce. Shelton Decl. (dkt. 189–8) Ex. B (Jones Depo) at 48–50, 56–57. The products that Jones purchased were labeled "100% Natural" and "Free of artificial ingredients & preservatives." Hunt's Mot. at 2. Hunt's diced tomatoes contain citric acid and calcium chloride, and Hunt's tomato sauce includes citric acid, but not calcium chloride. *Id.*

***2** According to Plaintiffs, *all* Hunt's tomato products included the "100% Natural" and "Free of artificial ingredients & preservatives" labels, although some segments contained only citric acid (crushed tomatoes, tomato sauce, tomato paste, and tomato puree), while some contained both citric acid and calcium chloride (diced tomatoes, whole tomatoes, and stewed tomatoes). *Id.* at 2–3. According to Defendant, the product labels changed during the proposed class period, and "for some product varieties, no references to preservatives were ever made on the label." Opp'n to Hunt's Mot. at 4; Nagle Decl. ¶¶ 6 (handful of Hunt's tomato products do not state "100% Natural"), 10–11 ("for some product varieties, no references to preservatives were ever made on the label"), 14 (Defendant removed the "artificial/preservatives" label from most Hunt's products during the class period, and at various times between 2011 and 2013).

### B. PAM

As to PAM, Plaintiffs seek to certify a class under Rule 23(b)(2) and Rule 23(b)(3) of "All persons in the State of California who, from four years prior to the filing of the original complaint until the date of notice, purchased PAM cooking spray labeled '100% NATURAL.' " PAM Mot. at i. Plaintiffs assert that the PAM products are not natural because "they contain significant quantities of undisclosed petrochemicals such as Petroleum gas (liquefied), Propane, Propane 2—methyl (isobutane) and Butane." *Id.* at 1.[3] Plaintiff Christine Sturges purchased PAM Original Cooking Spray in a 12 ounce can, and PAM Certified Organic Olive Oil Spray in a 5 ounce can. *Id.*[4]

According to Plaintiffs, "[t]here are two varieties of PAM cooking spray products at issue." *Id.* at 3. According to Defendant, there are seven varieties of PAM for retail sale: Original, Butter, Baking, Grilling, Olive Oil, Organic Olive Oil, and Organic Canola Oil. Opp'n to PAM Mot. at 2; Richardson Decl. (dkt. 160) ¶ 6. The Butter, Baking and Grilling varieties never had a "100% Natural" label. Opp'n to PAM Mot. at 3; Richardson Decl. ¶ 8. The PAM Original and Olive Oil varieties included a "100% Natural" label at the beginning of the class period, and then in 2010, Defendant replaced the "100% Natural" claim with a claim that the products were "made with 100% natural canola [or olive] oil." Opp'n to PAM Mot. at 2–3; Richardson Decl. ¶ 13.[5] The timing of that label change varied between the two products and among the different sizes. Opp'n to PAM Mot. at 3; Richardson Decl. ¶ 19. The Organic Olive Oil and Organic Canola Oil products have not gone through relevant label changes. *Id.*

### C. Swiss Miss

As to Swiss Miss, Plaintiffs seek to certify a class under Rule 23(b)(2) and Rule 23(b)(3) of "All persons in the State of California who, from April 2, 2008, until the date of notice, purchased a Swiss Miss® hot cocoa product bearing the label statement 'Natural Source of Antioxidants' or 'Natural Antioxidants Are Found in Cocoa.' " SM Mot. at i. Plaintiffs assert that Defendant is "forbidden from making unauthorized antioxidant claims on products that fail to meet the minimum nutritional requirements required for the antioxidant claim being made." *Id.* at 1, 2.[6] During the class period, Plaintiff Christine Sturges purchased Swiss Miss cocoa products, including Classics Milk Chocolate cocoa in a 7.3 ounce box. *Id.* at 1. The products purchased by Plaintiff were labeled with the statements "Natural Source of Antioxidants" and "Natural Antioxidants Are Found in Cocoa." *Id.*

***3** According to Plaintiffs, "Purchasers of ConAgra's Swiss Miss® hot cocoa mix bought products with the identical labeling claims." *Id.* at 1–2. According to Defendant, it has offered over a dozen varieties of Swiss Miss for sale during the class period, in multiple sizes,

boxes and canisters. Kensicki Decl. (dkt. 198) ¶ 6. During the class period, labels on some Swiss Miss varieties included one of the two challenged statements about antioxidants, while others made no antioxidant references. *Id.* ¶ 12. The antioxidant statements were either on the top box panel or on the back of the canister. *Id.* ¶ 10. The following chart is a partial reproduction of one from the Swiss Miss brand manager's declaration:

| **Swiss Miss Variety** | **No antioxidant reference** | **Natural Source of Antioxidants** | **Natural Antioxidants Are Found in Cocoa** |
|---|---|---|---|
| Rich Chocolate (10 pk) | until 7/29/10 | | since 7/29/10 |
| Rich Chocolate (54 oz.) | until 6/28/10 | | since 6/28/10 |
| Milk Chocolate (6 pk) | until 11/1/07 | 11/1/07–7/29/10 | since 7/29/10 |
| Milk Chocolate (10 pk) | until 10/19/07 | 10/19/07–7/29/10 | 7/29/10 |
| Milk Chocolate (10+2 pk) | since introduction 8/2/11 | | |
| Milk Chocolate (30 pk) | until 6/18/10 | | since 6/18/10 |
| Milk Chocolate (50 pk) | throughout class period | | |
| Milk Chocolate (19 oz./26 oz.) | until 11/5/07 & since 6/23/10 | 11/5/07–6/23/10 | |
| Marshmallow (6 pk) | until 10/23/07 | 10/23/07–7/29/10 | since 7/29/10 |
| Marshmallow (10+2 pk) | since introduction 8/2/11 | | since introduction 8/2/11 |
| Marshmallow (30 pk) | until 6/18/10 | | since 6/18/10 |

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| No Sugar Added (13.8 oz.) | until 12/5/07 & since 6/25/10 | 12/5/07–6/25/10 | |
| No Sugar Added (60 pk) | throughout class period | | |
| Dark Chocolate Sensation (8 pk) | until 9/12/07 | 9/12/07–5/5/10 | since 5/5/10 |
| French Vanilla (6 pk/8 pk) | until 10/30/07 & since 6/18/12 | 10/30/07–7/29/10 | 7/29/10–6/18/12 |

*See id.* ¶ 12 (additional rows omitted).

**II. LEGAL STANDARD**

Class certification under Rule 23 is a two-step process. First, Plaintiffs must meet the four requirements of 23(a): "numerosity," "commonality," "typicality," and "adequacy." Fed.R.Civ.P. 23. "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.,* 709 F.3d 829, 833 (9th Cir.2013) (quoting *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011)).

Second, Plaintiffs must also establish that one of the bases for certification in Rule 23(b) is met. Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) provides that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*; *see also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1163 (9th Cir.2001) (holding Rule 23(b)(3) satisfied where "[i]ndividualized issues [were] few, and most of them [were] likely to be relatively easy").

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met. *See Dukes,* 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

**III. DISCUSSION**

**A. Plaintiffs' Standing**

"[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357 (1996) (internal quotation marks omitted).

**1. Hunt's**

As to Hunt's, Defendant asserts that Jones lacks standing to bring suit because he did not rely on the allegedly misleading labels, because compliance with the law was not a factor in his purchasing decisions, because he was not injured, and because he only purchased two of the many products at issue. Opp'n to Hunt's Mot. at 8–11. Aside from the argument about the unpurchased products, which really pertains to typicality, *see also Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998) (representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical."), these arguments are initially persuasive, based on Jones's deposition testimony. Jones testified that there was nothing particular on the label that was a factor in his decision to purchase Hunt's diced tomatoes but that he bought them because his parents did and he was a "loyal customer." Hawk Decl. II (dkt. 205) Ex. D (Jones Depo) at 53–54. He testified initially that he was "absolutely" influenced in part by the "100% natural" label to purchase Hunt's products, *id.* at 58, then immediately conceded that he did not know whether the "100% natural" statement on the label was a factor in his purchases, *id.* at 59. He testified that he had no specific recollection of seeing the "free of artificial ingredients and preservatives" label. *Id.* at 81. He testified that citric acid is not a food he tries to avoid, *id.* at 77, that calcium chloride is not an ingredient he has ever tried to avoid, *id.* at 79, and that "if those tomatoes had calcium chloride and citric acid in them when [he] purchased them, and [he'd] known that, [he] still would have purchased them," *id.* at 80. Indeed, after this suit was filed, he purchased multiple other brands of tomato products that also contained citric acid and/or calcium chloride. *Id.* at 114, 117–18, 121–22.

***4** Nonetheless, Plaintiffs' counsel rehabilitated Jones later in the same deposition. Under questioning from his counsel,[7] Jones testified that he did read the "100% natural" label at the time he made his purchase and that he relied on it. *Id.* at 134–35. He went on to say that he makes an effort to seek out natural foods in his diet, *id.* at 136, and that had he known that Hunt's products had citric acid and calcium chloride, he would not have purchased them, *id.* He testified that he did not know that citric acid and calcium chloride were unnatural products, and that when he found out that Hunt's products contained those ingredients, he stopped buying them. *Id.* at 137–38.[8] Given this testimony, Jones has made a sufficient showing that he relied on the labels in purchasing a product that he would not have otherwise purchased. This Order addresses the question of damages in its discussion of Rule 23(b)(3) predominance.

**2. PAM**

As to PAM, Defendant does not challenge Plaintiff Sturges's standing.

**3. Swiss Miss**

As to Swiss Miss, Defendant challenges Plaintiff Sturges's standing, arguing that she was not deceived by the challenged statements and that she was not injured. *See* Opp'n to SM Mot. (dkt. 197) at 10–12. Sturges's testimony indeed presents a problem for Plaintiffs.

Although Sturges's testimony undermined the notion that she was injured, at least it did not entirely disclaim injury, *see* Hawk Decl. I (dkt. 151) Ex. A (Sturges Depo) at 150–51 (answering that she did not know whether she suffered "any kind of injury, financial or otherwise," or whether the Swiss Miss products were "worth what [she] paid for them.")—and this Order will discuss whether it is possible to quantify her injury in its discussion of Rule 23(b)(3) predominance.

More problematic, despite testifying adequately that she relied on an antioxidant statement,[9] *see* Hawk Decl. II Ex. A (Sturges Depo) at 86 (Q: "So, in ... deciding to buy Swiss Miss, what factors influenced you in your purchases since April 2008?" A: "I liked that it said antioxidants, I liked that it had calcium, and then I know the brand."), Sturges also testified that the statement was *not misleading:*

> Q: Is the statement natural antioxidants are found in cocoa, to your understanding now as you sit here, is that a true statement?
>
> A: Yes.

Q: Is there anything that you know of that is misleading about that statement? ...

A: I don't—I don't know if it's misleading. Now, I don't think so.

Q: You don't think so what?

A: I would say it's not misleading now, but I don't know, 'cuz it just says—

Q: Well, was it misleading to you when you read it before you bought Swiss Miss?

A: No, I'm just saying it's one of the things that I was attracted to when I bought it.

Q: All right. But I—I was really trying to focus on whether it was misleading or not .... your testimony is that it's not misleading today, correct?

A: Correct.

*Id.* at 98–99. She went on to testify that "it made me think I was buying something with antioxidants in it, as opposed to just saying they're in cocoa." *Id.* at 101.[10] She later stated that she did not know whether she felt that it was misleading when she bought the product. *Id.* at 101–102. And she responded "No" to the question of whether "a belief that [her] family would enjoy some particular health benefit from drinking Swiss Miss" was a factor in her purchase. *Id.* at 88.[11] This testimony falls short of the requirement in *Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1109 (9th Cir.2013), that to establish standing to bring a UCL or FAL claim, a consumer must allege, among other things, that "the defendant made a false representation about a product." Of course the SAC alleges that the challenged antioxidant statements are misleading, *see* SAC ¶ 3(H), but Sturges's testimony contradicts that allegation.

***5** Based on her testimony, Sturges lacks standing.

**B. Rule 23(a) factors**

**1. Numerosity**

The requirement of numerosity is that the class be so numerous that joinder of all members individually would be impracticable. *See* Fed.R.Civ.P. 23(a)(1); *Staton v. Boeing,* 327 F.3d 938, 953 (9th Cir.2003). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." *See Krzesniak v. Cendant Corp.,* No. 05–05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007).

**a. Hunt's**

As to Hunt's, Plaintiffs represent that "this element is easily satisfied, as Defendant has sold hundreds of thousands (if not millions) of Hunt's canned tomato products during the class period in California." Hunt's Mot. at 7. Defendant does not dispute numerosity.

**b. PAM**

As to PAM, Plaintiffs represent that "[b]ased on sales data, it is estimated that hundreds of thousands of consumers have purchased PAM cooking spray labeled '100% Natural' in California during the class period." PAM Mot. at 6. Defendant does not dispute numerosity.

**c. Swiss Miss**

As to Swiss Miss, Plaintiffs represent that "Defendant has sold hundreds of thousands (if not millions) of Swiss Miss hot cocoa products during the class period in California." SM Mot. at 5. Defendant does not dispute numerosity.

**2. Commonality**

The requirement of commonality demands that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The requirements for showing commonality are "minimal." *See Hanlon,* 150 F.3d at 1020. The showing required for Rule 23(a)(2) is "less

rigorous" than the related requirements of Rule 23(b)(3). *See id.* at 1019. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* Commonality is satisfied where claims "depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551.

**a. Hunt's**

As to Hunt's, Plaintiffs assert that there are numerous common questions of law and fact, such as whether the "100% natural" and "free of artificial ingredients & preservatives" labels are unlawful, unfair, deceptive, or misleading when afixed to products containing citric acid and/or calcium chloride. Hunt's Mot. at 8; *see also Chavez v. Blue Sky Natural Bev. Co.,* 268 F.R.D. 365, 377 (N.D.Cal.2010) (concluding that class member claims had common issue of "whether the Blue Sky packaging and marketing materials are unlawful, unfair, deceptive or misleading to a reasonable consumer."). Defendant does not dispute commonality.

**b. PAM**

As to PAM, Plaintiffs assert that there is a common core of facts—purchase of Defendant's cooking spray products with the same misleading label—and a common question: "can Defendant use the term '100% Natural' when the product includes unnatural ingredients?" PAM Mot. at 6. Defendant does not dispute commonality.

**c. Swiss Miss**

***6** As to Swiss Miss, Plaintiffs assert that there is a common core of facts, in that all class members purchased one of Defendant's hot cocoa products with the same misleading antioxidant language. SM Mot. at 6. There are also common questions, such as "whether the antioxidant label representations are unlawful, unfair, deceptive, or misleading to reasonable consumers." *Id.* Defendant does not dispute commonality.

**3. Typicality**

The requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical." *See Hanlon,* 150 F.3d at 1020.

**a. Hunt's**

As to Hunt's, Defendant argues that Jones is not typical because he lacks standing. Opp'n to Hunt's Mot. at 15. Because the Court concludes above that Jones has adequately established standing, it also finds that he is typical. Jones's claims are based on Defendant's products being misbranded in exactly the same way as set out in the proposed class definition. *See Chavez,* 268 F.R.D. at 377 (finding plaintiff typical where his claims arose "out of the allegedly false statement, worded in several variations, made on every Blue Sky container indicating that the beverages are connected to Santa Fe, New Mexico").

**b. PAM**

As to PAM, Defendant argues that Sturges is not typical because she cannot assert ingredient list claims, because she cannot pursue claims premised on purchases of illegal products, and because she did not buy all of the varieties of PAM. Opp'n to PAM Mot. at 11–12.[12] Defendant's first two arguments are persuasive.

It is not clear from Plaintiffs' moving papers whether they intended to certify a class based on Defendant's having

listed "propellant" on the ingredient list instead of identifying each of the component parts of the propellant. *See, e.g.,* PAM Mot. at 7 ("Defendant misbranded an ingredient as 'propellant' instead of using the common or usual name"). Assuming that they did move to certify such a class, Sturges conceded in her deposition that she did not read the ingredient list and was not curious about the composition of the propellant. *See* Hawk Decl. II Ex. A (Sturges Depo) at 92. In their reply, Plaintiffs state that "Plaintiff's claim is not that she relied on the ingredient list to her detriment. Her claim is that she relied on the label statement '100% Natural,' when in fact the products were not 100% natural." Reply to PAM Mot. (dkt. 172) at 5. Accordingly, Plaintiffs agree that Sturges cannot represent a "propellant" ingredient class.

Nor can Sturges represent a class based on claims about purchases of illegal products.[13] Sturges testified that it was never "a factor in [her] decision to buy PAM, whether or not the labeling on the can complied with state or Federal law." Hawk Decl. II Ex. A at 91. Plaintiffs argue that "[t]his testimony does not lead to the conclusion that Plaintiff did not care whether the products were legal or not," Reply at 5, but that seems precisely what it means.

***7** Sturges can, however, represent a class of people who purchased different PAM varieties than the two she purchased, provided that the varieties at issue all contained the same allegedly misleading label and are alleged to be misleading for the same reason. Her claims are reasonably co-extensive with those of absent class members, even if they bought Organic Canola Oil PAM and she bought Organic Olive Oil PAM. *See Chavez,* 268 F.R.D. at 377 (finding plaintiff typical where his claims arose "out of the allegedly false statement, worded in several variations, made on every Blue Sky container indicating that the beverages are connected to Santa Fe, New Mexico").

**c. Swiss Miss**

As to Swiss Miss, Defendant argues that Sturges is not typical because (1) she was not deceived by the challenged statements and (2) she cannot claim that she "would not have purchased Defendant's Misbranded Food Products had [she] known they were not capable of being legally sold or held," SAC ¶¶ 238, 242, having disclaimed that position, Opp'n to SM Mot. Defendant is correct on both counts. Sturges indeed testified that compliance with labeling law was not a factor in her purchase. *See* Hawk Decl. I Ex. A (Sturges Depo) at 88. And, given Sturges's testimony that the statement she relied on was not misleading, she is not typical of a class of consumers who were allegedly misled. *See Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1019–20 (9th Cir.2011) (upholding district court's holding that proposed class representative who did not see challenged statement, and other who was not deceived by challenged statement, were not typical). The Court finds that Sturges is not typical.

**4. Adequacy**

The requirement of adequate representation asks whether the representative "will fairly and adequately protect the interests of the class." *See* Fed.R.Civ.P. 23(a)(4). Courts are to inquire (1) whether the named plaintiffs and counsel have any conflicts of interest with the rest of the class and (2) whether the named plaintiff and counsel will prosecute the action vigorously for the class. *See Hanlon,* 150 F.3d at 1020.

**a. Hunt's**

As to Hunt's, Defendant argues that Jones is inadequate because he is not typical. Opp'n to Hunt's Mot. at 15. Because the Court concludes above that he is typical, it rejects this argument. Defendant also contends that Jones is inadequate because he "has handed the car keys to his lawyers"—by not having reviewed the initial complaint or the SAC before they were filed and by having no independent understanding of whether calcium chloride or citric acid are synthetic. *Id.* (citing Hawk Decl. II Ex. D (Jones Depo) at 104, 107). "Individuals are not adequate representatives of a class when 'it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs.' " *See Keegan v. Am. Honda Motor Co.,* 284 F.R.D. 504, 525 (C.D.Cal.2012). Jones did not abdicate; he made himself available for a lengthy deposition and he read the original complaint after it was filed. *See* Hawk Decl. II Ex. D (Jones Depo) at 105–106 (explaining the he had not read every paragraph but "what I have read, I have agreed with. But to say cover for cover and took notes on it, absolutely not."). Though he is no expert on the ingredients at issue, it is sufficient for present purposes that he tries to live a healthy lifestyle, and that he "work[s] on the assumption that [a label] is

true .... that a hundred percent natural means it is a much—it's a better alternative than the cans sitting next to it." *Id.* at 135–36. Jones is an adequate representative.

Defendant argues that Plaintiffs' counsel is inadequate because it misrepresented key facts in the complaints, primarily allegations concerning Jones's reliance. Opp'n to Hunt's Mot. at 15–16. Defendant's best example is that the SAC alleged that Plaintiff relied on a label about lycopene, but Jones stated in his deposition that he had never heard of lycopene before speaking with counsel, and that he did not see any statement about lycopene on a Hunt's label until after filing suit. *See* Hawk Decl. II Ex. D (Jones Depo) at 64–66.[14] Although Defendant casts the lycopene allegation as a violation of Rule 11, Opp'n to Hunts Mot. at 16, an overreaching complaint is hardly sufficient to find inadequacy. Every indication is that Plaintiffs' counsel would prosecute the case vigorously. Moreover, there is no evidence of a conflict. The Court therefore finds that Plaintiffs have demonstrated adequacy.

**b. PAM**

***8** As to PAM, Defendant argues that neither Sturges nor her counsel are adequate, because of the typicality arguments discussed above, and because they disregard the Court's deadlines, made misrepresentations in the complaints, and retained a conflicted expert witness in another case. Opp'n to PAM Mot. at 12–15. None of these arguments are persuasive. The Court has already addressed Plaintiffs' having moved for class certification on just their PAM claims; although the Court did not grant severance, Plaintiffs' actions do not make them inadequate. In addition, as with Hunt's, the complaints overreached, but do not make counsel inadequate. Finally, this Court will not insert itself into Judge Koh's *Kane v. Chobani* case. Plaintiffs' counsel is adequate.

**c. Swiss Miss**

As to Swiss Miss, Defendant argues that "[f]or many of the same reasons she fails the typicality requirement, Sturges is not an adequate representative." Opp'n to SM Mot. at 12–13 (citing *Kandel v. Brother Int'l Corp.,* 264 F.R.D. 630, 634 (C.D.Cal.2010)). Defendant further argues that Sturges is inadequate because her counsel has misrepresented key facts in the complaints, such as the allegations that Sturges relied on statements on the website. *Id.* at 13 (citing AC ¶¶ 231–32, SAC ¶¶ 235–36). Sturges's deposition revealed that she never visited the websites. Hawk Decl. I Ex. A (Sturges Depo) at 57, 79, 88. As with Hunt's and PAM, the complaints overreached, but do not render counsel inadequate. Nonetheless, because of her testimony about not being misled, Sturges is not an adequate class representative.

**5. Ascertainability**

Although there is no explicit ascertainability requirement in Rule 23, courts in this district have routinely required plaintiffs to demonstrate ascertainability as part of Rule 23(a). *See, e.g., Astiana v. Ben & Jerry's Homemade, Inc.,* No. 10–4387, 2014 WL 60097, at *1 (N.D.Cal. Jan. 7, 2014) ("apart from the explicit requirements of Rule 23, the party seeking class certification must also demonstrate that an identifiable and ascertainable class exists."). A class is not ascertainable unless membership can be established by means of objective, verifiable criteria. *Xavier v. Philip Morris USA, Inc.,* 787 F.Supp.2d 1075, 1088–90 (N.D.Cal.2011). "Without an objective, reliable way to ascertain class membership, the class quickly would become unmanageable, and the preclusive effect of final judgment would be easy to evade." *Id.* at 1089. Nonetheless, " 'not all class members need to be ascertained prior to class certification.' " *Mauto v. Gen. Motors Corp.,* No. 07–892, 2008 WL 2775004, at *4 (E.D.Cal. July 15, 2008).

**a. Hunt's**

As to Hunt's, Defendant argues that the class is unascertainable because it is overbroad and because there is no objective and verifiable criteria for determining its members.

Defendant maintains that the proposed class includes individuals who either bought Hunt's products for reasons other than the labels, or who would not consider the labels misleading. Opp'n to Hunt's Mot. at 11. Judge Walker considered a similar argument in *Chavez,* and concluded that under the UCL and CLRA, a consumer class was

ascertainable without needing to inquire into prospective class members' states of mind. 268 F.R.D. at 376 (explaining that under the UCL, relief "is available without individualized proof of deception, reliance and injury" and under the CLRA, "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members."). Although the Hunt's products' labeling changed over time, Opp'n to Hunt's Mot. at 14, the class definition only includes products "bearing the label statement '100% Natural' or 'Free of artificial ingredients & preservatives,' " Hunt's Mot. at i, so individuals who purchased products without the challenged label statements are not at issue. *See* Notice of Supplemental Authority (dkt. 213) Ex. A (Order Denying Motion for Class Certification in *Algarin v. Maybelline,* No. 12–3000 (S.D.Cal. May 12, 2014) hereinafter "Algarin Order") at 11 ("Consumer action classes that have been found to be overbroad generally include members who were never exposed to the alleged misrepresentations at all."). The overbreadth question therefore comes down to whether the challenged label statements are material; that question is better addressed in the context of 23(b)(3) predominance.

***9** Defendant next argues that there is no way to know who is really a member of the class. Opp'n to Hunt's Mot. at 13–15. This is a subject upon which courts in this Circuit have diverged. *See Sethavanish v. ZonePerfect Nutrition Co.,* No. 12–2907, 2014 WL 580696, at *5 (N.D.Cal. Feb. 13, 2014) (recognizing split).

Some courts have concluded that the ascertainability requirement cannot be met in the case of low-cost consumer purchases that customers would have no reliable way of remembering. *See, e.g., id.* at *6 (in which Judge Conti found it administratively unfeasible to determine who purchased ZonePerfect bars during the class period, or how many they purchased); *In re POM Wonderful LLC,* No. 10–2199, 2014 WL 1225184, at *6 (C.D.Cal. Mar. 25, 2014) (unascertainable because "[f]ew, if any, consumers are likely to have retained receipts during the class period" and "there is no way to reliably determine who purchased Defendant's [juice] products or when they did so."); *Red v. Kraft Foods, Inc.* No. 10–1028, 2012 WL 8019257, at *5 (C.D.Cal. Apr. 12, 2012) (finding unascertainable a proposed class of purchasers of various cracker and cookie products marketed as healthy despite including partially hydrogenated vegetable oil and other unhealthy ingredients); *Hodes v. Van's Int'l Foods,* No. 09–1530, 2009 WL 2424214, at *4 (C.D.Cal. July 23, 2009) (court had concerns about "how Plaintiffs will identify each class member and prove which brand of Van's frozen waffles each member purchased, in what quantity, and for what purpose" given low probability class members saved receipts).

Some courts have found such classes ascertainable, largely out of a concern that to find otherwise would render a vast number of consumer class actions dead on arrival. *See, e.g., Ries v. Ariz. Beverages USA LLC,* 287 F.R.D. 523, 535 (N.D.Cal.2012) (in which Judge Seeborg concluded that lack of receipts for iced tea purchases cannot be dispositive, or "there would be no such thing as a consumer class action."); *Astiana v. Kashi Co.,* 291 F.R.D. 493, 500 (S.D.Cal.2013) (relying on Ries in holding that "As long as the class definition is sufficiently definite to identify putative class members, '[t]he challenges entailed in the administration of this class are not so burdensome as to defeat certification.' "); *Thurston v. Bear Naked, Inc.,* No. 11–2890, 2013 WL 5664985, at *3 (S.D.Cal. July 30, 2013) (same judge also following *Ries); McCrary v. The Elations Co., LLC,* No. 13–242, 2014 WL 1779243, at *8 (C.D.Cal. Jan. 13, 2014) ("In this Circuit, it is enough that the class definition describes a 'set of common characteristics sufficient to allow' a prospective plaintiff 'to identify himself or herself as having a right to recover based on the description.' ").

Plaintiffs argue that the class here can be ascertained by reference to objective criteria, and that "the objective criteria here is whether a consumer purchased one of the products at issue during the class period." Reply to Hunt's Mot. (dkt. 210) at 5. Plaintiffs propose having putative class members identify the Hunt's brand products they purchased "by photographic verification"[15] and "through notice and by the requirement of sworn testimony that each class member purchased a Hunt's canned tomato product with the subject label claims." *Id.* at 4. This is problematic.

***10** Even assuming that all proposed class members would be honest, it is hard to imagine that they would be able to remember which particular Hunt's products they purchased from 2008 to the present, and whether those products bore the challenged label statements. As Defendant points out, there were "literally dozens of varieties with different can sizes, ingredients, and labeling over time" and "some Hunt's cans included the challenged language, while others included no such language at all." Opp'n to Hunt's Mot. at 14, 15 n.10.[16] Plaintiffs argued at the motion hearing that there is evidence that the named plaintiffs remember their specific purchases, and no evidence that any class members would have difficulty remembering theirs. But Defendant noted that Plaintiffs' own materiality expert testified in this case that she had "no idea" whether the PAM she owned had a

"100 percent natural" claim on it. Hawk Decl. I Ex. D (Caswell Depo) at 104. The Court observed that it has bought PAM and did not recall what its label said.[17] Common sense tells us that while named plaintiffs might make a point of remembering in great detail their history with the products about which they have filed suit, *but see* Hawk Decl. II Ex. D (Jones Depo) at 56 (Q: "Have you purchased Hunt's tomato paste since April 2008?" A: "Maybe. I don't know."), regular class members might not.

Thus in *Xavier,* Judge Alsup concluded that a proposed class of individuals with a twenty-or-more-pack-a-year smoking history was unascertainable because "[t]here is no good way to identify such individuals" and "we cannot expect smokers to recall the cumulative total of Marlboro packs they have smoked." 787 F.Supp.2d at 1089.[18] Although *Xavier* is somewhat distinguishable on its facts (the class definition here does not require that class members have bought a particular number of Hunt's products), its rejection of class member affidavits due to a "subjective memory problem" applies with equal force here, as the class definition carves out some Hunt's products that did not contain the challenged labels.[19] *See id.* at 1090. *Xavier's* concern that the defendant "would be forced to accept [class members'] estimates without the benefit of cross-examination" is also applicable. *Id.* The court in Red explained that "cases where self-identification alone has been deemed sufficient to render a class ascertainable generally involve situations where consumers are likely to have retained receipts ... where the relevant purchase was a memorable bigticket item ... or where the defendant would have access to a master list of either consumers or retailers who dealt with the items at issue." 2012 WL 8019257, at *5 (collecting cases). This case fits none of those categories. Although this Court might be persuaded that a class of "all people who bought Twinkies," for example, during a certain period, could be ascertained—one would at least have more confidence in class members' ability to accurately self-identify—the variation in the Hunt's products and labels makes self-identification here unfeasible.[20]

***11** Accordingly, the Court follows *Xavier* rather than *Ries* in this case. *See Sethavanish,* 2014 WL 580696, at *5 ("While [the *Xavier]* line of cases may restrict the types of consumer classes that can be certified, they do not bar certification in consumer class actions altogether."). The class is unascertainable.[21]

In the end this question is not dispositive, because a "lack of ascertainability alone will generally not scuttle class certification." *Red,* 2012 WL 8019257, at *6. This Order therefore goes on to analyze the other Rule 23 factors—noting that, of course, "these administrative difficulties implicate not only the threshold ascertainability question, but also manageability and superiority concerns under Rule 23(b)(3)." *See In re POM Wonderful LLC,* 2014 WL 1225184, at *6 n.8.

**b. PAM**

As to PAM, there are also significant ascertainability problems. Defendant makes the same arguments that it did as to Hunt's—that the class is overbroad and that there is no objective, verifiable criteria for determining membership. *See* Opp'n to PAM Mot. at 7–11.

Again, the overbreadth determination turns on materiality: if the class constitutes people who were exposed to a material misrepresentation, then it is not overbroad. *See Chavez,* 268 F.R.D. at *376. This Order discusses materiality in its discussion of 23(b)(3) predominance.

Again, there is no good way to determine who bought the relevant products. Sturges was unable to produce any receipts of PAM purchases. *See* Hawk Decl. I ¶ 2. It is unlikely that any other customers would retain such receipts.[22] And Defendant does not know who the ultimate purchasers of its products are. Richardson Decl. ¶ 5. Moreover, that there are seven varieties of PAM, *id.* ¶ 6, some which bore the "100% Natural" label and some of which did not, *id.* ¶ 8, and that two of the products bearing the "100% Natural" label stopped bearing that label in 2010, *id.* ¶ 13, makes it all the less likely that a consumer would accurately remember whether he had been exposed to the label. Indeed, as Defendant notes, because there were periods of time in which the same variety of PAM was on store shelves with the "100% Natural" label and without that label, it will be hard for customers to accurately self-identify even if they know, for example, that they bought a can of original PAM in 2010. *See* Opp'n to PAM Mot. at 8 (citing Richardson Decl. ¶ 17). That some PAM products during the class period had a "Made with 100% Natural Vegetable [or Canola] [or Olive] Oil" label—a label not challenged by Plaintiffs—instead of a "100% Natural" label, *see* Richardson Decl. ¶¶ 8, 13, will cause further class member confusion. Plaintiffs cite *Johnson v. General Mills, Inc.,* 276 F.R.D. 519, 521 (C.D.Cal.2011), for the proposition that a UCL class should be certified when all class members were "misled by a common advertising campaign that had little to no variation." *See* Reply to PAM Mot. at 2. Here, however, there was variation. It is

no answer that "[i]f certain varieties of PAM never bore a '100% natural' claim ... then those products are not at issue." *See* Reply to PAM Mot. at 2. The variety of products and of labels, combined with the lack of receipts and the low cost of the purchases, means that consumers are unlikely to accurately self-identify. Plaintiffs have offered no verifiable means of identifying class members. And so the Court finds that the class is unascertainable.

**c. Swiss Miss**

***12** As to Swiss Miss, the parties make the same arguments and the Court reaches the same conclusion. *See* Opp'n to SM Mot. at 7–10; Reply to SM Mot. (dkt. 211) at 1–3. The class is not necessarily overbroad, but it is not verifiable. While Plaintiffs are correct in a sense that "[w]hether a putative class member bought a particular Swiss Miss cocoa product with the antioxidant label claims is an objective inquiry that can be answered by asking consumers a straightforward question to determine whether they are class members," Reply to SM Mot. at 3, there is no way to know that the answers consumers give will be accurate. Given the variety of products and sizes, and the different timing for the label changes (such that some variants of Swiss Miss products had the challenged label statements for some points in the class period and not others, and during certain periods of time, versions of a given product with and without the challenged statements were for sale at the same time, *see* Kensicki Decl. ¶¶ 10–12), that a consumer simply recalls buying a Swiss Miss product in 2010, or even buying a Rich Chocolate 10 pack in 2010, does not establish that the consumer was exposed to the challenged statement.[23] Accordingly, the Court finds the class unascertainable.

**C. Rule 23(b)(2)**

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." " 'Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive.' " *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 986 (9th Cir.2011).

**1. Hunt's**

As to Hunt's, Plaintiffs seek "an injunction to stop Defendant from continuing to misbrand and sell its products in the same way it has done so during the class period." Hunt's Mot. at 16. Defendant opposes certification of a Rule 23(b)(2) class, arguing that (1) Plaintiffs failed to make a proper 23(a) showing, (2) Plaintiff seeks monetary relief, and (3) Jones lacks standing because he no longer buys Hunt's and does not intend to do so in the future. Opp'n to Hunt's Mot. at 25. This Order has already addressed the first argument.

Defendant's second argument, about monetary relief, is not an insurmountable hurdle. Plaintiffs assert that they are "not seeking certification of a(b)(2) class for [their] restitution claims under the UCL, FAL, and CLRA or for their damages claim under the CLRA." Reply to Hunt's Mot. at 15. And they cite *Dukes* for the proposition that damages incidental to an injunction are still available. *Id.* This is not a controversial position, and nothing would prevent the Court from following *Ries,* which granted class certification "for the purposes of declaratory and injunctive relief and denied [it] to the extent plaintiffs seek monetary damages, including restitution, refund, reimbursement and disgorgement." 287 F.R.D. 523, 542; *see also Lanovaz v. Twinings N. Am., Inc.,* No. 12–2646, 2014 WL 1652338, at *5 (N.D.Cal. Apr. 24, 2014) (same).

Defendant's third argument, about standing, is more persuasive. Courts have rejected the argument that a plaintiff cannot establish standing if he has learned that a label is misleading and therefore will not be fooled by it again. *See Ries,* 287 F.R.D. at 533 ("were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result."). Nonetheless, courts do require plaintiffs to express an intent to purchase the products in the future. *See, e.g., Rahman v. Mott's LLP,* No. 13–3482, 2014 WL 325241, at *10 (N.D.Cal. Jan. 29, 2014) ("to establish standing [for injunctive relief], plaintiff must allege that he intends to purchase the products at issue in the future")[24]; *Jou v. Kimberly–Clark Inc.,* No. 13–3075, 2013 WL 6491158, at *4 (N.D.Cal. Dec. 10, 2013) ("[b]ecause Plaintiffs fail to identify any allegation in their Complaint that suggests that they maintain an interest in purchasing the diapers or wipes, or both, in the future, Plaintiffs have not sufficiently alleged standing to pursue injunctive relief."); *Moheb v. Nutramax Labs., Inc.,* No. 12–3633, 2012 WL 6951904, at *6 (C.D.Cal. Sept. 4, 2012) ("Plaintiff and other members of the Class no longer buy Cosamin and, thus, will obtain no benefit from an injunction concerning

Defendant's advertising because they cannot demonstrate a probability of future injury."). This is somewhat problematic, policywise: if a plaintiff bought a product that claimed to be "nutritious" but actually contained arsenic, would he have to claim that he intends to buy it again? On the other hand, citric acid is not arsenic, and there is no way around the principle that a plaintiff must establish a " 'real and immediate threat of repeated injury' " to establish standing for injunctive relief. *See Jou,* 2012 WL 6491158, at *4 (quoting *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 985 (9th Cir.2007)).

***13** Here, Jones testified that he "stopped buying" Hunt's products once he found out that they contained the challenged ingredients, and he did not attest to having any intention of buying Hunt's products in the future. *See* Hawk Decl. II Ex. D (Jones Depo) at 138. While Jones testified that he makes an effort to seek out natural foods in his diet, *id.* at 136, he also testified that he might actually prefer products not labeled "natural" depending on price, content and flavor. *Id.* at 75. He also, after filing the lawsuit, purchased other brands of canned tomatoes that contained citric acid and calcium chloride. *See, e.g., id.* at 114. Accordingly, Jones could have testified, if true, that he bought the Hunt's products in reliance on the label because he seeks out natural products, but that he might purchase Hunt's products in the future if they were properly labeled. He did not so testify. And Plaintiffs failed to respond to this argument in their reply brief, arguing only that the "class members are no longer being misled" argument (which Defendant does not make) "is unconscionable and contrary to the better-reasoned law on this issue." Reply to Hunt's Mot. at 15.

Plaintiffs argued for the first time at the motion hearing that a named plaintiff's intent to purchase in the future is irrelevant, because what Plaintiffs are really seeking is akin to a public injunction under the UCL. But Judge Chhabria recently explained why this argument fails:

> It may very well be that the legislative intent behind California's consumer protection statutes would be best served by enjoining deceptive labeling.... But the power of federal courts is limited, and that power does not expand to accommodate the policy objectives underlying state law. *See Hollingsworth v. Perry,* 133 S.Ct. 2652, 2664 (2013) (explaining that California's policy-related interests in seeing ballot measures vigorously defended in court do not override federal standing limitations).

*Garrison v. Whole Foods Mkt. Grp., Inc.,* No. 13–5222, 2014 WL 2451290, at *5 (N.D. Cal. June 2, 2014).

Accordingly, the Court finds that Plaintiffs lack standing under Rule 23(b)(2).

**2. PAM**

As to PAM, "Plaintiff seeks an injunction to stop Defendant from continuing to sell its unlawful products." PAM Mot. at 14. Defendant opposes certification of a Rule 23(b)(2) class, arguing that (1) Plaintiffs failed to make a proper 23(a) showing, (2) Plaintiff seeks monetary relief, and (3) Sturges lacks standing because in 2010, "long before this action was filed, ConAgra ceased using a '100% natural' claim on any PAM products containing hydrocarbon propellants," and because Sturges no longer buys PAM products. Opp'n to PAM Mot. at 25. This Order has already addressed the first argument, and the second is not an insurmountable hurdle, as discussed above regarding Hunt's.

Defendant's third argument, about standing, is again persuasive. Plaintiffs point to no evidence that Sturges intends to buy PAM products again. She testified that she still has two cans of PAM and that she has not used them at all since the litigation was filed. Hawk Decl. I (Sturges Depo) Ex. A at 144. Without any evidence that Sturges plans to buy PAM products in the future, she does not have standing to bring an injunctive class. Jou, 2012 WL 6491158, at *4. Again, Plaintiffs failed to respond to this argument in their reply brief, *see* Reply to PAM Mot. at 12 (arguing about monetary relief).[25] The Court finds that Plaintiffs lack standing under Rule 23(b)(2).

**3. Swiss Miss**

***14** As to Swiss Miss, "Plaintiff seeks an injunction to stop Defendant from continuing to misbrand and sell its products in the same way it has done during the class period." SM Mot. at 14. Defendant opposes certification of a Rule 23(b)(2) class, arguing that (1) Plaintiffs fail to make a proper 23(a) showing, (2) Plaintiff seeks monetary relief, and (3) Sturges lacks standing to seek injunctive relief because she no longer buys Swiss Miss and has not alleged any intent to do so in the future. Opp'n to SM Mot. at 24 (citing Hawk Decl. II Ex. A at 144) (Sturges has not used any Swiss Miss products since litigation was filed). The 23(a) argument is persuasive, as discussed above. And Plaintiffs again fail to respond to Defendant's future injury argument—instead taking on the straw horse

of Plaintiff not getting fooled again, *see* Reply to SM Mot. at 15. This is a fatal flaw. Accordingly, the Court finds that Plaintiffs lack standing under Rule 23(b)(2).

**D. Rule 23(b)(3)**

Rule 23(b)(3) provides that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."

**1. Predominance**

**a. Individual Determinations**

Rule 23(b)(3)'s predominance requirement is more stringent than Rule 23(a)(2)'s commonality requirement, and "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang,* 737 F.3d at 545 (quoting *Hanlon,* 150 F.3d at 1022).

**i. Hunt's**

As to Hunt's, Defendant argues that individual questions of reliance predominate. Opp'n to Hunt's Mot. at 16–20. Plaintiffs argue that "[t]he predominant issue is whether [the challenged Hunt's] labels are misbranded as alleged under California law," and "there are no individual reliance components (individual issues) for Plaintiff's UCL, FAL and CLRA claims." Hunt's Mot. at 17.

Plaintiffs argue that, under the UCL and the FAL, they need not establish the class's reliance at all. Hunt's Mot. at 18. *In re Tobacco II Cases,* upon which Plaintiffs rely, held that, for the purposes of *standing,* so long as the representative plaintiff can establish causation and injury under the UCL, the class members will also have standing. 46 Cal.4th 298, 315–16 (2009). That case "does not stand for the proposition that causation and injury should be inferred on a class-wide basis" in every case. *Campion v. Old Republic Home Prot. Co.,* 272 F.R.D. 517, 533 n.4 (S.D.Cal.2011). Nor did it "eliminate the need to satisfy the requirements for class certification, including the predominance requirement." *Id.*; *see also Hodes,* 2009 WL 2424214, at *4 (explaining that "[w]hile proof of individual reliance may not be necessary to assert claims under the FAL and UCL," citing *In re Tobacco II,* "[c]ourts in the Ninth Circuit and in California have regularly found that where such inquiries predominate over common questions ... courts may refuse to certify a class action."); *Cohen v. DIRECTV, Inc.,* 178 Cal.App. 4th 966, 981 (2009) (limiting *Tobacco II* holding to standing and finding it "irrelevant" as to commonality). Thus, in *Stearns,* 655 F.3d at 1020, which relied on *In re Tobacco* in reversing and remanding a district court's denial of class certification, the Ninth Circuit explained: "We do not, of course, suggest that predominance would be shown in every California UCL case. For example, it might well be that there was no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant." Here, there is a lack of cohesion among the class members, both because consumers were exposed to label statements that varied by can size, variety, and time period (and the challenged ingredients also differed), but more importantly because "even if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be." *See* Opp'n to Hunt's Mot. at 19. As discussed below, there is no fixed meaning for the word "natural."[2627]

***15** Under the CLRA, each class member must "have an actual injury caused by the unlawful practice," *see Stearns,* 655 F.3d at 1022, but a plaintiff may demonstrate that a defendant's alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation would have been *material* to reasonable persons, *see In re Steroid Hormone Prod. Cases,* 181 Cal.App. 4th 145, 156–57 (2010). Under California law, a misrepresentation is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* at 157 (internal quotation marks omitted). "If the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Stearns,* 655 F.3d at 1022–23 (citing *In re Vioxx Class Cases,*180 Cal.App. 4th 116, 129 (2009)).

Plaintiffs' materiality argument—that "[u]ndoubtedly, a reasonable consumer would attach significance to the

challenged label statements" and that defendant must believe that the statements are material or it would not have included them on its labels—is rather weak. *See* Hunt's Mot. at 11.[28] The only evidence Plaintiffs rely on in support of this contention is the Caswell Declaration. *Id.* Caswell, Plaintiffs' materiality expert, concluded that "In my experience with labeling statements and consumer choice, it is my opinion that the [challenged statements] would be material to a reasonable consumer." Caswell Decl. (dkt. 189–5) ¶ 27. She concluded that the "100% Natural" label would be material "because reasonable consumers would rely on this label to identify products that are natural and in comparison shopping between food products" and that the "Free of artificial ingredients & preservatives" label "is material because consumers would rely on this label to identify products that do not contain both (a) artificial ingredients and (b) preservatives in comparison shopping between food products." *Id.* ¶¶ 27–28. This is a bit of an *ipse dixit.*

Caswell did not explain *how* the challenged statements, together or alone, were a factor in any consumer's purchasing decisions. She did not survey any customers to assess whether the challenged statements were in fact material to their purchases, as opposed to, or in addition to, price, promotions, retail positioning, taste, texture, or brand recognition. *See* Hanssens Decl. (dkt. 204) ¶¶ 12–26. Caswell acknowledged in her deposition that some customers have never noted the "natural claim," have never looked at the ingredients list, would buy a product regardless of whether the product says "natural," and do not care about labeling statements. Hawk Decl. II Ex. B (Caswell Depo) at 191–93. She also testified that she personally "do[es] not pay much attention to 'natural' claims," because "[t]hey're not important to [her] in [her] purchase decisions." *Id.* at 116–17.[29]

Caswell's rather startling admission might have something to do with the fact that there is no single, controlling definition of the word "natural." *See Pelayo v. Nestle USA, Inc.,* No. 13–5213, 2013 WL 5764644, at *4–5 (C.D.Cal.2013) (discussing lack of a common understanding of the term "all natural" that is shared by reasonable consumers). It is undisputed that the FDA has not defined the word "natural." *See Lockwood v. ConAgra Foods, Inc.,* 597 F.Supp.2d 1028, 1034 (N.D.Cal.2009) ("Although the FDA acknowledges that consumers are being misled by the use of the term 'natural,' it has declined to adopt any regulations governing this term."); "Defining Natural Foods," 26 Regent U.L.Rev. at 330 (explaining that in 1991, the FDA adopted an "informal policy" that "natural means merely that 'nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there,' " but that such "policy carries only the weight of an advisory opinion, and it does not establish a legal requirement."). Moreover, it is not clear that the challenged ingredients here are not "natural." *See* Hawk Decl. II Ex. H (Michelizzi Decl.) ¶¶ 2–3 (ConAgra purchases calcium chloride from a natural source; ConAgra's citric acid is purchased from suppliers who manufacture it using "a natural process of fermentation, using naturally defined carbohydrates, and [it] is confirmed to be natural by these suppliers."); RJN (dkt. 206) Ex. B (FDA letter of May 8, 2012 stating that, provided citric acid was from a natural source, "we would not take issue with its use on a product labeled as 'natural.' ").

***16** While the Court has no trouble believing that the "100% natural" claim is material to some customers, Caswell's testimony does not demonstrate that it is necessarily "material to reasonable consumers." *See In re Steroid Hormone Prod. Cases,* 181 Cal.App. 4th at 156–57. This Court held in *Badella v. Deniro Mktg. LLC,* No., 10–3908, 2011 WL 5358400, at *9 (N.D.Cal. Nov. 4, 2011), that "[m]ateriality is an objective standard, but still, Plaintiffs will need to point to some type of common proof, particularly given Defendant's arguments that people join Amateur Match for many different reasons and for many different purposes." Here, although only two challenged label statements are at issue, there are numerous reasons a customer might buy Hunt's tomatoes, and there is a lack of evidence demonstrating the impact of the challenged label statements. Accordingly, Plaintiffs lack common proof of materiality. *See also Astiana,* 291 F.R.D. at 508 (finding inadequate showing of materiality where "Plaintiffs fail to sufficiently show that 'All Natural' has any kind of uniform definition among class members, that a sufficient portion of class members would have relied to their detriment on the representation, or that Defendant's representation of 'All Natural' in light of the presence of the challenged ingredients would be considered to be a material falsehood by class members.")[30]; Algarin Order at 16 (holding, as to commonality under Rule 23(a)(2), that "given the persuasive evidence presented on consumer expectations, the varying factors that influence purchasing decision[s], and consumer satisfaction, the Court finds that Plaintiffs have also failed to demonstrate that the elements of materiality and reliance are subject to common proof."); *but see Werdebaugh v. Blue Diamond Growers,* No. 12–2724, 2014 WL 2191901, at *12–14, 18 (N.D.Cal. May 23, 2014) (finding that materiality is a question common to the class, noting that representations did not differ for each proposed class member, concluding that predominance was met for the same reason commonality was met).[31]

Even assuming that Plaintiffs had met their burden as to reliance, however, there are other individual questions that threaten to predominate. In *Hodes,* 2009 WL 2424214, at *4, the court explained that there were "individualized purchasing inquiries" that would need to be made. Explaining that courts in this Circuit have refused to certify classes where such inquiries predominated, the court declared itself "not convinced that the common questions of Van's liability would predominate over the individual questions of *who* purchased Van's frozen waffles during the relevant class period, *which kind* of frozen waffles they purchased, *how many* they purchased, and whether the kinds they purchased contained false nutritional information." *Id.* Whether this is a predominance question, an ascertainability question, or a manageability question, it is also the case here that "ConAgra has no way to determine, through IRI data or otherwise, who the purchasers of its canned tomato products are, i.e., the identity of class members." Opp'n to Hunt's Mot. at 6. And it is true that individualized purchasing inquiries will be required to determine how many and which kind of Hunt's products each class member bought.

Accordingly, the Court finds that individual inquiries predominate over common ones as to Hunt's.

### ii. PAM

As to PAM, Plaintiffs face the same problems. Plaintiffs point to Defendant's common conduct of (1) misbranding PAM products as "100% Natural" when they were not, and of (2) identifying a group of ingredients as "propellant," and argue that such common conduct predominates over any individual questions. PAM Mot. at 16.[32]

***17** Plaintiffs' argument under the UCL is that "class-wide reliance is not required." PAM Mot. at 18. But the Ninth Circuit recognized in *Stearns,* 655 F.3d at 1020, that predominance would not "be shown in every California UCL case," such as where there is "no cohesion among the members." As with Hunt's, there is a lack of cohesion among the class members here, both because consumers were exposed to label statements that changed over time and from product to product, and, more importantly, because "even if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be." *See* Opp'n to PAM Mot. at 19. As already discussed, there is no fixed meaning for the word "natural." And, as Defendant notes, Plaintiffs' objection to the term here relates to the propellant; it is not clear that Plaintiff or anyone else would understand the "natural" clam to extend to such substances. *See* Hawk Decl. I Ex. A (Sturges Depo) at 109–110 (Q: "Can a food delivered with a propellant ... be natural?" A: "I don't really know."), 129–30 (food she was intending to consume was cooking oil, not propellant, and she does not understand the cooking oil in PAM to be made up in part of propellant); Hawk Decl. I Ex. D (Caswell Depo) at 151 (Q: "Do consumers understand a 'natural' claim on PAM to pertain to the propellant?" A: "Again, I have not studied that.... As a result, I do not know.").

Plaintiffs' argument under the CLRA is that "class-wide reliance is presumed when the misrepresentations or omissions would have been material to 'reasonable persons.' " PAM Mot. at 19. But Plaintiffs again rely entirely on the Caswell Declaration to establish materiality, *id.,* and that Declaration is again lacking, *see* Caswell Decl. (dkt. 128–1) ¶ 26 ("The labeling of the product as '100% Natural[']' is material because reasonable consumers would rely on this label to identify products that are natural and in comparison shopping between food products.").[33] As with Hunt's, Caswell did not explain *how* the challenged statement was a factor in any consumer's purchasing decisions. She did not survey any customers. She testified that some percentage of PAM consumers never noted the natural claim on the label, never looked at the ingredient list, bought PAM because they grew up using it and would buy PAM regardless of the natural label, and do not care what the propellant is made from. Hawk Decl. I Ex. D (Caswell Depo) at 191–93. She further testified that the "most important attributes of PAM" will vary "by consumer." *Id.* at 211. And of course she testified that she does "not pay much attention to 'natural' claims" in making her own purchasing decisions. *Id.* at 116. As with Hunt's, Plaintiffs have failed to demonstrate materiality. *See Astiana,* 291 F.R.D. at 508.

Also, as with Hunt's, even assuming that Plaintiffs had met their burden as to reliance, other individual questions threaten to predominate. *See Hodes,* 2009 WL 2424214, at *4. Here, too, individualized purchasing inquiries will be required to determine how many PAM products each class member bought, which kind of PAM products they bought, when they bought them, and what label they bore.

Accordingly, the Court finds that individual inquiries predominate over common ones as to PAM.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

**iii. Swiss Miss**

As to Swiss Miss, Plaintiffs again fall short. Plaintiffs argue that "Defendant's label statements on a given product are the same, everywhere in California. So, all consumers would have seen the same labeling claims as Plaintiff. Further, there are no individual reliance components (individual issues) for Plaintiff's UCL, FAL and CLRA claims." SM Mot. at 15–16.

Plaintiffs' argument under the UCL is again that "class-wide reliance is not required." SM Mot. at 16. But predominance cannot be shown where there is "no cohesion among the members." *See* Stearns, 655 F.3d at 1020. As with Hunt's and PAM, there is a lack of cohesion among the class members here. Consumers were exposed to label statements that changed over time, at different times, from product to product. Although the class is limited to Swiss Miss products that included antioxidant statements, some class members will never have seen the challenged statements (because the statements were on the top or back of the products, for example), and there is no way to determine whether a class member ever bought a product with a challenged statement on it.

***18** Plaintiffs seek to avoid any need for proof by arguing that the labels are illegal: "If Defendant's labels violate the unlawful prong of the UCL, the inquiry ends there and whether unnamed class members relied on the relevant statement is not an issue before the Court." SM Mot. at 16 (citing *In re Steroid Hormone Prod. Cases,* 181 Cal.App. 4th at 155). But *In re Steroid Hormone Prod. Cases* involved a product (a bodybuilding drug) that was illegal because of what it was (a Schedule III substance unlawful to sell or possess without a prescription), not how it was labeled. 181 Cal.App. 4th at 155. Swiss Miss hot cocoa—even if it was mislabeled—is not analogous to a Schedule III substance. *See Gitson v. Trader Joe's* Co., No. 13–1333, 2013 WL 5513711, at *6 (N.D.Cal. Oct. 4, 2013) (distinguishing *In re Steroid Hormone Prod. Cases,* holding in case about yogurt, soy milk, and other grocery products that court would "not presume that a reasonable person would not have purchased the products at issue had the person known of the alleged mislabeling."). Even if the products were analogous, Sturges has disavowed the "unlawful" theory. *See* Hawk Decl. II Ex. A (Sturges Depo) at 88.

Plaintiffs' argument under the CLRA is that "class-wide reliance is presumed when the misrepresentations or omissions would have been material to 'reasonable persons.' " SM Mot. at 16. But Plaintiffs again rely entirely on the Caswell Declaration to establish materiality, *see* Reply to SM Mot. at 7,[34] and that Declaration is again lacking, *see* Caswell Decl. (dkt. 190–4) ¶ 27 ("The labeling of the product as containing "antioxidants" is material because reasonable consumers would rely on this label to identify products that have particular nutrition attributes and in comparison shopping between food products."). As with Hunt's and PAM, Caswell did not explain how the (apparently factually accurate) challenged statements were a factor in any consumer's purchasing decisions. She did not survey any customers. In addition, Caswell testified that individual consumers' perceptions of what affects their purchasing decisions would be important in determining the materiality of label statements, Hawk Decl. II Ex. B (Caswell Depo) at 66–68, but that she has no knowledge of how customers viewed the challenged statement, *id.* at 58–60. Caswell acknowledged that some consumers do not read food labels at all beyond the brand and type of food, and that others do not care about labeling statements and would purchase products regardless of their labels. *Id.* at 191–93, 211. She also asserted that the word "delicious" would be material, and that *"all the information that appears on labels* is of use to consumers and, yeah it's material or could be material." *Id.* at 125 (emphasis added); *compare* Hanssens Decl. (dkt. 200) ¶¶ 29–33 ("Given the heterogeneity in the purchase decision process, it is speculative to assume that the [challenged label statements] on Swiss Miss hot cocoa products were a factor in the purchase decision for all or many of the putative class members, absent evidence directly supporting that assumption.")

Also, as with Hunt's and PAM, even assuming that Plaintiffs had met their burden as to reliance, other individual questions threaten to predominate. *See Hodes,* 2009 WL 2424214, at *4. Here, too, individualized purchasing inquiries will be required.

***19** Accordingly, the Court finds that individual inquiries predominate over common ones as to Swiss Miss.

**b. Damages**

In *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1433–34 (2013), the Supreme Court held that in order to satisfy the predominance inquiry, plaintiff must also present a model

that (1) identifies damages that stem from the defendant's alleged wrongdoing and (2) is "susceptible of measurement across the entire class." 133 S.Ct. at 1433–34. Finding that plaintiffs' damages model did not isolate damages resulting from the accepted theory of antitrust impact, the Court reversed the district court's certification of the class. *Id.* at 1435. "At class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time." *Chavez,* 268 F.R.D. at 379 (internal quotation marks omitted). Individualized damage calculations alone cannot defeat class certification. *See Leyva v. Medline Indus., Inc.,* 716 F.3d 510, 513 (9th Cir.2013) (citing *Yokoyama v. Midland Nat'l Life Ins. Co.,* 594 F.3d 1087, 1094 (9th Cir.2010)).

**i. Hunt's**

As to Hunt's, Plaintiffs assert that their expert, Dr. Oral Capps, Ph.D., has set forth "sound methods by which the Court may award restitution or a jury may award damages." Hunt's Mot. at 19 (citing Capps Decl. (dkt. 189–7)). Plaintiffs seek restitution under the UCL and FAL, and damages under the CLRA. *Id.*

Capps asserts that "Restitution may be partial, such as in the form of the wholesale price of the products; full, such as in the form of the retail price of the products; or restitution [sic], such as in the form of differences in prices between Defendant's products and similar products not marketed with the unlawful and misleading label statements." Capps Decl. at 4. Return of the full retail or wholesale prices is not a proper measure of restitution,[35] as it fails to take into account the value class members received by purchasing the products.[36] Judge Seeborg recently reiterated that "[t]he difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution." *Ries v. Ariz. Beverages USA LLC,* No. 10–1139, 2013 WL 1287416, at *7 (N.D.Cal. Mar. 28, 2013) (citing *Vioxx,* 180 Cal.App. 4th at 131); *see also Lanovaz,* 2014 WL 1652338, at *6 ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received."); In re *POM Wonderful,* 2014 WL 1225184, at *3 (also citing *Vioxx,* 180 Cal.App. 4th at 131). Plaintiffs' assertion that "restitution is not limited to the difference between what the plaintiff received versus what he or she paid," Reply to Hunt's Mot. at 14, is therefore incorrect in this context.[37]

***20** The other means of calculating restitution that Capps offers (he later refers to this as the "benefit of the bargain approach") is to take a comparable product and compare the price between it and the allegedly mislabeled Hunt's product. *See* Capps Decl. at 5–6. On February 4, 2014, at the Safeway Kitchens in San Jose, California, Hunt's canned tomato sauce labeled "100% Natural" and "Free of artificial ingredients & preservatives" in a 15 ounce can, containing citric acid as an ingredient, sold for $1.49, or 9.9 cents per ounce. *Id.* at 6. Safeway Kitchens canned tomato sauce labeled "100% Natural" but not containing citric acid and not labeled "Free of artificial ingredients & preservatives" in a 15 ounce can sold for $0.99, or 6.6 cents per ounce. *Id.* Capps concludes that "[t]he price difference per ounce subsequently amounts to 3.33 cents per ounce." *Id.* Capps promises that "additional comparable products are likely to be identified," and asserts that "[t]he difference in the price of the ConAgra products from comparable products without the misbranding statement ... constitutes the damages per unit sold." *Id.* at 6–7.

This approach is deeply flawed. It is inadequate to identify a single comparator, given the seven product lines and multiple varieties within each Hunt's product line. *See* Nagle Decl. ¶ 6 (listing all Hunt's products).[38] Even the single comparator that Capps selects is inadequate—first, because it has a 100% natural statement, so it cannot demonstrate any price difference associated with that statement, *see* Ugone Decl. ¶¶ 33–34, and second, because Safeway is a generic brand, while "Hunt's is a market leader that has spent decades building a brand synonymous with canned tomatoes," *id.* ¶¶ 37–38. One cannot assume that the entire price difference between the Hunt's and Safeway cans is attributable to the alleged misstatements. *See In re POM Wonderful,* 2014 WL 1225184, at *5 ("Rather than answer the critical question of why that price difference existed, or to what extent it was a result of Pom's actions, Nolte instead assumed that 100% of that price difference was attributable to Pom's alleged misrepresentations.... This damages 'model' does not comport with *Comcast's* requirement that class-wide damages be tied to a legal theory.").

To calculate damages under the CLRA, Capps points to the difference in price between Hunt's products and comparator products, Capps Decl. at 6, discussed above, as well as regression analysis. But the regression analysis he proposes is vague and abstract:

> With the econometric or regression approach, the key finding is the difference in sales of the respective

> products before and after the claims made by ConAgra first appeared on the labels. To glean this difference in sales while controlling for other factors which may be related to sales, the appropriate methodological approach is the use of econometric analysis with dummy variables.... The subsequent calculations of damages rests on the estimated coefficients associated with these dummy variables, controlling for other factors that may also affect sales.

*Id.* at 8–9. Capps does not provide a clearly defined list of variables, he has not determined whether the data related to any or all of his proposed control variables exists, and he has not determined, or shown how he would determine, which competing and complementary products he would use. *See* Ugone Decl. ¶ 50. In *Kottaras v. Whole Foods Market, Inc.,* 281 F.R.D. 16, 25–27 (D.D.C.2012), where Capps had "not yet performed a single regression,[39] [and] could not even tell the Court the precise analyses he intended to undertake," the court found that his proposed methodology was "not sufficiently developed to meet Plaintiff's burden of showing that common questions predominate." The Court reaches the same conclusion here. Plaintiffs have not presented an adequate damages model as to Hunt's.[40]

**ii. PAM**

***21** As to PAM, Plaintiffs face the same problems.

Capps proposes to effect restitution under the UCL and FAL simply by "return of the purchase price" to class members. Capps Decl. (dkt. 128–7) ¶ 6; Hawk Decl. I Ex. E (Capps Depo) at 90 (assuming class members "would be refunded 100 percent of the price he or she paid for the product."). That method does not account for the value class members received from the PAM products, and so it is incorrect. *See* Ries, No. 10–1139, 2013 WL 1287416, at *7 (citing *Vioxx,* 180 Cal.App. 4th at 131). Capps acknowledges that PAM is not "economically worthless." Hawk Decl. I Ex. E (Capps Depo) at 91. And he admits that, absent the legal assertion that PAM products had no value to class members, his restitution analysis would have no correlation to any economic injury suffered. *Id.* at 101. He further concedes that his model would not work without "some sort of proof of purchase," "[o]therwise, some consumers would be inappropriately compensated." *Id.* at 93–94. But Capps does not know what individual class members paid, and neither does Sturges. *See* Hawk Decl. I Ex. A (Sturges Depo) at 73, 150, 152 (Sturges does not know what she paid for PAM purchases, does not know if she suffered financial injury, does not know if they were worth what she paid for them).

Capps again proposes calculating damages under the CLRA via a benefit-of-the-bargain analysis, *see* Capps Decl. ¶¶ 10–14, or a regression analysis, *see id.* ¶¶ 15–21. But he fails to identify a comparator product in order to calculate a percentage of overpayment. *See* Capps Decl. ¶ 14 ("With sufficient discovery, I can ascertain whether there are comparable products with which to conduct the benefit of the bargain analysis."). And he admitted in his deposition that he does not know whether such a comparator product exists. Hawk Decl. I Ex. E (Capps Depo) at 153–54 (Q: "do you intend to compare PAM to competitive cooking sprays with hydrocarbon propellants that do not have 100% natural on the label? Is that what you're intending to do?" A: "I suppose I'll have to...." Q: "Are there such competitive products on the market that use hydrocarbon propellants but don't have 100% natural on the label?" A: "I don't know that for sure."). He also asserts that "The difference in the price of the ConAgra cooking spray products from comparable cooking spray products constitutes the damages per unit sold," Capps Decl. ¶ 14, but does not explain why the entire price difference is attributable to the challenged statement.

Capps's regression analysis is as vague and untested as it is with Hunt's. *See* Ugone Decl. (dkt. 161) at 20–22. Plaintiffs' reply that "Dr. Ugone does not consider Dr. Capps' [s] complete deposition testimony in which he clearly describes the blueprint of the explanatory variables to be used in the regression analysis," without any citation to that testimony, *see* Reply to PAM Mot. at 11, is clearly inadequate. Moreover, Capps testified that the overpayment percentage he expects to calculate under either the benefit of the bargain or the regression approach must be multiplied by the specific purchase price a class member paid in order to convert it to an actual damages award. Hawk Decl. I Ex. E (Capps Depo) at 89–90 (describing how allocation would work, requiring "some proof of purchase"), 142 ("I don't know how a consumer would be compensated without proof"). Again, Plaintiffs point to no accurate way to determine what class members actually paid. *See* *Red,* 2012 WL 8019257, at * 11 ("While the amount of [a] premium might be established on a class-wide basis, Plaintiffs cannot get around the fact that individual class members, to recover, would need to show, at a minimum, proof of how many purchases they made of the offending products.")

***22** Plaintiffs have not presented an adequate damages model as to PAM.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

**iii. Swiss Miss**

As to Swiss Miss, Plaintiffs also fall short.

Capps proposes to effect restitution under the UCL and FAL "using average retail prices, average wholesale prices, or using a 'benefit of the bargain' approach." SM Mot. at 18. The Court has already concluded that return of the full purchase price is improper under *Ries,* No. 10–1139, 2013 WL 1287416, at *7 (citing *Vioxx,* 180 Cal.App. 4th at 131), because it does not account for the value class members received from the Swiss Miss products. The benefit of the bargain approach here is also problematic because Capps identified just one comparable product. On February 4, 2014, at a Safeway Kitchens in San Jose, California, a 10 ounce package of Swiss Miss hot cocoa mix containing an antioxidant claim sold for $3.39, or 33.9 cents per ounce. Capps Decl. (dkt. 190–3) ¶ 15. Capps also identified a Safeway Kitchens hot cocoa mix in a 10 ounce package without an antioxidant claim, which sold for $2.99 or 29.9 cents per ounce. *Id.* He concludes that the "price difference is tantamount to an overcharge of approximately 11.8 percent," *id.,* and that the entire overcharge is the damages per unit sold, *id.* ¶ 18. As with Hunt's, the generic comparator product is not appropriate. *See* Ugone Decl. ¶¶ 37–38 (Swiss Miss is a market leader that has spent decades building a brand synonymous with cocoa). As with Hunt's, the entire price difference between Swiss Miss and the generic comparator cannot be attributable to the label statement. *See In re POM Wonderful,* 2014 WL 1225184, at *5.

Capps again proposes calculating damages under the CLRA via a benefit-of-the-bargain analysis, *see* Capps Decl. ¶¶ 14–18, or a regression analysis, *see id.* ¶¶ 19–24. But his benefit-of-the-bargain analysis requires the use of a comparable product, and as already discussed, Capps did not identify an adequate comparator. Defendant challenges Capps's regression analysis on the same bases as it did as to the other product groups, *see* Ugone Decl. ¶ 7 (incomplete description, etc.), and Plaintiffs try to correct some of the deficiencies through a reply declaration, *see generally* Capps Reply Decl. (dkt. 209–3) ("I have demonstrated using data obtained from the Defendant that several damages models can be constructed in regard to the class defined in Plaintiffs' Motion for Class Certification."). Defendant objects to the reply declaration, arguing that it introduces new evidence, fails to meet evidentiary standards for proper expert testimony, and is not a proper reply. *See generally* Obj. to Reply Decl. Plaintiffs oppose those objections. *See* Opp'n to Obj. (dkt. 216). The Court permits the declaration but recognizes its limitations.[41] Even assuming Capps had sufficiently demonstrated that his proposed regression model was viable, his model requires purchase price information in order to allocate any award. *See* Hawk Decl. I Ex. E (Capps Depo) at 89–90 (describing how allocation would work, requiring "some proof of purchase"), 142 ("I don't know how a consumer would be compensated without proof"). And, as already discussed, it is highly unlikely that consumers will be able to provide such information. This is highly problematic. *See* Red, 2012 WL 8019257, at * 11.

***23** Perhaps in light of these problems, Plaintiffs argue for the first time in their reply brief that "[t]here are still other ways to prove class-wide damages." Reply to SM Mot. at 13. They argue that the Swiss Miss products are "legally worthless" because they are illegal to sell or possess, and therefore result in damages equal to the entire purchase price. *Id.* This Order has already concluded that the unlawful product theory fails. Even if it did not, Plaintiffs face the same obstacle in class members not knowing their purchase prices.

Plaintiffs also argued for the first time in their reply brief that the Court could award nominal damages under California Civil Code section 3360, or statutory damages under the CLRA. *Id.* at 14.[42] Neither of these would require a damages model or proof of individual consumers' purchase prices. However, neither are appropriate.

Section 3360 allows for nominal damages "[w]hen a breach of duty has caused no appreciable detriment to the party affected." Cal. Civ.Code § 3360. But Plaintiffs' CLRA claim has nothing to do with a breach of duty, *see* SAC ¶¶ 298–316, and Plaintiffs do not identify one in their reply brief, *see generally* Reply to SM Mot. Nor do Plaintiffs point to any CLRA case permitting nominal damages, let alone a CLRA class action. *See id.*; *cf. Stilson v. Reader's Digest Ass'n, Inc.,* 28 Cal.App.3d 270, 274 (1972) ("Although an award of but nominal damages to each of the millions of unnamed plaintiffs would impose a heavy penalty upon defendants, it would hardly serve the interest of any plaintiff.").

The CLRA addresses damages, but only to say that any consumer who suffers damage may bring an action to recover, among other things, "Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000)." Cal. Civ.Code § 1780(a)(1). That language sets the minimum for a total award of damages in a class action at $1,000; it does not

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

provide for an automatic award of $1,000 per individual class member. *Compare* 17 U.S.C. § 504(c) (providing that copyright owner may elect award of statutory damages for all infringements of $750 to $30,000 per infringement). Thus in *Wilens v. TD Waterhouse Grp., Inc.,* 120 Cal.App. 4th 746, 754 (2003), the California Court of Appeal explained, "This language does not create an automatic award of statutory damages upon proof of an unlawful act. Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof." *See also Delarosa v. Boiron, Inc.,* 275 F.R.D. 582, 593 (C.D.Cal.2011) (same).[43]

Accordingly, the Court finds that Plaintiffs have not presented an adequate damages model as to Swiss Miss.

**2. Superiority**

Finally, in addition to demonstrating the predominance of common issues, a plaintiff seeking to certify a class under Rule 23(b)(3) must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Pertinent to that determination is: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. *Id.* Assessing superiority "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *See Hanlon,* 150 F.3d at 1023.

**a. Hunt's**

***24** As to Hunt's, Defendant does not specifically address superiority. Nonetheless, its arguments about ascertainability also apply to manageability. *See In re POM Wonderful LLC,* 2014 WL 1225184, at *6 n.8. Plaintiffs have not proposed an adequate means of identifying each class member, which products each class member purchased, and how many products each class member purchased. *See Hodes,* 2009 WL 2424214, at *4 (expressing same concerns); *Sethavanish,* 2014 WL 580696, at *6 (same); *see also* Algarin Order at 23 ("Courts are reluctant to permit action[s] to proceed where there are formidable ... difficulties of distributing any ultimate recovery to the class members, because such actions are not likely to benefit anyone but the lawyers who bring them.") (internal quotation marks omitted). Given these deficiencies, it is not at all clear that a class action as to Hunt's would be manageable, or superior to individual actions.[44]

**b. PAM**

As to PAM, Plaintiff argues that "[g]iven the number and importance of the common questions described above, the adjudication of class claims would not be significantly more burdensome than if the matter were prosecuted individually." PAM Mot. at 22. Defendant responds, though, that PAM labels differed during the class period among products and over time, that consumers will not be able to readily determine whether they are class members, that there is no way to test their recollections, and that there is no way to establish what class members paid for their PAM purchases. Opp'n to PAM Mot. at 24–25. Despite the undeniably common questions—chiefly, can Defendant label PAM as "all natural" if it contains unnatural propellants—the concerns Defendant raises are substantial and render the case unmanageable. Class treatment is not superior as to PAM.

**c. Swiss Miss**

As to Swiss Miss, Defendant does not specifically address superiority. Nonetheless, its arguments about ascertainability also apply to manageability. *See In re POM Wonderful LLC,* 2014 WL 1225184, at *6 n.8. As with Hunt's and PAM, it is not at all clear that a class action as to Swiss Miss would be manageable, or superior to individual actions.

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES all three motions.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 2702726

Footnotes

1 *See* Nicole E. Negowetti, "Defining Natural Foods: The Search for a Natural Law," 26 Regent U.L.Rev. 329, 333 (2014) (recognizing that the Northern District of California is known as the "Food Court.").

2 Ozard has since voluntarily dismissed his claims. *See* Order Denying Motion for Fees (dkt. 182) at 1.

3 According to Defendant, the two organic PAM varieties use carbon dioxide as a propellant. *See* Opp'n to PAM Mot. (dkt. 149) at 4.

4 Plaintiffs do not challenge the "organic" designation.

5 Plaintiffs do not challenge the newer "made with" label.

6 This assertion is based on the Sherman Law's having incorporated the FDA's regulations into California law, and specifically on 21 C.F.R. § 101.54. *Id.* at 2.
Section *101.54(b)* provides that "The terms 'high,' 'rich in,' or 'excellent source of 'may be used on the label and in the labeling of foods ... provided that the food contains 20 percent of more of the RDI [Reference Daily Intake] or the DRV [Daily Reference Value] per reference amount customarily consumed." Such terms are permitted provided that "(i) The product contains a food that meets the definition of 'high' in paragraph (b)(1) ....; and (ii) The label or labeling clearly identifies the food that is the subject of the claim...."
Section 101.54(c) provides that "(1) The terms 'good source,' 'contains,' or 'provides' may be used on the label and in the labeling of foods ... provided that the food contains 10 to 19 percent of the RDI or the DRV per reference amount customarily consumed." Such terms are permitted provided that "(2)(i) The product contains a food that meets the definition of 'good source' in paragraph (c)(1) ....; and (ii) The label or labeling clearly identifies the food that is the subject of the claim...."
Section *101.54(g)* governs antioxidant claims, and provides that "A nutrient content claim that characterizes the level of antioxidant nutrients present in a food may be used on the label or in the labeling of that food when: (1) An RDI has been established for each of the nutrients; (2) The nutrients that are the subject of the claim have recognized antioxidant activity....; (3) The level of each nutrient that is the subject of the claim is sufficient to qualify for the § 101.54(b), (c), or (e) claim ....; and (4) The names of the nutrients that are the subject of the claim are included as part of the claim...."

7 Defense counsel rightly objected to some of these questions as leading. *See id.* at 134–36. Nonetheless, "Did you in any way rely on that label?" is permissible. *See id.* at 135.

8 Plaintiff's counsel did not walk back Jones's testimony that he never considered whether the labeling of a product complied with state or federal labeling laws. *See id.* at 63. The "illegal products" basis for standing is therefore unavailable here, and Jones could represent no such class.

9 Sturges testified that the only antioxidant statement that she relied on was "Natural Antioxidants Are Found In Cocoa." *Id.* at 98.

10 Importantly, Plaintiffs point to no evidence that this is false. Their argument is not that Swiss Miss products *do not contain antioxidants* but instead that Defendant did not comply with 21 C.F.R. § 101.54. *See* Reply to SM Mot. (dkt. 211) at 5 ("ConAgra's antioxidant claims ... are unlawful and render the product mislabeled because the label claim does not include the specific name of the nutrient that is an antioxidant; there is no established RDI for that unnamed antioxidant; and the antioxidant nutrient does not meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b)."); *see also* Hawk Decl. II Ex. F (Andon Decl.) ¶ 2 (concluding that Swiss Miss antioxidant statement is factually accurate).

11 Sturges also testified that whether or not the product's labeling complied with federal or state law was not a factor in her decision to purchase it. *Id.*

12 Defendant also argues that Sturges is atypical because she cannot recover for any alleged injury—noting that she cannot recall what she paid for the products and does not know whether she paid more than they were worth. *Id.* at 12 (citing Hawk Decl. I Ex.

A (Sturges Depo) at 73, 150, 152, 193). This is not really a typicality argument—indeed, Defendant would probably argue that Sturges is typical in that none of the class members know what they paid—but an argument about ascertainability and Plaintiffs' damages plan.

13 The SAC alleges that Sturges "would not have purchased Defendant's Misbranded Food Products had [she] known they were not capable of bring legally sold or held." SAC ¶¶ 238, 242.

14 Plaintiffs are not seeking to certify a class involving the lycopene label.

15 Plaintiffs never state what that actually means. That the class members take pictures of cans they own? Class members would not have saved all of their cans for the last six years. That the class notice include pictures? That is not verification.

16 The Court notes that the "100% Natural" label was more widespread (i.e., more consistently present on more Hunt's products) than the "free of artificial ingredients & preservatives" label. *See generally* Nagle Decl. In general there appears to be the least amount of label variation in the Hunt's product group as compared to the other two product groups at issue. But there is still variation.

17 Of course, the Court and Plaintiff's expert could presumably both go home, look in their pantries, and check what the labels say. But that means of verification "is incomplete for purposes of this action," *see Xavier,* 787 F.Supp.2d at 1090 (reaching same conclusion as to Marlboro Miles customer loyalty program, which would not capture all class members), and Plaintiffs have expressed no interest in certifying a class consisting only of people who currently have Hunt's, PAM, or Swiss Miss products in their pantries.

18 The court further held that "[s]wearing 'I smoked 146,000 Marlboro cigarettes' is categorically different from swearing 'I have been to Paris, France,' or 'I am Jewish,' or even 'I was within ten miles or the toxic explosion on the day it happened.' " *Id.* at 1090.

19 Plaintiffs' argument at the motion hearing that the variation in labels is "irrelevant" because products that do not contain the challenged label statements are "not at issue," misses the point. Indisputably, such products are not at issue. The problem is that class members will not be able to remember whether they purchased the products that are not at issue, or the ones that are.

20 To be clear, the Court does not fault Plaintiffs for failing to identify all class members prior to class certification, *see Mauto,* 2008 WL 2775004, at *4; it holds that Plaintiffs have not established how they will accurately identify all class members ever.

21 Moreover, the availability of a *cy pres* award does not solve the problem of not knowing who the class is:

> [T]he cy pres doctrine governs distribution of unclaimed monies. Applicability of this doctrine presupposes a scenario in which plaintiffs have emerged victorious at the end of this litigation. The doctrine therefore does not help plaintiffs overcome the problem of how to enforce the res judicata effect of final judgment against an unsuccessful, unascertainable plaintiff class.

Xavier, 787 F.Supp.2d at 1090–91.

22 Even if class members had receipts, the label changes did not alter the UPC of each PAM product, and so for the PAM products for which the "100% Natural" label was removed, a receipt would not show whether the PAM product purchased bore the old or new label. *See* Ugone Decl. (dkt. 161) at 19–20 n.60; Richardson Decl. ¶ 18 ("although the content of the labels changed, the UPC codes on the products remained the same.").

23 That the label was not even on the front of the products further undermines any confidence the Court could have that a consumer would remember seeing it. *See id.* ¶ 10.

24 In *Rahman,* Judge Illston changed her position on this issue, declining to follow her prior analysis in *Larsen v. Trader Joe's Co.,* No. 11–5188, 2012 WL 5458396, at *4 (N.D. Cal. June 14, 2012).

25 Defendant's argument that an injunction is also unnecessary because Defendant no longer uses the "100% Natural" label on products with hydrocarbon propellants, Opp'n to PAM Mot. at 25, is not persuasive. The Organic Olive Oil and Organic Canola Oil varieties of PAM continue to bear the label, which Plaintiffs allege is misleading. *See* Richardson Decl. ¶ 19; PAM Mot. at 2. In addition, Defendant states elsewhere that "[a]fter any label change is made, a period follows in which ConAgra and its retailers have a mix of old and new labeled product in their facilities." Opp'n to PAM Mot. at 3. Accordingly, there could still be some PAM varieties with hydrocarbon propellants and "100% Natural" labels on the shelves; an injunction could lead to those products being pulled.

26 In their reply brief, Plaintiffs cite to *Hinojos,* 718 F.3d at 1107, which held that a legislative decision to prohibit a particular misleading advertising practice is evidence that the practice is a material misrepresentation. Reply to Hunt's Mot. at 12. But

Plaintiffs point to no relevant legislation about the word "natural," and in fact their brief discusses "legislative regulation of the antioxidant statements," which has nothing to do with the Hunt's products. *Id.*

27 In addition, as already noted, Jones does not have standing to represent a class of individuals who would not have purchased the products at issue if they had known that those products were illegally labeled. An "unlawful" theory will not solve Plaintiffs' reliance problem.

28 Defendant submits evidence that it did not alter its prices to retailers depending on whether the "Free of Artificial Ingredients & Preservatives" label appeared on the label. *See* Opp'n to Hunt's Mot. at 18 (citing Nangle Decl. ¶ 8). At best, Defendant's decision to include the representations indicates that Defendant hoped that the representations could be material to some customers.

29 Caswell further testified that she did not think her husband was deceived in purchasing the bottle of PAM they had at home "but I don't think he was necessarily paying attention to '100 percent' claims." Hawk Decl. I Ex. D (Caswell Depo) at 104.

30 That court went on to note that even the named plaintiffs disagreed about the definition of "all natural," *id.,* which is also the case here, see Opp'n to Hunt's Mot. at 7 (to Jones, natural "means that the contents of the package contain products that come from nature"; to Sturges, natural means "no added chemicals" and for tomatoes means "just the tomato"; and to Ozzard, natural means "nonprocessed.").

31 Judge Koh noted in that case that "Blue Diamond does not assert that differences in its products' labels cause prospective consumers to understand the representations differently." *Id.* at 25. Although Defendant here does not point to differences in its products labels, it certainly argues—and the record reflects—that consumers understood, and weighed, the 100% natural representations differently.

32 Defendant notes that Plaintiffs fail to address predominance as to the FAL and unjust enrichment claims. Opp'n to PAM Mot. at 15 n.6. Plaintiffs reply that they do seek certification of those claims. Reply to PAM Mot. at 8 n.4.

33 Notably, Caswell's opinion is limited to the PAM products "containing significant quantities of undisclosed petrochemicals such as Petroleum Gas (liquified), Propane, Propane 2—methyl (Isobutane) and Butane that comprise 24% or more of the products' ingredients," Caswell Decl. ¶ 25; it *does not pertain* to the organic PAM products, which used a different propellant, *see* Opp'n to PAM Mot. at 4.

34 To the extent that Plaintiffs in their reply brief seek to rely on "the legislative decision to prohibit certain types of label statements regarding antioxidants," Reply to SM Mot. at 8, section 101.54 pertains to the *level* of antioxidants in a product, not simply their presence. That the legislature prohibited statements about the amount of antioxidants is not conclusive evidence that all statements about antioxidants are material. *See also* Hawk Decl. II Ex. A (Sturges Depo) at 98 (Sturges testified that she did not interpret the challenged label statement to say anything about the amount of antioxidants in the products.).

35 Using the full retail or wholesale price does not represent the economic loss attributable to the alleged wrongful conduct. *See* Ugone Decl. (dkt. 196–3) at 17–20.

36 Capps asserts in a reply declaration that he "did not ignore the value received by class members from the purchase and use of the subject products in question," he just "did not consider this issue to be relevant especially when operating under the assumption that the misbranded or challenged products are worthless from a legal standpoint." Capps Reply Decl. (dkt. 209) at 6.

37 Plaintiffs argue that the Ninth Circuit held in *FTC v. Figgie Int'l,* 994 F.2d 595, 606 (9th Cir.1993), that once a defendant is liable for deceptive practices, recovery is not limited "to the difference between what [plaintiffs] paid and a fair price for [the product]." *Id.* at 14 n.6. *Figgie* is distinguishable. Importantly, the FTC brought that case to seek consumer redress under the FTC Act, 15 U.S.C. § 57b. 994 F.2d at 598. That statute allows a court to "grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair and deceptive act or practice, as the case may be." *Id.* at 605 (citing 15 U.S.C. § 57b(b)). The language Plaintiffs cite comes from the court's discussion of an appropriate refund. *See id.* at 606. There is no reason to import the remedies from the FTC Act into a California UCL or FAL case, and Plaintiffs point to no authority that does so.

38 Defendant's expert, Keith R. Ugone, Ph.D., opines that "given the complexity of the Hunt's ... product lines (e.g. large numbers of segments and multiple flavors in each segment), it is not clear that suitable benchmark products exist for each Challenged Product." Ugone Decl. ¶ 35.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

39 Capps did a "preliminary regression[ ]" in his reply declaration here, Capps Reply Decl. ¶ 19 & figs. 5–6, but Defendant complains that it does "not include the variable that he previously identified as his 'key finding': a variable associated with the presence of absence of the Challenged Claims ... over time." Obj. to Reply Decl. (dkt. 215) at 3.

40 The Court observes that Judge Koh recently assessed Capps's work in *Werdebaugh,* 2014 WL 2191901, at *21–26, and while she rejected his restitution analysis for many of the reasons discussed herein, *see id.* at *22–23, she found that his regression analysis was "sufficient," *id.* at *24–26.

41 Again, Defendant's most persuasive objections to the reply declaration are that while it purports to do a preliminary regression, it provides no measure of claimed class damages and does not include the variable Capps previously identified as his "key finding"—a variable associated with the presence or absence of the challenged label statements over time. *Id.* at 3.

42 The Court allowed Defendant to file, after the motion hearing, a short brief responding to this argument. *See* Minutes (dkt. 226). Defendant did so. *See* Supp. Br. (dkt. 227).

43 To the extent that *Pickman v. Am. Exp. Co.,* No. 11–5326, 2012 WL 258842, at *2 (N.D.Cal. Jan. 27, 2012) (calculating amount in controversy by multiplying "the minimum amount of damages to be sought under the CLRA ($1,000) by the number of alleged violations"), suggests a different analysis, the Court would disagree with it.

44 Of course, there are significant problems with individual actions as well. As in *Hanlon,* individual cases here "would not only burden the judiciary, but would prove uneconomic for potential plaintiffs." 150 F.3d at 1023. It is hard to imagine many class members actually pursuing individual cases. "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004). This case is "unwieldy indeed."

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

2018 WL 4690790
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

MIAMI VALLEY FAIR HOUSING CENTER, INC., et al., Plaintiffs,
v.
PREFERRED LIVING REAL ESTATE INVESTMENTS, LLC, et al., Defendants.

Case No. 2:15-cv-2737
|
Signed 09/28/2018

**Attorneys and Law Firms**

Stephen M. Dane, Relman, Dane & Colfax PLLC, Perrysburg, OH, Laura Gaztambide-Arandes, Megan Cacace, Ryan C. Downer, Sasha Samberg-Champion, Tara Kolar Ramchandani, Relman, Dane & Colfax PLLC, Washington, DC, for Plaintiffs.

Matthew Scott Zeiger, Marion H. Little, Zachary M. Sugarman, Zeiger Tigges & Little LLP, Bridget C. Coontz, Ohio Attorney General's Office, Columbus, OH, for Defendants.

**OPINION AND ORDER**

EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE

***1** This action arises out of alleged violations of the Fair Housing Act, Title VII of the Civil Rights Act of 1968 ("FHA"), as amended by the Fair Housing Amendments Act of 1988 ("FHAAA"), 42 U.S.C. § 3601, *et seq.* Specifically, Plaintiff Miami Valley Fair Housing Center, Inc. ("Plaintiff") alleges that Defendants Preferred Real Estate Investments, Inc. ("PREI, Inc."); Preferred Real Estate Investments, LLC ("PREI, LLC"); Preferred Real Estate Investments II, LLC ("PREI II"); Andover Park, LLC; Andover Park II, LLC; Taylor House, LLC; Palmer Square, LLC; Clifton Park, LLC; and Alexander Square, LLC (collectively "Defendants"), through their design and construction of five multifamily apartment complexes located in and around Columbus, Ohio, violated and continue to violate the accessibility requirements of the FHAA, thereby discriminating against individuals with disabilities. (Am. Compl. ¶¶ 13, ECF No. 2.)

This action is before the Court on a number of pending matters, all of which are ripe for review. For the reasons described herein, the following motions are **DENIED**: Plaintiff's Motion to Strike the Report and Testimony of Mark Drotar (ECF No. 100); Defendants' Motion for Summary Judgement (ECF No. 101); Plaintiffs Motion to Strike the Report and Testimony of Paul Sheriff (ECF No. 102); Plaintiff's Motion for Partial Summary Judgment (ECF No. 103).

The following motions are **DENIED** as **MOOT**: Plaintiff's Motion to Strike Defendants' Inadmissible Affidavit Evidence (ECF No. 123); Plaintiff's Motion to Stay Defendant's Motion in Limine (ECF No. 126); Plaintiff's Motion for Expedited Briefing on its Motion to Stay (ECF No. 127).

The following motions are **GRANTED**: Defendants' Motion in Limine Permitting Use of Paul Sheriff's Report and Video (ECF No. 125); Plaintiff's Unopposed Motion for Hearing (ECF No. 143).

This Court hereby STAYS this action as described more fully below.

## I. BACKGROUND

The Court incorporates the background facts described in its March 3, 2017, Opinion and Order resolving the parties' previous motions for summary judgment. (ECF No. 83.) For clarity, it briefly recites a few of those facts and describes new ones relevant to the parties' current motions.

Plaintiff is non-profit Ohio organization that aims to eliminate housing discrimination. It alleges that Defendants are responsible for violations of the FHAA at five multifamily apartment complexes located in and around Columbus, Ohio: Andover Park, Palmer House, Clifton Park, Taylor House, and Alexander Square (collectively "the developments"). Each of the developments is or was owned by the LLC defendant that bears the same name— Andover Park, LLC; Palmer

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

House, LLC; Clifton Park, LLC; Taylor House, LLC; and Alexander Square, LLC (collectively "the ownership LLCs").

PREI, LLC is an Ohio investment entity. (Nick King Aff., ¶ 6, ECF No. 101–6, at PAGE ID # 11295.) It asserts that it holds or held an ownership interest in three of the ownership LLCs: Andover Park, LLC, Palmer Square, LLC, and Clifton Park, LLC.[1] PREI, LLC has been owned by Nick King and Mike Kenney since 1999. (King Dep. II, ECF No. 98–3, at PAGE ID # 6104–05.) PREI, LLC acquired land as part of a 1031 like-kind tax exchange and then immediately sold it to Andover Park, LLC, Palmer Square, LLC, and Clifton Park, LLC. (Nick King Aff., ¶ 10, ECF No. 101–6, at PAGE ID # 11296.) That land was then used to build those three corresponding developments. (*Id.*) Aside from that, however, PREI, LLC, has never owned any land. (*Id.*)

***2** PREI II is also an Ohio investment entity. (Nick King Aff., ¶ 6, ECF No. 101–6, at PAGE ID # 11295.) It holds or held an ownership interest in two of the ownership LLCs: Taylor House, LLC, and Alexander Square, LLC. (King Dep., ECF No. 101–2, at PAGE ID # 11268–69; ECF No. 101–10, at PAGE ID # 11344; ECF No. 101–11, at PAGE ID #11354.) PREI II is owned by Mike Kenney, Nick King, and Jennifer King. (King Dep. II, ECF No. 98–3, at PAGE ID #6171.)

Defendant PREI, Inc. is an Ohio corporation engaged in real estate development and management. It contracted with the ownership LLCs to act as developer and general contractor for each of the developments. In that capacity, PREI, Inc. secured financing for the developments and hired architects, civil engineers, land planners, and other design professionals as well as subcontractors for construction. (Nick King Aff., ¶ 3, ECF No. 101–6, at PAGE ID # 11295; King Dep. Exc., ECF No. 101–2, at PAGE ID # 11255, 11258, 11260, 11246, 11250, 11257, 11259, 11252.) The developments were all developed at the same time or in successive order during a continuous seven-year period. (King Dep., ECF No. 98–2, at PAGE ID # 5786–87, 5795–96, 5853, 5875, 5890, 5895, 5904, 5909, 5918, 5922.) Although PREI II owned a one per cent interest in PREI, Inc., in 2003, PREI, Inc. is now owned by Mike Kenney and Nick King, who are also employed by PREI, Inc. as President and Vice-President respectively. (Nick King Aff., ¶ 5, ECF No. 101–6, at PAGE ID # 11295.) They both oversaw the developments as PREI, Inc. employees. (*Id.* at ¶¶ 1–2.)

As more fully described in the Court's March 3, 2017, Opinion and Order, Plaintiff became aware of the developments in 2014, after someone saw them on a website and noticed what she thought might be FHAA violations. That person visited several of the developments to confirm her suspicions and then sought assistance in investigating the development from Plaintiff and a second non-profit organization, Central Ohio Fair Housing Association ("COFHA"). Those investigation efforts included field testing and hiring several professionals, including an accessibility expert, to evaluate the developments. On August 19, 2015, Plaintiff and COFHA filed suit against the current Defendants and architect Jonathan Barnes Architecture and Design, Ltd. ("JBAD") alleging violations of the FHAA's accessibility requirements. (ECF No. 1.) On March 8, 2017, Defendants were awarded summary judgment on COFHA's claims on the basis that COFHA lacked standing. (ECF No. 83.) On April 11, 2017, Plaintiff dismissed its claims against JBAD. (ECF No. 86.) Discovery closed July 31, 2017, with the exception of punitive damages discovery, which was stayed pending resolution of the parties' dispositive motions. (ECF No. 89.)

Plaintiff and Defendants have both moved for summary judgment and filed a number of other motions related to the same.

## II. THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). When the moving party has carried this burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

***3** "After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " *Moldowan,*

578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ). In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party. *Id.* The nonmoving party, however, cannot establish a genuine issue for trial by producing a mere scintilla of evidence in support of its position. *Anderson*, 477 U.S. at 251; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (showing the existence of "some metaphysical doubt as to the material facts" does not create a genuine issue for trial). A genuine issue for trial exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Toft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

**B. Discrimination in Design and Construction Under the FHAA**

The FHAA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Under the FHAA, discrimination includes:

> in connection with the design and construction of a covered dwelling dwelling[2] built for first occupancy after [March 13, 1991], a failure to design and construct those dwellings in such a manner that—
>
> > (i) The public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;
> >
> > (ii) All the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and
> >
> > (iii) All premises within such dwellings contain the following features of adaptive design:
> >
> > (I) An accessible route into and through the dwelling;
> >
> > (II) Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;
> >
> > (III) Reinforcements in bathroom walls to allow later installation of grab bars; and
> >
> > (IV) Usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

*Id.* § 3604(f)(3)(C)(i)–(iii). Congress did not define many key statutory terms including, for instance, what makes a public or common use area "accessible" or "usable," or what makes premises within dwellings inclusive of "adaptive design." The statute does, however, provide that a party can satisfy the FHAA's adaptive design requirements (paragraph (iii) above) by complying "with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1')."[3] *Id.* § 3604(f)(4). The statute also provides that a party can satisfy its design and construction obligations (paragraphs (i), (ii), and (iii) above) if it complies with a state or local building code that has incorporated the requirements in § 3604(f)(3)(C). *Id.* § 3604(f)(5)(A).

***4** In lieu of more specific statutory guidance, Congress authorized the Secretary of Housing and Urban Development ("HUD") to implement the FHAA and required HUD to provide technical assistance to help parties achieve compliance with the Act. *Id.* §§ 3604(f)(5)(c); 3614(a). Accordingly, in 1989, HUD promulgated implementing regulations that defined some of the Act's key terms. *See* C.F.R. § 100.200 (2015) *et seq.* Shortly thereafter, HUD issued the Fair Housing Accessibility Guidelines ("the Guidelines"). 56 Fed. Reg. 9472 (Mar. 6, 1991) (codified at 24 C.F.R Ch. 1, Subch. A., App. II).

The Guidelines contain technical standards that developers can use to achieve presumptive compliance with the FHAA's design and construction requirements. *Id.* at 9479. For instance, under the FHAA, doors

designed to allow passage into and within premises in covered multifamily dwellings must be "sufficiently wide to allow passage by handicapped persons in wheelchairs." § 3604(f)(3)(C)(2). The Guidelines refer to provisions from the 1986 version of ANSI A117.1 or provide exact measurements that will presumptively make a door "sufficiently wide" to allow such passage.[4] HUD regulations provide that compliance with the Guidelines, as supplemented in 1994, constitutes a "safe harbor" that can be used by builders to achieve compliance with the FHAA. *See* 24 C.F.R. § 100.205(e)(2)(i). Compliance with the Guidelines is not, however, mandatory. 56 Fed. Reg. at 9473. The Guidelines do not "prescribe specific requirements which must be met, and which, if not met, would constitute unlawful discrimination" under the FHAA. *Id.* Builders and developers may choose to depart from the Guidelines and seek alternate ways to establish that they have complied with the FHAA's requirements. *Id.* Indeed, the United States Court of Appeals for the Sixth Circuit has explained that "the Guidelines, though relevant and highly significant, are not decisive. The real question is whether ... [covered multifamily dwellings] are reasonably accessible and useable to most handicapped persons." *Fair Housing Council, Inc. v. Village of Olde St. Andrews*, No. 05-5862, 210 Fed. App'x 469, 482 (6th Cir. 2006). That said, the Guidelines are probative— although the touchstone of the compliance analysis is the FHAA, " '[d]efendants undoubtedly face a heavy burden of demonstrating accessibility' in instances where a construction feature does not comply with the HUD Guidelines.' " *Id.*

In addition to the Guidelines, HUD regulations currently identify nine other non-mandatory safe harbors[5] that can be used to achieve presumptive compliance with the FHAA, including the Fair Housing Act Design Manual ("FHAADM"). *See* 24 C.F.R. § 100.205(e)(1)–(2). Like the FHAA, HUD's regulations also provide that compliance with a state or local building code that incorporates the FHAA's design and construction requirements will satisfy the FHAA. *Id.* § 100.205(f).

**C. Plaintiffs Motion for Summary Judgment**[6]

***5** Plaintiff moves for summary judgment. Plaintiff alleges that over 400 accessibility barriers at the five developments violate the FHAA. As evidence of these violations, Plaintiff relies upon an expert report prepared by Mariesha Blazik, who reviewed a partial set of building plans for Andover Park, physically surveyed the other four developments, and identified alleged deviations from the technical standards contained in the Guidelines.[7] In particular, Plaintiff alleges the following violations:

• At all the developments, there is no accessible pedestrian route from public streets and transportation stops to public use and common use areas.

• At Alexander Square and Taylor House, a number of parking spaces lack adjacent access aisles, and the access aisles that do exist at those two properties and at Palmer House and Clifton Park lack properly placed curb ramps.

• Routes to public use and common use areas include steps or stairs that cannot be traversed by wheelchair users including routes to the leasing office/clubhouse, bowling lane, and a fitness center/tanning room at Clifton Park; the route to the leasing office/clubhouse at Palmer House; the routes to a sunken fireplace lounge and a fitness center/tanning room at Alexander Square; and the route to a sunken fireplace lounge at Taylor House.

• At Alexander Square, the trash disposal area can only be accessed by steps, and although trash disposal areas at Taylor House and Clifton Park have access ramps, the ramp at Taylor House is too steep and the ramp at Clifton Park lacks handrails.

• Protrusions create safety hazards for visually impaired persons on routes to public and common use areas including light fixtures that protrude from breezeways and a cabana wall at Clifton Park; light fixtures that protrude from breezeways at Alexander Square; light fixtures that protrude from the corridors at Taylor House; and a barbeque countertop that protrudes into the route to a pool at Palmer House.

• At Andover Park, Clifton Park and Palmer House, common use restrooms in the clubhouses lack grab bars for wheelchair users, and the grab bars that do exist at Palmer House and Taylor House are too short for safe use.

• At all the surveyed developments, "numerous doors" in dwelling units that lead to bathrooms, bedrooms, and walk-in closets, are too narrow for wheelchair users to enter.

• In 52 units at Alexander Square, 48 units at Palmer House, 20 units at Clifton Park, and 1 unit at Taylor House, the kitchens lack sufficient clearance for wheelchair users to maneuver between counters and other kitchen elements.

• In multiple units at Alexander Square, Clifton Park, and Palmer House, kitchens lack sufficient clearance in front of ranges and cooktops for wheelchair users

to use them from a parallel position.

• At all the developments, bathrooms are not usable in some of the units because they lack enough floor space to permit a wheelchair user to enter and close the door.

• At 14 units at Alexander Square, 36 units at Palmer House, and 157 units at Taylor House, compartments or alcoves that were constructed around toilets are too narrow for the safe use of grab bars if they were to be installed.

(Pl's Mot. Summ. Jdgmt., ECF No. 103, at PAGE ID # 13171–96.) Plaintiff asserts that because it has produced expert evidence of alleged deviations from the Guidelines, it has also demonstrated that the developments were not designed and constructed in accordance with any of safe harbors recognized by HUD because the Guidelines contain the least restrictive set of accessibility standards of all the safe harbors. (*Id.* at PAGE ID # 13173 (citing Pl's Mot. Summ. Jdgmt. Ex. 29, ECF No. 104–25, at PAGE ID # 15144–51.) ) Plaintiff additionally argues that although the versions of the Ohio Building Code ("OBC") that were in effect at the time the developments were constructed contain accessibility requirements,[8] those accessibility requirements fall short of what is required by the FHAA or were interpreted by permitting agents in such a way that the developments received permits even when they failed to comply with the OBC's accessibility requirements. (*Id.* at PAGE ID # 13197–13202.) Plaintiff asserts that because it has established that the developments do not comply with any safe harbors or the OBC, it is entitled to summary judgment.

***6** In opposing Plaintiff's motion for summary judgment, Defendants assert that Plaintiff cannot use Blazik's assessment of Guideline deviations as evidence of non-compliance with all other safe harbors. (Defs' Opp., ECF No. 112, at PAGE ID # 17287–91.) Specifically, Defendant objects to an Exhibit prepared by Plaintiff's counsel that purports to summarize comparable provisions from the Guidelines, the other HUD recognized safe harbors, and the 2011 version of the OBC. (*Id.* (citing Plaintiffs Mot. Summ. Jdgmt. Ex. 29, ECF No. 104–25, at PAGE ID # 15144–51.) ) In addition, Defendants point to a report from their expert, Paul Sheriff, who inspected the developments surveyed by Blazik, and found them to be "accessible, usable, and adaptable" and that they "satisfy all aspects of the FHAA." (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11931.) Sheriff's report also rebuts a number of Blazik's specific findings and further opines that her methodologies were flawed including that some of her measurements were done incorrectly and that she applied dimensional tolerances inconsistently. (*Id.* at PAGE ID # 11928–29.) With regard to Plaintiff's other allegations that Sheriff does not specifically rebut, Defendants contest these allegations by pointing to deposition testimony or affidavits and asserting that additional facts demonstrate how those alleged issues do not constitute accessibility barriers or critiquing Blazik's assessments and measurements. (Defs' Opp., ECF No. 112, at PAGE ID # 17302–08.)

On this record, the Court finds that Plaintiff is not entitled to summary judgment. As a preliminary matter, even if all the conditions identified by Plaintiff deviate from the technical specifications contained in the Guidelines, the Guidelines are neither mandatory nor prescribe specific requirements which, if not met, would constitute unlawful discrimination. *Village of Olde St. Andrews,* 210 Fed. App'x at 482; 56 Fed. Reg. at 9473. *See also* *Barker v. Niles Bolton Assoc, Inc.,* 316 Fed. App'x 933, 941 (11th Cir. 2009) (holding that because the Guidelines are not mandatory, the fact that a covered complex does not comply with the Guidelines does not establish a violation of the FHAA); *United States v. Pacific Northwest Elec., Inc.*, No. CV–01–019–S–BLW, 2003 WL 24573548, at *12 (N.D. Idaho, Mar. 21, 2003) (holding that the fact that a covered complex does not comply with the Guidelines does not establish a violation of the FHAA). It is also unclear whether evidence of non-compliance with the Guidelines can constitute proof of non-compliance with all other safe harbors. But again, even if it could, the safe harbors are not mandatory— they constitute a shield rather than a sword. Moreover, Defendants have presented evidence rebutting Blazik's finding of Guideline deviations, challenging her methodologies, and contesting the facts that form the basis for her conclusions. Consequently, for all but one alleged violation, the Court easily concludes that genuine issues of material fact remain as to whether the alleged accessibility barriers violated the FHAA.[9]

***7** The Court has more trouble reaching that conclusion with regard to the alleged lack of accessible routes to fitness centers/tanning rooms located on mezzanines at Clifton Park and Alexander Square. The FHAA requires that "common use portions" of covered multifamily dwellings be readily accessible to handicapped persons. § 3604 (f)(3)(C)(i), The parties apparently agree that these fitness centers/tanning rooms currently constitute common use areas. The parties also appear to agree that these common use areas can only be accessed by stairways, and that therefore, persons in wheelchairs cannot access them. Defendants note that alternative arrangements have been made for wheelchair users at these two developments. Specifically, Clifton Park and another development, Palmer House, are adjacent to one another. (Aff. Nicholas King, ECF No. 112–8, 114, at

PAGE ID # 17514.) Wheelchair users who reside at Clifton Park can access a more extensive first-floor fitness center at Palmer House. *Id.* In addition, wheelchair users who reside at both Clifton Park and Alexander Square are offered memberships to off-site exercise facilities in the vicinity. *Id.* The FHAA, however, requires that common use portions of covered dwelling be readily accessible—the statute nowhere indicates that this mandate can be satisfied by providing amenities at alternative locations. Nevertheless, Defendants point out that Plaintiff has failed to produce evidence demonstrating that the fitness equipment (and presumably tanning rooms) were located on the mezzanines at the time Clifton Park and Alexander Square were designed and constructed. (Defs' Resp. to Pl's Supp. Brief., ECF No. 153, at PAGE ID # 20460.) Because Plaintiff bears the burden of proving discrimination at the design and construction stage, the Court ultimately declines to grant Plaintiff summary judgment on these alleged violations because of the possibility that these areas were not designed and constructed as common use areas but were later used as such.

In sum, because there are contested issues of material facts about the alleged violations, Plaintiff's claims are not appropriate for summary judgment, and they should be addressed at trial. Plaintiffs Motion for Partial Summary Judgment (ECF No. 103) is **DENIED**.

**D. Defendants' Motion for Summary Judgment**

Defendants also move for summary judgment. Defendant asserts that Plaintiff's claims must be dismissed because Plaintiff has failed to meet its burden of proof. Defendants further assert that even if all of Plaintiff's claims are not dismissed on that basis, claims related to Andover Park must be dismissed because Plaintiff's expert did not physically survey that development, and that claims related to Alexander Square are barred by the statute of limitations. Defendants also assert that claims against PREI, LLC and PREI II should be dismissed because neither of those two entities designed or constructed any of the developments. Defendants finally assert that Plaintiffs punitive damages claims should be dismissed. Because the Court finds that these assertions are without merit, Defendants' Motion for Summary Judgement (ECF No. 101) is **DENIED**.

**1. Defendants' Arguments Regarding Plaintiffs Burden of Proof**

When asserting that Plaintiff has failed to meet its burden of proof, Defendants advance two arguments. The first argument relates to Plaintiff's evidence of Guideline deviations; the second relates to Defendants' compliance with the OBC.

**a. Guideline Deviations**

Defendants first contend that because Plaintiff has only presented evidence of Guideline deviations at the developments, and because the Guidelines are not mandatory, Plaintiff has failed to make its *prima facie* case. (Defs' Mot. Summ. Jdgmt., ECF No. 101, at PAGE ID # 11196–99.) The Court finds that Defendants are not entitled to summary judgment on this basis. Even though the Court agrees that the Guidelines are not mandatory, a finder of fact might be persuaded by evidence related to the alleged absence of design features that tend to make dwellings accessible under the FHAA. A finder of fact might also be persuaded by expert evidence that certain features of the Guidelines are necessary to make a covered dwelling accessible. The Sixth Circuit has explained that although "[t]he real issue is whether the units ... are reasonably accessible and useable for most handicapped persons" the Guidelines remain "relevant and highly significant," and " '[d]efendants undoubtedly face a heavy burden of demonstrating accessibility' in instances where a construction feature does not comply with the HUD Guidelines.' " *Village of Olde St. Andrews,* 210 Fed. App'x at 482. The Sixth Circuit has thus indicated that evidence of Guideline deviations is sufficient to allow a plaintiff to resist summary judgment even though such evidence is not sufficient to award a plaintiff summary judgment. Defendants are denied summary judgment on this basis.

**b. Compliance with the 2011 and 2007 OBC**

Defendants next contend that its compliance with the OBC, as evidenced by occupancy certificates issued to each of the developments, entitles it to summary judgment (Defs' Mot. Summ. Jdgmt., ECF No. 101, at PAGE ID #11199–11202).

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

***8** The FHAA expressly provides that a party can satisfy its design and construction obligations if it complies with a state or local building code that incorporates the requirements found in the FHAA. § 3604(f)(5)(A). Accordingly, Defendants contend that a defendant should be entitled to summary judgment on an alleged violation of the FHAA whenever a covered multifamily dwelling receives a building permit from a jurisdiction with its own accessibility requirements unless a plaintiff shows either: "(1) that the jurisdiction's permitting regime does not comply with the accessibility requirements of the FHAA, or (2) how the builder evaded the permitting regime or wrongfully obtained a permit." (Defs' Mot. Summ. Jdgmt. ECF No. 101, at PAGE ID # 11199) (citing *United States v. Mid-America Apartment Comms., Inc.*, 247 F. Supp. 3d 30, 36 (D.D.C. Mar. 27, 2017) ) ("*Post*"). After urging the Court to adopt this summary judgment standard, Defendants contend that the developments received occupancy certificates certifying that they complied with the versions of the OBC in effect when issued, and that Plaintiff cannot demonstrate that any building permits, plan approvals, or occupancy certificates were wrongly or fraudulently obtained. (*Id.* at PAGE ID # 11199, 11201.)

The Court declines to adopt Defendants' proposed standard, which was derived from a Memorandum Opinion issued by the U.S. District Court for the District of Columbia in order to clarify certain legal issues before trial in an FHS case. *Post*, 247 F. Supp. 3d at 34. Specifically, after the summary judgment stage in *Post*, the parties sought guidance about the type of evidence that could be used in a civil enforcement action brought by the Government to demonstrate that a developer had engaged in a pattern and practice of discrimination under the FHAA. *Id.* Therefore, *Post*, which does not constitute controlling authority, is procedurally distinguishable. More importantly, the parties in *Post* also apparently agreed that North Carolina, Georgia, and Virginia (after 2000) had incorporated the requirements of the FHAA into the accessibility provisions of those states' building codes. *Id.* at 39. Thus, *Post* is also substantively distinguishable because the parties in this case disagree as to whether the relevant versions of the OBC incorporate the FHAA's requirements.

The parties agree that the 2011 OBC governs all but one of the developments.[10] The parties also agree that the 2009 version of ANSI A117.1 provides technical specifications that can be used to make design and construction features accessible under the FHAA.[11] Defendants state that the 2011 OBC contains accessibility provisions and that the 2011 OBC provides that those accessibility provisions can be met by complying with the technical specifications in the 2009 version of ANSI A117.1. (Defs' Supp. Brief., ECF No. 151, at PAGE ID # 20176.) Plaintiff generally agrees but stresses that the 2011 OBC actually allows builders to deviate from a handful of provisions in the 2009 version of ANSI A117.1. (Pl's Supp. Brief., ECF No. 150, at PAGE ID # 20167–68.) Plaintiff further notes that the 2009 version of ANSI A117.1 provides technical standards but it does not address scoping issues, and that a building code's scoping requirements must be coterminous with the FHAA's requirements in order for the building code to operationalize the FHAA's standards. (*Id.* at PAGE ID #20160–61.) Plaintiff asserts the scoping requirements in the 2011 OBC and the FHAA are not, however, coterminous.

Specifically, the 2009 version of ANSI A117.1 provides measurements that could presumptively make a doorway accessible to a wheelchair user under either the FHAA or the 2011 OBC. (*Id.*) But the 2009 version of ANSI A117.1 does not indicate which doors must be accessible. (*Id.*) That scoping issue is addressed by the 2011 OBC—it indicates which doors must be accessible. Plaintiff appears to concede that if the 2011 OBC used the 2009 version of ANSI A117.1 for technical specifications, and the 2011 OBC's scoping requirements matched the FHAA's requirements, then the 2011 OBC would fully operationalize the FHAA. Plaintiff argues that the 2011 OBC's scoping requirements do not, however, match the FHAA's requirements in a number of ways and thus compliance with the 2011 OBC does not ensure compliance with the FHAA. (*Id.* at PAGE ID # 20162–67.) For instance, the 2011 OBC provides that restrooms will be readily accessible if a builder designs and constructs them in accordance with technical specifications from the 2009 version of ANSI A117.1. (*Id.* at PAGE ID # 20163–64.) Pursuant to the scoping requirements in the 2011 OBC, "at least 50 percent but not less than one" of each type of restroom "clustered at a single location" "shall be accessible." 2011 OBC § 1109.2. The FHAA requires, however, that all common use areas be readily accessible by all handicapped persons, and Plaintiff argues that this includes all restrooms at public use and common use areas, not just 50 percent of clustered restrooms. § 3604(f)(3)(C)(i). Thus, Plaintiff reasons, even though compliance with the 2011 OBC will make some restrooms in such areas readily accessible under the FHAA because they will be built in accordance with the technical specifications found in the 2009 version of ANSI A117.1, compliance with the 2011 OBC does not guarantee full compliance with the FHAA because the 2011 OBC does not require that all restrooms in such areas be built in accordance with those technical specifications.

***9** Defendants assert that the 2011 version of the OBC's scoping requirements do match the FHAA's requirements. Defendants assert that the 2011 version of the OBC provides scoping requirements that are " 'based on the 2009 International Building Code ("IBC"),' the same IBC code recognized throughout the country" and that "the IBC provides accessibility scoping requirements that fulfill the scoping requirements of the [FHAA]." (Defs' Supp. Brief, ECF No. 151, at PAGE ID # 20178.) Plaintiff responds that although certain versions of the IBC are HUD recognized safe harbors when adopted without modifications, the 2009 IBC is not one of them. (Pl's Resp., ECF No. 152, at PAGE ID # 20418–19.) It is, instead, a model code that can be adopted by jurisdictions who can and do amend it in ways that impact provisions that are essential to making covered multifamily dwellings accessible. (*Id.*) Plaintiff further asserts that Ohio amended the 2009 IBC when it developed the 2011 OBC, and thus Defendants' reliance on it to defend the 2011 OBC's scoping requirements is misplaced.[12] (*Id.*)

Because the parties contest whether the relevant versions of the OBC incorporate the FHAA's requirements, this matter is distinguishable from *Post* and the Court declines to adopt *Post's* evidentiary ruling as a summary judgment standard in this case. Moreover, the Court notes that the proposed standard appears to misallocate the burden of proof. Defendants ask the Court to find that a defendant would be entitled to summary judgment any time a covered multi-family dwelling received a permit from a permitting regime with its own accessibility standards unless a plaintiff shows that the jurisdiction's permitting regime does not comply with the accessibility requirements of the FHAA or that a builder evaded the permitting regime or wrongfully obtained a permit. As a practical matter, however, permits are required in virtually every instance of construction. Accordingly, under Defendants' proposed standard, a plaintiff would be required to prove fraud or that the pertinent permitting regime violated the FHAA as a means to defeat a defendant's motion for summary judgment. But a plaintiff is not required to show that a jurisdiction's building code violates the FHAA. Rather, a plaintiff is required to show that a covered multi-family dwelling violates the FHAA. To the extent a defendant wants to use compliance with a state building code as a shield or a safe harbor, a defendant is required to prove that the building code incorporates the FHAA's requirements in order to be awarded summary judgment, not that a plaintiff must prove that it does not.

On the basis of the arguments presented in this case, the Court is not persuaded that, as a matter of law, the 2011 OBC's scoping requirements are coterminous with the FHA's requirements.[13] Notably, the Court does not conclude that the 2011 OBC's scoping requirements do not incorporate the FHA's requirements— the Court is simply unable to conclude that they do. In light that inability, the Court finds that Defendants are not entitled to summary judgment.

### 2. Andover Park

***10** Defendants argue that even if it is not awarded summary judgment on all of Plaintiff's alleged FHAA violations, claims related to Andover Park must be dismissed because Plaintiff's expert, Blazik, did not physically survey that development and she only reviewed a subset of site-plans. Nevertheless, " 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 249). Here, Plaintiff has produced expert evidence of alleged accessibility barriers at Andover Park. A trier of fact must assess the appropriate weight to assign that evidence in light of the issues identified by Defendants.[14] Accordingly, the Court denies Defendants' request for summary judgment on claims related to Andover Park on this basis.

### 3. Statute of Limitations and Alexander Square

Defendants contend that the statute of limitations bars Plaintiff's FHAA claims related to Alexander Square. That development was developed in 2008 and 2009, and it was issued an occupancy certificate on November 11, 2011— approximately four years before this action was commenced.

The FHAA requires a plaintiff to file a complaint "not later than 2 years after the occurrence or the termination of an alleged discriminatory practice ... whichever occurs last." 42 U.S.C. § 3613(a)(1)(A). With regard to a "discriminatory practice" the FHAA makes it unlawful to "discriminate in the sale or rental, or otherwise make unavailable or deny a dwelling to any buyer or renter." 42 U.S.C. § 3604(f)(1)–(2). Accordingly, the Sixth Circuit has held that "[i]n the context of the construction and

design of multifamily dwelling units that are inaccessible to disabled individuals, the discriminatory act occurs during the sale or the rental of a unit. Thus, once a unit has been sold or rented, the discriminatory act is complete." *Village of Olde St. Andrews,* 210 Fed. App'x at 480.

The Sixth Circuit has also recognized that the two-year statute of limitation may be tolled and that the "limitations period will depend on the specific circumstances of each case." *Id.* at 481. In circumstances where a plaintiff alleges that "the owner of several housing developments engaged in a continuous policy or practice with regard to the non-compliant design and construction of each of the developments, the continuing violations doctrine may toll the running of the limitations period until the last unit of all the implicated developments is initially sold." *Id.* Because the language of 42 U.S.C. § 3604(f)(1) provides that it is unlawful to discriminate in the "sale or rental" of covered multifamily dwellings, the Court concludes that the same rationale applies here, and that in circumstances where a developer or others are alleged to have engaged in a continuing practice with regard to non-compliant design and construction, the continuing violations doctrine may toll the running of the statute of limitations until the last unit of all implicated developments is initially rented. *See Housing Research & Advocacy Ctr. v. WXZ Residential Group*, No. 1:16-cv-2032, 2017 WL 1078956, at * 3 (N.D. Ohio Mar. 22, 2017) (holding that the statute of limitations begins running when the last housing development sells or rents it final unit); *see also Housing Advoc., Inc. v. Berardi & Partners, Inc.*, No:1:10-cv-0790, 2010 WL 4905547, at *7 (N.D. Ohio Nov. 29, 2010).

When determining the existence of a continuous practice, at least one court has analyzed the nature of the relationship between the developments to see if they are independent from one another or if a lack of independence suggests they were collectively developed. *See WXZ Residential Group*, 2017 WL 1078956, at * 3. In this case, Plaintiff points to record evidence suggesting that these developments were not independent. All of the developments, including Alexander Square, had the same general contractor and developer who was responsible for securing financing for them, and for hiring architects, civil engineers, land planners, and other design professionals as well as subcontractors for construction. (Nick King Aff., ¶ 3, ECF No. 101–6, at PAGE ID # 11295; King Dep. Exc., ECF No. 101–2, at PAGE ID # 11255, 11258, 11260, 11246, 11250, 11257, 11259, 11252.) The developments, which were all located in the greater Columbus, Ohio, area, were developed at the same time or in successive order during a continuous seven-year period. (King Dep., ECF No. 98–2, at PAGE ID # 5786–87, 5795–96, 5853, 5875, 5890, 5895, 5904, 5909, 5918, 5922.) Further, the developments were all advertised on the same "Preferred Living" website. (ECF No. 108–19, at PAGE ID # 16480–84.) Based on these uncontested record facts, the Court finds that Alexander Square and the other properties were collectively developed. Consequently, under the facts of this case, the statute of limitations did not begin running until the initial rental of the last unit in all the developments.

***11** Neither party has, however, pointed to record evidence indicating when that last unit was initially rented. Thus, the Court cannot determine when the statute of limitations began running and if Plaintiff's claims were timely. For that reason, genuine issues of material fact remain as to the statute of limitations and the Court denies Defendants' summary judgment on that issue.

**4. Claims Against PREI, LLC and PREI II**

PREI, LLC and PREI II also move for summary judgment. They argue that the FHAA imposes liability only on those persons or entities that design and construct covered dwellings, and that they did neither.

The FHAA does not identify who can be held liable for design and construction violations, but nor does it include language expressing an intent to limit who can be liable. The FHAA focuses instead on prohibited acts, making it unlawful to discriminate "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap ..." 42 U.S.C § 3604(f)(1). The provision of the FHAA that defines discrimination to include the failure to design and construct covered dwellings with specific features is also prefaced with the phrase "*in connection with* the design and construction of covered multifamily dwellings ..." 42 U.S.C § 3604(f)(3)(c). In light of that prefatory language, the fact that there are no express limitations as to who can be liable, and the FHAA's broad remedial purpose, courts have generally taken an expansive view when determining who can be liable for design and construction claims.

Courts have, for instance, rejected the notion that only an entity that both designs *and* constructs a covered dwelling can be liable for such claims under the FHAA because such a narrow construction would leave too few entities

subject to liability and might defeat the FHAA's goal of making housing available to handicapped persons. *See e.g., Baltimore Neighborhoods, Inc. v. Rommel Builders Inc.*, 3 F. Supp. 2d 661, 662, 664–65 (D. Md. 1998); *Unites States v. Shanrie Co., Inc.*, No. 05–cv–306, 2007 WL 980418, at *6–7 (S.D. Ill. Mar. 30, 2007) (citing *Rommel Builders* ); *United States v. Quality Built Const., Inc.*, 309 F. Supp. 2d 756, 761–62 (N.D. Ill. 2001) (citing *Rommel Builders* ); *Mont. Fair Hous. v. Amer. Capital Dev. Inc.*, 81 F. Supp. 2d 1057, 1062, 1068–69 (D. Mont. 1999) (citing *Rommel Builders* ). When rejecting that narrow construction, one district court explained that, "[w]hen a group of entities enters into the design and construction of a covered dwelling, all participants in the process as a whole are bound to follow the [FHAA]." *Rommel Builders*, 3 F. Supp. 2d at 665. In accordance with that principle, claims against a diverse group of participants have been permitted including claims against owners, builders, developers, contractors, architects, engineers, and others. *See, e.g., Memphis Ctr. For Indep. Living v. R. & M. Grant Co.*, No. 01-2069, 2004 WL 6340158, at * 1 (W.D. Tenn. June 29, 2004) (claims against engineers); *Eastern Paralyzed Veterans Ass'n v. Lazarus-Burman Associates*, 133 F. Supp. 2d 203, 205 (E.D.N.Y. 2001) (claims against builder of prefabricated units designed and constructed by another defendant); *United States v. Days Inns of Am., Inc.*, 997 F. Supp. 1080, 1083 (C.D. Ill. 1998) (stating that liability encompasses architects, builders, and planners); *Baltimore Neighborhoods, Inc., v. Cont'l Landmark*, Fair Hous.-Fair Lending Rep. P 16,236, at 16,236.4 (D. Md. 1997) (finding that real estate firm that exercised authority over an architectural review board with considerable influence over a myriad of features relevant to FHAA compliance could be liable).

***12** The theme that emerges from these cases is that a person or entity can be liable for design and construction claims under the FHAA if that person or entity can affect implementation of the FHAA's requirements during the design and construction stage. *See Cont'l Landmark*, Fair Hous.-Fair Lending Rep. at 16,236.4. That interpretation is buttressed by the Eleventh Circuit Court of Appeals' opinion in *Harding v. Orlando Apts.*, 748 F.3d 1128 (11th Cir. 2014). There, two plaintiffs visited an apartment complex and identified a number of accessibility issues including, for instance, that some common areas were not readily accessible due to a lack of accessible parking. *Id.* at 1130 n.5. Shortly after their visit, a corporate entity who played no role in the original design and construction of the apartment complex purchased the complex from the original owner and builder. *Id.* at 1130–31. The Eleventh Circuit concluded that the subsequent purchaser could not be held liable for design and construction claims under the FHAA. In reaching that conclusion, the Eleventh Circuit pointed to the prefatory language " '*in connection with the design and construction*' of a covered dwelling" and found that it constituted an intentional contextual limit on the provision's application. *Id.* at 1131 (citing 42 U.S.C § 3604(f)(3)(c) ) (emphasis in original). The Eleventh Circuit reasoned that such a limitation was substantially justified given that "accessible designs that are easy to implement at the design-and-construction stage may be excessively costly and difficult to implement once a dwelling has been built." *Id.* at 1132. Moreover, the Eleventh Circuit found that the relevant legislative history supported its conclusion. The Court explained:

> In the report of the Committee on the Judiciary of the House of Representatives recommending passage of the provisions at issue in this appeal (the House Report), the Committee emphasized the comparative ease of incorporating accessible features into a dwelling at the design-and-construction stage. H.R.Rep. No. 100–711, at 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2188 ("The Committee believes that these basic features of adaptability are essential for equal access ... as well as being easy to incorporate *in housing design and construction.*" (emphasis added) ); *id.* ("When reinforcements are installed as a part of new construction, there is no aesthetic change to the bathroom and it is of minimal expense. Having to add reinforcements later, however, can be a major structural undertaking with associated expense."); *id.* at 18, 1988 U.S.C.C.A.N. at 2179 (noting that designing dwellings with accessible features would allow occupants with handicaps to "install[ ] grab bars ... without major renovation or structural change"); *id.* (describing the statute's "modest requirements" and noting it does "not add significant additional costs" and "does not require ... the renovation of existing units"). The House Report therefore demonstrates Congress's intent to mitigate the burdens of compliance with the guidelines by applying them only during design and construction when they can be implemented more easily and with less expense.

*Id.* at 1132.

In this case, unlike the subsequent purchaser in *Harding*, PREI, LLC and PREI II do not contend that they were not involved in the design and construction process in any way. Rather, they contend that their participation in the design and construction process was simply *de minimus*, and that this precludes liability. PREI, LLC asserts that it held an ownership interest in Andover Park, LLC, Palmer Square, LLC, and Clifton Park, LLC, and that it acquired land which it immediately sold to those three LLC entities and where the three developments bearing those same names were later constructed. (Aff. Nicholas King, ¶ 10,

ECF NO. 101–6, at PAGE ID # 11296.) PREI II has an ownership interest in Taylor House, LLC and Alexander Square, LLC, which each own the developments that bear those names. (King Dep., ECF No. 101–2, at PAGE ID # 11268–69; ECF No. 101–10, at PAGE ID # 11344.) PREI, LLC and PREI II admit that they signed agreements on behalf of the entities that owned the developments, including agreements for utility easements for services as at the developments, but they assert that they did so in the "normal course of ownership and management, consistent with corporate law." (Defs.' Reply, ECF No. 124, at PAGE ID # 19010).

These facts do not demonstrate that that either PREI, LLC or PREI II performed design or construction work. The Court finds, however, that liability is not narrowly imposed upon only those persons or entities that perform design and construction work, but that all participants in the design and construction process are obligated to follow the FHAA because that is when the statute's requirements can be most easily implemented. *Rommel Builders*, 3 F. Supp. 2d at 665. Moreover, this is not an instance where either of these entities can claim that it was not involved in the design and construction process at all, particularly PREI, LLC, which procured the land where three of the developments were ultimately built. The Court finds, however, that the question of whether either entities' involvement was too negligible to justify the imposition of liability is one that is more appropriate for a trier of fact to evaluate. For these reasons, the Court denies PREI, LLC's and PREI, LLC II's request for summary judgment on the basis that they did not design and construct any of the developments.[15]

**5. Punitive Damages**

***13** Defendants move for summary judgment as to the availability of punitive damages in this action. "[I]f the court finds that a discriminatory housing practice has occurred ..., the court may award to the plaintiff actual and punitive damages[.]" 42 U.S.C. § 3613(c)(1). The Sixth Circuit has held that punitive damages are appropriate under the FHAA when defendants act "with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 239 (6th Cir. 2003) (citing *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 800 (6th Cir. 2002) ).

Defendants cite the following as evidence of their lack of malice: they attempted to comply with the FHAA by hiring and requiring architects to create FHAA–compliant plans; they met regularly with design professionals to discuss accessibility issues; they complied with the accessibility provisions found in the pertinent versions of the OBC; and they addressed compliance issues identified by the Columbus permitting agency.

Plaintiff asserts that Defendants cannot shield themselves from liability by relying on architects and other design professionals and that compliance with the OBC does not guarantee compliance with the FHAA given that their scoping requirements are not coterminous. Plaintiff also asserts that Defendants were previously sued in 2010 for design and construction violations at Alexander Square, and that Defendants failed to take sufficient action after that to ensure that the design and construction professionals it employed there did not commit the same FHAA violations at the other developments. Although Defendants claim that the prior lawsuit was frivolous, Plaintiff contends that the organizational plaintiff in that matter voluntarily dismissed its claims due to financial constraints before those claims were ever analyzed by a court.

In light of these competing contentions, the Court finds that resolution of whether punitive damages should be submitted as an issue to the jury is premature. Entitlement to such damages requires a significant evidentiary showing. This issue is reserved for trial. For these reasons, the Court denies Defendants' request for summary judgment on punitive damages.

## III. PLAINTIFF'S MOTIONS TO EXCLUDE EXPERT EVIDENCE

Plaintiff has also moved to strike the reports and testimony from Defendants' expert witnesses, Sheriff and Mark Drotar.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The Rule allows for a witness, "qualified as an expert by knowledge, skill, experience, training, or education," to testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).

Under *Daubert, Kumho*, and Rule 702, the district court acts as the gatekeeper of expert testimony. *Id.* In that gatekeeping role, a court only admits expert testimony when: (1) the witness is qualified; (2) the witness's testimony is relevant; and (3) the witness's testimony is reliable. *Id.* at 528-29. That gatekeeping function is not intended, however, to supplant the adversary system or the role of the jury. *See id.* at 531–32. Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. *See id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 532 (quoting *Daubert*, 509 U.S. at 596).

***14** In determining the reliability of expert testimony, the district court's role, and the offering party's responsibility, "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Generally, the expert's opinions must reflect " 'scientific knowledge' ... derived by the scientific method." *Daubert*, 509 U.S. at 590. The test of reliability is, however, a flexible one. *Kumho*, 526 U.S. at 141. Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to "opinion" testimony' " (quoting *Daubert*, 509 U.S. at 588) ).

The party proffering the expert testimony carries the burden of establishing, by a preponderance of the evidence, the testimony's admissibility. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

**A. Motion to Exclude Expert Report and Testimony from Paul Sheriff**

Plaintiff moves to exclude opinions from Sheriff. As discussed previously, Sheriff assessed the portions of the four developments that were physically evaluated by Plaintiff's expert, Blazik. He found that they were "designed and constructed in fact so as to be accessible, usable, and adaptable for persons with disabilities," and that the each of the developments "has a consistent level of accessibility for individuals in wheelchairs, canes, crutches, and walkers ..." (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11895.) Sheriff, who was a paraplegic, performed his assessment using a custom-built, made-to-measure wheelchair specifically designed for evaluating accessibility under the FHAA. His assessment was documented by video recording.

The Court finds that before his untimely death, Sheriff was an expert on accessibility issues. Sheriff owned and operated a consulting business that provided accessibility-related services to individuals with disabilities, architectural firms, property owners, and other businesses and facilities throughout the United States. (*Id.*, at PAGE ID # 11895.) During his thirty-year career, Sheriff performed evaluations and offered strategies for compliance with the Americans With Disabilities Act, the FHAA, and the Air Carriers Act. (*Id.*) He served as a special master, a court monitor, and an arbitrator/mediator in the United States District Court for the District of Hawaii where he monitored the implementation of, and compliance with, settlement agreements, and reviewed and analyzed consent decrees related to accessibility. (*Id.* at PAGE ID # 11896.) He also served as an Independent Compliance Inspector for the Department of Justice and HUD. (*Id.*) He provided blueprint reviews for architects, contractors, and other entities to ensure compliance with accessibility laws and produced Auto CAD Barrier Removal Drawings. (*Id.* at PAGE ID # 11896–97.) He performed site roll-throughs with his custom wheelchair, site–surveys, and barrier identification surveys. (*Id.* at PAGE ID # 11897.) The Court concludes that Sheriff possessed significant experience as an accessibility consultant and specialized knowledge about accessibility issues.

The Court also finds that Sheriff's expert opinions are relevant. When assessing relevance, a court must ensure that the proffered expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *States v. LeBlanc*, 45 Fed. App'x 393,

400 (6th Cir. 2002). In other words, "there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert,* 509 U.S. at 592). Plaintiff contends that Sheriffs opinions are not relevant because Sheriff failed to assess whether the developments comply with the Guidelines or one of the other HUD recognized safe harbors. As discussed previously, however, the Guidelines are neither mandatory nor prescribe specific requirements which, if not met, would constitute unlawful discrimination. *Village of Olde St. Andrews,* 210 Fed. App'x at 482; 56 Fed. Reg. at 9473; *Barker,* 316 Fed. App'x at 941; *Pacific Northwest Elec., Inc.*, 2003 WL 24573548, at *12. Sheriff opined about accessibility, usability, and adaptability at the four developments and offered specific critiques of Blazik's methodology and interpretations. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11926–31.) The Court thus finds that Sheriff's opinions would assist a trier of fact because such matters are not within the common knowledge of lay persons.

***15** In addition, the Court concludes that Sheriff's opinions are reliable. When evaluating reliability, courts generally consider whether an expert's method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community. *Daubert*, 509 U.S. at 593-94. Nevertheless, in instances like this, where a witness' expertise is based on specialized knowledge or experience as opposed to scientific knowledge, consideration of those factors is not always appropriate. *Kumho Tire Co.,* 526 U.S. at 149–51. The Sixth Circuit has explained that these factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r,* 272 F.3d 333, 339 (6th Cir. 2001).

Although the traditional factors are not appropriate in this case, Sheriff's opinion has met the reliability standard for experts based upon experience. That standard requires an expert to explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 (6th Cir. 2007) (quoting Fed.R.Evid. 702 advisory committee's note). Sheriff did so. First, Sheriff explained that because his profession involves assisting clients in analyzing compliance with the FHAA, he utilized the framework set forth in the FHAA as the basic scope for his analysis. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11901.) When describing his methodology, he further indicated that he field tested the properties with his made-to-measure wheelchair and then applied his specialized knowledge "of the various guidelines, standards, and regulations, as well as technical interpretations and guidance documents related to the FHAA and the ADA ..." to analyze whether the developments were accessible. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11905.) Sheriff also explained that he had performed field testing for 25 years using the same made-to-measure wheelchair. (*Id.* at 11907.) That wheelchair measured 28″ × 46″, which is slightly larger than the standard 26″ × 44″ wheelchair used by about 90% of the population. (*Id.*; Sheriff Dep., ECF No. 110–3, at PAGE ID # 16988–89.) The wheelchair's other dimensions also remained constant including, for instance, the distance between the floor and the arm rests, the floor and the handles, and the floor and the footplate. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11910, 11913–14.) Sheriff's report also contains photographs and diagrams illustrating how his wheelchair permitted him to measure things like reach ranges described in the CFR. (*Id.* at PAGE ID # 19556.) Therefore, the wheelchair constituted a reliable movable measuring tool. Sheriff indicated that he used the wheelchair to maneuver through and "evaluate[s] the various components of the living space for its intended purpose in regards to the ... requirements of the FHAA" and that his evaluation was based on his specialized knowledge. (*Id.* at PAGE ID # 11905–06.) Specifically, his evaluations were based upon his "understanding of the purpose and goals of the FHAA," "its Congressional intent," and his "experience working with individuals with disabilities in designing living spaces to meet their specific needs for usability and accessibility." (*Id.* at PAGE ID # 11905.)

Because the Court finds that Sheriff was an expert and that his opinions are relevant and reliable, the Rule 702 criteria has been satisfied. Plaintiff's Motion to Strike the Report and Testimony of Paul Sheriff (ECF No. 102) is **DENIED**.

**B. Motion to Exclude Expert Report and Testimony from Mark Drotar**

***16** Plaintiff also moves to exclude expert evidence from Drotar— a rebuttal expert who addressed opinion evidence from Plaintiff's expert, Blazik. Specifically, Blazik used a two-foot-long digital level to measure and calculate slopes for paved routes to common and public use areas at four of the developments and concluded that excessive slopes made many of them inaccessible. Drotar

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

analyzed Blazik's measurements and opined that they were inconsistent with the 1986 version of ANSI, which requires slope to be calculated by dividing the change in rise by the change in run. (Mark Drotar Report, ECF No. 100–5, at PAGE ID # 11057–58.) Drotar explained that run must be measured along the entire length of a feature such as a sidewalk. (*Id.*) Because Blazik instead measured run in two-foot increments, Drotar opined that she did not accurately measure run, and thus she could not accurately measure or calculate slope. (*Id.*) Drotar further concluded that even if Blazik's slope measurements were done accurately, her measurements would only reflect current slope conditions and would not reflect slope conditions that existed when the developments were constructed. (*Id.* at PAGE ID # 11058–59.) According to Drotar, that is because slopes in concrete sidewalks and asphalt pavements change when exposed to post-construction stressors, such as weather. (*Id.*) Drotar further opined that slopes for concrete pavement must be calculated with on-site measurements, and thus, any slope calculations for Andover Park based on Blazik's plan review are unreliable. (*Id.* at PAGE ID # 11059.)

After reviewing Drotar's *curriculum vitae*, the Court finds that he is an engineering expert. Drotar is a professional engineer licensed in 22 states. (*Id.* at PAGE ID # 11064.) He works as a senior project engineer at SEA, Ltd. ("S-E-A"), which is a forensic engineering firm. (*Id.* at PAGE ID # 1105; Mark Drotar Dep., 99–1, at PAGE ID # 8502.) In that capacity he performs failure studies and investigations with regard to constructed features. (Mark Drotar Dep. 99–1, at PAGE ID # 8502.) His experience includes measurement, confirmation, and determination of whether construction features, including sidewalks, are built in compliance with project plans and specifications. (*Id.* at PAGE ID #8510–11.) Prior to joining S-E-A, Drotar worked as a project manager at Timmerman Geotechnical Group, Inc.; a project engineer at EDP Consultants, Inc.; and an engineer at Foundation Design, P.C. (Mark Drotar Report, ECF No. 100–5, at PAGE ID # 11063–64.) Drotar has a master's degree in civil engineering, where his studies were concentrated on geotechnical engineering, or the science of soil. (Mark Drotar Dep., 99–1, at PAGE ID # 8506.) He has a bachelor's degree in civil engineering. (*Id.* at PAGE ID # 8505.) He took courses in concrete, soil materials, and asphalt as an undergraduate. (Id. at PAGE ID # 8506.)

Plaintiff asserts that Drotar is not qualified because he is not an expert in the FHAA. Nevertheless, the Sixth Circuit has long held that the fact that a "proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify." *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984); *see also*, *Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (unfamiliarity with some aspects of banking relationships merely affects weight and credibility, not admissibility). The proper remedy for any perceived deficiencies in Drotar's testimony is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Plaintiff urges that Drotar's opinion is not reliable because, in part, he "did not visit any of the [developments]" or "take his own measurements." (Pls' Mot. to Strike Drotar, ECF No. 100, at PAGE ID # 10288.) Drotar's opinion is not, however, being offered as evidence of a slope. It is being offered to demonstrate weaknesses in Blazik's methodology when taking slope measurements. Rebuttal experts like this generally do not independently assess a fact at issue but instead respond to a prior opinion. *See Rover Pipeline, LLC v. 1.23 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude)*, No. 17-CV-10365, 2018 WL 3322995, at *15 (E.D. Mich. July 6, 2018) (citing *E.E.O.C. v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("Rebuttal experts can properly respond[ ] to the content of [the original] expert witness' report and opinions") ). Drotar's report indicates that he received and reviewed Blazik's expert reports for this matter, video clips of her site inspection, and transcripts from her deposition. (Drotar Report, ECF No. 100–5, at PAGE ID # 11056.) Accordingly, the Court finds that Drotar's rebuttal opinion is supported by sufficient facts and data and that the opinion is thus reliable for rebuttal purposes. Plaintiff's other objections to the reliability of Drotar's report go to the weight of the opinion, not its admissibility.

***17** The Court also finds that Drotar's expert opinions are relevant and will aid the trier of fact. Plaintiff alleges that excessive slopes make routes to common and public use areas inaccessible at the developments. That allegation is based on her slope measurements. Testimony that challenges how she determined those measurements is probative rebuttal evidence.

Because the Court finds that Drotar was an expert and that his opinions are relevant and reliable, the Rule 702 criteria has been satisfied. Plaintiffs Motion to Strike the Report and Testimony of Mark Drotar (ECF No. 100) is **DENIED**.

## IV. DEFENDANTS' MOTION IN LIMINE

As previously indicated, Defendants' expert, Sheriff, assessed four of the developments in this matter and he video recorded that assessment. In September of 2016, he prepared a report which incorporated the video recording by reference. The record reflects that Plaintiff received a copy of the report and the video before deposing Sheriff in this action in July of 2017; Plaintiff had both items at the deposition; Plaintiff played portions of the video at the deposition; and Plaintiff questioned Sheriff about both items while Sheriff was under oath. Indeed, Plaintiff marked Sheriff's report and the video as exhibits at Sheriff's deposition. (Dep. of Paul Sheriff, ECF No. 98–8, at PAGE ID # 7745.) In December of 2017, however, Sherriff unexpectedly passed away. Defendants move for an order *in limine* permitting them to use Sheriff's report and video at trial.

Federal Rule of Evidence 804 provides that in certain circumstances, former testimony from a witness is not excluded by the rule against hearsay when that witness is unavailable. Specifically, Rule 804(b)(1) provides that when a declarant is unavailable, the Court may accept into evidence:

> **(1) Former Testimony**. Testimony that:
>
> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> (B) is now offered against a party who had–or, in a civil case, whose predecessor in interest had–an opportunity to and similar motive to develop it by direct, cross, or redirect examination.

The Rule allows the use of deposition testimony from a deceased witness because the opponent of the party seeking admission is typically present at a deposition and thus has the opportunity to cross-examine the witness. Such are the circumstances here.[16] Accordingly, the Court finds that Sheriff's deposition, and any items marked as exhibits at the deposition, including the report and video, may be used at trial. *See Gore v. Maritime Overseas Corp.*, 256 F. Supp. 104, 119 (E.D. Pa. 1966), *aff'd in part, rev'd in part*, 378 F.2d 584 (3d Cir. 1967) (finding that because deposition was admissible, exhibits marked at the deposition were admissible). *See also, Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp.*, 729 F. Supp. 1488, 1499 (D.N.J.), *aff'd sub nom, Associated Bus. Tel. Sys. Corp. v. Greater Capital Hotel Corp.*, 919 F.2d 133 (3d Cir. 1990), and *aff'd sub nom, Appeal of Greater Capital Hotel Corp.*, 919 F.2d 135 (3d Cir. 1990), and *aff'd sub nom, Greater Capital Hotel Corp. v. Dalia*, 919 F.2d 135 (3d Cir. 1990) (stating that "[i]t is well established that generally, if a deposition is admissible, exhibits marked at the taking of the deposition are admissible").

***18** Defendants' Motion in Limine (ECF No. 125) is **GRANTED**. Plaintiff's Motion to Stay Defendant's Motion in Limine (ECF No. 126), and Plaintiff's Motion for Expedited Briefing on its Motion to Stay (ECF No. 127), are both **DENIED** as moot.

## V. PLAINTIFF'S UNOPPOSED MOTION FOR HEARING

Plaintiff previously moved the Court for a telephonic hearing to discuss pending deadlines. (ECF No 143.) The Court delayed determination of that motion while the parties' potentially dispositive motions were under active consideration. The Court also Ordered the parties to submit mutually agreeable dates for trial. (ECF No. 147.) The parties have done so. (ECF No. 149.) In their joint submission of dates, the parties also indicate that they have agreed to participate in two days of private mediation starting October 17, 2018. (*Id.*) Accordingly, the Court **STAYS** this action pending that mediation. The parties are **ORDERED** to file a status report describing the results of their mediation by or before October 24, 2018. In their status report, the parties must indicate a mutually agreeable time for a telephonic conference during the week of October 29, 2018, should the parties continue to need one. The Court will revisit the issue of trial dates after the stay in this matter is lifted. Plaintiffs Unopposed Motion for Hearing (ECF No. 143) is **GRANTED** subject to these conditions.

## VI. CONCLUSION

For all the reasons previously described, the Court **DENIES** the following motions: Plaintiffs Motion to Strike the Report and Testimony of Mark Drotar (ECF No. 100); Defendants' Motion for Summary Judgement (ECF No. 101); Plaintiff's Motion to Strike the Report and Testimony of Paul Sheriff (ECF No. 102); Plaintiff's Motion for Partial Summary Judgment (ECF No. 103).

The Court **DENIES** the following as **MOOT**: Plaintiff's Motion to Strike Defendants' Inadmissible Affidavit Evidence (ECF No. 123); Plaintiffs Motion to Stay Defendants' Motion in Limine (ECF No. 126); Plaintiff's Motion for Expedited Briefing on Defendants' Motion to Stay (ECF No. 127).

The Court **GRANTS** the following motions: Defendants' Motion in Limine Permitting Use of Paul Sheriffs Report and Video (ECF No. 125); Plaintiff's Unopposed Motion for Hearing (ECF No. 143).

Finally, prior to a trial in this case, the Court will hold an oral argument as to whether the OBC's scoping requirements are coterminous with the FHAA requirements, as described in Footnote 13, *Infra.*

This is action is **STAYED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4690790

Footnotes

1 PREI, LLC sold its membership interest in Palmer Square, LLC and Clifton Park, LLC in 2015. Aff Nicholas King, ¶ 8, ECF No. 101–6, at PAGE ID # 11295.

2 "Multifamily dwellings" covered by the FHAA are defined as "(A) buildings consisting of 4 or more units if such buildings have elevators; and (B) the ground floor units in other buildings consisting of 4 or more units." 42 U.S.C. § 3604(f)(7). The parties appear to agree that the ground floor units at all five developments in this case are covered multifamily dwellings.

3 The American National Standard Institute is a private non-profit organization that establishes, among other things, standards for achieving accessibility in construction.

4 The Guidelines provide that "... for primary entry doors to covered units, doors that comply with ANSI 4.13 would meet this requirement.... [w]ithin individual dwelling units, doors intended for user passage through the unit which have a clear opening of at least 32 inches nominal width when the door is open 90 degrees, measured between the face of the door and the stop, would meet this requirement...." 56 Fed Reg. at 9506.

5 HUD regulations identify the 1986, 1992, 1998, and 2003 versions of ANSI-A117.1 as safe harbors for the FHAA's adaptive design requirements. 24 C.F.R § 100.205(e)(1). HUD regulations also identify the following safe harbors for the FHAA's design and construction requirements: 1) the Guidelines; 2) the FHAADM, published in 1986, updated in 1998; 3) the 2000 ICC Code Requirements for Housing Accessibility published in October of 2000, with corrections contained in an ICC-issued errata sheet; and 4) the 2000, 2003, and 2006 versions of the International Building Codes provided certain conditions are met. *Id.* § 100.205(e)(2)(i)–(vi).

6 Two affidavits are attached to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment: an October 26, 2017, Affidavit from Robert Schutz (ECF No. 112–13) and an October 27, 2017, Affidavit from Thomas Warner (ECF No. 113–4). Plaintiff challenged specific averments in both of those affidavits and moved the Court to strike them. (ECF No. 123.) The Court did not rely on any of the challenged provisions when ruling on any pending motion because, in part, of the parties' responses to the Court's Order for additional briefing. (ECF Nos. 148, 150, 151, 152, 153.) For that reason, Plaintiff's Motion to Strike Inadmissible Evidence (ECF No. 123) is **DENIED** as moot.

7 Blazik assessed whether the developments complied with the Guidelines, which references the FHAADM and incorporates a number of provisions of the 1986 version of ANSI A117.1 (Blazik Dep., ECF No 57–8 at PAGE ID #1824–25.)

8 The parties agree that the 2003 OBC was in effect when Alexander Square was designed and constructed and that the 2011 OBC was in effect when the rest of the developments in this case were designed and constructed.

9 Some courts have adopted a burden-shifting framework for design and construction cases, pursuant to which a plaintiff can be awarded summary judgment if a plaintiff demonstrates that a covered multifamily dwelling does not comply with the Guidelines or the ANSI A117.1 standards and a defendant fails to respond by presenting evidence that the covered dwelling complies with some other accessibility standard. *See e.g., United States v. Tanski*, No. 1–04–cv–714, 2007 WL 1017020, at *11 (N.D. N.Y. Mar. 30, 2007); *United States v. Quality Built Constr.*, 309 F.Supp. 2d 756, 763 (E.D.N.C. 2003). Plaintiff suggests that this is the governing standard. The Sixth Circuit has not, however, adopted that burden-shifting framework and has instead noted that "the Guidelines, though relevant and highly significant, are not decisive" and on that basis upheld a district court's decision to deny a plaintiff summary judgment where the plaintiff presented unrebutted proof of Guideline deviations. *Village of Olde St. Andrews*, 210 Fed. App'x at 481–82, *aff'g* 250 F. Supp. 2d 706, 720 (W.D. K.Y. 2003) ("The Court cannot grant summary judgment for Plaintiff's where the only uncontested evidence presented by Plaintiffs is a failure to meet the requirements set out in HUD's Guidelines.") In any event, even if that burden-shifting framework governed, Plaintiff would still not be entitled to summary judgment in this case

because Defendants have presented some evidence challenging each of the FHAA violations explicitly raised in Plaintiff's motion.

10 The parties agree that Alexander Square is governed by the 2007 OBC. The 2007 OBC contains accessibility provisions for units that can be met if a builder complies with provisions from the 2003 version of ANSI A117.1, and accessibility provisions for other areas that can be met by complying with provisions from the Americans With Disabilities Act Accessibility Guidelines ("ADAAG").

11 The parties agree that the 2009 version of ANSI A117.1 is not one of the HUD recognized safe harbors.

12 Defendants indicate that the scoping requirements for the 2007 OBC, which governed Alexander Square, are based on the 2006 version of the IBC, which is a HUD recognized safe harbor. (Deft' Supp. Brief., ECF No. 151, at PAGE ID # 20182.) Plaintiff asserts that the IBC's is a safe harbor only when adopted without modifications, and that Ohio significantly modified the 2006 IBC when it developed the 2007 OBC. (Pl's Resp., ECF No. 152, at PAGE ID # 20418, n.9.) Plaintiff also asserts that the Columbus Building Department incorrectly interprets the ANSI A117.1 provisions that are referenced in the 2007 OBC, and thus, Plaintiff contends that permits are issued even when those standards are not met. Either way, the parties do not agree that the 2007 OBC's scoping requirements are coterminous with the FHAA's requirements and the Court is unable, on the basis of the arguments presented, to conclude that as a matter of law, they do.

13 Whether or not the OBC's scoping requirements match or incorporate the FHA's requirements is a complex and technical question of law. If the parties' upcoming mediation is unsuccessful, the Court will issue an Order prior to trial delineating the legal issues that will need to be resolved by the Court and the factual issues that will need to be resolved by the jury.

14 Defendants did not move to exclude any portion of Blazik's expert report.

15 In light of this conclusion, the Court does not address the parties' arguments related to veil piercing.

16 Plaintiff acknowledges that Defendants can use Sheriff's deposition at trial. (Pl's Opp. Defs' Mot in Limine, ECF No. 129, at PAGE ID # 19520.)

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 5957833
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

# Howard MILLER v. THANE INTERNATIONAL, INC. et al.

No. SACV 03-1031-JVS(SGLx).
|
March 3, 2005.

Named Expert: Candace L. Preston & Bradford Cornell Ph. D.

**Attorneys and Law Firms**

Daniella Quitt, Joel C. Feffer, Peter W. Overs, Jr., Robert I. Harwood, Wechsler and Harwood, New York, NY, Lionel Z. Glancy, Michael M. Goldberg, Peter A. Binkow, Glancy Binkow and Goldberg, Los Angeles, CA, for Howard Miller.

Colin H. Murray, Baker & McKenzie Wells Fargo PLZ, Lawrence H. Davidson, Marshall S. Brenner, Roger M. Mansukhani, Gordon & Rees, San Diego, CA, Daniel J. Tyukody, Jr., Jason L. Krajcer, Michael C. Tu, Orrick Herrington and Sutcliffe, Los Angeles, CA, for Thane International, Inc., William F. Hay, Denise Dubarry-Hay, Kevin J. McKeon, and Mark Taylor.

**ORDER:**

*(1) Granting Plaintiffs' Motion to Strike Defendants' Expert's Reports;*

*(2) Granting in Part Defendants' Motion to Exclude Expert Report and Testimony of Candace L. Preston*

Honorable JAMES V. SELNA, District Judge.

***1** The Plaintiff Class ("Class") moves this Court for an order striking the expert reports of Bradford Cornell, Ph.D. ("Cornell") and preventing him from giving expert testimony. Defendants Thane International, Inc., William F. Hay, Denise Dubarry-Hay, Kevin McKeon and Mark Taylor (collectively "Thane") also move this Court, pursuant to Federal Rule of Evidence ("FRE") 702, for an order excluding the expert opinion report and testimony of Candace L. Preston ("Preston"). The Court denies the Class' motion and grants, in part, and denies, in part, Thane's motion.

**Discussion**

FRE 702 governs the admission of expert testimony, a decision in which the Court has "broad latitude." *Elsayed Mukhtar v. California State Univ., Hayward,* 299 F.3d 1053, 1064 (9th Cir.2002). Under FRE 702, in order for a court to admit expert testimony, the party offering such evidence must show it to be both reliable and relevant. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590-91, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Specifically, FRE 702 permits expert testimony "if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

When assessing the reliability of an expert's method or technique, a court should consider the four *Daubert* factors: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory has gained general acceptance by the relevant scientific community. *Daubert,* 509 U.S. at 593-94.

If, after applying these factors, a court determines that the expert's methods are reliable, the court must then decide whether the testimony is relevant, i.e. whether it fits the facts of the case and will assist the trier of fact. *Id.* at 591-92. Once this decision is made, the court has fully performed its "gatekeeping" function and may admit an expert. Fed.R.Evid. 104(a).

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

*1. The Class' Motion to Exclude Expert Opinion Report and Testimony*

The Class asks this Court to strike Cornell's reports and prevent him from testifying. According to the Class, the reports: (1) are not based on accepted methodology; (2) are likely to confuse the jury at trial; and (3) are unreliable because they are inconsistent with Cornell's deposition testimony. As a result, the Class contends, the reports fail to meet the reliability and relevancy standards established by *Kumho Tire.*

Primarily the Class argues Cornell's reports are inadmissible because he refers to and uses techniques applicable only to efficient markets[1] while failing, as he admitted at deposition, to actually determine that Thane's stock was efficient. (Deposition of Bradford Cornell, Ex. 5 to December 16, 2004 Declaration of Joel C. Feffer [hereinafter "Cornell Depo.], at 65:19-23.) According to the Class, two problems related to FRE 702 arise from this inconsistency. First, if the market for Thane's stock was not efficient, as the Class contends it was not,[2] Cornell's methodology was inappropriate and his conclusions are unreliable. Second, because the methods that Cornell used assume that Thane's stock was efficient, a jury will believe, in error, that Cornell concluded that Thane's stock was efficient.

***2** The Class asserts that the inconsistency in Cornell's reports render them unreliable because, unless Thane traded efficiently, the "event study" Cornell conducted to determine that the Class suffered little or no damages as a result of Thane's failure to list its stock on the Nasdaq National Market ("Nasdaq-NMS") is invalid.[3]

Event studies are important to damage analyses in securities cases because they filter out price effects that cannot be legally attributed to the defendant. *In re Imperial Credit Indus. Sec. Litig.,* 252 F.Supp.2d 1005, 1014-15 (C.D.Cal.2003). Such studies examine how a stock price responds to the release of company-specific information, while accounting for what is happening in the market overall and in an index of comparable companies.

In his event study, Cornell analyzed Thane's stock price movements in response to public news announcements from May 24, 2002, when the stock was first publicly traded, through September 23, 2002, when the Class filed the complaint, to determine whether those events were statistically significant. According to Cornell, while the market for Thane's stock was not perfectly efficient, his study showed that Thane's stock price moved in statistically significant ways upon the release of company-specific information and reflected both market and industry events. (Declaration of Bradford Cornell [hereinafter "Cornell Decl."], ¶¶ 4, 6, 8, 11; Cornell Report, p. 9.) For example, when Thane's August 14, 2002 earnings announcement disclosed a $0.06 drop per share, Thane's share price declined 46% over a three-day trading period, (Cornell Decl., ¶ 6, 11; Cornell Report, p. 9.) From these figures and through comparisons of Thane's performance to that of various indexes (Cornell Decl., ¶ 9; Cornell Report, p. 8), Cornell concluded that the decline in Thane's share price was not related to the failure to list on the Nasdaq-NMS, and the Class suffered no damages from the purported misrepresentation in the Proxy Statement/Prospectus. (Cornell Report, p. 9.)

According to the Class, an event study "assumes that the markets are informationally efficient, such that security prices reflect all publicly available information, and price changes reflect new information." Jerayr Haleblian & Sydney Finkelstein, *The Influence of Organization Acquisition Experience on Acquisition Peformance: A Behavioral Learning Perspective,* Admin. Sci. Q., March 1999, at 5. Because of this assumption, the Class contends that Cornell erred in conducting an event study without first determining that Thane's stock was efficient.

In response, Thane asserts that event studies do not require a prior determination that a market is efficient. (Cornell Decl., ¶ 13.) Rather, event studies themselves can determine the degree to which a market is efficient. (Ex. B to Supplemental Declaration of Michael Tu, W. Sharpe, G. Alexander & J. Bailey, *Investments* [hereinafter "Sharpe"] 97 (5th ed.1995).) Accordingly, Thane contends Cornell's use of an event study without determining, in advance, Thane's stock to be efficient was appropriate. Furthermore, and perhaps more importantly, Thane argues that, contrary to the Class' assertions, Cornell's methods are appropriate and his reports are not misleading because he has been consistent in his opinion that Thane's stock, while not perfectly efficient, is efficient with respect to particular sets of information.

***3** The Class rebuts this assertion by arguing that the concept that a stock can be efficient with respect to select information is counter-intuitive. Responding to the Class, Thane states that this statement merely demonstrates the Class' fundamental misunderstanding of the efficient market theory.

According to Thane, the Class' belief that an efficient market is an "on/off switch," i.e. stocks that are not

perfectly efficient cannot absorb any information over any length of time, is nonsensical. (Thane's Opp'n, p. 1.) Rather, Thane asserts, efficiency exists on a continuum. (Sharpe, at 105-06 (noting the three forms of market efficiency, weak, semistrong, and strong).) Therefore, even though a stock may not be perfectly efficient, it can still be efficient, i.e. impound information into its price, with regard to certain information sets. (*Id.* at 106 ("A market is efficient with respect to a particular set of information....").)

This concept, Thane contends, not only is a fundamental tenet of modern finance theory, but is one that simply makes sense for two reasons. First, because perfectly efficient and perfectly inefficient markets rarely, if ever, exist, market efficiency naturally must be measured in degrees, rather than in the absolute. Second, some types of information are clearly easier to observe and process than others. Therefore, certain information will be absorbed more rapidly than others. For example, were Thane to decide to change its product mix, the new information might not get immediately impounded into its price because the stock was thinly traded and lacked analyst coverage. On the other hand, knowledge of where Thane's stock was traded was immediately obvious. Accordingly, Thane argues, this latter information must have been incorporated rapidly into Thane's stock price.

Based on these concepts and the fact that Cornell found that Thane's stock demonstrated objectively measurable efficiency with respect to particular sets of information,[4] Thane contends that the event study that Cornell conducted was appropriate and not misleading.

The Court agrees with Thane. The authorities to which Thane cites clearly show that market efficiency exists on a continuum and that a stock can be efficient with regard to particular information sets. Because Cornell has indicated in both his Report and his Declaration that, although it was not perfectly efficient, Thane's stock did respond to certain information, indicating some level of efficiency, the Court finds that his report is not misleading and does not threaten to confuse the jury. In light of this finding, and because the Court finds that an expert need not make a determination of efficiency prior to conducting an event study (because such studies are designed to show where on the continuum a particular stock lies), the Court further finds that Cornell's use of an event study, even absent regression analysis and in spite of his opinion that the efficiency of Thane's stock was a "gray area" (Cornell Depo., p. 66), was appropriate in this context.

***4** Besides its main contention regarding the efficiency of Thane's stock, the Class raises several other issues in its motion. First, the Class asserts that Cornell's statements that the market was fully aware of where Thane's stock was listed are misleading. In the reports, Thane contends that the term "market" appears to include all Thane shareholders. Cornell, however, testified in his deposition that, by the term "market," he means only those people buying and selling the stock. (Cornell Depo., at 64:4-5). The Class asserts that this inconsistency could mislead the trier of fact.

The Court disagrees. In the context of the market efficiency arguments in which these statements were made, they cannot be misleading because a belief that Cornell intended the term "market" in these statements to mean "every single shareholder" is absurd. If every single shareholder, regardless of whether they were actually buying or selling shares and thereby affecting share price, needed to be aware of a certain information set in order for the market to be efficient with regard to this information, i.e. for it to be reflected in the share price, markets would never be efficient with regard to anything. Clearly this is not the case. In reality, even in highly efficient markets, e.g. Microsoft, every single shareholder need not be aware of all of the information affecting the stock in order for financial analysts to conclude that the information is completely impounded into the share price.

Next, the Class asserts that, in violation of Federal Rule of Civil Procedure ("FRCP") 26, neither of Cornell's reports cite with any degree of specificity what evidence he relied upon in reaching his conclusions. The Court disagrees. The Court finds that Cornell has clearly explained the data upon which he relied, the methods he used, and the manner in which he reached his conclusions.

Finally, the Class contends that the reports were "ghost-written" by others, including attorneys and assistants. With regard to Cornell's interactions with his attorneys, it is well-established that experts may discuss aspects of their reports with counsel in the course of their preparation. Advisory Committee Notes to the 1993 Amendments to Fed.R.Civ.P. 26(a)(2). Under this rule, the Court finds no evidence that Cornell improperly interacted with Thane's attorneys. Next, on the issue of assistants, federal courts have held that experts may use assistants to help them prepare expert reports so long as the experts sign the report and attest to the accuracy of their contents. *United States v. Dallide,* 227 F.3d 385, 392 n. 6 (6th Cir.2000). Here, Cornell has testified that he reviewed all of the event study calculations performed by his assistants and that he drew his own conclusions about what the data showed. (Cornell Depo., at 50:17-23 .) Accordingly, the Court finds Cornell's use of assistants

here to be appropriate.

Based on the foregoing, the Court finds that Cornell has reliably applied accepted methods and techniques to the facts of this case in satisfaction of *Daubert, Kumho Tire* and FRE 702. Furthermore, the Court finds that Cornell's reports and testimony will assist the trier of fact and are therefore relevant. The Court denies the Class' motion. Fed.R.Evid. 702.

*2. Thane's Motion to Exclude Expert Opinion Report and Testimony*

***5** Thane seeks to exclude Preston's expert report and prevent her from testifying at trial because she used unscientific and unreliable methods to arrive at conclusions that are self-contradicting. For these reasons, Thane contends, Preston's report fails to satisfy the requirements of FRE 702 and is inadmissible under *Daubert* and *Kumho Tire.*

First, Thane takes issue with Preston's opinion that, because Thane's stock did not trade efficiently, the market could not react to the alleged misrepresentation in the Proxy Statement/Prospectus, even though it was material. According to Thane such a situation defies modern finance theory, which holds that a market that absorbs information will respond via stock price changes. (E. Fama, *Efficient Capital Markets: II,* J. Fin. 1575 (Dec.1991).) In other words, it is simply impossible for information to be absorbed by, or material to, the market without clearly affecting the stock price. (G. Dent, *Dual Class Capitalization: A Reply to Professor Seligman,* 54 Geo. Wash. L.Rev. 725, 741-41.) On this basis, Thane contends, it is fundamentally inconsistent for Preston to opine that, even though there was no quantifiable effect on Thane's share price, the market was nervous about, or paying attention to, the alleged misrepresentation. According to Thane, this inconsistency renders Preston's report unreliable.

In addition, Thane contends that Preston contradicts herself by concluding that the alleged misrepresentation was material while claiming to be unable to discern a point where the market impounded that information into Thane's stock price. According to Thane, it would be impossible to determine that information was material, or had some effect, if one could not find some point at which share prices reflected this information.

Finally, Thane disputes Preston's assertion that she could opine that the purported misrepresentation was material based on the contents of the Proxy Statement/Prospectus simply because of her professional expertise. (Deposition of Candace L. Preston, Ex. D. to Declaration of Michael C. Tu [hereinafter "Preston Depo."], at 86:17-87:8.) In Thane's opinion, first, an expert's expertise, without more, is not an appropriate method to use to draw conclusions, and, second, reading a prospectus is not an exercise that requires an expert. Rather, a court or a trier of fact can competently read a prospectus and draw conclusions therefrom. *See In re Stratosphere Corp. Secs. Litig.,* 66 F.Supp.2d 1182, 1188 (D.Nev.1999) (stating that it "does not take any special competence, for example, to read pertinent public documents (e.g. prospectuses, press releases, and recorded statements) to determine whether certain risks were conveyed to the public").

Although not directly addressed by the Class in its opposition to Thane's motion, the Court nonetheless disagrees with Thane that, on the above bases, Preston's report should be excluded. First, the Court finds that Preston's report does conclude that, after ten days, the alleged misrepresentation, even if not completely absorbed, was reflected to some degree in Thane's share price. (Preston Report, ¶¶ 49-51.) According to Preston, beginning on June 4, 2002, Thane's share price began to decline and underperform certain competitor companies and general market indexes. (*Id.* at ¶ 49, 51.) Because the first evidence of any company- or market-related events that could have completely accounted for the decline was Thane's earnings release on June 25, 2002, the Court finds that Preston's opinion that the decline was due, at least in part, to the purported misrepresentation is reasonable and reliable.[5]

***6** The Court, therefore, will allow Preston to express the opinions in paragraph 49 through the end of the second sentence in paragraph 51 of Preston's report that the purported misrepresentation was material because the stock price declined after June 4, 2002. The Court, however, specifically prohibits the Class from using this portion of the expert report as evidence of damages because Preston did not even attempt to factor out the effect of other events that could have accounted for a portion of the decline.

The Court also finds that the first portion of Preston's report, in which she deals with issues of materiality (*Id.* ¶¶ 13-25) and whether investors were misled (*Id.* at ¶¶ 26-39) are reliable and relevant. The Court disagrees with Thane's assertion that Preston's review of the Proxy Statement/Prospectus could have just as easily been done by this Court. Here, Preston did not merely review the Proxy Statement/Prospectus to determine exactly what

information it contained. Rather, Preston used her experience as a financial analyst to opine on the reason why Thane included certain statements in the Proxy Statement/Prospectus and the importance of this document to investors, especially because the merger created a new company without a track record. Preston also drew upon her experience as a financial analyst to render reliable and relevant opinions on the benefits of listing on the Nasdaq-NMS, as opposed to the Nasdaq-OTCBB.

The Court, therefore, finds Preston's opinions on materiality and whether investors were misled (*Id.* at ¶¶ 13-39) to be reliable, as based upon her professional experience, and relevant because they will assist the trier of fact. Accordingly, the Court will allow Preston to express the opinions in paragraphs 13 through 39 of Preston's report that the alleged misrepresentation was material and misled investors. The Court further permits Preston to use this portion of her report to show that the Class was damaged to some degree by the purported misrepresentation. The Court, however, notes that these opinions are not a substitute for damage computations that factor out other events that may have contributed to the decline in Thane's share price.

Next, Thane contends that Preston's attribution of the entire loss in value of Thane's stock price to Thane's failure to list on the Nasdaq-NMS is based on wholly unreliable methods. According to Thane, Preston errs in finding that, because Thane's stock was not perfectly efficient, all of the market events, aside from the alleged misrepresentation, that occurred during the twenty-one months after the merger are irrelevant. Thane further contends that because Preston's fundamental premise was flawed, her conclusion that the entire decline in Thane's share price can be attributed to the purported misrepresentation is invalid.

As noted above, the Court agrees with Thane that a stock need not be perfectly efficient in order for its price to reflect company- or market-related information. Based on the evidence contained within Cornell's report, the Court finds that during the twenty-one months after the merger Thane's stock price was affected by a number of things, including general market and industry trends and Thane's earning reports.

***7** Furthermore, based on Cornell's report and testimony and the authorities upon which he relied, the Court finds that Preston could and should have factored out, at least to some degree, these effects in order to determine the effect of the alleged misrepresentation on Thane's share price. The Court, therefore, finds Preston's failure to even attempt to control for or quantify such factors unacceptable under *Imperial Credit. See* 252 F.Supp.2d at 1016 (holding that an expert's opinion must take into account "market events for which Defendants cannot be held responsible" and must "eliminate that portion of the price decline of [the] stock which is unrelated to the alleged wrong."). The failure to factor out the effect of known events is not merely one of degree to be brought out on cross-examination, but represents a fundamental flaw which invalidates Preston's damage calculation. Preston's criticism's of Thane's efficiency may explain her inability to determine the point at which the market impounded Thane's failure to list on the Nasdaq-NMS; it is not the basis for ignoring events such as the drop in Thane's share value following its negative August earnings report.

The Class, however, vigorously opposes this conclusion on the grounds that at least one federal court has accepted the type of "event analysis" Preston conducted here. In *RMED International, Inc. v. Sloan's Supermarkets, Inc.,* 2000 WL 310352 (S.D.N.Y. Mar.24, 2000), *aff'd,* 2000 WL 420548 (S.D.N.Y. April 18, 2000), the Court admitted a non-statistical event analysis, allegedly similar to the one in this case, conducted by Preston. There, the court accepted Preston's event analysis, even though she had not used any formal statistical methods, because the required price history for the stock did not exist. *Id.* at *7. Because the situation here is analogous, the Class argues that this Court should also find the method Preston employed in *Sloan's* to be acceptable. The Court, however, need not opine on the acceptability of this method because Preston did not conduct the same type of analysis here.

In *Sloan's,* the court specifically notes that, in her event analysis, Preston "account[ed] for general economic, market and industry influences" and "analyze[d] company-specific events which might have been the cause of the price movement of Sloan's stock." *Id.* at *4. The court even distinguishes Preston's event analysis from that performed in *In re Oracle Securities Litigation,* 829 F.Supp. 1176 (N.D.Cal.1993), where the expert "failed to employ any methodology to eliminate information ... other than the alleged fraud that might have influenced the stock price," on this ground. *Id.* at 1181. According to the court, Preston's method differed from that used in *Oracle* because she "conducted a microanalysis of each company-specific event which could have influenced Sloan's stock price, methodically charting those events on a daily basis." *Sloan's,* 2000 WL 310352, at *6.

***8** Because this Court finds that Preston did not employ

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

any of the methods that she used in *Sloan's* to control for outside effects on share price, the Court is not persuaded by this case to accept that portion of Preston's report related to damages. Accordingly, the Court remains firm in its decision that Preston's conclusions on the issue of damages and her damage calculations are unreliable because they are not based on an accepted methodology. The Court, therefore, grants Thane's motion to exclude Preston's expert report insofar as it relates to the issue of damages or damage calculations. Fed.R.Evid. 702. The Court also bars her from providing testimony on either of these issues, as well.

Next, Thane attacks Preston's "economic suicide" theory, which Preston offers to explain why Thane's shareholders did not sell their shares as soon as the purported misrepresentation was revealed. In this theory, Preston asserts that, even though shareholders thought the alleged misrepresentation was material, they nevertheless decided not to sell their shares at a profit, because they collectively knew that "it would have been virtually impossible" to sell "more than a few hundred shares at any given time" without depressing the stock's price. (Preston Report, at ¶ 55.) The Court finds this to be little more than unsubstantiated speculation.

The Class notes that the statement in the Proxy Statement/Prospectus states, "Sales of a substantial number of shares of Thane common stock in the public market after this offering could depress the market price of Thane common stock." (Ex. 18 to Opposing Declaration of Joel C. Feffer.) While undoubtedly true, this does not explain why an investor would hold if he believed that continued retention of the stock was to his detriment. And it hardly explains why a savvy investor who first perceived the effect of the misrepresentation would not attempt to be the first out of the market, presumably beating or minimizing the effects of any slide.

Finally, Thane takes issue with the portion of Preston's report dealing with bid-ask spread. According to Thane, when comparing the bid-ask spread that Thane experienced after the merger with what Reliant shareholders experienced before the merger, Preston failed to include the days in which Reliant had spreads well in excess of those experienced by Thane. At her deposition, Preston could not offer an explanation for her failure to include the larger Reliant spreads beyond, "This is about Thane." (Preston Depo., at 172:21-22.) The Court finds this unconvincing.

In addition, in her comparison between Thane's spreads and those of a weighted average of the entire Nasdaq-NMS, Preston used Thane's "outside" spreads[6] but the Nasdaq-NMS' "inside" spreads[7]. Thane contends that this comparison is misleading because inside and outside spreads are not comparable. Furthermore, Thane asserts that the comparison would have been inappropriate even had Preston used all "inside" spreads. Because the weighted Nasdaq-NMS index contains very large companies, such as Microsoft, that, because of their large public floats and significant analyst following, have very narrow spreads, it is inherently not comparable to the spreads of companies like Thane that have small public floats and little to no analyst following. The Court agrees on both points.

***9** Accordingly, the Court excludes Preston's comparisons of spreads, paragraphs 43 through 45 of her report, as misleading, and therefore, unreliable under FRE 702. Fed.R.Evid. 702.

## All Citations

Not Reported in F.Supp.2d, 2005 WL 5957833

Footnotes

1 A perfectly efficient market is one in which every security's price equals its investment value at all times. (Ex. B to Supplemental Declaration of Michael Tu, W. Sharpe, G. Alexander & J. Bailey, *Investments* 105 (5th ed.1995).) In a perfectly efficient market, a set of information is fully and immediately reflected in market prices. (*Id.*) An irrational market, or one in which stock prices never bear any particular relationship to investment value, is the opposite of a perfectly efficient market. (*Id.* at 106.) Although financial experts conclude that U.S. securities markets are neither perfectly efficient nor irrational, most consider these markets to be much more efficient than irrational. (*Id.* at 106.)

2 The Class contends that even Cornell admitted Thane's stock failed to meet the criteria for efficiency laid out in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989), when he acknowledged Thane's low trading volume, lack of analyst following and the existence of only one or two market makers. (Class Mot'n, p. 11; Cornell Report, p. 6; Cornell Depo., at 108:17-19; 109:17-20; 109:25-110:2.)

3 In addition to contesting the fundamental appropriateness of the event study, the Class also contends that Cornell conducted the event study incorrectly because he failed to perform a regression analysis. (Cornell Depo., at 77:8-12.) As support for this

contention, the Class points to *In re World Access, Inc. Sec. Litig.,* 310 F.Supp.2d 1281 (N.D.Ga.2004), which explains that an event study is a "statistical regression analysis that examines the effect of an event, such as an allegedly fraudulent statement or omission, on a dependent variable, such as a company's stock price." *Id.* at 1298 n. 10.

Thane, on the other hand, disagrees with the Class' reading of *In re World Access* and contends that this case, and those like it, merely describe the particular method of event study used in those cases, not lay down their legal requirements. Thane asserts that regression analyses are not essential to event studies. As proof, Thane cites an article written by Haleblian & Finkelstein (and cited by the Class) that explicitly refers to event studies that are only adjusted for market factors and that do not involve regression analyses.

Upon review of this authority, the Court must agree with Thane that event studies do not require regression analyses. Therefore, the Court cannot strike Cornell's expert reports on this basis.

4 The Class argues that the share price movements that Cornell observed are unreliable because Thane's stock also moved appreciably without any corresponding release of information. In response, Thane asserts that such movement is not rare and that even highly efficient markets exhibit some statistically significant price movements in the absence of publicly disclosed information. (Ex. E to Supplemental Declaration of Michael Tu, R. Roll, *$R^2$,* J. of Fin. 541, 559 (July 1998).) Furthermore, these types of statistically significant movement become even more common when stocks trade at low dollar values because at those levels percentage changes are magnified.

Based on the authority Thane cites and the simple mathematics, i .e. a change of a few cents appears more significant for a stock priced at two dollars than for a stock priced at ten, the Court agrees with Thane and finds that these changes do not render the results of Cornell's event study unreliable.

5 In reaching this conclusion, the Court did not consider the issue of whether or not damages may be available for the period of the post-June 4, 2002 decline during which the shares traded above the imputed merger price. The Court simply determined whether Preston's report contained any reasonable conclusions that the alleged misrepresentation affected Thane's share price.

6 An "outside" spread is a single market maker's bid and ask prices.

7 Under the "best execution" rules governing the Nasdaq, a broker must sell at the highest bid price and buy at the lowest ask price from all dealers making a market. This is known as the "inside spread."

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 989280
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan,
Southern Division.

NEXT WEEK ROVER PIPELINE LLC, Plaintiff,
v.
1.23 ACRES OF LAND, et al., Defendants.

Case No. 17-10365
|
Signed 03/01/2019

**Attorneys and Law Firms**

Douglas A. Donnell, William A. Horn, John M. DeVries, Nikole Canute, Mika Meyers Beckette & Jones, Grand Rapids, MI, Thomas A. Zabel, Zabel Freeman Law Firm, Houston, TX, for Plaintiffs.

William J. McHenry, Law Office of William J. McHenry, PLLC, Farmington Hills, MI, for Defendants 0.33 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 0.91 Acres of Land, More or Less, Temporary Work Space, In Livingston County, Michigan, Elaine A. Simcheck a, Elaine A. Simcheck, Michael Simcheck, Meadowbrook Acres, Inc.

Zachary Joseph Murry, Barkan & Robon Ltd., Maumee, OH, for Defendants 1.60 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 3.00 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, BVK Holdings, LLC Tr, 0.52 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 1.23 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, Barry Kenyon Tract No, 1.61 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 2.95 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, Jean D. Little, 0.60 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 1.06 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, William C. Zimmer & K, 3.12 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 6.27 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, L&B Schaible, L.L.C. T, 0.37 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 0.79 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, L&B Schaible, L.L.C. T, 1.53 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 2.50 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, Cynthia J. Kemner, Ak, 1.82 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 1.98 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, Mark S. Selby And Lin, 0.18 Acres of Land, More or Less, Temporary Workspace, In Washtenaw County, Michigan, Mark S. Selby And Linda K. Selby Tract No. MI-WA-100.000, 1.51 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), And 2.54 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, Mark S. Selby and Lin, BVK Holdings, LLC, Barry Kenyon, Jean D. Little, Trustee of the Jean D. Little Trust u/a/d July 27, 2016, Matthew P. Little or Successors, William C. Zimmer, Karen Louise Zimmer, L&B Schaible, L.L.C, Barbara G. Schaible, Trustee of the Barbara G. Schaible Living Trust, u/a/d 1/5/99, Luther J. Schaible, Trustee of the Luther J. Schaible Living Trust, u/a/d 1/5/99, Cynthia J. Kemner, Cynthia Kemner, Mark S. Selby, Linda K. Selby.

Jason R. Abel, Honigman LLP, Detroit, MI, for Defendants 1.48 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 2.95 Acres of Land, More or Less, Temporary Work Space, In Washtenaw County, Michigan, Leonard M. Middleton, Leonard M. Middleton and Terri S. Middleton Revocable Trust U/A/D April 20, 2009, Leonard M. Middleton and Terri S. Middleton, Trustees.

Matthew A. Romashko, Lynch, Gallagher, Mount Pleasant, MI, for Defendant Legend Dairy, LLC.

Lynn Marie Dodge, U.S. Attorney's Office, Detroit, MI, for Defendant U.S. Dept. of Treasury Internal Revenue Service.

Allen J. Philbrick, Conlin, McKenney, Ann Arbor, MI, for Defendant Washtenaw County Board of Road Commissioners.

Leland Prince, DTE Energy Company, Detroit, MI, for Defendant DTE.

1.23 Acres of Land, more or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 3.74 Acres of Land, more or Less, Temporary Work Space, in Lenawee County, Michigan, Office of the Lenawee C, pro se.

0.76 Acres of Land, more or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 2.28 Acres of Land, more or Less, Temporary Work Space, in Lenawee County, Michigan, Midwest Energy Cooperat, pro se.

2.73 Acres of Land, more or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 4.05 Acres of Land, more or Less, Temporary Work Space, in Washtenaw County, Michigan, Michigan Paving and M, pro se.

0.04 Acres of Land, more or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 0.06 Acres of Land, more or Less, Temporary Work Space, in Washtenaw County, Michigan, Michigan Paving and M, pro se.

**ORDER DENYING MOTION FOR RECONSIDERATION (DKT. 871) AND GRANTING MOTION FOR ORDER SEEKING TO APPLY THE COURT'S JULY 6, 2018 OPINION TO DEFENDANT MEADOWBROOK (Dkt. 883)**

MARK A. GOLDSMITH, United States District Judge

***1** These matters are before the Court on Plaintiff Rover Pipeline's motion for reconsideration of the Court's July 6, 2018 Opinion and Order (Dkt. 871) and motion to apply the Court's July 6, 2018 Opinion and Order to Defendant Meadowbrook Acres, Inc. The Defendant land owners filed a response to the motion for reconsideration (Dkt. 877). No response was filed to the motion to extend the Court's prior ruling to Defendant Meadowbrook Acres. For the reasons discussed below, the Court denies the motion for reconsideration and grants the motion to extend the July 6, 2018 ruling to Defendant Meadowbrook Acres.

## I. BACKGROUND

On July 6, 2018, this Court issued its Opinion and Order (Dkt. 868) regarding a series of motions in limine filed by Rover and Zachary J. Murry, counsel for several Defendant land owners. Two of those motions sought to exclude expert testimony from two of Defendants' experts: William Lawrence (an arborist) and Frank Tokar Jr. (a mineral valuation expert). In addition, Rover sought to exclude Eric Gardner's appraisals that incorporated Lawrence's and Tokar's opinions. (Dkts. 819, 820).

Defendant Meadowbrook joined this action after Rover filed the motions in limine against all Defendants (Dkts. 813, 814, 818, & 821), which were resolved in the Court's July 6, 2018 order. See April 3, 2018 Stipulated Order Adding Meadowbrook Acres, Inc. as Defendant (Dkt. 860). Rover attempted to contact Meadowbrook before filing its motion to extend the Court's July 6, 2018 ruling, but was ultimately unsuccessful in contacting opposing counsel.

## II. LEGAL STANDARD

Motions for reconsideration may be granted under Eastern District of Michigan Local Rule 7.1(h)(1) when the moving party shows (1) a "palpable defect," (2) that misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case. E.D. Mich. LR 7.1(h)(3). A "palpable defect" is a defect "which is obvious, clear, unmistakable, manifest, or plain." Mich. Dep't of Treasury v. Michalec, 181 F. Supp. 2d 731, 734 (E.D. Mich. 2002) (citations omitted). "Generally, ... the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court." E.D. Mich. LR 7.1(h)(3).

## III. ANALYSIS

### A. Plaintiff Rover Pipeline's motion for reconsideration of the Court's July 6, 2018 Opinion and Order (Dkt. 871)

Rover makes three arguments in support of its motion for reconsideration: (i) the Court erred by failing to exclude William C. Lawrence's expert testimony where he cannot provide all of the information necessary under the

Sherburn Formula; (ii) the Court erred by failing to exclude Frank Tokar, Jr.'s testimony on mineral valuation as a contributory factor in fair market value calculation; and (iii) the Court erred by failing to exclude Frank Tokar, Jr.'s mineral valuation. The Court will take each argument in turn.

**1. The Sherburn Formula**

Rover argues that William C. Lawrence's expert testimony should be excluded under Federal Rule of Civil Procedure 403, because it will confuse the issues and mislead the trier of fact. Rover. Mot. ¶ 9. It argues that Lawrence cannot present all the information necessary to do a proper calculation under Department of Transp. v. Sherburn, 492 N.W.2d 517, 520 (Mich. Ct. App. 1992). In its previous ruling, the Court found that Lawrence's opinion was "admissible as evidence of the cost to cure" and "relevant to the extent that Defendants seek to introduce evidence of severance damages." Rover Pipeline, LLC v. 1.23 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), No. 17-CV-10365, 2018 WL 3322995, at *9-10 (E.D. Mich. July 6, 2018). Defendants argue that the Court previously addressed Rover's arguments and therefore its motion for reconsideration is improper under Local Rule 7.1.

***2** "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. District courts have broad discretion in ruling on the admissibility of evidence. Journey Acquisition–II, L.P. v. EQT Prod. Co., 830 F.3d 444, 458 (6th Cir. 2016).

In Michigan, one "proper measure of damages in a condemnation case involving a partial taking consists of the fair market value of the property taken plus severance damages to the remaining property if applicable." Sherburn, 492 N.W.2d at 520. Severance damages are damages to the remaining property where the partial taking has caused damages attributable to the partial taking. Id. at 519-520. "Where severance damages are claimed, the maximum damages recoverable equal (the market value of the parcel taken) plus (the market value of the remainder after the taking) plus (the cost-to-cure expenses); however, the total damages awarded may not exceed the fair market value of the whole parcel before the taking." Id. at 520.

Rover has not presented any cases to support its position that Lawrence is required to provide all the information necessary to make a proper damages calculation under Sherburn. Nor is it obvious to the Court why each portion of the Sherburn equation must be established by a single witness. The Court held that Lawrence's testimony is admissible as to the cost-to-cure aspect of the Sherburn formula and Rover has offered nothing to convince the Court that such testimony should be excluded under Rule 403. Therefore, the Court finds that its prior ruling did not contain a palpable defect which misled the Court such that correcting such defect would have resulted in a different outcome on this matter.

**2. Frank J. Tokar's Testimony Regarding Present Value of Minerals on the Little Trust Property**

Rover makes two arguments with respect to Frank Tokar, Jr.'s expert testimony on mineral valuation. Rover Mot. at 3-4. First, it argues that, like Lawrence, any testimony related to a cost-to-cure evaluation should be excluded because Tokar cannot provide all the information under the Sherburn formula. Id. at n.4. For the reasons already explained with respect to Lawrence, the Court finds this argument lacking. Second, Rover argues that Tokar's testimony with respect to the present value of mineral deposits on condemned properties should not be considered as a contributory value to the land as a whole. Rover relies on Columbia Gas Transmission Corp. v. Exclusive Nat. Gas Storage Easement, 962 F.2d 1192 (6th Cir. 1992) and State Highway Commission v. Fegin, 141 N.W.2d 312 (Mich. Ct. App. 1966) to support its position.

In its prior ruling, the Court explained that "[i]n order for an appraiser to take into account the contributory value of the minerals to the land as a whole, it is instructive for the appraiser to first understand how much the minerals are worth." Rover Pipeline, 2018 WL 3322995, at *10 (citing Columbia Gas, 962 F.2d at 1199 (holding that while, under Ohio law, mineral deposits are not valued separately from the land on which they are located, it is still proper to admit evidence that the land contains valuable deposits in order to determine the land's fair market value) ). Rover argues that Columbia Gas stands for the proposition that while an expert witness may provide testimony regarding the quantity and quality of minerals present, the expert may not affix a dollar amount intended to represent the independent present value of

those minerals. Columbia Gas is not the ideal case upon which to rely, because it applies Ohio law rather than Michigan law. Nonetheless, Rover argues that Columbia Gas is consistent with Michigan law, specifically Fegin. The Court does not agree that Tokar's testimony on mineral valuation should be excluded.

***3** Tokar provided a mineral valuation, which includes sand and gravel. Tokar Mineral Evaluation, Ex. 4 to Rover's Mot. in Lim. at 3 (Dkt. 820-5). In Tokar's opinion, the value of the sand and gravel on the subject property is $448,000, which he believes will be rendered inaccessible by Rover's presence. Tokar Decl. ¶ 8, Ex. 1 to Rover's Mot. in Lim. In Fegin, the landowner's expert witness testified that the best use of the land was for the removal of borrowed earth material (sand), which was valued at $0.03 a cubic yard. 141 N.W.2d at 313. The court-appointed commission agreed and awarded just compensation in the amount of $6,475 for the taking. Id. The Fegin court affirmed the award and held that "[i]f a fee or a right of way is condemned[,] the before and after value of the land measures the damage and mineral deposits may be shown to affect its value per acre." 141 N.W.2d at 315. In other words, "[i]f the right to remove minerals is condemned[,] their value in place must be established to fix the damage." Id. The Michigan Supreme Court expressly adopted this conclusion and the reasoning in Fegin. State Highway Commission v. Hahn, 156 N.W.2d 33, 34 (Mich. 1968) (explaining that "if the right to remove minerals is condemned, ... the value of the minerals in place determines the compensation which must be paid the owner"); see also Michigan State Highway Comm'n v. McLaughlin, 167 N.W.2d 468, 470 (Mich. Ct. App. 1969).

It appears that the land-owner defendants will be presenting a valuation theory that Rover condemned the minerals on their property and therefore the sand and gravel value may be shown to affect the lands' value per acre. Rover concedes that Tokar may provide testimony regarding the highest and best use of the property. Mot. at 4. If Tokar testifies that the highest and best use of the subject property is mineral mining, then he would also be allowed to testify regarding the value of the condemned minerals as it relates, as the Court explained previously, to the contributory value of the minerals to the land as a whole. Accordingly, Rover's motion is denied in this respect.

### 3. Independent Value of the Natural Features

Finally, Rover argues that neither Lawrence's nor Tokar's testimony on the value of natural features should be allowed because the value of natural features is not at issue. Mot. at 5. It argues that the Court erroneously found that both experts would be able to provide testimony regarding severance damages. Id. This matter has already been addressed above. Two bites at the apple is enough.

## B. Motion to Extend the Court's July 6, 2018 Opinion and Order to Defendant Meadowbrook (Dkt. 883)

The Court has reviewed its July 6, 2018 Opinion and Order. There is no opposition by Meadowbrook to the extension of the July 6, 2018 Opinion and the Court finds that it is appropriate to extend the Opinion to include Meadowbrook. Accordingly, the Court's July 6, 2018 Opinion and Order with respect to Rover's Motions in Limine against all defendants (Dkts. 813, 814, 818, & 821) apply to Defendant Meadowbrook.

## IV. CONCLUSION

Accordingly, because Rover has not identified a palpable defect that misled the Court such that correcting the defect would have resulted in a different disposition in its prior opinion, E.D. Mich. LR 7.1(h)(3), Rover's motion for reconsideration (Dkt. 871) is **DENIED**. Rover's motion to extend the Court's July 6, 2018 Opinion and Order to Defendant Meadowbrook (Dkt. 883) is **GRANTED**.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 989280

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

2012 WL 4017808
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

ORACLE AMERICA, INC., Plaintiff,
v.
GOOGLE INC., Defendant.

No. C 10–03561 WHA.
|
April 10, 2012.

**Attorneys and Law Firms**

Alanna Rutherford, Boies, Schiller, Flexner LLP, New York, NY, Beko Osiris Ra Reblitz-Richardson, Meredith Richardson Dearborn, Steven Christopher Holtzman, William Fred Norton, Jr., Boies Schiller & Flexner LLP, Oakland, CA, Benjamin Andrew Petersen, Kenneth Alexander Kuwayti, Marc David Peters, Michael A. Jacobs, Roman A. Swoopes, Ruchika Agrawal, Rudolph Kim, Yuka Teraguchi, Morrison and Foerster LLP, Palo Alto, CA, Daniel Pierre Muino, Morrison & Foerster LLP, San Francisco, CA, David Boies, Boies Schiller and Flexner, Armonk, NY, Deborah Kay Miller, Matthew M. Sarboraria, Oracle USA, Inc. Legal Department, Dorian Estelle Daley, Redwood City, CA, Mark Edward Ungerman, Morrison Foerster, Washington, DC, for Plaintiff.

Donald Frederick Zimmer, Jr., Cheryl A. Sabnis, Geoffrey M. Ezgar, King & Spalding LLP, Robert Addy Van Nest, Christa M. Anderson, Daniel Edward Purcell, Eugene Morris Paige, Matthias Andreas Kamber, Michael S. Kwun, Reid Patrick Mullen, Keker & Van Nest LLP, San Francisco, CA, Brian Christopher Banner, Truman Haymaker Fenton, King and Spalding LLP, Austin, TX, Bruce W. Baber, Christopher C. Carnaval, Mark H. Francis, Robert F. Perry, Scott T. Weingaertner, King & Spalding LLP, New York, NY, Luis Villa, IV, Greenberg Traurig LLP, East Palo Alto, CA, Renny F. Hwang, Google Inc., Mountain View, CA, Steven T. Snyder, King and Spalding LLP, Charlotte, NC, Valerie Wing Ho, Greenberg Traurig, LLP, Santa Monica, CA, for Defendant.

**ORDER REGARDING *DAUBERT* MOTIONS AGAINST DR. JAMES KEARL**

WILLIAM ALSUP, District Judge.

## INTRODUCTION

***1** In this patent and copyright infringement action involving Java and Android, both parties move to exclude portions of the report and testimony of the Rule 706 expert Dr. James Kearl. For the reasons stated, the motions are **Granted in Part** and **Denied in Part.**

## STATEMENT

The background of this action has been exhaustively set forth in prior orders (Dkt.Nos.230, 632, 685, 785). Because the damages aspect of this controversy is particularly complex, the parties have advanced extremely divergent views, and the sums in play vast, a Rule 706 expert, Dr. Kearl, was appointed to assist the jury in evaluating the damages issues (Dkt. No. 610).

Dr. Kearl issued his report on March 21, 2012. On April 2, both parties moved to exclude portions of the report.

## ANALYSIS

An expert witness may provide opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FRE 702. District courts thus "are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and

relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1360 (Fed.Cir.2008).

**1. Google's Motion To Exclude Opinion that the Value of the Intellectual Property in Suit Would Have Been the Value of the Entire Java Mobile IP Portfolio.**

To calculate the reasonable royalty for the intellectual property in suit, Dr. Kearl begins with the 2006 negotiations between the parties. He then considers the relationship between the value of the IP in suit (two patents and API copyrights) and Sun's entire Java mobile edition intellectual property portfolio in 2006, which would have included licenses to many patents and copyrights in addition to the IP in suit (Kearl Rpt ¶¶ 97–105). Before conducting an apportionment analysis, Dr. Kearl opines that, as a matter of economics, there are good reasons to not apportion and explains why the value of the IP in suit is equal to the value for the entire portfolio (Rpt ¶¶ 104–05):

> Setting aside what the law may require, my best economic advice is that there are good economic reasons why value of the in suit IP in this matter is the 2006 value of a hypothetical negotiation for the entire Java ME IP portfolio and the reasonable royalty rate is 20%.

Dr. Kearl offers three explanations for this opinion. *First,* he opines that if the parties knew in 2006 that the IP in suit would be the most relevant for Android, then the IP in suit would have "driven the negotiations and the aggregate value of the license in the 2006 negotiations is attributable to this subset" (Rpt.¶ 100). *Second,* if the parties in 2006 did *not* know which subset of IP in the portfolio would be the most useful, then Google would have licensed an "option" to use any subset, to be decided at a later date. Dr. Kearl explains as follows (Rpt.¶ 101):

> ***2** The reason is that if Google knew that it needed a subset of the Java ME IP portfolio, but didn't know in 2006 which subset it needed, then the 2005/06 negotiations can be thought determining the value of an option to, at some later date, decide which, if any, subset of the Java ME IP portfolio to use and when to use it. In this case, the 2006 value of the in suit IP is also the 2006 value of the Java ME IP portfolio—essentially the aggregate value of the 2006 Java ME IP license is what Sun was willing to accept for an option for Google to use one, two or as many of the patents and copyrights in the Java ME IP portfolio as it wished and, hence, the amount paid for the option to use what turned out to be the in-suit IP.

To illustrate, Dr. Kearl analogizes the 2006 scenario to a person who subscribes to a 100–page magazine knowing that he intends to read only one page. To that subscriber, the value of that single page is the same as the price of the entire magazine. This is true whether the subscriber already knows the specific page he intends to read, or simply knows that once he has the magazine, he will just choose one page to read. *Third,* Dr. Kearl opines that if Google was interested in writing its own operating system but decided that it needed to be written in Java and based on Java mobile-like technology, then Google would have gotten a license to Sun's entire mobile portfolio as "insurance against litigation if it happened that Google" later infringed unintentionally (Rpt.¶ 102).

This Court's prior order held that the hypothetical license must be "tailored to the amount and type of infringement that actually occurred" and that "the reasonable royalty must compensate for the infringing features, but not for non-infringing ones" (Dkt. No. 230 at 8). In so holding, the order relied on the Federal Circuit decision of *ResQNet,* which held that "[a]t all times, the damages inquiry must concentrate on compensation for the economic harm caused *by infringement of the claimed invention.*" *ResQNet.com, Inc.. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed.Cir.2010). This remains true.

Dr. Kearl's second and third explanations for equating the value of the IP in suit to the entire Java ME IP portfolio are inappropriate for the hypothetical negotiation scenario. Significantly, Dr. Kearl fails to take into account that at the end of the hypothetical negotiation, Google gets a license to the IP in suit, *nothing more.* Google would not have a license to the entire portfolio, an option to choose any subset of Java IP to license at a later date, nor insurance against future litigation. Nor can we presume that Google would have made good use of the licensed IP. If Google was liable for the value of the entire IP portfolio each time a single IP in that portfolio was asserted in an infringement action, then Oracle would be overcompensated.

Thus, paragraphs 101 and 102 of Dr. Kearl's report are **Stricken.** Paragraph 103 is stricken to the extent it suggests that the hypothetical negotiation would have been for a license to the entire portfolio. Paragraph 104 is stricken to the extent that it relies on the above-stricken material.

***3** Dr. Kearl's first explanation, that *"if* Sun and Google understood that the subset of Sun's Java ME IP portfolio *most relevant* to their negotiations was composed of the now in suit patents and copyright, the 2006 value of the

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

Java ME IP portfolio is the value of the in suit IP," does not run into the problems discussed above because this explanation appropriately presumes that Google would receive only a license for the alleged infringement in the hypothetical negotiation (Rpt.¶ 100). Google has failed to show that this opinion is inappropriate as a matter of law. However, because Dr. Kearl frames his opinion as a conditional, it is unclear whether he actually opines that the IP in suit was understood in 2006 to be the most relevant to the 2006 negotiations. If so, then the parties have not adequately briefed the appropriateness of this opinion and Google's objection to paragraph 100 is **Denied Without Prejudice.**

**2. Oracle's Motion to Exclude Deductions for Copyright Disgorgement.**

In his copyright-disgorgement analysis, Dr. Kearl used figures for Android-related expenses from Google's expert Dr. Alan Cox's October 2011 damages report (Kearl Rpt ¶¶ 120–21). Dr. Cox had relied on an "Android Profit–and–Loss Statement" to calculate traffic acquisition costs, operations, and operating expenses, including sales expenses, marketing, product management, and engineering expenses for the Android platform (Cox Rpt Exh. 3b). Dr. Cox did not conduct an independent audit of the P & L statement to determine its reliability. Instead, he relied on interviews of Aditya Agarwal, a senior financial analyst at Google.

Oracle attacks Dr. Cox's reliance on the P & L statements and seeks to preclude both Dr. Kearl *and* Dr. Cox from offering *any* testimony about Google's Android-related expenses in the copyright-disgorgement analysis. This would result in a difference of approximately $700 million for disgorgement damages (*compare* Kearl Rpt ¶ 119 *with* Rpt ¶ 121). Oracle argues the following: *First,* Dr. Cox did not conduct an independent audit on the Android P & L statements. *Second,* Dr. Cox testified in his deposition that he only relied on Mr. Agarwal for the foundational fact that all engineering expenses in the Android P & L Statement were appropriately allocated to the Android platform (Dearborn Decl. at 74–76). *Third,* Mr. Agarwal is *not* on Google's witness list and thus cannot offer foundational testimony at trial (Dkt.Nos.525–2, 840). In its opposition brief, Google counters that there are other witnesses on its witness list who can lay the proper foundation (authentication and explaining the figures contained therein) for the P & L statements.

Our court of appeals has held that

> [A] deduction for overhead should be allowed only when the infringer can demonstrate that the overhead expense was of actual assistance in the production, distribution or sale of the infringing product. We do not take this to mean that an infringer must prove his overhead expenses and their relationship to the infringing production in minute detail. Nonetheless, the defendant bears the burden of explaining, at least in general terms, how claimed overhead actually contributed to the production of the infringing work.

***4** *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 516 (9th Cir.1985) (citations omitted). In Frank, the court held that the defendants did not meet their burden of showing deductible expenses because there was no evidence of what costs were attributable to the infringing movie in MGM's overall "general and administrative expenses." *Ibid.* In a prior order, this Court held that Dr. Cox could offer opinions based on interviews with percipient witnesses so long as the interviewees on which he relied can testify to the foundational facts with firsthand knowledge at trial (Dkt. No. 632 at 3).

*First,* Oracle's challenge that Dr. Cox is required to conduct an independent audit of the Android P & L statements is denied without prejudice. If the proper foundation is laid at trial that the P & L statements were "routinely updated every quarter by Google in the ordinary course of business" and the figures therein accurately "encompass Android financial data" (Opp. at 2), then Dr. Cox can reasonably rely on those figures for calculating Android expenses. He does not need to conduct an independent audit of the P & L statements. Oracle may re-raise this issue if Google's witnesses fail to lay the necessary foundation for Dr. Cox's testimony at trial.

*Second,* Oracle's assertion that because Mr. Agarwal will not be a witness at trial, no one else can lay the proper foundation for the P & L statements is rejected. This punishment is too harsh for failure to list a witness. The issue is whether the foundational facts must be laid by the same individual(s) cited in Dr. Cox's report. Rule 37(c) guides our analysis:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> > (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Oracle's motion, which seeks to prevent *any* testimony based on the P & L statements, would be highly prejudicial to Google because then the jury would not have any information regarding deductible expenses for Android. These expenses were approximately $700 million. Our court of appeals has specifically cautioned against such an unjust outcome:

> Although the statute imposes upon the infringer the burden of showing "the elements of profit attributable to factors other than the copyrighted work," 17 U.S.C. 504(b), nonetheless where it is clear, as it is in this case, that not all of the profits are attributable to the infringing material, the copyright owner is not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements. "In cases such as this where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment
>
> ***5** .....
>
> But we are resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share. In cases where plaintiffs fail to prove their damages exactly, we often make the best estimate we can, even though it is really no more than a guess, and under the guise of resolving all doubts against the defendants we will not deny the one fact that stands undoubted.

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828–29 (9th Cir.1985) (citations omitted). Here, it is clear that Android's gross revenue through 2011 was not entirely profit attributable to the allegedly infringed material. There were undoubtedly expenses that went into the development and marketing of Android. It would be unjust to hide these expenses from the jury. Moreover, any prejudice to Oracle of allowing another witness to lay the foundation for the P & L statements is minimized because Oracle was on notice that other witnesses on Google's witness list, such as Android project head Andy Rubin, would potentially testify about the costs that went into Android (see Dkt. No. 525–3).

The following compromise will be implemented. Oracle's motion is **Denied Without Prejudice.** Dr. Cox will submit a supplement report revising only the foundational interviewee(s) for the P & L statements by **April 16.** The new interviewee(s) must already be on Google's witness list and their disclosed testimonial topic must be related to Android expenses. Oracle may depose each new foundational interviewee(s) for three hours, to be taken by **April 30.** Google must produce at the deposition any materials used by the deponent in supplying information to Dr. Cox. No other materials need be produced. The questioning shall be limited to the subject of the interviews and the information provided to the expert and its accuracy. Oracle may re-raise its motion if the new foundational interviewee(s) proves inadequate to lay the proper foundation at trial.

## CONCLUSION

For the reasons stated above, paragraphs 101 and 102 of Dr. Kearl's report are **Stricken.** Paragraph 103 is stricken to the extent it suggests that the hypothetical negotiation would have been for a license to the entire portfolio. Paragraph 104 is stricken to the extent that it relies on the above-stricken material.

Oracle's motion is **Denied Without Prejudice.** Dr. Cox will submit a supplement report revising only the foundational interviewee(s) for the P & L statements by **April 16.** Oracle may depose each new interviewee(s) for three hours, to be taken by **April 30.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2012 WL 4017808

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 12990115
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan,
Southern Division.

ORTHOFIX INC., Plaintiff,
v.
Robert LEMANSKI, Defendant.

No. 13-11421
|
Signed 09/29/2015

**Attorneys and Law Firms**

Brian J. Hurst, Nicholas O'Brian Kennedy, Eugenie R. Rogers, Baker & McKenzie LLP, Dallas, TX, Morley Witus, Barris, Sott, Denn & Driker, PLLC, Detroit, MI, for Plaintiff.

Janet E. Lanyon, Dean & Fulkerson, Troy, MI, Laura Bacon, Nixon Peabody LLP, Lisa C. Sullivan, Ungaretti & Harris LLP, Chicago, IL, for Defendant.

**OPINION AND ORDER**

R. STEVEN WHALEN, UNITED STATES MAGISTRATE JUDGE

***1** Before the Court are Defendant Robert Lemanski's Motions to Exclude Opinion Testimony of Plaintiff's Damages Expert [Doc. #74 and #75], which have been referred for hearing and determination under 28 U.S.C. § 636(b)(1)(A).[1] For the reasons discussed below, the motions are GRANTED.

**I. BACKGROUND**

This is a wrongful competition case. Plaintiff Orthofix, Inc. ("Orthofix") produces and markets bone-growth stimulators. Defendant Robert Lemanski ("Lemanski") and Eric Hunter ("Hunter") were employed by Orthofix. Lemanski sold bone-growth stimulators to spinal surgeons in the Detroit area, and Hunter sold in the Toledo, Ohio area. Orthofix alleges that both Lemanski and Hunter resigned in November of 2012, to join a competitor, DJO Global LLC, and that they misappropriated and took customer account identities, sales histories, product preferences, and other trade secrets. Orthofix filed a separate lawsuit against Hunter in the Northern District of Ohio. *Orthofix, Inc. v. Eric W. Hunter*, N.D. Ohio No. 3:13-CV-828.

In its amended complaint [Doc. #9], Orthofix alleged five claims: (1) breach of a contractual non-solicitation provision (Count I); (2) breach of a contractual unfair competition provision (Count II); (3) breach of contractual promise not to disclose confidential information (Count III); (4) trade secret misappropriation (Count IV); and (5) tortious interference with business relations (Count V). On March 25, 2015, the Court dismissed Counts III, IV, and V [Doc. #87]. Orthofix seeks monetary damages on the remaining Counts I and II.

Orthofix's damages expert, Mike L. O'Brien ("O'Brien"), prepared a report that is appended to Lemanksi's sealed motion [Doc. #75] as Exhibit A. O'Brien, a Certified Public Accountant, based his conclusions on spreadsheets summarizing Orthofix's monthly sales averages. This Court's dismissal of Counts III, IV, and V was premised on the preclusive effects of Judge Zouhary's findings in the Ohio case against Hunter. O'Brien also served as Orthofix's damages expert in the Ohio case. Stating that "no distinction is made between Mr. Hunter and Mr. Lemanski regarding the claimable damages by Orthofix against each Defendant," O'Brien initially calculated lost sales damages at $3.8 million. However, he reduced his opinion to $1.6 million owing to "bad data" in the spreadsheets. In an email to Judge Zouhary, offered as Defendant's Exhibit F, counsel for Orthofix stated:

> "Sales reports prepared by the Orthofix finance department which were the basis for Orthofix's expert's damage calculations overstated sales in the relevant period by approximately double. This overstatement was the result of an IT error in generating the report from Orthofix's database, which caused duplicate sales to be reported. As a result of this bad data unrecognized by Orthofix, its counsel, or its expert, Orthofix's expert's report overstated Orthofix's damages."

***2** Lemanski now seeks to exclude O'Brien's expert report under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## II. LEGAL PRINCIPLES

Fed.R.Ev. 702 provides as follows:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Rule 702, as amended in 2000, codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999). *See* Rule 702 advisory committee's notes, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science."). The admissibility of expert testimony under Rule 702 entails a flexible inquiry, and is addressed to the trial judge's discretion. *Id.*; *Daubert*, 509 U.S. at 594. In *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008), the Sixth Circuit described the Rule 702/*Daubert* process as follows:

> "Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Fed.R.Evid. 702. Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' *Id.* Third, the testimony must be reliable. *Id.* Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.' *Id.* In addition, *Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: 'testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community.' *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786). The test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case. *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167 (citing *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). Indeed, we have recognized that the *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.' *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001).

## III. DISCUSSION

***3** Mike O'Brien is a Certified Public Accountant. Lemanski does not challenge his professional qualifications as an expert, but rather attacks the relevance and reliability of his conclusions. O'Brien's report fails the test of reliability, and for that reason, it must be excluded.

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original). A critical aspect of reliability is the sufficiency or integrity of the facts or data that support the expert's opinion. *See* Rule 702(b). In this case, O'Brien's reliance on Orthofix's monthly sales spreadsheets, without examination of or inquiry into any of the underlying documents, raises serious questions about the reliability of his opinion.

It is undisputed that O'Brien did not review any hard data concerning sales. His written report (Defendant's Exhibit A) specifies that "[t]he opinions expressed herein are based upon my review of the materials disclosed in Exhibit III [to the report]." Exhibit III, in turn, lists Orthofix's monthly sales numbers (the spreadsheets), but not any supporting documentation. Indeed, O'Brien testified at a deposition in a separate Orthofix case[2] in a Texas state court, that not only was he uninvolved with

the extraction of the supporting data, but notwithstanding the error in the spreadsheets that overstated the alleged damages by a factor of two, he still declined to review the underlying documents:

Q: And what did you understand that data to be in comparison to the data that had been given to you from the outset that resulted in your original report? What was the difference?

A: The difference was the extraction methodology utilized by Orthofix in extracting that information from its accounting records.

Q: *Did you assist in that from the outset?*

*A: Assist in what?*

*Q: Extracting that data.*

*A: No.*

*Q: It was presented to you by Counsel; is that correct?*

*A: Yes.*

Q: And what was it represented to be, if you recall?

A: It was represented to be sales to the 28 customers identified in my report.

Q: And why did they have to supplement or amend that data, do you know?

A: Yes.

Q: What is the reason?

A: The reason is there was an error in the program that was utilized in extracting that information.

Q: But do you know what that error consisted of in terms of, practically speaking, what that means?

A: In a general sense, yes.

Q: What does it mean, in a general sense?

A: In a general sense, it means that certain sales were duplicated in the extraction process; therefore, the original sales data was overstated. The error was detected and corrected, *and the revised sales data, hopefully, eliminated the duplication of the sales which had been extracted.*

Q: *And there was no way that you were able to detect that duplication from the original sales data that was given to you; is that correct?*

*A: That is correct.*

*Q: Was there a way for you to validate that data at the time to determine whether or not it was valid data?*

*A: Yes.*

*Q: And express to me some of the ways in which a CPA or a man of your training and experience would validate the sales data that's been given to you in this instance.*

*A: By going in and reviewing underlying documents and data and verifying the information which had been extracted.*

***4** *Q: And you did not do that in this instance, did you?*

*A: I did not do that.*

*Q: And it would not require a full review of all the data; you could do that by simply sampling the data. Is that a fair statement?*

*A: I guess my best answer is I don't know because I didn't do it. But I would certainly think so, yes.* (Emphasis added).

From this testimony, we know that O'Brien did not prepare the spreadsheets that formed that basis of opinion, but rather Orthofix's counsel provided them. We also know that in reviewing those spreadsheets, O'Brien was incapable of detecting an error that resulted in a significant overstatement of his initial damages calculations. He was no more capable of determining whether there were errors in the revised spreadsheets, which he "hoped" were accurate, and he declined to avail himself of the one method that would verify the accuracy of the sales date–a review of the underlying documents. It is not surprising that the Texas State Judge granted the defendant's motion to strike O'Brien's report. *See* Defendant's Exhibit A.

Orthofix suggests that an examination of all of the sales data would have been unwieldy. However, this ignores the possibility of at least reviewing a sampling of the data. Moreover, the underlying sales documents were readily available. In my March 31, 2015 Order granting Lemanski's motion to compel sales data [Doc. #88], I noted that in a parallel Orthofix case in the Central District of Illinois, Judge Schanzle-Haskins, addressing the error in Orthofix's initial damages calculation, stated, "It is reasonable that the problems with the Plaintiff's damage calculation prompts the Defendant to seek

underlying data in order to ensure the validity and accuracy of the Plaintiff's damage calculations." Doc. #88, pp. 4-5. Ordering Orthofix to produce underlying data, I stated:

> "The inadequacy of the spreadsheets showing only monthly averages as a method for calculating damages is underscored by the error in the *Hunter* case, an error that overstated Orthofix's sales by a factor of two, and which resulted in the imposition of sanctions. I agree with Judge Schanzle-Haskins that this error "may certainly be considered" with respect to the present motion. I also agree that while Judge Zahoury found in the *Hunter* case that Orthofix was not required to create a 'custom report,' there is an alternative: production of the underlying sales data to the Defendant, 'who could make an analysis of the underlying date to challenge the 'average' profit figures compiled by Orthofix.' " *Id.*, p. 6.

This case is similar to *Auto Industries Supplier Employee Stock Ownership Plan v. Ford Motor Company*, 435 Fed.Appx. 430, 2011 WL 2610584 (6th Cir. 2011), where the Sixth Circuit upheld Judge Cohn's order excluding expert testimony on the basis of unreliability. As in the present case, the expert in *Auto Industries* relied on data compilations and summaries that were prepared by someone else, but did not himself examine any of the underlying documentation. And like Orthofix, the plaintiff in *Auto Industries* claimed that the summaries "were prepared in the ordinary course of business," and that review of voluminous documents "was not necessary or appropriate." *Id.* at 454. Rejecting these arguments, the Court held that "because [the expert] had no familiarity with the underlying source documents, he was not qualified to testify as an expert under Rule 702, because his expert opinion was not based on 'sufficient facts and data.' " Quoting and incorporating Judge Cohn's findings, the Court stated:

> ***5** "Ford argues that SNAPP cannot meet the threshold requirement of *Daubert* and Rule 702 with respect to Frazee's opinions and testimony essentially because Frazee's testimony made clear that he had little, if any personal knowledge of the underlying data used to created [sic] the opinions contained in his report. The Court agrees. *As was born out at the hearing, Frazee accepted summaries of data supplied to him by Vetter wholesale and simply used the data, often in the same format sometimes reformatting the data, to prepare his report. Frazee had no personal involvement in the preparation of the data.*" *Id.* (Emphasis added).

In support of its argument that any deficiencies in O'Brien's report go to weight rather than admissibility, Orthofix points out that in the Ohio case against Turner, Judge Zahoury admitted O'Brien's report. However, the Ohio case was tried before the judge, not a jury. "The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004). *See also UAW v. General Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006)("The trial judge sitting alone is presumed capable of weighing evidence to sift the important from the unimportant, and even the admissible from the inadmissible when those are intertwined in a way that might counsel excluding the same evidence from consideration by a lay jury").

O'Brien's initial damages calculation was overstated by a factor of two, and without examining the underlying documents, he was incapable of discovering that error. He has still not looked at even a sampling of those documents, and the Court can have no confidence that his current calculation is based on "sufficient facts and data." Because O'Brien's report and testimony fails the reliability test of Rule 702 and *Daubert*, they must be excluded.

## IV. CONCLUSION

Defendant Robert Lemanski's Motions to Exclude Opinion Testimony of Plaintiff's Damages Expert [Doc. #74 and #75] are GRANTED.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2015 WL 12990115

Footnotes

1 The publically filed motion is found at Doc. #74, and the same motion, unredacted and filed under seal, is found at Doc. #75.

2 *Orthofix, Inc. v. David Wagenseller, et al.*, Harris County, Texas District Court, No. 2013-18401. The transcript is appended to

Lemanski's motion as Exhibit C.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 626355
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

# QUINTEL TECHNOLOGY LTD., v. HUAWEI TECHNOLOGIES USA, INC., Futurewei Technologies Inc., Huawei Technologies Co., Ltd., Zhengxiang Ma

Civil Action No. 4:15-CV-307
|
Signed 01/30/2018

**Attorneys and Law Firms**

Jeffrey A. Wadsworth, Erika Dunn Stanat, Jessica Nicole Clemente, John P. Bringewatt, Kyra T. Keller, Adam Braveman, Jerauld Brydges, Harter Secrest & Emery LLP, Rochester, NY, David Thomas Dezern, George Marcus Fettinger, Michael C. Kelsheimer, Gray Reed & McGraw, LLP, Dallas, TX, for Quintel Technology Ltd.

Timothy C. Bickham, James F. Hibey, Jeffrey M. Theodore, Jessica I. Rothschild, Michael E. Stoll, Steptoe & Johnson LLP, Washington, DC, Clyde Moody Siebman, Siebman Burg Phillips & Smith LLP, Sherman, TX, David L. Hecht, Steptoe & Johnson LLP, New York, NY, Elizabeth Siebman Forrest, Stephanie Rene' Barnes, Siebman, Burg, Phillips & Smith LLP, Plano, TX, Jeffrey Joseph Cox, Hartline Dacus Barger Dreyer, LLP, Sean Nean Hsu, Janik Vinnakota LLP, Dallas, TX, Kelly J. Eberspecher, Steptoe & Johnson LLP, Chicago, IL, for Huawei Technologies USA, Inc., Futurewei Technologies Inc., Huawei Technologies Co., Ltd., Zhengxiang MA.

## MEMORANDUM OPINION AND ORDER

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

***1** Pending before the Court is Defendants' Motion to Exclude Expert Testimony of Michael Jensen and Professor Stephen Magee (Dkt. #195). After reviewing the relevant pleadings and motion, the Court finds the motion to should be granted in part.

## BACKGROUND

Plaintiff Quintel Technology Ltd. ("Quintel") "designs, develops, and delivers advanced high-efficiency, high-performance antenna solutions for mobile operators to improve their delivery of wireless network services" and "has developed cutting-edge, proprietary antenna technology to better serve wireless network operators and users." (Dkt. #20 at ¶¶ 2, 10). Collectively, Huawei Technologies USA, Inc., FutureWei Technologies, Inc., Huawei Technologies Co., Ltd. (collectively "Huawei"), and Zhengxiang Ma (together with Huawei, "Defendants") are "telecommunications equipment maker[s] and, among other things, manufacture[ ] base stations for wireless networks." (Dkt. #20 at ¶ 11).

Around July of 2008, David Barker, the chief technology officer and an employee of Quintel, "conceived a concept to improve reception between an antenna providing cellular telephone and/or data services, and a mobile receiving telephone and/or data services from the antenna" (the "Per User Tilt Concept") (Dkt. #20 at ¶¶ 12–13). "In 2009, because of potential synergies in their respective business models, Quintel and [Defendants] explored whether they might partner together to service mobile operators in the wireless network industry." (Dkt. #20 at ¶ 14).

According to Plaintiff, after the parties entered into a non-disclosure agreement ("NDA"), Plaintiff began to share confidential and proprietary information and trade secrets, including its proprietary antenna technology, with Defendants (Dkt. #20 at ¶¶ 20, 30–45). In particular, Plaintiff showed Defendants how the "Per User Tilt Concept" works and provided some additional confidential and proprietary information regarding Plaintiff's antenna technology, including information about Plaintiff's patents—all information Plaintiff contends was protected under the NDA.

Plaintiff alleges the parties "ultimately could not agree on final terms to any business or partnering relationship" and that "despite its professed interest, [Defendants] never intended to enter into a partnering relationship with

Quintel." (Dkt. #20 at ¶¶ 44–46). FutureWei filed a nonprovisional patent application with the United States Patent and Trademark Office ("USPTO"), claiming the benefit of its provisional patent application "seeking protection of an invention based on the Quintel confidential and proprietary antenna technology that Quintel had shared under the terms of the ... NDA." (Dkt. #20 at ¶ 50). On November 18, 2014, the USPTO issued FutureWei Patent No. US 8,891,647 B2 ("the '647 patent"), titled "System and Method for User Specific Antenna Down Tilt in Wireless Cellular Networks." (Dkt. #20 at ¶ 52). According to Plaintiff, the '647 patent includes claims for user specific antenna down tilt, which Plaintiff alleges is a characteristic of the Per User Tilt Concept. Specifically, Plaintiff alleges the '647 patent includes one or more claims to which David Barker made an inventive contribution, but the '647 patent failed to name David Barker as a joint inventor (Dkt. #20 at ¶ 52).

***2** As a result, on May 15, 2015, Plaintiff filed suit against Defendants. In its First Amended Complaint, filed December 1, 2015, Plaintiff asserts the following claims against Defendants: (1) breach of contract; (2) misappropriation of trade secrets; (3) unfair competition by misappropriation; (4) common law fraud and fraud in the inducement; (5) promissory estoppel; (6) unjust enrichment; (7) accounting; and (8) correction of patent inventorship—35 U.S.C. § 256 (Dkt. #20 at ¶¶ 55–117).[1]

On December 22, 2017, Defendants filed their Motion to Exclude Expert Testimony of Michael Jenson ("Jensen") and Stephen Magee ("Magee") (Dkt. #195). On January 2, 2018, Plaintiff filed its response (Dkt. #211). At the pretrial conference, held on January 4, 2018, the Court allowed the parties to file supplemental briefing regarding the admissibility of Jensen's anticipated testimony. As a result, on January 12, 2018, Defendants filed their reply (Dkt. #234), and on January 19, 2018, Plaintiff filed its sur-reply (Dkt. #245).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

***3** The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

## ANALYSIS

Defendants argue exclusion of Jensen's testimony is

proper because his opinions concern matters outside his purported expertise. Specifically, Defendants claim that Jensen cannot testify as to (1) Huawei's thoughts and beliefs; (2) Plaintiff's co-inventorship claim; (3) Plaintiff's claim that its alleged trade secrets were not known and valuable; (4) Plaintiff's alleged trade secrets; and (5) any alleged misappropriation.

Regarding Magee, Defendants contend exclusion is necessary because (1) Magee's four damages theories are based on unreliable data, use unreliable methodology, or are unreliably applied to the facts of this case, and (2) Magee's purported opinions are not his own. In the alternative, Defendants aver that if Magee is permitted to testify, his testimony should be limited to no more than one of his four damage theories.

The Court first addresses the admissibility of Jensen's testimony followed by Magee's.

**I. Jensen**

As explained above, Defendants claim that Jensen's opinions as they relate to five different categories should be excluded because such opinions are outside Jensen's purported expertise. The Court addresses each argument separately.

**a. Huawei's Thoughts and Beliefs**

Defendants contend that Jensen's opinions as they relate to Defendants' "thoughts and beliefs via interpretation of various documents" are inadmissible because"[i]t is for the jury to interpret [such] underlying documents." (Dkt. #195 at pp. 18–19). Conversely, Plaintiff argues that Jensen's reports "constitute his *understanding* and *interpretation* of highly technical documents and information well within his filed of expertise on matters relevant to Quintel's claims. [Jensen] is not purporting to read Huawei's 'mind.' " (Dkt. #211 at p. 18) (emphasis in original).

"[A] trial court may strike expert testimony that evaluates a party's state of mind, as that evaluation is within the province of the jury." *Fisher v. Halliburton*, No. H-05-1731, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21, 2009) (citing *Marlin v. Moody Nat'l Bank, N.A.*, 248 Fed.Appx. 534, 541 (5th Cir. 2007)). " 'An expert's credentials do not place him in a better position than the [trier of fact] to draw conclusions about a defendant's state of mind.' " *Id.* (alterations in original) (quoting *Marlin*, 248 Fed.Appx. at 541). As such, Jensen's opinions as they relate to Defendants' state of mind or intent are inadmissible. *See id.*; *accord Retractable Tech. Inc. v. Abbot Lab., Inc.*, No. 5:05-CV-157, 2010 WL 11531436, at *4–*7 (E.D. Tex. June 18, 2010) (excluding an expert's testimony as it related to a party's knowledge, intent, or belief). However, Jensen is permitted to offer opinions concerning the purpose, importance, or content of technical documents in order to assist the jury's understanding of such documents. *See Romero v. Wyeth Pharm., Inc.*, No. 1:03-CV-1367, 2012 WL 12905978, at *6 (E.D. Tex. Apr. 26, 2012).

**b. Co-Inventorship**

***4** Defendants aver that Jensen's opinions as they relate to Plaintiff's claim that David Barker is a co-inventor of the '647 patent are outside Jensen's purported expertise. Specifically, Defendants claim that in offering his opinion, Jensen fails to apply any legal standards, but instead bases his entire opinion "on his personal experience as a business owner." (Dkt. #195 at p. 20). Conversely, Plaintiff argues "Jensen's extensive expertise in the field of antenna design and analysis well qualifies him to opine on [Defendants'] use and inclusion of Quintel's [Per User Tilt] technology in the '647 Patent." (Dkt. #211 at p. 19).

On December 18, 2017, Magistrate Judge Craven issued a Report and Recommendation recommending dismissal of Plaintiff's correction of inventorship claim (Dkt. #190). In Plaintiff's objections to the Magistrate Judge's Report and Recommendation, Plaintiff argued that the Magistrate Judge incorrectly dismissed Plaintiff's inventorship claim (Dkt. #209 at pp. 4–9). In the Court's Order Adopting Report and Recommendation of the United States Magistrate Judge, the Court stayed its consideration of Plaintiff's objections "until such time as the jury trial has been resolved." (Dkt. #240 at p. 13). As such, the Court reserves its ruling on the admissibility of Jensen's opinions as they relate to Plaintiff's correction of inventorship claim until the resolution of the jury trial.

**c. Whether Plaintiff's Alleged Trade Secrets Were Known and Valuable**

Defendants contend that the Court "should exclude testimony from Dr. Jensen regarding Quintel's claim that its alleged trade secrets were not known and valuable." (Dkt. #195 at p. 20). To support their argument, Defendants claim that "Jensen is not being offered as an expert" on this particular topic, but that his opinion, "based on his personal experience and 'literature,' ... merely summarizes Quintel's litigation proposition that its alleged trade secrets were known and valuable." (Dkt. #195 at p. 21). Conversely, Plaintiff responds that Jensen "is more than qualified to opine on the industry itself and what is both 'known' and 'valuable' in the industry" and that "[a]ny perception that Dr. Jensen lacks sufficient 'industry experience' ... goes to the weight of his testimony, not its admissibility." (Dkt. #211 at p. 19).

An expert witness must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "A court must exclude an expert witness 'if it finds that the witness is not qualified to testify in a particular field or on a given subject.' " *Engenium Sol., Inc. v. Symphonic Tech., Inc.*, 924 F. Supp. 2d 757, 769 (S.D. Tex. 2013) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). "However, 'Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.' " *Id.* (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

Jensen has twenty-seven years of experience in design and analysis of communications systems, has consulted with various corporations to create antenna and circuit designs for various wireless communications systems, and founded a company that created and commercially marketed software for radio frequency circuit design. (*See* Dkt. #211, Exhibit 3 at ¶ 8). As such, the Court finds that Jensen's experience qualifies him to opine about what is both known and valuable in this particular industry. Regarding Defendants' other objections, the Court finds that such objections fall within the scope of cross-examination. *See Daubert*, 509 U.S. at 596.

**d. Trade Secrets**

***5** Defendants argue that Jensen's testimony regarding trade secrets is inadmissible because "Jensen did not identify a single trade secret in his opening expert report ... never opined on several of the required elements of a trade secret" and such testimony "is not within the scope of his expertise." (Dkt. #195 at p. 22). Plaintiff claims that "Jensen will not be opining on the legal definition of 'trade secret' " but instead will "provide [an] opinion on the extent to which Quintel's technology was well known or valuable in the industry, as well as address[ ] many of the factual questions that play a role in determining what constitutes a trade secret." (Dkt. #211 at p. 20).

As explained above, the Court finds that Jensen may provide opinions regarding whether Plaintiff's alleged trade secrets were known and valuable within the industry. However, the Court finds that Jensen may not provide opinions as to what constitutes a trade secret or the legal definition of a trade secret as such testimony is outside the scope of his expert report. *See* (Dkt. #195, Exhibit 4 at p. 18 ("I have not been asked nor do I [Jensen] have the legal definition of a trade secret."); Dkt. #211, Exhibit 3 (Jensen's report, which fails to make any mention of or reference to an opinion regarding what constitutes a trade secret)).

**e. Misappropriation**

Defendants aver that Jensen's conclusions regarding the alleged misappropriation of trade secrets are unreliable and not based on scientific principles. Specifically, Defendants claim that Jensen never inspected the product, but instead "invent[ed] a new test for misappropriation—similarity"—which Jensen failed to provide any standards or legal precedent to support (Dkt. #195 at p. 23). Conversely, Plaintiff contends that inspection of a product is not the only reliable method an expert can base his or her opinion on. Further, Plaintiff responds that Jensen "follows his 'similarity' discussion with an extensive analysis" explaining "Defendants' incorporation of Quintel's technology" and that Defendants "fail to specify *what* is unreliable about his detailed comparison." (Dkt. #211 at p. 21; Dkt. #245 at p. 6) (emphasis in original).

Expert testimony is reliable if it is "the product of reliable principles and methods." Fed. R. Evid. 702(c). "The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all [Rule 702] requirements have been met." *Engenium*, 924 F. Supp. 2d at 769 (citing *Daubert*, 509 U.S. at 593 n.10).

Here, Jensen compares side-by-side Figure 2B, a block diagram from the '647 patent, with a Quintel block diagram explaining how a cellular base station can implement Per User Tilt technology. Following Jensen's opinions as to the similarities between the diagrams, Jensen provides an analysis explaining how he believes Defendants incorporated Plaintiff's technology in the '647 patent. (*See* Dkt. #211, Exhibit 3 at ¶¶ 154–162). The Court finds Jensen's methodology and analysis explaining such is reliable. *See Engenium*, 924 F. Supp. 2d at 770–72 (finding that manually comparing code side-by-side is not an inherently unreliable methodology as long as the expert provides explanation and support for such methodology and reliability). As such, the Court does not exclude Jensen's opinions as they relate to any alleged misappropriation.

Accordingly, the Court finds that Jensen's opinions are limited only to the extent that he cannot provide testimony concerning Defendants' state of mind or intent and what constitutes or the legal definition of a trade secret.

## II. Magee

Defendants contend exclusion of Magee's testimony is warranted because (1) Magee's four damages models are based on unreliable data, use unreliable methodology, or are unreliably applied to the facts of this case, and (2) Magee's purported opinions are not his own. In the alternative, Defendants aver that if Magee is permitted to testify, his testimony should be limited to no more than one of his four damage models. The Court addresses each argument in turn.

### a. Magee's Four Damage Models

***6** Plaintiff seeks to have Magee testify as to four different damage models. Defendants claim each model "bear[s] no relationship to the facts or to the economic evidence in this case" and fails to meet "the standard of reliability established in *Dabutert.*" (Dkt. #195 at p. 24). Conversely, Plaintiff responds that "[e]ach of [Magee's] four theories [are] properly grounded in reliable data and in Dr. Magee's experience, education, and analysis." (Dkt. #211 at p. 22). Further, Plaintiff states that the brunt of "Defendants' attack on Dr. Magee demonstrates nothing more than that they disagree with his conclusions," which "is an insufficient basis to exclude expert testimony." (Dkt. #211 at p. 22). The Court addresses each damage model separately.

#### i. Lost Patent Ownership

Magee's Lost Patent Ownership damage model calculates the alleged damages Plaintiff suffered "because of Defendants' misappropriation of Quintel's trade secrets," which prevented Plaintiff from being able "to fully protect those secrets through the patent process." (Dkt. #211 at p. 22). In calculating such lost profits, Magee "used Quintel's SONWav sales projections ... for the years 2018 through 2022." (Dkt. #211 at p. 23). Specifically, Magee found approximately $800 million as the worldwide SONWav revenue projection for 2018–2022. (*See* Dkt. #211, Exhibit 19 at pp. 82–83). Magee "then calculated operating profits on those revenue projections at an 18.1% margin for U.S. sales and 11% for other regions." (Dkt. #211 at p. 23). Next, Magee "attributed 28.5% ... of the resulting profit to Quintel's trade secrets" and lastly "applied a further discount of 47% ... to account for a 'patent ownership premium.' " (Dkt. #211 at p. 23).

Regarding Magee's $800 million sales projection, Defendants claim that such projection "has no connection to reality ... was invented by Quintel's [Chief Technology Advisor] David Barker for purposes of this litigation" and "has been subject to no analysis or scrutiny." (Dkt. #195 at pp. 25-26). Further, Defendants contends that "[g]iven that Quintel has never sold a single SONWav device ... Magee simply accepted his client's projection of a massive increase in sales and conducted no independent research [into] whether the projected figures given to him ... were valid, or even reasonable." (Dkt. #195 at pp. 27–28) (citations omitted). As to Magee's assumptions on profit margin and patent ownership premium, Defendants argue there is a "fundamental mismatch" between "Magee's profitability numbers and the facts of this case" rendering Magee's opinions inadmissible (Dkt. #195 at p. 29).

Plaintiff responds that Magee derived such revenue projections from "projections provided by Quintel, and [Magee's] team had direct discussions with David Barker, Quintel's chief technology officer, regarding those projections." (Dkt. #211 at p. 23). Furthermore, Plaintiff states that Magee, in at least four ways, "subjected these projections to analysis and scrutiny and determined them

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

to be reasonable." (Dkt. #211 at p. 23). Moreover, Plaintiff claims that Magee "analyzed what he considered to be the 'best estimate' available to him regarding Quintel's SONWav sale projection ... assessed that figure in the context of the value of and demand for Quintle's technology in the market, and further compared it to figures generated by Huawei's own assessment of sales volumes." (Dkt. #211 at p. 25). Responding to Defendants' arguments as they relate to Magee's profit margin and patent ownership premium assumptions, Plaintiff claims such arguments go to the weight and not admissibility of Magee's opinions.

In sum, Defendants disagree "with the underlying assumptions and figures [Magee] plugged into his methodology" and the extent that Magee conducted independent research. *Right of Way Maint. Co. v. Gyro-Trac, Inc.*, No. H-05-4081, 2007 WL 1428634, at *2 (S.D. Tex. 2007 May 11, 2007). The Court finds these objections fall within the scope of cross-examination. *See id.* As such, the Court finds exclusion of Magee's testimony as it relates to his Lost Patent Ownership damage model is improper. *See id.*; *Daubert*, 509 U.S. at 596; *B.J. Tidwell Indus., Inc. v. Diversified Home Products, Inc.*, No. SA-06-CA-0264, 2007 WL 3118300, at *2 (W.D. Tex. Oct. 19, 2007) ("It seems reasonable for a business valuation expert to rely on information the client provides about its customers, invoices, billing, finance charges, and financial records in valuating a business's economic loss").

### ii. Unjust Enrichment

***7** Magee's Unjust Enrichment damage model "reflects damages to Quintel due to Huawei's 'misappropriation' and 'use' of trade secrets, without paying for them." (Dkt. #211, Exhibit 19 at ¶ 91). Magee "calculated Huawei's Unjust Enrichment from the sales of its AAU3902 Product that uses Quintel's trade secrets." (Dkt. #211, Exhibit 19 at ¶ 91).

Defendants contend that Magee's calculation is flawed and inadmissible. Specifically, Defendants claim that Magee does not attempt to apportion his unjust enrichment damages between those features of the AAU3902 that use Plaintiff's technology and those that do not. As such, Defendants argue that "Magee's failure to apportion unjust enrichment according to the value of the allegedly misappropriated technology rather than the AAU3902 product as a whole requires exclusion of his opinion." (Dkt. #195 at p. 30). Conversely, Plaintiff responds that "Defendants have failed to demonstrate that apportionment is even required in this case, much less that Dr. Magee's opinions on the unjust enrichment model are somehow unreliable." (Dkt. #211 at p. 30).

If a defendant is found to have "enjoyed actual profits" in misappropriating trade secrets, "a type of restitutionary remedy can be afforded [to] the plaintiff—either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). Whether the full amount of the infringer's profits is attributable to the alleged misappropriation of trade secrets is for the jury to decide when awarding damages. *See Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 855–56 (E.D. Tex. 2012).

The Court finds that Magee's failure to apportion is not fatal to his opinion since such a determination is for the jury. *See id.* Further, the cases in which Defendants rely on to support the proposition that apportionment is required are distinguishable from the case at hand. As such, the Court declines to exclude Magee's opinion as it relates to his Unjust Enrichment damage model.[1]

### iii. Reasonable Royalty

Magee's Reasonable Royalty damage model represents the lost reasonable royalties Huawei should have paid Quintel. "A reasonable royalty represents compensation for the use of intellectual property that a willing licensor and willing licensee would have negotiated in an arm's-length setting prior to infringement or misappropriation." (Dkt. #211, Exhibit 19 at ¶ 105).

Defendants maintain that Magee's calculation is flawed because "Magee uses hypothetical numbers for both his royalty base and royalty rate to generate a grossly inflated result." (Dkt. #195 at p. 32). Plaintiffs claim that Magee's report describes in detail the analysis Magee undertook to arrive at such results. (*See* Dkt. #211, Exhibit 19 at ¶¶ 109–117). Further, Plaintiff contends that Defendants' argument "ignores that the royalty base used by Dr. Magee originated in part from [Defendants'] own data, and was refined and reduced through a generally accepted methodology commonly used by economists in calculating reasonable royalties." (Dkt. #211 at p. 32).

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

***8** " 'As a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned [to] that opinion rather than its *admissibility* and should be left to the jury's consideration.' " *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (emphasis in original) (citation omitted). "It is the role of the adversarial system, not the court, to highlight weak evidence." *Id.* Further, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

At the heart of Defendants' argument, Defendants merely disagree "with the underlying assumptions and figures that [Magee] plugged into his methodology." *Right of Way*, 2007 WL 1428634, at *2. "Those type of arguments should be made on cross-examination of the witness in front of the trier of fact." *Id.* As such, the Court finds exclusion of such testimony is improper. *See id.*; *Daubert*, 509 U.S. at 596.

**iv. Market Value of Plaintiff's Trade Secret Development Cost**

Magee's Market Value damage model determines "the damages caused by Defendants' conduct in terms of Quintel's actual loss as measured by the investment value of the trade secrets at issue." (Dkt. #211 at p. 33). Stated differently, Magee calculates "what a reasonable investor would have paid for the secrets, using detailed development cost information provided by Quintel and applying a price-to-book ratio based upon market reports." (Dkt. #211 at p. 33). This approach consists of two steps: (1) "calculate the book value of what Quintel paid for the research and development of the trade secrets;" and (2) "adjust that to market value using the relevant industry stock market value to book ratio, times the book value of the associated development costs." (Dkt. #211, Exhibit 19 at ¶ 119).

Defendants provide three reasons for why they believe "Magee's approach is conceptually and methodologically flawed." (Dkt. #195 at p. 33). First, "[a]pplying a set multiplier to development costs is not an accepted or reliable method of valuing technology;" second, "Magee's trade secret development costs theory depends on unreliable Quintel cost data that Professor Magee made no effort to check or validate;" and third, "Quintel's cost estimates bear no relationship to the alleged trade secrets or the alleged misappropriation at issue in the litigation." (Dkt. #195 at pp. 34–35). Plaintiff responds stating that "it is well established that damages in a trade secrets case may be measured by the value that a reasonable investor would pay for the trade secrets." (Dkt. #211 at p. 33). Further, Plaintiff points out that Defendants' remaining arguments are merely repetitive of the arguments made in attacking Magee's Lost Patent Ownership damage model, which go to the weight and not the admissibility of Magee's opinions.

Defendants disagree with the method, assumptions, and figures Magee uses in his calculation. As explained earlier, these types of objections and arguments are better dealt with on cross-examination. *See Right of Way*, 2007 WL 1428634, at *2; *Daubert*, 509 U.S. at 596. As such, the Court does not exclude Magee's testimony as it relates to his Market Value damage model.

**b. Magee's Reliance Upon His Staff in Preparing His Report**

Defendants aver that "Magee's opinions also should be excluded because [Magee] appears to have done no work of his own in coming to the conclusions reflected in his expert report, instead relying entirely on his staff, particularly Devrim Ikizler." (Dkt. #195 at p. 35). Plaintiff responds that Magee appropriately relied on his staff in preparing his report and that the opinions within the report are his own.

***9** "Experts must undertake their own analyses and may not blindly rely on the opinions of others." *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-33-JRG-RSP, 2015 WL 12911530, at *2 (E.D. Tex. Sept. 30, 2015). "Preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with [Federal Rule of Civil Procedure] 26(a)(2)(B)'s requirement that the expert 'prepare' the report." *Seitz v. Envirotech Sys. Worldwide Inc.*, No. H-02-4782, 2008 WL 656513, at *2 (S.D. Tex. Mar. 6, 2008) (citations omitted). "Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." *Id.* (citation omitted). "The party seeking to strike an expert's testimony has the burden of proving that the report was 'ghost-written.' " *Id.*

Magee testified during his deposition that in preparing his

report he sat down with the consultants, his staff, and Ikizler to outline how he saw the report being laid out (Dkt. #211, Exhibit 20 at p. 10). After discussing the report's outline, Ikizler prepared the first draft (Dkt. #211, Exhibit 20 at p. 11). Magee and Ikizler then went "back and forth" discussing the content and structure of the report followed by Magee making edits (Dkt. #211, Exhibit 20 at p. 11). When asked whether Magee wrote the report, Magee answered that he "ultimately wrote the whole thing in the sense that [he] either wrote sections of it or mainly edited extensively the report on multiple drafts." (Dkt. #211, Exhibit 20 at p. 11). Further, Magee made clear that the opinions in the reports are indeed his own (Dkt. #211, Exhibit 20 at p. 12).

Taking Magee's testimony as true, the Court finds that Defendants failed to meet their burden of showing that Magee "had so little involvement in preparing the reports of his opinions as to warrant striking his opinions." *Seitz,* 2008 WL 656513, at *3. As such, the Court finds striking Magee's report would be inappropriate.

**c. Scope of Magee's Testimony**

Defendants claim that if "Magee's opinions are not excluded, [Magee] should not be permitted to present duplicative damage[ ] theories at trial, lest he confuse the jury and create an unnecessary risk of double recovery." (Dkt. #195 at p. 37). Plaintiff responds that "Defendants are simply wrong as a matter of procedure." (Dkt. #211 at p. 36).

"A party is generally entitled to sue and to seek damages on alternative theories." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *accord Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987). However, "[a] party is not entitled to a double recovery." *Id.* "A double recovery exists when a plaintiff obtains more than one recovery for the same injury." *Id.* As such, to preclude double recovery when a party seeks damages on alternative theories, the defendant should request, "before judgment, that the trial court require [the plaintiff] to elect its remedy." *Id.*

Here, Defendants attempt to preclude Plaintiff from doing what the law permits—seek damages on alternative damages. If the jury awards Plaintiff damages pursuant to different damage theories, Defendant should, before judgment, request the Court to require Plaintiff to elect its remedy. As such, the Court does not limit Magee's testimony to one damage model.

**CONCLUSION**

***10** It is therefore **ORDERED** that Defendants' Motion to Exclude Expert Testimony of Michael Jensen and Professor Stephen Magee (Dkt. #195) is hereby **GRANTED in part.** Specifically, the Court finds that Jensen's opinions are limited only to the extent that he cannot provide testimony concerning Defendants' state of mind or intent and what constitutes or the legal definition of a trade secret.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 626355

Footnotes

1 On September 27, 2016, Judge Davidson dismissed the accounting claim for failure to state a claim, and the breach of contract claim against Dr. Ma in his individual capacity was dismissed as conceded by Quintel (Dkt. # 42 at p. 39). On January 17, 2018, the Court adopted, in pertinent part, the Magistrate Judge's Report and Recommendation recommending Quintel's breach of contract claim based on failure to destroy documents and unfair competition by misappropriation claim be dismissed with prejudice (Dkt. #239).

1 Pursuant to the Court's Order Adopting Report and Recommendation of the United States Magistrate Judge (Dkt. #239), the Court dismissed Plaintiff's unjust enrichment claim as it relates to all Defendants except Zhengxiang Ma. As such, Magee's testimony concerning his Unjust Enrichment damage model is permissible only as it pertains to Ma.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3322995
United States District Court, E.D. Michigan, Southern Division.

ROVER PIPELINE, LLC, Plaintiff,
v.
1.23 ACRES OF LAND, MORE OR LESS, PERMANENT EASEMENT (PIPELINE RIGHT-OF-WAY SERVITUDE), et al., Defendants.

Civil Action No. 17-cv-10365
|
Signed 07/06/2018

**Attorneys and Law Firms**

Douglas A. Donnell, William A. Horn, John M. DeVries, Nikole Canute, Mika Meyers Beckette & Jones, Grand Rapids, MI, Thomas A. Zabel, Zabel Freeman Law Firm, Houston, TX, for Plaintiff.

Mary K. Markman, MI Dept. of Atty. Gen., Gary P. Gordon, Dykema Gossett, Richard J. Aaron, Honigman, Miller, Lansing, MI, Zachary Joseph Murry, Barkan & Robon Ltd., Maumee, OH, Jason R. Abel, Honigman, Miller, Leland Prince, Dte Energy Company, Detroit, MI, Brian J. Renaud, Foster Swift Collins & Smith PC, Jonathan H. Schwartz, Jaffe, Raitt, Heuer & Weiss, P.C., Southfield, MI, Robert F. Magill, Jr., Magill and Rumsey, Allen J. Philbrick, Conlin, McKenney, Ann Arbor, MI, Matthew A. Romashko, Lynch, Gallagher, Mount Pleasant, MI, Christopher E. McNeely, Mittelstaedt & McNeely, Rochester Hills, MI, William J. McHenry, Law Office of William J. McHenry, PLLC, Farmington Hills, MI, for Defendants.

1.23 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 3.74 Acres of Land, More or Less, Temporary Work Space, in Lenawee County, Michigan, Office of the Lenawee C, pro se.

0.76 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 2.28 Acres of Land, More or Less, Temporary Work Space, in Lenawee County, Michigan, Midwest Energy Cooperat, pro se.

2.73 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 4.05 Acres of Land, More or Less, Temporary Work Space, in Washtenaw County, Michigan, Michigan Paving and M, pro se.

0.04 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude), and 0.06 Acres of Land, More or Less, Temporary Work Space, in Washtenaw County, Michigan, Michigan Paving and M, pro se.

**OPINION & ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF CONSUMERS ENERGY PIPELINE EXPLOSION (Dkt. 813); GRANTING PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ROUTE CHANGES (Dkt. 814); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION IN LIMINE AS TO WAYNE ESCH (Dkt. 816); DENYING PLAINTIFF'S MOTION IN LIMINE AS TO ERIC GARNDER AND MARK KOENINGER (Dkt. 817); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION IN LIMINE AS TO WILLIAM LAWRENCE AND ERIC GARDNER (Dkt. 819); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION IN LIMINE AS TO FRANK TOKAR, JR. AND ERIC GARDNER (Dkt. 820); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF PRIOR EASEMENT PURCHASES AND SETTLEMENTS (Dkt. 821); GRANTING DEFENDANTS' MOTION IN LIMINE AS TO MIKE ISRANI AND RICHARD HURIAUX (Dkt. 822); DENYING DEFENDANTS' MOTION IN LIMINE AS TO ANTHONY SANNA (Dkt. 823); DENYING DEFENDANTS' MOTION IN LIMINE AS TO JEFFREY KERN AND DAVID FALKENSTERN AND TO STRIKE SUPPLEMENTAL REPORT (Dkt. 824); AND DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION IN LIMINE TO EXCLUDE PIPELINE IMPACT STUDY (Dkt. 825)**

MARK A. GOLDSMITH, United States District Judge

***1** This matter is before the Court on several motions in limine brought by Plaintiffs (Dkts. 813-814, 816-821) and Defendant landowners (Dkts. 822-825). Most of the

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

issues have been fully briefed; for those without full briefing, the time to file has since passed. See E.D. Mich. LR 7.1(e)(2). The Court has dispensed with oral argument, as it will not aid in the decisional process. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). The disposition of each motion will be addressed below and summarized in the conclusion of this opinion and order.

## I. ANALYSIS

The majority of the motions in limine presently before the Court are those brought pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The Court will thus first address each Daubert motion, followed by a discussion of the remaining motions in limine.

### A. Daubert Motions

Under Federal Rule of Evidence 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following criteria are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 places a special obligation on the trial court to be a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 597. In Kumho Tire Company v. Carmichael, 526 U.S. 137 (1999), the Supreme Court clarified that the "gatekeeping obligation" is not limited to "scientific" expert testimony, but applies to all expert testimony. In other words, Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the trier of fact, before permitting the trier of fact to assess such testimony. Id. at 148-149. The proponent of the expert must establish admissibility by a preponderance of the evidence. Nelson v. Tenn. Gas Pipeline, Co., 243 F.3d 244, 251 (6th Cir. 2001).

#### 1. Wayne Esch

The first Daubert motion brought by Rover concerns Wayne Esch, a realtor based in Washtenaw County, Michigan. Esch was retained by Defendants to assess the effect of the Rover pipeline on the following property tracts: (i) MI-WA-006.000 and MI-WA-009.500 (owned by Barry Kenyon/BVK Holdings, LLC); (ii) MI-WA-052.000 (owned by Jean and Matthew Little, Trustees of the Little Trust ("Little Trust") ); (iii) MI-WA-058.000 (owned by William and Karen Zimmer); (iv) MI-WA-059.000 and MI-WA-059.500 (owned by L&B Schaible, LLC); and (v) MI-WA-064.000-T (owned by Cynthia and William Kemner).[1] Esch ultimately concluded that the Rover pipeline "will have a severe and negative impact on the marketability of the properties in the future," to the tune of a 25% decrease in value for each property. Esch Decl., Ex. 1 to Defs. Mot., ¶ 10 (Dkt. 816-2). Esch also opined that the location of the properties made them ideal for residential subdivision development, but the presence of the pipeline "will have a substantial negative impact on their ability to be developed." Ex. D to Esch Decl. at PageID.9613. Rover argues that Defendants have failed to satisfy any of the requirements set forth in Rule 702. The Court will address each requirement in turn.

***2** Rover argues that while Esch has experience as a realtor, he does not have any relevant experience with properties encumbered by pipelines or large properties sold for potential development as residential subdivisions. It notes Esch's assertion that a pipeline on the subject properties would cause a 25% loss in value cited to only one previous experience where one of his buyers insisted on a discount because of a pipeline. Rover notes the Sixth Circuit's holding in Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994), that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Defendants argue that Esch's "experience and specialized knowledge as a successful realtor" in the Washtenaw County market qualify him as an expert under Rule 702. They note that he has been in the top five percent of realtors in Washtenaw County by annual sales each of the past ten years. See Ex. D to Esch Decl. at PageID.9614.

Esch's experience as a longtime realtor in Washtenaw County satisfies the first requirement under Rule 702. While Esch could only name one specific transaction where a buyer demanded a price decrease due to an oil pipeline, he noted that he had dealt with several other instances of encumbrances, including electrical lines. He also has been working for over fifteen years in Washtenaw County, where each of the properties at issue is located. Putting aside the methods used to come to his conclusion, his credentials qualify him to testify regarding the effect a pipeline would have on the resale value of property in the county.

Despite his experience, Esch did not base his conclusion regarding the property values on sufficient facts or data, or reliable principles and methods. While the Court in Daubert set forth factors to consider when determining whether an expert's methods are reliable, including whether the methods have been tested, subject to peer review, and generally accepted in the scientific community, the "factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony." First Tennessee Bank Nat. Ass'n v. Barreto, 268 F.3d 319, 334 (6th Cir. 2001). "In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.' " Id. at 335 (quoting Kumho Tire, 526 U.S. at 150). "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Id. (quoting Kumho Tire, 526 U.S. at 153).

Defendants argue that Esch should be permitted to testify based solely on his past experience, because his testimony is only being offered to "educate the jury as to the condition of the real estate market where these properties are located." Def. Resp. at 7. Esch's report does begin by discussing the nature of the Washtenaw County market, noting that "[m]any environmental conscience [sic] Buyers refuse to live close to gas pipelines, others will consider purchasing only if the price is adjusted." Ex. D to Esch. Decl. at PageID.9610. However, he then gets into much more detail regarding the effect of the Rover pipeline on the subject properties. Esch stated in his report and at his deposition that the highest and best use for each of the properties is to convert them into residential subdivisions, and that the presence of the Rover pipeline will cause this land to decrease in value by 25%. In coming to the precise conclusion in his report that the subject properties will lose a quarter of their value, Esch relies solely "upon my real estate experience in Washtenaw County." Id.

Although the Daubert factors may not be applicable where, as here, the issue involves a non-scientific opinion, the trier of fact needs to be given some basis, other than a generalized reference to experience, when being presented with a statistical conclusion regarding the value of specific properties. See Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."). Esch conceded that he did not inspect any of the subject properties, compare sales data for properties with and without pipeline easements, review or conduct any studies examining the effect of pipelines on home values, nor did he consider the fact that three of the properties already have pipeline easements, a fact that might well alter his 25% devaluation estimate. When asked what market data he used to arrive at his 25% conclusion, he once again relied on his anecdotal experience of "taking buyers out to look at properties and the market feedback that they give to me based upon that." Id. at 54.[2] Esch Dep., Ex. 2 to Defs. Mot., at 54, PageID.9629 (Dkt. 816-3).

***3** While Defendants now try to characterize Esch's testimony as a mere general discussion of the Washtenaw County housing market, this is belied by Esch's own report and testimony, which give a precise percentage of how much the landowners can expect their property to be devalued by the Rover pipeline. The failure to rely on any meaningful data in coming to his conclusion regarding the 25% devaluation of the Kenyon, Little Trust, Zimmer, L&B Schiable, and Kemner properties renders this portion of Esch's opinion unreliable. As a result, this portion of his testimony is excluded.[3] However, based on his experience, the Court will allow him to testify about the market generally, as well as the highest and best use of the property.

### 2. Mark Koeninger and Eric Gardner: PIR/Stigma Theory

Rover next seeks to exclude the opinions of Mark Koeninger, an architect, and Eric Gardner, an appraiser, both of whom were retained by the Kenyon, Little Trust, Zimmer, Schiable, and Kemner landowners. Gardner appraised all six of the properties, and based his appraisals in part on Koeninger's potential impact radius

("PIR")/stigma theory. This theory relies on the Pipeline and Hazardous Safety Materials Administration's ("PHMSA") definition of PIR, which it defines as "the radius of a circle within which the potential failure of a pipeline could have significant impact on people or property." 49 C.F.R. § 192.903. Koeninger estimates that the PIR for the Rover pipeline is 1,100 feet on each side of the pipeline. According to Koeninger, this potential blast radius causes a stigma which devalues not just the land on which the pipeline is situated, but also the land that is within the PIR, and even the land outside the PIR. Koeninger estimates that the land within the radius is devalued anywhere from 25% to 40%, with the land outside of the PIR losing 10% of its value.

Defendants now seek what is sometimes referred to as "severance damages," which arise where a "partial taking not only deprives the owner of the property that is actually taken but also diminishes the value of the property remaining to the owner." United States v. 91.90 Acres of Land, Situate in Monroe Cty., Mo., 586 F.2d 79, 86 (8th Cir. 1978). Koeninger and Gardner assert that because of the stigma caused by the pipeline and its PIR, the value of the property remaining to Defendants has diminished. Rover now moves to exclude this opinion, on the grounds that it is not based on sufficient facts or data, is not the product of reliable principles and methods, and even if it was, the principles and methods were not reliably applied to the facts of the case.

***4** Rover asserts that neither Gardner nor Koeninger relied on sufficient facts or data when conducting the appraisals, or formulating the PIR/stigma theory, respectively. Rover's main point of contention is that while the putative experts reviewed market data to determine the "before take" value of Defendants' land, they did not consult any market data within Washtenaw County to determine the "after take" value of the properties.

A review of Gardner's reports shows that, in addition to reviewing regional and neighborhood data, he began by comparing each subject property with four to five comparable properties to determine each property's "before take" value. See, e.g., Kemner Appraisal, Ex. 1 to Pl. Mot., at 28, PageID.9745 (Dkt. 817-2). He also toured each property, met with the landowners, and spoke with local officials. He then adjusted this value based on Koeninger's PIR/stigma theory, a theory which Koeninger became familiar with after reviewing a 2002 study of the effects of the Guardian Pipeline in Wisconsin ("the Guardian Pipeline study"), as well as a study in Right of Way magazine, in order to arrive at the "after take" valuation. Id. at 13. A review of Koeninger's deposition indicates that he reviewed some market data—what he refers to as "demographic information"—to get a general sense of the housing market in Washtenaw County. See Koeninger Dep., Ex. 8 to Pl. Mot., at 55, PageID.10134 (Dkt. 817-9). In addition to the Guardian Pipeline Study, he reviewed zoning information and master plans. Id. He also used the county auditor's surveys and records to determine which easements already existed on the subject properties. Id. at 50.

Rover contends that, instead of relying on the PIR/stigma theory and two studies that supposedly support that theory, Gardner should have compared the subject properties to comparable properties that sold after being encumbered by pipelines in order to determine the "after take" value of the properties. See Rockies Exp. Pipeline LLC v. Hopkins, No. 1:08-CV-00751-RLY, 2012 WL 1622532, at *5 (S.D. Ind. May 9, 2012) ("One would expect that if the presence of an underground natural gas pipeline makes residential development economically non-viable, then some market data would exist to evidence that."). Rover takes issue with Gardner's and Koeninger's failure to examine sales data along the Rover pipeline to determine whether news of the pipeline had caused properties to depreciate. However, there is authority that holds that "[c]omparable sales are only one method of estimating property values. Other methods may be used 'where no comparable sales exist.' " Vector Pipeline, L.P. v. 68.55 Acres of Land, 157 F. Supp. 2d 949, 956 (N.D. Ill. 2001) (quoting United States v. 99.66 Acres of Land, 970 F.2d 651, 655 (9th Cir. 1992) ). Gardner testified that such comparable properties do not exist at this time, because while there are some properties with six to twelve inch pipelines, the Rover pipeline's forty-two inch diameter makes it distinguishable. Gardner Dep., Ex. 9 to Pl. Mot., at 43 (Dkt. 817-10); see also id. (describing the Rover pipeline as a "game changer."). Gardner instead relied on the PIR and literature on the stigma of pipelines to determine the decrease in value caused by the Rover pipeline.

Rover insists that comparable sales do exist, noting a study by Integra Realty Resources ("Integra Study"), to which Gardner and Koeninger were privy, which analyzed homes on and off other large pipelines in Ohio, Virginia, New Jersey, Pennsylvania, and Mississippi. The report ultimately concluded that "there is a sales frequency for homes 'on' a pipeline that is consistent with those 'off' a pipeline. This indicates that the presence of a pipeline does not inhibit sales." IRR Report, Ex. 11 to Pl. Mot., PageID. 10303 (Dkt. 817-12). Contrary to Gardner's conclusion, the report also concluded that the "size of the pipeline has no effect on sales price in the

study areas.” Id.

***5** While this report may contradict the PIR/stigma theory, it is well-settled that “[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.” Clay, 215 F.3d at 669. Gardner was entitled to rely on his experience and the literature he reviewed in order to conclude that the PIR/stigma effect was real. See Vector Pipeline, 157 F. Supp. 2d at 957 (“Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.”) (internal citation and quotations omitted).

Rover also takes issue with the literature relied on for Gardner’s “after take” valuation, first arguing that the study of the stigma caused by the Guardian Pipeline is unreliable because it consisted of a phone survey of individuals selected at random, rather than a survey of only active home buyers. A review of the study reveals that it conducted a thorough, scientific survey of homeowners regarding how the then-forthcoming Guardian pipeline in Wisconsin would affect their home-buying decisions. See Guardian Pipeline Study, Ex. A to Defs. Resp. to Mot. to App. Comm. (Dkt. 689-2). The study began by asking respondents generally whether a pipeline would impact their decision to purchase a home, and then followed up by asking by what percentage the property would have to be reduced for them to make a purchase. Id. at 3-7. While Rover believes the study should have only surveyed those active in the market, this critique does not render the entire study unreliable. Rover does not actually critique the Right of Way magazine article, but instead notes the article’s recommendation that appraisers also analyze comparable sales to determine the “after take” value. However, as noted above, Gardner insisted that, in light of the size of the Rover pipeline, there were not comparable sales in Washtenaw County.[4] The Court concludes that Koeninger and Gardner could reasonably rely on both pieces of literature in lieu of comparable sales in order to satisfy Rule 702(b)’s mandate that they rely on sufficient facts and data in formulating their opinions.

The next issue concerns whether Koeninger’s PIR/stigma theory itself is the product of reliable principles and methods. As noted above, “Daubert provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique’s operation, and general acceptance in the relevant scientific community.” In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529 (6th Cir. 2008) (internal citation and quotations omitted).

Rover contends that the PIR/Stigma theory “has failed” when tested, ostensibly referring to the Integra study, and has not been the subject of peer review or publication. However, as noted above, it has found support in the Guardian Pipeline Study, and in the study published in Right of Way Magazine. While Rover notes that a court in the Southern District of Ohio explicitly found that Koeninger’s PIR/stigma theory possessed a “fundamental weakness,” see Rockies Exp. Pipeline, LLC v. 4.895 Acres of Land, More or Less, in Butler Cty., Ohio (Pipeline Right-Of-Way Servitude), No. 2:08-CV-554, 2011 WL 1043493, at *1 (S.D. Ohio Mar. 16, 2011), the court held that the PIR was properly considered and was “an interesting theory that lacks persuasive force under the circumstances of this case.” Id. This lends more support to the argument that the weaknesses in the PIR/stigma theory go towards the theory’s weight, not its admissibility.[5]

***6** Lastly, Rover argues that, even if the PIR/stigma theory is reliable, Gardner and Koeninger did not reliably apply the theory to each tract they evaluated. It argues that the theory was misapplied because the putative experts failed to take into account that three of the properties—those owned by Kemner, Schiable, and Zimmer—were already encumbered with pipelines. As a result, Rover argues, the theory should have led to a diminished “before take” value in light of the preexisting pipelines.

In Gardner’s expert reports on the Kemner, Schiable, and Zimmer properties, he acknowledges that there are existing pipelines on the properties, but concedes that “the size, pressure and contents of the pipe are unknown and therefore not included in this report.” See, e.g., Kemner Appraisal, Ex. 6 to Pl. Mot., at PageID.10080 (Dkt. 817-17). The failure to consider the potential stigma of the existing pipelines on the “before take” value of the Kemner, Schiable, and Zimmer properties allows for the inference that Gardner did not faithfully apply the PIR/stigma theory. Even allowing for their contention that the Rover pipeline is a “game changer” in terms of its size, it stands to reason that under the PIR/stigma theory, the “before take” value of the three pieces of property would at least be marginally depressed by the purportedly smaller preexisting pipelines. The failure to at least consider their impact on the property values makes it appear as though Gardner was attempting to inflate the “before take” value of the properties, so that he could then apply the PIR/stigma theory to the Rover pipeline to maximize Defendants’ just compensation.

Despite this apparent flaw in Gardner's appraisals, the Court holds that it is not grounds for a wholesale exclusion of Koeninger's PIR/stigma theory, or Gardner's application of the theory to his appraisals. As noted above, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Clay, 215 F.3d at 669. It is for the trier of fact to determine whether, in light of the apparent disparity in size between the preexisting pipelines and the Rover pipeline, Gardner was correct in choosing not to apply the PIR/stigma theory to determine the "before take" value. As a result, the Court holds that the testimony of Koeninger is admissible, as is the testimony of Gardner as it pertains to his application of the PIR/stigma theory.

### 3. William Lawrence and Eric Gardner: Cost to Cure

The next Daubert motion concerns William Lawrence, an arborist retained by the Kemner, Little Trust, and Zimmer Defendants, as well as Gardner's incorporation of Lawrence's opinions into his appraisals. Rover argues that Lawrence's opinion should be barred because his method of calculating the value of trees felled on the subject properties, as well as the cost to replace those trees, is not reliable under Rule 702. When evaluating the trees felled, Lawrence applied the trunk formula method, which values each tree distinctly from the land on which it was situated. Defendants' appraiser, Gardner, then took Lawrence's valuation of the felled trees, and added that amount to his appraisal of the land itself. Rover argues that because the rule in Michigan, known as the unit rule, requires that land be valued as an integrated whole, rather than as a sum of its components, Lawrence's opinion and reports, as well as Gardner's incorporation of Lawrence's opinion, should be excluded as evidence of just compensation due.

***7** As a threshold matter, Defendants argue that Rover is bound, as a contractual matter, by the Federal Energy Regulatory Commission's ("FERC") Certificate of Public Convenience and Necessity and Rover's Final Environmental Impact Statement ("FEIS") to pay them the value of the trees as damages, in addition to the just compensation owed to them for the diminution in their land's value. Defendants argue that while they "do not challenge the general utility of the 'unit rule,' Rover's conduct in agreeing to the terms contained within the FEIS has waived its application to the issue of the trees removed from Defendants' properties." Defs. Resp. at 7-8.

There are numerous problems with Defendants' theory that the Certificate of Public Convenience and Necessity and FEIS can contractually bind Rover to pay damages above and beyond just compensation. To begin, Defendants do not provide any cases or other authority where an individual (or group of individuals) successfully brought a breach of contract action as a third-party beneficiary against the drafter of an environmental impact statement, or the grantee of a Certificate of Public Convenience and Necessity.

Even assuming the Certificate and the FEIS are a contract, and that Defendants have standing to assert a claim under that contract, a review of both documents does not show a promise to provide damages for the trees in addition to any just compensation. Defendants highlight language in the FEIS that states that Rover is required to compensate the landowners for "damages incurred during construction," and that if there are trees of commercial or other value that have to be removed during construction, "Rover would allow the landowner the right to retain ownership of the trees and negotiate with them regarding the disposition of the trees." See Defs. FEIS Excerpt, Ex. A to Defs. Resp., at PageID.12648-12649 (Dkt. 838-2). This language does not establish a promise by Rover to provide damages above and beyond just compensation. Indeed, another section of the FEIS, omitted by Defendants, explicitly addresses the method of compensation for the forthcoming tree removal. Noting that roughly 3,000 acres of forested land would be affected by the project, Rover stated that it "retained appraisers to help determine property values and fair market value." Pl. FEIS Excerpts, Ex. 1 to Pl. Reply, at PageID.12871 (Dkt. 850-1). It also stated that "[l]andowners would be compensated for any marketable timber that is removed from their property during construction." Id. The FEIS makes clear that this compensation will be determined through negotiation between Rover and the landowners, or if necessary, through eminent domain proceedings.

Finally, as noted by Rover, even if there was evidence that it breached the FEIS and Certificate, Federal Rule of Civil Procedure 71.1, the rule governing condemnation cases, "provides that other than an answer, no pleading or motion asserting any additional defense or objection shall be allowed by the defendant." United States v. Banisadr Bldg. Joint Venture, 65 F.3d 374, 380 (4th Cir. 1995) (holding that breach of contract counterclaim was barred in an eminent domain proceeding). As a result, the FEIS and Certificate do not entitle Defendants to any amount of

above just compensation.[6]

***8** Turning to the admissibility of Lawrence's opinion, Rover argues that it should be excluded because he determined a value for the trees that was separate and distinct from the value the trees may have contributed to the fair market value of the underlying land as a whole. Michigan law, which governs here under the Natural Gas Act, see Columbia Gas Transmission Corp. v. Exclusive Nat. Gas Storage Easement, 962 F.2d 1192, 1199 (6th Cir. 1992), allows for application of the unit rule, which states that "the value of natural physical assets ... will not be valued separately from the land." Muskegon Cty. v. Bakale, 303 N.W.2d 29, 30 (Mich. Ct. App. 1981). The court in Bakale stated that

> Where land taken in eminent domain has ... trees capable of being converted into lumber, these circumstances may be considered so far as they affect the market value of the land; but part of the realty cannot as a rule be separately valued for its materials, trees, etc., as an item additional to the value of the land for the purpose of sale.

Id. (quoting 26 Am. Jur. 2d Eminent Domain § 279).

However, contrary to Rover's assertion, the unit rule is not the exclusive measure of damages in Michigan where a partial taking is at issue. "Generally, in eminent domain cases a condemnee's damages are measured by the fair market value of the property taken. However, where ... a partial taking occurs, it is possible for the property not taken (the remainder) to suffer damages attributable to the taking. These damages have been described as 'severance damages.' " Dep't of Transp. v. Sherburn, 492 N.W.2d 517, 519–520 (Mich. Ct. App. 1992).

"[T]he proper measure of damages in a condemnation case involving a partial taking consists of the fair market value of the property taken plus severance damages to the remaining property if applicable. To calculate the severance damages, the parties may present evidence of the cost to cure." Id. In order to calculate the cost to cure, Lawrence employed the trunk formula method, which is a way to value large trees that have been felled. Lawrence described the method as "an attempt to reflect the cost of a tree if you were to replace it. It is essentially the landscape installation and guarantee cost of smaller trees extrapolated with a mathematical formula to larger trees." Lawrence Dep., Ex. 5 to Pl. Mot., at 32, PageID.10697 (Dkt. 819-6).

Rover does not contest that the trunk formula method is a reliable methodology for determining the cost to cure. It argues that Lawrence's opinion should be excluded because he cannot prove that the cost to cure will actually decrease the amount of severance damages, and correspondingly increase the parcel's value. Rover notes the court's ruling in Sherburn that "curing," by its very nature, "decreas[es] the amount of severance damages and correspondingly increase[es] the parcel's market value." Sherburn, 492 N.W.2d at 520. Rover contends that because Lawrence does not assert that he knows the parcel's actual market value, he has no way of knowing whether the proposed replacement of the felled trees would actually cause the property to appreciate. However, such knowledge does not seem necessary for Lawrence to conclude that curing the felled trees would cause an increase in the property's value. The Michigan Tree Valuation Guide, relied on heavily by both parties, begins by stating that "[t]rees and other landscape plants have a value." Mich. Tree Guide, Ex. F to Defs. Resp., at 4, PageID.12667 (Dkt. 838-7). The guide notes that, in addition to aesthetic value, it is widely accepted that trees provide functional value, serving to abate noise, provide screening, and traffic control. Id. Indeed, it is hard to imagine a scenario where expending the cost to cure would somehow increase the severance damages, and correspondingly decrease the property value. Further, as noted infra, Lawrence has provided testimony that each of the trees at issue provides distinct value to the subject properties.

***9** Lastly, Rover argues that, while the trunk formula method is reliable, it was not reliably applied by Lawrence. It notes the statement in the Michigan Tree Valuation Guide that the guide is meant to "provide[ ] a framework of the acceptable practices or methods used to value trees in maintained landscapes." Id. at 5, PageID.12667. The guide cautions that "[i]t is not intended to be used as a framework for determining the value of trees outside of landscaped settings such as woodlots and fencerows where the tree does not add distinct value to the landscape through attributes such as aesthetics, shading, etc." Id. Rover points to Lawrence's testimony that the felled trees on the Kemner, Little Trust, and Zimmer properties were located in woodlots and fencerows. Lawrence Dep. at 18, PageID.12684. Based on this testimony, Rover argues, the trunk formula method should not have been applied to the trees on the subject properties.

A review of Lawrence's deposition and report indicate that he applied the trunk formula method reliably. The Michigan Tree Valuation Guide specifically provides that it can be used as a framework for trees located in woodlots and fencerows, provided that those trees add "distinct value to the landscape through aesthetics, shading, etc." Mich. Tree Guide at 5. Lawrence testified that the trees on each subject property provided distinct

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

value. As to the Little Trust property, Lawrence testified that the trees contributed to the owners' recreational use of the property. Lawrence Dep. at 36-37, PageID.12688-12689. Lawrence testified that the property had long been used for hunting, and that the trees played an important role in this activity. Id. at 37, PageID.12689. Regarding the Zimmer property, Lawrence testified that the trunk formula method was appropriate because the area around the trees was regularly mowed and maintained as if it were in a landscape setting, which contributed to the home on the property. Id. at 38, PageID.12689. Finally, with regard to the Kemner property, Lawrence believed the trunk formula method was appropriate because the owner intended to subdivide the property, with plans to preserve the trees as a nature preservation area for the subdivision. Id.

Lawrence also testified that based on his extensive experience, which Rover does not contest, he believed the trunk formula method "comes closest to the true value of the trees on those properties based on the existing land uses." Id. at 36. Because he considered the distinct value of the trees, and his own experience, Lawrence reliably applied the trunk formula method to the subject properties. His opinion is thus admissible as evidence of the cost to cure.

Rover also contends that Gardner's appraisal should be excluded because he failed to apply the unit rule. It argues that he merely added Lawrence's tree valuations to his opinion of diminution in market value of the Kemner, Little Trust, and Zimmer properties in order to arrive at the amounts due. Defendants do not address this argument in their response.

There are two different ways Gardner could have arrived at the amount due under Michigan law. He could have applied the unit rule, whereby he would have considered how the trees added to fair market value of the subject properties as a whole, and correspondingly, how much the removal of those trees lowered the fair market value of the property, if at all. Such a valuation would have conformed to the unit rule as announced in Bakale. Alternatively, Gardner could have arrived at the damages due to the landowners by applying the method set forth in Sherburn. As noted above, the court in that case held that "the proper measure of damages in a condemnation case involving a partial taking consists of the fair market value of the property taken plus severance damages to the remaining property if applicable." Sherburn, 492 N.W.2d at 520.

Gardner appears to have a taken a third course. For each landowner, he assessed how much Rover's partial taking lowered the value of the entire property (not just the fair market value of the property taken), to arrive at his "value conclusion," i.e. how much Rover owed the landowner for the diminution of the entire tract. He then added the cost of the trees as estimated by Lawrence on top of his "value conclusion" in order to arrive at the total amount due to the landowner. This method involves double-counting—by accounting for the lowered value triggered by the partial taking and then adding the value of lost trees. Because this methodology is not supported under Michigan law, it cannot be said that Gardner's appraisal is reliable.

***10** Gardner's appraisals as to the Kemner, Little Trust, and Zimmer properties are excluded. Lawrence's testimony is relevant to the extent that Defendants seek to introduce evidence of severance damages.

**4. Frank Tokar, Jr.: Mineral Valuation**

Rover next seeks to exclude the opinions of Frank Tokar, Jr., an expert retained by Defendant Little Trust to opine on the value of mineral deposits on their property. Like with the opinion of Lawrence, the Little Trust's arborist, Rover seeks to exclude Tokar's testimony and report on the grounds that Tokar's opinion is "fundamentally flawed" because he considered the value of the mineral deposits separately from the value they contribute to the land as a whole, thus violating the unit rule. He also argues that Tokar's opinion is not reliable because the factual assumptions underlying his opinion are false. Rover again seeks to exclude Gardner's appraisal, this time on the grounds that he has simply taken Tokar's valuation of the minerals and added it to the decrease in land value to arrive at the Little Trust's just compensation.

This brings the Court to Rover's first argument for exclusion—that Tokar's opinion is inadmissible because he values the minerals independently from the land. This is not grounds for exclusion. In order for an appraiser to take into account the contributory value of the minerals to the land as a whole, it is instructive for the appraiser to first understand how much the minerals are worth. See Columbia Gas, 962 F.2d at 1199 (holding that while, under Ohio law, mineral deposits are not valued separately from the land on which they are located, it is still proper to admit evidence that the land contains valuable deposits in order to determine the land's fair market value). Further, Tokar's opinions are probative of

potential severance damages. See Sherburn, 492 N.W.2d at 520.

Rover next argues that Tokar's method for determining the minerals' worth does not pass muster under Rule 702 because the assumptions underlying his valuation are "demonstrably false." In his report, Tokar valued the mineral deposits at $448,000. Rover contends that this valuation was entirely dependent on Tokar's assumption that, but for the Rover pipeline, the Little Trust would have contracted with Stoneco, a construction materials provider that purchased land adjacent to the Little Trust property, to mine the minerals on the Little Trust's land. As initial matter, it does not appear that Tokar limited his valuation to a scenario where Stoneco would mine the minerals on the Little Trust's property; his report states that his valuation is based upon "the present value that would be realized by an owner if leased to an operator, such as Stoneco of Michigan or other mining company capable of conducting such operation." Tokar Report, Ex. 4 to Pl. Mot., at 9, PageID.10858 (Dkt. 820-5) (emphasis added).

Assuming Tokar limited his estimation to Stoneco, Rover argues that he had no basis to believe that the company would have been interested in mining the Little Trust minerals. It notes that in private communications between Tokar and Stoneco, Tokar represented to the company that the amount of minerals on the Little Trust property was less than the amount necessary for mining to be economically feasible for Stoneco. During his deposition, Tokar testified that a property would need to contain approximately 600,000 tons of minerals for mining to be worthwhile. Tokar Dep., Ex. 3 to Pl. Mot., at 93, PageID.10843 (Dkt. 820-4). In his emails with Stoneco, Tokar estimated that there was a total of 530,000 tons of minerals on the Little Trust's property. See 4/26/2017 Email, Ex. 5 to Pl. Mot. (Dkt. 820-6). Rover also notes estimates by Stoneco that there would be less minerals than Tokar represented. However, in his expert report, issued a month after his communication with Stoneco, Tokar concluded that there was 673,000 tons of minerals, above the threshold to make mining economically feasible. Tokar Report at 8, PageID.10857.

***11** To the extent Rover argues that this inconsistency in estimates renders Tokar's opinion unreliable, it is well-settled that Rule 702 "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (quoting Advisory Committee Note to Rule 702); see also Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which Dr. Coco relied are accurate."). Tokar's varying estimates of the amount of mineral deposits on the Little Trust property is not grounds for exclusion of his opinion.

Even assuming mining the Little Trust property would be economically feasible, Rover argues that it is entirely speculative whether Stoneco would have agreed to lease the property but for the Rover pipeline. In support of this assertion, Rover submits the declaration of Jay Ellis, an administrative manager for Stoneco. See Ellis Decl, Ex. 11 to Pl. Mot., ¶ 1 (Dkt. 820-12). Ellis states that prior to its most recent discussions with the Littles in April 2017, Stoneco discussed mining the property in 2015, but never reached an agreement. Id. ¶ 6. According to Ellis, over the course of their most recent discussions with the Littles, they were provided with samples of the minerals from Tokar, and determined that "the quality and the quantity of the materials were not worth the investment." Id. ¶ 9. Ellis stated that while the pipeline may have affected one of the two areas to be mined, Stoneco would likely not have been interested regardless of the pipeline. Id. ¶ 10. Stoneco also indicated that it would not be ready to mine the materials until at least 2020, which affects Tokar's royalty calculation. See Stoneco Annual Report, Ex. 12 to Pl. Mot., at PageID.10966 (Dkt. 820-13).

In response, the Little Trust notes that construction of the Rover pipeline was already before the FERC at the time of the 2015 negotiations, which likely led to the failure to reach an agreement. See Def. Resp. at 11. They also note that Stoneco, originally a Defendant in this matter, has since settled with Rover and has provided materials as part of the construction of the pipeline. Id. at 11-12. As with Rover's argument regarding the amount of minerals to be mined, whether Stoneco was actually agreeable to mining the Little Trust property but for the Rover pipeline is a question for the trier of fact. While Ellis's declaration asserts that Stoneco was likely not going to enter an agreement due to factors aside from the Rover pipeline, the failure to reach a deal in 2015, shortly after the pipeline was proposed, as well as Stoneco's potential bias as a supplier of the pipeline, could lead the trier of fact to conclude that the pipeline did in fact prevent the Little Trust from reaching a mining agreement with Stoneco. The trier of fact is entitled to hear Tokar's opinion and assess his credibility in light of Ellis's rebuttal. See Pipitone, 288 F.3d at 250.[7]

***12** Finally, Rover again challenges Gardner's appraisal on the grounds that he reached his conclusion by simply

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

adding Lawrence's mineral valuation on top of the amount of fair market value lost for the entire tract as a result of the Rover pipeline. The Court agrees. As noted above, Gardner's appraisal method improperly combines the unit rule and severance damages by calculating the loss in value for the entire tract (rather than just the portion taken) and then adding the value of the minerals and trees on top of that calculation. See United States v. 0.648 Acres or Land, No. CIV.A. 13-4722, 2014 WL 2533778, at *2 (E.D. La. June 5, 2014) ("[S]everance damages should not be assessed separately from the before-and-after method because the before-and-after method already includes severance damages in the calculation.").

As a result, Gardner's appraisal for the Little Trust property is excluded.[8]

**5. Mike Israni and Richard Huriaux: Rebuttal to PIR/Stigma Theory**

Defendants bring their first Daubert motion in response to the proposed testimony of Mike Israni and Richard Huriaux. Israni and Huriaux, engineers and former PHMSA employees, were retained by Rover for the sole purpose of rebutting the PIR/stigma theory set forth by Koeninger and adopted by Gardner in his appraisal. They state in their report that "the additional safety requirements that may be triggered by a larger PIR ... are designed to equalize risk across a pipeline system." See Israni and Huriaux Report, Ex. A to Defs. Mot., at 7, PageID.11116 (Dkt. 822-3). Thus, according to the report, "the use of a PIR as an arbitrary marker of risk or the reflection of a PIR in property market value makes no sense." Id. Defendants argue that these putative rebuttal experts fail to meet any of the Rule 702 requirements.

The Court holds that the proposed testimony of Israni and Huriaux fails to satisfy Rule 702(a) because it will not help the trier of fact determine a fact in issue. "While an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts." Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (internal citation and quotations omitted). "Accordingly, courts exclude expert testimony that provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." Id. (internal citation and quotations omitted).

Israni and Huriaux's report ultimately concludes that Koeninger has misused the PIR, which they contend was solely meant as an evaluation of risk, as a measure of property value. This legal conclusion is outside of their purview as engineers. Simply because PIR was created in order to mitigate risk along pipeline, does not mean that it can be summarily dismissed as an indicator of property values. Because the interpretation of the federal regulation establishing PIR falls beyond the expertise of Israni and Huriaux, their rebuttal testimony is excluded.

**6. Anthony Sanna**

The next Daubert motion is brought by Defendants Little Trust, Zimmer, and Kemner, owners of what have been identified as "timber tracts," which contained trees that were felled by Rover while constructing the pipeline. In addition to trees, the Little Trust seeks compensation for the loss of sand and gravel minerals on its property. Defendants argue that Rover's appraiser, Anthony Sanna of Integra Realty Resources, should be excluded from presenting his opinion because his appraisals failed to attribute any value to the trees and minerals at issue.

***13** Defendants do not challenge Sanna's qualifications. Their argument is that Sanna's appraisal is unreliable because it focuses on an "extraordinary assumption" made by Sanna, defined as "uncertain information accepted as fact." See, e.g., Sanna Little Appraisal, Ex. A to Defs. Mot., at PageID.11286 (Dkt. 823-3). The extraordinary assumption at issue states that "[t]his appraisal does not address compensation for ... commercial-grade timber ... Specific instructions for this appraisal include the extraordinary assumption that Rover Pipeline, LLC will separately reimburse the owners for ... commercial-grade timber damaged or removed during construction." Id. Sanna testified that Rover informed him "that part of our plan is to restore these to the original condition so the appraisal doesn't need to reflect that." Sanna Dep., Ex. D to Defs. Mot. at 171, PageID.11338 (Dkt. 823-6). Defendants now argue that Sanna's assumption that only commercial-grade timber is compensable renders his appraisals unreliable.

In response, Rover notes Sanna's deposition testimony. When asked whether the extraordinary assumption in his report regarding commercial-grade timber meant that Rover only agreed to reimburse landowners for commercial timber, Sanna testified that "I don't think our

comment was intended to be all inclusive, that it was only going to pay for commercial timber." See Sanna Dep. at 178, PageID.11340 (Dkt. 823). Sanna testified that his just compensation conclusion incorporated the contributory value of noncommercial trees; he stated that "our data had trees on the comparables. So the comparables [that] sold with trees, we're giving them a value for any trees that may have been on that site prior to the take." Id. at 179, PageID.11340. As a result, it does not appear that either Sanna or Rover limited the compensation due to the property owners to just commercial-grade timber. Consistent with the unit rule, Sanna considered the contributory value of timber found on comparable properties when conducting his appraisals.

Defendants also object to Sanna's failure to attribute any value to the mineral reserves found on the Little Trust property. In his report, Sanna states that "[n]o opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal." Sanna Little Appraisal at 43. Defendants argue that Sanna's "failure to even mention the presence of known extractable mineral deposits ... represents deliberate chicanery on the part of the Plaintiff." Defs. Mot. at 12.

Rover's decision to limit Sanna's consideration of the value of any subsurface minerals is permissible. Rover notes that, under Michigan law, "[i]n determining fair market value, one must ... determine the highest and best use of the property." Detroit/Wayne Cty. Stadium Auth. v. Drinkwater, Taylor, & Merrill, Inc., 705 N.W.2d 549, 557 (Mich. Ct. App. 2005). " 'Highest and best use' means the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use." Id. (internal citation and quotations omitted). With regard to alternate uses of condemned property, Michigan law holds as follows:

> To warrant admission of testimony as to the value for purposes other than that to which the land is being put ... the landowner must first show: (1) that the property is adaptable to the other use, (2) that it is reasonably probable that it will be put to the other use within the immediate future, or within a reasonable time, and (3) that the market value of the land has been enhanced by the other use for which it is adaptable.

Id. at 560.

Rover argues that there are questions of fact regarding whether the Little Trust property would be adaptable from its current rural and agricultural use, and whether it is reasonably probable that the property would be put to use within a reasonable time. Rover again notes the Ellis declaration, which casts doubt on the economic feasibility of mining the Little Trust property, and notes that Stoneco could not began any mining until sometime between 2020 and 2023. It also argues that there is no evidence to show that adapting the land's use would enhance its property value.

***14** Rover was entitled to rely on these facts when commissioning its expert. It instructed Sanna not to consider subsurface minerals because it concluded that they essentially had no value. Like with Tokar, a disputed factual predicate is not grounds for exclusion of an expert opinion. See Pipitone, 288 F.3d at 250.

Defendants lastly argue that Sanna's appraisal method violated multiple USPAP standards, contained errors and omissions, and failed to apply an appropriate methodology, all of which resulted in unreasonable valuations. Defendants do not elaborate on the alleged errors or omissions (beyond previously noting their objection to the failure to consider the mineral reserves), and do not explain how Sanna's appraisal methods are inappropriate or violate USPAP. Indeed, one of the USPAP standards cited by Defendants requires appraisers to identify a property's "physical, legal, and economic attributes" when formulating a valuation. See Defs. Mot. at 13. Each of Sanna's appraisals determined the physical attributes, legally permissible uses, feasibility of development on the land, and its most productive use. See, e.g., Sanna Little Appraisal at 28-29.

For all of these reasons, Sanna's opinion is reliable under Daubert.[9]

**7. Jeffrey Kern and David Falkenstern: Rebuttal to Frank Tokar**

The final Daubert challenge concerns Defendant Little Trust's motion to exclude Rover's putative rebuttal experts Jeffrey Kern and David Falkenstern. Kern and Falkenstern were retained to opine on Tokar's expert report, which addressed the value of the subsurface minerals on the Little Trust property. As noted above, Tokar concluded that there were enough minerals on the property to make mining feasible for Stoneco, the gravel mining company that owns the land adjacent to the Little Trust's mineral deposits. In their report, Kern and

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

Falkenstern agree with Tokar's conclusion that one section of the mineral deposits, identified as "Area A," will be rendered at least partially inoperable by the pipeline. They disagree that the other section of the mineral deposits, identified as "Area B," would be affected at all by the Rover pipeline.

The Little Trust argues that the opinions of Kern and Falkenstern fail to satisfy the requirements of Rule 702. It begins by arguing that the proposed testimony will not help the trier of fact to understand the evidence or determine a fact in issue, contending that the testimony is "nothing more than a straw man through which Plaintiff counsel [sic] can proffer a preview of its closing arguments." Def. Mot. at 6. It notes Kern and Falkenstern's approval of Tokar's methodology, and contrast it with their conclusion ("an abrupt about-face") that Tokar's valuation was less accurate than the valuation arrived at by Rover's mineral expert, Glen Tolksdorf. While Falkenstern acknowledged that Tokar's decision to bore into the soil was more reliable than Tolksdorf's decision to simply look into the trench, Falkenstern Dep., Ex. B to Defs. Mot., at 26, PageID.11415 (Dkt. 824-4), he also testified that, these differing methodologies notwithstanding, Tolksdorf did a better job of defining which areas of the mineral deposits were within wetlands, which made mining impractical, id. at 49, PageID.11421. By acknowledging those portions of Tokar's report that they were in agreement with, and critiquing portions with which they disagreed, Kern and Falkenstern were acting as quintessential rebuttal experts. See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d 802, 835 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports.").

***15** The trust next argues that the opinions of Kern and Falkenstern fail to satisfy Rule 702(b)-(d) because their opinions do not rely on sufficient facts and are not the result of a reliably applied methodology. It notes that neither Kern nor Falkenstern conducted a site visit or conducted their own independent analysis of the mineral deposits. It is well-settled that rebuttal experts are not required to independently assess the fact in issue. See E.E.O.C. v. Tepro, Inc., 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("Rebuttal experts can properly respond[ ] to the content of [the original] expert witness' report and opinions."); see also Rivas v. Preston, No. 11-0193, 2012 WL 7782960, at *5 (W.D. Tex. Feb. 29, 2012) ("Rule 703 provides that an expert may base his opinion on facts or data in the case that the expert has been made aware of or personally observed.").[10]

Defendants also seek to strike a supplemental report submitted by Kern and Falkenstern. Their original report was served on Defendants on October 30, 2017, and Falkenstern was deposed on December 21, 2017. However, it was not until December 29, 2017 that counsel for Rover was provided with Tokar's entire work file. On January 26, 2018, subsequent to receipt of the file, Rover served on Defendants Kern and Falkenstern's supplemental report. Federal Rule of Civil Procedure 26(a)(2)(D)(ii) provides that expert rebuttals are to be provided within thirty days of the other party's disclosure. It is undisputed that the entirety of Tokar's work file was not provided to counsel for Rover until December 29, 2017. Because the supplemental report was served on January 26, 2018, less than thirty days after receipt of the entire file, Kern and Falkenstern complied with Rule 26.[11]

In any event, the supplemental report arrives at essentially the same conclusion as the original report—that while at least a portion of "Area A" of the Little Trust's property will be rendered unusable by the Rover pipeline, "Area B" of the property is unaffected by the pipeline. The supplemental report includes a few criticisms of Tokar that were not present in the original report, namely, that he did not conduct a feasibility study for mining on the property, and that his valuation did not take into account Stoneco's statement that they would not be able to mine the property for at least three years. While Defendants characterize the supplemental report as coming to a "completely different" conclusion than the original report, a review of the reports demonstrates that this is simply not the case. As a result, the Court denies Defendant Little Trust's motion to exclude Kern and Falkenstern and to strike their supplemental report.

### B. Remaining Motions in Limine

#### 1. Consumers Energy Pipeline Explosion

Rover has brought a motion in limine seeking to exclude evidence of a November 2017 explosion of a Consumers Energy Pipeline in Orion Township (Dkt. 813). It argues that the explosion is irrelevant to the issue of just compensation, and thus should be excluded under Federal Rule of Evidence 401, and that even if the Court deems the incident relevant, any relevance is substantially outweighed by the risk of prejudice, in contravention of Rule 403.

***16** The Court denies Rover's motion without prejudice. The Court must first allow trial proofs to proceed, including Koeninger's testimony regarding PIR. The Court will also have to review the video on its own to determine whether it is admissible as a demonstrative exhibit, or possibly admissible as evidence. Rover may renew its motion at trial.

### 2. Pipeline Route Changes

Rover's next motion in limine seeks to exclude evidence of alternate routes for the Rover pipeline (Dkt. 814). Rover notes that Defendant Mark Selby seeks to introduce an expert report noting that the pipeline could have taken a less intrusive route through his property. It argues that pipeline routes are irrelevant to the issue of just compensation, and the FERC establishes the pipeline route and is the only venue in which to challenge the route.

Defendants have failed to file a response to this motion. The Court has reviewed the motion and concludes that it is meritorious. Federal Rule of Civil Procedure 401 states that evidence is relevant if it has "any tendency to make a fact more or less and probable than it would be without the evidence; and the fact is of consequence in determining the action." The sole issue to be determined is the amount of just compensation owed by Rover to Defendants. While alternate routes may have resulted in a smaller taking to certain properties, they are not probative of how much compensation is owed to Defendants in light of the routes that were actually chosen by FERC. As a result, the Court grants Rover's motion to exclude all evidence of route changes, considerations, and alternative routes.

### 3. Construction Damages

Rover next seeks to exclude all evidence of damages caused to the subject properties by negligence, nuisance, or trespass during construction of the pipeline (Dkt. 818). Rover argues that such evidence is outside of this Court's jurisdiction, irrelevant or, to the extent the Court deems it relevant, substantially outweighed by the risk of unfair prejudice, confusion, and undue delay.

In response, the "non-Selby Defendants" (those Defendants other than Mark and Linda Selby) state that they have no objection to Rover's motion and do not intend to offer any evidence relating to tort claims against Rover. However, the Selby Defendants argue that this motion is premature because it was filed in advance of the deadline for all Selby-related pretrial motions. The Selbys state that because they intend to file a motion to consolidate in their companion case, Selby v. Rover Pipeline, LLC, No. 18-cv-10066, alleging tort claims, it is premature to exclude all tort related evidence. The Court disagrees. It is well-settled, and Defendants do not contest, that damages to the remainder property during construction are not compensable in a condemnation proceeding. See, e.g., United States v. 79.20 Acres of Land, More or Less, Situated in Stoddard Cty., Missouri, 710 F.2d 1352, 1356 (8th Cir. 1983). Thus, any evidence of alleged torts committed during the course of construction is excluded for this condemnation case. In the event the Selby's companion case asserting tort claims is consolidated with this case, any evidentiary issues relating to the tort claims will be addressed at that time.

### 4. Prior Easement Purchases and Settlement Negotiations

Rover also brings a motion in limine to exclude two categories of information that it believes Defendants seek to introduce to establish fair market value: (i) settlement discussions between Rover and Defendants; and (ii) the price paid for easements purchased on certain Defendants' properties by other condemning authorities prior to this litigation (Dkt. 821). In their response, Defendants state that they agree that any evidence of settlement discussions is barred by Federal Rule of Evidence 408. Thus, the only issue remaining is whether evidence of previous easements that were purchased on Defendants' properties is admissible.

***17** "The traditional rule is that '[t]he price paid by a condemnor in settlement of condemnation proceedings or in anticipation of such proceedings is inadmissible to establish value of comparable land as such payments are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value.' " Rockies Express Pipeline, LLC v. 4.895 Acres of Land, More or Less, In Butler Cty., Ohio, No. 2:08-CV-554, 2009 WL 1163054, at *1 (S.D. Ohio Apr. 28, 2009) (quoting United States v. 10.48 Acres of Land, 621 F.2d 338, 339 (9th Cir. 1980) ). However, courts have

held that such evidence may be admitted where the proponent of the evidence makes a preliminary showing that the purchase was actually voluntary. Id. There is also an exception if "the fact that parties were condemnor and condemnee either was not known or had no influence because the sale was not in connection with, or in anticipation of condemnation proceedings." Id. (quoting Transwestern Pipeline Co. v. O'Brien, 418 F.2d 15, 19 (5th Cir. 1969) ). Defendants have also offered a ruling by the Southern District of Ohio in a suit concerning the Rover pipeline, in which the court allowed for the admission of prior easement purchases where the proponent lays a foundation establishing that the transaction was voluntary and conducted at arms-length. See 2/26/2018 Order, Ex. A to Defs. Resp. (Dkt. 834-1).

The Court believes this approach, rather than a wholesale exclusion of all prior easement purchases, as argued by Rover, is appropriate. As a result, evidence of these purchases will only be admitted if the proponent lays an adequate foundation establishing that the transaction was voluntary, including that the transaction was conducted at arms-length, i.e., not influenced by the fact of the impending condemnation. See Rockies Express, 2009 WL 1163054, at *1.

**5. Pipeline Impact Study**

The final motion in limine is brought by Defendants, and seeks to exclude a February 2016 report prepared by Integra Realty Resources on behalf of the Interstate Natural Gas Association of America entitled Pipeline Impact Property Value and Property Insurability (Dkt. 825). Defendants argue that the study is inadmissible hearsay and that it is also barred by Rule 403, because its probative value is substantially outweighed by the risk of prejudice.

The Court denies this motion without prejudice. A review of the briefing indicates that the parties dispute whether Sanna, Rover's appraiser, relied on the report in coming to his valuations, or merely "considered" the report. Prior to ruling on this issue, the Court will need to hear Sanna's testimony at trial. Further, whether the report is only admissible as rebuttal evidence is dependent on the testimony of Defendants' experts. As a result, Defendants' motion is denied without prejudice.

## II. CONCLUSION

For the foregoing reasons, the Court (i) grants in part and denies in part Rover's motion as to Wayne Esch (Dkt. 816); (ii) denies Rover's motion as to Mark Koeninger and Eric Gardner (Dkt. 817); (iii) grants in part and denies in part Rover's motion as to William Lawrence and Gardner (Dkt. 819); (iv) grants in part and denies in part Rover's motion as to Frank Tokar Jr. and Gardner (Dkt. 820); (v) grants Defendants' motion as to Mike Israni and Richard Huriaux (Dkt. 822); (vi) denies Defendants' motion as to Anthony Sanna (Dkt. 823); (vii) denies Defendants' motion as to Jeffrey Kern and David Falkenstern and to strike their supplemental report (Dkt. 824); (viii) denies without prejudice Rover's motion as to the Consumers Energy explosion (Dkt. 813); (ix) grants Rover's motion as to alternate pipeline routes (Dkt. 814); (x) grants Rover's motion as to construction damages (Dkt. 818); (xi) grants in part and denies in part Rover's motion as to prior easement purchases and settlements (Dkt. 821); and (xii) denies without prejudice Defendants' motion as to the pipeline impact study (Dkt. 825).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3322995, 106 Fed. R. Evid. Serv. 1020

Footnotes

1 Esch was also retained to opine on tract MI-WA-017.000, owned by Sue and Sally Schiel. The Schiels have since been dismissed from this case.

2 Regarding his assertion that the pipeline will hinder the ability to convert the subject properties into residential subdivisions, their highest and best use, Esch conceded that he did not determine whether the properties could be reclassified as residential, or whether building permits would issue. He instead relied on a search of the Multiple Listing Service, and saw that some houses had sold in the general area of the subject properties. While he failed to consider the zoning of the properties, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

appropriate means of attacking shaky but admissible evidence." Clay v. Ford Motor Co., 215 F.3d 663, 669 (6th Cir. 2000) (quoting Daubert, 509 U.S. at 596).

3 Defendants rely on a ruling by the Michigan Court of Appeals in Lenawee Co. v. Wagley, 836 N.W.2d 193, 209 (Mich. Ct. App. 2013), in which the county appealed a ruling by the trial court allowing an appraiser to testify on behalf of the landowner. Despite the fact that the appraisal was not based on "professional literature or studies," the court held that testimony was admissible because it "was limited to the marketability of the property and the necessity for disclosures." As discussed above, Esch's testimony goes beyond a general discussion of marketability and disclosures; it gives a precise percentage for the value lost as a result of the Rover pipeline. The Wagley court also indicated that the appraiser had specific experience with the easements involved in that case, noting his "expertise and its direct relationship to the facts of the case." Id. at 209. While Esch is qualified to speak on real estate valuations in Washtenaw County, his experience, without more, is insufficient to conclude that Defendants' properties will lose a quarter of their value from the pipeline.

4 Rover also argues that the opinions of Gardner and Koeninger are unreliable because they did not incorporate the opinions set forth in the Final Environmental Impact Statement created by FERC when it approved the pipeline, and a report by Integra Realty Resources, which concluded that natural gas pipelines do not create a "stigma impact" on property values. Pl. Mot. at 10. However, as noted by Defendants, they "were not required to match [the Plaintiff] study for study or produce evidence of a particular type." Vector Pipeline, 157 F. Supp. 2d at 957.

5 Rover also argues that Gardner violated the Uniform Standards of Professional Appraisal ("USPAP") when he failed to use comparable sales for his "after-take valuation." Gardner asserts in his report that the use of PIR/stigma theory is a valid sales comparison approach, and that the report thus complies with the USPAP. Like with Rover's other objections, this issue may be used to impeach Gardner; it does not render his opinion inadmissible.

6 Defendants also note that Anthony Sanna, Rover's appraiser, testified that he did not consider the value of the trees when making his appraisal, because he was told they would be valued separately. Defendants cite this testimony as evidence that Rover has changed its position regarding whether they would separately compensate the landowners for the trees, in addition to paying the loss of fair market value of the land itself. Such a statement would go towards the reliability of Sanna's appraisal, not whether Defendants are legally entitled under either the FEIS, Certificate, or Michigan law to separate, distinct damages for tree loss.

7 Rover also argues that Tokar's opinion should be excluded because his report does not contain all the facts or data considered by Tokar in forming his opinion, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii). It notes a statement in Tokar's report that "[s]ome information used in this report is proprietary ... Because of this, details of some sources ... or other aspects of the mineral mining operations cannot be presented in this report." See Tokar Report at 3. Rule 37(c)(1) provides that if information is withheld under Rule 26(a), "the party is not allowed to use that information or witness to supply evidence ... unless the failure was substantially justified or is harmless." Tokar testified that the referenced information did not influence the methodology or his ultimate conclusion regarding the value, and that while the proprietary information was not attached to his report, these confidentially designated materials were produced in his work file. See Tokar Dep. at 123-124, PageID.12257. It thus appears that there was either no actual failure to disclose, or if there was, such failure was harmless.

8 Rover also again argues that this method of appraisal violates the Uniform Standards of Professional Appraisal Practice, and that failure to abide by USPAP renders Gardner's opinion unreliable. Noncompliance with USPAP does not render testimony per se unreliable; courts have held that it bears on credibility rather than admissibility. See Whitehouse Hotel Ltd. P'ship v. C.I.R., 615 F.3d 321, 332 (5th Cir. 2010) ("[T]he tax court acted within its ample discretion in considering USPAP compliance as relevant to the weight Argote's report should be given, instead of whether it should be admitted.").

9 Defendants again set forth a cursory argument that Sanna's opinion is inadmissible under Fed. R. Evid. 403 for the same reasons that it does not pass muster under Daubert. They do not elaborate on why Fed. R. Evid. 403 bars Sanna's testimony, other than a conclusory allegation that his opinions "would serve only to mislead and confuse the jury." Def. Mot. at 15. Because the Court concludes that Sanna's testimony is reliable under Daubert, it is not barred by Rule 403.

10 They also argue that Kern and Falkenstern's testimony will confuse and mislead the trier of fact in violation of Federal Rule of Evidence 403. Because their testimony is merely a critique of Tokar's valuation, it cannot be said that that the risk of misleading or confusing the trier of fact substantially outweighs the relevance of the testimony.

11 Rule 26(e)(2), governing supplemental expert disclosures, states that any supplement to an expert report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Under Rule 26(a)(3), these disclosures are due at least thirty days before trial. The Court has suspended all trial dates until disposition of the pending motions in limine; however, because the supplemental report was submitted back in January 2018, the disclosure was made well in advance of any plausible trial date.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 12009694
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
BANKATLANTIC BANCORP, INC. and Alan B. Levan, Defendants.

Case No. 12-60082-CIV-SCOLA/OTAZO-REYES
|
Signed 11/14/2013

**Attorneys and Law Firms**

Brian Patrick Knight, Andrew O. Schiff, James Michael Carlson, Russell Koonin, US Securities and Exchange Commission, Miami, FL, for Plaintiff.

Eugene E. Stearns, Cecilia Duran Simmons, Grace Lee Mead, Matthew Clarence Dates, Jenea M. Reed, Andrea Naomi Nathan, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Adam Michael Schachter, Gelber Schachter & Greenberg, P.A., Miami, FL, for Defendants.

**ORDER RE: D.E. 148, 155, 159 & 156**

ALICIA M. OTAZO-REYES, UNITED STATES MAGISTRATE JUDGE

***1** THIS CAUSE came before the Court upon the following motions: (1) Plaintiff's Daubert Motion to Exclude the Opinion and Testimony of John J. Huber ("Huber") (hereafter, "Huber Motion") [D.E. 148]; (2) Plaintiff's Daubert Motion to Exclude the Opinion and Testimony of Christopher M. James ("James") (hereafter, "James Motion") [D.E. 155]; (3) Plaintiff's Daubert Motion to Exclude the Testimony of Linda A. MacDonald ("MacDonald") (hereafter, "MacDonald Motion") [D.E. 159] (collectively, "Plaintiff's Daubert Motions"); and (4) Defendants' Motion in Limine to Exclude the Opinions and Testimony of Expert Witness Lynn E. Turner ("Turner") (hereafter, "Turner Motion" or "Defendants' Daubert Motion") ( [D.E. 156] ).[1]

Plaintiff's Daubert Motions and Defendants' Daubert Motion were referred to the undersigned by the Honorable Robert N. Scola, Jr., United States District Judge, "*to be heard and determined* in accordance with [ ] 28 U.S.C. § 636(b)(1)(A) and Rule 1(c) of the Local Magistrate Judge Rules" [D.E. 169]. The undersigned held an evidentiary hearing on the motions, which took place on September 23-25, 2013. For the reasons stated below, the undersigned hereby DENIES the Huber Motion, the MacDonald Motion and the Turner Motion; and GRANTS IN PART and DENIES IN PART the James Motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Defendant BankAtlantic Bancorp, Inc. ("Bancorp" or "BBX") is a publicly traded company. During 2006 and 2007, Bancorp was the holding company for BankAtlantic, a federal savings bank offering consumer and commercial banking and lending services throughout Florida. Bancorp's common stock is listed on the New York Stock Exchange and registered with the Securities and Exchange Commission ("SEC" or "Plaintiff") under Section 12(b) of the Securities and Exchange Act of 1934 (hereafter, "Exchange Act"), 15 U.S.C. § 78*o*(b). Defendant Alan Levan ("Levan") is the Chairman of the Board and CEO of Bancorp, and in 2007 he was also the Chairman of BankAtlantic.

In 2007, BankAtlantic was one of Florida's largest commercial banking and lending institutions with $1.5 billion in its commercial real estate loan portfolio. Approximately $533 million of this portfolio consisted of loans in BankAtlantic's commercial residential real estate land acquisition and development portfolio ("Commercial Residential Portfolio" or "Portfolio"). The loans in the Portfolio consisted of Builder Land Bank ("BLB") loans and non-BLB loans.[3] In managing the Portfolio, Bancorp assigned to the loans, and reassigned as necessary, internal grades of 1 to 13, based on their individual creditworthiness. Grades 10-13 were considered non-passing grades.

***2** The SEC brings this action against Bancorp and Levan (collectively, "Defendants") for alleged securities laws violations, arising from: (1) Defendants' public disclosures regarding the health of the Commercial

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

Residential Portfolio; (2) Bancorp's accounting treatment of a portion of the Portfolio; and (3) Bancorp's maintenance of internal controls. The SEC alleges the following as to each of these three violation categories.

*1. Public Disclosures:*

The SEC alleges that Defendants failed to provide appropriate disclosures in the Management Discussion and Analysis ("MD&A") section of Bancorp's Forms 10-Q for the first and second quarter of 2007.[4] The SEC also alleges that Defendants made material misrepresentations during Bancorp's first and second quarter earnings conference calls in 2007.[5] According to the SEC, Defendants had knowledge of serious problems within BankAtlantic's Commercial Residential Portfolio during the first two quarters of 2007, yet did not disclose those problems until the third quarter of 2007. The SEC further alleges that Defendants, by misrepresentations and omissions, failed to alert investors to a known trend of loan extensions and internal loan downgrades in the Commercial Residential Portfolio.

*2. Accounting:*

The SEC alleges that Defendants committed accounting fraud violations in connection with Bancorp's 2007 Form 10-K.[6] According to the SEC, Bancorp engaged an investment bank, JMP Securities, Inc. ("JMP"), in 2007 to sell some of the problem loans in the Commercial Residential Portfolio (the "JMP Loans"), yet Bancorp did not reclassify the JMP Loans from "held-for-investment" to "held-for-sale" in accordance with Generally Accepted Accounting Principles ("GAAP"). As a result, Bancorp avoided writing down the JMP Loans to the lower of cost or fair value and reporting a materially significant loss for 2007 in the Form 10-K.

*3. Controls:*

The SEC alleges that Bancorp failed to maintain or follow adequate internal Disclosure Controls and Procedures ("DC&P") in violation of Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2). According to the SEC, the DC&P that were maintained by Bancorp were usurped by Levan, were never properly in place, or failed.

Defendants have retained MacDonald, James and Huber, all of whom are nonscientific expert witnesses, to testify at trial concerning these allegations of securities laws violations. The SEC has retained a single nonscientific expert witness, Turner, for the same purpose. In their respective Daubert Motions, Plaintiff and Defendants do not challenge the overall professional qualifications of these expert witnesses.[7] However, each side argues that the other's proposed expert testimony raises serious concerns about: the reliability of the testimony; whether the testimony will assist the trier of fact; and whether the testimony will invade the province of the Court to instruct the jury.

## II. LEGAL STANDARDS

***3** A party who seeks to admit expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, before expert testimony may be admitted as evidence at trial pursuant to Rule 702 of the Federal Rules of Evidence, the district court must act as a gatekeeper and screen the proffered evidence. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). In the Eleventh Circuit, this gatekeeping function must be performed as follows:

> [I]n determining the admissibility of expert testimony under Rule 702, [the court must] engage in a rigorous three-part inquiry [and] must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). Seealso, McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (The gatekeeping function requires the trial

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

court "to conduct an exacting analysis of the proffered expert's methodology" to ensure it meets the standards of admissibility under Daubert.).

However, a "district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (citing Allison, 184 F.3d at 1311). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Allison, 184 F.3d at 1311.

### A. First Daubert Inquiry – Expert's Qualifications

"While scientific training or education may provide possible means to qualify [an expert], experience in a field may offer another path to expert status." United States v. Masferrer, 367 F. Supp. 2d 1365, 1372 (S.D. Fla. 2005) (citing Frazier, 387 F.3d at 1260-61). "[I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." United States v. Augustin, 661 F.3d 1105, 1125 (11th Cir. 2011) (citing Frazier, 387 F.3d at 1261). In this case, all of the proffered experts are nonscientific and rely primarily on their experience in their respective professional fields to justify their opinions. Therefore, although the experts' overall professional qualifications have not been challenged, those qualifications are a factor to take into consideration when assessing the reliability of their opinions. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261.

### B. Second Daubert Inquiry – Reliability of Expert's Opinion

"For nonscientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)). Thus, "[a] district court may decide that nonscientific expert testimony is reliable based upon [the expert's] personal knowledge or experience." Schoenthal, 555 F.3d at 1338 (citing Kumho, 526 U.S. at 150). In the context of nonscientific experts, therefore, the main purpose of the Daubert reliability inquiry is to determine whether the expert who is "basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1255 (11th Cir. 2005) (citing Kumho, 526 U.S. at 152).

### C. Third Daubert Inquiry – Helpfulness/Relevance of Expert's Testimony

***4** "To be admissible, expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance."Johnson v. Bush, Case No. 00-3542-CIV, 2002 WL 34355950, at *1 (S.D. Fla. Apr. 19, 2002). Put another way, the proposed testimony must "fit" the case. Id. Seealso, Allison, 184 F.3d at 1312 ("[T]he court must ensure that the proposed testimony is relevant to the task at hand, i.e., that it logically advances a material aspect of the proposing party's case.").

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. However, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). In the Eleventh Circuit, "an expert may offer opinion testimony on an ultimate issue of fact, Fed. R. Evid. 704, [but] an expert may not [ ] merely tell the jury what result to reach." United States v. Caro, 454 Fed.Appx. 817, 843 (11th Cir. 2012) (citing Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990)). Further, " 'while an expert may testify as to his opinion on an ultimate issue of fact, [he or she] may not testify to the legal implications of conduct; the court must be the jury's only source of law.' " Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. P'ship, Case No. 04-80283-CIV, 2005 WL 5955691, at *5 (S.D. Fla. Jan. 11, 2005) (citing Montgomery, 898 F.2d at 1541).

While an expert may opine "as to whether one party or another acted in compliance with industry standards, an expert cannot permissibly opine on whether a party had a right to do what it did under *legal* standards. Instead, this area is reserved for the Court." R&R Int'l, Inc. v.

Manzen, LLC, Case No. 09-60545-CIV, 2010 WL 3605234, at *19 (S.D. Fla. Sept. 12, 2010). Seealso, United States v. Long, 300 Fed.Appx. 804, 814-16 (11th Cir. 2008) (finding it admissible for a forensic expert witness to testify that the actions of the defendant "bore the hallmarks of a Ponzi Scheme" because it "was a factual, and not a legal conclusion," but excluding an expert who used the language "artifice or scheme to defraud").

## III. THE EVIDENTIARY HEARING

On September 23-25, 2013, the undersigned heard the testimony of MacDonald, James, Huber and Turner regarding their proposed expert opinions. Defendants tendered MacDonald on the subject of Defendants' alleged failure to reclassify the JMP Loans from "held-for-investment" to "held-for-sale pursuant to GAAP;" James on the subjects of Defendants' alleged failure to provide appropriate disclosures in the MD&A section of Bancorp's 2007 first and second quarter Forms 10-Q and Defendants' alleged misrepresentations during the 2007 first and second quarter earnings conference calls; and Huber on the subjects of Bancorp's allegedly inadequate DC&P and misleading public disclosures.[8] The SEC tendered Turner as its sole expert witness with respect to all of these issues.

By agreement of the parties, the initial and rebuttal report of each expert were deemed to constitute that expert's direct examination. See Order Setting Evidentiary Hearing [D.E. 216]. Thus, the live testimony at the evidentiary hearing was limited to cross-examination and re-direct examination of each witness. Having considered the expert witnesses' proposed trial testimony (as expounded at the Daubert Evidentiary Hearing), the pertinent portions of the record and the applicable law, the undersigned concludes with regard to Defendants' experts that MacDonald and Huber satisfy the Daubert requirements and that James also satisfies them, except for two of his opinions. The undersigned also concludes that the SEC's expert, Turner, passes muster under Daubert.

## IV. MACDONALD

***5** At trial, MacDonald would offer the following opinions:(1)Defendants were not required by GAAP to reclassify the JMP Loans from "held-for-investment" to "held-for-sale;" and (2) even if the loans had to be reclassified as "held-for-sale," the resulting write down of the loans should not be calculated using the fair value approach proposed by the SEC's expert. McDonald Expert Report [D.E. 171-20 at ¶ 10].

### A. Reclassification of the JMP Loans

MacDonald began her analysis by evaluating the relevant GAAP principles applicable to determining whether the JMP Loans should have been reclassified from "held-for-investment" to "held-for-sale." Id. at ¶¶ 11-17. The first GAAP source she consulted was the American Institute of Certified Public Accountants' Statement of Position 01-6 ("SOP 01-6"). See Transcript of Daubert Evidentiary Hearing on September 23, 2013 (hereafter, "Trans. 9/23") [D.E. 243 at 10, 24-25]. According to MacDonald, SOP 01-6 provides that loans previously classified as "held-for-investment" should be reclassified as "held-for-sale" at the lower of cost or fair value only after a decision has been made to sell them. MacDonald Expert Report [D.E. 171-20 at ¶ 12]. Because SOP 01-6 does not explain how to determine whether "a decision to sell" has been made, Trans. 9/23 [D.E. 243 at 11], MacDonald then turned to Financial Accounting Standard 144 ("FAS 144") for further guidance. MacDonald Expert Report [D.E. 171-20 at ¶ 13].[9]

Although FAS 144 does not pertain to loans, Trans. 9/23 [D.E. 243 at 15], MacDonald, as the primary author of FAS 144, reasoned by analogy from that source because there was a void in GAAP with respect to loans, and FAS 144 supplied guidance for long-lived assets, the most analogous asset to loans. Id. at 56-60. According to MacDonald, FAS 144 provides that intent to sell is not sufficient to classify a long-lived asset as "held-for-sale." MacDonald Expert Report [D.E. 171-20 ¶ 14].

In MacDonald's opinion, the factual record did not reflect that Bancorp, through Levan or otherwise, had made a decision to sell the JMP Loans. Id. at ¶ 18. Specifically, MacDonald opined that Bancorp's engagement with JMP regarding the JMP Loans constituted a market test and not a decision to sell. Id. at ¶¶ 19-50.[10] MacDonald testified that, under FAS 144, when "there [are] indicia that you are test marketing [ ] long-lived assets, you will not call it Held-for-Sale even if all of the other conditions [for a sale] are met." Trans. 9/23 [D.E. 243 at 60]. When asked whether a jury could just as easily undertake the same

review of the record that she had conducted to reach her conclusions, MacDonald responded that her review had been conducted through the lens of her understanding of GAAP, and based on her professional experience. Id. at 23.

### B. The SEC's Expert's Fair Value Approach

According to MacDonald, even if the JMP Loans should have been reclassified as "held-for-sale," the fair value approach utilized by the SEC's expert was not valid under GAAP. MacDonald Expert Report [D.E. 171-20 at ¶¶ 51-83]. MacDonald looked to FAS 157, which addresses fair value measurements, for guidance on determining fair value. Id. at 53-54.[11] FAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." Trans. 9/23 [D.E. 243 at 64]. Thus, an orderly transaction is one of the bases for determining fair value. Id. at 65.

***6** In MacDonald's opinion, bids in a proposed sales transaction that reflect distressed pricing cannot qualify as a measurement of fair value under FAS 157 because the sale would not constitute an "orderly transaction." MacDonald Expert Report [D.E. 171-20 at ¶ 75]. MacDonald further testified that, for purposes of reclassifying the JMP Loans as "held-for-sale," the applicable fair value "measurement date" under FAS 157 would have been December 31, 2007. Trans. 9/23 [D.E. 243 at 30]. However, all of the bids relied upon by the SEC were received at some point after that date, MacDonald Expert Report [D.E. 171-20 at ¶¶ 55-63], and, in any event, an unaccepted offer cannot form the basis for a transaction date. Trans. 9/23 [D.E. 243 at 65-66],[12]

MacDonald testified that the SEC's proposed approach for determining fair value of the JMP Loans was missing a number of steps required under GAAP. Id. at 38-39. Though MacDonald admitted that she did not undertake these steps herself, including reviewing the underlying appraisals, performing a discounted cash flow analysis or confirming the findings of Bancorp's external auditors, id. at 40-44, she saw no signs that the SEC's expert, Turner, who actually valued the JMP Loans, carried out any of these tasks when computing their fair value. Id. at 66-68.[13] According to MacDonald, the only two bids upon which Turner relied, which were received after the measurement date in a disorderly transaction, could not provide a legitimate basis to determine fair value under GAAP. Id.

### C. Challenges to MacDonald's Opinions

The SEC challenges the reliability and helpfulness/relevance of MacDonald's opinions. As to reliability, the SEC argues (i) that MacDonald's first opinion on GAAP compliance is not reliable because she applied no real methodology and did nothing more than weigh the factual evidence, which is a task solely reserved to the jury, and (ii) that her second opinion is not reliable because she failed to carry out her own valuation of the JMP Loans. MacDonald Motion [D.E. 159 at 3]. As to helpfulness/relevance, the SEC argues (i) that MacDonald's first opinion on GAAP compliance is ultimately a legal conclusion, which is improper and intrudes on the Court's role; and (ii) that in rejecting the SEC's expert's determination of fair value in her second opinion, MacDonald reached an improper legal conclusion and provided no coherent alternative theory of her own. Id.

#### 1. Reliability

Because MacDonald is a nonscientific expert, consideration of her qualifications is part of the inquiry into the reliability of her methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261. MacDonald is a Certified Public Accountant with over thirty years of professional experience in financial accounting and reporting, including her present position as a Senior Managing Director in the forensic and litigation consulting practice of FTI Consulting, Inc. and as a past Director of the Financial Accounting Standards Board ("FASB"). MacDonald Expert Report [D.E. 171-20 at ¶¶ 4-8]. MacDonald also worked at the SEC's Enforcement Division on investigations into fraud and GAAP violations associated with public companies' financial statements. Id. at 6.

*(i) MacDonald's first opinion on GAAP compliance*

***7** The SEC contends that MacDonald applied no real methodology and did nothing more than a jury would do with respect to this opinion. However, as discussed above, MacDonald testified that she consulted the GAAP

guidance that she found to be relevant to the classification of loans as "held-for-sale;" applied that guidance, viewed through the lens of her extensive experience in financial accounting and reporting, to the factual record; and opined that the JMP Loans were correctly classified under GAAP as "held-for-investment" rather than "held-for-sale." Because her methodology was informed by and conducted in accordance with her professional experience, MacDonald's opinion as a nonscientific expert meets the Daubert reliability prong. Schoenthal, 555 F.3d at 1338; McClain, 401 F.3d at 1255. Moreover, because she applied her professional experience to formulate her opinion, MacDonald did not just weigh the facts as a lay jury would.

*(ii) MacDonald's second opinion on fair value*

The SEC challenges MacDonald's second opinion as unreliable because, while criticizing the SEC's expert's valuation, she did not perform one herself. However, the impact of such failure simply goes to the weight to be given by the jury to MacDonald's opinion, rather than its admissibility. Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

**2. Helpfulness/Relevance**

The SEC also seeks to exclude both of MacDonald's opinions under the helpfulness/relevance inquiry as improper legal conclusions.

*(i) MacDonald's first opinion on GAAP compliance*

The SEC argues that MacDonald's first opinion constitutes an impermissible legal opinion because the "clear risk here is the jury will likely confuse MacDonald's opinion that the Defendants followed GAAP as a determinative conclusion, if not exactly the same as, finding the Defendants did not violate the federal securities laws." MacDonald Motion [D.E. 159 at 7]. However, expert testimony as to the interpretation of GAAP and its application to the facts of a case is permissible and does not, without more, constitute improper legal conclusions. Seee.g., In re Novatel Wireless Sec. Litig., Case No. 08cvl689, 2011 WL 5827198, at *3 (S.D. Cal. Nov. 17, 2011) (admitting expert testimony of "whether Defendants complied with SEC and GAAP requirements" but excluding testimony about what their contracts permitted); S.E.C. v. Leslie, Case No. C 07-3444, 2010 WL 2991038, at *7-9 (N.D. Cal. July 29, 2010) (admitting expert's interpretation of GAAP but excluding testimony about judicial opinions and Securities Exchange Rule quotations); S.E.C. v. Retail Pro, Inc., No. 08cv1620, 2011 WL 589828, at *4 (S.D. Cal. Feb. 10, 2011) (finding that evidence regarding GAAP and revenue recognition was a proper basis for expert testimony). Therefore, so long as MacDonald's testimony does not veer into the subject of securities laws violations, her opinion that GAAP did not require Defendants to reclassify the JMP Loans from "held-for-investment" to "held-for-sale" is not impermissible, even if GAAP compliance is an element of the securities laws violations alleged by the SEC.

Further, the Eleventh Circuit has "recognized that an instruction may be used to prevent a jury from placing too much weight on an expert's legal conclusions." Maiz, 253 F.3d at 667. Seealso, United States v. Gold, 743 F.2d 800, 817 (11th Cir. 1984) (upholding the district court's decision to admit expert testimony about an ultimate legal issue in the case because the court was "careful to instruct the jury about the weight that should be given expert testimony such as [this]"). Indeed, the Eleventh Circuit has ruled that in such instances "[i]f the district court takes a curative measure, [the appellate] court will reverse only if the evidence is so prejudicial as to be incurable by that measure." United States v. Pacheco, 426 Fed.Appx. 832, 835 (11th Cir. 2011). Thus, the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on MacDonald's opinion regarding GAAP compliance.

*(ii) MacDonald's second opinion on fair value*

***8** The SEC argues that MacDonald's second opinion "attempts to 'rule' on the adequacy of support for the [SEC]'s 'held-for-sale' claim, and, in doing so, seeks to reach an impermissible legal conclusion." MacDonald

Motion [D.E. 159 at 10]. However, MacDonald's criticism of Turner's approach to computing the fair value of the JMP Loans is neither a "ruling" nor an "impermissible legal conclusion." Novatel, 2011 WL 5827198, at *3; Leslie, 2010 WL 2991038, at *7; Retail Pro, 2011 WL 589828, at *4. Moreover, the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on MacDonald's opinion regarding the SEC's proposed fair value calculation. Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817; Pacheco, 426 Fed.Appx. at 835.

Therefore, the MacDonald Motion is denied.

## V. JAMES

At trial, James would offer the following opinions relating to Defendants' public disclosures: (1) the credit market crisis unexpectedly and negatively impacted real estate prices and market conditions for lenders beginning in the third quarter of 2007; (2) The MD&A disclosures in Bancorp's 2007 first and second quarter Forms 10-Q were consistent with regulatory requirements and industry practice; (3) Bancorp's loan performance during that time was consistent with Defendants' specific disclosures as well as the market trends they disclosed; and (4) several analysts thought that Bancorp was conservative in disclosing negative trends and addressing problem loans. James Expert Report [D.E. 155-1 at 2-4]. James testified that, in preparing his expert report, he "followed the same procedures that [he] does in his research ... [and] that are commonly used by economists" and that those procedures are the same as "the scholarly standard and the scientific standard that [are] applied when [he does his] own published research." Transcript of Daubert Evidentiary Hearing on September 24, 2013 (hereafter "Trans. 9/24") [D.E. 244 at 187, 196].[14]

### A. The credit market crisis

According to James, the credit markets dramatically and unexpectedly declined in August 2007 and the real estate sector deteriorated significantly amid this crisis. James Expert Report [D.E. 155-1 at ¶¶ 19-46]. James opined that Florida was more affected by the real estate downturn than almost all other states. Id. at ¶ 39. When asked why he focused on trends in the Florida real estate market when the SEC did not allege such a trend in its complaint, James responded that Defendants' "disclosing their business and its exposure to the real estate market [was], in [his] opinion, disclosing an important trend that is common to their business model and the loans they make." Trans. 9/24 [D.E. 244 at 168-69].

### B. Consistency of disclosures with regulatory requirements and industry practice

According to James, Defendants' public disclosures were adequate in that they disclosed: (1) known trends in the real estate market and the risks in BankAtlantic's loan portfolio; (2) the fact that problem loans existed throughout the portfolio; (3) risks consistent with regulatory requirements; and (4) risks that were more comprehensive than those of most comparable banks. James Expert Report [D.E. 155-1 at ¶¶ 47-84], The SEC asked James whether he was aware of any evidence supporting Defendants' non-disclosure of Bancorp's internal loan grades. Trans. 9/24 [D.E. 244 at 172-77]. James responded that he relied on the deposition testimony of bank employees, id., and his own experience as a director of a bank for 16 years in concluding that this type of information is not commonly disclosed because such level of disclosure is discouraged by bank regulators. Id. at 197-98. The SEC also questioned whether James had actually compared Bancorp's disclosures with the other banks' disclosures in terms of what was happening in their loan portfolios, and, in particular, their own internal loan grades. Id. at 176-77. James responded that he did look at the other banks' disclosures, but acknowledged that, because internal loan grades are not generally publicly available, he was not able to review them. Id.[15]

### C. Consistency of Bancorp's loan performance with Defendants' specific disclosures and the market trends they disclosed.

***9** According to James, Bancorp's actual loan performance was consistent with Defendants' specific disclosures as well as the market trends they disclosed. James Expert Report [D.E. 155—1 at ¶¶ 85-91]. In formulating this opinion, James reviewed the deterioration of BankAtlantic's Commercial Residential Portfolio through the fourth quarter of 2008. Id. at ¶¶ 85-86. James also looked to performance data for the loan portfolios of other, purportedly similarly situated Florida

and non-Florida banks through the fourth quarter of 2008. Id. at ¶¶ 87-91. After noting that Defendants reported worse than average losses in the third quarter of 2007, James observed that most of the other banks he considered eventually reported similar losses to Bancorp's and caught up to Bancorp's reported losses by the end of 2008. Id. at ¶¶ 86-91. Based on these observations, James concluded that, "throughout the first half of 2007 [Defendants] warned about the negative market trend" and that "[t]he losses [Bancorp] reported in [the third quarter of 2007] therefore can be described as the realization of a disclosed risk, the magnitude of which was unforeseeable by most market[ ] participants" and "in line with that experienced by comparable banks." Id. at ¶ 85. To put it in simpler terms, the gist of this third opinion by James is that the events that occurred after the first and second quarters of 2007, both with respect to Bancorp's and other banks' loan performances, show that Defendants' public disclosures in those two quarters were "par for the course."

**D. Analysts' Reports**

According to James, several analysts indicated that Bancorp was conservative in disclosing negative trends and problem loans in 2007, that Bancorp recognized the negative trend in Florida real estate, and that Bancorp was one of the most proactive banks in addressing and disclosing market concerns and regarding the deterioration of Bancorp's real estate loan portfolio. Id. at ¶¶ 92-100. In support of these observations, James quoted and summarized the underlying analysts' reports. Id. When challenged regarding his "expertise in reading an analyst's report and providing a one-sentence summary" of it, Trans. 9/24 [D.E. 244 at 186], James acknowledged that he did not possess such expertise, but explained that those reports are of the same type as those on which he would rely in his published research. Id.

**E. Challenges to Janies' Opinions**

The SEC objects to James testifying on the grounds that: (1) James' opinion that the credit crisis unexpectedly and negatively impacted real estate prices and market conditions for lenders beginning in the third quarter of 2007 is irrelevant, based on flawed methodology, and will confuse the jury; (2) James' opinion that Defendants' disclosures appear consistent with regulatory requirements and industry practice is a legal opinion that improperly invades the province of the Court and jury, and is also irrelevant and unreliable; (3) James' opinion that Bancorp's loan performance was consistent with Defendants' specific disclosures and the market trends they disclosed is irrelevant and unreliable; and (4) James' opinion reporting the contents of analysts' reports regarding Bancorp's disclosures is hearsay. James Motion [D.E. 155 at 5-18]. Thus, the SEC's challenges to James' opinions fall into three categories: the reliability of James' methodology; the helpfulness/relevance of his opinions; and, as to the fourth opinion, that it is hearsay.

**1. Reliability**

Because James is a nonscientific expert, consideration of his qualifications is part of the inquiry into the reliability of his methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261. James is the William H. Dial/Sun Bank Eminent Scholar and Professor of Finance and Economics at the University of Florida, as well as a visiting scholar at the Federal Reserve Bank of San Francisco. James Expert Report [D.E. 155-1 at 1]. James has authored or co-authored numerous peer-reviewed articles on economics and banking. Id. at App. A. In 1995 and 1998, James served as a consultant to the Federal Reserve Board of Governors. Id. Additionally, from 1989 to 2006, James served on the Board of Directors and the Advisory Board to SunTrust Banks of Florida. Id. James testified that the methodology for all of his opinions was grounded in the same level of intellectual rigor that undergirds the work of professional economists in the field. Trans. 9/24 [D.E. 244 at 187, 198]. Hence, the SEC's challenge to the reliability of James' methodology fails. SeeMcClain, 401 F.3d at 1255 (an expert basing testimony upon professional studies or personal experience must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field); Maiz, 253 F.3d at 665-66 (finding an economists' theories and methodology sufficiently reliable where his model was not unusually complex and his use of a broad-based index to estimate the performance of U.S. real estate was not without foundation).

**2. Helpfulness/Relevance**

***10** The SEC challenges the helpfulness/relevance of

James' first three opinions.

*(i) James' first opinion on the credit market crisis*

The SEC argues that this opinion is not relevant because it will not help the trier of fact understand a fact in issue, as there is no requirement for the SEC to prove loss causation. Plaintiff's Reply Memorandum in Support of its Daubert Motion to Exclude the Opinion and Testimony of Christopher M. James (hereafter, "James Reply") [D.E. 201 at 4], In order to prevail on its securities fraud claims, the SEC must show that Defendants knowingly, willingly or recklessly made untrue statements or omissions of material fact. See Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.[16] Significantly, the SEC must show that the allegedly misleading statements or omissions made by Defendants were *material.* Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988). A fact is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32. The credit market crisis' impact on real estate prices and market conditions for lenders would arguably have been part of the "total mix" of information considered by reasonable investors in the first half of 2007. Therefore, James' first opinion is not unhelpful or irrelevant.

*(ii) James' second opinion on consistency of disclosures with regulatory requirements and industry practice.*

The SEC argues that James' second opinion is an impermissible legal opinion and that disclosures made by other banks are irrelevant to whether Defendants made adequate disclosures. James Motion [D.E. 155 at 9]. However, in addition to materiality, the SEC must prove scienter by showing that Defendants acted with, at a minimum, severe recklessness, when making the alleged misleading statements or omissions in their public disclosures. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008). Severe recklessness is "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id. Adherence to, or departure from, industry standards can be probative of whether ordinary care was observed in conducting business. Messer v. E.F. Hutton & Co., 847 F.2d 673, 677-78 (11th Cir. 1988). Because James' opinion on regulatory requirements and industry standards goes to an element of the SEC's securities fraud claims, it is not irrelevant. Allison, 184 F.3d at 1312.[17]

***11** Moreover, expert testimony on regulatory requirements and industry practices is permissible and does not, without more, constitute improper legal conclusions. Novatel, 2011 WL 5827198, at *3; Leslie, 2010 WL 2991038, at *7; Retail Pro, 2011 WL 589828, at *4. Therefore, so long as James' testimony does not veer into the subject of securities laws violations, his second opinion is not impermissible. And the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on James' second opinion. Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817; Pacheco, 426 Fed.Appx. at 835.

*(iii) James' third opinion on consistency of Bancorp's loan performance with Defendants' specific disclosures and the market trends they disclosed.*

As noted above, James' third opinion is, essentially, that the events that occurred after the first and second quarters of 2007, both with respect to Bancorp's and other banks' loan performances, show that Defendants' public disclosures in those two quarters were "par for the course." The SEC contends that this opinion is irrelevant and unreliable. According to the SEC, the opinion would mislead or confuse the jury because the performance of other banks is not relevant to the SEC's claims, and because, without access to the other banks' internal loan portfolios, any such comparisons would be unreliable. James Motion [D.E. 155 at 15-16]. Defendants counter that the fact that comparable banks eventually reported the same types of losses as Bancorp, demonstrates that Bancorp responded more aggressively to the crisis by reporting those losses in the third quarter of 2007, and that "[s]uch evidence undercuts any claim that there was any intention to mislead investors," which is critical for the establishment of scienter. Defendants' Memorandum in Opposition to Plaintiff's *Daubert* Motion to Exclude the Testimony of Christopher M. James (hereafter, "James Response") [D.E. 178 at 20, 23]. Defendants also argue that specific knowledge of the comparable banks' internal loan portfolios was unnecessary since the loans in

question were not an "exotic type of loan only made by [Bancorp]." Id. at 24.

The undersigned fails to see how James' third opinion, which is wholly predicated on after-the-fact events involving not only Bancorp but other banks, would be relevant to rebutting the element of scienter in the SEC's securities fraud claims. Additionally, Defendants failed to meaningfully address the SEC's contention that the data from other banks utilized by James is incomplete, given his lack of access to those banks' internal loan portfolios. Therefore, the undersigned agrees that James' third opinion is both irrelevant and unreliable and finds that it should be excluded.[18]

### 3. Hearsay Objection

The SEC argues that James' fourth opinion does nothing more than recite the contents of analysts' reports regarding Bancorp's disclosures, hence is inadmissible hearsay. James Motion [D.E. 155 at 16-18]. Defendants contend that James' opinion and the analysts' reports are admissible under Fed. R. Evid. 703, which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

***12**Fed. R. Evid. 703. Seealso, Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co., Case No. 07-CIV-21404, 2009 WL 2208166, at *2 (S.D. Fla. July 24, 2009) (admission of hearsay evidence through an expert creates a danger that the testifying expert will serve as a conduit for the opinions of others).

Defendants argue that, James, as an expert, was entitled to rely on the analysts' reports in forming his own opinion notwithstanding their hearsay status. James Response [D.E. 178 at 19]. Defendants further argue that the reports may be disclosed directly to the jury "because...they are a contemporaneous assessment...that directly undercut[s] the SEC's theory of fraud." Id. at 19-20. As noted above, James did testify that these analysts' reports are of the type that he would rely on in his own research. However, James' purported fourth opinion consists of nothing more than a summary of the analysts' reports. James Expert Report [D.E. 155-1 at ¶¶ 92-100]. Because James did not actually render an opinion, the probative/prejudicial prong of Rule 703 does not come into play and Defendants' attempt to gain admissibility of the hearsay analysts' reports through Rule 703 to rebut the SEC's securities fraud claims fails.

Therefore, the James Motion is denied as to his first and second opinions but granted as to the third and fourth ones.

## VI. HUBER

At trial, Huber would offer the following opinions: (1) during the relevant period, Bancorp's relevant DC&P were adequate under the circumstances; and (2) Bancorp's disclosures in its 2007 first and second quarter Forms 10-Q concerning known trends or uncertainties were adequate under the circumstances, and the statements made during the 2007 first and second quarter earnings conference calls were not misleading. Huber Expert Report [D.E. 148-1 at 13].

### A. Adequacy of Bancorp's relevant DC&P.

According to Huber, during the period in question, Bancorp's relevant DC&P were adequate under the circumstances. Huber Expert Report [D.E. 148-1 at ¶¶ 22-69], Huber further opined that adjustments made by Bancorp to its DC&P during the period from January 1 through November 9, 2007 enabled Bancorp to respond to evolving market conditions, id. at ¶¶ 27-52; that Bancorp's DC&P incorporated reviews conducted by external third parties, id. at ¶¶ 53-58; that Bancorp's public disclosures were drafted in an atmosphere of open communication and cooperation, id. at ¶¶ 59-62; and that Bancorp's internal certification process by its senior management provided an additional check to ensure that its DC&P were complete and accurate. Id. at ¶¶ 63-68. Huber also opined that Bancorp had adequate DC&P in place before the credit crisis, and that Bancorp was proactive in adjusting and adapting its DC&P to address the downturn in the Florida real estate market. Id. at ¶¶ 27-52. "As conditions deteriorated in 2007, [Bancorp]

enhanced its processes ... and senior ... executives were proactive and ordered measures to refine [Bancorp's] disclosure, controls and procedures as conditions deteriorated." Id. at ¶ 15. In concluding that the DC&P were adequate throughout the crises, Huber thoroughly analyzed Bancorp's formal and informal credit approval and loan monitoring functions. Id. at ¶¶ 53-68.

**B. Adequacy of Defendants' disclosures**

***13** Huber testified that the existence of adequate DC&P would also be relevant to determining whether there was intent to deceive or mislead by Defendants in their public disclosures, and that, in this case, the DC&P "facilitate[d]...disclosure being made." Transcript of Daubert Evidentiary Hearing on September 25, 2013 (hereafter "Trans. 9/25") [D.E. 245 at 61-62]. Huber further testified, in response to various examples posed by Defendants' counsel, that the public disclosures made by Defendants matched the internal commentary at Bancorp. Id. at 68-81, 85.

According to Huber, Bancorp's disclosures in the 2007 first and second quarter 10-Q's regarding known trends or uncertainties in BankAtlantic's Commercial Residential Portfolio were adequate under the circumstances. Huber Expert Report [D.E. 148-1 at ¶¶ 68-87], Huber further opined that, considering the total mix of information, Defendants' disclosures in the 2007 first and second quarter earnings conference calls were not misleading, id. at ¶¶ 88-103, and that "disclosing downgraded and extended loans could have confused, rather than informed, investors." Id. at ¶ 17. Huber clarified that his opinion reflects how he, as a professional who works in the field of disclosure, would have advised management to disclose the trend it identified, and such level of disclosure would have been preferable because it was more general and easily understood by investors than "complex specifics that might be included within the general." Trans. 9/25 [D.E. 245 at 43-46].[19]

The SEC asked Huber to confirm his opinion that management did not appear to believe that extensions or downgrades in the first and second quarters constituted a known trend requiring disclosure, id. at 52, and his opinion that the total mix of information indicated that Levan did not intentionally mislead investors during the first and second quarter earnings conference calls. Id. at 53. Huber confirmed his opinions, and indicated that they were based on his experience as an expert in the field of securities disclosure, combined with his review of the record. Id. at 52-55.

**C. Challenges to Huber's Opinions**

The SEC objects to Huber's methodology based on how Huber structured his team of assistants, how he divided the work, and for "not analyzing much of the material he purported to base his conclusions on." Huber Motion [D.E. 148 at 9]. The SEC further contends that Huber offers no sound methodology for his conclusions and that those conclusions are nothing more than a biased recitation of facts. Id. at 1, 4. Finally, the SEC argues that Huber's testimony will confuse the jury as it is nothing more than a legal opinion. Id. at 1. As with MacDonald and James, the SEC challenges the reliability and helpfulness/relevance of Huber's testimony.

**1. Reliability**

Because Huber is a nonscientific expert, consideration of his qualifications is part of the inquiry into the reliability of his methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261. Huber is currently a Senior Managing Director at FTI Consulting, Inc. Huber Expert Report [D.E. 148-1 at App. A]. Huber previously served as Deputy Director and Director of the SEC's Division of Corporation Finance and was responsible for the Division's rule-making program. Id.[20] Huber was also a senior partner at Latham & Watkins, LLP, where he advised clients on securities regulation issues, including compliance with securities laws and internal control over financial reporting. Id. Huber is an editor of ThePractitioner's Guide to theSarbanes-Oxley Act, published by the American Bar Association in 2004. Id.

***14** With regard to Huber's use of assistants, how he divided the work between himself and his staff, and the extent of his own personal analysis of the materials underlying his opinions, Huber testified at his deposition that he closely supervised the work of his team of two certified public accountants, that he did his own review of the documents as needed, that he conducted research independently of his team, and that he and his team generated over twenty drafts of his expert report. Huber Deposition pp. 29-32 [D.E. 171-1 at 30-33]. This testimony refutes the SEC's contention that Huber's expert work was not his own.

The SEC's argument that Huber simply recites the facts in the record and provides no explanation for his conclusions is similarly refuted by Huber's testimony. At the Daubert Evidentiary Hearing, Huber explained his reasoning for extensively quoting portions of the record in his expert report as being in keeping with his methodology for writing disclosures in his professional practice. Seee.g., Trans. 9/25 [D.E. 245 at 20-21] (explaining that in writing disclosures he balances "yes or no with respect to putting out all of the facts in a true, accurate, and complete fashion"). At his deposition, Huber testified that his opinion regarding the adequacy of the changes in Bancorp's DC&P was based on his experience in private practice doing DC&P and restatement work, participating in panels with SEC officials, and testifying at SEC hearings. Huber Deposition pp. 104-05 [D.E. 171-2 at 27-28]. Huber also laid out the twelve factors that he used in deriving his conclusions regarding Bancorp's DC&P. Huber Deposition pp. 122-28, 145-46 [D.E. 171-2 at 45-51, 68-69]. Further, with respect to his opinion on the adequacy of Defendants' disclosures in the 2007 first and second quarter Forms 10-Q, Huber described in his expert report his analysis of the SEC regulation on MD&A and its application to the facts of this case. Huber Expert Report [D.E. 148-1 at ¶¶ 69-75]. Similarly, with respect to his opinion regarding the first and second quarter earnings conference calls, Huber outlined his familiarity and experience with the informality of those calls and the importance of considering their content in light of the total mix of information, and explained how he considered these factors in forming his opinion. Id. at ¶¶ 89-103.

Based on the foregoing, the undersigned finds sufficient record support for Huber's methodology of applying his professional experience to the facts of this case. Because his methodology was informed by and conducted in accordance with his experience, Huber's opinion as a nonscientific expert meets the reliability prong. Schoenthal, 555 F.3d at 1338; McClain, 401 F.3d at 1255.

### 2. Helpfulness/Relevance

The SEC seeks to exclude Huber's opinions under the helpfulness/relevance inquiry as improper legal conclusions on the grounds that they embrace an ultimate legal issue and would tell the jury how to decide the case. Huber Motion [D.E. 148 at 15-17]. However, expert testimony as to the interpretation of the SEC's requirements relating to DC&P and public disclosures and the application of those requirements to the facts of a case, does not, without more, constitute improper legal conclusions. Novatel, 2011 WL 5827198, *3; Leslie, 2010 WL 2991038, at *7; Retail Pro, 2011 WL 589828, at *4. Therefore, so long as Huber's testimony does not veer into the subject of securities laws violations, his opinions regarding the adequacy of Bancorp's DC&P and Defendants' public disclosures are not impermissible legal opinions. And the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on Huber's opinions. Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817; Pacheco, 426 Fed.Appx. at 835.

***15** Therefore, the Huber Motion is denied.

## VII. TURNER

At trial, Turner would provide the following opinions: (1) during the first and second quarters of 2007, a material downward trend related to loan quality existed within BankAtlantic's Commercial Residential Portfolio that was not adequately disclosed in the MD&A section of Bancorp's 10-Q's and the earnings conference calls for those quarters; (2) Bancorp's lack of disclosure of this trend failed to inform the investing public of the negative developments; (3) Bancorp incorrectly categorized certain loans as "held-for-investment;" and (4) due to the failure to appropriately report certain loans at market value, Bancorp's assets and income before taxes were overstated by $53 million for the year ended December 31, 2007. Turner Expert Report [D.E. 162-3 at ¶¶ 19-24, 113-16],

### A. Turner's Methodology.

At the Daubert Evidentiary Hearing, Defendants questioned the number of hours that Turner devoted to the preparation of his expert report and asked him to confirm the fact that 8 days before his expert report was due, he had billed only 3 hours to the SEC. Trans. 9/24 [D.E. 244 at 20, 56-57], Turner confirmed this fact, id., and the additional fact that, in total, he only billed the SEC 38 hours for the preparation of his expert report. Id. at 21. Turner explained that he worked many additional hours that he did not bill out of "a notion of public service." Id.[21]

Defendants also questioned Turner's independence, given that he was donating time to one party in the case. Trans. 9/24 [D.E. 244 at 21]. Turner responded that "just because you don't bill for all your hours doesn't mean that you're not independent" and that other members of his accounting profession do not see providing this type of public service to be in conflict with their independence. Id. at 22. Turner also stated that he makes it clear on any engagement that his opinions are his own, and that he also takes his ethical responsibilities seriously. Id. at 103-05.[22]

In response to an inquiry as to how many hours he actually spent on the engagement, Turner testified, "I don't recall.... I can tell you it was a fair amount of hours." Id. at 22-23. Turner further testified that he approaches the task of providing an expert opinion in the same manner as preparing for an audit. Id. at 24-25, 106-07. Turner explained that "[y]ou plan it up front. You direct the staff as to what you want... and then it becomes an iterative process.... At the end of the day ... the audit is signed by the audit partner. It is [his] opinion, ... not the opinion of the staff." Id. at 25.[23]

**B. Defendants' disclosures.**

***16** At the Daubert Evidentiary Hearing, Turner agreed with the proposition that a "collapsing Florida real estate market" was a negative trend, but explained that "if you've got, in a particular part of your loan portfolio ... some significant positive or negative trends ... you would need to say that ... the disclosure needs to run to the particulars of the company, not a broad general [statement of] what's happening to everyone." Id. at 43, 45. Turner opined that Defendants' disclosure of the real estate market trend was not sufficient for MD&A purposes because one has "to put [the disclosure] in the context of what's going on in that particular bank so that the investors can see the bank through the eyes of management." Id. at 121.[24] Turner stated, "The cause of [Bancorp's loss] was ... I wouldn't say just the Florida real estate market. Certainly that might have been part of the cause." Id. at 53.

According to Turner, the disclosure in Bancorp's 2007 first quarter 10-Q that non-BLB Loans were "of relatively lower risk than the [BLB] loans" did not correctly identify the trend with respect to the non-BLB loans, albeit he acknowledged that he had not reviewed Bancorp's 2007 third quarter losses to determine if they matched Defendants' earlier disclosures with respect to both the BLB and the non-BLB Loans. Id. at 48-49, 52. Defendants' counsel asked Turner whether Bancorp had to disclose individual internal loan downgrades and extensions. Id. at 57. In response, Turner explained that, though trends of downgrades or extensions in a portfolio should be described, it was not necessary to mention specific loans. Id. at 58. Finally, Defendants' counsel asked Turner if he was aware that banking regulators "unanimously objected to disclosure of internal loan grades." Id. at 60. Turner confirmed his understanding that bank regulators "didn't like to see the loan grades disclosed," id. at 61, but added that companies would still need to disclose the general trend of these occurrences. Id. at 116.

**C. Reclassification of the JMP Loans**

In his testimony, Turner explained his reliance on two offers for establishing his valuation of the JMP Loans. Id. at 75. Turner clarified that there were actually 6 bids and that he used the 2 highest ones in computing the fair value of the JMP Loans, but could not recall whether these two bids were oral or written or when they were received. Id. at 75-76.

Defendants' counsel asked Turner whether the market was "orderly" at the December 31, 2007 measurement date. Id. at 81. Turner did not respond directly, but opined that, under FAS 157, an orderly transaction is a transaction in which information is available to the buyer and seller to make an informed bid at a fair price. Id. at 82. In response to Defendants' contention that one of the bids he relied on was from a vulture fund looking for distressed sales in a market under duress, id. at 83-84, Turner disagreed with Defendants' understanding of the term "duress," and explained that, in the context of a FAS issued by the FASB, duress is a term of art that refers only to involuntary sale or liquidation, as in bankruptcy. Id. at 84.

Turner testified that, in opining that Bancorp had made a decision to sell the JMP Loans, he relied, as would an auditor in private practice, on the engagement letter between Bancorp and JMP because it was a legal agreement. Id. at 86. Defendants' counsel asked Turner if someone else could read the contract language of the engagement letter as meaning something other than that Bancorp was offering the JMP Loans for sale. Id. at 92. Turner responded that, as a former CFO and corporate executive, he could only read it as a decision to sell loans.

Id.

***17** Turner testified that he was not asked to opine regarding the fact that Bancorp still failed to properly account for the JMP Loans in the first quarter of 2008 because "[w]hat [Bancorp] did in the first...quarter [of 2008], at least in [his] mind, [wasn't] relevant to whether they did the accounting right at the end of the fourth quarter of [2007]." Id. at 74-75.

### D. Challenges to Turner's Opinions

Defendants argue that Turner must be precluded from offering expert testimony at trial on several grounds. First, Defendants argue that Turner did not employ any intellectual rigor in reaching his conclusions. Turner Motion [D.E. 156 at 2]. Specifically, Defendants contend that Turner lacks the qualifications to opine regarding the Florida real estate market; that he billed only 38 hours for the generation of his expert report; that he improperly relied on unqualified assistants to conduct the underlying research and draft the report; and that he used his team's research to support his preconceived conclusions in favor of the SEC. Defendants' Reply Memorandum in Further Support of Their Motion in Limine to Exclude the Opinions and Testimony of Lynn E. Turner (hereafter, "Turner Reply") [D.E. 211 at 1-3].

Second, with respect to the "held-for-sale" issue, Defendants argue that Turner's opinions that Bancorp intended to sell the JMP Loans in the fourth quarter of 2007 and that a sufficiently orderly market existed for Bancorp to sell loans at that time; and his calculation of the fair value of the JMP Loans in the fourth quarter of 2007, must all be excluded because they are unreliable. Turner Motion [D.E. 156 at 2].

Third, Defendants argue that Turner's opinions on what a law or regulation says or means cannot be presented to a jury because they are improper legal conclusions and it is the exclusive function of the Court to address, resolve, and instruct on matters of law. Id.

Fourth, in challenging Turner's opinions that during the first and second quarters of 2007, a material downward trend related to loan quality existed within BankAtlantic's Commercial Residential Portfolio that was not adequately disclosed in the MD&A section of Bancorp's 10-Q's and the earnings conference calls for those quarters and that Bancorp's lack of disclosure of this trendfailed to inform the investing public of the negative developments, Defendants parse these two opinions into the following list of sub-opinions, which they argue must be excluded as a matter of law:

> a. His opinion that BBX violated securities laws by failing to disclose changes in internal loan grades (it is an undisputed fact that the vast majority of publicly reporting banks declined to publish loan grades at the urging of all federal bank regulators and it is undisputed that disclosing the substance of what would be learned from internal loan grades, which BBX did, is perfectly appropriate);
>
> b. His opinion that changes in internal loan grades for some land loans constituted a trend requiring disclosure;
>
> c. His opinion that BBX was required to disclose the number and amount of loan extensions in the first and second quarter of 2007 (the vast majority of financial institutions do not make such disclosures and Turner has no knowledge of the condition of the loans that were extended thus he fails to provide any connection between a loan extension and an increased risk of loss);
>
> ***18** d. His opinion that non-BLB commercial real estate loans were just as risky as BLB loans and that the market should have been told as much (it is indisputable that the risk was not the same and the Company correctly weighed the relative risks and advised the market accordingly and timely);
>
> e. Any opinion that the Company failed to disclose "crumbling creditworthiness of the loans within BankAtlantic's commercial real estate land acquisition and development portfolio in Q 1 and Q2 of 2007";
>
> f. His opinion that a company can be guilty of violating securities laws for failing to include in a Form 10-Q information disclosed in an earnings conference call (Turner's opinion is nothing but a legal conclusion and an incorrect one at that); and,
>
> g. His opinion regarding BBX's and Levan's alleged intent to defraud or deceive (another's intent is not a proper subject of expert testimony).

Id. at 3-4.

In their first and second arguments, Defendants challenge the reliability of Turner's opinions. In their third argument, they challenge their helpfulness/relevance. Defendants' fourth argument is predicated on parsing Turner's opinions that Defendants failed to disclose a material downward trend in the quality of BankAtlantic's

Commercial Residential Portfolio and that the lack of disclosure of this trend failed to inform the investing public of the negative developments.

1. **Reliability**

Because Turner is a nonscientific expert, consideration of his qualifications is part of the inquiry into the reliability of his methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261.Turneris currently a Managing Director at LitiNomics. Turner Expert Report [D.E. 162-3, Ex. C, at 60]. Turner has over thirty-five years of business, regulatory and academic experience concerning accounting, auditing and financial reporting matters. Id. From 1996 to 1998, Turner was Vice President and CFO of a high-technology semiconductor and storage systems manufacturing company. Id. From July 1998 to August 2001, he served as Chief Accountant for the SEC. Id. From 2001 until 2003, he was as a professor at Colorado State University where he taught courses in accounting and auditing, including MBA-level classes, Id.

*(i) Turner's intellectual rigor*

Defendants first challenge Turner's lack of qualifications to opine regarding the Florida real estate market. In response, the SEC argues that Turner's expertise in the Florida housing market is irrelevant because the "true trend at issue in this case" is not the Florida real estate market, but the "crumbling creditworthiness within the [Commercial Residential] Portfolio as reflected by the multiple loan downgrades and extensions." Response in Opposition re Defendants' Motion in Limine to Exclude the Opinions and Testimony of the SEC's Expert Witness Lynn B. Turner (hereafter, "Turner Response") [D.E. 186 at 15]. However, as discussed above with respect to James, the collapse of the Florida real estate market is not irrelevant to the SEC's claims. Further, at the Daubert Evidentiary Hearing, Turner testified that, while he did not believe that Bancorp's loss was just due to the downturn in the Florida real estate market, that factor might have been part of the cause. But the fact that Turner is not versed in the Florida real estate market does not merit striking him as an expert as Defendants contend; it simply goes to the credibility and weight of his testimony. Rosenfeld, 654 F.3d at 1193 ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility."). Defendants also challenge Turner's reliability based on his having billed the SEC for only 38 hours of his time and for the way he utilized his assistants in rendering his expert report. But Turner testified extensively as to the hours he billed, the independence of his opinion, and the preparation of his expert report in the same fashion as he would conduct an audit. Based on the foregoing, the undersigned finds sufficient record support for Turner's methodology of applying his professional experience to the facts of this case. Because his methodology was informed by and conducted in accordance with his experience, Turner's opinion as a nonscientific expert meets the reliability prong. Schoenthal, 555 F.3d at 1338; McClain, 401 F.3d at 1255.

*(ii) The held-for-sale issue*

***19** Defendants argue that Turner's opinions with respect to this issue are unreliable. At the same time, Defendants are attacking those opinions through their own expert on this issue, MacDonald. Therefore, rather than exclude Turner's opinions as Defendants propose, the Court should defer to the jury the task of weighing the testimony of these two opposing experts. Allison, 184 F.3d at 1311 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence.").

2. **Helpfulness/Relevance**

Defendants argue that Turner's opinions on what a law or regulation says or means cannot be presented to a jury as it is the exclusive function of the Court to address, resolve, and instruct on matters of law. However, expert testimony on legal and regulatory requirements is permissible and does not, without more, constitute improper legal conclusions. Novatel, 2011 WL 5827198, *3; Leslie, 2010 WL 2991038, at *7; Retail Pro, 2011 WL 589828, at *4. Additionally, because securities laws constitute a complex topic that is outside the understanding of the average juror, courts have allowed the testimony of experts in this area. Seee.g., S.E.C. v. Big Apple Consulting U.S., Inc., No.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

6:09-cv-1963-Orl-28GJK, 2011 WL 3753581, at *4 (M.D. Fla. Aug. 25, 2011) (acknowledging that testimony by securities experts is often admitted to assist the jury in understanding complex securities terms, practices and regulations); S.E.C. v. Sky Wav Global, LLC, Case No. 8:09-cv-455-T-23TBM, 2010 WL 5058509, at *4 (M.D. Fla. Dec. 6, 2010) (attorneys can testify in securities cases and offer opinions on securities industry customs and practices).

Therefore, so long as Turner's testimony does not veer into the subject of securities laws violations, his opinions are not impermissible legal opinions. And the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on Turner's opinions. Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817; Pacheco, 426 Fed.Appx. at 835. Moreover, given that MacDonald, James and Huber will be permitted to testify regarding Defendants' conduct vis-a-vis SEC laws and regulations, it would be unfair to exclude Turner. United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir. 1992) ("It is an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.").

**3. Parsing of Turner's Disclosure Opinions**

As noted above, Defendants' fourth argument is predicated on parsing Turner's opinions that Defendants failed to disclose a material downward trend in the quality of BankAtlantic's Commercial Residential Portfolio and that the lack of disclosure of this trend failed to inform the investing public of the negative developments.

With regard to trends in the Commercial Residential Portfolio, Defendants challenge the following: Turner's purported opinion that Bancorp violated securities laws by failing to disclose changes in internal loan grades; his opinion that changes in internal loan grades for some land loans constituted a trend requiring disclosure; and his opinion that Bancorp was required to disclose the number and amount of loan extensions in the first and second quarter of 2007. However, Turner explained at the Daubert Evidentiary Hearing that, though trends of downgrades or extensions in a portfolio should be described, it was not necessary to mention specific loans. Turner also confirmed his understanding that bank regulators did not like to see loan grades disclosed, but opined that companies would still need to disclose the general trend of these occurrences. To the extent that Defendants disagree with these opinions, they will have the opportunity to challenge them at trial. Allison, 184 F.3d at 1311 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence.").

***20** Defendants also challenge Turner's opinion that non-BLB commercial real estate loans were just as risky as BLB loans and that the market should have been told as much because, according to Defendants, it is indisputable that the risk was not the same and Bancorp correctly weighed the relative risks and advised the market accordingly and timely. Here, Defendants are simply disagreeing with Turner's opinion and they will be able to do so at trial. Allison, 184 F.3d at 1311.

Defendants seek to exclude any opinion that Bancorp failed to disclose "crumbling creditworthiness" of BankAtlantic's Commercial Residential Portfolio. However, this argument has been forestalled by Judge Scola's ruling that "crumbling creditworthiness" does not constitute a new and unpleaded claim. See Omnibus Order on Pending, Non-Referred Motions in Limine [D.E. 242 at ¶ 6].

Defendants argue that Turner should not be allowed to opine that a company can be guilty of violating securities laws for failing to include in a Form 10-Q information disclosed in an earnings conference call because this is nothing but a legal conclusion and an incorrect one at that. Initially, it is not clear from Turner's expert report that he intends to opine on violations of securities laws. In any event, as more fully discussed above, expert testimony on legal and regulatory requirements is permissible, particularly in such a complex area as securities laws.

Finally, Defendants seek to exclude Turner's purported opinion regarding BBX's and Levan's alleged intent to defraud or deceive because another's intent is not a proper subject of expert testimony. However, Defendants have not pointed to any particular statement by Turner indicating that he is intending to proffer any such testimony.

Therefore, the Turner Motion is denied.

**VIII. CONCLUSION**

Having considered the parties' arguments and the

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

applicable law, the undersigned concludes that MacDonald, James, Huber and Turner may provide expert testimony at trial within the parameters discussed herein. Accordingly, it is

ORDERED AND ADJUDGED that:

1. The MacDonald Motion [D.E. 159] is DENIED.

2. The James Motion [D.E. 155] is DENIED as to James' first and second opinions and GRANTED as to James' third and fourth opinions.

3. The Huber Motion [D.E. 148] is DENIED.

4. The Turner Motion [D.E. 156] is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida this 14th day of November, 2013.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12009694

Footnotes

1 The undersigned will issue a separate Order on Plaintiff's Daubert Motion to Exclude the Testimony of David Friedman and Jeff Mindling [D.E. 149].

2 A detailed factual recitation is found in Judge Scola's Omnibus Order on Summary Judgment [D.E. 234 at 2-11].

3 BLB loans were loans made to land investors after they had sold to homebuilders options to purchase lots in the land holdings. For non-BLB loans, the land investors did not have pre-loan option contracts.

4 Form 10-Q is a report that must be filed by publicly traded companies for each of their first three fiscal year quarters. Seehttp://www.sec.gov/answers/form10q.htm (last visited on October 31, 2013). "The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year." Id.

5 "The earnings conference call is a way for companies to relay information to all interested parties, including institutional and individual investors, as well as buy– and sell-side analysts." Seehttp://www.investopedia.com/ask/answers/04/052104.asp (last visited October 31, 2013).

6 Form 10-K is an annual report that must be filed by publicly traded companies. Seehttp://www.sec.gov/answers/form10k.htm (last visited on October 31, 2013). "The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." Id.

7 Defendants do object to Turner's lack of expertise in a particular area, as more fully discussed below.

8 Judge Scola has ruled that certain statements made by Levan during the second quarter earnings conference call were false as a matter of law. See Omnibus Order on Summary Judgment [D.E. 234 at 12-15],

9 The FAS promulgated by the Financial Accounting Standards Board ("FASB") were the highest GAAP authority in 2007 and 2008. Trans. 9/23 [D.E. 243 at 54].

10 In MacDonald's view, the following are indicia of a decision to sell: "the plan of sale must be approved by management having the authority to take such action;" the "actions needed to complete the plan of sale ... must be initiated;" and "the actions needed to complete the plan of sale must indicate that it is unlikely that... the plan will be withdrawn." [Id. at ¶ 14].

11 MacDonald testified that she had led the team that developed FAS 157 and that she was the primary author for the final rule. Trans. 9/23 [D.E. 243 at 64],

12 Additionally, MacDonald opined that, while an orderly transaction is fundamental to a determination of fair value, there would be no orderly transaction where only six out of fifty potential bidders responded to JMP's solicitation and at least three of those bids contemplated distressed debt pricing. Id. at 65-66.

13 While MacDonald conceded on cross-examination that there is no mathematical formula to determine fair value, Trans. 9/23 [D.E. 243 at 34], she clarified that, under GAAP, one is expected to conduct a comprehensive approach and that, while a certain amount of artistry is involved in the process, it has more to do with the precision of the valuation rather than the methodology used in

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

conducting the valuation. Id. at 67-68.

14 In response to repeated inquiries into the methodology underlying his market observations, James explained that methodology in detail and occasionally corrected SEC's counsel's articulation of it. Trans. 9/24 [D.E. 244 at 150-68].

15 Judge Scola has ruled that evidence that the Office of Thrift Supervision prohibits the disclosure of internal loan grades in the MD&A section of 10-Q's is admissible because it is relevant and material to Defendants' overall state of mind. See Omnibus Order on Pending, Non-Referred Motions in Limine [D.E. 242 at ¶ 10(F) ].

16 Thus, the SEC's burden here is different from that of plaintiffs in a private securities class action that was based on the same events, namely, Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713 (11th Cir. 2012). There, in addition to the foregoing elements, plaintiffs needed to prove loss causation and damages. Id. at 725.

17 Judge Scola has ruled that testimony comparing Bancorp's disclosures and performance to that of other banks will only be admissible at trial to rebut scienter to the extent that Levan or anyone else at Bancorp knew of the disclosures and performance of other banks and relied upon that knowledge in their activities and decision-making process. See Omnibus Order on Pending, Non-Referred Motions in Limine [D.E. 242 at ¶ 10(E) ]. Logically, James' second opinion is subject to this same restriction.

18 Although the undersigned has found that James utilized an acceptable overall methodology, this particular opinion is unreliable due to the lack of complete data.

19 Huber repeatedly characterized Defendants' disclosures regarding Bancorp's loan exposure in the deteriorating Florida real estate market as "putting up a flare," that is, warning the market of a serious issue. Trans. 9/25 [D.E. 245 at 64-66, 78].

20 The Division of Corporation Finance is the division that: drafts the SEC's rules concerning disclosure by companies that report to the SEC; provides interpretive guidance concerning disclosure by public companies; and reviews and comments on filings by public companies. Seehttp://www.sec.gov/divisions/corpfin/cfabout.shtml (last visited on October 31, 2013).

21 Turner testified that public service is "near and dear to [his] heart" and "an important thing in this country." Trans. 9/24 [D.E. 244 at 109]. Furthermore, Tuner provided a sworn declaration attesting to the appropriateness of the time billed and the reliability of his methodology. [D.E. 186-1 at ¶¶ 4-13].

22 Turner further explained that he doesn't care about his billable hours because he has done "very well in life" and "just enjoy[s] what [he's] doing." Id. at 108.

23 Turner added that, for professional accountants practicing in the field, in a typical audit staffing, only "about five percent" of the total time billed by the team on the project is billed by the audit partner. The rest of the time is billed by an "audit manager" and "by other staff." Id. at 106.

24 According to Turner, a bank should disclose in its MD&A concerns about creditworthiness within the respective subsections of its loan portfolios. Id. at 115.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4398506
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Collin SHANKS
v.
JARROW FORMULAS, INC.

Case No. CV 18-09437 PA (AFMx)
|
Filed 08/27/2019

**Attorneys and Law Firms**

Paul K. Joseph, Jack Fitzgerald, Melanie Rae Persinger, Trevor M. Flynn, Law Office of Paul Joseph PC, San Diego, CA, for Collin Shanks.

Anthony J. Anscombe, Carol Brophy, Steptoe and Johnson LLP, San Francisco, CA, Darlene K. Alt, Pro Hac Vice, Mary E. Buckley, Pro Hac Vice, Steptoe and Johnson LLP, Chicago, IL, Melanie Atswei Ayerh, Steptoe and Johnson LLP, Los Angeles, CA, for Jarrow Formulas, Inc.

**Proceedings:** IN CHAMBERS - COURT ORDER

The Honorable PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

***1** Before the Court is a Motion for Class Certification filed by plaintiff Collin Shanks ("Plaintiff"). (Docket No. 38 ("Mot.").) Defendant Jarrow Formulas, Inc. ("Defendant") filed an Opposition, to which Plaintiff filed a Reply. (Docket Nos. 45 ("Opp'n."), 50 ("Reply").) Defendant filed an Ex Parte Application for Leave to File a Sur-Reply, which this Court denied. (Docket Nos. 56, 59.) Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds this matter appropriate for decision without oral argument.

**I. Background**

Defendant is a California corporation that sells various coconut oil products, including (1) Jarrow Formulas Organic Extra Virgin Coconut Oil ("Extra Virgin Coconut Oil") and (2) Jarrow Formulas Coconut Oil ("Coconut Oil"). (Docket No. 1, Complaint ("Compl.") ¶¶ 5, 48.) Defendant's coconut oil products are sold at national retailers, including Sprouts Farmers Market. (Id. ¶ 47.)

Plaintiff alleges he purchased Defendant's Extra Virgin Coconut Oil approximately six to eight times. (Id. ¶ 83.) "To the best of his recollection, Plaintiff began purchasing [Defendant's] Extra Virgin Coconut Oil in 2016." (Id.) The Complaint alleges that "[w]hen deciding to purchase [Defendant's] Extra Virgin Coconut Oil, Plaintiff read and relied on the following claims contained on the [product's] label:

> a. 'Source of Medium Chain Triglycerides';
>
> b. 'No Trans Fatty Acids';
>
> c. 'No Hydrogenation'; and
>
> d. 'Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8).' " (Id. ¶ 84.)

When Plaintiff purchased Defendant's Extra Virgin Coconut Oil, he claims he was "seeking a [p]roduct that had the qualities expressly described and implied by the [p]roduct's label, namely, a non-hydrogenated coconut oil that was free of trans fatty acids and was a source of Medium Chain Triglycerides, and the consumption of which would benefit rather than harm health." (Id. ¶ 86.)

On November 6, 2018, Plaintiff filed this putative class action. The Complaint alleges claims against Defendant for violations of the (1) Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; and (3) False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17200 et seq. (Id. ¶ 2.)

Plaintiff alleges that the labels on Defendant's Extra Virgin Coconut Oil and Coconut Oil were "misleading, deceptive, and unlawful" because "contrary to the message conveyed by the challenged labeling claims, the [p]roducts are not healthy, but rather detriment[al] [to] health when consumed." (Id. ¶¶ 1, 3.) Plaintiff claims that he "relied upon [Defendant's] misleading and unlawful claims when purchasing [Defendant's] coconut oil, and

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

was damaged as a result." (Id. ¶ 2.) Plaintiff further alleges that "[b]ased on the entire label collectively, [he] believed the [p]roduct was a healthy oil and not harmful to health, and healthier than other fat sources." (Docket No. 36, Decl. of C. Shanks ISO Mot. ¶ 6.) Plaintiff claims he "relied on these statements in that they were a substantial factor and strongly influenced [his] decision to purchase the [p]roduct, even though the [p]roduct was more expensive than other oils." (Id. ¶ 7.)

***2** Plaintiff alleges that Defendant's "coconut oils cost more than similar [p]roducts without misleading labeling, and/or would have cost less in the marketplace ... absent the false and misleading statements complained of herein." (Compl. ¶ 90.) Plaintiff also claims that he would not have purchased Defendant's coconut oil products "if he knew the [p]roduct was misbranded pursuant to California and FDA regulations, or that its claims were false or misleading." (Id. ¶ 94.) Rather than receiving the healthy products he thought he was getting, Plaintiff claims the products he received were not healthy, "but rather their consumption causes increased risk of [coronary heart disease], stroke, and other morbidity." (Id. ¶ 93.)

Plaintiff now moves for class certification. Plaintiff seeks to represent the following class:

> All persons who, since November 6, 2014, purchased in the United States (or alternatively in California, if the Court does not certify a nationwide class), for personal or household use, and not for resale or distribution, a 16 oz. or 32 oz. Jarrow Organic Extra Virgin or Jarrow Regular Coconut Oil whose label did not bear a disclosure statement of the type required by 21 C.F.R. 101.13(h).

(Mot. 1.) In his Reply, Plaintiff seeks to modify the class definition to include only individuals who purchased Extra Virgin Coconut Oil or Coconut Oil in California. (Reply 12 n. 8.) The proposed class definition otherwise remains the same.[1]

## II. Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties.' " Comcast Corp. v. Behrend, 569 U.S. 27, 33, 133 S. Ct. 1426, 185 L.Ed. 2d 515 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L.Ed. 2d 176 (1979)). "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance with Federal Rule of Civil Procedure 23,' " which governs class actions in federal court. Id. (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L.Ed. 2d 374 (2011)). To obtain class certification under Rule 23, a plaintiff must satisfy all four requirements of Rule 23(a), and one of the requirements of Rule 23(b). Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(a) requires the plaintiff to demonstrate that (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

After satisfying Rule 23(a)'s prerequisites, the plaintiff must establish that the class meets the prerequisites of at least one of the three types of class actions set forth in Rule 23(b). In re ConAgra Foods, Inc., 302 F.R.D. 537, 562 (C.D. Cal. 2014). Under Rule 23(b), class certification is appropriate if (1) there is a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice the individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. Fed. R. Civ. P. 23(b)(1-3).

***3** A district court must conduct a "rigorous analysis" to ensure the Rule 23 requirements are satisfied. Zinser, 253 F.3d at 1186. As the Ninth Circuit has explained, this rigorous analysis "does not mean that a district court must conduct a full-blown trial on the merits prior to certification. A district court's analysis will often, though not always, require looking behind the pleadings, even to issues overlapping with the merits of the underlying claims." Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 581 (9th Cir. 2009), rev'd on other grounds, 564 U.S. 338, 131 S. Ct. 2541, 180 L.Ed. 2d 374 (2011). Thus, while a court at the class certification stage is prohibited from making determinations on the merits that do not overlap with the Rule 23 inquiry, a district court's class certification analysis "will entail some overlap with the merits of the plaintiff's underlying claim." Wal-Mart, 564 U.S. at 351. Rule 23 provides district courts with "broad discretion to grant or deny a motion for class certification." Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).

"The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." Zinser, 253 F.3d at 1186. Although neither the Ninth Circuit nor the Supreme Court has decisively attached a standard of proof to Rule 23's requirements, many courts apply the preponderance of the evidence standard. See, e.g. Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008) ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 321–22 (3d Cir. 2008) ("Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."); Mekhitarian v. Deloitte & Touche (ICS), LLC, No. CV 07-412 DSF (MANx), 2009 U.S. Dist. LEXIS 131754, at *14 (C.D. Cal. Nov. 3, 2009) ("Because the Court finds that the preponderance standard of Rule 23(b)(3) is not met, it does not decide if all of the Rule 23(a) factors are satisfied."). The Court finds that this is the appropriate burden of proof

**III. Analysis**

Plaintiff seeks to certify a class seeking damages under Rule 23(b)(3). (Mot. 13.) As Plaintiff's Motion can be resolved conclusively at the Rule 23(b) stage, the Court only addresses this step of the class certification analysis.[2]

Under Rule 23(b)(3), the party seeking class certification must show that common questions of law or fact predominate over questions affecting individual members. Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) predominance inquiry asks whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009). This inquiry focuses on "the relationship between common and individual issues." Id. This standard is "far more demanding" than the commonality requirement under Rule 23(a). Amchen Prods., Inc. v. Windsor, 521 U.S. 591, 623–24 & n.18, 117 S. Ct. 2231, 138 L.Ed. 2d 689 (1997). "Rule 23(b)(3) requires a district court to formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate." Dukes, 603 F.3d at 593 (citation and quotation marks omitted). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Torres v. Nutrisystem, Inc., 289 F.R.D. 587, 594 (C.D. Cal. 2013). However, if a predominant issue in a case requires "the separate adjudication of each class members' individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Zinser, 253 F.3d at 1189 (internal quotation marks and citation omitted).

1. The UCL, FAL, and CLRA Under Rule 23(b)(3)'s Predominance Requirement

***4** Plaintiff argues that his UCL, FAL, and CLRA claims present common questions that predominate over individualized inquiries. (Mot. 14.) Plaintiff alleges that "[b]ecause the same [c]hallenged [c]laims appear on every [c]hallenged [p]roduct, if Plaintiff demonstrates [Defendant's] labeling was likely to deceive under California's objective 'reasonable consumer' test, he will have established [Defendant's] liability as to all class members." (Id. 15.) Plaintiff argues that there is "no reason to look at the circumstances of each individual purchase in this case, because the allegations of the complaint are narrowly focused on allegedly deceptive provisions of [Defendant's] own marketing" and the "fact-finder need only determine whether that marketing was capable of misleading a reasonable consumer." (Id.) (internal quotations omitted). Plaintiff argues that this inquiry "does not require individualized proof of deception, reliance, or injury" and that whether the challenged claims were misleading can be determined using common evidence applicable to the entire class. (Id.)

"For purposes of class certification, the UCL, FAL, and CLRA are indistinguishable." Townsend v. Monster Beverage Corp., 303 F. Supp. 3d 1010, 1043 (2018). "Each statute allows Plaintiff to establish the required elements of reliance, causation, and damages by proving that Defendant[ ] made what a reasonable person would consider a material misrepresentation. Id. "[U]nder the UCL, FAL, and CLRA[,] ... injury is shown where the consumer has purchased a product that is marketed with a material misrepresentation, that is, in a manner such that members of the public are likely to be deceived." Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 534 (C.D. Cal. 2011) (internal quotations omitted).

Here, "Plaintiff[ ] must show that the challenged statements are [ (1) ] material and [ (2) ] likely to mislead or deceive consumers on a classwide basis." Townsend, 303 F. Supp. 3d at 1043. In the context of CLRA, FAL, and UCL claims, "[a] misrepresentation is judged to be


© 2020 Thomson Reuters. No claim to original U.S. Government Works.

'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." Kwikset Corp., 51 Cal. 4th at 332-33 (citation omitted); see also Caro v. Proctor & Gamble Co., 18 Cal. App. 4th 644, 668, 22 Cal. Rptr. 2d 419 (1993) ("A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment. Stated in terms of reliance, materiality means that without a misrepresentation, the plaintiff would not have acted as he did." (internal formatting and citations omitted)). "If the misrepresentation or omission is not material to all class members, the issue of reliance would vary from consumer to consumer and the class should not be certified." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1022 (9th Cir. 2011) abrogated on other grounds by Comcast, 569 U.S. 27, 133 S. Ct. 1426 (internal quotations omitted). "While a challenged statement need not be the sole or even dominant factor in consumers' purchasing decisions," a plaintiff must present evidence "to assess whether the challenged statements were in fact material to [consumer's] purchases, as opposed to, or in addition to, prices, promotions, retail positioning, taste, [ ]brand recognition" or any other number of additional factors that influence consumer purchasing decisions. Townsend, 303 F. Supp. 3d at 1045; see also In re 5-Hour Energy Mktg. and Sales Practices Litig., 13ML2438, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017) ("Absent a consumer survey or other market research to indicate how consumers reacted to the [challenged] statements, and how they valued those statements compared to other attributes of the product and the [relevant] market generally, Plaintiffs have not offered sufficient evidence of materiality across the class."). A product's packaging is misleading if it objectively presents "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising extraordinary care." Brockey v. Moore, 107 Cal. App. 4th 86, 99, 131 Cal. Rptr. 2d 746 (2003) .

***5** "Further, the challenged statements must be likely to deceive a reasonable consumer." Townsend, 303 F. Supp. 3d at 1044. "The UCL, CLRA, and FAL, prohibit not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Kumar v. Salov N. Am. Corp., 14CV2411-YGR, 2016 WL 3844334, at *4 (N.D. Cal. July 15, 2016) (internal quotations omitted). "Likely to deceive implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few customers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general public or of the targeted consumers, acting reasonably in the circumstances, could be misled." Townsend, 303 F. Supp. 3d at 1044. "Under this standard, Plaintiff must show that members of the public are likely to be deceived." Ebner v. Fresh, Inc., 838 F. 3d 958, 965 (9th Cir. 2016).

Plaintiff argues that "[t]he objective tests for deception and materiality renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." (Mot. 14.) (internal quotations omitted). While this Court agrees that, in CLRA, UCL, and FAL actions, class members are not required to prove their individual reliance on the allegedly misleading statements in order to satisfy Rule 23(b)(3)'s predominance requirement, Plaintiff still must put forth at least some evidence that the challenged statements were material, and that members of the public were likely to be deceived by these statements. See, e.g. Townsend, 303 F. Supp. 3d at 1045 (denying class certification for failure to establish predominance under Rule 23(b) because the plaintiffs failed to present adequate evidence that the statement "[h]ydrates" was material to consumers' purchasing decisions and likely to deceive a reasonable consumer); In re 5-Hour Energy, 2017 WL 2559615, at *8 (denying class certification under Rule 23(b)(3)'s predominance standard, and finding that "[a]bsent a consumer survey or other market research to indicate how consumers reacted to the [challenged] statements, and how they valued these statements compared to other attributes of the product and the [relevant] market generally, Plaintiffs ha[d] not offered sufficient evidence of materiality across the class.").

Plaintiff relies on the following evidence that the challenged statements are material to a reasonable consumer: (1) "the advertising itself"; (2) "scientific literature regarding the health effects of consuming coconut oil"; and (3) that "[a]s a matter of common sense, consumers rely on health-related food claims on food products in making purchasing decisions." (Mot. 14-15.) (internal quotations omitted). This evidence is insufficient to meet Plaintiff's burden under Rule 23(b)(3).

First, nothing in the "advertising itself" suggests that consumers would read the challenged label and believe that coconut oil was a healthier fat than other alternatives. To support this argument, Plaintiff relies on cases like Bradach v, Pharmavite, LLC, in which the challenged statement was "Helps Maintain a Healthy Heart." 735 Fed. Appx. 251, 252 (9th Cir. 2018). This Court agrees that on its face, a label that says "Helps Maintain a Healthy Heart" could be considered material and likely to lead a significant portion of the public to believe that the

product does in fact help maintain a healthy heart. The same cannot be said for the challenged statements here. The Court is not convinced that the label statements – "Source of Medium Chain Triglycerides"; "No Trans Fatty Acids"; "No Hydrogenation"; and "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)" – would lead a significant portion of the public to believe that Defendant's coconut oil is a healthier fat than other alternatives. Unlike the phrase "Helps Maintain a Healthy Heart," these scientific terms are unlikely to be understood by an average consumer, let alone lead a consumer to believe that coconut oil is healthy. An average consumer could easily conclude that the challenged label is disclosing unhealthy attributes of coconut oil.

***6** Second, the "scientific literature regarding the health effects of consuming coconut oil" that Plaintiff relies on does not provide any insight into a reasonable consumer's purchasing decisions. Plaintiff points to the testimony of Thomas Bowman, Senior Scientist at Defendant and one of Defendant's 30(b)(6) corporate witnesses, in which Mr. Bowman states that whether or not coconut oil is healthy can be determined by looking to scientific literature. (Mot. Ex. 5.) This statement says nothing about whether a reasonable consumer would read the challenged statements and be deceived into believing coconut oil is healthy.

Plaintiff also submitted an expert report of Dr. Michael Greger, a physician who specializes in clinical nutrition, in which Dr. Greger was asked to "provide [an] expert opinion on whether coconut oil is generally healthy, and, as a result, whether Jarrow's labeling claims stating expressly or suggesting that its Coconut Oil Products are healthy are inaccurate." (Mot. Ex. 1.) Dr. Greger did not opine on whether a significant portion of the general public would read the challenged label, understand the statements on the label to mean Defendant's coconut oil products are healthy, and subsequently purchase Defendant's coconut oil based on this mistaken belief.

This District's recent decision in Townsend v. Monster Beverages Corporation is instructive. 303 F. Supp. 3d at 1016. In Townsend, consumers filed an action alleging violations of the UCL, CLRA, and FAL. Id. On a motion for class certification, the plaintiffs principally relied on an expert report to show that the statements "Hydrates, Re-hydrates, and Consume Responsibly" were material and likely to mislead a reasonable consumer under Rule 26(b)(3). Id. at 1044. The expert was asked to "design and implement an online survey to assess[ ] consumers' perceptions of claims made" on Monster energy drink cans. Id. at 1027. The expert report presented survey evidence regarding how consumers understood the challenged terms, but did not opine on whether these statements actually impacted a consumer's purchasing decisions. Id. at 1044. The court held that the expert report "did not provide insight into consumers' purchasing decisions," and in particular did not determine whether the statements influenced any consumers to purchase Monster energy drinks. Id. The court denied class certification, finding in part that the plaintiffs did not show "that there [was] a common answer to the question of whether a reasonable consumer would consider any of the challenged statements a material misrepresentation." Id. at 1048. The court found there were "significant individualized issues related to proof of reliance," and the plaintiffs could not maintain an action under Rule 23(b)(3). Id.

Similarly in In re ConAgra, the Court denied class certification under Rule 23(b)(3), finding that the plaintiffs "adduce[d] no survey evidence concerning the actual reaction of consumers to the [challenged] '100% Natural' label on [Defendant's oils] specifically or the presence of such labels of cooking oils more generally." 302 F.R.D. at 576-77. The court held that ConAgra's market research did "not link consumers' understanding of '100% Natural' to the specific issues raised in this case - i.e. whether consumers believe[d] the label means the product contains no genetically modified organisms or GMO ingredients." Id. at 579. The court denied class certification under Rule 23(b)(3), finding that the plaintiffs could not show that common questions predominated over individualized ones. Id.

While Plaintiff has presented no evidence in support of Rule 23(b)(3)'s predominance requirement, Defendant has presented evidence suggesting that consumers of Defendant's coconut oil products do not interpret the challenged statements to mean Defendant's coconut oil is healthy, or purchase the product because of the challenged label. Defendant presented a 2019 survey of 500 coconut oil purchasers to determine how and why consumers purchase coconut oil. (Opp'n. Ex. Q.) Sara Butler, Managing Director at NERA Economic Consulting[3], conducted a survey of 500 coconut oil purchasers to understand "how they learned about coconut oil and what features of the product or information may have influenced their decision to purchase this type of coconut oil." (Id. at 228.) Ms. Butler looked at 201 purchasers of Defendant's products, and 299 purchasers of other brands. (Id. at 229.) When those surveyed were asked why they purchased Defendant's coconut oil products, "only 16 of the 201 purchasers who purchased Defendant's product indicated that statements

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

related to MCTs, hydrogenation, or no trans fats were influential." (Id. at 232.) In fact, "62.2 percent [of purchasers of Defendant's coconut oil products] indicate[d] they have purchased the product for[ ]either skin or haircare uses and ... 11.9 percent ... have *only* purchased the product for skin or haircare use." (Id. at 231.) (emphasis added). This evidence rebuts any presumption that the challenged statements were material and that a significant portion of consumers relied on, and were likely to be deceived by, the challenged statements. While Plaintiff has not submitted any evidence suggesting that a reasonable consumer would read the challenged statements, determine that Defendant's products are healthy based on those challenged statements, and then purchase the product, Defendant has submitted persuasive evidence that consumers of Defendant's coconut oil typically do not read the label, conclude based on the challenged statements that Defendant's coconut oil is healthy, and then purchase Defendant's coconut oil based on that belief.

***7** Finally, while it may be true that consumers, as a matter of common sense, "rely on health-related claims on food products in making purchasing decisions," Plaintiff has presented no evidence to show that a reasonable consumer would look at the challenged statements and determine that these statements meant Defendant's coconut oil products are healthy, or otherwise rely in any way on these statements in deciding whether to purchase Defendant's coconut oil products. Plaintiff cites to an opinion on a motion to dismiss in Bruton v. Gerber Products Co. to support his argument that common sense about health-food related purchases is enough to establish that a reasonable consumer would have relied on the challenged claims. (Mot. 16.) However, at the class certification stage, the court in Bruton denied the plaintiff's motion for class certification in part because the plaintiff failed to establish predominance under Rule 23(b)(3). Bruton v. Gerber Products Co., 12CV02412 LHK, 2018 WL 1009257, at * (N.D. Cal. Feb. 13, 2018).

While Plaintiff alleges that the challenged statements were a substantial factor in his decision to purchase Defendant's coconut oil (Docket No. 36, Decl. of C. Shanks ISO Mot. ¶ 7) Plaintiff has not introduced any evidence to suggest that any other proposed class members similarly relied on, and were misled by, these statements. Thus, Plaintiff has failed to present any evidence to show that the challenged statements were a factor in a reasonable consumer's purchasing decisions. Plaintiff has not shown that a reasonable consumer would consider any of the challenged statements a material misrepresentation. Therefore, there are significant individualized issues related to proof of reliance, and Plaintiff cannot maintain a class action under Rule 23(b)(3).

2. "Unlawful" Misbranding

Plaintiff attempts to keep alive his UCL class certification claims by stating that liability under the UCL for "misbranding violations does 'no[t] require[ ] that the public be likely to experience deception,' " and that "using prohibited nutrient content claims is deceptive as a matter of law." (Mot. 18.) Plaintiff argues that the UCL's "unlawful" prong "borrows" predicate "legal violations [from California's Sherman Law] and treats them as independently actionable." (Id.) He alleges that liability under the UCL for misbranding violations does not require that the public is likely to experience deception, and that resolving these claims "requires only applying the regulations to the labels to determine their compliance." (Id.) Plaintiff argues that "the label is either illegal or it is not" and "that determination will apply to all Class Members the same." (Id.)

However, Plaintiff "cannot circumvent the reliance requirement by simply pointing to a regulation or code provision that was violated by the alleged misrepresentation, summarily claiming that the product is illegal to sell and therefore negate the need to plead reliance." Pratt v. Whole Foods Market California, Inc., 12CV05652, 2014 WL 1324288, at *8 (N.D. Cal. Mar. 31, 2014); see also Ebner v. Fresh, Inc., 838 F.3d 958, 967 (9th Cir. 2016) ("[L]abel-based claims ... under [California's Sherman Law] are governed by the reasonable consumer test.") In Pratt, the plaintiff made the same argument Plaintiff makes here -namely that "his [UCL] claims [were] not based on misrepresentation, rather on the illegality of the products themselves as their misbranding violate[d] the Sherman Law" and "therefore there [was] no need for Plaintiff to prove reliance." 2014 WL 1324288, at *8. The court held that "actual reliance must be pled in order to satisfy the requirements of the UCL." Id.

Even assuming a per se violation, Plaintiff still must be able to demonstrate "what portion of the sale price was attributable to the value consumers placed on the [challenged] statement[s]." Rahman v. Mott's LLP, 13CV03482, 2014 WL 6815779, at *8 (N.D. Cal. Dec. 3, 2014). Plaintiff has not met his burden of showing, by a preponderance of the evidence, what portion of the sale of Defendant's coconut oil products was attributable to the value consumers placed on the challenged statements,

because Plaintiff has not introduced any evidence that any consumer other than himself actually relied on the challenged statements and paid a premium for Defendant's products based on that reliance.

**Conclusion**

***8** For the foregoing reasons, the Court denies Plaintiff's Motion for Class Certification.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 4398506

Footnotes

1/ In his Complaint, Plaintiff alleges there were "false and misleading" statements on Defendant's website during some portion of the proposed class period. (See, e.g. Compl. ¶¶ 54-57.) Plaintiff does not address these allegations in his Motion, and therefore the Court does not address them here.

2/ Defendant also argues that Plaintiff is not an adequate class representative. Because the Court can conclusively decide class certification based on Rule 23(b)(3)'s predominance requirement, it does not address Defendant's adequacy argument.

3/ NERA Economic Consulting is a San Francisco based firm that provides expert statistical, survey, economic, and financial research analysis.

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7422683
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

Amy C. SMITH, Plaintiff,
v.
OLD DOMINION FREIGHT LINE, INC,
et al., Defendants.

CIVIL ACTION NO. 3:15-CV-560-CRS
|
Signed December 21, 2016
|
Filed 12/22/2016

**Attorneys and Law Firms**

Dennis E. Goldasich, Joseph A. Fulk, Joshua M. Vick, Justin C. Owen, Goldasich & Associates, LLC, Birmingham, AL, for Plaintiff.

Gene F. Zipperle, Jr., Rebecca L. Galloway, Ward Hocker & Thornton, PLLC, Louisville, KY, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Colin Lindsay, Magistrate Judge

***1** This matter is before the Court on Plaintiff's motion to exclude or limit the opinions of two of Defendants' rebuttal experts, William Smock and Lane VanIngen (DN 52). Defendants filed a response in opposition (DN 59) and Plaintiff filed a reply (DN 66). The motion is now ripe for review. For the following reasons, Plaintiffs' motion is **denied**.

**BACKGROUND**

Plaintiff asks the Court, pursuant to Rules 26(a)(2)(D)(ii) and 37(c)(1) of the Federal Rules of Civil Procedure, to exclude and/or limit the opinions of two rebuttal experts proffered by Defendants. Pursuant to a series of amended scheduling orders, the following deadlines applied to the parties' disclosures of expert opinions: (1) Plaintiff's expert witness deadline—May 18, 2016; (2) Defendants' expert witness deadline—June 20, 2016; and (3) both parties' rebuttal expert witness deadline—July 13, 2016. (DN 29, 34.) The parties appear to agree that Plaintiff served on Defendants four expert reports[1] on May 18, 2016, and that Defendants disclosed two expert witnesses[2] who jointly submitted one report on June 20, 2016. Then, on July 13, 2016, Plaintiff disclosed two rebuttal expert reports, authored by David Stopper and Nancy Grugle, two of the individuals who she identified in her initial expert disclosure. On the same date, Defendant identified five new individuals as rebuttal experts.[3] Plaintiff now contends that two of the purported rebuttal experts disclosed by Defendants, William Smock and Lane VanIngen, were in reality *new* expert witnesses offering *new* opinions, rather than opinions designed to rebut the expert reports proffered by Plaintiff. Defendants disagree, arguing that their rebuttal experts intended to—and did—rebut the expert opinions proffered by Plaintiff.

**DISCUSSION**

Rule 26(a)(2) of the Federal Rules of Civil Procedure sets forth certain parameters applicable to expert testimony. Absent a stipulation or court order to the contrary, disclosures of "evidence [ ] intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)[must be made] within 30 days of the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). In this case, it is undisputed that Defendants served Smock and VanIngen's reports in compliance with the Court's July 13, 2016 deadline for disclosure of rebuttal experts. The question before the Court is whether Smock and VanIngen's reports were within the permissible scope of rebuttal experts provided in the Rule—that is, whether they were "intended solely to contradict or rebut evidence on the same subject matter" identified by one or more expert witnesses disclosed by Plaintiff. Fed. R. Civ. P. 26(a)(2)(D)(ii).

***2** The parties state in their briefs that there is little case law from our district applying Rule 26(a)(2)(D)(ii). This

is true; however, after completion of the parties' briefing on the instant motion, Magistrate Judge Dave Whalin issued a memorandum opinion and order addressing a number of motions in limine, including arguments regarding rebuttal experts. Magistrate Judge Whalin's opinion is instructive with respect to both the permissible scope of rebuttal expert opinions and the analytical approach to questions involving Rule 26(a)(2)(D)(ii). *See Louisville Mktg. v. Jewelry Candles, LLC*, 2016 U.S. Dist. LEXIS 153328, *26-34, 2016 WL 6595094 (W.D. Ky. Nov. 4, 2016). In the *Jewelry Candles* case, Magistrate Judge Whalin considered whether a defense expert's second report was properly considered an initial report or a rebuttal report. The plaintiff argued that the report in question was should be classified as an initial report and that it should have an opportunity to rebut the opinion. The court examined the contents of the defense expert's report, as compared to the reports of three of plaintiff's experts to whom he purported to respond. *Id.* at *29. The court concluded that the defense expert's report "addresse[d] the same subject matter as [the plaintiff's experts]—namely, whether 'jewelry in candles' and 'jewelry candles' are generic terms," and that his report "provide[d] a counterpoint for [plaintiff's] expert reports indicating the terms and logos were generic." *Id.* at *31. The court went on to state that the defense expert's report exceeded the scope of "simply responding" to the plaintiff's experts, but it concluded that "any matters regarding the potentially excessive scope of his rebuttal testimony can be challenged through objections and rigorous cross-examination." *Id.* at *31-32; *see id.* at *32 (further finding that report identified three flaws in a third plaintiff's expert's report and refuted those points).

Looking beyond the Sixth Circuit, the Northern District of Illinois provided a helpful, albeit non-binding, discussion of the issue in *Green v. Kubota Tractor Corporation*, 2012 U.S. Dist. LEXIS 56770, 2012 WL 1416465 (N.D. Ill. Apr. 24, 2012). In *Green*, the defendant argued that a rebuttal expert identified by plaintiffs did not actually rebut defendant's experts, but rather, "merely covered the same subjects as plaintiffs' originally disclosed experts," and therefore, his opinions should have been disclosed at the time of plaintiffs' original expert opinions. *Id.* at *8-9. The court first described the opinions set forth in the purported rebuttal report and then examined it in light of the opinions offered by defendant's experts. The court found that the rebuttal expert's opinions were "specifically targeted at the expert evidence proffered by the defendants and ... either contradict[ed] or rebut[ted] that evidence." *Id.* at *13 (laying out differing opinions among the parties' experts regarding a certain type of technology used in lawn mowers).

Further, the *Green* court acknowledged that the rebuttal expert opinions "touch[ed] upon subjects previously addressed by" certain of plaintiffs' initially disclosed experts, but stated that "the mere fact that opinions offered in a rebuttal report touch upon the same subjects covered in an initial expert report [by the same party] does not require that the rebuttal reports be stricken." *Id.* at *13 (discussing *City of Gary v. Paul Shafer*, 2009 U.S. Dist. LEXIS 41004, 2009 WL 1370997 (N.D. Ind. May 13, 2009)). The court went on to decline to adopt a rule that would exclude a rebuttal opinion that could have been offered as part of the party's initial expert disclosures, as that "would open the doors to 'vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing relevant material.' " *Id.* at *17-18 (quoting *Shafer*, 2009 U.S. Dist. LEXIS 41004 at *5, 2009 WL 1370997).

Following the approaches employed in the cases discussed above, the Court will examine Smock's and VanIngen's purported rebuttal expert reports at issue in light of the Plaintiff expert reports that they purport to rebut: those of Marks and Stopper, respectively. While the motion, response, and reply all discuss the extent to which Smock and VanIngen rebut the expert reports of Marks and Stopper, respectively, the parties have not filed Marks and Stopper's reports as exhibits to their briefs. Fortunately, the two reports have been filed elsewhere in the record, so they are available for the Court's review. (*See* DN 96-8 (Stopper's expert report, exhibit to Plaintiff's response to DN 72); DN 98-5 (Marks's expert report, exhibit to Plaintiff's response to DN 73).)

**A. William Smock, M.S., M.D.**

***3** In his report, Smock sets forth an itemized list of the documents that he reviewed, and states that the "purpose of [his] review was to examine the medical issues and facts in order to develop opinions in this case." (DN 52-2 at 1-2.) As Plaintiff emphasizes, Smock makes only one direct reference to Marks, whose opinion Defendants argue Smock intends to rebut. Smock states as follows:

> I have reviewed the report of Dr. Marks and the information related to [Defendant Danny] Webb's medications and medical conditions. I strongly disagree with many of his opinions and speculative conclusions, as there is no foundation based upon the medical or forensic evidence in this case.

(*Id.* at 3.) However, the frequency with which Smock

mentions Marks's name, or whether he structures his opinion in the same way as Marks's opinion, is not determinative of whether Smock's opinion is deemed a rebuttal opinion for purposes of Rule 26. The question before the Court is whether Smock's opinion is "intended solely to contradict or rebut evidence on *the same subject matter* identified by" Marks. Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added).

Returning to Smock's report, after providing a narrative analysis, he offered five opinions regarding Webb's medical condition at the time of the motor vehicle accident underlying this case.

> 1. There is no medical or forensic evidence any of Mr. Webb's medical conditions played a role in or contributed to the incident on March 7th, 2015.
>
> 2. There is no medical or forensic evidence any of Mr. Webb's prescribed medications played a role in or contributed to the incident on March 7th, 2015.
>
> 3. There is forensic evidence Mr. Danny Webb was awake, alert and initiated evasive maneuvers, including steering inputs, reducing throttle input and the application of brakes, prior to the collision on I-71.
>
> 4. There is no medical evidence Mr. Danny Webb suffered from sleep apnea or that sleep apnea played any role in or contributed to the incident on March 7th, 2015.
>
> 5. There is no medical or forensic evidence, which indicates Mr. Danny Webb was physically or medically impaired on March 7th, 2015.

(DN 52-2 at 3-4.)

In comparison, after setting forth a narrative analysis of Webb's medical records in light of the motor vehicle accident, Marks provided the following conclusions:

> 1. Due to numerous existing medical conditions, Danny Webb was not fit to operate a commercial motor vehicle, such as the Old Dominion Freight Line tandem-trailer semi-truck that he was driving on March 7, 2015;
>
> 2. Danny Webb failed or refused to be completely forthcoming with and/or disclose in entirety all medical conditions known to him and existing to him at the time that he was interviewed by the medical examiner on January 12, 2015;
>
> 3. Danny Webb failed or refused to comply with and follow medical advice and instructions by his treating physicians regarding apneic episodes, sleep apnea, and the advice to receive treatment in a sleep clinic and/or sleep study, which he was known to exhibit prior to the fatal accident;
>
> 4. Danny Webb was consuming a significant number and amount of prescription medications which in combination probably adversely affected his driving abilities and contributed to the fatal accident;
>
> 5. Danny Webb's existing medical conditions and failures or refusals to timely and appropriately address those medical conditions prior to the collision rendered him unfit to operate a[ ] commercial motor vehicle at the time of the collision; and
>
> ***4** 6. Danny Webb's physically debilitated condition rendered him a danger to both himself and other drivers and passengers traveling on the roadway on March 7, 2015, when the fatal accident in question occurred.

(DN 98-5 at 8.)

Having carefully examined Smock's report and Marks's report, and particularly the conclusions that each draws, the Court finds that Smock's report addresses the same subject matter as Marks's report. Specifically, Smock disagrees with Marks's conclusions regarding whether Webb's medical conditions, including possible sleep apnea, and/or use of prescription medications, caused him to be impaired or unfit to operate the tractor-trailer, generally and on the night of the fatal accident. While Smock does not expressly analyze the medical records in reference to Marks's analysis, with the exception of his statement of "strong disagree[ment] with Marks" (DN 52-2 at 3), the Court finds that this does not preclude a conclusion that Smock's report is a proper rebuttal pursuant to Rule 26(a)(2)(D)(ii). It is clear to the Court that Smock addressed the same "subject matter" as Marks and that his analysis did not veer unnecessarily beyond the scope of Marks's report. If anything, it appears to the Court that *Marks's report*, not Smock's, is the broader one with respect to scope of analysis. Smock's report addresses some, but not all, of the areas of analysis in Marks's report. For example, Marks discussed Webb's "advanced age" and its possible impact on his driving (*see* DN 98-5 at 6); Smock did not expressly discuss Webb's age. Based on the foregoing, Plaintiff's motion is denied insofar as it seeks exclusion or limitation of Smock's report.

**B. Lane VanIngen**

VanIngen offered six "conclusions" in her report to Defendants. These conclusions are set forth below.

> 1. Old Dominion and Webb were subject to the Federal Motor Carrier Safety Regulations ("FMCSR") on March 27 [sic], 2015, the date of the subject accident.
>
> 2. Old Dominion has demonstrated safety management controls that meet the prescribed FMCSA Safety Fitness Standard outlined in 49 CFR Part 385.
>
> 3. Old Dominion has historically operated at a level of highway safety significantly higher than that of the U.S. motor carrier population as a whole.
>
> 4. Webb was fully qualified to operate a CMV on the date of the accident that is the basis for this case.
>
> 5. The evidence in this case indicates that Webb was not talking on his cell phone on the day of the subject accident in a way that violated FMCSR provisions.
>
> 6. The report issued by Stopper dated May 16, 2016 contains positions and compliance determinations that are inconsistent and inaccurate when compared to the applicable safety regulations.

(DN 52-5 at 5-10.) Plaintiff contends that with the exception of the sixth and final conclusion, VanIngen's conclusions do not rebut Stopper's expert report, and therefore, VanIngen's report should be excluded.

Unlike the other three experts discussed herein, Stopper did not close his report with enumerated conclusions. Rather, he provided a lengthy analysis (over 40 pages long) of the fatal accident and closed with a summary of his opinions. While the structural differences between an enumerated list of conclusions and a narrative summary make for an imperfect comparison, both show the expert's conclusions in his or her own words. Stopper's summary is excerpted below:

> ***5** Drivers of CMVs are considered to be operating in their capacity as professional drivers and are held to a higher standard of care than other motorists pursuant to interpretations by the U.S. Department of Transportation. The Federal Highway Administration, Office of Motor Carrier Standards, published language in this regard[ ] pursuant to the February 8, 1991 Interpretations of 49 CFR Part 383:
>
> > ***"Because of the greater potential for loss of life, serious injury, and significant property damage in accident involving CMV's, the FHWA's regulations (in 49 CR Part 383) hold drivers of these vehicles to a higher standard of conduct than other highway users."***
>
> Mr. Webb testified that he observed brake lights and the vehicle stopped in the lane ahead as he crossed the hillcrest. That distance is found to be approximately ¼ mile (1300-1400 feet) from the point of impact. Although the evidence indicates Mr. Webb made some brake application as he approached the stopped vehicles he had more than adequate time and distance to bring his vehicle to a full and complete stop well before impact. Scene photographs show the approach to the collision site was free of snow and ice and the surface appeared to be dry. Friction tests performed by the Oldham County Investigators indicated a good surface friction level and made no note of icy conditions, which would have prevented Mr. Webb from bringing his vehicle to a stop before impact.
>
> Mr. Webb's failure to apply the most basic required knowledge and skill as instructed in the Commercial Driver's License manual as demonstrated by his failure to "See" and properly respond to other vehicles on the roadway that were a conflict, his failure to manage space around his vehicle and his failure to reduce his speed and respond to slowing traffic indicates a significant distracted driver and callous indifference to this higher standard and to the safety of other motorists with whom he shares the road.
>
> A preventable accident is defined pursuant to ***49 CFR § 385.3*** as:
>
> > ***Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver.***
>
> The motor carrier was responsible for ensuring the safe operation of its driver and the equipment operating under its authority. This included providing driver training and reinforcing the required skills and knowledge that would include the critical problems related to distracted driving especially with the use of cellular phones. While Mr. Webb described utilizing a hands-free cell phone device, which is permitted under the Federal Motor Carrier Safety Regulations, the motor carrier must ensure its drivers understand the potential dangers involved with distracted driving.
>
> I found no indications Carl A. Winner, Jr., or his Jaro Transportation Services, Inc. truck tractor semi-trailer,

> contributed to this fatal collision. Mr. Winner was at a full stop, when Mr. Webb, operating his Old Dominion truck tractor, semi-trailer & full trailer, collided with the stopped Subaru operated by Mr. Smith.

(DN 98-2 at 43-44 (emphasis in original).)

Again, having reviewed each expert's report and considered the parties' arguments, the Court finds that VanIngen's report is within the bounds of a rebuttal expert opinion pursuant to Rule 26(a)(2)(D)(ii). The Court disagrees with Plaintiff's statement that VanIngen's report is "in actuality, overwhelmingly [an] initial expert report[ ]" which Defendants seek to use in order "to backdoor initial expert testimony [and] opinions" after their initial expert deadline passed. (DN 52 at 8.) Plaintiff attempts to hold Defendants to a nearly impossible task—to respond precisely to the opinions expressed by Plaintiff's experts and to stop short of providing any additional information. It should be obvious that if one of Defendants' experts disagrees with the opinions set forth by one of Plaintiff's experts, then he or she will preface the rebuttal report with background information and subsequently provide analysis and conclusions that differ from those proffered by Plaintiff's expert. This is appropriate in light of Rule 26, so long as the rebuttal expert's opinion is confined to the same "subject matter" as the opposing expert. Rule 26(a)(2)(D)(ii). Looking to Stopper and VanIngen's reports, both focus on the federal highway safety regulations, their application to Old Dominion and Webb, and Old Dominion and Webb's compliance or noncompliance therewith.

***6** The sole aspect of VanIngen's list of conclusions with which the Court takes issue is her statement regarding Old Dominion's historical record of "operat[ing] at a level of highway safety significantly higher than that of the U.S. motor carrier population as a whole." (DN 52-5 at 6.) This goes beyond the scope of Stopper's commentary on Old Dominion, which the Court interprets as being confined to the crash underlying this action. With that said, the conclusion is still closely related to the subject matter of Stopper's report, and, as Magistrate Judge Whalin reasoned in *Jewelry Candles*, "any matters regarding the potentially excessive scope of [VanIngen's] rebuttal testimony can be challenged through objections and rigorous cross-examination." *Jewelry Candles*, 2016 U.S. Dist. LEXIS 153328 at *31-32, 2016 WL 6595094.

Based on the foregoing, the Court concludes that Plaintiffs motion is denied as it relates to VanIngen's rebuttal opinion.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs motion to exclude and/or limit the opinions of Defendants' rebuttal experts (DN 52) is **DENIED**.

### All Citations

Not Reported in Fed. Supp., 2016 WL 7422683

Footnotes

1 The expert reports were as follows, as described by Plaintiff: (1) David Stopper (forensic reconstruction and investigations, traffic safety, commercial motor vehicle operations and motor carrier safety regulations); (2) Sara Ford, MRC/Linda Jones, MRC, MBA, MPA, CRC (vocational and economic assessment, wage loss/loss of earnings); (3) Nancy Grugle, Ph.D. (human factors analysis); and (4) Donald Marks, M.D., Ph.D. (internal medicine, medication adverse effects, driver health impacts). (DN 52 at 2.)

2 Robert Bortolin, B.A.Sc., P. Eng., and James Hrycay, M.A.Sc., P. Eng., both of whose reporting areas Defendants described as "engineering investigation and analysis of the motor vehicle accident." (DN 52 at 2.)

3 (1) William Smock, M.S., M.D. (medical issues and driver medical examinations); (2) Lane VanIngen (FMCSR/FMCSA regulations and driver safety); (3) Alison Smiley, Ph.D., CCPE (human factors analysis); (4) Howard Caston, Ph.D. (loss of earnings capacity/vocational expert); and (5) Frank Slesnick, Ph.D. (calculation of lost earnings). (DN 52 at 3.)

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 264701
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

SUMOTEXT CORP., Plaintiff,
v.
ZOOVE, INC., dba StarStar Mobile; Virtual Hold Technology, LLC; Starsteve, LLC; and VHT StarStar LLC, Defendants.

Case No. 16-cv-01370-BLF
|
Signed 01/02/2020
|
Filed 01/17/2020

**Attorneys and Law Firms**

David Wayne Kesselman, Trevor Vincent Stockinger, Kesselman Brantly Stockinger LLP, Manhattan Beach, CA, Jeffrey M. Swann, Pro Hac Vice, Julie DeWoody Greathouse, M. Christine Dillard, Pro Hac Vice, Ppgmr Law, PLLC, Little Rock, AR, for Plaintiff.

Robert Bernard Pringle, Winston & Strawn LLP, David Spencer Bloch, Jie Li, Michael Ross Hogue, Greenberg Traurig, LLP, San Francisco, CA, Brandon W. Duke, Pro Hac Vice, Merritt Diane Westcott, Winston and Strawn LLP, Houston, TX, Kathleen Y. Kim, Lauren E. Duxstad, Pro Hac Vice, Winston & Strawn LLP, New York, NY, Kyle Lee Flynn, Pro Hac Vice, Greenberg Traurig, LLP, Chicago, IL, Noorossadat Torabi, Pooya Shoghi, Pro Hac Vice, Winston & Strawn LLP, Menlo Park, CA, for Defendant Zoove, Inc.

Robert Bernard Pringle, Winston & Strawn LLP, David Spencer Bloch, Jie Li, Michael Ross Hogue, Greenberg Traurig, LLP, San Francisco, CA, Brandon W. Duke, Pro Hac Vice, Merritt Diane Westcott, Pro Hac Vice, Winston and Strawn LLP, Houston, TX, Kathleen Y. Kim, Lauren E. Duxstad, Pro Hac Vice, Winston & Strawn LLP, New York, NY, Kyle Lee Flynn, Pro Hac Vice, Greenberg Traurig, LLP, Chicago, IL, Noorossadat Torabi, Pooya Shoghi, Pro Hac Vice, Winston & Strawn LLP, Menlo Park, CA, for Defendant Virtual Hold Technology, LLC.

Brady James Cobb, Pro Hac Vice, Cobb Eddy Mijares, PLLC, Fort Lauderdale, FL, Noorossadat Torabi, Winston & Strawn LLP, Menlo Park, CA, Thomas N. FitzGibbon, Apex Law, APC, Santa Monica, CA, for Defendant Starsteve, LLC.

Douglas Richard Kertscher, Hill, Kertscher & Wharton, Atlanta, GA, Noorossadat Torabi, Winston & Strawn LLP, Menlo Park, CA, Steven Michael Berki, Corey, Luzaich, de Ghetaldi & Riddle LLP, Millbrae, CA, for Defendant mBlox, Inc.

David Spencer Bloch, Jie Li, Michael Ross Hogue, Greenberg Traurig, LLP, Robert Bernard Pringle, Winston & Strawn LLP, San Francisco, CA, Kathleen Y. Kim, Lauren E. Duxstad, Pro Hac Vice, Winston & Strawn LLP, New York, NY, Kyle Lee Flynn, Greenberg Traurig, LLP, Chicago, IL, Noorossadat Torabi, Winston & Strawn LLP, Menlo Park, CA, for Defendant VHT StarStar LLC.

**ORDER DENYING PLAINTIFF'S *DAUBERT* MOTIONS RE DEFENSE EXPERTS DR. DEBRA ARON AND GREG J. REGAN**

[Re: ECF 339-4, 347-4]

BETH LABSON FREEMAN, United States District Judge

***1** Jury selection in this antitrust case is scheduled to commence on February 21, 2020. In preparation for trial, Plaintiff Sumotext Corporation has filed *Daubert* motions with respect to certain opinions offered by Dr. Debra Aron and Greg J. Regan, experts retained by Defendants Zoove, Inc., Virtual Hold Technology, LLC, and VHT StarStar LLC ("Defendants").[1] Following completion of the briefing, the Court vacated the December 12, 2019 hearing and took the motions under submission without oral argument.

The motions are DENIED for the reasons discussed below.

**I. LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The Supreme Court discussed four factors that may be used to determine reliability: (1) whether the theory or technique used by the expert "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether there is "general acceptance" of the theory or technique in the "relevant scientific community." *Id.* at 593-94; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (reciting factors).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. The Supreme Court also made clear that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

The Ninth Circuit has emphasized that "[u]nder *Daubert*, the district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation marks and citation omitted). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* at 565. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564.

**II. DISCUSSION**

***2** Dr. Debra Aron is an antitrust expert retained by Defendants to respond to the opinions of Sumotext's antitrust expert, Dr. Ryan Sullivan. Dr. Aron received a Ph.D. in economics from the University of Chicago in 1985, with honors. Aron Report ¶ 3, Exh. 1 to Kesselman Decl. She is a vice president at Charles Rivers Associates, an international economics and finance consulting firm that provides economic expertise for litigation, regulatory proceedings, policy debates, and business strategy. *Id.* ¶ 2.

Greg J. Regan is a damages expert retained by Defendants to respond to the opinions of Sumotext's damages expert, Dr. Alan G. Goedde. Mr. Regan is a certified public accountant, licensed in California and New York. Regan Report ¶ 8, Exh. 2 to Stockinger Decl. He has worked as an auditor at Ernst & Young LLP, as the controller of a publicly traded company, and as a consultant. *Id.* ¶ 9. Mr. Regan has worked on many complex litigation matters, analyzing lost business value, lost profits, and other forms of economic damage involving entities in the tech industry, retail, health care, and real estate. *Id.*

Sumotext does not challenge these experts as unqualified to give their respective opinions, and the Court finds that Dr. Aron and Mr. Regan are qualified in their respective fields. Sumotext challenges certain of these rebuttal experts' opinions as lacking in foundation and/or based on unsound methodology. The Court notes that Sumotext's challenges are not framed in terms of the four factors discussed in *Daubert*. However, it does not appear that the *Daubert* factors would be a particularly good fit in this case, given the nature of the opinions offered by Dr. Aron and Mr. Regan. The Court therefore conducts the flexible inquiry mandated under *Daubert* and its progeny by determining whether Sumotext's asserted bases for exclusion are sufficient to show that challenged opinions fail to meet the threshold established by Rule 702.

**A. Motion to Exclude Certain Opinions of Dr. Debra Aron**

Sumotext objects to two aspects of Dr. Aron's opinions. First, Sumotext argues that Dr. Aron opines on the scope of the relevant markets in this case but has not performed the necessary foundational market analysis to offer such opinions. Second, Sumotext argues that Dr. Aron's opinions regarding application of the "single monopoly profit" theory must be excluded, on the basis that Dr. Aron has not undertaken a market analysis and or defined a relevant market. In response, Defendants argue that Dr. Aron appropriately criticizes the market definitions offered by Sumotext's expert, Dr. Sullivan, and that Dr. Aron – a rebuttal expert – need not offer her own market definitions in order to offer such criticism. Defendants also argue that Dr. Aron properly applies the single

monopoly profit critique to Dr. Sullivan's market definition, and that she need not offer her own market definition to do so.

**1. Dr. Aron's Criticisms of Dr. Sullivan's Market Definitions**

Sumotext's antitrust expert, Dr. Sullivan, opines that there are two relevant markets in this case: the market for leasing StarStar numbers in the United States, and the market for servicing StarStar numbers in the United States. *See* Pl.'s Motion at p.3 n.1, ECF 347-4; Aron Report ¶¶ 12, 43, Exh. 1 to Kesselman Decl. Dr. Aron criticizes Dr. Sullivan's market definitions, stating that "[h]e not only failed to demonstrate the existence of a distinct market for StarStar numbers; he also failed to provide any fact-based economic analysis that could demonstrate the existence of such a market." Aron Report ¶ 1, Exh. 1 to Kesselman Decl. Sumotext contends that Dr. Aron not only criticizes Dr. Sullivan's market definitions but also offers her own affirmative market definitions without laying a foundation for doing so. In response, Defendants argue that Dr. Aron's criticisms of Dr. Sullivan's market definitions constitute proper rebuttal opinions. The Court agrees with Defendants for the reasons discussed below.

***3** In her report, Dr. Aron cites a number of sources, including deposition testimony and industry publications, indicating that StarStar number technology is one of several direct marketing channels that marketers can use to reach potential consumers. Aron Report ¶¶ 13-15, 27-35, Exh. 1 to Kesselman Decl. She observes that the record evidence shows that direct marketing channels available to advertisers include toll-free phone numbers, vanity 10-digit phone numbers, mobile short codes, text messages, Quick Response ("QR") codes, and search engine optimization ("SEO"). *Id.* Dr. Aron opines that "[a]s an economic matter, the goals and perceived strengths and weaknesses of each marketing tool (including the return on investment perceived by the marketer) would determine the extent to which marketers may treat each as a suitable economic substitute for other means to reach their targeted audience." *Id.* ¶ 31.

Dr. Aron opines that Dr. Sullivan has not given adequate consideration to each identified direct marketing channels as a suitable economic substitute for StarStar numbers, and has not utilized any valid methodology in excluding all such channels from the relevant markets. Aron Report ¶ 12.G, Exh. 1 to Kesselman Decl. Specifically, Dr. Aron states that Dr. Sullivan "has provided no economic evidence that StarStar numbers constitute an antitrust market or that other forms of Call to Action marketing such as 1-800 numbers, texts, and emails are not adequate substitutes in the eyes of customers." *Id.* Dr. Aron suggests that Dr. Sullivan based his market definitions on the deposition testimony of Tim Miller, Sumotext's President and CEO, rather than conducting a valid or accepted economic analysis of the market. *Id.* ¶ 12.A.

A defendant may present expert rebuttal of the plaintiff's expert "by putting forth its own expert who either claims that (1) the plaintiff's expert's methodology was conducted improperly in some way; or (2) the ultimate conclusion the plaintiff's expert makes is flawed because a superior methodology provides a different result." *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. CV 15-02370 JVS, 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016). Dr. Aron's opinions fall into the first category, as she identifies numerous potential substitutes for StarStar numbers based on record evidence, and concludes that Dr. Sullivan has not used any legitimate methodology to exclude those potential substitutes from his market definitions.

Sumotext argues that Dr. Aron goes beyond criticizing Dr. Sullivan's methodology and offers affirmative opinions regarding the scope of the relevant markets and what products constitute substitutes for StarStar numbers. Sumotext contends that Dr. Aron cannot opine on the latter topics without conducting an independent market analysis, citing numerous cases discussing the required foundation for expert testimony. *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002). At her deposition, Dr. Aron testified expressly that she was not asked to perform an independent market analysis or to define the relevant markets in this case, and that she did not engage in either task. *See* Aron Dep. 36:9-38:20, Exh. 3 to Kesselman Decl. After reviewing Dr. Aron's report, the Court concludes that she does not offer her own market definitions or opine as to which products constitute adequate substitutes for StarStar numbers; instead, Dr. Aron challenges Dr. Sullivan's methodology in excluding all potential substitutes from *his* market definitions. Dr. Aron is qualified to challenge Dr. Sullivan's methodology in this manner, and such challenge constitutes proper rebuttal opinion. Sumotext has offered no authority for the proposition that Dr. Aron must offer her own market definitions in order to criticize Dr. Sullivan's market definitions.

***4** Sumotext identifies several statements in Dr. Aron's report that could be construed as affirmative statements regarding the scope of the relevant markets or the suitability of certain products as substitutes for StarStar numbers. For example, Sumotext points to Dr. Aron's statement that "[t]he evidence I discuss below indicates that the relevant market is much larger than StarStar numbers and StarStar services and includes a much broader set of consumer engagement products." Aron Report ¶ 145, Exh. 1 to Kesselman Decl. Read in context, however, the identified statements do not appear to be independent determinations regarding the scope of the relevant markets, but merely part of Dr. Aron's commentary on asserted deficiencies in Dr. Sullivan's opinions. For example, immediately after the language quoted above, Dr. Aron points to evidence that a decrease in the price of StarStar numbers did not result in increased demand, and opines that "[i]f StarStar numbers constituted a market, a decrease in price would result in an increase in sales of the product." *Id.* ¶¶ 145-47. Highlighting Dr. Sullivan's failure to address this and other record evidence is proper rebuttal. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018) (internal quotation marks and citation omitted). Dr. Aron's opinions do just that. To the extent Dr. Aron offers affirmative market definitions at trial, Sumotext may raise an appropriate objection based on Dr. Aron's testimony that she did not conduct an independent market analysis or to define the relevant markets.

In its reply brief, Sumotext argues that Defendants' opposition inappropriately attacks Dr. Sullivan's report as unreliable and factually unsupported. Sumotext correctly points out that Defendants have not filed a *Daubert* motion with respect to Dr. Sullivan, and that an opposition brief is not a proper vehicle to do so. The Court has disregarded Defendants' attacks on Dr. Sullivan arguments except as relevant to the reliability and admissibility of Dr. Aron's opinions. As stated above, the Court finds Dr. Aron's criticisms of Dr. Sullivan's report to be appropriate expert rebuttal. To the extent Sumotext believes Dr. Aron has mischaracterized Dr. Sullivan's report, that argument goes to the weight of Dr. Aron's opinions and not their admissibility. *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2011 WL 8601203, at *8 (N.D. Cal. Dec. 7, 2011) ("Whether Bashline's analysis and conclusions misrepresent or mischaracterize the Cripe and Rubinfeld Reports goes to the weight of his testimony rather than its admissibility.").

Accordingly, the Court DENIES Sumotext's motion to exclude Dr. Aron's opinions regarding Dr. Sullivan's market definitions.

### 2. Dr. Aron's Single Monopoly Profit Critique

Dr. Aron concludes that if Dr. Sullivan's market definitions are accepted, then Dr. Sullivan's opinion that Defendants excluded Sumotext as a reseller is internally inconsistent under the "single monopoly profit" principle of economics. *See* Aron Report ¶ 12.E., Exh. 1 to Kesselman Decl. Dr. Aron explains that principle in her report as follows:

> Economics teaches that even if VHT**/SSM were a monopolist as Dr. Sullivan opines, a monopolist has no short-run or long-run incentive to exclude efficient resellers, dealers, and retailers from the market. This is because an upstream monopolist can extract all of the monopoly profits available without controlling the retailing function, and would only seek to control the retailing function if it were a more efficient retailer than existing retailers. An upstream monopolist has no incentive to attempt to "leverage" or extend its upstream monopoly into downstream sales because there are no additional profits to be had; on the contrary, if the downstream dealers or resellers were more efficient at selling, the upstream monopolist would earn more profits by encouraging resellers and dealers. The upstream monopoly would have an incentive to operate the retailing function itself only if it were more efficient at doing so (because it could share in the efficiency gains), and operating the downstream function itself would not harm, and may rather benefit, consumers. This economic principle is known as the "single monopoly profit" critique.

*Id.* ¶ 104 (footnotes excluded), Exh. 1 to Kesselman Decl.

Sumotext argues that Dr. Aron may not offer testimony based on a theory that requires analysis of conduct in two defined markets when she has not defined a relevant market or undertaken a market analysis. That argument is not well-taken. Dr. Aron offers the "single monopoly profit" critique to show that if Dr. Sullivan's market definitions are accepted, his report is internally inconsistent. Dr. Aron need not establish that Dr. Sullivan's market definitions are correct – in fact she has sought to establish just the opposite – in order to argue that *if* they are correct then Dr. Sullivan's report is flawed under a particular economic principle.

***5** Sumotext also argues that to the extent Dr. Aron opines that upstream monopolists cannot be liable for antitrust violations arising from refusal to deal with downstream resellers, Dr. Aron's opinion is contrary to Supreme Court precedent. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). Sumotext's argument is inapposite, as Dr. Aron does not opine that the "single monopoly profit" principle renders upstream monopolists immune from antitrust liability. Dr. Aron merely opines that if Dr. Sullivan's market definitions are accepted, then his report is internally inconsistent.

Finally, Sumotext cites economic literature for the proposition that the "single monopoly profit" theory has been discredited, and it argues that Dr. Aron's opinions based on the theory therefore should be excluded. In response, Defendants cite other economic literature and case law recognizing the validity of the "single monopoly profit" theory. Sumotext has not provided the Court with an adequate basis to determine that the "single monopoly profit" theory has been uniformly rejected in the field of economics such that Dr. Aron's application of the theory is inherently unreliable. Where, as here, two qualified economists espouse conflicting views about the effect of a particular economic principle on the case, a "battle of the experts" arises. The proper course is to allow each side to attack the other's with contrary expert opinion, other contrary evidence, and cross-examination. *See Primiano*, 598 F.3d at 564-65. Dr. Sullivan in fact takes on Dr. Aron's application of the "single monopoly profit" principle in his reply report, asserting that Dr. Aron's approach is erroneous. Sullivan Reply Report ¶¶ 32-37, Exh. 2 to Kesselman Decl. It will be up to the jury to decide which expert to believe.

The Court DENIES Sumotext's motion to exclude Dr. Aron's opinions regarding the "single monopoly profit" principle.

**B. Motion to Exclude Certain Opinions of Greg J. Regan**

Sumotext challenges two aspects of the opinions offered by Defendants' rebuttal damages expert, Greg J. Regan. First, Sumotext seeks to exclude Mr. Regan's opinion that Sumotext's lost profits, if any, total approximately $1.1 million rather than the $9.2 million calculated by Sumotext's damages expert, Dr. Alan G. Goedde. Second, Sumotext seeks to exclude Mr. Regan's opinions regarding Sumotext's lease cancellations. Sumotext asserts that these opinions are based on unreliable and inconsistent methodology. In response, Defendants argue that Mr. Regan's opinions are based on sound methodology and are admissible.

**1. Mr. Regan's Damages Calculation**

Sumotext's damages expert, Dr. Goedde, opines that the present value of Sumotext's lost profits resulting from Defendants' alleged anticompetitive conduct totals $9,223,500. Goedde Report ¶ 44, Exh. 1 to Stockinger Decl. Mr. Regan criticizes Dr. Goedde's methodology on a number of grounds, including Dr. Goedde's asserted failure to adequately account for the impact of lease cancellation by Sumotext's customers, overstatement of projected growth rate, dismissal of the Verizon VoLTE issue, and failure to account for all of Sumotext's variable costs. Regan Report ¶¶ 46-56, 73-77, 89-92, 93-96, Exh. 2 to Stockinger Decl. Mr. Regan provides an alternative calculation of $1,105,200 for the present value of Sumotext's lost profits, if any, resulting from Defendants' alleged anticompetitive conduct. Regan Report ¶¶ 115, 128-33 & Sched. 3. Sumotext moves to exclude Mr. Regan's alternative damages model and damages calculation.

***6** As noted above, a defendant may present expert rebuttal of the plaintiff's expert by putting forth its own expert who either (1) challenges the methodology of the plaintiff's expert, or (2) claims that the ultimate conclusion reached by the plaintiff's expert is flawed because a superior methodology provides a different result. *See TCL Commc'ns Tech. Holdings Ltd.*, 2016 WL 7042085, at *5. Mr. Regan's opinions satisfy both categories, as he challenges Dr. Goedde's methodology and offers a different damages calculation based on what he claims is superior methodology.

Sumotext argues that Mr. Regan's alternative damages model is unreliable because it is dependent on a 75% lease cancellation rate that Sumotext contends is unsupported by the record and based solely on Mr. Regan's *ipse dixit.*[2] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (internal quotation mark and citation omitted). However, as discussed below, the Court finds that Mr. Regan adequately explains how he arrived at the 75% lease cancellation rate and used the rate in his damages calculation.

Mr. Regan observes that Sumotext's StarStar leases typically were for a fixed initial term such as three months, with the leases thereafter renewing on a month-to-month basis. Regan Report ¶ 48, Exh. 2 to Stockinger Decl. Sumotext experienced significant lease cancellations over the period it operated its StarStar business. *Id.* ¶¶ 49-52. Mr. Regan calculated that the average duration of Sumotext's leases at the time of cancellation was 6.4 months. *Id.* ¶ 62. Based on leases in service as of September 15, 2015, which was 6.4 months prior to the termination of all of Sumotext's StarStar numbers, Mr. Regan calculated that Sumotext had a lease cancellation rate of 82%. *Id.* ¶ 65. Mr. Regan did not include leases commencing after September 15, 2015 when calculating Sumotext's cancellation rate, because in his opinion those leases had not been in service long enough for complete cancellation data to emerge. *Id.* ¶ 67. Mr. Regan also determined the average duration of StarStar Mobile's leases and StarStar Mobile's cancellation rate based on leases commencing after January 2016. *Id.* ¶ 64. Mr. Regan found that the average duration of StarStar Mobile's leases at the time of cancellation was 8 months and that StarStar Mobile's lease cancellation rate was 67%. *Id.*

Mr. Regan used these lease cancellation rates in his lost profits calculation as follows. First, he calculated Sumotext's gross revenue based on its active StarStar leases as of December 31, 2015. Regan Report ¶ 128, Exh. 2 to Stockinger Decl. Mr. Regan then calculated Sumotext's future gross revenue based on growth rates identified and explained in his report. *Id.* ¶¶ 128-29. However, those calculations did not take into account the impact of lease cancellation. *Id.* ¶ 130. As noted above, Mr. Regan determined that Sumotext's lease cancellation rate was 82%. However, he applied a lower cancellation rate of 75% for purposes of his analysis. *Id.* Mr. Regan stated in his report that "[t]his reduced cancellation rate considers the cancellation experience of StarStar Mobile (*i.e.*, approximately 67%)." *Id.* Applying the 75% cancellation rate and deducting operating costs, Mr. Regan concludes that the present value of Sumotext's lost profits, if any, total $1,105,200. Regan Report Schedule 3.

***7** Sumotext contends that Mr. Regan's explanation of why he applied a 75% cancellation rate is inadequate, and it asserts that Mr. Regan conceded in his deposition that the 75% rate is based solely on his *ipse dixit* judgment. Sumotext mischaracterizes Mr. Regan's testimony. Mr. Regan testified that although he could have used the 82% cancellation rate he had determined for Sumotext, he made a judgment that cancellation rates might decline somewhat over time and thus that a lower rate of 75% was more appropriate. Regan Dep. 131:17-25, Exh. 4 to Stockinger Decl. Mr. Regan's judgment was based in part on StarStar Mobile's 67% cancellation rate. *Id.* Mr. Regan also considered the abatement of the Verizon VoLTE issue and he anticipated that Sumotext might get better at avoiding cancellations as it gained experience in the business. Regan Dep. 132:3-9, Exh. A to Bloch Decl. Based on all of those factors, Mr. Regan decided to apply a more conservative cancellation rate of 75% rather than the rate of 82%. Regan Dep. 132:9-17. Mr. Regan's downward adjustment of Sumotext's actual 82% cancellation rate to an estimated 75% cancellation rate, based on his professional judgment that the factors identified above might cause a decline in cancellation rates over time, is an appropriate exercise of his expertise that meets the threshold of Rule 702. *See* Fed. Judicial Ctr. Reference Guide on Estimation of Economic Damages 432-33 (3d Ed. 2011), 2011 WL 7724259, *4 ("Relatively few economists serving as damages experts succumb to Daubert challenges, because most damages analyses operate in the familiar territory of measuring economic values using a combination of professional judgment and standard tools.").

The Court DENIES Sumotext's motion to exclude Mr. Regan's damages model and lost profits calculation on the ground that the 75% lease cancellation rate is based solely on *ipse dixit.*

**2. Mr. Regan's Opinions Re Sumotext's Lease Cancellations**

In addition to challenging the 75% estimated lease cancellation rate used by Mr. Regan, Sumotext also challenges the actual 82% lease cancellation that was Mr. Regan's starting point.

First Sumotext contends that the 82% cancellation rate is inflated by inclusion of leases cancelled on March 31, 2016 – the effective date of Defendants' termination of Sumotext – as a result of Defendants' anticompetitive conduct. Sumotext argues that it is improper to calculate lost profits based on data affected by Defendants' alleged anticompetitive conduct, because "[a] plaintiff's antitrust damages are to be calculated by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) (internal quotation marks and citation omitted).

Mr. Regan expressly recognized in his deposition testimony that his goal was to determine what Sumotext's baseline performance was prior to the alleged bad acts, and to use that baseline to estimate Sumotext's hypothetical performance had the bad acts not occurred. Regan Dep. 32:17-6, Exh. A to Bloch Decl. Mr. Regan acknowledged that in determining the 82% lease cancellation rate, he considered leases that were cancelled on March 31, 2016. *Id.* 150:16-25. He explained that he did so to increase his data pool. *Id.* More specifically, the leases terminated on March 31, 2016 generally were cancelled more quickly than other leases, and thus including those leases brought down the average months to termination figure, which enabled a deeper pool of leases to be analyzed. *Id.* Mr. Regan confirms the 82% cancellation rate by looking at other data, such as how many of Sumotext's StarStar numbers leased in 2012 were still leased in 2015. Regan Report ¶¶ 49-50, Exh. 2 to Stockinger Decl. That data shows a cancellation rate of 80%. *Id.* Mr. Regan also analyzes data on usage of StarStar numbers and concludes that there is a strong correlation between low or declining call volume and cancellation. *Id.* ¶¶ 56-61. Mr. Regan indicates that most of leases cancelled on March 31, 2016 had low call volume and therefore likely would have been cancelled in any event. *Id.* ¶¶ 67-70. Mr. Regan looks to the call usage activity as a cross-check for his lease cancellation rate and concludes that Defendants' alleged bad acts did not affect the analysis. Regan Dep. 165:17-167:1, Exh. A to Bloch Decl.

Based on the foregoing, the Court is satisfied that Mr. Regan has articulated a reasonable methodology grounded in the record evidence which is sufficient to satisfy the threshold of Rule 702. Sumotext's assertions that the methodology of its expert is superior, or that Mr. Regan's 82% lease cancellation rate is inaccurate, may be addressed at trial through presentation of Dr. Goedde's testimony and cross-examination of Mr. Regan.

***8** Sumotext argues that Mr. Regan acted inconsistently by excluding all Sumotext leases in effect for less than 6.4 months when calculating the lease cancellation rate, but applying the cancellation rate to new leases on a trailing 6.0 month basis. Sumotext argues that had Mr. Regan used a 6.0 month term for the average lease duration, the cancellation rate would have been 41% - half of the 82% rate he reached. Mr. Regan explains the basis for his determination that the average duration of Sumotext's leases at the time of cancellation was 6.4 months. Regan Report ¶ 62, Exh. 2 to Stockinger Decl. Using the 6.4 figure, Mr. Regan calculates a lease cancellation rate of 82%. It is not apparent that use of the 6.4 month average lease duration figure in calculating the lease cancellation rate is inconsistent with Mr. Regan's subsequent application of the reduced lease cancellation rate of 75% "on a trailing two quarter basis" as disclosed in the portions of Mr. Regan's testimony cited by Sumotext. Regan Dep. 127:14-20, Exh. 4 to Stockinger Decl. Even if there were an inconsistency in the manner in which Mr. Regan applies the lease cancellation rate, that inconsistency would not dictate reduction of the average lease duration from 6.4 months to 6.0 months or render unreliable Mr. Regan's calculation of the lease cancellation rate. Sumotext is free to challenge Mr. Regan's calculations regarding average lease duration, lease cancellation rate, or any other of his results at trial through presentation of competing expert opinion or cross-examination. However, Sumotext has failed to establish that the asserted inconsistency described above renders Mr. Regan's opinions unreliable and thus excludable under Rule 702 and *Daubert*.

The Court notes that the parties engage in substantial debate as to whether and which portions of Mr. Regan's report may be irrelevant now that Sumotext has dismissed its state law claims. The Court is confident that any testimony offered at trial will be relevant to the remaining antitrust claims. If that is not the case, Sumotext may raise an appropriate objection.

Accordingly, the Court DENIES Sumotext's motion to exclude Mr. Regan's opinions regarding Sumotext's lease cancellations.

## III. ORDER

Sumotext's *Daubert* motions regarding defense experts Dr. Aron and Mr. Regan are DENIED.

## All Citations

Slip Copy, 2020 WL 264701

Footnotes

1 While StarSteve, LLC also is a defendant in this case, it is not clear whether Dr. Aron and Mr. Regan have been retained on his behalf as well.

2 An *ipse dixit* is "an assertion made but not proved." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ipse% 20dixit (last visited December 30, 2019).

End of Document © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 25695244
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

George TAYLOR and Roberta Taylor, Plaintiffs,
v.
CERTAINTEED CORPORATION d/b/a Wolverine Vinyl Siding, Defendant.

No. 01–74544.
|
Oct. 9, 2003.

Named Expert: Arnold Przepiora

**Attorneys and Law Firms**

Anne L. Zachary, Yockey, Yockey, Farmington Hills, MI, for Plaintiffs.

Nancy L. Kahn, Foster, Swift, Farmington Hills, MI, Nancy L. Kahn, Michael D. Weaver, Plunkett & Cooney, Bloomfield Hills, MI, for Defendant.

***OPINION***

PATRICK J. DUGGAN, District Judge.

***1** This diversity action stems from injuries Plaintiff George Taylor, a truck driver, sustained while he was unloading vinyl siding from a curtainside trailer.[1] Currently before the Court are Defendant's Motions to Exclude Testimony of Plaintiffs' Liability Expert and for Summary Disposition. A hearing was held on April 17, 2003. For the reasons stated herein, Defendant's Motions to Exclude Testimony of Plaintiffs' Liability Expert and for "Summary Disposition" are granted.

**Discussion**

I. *Defendant's Motion to Exclude Testimony of Plaintiffs' Liability Expert*
The introduction of expert testimony is governed by Federal Rule of Evidence 702 (Testimony by Experts). Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993), the Supreme Court charged trial judges with the task of determining whether expert testimony "will assist the trier of fact to understand or determine a fact in issue."

In determining whether an expert qualifies under Rule 702, courts must determine "whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Berry v. Crown Equipment Corp.,* 108 F.Supp.2d 743, 749 (E.D.Mich.2000) (citing *Smelser v. Norfolk Southe rn Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997)). "Thus, the trial court must determine whether the expert's training and qualifications provide a foundation for a witness to answer a specific question." *Id.* (citing *Smelser,* 105 F.3d at 303).

Once a determination has been made that an expert is qualified to testify to the subject matter at issue, courts must determine whether the testimony is reliable. Specifically, Rule 702 provides that an expert may testify if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In the case at bar, although Defendant acknowledges that Plaintiffs' proposed expert, Arnold Przepiora, is an expert in the area of manufacture and design of trucks and truck components, it maintains that he has "virtually no

education, experience or training with respect to his theory in this case (i.e., that the poly wrap packaging system used for Defendant's packaged loads was insufficient and that a metal banding system would have been superior)." (Def.'s Mot. at 1). Plaintiffs oppose the motion to exclude Przepiora's testimony arguing that Defendant's attempts to characterize Przepiora only as an expert in the design and manufacture of trucks and truck components is "simply false." (Pls.' Resp. at 7).

***2** When asked by this Court at a hearing on January 15, 2003, whether "lack of metal strapping was the negligence on the part of defendant, plain and simple," Plaintiffs' counsel responded:

> Correct. Plain and simple.
>
> I might add just for expansion of the record, the metal straps on the picture that you see, one, are Certainteed themselves. This is what they do for other customers, not this particular customer.
>
> Second of all, metal strapping is not the exclusive way of maintaining positive restraint, but it's a very good way.

(Def.'s Mot. Ex. 3 at 22). Plaintiffs again summarized their theory of this case in their response to Defendant's motion to exclude expert testimony:

> To condense and summarize Plaintiffs' expert's theories, it can be said that he argues that the defect in this case is that the system of loading was not designed with a feature that would have protected the person unloading the trailer. For example, there was an absence of metal banding, and/or strapping, etc., that would have assured the integrity of the tier of bundled boxes and would have attached the boxes to the pallet. This would then have prevented the boxes from falling out of the trailer onto the person unloading said vehicle.

(Pls.' Resp. at 11). Plaintiff maintains that "Mr. Przepiora has the credentials, education and experience necessary in order to render an opinion with respect to the deficient loading in this case ." (Pls.' Resp. at 11). The Court disagrees. Mr. Przepiora is prepared to testify that, in his opinion, the load could have been secured differently. However, Mr. Przepiora's opinions with respect to his preferred methods of securement, i.e., metal banding or strapping of the boxes to the pallets, lack adequate foundation.

*A. Mr. Przepiora's Qualifications*

Mr. Przepiora graduated from the University of Detroit in 1967 with a Bachelor of Mechanical Engineering degree. (Pls.' Resp. Ex. 1) From 1955 to 1996 he held various engineering positions relating to trailer manufacturing at Fruehauf Corporation/Fruehauf Trailer Corporation, including Director of Product Development & Components & Truck Equipment, Director of Product Development & Engineering (Responsible for dry freight van, dollies, reefers, components, materials, container trucks), and Director of Product Design (Responsible for development and design for dry freight vans and reefers, materials, components, truck equipment, containers, dollies). (Pls.' Resp. Ex. 1). From 1996 to the present, Mr. Przepiora has served as an engineering consultant. (Pls.' Resp. Ex. 1).

Mr. Przepiora has testified as an expert in nine cases in the last five years. In one of the cases, Mr. Przepiora gave an opinion about the secureme nt of a load on a trailer related to chain strength. His opinion was that there were not enough chains for the load based on federal standards for chain strength. (Def.'s Mot. Ex. 2 at 118). None of the other cases involved load securement, pallets, or tie-downs.

***3** In the absence of any showing that Mr. Przepiora is qualified to render an opinion as to load securement on curtainside trailers, his testimony must be excluded. Simply put, Mr. Przepiora's training and qualifications do not relate to the subject matter of his proposed testimony. *See Berry v. Crown Equipment Corp.,* 108 F.Supp.2d 743, 749 (E.D.Mich.2000).

Plaintiffs' counsel's response to questions posed by this Court at the hearing on April 17, confirm this Court's belief that Mr. Przepiora is not qualified to testify in this case. The Court asked Plaintiffs' counsel to describe Mr. Przepiora's qualifications with respect to what is involved in this case, i.e., securing loads on trailers. Plaintiffs' counsel responded by referring to a portion of Mr. Przepiora's affidavit wherein he states:

> I have more than forty seven (47) years experience in trailer design, and that experience continues today. In connection with this, I have been involved in the continual process of design and redesign of the basic structure for all the trailer models as well as their related components. With each incremental change in the design of trailers there was an analysis of service life, stability of the trailer, handling, ride and/or what effect, if any, the changes to trailers had upon the carrying characteristics of the load, including load securement.

(Pls.' Resp. Ex. 7, ¶ 7).

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

This very general statement is simply insufficient to convince this Court that Mr. Przepiora is qualified to render an opinion as to load securement on the curtainside trailer involved in this case. Although Przepiora stated during his deposition that he had experience in tying down loads on flatbed trailers (*see* Def.'s Mot. Ex. 2 at 269), he has no experience with respect to the securing of loads on curtainside trailers. The Court is persuaded, based on evidence produced thus far in this case, that there is a significant difference between an open flatbed trailer and a curtainside trailer. In his deposition, Defendant's expert, Dr. Singh, testified that the regulations governing flatbed trailers require a certain type of securing, i.e., tie-down or positive affixing to the trailer, to prevent the load from falling off the trailer. In the case of curtainside trailers, except for small loads, i.e., 12 inches or less, the poles or posts on the curtainside trailer protect against the load falling off the trailer. Because of this difference, there are no regulations that require the load on a curtainside trailer to be positively affixed or tied-down to the curtainside trailer itself.

The absence of a regulation do e s not necessarily preclude negligence on the part of Defendant. However, Mr. Przepiora has not satisfied this Court that he has any experience with respect to the securing of loads on curtainside trailers.[2] He simply is prepared to testify that in his opinion, the load could have been secured differently. Nothing in his experience suggests that he is qualified to offer an opinion that it was "unreasonable" for Defendant to have secured the load as it did.

*B. Whether Mr. Przepiora's Testimony is Reliable*

***4** Even if Mr. Przepiora did qualify as an expert, Plaintiffs have not demonstrated that any such proposed testimony would be reliable. Fed.R.Evid. 702 provides that an expert may testify if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In this case, there has been no showing that Mr. Przepiora's testimony is reliable.

Mr. Przepiora believes that if the load at issue had been tied down with a strap secured on either end of the curtainside trailer, it would not have shifted to the same degree as it did in this case.[3] He admitted that he had no test results to support the contention.[4] (Pls.' Resp. Ex. 16 Dep. of Przepiora at 158). Instead, he stated that his opinion was based on the, "[n]ormal practice of tying down loads for years on flat-bed trailers." (*Id.* at 269).[5]

In addition, although one of Plaintiffs' theories in this case is that metal banding could have been used to secure the load, Mr. Przepiora's deposition testimony indicates that he has little familiarity with such metal banding:

> Q: Do you know whether there is a history of any injury issues relating to the use of metal banding to pallets of this type?
>
> A: Injury to whom ma'am?
>
> Q: To the people unloading the pallets.
>
> A: I have no background, ma'am....
>
> Q: Has the practice of using metal band for attaching materials to pallets been around for more than a decade would you say?
>
> A: Yes, ma'am.
>
> Q: And do you know whether use of the metal banding is on the increase or decrease, do you have any idea?
>
> A: No, ma'am.

(Def's Mot. Ex. 2 at 289–290).

Mr. Przepiora's testimony reveals that he has done no testing that would support a conclusion that his preferred method of securing a load, i.e., metal strapping, would have been more effective.

> Q: Now, is it your contention that this load would not have shifted during transit if the boxes had been metal banded to the pallet?
>
> A: If the boxes would have been attached properly to the pallet, secured to the pallet, it would not have shifted, yes.
>
> Q: Okay. Now, on what test results, if any, do you base that opinion?
>
> A: I base that opinion on experience in the heavy-duty trucking industry, ma'am.
>
> Q: Okay. Well, that wasn't my question. My question was: Do you have any test results on which to base that opinion?
>
> A: No, ma'am, I do not.

(Pls.' Resp. Ex. 16, Dep. of Przepiora at 240). A lack of testing does not necessarily render Przepiora's opinion unreliable. However, the lack of testing combined with

Przepiora's stated unfamiliarity with metal banding and Przepiora's lack of experience with respect to load securement on curtainside trailers persuade this Court that his testimony would not "assist the trier of fact to understand the evidence or to determine a fact in issue" in this case. Fed.R.Evid. 702.

***5** At the hearing, when asked by this Court whether he had any evidence that the process of affixing cargo to pallets was ever tested or used in the industry prior to the accident in this case, Plaintiffs' counsel responded with another reference to Mr. Przepiora's affidavit wherein he states that his opinions are based in Newtonian physics and gravity. Plaintiffs' counsel acknowledged that his expert never conducted any testing with respect to this type of load securement method.

Because the Court is not persuaded that Mr. Przepiora is qualified as an expert in load securement on curtainside trailers, or that his opinions are reliable, the testimony of Mr. Przepiora must be excluded.

II. *Defendant's Motion for Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure mandates the entry of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is no genuine issue of material fact for trial unless, by viewing the evidence in favor of the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994). The nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Phillip Morris Co., Inc.,* 8 F.3d 335, 340 (6th Cir.1993). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Defendant believes that the exclusion of Plaintiffs' expert's testimony will necessarily result in the entry of "Summary Disposition" for the defense. (Def.'s Mot. at 2). Plaintiffs oppose the motion for summary judgment arguing that there is a "liability case" against Defendant. (Pls.' Resp. at 14).

Plaintiffs point to the deposition testimony of Defendant's expert, Paul Singh, wherein he stated that in order to meet "the standard, the bundled boxes themselves must be positively affixed to the pallet upon which they sit; no such positive affixing of the bundled boxes to the pallet existed in this case." (Pls.' Resp. at 15) (internal citation to record omitted). In its reply brief, Defendant argues that "Plaintiff attempts to mislead the Court by suggesting that Dr. Paul Singh testified that the stretch-wrap system did not meet a required government standard. This is disingenuous." (Def.'s Reply at 4). Defendant then goes on to quote a portion of Dr. Singh's deposition testimony wherein he stated that he had no knowledge of an industry standard requiring a metal band affixing the boxes to the pallets. (Def.'s Reply at 4).

***6** Prior to the hearing on April, 17, 2003, the Court was without the benefit of Dr. Singh's complete deposition transcript. As a result, on June 11, 2003, the Court issued an order directing the parties to further depose Dr. Singh. In addition, the Court requested that the deposition focus on, but not be limited to, the following issues: what regulations or standards (if any) apply to open flatbed trailers, what regulations or standards (if any) apply to curtainside trailers, what methods or practices are used in securing loads on open flatbed trailers, what methods or practices are used in securing loads on curtainside trailers, and why there may be different standards and regulations for the securing of loads on open flatbed trailers, as opposed to curtainside trailers. The parties have complied with the order and filed a complete transcript of Dr. Singh's deposition taken on July 21, 2003. In addition, both parties have filed supplemental briefs on the issues of whether Plaintiffs' expert should be excluded and summary judgment.

Having reviewed Dr. Singh's deposition and Plaintiffs' supplemental brief opposing summary judgment in response, the Court is satisfied that no genuine issue of fact exists in this case and that summary judgment for Defendant is proper.

During the July 2003 deposition of Dr. Singh, the parties referred to two methods of load securement throughout the deposition: "method one" where the bundled boxes would be independent of the pallet, i.e., not attached to the pallet; and "method two," where the boxes are attached to the pallet. Dr. Singh stated that with respect to open flatbed trailers, neither method one nor method two

used alone would meet applicable regulations under the Federal Motor Carrier Safety Regulations. (Singh Dep. at 39, 7/21/03). Rather, some additional securement requirements are needed because "loads could shift and fall off the trailer." (*Id.* at 39). Dr. Singh further stated that the types of methods contemplated by the regulations, with respect to open flatbed trailers, are "[t]h e use of different restraining devices, such as straps, chains, depending on the type of load that'll be used to restrain the load to the flatbed trailer." (Singh Dep. at 69, 7/21/03).

Plaintiffs' counsel asked Dr. Singh what the appropriate method of securement would be for transporting palletized boxes of vinyl siding on an open flatbed trailer. Dr. Singh responded that nylon straps would be one of the most commonly used, as opposed to chains or other materials that could damage the corrugated boxes. (*Id.* at 70). Dr. Singh was then asked about the securement of vinyl siding on curtainside trailers, the type of trailer at issue in this case.

> Q: Now with reference to curtainside trailers, what has been your experience in methods or practices used in securing loads on curtainside trailers?
>
> A: And again, my review is based on working for this industry and a wide range of competitors of Certainteed, as well, as a consultant, that there is no other securement requirement to affix any of these palletized loads to the trailer itself for curtainside trailers.
>
> ***7** ...
>
> Q: With reference to curtainside trailers, there is no regulation that requires securing loads when you have a curtainside trailer?
>
> A: Securing loads to the trailer using straps or other securement devices. That is correct.

(Singh Dep. 70–71, 7/21/03).

Furthermore, with respect to preventing the shifting of boxes during transit, Dr. Singh testified that there is no significant difference between method one and method two.

> Q: Sir, would, in your opinion, there be any appreciable difference in performance when the desired upon performance relates to maintaining a load of bundled box vinyl siding like we sec in this case—maintaining the integrity of the shape of the bundled boxes; that is, to prevent leaning? Would you expect that there would be any difference in performance between method one and method two?
>
> A: In shipment or handling?
>
> Q: In transit. During transit, any difference in performance between Exhibit—between method one and method two?
>
> A: No, not based on a lot of the testing with different types of unitization methods that I have studied, I don't think there will be a significant difference. Because you have a lot of other variables that play a key role, other than method one and method two.
>
> ...
>
> A: No. I mean, I've seen leans that have occurred in both types of methods, you know, which are well within the safe handling practices. And again, you know, as long you use [sic] curtainsides or van trailers in these types of load configurations, there is no possibility of them falling off the trailer.

(*Id.* at 81–83). Dr. Singh was also asked whether method one, i.e., boxes not affixed to pallet, would ever *not* meet the regulations that apply to curtainside trailers. Dr. Singh stated that method one would not meet the regulations if the pallets were very small:

> Q: Okay. For curtainside trailers to meet the regulations, are there occasions when method two is acceptable and meets the regulation and method one does not meet the regulation?
>
> A: The only conditions I can foresee are if the pallets were so small that they could essentially pass through the allowable partitions between poles. Because that's what the requirements require, is that no part of the load can actually come through in the loaded configuration during transit.
>
> ...
>
> A: I mean extremely small pallets. I'm talking about things that are probably less than 12 inches when—you know, I don't know of anybody using pallets that small.

(Singh Dep. at 85, 7/21/03). Dr. Singh stated that in the industry, method one is used over 95 percent of the time "to ship all kinds of loads in curtainside and van trailers." (*Id.* at 91). When asked if method two, i.e., affixing the boxes to the pallet, offered any safety advantage over method one, Dr. Singh responded, "No, because it meets the regulations and it's as safe as method two." (*Id.* at 91). To summarize Dr. Singh's deposition with respect to curtainside trailers, there are no regulations requiring that the load be positively affixed to the trailer, unless the load

is small, i.e., less than 12 inches.

***8** Plaintiffs' counsel questioned Dr. Singh about the possibility of using metal bands to affix boxes to pallets. Dr. Singh testified at deposition that due to safety issues, this practice was no longer used.

> Q: Is there any safety advantage in utilizing those steel bands in that manner vis-a-vis having no steel bands or method of positively affixing the stacked boxes to the pallet?
>
> A: No, I think the industry has long gone away from a use of such a system that is often referred to as metal bands for affixing boxes onto pallets. In fact, that was done back in the 60's and 70's. But it is really for the purpose of safety that that initial trend started to shift, because there could be a lot of injuries associated with metal bands. But the other bigger issue was the metal bands, when you use them on a unitized load, they are designed to handle a specific unit load. So you use like, say, two bands or three bands, depending on the strength of the band, to the entire load that's being constrained. And what used to often happen is, when you essentially lost one band, due to a poor crimp or a poor notch, you would start a triggering effect. Because the next weakest band would break and third band would break or whatever number of bands. So you would lose the entire load. And the method, such as stretch wrapping became a preferred choice, really, in the later 80's and 90's. Because they obviously do not have this triggering effect from the failure of one band to lose an entire load. So not only because of the operator's safety, but because of a better load integrity, the choice has been stretch wrap.

(Singh Dep. at 98–99, 7/21/03). Finally, when asked by Defense counsel whether the load in this case met "all regulations and industry standards," Dr. Singh replied, "Yes it did, as far as my understanding was." (*Id.* at 104).

Aside from Mr. Przepiora's testimony, which this Court finds inadmissible, Plaintiffs have not presented any evidence to this Court refuting Dr. Singh's testimony that the load at issue was in compliance with applicable regulations. In Plaintiffs' supplemental brief, Plaintiffs continue to argue that Dr. Singh's deposition testimony raises questions of fact. The Court disagrees. Plaintiffs argue that because Dr. Singh stated that neither method one nor method two alone are sufficient methods of load securement on an open flatbed trailer, and because, according to Plaintiffs, "[a] curtainside trailer with the side posts or poles pulled back to the unloading position is nothing more than an open, flatbed trailer," they have set forth a negligence action. (Pls.' Supp. Br. at 3). This argument is unpersuasive. The Court is satisfied that based on the record before it, there is a significant difference between an open flatbed trailer and a curtainside trailer. Dr. Singh specifically stated that the reason why neither method one nor method two alone were adequate on an open flatbed trailer is because the load could fall off of an open flatbed trailer. There is no such risk on a curtainside trailer.

## Conclusion

***9** For the reasons stated herein, Defendant's Motions to Exclude Testimony of Plaintiffs' Liability Expert and for "Summary Disposition" are granted. A judgment consistent with this opinion shall issue.

## All Citations

Not Reported in F.Supp.2d, 2003 WL 25695244

Footnotes

1 A curtainside trailer is "manufactured from a standard flatbed trailer, to which is added a solid roof, front and back." (Def.'s Mot. at 2). The trailer also has support poles down the center of the trailer and a heavy vinyl curtain covering each side of the trailer.

2 Mr. Przepiora does have experience designing curtainside trailers. (Pls.' Resp. Ex. 3).

3 During his deposition, Mr. Przepiora described alternative methods of securing the load at issue that he believes would have been superior to the method used by Defendant. One of these methods was affixing the load to the curtainside trailer. He described this method as follows:

> Mr. Przepiora: Number three, you could have what I call one and two and you could have three, you could take the one, you could have the pallets banded or strapped, that's one, and to secure it, you could have a strap that, that physically goes over the, the pallets and attaches to the, to the frame of the trailer.
>
> ...

> Mr. Przepiora: No, but it would be a, a commercial strap, strapping that is used by, that, that would, that could contain the total load, would contain not only that pallet, not the pallet that we're talking about, it contained several pallets that were stacked.
> [Mr. Przepiora then sketched a drawing of this method of securement, subsequently marked Exhibit 39].
> Ms. Kahn: You have made me a lovely drawing, Exhibit 39 is how we've marked it, and this is your example of number three where you indicate the load could be strapped to the trailer and you're going to explain to me as I walk around where this strap would be going and how it would be attached to the trailer on Exhibit 39.

(Pls.' Resp. Ex. 16, Dep. of Przepiora, at 139–140).

4 Mr. Przepiora acknowledged during deposition that he did not know whether any vinyl siding manufacturers in the United States transported vinyl on a curtainside trailer using such a strap. (Def .'s Reply Ex. 1 at 255).

5 When asked at deposition whether he ever personally tied down loads on flat-bed trailers, Mr. Przepiora responded, "[n]ot for years, but I have tied down loads on flat-bed trailers—excuse me—assisted in tying down loads on flat-bed trailers." (Def.'s Mot. Ex. 2 at 269). The fact that Przepiora assisted in tying down loads years ago on flat bed trailers does not render him qualified to offer an opinion as to whether Defendant failed to adequately secure the vinyl siding on the curtainside trailer at issue in this case.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1233081
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Western Division.

UNITED STATES of America, ex rel. Donald E. HOWARD, et al., Plaintiffs and Relators,
v.
LOCKHEED MARTIN CORPORATION, Defendant.

No. 1:99–cv–285.
|
Filed March 25, 2014.

**Attorneys and Law Firms**

Michael F. Hertz, Russell B. Kinner, U.S. Department of Justice, Washington, DC, Matthew Joseph Horwitz, United States Attorney's Office for The Southern District, Jennifer Marie Verkamp, Morgan Verkamp LLC, Cincinnati, OH, Kevin Weimer, Stephen Thomas Labriola, Fellows Labriola LLP, Atlanta, GA, Mike Bothwell, Julie Keeton Bracker, Bothwell Bracker PC, Roswell, GA, for Plaintiffs and Relators.

Christopher C. Burris, Edward T. Logan, Jessica J.M. Hagen, King & Spalding, Atlanta, GA, Glenn Virgil Whitaker, Vorys Sater Seymour & Pease, Jacob D. Mahle, Victor A. Walton, Jr., Cincinnati, OH, for Defendant.

Order Denying without Prejudice to Renewal Motions in Limine to Exclude Relators' Expert Witnesses

SUSAN J. DLOTT, District Judge.

***1** This matter is before the Court on Defendant's Motions in Limine to Exclude Relators' Expert Witnesses (Docs. 251, 252, 253, and 254). Defendant Lockheed Martin Corporation moves to exclude testimony from Relators' purported expert witnesses: Charles R. Henry, William A. Stimson, Shermon E. Roberts, and Clarence Edward Brooks, Jr. For the reasons that follow, the Court will **DENY WITHOUT PREJUDICE TO RENEWAL** the Motions in Limine.

## I. LEGAL STANDARDS GOVERNING MOTIONS IN LIMINE

District courts have authority to adjudicate motions in limine pursuant to their "inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Courts should exclude evidence in limine "only when evidence is clearly inadmissible on all potential grounds." *Gresh v. Waste Servs. of Am., Inc.,* 738 F.Supp.2d 702, 706 (E.D.Ky.2010) (citation omitted). The Sixth Circuit has stated that the "better practice" is to address questions regarding the admissibility of broad categories of evidence "as they arise." *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.1975). "[A] court is almost always better situated during the actual trial to assess the value and utility of evidence." *Owner–Operator Independent Drivers Ass'n v. Comerica Bank,* No. 05–CV–0056, 2011 WL 4625359, at *1 (S.D.Ohio Oct.3, 2011). Denial of a motion in limine does not necessarily mean that the evidence, which is the subject of the motion, will be admissible at trial. *Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004).

This rationale applies to motions in limine to exclude expert witness testimony. "A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance." *Jahn v. Equine Servs., PSC,* 233 F.3d 382, 393 (6th Cir.2000) (overturning an order granting summary judgment because the district court prematurely decided to exclude expert testimony). " '[I]n all but the most clear cut cases,' it will be difficult for a court to adequately gauge the reliability of an expert's testimony based on the 'truncated record' available at summary judgment." *Davis v. United States,* No. 08–184–ART, 2012 WL 424887, at *6 (E.D.Ky. Feb.9, 2012) (quoting *Cortes—Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 188 (1st Cir.1997)).

## II. RELEVANT FEDERAL RULES OF EVIDENCE

### A. Rule 702 of the Federal Rules of Evidence

Rule 702 of the Federal Rules of Evidence addresses the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> ***2** (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. "A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.' " *Newell Rubbermaid, Inc. v. Raymond Corp.,* 676 F.3d 521, 527 (6th Cir.2012) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The district court acts as a "gatekeeper" in making these determinations and must evaluate relevancy and reliability with "heightened care." *United States v. Cunningham,* 679 F.3d 355, 380 (6th Cir.2012) (citation omitted). The district court must perform its gatekeeper function before the testimony can be admitted regardless of whether the testimony is based on scientific knowledge, technical knowledge, or other specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *see also Mike's Train House v. Lionel, L.L.C.,* 472 F.3d 398, 407 (6th Cir.2006).

As to reliability, the Supreme Court in *Daubert* identified several factors which might bear on a reliability determination: testing, peer review, publication, known or potential rate of error, and general acceptance. 509 U.S. at 593–94. The *Daubert* factors are neither definitive nor exhaustive and may not apply in every case. *Mike's Train House,* 472 F.3d at 407. "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid,* 676 F.3d at 527. However, an evaluation of the reliability of an expert opinion does not involve a determination of whether the opinion is correct. *In re Scrap Metal Antitrust Lit.,* 527 F.3d 517, 529–30 (6th Cir.2008); *GED Integrated Solutions, Inc. v. Durotech Int'l, Inc.,* No. 5:06CV1327, 2009 WL 233872, at *4 (N.D.Ohio Jan.30, 2009) (citing *In re Scrap Metal* ).

In certain cases, an expert's experience alone may provide a reliable basis for his testimony. Fed.R.Evid. 702 (2000 Amendments advisory committee notes); *see also Campbell v. City of Springboro, Ohio,* 788 F.Supp.2d 637, 662 (S.D.Ohio 2011) (stating that reliability concerns may focus on personal knowledge and experience). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702 (2000 Amendments advisory committee notes); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 296 (6th Cir.2007) (quoting the advisory committee notes).

Rule 702 "does not require anything approaching absolute certainty." *Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 671 (6th Cir.2010). However, an expert's opinion must amount to more than mere speculation. *Id.* The Sixth Circuit has excluded an expert's opinion when it was based upon a "string" of speculations:

> ***3** And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line. Yet, so long as there is a line, some forms of testimony may cross it, and that happened here. [The expert's] opinion contains not just one speculation but a string of them: A suggests by analogy the possibility of B, which might also apply to C, which, if we speculate about D, could eventually trigger E, so perhaps that happened here. At some point, the train becomes too long to pull and the couplings too weak to hold the cars together.

*Id.* at 672 (internal citation omitted).

Courts have struggled to draw the line between expert testimony that should be excluded because it is unreliable and testimony that should be admitted despite weakness in its factual bases. The Sixth Circuit has instructed as follows:

> [A]n expert's opinion ... should be supported by good grounds, based on what is known. The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, *mere weaknesses in the factual basis of an expert witness' opinion ...*

> *bear on the weight of the evidence rather than on its admissibility.*

*McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800–01 (6th Cir.2000) (internal quotations and citations omitted) (emphasis added); *see also In re Gen. Motors OnStar Lit.,* No. 2:–CV–DT, 2011 WL 679510, at *8 (E.D.Mich. Jan.12, 2011) (stating that an expert's failure to consider all available material goes to the weight of the expert's testimony), *report and recommendations adopted by,* No. 2:07–MDL–01867, 2011 WL 674727 (E.D.Mich. Feb.16, 2011). "An expert need not consider every possible factor to render a 'reliable opinion;' rather the expert need only consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court." *In re Gen. Motors OnStar Lit.,* 2011 WL 679510, at *8 (internal citation and quotation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595.

**B. Rule 403 of the Federal Rules of Evidence**

Also, Rule 403 of the Federal Rules of Evidence permits relevant evidence to be excluded if it is prejudicial:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed.R.Evid. 403. "Like all evidence, the admissibility of expert testimony is also subject to a ... balancing of probative value against likely prejudice under Rule 403." *United States v. Geiger,* 303 F. App'x 327, 329 (6th Cir.2008). The Supreme Court has recognized that expert testimony can "be both powerful and quite misleading because of the difficulty in evaluating it" so the district court in weighing probative value versus prejudicial effect should "exercise[ ] more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (quotation and citation omitted).

**III. ANALYSIS**

**A. Motion to Exclude Testimony from Relators' Expert Clarence Edward Brooks, Jr. (Doc. 254)**

***4** Clarence Edward Brooks, Jr. is a former auditor with thirty years of auditing experience, including twenty-five years with the Defense Contract Audit Agency. He submitted an expert report dated May 4, 2011 and gave opinions as to the adequacy of the so-called "Elliot Method" to trace tooling labor and vending costs through Lockheed's accounting and billing systems. (Doc. 226–10 at PageID 9029.) Brooks expressly stated that he did not consider or give an opinion regarding the broader subject of Lockheed's accounting and billing systems in general. (*Id.*)

Relators relied on the Brooks expert report to support a Motion to Compel seeking that Lockheed be required to produce additional discovery regarding the tool-tracing process. (Doc. 209.) The Court granted the Motion to Compel in part on a limited basis, but denied it insofar as Relators sought discovery sanctions against Lockheed. (Doc. 242.) The Court, in adjudicating the Motion to Compel, specifically declined to address the "the elements of Relators' claims, the merits of those claims, and the calculation of damages, if any." (Doc. 242 at PageID 9496.) Relators assert that they will rely on Brooks's testimony to help establish that Lockheed's tool-tracing process has interfered with Relators' ability to calculate damages and to identify specific false claims. (Doc. 260 at PageID 11184.)

The Court finds that it would be premature to determine the relevance, probative value, and potential prejudicial effect of the Brooks's testimony at this point. The Court notes that Brooks, and all the expert witnesses, will not be permitted to offer expert testimony beyond the opinions stated in their expert reports consistent with Federal Rule of Civil Procedure 26(a)(2)(B)(i) & (D). Rule 26(a)(2)(B)(i) requires the expert to provide a "complete statement of all opinions" and Rule 26(a)(2)(D) requires that the parties make expert disclosures in the time and sequence mandated by the Court.

**B. Motion to Exclude Testimony From Relators' Expert Charles R. Henry, William A. Stimson, and Shermon E. Roberts (Docs. 251, 252, and 253)**

The Motions to Exclude the testimony of Relators' three other proposed expert witnesses raise overlapping issues, and therefore, will be addressed together.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

**1. Summary of the Purported Experts' Qualifications and Opinions**

Charles R. Henry, Major General (U.S.Army, Ret.), spent thirty-two years in the Army, including nineteen years in procurement/acquisition. Relators offer him as an expert possessing specialized knowledge regarding government procurement. (Doc. 251–1 at PageID 9620.) Gen. Henry submitted an expert report on May 9, 2011 regarding Lockheed's quality assurance (sometimes referred to herein as "QA") obligations under its contracts and the alleged failure of Lockheed's quality assurance systems.

Gen. Henry made a number of findings in his report. He stated that in the procurement process the Government buys both the end product and "the capability to use those items reliably ..., to support them as necessary, and even to restart production if necessary." (Doc. 251–1 at PageID 9624.) Elsewhere, he opined that the Government contracted for the capacity to build and maintain the F–22 aircraft. (Doc. 251–1 at PageID 9628–29.) Gen. Henry did not cite specific contract provisions in stating this opinion. He also reviewed Lockheed documents which he asserted established that the Lockheed quality assurance systems were insufficient. He concluded, in part, that "[t]he failure of Lockheed to follow quality requirements gives no assurances that future use of the manufacturing process will produce conforming F–22s (or that DOD can reliably sustain the fleet without expending considerable resources), and as a result, the Air Force did not get what it paid for." (Doc. 251–1 at PageID 9634.)

***5** Relators offer William A. Stimson, Ph.D., as an expert with specialized knowledge in the field of quality engineering systems. He held a civilian position in quality assurance with the Navy and then, after he retired, he obtained a doctorate in systems engineering from the University of Virginia. (Doc. 252–1 at PageID 9704.) Additionally, he has authored books on quality assurance standard ISO–9001. (*Id.* at PageID 9743.) He completed an expert report for Relators dated April 26, 2011 and a supplemental report dated August 22, 2011. (Doc. 252–1; Doc. 261–10.)

In his report, Dr. Stimson identified and quoted from quality standards applicable to the F–22 including the MIL–Q–9858A, ISO 9001:1994, ISO 9001:2000, AS9100, and AS9100A/B. (Doc. 252–1 at PageID 9710–12.) He also identified Lockheed's own quality systems provisions governing tooling including EMD QA Plan (October 30, 1991) and the Lockheed QA Manual, Tool and Gage (Revision April 30, 1996). (Doc. 252–1 at PageID 9712–13.) Dr. Stimson reached three primary conclusions: (1) there was a "near continuum of failure of the tool management system" which resulted in a population of products "subject to unbounded variation in the quality characteristics" such as uniformity, accuracy, interchangeability, and quality; (2) "the product population of a nonconforming system is itself nonconforming;" and (3) Lockheed's inability to provide the costs of quality to the government over the period of contract performance is a systemic failure of the quality management system in violation of MIL–Q–9858A and ISO–9001 (known as AS9100 in the aerospace industry). (Doc. 252–1 at 9741–42.)

Finally, Relators offer Shermon E. Roberts as an expert with specialized knowledge regarding quality engineering systems. Roberts retired from his position as a civilian employee of the United States Army Missile Command in 1988. (Doc. 253–1 at PageID 9885.) He then worked for government contractors. (*Id.*) Roberts asserted that his positions provided him experience in the technical disciplines of "configuration management" and "quality assurance." (*Id.*) He completed an expert report dated May 9, 2011. (*Id.* at PageID 9884.)

In his written report, Roberts identified the relevant contract documents stating as follows:

> The prime contracts applicable to this case are Contract No. F33657–91–C–0006, referred to as the "EMD" contract, and production contracts. The initial quality specifications for the F–22 Program invoked in the EMD contract were MIL–Q–9858A (tailored), *Quality Program Requirements;* MIL–STD–1520C (tailored), *Corrective Action and Disposition System for Nonconforming Material;* and MIL–STD–1535A (tailored). These specifications were superseded by the ISO series of documents in 1996. Additional quality requirements were included in the EMD Statement of Work and in FAR 52.246–3.

(Doc. 253–1 at PageID 9886.) Roberts stated that the "quality specifications applicable to the F–22 Program (MIL–Q–9858A, MIL–STD–1520C, ISO 9001, and AS9011) included requirements for the design, verification, documentation, and control of special tooling." (*Id.*)

***6** After setting forth the contract requirements, Roberts stated multiple findings and opinions. The findings were based on his review of the depositions and Lockheed documents, including memoranda, letters, emails, and reports. He stated in relevant part:

> One of the fundamental, overarching purposes of any quality assurance program is to provide assurances to the customer that outputs conform to all requirements. A properly functioning QA program will provide such assurance, while a defective one cannot. Thus, a

properly functioning QA program satisfies two interrelated but separately important objectives: it creates outputs that meet requirements, and assures the customer that outputs meet requirements. These dual objectives cannot be de-linked, nor can one be overlooked. *Any QA program, no matter how ineffective, can produce outputs that meet specifications, but no QA program that is ineffective can assure the customer that any of the outputs do so. Because of the latter truism, all of the outputs of an ineffective QA program necessarily are nonconforming.*

(Doc. 253–1 at PageID 9906 (emphasis added).) He further stated that because, of "on-going failures in the F–22 QA Program," the Air Force could not "have confidence that what they purchased—finished F–22's and the tools to build more—[would] perform as intended." (*Id.* at PageID 9907.) Roberts concluded that "every output of this ineffective system was nonconforming." (*Id.*)

**2. Analysis**

The Court will not exclude the purported expert testimony of Charles Henry, Shermon Roberts, and William Stimson at this time. Relators cite to portions of the experts' testimony to support their summary judgment briefing, but their testimony is not dispositive on any summary judgment issue. The Court will be better able to assess the reliability of the expert testimony in context of a complete evidentiary foundation during trial. *See Davis,* 2012 WL 424887, at *6 (stating it is difficult to gauge reliability on a truncated record); *Comerica Bank,* 2011 WL 4625359, at *1 (stating that the court is usually able to better assess value and utility of evidence at trial). However, the Court can offer preliminary thoughts to guide later arguments if Lockheed renews its motions to exclude the experts' testimony.

**a. Reliability Generally**

Lockheed does not challenge the qualifications of Gen. Henry, Dr. Stimson, or Mr. Roberts. Instead, Lockheed seeks to exclude their testimony on the grounds that the testimony is unreliable. Lockheed summarizes the experts' opinions as being that "bad tooling makes bad parts," then criticizes those opinions as unreliable. First, it faults Relators' experts for failing to identify any specific bad tools or bad parts. The experts admitted that they lacked specific knowledge about bad parts on the F–22s. (Henry Dep. 87, Doc. 251–2 at PageID 9675; Stimson Dep. 183–84, Doc. 252–2 at PageID 9820; Roberts Dep. 67–68, Doc. 253–2 at PageID 9935.) Likewise, the experts did not offer statistical analysis or evidence to support their broad statements that statistics support the conclusion that bad tooling created bad parts. (Stimson Dep. 183–84, Doc. 252–2 at PageID 9820; Roberts Dep. 68–69, 253–2 at PageID 9935.)

***7** Next, Lockheed criticizes the experts' methodology and evidentiary bases. Lockheed faults the experts for relying on only a set of documents hand-picked by Relators' attorneys and for not conducting any onsite testing or product measurements. Lockheed questions why the experts did not review available NMDs (nonconforming material documents) or quality assurance reports where the cause code was related to tooling. Lockheed contends that the experts could have used these documents to try to tie the production of bad parts to bad tooling caused by vendor error. Lockheed further posits that the internal Lockheed documents that discuss nonconforming tools are not evidence that the Lockheed quality assurance system was deficient. Rather, Lockheed contends that the documents suggest the quality assurance system worked by identifying nonconforming tools and preventing bad parts from being installed on the F–22s.

In general, Lockheed's criticisms of the factual foundations for the experts' opinions bear more on the weight of the evidence than its admissibility. The experts identified documents produced in discovery to support their opinion that deficiencies existed in the quality assurance system generally, and in tooling specifically. The experts cited a variety of Lockheed internal inspection reports, internal audits, quality alerts, and emails. They pointed out that the Air Force's quality assurance manager for the F–22, Terry Freeman, testified that quality assurance requirements applied to tooling and that "you don't get good parts off bad tooling." (Freeman Dep. 33, Doc. 261–7 at PageID 11494.)

However, the experts will not be permitted to baldly assert that statistics justify their opinions without providing a factual basis for that assertion. If the experts purport to rely on their own experience, they need to explain how their experience relates to the facts at hand and leads to the conclusion reached. *See* Fed.R.Evid. 702 (2000 Amendments advisory committee notes). "[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." *Id.* Rule 702 recognizes that it is a "venerable practice" to use "expert testimony to educate the factfinder on general principles." *Id.*

Lockheed will be given latitude at trial, assuming the case goes to trial, to subject the factual bases for the experts' opinions to vigorous cross-examination. *See Daubert,* 509 U.S. at 595.

### b. Other Issues

To begin, the experts will be permitted to testify regarding only their specific areas of expertise. The experts can testify on areas within their expertise based on hypothetical facts. "The language 'facts or data' [in Rule 702(b) ] is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." Fed. R. of Evid. 702 (2000 Amendments advisory committee notes); *see also McLean,* 224 F.3d at 801 (stating that assumed facts must find support in the record); *Melton v. O.F. Shearer & Sons, Inc.,* 436 F.2d 22, 27–28 (6th Cir.1970) (same).

***8** Lockheed criticizes Gen. Henry for citing to the expert report of Dr. Stimson. (Doc. 251–1 at PageID 9633.) Lockheed argues that Dr. Stimson's report does not qualify as sufficient facts or data under Rule 702 to support Gen. Henry's expert opinion. However, Lockheed's argument is contradicted by the advisory committee note to Rule 702 which states that the term "data" is "intended to encompass the reliable opinion of other experts." Fed. R. of Evid. 702 (2000 Amendments advisory committee notes). In *Auto Indus. Supplier ESOP v. Ford Motor Co.,* 435 F. App'x 430 (6th Cir.2011), the court excluded the first expert's testimony because he relied on a second expert's summaries of data without personally verifying or analyzing the underlying data. *Id.* at 454–56. The case does not require the Court always to strike an expert's opinion if the expert bases his analyses and conclusions upon the opinion of a second expert's report.

Finally, the Court notes that "[a]bsent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." *N. Am. Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir.1997) (citation omitted). The experts "may not testify as to the legal effect of a contract." *U.S. ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 301 (6th Cir.1998) (citation omitted). Similarly, the experts generally may not testify as to the interpretation of federal regulations. *See Rumsfeld v. United Techs. Corp.,* 315 F.3d 1361, 1369 (Fed.Cir.2003); *CSX Transp., Inc. v. City of Plymouth,* 92 F.Supp.2d 643, 656 (E.D.Mich.2000). Relatedly, the experts cannot testify as to whether Lockheed's conduct conformed to the requirements of a contract, quality standard, or regulation that they have not read or with which they are not otherwise familiar because such an opinion would not be based on sufficient facts or data under Rule 702(b).

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motions in Limine to Exclude Relators' Expert Witnesses (Docs. 251, 252, 253, and 254) hereby are **DENIED WITHOUT PREJUDICE TO RENEWAL.**

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1233081

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 611011
Only the Westlaw citation is currently available.
United States District Court, D. New Mexico.

WHEELER PEAK, LLC, an Illinois limited liability company, Plaintiff,
v.
L.C.I.2, INC., a New Mexico Corporation, Defendant.
L.C.I.2, Inc., a New Mexico Corporation, Counterclaimant,
v.
Wheeler Peak, LLC, an Illinois limited liability company, KMG, Inc ., an Illinois Corporation, and Keith Giles, an individual, Counter–Defendants.
L.C.I.2, INC., a New Mexico Corporation, Third–Party Plaintiff,
v.
Donner Plumbing and Heating, Inc., JC Constructors, Inc., and De La Torre Architects, P.A., A.I.A., and Simplex Grinnell, LP, Melissa Deaver–Rivera, Carl Davis and Lisa Davis, husband and wife, David Borns, Roy Diklich and Kathy Diklich, husband and wife, Kent Nix and Angela Nix, husband and wife, Joseph Forbess and Lisa Forbess, husband and wife, and Ted Galanthay and Phyllis Galanthay, husband and wife, Third–Party Defendants.
Donner Plumbing and Heating, Inc., Third–Party Plaintiff,
v.
Parker Excavating, Inc., Third–Party Defendant.

No. CIV. 07–1117 JB/WDS.
|
Jan. 31, 2010.

**Attorneys and Law Firms**

Donald A. Walcott, Holly Hart, Kris C. Knutson, Scheuer, Yost & Patterson, Santa Fe, NM, for Plaintiff and Counter–Defendant Wheeler Peak, LLC.

Scott P. Hatcher, Hatcher & Tebo, P.A., Santa Fe, NM, for Proposed Intervenor–Plaintiffs American Hallmark Insurance Company of Texas and Clarendon National Insurance Company.

Alan Maestas, Lee Boothby, Maestas Baker Boothby & Warren, P.C., Taos, NM, Tim L. Fields, Samuel L. Winder, Brian K. Nichols, Cristin M. Heyns, Modrall Sperling Roehl Harris & Sisk, P.A., Albuquerque, NM, for Defendant, Counterclaimaint, and Third–Party Plaintiff L. C.I.2, Inc.

Todd Schwarz, H. Brook Laskey, Bryan Hatherly, Miller Stratvert, P.A., Albuquerque, NM, for Third–Party Defendant and Third–Party Plaintiff Donner Plumbing and Heating Inc.

Robert J. Perovich, Mariposa Padilla Sivage, Tina Muscarella Gooch, Keleher & McLeod, Albuquerque, NM, for Third–Party Defendant De La Torre Architects, P.A., A.I.A.

Steven L. Gonzales, Anita M. Kelley, Silva, Saucedo & Gonzales, P .C., Albuquerque, NM, for Third–Party Defendant Parker Excavating, Inc.

Robert Bruce Collins, Holly R. Harvey, Law Office of Robert Bruce Collins, Albuquerque, NM, for Third–Party Defendant JC Constructors, Inc.

Michael S. Jahner, Yenson, Lynn, Allen & Wosick, P.C., Albuquerque, NM, J. Michael Roberts, Jason R. Scott, Shook Hardy & Bacon, LLP, Kansas City, KS, for Third–Party Defendant Simplex Grinnell, LP.

Julie J. Vargas, Hunt & Davis, P.C., Albuquerque, NM, for Third–Party Defendants David Born, Carl Davis, Lisa Davis, Melissa Deaver–Rivera, Kathy Diklich, Roy Diklich, Joseph Forbess, Lisa Forbess, Phyllis Galanthay, Ted Galanthay, Angela Nix, and Kent Nix.

***MEMORANDUM OPINION AND ORDER***

JAMES O. BROWNING, District Judge.

***1 THIS MATTER** comes before the Court on Third–Party Defendant SimplexGrinnell LP's Motion to Exclude Expert Opinions and Testimony of Gregory Hicks, filed August 14, 2009 (Doc. 320)("SimplexGrinnell's motion"). The Court held a hearing November 23, 2009. The primary issue is whether an expert witness in architecture can testify which party is liable and which party is not liable for the failure of a fire sprinkler system. The Court, after careful review of the record and the parties' arguments, will grant in part and deny in part SimplexGrinnell's Motion to Exclude Expert Opinions and Testimony of Gregory Hicks.

## *FACTUAL BACKGROUND*

Defendant, Counterclaimant, and Third–Party Plaintiff L.C.I.2, Inc. entered into an agreement with Plaintiff Wheeler Peak, LLC to construct condominiums in Taos Ski Valley, New Mexico. *See* Third Amended Third–Party Complaint for Damages for Breach of Contract; Contractual Indemnification; Professional Negligence; Negligent Misrepresentation; Comparative Negligence (Fault) Breach of Implied Warranties, Equitable Indemnification; and Contribution ¶ 6, at 3, filed December 17, 2008 (Doc. 139). LCI2 entered into a subcontract with Third–Party Defendant SimplexGrinnell, LP wherein SimplexGrinnell agreed to furnish all material, labor, and equipment necessary to complete all fire sprinkler work per the plan to the satisfaction of the owner, architect, and general contractor. *See id.* ¶ 27, at 6.

## *PROCEDURAL BACKGROUND*

Wheeler Peak submitted two expert reports, one dated October 10, 2008 and the other dated December 24, 2008, written by Gregory Hicks, a licensed architect. *See* SimplexGrinnell's motion at 2, 4. In those reports, Hicks opines that SimplexGrinnell's design and installation of the fire sprinkler system at the Wheeler Peak Condominium Complex "fell below the applicable standard of care and, therefore, SimplexGrinnell is liable for all the damage caused by freezing sprinkler lines and sprinkler heads." *Id.* at 2–3.

After Wheeler Peak submitted Hicks' October 10, 2008 report, LCI2 filed a motion to amend its second amended third-party complaint to add SimplexGrinnell to the lawsuit. *See* LCI2, Inc.'s Motion for Leave to Amend Second Amended Third Party Complaint Against Simplex Grinnell, LP ¶ 12, at 4, filed December 11, 2008 (Doc. 131). The Court granted LCI2's motion. *See* Stipulated Order Regarding Motion for Leave to Amend Second Amended Third Party Complaint Against Simplex Grinnell, LP at 2, filed December 16, 2008 (Doc. 135). LCI2 filed its third amended complaint on December 17, 2009. *See* Doc. 139.

On August 14, 2009, after Hicks' deposition, SimplexGrinnell filed its motion to exclude Hicks' expert opinions and testimony. *See* SimplexGrinnell's motion at 2. SimplexGrinnell contends that Hicks is not qualified to provide opinions on the design and installation of fire sprinkler systems. *See id.* at 3. Wheeler Peak filed its response on September 9, 2009. *See* Plaintiff Wheeler Peak, LLC's Response to Third–Party Defendant SimplexGrinell [sic] LP's Motion to Exclude Expert Opinions and Testimony of Gregory Hicks (Doc. 359). SimplexGrinnell filed its Reply in Support of its Motion to Exclude Expert Opinions and Testimony of Gregory Hicks on September 28, 2009. *See* Doc. 377.

***2** The Court held a hearing on SimplexGrinnell's motion on November 23, 2009. *See* Clerk's Minutes at 1, filed November 23, 2009 (Doc. 433). At the hearing, SimplexGrinnell and Wheeler Peak presented their arguments to the Court. *See* Hearing Transcript at 71:20–80:6–9 and 83:4–87:12–14 (taken November 23, 2009)("Tr.")(Scott); *id.* at 80:16–82:25 (Walcott).[1] The other parties declined to argue in favor of, or opposition to, the motion. *See* Tr. at 80:12–14 (Perovich).

## *LAW REGARDING EXPERT TESTIMONY*

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Architects are experts within the scope

of rule 702. *See* Fed.R.Evid. 702 advisory committee's note ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert must possess a verifiable expertise in the subject matter for which he or she seeks to testify. *See* Fed.R.Evid. 702. The expert is also "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir.2004).

***ANALYSIS***

SimplexGrinnell contends that Hicks is not qualified to offer expert opinions on the design and installation of fire sprinkler systems.[2] Wheeler Peak argues that interpreting code requirements, reading documents, observing site conditions, and using deductive reasoning to determine how a problem arose are what architects do and, therefore, are within an architect's expertise.

SimplexGrinnell argues that, because Hicks has no formal education, no training, and no experience as a fire-protection engineer, *see* Tr. at 72:2–20 (Scott), Hicks is not qualified to offer opinions about a fire-protection engineer's standard of care and whether there was a breach of that standard of care, *see* Tr. at 83:9–15 (Scott). SimplexGrinnell points to Hicks' opinion number two on page 4 of 16 in Hicks' report, which states:

> Simplex–Grinnell, through proper written channels up the chain of command to LCI2, should have informed the Architect of the change, irrespective of the reason for the change. The Architect was contractually not responsible for the design of the fire sprinkler system, whether it was dry or wet, per the Standard Form of Agreement Between Owner and Architect. LCI2 was responsible for the design of the system per the Standard Form of Agreement Between Owner and Architect and with its own contract with the Owner. Since the Architect was not responsible for the design of the system, it cannot be held liable for the failures of the system.

***3** Doc. 320–3 at 5. The only portion of this opinion to which SimplexGrinnell objects is where Hicks provides his opinion as to what SimplexGrinnell should have done. *See* Tr. at 84:12–15 (Scott).

SimplexGrinnell also objects to opinion four on page 5 of 16 in Hicks' report, which states:

> Simplex–Grinnell should have designed and installed a freeze-proof system in the initial design and installation in accordance with NFPA13 and NFPA 13R. Simplex–Grinnell failed to do so. Simplex–Grinnell is liable for lines and heads freezing, all subsequent damages, and for installing a system not suitable for this project in its harsh climate.

Doc. 320–3 at 6. SimplexGrinnell contends that this opinion amounts to nothing more than the *ipse dixit* of the expert because Hicks did not review any of the fire sprinkler plans or drawings. *See* Tr. at 85:4–87:11 (Scott). SimplexGrinnell further contends that Hicks "admitted to having an incomplete understanding of the code regulating the installation of fire sprinkler systems." SimplexGrinnell's motion at 7.

The Court, having heard the parties' arguments, and having read the briefs, Hick's report and deposition transcript, concludes that Hicks: (i) may not testify about the standard of care for engineers; (ii) may not testify that SimplexGrinnell is liable and that the architect is not liable for the failure of the fire sprinkler system; (iii) may testify who had the responsibility for the design of the fire sprinkler system based on his review of the documents; and (iv) may testify that there was a need for a fire sprinkler system that dealt with the cold conditions and complied with NFPA13 and NFPA13R, but cannot testify about being an expert in NFPA13 and NFPA13R or what the alternatives were.

**IT IS ORDERED** that SimplexGrinnell's Motion to Exclude Expert Opinions and Testimony of Gregory Hicks is granted in part and denied in part.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 611011

Footnotes

1 The Court's citations to the transcript of the November 23, 2009 hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2 SimplexGrinnell also argues that the Court should also exclude Hicks' opinions because Hicks failed to comply with rule 26(a)(2) of the Federal Rules of Civil Procedure. *See* SimplexGrinnell's motion at 2. The Court has previously ruled that it would not exclude Hicks' opinions as a result of his failure to comply with rule 26(a)(2) because Hick's noncompliance with rule 26(a)(2) caused very little prejudice. *See* Memorandum Opinion and Order at 6–7, filed January 31, 2010 (Doc. 501).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.