Case 1:16-cv-12541-TLL-PTM ECF No. 374-14, PageID.33043 Filed 01/15/20 Page 2 of 94

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

JASON COUNTS, *et al.*, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GENERAL MOTORS LLC, ROBERT BOSCH GMBH, and ROBERT BOSCH, LLC, *et al.*,

Defendants.

C.A. No. 1:16-cv-12541-TLL-PTM

Honorable Thomas L. Ludington

Magistrate Judge Patricia T. Morris

# PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

**[UNREDACTED VERSION OF DOCUMENT(S) TO BE SEALED PURSUANT TO 5.3(b)(B)(iii)]**

# TABLE OF CONTENTS

**Page**


STATEMENT OF ISSUES ..... vii

CRUZE STATEMENT OF CONTROLLING/PERSUASIVE ..... x

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 7

A. Ryan Harrington ..... 10

1. Because Mr. Harrington has no knowledge, skill, experience, training, or education in PEMS testing design or data analysis, his opinions relating to PEMS testing are unreliable and should be excluded. ..... 10

2. Mr. Harrington's opinions, theories, and methodologies are unreliable, and his opinions regarding PEMS testing, alleged problems with the test vehicle, and the use of an outside air temperature model should be excluded. ..... 20

B. Nick Molden ..... 47

1. Mr. Molden is not qualified to offer an opinion on the soundness of Mr. Smithers's engineering judgment. ..... 48

2. Mr. Molden's report and deposition demonstrate ignorance of U.S. emissions testing regime. ..... 49

C. Dr. Kimberly A. Neuendorf's conclusions are unreliable and unhelpful to the jury and should be excluded. ..... 63

D. Dr. Eric T. Bradlow ..... 68

1. Certain of Dr. Bradlow's Opinions are Contrary to Law and Cannot Help the Jury. ..... 69

2. Dr. Bradlow's Opinions are Unreliable. ..... 72

3. Dr. Bradlow is Not Qualified to Opine on Qualitative Content Analysis. ..... 76

E. Dr. Lorin Hitt ..... 78

III. CONCLUSION ..... 79




010611-11/1337361 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. Am. Capital Ltd.*,
287 F. Supp. 3d 763 (D. Ariz. 2017) ....................67

*Ancho v. Pentek Corp.*,
157 F.3d 512 (7th Cir. 1998) ....................13

*Auto Ins. Supplier ESOP v. Ford Motor Co.*,
435 F. App'x 430 (6th Cir. 2011) ....................31, 32

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) ....................66

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ....................x, 11, 71

*Berry v. Crown Equip. Corp.*,
108 F. Supp. 2d 743 (E.D. Mich. 2000) ....................x, 21, 48

*Boucher v. U.S. Suzuki Motor Cop.*,
73 F.3d 18 (2d Cir. 1996) ....................75

*Broomfield v. Craft Brew All., Inc.*,
No. 17-cv-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ....................70, 71

*Concord Boat v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ....................9

*Cook v. Am. S.S. Co.*,
53 F.3d 733,739 (6th Cir. 1995), *abrogated on other grounds by GE v. Joiner*, 522 U.S. 136 (1997) ....................22

*Counts v. Gen. Motors, LLC*,
No. 16-CV-12541, 2017 WL 1406938 (E.D. Mich. Apr. 20, 2017) ....................69

*Daubert v. Merrell Dow Pharms. Inc.*,
509 U.S. 579 (1993) ....................*passim*



010611-11/1337361 V1

*Design Basics, L.L.C. v. DeShano Cos., Inc.*,
No. 10-14419, 2012 WL 4340784 (E.D. Mich. Sept. 21, 2012) ........................11

*Dow Corning Corp. v. Weather Shield Mfg., Inc.*,
No. 09-10429, 2011 WL 2490962 (E.D. Mich. June 22, 2011)...............x, 10, 20

*Dow v. Rheem Mfg. Co.*,
No. 09-13697-BC, 2011 WL 4484001 (E.D. Mich. Sept. 26, 2011) ..........*passim*

*Everlight Elecs. Co. v. Nichia Corp.*,
No. 12-CV-11758, 2014 WL 4707053 (E.D. Mich. Sept. 22, 2014) .....12, 13, 14

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
334 F.R.D. 96 (E.D. Mich. 2019) ..................................................................69

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
382 F. Supp. 3d 687 (E.D. Mich. 2019) ..........................................................77

*Finn v. Warren Cty., Ky.*,
768 F.3d 441 (6th Cir. 2014) ..........................................................................65

*FTC v. DIRECTV, Inc.*,
No. 15-CV-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16,
2018) ..............................................................................................................76

*GE v. Joiner*,
522 U.S. 136 (1997)...........................................................................53, 65, 75

*Hyland v. HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) ..........................................................................74

*Isely v. Capuchin Province*,
877 F. Supp. 1055 (E.D. Mich. 1995) .......................................................10, 11

*Kerns v. Beam*,
No. 3:15CV-00212-DJH, 2017 WL 3584921 (W.D. Ky. Aug. 18,
2017) ..............................................................................................................65

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999).......................................................................................x, 67

*LidoChem, Inc. v. Stoller Enters. Inc.*,
No. 1:09-CV-204, 2013 WL 12224209 (W.D. Mich. May 7, 2013) .................77

Case 1:16-cv-12541-TLL-PTM ECF No. 374-24, PageID.33087 Filed 01/05/20 Page 56 of 94

*Lyngaas v. Curaden AG*,
No. 17-10910, 2019 WL 6210690 (E.D. Mich. Nov. 21, 2019) ........................75

*McGuire v. Metro. Life Ins. Co.*,
No. 12-10797, 2014 WL 3894363 (E.D. Mich. Aug. 8, 2014) ........................8, 9

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) ..................................................................52, 53, 76

*Meemic Ins. Co. v. Hewlett-Packard Co.*,
717 F. Supp. 2d 752 (E.D. Mich. 2010) ..........................................................55

*Merisant Co. v. McNeil Nutritionals, LLC*,
515 F. Supp. 2d 509 (E.D. Pa. 2007)...............................................................71

*Mike's Train House, Inc. v. Lionel, LLC*,
472 F.3d 398 (6th Cir. 2006) .............................................................................9

*Moore v. Ashland Chem., Inc.*,
151 F.3d 269 (5th Cir. 1998) .............................................................................9

*In re Northwest Airlines Corp. Antitrust Litig.*,
197 F. Supp. 2d 908 (E.D. Mich. 2002) ............................................................9

*Oglesby v. General Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) ...........................................................................13

*Orthofix Inc. v. Lemanski*,
No. 13-11421, 2015 WL 12990115 (E.D. Mich. Sept. 29, 2015)................31, 33

*Papin v. Demski*,
169 N.W.2d 351 (Mich. Ct. App. 1969), *aff'd*, 177 N.W.2d 166
(Mich. 1970) ....................................................................................................71

*Pride v. BIC Corp.*,
218 F.3d 566 (6th Cir. 2000) ......................................................................21, 22

*Reliable Transp. Specialists, Inc. v. Wausau Underwriters Ins. Co.*,
No. 15-12954, 2019 WL 1455439 (E.D. Mich. Apr. 2, 2019).............................8

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ...........................................................................69

Case 1:16-cv-12541-TLL-PTM ECF No. 81, PageID.3733 Filed 01/20/21 Page 67 of 94

*Rose v. Truck Ctrs., Inc.*,
388 F. App'x 528 (6th Cir. 2010) ....................52

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ....................76

*Shanks v. Jarrow Formulas, Inc.*,
No. CV1809437PAAFMX, 2019 WL 4398506 (C.D. Cal. Aug. 27, 2019) ....................72

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) ....................14

*Sigler v. Am. Honda Motor Co.*,
532 F.3d 469 (6th Cir. 2008) ....................52

*Smelser v. Norfolk S. Ry. Co.*,
105 F.3d 299 (6th Cir. 1997) ....................x, 22

*Stanczyk v. Black & Decker, Inc.*,
836 F. Supp. 565 (N.D. Ill. 1993) ....................23

*Stevens v. Nat'l Liab. & Fire Ins. Co.*,
No. 13-12920, 2015 WL 5567758 (E.D. Mich. Sept. 21, 2015) ....................10

*Taylor v. Certainteed Corp.*,
No. 01-74544, 2003 WL 25695244 (E.D. Mich. Oct. 9, 2003) .......13, 14, 22, 55

*Thomas v. Novartis Pharms. Corp.*,
443 F. App'x 58 (6th Cir. 2011) ....................7

*Tipton v. CSX Transp., Inc.*,
No. 3:15-CV-311-TAV-CCS, 2018 WL 4904954 (E.D. Tenn. Jan. 2, 2018) ....................73

*United States v. Bonds*,
12 F.3d 540 (6th Cir. 1993) ....................71

*United States v. Rios*,
830 F.3d 403 (6th Cir. 2016) ....................73

*Universal Coin & Bullion, Ltd v. Fed. Express Corp.*,
No. 2:12-CV-2778-SHM-DKV, 2015 WL 12001264 (W.D. Tenn. June 30, 2015) .......... 73

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .......... 10, 72

## OTHER AUTHORITIES

Akshaya Kamalnath, *Corporate Governance Case for Board Gender Diversity: Evidence from Delaware Cases*, 82 Alb. L. Rev. 23, 42 (2019) .......... 63

Fed. R. Evid. 104 .......... 11

Fed. R. Evid. 702 .......... *passim*

Fed. R. Evid. 704(a) .......... 71

Local Rule 7.1 .......... 7

## STATEMENT OF ISSUES

Rule 702 provides that expert witnesses may only testify if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. If Defendants' experts lack qualifications and do not proffer reliable testimony, should the Court exercise its gatekeeping function to exclude the proffered expert witnesses from testifying? Specifically:

### Ryan Harrington

1. Mr. Harrington has no knowledge, skill, experience, training, or education in PEMS testing design or data analysis. Should the Court exclude Mr. Harrington's opinions concerning:

    a. [redacted]

    b. Mr. Smithers's PEMS testing methodology and analysis at section 6 of his report?

2. Mr. Harrington's theories, opinions, and methodologies are unreliable because he failed to test any of his theories. Should the court exclude Mr. Harrington's opinions concerning:

    a. Mr. Smithers's PEMS testing methodology at sections 6.2, 6.3, 6.4 of his report?

    b. [redacted]

    c. Whether Mr. Smithers's test vehicle is representative of Cruze vehicles in general at section 6.3.1 of his report?

3. [redacted] Should the court exclude as unreliable Mr. Harrington's opinions concerning:

[1] "PEMS" refers to a "portable emissions testing system" that allows measurement of emissions in the real world, outside a laboratory environment. *See* Ex. 9 (Smithers Report at § 78, p. 23).



010611-11/1337361 V1

[redacted]

4. Mr. Harrington improperly relied on staff and consultants to conduct analyses and draft sections of his report, to such an extent that it is not possible to determine to what extent the report reflects his own work or engineering judgment? Should the Court exclude all, or at least Sections 5.2.4, 5.2.5, 6, and 7.2 of Mr. Harrington's report as unreliable?

**Nick Molden**

5. Mr. Molden lacks engineering training and experience and has degrees in philosophy and economics. Should he be permitted to testify concerning engineering principles as applied to vehicle emissions technology such as a purported correlation between driving style and diesel emissions implied by § IV of his report?

6. Mr. Molden proffers no training or verifiable experience with U.S. emissions regulations. And he demonstrated ignorance of U.S. regulatory driving cycles in his report and his testimony. Should the Court exclude Mr. Molden's opinions concerning:

   a. The appropriate on-road driving cycles and conditions during PEMS testing for determining compliance with U.S. emissions set forth at Molden Report ¶¶ 39–40?

   b. The U.S. approach to emissions certification set forth at Molden Report ¶¶ 47–48?

   c. EPA test cycles set forth at Molden Report ¶¶ 59–64?

7. Mr. Molden proffers no verifiable training or experience in designing protocols for using PEMS to detect defeat devices in the U.S. Should he be permitted to testify as to the appropriate test protocols for using PEMS to detect a defeat device in vehicles sold in the U.S. as discussed in § III.b. of Mr. Molden's report?

8. Mr. Molden speculates throughout his report that just because certain phenomena can occur, that they did occur in this case. Should the Court exclude Mr. Molden's *ipse dixit* statements, including:

   a. His assertion that data may have been edited or omitted from Mr. Smithers test results as set forth in sections III.a., III.c., and ¶ 143 of his report?

b. Statements declining to offer opinions with any degree of scientific certainty contained in ¶¶ 71, 81, 88, 89, 119, 122 and 139 of his report?

**Dr. Kimberly A. Neuendorf**

9. Dr. Neuendorf proffers opinions critical of Plaintiffs' expert's qualitative content analysis that apply principles applicable to quantitative content analysis, which is a separate field.

a. Should her opinions at ¶¶ 12–71 of her report be excluded because they are unreliable and because they do not "fit" the issues in this case?

b. Should her opinions at ¶¶ 12–20 of her report be excluded because they do not help the trier of fact understand the evidence?

10. Dr. Neuendorf lacks qualifications in qualitative content analysis, which she was retained to critique. Should her opinions be excluded because she is not capable of rebutting the conclusions set forth in the report and testimony of Plaintiffs' expert, Dr. Venkatesh Shankar?

**Dr. Eric T. Bradlow**

11. Dr. Bradlow offers opinions in ¶¶ 15–16, 18, 20-22, 24–27 of his report that are contrary to law, do not "fit" the issues in this litigation, and are contrary to the record. Should they be excluded as unreliable and unhelpful to the jury?

12. Dr. Bradlow is not qualified to offer an opinion on qualitative content analysis and thus cannot rebut the opinions proffered by Plaintiffs' expert, Dr. Shankar. Should he be excluded as an expert in this litigation?

