# Exhibit  6

HIGHLY CONFIDENTIAL

                                                    Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2

                        - - - - -
3

4      JASON COUNTS, DONALD KLEIN,    C.A. NO.
       OSCAR ZANORA, DEREK LONG,      1:16-CV-12541-TLL-PTM
5      HASSAM HIRMIZ, JASON SILVEUS,
       JOHN MISKELLY, THOMAS HAYDUK,
6      CHRISTOPHER HEMBERGER and
       JOSHUA RODRIGUEZ, individually
7      and on behalf of all others similarly
       situated,
8                 Plaintiffs,
9
                  -against-
10
11     GENERAL MOTORS LLC, ROBERT
       BOSCH GMBH, and ROBERT
12     BOSCH, LLC, et al.,
                  Defendants.
13

                        - - - - -
14

                   HIGHLY CONFIDENTIAL
15

                        - - - - -
16
17     VIRTUAL VIDEOTAPED DEPOSITION OF RYAN HARRINGTON
18                 NATICK, MASSACHUSETTS
19               Wednesday, July 22, 2020
20
21                      VOLUME 1
22
23     REPORTED BY:
24     ROBIN CLARK, RPR, CLR
25

HIGHLY CONFIDENTIAL

Page 2

1     Virtual Videotaped Deposition of RYAN
2  HARRINGTON, taken by Plaintiffs, pursuant to notice,
3  commencing at 10:12 a m., by and before Robin L.
4  Clark, Registered Professional Reporter and Notary
5  Public in and for the Commonwealth of Pennsylvania.
6          - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  REMOTE APPEARANCES:
2
    HAGENS BERMAN SOBOL SHAPIRO, LLP
3    BY:  GARTH WOJTANOWICZ, ESQ
      STEVE BERMAN, ESQ
4      1301 Second Avenue, Suite 2000
      Seattle, Washington 98101
5      206-623-7292
      garthw@hbsslaw com
6      steve@hbsslaw com
          For the Plaintiffs
7
8
    CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
9    AGNELLO, P C
      BY:  JAMES E  CECCHI, ESQ
10      ZACH BOWER, ESQ
      5 Becker Farm Road
11      Roseland, New Jersey 07068
      973-997-1700
12      jcecchi@carellabyrne com
      zbower@carellabyrne com
13          For the Plaintiffs
14
    SEEGER WEISS, LLP
15    BY:  SHAUNA ITRI, ESQ
      1515 Market Street, Suite 1380
16      Philadelphia, Pennsylvania 19102
      215-564-2300
17      sitri@seegerweiss com
          For the Plaintiffs
18
19    KIRKLAND & ELLIS, LLP
      BY:  RENEE D  SMITH, ESQ
20      JEFFREY S  BRAMSON, ESQ
      300 North LaSalle
21      Chicago, Illinois 60654
      312-862-2000
22      rdsmith@kirkland com
      jeffrey bramson@kirkland com
23          For the Defendant General
      Motors LLC
24
25

Page 4

1  REMOTE APPEARANCES, continued:
2
3
    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
4    BY:  PATRICK SWIBER, ESQ
      DAVID BRODSKY, ESQ
5      RENEE GRIFFIN, ESQ
      2000 Pennsylvania Avenue, N W
6      Washington, D C  20006
      202-947-1588
7      pswiber@cgsh com
      dbrodsky@cgsh com
8      rgriffin@cgsh com
          For the Defendant Robert Bosch
9      LLC
10
    ALSO PRESENT REMOTELY:
11
      STEVEN HURVITZ, ESQ
12
      JOELLE ROSEN
13
      HOWARD BRODSKY, VIDEOGRAPHER
14
      JUSTON SMITHERS
15
16          - - - - -
17
18
19
20
21
22
23
24
25

Page 5

1              I N D E X
2  WITNESS                          PAGE
3  RYAN HARRINGTON
      BY MR. WOJTANOWICZ:              11
4
5          E X H I B I T S
6  NUMBER    DESCRIPTION              MARKED
7  Harrington
8  Exhibit 1    Expert Report of Ryan      17
          Harrington
9
    Exhibit 2    Chevrolet Cruze Diesel    268
10          Discussion with EPA & CARB
          9/13/16 Document Bates
11          GMCOUNTS0000851587 TO 51607
12  Exhibit 3    Application for          287
          Certification 2015 Model
13          Year Document Bates
          GMCOUNTS000812193 to
14          GMCOUNTS000812238
15  Exhibit 4    Certification Summary    287
          Information Report Bates
16          GMCOUNTS000222607 to
          000222624
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 22

1   vehicle control theory and he supported me in
2   many, many cases related to diesel engine,
3   diesel engine control and emissions.
4       Q.  What about David Anderson, what was
5   his role in assisting you?
6       A.  So David is a Ph.D mechanical
7   engineer with a lot of experience in diesel
8   after treatment systems, so, you know, he kind
9   of brought in some general support and then
10  also assisted in the analysis of some of Mr.
11  Smithers' data, the PEMS reports and then the

15  role?
16      A.  So she was the project manager on
17  the project.  She helped kind of, me kind of
18  make sure that everything was getting done and,
19  you know, kind of on a timely basis and then
20  provided some input on testing and other
21  aspects.
22      Q.  And then Peter, I can't read my own
23  handwriting, Peter, is it Lillo?
24      A.  Lillo, yes.
25      Q.  What was his role?

Page 23

1       A.  So he was the Ph.D mechanical
2   engineer that performed the vehicle inspection.
3       Q.  And did he do anything else
4   significant in connection with your work in
5   this case?
6       A.  Most of it had to do with the
7   vehicle inspection and looking at the ECM data
8   and helped, you know, kind of analyze the
9   findings from the inspection.
10      Q.  And that inspection you're
11  referring to, is that the inspection that
12  Defendants conducted of the diesel Cruze and
13  the gas Cruze vehicle that were used in the
14  testing that Mr. Smithers reported on?
15      A.  That is correct.
16      Q.  And Jeffrey Willard [sic], what was
17  his role?
18      A.  Jeffrey Wishart.
19      Q.  I'm sorry, Wishart.
20      A.  So he was also at the inspection
21  looking at the PEMS equipment.  I believe he
22  did the drive of the vehicle and most of his
23  focus was on the PEMS equipment and testing.
24      Q.  Did he have any role beyond the
25  vehicle inspection that you were talking about

Page 24

1   in your work in this case?
2       A.  He helped with some of the analyses
3   of, you know, kind of the PEMS setup and PEMS
4   protocols in the regulatory environment kind of
5   best practices related to PEMS testing.
6       Q.  And what is Mr. Wishart's
7   credential or specialty, do you know?
8       A.  So I think his -- he has got a
9   Ph.D.  It's in engineering mechanics or
10  mechanical engineering.  He's worked with PEMS
11  equipment in his prior work, fuel efficiency,
12  plug-in hybrid vehicles.  I'm trying to think,
13  most of his work was kind of in the electric
14  vehicle plug-in hybrid emissions realm with
15  vehicles from an inspection and testing
16  capability.
17      Q.  And Matthew Pooley, what was his
18  role?
19      A.  So he helped, he's a Ph.D in
20  electrical engineering and computer science.
21  So he assisted myself and David Anderson
22  looking through the control strategy and Mr.
23  Levchenko's report.
24      Q.  And what about Sri Danthurthi?
25      A.  Danthurthi, so she helped with

Page 25

1   quality checking the report, so just verifying
2   some of the calculations and the numbers and
3   making sure the footnotes and everything lined
4   up.
5       Q.  Are all the people that you have
6   identified, been able to identify as people
7   assisting you in preparing the report, are they
8   all employees of Exponent?
9       A.  Yes.
10      Q.  Did you retain any outside
11  consultants in order to help you with the work
12  that you did in this case?
13      A.  I didn't retain any outside
14  support.  The Analysis Group supports Kirkland
15  and Ellis and the client and I had some
16  interactions with their staff.
17      Q.  And who did you interact with on
18  their staff?
19      A.  Andrea Okie, Kris Comeaux, and
20  Kerri Leonhardt.
21      Q.  And for what purpose were you
22  dealing with them?  Why were you talking to
23  them?
24      MS. SMITH:  I'm just going
25  to -- I'm so sorry, I'm just going to

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1   object and you can say if they provided
2   facts or data or did actual work in
3   connection with your report, but other
4   than that, I would just caution to not
5   respond regarding communications you
6   may have had with them, which I don't
7   think is what Garth is asking, but I
8   just want to be careful.
9           MR. WOJTANOWICZ:  Hold on,
10  Renee, I would like to ask for a
11  clarification.  Are you indicating that
12  you believe that discussions between
13  Mr. Harrington and the Analysis Group
14  are subject to attorney-client
15  privilege or work product?
16          MS. SMITH:  I believe it is
17  subject to at least the work product
18  privilege and as Mr. Shaeffer said in
19  an email, that the communications
20  between people who he may be working
21  with may be privileged.  He can talk
22  about just pursuant to Rule 26, he can,
23  obviously, say if facts or data was
24  provided to him, but the actual
25  communications he's having with them,

Page 27

1   yes, I will say are privileged and
2   protected --
3   BY MR. WOJTANOWICZ:
4       Q.  Well, let me rephrase my question.
5   Were you communicating with the Analysis Group
6   in order to obtain facts or data that you were
7   using in connection with the analysis performed
8   for your report?
9       A.  I'm sorry, I think I lost track of
10  everything.  Could you restate the question?
11      Q.  Sure.  Were you communicating with
12  the Analysis Group in order to obtain facts or
13  data for purposes of performing the analysis
14  described in your report?
15          MS. SMITH:  Garth, let me
16  clarify the objection and instructions
17  so we're on the same page, is he can
18  disclose if Analysis Group provided
19  facts or data, the substance of the
20  communications, what they were about, I
21  would instruct not to answer.  But he
22  can certainly provide information if
23  they provided facts or data that he
24  relied upon in forming his opinions in
25  this case or considered.

Page 28

1   THE WITNESS:  Okay.  So the
2   Analysis Group did look at some of Mr.
3   Smithers' data and did some data
4   analyses on that looking at routes and
5   things like that and how to kind of put
6   together the data that Mr. Smithers
7   provided.  So they provided some of
8   that to which my staff at Exponent
9   reviewed and we basically redid all of
10  it and then did kind of a QC to make
11  sure that we were correctly
12  interpreting --
13          THE STENOGRAPHER:  And did
14  kind of what, wait a minute, there was
15  a glitch, you did kind of what?
16          THE WITNESS:  So we checked
17  the data and used -- and made sure that
18  our analyses and compiling of Mr.
19  Smithers' data was consistent with the
20  Analysis Group just to double check
21  that we were all looking at the data
22  correctly and understood it correctly.
23  BY MR. WOJTANOWICZ:
24      Q.  Was the additional analysis
25  performed by the Analysis Group done according

Page 29

1   to your instruction or specification?
2       A.  Yes, so I had worked with them and
3   my staff had worked with them to instruct them
4   on what we were looking to do and, you know,
5   provided guidance as to what type of analysis
6   we were planning to do.
7       Q.  And what type of data or analysis
8   did they provide you with?
9       A.  So, again, as I mentioned, it was
10  the data that Mr. Smithers had provided, so his
11  routes and his segments, some of the Excel
12  files and the presentation materials that he
13  provided, you couldn't always glean all the
14  information out, so it was looking to compile
15  all of that so that we could, you know, kind of
16  double check his analyses and then understand
17  how they were put together so that we could
18  then analyze them ourselves.
19      Q.  So you're referring to data that
20  Mr. Smithers provided, but presumably, Analysis
21  Group did something with that data rather than
22  just giving you what Mr. Smithers already
23  produced, so what was the product, the work
24  product that they gave you?
25          MS. SMITH:  Sorry, again, I

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 34

1  BY MR. WOJTANOWICZ:
2      Q.  And describe the documents for me,
3  would you please?
4      A.  They would have been light-duty or
5  heavy-duty regulations from the code of federal
6  regulations, so documents that are online that
7  the EPA and CARB would have been putting out.
8      Q.  Did the Analysis Group provide any
9  summary or analysis relating to those
10 regulations that they provided to you?
11     A.  There wasn't a separate analyses.
12 I think from time to time, they provided on the
13 report, provided some input on some of those
14 things that I had asked them to do and provided
15 some edits --
16             MS. SMITH:  Yeah, I'm just
17     going -- I'm sorry to interrupt, I just
18     want to caution you that in terms of
19     any of the substance of draft reports,
20     things like that, I would just caution,
21     it's fine, he can answer the question
22     that Garth just asked, but I just want
23     to caution that the draft reports are
24     and communications related thereto, we
25     would maintain the privilege on.

Page 35

1             MR. WOJTANOWICZ:  It didn't
2     sound like you were done with your
3     answer there.  Do you want to continue?
4             THE WITNESS:  Could you ask
5     the question again?  I can't remember
6     what the question was.
7             MS. SMITH:  I'm sorry, I
8     apologize for interrupting.
9  BY MR. WOJTANOWICZ:
10     Q.  I was asking whether the Analysis
11 Group provided any analysis or commentary
12 relating to the regulatory documents that they
13 sent to you?
14             MS. SMITH:  Okay.  I'm going
15     to instruct not to answer.  To the
16     extent there is commentary, he can
17     disclose if Analysis Group provided or
18     did work or facts or data upon which
19     Mr. Harrington relied.
20             THE WITNESS:  So, again,
21     they provided some input into the
22     report, but I don't remember separate
23     analyses that they had done or
24     communicated.
25

Page 36

1  BY MR. WOJTANOWICZ:
2      Q.  Did the Analysis Group draft any
3  sections of your report?
4      A.  I had set forth the outline of the
5  report and kind of the structure of it and then
6  at my direction, my staff helped me draft some
7  of it.  I think the Analysis Group did assist
8  in drafting a few parts of it or kind of
9  augmenting some of what we had and then my
10 staff or myself reviewed all of that.
11     Q.  What sections of the report did the
12 Analysis Group help to draft?
13     A.  I mean, I can't remember the exact
14 specifics, but I think in the appendices,
15 there's some discussion of the regulatory
16 requirements and testing.  So if there was some
17 input from the Analysis Group, it would have
18 been mostly in those sections.
19     Q.  Aside from information in the
20 appendices relating to regulatory requirements
21 are there any other sections of the report that
22 you can recall the Analysis Group helping to
23 draft?
24     A.  I don't remember them helping draft
25 any of those sections.  They might have

Page 37

1  provided some input on, you know, how -- if
2  some sections didn't read very well and
3  provided some thoughts there, but --
4             MS. SMITH:  Yeah, I'm going
5     to instruct not to answer and just to
6     be careful, like, in terms of
7     commentary you're asking, in terms of
8     wording, you can answer, if Analysis
9     Group did -- actually provided
10     analysis, data, facts upon which you're
11     relying.
12 BY MR. WOJTANOWICZ:
13     Q.  For the sections that the Analysis
14 Group helped to draft, did you rely upon their
15 expertise in these areas in order to determine
16 whether that information should be included in
17 your report?
18             MS. SMITH:  One more second.
19     Hold on.
20             THE WITNESS:  I took their
21     information --
22             MS. SMITH:  Hold on, one
23     second, sorry.  Okay.  You may answer.
24     Sorry, I just wanted to check.
25             THE WITNESS:  So, again, as

10 (Pages 34 - 37)

Page 38

1  I stated, I reviewed the information or
2  my staff reviewed the information that
3  was provided, but Exponent used our
4  expertise and my expertise to form, you
5  know, the opinions based on that
6  information.
7  BY MR. WOJTANOWICZ:
8      Q.  So you formed your opinions using
9  your own expertise, but in doing so, you
10  considered this information provided to you
11  from the Analysis Group, correct?
12          MS. SMITH:  Objection, form.
13          THE WITNESS:  So some of the
14      analyses or documents they provided, I
15      considered, but my opinions and my
16      analyses were done by myself or my
17      staff.
18          MR. WOJTANOWICZ:  Okay.
19      Renee, I would ask that General Motors
20      produce the documents between the
21      Analysis Group and Mr. Harrington as
22      part of the materials that he
23      considered in connection with forming
24      his opinions in this case.
25          MS. SMITH:  Yeah, I believe

Page 39

1      all facts and data which he considered
2      were produced, but we will double
3      check.
4  BY MR. WOJTANOWICZ:
5      Q.  Did you have email communications
6  with the Analysis Group regarding the -- we're
7  not asking for the content of those
8  communications at this point, did you have
9  email communications or phone communications
10  with the Analysis Group regarding the sections
11  of the report that they drafted?
12      A.  Can you ask the question again?
13      Q.  Sure.  Did you have telephone or
14  email communications with the Analysis Group
15  regarding the sections of the report that they
16  drafted?
17      A.  I believe there was some
18  communication with them.
19      Q.  And was the purpose of that
20  communication to consider their -- the basis
21  for the statements that they made that you were
22  considering putting inside your report?
23          MS. SMITH:  Objection, form.
24          THE WITNESS:  So it was more
25      of a coordination role to make sure

Page 40

1      that we knew the documents were coming.
2      There might have been a clarifying
3      statement here or there, but most of it
4      was in the report.
5  BY MR. WOJTANOWICZ:
6      Q.  And what did you do to -- you said
7  that you relied on your own expertise or the
8  expertise of people within Exponent to -- with
9  respect to the parts of the report that were
10  drafted by the Analysis Group.  What did you do
11  in order to verify those sections using your
12  own expertise?
13          MS. SMITH:  Objection, form.
14          THE WITNESS:  So as is
15      typical even with stuff that's drafted
16      by Exponent, we always have another
17      individual read over of the documents,
18      read over of the report, check all the
19      references, check all the calculations,
20      so and any part of the report, my staff
21      and then myself is another QC who goes
22      through the report, reads it all, looks
23      at the analyses, double checks the work
24      for accuracy.
25

