# Exhibit 7

UNITED STATES DISTRICT
EASTERN DISTRICT OF MICHIGAN
C.A. NO. 1:16-CV-12541-TLL-PTM

--------------------------------

JASON COUNTS, DONALD KLEIN,
OSCAR ZANORA, DEREK LONG,
HASSAM HIRMIZ, JASON SILVEUS,
JOHN MISKELLY, THOMAS HAYDUK,
CHRISTOPHER HEMBERGER and
JOSHUA RODRIGUEZ, individually
and on behalf of all others
similarly situated,

Plaintiffs,

-against-

GENERAL MOTORS LLC, ROBERT BOSCH
GMBH, AND ROBERT BOSCH, LLC,

Defendants.

--------------------------------

HIGHLY CONFIDENTIAL

VIRTUAL VIDEOTAPED DEPOSITION of NICHOLAS MOLDEN, an Expert Witness on behalf of Defendant, taken by Plaintiff, pursuant to Notice, held in Winchester, United Kingdom, before Kathleen Piazza Luongo, a Notary Public of the State of New York.

HIGHLY CONFIDENTIAL



REMOTE APPEARANCES:

HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Attorneys for Plaintiffs
BY: JESSICA THOMPSON, ESQ.
jthompson@bbslaw.com
-and-
STEVE BERMAN, ESQ.
sberman@bbslaw.com
206-623-7292

CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C.
Five Becker Farm Road
Roseland, New Jersey 07068
Attorneys for Plaintiffs
BY: DONALD ECKLUND, ESQ.
decklund@carellabyrne.com
-and-
JAMES E. CECCHI, ESQ.
jcecchi@carellabyrne.com



APPEARANCES: [Cont'd.]

KIRKLAND & ELLIS, LLP
300 North LaSalle
Chicago, Illinois 60654
Attorneys for the Defendant
General Motors LLC
BY: KATHERINE WARNER, ESQ.
kate.warner@kirkland.com
-and-
JEFFREY S. BRAMSON, ESQ.
jeffrey.bramson@kirkland.com

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Attorneys for the Defendants
Robert Bosch GMBH, and
Robert Bosch, LLC
BY: LARRY C. WORK-DEMBOWSKI, ESQ.
lwork-dembowski@cgsh.com
-and-
PATRICK SWIBER, ESQ.
-and-
JABARI MATTHEW, ESQ.



ALSO PRESENT REMOTELY:

Steven Hurvitz, Esq.
Howard Brodsky, Videographer
Ali Kral, Virtual Video Technician
[Portion of a.m. only]



I N D E X

WITNESS:

Nicholas Molden


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Thompson | 9 |


E X H I B I T S


| MOLDEN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | "Guest Opinion: Don't Ban Diesel - Sort the Clean from the Dirty" | 33 |
| Exhibit 2 | audio file from MP3 player | 56 |
| Exhibit 3 | transcript of audio file | 56 |
| Exhibit 4 | slip sheet in re Radio 4 in Four | 109 |
| Exhibit 5 | Expert Report of Nick Molden dated June 5, 2020 | 124 |

building the wrong cars and this needed to be put right.

MS. THOMPSON: All right, Mr. Molden, I'm going to ask you the same question.

CONTINUED EXAMINATION BY MS. THOMPSON:

Q. Those statements that you just heard, that was your voice; correct?

A. Correct.

Q. And those statements were true at the time you made them; correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. Yes, they would have been absolutely true in the context of the interview.

MS. THOMPSON: All right.

I'm going to play you another segment.

MR. WORK-DEMBOWSKI: Jessica, do you know approximately where in the transcript that you submitted as Exhibit 3 the passage is?

MS. THOMPSON: Very good question. It is starting with the



word: "Yeah, the car manufacturers, so they are far too close to each other in Europe," if you can find that.

Mr. Molden, while we are waiting, you said in hat statement: "My training is as an economist, and what I was thinking was that the market was failing terribly because of this bad data."

Can you find that in your transcript?

THE WITNESS: Yes, I think I've located it. I think it's at the bottom of the second page.

MS. THOMPSON: All right.

CONTINUED EXAMINATION BY MS. THOMPSON:

Q. And when you say: "My training is as an economist," you're not coming at this problem from an engineering standpoint; is that correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. What do you mean by "this problem"? Do you mean this particular



case or the broader sector?

MS. THOMPSON: Why don't I just ask a better question.

Q. You're a trained economist; is that right?

A. I have a Bachelor's and Master's in philosophy, politics and economics, of which I majored in economics.

Q. All right, but you would call yourself a trained economist; is that correct?

A. Actually that's -- that's -- I would stick with the expression in here, I had training as an economist through that degree, and I've applied my economic skills throughout most of the things I've done in my career; so I think, uh, with that qualification, yes, I think the answer to your question would be yes.

Q. Okay.

And you're not an engineer; is that correct?

A. I'm not trained as an engineer, I don't hold an engineering



qualification.

Q. And when you say, just for those of us in the U.S., "an engineering qualification" would be what, for example?

MR. WORK-DEMBOWSKI: Objection, form.

A. Because I'm not a qualified engineer I'm also not that familiar with the range of engineering qualifications that I could have got; however, for example, I do not have a Bachelor's degree in engineering.

Q. Do you have any degree in engineering?

A. No, I do not.

Q. Do you have any certification -- certificates, recognition by a professional body in engineering?

MR. WORK-DEMBOWSKI: Objection, form.

A. I don't -- I don't have any from, for example, a university for a completion of an engineering course, um, I have various, uh, certificates, but of

Page 70

different, uh, membership of various bodies, but nothing that would count, I don't think, in normal understanding as an engineering qualification, no.

Q. Any training in engineering?

MR. WORK-DEMBOWSKI: Objection, form. Objection, form.

A. As part of my role in the business I have -- Emissions Analytics -- I have organized the training of our staff, um, and so I have an awareness of the subject matter and the requirements but I'm not, myself, trained, no.

Q. So you yourself have no training in engineering; is that correct?

A. I have no formal training in engineering. As you can imagine I've picked up knowledge as I've gone along, but I do not have formal training as an engineer.

Q. What are some examples of some knowledge that you might have picked up as you went along?

MR. WORK-DEMBOWSKI: Objection, form.

Page 71

A. So, for example, at the various stages as a -- at the overall level of how you conduct a PEMS test.

Q. And have you received informal training in engineering through your participation at various stages of the overall PEMS testing process?