**Dr. Lorin Hitt**

13. Dr. Hitt attempts to construct a "but-for" damages model that runs contrary to the admonition in the Federal Manual of Scientific Evidence that such a model is useful only to the extent that it can isolate the value Plaintiffs lost. Should his opinion summarized at 185:9–191:3 of his deposition be excluded because it does not assist the jury in understanding the evidence?

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

1. Fed. R. Evid. 702

2. *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

3. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

4. *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299 (6th Cir. 1997).

5. *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

6. *Dow v. Rheem Mfg. Co.*, No. 09-13697-BC, 2011 WL 4484001 (E.D. Mich. Sept. 26, 2011).

7. *Dow Corning Corp. v. Weather Shield Mfg., Inc.*, No. 09-10429, 2011 WL 2490962 (E.D. Mich. June 22, 2011).

8. *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000).

# I. INTRODUCTION

Defendants in this case have retained a stable of opposition experts to gather and proffer every criticism available, without regard for validity or materiality. Neither of Defendants' proffered engineering experts has tested the Cruze diesel vehicles to determine whether they are clean, compliant, or environmentally friendly. Indeed Bosch's proffered Portable Emissions Measurement System ("PEMS") expert, Nick Molden, runs a business that tests and provides air quality "grades" to vehicles:




[2]

"Mr. Molden," they could have said, "we're so confident that our cars are clean, put them to the test. Give us a grade. We know we'll get an A." Instead, they asked

[2] Ex. 1-A (Air Index, last visited Aug. 26, 2020).



010611-11/1337361 V1

their testifying experts to perform no tests at all on the Cruze vehicles, content merely to raise the specter of untested theories for how these vehicles could have failed PEMS tests so spectacularly during Plaintiffs' testing

Juston Smithers is a trained chemical engineer who has focused his two-decade career on emissions and emissions control technologies. Mr. Smithers directed PEMS testing of two Cruze vehicles, and personally analyzed the resulting data to assess the emissions performance of the test vehicles.[3] He found that the diesel Cruze vehicle's emissions were several times higher than permitted by regulations and represented by GM and Bosch in a variety of driving styles, at low and high ambient temperatures, and on road grades of 2% or higher.[4] [redacted]

---

[3] Ex. 9 (Smithers Report, at §§ 68-82, pp. 22–23).

[4] *Id.* §§ 105–130, pp. 30–46.

[5] "Defeat devices" "are undisclosed mechanisms of reducing the effectiveness of the emission control system when the vehicle is driven off the test cycle but in conditions that are 'reasonably to be expected to be encountered in normal vehicle operation and use.'" *Id.* ¶ 136, p. 48.

[redacted]

Case 1:16-cv-12541-TLL-PTM ECF No. 74-12, PageID.3316 Filed 01/12/21 Page 15 of 94

[redacted]

To respond to Mr. Smithers's analysis, Defendants proffer two witnesses: (1) Ryan Harrington, a mechanical and auto engineer with no PEMS experience, and (2) Nick Molden, the aforementioned British economist CEO of Emissions Analytics, a PEMS testing company. Mr. Harrington, though an engineer by training, has no background in PEMS or experience with PEMS testing. Despite his lack of PEMS experience, GM asked Mr. Harrington to opine on the validity of [redacted] and critique Plaintiffs'. Predictably, Mr. Harrington generates a bevy of kitchen sink criticisms that have no demonstrated material effect on Mr. Smithers's emissions results. [redacted]

And though Mr. Molden has experience with PEMS data analysis in European real-world driving cycles, he has no engineering training, no verifiable experience or training on test protocols for detecting defeat devices in Europe or the U.S., and a demonstrated ignorance of U.S. emissions testing. His opinions

---

[redacted]



010611-11/1337361 V1

Case 1:16-cv-12541-DML-PTM ECF No. 81-4, PageID.3387 Filed 01/20/21 Page 16 of 94

amount to a handful of *ipse dixit* conclusions that the results of Mr. Smithers's analysis may (or may not) reflect the true emissions performance of the vehicles.

[redacted]

Defendants' advertising critics fair no better. Here again, Defendants rely on two proffered witnesses to attack Plaintiffs' advertising expert, Dr. Venkatesh Shankar. Plaintiffs retained Dr. Shankar, Professor of Marketing, Coleman Chair in Marketing, and Director of Research at the Center for Retailing Studies at Mays Business School, Texas A&M University and asked him "to review the marketing strategy of [GM] with regard to its marketing and sales of Chevrolet Cruze Clean Turbo Diesel" and, specifically, "to consider the extent and role of any themes in GM's marketing of these vehicles."[8] Dr. Shankar therefore conducted a *qualitative* (not *quantitative*) content analysis to evaluate the extent and role of any themes in GM's marketing of these vehicles.[9]

Dr. Shankar reviewed GM's own documents and other advertising and concluded that "GM conducted a significant and widespread marketing campaign for its Chevrolet Cruze vehicle, emphasizing in particular the Clean Turbo Diesel

---

[8] Ex. 2 (Shankar Report ¶ 6); Ex. 3 (Shankar Dep. at 48:4–48:6).

[9] *See, e.g.*, Ex. 2 (Shankar Report ¶¶ 9-10, 46–75); *See also* Ex. 4 (Neuendorf Dep. at 58:4–60:2).

model and engine."[10] He also found that GM "extensively promoted the bundle of power /performance, fuel efficiency, and environment friendliness as attributes (themes) of the Clean Turbo Diesel model."[11]

GM proffers two rebuttal expert reports in response to Dr. Shankar's qualitative content analysis, each of which seeks to criticize or undermine Dr. Shankar's opinions for bizarre and unfounded reasons. First, GM's expert, Dr. Kimberly A. Neuendorf, claims that Dr. Shankar's content analysis was unreliable and fatally flawed. To reach this conclusion, GM's expert pretends, because she must, that all content analysis fits her own myopic view that content analysis is *quantitative*. But content analysis is not so limited or one dimensional. Misapplying her views of what content analysis must be does not come close to meeting even the liberal *Daubert* standard, as courts have recognized. Among other failures, Dr. Neuendorf's criticisms have no relation to the *qualitative* content analysis performed by Dr. Shankar. Dr. Neuendorf's testimony must be excluded because it fails to incorporate or even address aspects of the methodology in the field of qualitative content analysis. Dr. Neuendorf's report and opinions have nothing to do with Dr. Shankar's work and cannot help the jury.

---

[10] Ex. 2 (Shankar Report ¶ 9).

[11] *Id.*

Not satisfied with Dr. Neuendorf's contrived criticisms, GM's expert, Dr. Eric T. Bradlow, offers several opinions that fail to satisfy the requirements of Fed. R. Evid. 702. Dr. Bradlow's opinions rest on an assumption that it is the consumers' subjective belief of the meaning of a manufacturers' representations and omissions. This is not the objective, reasonable consumer standard set forth in the case law that governs materiality of omissions and representations made in the fraud context. His opinions therefore cannot help the jury because they ignore the law. And Dr. Bradlow is unqualified to opine on content analysis, as it is not within his expertise. As a result, these opinions are irrelevant, unreliable, and would unnecessarily confuse the jury.

Finally, Defendants offer Dr. Hitt, who completely disregards the Federal Manual of Scientific Evidence in constructing an alternative but-for world. Despite the Manual's admonition that a "but-for" world "differs from what actually happened only with respect to the harmful act," Dr. Hitt speculates that GM could change the price of the class vehicles, add new features to the class vehicles, or change their advertising and marketing of the class vehicles in a but-for world. This introduction of variables renders Dr. Hitt's but-for model utterly useless to a jury because it fails to isolate the loss of value suffered by Plaintiffs. It should thus be excluded from consideration.

Case 1:16-cv-12541-DML-PTM ECF No. 374-4, PageID.33370 Filed 11/05/20 Page 19 of 94

Pursuant to Local Rule 7.1, Plaintiffs have sought concurrence in the exclusion of experts on *Daubert* and Rule 702 grounds. Defendants have not consented to exclusion.

## II. ARGUMENT

Under Daubert and its progeny, district courts must exercise a gatekeeping role in screening the reliability of expert testimony to keep “junk science” away from juries. *Thomas v. Novartis Pharms. Corp.*, 443 F. App’x 58, 60 (6th Cir. 2011) (citing *Daubert*, 509 U.S. 579). Consistent with this directive, the Federal Rules of Evidence provide:

> A witness who his qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule gives district courts “broad discretion to determine whether a putative expert’s testimony would be inadmissible junk science or instead would be testimony falling within the ‘range where experts might reasonably differ.’” *Thomas*, 443 F. App’x at 60 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)).

The touchstone for assessing admissibility under Rule 702 and *Daubert* is reliability: if an expert’s opinions are deemed sufficiently reliable they may be

Case 1:16-cv-12541-TLL-PTM ECF No. 74-14, PageID.3321 Filed 01/15/20 Page 20 of 94

admitted. If they are not deemed reliable, they must be excluded. Courts determine whether opinion testimony is sufficiently reliable, and therefore admissible, by applying five essential principles governing Rule 702 opinion testimony. First, the "expert 'must possess a verifiable expertise in the subject matter for which he or she seeks to testify.'" *McGuire v. Metro. Life Ins. Co.*, No. 12-10797, 2014 WL 3894363, at *13-14 (E.D. Mich. Aug. 8, 2014) (quoting *Wheeler Peak, LLC v. L. C.I.2, Inc.*, No. 07-1117, 2010 WL 611011, at *2 (D.N.M. Jan. 31, 2010)); *see also* Fed. R. Evid. 702. "The expert is also 'required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.'" *McGuire*, 2014 WL 3894363, at *13–14 (citation omitted).

Second, Rule 702 assigns the trial court the task of ensuring that an expert's proffered testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 597 (1993). The court must ultimately be satisfied that the proposed expert testimony is both relevant and will assist the trier of fact, before such evidence may be submitted to the trier of fact. *Reliable Transp. Specialists, Inc. v. Wausau Underwriters Ins. Co.*, No. 15-12954, 2019 WL 1455439, at *1 (E.D. Mich. Apr. 2, 2019) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008)).

Third, "[e]xpert testimony . . . must be reasonably grounded in the record." *In re Northwest Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 914 (E.D. Mich. 2002) (citations and internal quotations omitted). *Daubert* also requires a "'fit' between the data and the opinion proffered." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 408 (6th Cir. 2006) (holding expert's testimony should have been excluded because its "methodology [did] not reflect the realities of the [relevant field]"). Expert testimony must be excluded if it "ignore[s] [critical] inconvenient evidence" or fails to incorporate all aspects of the methodology in the relevant field. *See Concord Boat v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).

Fourth, "it is well-established that 'an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.'" *McGuire*, 2014 WL 3894363, at *14 (quoting *United States v. Gordon*, 493 F. App'x 617, 626–27 (6th Cir. 2012)). "Indeed, the Sixth Circuit has made clear that '[e]xpert testimony on the law is excluded because the trial judge does not need the judgment of witnesses.'" *Id.* (quoting *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)). And expert testimony that does not differentiate between lawful and unlawful conduct is "of absolutely no use to a fact

finder," and should be excluded. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322 (11th Cir. 2003).

And fifth, "[e]xpert testimony may not be based on mere speculation, . . . and assumptions must be supported by evidence in the record." *Dow v. Rheem Mfg. Co.*, No. 09-13697-BC, 2011 WL 4484001, at *5 (E.D. Mich. Sept. 26, 2011) (citations omitted), *aff'd*, 527 F. App'x 434 (6th Cir. 2013); *Dow Corning Corp. v. Weather Shield Mfg., Inc.*, No. 09-10429, 2011 WL 2490962, at *3 (E.D. Mich. June 22, 2011) ("An expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known.") (citation omitted). "The proponent of expert testimony . . . has the burden of showing by a preponderance that her experts are qualified and their methods reliable." *Stevens v. Nat'l Liab. & Fire Ins. Co.*, No. 13-12920, 2015 WL 5567758, at *2 (E.D. Mich. Sept. 21, 2015).

## A. Ryan Harrington

### 1. Because Mr. Harrington has no knowledge, skill, experience, training, or education in PEMS testing design or data analysis, his opinions relating to PEMS testing are unreliable and should be excluded.

Mr. Harrington does not possess the knowledge, skill, experience, training, or education to render an opinion specific to PEMS testing or data analysis. As a threshold examination, courts ask whether a proposed expert is qualified to render an opinion. *Isely v. Capuchin Province*, 877 F. Supp. 1055, 1063 (E.D. Mich.

1995) (stating that qualification of witness by virtue of education and training is the "initial foundational requirement"). "An expert must possess a verifiable expertise in the subject matter for which he or she seeks to testify." *Design Basics, L.L.C. v. DeShano Cos., Inc.*, No. 10-14419, 2012 WL 4340784, at *2 (E.D. Mich. Sept. 21, 2012) (citing *Wheeler Peak, LLC v. L.C.I.2, Inc.*, 2010 WL 611011 (D.N.M. 2010)); *see also* Fed. R. Evid. 702. The expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Id.* (citing *Life Wise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

When making a preliminary finding regarding an expert's qualifications under Fed. R. Evid. 104(a), the court is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). A proper foundation for a technical expert demonstrates "firsthand familiarity" with the subject of the testimony. *Id.* at 1350.

Mr. Harrington purports to render expert opinions on numerous aspects of PEMS testing and the methodology Mr. Smithers used in his testing program for

the subject Cruze vehicles.[12] Among other things, Mr. Harrington opines that: 1) PEMS equipment introduces unacceptable measurement uncertainties;[13] 2) Mr. Smithers should have calibrated his PEMS equipment against a dynamometer;[14] 3) Mr. Smithers should have designed his testing program differently, including duplicate runs of the same test routes, and testing multiple vehicles with multiple drivers.[15] But Mr. Harrington has no professional experience or education that qualify him to render opinions on how to properly conduct PEMS testing.