Page 41

1  BY MR. WOJTANOWICZ:
2      Q.  Have you spoken -- you're aware
3  that there are other experts who have submitted
4  reports in this case on behalf of Defendants
5  Bosch and GM?
6      A.  That's my understanding.
7      Q.  Have you reviewed any other expert
8  reports submitted on behalf of Defendants?
9      A.  No, I have not.
10      Q.  Do you know who Nick Molden is?
11      A.  I'm aware of who he is, but I don't
12  know him.  I haven't seen anything from him.
13      Q.  So you've not reviewed the report
14  that he submitted in this case?
15      A.  I have not.
16      Q.  And have you spoken with
17  Mr. Molden?
18      A.  I have not.
19      Q.  Have you, and when I say "you,"
20  has -- do you know whether any of the staff
21  working under your direction for purposes of
22  preparing this report have reviewed Mr.
23  Molden's report?
24      A.  No, they have not.
25      Q.  Has anyone working under your

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 54

1    THE WITNESS:  Not that I can
2    remember.
3    BY MR. WOJTANOWICZ:
4    Q.   So you've already testified that
5    the Analysis Group helped you by writing some
6    sections of the report and appendices.  Did any
7    others at Exponent write any of the -- or help
8    you by writing sections of the report?
9    MS. SMITH:  Objection, form,
10   compound.  Misstates his testimony.
11   THE WITNESS:  So I mentioned
12   the key staff that helped me draft the
13   report.  There were a number of staff that
14   may have supported or done some QC of
15   the report, but I can't remember who
16   would have done what or all their names
17   at this point.
18   BY MR. WOJTANOWICZ:
19   Q.   Were there sections of the report
20   that you personally consider yourself to be the
21   principal drafter of?
22   A.   So I set forth the outline, the key
23   points, the summaries and the opinions and then
24   I typically start at all the different sections
25   and then others kind of filled in based on my

Page 55

1    direction.
2    Q.   Did anyone other than people at
3    Exponent and people at the Analysis Group draft
4    any sections of the report or the appendices?
5    A.   No.
6    Q.   Did the lawyers representing GM or
7    Bosch draft any sections of the report?
8    A.   They didn't draft any of it, no.
9    Q.   Was any part of the report,
10   including the appendices, copied in whole or in
11   part from work that you had performed or
12   Exponent performed for purposes of another
13   case?
14   MS. SMITH:  Objection, form.
15   THE WITNESS:  So I've done
16   work on similar cases and so some of
17   the kind of base materials may have
18   been pulled from some other reports or
19   other analyses we've done on similar
20   cases where it's kind of, you know,
21   background material or appendices.
22   BY MR. WOJTANOWICZ:
23   Q.   What do you mean by base materials?
24   A.   It's kind of like the base research
25   on regulations or how diesel engine

Page 56

1    after-treatment systems operate.
2    Q.   So, for example, if you turn to
3    your report, Exhibit No. 1, near the back, and
4    it gets kind of difficult because the pages
5    aren't totally sequential through the
6    appendices, but there's Appendix D, Overview of
7    Diesel Vehicle Emissions.  Is this one of the
8    sections that was derived in whole or in part
9    from work that you had performed in other
10   diesel cases?
11   MS. SMITH:  I just want to
12   just caution Mr. Harrington to the
13   extent the work is as a consulting
14   expert and has not been disclosed, I
15   just want to be careful not to waive
16   any privilege that he may have, that
17   other companies may have or other
18   entities may have.
19   THE WITNESS:  You said
20   Appendix D, which page?
21   BY MR. WOJTANOWICZ:
22   Q.   Well, Appendix D starts at page 1
23   of Appendix D, but it's after the very end of
24   your reliance materials section.  There's no
25   other way really to -- so after page C60, which

Page 57

1    is page 60 of Appendix C.
2    A.   Yeah, we had a problem with the
3    page number on the pdfs, so they're by
4    sections.  So you're asking about Appendix D,
5    was there a particular page you were talking
6    about in Appendix D?
7    Q.   No, I'm asking whether Appendix D
8    was derived in whole or in part from work that
9    you performed in other cases?
10   MS. SMITH:  Same objection.
11   I just caution not to get into the
12   substance of anything where you were an
13   undisclosed expert or consultant.
14   THE WITNESS:  There are
15   likely parts of that that could have
16   been pulled from another report.
17   BY MR. WOJTANOWICZ:
18   Q.   Do you know what report or what
19   report in what case parts of this analysis may
20   have been pulled from?
21   MS. SMITH:  And I'm just
22   going to say, same instruction and to
23   the extent any of that is confidential
24   or you're concerned it's confidential,
25   I would just caution you on how to

| Page 58 | Page 60 |
|---|---|

1 answer. And, Garth, just so you know,
2 I have no idea, so if it is or it is
3 not, but I just want to be careful
4 here.
5 THE WITNESS: So I don't --
6 there was some of the reports that were
7 privileged, still confidential, but I
8 believe there's some that were not in
9 relation to some Volkswagen cases that
10 some of this information or some of the
11 text could have come from in the
12 report.
13 BY MR. WOJTANOWICZ:
14 Q. Were those -- so you referred to
15 some Volkswagen cases. Were those Volkswagen
16 cases relating to diesel emissions?
17 A. They were.
18 Q. And you say you're not sure whether
19 some of this analysis shown in Appendix D was
20 derived or taken from reports submitted in
21 these Volkswagen emission cases?
22 A. See, I don't know if they -- were,
23 how much they were changed, but -- and I would
24 have to go through it you know, line by line to
25 completely answer it, but some of the text and

1 some of the images look like they were pulled
2 from that report.
3 Q. And were those -- was that a report
4 that was issued under your name? Were you the
5 person issuing this report in those cases that
6 you believe may or may not be the source of
7 some of the information in Appendix D?
8 MS. SMITH: Objection, form.
9 THE WITNESS: So yes, I was
10 the named expert and the me is I don't
11 know if things, you know, I can't
12 remember on some of these if they
13 changed a little bit, but there was for
14 sure some of this text or portions of
15 it that came from those other reports.
16 BY MR. WOJTANOWICZ:
17 Q. We'll go through your list of cases
18 later. Do you think that if you hear the name
19 of the case you'll recognize it as being
20 potentially the source of some of the
21 information contained in Appendix D?
22 MS. SMITH: Objection, form.
23 THE WITNESS: I should be
24 able to to do that.
25

1 BY MR. WOJTANOWICZ:
2 Q. I'm going ask you the same kind of
3 set of questions for Appendix E, which follows
4 Appendix D and Appendix D is about 12 pages
5 long, so not too much further down the line.
6 So my question is simply whether you believe
7 any of the analysis contained in Appendix E was
8 copied or derived from work contained in
9 another report submitted for purposes of a
10 different case?
11 MS. SMITH: Object to form.
12 THE WITNESS: So in Appendix
13 E, it does look like there is, you
14 know, some of the summaries of
15 emissions and tier two emissions came
16 from some of those other reports I
17 wrote --
18 THE STENOGRAPHER: And what?
19 Wait a minute, emissions and what?
20 THE WITNESS: It's omissions
21 and standards, I can't remember if
22 that's what I was going to say, but the
23 emissions and standards summaries,
24 portions of that came from other
25 reports or another report.

1 BY MR. WOJTANOWICZ:
2 Q. And is that, again, do you believe
3 that's from Volkswagen diesel emissions cases
4 as well or are you referring to a different
5 case or cases than we were talking about with
6 respect to Appendix D?
7 MS. SMITH: Objection, form.
8 THE WITNESS: The same
9 Volkswagen cases.
10 BY MR. WOJTANOWICZ:
11 Q. Did you conduct any vehicle tests
12 on your own in connection with your report in
13 this case?
14 MS. SMITH: Objection, form.
15 THE WITNESS: Could you
16 restate the question?
17 BY MR. WOJTANOWICZ:
18 Q. Did you conduct any vehicle
19 emissions tests in connection with your work in
20 this case?
21 A. So at the inspection, we analyzed
22 or we looked at the vehicle in the PEMS unit,
23 drove the vehicle, but there was no testing of
24 the emission system.
25 Q. So you said you're referring to the

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1 inspection of the Cruze diesel and gasoline
2 test vehicles in this case, correct?
3     A.   Correct, we analyzed the vehicle
4 and assessed the vehicle, but we didn't do any
5 PEMS testing looking at the emissions of the
6 vehicle.
7     Q.   Were you present at the vehicle
8 inspection?
9     A.   I was not.
10    Q.   So and is it your understanding
11 that the PEMS equipment that was used in
12 connection with testing those vehicles was
13 available at that vehicle inspection --
14    A.   Correct.
15    Q.   -- correct?  But at that time,
16 neither you nor anyone working under your
17 direction attempted to perform an actual PEMS
18 test using that equipment, correct?
19         MS. SMITH:  Objection, form.
20         THE WITNESS:  That is
21     correct.  We couldn't drive the vehicle
22     off of our property, because the
23     vehicle wasn't registered and the
24     vehicle had active MIL lights and some
25     other maintenance issues, so we were

Page 63

1     unable to do any testing.
2 BY MR. WOJTANOWICZ:
3     Q.   The fact that you couldn't drive
4 the vehicle off the property would not prevent
5 you from actually hooking up and driving the
6 vehicle with the PEMS equipment active, would
7 it?
8         MS. SMITH:  Objection, form.
9         THE WITNESS:  No, we could
10     have, but with the condition of the
11     vehicle and, you know, driving the
12     test track would have been
13     difficult to do any kind of, you know,
14     on-road testing had, you know, there
15     wasn't as much as value especially
16     given the condition of the vehicle.
17 BY MR. WOJTANOWICZ:
18    Q.   Aside from the vehicle inspection
19 that people working under your direction
20 attended, you have not conducted any PEMS
21 testing of any Cruze vehicles for purposes of
22 this report, correct?
23    A.   That is correct.
24    Q.   Have you ever performed emissions
25 testing on any Cruze vehicle for any purpose?

Page 64

1     A.   No, I have not.
2     Q.   Did you -- in determining how you
3 were going to perform your analysis in this
4 case, did you consider conducting PEMS testing
5 on a vehicle, the Cruze vehicle for this case?
6         MS. SMITH:  Objection, form.
7         THE WITNESS:  When I was
8     first retained, you know, I was trying
9     to understand the testing that
10     Mr. Smithers had done as I got into
11     it and realized some of the methodology
12     issues and the issues with the vehicle,
13     there seemed to be so many issues with
14     the vehicle that at that point it
15     didn't seem necessary to do any
16     additional testing.
17 BY MR. WOJTANOWICZ:
18    Q.   So did you determine fairly early
19 on in your review of the case that you didn't
20 feel you needed to conduct any vehicle testing
21 on your own, correct?
22         MS. SMITH:  Objection, form.
23         THE WITNESS:  It evolved
24     over time, you know, there was some
25     tighter deadlines and as things got

Page 65

1     extended, obviously, as I continued to
2     evaluate the data by Mr. Smithers and
3     his testing on the timelines, you know,
4     I continued to evaluate that, but
5     given, you know, early assessments and
6     then the continued assessment, but it
7     didn't change my opinion of that.
8 BY MR. WOJTANOWICZ:
9     Q.   So I believe that the primary
10 reason you stated for deciding you didn't want
11 or need to conduct any emissions testing on a
12 Cruze vehicle for this case was that you had
13 identified what you thought were issues with
14 the Cruze test vehicles, correct?
15         MS. SMITH:  I'm just going
16     to object -- sorry, objection, form.
17     And objection to the extent you're
18     calling for a legal conclusion about
19     what would be needed or not needed to
20     do for this case.
21         THE WITNESS:  Could you
22     restate the question or read it back?
23 BY MR. WOJTANOWICZ:

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

**Page 66**

19  BY MR. WOJTANOWICZ:
20      Q.  So in your opinion, the data that
21  you were able to review from testing performed
22  by General Motors was sufficiently reliable for
23  you to rely on that date for purposes of
24  rendering your opinion in this case?
25          MS. SMITH:  Objection, form.

**Page 67**

1          Objection, misstates his testimony.
2              THE WITNESS:  So again, that
3      was a piece of it, right, so there was
4      some testing that was done there, but
5      there was some testing on additional
6      vehicles through the in-use program,
7      there was the certificate of conformity
8      data, so there was not just, you know,
9      one set of data or one vehicle tested,
10     there was multiple data and information
11     available for multiple vehicles.
12  BY MR. WOJTANOWICZ:
13      Q.  Okay.  So there was General Motors
14  testing data you were able to review relating
15  to its application in obtaining a certificate
16  of conformity for the Cruze vehicles, correct?
17          MS. SMITH:  Objection, form.
18          THE WITNESS:  That is
19      correct.
20  BY MR. WOJTANOWICZ:
21      Q.  And based on your review, is your
22  opinion that data was sufficiently reliable for
23  you to use it in rendering your opinions in
24  this case?
25          MS. SMITH:  Objection, form.

**Page 68**

1          Misstates testimony, vague.
2              THE WITNESS:  So that data
3      in addition to the other data and
4      testing that GM needed to do to develop
5      a program.
6  BY MR. WOJTANOWICZ:
7      Q.  But you felt that that testing was
8  sufficiently reliable for you to use it in
9  rendering your opinions in this case; that's
10  correct, right?
11          MS. SMITH:  Objection, form.
12          THE WITNESS:  So that
13      testing was reliable in addition to the
14      other information that was available.
15  BY MR. WOJTANOWICZ:
16      Q.  Okay.  But I'm trying to -- I want
17  to separate these.  You said you had three
18  sources of the testing information that you
19  reviewed and relied on, one of them, the
20  certificate of conformity testing and data,
21  in-use testing data,
23      A.  Correct.
24      Q.  So the certificate of conformity
25  data, taking it by myself, did you consider

**Page 69**

1  that data sufficiently reliable for you to use
2  it in connection with rendering the opinions in
3  your report?
4      A.  So that data was reliable because
5  it was backed up by testing, you know, during
6  the development of the diesel Cruze and the
7  scrutiny of the EPA and the potential scrutiny
8  and audits that the EPA could have conducted on
9  that vehicle or some other vehicle.
10     Q.  What about the in-use testing data
11  that you referred to, did you consider that
12  testing data to be sufficiently reliable for
13  you to use it in connection with rendering the
14  opinions stated in your report?
15     A.  So I considered it reliable
16  information.  I believe they tested, was it six
17  or seven, seven vehicles which was the results
18  were submitted to the EPA and CARB and my
19  understanding, it was reviewed by them.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

BY MR. WOJTANOWICZ:
24
25    Q.  Now, you wouldn't have relied on

Page 71

1   the data if you believed that it was -- that
2   the tests were improperly conducted or the data
3   wasn't reliable, would you?
4            MS. SMITH:  Objection, form.
5            THE WITNESS:  Sorry, go
6       ahead.
7            MS. SMITH:  Go ahead, sorry.
8            THE WITNESS:  All right.  So
9       could you clarify the statement, if I
10      knew what about the data?
11  BY MR. WOJTANOWICZ:

21      Q.  Is it your practice to include or
22  rely upon faulty or false data in rendering
23  expert opinions in litigation?
24            MS. SMITH:  Objection, form.
25            THE WITNESS:  You said

Page 72

1       relying upon faulty data?
2   BY MR. WOJTANOWICZ:
3       Q.  Yes.
4       A.  If I know it's faulty, I will
5   investigate it and caveat what I know about it
6   and provide some context if I find something
7   that's unexpected about the data.

17      have been going for a little more than
18  an hour, I think now would be a good
19  time to take a short break before we
20  move on.  Is that okay?
21            MS. SMITH:  Yes, that's
22  fine.  Thank you.
23            THE VIDEOGRAPHER:  The time
24  is 11:26.  We are off the record.
25            - - - - -

Page 73

1       (A recess was taken at this time.)
2            - - - - -
3            THE VIDEOGRAPHER:  The time
4   is 11:43.  We're on the record.
5   BY MR. WOJTANOWICZ:

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 78

1    and others, some emails about, you
2    know, some questions they were asking
3    about the PEMS data, so that's some of
4    the information that I saw.
5    BY MR. WOJTANOWICZ:
6        Q.   The bottom line is you don't know
7    how deeply the EPA dug into any of this testing
8    data other than the fact that this data was
9    given to it, right?
10            MS. SMITH:  Objection, form.
11    Misstates testimony.
12            THE WITNESS:  So that
13        information is typically not made
14        public.  So I didn't see anything
15        specific to that, you know, exactly
16        what they did in relation to that data
17        that was submitted.
18    BY MR. WOJTANOWICZ:
19        Q.   Is it your opinion that any
20    information submitted to the EPA is inherently
21    reliable because of the potential scrutiny that
22    it's subject to?
23        A.   Could you restate that question?
24        Q.   Is it your opinion that any
25    information or data submitted to the EPA is

Page 79

1    inherently more reliable just because it's
2    submitted to the EPA?
3        A.   I don't know if you can say it is
4    inherently more reliable, but you're submitting
5    it to an entity that has to look into it and,
6    you know, or an OEM knows that that data and
7    those test results can be audited by the EPA,
8    so there's definitely increased scrutiny on the
9    data and what's going to be done with it.
10        Q.   Have you ever conducted personally
11    a PEMS tests on the vehicle?
12        A.   I have not conducted PEMS testing.
13    I've conducted FTP testing, but not PEMS
14    testing.  And I've conducted a lot of on-road
15    fuel economy testing, which has some of the
16    inherent variability with PEMS testing.
17        Q.   But specifically with respect to
18    PEMS testing for purposes of analyzing diesel
19    vehicle emissions, you have never conducted a
20    test like that, correct?
21            MS. SMITH:  Objection, form.
22            THE WITNESS:  I have not
23        conducted PEMS testing.  Again, I've
24        conducted FTP testing for emissions and
25        conducted on-road testing, which PEMS

Page 80

1    is really kind of the combination of
2    the two of those is using a PEMS unit
3    to do on-road testing of emissions.
4    BY MR. WOJTANOWICZ:
5        Q.   Again, I am not asking about the
6    other kinds of tests you may or may not have
7    performed, I'm asking you specifically about
8    PEMS testing for purposes of analyzing diesel
9    vehicle emissions.  So if you can answer my
10    question, please.  Have you ever conducted a
11    PEMS test for the purpose of analyzing diesel
12    vehicle emissions?
13            MS. SMITH:  Objection, form.
14            THE WITNESS:  I think I
15        answered that, but I said I had not
16        conducted PEMS testing.  I provided
17        some context to the other testing, but
18        I think I clearly stated I hadn't
19        conducted PEMS testing on a diesel
20        vehicle.
21    BY MR. WOJTANOWICZ:
22        Q.   Have you ever conducted a PEMS test
23    for purpose of analyzing emissions on a
24    gasoline vehicle?
25        A.   I have not.