MR. WORK-DEMBOWSKI: Objection, form. Misstates testimony.

A. I'm not trained as -- in those roles and don't claim to be. What I do have is an overall appreciation and knowledge of the elements that go into it and what training requirements are needed of people in -- in engineering roles.

Q. But you don't have any of that training yourself, do you?

A. As I've said, I'm not a trained engineer, no.

Q. Can you give me an example related to PEMS testing of an engineering problem that you would be capable of solving by virtue of your experience at a high level administering PEMS tests?

MR. WORK-DEMBOWSKI: Objection,

Page 72

form.

A. Where I have my expertise is where I employ it in terms of the overall understanding of the processes and the data and the analysis coming out of it, and I rely upon my qualified engineering staff to do those engineering parts.

Q. So you can't give me an example of an engineering problem that you would be qualified to solve by virtue of your experience administering PEMS tests?

MR. WORK-DEMBOWSKI: Objection, form.

A. As I've said, it requires an appreciation of the steps in the process, but I wouldn't claim to be trained to execute any particular elements of it and I would -- I stick to my areas of expertise, which are around the overall protocols and data analysis.

Q. All right.

And in connection with your work with Oxford Indices Limited, do you have any practice or experience with engineering problems?

Page 73

A. I can't recall every program that I've conducted through Oxford Indices, but I can say that while the topic may have been potentially in engineering areas it's not involved engineering work in a -- in a physical sense, yes, in that's your question.

Q. So Oxford Indices Limited does data analysis; is that correct?

A. Data analysis and consultancy work, yes.

Q. And is that a company that employs engineers?

A. No, it does not.

Q. Do you have a degree in computer software or any related computer science field?

MR. WORK-DEMBOWSKI: Objection, form.

A. No, the degree I have is a Master's, a Bachelor's and Master's in philosophy, politics and economics, within which I majored in economics, which involved statistical content. That is the extent of my, um, university

Page 154

Q. How many employees do you have?
A. Um, worldwide it's around 17.
Q. Okay.
And do you -- how many in the U.S.?
A. Two permanently, um, but our business, prior to the current situation, involved travel as well, so there were often engineers over from Europe when our needs required.
Q. And how many of your 17 employees are professional engineers?
MR. WORK-DEMBOWSKI: Objection, form.
A. What specifically would you mean by "professional engineer"?
Q. Well, let's see.
The Merriam Webster definition of the word "engineer" is: "A person who is trained in or follows as a profession a branch of engineering."
That's what I mean when I say "professional engineer."
A. All our engineers are appropriately trained to conduct PEMS

Page 155

testing with all the associated skills required. That does not necessarily entail having, for example, an engineering degree.
Q. When you say "all our engineers," how many of them are there?
A. If I recall correctly I think it is nine.
Q. Okay.
Do you personally test vehicles?
A. If you mean by testing them do I install the equipment, calibrate the equipment, run the tests, drive the test, no, I do not.
I have from time to time driven a test vehicle and from time to time been a passenger in the vehicle, um, but that -- my focus is on overseeing the overall operation, methodology and test plan development and data analysis.
Q. Would you call that a very high level of oversight by you?
MR. WORK-DEMBOWSKI: Objection, form.

Page 156

A. I wouldn't qualify it by the term "high level," I would say it's the necessary oversight required to deliver quality PEMS testing.
Q. So you would not agree with the following statement -- let me find it -- that "the operational part of Emissions Analytics will typically have only a very high level oversight by me."
Do you agree with that?
MR. WORK-DEMBOWSKI: Objection, form.
A. What's the source of that quotation, please?
Q. Your deposition in another case.
A. Oh, in another --
Q. In the Koopman case.
A. Is that a document that's going to be shared on the platform?
Q. This is a brief that is not going to be helpful to you.
I'm asking you if you agree with the following statement: "The operational part of Emissions Analytics

Page 157

will typically have only a very high level of oversight by me."
That's page 8616, lines 16 through 18 of your deposition in that case. Do you agree with that statement, sir?
A. Yes, in that context, um, for the purposes of that report I think that that's not an unfair statement.
What "high level" in that context means is that I'm not physically attaching equipment to cars, I'm not typically driving them. My concern is around the integrity of the process and the data analysis.
Q. Have you ever been hired, you or your company, Emissions Analytics, to all attempt to detect an illegal defeat device in a vehicle?
MR. WORK-DEMBOWSKI: Objection, form, and I don't -- just to come back to the issue that we had talked about a couple of times, if this is trying to get at where he may have been engaged, I don't know, in

litigation then I'll instruct him
not -- that he doesn't have to answer
questions about where he may have
been or may not have been engaged for
litigation where he's not disclosed
as a testifying expert.
MS. THOMPSON: Of course.
I'll ask the question again.
CONTINUED EXAMINATION BY MS. THOMPSON:
Q. Mr. Molden, have you or
Emissions Analytics, other than in the
context of a litigation where you have
not been disclosed as a testifying
expert, ever been hired to attempt to
detect an illegal defeat device in a
vehicle?
MR. WORK-DEMBOWSKI: Objection,
form.
A. That's difficult to answer
definitively because of the pitfalls and
ambiguities in the expression "illegal
defeat device," that itself is, um, open
to interpretation.
Have we been commissioned, um,
to look at behaviors of after-treatment



systems, um, in a small number of cases,
to my recollection, but whether that was
the specific purpose of the client was
not necessarily disclosed to us.
In some cases clients
deliberately want us to work partly in
verticum as blind, so we don't know
exactly what they're looking for; so if I
hesitate that is the reason why, that it
may be that we were and we didn't know,
for example.
So there's ambiguity around
what you mean by "illegal defeat
devices," and there may be circumstances
where as part of a wider project this was
one of the client's outputs that they
were looking for.
Q. So if you had testified in
another case that you and your firm had
never been hired to attempt to detect an
illegal defeat device in a vehicle that
would be incorrect?
MR. WORK-DEMBOWSKI: Objection,
form. Misstates testimony.
THE WITNESS: I'm sorry could



you repeat -- repeat that again.
MS. THOMPSON: Sure.
Q. If you testified in a different
litigation that you and your company had
never been hired to attempt to detect an
illegal defeat device in a vehicle, that
testimony would be incorrect?
A. It would have been true at the
time.
MR. WORK-DEMBOWSKI: Objection.
A. It would have been true at the
time, but that is, of course,
approximately two years ago.
Q. Okay.
So as of two years ago you had
not been hired to detect an illegal
defeat device in a vehicle, but since
then you have; is that correct?
MR. WORK-DEMBOWSKI: Objection,
form. Misstates testimony.
A. The first part of it is true,
that that prior testimony would have been
true; as to what may have happened
subsequently, as I answered a short time
ago.