Mr. Harrington has education and training mechanical and automotive engineering but has no education, training, or experience specific to PEMS emissions testing or data analysis.[16] The fact that a purported witness is an expert in one area does not automatically qualify him to testify as an expert in all related areas. *See Everlight Elecs. Co. v. Nichia Corp.*, No. 12-CV-11758, 2014 WL

---

[12] The sections of Mr. Harrington's report that relate to PEMS testing, and which Plaintiffs seek to exclude based on his lack of experience or expertise are: [redacted], and Section 6 (addressing Mr. Smithers's PEMS testing and analysis methodology). For this and the following sections, Plaintiffs' request to exclude sections of Mr. Harrington's report also includes Section 4 of his report, to the extent that the Executive Summary and Summary of Opinions summarize opinions for which exclusion is sought.

[13] *See* Ex. 5 (Harrington Report at 37–39).

[14] *See Id.* at 41–42.

[15] *Id.*

[16] *See* e.g., Ex. 5 (Harrington Report Appendix A (Curriculum Vitae) at p. 2); Ex. 6 (Harrington Dep. Vol. I at 79:10–85:5; 88:4–89:5; 120:13–121:13; 161:2–9; 181:3–11; 182:4–16; 183:9–13; 185:12–19).

Case 1:16-cv-12541-DML-PTM ECF No. 74-4, PageID.3376 Filed 01/15/20 Page 25 of 94

4707053, at *9 (E.D. Mich. Sept. 22, 2014) (citing *Oglesby v. General Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999)). The *Oglesby* court held that the district court properly excluded plaintiff's proffered liability expert, a mechanical engineer, and affirmed the district court's grant of defendant's motion for summary judgment explaining:

> While plaintiff's expert is clearly qualified as an expert on various engineering principles, ... this court finds that [the expert's] proposed testimony lacks the reliability, foundation and relevance necessary for admissibility in this case [because he] has shown no knowledge of the manufacturing process, the [allegedly defective] radiator's composite makeup, nor has he conducted any meaningful testing or analysis .... Without Bradbury's testimony, Oglesby failed to meet his burden of proof."

190 F.3d at 248–49. The Seventh Circuit's opinion in *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998) is also instructive. In *Ancho*, the proffered expert, a "graduate mechanical engineer" could not testify about plant redesign without specific expertise in the field. In so holding, that court explained that "[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Id.*

Following this guidance, courts in this District have likewise excluded proffered experts when their general engineering experience and training does not relate to the subject matter of the proposed testimony. In *Taylor v. Certainteed*

Case 1:16-cv-12541-TLL-PTM ECF No. 37-4, PageID.3287 Filed 11/05/20 Page 26 of 34

*Corp.*, No. 01-74544, 2003 WL 25695244, at *3 (E.D. Mich. Oct. 9, 2003), for example, the district court excluded expert testimony because the mechanical engineer expert had no training or experience with load securement on curtainside trailers (as opposed to other types of trailers that required different means of load securement). And in *Everlight*, 2014 WL 4707053, at *9, the proffered expert's training and experience in the broad field of chemical engineering and his experience in the general area of semiconductors and LEDs did not qualify him to testify specifically about phosphor synthesis. *Id.*; *see also Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001) ("[A]n expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering. Unless he is to testify only to general engineering principles that any mechanical engineer would know, the engineer must possess 'some special skill, knowledge or experience,' concerning the particular issue before the court.") (internal citation omitted).

Like the excluded experts in *Oglesby*, *Ancho*, *Taylor*, and *Everlight*, Mr. Harrington's general training in automotive engineering does not qualify him to offer opinions on PEMS testing or data analysis.

Mr. Harrington's report broadly criticizes Mr. Smithers's PEMS testing methodology, including such factors as vehicle selection and maintenance, route selection, equipment calibration, and driving styles, ultimately claiming that Mr.

Smithers's methodology was "inconsistent with good engineering practices."[17] But Mr. Harrington has never conducted a PEMS test. He has never designed a PEMS testing program, selected routes, or analyzed the impacts of driving styles on PEMS results. Though he is a mechanical engineer, he possesses no special knowledge, skill, or experience concerning PEMS testing.

Mr. Harrington admitted in deposition that he has never conducted a PEMS test:

> Q. Have you ever conducted personally a PEMS test on the vehicle?
>
> A. I have not conducted PEMS testing. I've conducted FTP testing, but not PEMS testing.
>
> . . .
>
> Q. …. Have you ever conducted a PEMS test for the purpose of analyzing diesel vehicle emissions?
>
> [Objection to form.]
>
> A. I think I answered that, but I said I had not conducted PEMS testing. I provided some context to the other testing, but I think I clearly stated I hadn't conducted PEMS testing on a diesel vehicle.
>
> Q: Have you ever conducted a PEMS test for purpose [sic] of analyzing emissions on a gasoline vehicle?
>
> A. I have not.[18]

---

[17] Ex. 5 (Harrington Report at 6–7).

[18] Ex. 6 (Harrington Dep. Vol. I. at 79:10–80:25).



010611-11/1337361 V1

Mr. Harrington's lack of experience in PEMS testing is not limited to hands-on experience using the equipment, but extends to the design and implementation of a PEMS testing program:

> Q. Have you ever designed a test route for purpose [sic] of running a PEMS test to analyze emissions on a diesel or gasoline vehicle?
>
> [Objection to form.]
>
> A. I have not designed a route for PEMS testing. . . .
>
> Q. Have you ever hooked up or set up a PEMS unit on a vehicle for purposes of emissions testing?
>
> A. I have not.
>
> Q. . . . Have you ever directed that a PEMS unit be attached to a vehicle and then test it on a dynamometer for purposes of assessing whether the PEMS was accurate or not?
>
> A. I have not.
>
> Q. Have you ever designed a testing program using a PEMS unit for purposes of analyzing diesel or gas vehicle emissions?
>
> A. I have not.[19]

Mr. Harrington has never even been asked to conduct a PEMS test or interpret or analyze the validity of PEMS testing results for non-litigation purposes.[20]

Mr. Harrington not only lacks any experience in PEMS testing, but he has never been trained in how to use a PEMS unit.

---

[19] *Id*. at 81:1–82:1.

[20] *Id*. at 88:4–89:2.



010611-11/1337361 V1

Q. Have you received any formal training in using a PEMS analyzer?

A. Again, not a PEMS analyzer, I've done other emissions analytics, but not a specific PEMS unit.

Q. Have you received, for example, any informal training, like attended a seminar or a demonstration by a manufacturer of a PEMS unit to learn how the PEMS unit works?

[Objection to form.]

A. I have not.

Q. Was the use of a PEMS unit the part of any aspect of your formal education? I know we'll go into that later, but have you had any classes or formal university training that relates specifically to the use of a PEMS unit?

A. When I went to school, PEMS units weren't typically in use or hadn't been very widespread in use.

Q. Okay. So the answer is no, there weren't any classes offered at the time you were in school that related to how to set up or use a PEMS unit?

A. Not specific to a PEMS unit, no. It was on-road testing in itself.

Q. In connection with your work on this case, have you spoken with any PEMS unit manufacturers regarding the proper use of PEMS equipment?

A. I have not.[21]

So Mr. Harrington cannot make up for his lack of experience with the equipment with any specialized knowledge or training in the field. In fact, Mr.

[21] *Id*. at 82:2–83:7.

Harrington did not even bother to study the user manual for the Semtech PEMS unit used by Mr. Smithers in his testing program:

> Q. Have you personally reviewed the user's manuals or the manuals for the Semtech PEMS unit?
>
> [Objection to form.]
>
> A. I can't say that I reviewed every aspect of it, but I did review the materials and some of the owner's manual pieces of that Semtech unit.
>
> Q. What parts of the owner's manual do you recall reviewing?
>
> A. There was the discussion of operating PEMS temperatures. I think some of the setup pieces, but it was a while ago, so I can't remember the exact sections.[22]

Mr. Harrington demonstrated his lack of knowledge regarding PEMS testing and analysis during his deposition when he admitted he was not even familiar with a standard calculation contained in the EU Real Driving Emissions ("RDE") regulations cited in his report. The calculation, known as $V*A^{POS}$@95, is required to assess how aggressively or passively a PEMS test conducted under the RDE was driven. But when asked whether he had made that calculation for purposes of assessing GM's test results, Mr. Harrington was entirely unfamiliar with it:

> Q. No, I'm asking if you are familiar with that calculation, apparently the answer to that is no. You're not familiar with the VA POS at 95 calculation?
>
> [Objection.]

[22] *Id*. at 84:15–85:5.

There's the relative positive – is it relative positive acceleration that you are talking about? Hearing what you said, I don't remember seeing that, that metric or that number or equation you're referencing.

Q. Relative positive acceleration is something else, let me ask you this, did you calculate the relative positive acceleration for the CoC test results presented here?

A. I don't remember calculating that, no.

Q. Okay. The VA POS at 95 measurement is defined sometimes as the 95th percentile of the products of instantaneous speed and positive acceleration. Does that ring any bells?

[Objection to form.]

A. It does not.[23]

Mr. Harrington's testimony also revealed that despite his use of the RDE to criticize Mr. Smithers's methodology, he was unfamiliar with its provisions regarding test route segments, which are a critical component of emissions analysis under the RDE.[24]

---

[23] *Id*. at 309:10–16. *See also id*. at 307:17–309:9; Harrington Dep. Vol. II at 480:8–15 (again indicating he was "not familiar" with the $V*A^{POS}$@95 calculation); 496:13–24. The calculation is required by the European Union Real Driving Emissions ("RDE") regulation which requires PEMS testing to verify real world vehicle emission. The $V*A^{POS}$@95 calculation is used "to determine the overall excess or absence of dynamics during urban, rural and motorway driving." *See* Commission Regulation (EU) 2016/646, L 109/12 (Appendix 7A, § 3.1.4). Mr. Harrington cites to and describes a different portion of that same regulation in his report at Appendix E, p. 26, n.551 (Ex. 5). Moreover, he analyzes the trip dynamics of Mr. Smithers's testing data at pp. 75–77 of his report, without discussing $V*A^{POS}$@95.

[24] Ex. 6 (Harrington Dep. Vol. II at 448:18–449:1). The RDE includes specific requirements for the classification of test route segments by speed into rural, urban, and motorway segments. *See* Commission Regulation (EU) 2016/646, L 109/8 – 109/9 (Appendix 6, § 3.2). It also specifies the weight each segment must be given

In short, Mr. Harrington has no qualifications, education, or experience that renders him qualified to assess the validity of PEMS testing, whether a PEMS testing program was properly designed or implemented, or assess the data that results from a PEMS testing program. He has not conducted a single PEMS test, has never received training in PEMS testing, and did not even bother to read the entire user manual for the equipment used in Mr. Smithers's test program. And he appears unfamiliar with standard PEMS testing calculations, even those based on regulations he cited in his report. Far from possessing special knowledge, skill, or experience on this subject, Mr. Harrington can do no more than render baseless opinions that will only confuse, not assist, the trier of fact.

**2. Mr. Harrington's opinions, theories, and methodologies are unreliable, and his opinions regarding PEMS testing, alleged problems with the test vehicle, and the use of an outside air temperature model should be excluded.**

In assessing reliability, the court is to focus on "the soundness of the expert's methodology." *Dow Corning Corp.*, 2011 WL 2490962, at *7. In making this inquiry, *Daubert* instructs that courts should determine (1) whether the proposed expert's theory has been tested; (2) whether it has been subject to peer

---

in calculating test results. *Id.* at L 109/9 (Appendix 6, § 3.9). Harrington testified that he understood that GM's PEMS testing was intended to replicate the RDE testing, but did not know the RDE requirements regarding test segment weighting, and admitted he had not analyzed GM's data to determine whether its tests conformed to RDE test route standards. *Id.* at 444:6–445:21, 498:11–500:9.

Case 1:16-cv-12541-TLL-PTM ECF No. 37-24, PageID.3054 Filed 01/05/20 Page 23 of 94

review and publication; (3) the rate of error associated with the methodology; and (4) whether the theory or methodology has been generally accepted in the particular scientific community. *Daubert*, 509 U.S. at 593–94; *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000). *See also* Amendments to Fed. R. Evid. 702 (effective Dec. 1, 2000); *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000).

**a. Mr. Harrington's opinions regarding PEMS testing, alleged problems with the test vehicle, and the validity of GM's AECD justifications are unreliable and inadmissible because he failed to test any of his theories.**

Compounding Mr. Harrington's lack of PEMS-specific qualifications and knowledge is his failure to test any of the theories he offers. Instead, Mr. Harrington identifies alleged shortcomings in Mr. Smithers's methodology, and in the test vehicle itself, but offers only bald speculation regarding the impacts of these supposed problems. Mr. Harrington's failure to test his theories renders his opinions unreliable and inadmissible.

Courts interpreting *Daubert* have considered testability of the expert's theory to be the most important of the four reliability factors. *Dow*, 2011 WL 4484001, at *9 (citing *Berry*, 108 F. Supp. 2d at 754). this is especially true in cases involving allegations of defect in product design, as opposed to cases involving medical and pure scientific theories that are subjected to rigorous peer review. *Berry*, 108 F. Supp. 2d at 754. And experts who lack specific experience or

training in the subject matter of their testimony are furthermore required to make up for that by performing reliable testing of their theories. *See Taylor*, 2003 WL 25695244, at *4 (holding that when the lack of testing is combined with the expert's stated unfamiliarity with a specific subject, the testimony does not "assist the trier of fact to understand the evidence or to determine a fact in issue").