Page 81

1        Q.   Have you ever designed test route
2    for purpose of running a PEMS test to analyze
3    emissions on a diesel or gasoline vehicle?
4            MS. SMITH:  Objection, form.
5            THE WITNESS:  I have not
6        designed a route for PEMS testing.
7        I've done, again, fuel economy testing
8        for on road commissions and fuel
9        economy, not a PEMS testing route.
10    BY MR. WOJTANOWICZ:
11        Q.   Have you ever hooked up or set up a
12    PEMS unit on a vehicle for purposes of
13    emissions testing?
14        A.   I have not.
15        Q.   Have you ever hooked up -- or let
16    me rephrase this.  Have you ever directed that
17    a PEMS unit be attached to a vehicle and then
18    test it on a dynamometer for purposes of
19    assessing whether the PEMS was accurate or not?
20            MS. SMITH:  Objection, form.
21            THE WITNESS:  I have not.
22    BY MR. WOJTANOWICZ:
23        Q.   Have you ever designed a testing
24    program using a PEMS unit for purposes of
25    analyzing diesel or gas vehicle emissions?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1      A.  I have not.
2      Q.  Have you received any formal
3  training in using a PEMS analyzer?
4      A.  Again, not a PEMS analyzer, I've
5  done other emissions analytics, but not a
6  specific PEMS unit.
7      Q.  Have you received, for example, any
8  informal training, like attended a seminar or a
9  demonstration by a manufacturer of a PEMS unit
10 to learn how the PEMS unit works?
11         MS. SMITH:  Objection, form.
12         THE WITNESS:  I have not.
13 BY MR. WOJTANOWICZ:
14     Q.  Was the use of a PEMS unit the part
15 of any aspect of your formal education?  I know
16 we'll go into that later, but have you had any
17 classes or formal university training that
18 relates specifically to the use of a PEMS unit?
19     A.  When I went to school, PEMS units
20 weren't typically in use or hadn't been very
21 widespread in use.
22     Q.  Okay.  So the answer is no, there
23 weren't any classes offered at the time you
24 were in school that related to how to set up or
25 use a PEMS unit?

Page 83

1      A.  Not specific to a PEMS unit, no.
2  It was on-road testing in itself.
3      Q.  In connection with your work on
4  this case, have you spoken with any PEMS unit
5  manufacturers regarding the proper use of PEMS
6  equipment?
7      A.  I have not.  Jeff Wishart who works
8  for me has done some PEMS testing and been a
9  part of PEMS testing, so I had spoke to him
10 about some the aspects of it.
11     Q.  But you personally did not reach
12 out to, for example, Sensors, Inc. in order to
13 ask them about how their PEMS unit that they
14 manufacture works, did you?
15     A.  I did not reach out to them.
16     Q.  Did you ask Mr. Wishart to do that
17 for you?
18     A.  I can't remember if he had
19 looked -- he looked into some of their manuals
20 and I can't remember if he called to clarify a
21 few different aspects, but I know he'd reviewed
22 their manuals and there may have been a phone
23 call, but I can't remember for sure.
24     Q.  Did you ask him to call the
25 manufacturer to get additional information

Page 84

1  about how the Sensors, Inc. PEMS unit works?
2         MS. SMITH:  Objection, form.
3         THE WITNESS:  I don't
4     remember if I asked him to call or if I
5     had asked him some questions and he
6     thought it was -- he needed to clarify
7     it with them, I can't remember the
8     exact specifics of the conversation.
9  BY MR. WOJTANOWICZ:
10     Q.  You're aware, aren't you, that
11 Sensors, Inc. was the manufacturer of the PEMS
12 unit that Mr. Smithers used in his testing
13 program?
14     A.  Yes, the Semtech unit, yes.
15     Q.  Have you personally reviewed the
16 user's manuals or the manuals for the Semtech
17 PEMS unit?
18         MS. SMITH:  Objection, form.
19         THE WITNESS:  I can't say
20     that I reviewed every aspect of it, but
21     I did review the materials and some of
22     the owner's manual pieces of that
23     Semtech unit.
24 BY MR. WOJTANOWICZ:
25     Q.  What parts of the owner's manual do

Page 85

1  you recall reviewing?
2      A.  There was the discussion of
3  operating PEMS temperatures.  I think some of
4  the setup pieces, but it was a while ago, so I
5  can't remember the exact sections.
6      Q.  Have you ever testified as an
7  expert witness in a case about PEMS testing
8  other than the testimony you're providing right
9  now in this case?
10     A.  I have got to think if any of that
11 was confidential and privileged.  I don't
12 believe it is in relation to some of the other
13 cases that we had mentioned before, I had
14 testified to some of the results of some PEMS
15 testing.
16     Q.  In what cases?
17     A.  Those would have been the
18 Volkswagen cases.
19     Q.  And were you testifying with
20 respect to PEMS testing conducted by Exponent
21 or by someone else?
22         MS. SMITH:  Objection, form.
23         THE WITNESS:  It would have
24     been by Volkswagen and West Virginia
25     University.

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1  BY MR. WOJTANOWICZ:
2      Q.  So in that case, you were able to
3  analyze some PEMS test results conducted by
4  Volkswagen on its own vehicles; is that
5  correct?
6      A.  And West Virginia's PEMS testing,
7  correct.
8      Q.  And the West Virginia PEMS testing,
9  was that a study done by some people at West
10  Virginia University related to diesel vehicle
11  emissions using analyzed using a PEMS setup?
12      A.  That is correct.
13      Q.  And you provided deposition
14  testimony is that case; is that correct?
15      A.  That is correct.
16      Q.  Did you or anyone under your
17  direction perform PEMS testing with respect to
18  that Volkswagen case where you offered
19  testimony relating to PEMS testing?
20      A.  No.
21      Q.  Did you issue a written report in
22  that case?
23      A.  Yes.
24      Q.  And you said then you provided
25  testimony that was deposition testimony?

Page 87

1      A.  Correct.
2      Q.  Was there a trial?  Did you give
3  any trial testimony?
4      A.  I did not.
5      Q.  Okay.  Any other case that you are
6  aware of or that you recall in which you
7  provided testimony regarding PEMS testing?
8      A.  No, there was -- it's, obviously,
9  in my appendix, there was some arbitrations
10  that were related to Volkswagen that would have
11  been the similar opinions, but I think that was
12  all confidential, but it's very similar to the
13  other reports that I mentioned.
14      Q.  Okay.  And we'll go through those
15  later, but and I was just trying to, for the
16  purpose of fairness, those are cases that you
17  provided testimony, like, where you actually
18  gave deposition or trial testimony; is that
19  correct?
20      A.  Deposition or arbitration
21  testimony, correct.
22      Q.  Okay.  In all of those cases, did
23  you also provide written reports that related
24  to your opinions regarding PEMS testing?
25      A.  Yes, there should have been a

Page 88

1  written report.  The California arbitration
2  cases are a little bit different, but the other
3  ones had a full report with them.
4      Q.  Have you ever been asked to conduct
5  PEMS testing on a vehicle for purposes other
6  than litigation?  And to the extent that you
7  are -- were asked as a consulting expert, I
8  don't know the substance, I want to know
9  whether you have been asked to actually just
10  conduct a PEMS testing for purposes other than
11  the litigation?
12      A.  I can't recall a request like that.
13      Q.  Have you ever been asked to
14  interpret or analyze the validity of PEMS
15  testing data for purposes other than
16  litigation?
17      A.  Not off the top of my head, I can't
18  recall a request like that.
19      Q.  And then a slight variation on
20  these questions and, again, without wanting to
21  know the substance, have you ever conducted
22  PEMS testing for purposes of litigation where
23  you were not disclosed as a testifying expert?
24      A.  No.
25      Q.  Have you ever been in a situation

Page 89

1  where you directed other people to conduct PEMS
2  testing for you for purposes of litigation
3  where you were working under the auspices of
4  being a consultant, not a testifying expert?
5      A.  No.
6      Q.  Did you conduct any tests on PEMS
7  equipment, meaning any tests analyzing how PEMS
8  equipment works in connection with your work in
9  this case?
10      MS. SMITH:  Objection, form.
11      THE WITNESS:  Could you ask
12  the question again?
13  BY MR. WOJTANOWICZ:
14      Q.  Sure.  Did you personally, let's
15  start personally, did you personally conduct
16  any tests of PEMS equipment in connection with
17  your opinions in this case?
18      A.  Other than what was done at the
19  inspection, which wasn't testing of the system
20  per se, no.
21      Q.  So you weren't present at the
22  inspection, correct?
23      A.  I think I've stated that before,
24  that's correct.
25      Q.  So then it's true, isn't it, that

23 (Pages 86 - 89)

Page 90

1    you have not conducted any testing on PEMS
2    equipment for purposes of this opinion
3    personally?
4        A.   That is correct.
5        Q.   Now, you're aware that during the
6    vehicle inspection of the test Cruze vehicles
7    in this case, that the PEMS units were present
8    at the inspection and available for inspection
9    as well, correct?
10           MS. SMITH:  Objection, form.
11           THE WITNESS:  Correct.
12   BY MR. WOJTANOWICZ:
13       Q.   Are you aware that those machines
14   were not tested or analyzed during that
15   inspection?
16           MS. SMITH:  Objection, form,
17       foundation.
18           THE WITNESS:  They were
19       what?
20   BY MR. WOJTANOWICZ:
21       Q.   Are you aware that those machines
22   were not tested or analyzed during those
23   vehicle inspections?
24       A.   My understanding, they were
25   inspected, but they were not, yes, tested,

Page 91

1    during the inspection.
2        Q.   Are you aware that the machines
3    were not even turned on by the people
4    conducting the inspection?
5            MS. SMITH:  Objection, form.
6            THE WITNESS:  I can't
7        remember exactly, but that seems
8        consistent with my understanding.
9    BY MR. WOJTANOWICZ:
10       Q.   Did you ask the people attending
11   that inspection under your direction to perform
12   any tests on the PEMS units?
13       A.   No, I had asked them, given the
14   time that we had, to just inspect the vehicle
15   and the PEMS equipment, but because we weren't
16   going to be doing any PEMS testing, it was
17   limited to just inspecting the vehicle -- or
18   the vehicle and the PEMS plumbing, anything
19   kind of visual that would have been
20   problematic.
21       Q.   So you just asked them to do a
22   visual inspection of the PEMS equipment that
23   was present at the inspection?
24       A.   To do what was possible during the
25   day to look at those vehicles, or to look at

Page 92

1    the PEMS equipment, that's correct.
2        Q.   Are you aware of the process by
3    which the PEMS units can be calibrated to
4    determine if they're measuring the correct
5    amount of gas?
6        A.   So my understanding is that the
7    exhaust flow meter is calibrated by the Semtech
8    unit itself and then before and after the test,
9    you need to do a zero and span gas test, which
10   is not something that Mr. Smithers stated in
11   his report and we tried to track down if that
12   information exists, but that wasn't mentioned
13   in his report, but he did say he calibrated
14   them before and after, but I never saw anything
15   about the span or zero gas that he used.
16   BY MR. WOJTANOWICZ:
17       Q.   And you didn't instruct the people
18   attending the inspection on your behalf to
19   perform a zero and span test, did you?
20       A.   That's my understanding, I don't
21   remember asking them to do them.
22       Q.   Why not?
23       A.   Because we weren't -- we weren't
24   doing testing, so, you know, we could have
25   looked at the calibration at that point, but

Page 93

1    that wouldn't have told us anything about the
2    calibrations or how the system was operating
3    when Mr. Smithers was doing his testing.
4        Q.   Other than requesting a visual
5    inspection of the PEMS units, did you ask the
6    people attending the inspection on your behalf
7    to conduct any other inspection or analysis of
8    the PEMS equipment used in Mr. Smithers'
9    testing?
10       A.   At this point, I can't recall any
11   other requests that I would have made at that
12   point.
13       Q.   Regarding that inspection, did you
14   personally design or specify what actions were
15   to be taken during the vehicle inspection?
16       A.   Yes, so I had talked to Peter and
17   Jeff about what we were looking to do during
18   the inspection, some of the things to look at,
19   and then, you know, used some of their input as
20   well having done work and especially with
21   Peter's doing quite a few vehicle inspections,
22   we talked through what we would need to look at
23   and do during that inspection.
24       Q.   Did you generate like a written
25   protocol for what the inspection procedures

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1  were supposed to be?
2      A.  So my memory is that it was verbal.
3  There may have been a protocol, but for some
4  reason, I can't remember if there was one.
5  There was one I know when I think it was shared
6  with you, you know, talking about what was
7  going to be done at the inspection.  That was
8  something that, you know, was written down
9  about what was going to be done during the
10  inspection at kind of a high level.
11      Q.  So that protocol, you're referring
12  to the protocol agreed to among the parties for
13  what things could be inspected and what kind of
14  notice needed to be provided; is that correct?
15          MS. SMITH:  Objection, form.
16          THE WITNESS:  That's
17      correct.
18  BY MR. WOJTANOWICZ:
19      Q.  Aside from that, you're not aware
20  of any other written protocol detailing the
21  steps you wanted to have taken during this
22  vehicle inspection?
23      A.  Since it was a one-day test, and
24  you know, just an inspection, or one-day
25  inspection, we weren't doing testing, I believe

Page 95

1  it was all verbal, but I would have to go back
2  and see if something was documented, but I
3  don't remember off the top of my head.
4      Q.  You say you weren't doing testing,
5  but the people working for you did actually
6  take both vehicles out for test drives; isn't
7  that right?
8      A.  Correct.  So a good clarification,
9  so there was test drives, there wasn't
10  emissions testing being done that day.
11      Q.  So where are the written protocols
12  for how the people working for you at that
13  inspection were supposed to conduct those test
14  drives?
15      A.  So, again, I can't remember if they
16  were documented or they weren't.  So if they
17  were, I can try to find them, but I can't
18  remember at this point.
19      Q.  Okay.  If they were, would you have
20  cited them in your report as among the
21  materials you relied on in rendering your
22  opinions in this case?
23      A.  Yes, unless I had forgotten about
24  them, but typically, we would have, so we can
25  go back and see if there is something.

Page 96

1      Q.  Were you aware that as part of the
2  vehicle inspection protocol you referred to
3  earlier, the parties were supposed to exchange
4  any information that they gleaned during the
5  course of the inspection?
6          MS. SMITH:  Objection.
7      Objection.  That protocol speaks for
8      itself and to the extent that it calls
9      for a legal conclusion and foundation
10      on what was required and agreed to
11      among the attorneys.
12          MR. WOJTANOWICZ:  You can
13      answer.
14          THE WITNESS:  Can you ask
15      the question again?
16  BY MR. WOJTANOWICZ:
17      Q.  Were you aware that the protocol,
18  the inspection protocol we referred to earlier
19  called for the parties to exchange information
20  they gleaned during the course of that
21  inspection?
22          MS. SMITH:  Same objection.
23          THE WITNESS:  It has been a
24      while since I read it.  I vaguely
25      remember something about, yeah, the

Page 97

1      information needed to be exchanged, but
2      I don't remember the specifics that was
3      listed in there.
4  BY MR. WOJTANOWICZ:
5      Q.  Do you know whether all of the
6  information that the people working under your
7  direction obtained from that inspection was
8  provided to Plaintiffs in this case?
9          MS. SMITH:  Objection, form,
10      foundation.
11          THE WITNESS:  That's my
12      understanding.
13  BY MR. WOJTANOWICZ:
14      Q.  Did you provide all of the
15  information that the people working for you
16  gathered at that inspection to counsel for that
17  purpose or for any purpose?
18      A.  That's my understanding.
19      Q.  Were you aware that there were --
20  no, let me back up a little bit.  How, if at
21  all, did you learn about what happened in
22  the course of that vehicle inspection?
23      A.  I talked to Peter and Jeff about
24  what they had found, had run through kind of
25  some of their findings and then asked them to

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1  draft those sections kind of outlining what the
2  findings were for the report.
3      Q.  Peter and Jeff, you're referring to
4  Peter Lillo and Jeff Wishart?
5      A.  Yes, sorry, correct.
6      Q.  So there was, you had a verbal
7  exchange with those two individuals regarding
8  what they observed during the course of the
9  inspection, correct?
10      A.  Correct.
11      Q.  Did they summarize their findings
12  for you in any way?
13      A.  So the summaries are what's in the
14  report.
15      Q.  So other than the sections that you
16  asked them to draft in the report related to
17  the inspection, there were no other summaries
18  that they made for you of what they observed
19  during the inspection?
20          MS. SMITH:  Objection, form.
21          THE WITNESS:  Yeah, that's
22      my memory is that everything was just
23      drafted into the report.
24  BY MR. WOJTANOWICZ:
25      Q.  Now, I mean, this report doesn't

Page 99

1  have Jeffrey Lillo -- I'm sorry, I'm mixing
2  them up.  It doesn't have Peter Lillo's name on
3  it, does it?
4          MS. SMITH:  Objection, form.
5          THE WITNESS:  Sorry.  It
6      does not.
7  BY MR. WOJTANOWICZ:
8      Q.  It doesn't have Jeffrey Wishart's
9  name on it, does it?
10      A.  That's correct.  Again, as I stated
11  in the beginning, so everything was done at my
12  direction and I had staff help draft certain
13  sections of the report.
14      Q.  And so because ultimately this
15  report is intended to reflect your professional
16  opinion and your engineering judgment, in order
17  to do that, you had to rely on the information
18  that Peter and Jeff put into the draft that
19  they made summarizing what they observed during
20  the inspection; isn't that right?
21          MS. SMITH:  Objection, form.
22          THE WITNESS:  So I
23      considered the information they gleaned
24      and their expertise coupled with my own
25      expertise, that's correct.