Q. And your answer was they may
have hired us to look for defeat devices
but I don't know because they didn't tell
me; is that correct?
MR. WORK-DEMBOWSKI: Objection,
form. Misstates his testimony.
A. What I would certainly say is
we conduct a lot of projects all the
time, and there isn't an instance that
immediately comes to mind of that form.
What I am saying is that I
can't be absolutely certain that there
may or may not have been, but certainly I
do not recollect one immediately.
MR. WORK-DEMBOWSKI: Jessica,
if you're getting close to a stopping
point this might be a good time for a
lunch break, or when you get to a
reasonable stopping point it might be
a good time for lunch, or dinner for
Mr. Molden.
MS. THOMPSON: Good idea. Let
me just look at my mess of an
outline.
Yes, okay, now is fine.

Given that we are a little bit
short, I don't want to rush people,
but what do you think for lunch?
MR. WORK-DEMBOWSKI: Thirty
minutes?
MS. THOMPSON: Okay.
THE VIDEOGRAPHER: The time is
12:42 p.m. eastern daylight time, we
are off the record.
[Whereupon, after a luncheon
recess was taken, the following was
had:]

A F T E R N O O N S E S S I O N

THE VIDEOGRAPHER: The time is
1:19 p.m. eastern daylight time, we
are on the record.
MS. THOMPSON: Welcome back.
All right. I want to go back
to two things that we covered before
lunch.
CONTINUED EXAMINATION BY MS. THOMPSON:
Q. First, you testified that
Emissions Analytics tested a Mercedes in



the U.S. for NOx emissions; do you recall
that testimony?
A. Yes, I do.
Q. Great.
And what were the results of
that test?
A. As I said earlier, we tested a
lot of vehicles and I can't recall, um,
this individual instance or indeed in
what exact model it was.
Q. Okay.
And I know you testified with
regard to the Chevy Cruze diesel sold in
the U.S. that it was tested for fuel
economy and CO2; do you recall that
testimony?
A. Yes, that's to my best
recollection, and for carbon monoxide as
well.
Q. Okay.
And did the Cruze pass or fail
the fuel economy test compared to the
advertised fuel economy on the Monroney
sticker?
MR. WORK-DEMBOWSKI: Objection,



form.
A. Again, I can't recall with such
specifics right here without reference to
my notes.
Q. Can you recall generally?
MR. WORK-DEMBOWSKI: Objection,
form.
A. Generally on U.S. vehicles for
miles per gallon, the Monroney five cycle
based label is on average a better
representation of -- or is more similar
to the fuel economy that we get from our
testing than is the case in the European
system; but there is inevitable variation
from model-to-model, so any
generalization is -- is quite dangerous.
Q. All right.
You testified that you worked
with a man named Richard Beasley to
prepare your report in this case; do you
recall that testimony?
MR. WORK-DEMBOWSKI: Objection,
form. Misstates previous testimony.
A. That's -- that's not correct.
So Richard was, um, asked to go



and perform the equipment inspection down
in Phoenix, Arizona, so, yeah, and so
that was what he was asked to do and
reported back the findings from that;
but beyond that had no input into the
report.
Q. And you testified that you
don't know if Mr. Beasley has any formal
training or certificates in engineering;
is that correct?
MR. WORK-DEMBOWSKI: Objection,
form. Misstates prior testimony.
A. What I -- what I said was that
he spent 28 years in the British Army,
and it's quite possible he would have
accumulated some qualifications that may
fall into a definition, um, but I can't
-- I don't know specifically.
Q. And when you say "it's quite
possible," you don't know for sure, do
you?
A. Not -- not off the top of my
head. I mean, he spent 28 years in the
Army and I don't recall, and he hasn't
necessarily told me everything that he

might have done during that time.
Q. Okay.
Do you hold any patents?
A. No, I don't, neither personally nor does Emissions Analytics.
Q. Okay.
Other than Mr. Smithers' Report, have you reviewed the reports or testimony of any other expert in this case?
A. Yes, so I was provided with the report of Mr. Levchenko.
Q. And you reviewed Mr. Levchenko's Report?
A. I did read it briefly, um, was able to ascertain it. It didn't have any particular bearing on the opinion I was forming, um, and it contained certain technical information; but it was not in my opinion relevant, so while I did quickly read it, it did not form a material part of my thinking going into this report.
Q. So you're not relying on anything contained in Mr. Levchenko's



reports as the basis for any of your opinions that you're testifying about in this litigation; is that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. Well, to be clear, so I received it, um, reviewed it, um, it was clear that it wasn't directly relevant to the opinions I was forming and so I didn't -- it wasn't a major focus of my activity in writing my report.
Q. You're not offering any criticisms of Mr. Levchenko's analysis, are you?
A. As I said, it was not directly relevant to the arguments I was putting forward; um, and no, I'm not in that the focus of my arguments was around the shortcomings in Mr. Smithers' Report.
Q. So you're not criticizing Mr. Levchenko's Report in this case, are you?
A. As you can see from the argumentation put forward in my report it centers around Mr. Smithers' Report not



Mr. -- Mr. Levchenko's.
Q. I can see that.
I'm asking you what I think is a pretty simple question: Are you criticizing any of the opinions offered by Mr. Levchenko in this litigation?
A. As you can see my report is silent on that because the focus of my report is on elucidating the shortcomings in Mr. Smithers' Report.
Q. The answer to my question then is no, you're not offering criticisms of Mr. Levchenko's report in connection with your work on this litigation, are you?
MR. WORK-DEMBOWSKI: Objection to form.
A. Indeed, I'm largely silent on it so...
Q. Okay.
Have you read any of the expert reports served by General Motors?
A. I don't believe so, no. It would -- it's not in my materials listed in my report, as long as I'm understanding you correctly.