Thus, where, as here, the proffered expert has performed no testing of his theory, courts, including the Sixth Circuit, have routinely precluded the witness from offering an expert opinion. *Dow*, 2011 WL 4484001, at *9–10. *See also Pride*, 218 F.3d at 577-78 (finding summary judgment in favor of the product liability defendant was proper where plaintiff's only expert's theory was unsupported by reliable testing); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 304–05 (6th Cir. 1997) (concluding where plaintiff's expert failed to perform any testing on the alleged defective seatbelt, the expert's opinion should have been excluded), *abrogated on other grounds by Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998); *Cook v. Am. S.S. Co.*, 53 F.3d 733,739 (6th Cir. 1995) ($100,000 judgment in favor of plaintiff vacated where the district court permitted an expert qualified in testing and failure analysis to offer an opinion that a marine rope had failed from exposure to a torch, where the only "test" performed by the expert was to visually examine the frayed end of the alleged defective line with the naked eye and under a low power microscope), *abrogated on other*

Case 1:16-cv-12541-TLL-PTM ECF No. 374-24, PageID.33376 Filed 11/05/20 Page 35 of 94

*grounds by GE v. Joiner*, 522 U.S. 136 (1997); *Stanczyk v. Black & Decker, Inc.*, 836 F. Supp. 565, 567 (N.D. Ill. 1993) (defendant's motion *in limine* to exclude expert testimony granted where plaintiffs' expert offered "no testable design to support his concept.").

Here, Mr. Harrington introduces numerous theories regarding issues he alleges could have impacted Mr. Smithers's test results.[25] He did not test any of them. For example, Mr. Harrington asserts that PEMS equipment introduces measurement uncertainties.[26] Yet Mr. Harrington's staff only visually inspected Mr. Smithers's PEMS equipment at the vehicle inspection; they did not run a PEMS test of their own, check the machine's calibration, or even turn the machines on.[27] And Mr. Harrington admitted that he did not conduct *any* testing of PEMS equipment for purposes of his opinion.[28] In other words, Mr. Harrington rendered an opinion about the accuracy of a machine he has never used, has never been trained on, and for all his testimony reveals, has never even seen in person. And he did so without testing, even though the actual accuracy of the PEMS equipment clearly could have been demonstrated.

---

[25] These theories, examples of which are summarized below, are reflected in Sections 6.2, 6.3, and 6.4 of Mr. Harrington's report. Because none of these theories were tested, they should be excluded as unreliable.

[26] Ex. 5 (Harrington Report at 37–39).

[27] Ex. 6 (Harrington Dep. Vol. I at 61:11–63:23, 89:14–93:12).

[28] *Id*. at 63:18–64:1, 89:14–90:4.

Case 1:16-cv-12541-DML-PTM ECF No. 374-4, PageID.33387 Filed 01/05/20 Page 36 of 94

Mr. Harrington theorizes that a number of factors, including hills, wind conditions, vehicle weight, wind drag from test equipment, and driver behavior could have impacted Mr. Smithers's results.[29] He also states that alleged issues with the diesel test vehicle "render it non-representative of the Plaintiffs' proposed class . . . ."[30] Yet again, Mr. Harrington did absolutely no testing to confirm his theories—he simply identified *potential* factors without 1) demonstrating that those factors actually impact PEMS test results; 2) quantifying any such impacts to show that they are material; or 3) showing that those factors actually impacted Mr. Smithers's test results.

Mr. Harrington could have, but elected not to run a PEMS test on Mr. Smithers's test vehicles during the vehicle inspection: "we analyzed the vehicle and assessed the vehicle, but we didn't do any PEMS testing looking at the emissions of the vehicle."[31] Nor did Mr. Harrington conduct (or have his staff conduct) PEMS testing on any other Cruze vehicles in order to test his theories regarding the potential impacts of temperatures, route selection, driver behavior, or vehicle maintenance:

> Q. Aside from the vehicle inspection that people working under your direction attended, you have not conducted any PEMS

---

[29] Ex. 5 (Harrington Report at 40–43).

[30] *Id*. at 58.

[31] Ex. 6 (Harrington Dep. Vol. I at 61:11–63:1).

testing of any Cruze vehicles for purposes of this report, correct?

A. That is correct.

Q. Have you ever performed emissions testing on any Cruze vehicle for any purpose?

A. No, I have not.[32]

Aside from the inspections performed on Mr. Smithers's test vehicles, neither Mr. Harrington nor anyone working under his direction even *inspected*, much less tested, any other Cruze vehicles:

Q. I'm just asking aside from the inspections of the test vehicles we have been discussing, have you or anyone working under your direction conducted any other inspection of a Cruze vehicle in connection with your work in this case?

A. No.

Q. Have you ever inspected any other Cruze vehicle for any other purpose?

A. Not that I can recall.[33]

Yet the fact that he never inspected a Cruze vehicle—he did not even attend the inspection of Mr. Smithers's diesel test vehicle—did not stop Mr. Harrington from giving an opinion that the test vehicle was not representative of the Cruze vehicle population.

[32] *Id*. at 63:18–64:1.

[33] *Id*. at 112:1–10.

Mr. Harrington's report speculates that several "potential issues" with the diesel test vehicle could cause the high emissions Mr. Smithers reported.[34] But despite the opportunity to do so, Mr. Harrington did nothing to confirm that any of these "potential issues" actually impacted emissions. For example, during the vehicle inspection Mr. Harrington's colleagues identified a small leak in the diesel vehicle's exhaust tube, which Mr. Harrington stated "can affect the after-treatment system."[35] But when asked in deposition whether he had done testing to determine whether or how the leak was actually impacting the vehicle's emissions, Mr. Harrington testified "I didn't do an analyses . . . . didn't evaluate whether or not there was an impact of that leak on his results in the operation of that vehicle."[36] Mr. Harrington also criticized Mr. Smithers for declining to install an update to the test vehicle's engine control software that was released after Mr. Smithers began testing.[37] But again, while he speculates that "it is possible that Mr. Smithers' failure to update . . . software affected the results of his emissions testing," (*id.* at 66) Mr. Harrington did nothing to determine if the software update would actually impact emissions.[38]

---

[34] Ex. 5 (Harrington Report at 55–70).

[35] *Id*. at 67.

[36] Ex. 6 (Harrington Dep. Vol. II at 382:10–19).

[37] Ex. 5 (Harrington Report at 66).

[38] Ex. 6 (Harrington Dep. Vol. II at 539:6–540:15).

[redacted]



010611-11/1337361 V1

Case 1:16-cv-12541-TLL-PTM ECF No. 374-24, PageID 33621 Filed 01/15/20 Page 40 of 94

[redacted]

Case 1:16-cv-12541-TLL-PTM ECF No. 374-4, PageID.33332 Filed 11/05/20 Page 40 of 94

[redacted]

Mr. Harrington—a person with no experience, training, or specialized knowledge relating to PEMS equipment—is purporting to render opinions about the factors that influence PEMS testing results. Without ever having run a single PEMS test. He purports to render opinions about whether Mr. Smithers's diesel test vehicle is representative of the general population of diesel Cruze vehicles. Without ever having inspected a single Cruze vehicle.[43] Even if Mr. Harrington possessed training, experience, and specialized knowledge in PEMS testing, which he does not, the *Daubert* standard requires a greater level of intellectual rigor for expert opinion testimony to be permitted. To allow Mr. Harrington's testimony on these subjects would confuse the jury by granting his theories the imprimatur of "expert" testimony despite the fact that they are unsubstantiated, unproven, and untested.

And while Mr. Harrington's failure to test his theories is, by itself, sufficient to justify exclusion, it is clear that his opinions fail to meet the other elements of reliability to the extent they even apply to what he has done. Mr. Harrington's opinions clearly have not been subject to peer review: he developed his theories

[43] Mr. Harrington's colleagues inspected the diesel test vehicle, but Mr. Harrington did not attend that inspection. *See* Ex. 6 (Harrington Dep. Vol. I at 62:7–9).



010611-11/1337361 V1

Case 1:16-cv-12541-DML-PTM ECF No. 74-24, PageID.3343 Filed 01/15/20 Page 42 of 94

and opinions for purposes of this litigation, and as discussed above, has no experience in this field.[44] Moreover, because he failed to test any of his theories, it is impossible to state the rate of error associated with his methodology—in essence, there is no rate of error because he has not done any replicable work or reached certain conclusions. Rather, he merely raised "possibilities," without attempting to determine whether or how those possibilities actually impacted Mr. Smithers's results. And finally, it cannot be said that Mr. Harrington's theories or methodologies have been generally accepted in the scientific community because the purely speculative nature of his opinions are not of the sort that *can be* generally accepted. Scientists do not generally accept speculative, untested theories. Had Mr. Harrington conducted any tests, we could assess his methodology and determine if it was generally accepted. But he did none; he has no methodology. Just opinions. As such, Sections 6.2, 6.3, 6.4, and 7.2, all of which reflect opinions that Mr. Harrington could have, but did not test, should be excluded.

---

[44] As discussed *supra* at section III.A.1., Mr. Harrington has no experience or training in PEMS testing. He also admitted in deposition that none of his consulting work relates to diesel vehicle emissions, or to measuring or controlling emissions in gasoline vehicles. Ex. 6 (Harrington Dep. Vol. I at 141:15–20, 142:22–143:3). And he has never published an article or given a presentation relating to PEMS testing or emissions compliance testing. *Id.* at 180:5–181:11, 182:4–16, 183:9–13; 185:12–19.

**b.** [redacted]

"A critical aspect of reliability is the sufficiency or integrity of the facts or data that support the expert's opinion." *Orthofix Inc. v. Lemanski*, No. 13-11421, 2015 WL 12990115, at *3 (E.D. Mich. Sept. 29, 2015). And one of the baseline requirements for expert testimony is that it must be based on the expert's review and knowledge of the facts and data underlying his opinions—he cannot simply adopt the work of another. In short, the expert has to do the work.

Two cases are illustrative. In *Auto Industries Supplier Employee Stock Ownership Plan v. Ford Motor Co.*, the Court assessed whether expert testimony was sufficiently reliable where the expert, Frazee, "accepted summaries of data supplied to him by Vetter [another proffered expert in the case] wholesale and simply used the data" with "little [or] any personal knowledge of the underlying data . . . ." 435 F. App'x 430, 454 (6th Cir. 2011) (internal quotation marks omitted). In that case, the Court noted the scant involvement Frazee had in preparing or analyzing the underlying data:

- Frazee admitted that he did no analysis to determine whether SNAPP's cost savings claim . . . was appropriate and that he did not know anything about it other than the fact it was on Vetter's papers that were given to him.
- Frazee admitted that he accepted SNAPP's calculation of "leaked revenue" without any analysis beyond "talk[ing] to SNAPP about the document."

Case 1:16-cv-12541-TLL-PTM ECF No. 38-12, PageID.3365 Filed 01/05/20 Page 44 of 94

- Frazee admitted that all of the cost savings information on Exhibit H–1 was provided to him by SNAPP and incorporated into his report with little more than mere formatting changes.

- Frazee admitted that he just incorporated the alleged savings percentage of 38.39 percent in a Nasser memo sent to him by SNAPP into his Report. Frazee did not undertake his analysis or due diligence to verify this percentage other than just talking to Thacker about Thacker's commodity experience.

- Frazee admitted that he incorporated most of the spreadsheet Vetter sent him entitled "Good Faith Renewal Damages" into his Report without doing any analysis of the information other than cross-referencing the numbers for accuracy with other documents provided to him by SNAPP.

- Frazee lifted and accepted the numbers from Vetter's email entitled "Damages Related to Past Due Payments Under the MLA" without further change or analysis to create Exhibit J to Supplemental Report.

*Id.* at 455–56 (citations omitted).

Based on this evidence, the Sixth Circuit Court of Appeals adopted the reasoning of the District Court in finding that: "Frazee's acceptance of other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony. . . . It is not the fact that Frazee did not have personal knowledge of the business record which is important. Rather, it is the fact that Frazee failed to perform any intellectual analysis or review of the underlying source documents (which SNAPP says are its business records) sufficient to qualify him as an expert. As demonstrated above, Frazee had no actual involvement in the calculations of SNAPP's damages components. Instead, he

either did no analysis or accepted the analysis supplied by others, particularly Vetter." *Id.* at 456 (alterations in original, italics omitted).

A recent decision out of the Eastern District of Michigan adopted the reasoning in *Auto Industries* to exclude expert opinion testimony. In *Orthofix*, the issue was whether an expert's damages opinion could be based upon summary documents he did not prepare, when he did not review the data underlying the summaries. 2015 WL 12990115 at *3. Relying on *Auto Industries*, the Court found that because the proposed expert had not reviewed the underlying data, it could "have no confidence that his current calculation is based on 'sufficient facts and data'" and excluded the report and testimony. *Id.* at *5.

The upshot of these cases is clear: an expert cannot simply rely upon and adopt the work or analysis of another person. He or she must do the work and conduct an independent review underlying data if opinion testimony is to be permitted. Without that independent review, opinion testimony based on another's work is unreliable and therefore inadmissible. As the following discussion will show, Mr. Harrington violated this basic rule first by adopting and relying upon [redacted] and then by relying upon colleagues and consultants to do his analysis for him and draft the report, which he adopted as his own.