Page 100

1  BY MR. WOJTANOWICZ:
2      Q.  And the two ways that you were able
3  to determine what they had gleaned and their
4  expertise were the verbal conversation you had
5  with them and the information that they put
6  into the draft report; isn't that right?
7      A.  That is correct.
8      Q.  Are you aware that there were other
9  people at the vehicle inspection associated
10  with other parties -- parties other than
11  Exponent and other than Plaintiffs?  In other
12  words, there were third-parties' experts, for
13  lack of a better term, present at the vehicle
14  inspection?
15          MS. SMITH:  Objection, form.
16          THE WITNESS:  You said third
17      parties?  I guess, I'm not sure who
18      you're talking about.
19  BY MR. WOJTANOWICZ:
20      Q.  Okay.  Let me just rephrase this.
21  Is it your understanding that there were
22  consultants or experts associated with Bosch,
23  the Defendant Bosch in this case that were also
24  present at the inspection?
25          MS. SMITH:  Objection, form.

Page 101

1          THE WITNESS:  My
2      understanding is that Bosch had some
3      representatives there.  I don't
4      remember exactly who they were, but I
5      was aware that Bosch had some
6      representatives there.
7  BY MR. WOJTANOWICZ:
8      Q.  Were you aware that General Motors
9  also had some representatives there who were
10  not employees of Exponent?
11          MS. SMITH:  Objection, form.
12          THE WITNESS:  I don't
13      remember General Motors
14      representatives, no, I don't remember
15      who they were.
16  BY MR. WOJTANOWICZ:
17      Q.  Did you speak with anyone other
18  than Peter and Jeff from Exponent about what
19  was observed or what data was gleaned from the
20  vehicle inspection?
21          MS. SMITH:  I'm just going
22      to instruct not to answer to the extent
23      it would reveal substance of
24      communications with counsel.
25          THE WITNESS:  Discussions of

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 110

1  for you, Peter and Jeff, with instructions
2  about the speeds that they should achieve
3  during the course of the test drive of the
4  diesel test vehicle?
5      A.  I don't remember a specific
6  discussion other than, you know, drive some,
7  stop and go, and some high speed driving, but
8  it wasn't a prescriptive profile, no.
9      Q.  And these were oral instructions,
10  it wasn't a written protocol for how to conduct
11  these tests?
12      A.  That's correct.  It was more of a
13  test drive, not an actual emissions test.
14      Q.  Okay.  Did you provide Peter and
15  Jeff with instructions about the duration of
16  time as opposed to length and distance that
17  they should conduct their test drive of the
18  diesel test vehicle?
19          MS. SMITH:  Objection, form.
20          THE WITNESS:  Again, since
21      we weren't doing any affirmative
22      testing, I don't think there was any
23      specifics about the amount of time to
24      drive the vehicle.
25

Page 111

1  BY MR. WOJTANOWICZ:
2      Q.  Did you instruct Peter and Jeff
3  with respect to the length of time, distance,
4  that the gas test vehicle should be driven?
5          MS. SMITH:  Objection, form.
6          THE WITNESS:  No, if I
7      remember correctly, it was the same
8      instructions for the diesel or
9      something similar to it.
10  BY MR. WOJTANOWICZ:
11      Q.  Did you give them specific
12  instructions not to use an active OBD logger
13  during their test drive of the gas test
14  vehicle?
15      A.  I don't remember a discussion about
16  that.
17      Q.  Setting aside the inspections that
18  were done by Peter and Jeff for you on the gas
19  and diesel test vehicles, did you or anyone
20  working under your direction conduct any other
21  inspections of Cruze vehicles in connection
22  with your work in this case?
23      A.  Sorry, something popped up and
24  blurred part of your question there.  Could you
25  restate it?

Page 112

1      Q.  Sure.  I'm just asking aside from
2  the inspections of the test vehicles we have
3  been discussing, have you or anyone working
4  under your direction conducted any other
5  inspection of a Cruze vehicle in connection
6  with your work in this case?
7      A.  No.
8      Q.  Have you ever inspected any other
9  Cruze vehicle for any other purpose?
10      A.  Not that I can recall.
11      Q.  So you identified earlier, you said
12  that Jeff Wishart had experience with PEMS
13  testing, correct?
14      A.  He had been part of system PEMS
15  testing, that's correct.
16      Q.  Is there anyone else who was
17  working on, among the people assisting you in
18  your work in this case, that to your knowledge
19  has experience with PEMS testing?
20      A.  There's others that have done
21  emissions testing, but specific to PEMS, I do
22  not believe so.
23      Q.  For purposes of your opinions in
24  this case to the extent that you are relying on
25  inputs from your team, is it fair to say Jeff

Page 113

1  Wishart is the one whose experience you were
2  drawing on to reach your opinions in this case?
3          MS. SMITH:  Objection, form.
4          THE WITNESS:  So in part,
5      some of his information, myself and my
6      staff have done some work looking at
7      PEMS data, understanding, you know,
8      best practices with PEMS data, how it
9      has been conducted and, again, you
10      know, PEMS data is really the
11      culmination of dyno testing with
12      on-road testing, so the same principles
13      apply.  But as it relates to PEMS, Jeff
14      would have been the one with the
15      experience.
16  BY MR. WOJTANOWICZ:
17      Q.  Is there anybody else who assisted
18  you in this case whose experience with PEMS
19  testing you relied on in reaching your opinions
20  in this case?
21      A.  No.
22      Q.  What's your understanding of Jeff
23  Wishart's educational background?
24      A.  So he has a Ph.D from Arizona State
25  University.  I believe it's in either

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  mechanical engineering or engineering
2  mechanics.
3      Q.   Do you have any idea what his work
4  background is, where he has worked before
5  Exponent?
6      A.   He worked at Intertek for a time, I
7  think on electric vehicle and plug-in vehicle
8  testing and where he did some PEMS testing.
9  And he worked for a couple of other energy
10 providers and then he was an adjunct professor
11 at Arizona State University.  I can't remember
12 the exact -- or which department it is, but
13 there's classes on vehicles and energy that he
14 teaches.
15     Q.   I'm a little confused.  You said
16 that he worked for an electrical and plug-in
17 vehicle manufacturer; is that right?
18     A.   I'm sorry, at Intertek, he did some
19 test on plug-in hybrid and hybrid vehicles, so
20 vehicle testing and emissions testing.
21     Q.   So hybrid vehicles as well, not
22 just full electric vehicles?
23     A.   I believe so, that is correct, but
24 I would have to double check on that, but I
25 thought it was plug in, hybrid, and electric

Page 115

1  vehicles.
2      Q.   Okay.  Unless I'm way off track
3  here, I don't see why a person would do a PEMS
4  test on a full electric vehicle.  That's not
5  something that would be done, correct?
6      A.   Correct.
7      Q.   How long has he been with, has Mr.
8  Wishart been with Exponent?
9      A.   I think it is between a year and a
10 half, I think a year and a half, something like
11 that.  Year and a half to two years.
12     Q.   Do you know whether Mr. Wishart has
13 performed any PEMS tests during the time that
14 he has been at Exponent?
15     A.   I don't know if he's actually
16 conducted PEMS testing while at Exponent.
17     Q.   Do you know approximately how for
18 long Mr. Wishart worked at Intertek?
19     A.   I don't have his CV in front of me.
20 Going off memory I thought it was between two
21 and four years, something like that.
22     Q.   Do you have an understanding of
23 approximately how long Mr. Wishart has been
24 working as an engineer in this field?
25     A.   I think most of his work was either

Page 116

1  in vehicles or in the energy space.  I think
2  it's between 10 or 15 years, including some of
3  his academic roles.
4      Q.   Do you know approximately how old
5  he is just to get a sense of how long he has
6  been out in the workforce as opposed to just
7  being in school?
8          MS. SMITH:  Objection, form.
9          THE WITNESS:  Actually, I do
10 not know how old he is.  And I guess I
11 could go back and look at when he
12 graduated, but I don't know how old he
13 is.
14 BY MR. WOJTANOWICZ:
15     Q.   Can you ballpark it, does he appear
16 to be under 40, under 50?
17         MS. SMITH:  Objection, form.
18         THE WITNESS:  If I had to
19 guess, he's probably in his thirties or
20 forties.
21 BY MR. WOJTANOWICZ:
22     Q.   What training has Mr. Wishart had
23 in conducting PEMS tests?
24     A.   I don't know if I can remember the
25 testing he's had.  I believe he had worked with

Page 117

1  one of the manufacturers prior to coming to
2  Exponent and I think he's had some either
3  training or some work with a manufacturer at
4  some point during his time at Exponent.
5      Q.   A manufacturer of what?
6      A.   A manufacturer of a PEMS unit.
7      Q.   Is it your understanding you
8  believe that he actually worked for one of the
9  manufacturers of PEMS units?
10     A.   No.  Did I state that?
11     Q.   That was what I understood.  That's
12 why I was asking the clarifying question.
13     A.   Sorry.  No, no, he had interacted
14 with or had some training with a manufacturer
15 of a PEMS unit, he hadn't worked for them.
16     Q.   All right.  So you believe that he
17 may have received some training from one of the
18 PEMS unit manufacturers.  Do you know the
19 nature of that training?
20     A.   I don't.  He's out in our Phoenix
21 office and I can't remember the specifics of
22 when or where that was, but we had a
23 conversation a while ago about some of the
24 training that he had been doing and
25 conversations he's had, but I don't remember

HIGHLY CONFIDENTIAL

Page 118

1    the specifics.
2         Q.  Do you know how many PEMS tests Mr.
3    Wishart has done?
4         A.  I do not.
5         Q.  Do you have any sense of scale?  Is
6    it, you know, has he done five, ten, a
7    thousand?
8         A.  I would say in the single to double
9    digit range.
10        Q.  And what's your basis for giving me
11   that estimate, if you have one?
12        A.  In talking to him about some of the
13   prior work that he had at Intertek that's, you
14   know, kind of an estimate from what I remember
15   from those discussions and different programs
16   he was on.
17        Q.  Did Mr. Wishart write any parts of
18   the report that specifically discuss PEMS
19   testing either by General Motors or by Mr.
20   Smithers?
21             MS. SMITH:  Objection, form.
22             THE WITNESS:  I don't know
23        if he drafted those sections.  He might
24        have provided input on those sections,
25        but I don't remember.  I can't remember

Page 119

1        exactly if he added to those sections
2        about GM's PEMS testing or not.
3    BY MR. WOJTANOWICZ:
4         Q.  Did Mr. Wishart summarize for you
5    the procedures that he followed during the
6    times that he was conducting PEMS testing?
7             MS. SMITH:  Objection, form.
8             THE WITNESS:  Again, I think
9        we talked about this before.  He and I
10       had a verbal discussion, I don't know
11       if he had a procedure that he drafted
12       for that day.  I can't remember.
13   BY MR. WOJTANOWICZ:
14        Q.  Did Mr. Wishart identify for you
15   any written protocols that he believes should
16   govern the conducting of a PEMS test?
17             MS. SMITH:  Objection, form.
18             THE WITNESS:  Again, we
19       weren't doing PEMS testing that day.  I
20       know we had talked about, you know,
21       some of the stuff that was in the
22       user's manual, but I don't remember a
23       specific protocol that he had drafted.
24   BY MR. WOJTANOWICZ:
25        Q.  You know, you testified that in

Page 120

1    some other cases relating to Volkswagen, you
2    have given testimony regarding PEMS tests and
3    written reports regarding PEMS tests.  Was Mr.
4    Wishart also assisting you in those cases?
5         A.  I believe most of those reports
6    were written prior to Dr. Wishart becoming an
7    employee of Exponent.  So I don't think he
8    drafted any of it.  There may have been some of
9    the later reports that he was, when he was
10   employed that I may have asked him to look at a
11   few things, but I think most of the drafting
12   was done prior to him coming on board.
13        Q.  Now, since you've never conducted a
14   PEMS test yourself, are you relying on the
15   experience of Mr. Wishart in order to
16   substantiate your opinions regarding whether
17   Mr. Smithers' PEMS tests were conducted
18   appropriately?
19             MS. SMITH:  Objection, form.
20             THE WITNESS:  So I
21        considered, you know, input from Dr.
22        Wishart, but my analyses is based on
23        other PEMS testing that I've looked at,
24        documented papers about PEMS testing,
25        information about West Virginia, how

Page 121

1        the EPA uses PEMS testing, and how the
2        European Commission has used PEMS
3        testing, so collectively, I considered
4        all that information.
5    BY MR. WOJTANOWICZ:
6         Q.  Okay.  To the extent that you
7    considered Mr. Wishart's input, you did that in
8    the form of some verbal communications,
9    correct?
10        A.  Verbal communications and then he
11   assisted drafting the sections on some of the
12   PEMS testing and the inspections -- on the
13   inspection.
14        Q.  Okay.  And so he communicated to
15   you his input regarding the sufficiency of the
16   PEMS testing described in your report by
17   helping to draft some of the sections for you
18   to consider whether that belonged in your
19   report or not, correct?
20             MS. SMITH:  Objection, form.
21             THE WITNESS:  It was based
22        on the conversations we had and, you
23        know, my observations from what he had
24        provided and then provided him some
25        direction about what observations I had

31 (Pages 118 - 121)

Page 122

1  from his reporting on what was
2  conducted at the scene during the
3  testing -- or during the inspection and
4  feedback that he had gleaned from
5  looking at different PEMS testing
6  protocols.
7  BY MR. WOJTANOWICZ:
8       Q.  Did you conduct any dynamometer
9  tests on any Cruze diesel vehicles for the
10  purposes of your analysis here?
11      A.  I did not.
12      Q.  Did anyone working under your
13  direction perform any dynamometer tests on
14  Cruze vehicles for this case?
15      A.  No, they did not.
16      Q.  Do you know -- are you aware of any
17  third party or any dynamometer tests on Cruze
18  vehicles being performed for purposes of this
19  case other than any one that may have been
20  performed by you or actually someone else at
21  Exponent?
22           MS. SMITH:  Objection, form.
23           THE WITNESS:  Sorry, am I
24       aware of anybody else who has done dyn
25       testing?

Page 123

1  BY MR. WOJTANOWICZ:
2       Q.  Correct, on the Cruze vehicles at
3  issue here.
4       A.  I'm not aware of anybody at
5  Exponent, obviously, Mr. Smithers did some dyno
6  testing at TRC, but other than that, I'm not
7  aware of any additional testing.
8       Q.  Did you consider conducting
9  dynamometer testing on any Cruze vehicles for
10  your analysis here?
11           MS. SMITH:  Objection, form.
12           THE WITNESS:  Not really.
13       Again, you know, as I was getting into
14       the analyses and understanding the
15       allegations and the data that Mr.
16       Smithers had provided and then looking
17       at the time constraints initially, that
18       there wasn't likely going to be time to
19       do it, but the more I got into it, and
20       I realized, you know, kind of the
21       issues with Mr. Smithers' methodology,
22       the vehicles he tested, I didn't see
23       how the dyno testing would have added
24       much more to the information than that
25       already had and to the opinions that I

Page 124

1  can glean from the produced materials
2  in Mr. Smithers' data.

Page 125

HIGHLY CONFIDENTIAL

Page 134

BY MR. WOJTANOWICZ:

Q.   And I want to call your attention back to a statement that you made earlier and tell me if I'm summarizing this correctly. I believe that you said that in the testing data that you received from -- regarding Mr. Smithers' PEMS tests that you do not have zero and span data for the test segments that he ran. Was that what you testified?

A.   His report didn't mention how he did his calibration data, was it on span gas data. There was some information in the Excel files. Some of it was missing. Some of it was there. We tried to understand that, but we couldn't come up with anything conclusive, but my statement was related to what was defined in his report.

Q.   So you're aware his report did indicate that they regularly calibrated the PEMS equipment during the course of their testing campaign. Do you recall that?

A.   He mentioned that he calibrated it, but didn't expand on what was done.

Q.   And the test data files that were provided to you by counsel for General Motors,

Page 135

those included data using the zero and span testing for every test segment, didn't it?

A.   There was some missing data in one of the cells and I can't recall exactly, but there was some information in some of the other cells about zero and span gas, but we couldn't conclusively determine what was done there, because there was a missing cell or some -- I can't remember, there was a note about zero span gas not used, but then in another spot, it was there, so we weren't able to conclusively determine if he used it or not, but there was some information in there.

Q.   So it's not your testimony, is it, that Mr. Smithers failed to conduct zero and span testing or calibrations on the PEMS units, that's not what you're testifying to?

MS. SMITH:  Objection, form.

THE WITNESS:  I'm not testifying that he didn't do it, I just couldn't confirm it and what was in the report didn't provide any insight, so we were left with trying to figure and interpret the data in there.

Page 136

BY MR. WOJTANOWICZ:

Q.   Going back, we were discussing your background, if any, in computer programming, computer science, kind of when we went to break there, so let me just ask you again, you don't have any degrees in computer programming or computer science, do you?