Q. Sure.
And what about Mr. Harrington's report, have you reviewed that?
A. I don't recall doing so and I don't believe it's in the list of my materials.
Q. Okay.
To your knowledge is the 2014 to 2015 U.S. Cruze diesel included as part of the EQUA Index?
A. The EQUA Index has four different indices: One for MPG, one for CO2, one for carbon monoxide and one for NOx, which is called EQUA-Aq, which of those are you referring to?
Q. The NOx.
A. To the best of my knowledge, no, because I believe, as I said earlier, when we tested it I believe we only tested it for MPG, CO2 and carbon monoxide.
Q. And why not test it for NOx?
MR. WORK-DEMBOWSKI: Objection, form.
A. As I said earlier, this -- when

you?
MR. WORK-DEMBOWSKI: Objection, form.
A. The underlying problem here is the absence of a written test protocol, um, that can be used to validate, um, that then the testing that's undertaken that's been done in accordance with that, which is designed to deliver a certain purpose; so by the nature I've written in non-representativeness to cover a number of different potential instances of where a trip may be not representative of what's trying to be achieved.
Q. And what specific instances in Mr. Smithers' Report do you contend are non-representative based on what you call "an apparently arbitrary 3.6-mile minimum length"?
MR. WORK-DEMBOWSKI: Objection, form.
A. The reason for using the word "arbitrary" is that the underlying issue is because of the absence of a test protocol then we observe that the trips,



the tests done, are of a wide variety of different lengths, and there's no good argumentation as to why 3.6 miles is an appropriate cutoff.
So what you have is a lot of data of different shapes and sizes, um, which is being compared to different benchmarks, and so it all leads to concern, um, that these trips are not suitably trying to represent what I assume may be attempted, which is real-world driving.
Q. So you cannot identify specific instances in Mr. Smithers report that you contend are non-representative based on what you call "an apparently arbitrary 3.6-mile minimum length," can you?
MR. WORK-DEMBOWSKI: Objection, form.
A. Apart from not having access to the detailed data, and there was a lot of the data, um, this point is about omitting the necessary information required to validate that they conform to an appropriate criteria of



representativeness.
So the point is that there is an absence in the information provided to validate that these are, indeed, representative trips.
Q. And we will certainly get to that, however -- and this is the third time that I'm asking you -- if you don't offer any specific instances in response to my question I'm going to assume that you cannot identify them.
What specific instances in Mr. Smithers' Report do you contend are non-representative based on what you call "an apparently arbitrary 3.6-mile minimum length"?
MR. WORK-DEMBOWSKI: Objection, form. Argumentative. Asked and answered.
A. I've just reiterated there's a lot of data here and, uh, without having, you know, access to it, I would not necessarily be able to quote specific examples, but the key point is what I'm arguing here is it's the what is omitted



that is the problem.
Q. So the answer is no, you can't identify any specific test trips that are responsive to my three prior questions?
MR. WORK-DEMBOWSKI: Objection, form.
A. I don't really have anything to add apart from what I've answered already.
Q. Okay.
You claim that you didn't have access to data; what data did you need that you didn't have access to?
MR. WORK-DEMBOWSKI: Objection, form. Misstates testimony.
A. Well, I'm referring to access right at this moment to be able to pinpoint specific examples, not about access to data for the purposes of this report.
Q. Well, Mr. Molden, I can provide that to you; if you want to identify something for me I'd be very happy to show it to you.
A. And is there, in terms of the

omission it would need to be considered in parallel with the process for validation that was used in terms of by Mr. Smithers in selecting the data in the first place, only those two could be meaningfully answered side-by-side.

Q. So I have invited you to identify specific test trips that you contend are not representative based on what you call "an apparently arbitrary 3.6-mile length." You have not identified any test trips, any specific instances, have you?

MR. WORK-DEMBOWSKI: Objection, form. You're arguing with the witness now.

A. What I'm saying is that you look at the trip length, there's a wide variety of trip lengths, no obvious logic or no written logic as to why they were selected.

Q. For example?

A. It doesn't require an example to -- the point is that there's a wide variety of trip lengths, um, I don't



think that's in any doubt, um, and I'm not aware of something which sets down the method by which the trip lengths were chosen. That -- that is the substantive part of this point.

Q. Paragraph 37, the first sentence: "A fair and representative test method should seek to capture a variety of real-world driving conditions, including low and high speeds, different road rates, a certain amount of idling, and different rates of acceleration and deceleration."

When you say "representative" here, representative of what?

A. In the context of this report this is talking about the sorts of testing that should be conducted if the desired effect is to compare it then to, say, the FTP cycle or the highway cycle, the sorts of characteristics of the testing that needs to be undertaken to make that comparison meaningful.

Q. Comparison to what though?

A. Well, as I said, as in this



report where the comparisons have been made to the FTP cycle and to the highway cycle, so that's the context of this report.

Q. Okay.

So when you say a "fair and representative test method" you mean representative of the FTP and highway cycles; is that correct, sir?

MR. WORK-DEMBOWSKI: Objection, form. Misstates testimony.

A. The point is a more generic point is to say the selection of -- or the definition of a test cycle or the selection of the data needs to be fair and representative of what you are trying to show.

Q. And your understanding of Mr. Smithers' Report is that he is trying to show what?

A. Well, he is making a comparison between the test data he has gathered and on the one side to city driving, and to the city limits within the FTP cycle, and highway driving as well.



Q. So in your view "fair and representative test method" would be representative of the FTP and highway cycles; is that correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. I'm not saying that that is the only driving you can conclude or that it is the only driving that people do when they're using their motor vehicle.

What I'm saying is when you then make a comparison to a particular standard, uh, then that needs to be -- that certain test method needs to be fair and representative.

Q. Of what?

A. Of the benchmark to which you are trying to compare it.

Q. So return briefly to paragraph 36. You're discussing here "an apparently arbitrary 3.6-mile minimum length."

We spent quite a bit of time here so I hope that you recall your testimony on this.

Page 190

My question for you is based on what are you saying 3.6-miles minimum length is arbitrary?
A. If I heard the question correctly, um, I did not see a justification, um, for that trip length and that -- that cutoff point and in this pool of trips of highly variable lengths.
Q. Okay.
But "arbitrary" means "existing or coming about, seemingly at random or by chance, or as a capricious and unreasonable act of will"; is that also your understanding of the word "arbitrary"?
A. I'll accept that as a general definition of it, which then needs to be understood in the context of what's been written.
Q. So are you -- I'm sorry, I didn't mean to cut you off.
Are you saying that 3.6 mile minimum length was arrived at seemingly at random or by chance; is that what you're saying in your report; sir?