010611-11/1337361 V1

[redacted]

[redacted]

[redacted]

[redacted]

Case 1:16-cv-12541-TLL-PTM ECF No. 37-24, PageID.3651 Filed 01/15/20 Page 90 of 94

[redacted]

[redacted]

[redacted]

[redacted]

**d. Because Mr. Harrington improperly relied on staff and outside consultants to conduct analyses and draft sections of his report, his entire report, or at least sections he has admitted were written by others, should be excluded.**

It is unclear to what extent Mr. Harrington's report reflects his own work or engineering judgment rather than that of his colleagues and consultants. It is clear, though, that Mr. Harrington relied on staff and consultants to draft sections of his report and conduct the analyses that underpin many of his opinions. [redacted] Mr. Harrington's reliance on others to do his work—including both the underlying analysis and drafting sections of the report—renders his opinion unreliable and inadmissible.[80]

Mr. Harrington described his role in drafting his report as follows: "So I set forth the outline, the key points, the summaries and the opinions and then I typically start at all the different sections and then others kind of filled in based on my direction."[81] Mr. Harrington clearly viewed his staff at Exponent as extensions of himself for purposes of analyzing the information and generating the opinions

---

[80] Plaintiffs believe that Mr. Harrington's inability to identify which parts of the report he wrote, and which parts others wrote justify excluding the entire report. At the very least, Sections 5.2.4, 5.2.5, and Section 6 (to the extent it relates to PEMS data analysis), and Section 7.2 (addressing vehicle programming and calibration) should be excluded because as described below, Mr. Harrington admitted his staff did the analysis and primarily wrote those sections.

[81] *Id.* (Harrington Dep. Vol. I at 54:19–55:1).

stated in his report. For example, when asked whether he relied on information provided by The Analysis Group, a third-party consultant, Mr. Harrington testified that ". . . I reviewed the information *or my staff* reviewed the information that was provided, but *Exponent* used our expertise and my expertise to form, you know, the opinions based on that information."[82] Later, when asked whether he relied on his colleagues for drafting sections of his report, Mr. Harrington testified that "I considered the information they gleaned and their expertise coupled with my own expertise, that's correct."[83]

The analysis and opinions of his colleagues are so intertwined in the report that Mr. Harrington cannot even remember who worked on the various sections of the report:

> Q. So you've already testified that the Analysis Group helped you by writing some sections of the report and appendices. Did any others at Exponent write any of the – or help you by writing sections of the report?
>
> [Objections.]
>
> A. So I mentioned the key staff that helped me draft the report. There were a few others that may have supported or done some

[82] *Id.* at 37:13–38:6 (emphasis added). *See also id* at 36:4–10 ("I had set forth the outline of the report and kind of the structure of it and then at my direction, my staff helped me draft some of it. I think the Analysis Group did assist in drafting a few parts of it or kind of augmenting some of what we had and then my staff or myself reviewed all of that").

[83] *Id.* at 99:14–25.

Case 1:16-cv-12541-TLL-PTM ECF No. 71-4, PageID.3706 Filed 01/15/21 Page 55 of 94

> QC of the report, but I can't remember who would have done what or all their names at this point.[84]

Indeed, Mr. Harrington's description of how he reached conclusions regarding the test vehicle inspection, which he did not attend personally, show just how reliant Mr. Harrington was on his colleagues' judgments:

> Q. [] How, if at all, did you learn about what happened during the course of the vehicle inspection?
>
> A. I talked to Peter [Lillo] and Jeff [Wishart] about what they had found, had run through kind of some of their findings and then asked them to draft those sections kind of outlining what the findings were for the report."
>
> []
>
> Q. Did they summarize their findings for you in any way?
>
> A. So the summaries are what's in the report.
>
> Q. So other than the sections that you asked them to draft in the report related to the inspection, there were no other summaries that they made for you of what they observed during the inspection?
>
> [Objection to form.]
>
> A. Yeah, that's my memory is that everything was just drafted into the report.[85]

Because Mr. Harrington lacks any experience, training, or special knowledge relating to the use of PEMS equipment, he particularly relied on a

---

[84] *Id*. at 54:4–17.

[85] *Id*. at 97:20–98:23.

colleague's experience in order to develop the opinions stated in his report relating to Mr. Smithers's PEMS testing:

> Q. For purposes of your opinions in this case to the extent that you are relying on inputs from your team, is it fair to say Jeff Wishart is the one whose experience you were drawing on to reach your opinions in this case?
>
> [Objection to form.]
>
> A. So in part, some of his information, myself and my staff have done some work looking at PEMS data, understanding, you know, best practices with PEMS data, how it has been conducted, and again, you know, PEMS data is really the culmination of dyno testing with on-road testing, so the same principles apply. But as it relates to PEMS, Jeff would have been the one with the experience."[86]

Yet despite his clear reliance on Mr. Wishart's experience in proffering opinions relating to PEMS testing and data analysis, Mr. Harrington could not identify what training, if any, Mr. Wishart had regarding PEMS testing.[87] Mr. Harrington could not state how many PEMS tests Mr. Wishart had conducted other than to estimate they were in the "single to double digit range," nor whether Mr. Wishart had conducted any PEMS tests while employed at Exponent.[88] He could not say with certainty whether Mr. Wishart had spoken with Sensors, Inc., the manufacturer of the PEMS unit Mr. Smithers used to gather information about the

[86] *Id*. at 112:23–113:15.

[87] *Id*. at 116:22–117:15.

[88] *Id*. at 118:2–16; 115:12–21.

equipment.[89] Mr. Harrington could not even testify whether Mr. Wishart had written parts of the opinion relating to PEMS testing, or if so, which portions he had written.[90]

Mr. Harrington also relied on Exponent staff to conduct the analysis of the diesel Cruze's calibration and programming. Mr. Harrington does not have a degree in computer science or programming.[91] He testified that Mr. Anderson (a mechanical Engineer) and Mr. Pooley (and engineer and Ph.D. in computer science or similar field) examined the software and coding for the vehicle and Dr. Levchenko's analysis of that code for him.[92] As with Mr. Wishart's work on PEMS issues, Mr. Anderson's and Mr. Pooley's analysis of the EDC coding issues was incorporated directly into Mr. Harrington's report:

> Q. And how did they convey from what they learned to you? Was it oral? Was it in writing?
>
> A. It was oral and then it was the drafting of the text in those areas. So I would talk to them about their findings and then they drafted it up or drafted up the observations for the report.
>
> Q. Did they summarize their findings for you in any way other than putting it in the draft report?
>
> A. My recollection is it was all done in the report.[93]

---

[89] *Id*. at 83:11–84:14.

[90] *Id*. at 113:22–122:6.

[91] *Id*. (Harrington Dep. Vol. I at 136:2–137:6).

[92] *Id*. at 136:7–20, 137:21–138:10.

[93] *Id*. at 138:19–139:6.

Case 1:16-cv-12541-DML-PTM ECF No. 74-14, PageID.3609 Filed 11/05/20 Page 58 of 94

In addition to his staff, Mr. Harrington relied on "The Analysis Group," which he described as a consultant that "supports Kirkland and Ellis and the client" to draft sections of his report.[94] According to Mr. Harrington. The Analysis Group "did look at some of Mr. Smithers' data and did some data analyses on that looking at routes and things like that and how to kind of put together the data that Mr. Smithers provided." *Id.* at 28:2–7. The Analysis Group also "provided on the report, provided some input on some of those things that I had asked them to do and provided some edits . . . ."[95] But Mr. Harrington could not specify what sections of his report The Analysis Group actually drafted:

> Q. Did the Analysis Group draft any sections of your report?
>
> A. I had set forth the outline of the report and kind of the structure of it and then at my direction, my staff helped me draft some of it. I think the Analysis Group did assist in drafting a few parts of it or kind of augmenting some of what we had and then my staff or myself reviewed all of that.
>
> Q. What sections of the report did the Analysis Group help to draft?
>
> A. I mean, I can't remember the exact specifics, but I think in the appendices, there's some discussion of the regulatory requirements and testing. So if there was some input from the Analysis Group, it would have been mostly in those sections.[96]

[94] *Id*. at 25:10–16, 28:1–29:18; 36:1–18.

[95] *Id*. at 34:8–15.

[96] *Id*. at 36:2–18.



010611-11/1337361 V1

Mr. Harrington relied so heavily on colleagues and consultants to write his report and conduct the analysis reflected in that report, it can hardly be said to be his work. The question for this Court is whether Mr. Harrington's report is sufficiently reliable to assist the trier of fact given [redacted] and his extraordinarily heavy reliance on others to analyze the case and draft his report. Plaintiffs respectfully submit that the answer to that question is "no." Mr. Harrington's report and testimony are not based upon a meaningful or intellectually rigorous examination of the facts. They do not bring to bear any qualifications that will assist the trier of fact to sort through the technical issues inherent in the case. They cannot even be fairly said to reflect his own engineering judgment. As such, Mr. Harrington's report and testimony should be excluded.

**B. Nick Molden**

Nick Molden's proffered opinions amount to little more that Monday-morning quarterbacking of an engineer's work by someone who is not qualified by training or experience to perform any engineering tasks. He furthermore makes a series of suppositions, asking the jury to believe that simply because an outcome is generally possible, it occurred in this case. The totality of his proposed testimony is thus inadmissible *ipse dixit* and should be excluded.

### 1. Mr. Molden is not qualified to offer an opinion on the soundness of Mr. Smithers's engineering judgment.

Mr. Molden is an economist, not an engineer.[97] His formal education was in philosophy, politics and economics, of which he majored in economics,[98] a field that is wholly unrelated to engineering.[99] Similarly, Mr. Molden's management of his Emissions Analytics business has not required him to receive training in engineering.[100] And in practice, he focuses on the "overall protocols and data analysis" in the PEMS testing process and relies on his engineering staff to, as he says "do those engineering parts."[101] Yet despite employing approximately nine engineers,[102] Mr. Molden did not see fit to rely on any engineering staff to assist him in forming his opinion.[103]

Defendant Bosch can therefore only purport to offer Mr. Molden as an expert on PEMS testing based solely on his experience as the business head of Emissions Analytics, where he calls himself an expert in "overall protocols and data analysis."[104] But in this role Mr. Molden has listed no training or verifiable

---

[97] Ex. 7 (Molden Dep. at 68:4–70:20).

[98] *Id*. at 68:7–9.

[99] *See Berry*, 108 F. Supp. 2d at 753 (excluding a proffered expert's opinion where his formal education was wholly unrelated to engineering and safety).

[100] Ex. 7 (Molden Dep. at 70:5–13).

[101] *Id*. at 71:4–72:20.

[102] *Id*. at 154:1–155:8.

[103] *Id*. at 164:18–166:1.

[104] *Id*. at 71:4–72:20.

experience with protocols for using PEMS to investigate a possible defeat device in the U.S. He offers no verifiable example where he or his company have been hired to detect a defeat device in a vehicle using PEMS equipment.[105] And though he claims to have general background knowledge of some unspecified "different organizations" publishing "certain approaches to how you might identify certain behaviors in vehicles," he cites none of these in his report. In fact, in his deposition Mr. Molden could not identify any universally accepted protocol for using PEMS to detect a defeat device.[106] Mr. Molden can have no basis for criticizing protocols that Mr. Smithers used to detect defeat devices in the Cruze vehicles when he hasn't studied these protocols or used them in any verifiable instance. His opinions concerning the appropriate test protocol for detecting a defeat device set forth in § III.b. of his report should therefore be excluded.[107]

**2. Mr. Molden's report and deposition demonstrate ignorance of U.S. emissions testing regime.**

Not only does Mr. Molden have no training or experience testing vehicles for defeat devices, he proffers no verifiable training or experience with the U.S. emissions regulations governing the Cruze Diesel vehicles. His Curriculum Vitae

---

[105] *Id*. at 159:18–161:14.

[106] Ex. 7 (Molden Dep. at 214:18–217:2).

[107] Ex. 8 (Molden Report § III.b.).



010611-11/1337361 V1

lists no experience with U.S. emissions regulations or test procedures.[108] The sole experience he offers with emissions testing outside of the United Kingdom is a claim that his company has international "bases."[109] Mr. Molden testified that his U.S. subsidiary has two permanent employees.[110] Neither of these employees were apparently enlisted to assist Mr. Molden in drafting his report.[111] Mr. Molden thus has not proffered any experience with testing or regulatory compliance in the U.S.

He furthermore pleads ignorance as to even the very basics of emissions testing in the U.S., calling Mr. Smithers's decisions arbitrary where they're clearly tied to city and highway cycles. For example:

| **Molden Report** | **Molden Testimony** | **Smithers Report** |
|---|---|---|
| Mr. Smithers "only provides an apparently arbitrary 3.6-mile minimum length and omits the necessary information explicitly to validate that the results presented conform to any criteria for avoiding nonrepresentative short trips." Ex. 8 (Molden Report ¶ 36). | Q. [B]ased on what are you saying 3.6-miles minimum length is arbitrary?<br><br>A. If I heard the question correctly, um, I did not see a justification, um, for that trip length and that -- that cutoff point and in this pool of trips of highly variable lengths.<br><br>Ex. 7 (Molden Dep. at 190:1–8). | In general, [for city driving] any individual data point is constrained to have a length of greater than 3.6 miles, which is the length of the shortest phase of the FTP-75 (Phases 1 and 3).<br><br>Ex. 9 (Smithers Report ¶ 98). |

[108] Ex. 8 (Molden Report Appx. 1).

[109] *Id.*

[110] Ex. 7 (Molden Dep. at 154:1–154:10).

[111] *Id*. at 164:18–166:1.