A.   I do not have degrees in those areas.

Q.   Have you had any training in computer science or computer programming?

A.   As part of my undergraduate and graduate study, we had to do computer programming.  And in my graduate program, we had to look at engine controls and evaluate vehicles on dynos and look at engine controls and how sensor inputs were used for vehicle control.

Q.   So is it fair to say that the computer science or computer programming classes you had as an undergraduate were sort of supplemental to or in conjunction with your general engineering classwork, it wasn't a specified emphasis in computer science?

A.   So, yeah, I don't have a degree in

Page 137

computer science.  My work in computer science is related to the vehicle level control and some of my work with calibrations and then loading calibrations on vehicles, and the applied use of control theory for mechanical and engine controls.

Q.   Did you personally -- did you examine the software coding for the EDC or electronic diesel control in the Cruze vehicles?

A.   I'm sorry, I missed that first part.

Q.   Software code for the EDC.

A.   I examined some parts of it and then I examined Dr. Levchenko's report.

Q.   Did you have someone at Exponent or elsewhere examine the computer code for you?

A.   So Dave Anderson and Matt Pooley had looked into that and looked at Dr. Levchenko's analysis of some of that code.

Q.   So you said earlier that Matt Pooley is an Exponent employee, he has a Ph.D in engineering and computer science or something to that effect; is that a fair summary?

HIGHLY CONFIDENTIAL

Page 138

1      MS. SMITH: Objection, form.
2      THE WITNESS: Yes, that's my
3  recollection.
4  BY MR. WOJTANOWICZ:
5      Q.  What about David Anderson, is he
6  also a computer scientist?
7      A.  I believe he's a mechanical
8  engineer that spent quite a bit a time with
9  controls for engines and after-treatment
10  systems.
11      Q.  So is it fair to say that Dave
12  Anderson and Matt Pooley performed the direct
13  analysis of the software code at your
14  direction?
15      A.  At my direction and with my input,
16  we reviewed it.  They did some deeper dives
17  when I asked for some additional information to
18  be gleaned from Dr. Levchenko's report.
19      Q.  And how did they convey from what
20  they learned to you?  Was it oral?  Was it in
21  writing?
22      A.  It was oral and then it was the
23  drafting of the text in those areas.  So I
24  would talk to them about their findings and
25  then they drafted it up or drafted up the

Page 139

1  observations for the report.
2      Q.  Did they summarize their findings
3  for you in any way other than putting it in a
4  draft report?
5      A.  My recollection is it was all done
6  in the report.
7      Q.  Because you didn't do the direct
8  analysis of the software code yourself in its
9  entirety, you had to rely on their analysis in
10  your consideration of the software issues
11  mentioned in your report; is that true?
12      MS. SMITH: Objection --
13      THE WITNESS:  So it was --
14  sorry, go ahead, Renee.
15      MS. SMITH:  Just objection,
16  form.
17      THE WITNESS:  So it was at
18  my direction and with my input.  I did
19  rely on some of their findings and then
20  reevaluated what they had done and
21  walked through the findings with them
22  and did some of my own review of Dr.
23  Levchenko's report.
24  BY MR. WOJTANOWICZ:
25      Q.  So I would like you to turn back to

Page 140

1  Exhibit 1, which is the copy of your report.
2  And I will go through some of the items in your
3  CV, which is at Appendix A following the body
4  of your report.
5      A.  Okay.  I'm there.
6      Q.  Okay.  First of all, is your CV, is
7  this the most up-to-date version of the CV that
8  you have?
9      A.  Yes, this is the most up-to-date
10  one.
11      Q.  And is everything accurate in here
12  to the best of your knowledge?
13      A.  Yes.
14      Q.  I would like to go through your
15  prior work experience.  You've been with
16  Exponent since 2017; is that correct?
17      A.  That is correct.
18      Q.  Describe for me in general what you
19  primarily do at Exponent.
20      A.  So I'm a principal at Exponent.  My
21  role is to work with clients, understand their
22  needs, develop new work, whether it be, you
23  know, kind of consulting work or expert
24  testimony.  So my work is really, you know,
25  working with clients and helping understand how

Page 141

1  I might be able to help them from a consulting
2  perspective in areas of vehicle engineering,
3  whether it's engines and controls, advanced
4  driver-assistance systems, automated vehicles,
5  government regulations.
6      Q.  What percentage of your work would
7  you say since you joined Exponent relates to
8  providing expert testimony or expert consulting
9  services, whether or not it leads to the
10  generation of a report or not?
11      A.  I would say kind of over the
12  three-plus years, something around kind of
13  50/50.  Fifty percent in consulting, 50 percent
14  expert witness.
15      Q.  With respect to your consulting
16  work, what percentage of your consulting work
17  relates to vehicle, diesel vehicle emissions?
18      A.  So specifically diesel vehicles, on
19  the consulting side, I can't think of any work
20  in that area.
21      Q.  Do you do any -- then what
22  percentage of your consulting work relates to
23  gasoline vehicle emissions?
24      A.  I'm sorry, I missed it, was it on
25  the consulting side or the expert testimony

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1  side?
2      Q.  On the consulting side.
3      A.  So of that 50 percent, I would say
4  a third to half of that relates to gasoline
5  vehicles, engines.
6      Q.  No, I'm specifically asking
7  regarding gasoline vehicles, and maybe you said
8  this and I misheard you, gasoline vehicle
9  emissions.
10     A.  Oh, sorry.  On the emissions side,
11  there's some attributes of what I do that's
12  related to emissions, it's not the primary
13  piece, so I would say a smaller fraction of
14  that 50 percent is related to gasoline vehicle
15  emissions.
16     Q.  And is that because a portion of
17  your work relates to fuel economy and there is
18  some cross, sort of some relationship between
19  fuel economy and emissions?
20     A.  Yeah, and a gasoline engine
21  performance kind of in general, yes.
22     Q.  So while some of your consulting
23  work may bear on issues that relate to
24  emissions, none of it really is focused
25  specifically on measuring or controlling

Page 143

1  emissions in gasoline vehicles; is that a fair
2  statement?
3      A.  I think that's a fair statement.
4      Q.  So does that kind of -- and to the
5  extent that we haven't -- what are the subject
6  matters that make up the bulk of your
7  consulting work at Exponent since you have been
8  there?
9      A.  So kind of fuel economy, government
10  regulatory analyses, engine failures, recalls,
11  and consulting related to advanced
12  driver-assisted systems or automated vehicles.
13     Q.  And what percentage of your
14  consulting work is done for automobile
15  manufacturers, if you can generalize?
16     A.  I would say of that consulting
17  work, 75 percent is for automotive
18  manufacturers.
19     Q.  Is GM among the companies that has
20  retained you for consulting work?
21     A.  No.
22     Q.  The 25 percent that remains of the
23  consulting work that is for somebody other than
24  auto manufacturers, what kind of companies are
25  those, if you can summarize for me?

Page 144

1      A.  They would be more in the tech
2  sector, I would call it.
3      Q.  Are these generally companies who
4  might manufacture components for vehicles, but
5  not an entire vehicle?
6      A.  I would say that's a fair
7  generalization.
8      Q.  Is it fair to say that they're all
9  related to the automobile industry, even if
10  they're not manufacturers, per se?
11         MS. SMITH:  Object to form.
12         THE WITNESS:  I would have
13     to go back and look for sure to see if
14     I'm missing something, but I think
15     that's a correct assessment.
16  BY MR. WOJTANOWICZ:
17     Q.  And of the roughly 50 percent of
18  your work at Exponent that has been related to
19  litigation-related work, what percentage of
20  that litigation-related work relates to diesel
21  vehicle emissions?
22     A.  I would say, like, a third to maybe
23  half, somewhere in there, it's kind of, it's
24  hard to say because it fluctuates, but I would
25  say a third to half is related to diesel

Page 145

1  emissions.
2      Q.  And what percentage relates to fuel
3  economy issues, if any?
4      A.  I would say 10, 15 percent,
5  somewhere in there.
6      Q.  And is there -- can you summarize
7  for me what the remaining, you know, whatever
8  35 to 40 or 50 percent of your time spent on
9  litigation-related matters, what the subject
10  matters are?
11     A.  Yeah, so it would be failures of
12  components in gasoline engines, failure to
13  recalls related to transmissions, then kind of
14  broadly some of the more emerging technologies,
15  like advanced driver-assistance systems
16  vehicles or automated vehicles.
17     Q.  Is it fair to say that all of the
18  work that you've done on the litigation side is
19  representing defendants in automobile-related
20  litigation?
21         MS. SMITH:  Objection, form.
22         THE WITNESS:  To date, it
23     has been on the defense side, yes.
24  BY MR. WOJTANOWICZ:
25     Q.  The diesel emissions-related work

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 158

1 worse than the fuel economy listed. There was
2 an offset, I think, around 10 percent that on
3 average, even though EPA and DOT got closer, it
4 wasn't always a perfect match that there was
5 typically a 10 percent offset and that was due
6 to things like wind resistance, maintenance on
7 the vehicle that couldn't be captured
8 completely on cycle.
9     Q.  During the course of your analysis
10 of the dynamometer testing results submitted in
11 connection with your work on the CAFE
12 standards, did you ever identify any
13 dynamometer testing results submitted by an OEM
14 that you believed were false or inaccurate?
15         MS. SMITH:  Objection, form.
16         THE WITNESS:  No.
17     Typically, the data I saw was at a
18     higher kind of aggregate level and I
19     didn't see anything where there was --
20     you know, it was more at the aggregate
21     level.
22 BY MR. WOJTANOWICZ:
23     Q.  Did you do an analysis to determine
24 why there historically had been a significant
25 difference between the reported fuel economy

Page 159

1 for purposes of compliance with CAFE standards
2 and the actual on-road fuel economy experienced
3 by consumers?
4     A.  You said -- I guess if you could
5 read the question back, the first part, the
6 specific nature of it.
7     MR. WOJTANOWICZ:  Sure.
8     Would the reporter please read it back?
9         - - - - -
10     (Whereupon, the reporter read back
11     as requested.)
12         - - - - -
13         THE WITNESS:  So, again,
14     that was at the higher level of looking
15     at what were some of the conditions
16     that were outside of the test procedure
17     that could be -- could influence fuel
18     economy in the real world, so there was
19     some, you know, kind of the broader
20     studies about environmental conditions,
21     hills, and things like that.  There
22     wasn't a deep dive into the specific
23     aspects.  The EPA had done quite a bit
24     of that over time and there was kind of
25     an analysis of if that adjustment

Page 160

1     factor needed to be corrected or
2     adjusted.
3 BY MR. WOJTANOWICZ:
4     Q.  Okay.  It sounds like you were
5 describing to me what the EPA had done to
6 analyze those factors, but I'm asking whether
7 you specifically conducted any analyses related
8 to identifying the reason for the discrepancy
9 between dynamometer testing results and
10 real-world results relating to CAFE standards?
11         MS. SMITH:  Objection, form.
12         THE WITNESS:  So my work was
13     with the EPA, I didn't conduct specific
14     testings or specific analyses at that
15     point trying to pinpoint the exact
16     differences, no.
17 BY MR. WOJTANOWICZ:
18     Q.  Okay.  Did you at any point?
19     A.  I think I worked with our economist
20 who looked at kind of -- it has been a long
21 time since I've had to think about this or do
22 anything with it.  There was some, like,
23 household survey studies that had information
24 about fuel economy that we had to look at as it
25 related to some of the work the EPA had done,

Page 161

1 but I can't remember the specifics offhand.
2     Q.  In your position as senior engineer
3 at the Department of Transportation, did you
4 have any responsibility for on-road testing to
5 assess the real-world performance of fuel
6 economy for vehicles?
7         MS. SMITH:  Objection, form.
8         THE WITNESS:  Actual vehicle
9     testing, no.  I had led some work with
10     Argonne National Labs who was doing
11     some simulation work on -- you know,
12     part of the reason it's hard to
13     evaluate technology is that they don't
14     exist, so there isn't dyno work or
15     on-road data, so the DOT contracted
16     with Argonne National Labs to do some
17     testing and some of that was testing
18     for on-cycle testing, but there was
19     some testing about kind of off-cycle
20     testing as well to understand where
21     there might be differences or gaps.  So
22     I would have led and informed some of
23     that work, but that was in simulation,
24     not physical vehicle testing.
25

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 178

1    MR. WOJTANOWICZ:  I was just
2    about to suggest that we take our lunch
3    break now, so.
4    MS. SMITH:  Perfect, and
5    could you stay on for one second after
6    we go off the record to just discuss
7    some general scheduling?
8    MR. WOJTANOWICZ:  Is that to
9    me or to --
10    MS. SMITH:  To everyone,
11    sorry.
12    THE VIDEOGRAPHER:  The time
13    is 2:09.  We're off the record.
14    - - - - -
15    (A recess was taken at this time.)
16    - - - - -
17    THE VIDEOGRAPHER:  The time
18    is 2:53.  We are on the record.
19    BY MR. WOJTANOWICZ:
20    Q.   All right.  Mr. Harrington, a few
21    more questions about your CV here.  Next, I
22    wanted to ask you about your publications,
23    there are quite a few of them listed there.  I
24    don't want to belabor this by going through
25    each of them.  Can you tell me whether any of

Page 179

1    these publications relate to emissions testing
2    for diesel vehicles?
3    A.   So the third from the bottom, the
4    Corporate Average Fuel Economy effects
5    modeling, so that deals with gasoline and
6    diesel vehicle, fuel economy and CO2 emissions.
7    It's not specific to diesel vehicle emissions
8    testing, but it relates to diesel vehicle, CO2
9    and fuel economy performance.  And the same
10    with the one just above it the "Corporate
11    Average Fuel Economy Effects and Modeling
12    System Documentation."
13    THE STENOGRAPHER:  Can you
14    slow down a little bit when you're
15    reading, please?
16    THE WITNESS:  I'm sorry.  So
17    there's two that are related to fuel
18    economy and CO2 emissions from gasoline
19    and diesel vehicles.  It would be the
20    third from the bottom and the fourth
21    from the bottom in my list.
22    BY MR. WOJTANOWICZ:
23    Q.   Those are on page 4 of the last
24    page of your CV?
25    A.   It's page 3.  You said

Page 180

1    publications, correct?
2    Q.   You know you're right, I slid over
3    into presentations.  I apologize.
4    A.   No worries.
5    Q.   Okay.  Yeah.  So the first one of
6    those that you referenced, that is -- it says
7    "Corporate Average Fuel Economy Compliance and
8    Effects Modeling System Documentation."  Can
9    you describe for me what that publication is?
10    A.   Sure.  The work that I did on fuel
11    economy standards, in order for the DOT and
12    EPA to -- or the DOT specifically to promulgate
13    fuel economy regulations, it has to evaluate
14    the feasibility of technologies and the fuel
15    economy standards.  So, again, as I mentioned,
16    my role was to look at the assumptions related
17    to emerging fuel saving and CO2 reducing
18    technologies and so that assumption was a
19    separate piece of all the regulatory documents
20    that I helped write, but I wasn't a named
21    author, because they're federal documents, but
22    that report was how the modeling system worked,
23    the assumptions that were in it, and a lot of
24    the assessments that I had made were documented
25    in that document as they relate to gasoline and

Page 181

1    diesel vehicle fuel economy and CO2 emissions
2    and related technologies.
3    Q.   But that publication did not
4    address the proper way to conduct PEMS testing,
5    did it?
6    A.   There was not a discussion of PEMS
7    testing that I can recall in that document.
8    Q.   And that publication did not
9    discuss the proper way to conduct dynamometer
10    testing for emissions testing, did it?
11    A.   Not that I recall.
12    Q.   Did that publication address the
13    proper way to -- the proper way to evaluate
14    data relating to emissions testing?
15    MS. SMITH:  Objection, form.
16    THE WITNESS:  I believe that
17    had some discussion of the on-road
18    adjustment as it relates to fuel
19    economy standards, if I recall
20    correctly.
21    BY MR. WOJTANOWICZ:
22    Q.   What's the on-road adjustment as it
23    relates to fuel economy --
24    A.   So from the difference between a
25    test cycle and kind of the average on-road fuel

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1  economy, that delta between what was tested and
2  versus kind of the average on-road fuel economy
3  performance of vehicles out in the fleet.
4      Q.  And then the next stated
5  publication, it looks like it was essentially
6  the same title "Corporate Average Fuel Economy
7  Compliance and Effects Modeling System
8  Documentation." Was that publication related
9  to the prior one that we just discussed?
10      A.  So they're, in essence, you know,
11  the same or similar document, the one you just
12  mentioned was for the 2012 through 2016 model
13  year rule and the first one that you had stated
14  was the 2017 to 2025 model year rule, so the
15  same document, but for two different documents
16  rule makings and time periods.
17      Q.  What was your role in -- and there
18  was some coauthors that you had with both of
19  those publications, correct?
20      A.  Correct.
21      Q.  What was your role with respect to
22  drafting those publications?
23      A.  So I drafted the sections that were
24  related to the technology assumptions that went
25  into the model and how we addressed the fleet

Page 183

1  of vehicles that were used to model an overall
2  fleet of vehicles going forward.
3      Q.  Any other parts that you drafted?
4      A.  It has been a while since I looked
5  at those.  Those are the two main parts that I
6  would have been responsible for.  I might have
7  provided input to some other sections, but I
8  can't think of them right now.
9      Q.  And other than those two that you
10  just identified, none of the other publications
11  listed here relate to emissions compliance
12  testing in any way, correct?
13      A.  That is correct.
14      Q.  Your CV also lists a number of
15  presentations.  It says "Selected Invited
16  Presentations," does that mean you've given
17  more presentations than the ones that you have
18  listed here?
19      A.  Yeah, there was some other -- where
20  I wasn't invited to speak, it was kind of
21  lesser roles, and I couldn't remember all of
22  them, so these are the main ones where I was
23  selected and invited to speak on a particular
24  topic.
25      Q.  And what sorts of occasions have