Page 191

A. Well, what I'm saying is that there is this -- these large number of trips that have been gathered which are highly variable in length, um, and the process by which it was decided to do these various lengths is un -- is unclear and it's not clear why in that pool of data that this particular cutoff was chosen.
Q. Does a 3.6-mile minimum trip length have any meaning to you?
MR. WORK-DEMBOWSKI: Objection, form.
A. I can't -- I can't -- I couldn't recall whether that conforms to any benchmark in some regulation somewhere; I don't have that familiarity off the top of my head.
Q. So you don't know, for example, that it is the length of the first phase of the FTP?
MR. WORK-DEMBOWSKI: Objection, form.
A. It could well be, um, but there are many different phases of many

Page 192

different cycles, so I don't necessarily recall all of them off the top of my head.
Q. Okay.
Did you have access to these trip lengths when you were writing your report?
A. Do you mean the --
MR. WORK-DEMBOWSKI: Objection, form.
A. Do you mean the trip lengths of Mr. Smithers' trips as tested?
Q. No, the trip lengths in the regulatory cycles.
A. That would have formed part of my background knowledge, um, in this area and, uh, and certain representations of it were included in Mr. Smithers' Report.
Q. All right.
Can you please turn to paragraph 66 of your report.
A. I'm there.
Q. Okay.
And in paragraph 66 you say: "I have been able to estimate the amount

Page 193

of raw data excluded. There is a mismatch between the size of raw data files and results in the report."
Do you see those two sentences?
A. Yes, I do.
Q. So is the issue here that there is data contained in the raw data files that is not relied on or included in the final Expert Report?
A. I'm not saying here that the raw data has not been provided, but it's when the data is broken down into the various trips, um, and analyzed and, as Mr. Smithers has done, put together with the on-board diagnostics data, there are certain gaps and missing data in those analyzed files.
Q. I'm sorry, so I'm not understanding you.
What I understand this paragraph to mean is that you received the report and you received the raw data and the raw data contains 8.6 hours of driving time that are not discussed in the report; am I summarizing that

correctly? Or maybe you can help me.
MR. WORK-DEMBOWSKI: Objection, form.
A. Not quite right.
So there's two sets of data provided, broad -- broadly, which is the underlying raw data and then there is some analyzed files. So that is where the data from the tailpipe PEMS testing is put together with the OBD, the on-board diagnostics data, and there is segmenting of it, graphing of it and calculations from it were performed by Mr. Smithers; and the point of this paragraph is to say that in those -- that latter group of files it appears that certain data is -- that is in sample mode as well, so that means when the equipment is actually measuring that data seems to be omitted from those analyzed files.
Q. Seems to be or it is?
A. When -- when I did this analysis it -- it was missing.
Q. But you could take the raw data and graph it, segment it and analyze it



even though it wasn't included, by your testimony, in what you call the second set of analyzed data; isn't that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. While -- while that is correct that I could have done that, the point is, the issue is here, that it has been omitted in doing the analysis.
So in selecting trips and variable lengths and which -- which were with apparently undocumented protocol for doing that, there is also some of the data is lost.
It is not -- my point is that that data is lost, not what that data might have contained.
Q. When you say the "data is lost," it was produced to you, wasn't it?
A. To clarify, by "lost" meaning lost from those analyzed files.
Q. And is it your testimony that had it not been lost from those analyzed files that Mr. Smithers' conclusions ought to have been different?



MR. WORK-DEMBOWSKI: Objection, form.
A. I'm not necessarily saying that, but what I'm saying is in order to conduct PEMS testing and analysis that provides reliable results, removing parts of data is not generally accepted good method.
Q. And when you say "removing," you would agree that none of the data was removed from the raw files that were provided to you; is that correct?
A. To the best of my knowledge that is correct.
Q. Okay.
A. But the very fact that they are removed from the analyzed files, which then produce the results that you go into the report, um, that is a potential issue with the quality of the data.
Q. But you're not testifying that had those 8.6 hours of driving been included in the analyzed files, that they would have produced different results, are you?



MR. WORK-DEMBOWSKI: Objection, form.
A. I'm not testifying that, I'm testifying about the facts that they are omitted leads to concerns about the quality and consistency of the methods used.
Q. All right.
Turn to paragraph 68, please.
You say here: "In addition, it appears that data was removed from the raw data files."
Do you see that up to the second comma?
A. Yes, I do.
Q. All right.
Are you suggesting that the raw data files were manipulated in some way to remove data that was unfavorable or undesired?
A. First of all --
MR. WORK-DEMBOWSKI: Objection to form.
You can answer if you understood the question.

THE WITNESS: I think I understood you and we'll try and answer.

A. So by "raw data files" here, this is a collective term for all the data provided, which is made up of, some which is the unanalyzed data and then the analyzed data.

What we're talking about here, um, to the best of my recollection, is once the data is analyzed, and if you look at the timestamps that are embedded in the files, it is one way of identifying where data may have been removed from the analysis, and again, this is a point about the robustness of the methods used rather than any particular result one way or the other.

Q. So you reviewed the timestamps in the analyzed data and you claim to have found gaps between timestamps; is that correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. Yes, and indeed that's what's



set out in Figure 7.

Q. And based on this purported finding you have concluded with a reasonable degree of certainty that data was removed from raw data files; is that correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. From those analyzed raw -- raw data files, yes.

Q. So did you conduct some kind of a forensic analysis to determine whether somebody went in there after the fact and removed data?

MR. WORK-DEMBOWSKI: Objection, form.

A. I'm not entirely aware of what the word "forensic" means specifically, but it doesn't require a forensic, any particular specialist skills to look at the continuity of the timestamps in the files, and it forms part of in when assessing the quality of data provided, um, that may form one of the integrity checks that would be generally used to



look if the file as presented is -- is complete.

Q. So, again, here your concern is not necessarily that some unfavorable data was removed in the formation of Mr. Smithers' opinions; is that correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. I'm not making any statements about what that data that was removed would have shown, because the point being made is that it is the very removal of it which is the concern and does not conform with generally accepted best practice.

Q. And the discontinuity that you are alleging here, for example, in pp 2018-08-21 --

MS. THOMPSON: That's a date, for the court reporter, and for the record it's the first line of Figure 7.

Q. -- you claim that there is time of discontinuity of one hour, 26 minutes and 44 and 1/10th of a second; is that correct?



A. No, that is the time, the first moment at which the discontinuity is identified.

Q. And are you saying that there is no raw data provided to show what testing, if any, was done in connection with the alleged discontinuity?