010611-11/1337361 V1

Case 1:16-cv-12541-TLL-PTM ECF No. 74-24, PageID.3654 Filed 11/05/20 Page 23 of 34

Mr. Molden furthermore could not identify, even when prompted by counsel, the significance of 3.6 miles as the first leg of the FTP-75 test, which is one of the major tests measuring emissions during city driving under the U.S. emissions regulatory regime:

> Q. Does a 3.6-mile minimum trip length have any meaning to you?
>
> [Form objection]
>
> A. I can't -- I can't -- I couldn't recall whether that conforms to any benchmark in some regulation somewhere; I don't have that familiarity off the top of my head.
>
> Q. So you don't know, for example, that it is the length of the first phase of the FTP?
>
> [Form objection]
>
> A. It could well be, um, but there are many different phases of many different cycles, so I don't necessarily recall all of them off the top of my head.
>
> Q. Okay. Did you have access to these trip lengths when you were writing your report?
>
> A. Do you mean the --
>
> [Form objection]
>
> A. Do you mean the trip lengths of Mr. Smithers' trips as tested?
>
> Q. No, the trip lengths in the regulatory cycles.
>
> A. That would have formed part of my background knowledge, um, in this area and, uh, and certain

> representations of it were included in Mr. Smithers' Report.[112]

Mr. Molden's report and deposition testimony thus reveal his ignorance of U.S. testing protocols and requirements, whatever *his* European credentials may be. Combined with his lack of engineering ability, the absence of any knowledge of defeat device testing protocols, this ignorance renders him unqualified to opine on Mr. Smithers's test protocols. The Court should therefore strike the following portions of Mr. Molden's report: ¶¶ 39-40 (discussing the appropriate on-road driving cycles and conditions during Portable Emissions Measurement System (PEMS) testing for determining compliance with U.S. emissions), ¶¶ 47-48 discussing the U.S. approach to emissions certification), and ¶¶ 59-64 (discussing U.S. regulatory test cycles). Mr. Molden does not make any conclusion that is helpful to the jury.

Mr. Molden's opinions are unsupported by any reasonable measure of technical data or foundation and are wholly unreliable. Expert testimony may not be based on mere speculation, *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–801 (6th Cir. 2000), and assumptions must be supported by evidence in the record. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 481–82 (6th Cir. 2008); *see also Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 534–35 (6th Cir. 2010).

---

[112] Ex. 7 (Molden Dep. at 191:10–192:18).

Indeed, an expert's conclusions must have an established factual basis and cannot be premised on mere supposition. *McLean*, 224 F.3d at 801; *Dow*, 2011 WL 4484001, at *5.

Mr. Molden makes statements throughout his report that are unconnected to the evidence in this litigation. Such *ipse dixit* is routinely excluded because the mere say so of an expert witness does not aid the jury in its search for truth. *See GE v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence [which] is connected to existing data only by the *ipse dixit* of the expert."). For example, in *Dow v. Rheem Mfg. Co.*, the proffered expert concluded that because adhesion of rubber to metal *can* occur as a general phenomenon, that it *did* occur in that case. 2011 WL 4484001, at *6 (emphasis added). That conclusion was premised on a series of unwarranted assumptions that were unproven by any testing done by the expert, testing done by others, or the relevant literature in the field. That opinion was therefore excluded as an impermissible *ipse dixit* of the expert. *Id.*

Mr. Molden's report is replete with speculation that he offers with no degree of scientific certainty, such as:

- A European date format allegedly suggests, "there *may be* errors in the configuration of the equipment or the data processing software."[113]
- [H]igh emissions events *would have been* of particular interest to Mr Smithers, which *may well have led to skewing* further test requests to elicit more high emissions events.[114]
- [T]he results presented *may reflect* more the selection of trip lengths rather than the inherent emissions performance of the vehicle.[115]
- "[T]rips *may have been* selectively short and not representative of a fuller driving cycle."[116]
- "[C]ycles *may have been* deliberately driven more aggressively to exaggerate a relationship between temperature and NOx emissions.[117]
- [T]he elevated NOx emissions at higher temperatures *may be explained* by this rather than other factors.[118]
- A sensor that needed replacement in the PEMS equipment "*may suggest* some wider issue with the equipment."[119]
- An alleged time discontinuity "*may indicate* exclusion of certain data or the introduction of errors."[120]

Taking Mr. Molden at his word, these phenomena may have occurred, or they may not have. That is not expert testimony that a jury would find useful. Just as in *Dow*

---

[113] Ex. 8 (Molden Report ¶ 71) (emphasis added).

[114] *Id.* at ¶ 81 (emphasis added).

[115] *Id.* at ¶ 88 (emphasis added).

[116] *Id.* at ¶ 89 (emphasis added).

[117] *Id.* at ¶ 119 (emphasis added).

[118] *Id.* at ¶ 122 (emphasis added).

[119] *Id.* at ¶ 139 (emphasis added).

[120] *Id.* at ¶ 143 (emphasis added).

*v. Rheem*,[121] merely because a phenomenon *can* occur doesn't mean it *did* occur in this instance. Mr. Molden's speculation contained in paragraphs 71, 81, 88, 89, 119, 122 and 139 of his report should be excluded.

**a. Mr. Molden establishes no link between driving style and Mr. Smithers's emissions results.**

Likewise, § IV of Mr. Molden's report criticizes Mr. Smithers for what he calls "aggressive" driving,[122] Mr. Molden has failed to perform even a basic analysis here that would support his conclusion that driving style influenced Mr. Smithers's emissions results. *See Taylor*, 2003 WL 25695244, at *4. Like the expert in *Meemic Ins. Co. v. Hewlett-Packard Co.*, who failed to show that an AC adapter even had the capability of causing the fire at issue there,[123] Mr. Molden makes no attempt to correlate driving style with emissions in the Cruze diesel vehicle. Mr. Molden's stated conclusion in his report also does not make this connection with any degree of scientific certainty, merely supposing the connection "very likely."[124]

---

[121] 2011 WL 4484001, at *6.

[122] Ex. 8 (Molden Report § IV).

[123] 717 F. Supp. 2d 752, 765 (E.D. Mich. 2010).

[124] Ex. 8 (Molden Report ¶ 103).

**(1) Mr. Molden speculates, without evidence, that reverse engineering was performed as part of the PEMS testing.**

In paragraph 92 of his report, Mr. Molden claims that Kirill Levchenko, a software expert who analyzed the software documentation and calibration of the ECU in the Cruze vehicles, sets out a means for "reverse engineering" the Cruze Diesel's ECU. Mr. Molden speculates that "[i]f this were achieved, it offers the *potential capability* to devise test cycles that trigger the control strategies in such a way that leads to elevated emissions results."[125] Mr. Molden confirmed in his deposition that this reference to reverse engineering is pure speculation on his part:

> Q. You're not testifying within a reasonable degree of certainty that that reverse-engineering of the ECU was, in fact, performed in this case in connection with Mr. Smithers' testing, are you?
>
> [Form objection]
>
> A. I'm not asserting that it definitely was or not. From what I take away from the Levchenko report is that it was a distinct possibility that that was done and that would then magnify the risk from the artifact of trip length selection.[126]

There are two problems with Mr. Molden's assertion here. (1) He is not qualified to offer any engineering-related opinion concerning software or emissions performance. And (2), the assertion is based on pure speculation about the

[125] *Id*. at ¶ 92 (emphasis added).

[126] Ex. 7 (Molden Dep. at 239:4–239:18).

possibility of reverse engineering, of which there is no evidence anywhere in Mr. Smithers's testing or data. Mr. Molden should be prohibited from offering speculation about reverse engineering (paragraph 92 of his report) in his testimony in this litigation.

**(2) Mr. Molden's analysis does not establish that the driving style was "aggressive," and he should not be permitted to so testify.**

Mr. Molden then asks the jury to take him at his word that the driving style used to test the Cruze diesel vehicles caused unrepresentative emissions spikes. Mr. Smithers used relative positive acceleration (RPA), a metric used commonly in PEMS testing to determine driving style.[127] A larger RPA typically represents more aggressive driving and sharper acceleration events, while small RPA values reflect conservative driving with relatively light accelerations.[128] Indeed, in a 2016 paper co-authored by Mr. Molden, the sole metric for measuring driving style was RPA.[129] And Mr. Molden can point to no specific test segment where RPA is insufficient to measure driving style in the Cruze diesel vehicles.

The only claim Mr. Molden makes here is that Mr. Smithers *should have also* used the metric v*a_pos@95 to evaluate driving style. Mr. Molden relies heavily on this metric—which incidentally Mr. Harrington could not identify over

---

127 Ex. 9 (Smithers Report ¶ 100).

128 *Id.* at ¶ 99.

129 Ex. 10 (Molden Dep. Ex. 7).

Case 1:16-cv-12541-DML-PTM ECF No. 81-24, PageID.3721 Filed 01/05/20 Page 69 of 94

the course of two days of deposition testimony. But Mr. Molden did not carry this analysis to the next logical step. (To be fair, he could not do so because he lacks the engineering training necessary to make this connection.) He asks us simply to take his word for it based on what he calls "engineering fundamentals"[130] and a "background knowledge of how the combustion works"[131] that high v*a_pos@95 necessarily correlates with unrepresentative emissions spikes in diesel vehicles:

> Q. So you cannot point to anyplace [sic] in your report where you analyze the data that Mr. Smithers provided to you and established a correlation between high NOx emissions and high v*a_pos; is that correct?
>
> [Speaking objection]
>
> A. To summarize what I have said, it is that it is generally accepted that NOx, high NOx, is often produced under high engine load, which does correlate with, amongst other things, high acceleration, v*a_pos@95 is a metric of high acceleration, and when we then look at his analysis in Figure 16 that shows how v*a_pos, with that background knowledge of how the combustion works, then v*a_pos is a plausible confounding factor not taken into account in Mr. Smithers' analysis.[132]

But even if Mr. Molden can, despite having no engineering training or experience, testify to engineering principles supporting his assertion that high v*a_pos@95 generally correlates with unrepresentative high emissions, he has not

---

[130] Ex. 7 (Molden Dep. at 248:7–23).

[131] *Id.* at 250:16–251:13).

[132] *Id.*

established that his assertion is true here. Mr. Molden had every opportunity to perform an analysis to test his theory that high emissions in the Cruze correlated with high v*a_pos@95. But he did not make this connection, perhaps because he wasn't qualified to do so, or perhaps because he knew that Cruze-specific analysis would support the validity of Mr. Smithers's testing rather than the generalities that he would like the jury to rely on here. Either way, he should not be permitted to bring this rank speculation before a jury. The entirety of § IV of his report should be excluded.

**b. Mr. Molden speculates, without evidence, that Mr. Smithers's emissions results were skewed by trip-length selection.**

Mr. Molden's report at ¶ 88 claims that Mr. Smithers's results "*may* reflect more the selection of trip lengths rather than the inherent emissions performance of the vehicle." He furthermore admits in his deposition that he is not making the conclusion with a reasonable degree of certainty that the results do in fact "reflect more the selection of trip lengths rather than inherent emissions performance of the vehicle."[133] Mr. Molden could not identify any test segment where the results were "the selection of trip lengths rather than the inherent emissions performance of the vehicle."[134] When asked to provide a specific example of what he called a "a wide

[133] Ex. 7 (Molden Dep. at 223:12–224:10).

[134] *Id*. at 225:2–23.

variety of trip lengths, no obvious logic or no written logic as to why they were selected" he failed to provide one, and asked us to simply accept that this assertion "doesn't require an example."[135] Mr. Molden should be prohibited from offering such *ipse dixit* speculation in his testimony in this litigation.

**c. Mr. Molden speculates, without evidence, that Mr. Smithers edited data from his report.**

Mr. Molden makes much of his contention that Mr. Smithers selectively presented data in his report.[136] Mr. Molden explains partly in his deposition that there are two sets of files, raw data and analyzed data. His concern is that there is data contained in one set of files that is not included in the second set of files.[137] He agrees that there was no data "removed" from the raw files that were provided to him for analysis.[138] He furthermore confirms in his testimony that he is not claiming any material effect of these data files on Mr. Smithers's results.[139] And finally he confirms that he had made no effort to analyze the data he mentions in order to make any such conclusion, which he could have done if he wished because it was all provided to him.[140]

---

[135] *Id*. at 186:17–23.

[136] Ex. 8 (Molden Report ¶¶ 65–71, 143).

[137] Ex. 7 (Molden Dep. at 195:22–196:14).

[138] *Id*.

[139] *Id*. at 194:24–195:17.

[140] *Id*. at 196:21–197:7.

Another of Mr. Molden's contentions regarding so-called "missing" data were apparent gaps in odometer readings between tests and time stamps during tests.[141] With respect to odometer readings, Mr. Molden does not claim with any degree of certainty that testing was performed for which results were not produced.[142] To the contrary, he suggests that there are many good reasons for such gaps, such as mileage accumulation.[143] With respect to what he calls discontinuities in time stamps for the PEMS testing, Mr. Molden admits that he made no attempt to determine whether that data was provided to him, and if so, what its significance was with respect to the vehicle's performance.

> Q. And are you saying that there is no raw data provided to show what testing, if any, was done in connection with the alleged discontinuity?
>
> [Form objection]
>
> A. *The missing data may or may not be there in the unanalyzed files.* The point I'm making is that it is the very omission of them, which is the issue, whatever they might have contained.
>
> Q. Okay, understood. So the data may or may not be contained in the unanalyzed raw data files; is that what you're saying?
>
> [Form objection]
>
> A. That's what I'm saying, yes.
>
> Q. All right. But you don't know because you didn't look, did you?

---

[141] Ex. 8 (Molden Report ¶ 69).

[142] Ex. 7 (Molden Dep. at 203:14–204:2).

[143] *Id*. at 204:6–205:4.