Page 184

1  you spoken where you weren't invited to speak?
2      A.  I can't recall which ones I
3  wasn't -- usually, I'm invited to speak.  I
4  think there was a few where I offered to speak,
5  but typically, I get invited to speak at
6  different conferences or different topic areas.
7      Q.  Are any of the -- do you know
8  whether any of the presentations that you have
9  not listed where you offered to speak, did any
10  of them relate to diesel vehicle emissions?
11      A.  I guess the presentations that
12  might not have been on there, when I was at
13  Cummins, I think I mentioned this before, I had
14  to go out and work with fleets about upcoming
15  changes to the vehicles due to regulations, so
16  I had to present on those topics to some of our
17  clients and customers.  So those probably were
18  not listed on here, talking to some fleets or
19  potential customers of Cummins engines, so that
20  related to heavy-duty vehicles and engines.
21      Q.  Any other presentations that are
22  not listed here that relate to diesel vehicle
23  emissions?
24      A.  Internally to the DOT and EPA, I
25  gave quite a few presentations to senior

Page 185

1  officials, White House staff, as relates to
2  fuel economy standards and greenhouse gas
3  emissions, which include diesel vehicles and
4  technology.  And it looks like the National
5  Academy of Sciences Committee Meeting is on
6  here, so that one is actually listed that's the
7  third from the bottom under presentations.
8      Q.  Okay.  Have you given any
9  presentations that relate to any diesel vehicle
10  emissions cheating allegations?
11      A.  No.
12      Q.  Have you given any presentations
13  that relate to PEMS testing or how to conduct
14  PEMS testing?
15      A.  Not that I can recall.
16      Q.  Have you given any presentations
17  regarding the proper way to conduct a
18  dynamometer testing?
19      A.  Not that I can recall, no.
20      Q.  There's a presentation listed at
21  the bottom of page 3 of your CV, the very
22  bottom is where it starts "The Future of
23  Vehicle Fuel Efficiency & Emissions Policies."
24  It says you were a panelist at a meeting of
25  Motor & Equipment Manufacturers Association.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 306

1  well.
2      Q.   There's also some time components
3  there that you need to have achieved a
4  prescribed speed within a certain period of
5  time, like a deadline within the testing
6  period; is that right?
7      A.   So it's part of that plus or minus
8  2-mile-an-hour curve, yeah, you have to follow,
9  you have to follow that trace and if you,
10  obviously, are lagging or ahead in speed, you
11  won't complete the test in the right time
12  period.
13      Q.   So there's some leeway for a driver
14  to have an influence on the outcome of an
15  emissions test on a dynamometer by either being
16  a little bit higher or a little bit lower on
17  speed and a little bit earlier or a little bit
18  late on time, as long as they can stay within
19  the acceptable parameters, correct?
20          MS. SMITH:  Objection, form.
21          THE WITNESS:  There is some,
22      just like there is vehicle-to-vehicle
23      variation, there's some
24      driver-to-driver variation, but the way
25      the regulations and the tests are

Page 307

1      written, it tries to minimize that to a
2      quantity that's not, you know, overly
3      influential in the overall results, but
4      there is some variability there.
5  BY MR. WOJTANOWICZ:
6      Q.   And what kind of analysis of driver
7  aggressiveness did you do for purposes of
8  determining whether you could rely on these CoC
9  tests and figures here?
10          MS. SMITH:  Objection, form.
11      Objection, misstates what his opinions
12      are.
13          THE WITNESS:  So I don't
14      remember doing any analyses and I don't
15      remember seeing data on that.
16  BY MR. WOJTANOWICZ:
17      Q.   Did you calculate -- do you know
18  what V times A underscore POS at 95 refers to?
19      A.   Can you repeat that again?
20      Q.   Sure.  There's a sort of, I guess
21  it's a calculation called the VA POS at 95,
22  which is representative of the V times A
23  underscore P-O-S or POS and the at sign, 95,
24  are you familiar with that measurement?
25          MS. SMITH: Are you

Page 308

1  referring to a specific page of this or
2  are you just asking him that?
3          MR. WOJTANOWICZ:  I'm just
4  asking him.
5          MS. SMITH:  Okay.  Are you
6  sure you're saying it right?
7          THE WITNESS:  Is there a --
8  I'm not remembering seeing something
9  like that, but I'm not sure.  Is there
10  a document that that's in?
11  BY MR. WOJTANOWICZ:
12      Q.   No, I'm asking if you are familiar
13  with that calculation, apparently, the answer
14  to that is no.  You're not familiar with the VA
15  POS at 95 calculation?
16          MS. SMITH:  Objection, form.
17      Objection, you are not showing the
18      document.  I'm not sure the way you're
19      even describing the signs is something
20      that's comprehensible.  So objection.
21          THE WITNESS:  There's the
22      relative positive -- is it relative
23      positive acceleration that you are
24      talking about?  Hearing what you said,
25      I don't remember seeing that, that

Page 309

1      metric or that number or equation that
2      you're referencing.
3  BY MR. WOJTANOWICZ:
4      Q.   Relative positive acceleration is
5  something else, let me ask you this, did you
6  calculate the relative positive acceleration
7  for the CoC test results presented here?
8      A.   I don't remember calculating that,
9  no.
10      Q.   Okay.  The VA POS at 95 measurement
11  is defined sometimes as the 95th percentile of
12  the products of instantaneous speed and
13  positive acceleration.  Does that ring any
14  bells?
15          MS. SMITH:  Objection, form.
16          THE WITNESS:  It does not.
17  BY MR. WOJTANOWICZ:
18      Q.   Okay.  It's safe to say then you
19  did not conduct that particular calculation on
20  the testing data relating to this CoC testing
21  that you cite in your report?
22      A.   Looking at the 95th percentile,
23  looking at the confidence interval, no, I did
24  not calculate that for these runs.
25      Q.   So you didn't believe for purposes

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 319

```
 1          UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
 2

                    - - - - -
 3

 4    JASON COUNTS, DONALD KLEIN,    C.A. NO.
      OSCAR ZANORA, DEREK LONG,      1:16-CV-12541-TLL-PTM
 5    HASSAM HIRMIZ, JASON SILVEUS,
      JOHN MISKELLY, THOMAS HAYDUK,
 6    CHRISTOPHER HEMBERGER and
      JOSHUA RODRIGUEZ, individually
 7    and on behalf of all others similarly
      situated,
 8               Plaintiffs,
 9
                  -against-
10

11    GENERAL MOTORS LLC, ROBERT
      BOSCH GMBH, and ROBERT
12    BOSCH, LLC,
                 Defendants.
13

                    - - - - -
14

                  HIGHLY CONFIDENTIAL
15

                    - - - - -
16

17     VIRTUAL VIDEOTAPED DEPOSITION OF RYAN HARRINGTON
18             NATICK, MASSACHUSETTS
19            Thursday, July 23, 2020
20

                    VOLUME 2
21

22

23    REPORTED BY:
24    ROBIN CLARK, RPR, CLR
25
```

HIGHLY CONFIDENTIAL

Page 320

1      Virtual Videotaped Deposition of RYAN
2  HARRINGTON, taken by Plaintiffs, pursuant to notice,
3  commencing at 10:12 a.m., by and before Robin L.
4  Clark, Registered Professional Reporter and Notary
5  Public in and for the Commonwealth of Pennsylvania.
6        - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 322

1  REMOTE APPEARANCES, continued:
2
3     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
      BY:  DAVID BRODSKY, ESQ
      PATRICK SWIBER, ESQ
4     RENEE GRIFFIN, ESQ
      2000 Pennsylvania Avenue, N W
5     Washington, D C  20006
      202-947-1588
6     dbrodsky@cgsh.com
      pswiber@cgsh com
7     rgriffin@cgsh com
        For the Defendant Robert Bosch
8     LLC
9
10  ALSO PRESENT REMOTELY:
11     STEVEN HURVITZ, ESQ
12     HOWARD BRODSKY, VIDEOGRAPHER
13     JUSTON SMITHERS
14     ALI KRAL, TECHNICIAN
15       - - - - -
16
17
18
19
20
21
22
23
24
25

Page 321

1  REMOTE APPEARANCES:
2
3    HAGENS BERMAN SOBOL SHAPIRO, LLP
     BY:  GARTH WOJTANOWICZ, ESQ
     STEVE BERMAN, ESQ
4    JESSICA THOMPSON, ESQ
     1301 Second Avenue, Suite 2000
5    Seattle, Washington 98101
     206-623-7292
6    garthw@hbsslaw com
     sberman@hbsslaw com
7    jthompson@hbsslaw com
       For the Plaintiffs
8
9    CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
     AGNELLO, P C
10   BY: JAMES E  CECCHI, ESQ
     ZACHARY BOWER, ESQ
11   5 Becker Farm Road
     Roseland, New Jersey 07068
12   973-997-1700
     jcecchi@carellabyrne com
13   zbower@carellabyrne com
       For the Plaintiffs
14
15   SEEGER WEISS, LLP
     BY:  SHAUNA ITRI, ESQ
16   1515 Market Street, Suite 1380
     Philadelphia, Pennsylvania 19102
17   215-564-2300
     sitri@seegerweiss com
18      For the Plaintiffs
19
20   KIRKLAND & ELLIS, LLP
     BY:  RENEE D  SMITH, ESQ
     KATE WARNER, ESQ
21   300 North LaSalle
     Chicago, Illinois 60654
22   312-862-2000
     rdsmith@kirkland com
23   kate warner@kirkland com
       For the Defendant General
24   Motors LLC
25

Page 323

1         I N D E X
2  WITNESS                PAGE
3  RYAN HARRINGTON
     BY MR  WOJTANOWICZ:     327, 676
4    BY MS  SMITH:         649
5
6        E X H I B I T S
7  NUMBER     DESCRIPTION      MARKED
8  Harrington
9  Exhibit 5  Dyno HP Coefficient     333
      Determination Bates
10    GMCOUNTS000852163 to 852211
11  Exhibit 6  Privately-Owned Vehicle   341
      Work Order Bates
12    GMCOUNTS000852050
13  Exhibit 7  Privately-Owned Vehicle   346
      Work Order Bates
14    GMCOUNTS000851986 to 851987
15  Exhibit 8  Driver's Checklist Bates   346
      GMCOUNTS000852149 to 852150
16
    Exhibit 9  Calculator Document Bates  362
17    GMCOUNTS000852229
18  Exhibit 10  HWFET Chart       373
19  Exhibit 11  Email dated 5/16/19 Bates  400
      GMCOUNTS000852424
20
    Exhibit 12  Email String Bates     407
21    GMCOUNTS000852421 TO 852422
22  Exhibit 13  07_GM Diesel PEMS    428
      Evaluation - MY14 Cruze
23    Bates GMCOUNTS000379567 to
      379574
24
    Exhibit 14  Deposition of Sarah Funk   449
25
    Exhibit 15  Chevrolet Cruze Diesel    467

2 (Pages 320 - 323)

Page 336

1  the HWFET test results for these in-use testing
2  vehicles?
3      A.  I don't remember analyzing those.
4  I think the focus was just on the FTP.
5      Q.  Okay.  So you didn't consider it
6  important to look at all of the available test
7  results for these in-use test vehicles before
8  you considered and used them in your analysis?
9          MS. SMITH:  Objection, form.
10         THE WITNESS:  So, again, I
11      focused on the FTP, because that's the
12      test where Mr. Smithers had a test
13      result that, you know, wasn't expected.
14  BY MR. WOJTANOWICZ:

9      Q.  Okay.  How did GM inspect the
10  vehicles that it was using for the test in
11  order to determine that they were mechanically
12  sound?
13      A.  So there's some information on here
14  about tire pressure being set, odometer miles,
15  and things along those lines.  I don't remember
16  seeing much information on other aspects of the
17  vehicle.
18      Q.  Did you review any written
19  procedures for which components and elements of
20  the vehicles were to be examined before the
21  testing procedure?
22      A.  I looked for those.  I thought
23  there was a few notes in here, but I wasn't
24  able to find a lot of information on that.
25      Q.  Did you conduct any additional

Page 338

1  investigation to try to ascertain exactly what
2  GM did to examine these vehicles before it ran
3  the tests?
4      A.  I wasn't able to find anything
5  else, so no.
6      Q.  Did you ask for additional
7  information from General Motors about what they
8  did to inspect these vehicles before they ran
9  the tests?
10     A.  I did not.  Again, my focus was on
11  Mr. Smithers' results and how his procedure
12  went.  I wasn't asked to go back and validate
13  everything that GM had done.  But all these
14  tests are, you know, the reason these tests are
15  done in-use and dyno testing is that anybody
16  can repeat them and they can be done at
17  multiple labs.  So these types of tests you
18  follow the Federal Test Procedure to run these
19  tests so they're repeatable and can be compared
20  against each other.
21     Q.  But they're only repeatable if you
22  know precisely what was done for each test;
23  isn't that true?
24     A.  So that's why the Federal Test
25  Procedure is there is that if you follow that

Page 339

1  and then you can have repeatable results, which
2  is what EPA takes in from OEMs and their own
3  testing to make comparisons.
4      Q.  So you didn't feel that it was
5  necessary in order to rely upon this data to
6  know what, if anything, was done to determine
7  if there were any mechanical or other issues
8  with the vehicles that were being tested?
9      A.  Again, my focus was on Mr.
10  Smithers' test.  You know, the one, the one
11  vehicle that tested above the limit, there was
12  documentation that the MIL light activated just
13  after the test for, I believe, an exhaust
14  manifold bolt that was loose and caused an
15  exhaust leak.  So that was one that had a
16  documented maintenance issue.
17     Q.  Well, I'm asking you a different
18  question.  You put in your report a table
19  summarizing all these test results from the
20  in-use testing.  You compared these tests to
21  the tests that Mr. Smithers conducted.  So I'm
22  asking you whether you considered it important
23  to know how those vehicles were inspected prior
24  to being tested for purposes of relying on
25  these test results in your report.

6 (Pages 336 - 339)

HIGHLY CONFIDENTIAL

Page 340

```
1          MS. SMITH: Objection, form,
2   compound.  Asked and answered.
3          THE WITNESS: So, again, my
4   focus is on Mr. Smithers' testing.  You
5   know, I compared these results as part
6   of my consideration, but my opinions
7   are based on the procedures that he had
8   done on the vehicle that he had that
9   showed above the limit with no
10  additional analyses on his part to
11  understand why his vehicle was not
12  compliant.
13  BY MR. WOJTANOWICZ:
14     Q.  Mr. Harrington, that answer was not
15  responsive to my question.  I'm going to ask
16  you again to respond to the question I'm
17  actually asking you, which is, before you put
18  in your report a summary and relied upon the
19  test results from this in-use testing, did you
20  feel it was important to understand how the
21  vehicles were inspected for mechanical problems
22  prior to there being tested?
23          MS. SMITH: Objection, form.
24  Objection, asked and answered.
25          THE WITNESS: I looked at
```

Page 341

```
1   the data that I had to see what was
2   there and reviewed the information that
3   was there, but I did not ask for
4   additional information.
5   BY MR. WOJTANOWICZ:
6      Q.  Okay.  I'm going to introduce
7   another exhibit now, I guess I can try to do it
8   electronically, but at the same time if my
9   colleagues could email it for me, please, it's
10  going to be tab number five in my private
11  exhibit folder and this will be introduced as
12  Exhibit No. 6, I believe.
13          - - - - -
14      (Privately-Owned Vehicle Work Order
15  Bates GMCOUNTS000852050 marked
16  Harrington Exhibit 6 for
17  identification.)
18          - - - - -
19          THE WITNESS: So for me,
20  which exhibit will it be?  Will it be
21  five for me as well?
22          MR. WOJTANOWICZ: It will be
23  tab five in that box, yes.
24          THE TECHNICIAN: I'm on the
25  line if you have issues.  Thank you.
```

Page 342

```
1          MS. SMITH: We still just
2   don't have the folder, so if people
3   could email it again.  Oh, I got it.
4   Thank you.
5          THE TECHNICIAN: You have
6   the folder now, Renee?
7          MS. SMITH: No, I have the
8   email.
9          MR. BRODSKY: This doesn't
10  need to be on the record.
11          - - - - -
12  (Discussion was held off the record.)
13          - - - - -
14          MS. SMITH: Why don't we do
15  this off the record?  For now, let's
16  just do the email and then we can play
17  around with this.  Thank you.
18          MR. WOJTANOWICZ: Okay.  It
19  appears that my ability to introduce
20  them online is still not back up.
21          THE TECHNICIAN: I can do
22  so.  Let me do that for you, please.
23  It's number six as introduced as --
24  it's number five introduced as number
25  six, correct?
```

Page 343

```
1          MR. WOJTANOWICZ: Correct.
2   BY MR. WOJTANOWICZ:
```

7 (Pages 340 - 343)

HIGHLY CONFIDENTIAL



47

15      Q.   And can you point to any document
16   in your report that you cited that actually
17   does contain any detailed instructions for
18   mechanical or electronic inspection of the
19   vehicles prior to testing?
20      A.   I don't remember a document that's
21   referenced in my report with that information,
22   no.
23      Q.   But any documents that you did
24   review and rely on would be cited in your
25   report, correct?

8 (Pages 344 - 347)

HIGHLY CONFIDENTIAL

Page 356

1 would be then on your internal?
2 MR. WOJTANOWICZ: Yeah, it
3 would be what I'm referring to is tab
4 number three and it's Exhibit 5 is the
5 first one introduced today.
6 THE WITNESS: The Bates
7 number on the very first page, could
8 you repeat that again?
9 MR. WOJTANOWICZ: Yeah, the
10 number on the first page,
11 GMCOUNTS852163.
12 MS. SMITH: Is it the one
13 you emailed today, Garth?
14 MR. WOJTANOWICZ: Yes.
15 THE WITNESS: Okay. I have
16 found that document.
17 MS. SMITH: Got it. Thank
18 you, sorry.
19 BY MR. WOJTANOWICZ:
20 Q. All right. So on page, are you at
21 page 198?
22 A. Let me get to 198. Okay.
23 Q. Do you see there in the middle of
24 the page it says "Truck Driver Monitoring
25 Report"?