MR. WORK-DEMBOWSKI: Objection, form.

A. The missing data may or may not be there in the unanalyzed files. The point I'm making is that it is the very omission of them, which is the issue, whatever they might have contained.

Q. Okay, understood.

So the data may or may not be contained in the unanalyzed raw data files; is that what you're saying?

MR. WORK-DEMBOWSKI: Objection, form.

A. That's what I'm saying, yes.

Q. All right.

But you don't know because you didn't look, did you?

A. The point I'm making is a

different point here, which is in this paragraph, is talking about the facts that the data has been omitted; it is making no comment one way or the other that the missing data says anything about anything in particular about the performance of the vehicle; according to generally accepted best practice those should not be removed from data.
Q. Okay.
Can you go to paragraph 69, please. You say here: "Although Mr. Smithers did not provide extensive data about the odometer readings on different dates, I have identified gaps in odometer readings that suggest the vehicle was driven for significant distances with no corresponding test data provided."
Other than the examples that you provide following this sentence, were there any other examples where you contend there are "gaps in the odometer readings that suggest the vehicle was driven for significant distances with no corresponding test data"?



A. From the data I received that was the biggest gap identified of unaccounted-for miles.
Q. Are there any other instances where you have identified gaps in odometer readings that suggest that the vehicle was driven for significant distances with no corresponding testing provided, other than what you list in paragraph 69?
A. I can't recall any -- any further ones, and I believe the one I quoted would be the most extensive gap.
Q. And are you suggesting here, sir, that the vehicle was, in fact, tested during these periods of time but no data was provided?
A. What I'm saying is we do not know, um, and that there is quite a significant gap in the testing, uh, and knowing exactly what happened to the vehicle in such a large period would be, um, a factor to consider in -- in the overall validity of testing; but no, it's a lack of information as to what



happened in that gap which is the concern raised.
Q. Does your company purchase vehicles for testing?
A. Sometimes it does, yes.
Q. All right.
If you're testing a vehicle over a long period of time will you sometimes exercise it in between tests, meaning drive it, without being tested?
MR. WORK-DEMBOWSKI: Objection, form.
A. There are often many, many reasons you would drive it, and generally it's good practice to define that as part of the what I would describe as test plan.
So sometimes you can deliberately, uh, you want to what's called accumulate miles, um, and but there needs to be that documented in a test plan, and that would generally go together with a rationale for it, um, and so you would have a complete understanding at the end, and if someone



else laterally takes a look at the report as to such as all the material activities on that vehicle whilst it was undergoing its test.
Q. So the issue that you're taking here in paragraph 69 is not necessarily with the odometer gap, it's with what you believe should be documented in connection with any odometer gap; is that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. I would describe it as it's one example, alongside others I've shown in the report, where there's -- when there is missing information that you would normally expect to see when doing testing of this sort to ensure that there's no doubt about the quality of the results.
Q. All right.
MR. WORK-DEMBOWSKI: Jessica, if you get to a good pausing point, we've been going about an hour.
MS. THOMPSON: Sure.
MR. WORK-DEMBOWSKI: Can we take

which is updated from time to time, which is it doesn't form part of the regulation but it is a working manual, if you like, with their view on what is best -- best practice, and that's clearly a key document to track.

Q. All right.

And what are the best practices for determining whether a vehicle contains defeat devices?

MR. WORK-DEMBOWSKI: Objection, form.

Q. Using the PEMS --

MS. THOMPSON: I'll just ask the question again and then we will wait for the objection and you can answer.

Q. What are the universally accepted test procedures for using PEMS to determine whether a vehicle has defeat devices?

MR. WORK-DEMBOWSKI: Objection, form.

A. I'll register my concern about the definition of defeat devices, but I



will try and endeavor to answer anyway.

I don't believe there will is a universally accepted approach. I am aware, I believe, that different organizations have published, if I recall correctly, certain approaches to how you might identify certain behavior in vehicles, um, but I don't think that's a universally accepted one.

Q. Are you relying --

A. I beg your pardon, nor a universally or unambiguous definition of what a defeat device is.

Q. These approaches to how you might identify certain defeat devices, obviously with the caveat that you just provided for the term "defeat device," are you relying on any of those approaches to inform your criticisms of Mr. Smithers' Report?

MR. WORK-DEMBOWSKI: Objection, form.

A. Apart from where I actually cite in my report, everything else would form part of my background knowledge --



the generic background knowledge we talked about before.

Q. So the approaches to how you might identify certain defeat devices using PEMS, if it's not contained in your report then it's part of your general background knowledge that informs your opinions in this case; is that what you're saying?

MR. WORK-DEMBOWSKI: Objection, form. Misstates testimony.

A. Sorry, the answer I was giving was in relation to the best practice documents, so those best practice documents, particularly are in my mind was around the best practice for operating PEMS equipment, that forms part of my generic knowledge, as you would imagine, um, it's nowhere specifically stated in the report.

Regarding publications or methods for identifying defeat devices, however they're defined, is I have a general awareness that they exist, but I couldn't recall specifically and there



have not been documents considered in forming this opinion.

Q. Okay.

Can you please turn to paragraph 80 -- sorry, 71 of your report, and here you say, starting at the top at the end of the first line: "There were 8 data files -- shown in Figure 8 -- where the date stamps were inconsistent with the other files."

Do you see that?

A. Yes, I do.

Q. Okay.

And the next sentence says: "It appears that actual European dates from the equipment configuration have been incorrectly read into the U.S. date format (MMDDYYYY) for these files, rather than correctly being read into the European format that was used in all other files (DDMMYYYY)."

Do you see that?

A. Yes, I do.

Q. All right.

And then at the bottom you say

"Overall..." this is the last sentence: Overall, this raises the concern of where else there may be errors in the configuration of the equipment or the data processing software that might not -- or that have not been identified.

Do you see that?

A. Yes, I do.

Q. Okay.

So you're saying here there may be errors in the configuration of the equipment or the data processing software that have not been identified; correct?

MR. WORK-DEMBOWSKI: Objection. Form.

A. Yes, I think that is correct.

Q. All right.

And the date stamps on these data files, did they lead you to specifically identify any such errors that you speculate about in this final sentence of paragraph 71?

MR. WORK-DEMBOWSKI: Objection, form.

A. To clarify your question, are



you saying beyond these errors in the date stamp identified in Figure 8, were there additional ones? Because the erroneous date stamp files are listed in Figure 8.