> A. The point I'm making is a different point here, which is in this paragraph, is talking about the facts that the data has been omitted; *it is making no comment one way or the other that the missing data says anything about anything in particular about the performance of the vehicle*; according to generally accepted best practice those should not be removed from data.[144]

Likewise, he fails to make any connection between the date stamps he identifies in Paragraph 71 of his report and any effect on Mr. Smithers's results:

> Q. You can't testify within a reasonable degree of certainty that the claimed inconsistency of the date stamps with other files materially impacted the results of Mr. Smithers' emissions testing, can you?
>
> [Form objection]
>
> A. If I understood the question correctly, no, and that's not what I'm claiming.[145]

Mr. Molden utterly failed to analyze the data at issue. He then repeatedly declines to opine within any reasonable degree of certainty that any test results were hidden or deleted, or that the errors he claims would have any effect on Mr. Smithers's results. And yet he attempts in his report to suggest that data was manually edited or excluded, implying that there is some impropriety.[146] Mr. Molden should be prohibited from offering the opinions set forth in § III.a., § III.c., and ¶ 143 of his report.

---

[144] *Id*. at 200:15–202:9 (emphasis added).

[145] *Id*. at 220:7–17.

[146] *E.g*., Ex. 8 (Molden Report ¶ 143).

Case 1:16-cv-12541-TLL-PTM ECF No. 74-4, PageID.3376 Filed 11/05/20 Page 75 of 94

**d. Mr. Molden speculates, without evidence, that the PEMS device used in this case has unspecified errors.**

In paragraph 139 of his expert report, Mr. Molden cites what he believes are an "unusually high number of failures of the non-dispersive ultra-violet (NDUV) sensor."[147] Rather than pointing to any material impact on Mr. Smithers's emissions testing, he merely speculates that this "may suggest some wider issue with the equipment."[148] Mr. Molden should not be permitted this *ipse dixit*, which suggests that there is an issue with the PEMS device here without actually connecting the sensor in any material way to an issue with the machine or with Mr. Smithers's results. This speculation should be excluded.

**C. Dr. Kimberly A. Neuendorf's conclusions are unreliable and unhelpful to the jury and should be excluded.**

Dr. Neuendorf's entire report and all her opinions ignore the most critical and basic rules relating to rebuttal experts—responding to the actual methods applied by the corresponding expert. Instead, Dr. Neuendorf's report analyzes Dr. Shankar's *qualitative* content analysis through the lens of *quantitative* content analysis—despite the continuous use of qualitative content analysis for decades, distinct methods and considerations for the assessment of qualitative content analysis, and the clear differences between the two approaches.[149] That Dr.

---

[147] *Id*. at ¶ 139.

[148] *Id*.

[149] *See*, Ex. 19, Akshaya Kamalnath, *Corporate Governance Case for Board Gender Diversity: Evidence from Delaware Cases*, 82 Alb. L. Rev. 23, 42 (2019)

Case 1:16-cv-12541-TLL-PTM ECF No. 74-1, PageID.3347 Filed 01/15/20 Page 76 of 94

Neuendorf begins her analysis with a definition of content analysis that has been criticized since it was first given and continually for nearly 70 years because it only focuses on manifest content instead of latent content—the focus of Dr. Shankar's analysis—is telling.[150] That she relies so extensively on her own book—which only focuses on quantitative content analysis—while ignoring legions of books and articles that encompass all content analysis or qualitative content analysis specifically raises both methodological and *ipse dixit* concerns that rise to an epic level.[151]

Her experience in another field and with another method does not give her license to apply it in an unreliable and unhelpful way, much less to ignore the existence of the method. As the Supreme Court has recognized, a court may exclude an expert because "there is simply too great an analytical gap between the

---

("Qualitative content analysis is a method that has gained prominence in recent times.") (footnote omitted).

[150] The term content analysis is about 70 years old. Webster's Dictionary of the English Language included the term in its 1961 edition, defining it as "analysis of the manifest and latent content of a body of communicated material (as a book or film) through classification, tabulation, and evaluation of its key symbols and themes in order to ascertain its meaning and probable effect." Ex. 11; Ex. 4 (Neuendorf Dep. at 89:11–90:1).

[151] Ex. 4 (Neuendorf Dep. at 41:1–43:4; 43:20–46:15; 47:5–51:21); Ex. 12 (James W. Drisko & Tina Maschi, Content Analysis, 5–8 (Oxford Uni. Press 2016)); *see also* Ex. 13 (Yan Zhang & Barbara M. Wildermuth, Qualitative Analysis of Content, at 1 (2009) (providing three definitions of qualitative content analysis)); Ex. 14 (Jan Schilling, On the Pragmatics of Qualitative Assessment Designing the Process for Content Analysis, Eur. J. of Psych. Assessment, Vol. 22(1) at 28 (2006) (citing definition by Dr. Mayring)).

data and the opinion proffered." *GE*, 522 U.S. at 146. Because here there is too great a gap—indeed a chasm—between the method used by Dr. Shankar and the approach taken to analyze it by Dr. Neuendorf and her cherry-picked support for that analysis. As a result, Dr. Neuendorf's opinion amounts to her own subjective belief or unsupported speculation. As such, for all these reasons, the Court should exclude it. *See Finn v. Warren Cty., Ky.*, 768 F.3d 441, 452 (6th Cir. 2014) ("In line with *Daubert*, we have explained that the 'knowledge' requirement of Rule 702 requires the expert to provide more than a subjective belief or unsupported speculation.") (citation omitted); *Kerns v. Beam*, No. 3:15CV-00212-DJH, 2017 WL 3584921, at *5 (W.D. Ky. Aug. 18, 2017).

Dr. Neuendorf completely ignores Dr. Shankar's qualitative content analysis because she is unqualified to assess and respond to it.[152] Dr. Neuendorf credits none of the controls used by Dr. Shankar; she either ignores them or is unaware that they exist.[153] Indeed, *none* of the factors or considerations that she raises such as validity, reliability, and objectivity—which are the focus when assessing quantitative content analysis—are used as controls and safeguards for qualitative content analysis—which considers, among others, trustworthiness, credibility,

[152] Ex. 4 (Neuendorf Dep. at 156:11–15).

[153] *Id*. at 81:1–83:8.

transferability, embodiment, accountability, reflexivity, and emancipatory capabilities.[154] This was a critical error.

Critically—and again though legions of books and journal articles explain qualitative content analysis—Dr. Neuendorf does not offer any opinion, evidence, or data about the ***actual*** qualitative content analysis performed by Dr. Shankar or properly critique his interpretation of GM's advertisements.[155] Dr. Neuendorf's analysis is irrelevant and not close to the right "fit" for the analysis for which GM uses it. Indeed, she never tries to address Dr. Shankar's actual approach and method—qualitative content analysis—or the bases of his opinions.

Dr. Neuendorf's decision to ignore Dr. Shankar's approach and pretend as if Dr. Shankar had tried to conduct a quantitative content analysis—despite his clear testimony—violates the standards applied outside the courtroom and inside.[156] Only by "cherry picking" the literature and relying extensively on her book—a book that has nothing to do with qualitative content analysis—while ignoring the work and guidance of experts in qualitative content analysis (*e.g.*, Dr. Margrit

---

[154] *See id.*; *see also* Ex. 15 (Klaus Krippendorff, Content Analysis: an introduction to its methodology, 25–27 (4th ed. 2019)).

[155] Ex. 4 (Neuendorf Dep. at 55:12–71:23; 90:21–101:7).

[156] *See* Ex. 3 (Shankar Dep. at 88:16–24); *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("[S]uch a selective use of facts fails to satisfy the scientific method [in] *Daubert*, and thus it fails to 'assist the trier of fact.'").

Schreier's *Qualitative Content Analysis in Practice* and Phillip Mayring[157] could Dr. Neuendorf support her conclusions. This is impermissible.[158] Whether Dr. Neuendorf's clear errors are viewed as "cherry picking" or biased omissions, her opinions are equally unreliable.

Since the objective of the *Daubert* rules "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999), this failure to consider the literature was improper. It also violates another of the *Daubert* criteria: whether the theory or technique has been generally accepted in the particular scientific field. *Daubert*, 590 U.S. at 593–594. No expert in qualitative content analysis supports the approach taken by Dr. Neuendorf, nor would Dr. Neuendorf or any expert in quantitative content analysis support an attempt to assess and criticize a quantitative content analysis using the

---

[157] Ex. 16 (Margrit Schreier, *Qualitative Content Analysis in Practice*, 12–46 (2012)); Ex. 17 (Amir B. Marvasti, *Qualitative Analysis: A Novice's Perspective*, Forum: Qualitative Social Research, Vol. 20 No. 3, Art. 32 (Sept. 2019)); Ex. 14 (Jan Schilling, *On the Pragmatics of Qualitative Assessment Designing the Process for Content Analysis*, Eur. J. of Psych. Assessment, Vol. 22(1):28–37 (2006)); Ex. 18 (Mariette Bengtsson, *How to plan and perform a qualitative study using content analysis*, NursingPlus Open 2, p. 8–14 (2016)).

[158] *See Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 788 (D. Ariz. 2017) (rejecting "cherry-picked methodology"). *Compare*, Ex. 20 (Neuendorf Dep. Ex. 9, Klaus Krippendorff, Content Analysis: an introduction to its methodology, 24 (4th ed. 2019)), *with* Ex. 15 (Klaus Krippendorff, Content Analysis: an introduction to its methodology, 28–43, 117–135 (4th ed. 2019)).

methods that govern for qualitative content analysis. As a result, her opinions are unreliable and impermissible.

For these reasons, Dr. Neuendorf's analysis was baseless, and misleading to the jury. Dr. Neuendorf's opinions are unsupported by any facts, and ignore the methodology used by Dr. Shankar as reflected in her report and testimony. She should not be allowed to testify.

**D. Dr. Eric T. Bradlow**

Dr. Bradlow offers certain opinions that are simply contrary to the law, do not meet the requirement under Fed. R. Evid. 702 and *Daubert* that opinions distinguish between lawful and unlawful conduct to be relevant to the jury and "fit" the issues in the case. *Daubert*, 509 U.S. at 591. Dr. Bradlow furthermore offers testimony based on subjective speculation that consumers could have learned of the alleged fraud through word of mouth and conversations with friends and family, experience, or depending on whether they bought from a Chevrolet dealership or another entity.[159] There is no evidence or support for such an opinion, and the subject of an expert's testimony must reflect more than subjective belief or speculation. *Id.* at 589–90.

Regardless of foundation, Dr. Bradlow is not qualified to opine on Dr. Shankar's qualitative content analysis. The Court should thus exclude Dr.

[159] *See*, Ex. 22 (Bradlow Dep. at 207:1–209:1).

Bradlow's opinions on these subjects, including those in his report at ¶¶ 15–16, 18, 20–22, 24–27. As a result, Dr. Bradlow should be permitted only to opine on the importance (or lack thereof) of the evidence from the documents and testimony of his own client, GM, and the effectiveness of GM's advertisements and Dr. Shankar's marketing opinions. In turn, Dr. Shankar should be permitted to opine on the same advertisements and evidence and the efficacy and themes of GM's advertisements so that the jury may weigh their testimony.

### 1. Certain of Dr. Bradlow's Opinions are Contrary to Law and Cannot Help the Jury.

Dr. Bradlow's opinions ignore the governing law. To succeed under their consumer fraud claims, Plaintiffs must show that Defendants' representations and omissions were material to a reasonable consumer. As this Court recognized, what a reasonable consumer would find material is an *objective* standard that looks at what importance the average consumer would attach to a representation or omissions, not their subjective preferences.[160]

---

[160] *See Counts v. Gen. Motors, LLC*, No. 16-CV-12541, 2017 WL 1406938, at *4 & n.3 (E.D. Mich. Apr. 20, 2017) ("reasonable consumer standard" applies to Plaintiffs' claims and issue involves "whether GM made material omissions that would have misled a reasonable consumer"); *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 507 (6th Cir. 2015) ("The false-advertising laws at issue punish companies that sell products using advertising that misleads the reasonable consumer. . . . Whether consumers were satisfied with the product is irrelevant.") (citations omitted); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 115–17 (E.D. Mich. 2019) ("In nearly all jurisdictions where the plaintiffs have pleaded consumer protection, deceptive practices, or fraudulent concealment claims, the pertinent rules of decision call for an evaluation of whether a 'reasonable consumer' or 'reasonable person' likely would consider the

Dr. Bradlow improperly views the issues as governed by individual consumers' *subjective* preferences and perceptions.[161] Dr. Bradlow states that there is "substantial heterogeneity in all aspects of a vehicle purchase or lease decision, including individualized issues relating to consumer preferences for vehicle attributes, information sources considered, search processes used, and decision strategies."[162] He argues that "consumers differ in the vehicle attributes they prefer, the information they consider when purchasing or leasing a vehicle, the way they make purchase or lease decisions, and across many other dimensions."[163] Dr. Bradlow argues that based on academic literature, market research, and case documents, "an empirical analysis of *consumers* is required to determine what was important to them and what actually influenced their purchase or lease decisions, including whether GM's marketing had an impact."[164] These opinions about consumers' subjective preferences are contrary to law. Bradlow's "many reasons"

information concealed to be important when making a purchasing decision. Because this universally calls for application of an objective standard, the question whether the concealment of information about the alleged gear shift defect should be deemed 'material' can be answered by common, class-wide proofs concerning whether reasonable consumers would have been concerned about the information withheld."); *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at *18 (N.D. Cal. Sept. 25, 2018).

[161] Ex. 21 (Bradlow Report ¶¶ 18–27).

[162] *Id*. at ¶ 16.

[163] *Id*. ¶ 18; *see also id*. at ¶¶ 19–27.