Page 357

1 A. Yes.
2 Q. And this particular report relates
3 to the HWFET, correct?
4 A. That's my understanding, yes.
5 Q. And then it says the limits are
6 plus or minus 2 miles per hour, 1.0 seconds; is
7 that right?
8 A. Correct.
9 Q. So is it your understanding that
10 the leeway allowed for a driver operating the
11 HWFET test is to stay within 2 miles per hour
12 of the prescribed speed and to achieve those
13 speeds within one second of the prescribed time
14 at which those speeds should be achieved?
15 A. That's my understanding.
16 Q. And it says there were no
17 violations during this test, right?
18 A. Correct.
19 Q. Did you have access to the
20 underlying test data for the HWFET and FTP-75
21 tests that were run on these in-use testing
22 vehicles?
23 A. I did not look at them. They may
24 have been there, but I don't remember analyzing
25 those.

Page 358

1 Q. But when it says no violations,
2 this test, that simply means that the driver
3 stayed within the leeway allowed by those plus
4 or minus 2 miles per hour and one second
5 parameters, correct?
6 A. Yes, the software and realtime
7 evaluates how the driver is doing compared to
8 the profile and at the end of the test it will
9 tell you whether he had violations or not.
10 Q. Did you calculate the RPA for each
11 of the in-use tests conducted on these
12 vehicles?
13 A. Again, I wasn't going back and
14 revalidating all of this work, so I did not go
15 calculate the RPA for these tests.
16 Q. Nor did you calculate the VA
17 positive calculation that we discussed
18 yesterday?
19 A. That's correct.
20 Q. Did you review the QA/QC data for
21 each test?
22 A. I don't remember going back to the
23 QA/QC data.
24 Q. Explain for the record, if you
25 would, what is QA/QC data?

Page 359

1 A. It's quality assurance, quality
2 control, which is a generic engineering term,
3 so it's going back and doing some checks on
4 whether or not you stayed within specified
5 limits or if things were done properly.
6 Q. Do you know how the vehicles were
7 preconditioned for every test cycle for these
8 in-use tests?
9 A. I don't remember looking through
10 those. Obviously, there's a prescribed way
11 that it needs to be done, but I didn't see the
12 verification of how those were done.
13 Q. Did you examine the maintenance
14 records for each of the vehicles that GM used
15 for these in-use testing -- tests?
16 A. I looked where I could find the
17 tire pressures, but I don't remember analyzing
18 the maintenance results for these vehicles.
19 Q. Do you remember seeing any -- you
20 don't cite any maintenance records in your
21 report, did you have access to any maintenance
22 records for any of these testing vehicles?
23 MS. SMITH: Objection, form.
24 THE WITNESS: I'm not aware
25 of them, no.

11 (Pages 356 - 359)

Page 360

1    BY MR. WOJTANOWICZ:
2        Q.   Do you know whether GM inspected
3    any maintenance records for the vehicles that
4    it used for its in-use testing?
5        A.   I don't have that information, no.
6        Q.   So I would like you to turn back to
7    Exhibit No. 1 in your report and the chart at
8    page 17.
9        A.   Okay.
10       Q.   So you compiled this chart based on
11   documents that you reviewed in this case,
12   correct?
13       A.   Correct.
14       Q.   Those documents are cited in
15   footnotes down below?
16       A.   That is correct.
17       Q.   And basically it just identifies
18   the vehicle by V.I.N. number and also by a sort
19   of identifying number that GM assigned to it
20   for purposes of its test; is that right?
21       A.   That's my understanding of the
22   numbers, yes.
23       Q.   It shows the date of the tests, the
24   mileage that GM recorded for the vehicle, and
25   then it has a couple of results in the last two

Page 361

1    columns, correct?
2        A.   Correct.
3        Q.   Now, the first column shows FTP --
4    well, let me back up.  What this is summarizing
5    are just the FTP-75 results that GM recorded
6    for these vehicles, right?
7        A.   That's correct.
8        Q.   As we established earlier, you
9    didn't examine or include the HWFET results?
10       A.   That is correct.
11       Q.   Now, the first, or the second to
12   last column shows the FTP NOx score without
13   adjustment factors and then the one after that
14   shows it with adjustment factors.  So my
15   question is, the adjustment factor basically is
16   a number that gets added to a sort of raw score
17   in order to account for additional NOx that a
18   vehicle will tend to produce because of the
19   regeneration cycles that it will go through in
20   the real world, but that aren't shown on the
21   certification cycles?
22            MS. SMITH:  Objection, form.
23            THE WITNESS:  So it's an
24   additive factor not just for the
25   real world, but GM had to do testing to

Page 362

1        see how frequently the DPF would regen
2    and then there's a calculation that
3    developed the upward adjustment factor
4    and that's what has been added to the
5    first column to get that second column.
6    BY MR. WOJTANOWICZ:
7        Q.   Okay.  At this point, I would like
8    you to pull out tab number ten and I would like
9    to introduce, if Ali would for me, please, and
10   or whoever sending emails for me, tab number
11   ten, which will be an Exhibit --
12            THE TECHNICIAN:  It will be
13   Exhibit No. 9.  Your exhibit has been
14   introduced.  Thank you.
15       - - - - -
16       (Calculator Document Bates
17   GMCOUNTS000852229 marked Harrington
18   Exhibit 9 for identification.)
19       - - - - -
20            MR. WOJTANOWICZ:  So wait a
21   second for Renee and David to receive
22   see the email.
23            MS. SMITH:  Yeah, I don't
24   have it yet, but I'll yell as soon as
25   it gets here.

Page 363

1            MR. BRODSKY:  I'm able to to
2    pull it up on the screen.  So I'm good,
3    thanks.
4            MS. SMITH:  I received the
5    email.
6    BY MR. WOJTANOWICZ:
7        Q.   Mr. Harrington, Exhibit No. 9, or
8    maybe you're still looking for it?
9        A.   Nope, I've got it.
10       Q.   And that's the document
11   GMCOUNTS85229, correct?
12       A.   That's what I have.

12 (Pages 360 - 363)

HIGHLY CONFIDENTIAL



Page 368

Page 370

Page 369

Page 371

22      Q.   So I would now like to introduce
23   and this one is going to have to be --
24   Mr. Harrington, the next exhibit, I don't have
25   a paper copy for you, so I'll ask Ali to

14 (Pages 368 - 371)

Page 380

1  going to be removed by the emissions system of
2  the diesel Cruze has done its work, correct?
3       A.  Could you state that again?
4       Q.  The leak that was identified came
5  in a point in the emissions system that is
6  after the FCR system, after the entire exhaust
7  treatment system has done its work and anything
8  that would pass that point is ultimately
9  heading to the tailpipe, correct?
10          MS. SMITH:  Objection, form.
11          THE WITNESS:  So a leak in
12     an exhaust after-treatment system can
13     suck air in and it can expel exhaust
14     out and then that NOx sensor also is
15     part of the feedback loop, it helps the
16     emissions system understand how it's
17     performing from a NOx perspective, so
18     there's potential impacts for how the
19     system is operating and the exhaust
20     that's measured -- or the exhaust
21     emissions that are measured at the
22     tailpipe.
23  BY MR. WOJTANOWICZ:
24       Q.  Move to strike that as
25  nonresponsive.  I asked you a simple question.

Page 381

1  The leak that you identified came after the
2  emissions control system in terms of the
3  physical layout of the vehicle, correct?
4       A.  So it didn't come after the control
5  system.  It came at the last point in the
6  control system for the emissions system.
7       Q.  It was past the last NOx sensor,
8  correct?
9       A.  It was at the last NOx sensor.
10       Q.  Now, what did you do to analyze
11  whether that leak was -- one of the things that
12  could happen with a leak developing at that
13  point is that NOx and other emitants or other
14  exhaust could be leaking out of that, correct?
15       A.  So there's pulsation in the exhaust
16  after -- or exhaust system, so some exhaust can
17  leave and other times air can come into the
18  system.
19       Q.  If exhaust is leaving, then that's
20  actually going to reduce the amount of tailpipe
21  NOx that's being measured either by a dyno
22  system or by a PEMS system, correct?
23       A.  Right, it could impact that NOx
24  reading.
25       Q.  I mean, if it's letting exhaust

Page 382

1  out, it's going to be letting out everything
2  that's in that exhaust, including NOx, correct?
3       A.  It could, yes.  However, it's going
4  to impact or could impact the NOx sensor
5  reading and impact how the vehicle is operating
6  and the vehicle's understanding of how much
7  tailpipe NOx is coming out in the SCR
8  efficiency.  So it could impact the emissions
9  system and the control system.
10       Q.  But you didn't do any analysis to
11  see whether, A, whether the system was actually
12  sucking in any air at any given time, did you?
13       A.  Not during the inspection and I
14  didn't do an analyses, that's, you know, Mr.
15  Smithers -- it's Mr. Smithers' testing, I
16  wasn't aware of the testing and didn't evaluate
17  whether or not there was an impact of that leak
18  on his results in the operation of that
19  vehicle.
20       Q.  Now, going back to -- do you recall
21  at page 56 of your report, if you would turn
22  there, please, quickly.
23       A.  Okay.
24       Q.  Actually, let me go back for a
25  second.  Do you know in fact whether the leak

Page 383

1  in the emissions system that was detected
2  during the vehicle inspection in fact impacted
3  any test results?
4       A.  I don't have evidence of when that
5  exhaust leak occurred, so I can't determine the
6  impact, but it's a -- having a known
7  maintenance issue on a vehicle, you know, can
8  impact the operation of the vehicle and Mr.
9  Smithers did not perform a leak test, so it's
10  unclear when that leak test developed or when
11  that leak developed.
12       Q.  And just to be clear, GM didn't
13  perform any leak tests on its test vehicles for
14  purposes of in-use testing, did it?
15       A.  They listened for leaks, so they
16  did perform a leak test.
17       Q.  You don't know in fact whether Mr.
18  Smithers or anyone else performing the PEMS
19  testing or the dyno testing also listened for
20  leaks, do you?
21       A.  I don't -- there was no evidence
22  that the leak test was performed and I thought
23  there was a discussion in Mr. Smithers'
24  deposition that he did not check for leak
25  tests, but I can't remember exactly how that

17 (Pages 380 - 383)

HIGHLY CONFIDENTIAL



Page 388

1      A.  So you said between the first and
2  the second?
3      Q.  Correct.
4      A.  I didn't do that math, but you're
5  saying it's greater than 12 percent?
6      Q.  Yes.
7      A.  Doing the math in my head, it looks
8  like it is greater than 12 percent.
9      Q.  But you didn't reject either of
10  those test results for purposes of your
11  analysis in this case, did you?
12          MS. SMITH:  Objection, form.
13          THE WITNESS:  So, again,
14      those were considered.  What I was here
15      to do was to evaluate Mr. Smithers'
16      vehicle, which had a vehicle that was
17      over the certification limit, over the
18      standard, had an exhaust leak, had an
19      open recall, had documentation that
20      didn't define some of the maintenance
21      records in the report.  So there was
22      many, many red flags with this vehicle
23      in addition to having a result that
24      wasn't similar to the other tests for
25      in-use.

Page 389

1  BY MR. WOJTANOWICZ:

19 (Pages 388 - 391)

HIGHLY CONFIDENTIAL

Page 396

15      Q.   And it's not of concern to you if
16  the vehicle achieves a score, a NOx value on
17  the test, that is very near but not quite above
18  the certification standard, that's not a
19  concern to you, right?
20          MS. SMITH:  Objection, form.
21          THE WITNESS:  You know, it's
22  reasonable to look at that, but it's
23  still, you know, underneath the
24  standard and there's -- the standard is
25  there for a reason and it met that.  It

Page 397

1   met the standard.
2   BY MR. WOJTANOWICZ:
3       Q.   Okay.  But you've drawn the line in
4   anything above the certification standard, in
5   your view, the results indicate some problem
6   with the vehicle and you've got to discount
7   those results?
8           MS. SMITH:  Objection, form.
9   And misstates his testimony.
10          THE WITNESS:  So a
11  reasonable and robust engineering
12  analyses would understand why that was
13  and that's the concern here is it's a
14  red flag that would -- a typical
15  engineer would try to understand why
16  that was.  I didn't see any evidence
17  that Mr. Smithers did anything other
18  than state that he thought it was close
19  enough.  However, there was a NOx
20  sensor that was replaced right at that
21  time, so, you know, of a result like
22  that, in a typical robust engineering
23  would require additional analyses to
24  understand, you know, why that
25  unexpected result was observed.

Page 398

1   BY MR. WOJTANOWICZ:
2       Q.   And you have attempted to be
3   reasonable and robust in rendering your
4   engineering opinions as outlined in your
5   report, haven't you?
6       A.   I've tried to, yes.

20      Q.   So you didn't feel the need to
21  apply these same reasonable and robust
22  engineering standards to your own reliance on
23  the test data cited in the summary table on
24  page 17?
25          MS. SMITH:  Objection, form.

Page 399

1   Misstates his testimony.
2           THE WITNESS:  Again, I
3   considered these data, but my focus was
4   on Mr. Smithers' vehicle and the known
5   maintenance issues at the time of the
6   inspection.
7   BY MR. WOJTANOWICZ:
8       Q.   I'm now going to introduce another
9   exhibit.  Let me see if I can do this directly.
10  Could you remind what exhibit number we're on,
11  please, court reporter?
12          THE TECHNICIAN:  You're on
13  Exhibit 10.
14          MR. WOJTANOWICZ:  So the
15  next one is 11.
16          THE TECHNICIAN:  Which tab
17  would you like?
18          MR. WOJTANOWICZ:  That is
19  tab number four, please.  Yeah, I tried
20  it, it's not working.
21          THE TECHNICIAN:  Okay.  One
22  moment, please.
23          MS. SMITH:  Garth, did you
24  say it is loaded up or you're having
25  difficulty?

21 (Pages 396 - 399)

Page 400

1        MR. WOJTANOWICZ: We're not
2    able to.
3        THE TECHNICIAN: Exhibit 11,
4    tab number four, thank you.
5        MS. SMITH: I've got it.
6        - - - - -
7    (Email dated 5/16/19 Bates
8    GMCOUNTS000852424 marked Harrington
9    Exhibit 11 for identification.)
10        - - - - -
11 BY MR. WOJTANOWICZ:
12    Q.  So Mr. Harrington, you're opening
13 up envelope number four there?
14    A.  Yes, I am.



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL



23    Q.   Now, I would like to introduce the
24  next exhibit, which is tab number 11.  It will
25  be Exhibit No. 12.

Page 407

1        THE TECHNICIAN:  Your
2   exhibit has been introduced.  Please
3   refresh your screens.  Thank you.
4        MS. SMITH:  That works for
5   me.  It's a miracle it's working.
6        - - - - -
7      (Email String Bates
8   GMCOUNTS000852421 TO 852422 marked
9   Harrington Exhibit 12 for
10  identification.)
11       - - - - -
12  BY MR. WOJTANOWICZ:
13    Q.  Do you have that in front of you,
14  Mr. Harrington?
15    A.  I do.

23 (Pages 404 - 407)

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

HIGHLY CONFIDENTIAL



Page 440

1    understanding how you are meaning
2       spirit.
3  BY MR. WOJTANOWICZ:
4       Q.   Okay.  Have you never heard that
5  phrase before?
6       A.   I've --
7          MS. SMITH:  Objection, form.
8          THE WITNESS:  I've heard the
9       phrase -- sorry.
10         MS. SMITH:  Go ahead.
11         THE WITNESS:  I've heard the
12      phrase, but I don't know there's an
13      exact definition of it.
14         MS. SMITH:  Garth, when
15      you're done with this document, if it's
16      a good breaking point, that would be
17      great.
18  BY MR. WOJTANOWICZ:
19      Q.   Okay.  I'm just reviewing my notes
20  to see if I asked what I wanted about this.
21  One second, please.  You know, I would go back,
22  please to page 4 of this document so we can put
23  it away were we're done here

Page 442

21      This is a good time to take a break,
22      please.
23         THE VIDEOGRAPHER:  The time
24      is 12:54.  We are off the record.
25          - - - - -

32 (Pages 440 - 443)

HIGHLY CONFIDENTIAL

Page 444

1          (A recess was taken at this time.)
2                 - - - - -
3              THE VIDEOGRAPHER:  The time
4      is 1:08.  We're on the record.
5    BY MR. WOJTANOWICZ:



33 (Pages 444 - 447)

HIGHLY CONFIDENTIAL

19    Q.  Okay.  Now, one of the things, you
20    recall that one of the things that you have
21    indicated that you believe Mr. Smithers did was
22    to not properly select a test route.  Is that
23    part of your opinion?
24    A.  So his testing and test -- well,
25    there isn't a single test route.  I don't think

Page 451

1    he had test routes.  I don't know how he
2    selected the routes.  He drove them and then
3    segmented them, but there's not an actual test
4    route that he did repeatedly.  It's just a
5    bunch of testing that he then segmented into
6    different segments and analyzed.
7    Q.  But one of the things that's
8    implicit in your criticism of Mr. Smithers is
9    that it's important to, you believe that it's
10   important to select a proper test route in
11   order to conduct PEMS testing as accurately as
12   you can.  Is that a fair summary of your
13   opinion?
14        MS. SMITH:  Objection, form.
15        THE WITNESS:  So when you
16      test something, you need to consider
17      the different influences that influence
18      the results from that test route or
19      that segment and consider things like
20      air conditioning use and hills and
21      temperature and things like that.
22   BY MR. WOJTANOWICZ:
23   Q.  And so part of your -- part of your
24   opinion in this case is that the route selected
25   is one of those things that influence or could

34 (Pages 448 - 451)

HIGHLY CONFIDENTIAL

Page 452

1   influence the results on a PEMS test; is that
2   true?
3       A.   The routes and then what seems to
4   be somewhat arbitrary segmentation by Mr.
5   Smithers.  So his test routes were conducted,
6   but then they segmented them up to do his
7   analyses, so he wasn't actually analyzing
8   routes.
9       Q.   Okay.  But again, I'm going to ask
10  you again, because I'm trying to get you to
11  answer whether it's part of your opinion that
12  the selection of the route is one of the
13  considerations that you believe is important
14  for accurate PEMS testing?
15              MS. SMITH:  Objection, form.
16              THE WITNESS:  It can be the
17      selection of the route or when you do
18      that the route that you evaluate it in
19      the context of what the route really
20      is.
21  BY MR. WOJTANOWICZ:



Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400



212-267-6868                Veritext Legal Solutions                516-608-2400
www.veritext.com

HIGHLY CONFIDENTIAL



37 (Pages 460 - 463)

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

HIGHLY CONFIDENTIAL



41 (Pages 476 - 479)

HIGHLY CONFIDENTIAL



42 (Pages 480 - 483)

HIGHLY CONFIDENTIAL



| Page 488 | Page 490 |
|---|---|

7    BY MR. WOJTANOWICZ:
8        Q.   What's your evidence that
9    regulators here in the United States use or
10   require calibration of a PEMS unit against the
11   dynamometer?
12              MS. SMITH:  Objection, form.
13              THE WITNESS:  So it's listed
14       in my report.  It might take a second
15       to find it.  I believe it's in the
16       appendices.  Sorry, it's taking me a
17       second.  So on page -- well, it's in
18       Appendix E, page 27, at the bottom of
19       the second paragraph, it says
20       "Moreover, PEMS equipment verification
21       against laboratory equipment is also
22       regulated within the United States with
23       PEMS measurements are being used to
24       verify heavy duty not to exceed
25       compliance" and there's a footnote 558

44 (Pages 488 - 491)

HIGHLY CONFIDENTIAL

Page 492

1  that points to a CFR PEMS calibration
2  and verifications.
3  BY MR. WOJTANOWICZ:
4  Q.  Okay.  So that was in the context
5  of the heavy-duty truck PEMS testing that's
6  part of the regulatory structure in the United
7  States, correct?
8  A.  Correct.  That's the only -- the
9  PEMS testing that's regulated in the U.S.
10  Again, as I stated before, there's no PEMS
11  testing for light-duty vehicles.