Q. Right, and how do what you say date stamps that are inconsistent with other files materially impact the results of Mr. Smithers' emissions testing?

MR. WORK-DEMBOWSKI: Objection, form.

A. They were your words, weren't they, that's not quoting from my report.

Q. Correct.

A. Just to be clear.

The point about this section is that it is another piece of evidence alongside what we've been talking about previously, um, and the missing rows, which all add up to -- to magnifying the concerns about how this testing and the rigor with which this testing was, uh, conducted.

From experience in PEMS testing there are many ways that you can make



errors that can potentially be material to the results, including date stamps, number formats, um, for example, and so this is, alongside everything else we've talked about, leads to the concern about the robustness of the methods used here.

Q. You can't testify within a reasonable degree of certainty that the claimed inconsistency of the date stamps with other files materially impacted the results of Mr. Smithers' emissions testing, can you?

MR. WORK-DEMBOWSKI: Objection, form.

A. If I understood the question correctly, no, and that's not what I'm claiming.

I'm not claiming that an erroneous date stamp in and of itself is leading to the results being incorrect, and those are the emissions results being incorrect; what I'm saying is by the fact that we're observing these sorts of errors in what I would call the Metadata or the data handling, leads to --



possibly we've seen other issues that we've talked about already -- leads to a concern that what other issues are there with the data that we've not been able to spot; and it comes back to why it's important to use, uh, good protocols and best practice in conducting the tests and handling the data to minimize the risk of these sorts of problems.

Q. And then your last sentence you suggest that your claimed inconsistencies in date stamps between a U.S. and European format, quote: "Raises the concern of where else there may be errors in the configuration of the equipment or the data processing software that have not been identified."

Did I read that correctly?

A. Yes, you did.

Q. All right.

And to be clear, you have not identified specifically errors in the configuration of the equipment or data processing software as a result of analyzing the U.S. versus European data

format; is that correct?
A. Yes, that is correct, because that -- I'm making a different point, and the different -- this is -- the aim of this is because best practices are not being followed it leads to the risk of certain things happening, and here we've got some evidence that those practices are not up to scratch, which may mean that there are other issues that we haven't identified.
The reason for having best practice protocols is to minimize the risk and to have the maximum confidence in the data, and these -- the evidence I put forward here leads you to doubt that those best practices have been followed, and thereby there should be some doubt of the quality of the data itself.
MS. THOMPSON: Can you go to paragraph 82 in your report, please.
THE WITNESS: Yes, I'm there.
MS. THOMPSON: All right. And actually, I apologize, I would like you to please turn to the next page,



page 24, paragraph 88.
THE WITNESS: Sorry, can I just check everyone can still hear me?
MS. THOMPSON: I can hear you.
THE WITNESS: My computer flashed up something funny and I wanted to make sure I have -- sorry, did you say paragraph 88?
MS. THOMPSON: Yes, sir.
THE WITNESS: Yes, I'm there.
CONTINUED EXAMINATION BY MS. THOMPSON:
Q. All right, and you say here:
"As the Smithers Report uses trips with lengths from 1 minute to 57 minutes, this demonstrates that the results presented may reflect more the selection of trip lengths rather than the inherent emissions performance of the vehicle."
Did I read that correctly?
A. Yes, you did.
Q. And you say that "the results presented may reflect more the selection of trip lengths rather than inherent emissions performance of the vehicle," you do not say that the results presented



do, to a reasonable degree of certainty, reflect more the selection of trip lengths rather than the inherent emissions performance of the vehicle.
Did I make that distinction correctly?
MR. WORK-DEMBOWSKI: Objection, form.
A. Yes, yes, you did make that distinction correctly.
Q. And you're not offering an opinion here that the results presented do, in fact, reflect the selection of trip lengths rather than the inherent emissions performance of the vehicle; is that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. What this section is demonstrating is that for the very same data file if you change the trip length you can get a wide variety of NOx results, which leads to the concern that the results being presented are an artifact of the trip selection, that is



the point I'm making.
Q. You're not testifying within a reasonable degree of certainty that the results presented actually do reflect the selection of trip lengths rather than the inherent emissions performance of the vehicle; is that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. What I'm saying is that you cannot judge the validity of what is presented because of the risk from that artifact of trip selection. And, again, it comes back to what we were talking about before, which is the absence of a test plan with the rationale for the method and the method of route determination, cycle determination, that being absent it is difficult to judge whether this is a valid method or not; and my section here is showing that you can create highly variable results as an artifact of the trip length selection.
Q. What is your basis for testifying that there was no test

achieved, it offers the potential capability to devise test cycles that trigger the control strategies in such a way that leads to elevated emissions results.
Did I read that correctly?
A. Yes, you did.
Q. All right.
And what evidence do you have that the reverse engineering that you're concerned about in paragraph 92 was actually performed in this case?
MR. WORK-DEMBOWSKI: Objection, form.
A. What I'm raising here is the possibility of it; and why that possibility is important is it relates to the previous topic we were talking about in terms of the, uh, trip length selection.
So it further adds an element of -- to the argument that trips can be -- the results can be an artifact of the trip selection, and if it were possible to reverse-engineer the ECU that would



actually give an idea of how best to select the trip lengths to get a desired result.
Q. You're not testifying within a reasonable degree of certainty that that reverse-engineering of the ECU was, in fact, performed in this case in connection with Mr. Smithers' testing, are you?
MR. WORK-DEMBOWSKI: Objection, form.
A. I'm not asserting that it definitely was or not. From what I take away from the Levchenko report is that it was a distinct possibility that that was done and that would then magnify the risk from the artifact of trip length selection.
Q. All right.
You testified -- excuse me, you didn't testify, you put this in your report -- on paragraph 97 of your report you say: "Rather than..." I'm sorry, let me know when you're there.
A. Yes, I'm there.