[164] *Id*. at ¶ 18 (emphasis in original).

theory is also irrelevant because consumer fraud laws do not require that deceptive statements be the sole cause of a consumer's purchase.[165]

Thus Dr. Bradlow's testimony should be excluded because it is irrelevant and cannot assist the trier of fact in resolving any relevant issue in this case. "[E]xpert testimony that does not relate to any issue in the case is not relevant and therefore not helpful." *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993).[166]

---

[165] *See Broomfield*, 2018 WL 4952519, at *11 (objection irrelevant because "[p]laintiffs need not prove that the alleged misrepresentation is the *only* material factor to their purchasing decisions to prove materiality") (emphasis in original); *Papin v. Demski*, 169 N.W.2d 351, 353 (Mich. Ct. App. 1969) (To be material, the representation need not "relate to the sole or major reason for the transaction, but … it [must] relate to a material or important fact."), *aff'd*, 177 N.W.2d 166 (Mich. 1970).

[166] Unlike Dr. Bradlow's testimony, Dr. Shankar's testimony is relevant and will assist a trier of fact because it is appropriate for an expert to base his opinions about deception on a content analysis of advertisements or other promotional materials shared with consumers, based on the expert's knowledge of and experience with consumer perceptions and the claims that consumers would take away. In that situation, the question is what claims were conveyed to consumers in the promotional materials at issue. In other words, the content analysis assists the trier of fact in answering the key question of deception. Although what claims were conveyed to consumers does not answer whether Defendants' advertisements were misleading to reasonable consumers, under Federal Rule of Evidence 704(a), an expert opinion is not objectionable just because it "embraces an ultimate issue to be decided by the trier of fact." Rather, "[w]hen the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue *or that give the jury all the information from which it can draw inferences as to the ultimate issue*." *Berry*, 25 F.3d at 1353 (emphasis added). Unlike Dr. Bradlow's testimony, Dr. Shankar's testimony meets this test. Dr. Shankar offers only expert testimony about the field of advertising generally and how GM employed advertising specifically. *See, e.g.*, *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 541 (E.D. Pa. 2007) ("[W]hen an issue before the court pertains to the effect of a marketing or advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies.").



010611-11/1337361 V1

And expert testimony that does not differentiate between lawful and unlawful conduct is "of absolutely no use to a fact finder," and should be excluded.[167]

**2. Dr. Bradlow's Opinions are Unreliable.**

Dr. Bradlow criticizes Dr. Shankar for using GM's actual advertisements—produced by GM in this case—and suggests that uniform misrepresentations and repeated omissions are not actionable because of heterogeneity among consumers. As explained above, Dr. Bradlow offers no opinions that can help a jury determine damages or reconcile GM's conduct with the consumer protection laws at issue. There are two more problems with Dr. Bradlow's opinions.

First, to the extent that he relies on peer-reviewed literature and industry research, he has not established that his reliance on those materials is reasonable. Under the Federal Rules of Evidence, "expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are *of a type reasonably relied upon by experts in the particular field* in forming opinions or inferences upon the subject."[168] Dr. Bradlow's Report does not even attempt to claim that experts in the consumer fraud context rely on the sources he cites.

---

[167] *See Williamson*, 346 F.3d at 1322.

[168] *Daubert*, 509 U.S at 595 (emphasis added); *cf. Shanks v. Jarrow Formulas, Inc*., No. CV1809437PAAFMX, 2019 WL 4398506, at *6 (C.D. Cal. Aug. 27, 2019) (scientific literature relied on provides no "insight into a reasonable consumer's purchasing decisions" or "says nothing about whether a reasonable consumer would read the challenged statements and be deceived").

Case 1:16-cv-12541-TLL-PTM ECF No. 37-14, PageID.3036 Filed 11/05/20 Page 85 of 94

Instead, Dr. Bradlow merely vaguely relies on "extensive peer-reviewed literature and industry research."[169] But that is not enough to admit hearsay through Dr. Bradlow. He must show that this "extensive peer-review literature and industry research" is reasonably relied on by experts *in the field of consumer fraud*. He has not even tried to do so. Furthermore, in relying upon "peer" literature, "industry research," and academic literature,[170] Bradlow improperly adopts as his own out of court statements of others.[171] Bradlow vaguely claims that "industry research" shows "substantial heterogeneity" in consumer purchasing decisions, ¶¶ 16, 20, but the sources he cites for this statement do not appear to involve the diesel vehicle industry.[172] Thus, Dr. Bradlow's opinions, to the extent that they rely on "extensive peer-reviewed literature and industry research," should be excluded.

---

[169] Ex. 21 (Bradlow Report ¶¶ 16, 21, 22).

[170] ¶¶ 16, 18, 19 & n.16, 20, 21 & nn.18–22, 22 & nn.23–27, 23 & n.28, 24 & nn.31–32, 25 & nn.33–35, 26 & nn.36–40, 27

[171] *See United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016) ("If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth."); *Tipton v. CSX Transp., Inc.*, No. 3:15-CV-311-TAV-CCS, 2018 WL 4904954, at *2 (E.D. Tenn. Jan. 2, 2018) ("While Rule 703 permits an expert to rely on facts or data that the expert has been made aware of, it does not permit an expert to merely parrot another's opinions, to which the expert is not qualified to render.").

[172] *See generally Universal Coin & Bullion, Ltd v. Fed. Express Corp.*, No. 2:12-CV-2778-SHM-DKV, 2015 WL 12001264, at *11 (W.D. Tenn. June 30, 2015) (finding unreliable opinion of expert who "did not engage in any industry research to support his optimistic conclusion") (citing *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009)

Second, Dr. Bradlow improperly reaches legal conclusions. *See See Hyland v. HomeServices of Am., Inc*., 771 F.3d 310, 322 (6th Cir. 2014) ("a witness may not testify to a legal conclusion"). Bradlow opines that any omission had no influencing effect on purchasing decisions, that Dr. Shankar demonstrated no such influencing, and that no common proof exists showing consumers' "response to the disclosure of omissions alleged here."[173] These are impermissible opinions as to legal issues: whether a representation is material to a reasonable consumer whether consumer's relied on Defendant's omissions and misrepresentations, and whether common proof exists to support Plaintiffs' claims. These opinions are thus inadmissible because they opine on legal issues.

Third, and more importantly, these opinions hinge on speculation. Dr. Bradlow offers no basis for his conjecture. He cites no data or evidence. He cites no evidence pointing to how consumers would have known of GM's inclusion of a defeat device, let alone why GM's misrepresentations and omissions of the vehicles' emissions should be ignored or countenanced. And he glosses over whether it is permissible for GM to make false and misleading representations or for consumers to rely on representations made by GM at all.

---

(excluding expert testimony because the expert made assumption "without any supporting industry research")).

[173] *See*, *e.g*., Ex. 21 (Bradlow Report ¶¶ 17 & n.15, 18, 27).

Dr. Bradlow's report provides *no* factual basis to support his contention that consumers could have known of the existence of the alleged defeat device, which is still a contested issue in this case. The report contains no citation to objective, verifiable evidence establishing that GM or its dealerships explained the existence of this particular assumption to consumers. There is no support for Dr. Bradlow's conjecture and speculation that consumers could have known of GM's alleged fraud. As a second bit of speculation, Dr. Bradlow opines that consumers may not mind being defrauded.[174] These opinions reflect "subjective belief or unsupported speculation."[175] This is not sufficient.[176]

The Court should exclude Dr. Bradlow's opinions that depend on assumptions, conjecture, and speculation instead of facts. Rule 702's text explicitly requires that an expert's testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). A court should exclude expert opinion evidence that rests on "incorrect assumptions" or "speculative evidence." *Boucher v. U.S. Suzuki Motor Cop.*, 73 F.3d 18, 21 (2d Cir. 1996). "[A]n expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported

[174] Ex. 21 (Bradlow Report ¶ 16).

[175] *Lyngaas v. Curaden AG*, No. 17-10910, 2019 WL 6210690, at *13 (E.D. Mich. Nov. 21, 2019) (quoting *Daubert*, 509 U.S. at 590).

[176] *Cf. GE*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

by ‘good grounds,’ based on what is known.” *McLean*, 224 F.3d at 800–01. As another Circuit remarked, expert evidence is reliable only if it is “genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.” *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). Dr. Bradlow, who is a genuine marketing expert, offers opinions that fall clearly into the latter category.

**3. Dr. Bradlow is Not Qualified to Opine on Qualitative Content Analysis.**

Dr. Bradlow is simply not qualified to offer any opinion on the validity of Dr. Shankar’s content analysis because he essentially admits that he has no expertise in content analysis and has never performed such an analysis. Similarly, his opinion that content analysis is never useful for assessing consumer perceptions in a consumer class action goes against case law approving the use of the method.[177]

Dr. Bradlow has no experience with the content analysis methodology, let alone qualitative content analysis methodology. He recalled no times when he has performed a content analysis and made vague assertions about his background in

[177] *See generally FTC v. DIRECTV, Inc.*, No. 15-CV-01129-HSG, 2018 WL 3911196, at *11, 12, 15 (N.D. Cal. Aug. 16, 2018) (“content analysis” would be relevant to “question of whether a reasonable consumer likely would be misled by Defendant’s advertisements”).

content analysis.[178] Dr. Bradlow's testimony reflects an unfamiliarity with qualitative content analysis.[179] Dr. Bradlow did not perform a content analysis of the GM advertisements or marketing materials examined by Dr. Shankar, let alone any GM advertisements or marketing materials relevant in this case. Although Dr. Bradlow states that he has "published papers on content design, content analysis,"[180] none of the publications cited by him reveal that they concern "content analysis." Dr. Bradlow cites no publications written by him (peer reviewed or otherwise) about content analysis or any times he has offered an opinion involving content analysis. Defendants have failed to establish by a preponderance of the evidence that Dr. Bradlow is qualified to give an expert's opinion about Dr. Shankar's content analysis.[181]

---

[178] *See* Ex. 22 (Bradlow Dep. at 126:18–127:1) (testifying he is "somewhat familiar with the field of content analysis").

[179] *See id*. at 127:2–128:13 (evasively testifying he "can't define" a qualitative content analysis, that he is "not sure [he] ha[s] a definition of" it, and declining to testify whether he ever performed such an analysis).

[180] Ex. 21 (Bradlow Report ¶ 4 & n.1).

[181] *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 694 (E.D. Mich. 2019) (excluding testimony of expert where he "admits that he is not an expert in conjoint analysis [performed by plaintiffs' expert] and never has performed such a task"); *LidoChem, Inc. v. Stoller Enters. Inc.*, No. 1:09-CV-204, 2013 WL 12224209, at *6–8 (W.D. Mich. May 7, 2013) ("to be qualified to assist the jury in understanding Dr. Allen's evidence, it must be shown that Dr. Nelson is, himself, qualified as an expert about the subject matter of the report and the methodology giving rise to that report, that he is critiquing. He, too, must satisfy the requirements of Rule 702. This showing has not been made.").

Case 1:16-cv-12541-DML-PTM ECF No. 374-24, PageID.33921 Filed 01/15/20 Page 90 of 94

For these reasons, Dr. Bradlow should be limited to opining on the effectiveness and impact (or lack thereof) of GM's advertisements, but nothing else, set out in his report at ¶¶ 14, 17, 19, and 23.

**E. Dr. Lorin Hitt**

Defendants' damages expert, Dr. Hitt, presents an unreliable and misleading construction of the "but-for" world. A "but-for" world, as explained by the Federal Manual on Scientific Evidence, allows courts to isolate the loss of value to plaintiffs caused by the defendant's bad acts:

> The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved.[182]

As the Manual recognizes, "a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss caused by the harmful act."[183] Thus constructed, the but-for scenario "differs from what actually happened only with respect to the harmful act, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's value arising from other sources."[184]

---

[182] Ex. 23 (Fed. Jud. Center, Ref. Man. on Sci. Evid. 432 (3d ed.2011) (https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf)).

[183] *Id.*

[184] *Id.*



010611-11/1337361 V1

Mr. Stockton follows this admonition precisely. Mr. Stockton's damages model isolates the loss in value from the lack of a properly functioning emissions control system and the resulting emission of NOx at levels much higher than consumers reasonably expect.[185] Dr. Hitt, on the other hand, proposes a "but-for" world where GM could, for example, change the price of the class vehicles, add new features to the class vehicles, or change their advertising and marketing of the class vehicles.[186] This is an utterly improper construction of a "but-for" world because it changes multiple variables. Because Dr. Hitt's proffered but-for world does not attempt to isolate the loss of value caused by Defendants' bad acts, it is thus meaningless to a jury in considering damages in this case and should be excluded.

## III. CONCLUSION

The myriad untested theories presented by Defendants' experts reveal their true expert strategy here: if they throw enough mud against the wall, some of it (they hope) will stick. The strategy is designed to obfuscate and confuse the issues for the jury, leaving them with impression of impropriety in testing and data analysis where there is none. By excluding unfounded, untested opinion evidence offered by unqualified witnesses, the Court can clarify the real dispute for the jury.

---

[185] *E.g.*, Ex. 24 (Report of Edward M. Stockton ¶ 25).

[186] Ex. 25 (Hitt Dep. at 185:9–191:3).

Plaintiffs therefore ask the Court to invoke its gatekeeping power to exclude the Defendants' proffered unqualified experts from offering unreliable testimony.

DATED: August 28, 2020

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*

Steve W. Berman
Jessica Thompson
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jessicat@hbsslaw.com

Jason J. Thompson
Lance C. Young
SOMMERS SCHWARTZ
One Towne Square, Suite 1700
Southfield, MI 48076
Telephone: (248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com

Christopher A. Seeger
SEEGER WEISS LLP
555 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-9393
cseeger@seegerweiss.com

Scott A. George
SEEGER WEISS LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029
sgeorge@seegerweiss.com

Robert C. Hilliard
HILLIARD MUNOZ GONZALES LLP
719 S Shoreline Blvd., # 500
Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com

James E. Cecchi
Caroline F. Bartlett
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 28, 2020, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

Dated: August 28, 2020

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
Steve W. Berman