Page 494

4  BY MR. WOJTANOWICZ:
5  Q.  Now, you indicated that there's
6  variability and you discussed that a few times.
7  In your experience, is the only variability
8  demonstrated by a PEMS equipment compared to
9  dynamometer results in the upward direction?
10  In other words, is it your opinion that the
11  only difference you're likely to get between a
12  PEMS result and a dynamometer result is that
13  it's going to be worse?
14  MS. SMITH:  Objection, form.
15  THE WITNESS:  No, go for it.
16  MS. SMITH:  Go ahead, sir.
17  THE WITNESS:  No, it's
18  possible that it could be lower.  If
19  you look at the information for the
20  European Commission and EPA, their
21  conformity factors or their adjustment
22  factors are always in the upward
23  direction showing there's more
24  variability with the -- a combination
25  of the PEMS equipment and the on-road

Page 495

1  testing.  So the way the regulators
2  have looked at it is always in the
3  upward direction, but under certain
4  directions, it's possible that it could
5  show better emissions, but that's not
6  something that the regulators have
7  considered.
8  BY MR. WOJTANOWICZ:
9  Q.  Are you aware that the RDE,
10  European RDE standards requires for PEMS
11  testing one continuous trip consisting of
12  urban, rural, and motorway segments?
13  MS. SMITH:  Objection, form.
14  THE WITNESS:  My
15  understanding is that --
16  MS. SMITH:  Sorry, go ahead.
17  THE WITNESS:  That's my
18  understanding.
19  BY MR. WOJTANOWICZ:
20  Q.  Okay.  And is it your understanding
21  that those segments are determined -- whether
22  you're in a particular segment is determined by
23  the speed of the vehicle at any given time?
24  A.  I can't remember the specifics of
25  that.  I can't remember the segmentation, so.

45 (Pages 492 - 495)

HIGHLY CONFIDENTIAL

Page 498

1  BY MR. WOJTANOWICZ:
2      Q.  And would you agree that when a car
3  is being driven less aggressively, that's
4  likely to have a downward impact on the NOx
5  emissions going out at any given time?
6      A.  It could influence emissions.
7  Typically, it would be less, but again, it
8  depends on the specific test conditions and
9  engine and after-treatment operation, but
10  typically, it would be lower.
11      Q.  Okay.  Are you aware that the RDE
12  requires urban driving, the urban driving
13  segment of a test to comprise 29 to 44 percent
14  of the total, the rural part of the drive is
15  supposed to be 23 to 43 percent, and motorway
16  is supposed to be 23 to 43 percent of the total
17  miles of the test route?
18          MS. SMITH:  Objection, form,
19      compound.
20          THE WITNESS:  I don't have
21      those foots memorized.  Is there a
22      document you're referencing?
23  BY MR. WOJTANOWICZ:
24      Q.  No, you cite and rely upon the RDE
25  and I'm assuming that you have some familiarity

Page 499

1  and expertise in it.  If you don't recall right
2  now, I will just represent to you that those
3  are the standards.  Do you have any reason to
4  disagree?
5          MS. SMITH:  Objection, form.
6          THE WITNESS:  Obviously, I
7      haven't seen them, but I will for
8      purposes of this go with your
9      representation.
10  BY MR. WOJTANOWICZ:

46 (Pages 496 - 499)

HIGHLY CONFIDENTIAL



47 (Pages 500 - 503)

HIGHLY CONFIDENTIAL

Page 504

5  MR. WOJTANOWICZ: Okay.
6 Well, we can take a lunch break now.
7 Should we go 40 minutes; is that okay?
8  MS. SMITH: You know, can we
9 go 45, sorry?
10  MR. WOJTANOWICZ: Sure.
11  MS. SMITH: So that takes us
12 to three Eastern, I think; is that
13 right?
14  MR. WOJTANOWICZ: Yeah, that
15 would be noon Pacific, three Eastern.
16  THE VIDEOGRAPHER: It's
17 2:14. We are off the record.
18  - - - -
19 (A recess was taken at this time.)
20  - - - - -
21  THE VIDEOGRAPHER: The time
22 is 3:02. We're on the record.
23 BY MR. WOJTANOWICZ:
24 Q. Okay. Mr. Harrington, I would like
25 to go back briefly to your report, page 23,

Page 505

1 Exhibit 1.
2 A. Okay.

Page 506

19 Q. But you have no basis for knowing
20 why the EPA may not have taken any enforcement
21 action, do you?
22  MS. SMITH: Objection, form.
23  THE WITNESS: I don't have
24 any information on the decision-making
25 on their end of it and I didn't see any

Page 507

1 action.
2 BY MR. WOJTANOWICZ:
3 Q. So you don't know if EPA decided
4 not to take an enforcement, because, for
5 example, they lacked the manpower to do so, you
6 have no idea?
7  MS. SMITH: Objection, form.
8  THE WITNESS: I can't
9 speculate on what they did.
10 BY MR. WOJTANOWICZ:



48 (Pages 504 - 507)

HIGHLY CONFIDENTIAL



49 (Pages 508 - 511)

HIGHLY CONFIDENTIAL

50 (Pages 512 - 515)

HIGHLY CONFIDENTIAL

Page 524

1   that could have significant impacts on
2   emissions?
3       A.  I guess it depends on how you run
4   your test and how you set it up.
5       Q.  Okay.
6       A.  I guess, for example, you could
7   test in very, very cold and very hot
8   temperatures that are not consistent with how
9   typical driving is done.  You could
10  overemphasize cold and hot testing.
11      Q.  Now, if you're trying to determine
12  how a vehicle performs specifically in the
13  realm of specifically when outside temperatures
14  were hot, for example, wouldn't it make sense
15  to actually run more tests in those conditions
16  in order to try and get a complete picture of
17  how the vehicle behaved under those conditions?
18      A.  Like I said, it depends on the
19  intent.  If you're trying to understand how
20  something operates at a particular temperature,
21  there could be some value in that.  So I guess
22  it depends how you then caveat your results.
23          I would also highlight that if
24  you're going to understand the impact of
25  temperature, not documenting how the air

Page 525

1   conditioner was used and having no record of
2   that and no information that you've told to
3   your drivers, that's a variable that can have
4   an impact on emissions if it is uncontrolled.
5   So in all of the testing that Mr. Smithers has
6   done, I saw no evidence and he stated he
7   didn't, he thought that it was with the A/C on,
8   but he wasn't sure, so it's, you know, he may
9   have been trying to understand how the impact
10  of high temperatures, but he had a variable
11  that was uncontrolled and not defined.
12      Q.  Do you have an understanding that
13  drivers in the real world driving vehicles
14  around when it's warm outside, they tend to
15  turn on their air conditioner, don't they?
16      A.  I can't speak to what people
17  typically do or what everybody would do, but
18  some people might roll the window down, some
19  people might use the air conditioner, which is
20  why the EPA has a specific test for high
21  temperature and air conditioning use, the SCO3.
22      Q.  Are you aware of any circumstances
23  in which GM has informed people buying the
24  Cruze vehicles that they shouldn't use their
25  air conditioners?

Page 526

1       A.  Just in any setting?
2       Q.  Yeah, does GM tell people who
3   bought these Cruze vehicles that they shouldn't
4   use their air conditioners to avoid polluting
5   the environment?
6       A.  I've not seen any documentation by
7   GM instructing drivers what to do with their
8   air conditioning.

53 (Pages 524 - 527)

HIGHLY CONFIDENTIAL



14       Q.   When you're conducting engineering
15   analyses for purposes other than litigation, do
16   you simply rely upon whatever data happens to
17   be presented to you or do you try to determine
18   what data you need in order to provide a
19   professional and thorough engineering analysis?
20               MS. SMITH:  Objection, form.
21               THE WITNESS:  Could you
22        state the question again?
23   BY MR. WOJTANOWICZ:
24       Q.   When you are performing engineering
25   analyses for purposes other than litigation, do

54 (Pages 528 - 531)

Page 536

1  again, it's hard to make those comparisons.
2  And you'd have to look really look through it.
3  But at the end of the day, there's still issues
4  with the vehicle, you know, issues that were
5  observed that could have influenced it, so it
6  calls into question the reliability of that
7  testing.
8       Q.   And, again, those supposed issues
9  with the vehicle you identified were at the
10  vehicle inspection, which occurred a
11  significant amount of time after the actual
12  PEMS tests were conducted, correct?
13       A.   So my understanding is that, you
14  know, the recall was still active starting in
15  2016.  There was a dyno test that was done in
16  between or in the middle of the testing that
17  showed results above the certification under
18  the standard, the 70 milligrams per mile, so
19  something was not normal with the vehicle at
20  that point or there was something that was
21  worth considering that was well prior to the
22  inspection.
23       Q.   You referred to a recall and you
24  refer to software updating in your report, but
25  you say that they should have updated the

Page 537

1  software, correct?
2       A.   There was an open recall on the
3  upstream NOx sensor, that's correct.
4       Q.   Okay.  Now, if some of the testing
5  had been done prior to the recall, then if they
6  had actually performed the recall, then the
7  testing that they had done prior to the recall
8  would not be replicable, would it?
9       A.   It may not have been replicable.
10  One thing that Mr. Smithers could have done was
11  retest under similar conditions, we would have
12  done a dyno testing at the very beginning which
13  would have been good.  He could have checked
14  that against new testing or he could have rerun
15  some of his routes under similar conditions to
16  see if there was any difference, but I didn't
17  see any evidence that he did anything to
18  understand or try to even understand the
19  difference if he would have applied it.  He
20  just did not apply the recall.
21       Q.   Okay.  So what did you do to
22  understand what the difference would have been
23  if you had applied the recall?
24       A.   I didn't do anything.  My
25  understanding that the recall mentioned a MIL

Page 538

1  light had something to do with the emissions
2  system, but I don't know if there would have
3  been any impact, however, having an active
4  recall and an emissions system component,
5  you're trying to replicate vehicles that are
6  on-road that are getting that recall, it seems
7  like it would be good engineering practice to
8  update the vehicle to have it under the same
9  conditions that the vehicles were in after the
10  recall and on-road.
11       Q.   And there's also a software update
12  that was issued during the time that the
13  vehicle was being tested, correct?
14       A.   That's my understanding, yes.
15       Q.   And, again, had Mr. Smithers
16  installed that software update, wouldn't there
17  have been an issue with tests run before the
18  update and after the update no longer being
19  comparable or having the tests before not being
20  replicable?
21            MS. SMITH:  Objection, form.
22            THE WITNESS:  You know, I
23       don't know what the impact would be.
24       There could be a difference, but not
25       understanding that difference, you

Page 539

1       know, leaves some question about his
2       vehicles' representativeness to the
3       other vehicles on the road that have
4       that recall.
5  BY MR. WOJTANOWICZ:
6       Q.   Okay.  But you didn't do anything
7  to analyze what emissions impact installing or
8  not installing that recall had, did you?
9       A.   No, I did not.
10       Q.   And General Motors, who presumably,
11  you know, on whose behalf you're offering
12  testimony in this case, and who presumably
13  knows the impacts of all of the software and
14  hardware changes it makes to the emissions on
15  its vehicles, they didn't provide you with any
16  information to tell you exactly what the
17  emissions impact would be for installing that
18  software update, did they?
19            MS. SMITH:  Objection, form.
20            THE WITNESS:  I haven't seen
21       any information on the impact on those
22       vehicles, no.
23  BY MR. WOJTANOWICZ:
24       Q.   And General Motors, whose counsel
25  provided you all of the information that you

56 (Pages 536 - 539)

HIGHLY CONFIDENTIAL



Page 540

1   relied on for purposes of your opinion, didn't
2   provide you with any information specifying the
3   emissions impact of performing the recall on
4   the sensor that you mentioned earlier?  They
5   didn't do that either, did they?
6        A.  I'm sorry, I lost track of the
7   question.
8        Q.  You were recalling or discussing a
9   recall earlier that was not performed on the
10  vehicle.  General Motors nor did its counsel
11  provide you with any information outlining the
12  specific emissions impacts of performing that
13  recall, did they?
14       A.  I have not seen any information on
15  the impact of that recall.
16       Q.  I would now like to mark --
17  or actually, we'll go back to tab number 16,
18  Exhibit 15.
19            THE TECHNICIAN:  By the way,
20       Garth, you've been given the ability to
21       introduce your own exhibits now.  I
22       troubleshoot over lunch.
23            MR. WOJTANOWICZ:  Okay.
24       Great, thank you.
25            THE TECHNICIAN:  So if you

Page 541

1   try the next time, we'll go from there.
2   Thank you.
3            - - - - -
4   BY MR. WOJTANOWICZ:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

Page 552

9      for Mr. Smithers' testing, don't you?
10            MS. SMITH:  Objection, form.
11            THE WITNESS:  Some of that
12       data.  Again, there's some missing data
13       about air conditioner use and other
14       aspects, but some of that information
15       about temperature and things like that
16       are present.
17     BY MR. WOJTANOWICZ:
18       Q.   Okay.  So you could repeat the test
19     routes, because there was GPA [sic] data for
20     Mr. Smithers' tests, correct?
21            MS. SMITH:  Objection, form.
22            THE WITNESS:  There's GPA
23       data?
24     BY MR. WOJTANOWICZ:
25       Q.   You have GPA information in the

Page 553

1      test results provided by Mr. Smithers that
2      would allow you to replicate every single test
3      run that he did, don't you?
4            MS. SMITH:  Objection.
5            THE WITNESS:  I don't know
6       what GPA data is.
7      BY MR. WOJTANOWICZ:
8       Q.   I'm sorry, you're right.  GPS, I'm
9      mixing the letters here, it's another, you
10     know.  Sorry, GPS data that would allow you to
11     replicate the routes that Mr. Smithers
12     provided?
13       A.   There are certain aspects that we
14     could replicate.  There's, obviously, not all
15     information was there and it's hard to do
16     complete repeatability testing with PEMS,
17     because there's some variability, but there was
18     GPS information and that --
19       Q.   Pardon me.  You also have, you have
20     information that allows you to know what the
21     temperature was, what the speed of the vehicle
22     was, and you've got the GPS data also allows
23     you to assess the elevation of the vehicle at
24     any given time, correct?
25       A.   You know, again, there was

Page 554

1      potential issues with the temperature probe
2      measurement that I mentioned that there was
3      some anomalies, so there would be some
4      uncertainty there and uncertainty about the
5      weight or exactly how the driver was driving,
6      but there would be some information from the
7      GPS vehicle speed and other things to allow
8      some form of repeatability, but there's,
9      obviously, vehicle condition and other things
10     would make it difficult to replicate completely
11     Mr. Smithers' data or Mr. Smithers' testing.

7       Q.   Mr. Smithers did provide
8      maintenance records and inspection records for
9      when the vehicle was purchased and as I said,
10     the DTC information is included in the testing
11     data, isn't that relevant to the state of
12     health of the vehicle?
13            MS. SMITH:  Objection, form.
14       And foundation.
15            THE WITNESS:  Again, the
16       DTCs, that data was not listed.  It was
17       listed for the gasoline vehicles, but
18       interestingly enough, it wasn't listed
19       for the diesel vehicle.  It's not clear
20       why it was recorded for one vehicle but
21       not the other.  And there were some
22       maintenance records, but as has been
23       evidenced throughout this, there was
24       not all the records.  There was -- his
25       report didn't mention the NOx sensor

60 (Pages 552 - 555)

HIGHLY CONFIDENTIAL





Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400