Q. Okay.
You say: "Rather than using RPA alone..." and by RPA you mean relative process acceleration, "a measure called 'v*a_pos@95' would have been more appropriate."
Do you see that?
A. Yes, I do.
Q. Okay.
And there are some symbols in there, how would you say that term?
A. Do you mean the v*a_pos?
Q. Yes.
A. I would normally express it as v*a_pos@95, or the fuller version would be v*a_pos the 95th percentile.
Q. Okay.
MS. THOMPSON: I'm going to -- I'm just going to drag and drop this in the marked exhibits folder and, okay, if you go to the marked exhibits folder I'm going to rename this file 07.
(Whereupon, the above-mentioned paper entitled "A Portable Emissions



Measurement System (PEMS) Study of NOx and Primary NO2..." was marked Molden Exhibit 07 for identification.)
MS. THOMPSON: Go ahead and open Molden 07 when you get a chance.
Let me know when you have it open.
THE WITNESS: Yes, I've got it open.
MS. THOMPSON: Okay.
CONTINUED EXAMINATION BY MS. THOMPSON:
Q. All right. And what is this paper?
A. Well, it's -- I haven't had a chance to scroll all the way down but it's a -- it's a co-authored -- well, a paper co-authored between myself and a number of other -- a number of academics, mainly drawn from Imperial College, London.
Q. All right. And what was your role on this paper?
A. Primarily provision of data and the review of the -- of the end product.

Page 246

particular sort of analysis, um, the primary way that I used v*a_pos was to quantify the aggressiveness of the test cycles presented, um, so then they could be -- the comparison that was being made by Mr. Smithers could be put in proper context.
Q. So you made no attempts to find a correlation between high v*a_pos and high NOx emissions in the raw data provided to you by Mr. Smithers underlying the opinions offered in his report?
MR. WORK-DEMBOWSKI: Objection, form.
A. I can't recall doing that specific exercise, no.
Q. So you don't know if there is any correlation in this instance between high v*a_pos and high NOx emissions; is that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. What would generally be accepted, um, and particularly if you

Page 247

look at, for example, Figure 2 in my report, it is generally accepted that there is a correlation between aggressiveness in driving or also could be expressed as load on the engine correlates with elevated NOx emissions.
Q. But you don't know if that's the case with respect to this vehicle in this litigation; is that correct?
MR. WORK-DEMBOWSKI: Objection, form.
A. As I said, I can't recall doing that specific exercise, but what the analysis does show is that many of the trips Mr. Smithers puts forward with elevated NOx emissions correlates with -- on the figures presented in my report, the high NOx emissions are often explained or correlate with the higher v*a_pos values.
Q. But you don't know if that's the case here?
MR. WORK-DEMBOWSKI: Objection, misstates his testimony. Form.
A. The purpose of the report is in

Page 248

a way the other way around. Mr. Smithers is asserting a relationship, um, and certain causal links; and what I am saying is actually that this aggressiveness may actually be a confounding factor in that analysis.
Q. But you can't say with a reasonable degree of certainty that it is a confounding factor in that analysis; is that correct?
MR. WORK-DEMBOWSKI: Objection, form. Misstates his testimony.
A. I believe my report identifies where there are -- where there are elevated NOx emissions that often correlates with a high v*a_pos value, and I would further say that it is generally accepted that -- from the engineering fundamentals, that high NOx emissions are produced generally under higher load in the engine, which would be a function of one -- one cause of high load on the engine would be more aggressive driving.
Q. So it is your testimony that your report demonstrates a correlation in

Page 249

this specific vehicle between high NOx emissions and high v*a_pos; is that your testimony?
A. What I'm saying is that the links that Mr. Smithers is drawing between the behavior of the vehicle and the high NOx emissions or the ambient temperature and the higher NOx emissions, the v*a_pos is a metric in that analysis, that is quite likely to be a confounding factor.
Q. But you cannot testify within a reasonable degree of certainty that it is a confounding factor, can you?
MR. WORK-DEMBOWSKI: Objection.
Q. Because you did not do that analysis?
MR. WORK-DEMBOWSKI: Objection, form. Misstates his testimony. Misstates his report.
A. In fact the charts in my report attempt to set out precisely that, how that process of confounding may be taking place.
Q. Sir, can you show me anywhere

in your report that you establish a correlation between high NOx emissions and high v*a_positive anywhere?

A. Well, we should refer to the charts, if I may.

For example, Figure 16 tends to show how the v*a_pos is a relevant variable in making the comparison between the data collected and the benchmarks chosen, FTP cycle, that that is not a fair comparison because there is this other variable, v*a_pos, which may well be explaining or have some explanatory power in that analysis which is not shown in Mr. Smithers' Report.

Q. So you cannot point to anyplace in your report where you analyze the data that Mr. Smithers provided to you and established a correlation between high NOx emissions and high v*a_pos; is that correct?

MR. WORK-DEMBOWSKI: Objection, form. Asked and answered and misstates the answer that he just gave.



A. To summarize what I have said, it is that it is generally accepted that NOx, high NOx, is often produced under high engine load, which does correlate with, amongst other things, high acceleration, v*a_pos@95 is a metric of high acceleration, and when we then look at his analysis in Figure 16 that shows how v*a_pos, with that background knowledge of how the combustion works, then v*a_pos is a plausible confounding factor not taken into account in Mr. Smithers' analysis.

Q. Yes, but you would agree that it's not necessarily the case that NOx emissions are highly sensitive to driving style; correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. Would you mind repeating that sentence just to make sure I've got it clearly, please.

Q. Sure.

You would agree that it's -- NOx emissions are not always in every



vehicle highly sensitive to driving style?

MR. WORK-DEMBOWSKI: Same objection.

A. That is a very broad question if that encompasses vehicles of all types, all fuels, I may be able to make a more meaningful answer if the domain of that question is more specific.

Q. Okay.

Would it surprise you if you tested a series of vehicles all within normal highway driving, some of those vehicles saw spikes in NOx as a result of aggressive but legal driving, others of those vehicles did not see a spike in NOx as a result of the same or very similar style of driving, would that surprise you?

MR. WORK-DEMBOWSKI: Objection, form. Object to the incomplete hypothetical.

A. Well, what sort of vehicles are you thinking about?

Q. Well, I'm talking about



passenger cars with diesel engines other than medium or heavy duty.

MR. WORK-DEMBOWSKI: Same objection.

A. That question really does encompass a wide range of different vehicle types with different after-treatment systems of different ages, it's really hard to give a hard and fast answer to that; but I still, nevertheless, think it would be true, you would generally expect to see spikes of NOx emissions around acceleration events.

Q. You didn't analyze the data here to determine whether or not your assumption about what you would generally see is something that you actually see with respect to the Cruze diesel vehicles; isn't that correct?

MR. WORK-DEMBOWSKI: Objection, form.

A. What I -- what I do show in Figure 2 -- Figure 2 is an illustration using Mr. Smithers' actual data, um, to illustrate that background knowledge of