UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON COUNTS et al.,

       Plaintiffs,                                  Case No. 1:16-cv-12541

v.                                             Honorable Thomas L. Ludington
                                                United States District Judge
GENERAL MOTORS, LLC,
and ROBERT BOSCH, LLC,

       Defendants.
_____/

**OPINION AND ORDER DISMISSING CASE WITH PREJUDICE UNDER IMPLIED PREEMPTION AND DENYING PENDING MOTION AS MOOT**

In this emissions-regulations case, the parties have spent years litigating the allegations that General Motors and Robert Bosch LLC misled consumers into purchasing a GM-manufactured car by installing devices that defeated the emissions testing approved by the Environmental Protection Agency. But then the Sixth Circuit Court of Appeals recently dismissed a substantially similar claim as preempted by the Energy Policy and Conservation Act, 42 U.S.C. § 6201 *et seq*. The parties were directed to submit supplemental briefing regarding whether this case should be dismissed under that new precedent.

As explained hereafter, the case will be dismissed with prejudice because Plaintiffs' state-claims are impliedly preempted by the Clean Air Act, 42 U.S.C. § 7401 *et seq*.

I.

Plaintiffs are a group of consumers who purchased a 2014 or 2015 Chevrolet Cruze diesel (the "diesel Cruze") and seek to represent a putative class of "[a]ll persons who purchased or leased a [diesel Cruze]." ECF No. 1 at PageID.62. Plaintiffs' alleged injury is their overpayment for a diesel Cruze caused by Defendants General Motors and Bosch duping them into buying a diesel

Cruze with a "defeat device" that made the emissions comply with the regulations of the Environmental Protection Agency (EPA) and California Air Resources Board ("CARB"). *See id.* at PageID.64–65, 68, 74–75. Their theory of liability follows:

> [R]eports and vehicle testing now indicate that General Motor's (GM) so called "Clean Diesel" vehicle, the Chevrolet Cruze (Cruze), emits far more pollution on the road than in lab tests and that these vehicles exceed federal and state emission standards. Real world testing has recently revealed that these vehicles emit dangerous oxides of nitrogen ($NO_x$) at levels ***many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect from a "Clean Diesel," and (iii) United States Environmental Protection Agency maximum emissions standards.***

*Id.* at PageID.12–13.

In June 2022, Defendants' motions for summary judgment were denied, *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 678 (E.D. Mich. 2022), and the parties' *Daubert* motions were resolved, *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547 (E.D. Mich. 2022). In August 2022, Plaintiffs filed a Motion to Certify a Class, which Defendants oppose, ECF Nos. 446, 462.

On April 21, 2023, the Sixth Circuit dismissed seemingly identical claims as impliedly preempted by the Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6201 *et seq.*, and its corresponding regulations for emissions testing, *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 862–64 (6th Cir. 2023); *see also* ECF No. 483 (notifying this Court of the dismissal). And the petition for an *en banc* rehearing was denied by "the full court." *Ford*, No. 22-1245, 2023 WL 4115991, at *1 (6th Cir. June 21, 2023).

The effect of that case, if any, has been briefed by the parties regarding this case. Plaintiffs assert their state-law claims are not preempted, ECF No. 489 (sealed), while Defendants contend that implied preemption warrants dismissal of Plaintiffs' state-law claims, ECF Nos. 491; 492.

II.

A.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land," despite "any Thing in the Constitution or Laws of any State to the Contrary." U.S. CONST. art. VI, cl. 2. "The phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." *City of New York v. FCC*, 486 U.S. 57, 63, (1988) (per curiam). Thus, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)). This inquiry is largely one of congressional intent, i.e., whether the statute demonstrates an "intent to supplant state authority in a particular field." *Id.* at 604-05. In line with the standards governing motions for dismissal, a defendant bears the burden of proof in establishing preemption as grounds for dismissal. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007).

Ordinary preemption[1] provides an affirmative defense to support dismissal of a claim (as Ford did here). *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 852 (6th Cir. 2023). "State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred." *McDaniel v. Upsher–Smith Lab'ys, Inc.*, 893 F.3d 941, 944 (6th Cir. 2018) (citation omitted). Through an express preemption clause, Congress

---

[1] Ordinary preemption is distinguished from the "misleadingly named doctrine" of complete preemption, a "jurisdictional" doctrine under which a court could conclude "that the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Hogan v. Jacobson*, 823 F.3d 872, 879 (6th Cir. 2016) (quotation marks omitted). This "complete preemption" doctrine is a narrow one that the Supreme Court has applied in only three statutory settings. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6–11 (2003).

may make clear "that it is displacing or prohibiting the enactment of state legislation in a particular area." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021).

By contrast, implied preemption applies in one of two forms: field or conflict. *Id.* "Field preemption occurs 'where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). Conflict preemption may instead be present when "Congress has not entirely displaced state regulation over the matter in question." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). In that circumstance, state law may be preempted "to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (internal citations omitted).

**B.**

Applying these principles three months ago, the Sixth Circuit dismissed a putative class action that a group of consumers brought against an automobile manufacturer. *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851 (6th Cir. 2023), *en banc reh'g denied per curiam*, No. 22-1245, 2023 WL 4115991 (6th Cir. June 21, 2023). The consumers asserted state-law "fraud-on-the-agency" claims arising from manufacturer's alleged fraud on the EPA via submission of false fuel-economy-testing figures for certain truck models, which the Sixth Circuit held were impliedly preempted for conflicting with the EPCA, 42 U.S.C. § 6201 *et seq.*, and its regulatory scheme.

The crux of the Sixth Circuit's holding of "first impression" is summarized as follows:

(1) "First, because the EPA accepted Ford's testing information and published its estimate based on that information, plaintiffs' claims essentially challenge the EPA's figures." *Ford*, 65 F.4th at 863 (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 122 (3d Cir. 2010)).

(2) "Second, allowing juries to second-guess the EPA's fuel economy figures would permit them to rebalance the EPA's objectives." *Id.*
(3) "Third, as the EPA has the authority to approve or reject fuel economy figures, its 'federal statutory scheme amply empowers the [agency] to punish and deter fraud.'" *Id.* (alteration in original) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001)).
(4) "Finally, state-law claims would skew the disclosures that manufacturers need to make to the EPA." *Id.*

In sum, the "state-law fraud-on-the-agency claims would 'inevitably conflict with the [EPA]'s responsibility to police fraud consistently with the Administration's judgment and objectives,'" *id.* at 861 (quoting *Buckman*, 531 U.S. at 350). All these holdings apply the same with respect to the state-law claims at issue in this case, explained more extensively below.

### III.

### A.

When reviewing preemption, Congress's intentions are the lynchpin. *Ford*, 65 F.4th at 860 (quoting *Cipollone v. Liggett Grp.*, 505 U.S. 504, 516 (1992)).

The EPCA and the Clean Air Act (CAA) both grant the EPA wide-ranging authority to manage and to supervise motor-vehicle performance. The EPCA, enacted in 1975, aimed to establish a thorough regulation plan for fuel-economy testing, emphasizing the improvement of motor-vehicle energy efficiency and assuring reliable energy data. *Id.* at 854 (quoting 42 U.S.C. § 6201(5), (7)). Similarly, the CAA's goal is to safeguard and to improve the nation's air quality with a detailed regulation plan, which ultimately benefits public health, welfare, and productive capacity. 42 U.S.C. § 7401(b)(1). In sum, the CAA directs the EPA to set standards for air-pollutant emissions from new motor vehicles or their engines. *Id.* § 7521(a)(1).

Under both these regulatory frameworks, the responsibility of rigorous testing falls on vehicle manufacturers. *Ford*, 65 F.4th at 854–55; 42 U.S.C. § 7525(a)–(d), (h). And the EPA requires such manufacturers to use "a chassis dynamometer" to conduct testing cycles for both

fuel economy under the EPCA and emissions under the CAA. *Ford*, 65 F.4th at 854–55; *see also* 40 C.F.R. § 86.115-78. Also, Congress clarified that fuel-economy tests should coincide with emission tests when possible, 49 U.S.C. § 32904, showcasing that regulating vehicle fuel economy (EPCA) and emissions (CAA) are complementary and manageable by the same testing procedures.

Both laws have provisions for "in-use testing" requiring manufacturers to conduct and to report emissions tests for vehicles already in use. *See* 42 U.S.C. § 7541; 40 C.F.R. § 86.1847-01. And if the EPA suspects the presence of a "defeat device," then it can test or demand additional testing on any vehicle at a specified location, using its defined driving cycles and test conditions. 40 C.F.R. § 86.1809-01(b); *cf. Ford*, 65 F.4th at 865.

In both frameworks, manufacturers must submit data specified by the EPA for review. *See* 40 C.F.R. §§ 86.1843-01, 86.1844-01; *Ford*, 65 F.4th at 856. Under the CAA, manufacturers must also deliver a meticulous account of the vehicle's auxiliary emission control devices ("AECDs"), enabling the EPA to investigate if any "defeat device" lurks beneath the deck. 40 C.F.R. § 86.004-2 (providing the EPA's definition of "defeat device"); *see also id.* § 86.1844-01(d)(11) (requiring manufacturers to describe any AECDs).

When it comes to data evaluation under both regimes, the EPA holds the reins. Manufacturers must convince the EPA that their vehicle design does not unnecessarily reduce the effectiveness of emissions control under normal operation and use. 40 C.F.R. § 86.1809-01(d)(1), (2)(ii). If the initial round of fuel-economy testing shows unsatisfactory results, then manufacturers must conduct more tests. *Ford*, 65 F.4th at 865.

Under both the EPCA and the CAA, the EPA is tasked with making an affirmative statement about the vehicle's performance based on its review of manufacturers' data. This results in either a fuel-economy estimate under the EPCA, 49 U.S.C. § 32904(c), or a Certificate of

Conformity (COC) based on emissions testing under the CAA, 42 U.S.C. § 7525(a)(1). If a vehicle complies with the regulations, then the EPA issues a COC: the EPA's positive verdict on the vehicle's emission performance. *See, e.g.*, ECF No. 12-2 at PageID.529 (issuing COC for the 2014 diesel Cruze).

The EPA also holds substantial power to investigate and to penalize manufacturers that stray off either course. As with the EPCA, *see Ford*, 65 F.4th at 857 (including statutory and regulatory citations), under the CAA the EPA may impose fines, *see, e.g.*, 42 U.S.C. §§ 7524(b), 7524(c), call back vehicles, *id.* § 7541(c)(1), and even revoke a vehicle's COC, 40 C.F.R. §§ 86.1850-01(d), 86.1851-10(d)(1).

And both legislative frameworks provide a lighthouse for consumers, guiding them with publicly disclosed test results. *See* Data on Cars used for Testing Fuel Economy, EPA (last updated June 14, 2023), https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-usedtesting-fuel-economy (releasing results of fuel-economy testing publicly); 42 U.S.C. § 7525(e) (requiring the EPA to do the same under the CAA). Even more telling in the CAA context, the EPA requires manufacturers to put specific language inside the engine compartment stating that the vehicle complies with the EPA's applicable emissions standards. 40 C.F.R. § 86.1807-01(a), (c)(ii). This transparency allows prospective buyers to make informed decisions and manufacturers to communicate clear compliance to their customers, ensuring consistent and comparable emissions information. *See Ford*, 65 F.4th at 857.

In sum, Congress's intent demonstrates that the CAA impliedly preempts state-law fraud-on-the-agency claims that rely on emissions figures that were provided by vehicle manufacturers and approved by the EPA.

B.

The *Ford* court concluded that the state-law claims were impliedly preempted by the EPCA because they were intertwined with alleged violations of the EPCA. *Ford*, 65 F.4th at 866. Those findings apply equally to the CAA implied preemption at issue here.

Like the claims in *Ford*, Plaintiffs' claims here are inextricably intertwined with alleged violations of the CAA. As explained earlier, Plaintiffs' state-law claims arise from alleged misconduct by GM and Bosch involving violations of the CAA vis-a-vis EPA regulations for defeat devices, testing procedures, and emissions output. *See* discussion *supra* Section III.B. Without the CAA and its regulations, Plaintiffs would have no basis for their claims. In this way, Plaintiffs' claims exist "solely because of" a federal statute and are thus impliedly preempted by it. *Ford*, 65 F.4th at 866; *see also Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 579 (6th Cir. 2013). That is, "any fraud committed by [GM] on consumers is a byproduct of alleged fraud committed on the EPA" such that challenging it "is 'tantamount to permitting Plaintiffs to challenge the EPA estimates themselves,' which plaintiffs cannot do." *Ford*, 65 F.4th at 866 (quoting *In re Ford Fusion and C-MAX Fuel Econ. Litig.*, No. 7:13-MD-02450, 2017 WL 3142078, at *10 (S.D.N.Y. July 24, 2017)).

Because Plaintiffs' "state-law fraud-on-the-agency claims would 'inevitably conflict with the [EPA]'s responsibility to police fraud consistently with the Administration's judgment and objectives,'" the claims are impliedly preempted by the CAA. *See Ford*, 65 F.4th at 861 (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)).

C.

To draw a tighter analogy, Plaintiffs' claims in this case are impliedly preempted by the CAA in the same way that the claims in *Ford* were impliedly preempted by the EPCA. Plaintiffs'

state-law claims alleging GM manipulated its emissions output and testing results for the diesel Cruze meet the CAA head on, in much the same way as state-law fraud claims related to fuel economy were knocked down in the *Ford* case. ECF No. 484 at PageID.42452. The intersection of these claims with the CAA is no coincidence—it is a direct reflection of the conflict these claims sparked in the EPCA landscape of *Ford*.

1.

*Ford* provided clear insight: when the EPA green-lights a manufacturer's test data, any legal challenges against the data are essentially proxy battles on the EPA's test data. *Ford*, 65 F.4th at 862–63. The same principle applies here. That is, to cement their state-law fraud claims here, Plaintiffs must demonstrate that GM "failed to follow the EPA-pr[e]scribed testing procedures or its obligation to report truthful information to the EPA." *Id.* at 865.

Despite the EPA's diligence, approving GM's emissions tests and AECD reports, a jury would still have to make an independent judgment, potentially sparking a flame on the EPA's mandate by determining whether GM's test results were deceptive—as Plaintiffs and their experts claim—or truthful, as per the EPA's assessment. *Id.* at 863. Plaintiffs claim that GM and Bosch deceived the EPA to secure EPA-issued COCs, resulting in diesel Cruzes that emit more emissions than federal standards in certain conditions. ECF No. 390 at PageID.32003 ("GM and Bosch employed three strategies that successfully deceived regulators and consumers."); *id.* at PageID.32004 ("Smithers shows in detail the multiple fraudulent statements made to regulators and repeated failure to disclose the effect of AECDs on emissions."); *id.* at PageID.32019 ("GM and Bosch designed and tested at least three defeat devices, installed them into the subject vehicles, and lied to regulators about them."); *accord* ECF No. 1 at PageID.12–13 ("Real world testing has recently revealed that these vehicles emit dangerous oxides of nitrogen (NO$_x$) at levels many times

higher than . . . ***United States Environmental Protection Agency maximum emissions standards***."). But Plaintiffs have not identified an emissions benchmark, standard, or metric—except the EPA's standards—that a reasonable consumer would be aware of, care about, or expect. *See Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 678, 702 (E.D. Mich. 2022) ("Plaintiffs now only argue that Defendants defrauded them by installing and concealing defeat devices that misrepresent the diesel Cruze's emissions [to the EPA]."). That is, Plaintiffs' allegations about "defeat devices" concealing excess emissions from the EPA hinge solely on the violation of EPA regulations, as confirmed by Plaintiffs' emissions expert, Juston Smithers. *See Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 564–67 (E.D. Mich. 2022) ("Smithers contends that GM should have identified its online dosing to regulators as an EI-AECD."); ECF No. 339-4 at PageID.19703 (testifying that "[d]efeat device has a specific definition in the CFR"); *accord* ECF No. 345-2 at PageID.22507–10. Indeed, Plaintiffs repeatedly testified that their only concern for emissions output was regulatory compliance. *E.g.*, ECF Nos. 346-24 at PageID.24032; 346-26 at PageID.24088; 346-27 at PageID.24159; 346-28 at PageID.24218; 346-30 at PageID.24296; 346-31 at PageID.24356.

Hence, Plaintiffs' claims, being thoroughly entwined with federal emissions standards and the EPA, are impliedly preempted by the CAA. *Ford*, 65 F.4th at 863 ("[P]laintiffs' claims essentially challenge the EPA's figures." (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 122 (3d Cir. 2010))).

The presence of the Federal Trade Commission (FTC) in *Ford*'s fuel-economy marketing saga does not change the analysis in this case. Since Plaintiffs' affirmative-misrepresentation claims have been dismissed from this case, *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 597–99 (E.D. Mich. 2017), neither the FTC nor the EPCA are at issue. Rather, the core of this

material-omissions case is Plaintiffs' belief that GM should have disclosed certain "defeat devices" and NO$_x$ emissions to the EPA under the CAA, based on definitions and expectations all arising from EPA regulations. *See* discussion *supra* Section III.B.

In sum, "because the EPA accepted [GM]'s testing information and published its estimate based on that information, plaintiffs' claims essentially challenge the EPA's figures." *Ford*, 65 F.4th at 683 (citing *Farina v. Nokia Inc.*, 625 F.3d 97, 122 (3d Cir. 2010))).

**2.**

Allowing juries to question the EPA's figures could lead to them overstepping their bounds and meddling with the EPA's balanced objectives, including cost, data accuracy, and test-redundancy considerations. *Id.* at 863. After manufacturers conduct EPA-prescribed testing and submit their required data, it is for the EPA—no one else—to evaluate the results based on various important factors and objectives. *Id.* at 854, 856.

The same principle applies to GM's diesel Cruzes, which are put through a stringent testing process before their results are submitted to the EPA for review. *See* 40 C.F.R. § 1066 *et seq.*; *see also* 42 U.S.C. § 7525(a)(1); 40 C.F.R. § 86.1844-01(d)(11) (requiring manufacturers to disclose the function and justification of any AECDs that reduce the effectiveness of emissions system under certain conditions); 40 C.F.R. § 86.1844-01(g)(3) (same for "[d]etailed technical descriptions of emission-related components and AECDs); 40 C.F.R. § 86.1844-01(g)(4) (same for "[d]etailed calibration specifications for all emission-related components and AECDs"); 40 C.F.R. § 86.1844-01(g)(5) (same for "[a]ny information necessary to demonstrate that no defeat devices are present on any vehicles covered by a certificate"). The EPA is well-equipped to assess these test results and disclosures holistically, while striking a balanced decision about regulatory compliance. *See* 42 U.S.C. § 7521(a)(1), (b)(2)(A) (permitting the EPA to revoke COCs).

Allowing plaintiffs and juries to override these judgments could give rise to a shadow regulatory system—one led by lawyers and experts, rather than by Congress and the EPA. *Ford*, 65 F.4th at 863 ("Second, allowing juries to second-guess the EPA's fuel economy figures would permit them to rebalance the EPA's objectives.").

**3.**

Plaintiffs' claims would overstep the EPA's powers to penalize and to prevent fraud. The EPA holds significant authority to enforce the EPCA and to deter fraudulent activities. *Id.* at 857. This power is intended to be wielded by the federal government, not by civil litigants before juries who could end up contradicting and usurping the EPA's role. *Id.* at 865 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001)). The EPA is vested with the powers to investigate violations, to issue civil penalties, to request voluntary recalls, and even to revoke COCs. *Id.* at 865; *see also* discussion *supra* Section III.A.

And the EPA has flexed its powers against other manufacturers. *E.g.*, Garret Ellison, *Michigan Companies Fined $10M for Selling Diesel "Defeat Devices,"* MLive (Sept. 15, 2022), https://www.mlive.com/public-interest/2022/09/michigan-companies-fined-10m-for-selling-diesel-defeat-devices.html [https://perma.cc/K88N-C8TL] ("The EPA says it resolved 40 diesel tampering cases in 2021."); Press Release, U.S. Dep't of Just., Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties; Six Volkswagen Executives and Employees are Indicted in Connection with Conspiracy to Cheat U.S. Emissions Tests (Jan. 11, 2017), https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six [https://perma.cc/48YH-37UE] (extracting a $1.45 billion settlement payment from Volkswagen in 2017 for its violations of the CAA).

These enforcement powers and execution of them reveals a comprehensive regulatory framework under the EPA's vigilant watch, leaning toward implied preemption under the CAA. *See Ford*, 65 F.4th at 863 ("Third, as the EPA has the authority to approve or reject fuel economy figures, its 'federal statutory scheme amply empowers the [EPA] to punish and deter fraud.'" (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001))).

**4.**

Plaintiffs' claims would distort the EPA-required disclosures. Under the CAA, manufacturers must adhere to EPA regulations to obtain a COC by providing details about their emissions tests and any AECDs they use. *See, e.g.*, 40 C.F.R. §§ 86.1843-01, 86.1844-01.

Here, Plaintiffs are effectively challenging the adequacy of GM's disclosures to the EPA, *e.g.*, ECF No. 390 at PageID.32019 ("Defendants designed the defeat devices to evade detection on regulatory cycles."), echoing the fraud-on-the-agency claims seen in *Ford*, 65 F.4th at 865. If allowed to proceed, then these claims would compel manufacturers to over-document their submissions, despite the EPA's satisfaction, resulting in an unnecessary burden on manufacturers and the EPA's evaluation process. *See Buckman*, 531 U.S. at 351 ("Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application."); *Ford*, 65 F.4th at 864 ("[I]f a state-law claim were to proceed, a jury may find this documentation inadequate even if the EPA had previously determined otherwise.").

By challenging these submissions, Plaintiffs are implying that the EPA either accepted false or insufficient data or made an incorrect judgment—both claims being preempted by federal law. *See Ford*, 65 F.4th at 863 ("Finally, state-law claims would skew the disclosures that manufacturers need to make to the EPA.").

**D.**

Plaintiffs advance three counterarguments that deserve attention. Their first argument is that, like a train, the *Ford* case should be confined to its tracks because it concerned fuel-economy figures, while this case concerns emissions-output statistics. ECF No. 489 at PageID.42714–22. But Plaintiffs have not explained why this difference should matter. Indeed, the holding of *Ford* seems to control the facts of this case with much greater force than the facts of *Ford*. In *Ford*, the debate revolved around fuel-economy information that was calculated from the emissions figures approved by the EPA. *Ford*, 65 F.4th at 854–57 ("This case centers on allegations that Ford cheated on its fuel economy *and emissions testing* . . . ." (emphasis added)). However, in this case, Plaintiffs are not just complaining about a product of the emissions data; they are directly challenging the emissions data that the EPA calculated itself. ECF No. 489 at PageID.42719–20 ("Under the Clean Air Act, the EPA only performs emissions testing to verify that the vehicles meet certain minimum standards to be approved for sale and use." (citing 42 U.S.C. § 7525(a)(1))). In other words, Plaintiffs' challenge here is one degree closer to the core issue than the challenge in *Ford*. This fact only strengthens the controlling force that *Ford* has here.

Plaintiffs also argue that *Ford* is not useful here, as it was decided based on implied conflict preemption, and this Court has already held that the claims here are not subject to express preemption or implied field preemption. ECF No. 489 at PageID.42722–24. But this argument is self-defeating because this Court never considered implied conflict preemption. *See Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 588-92 (E.D. Mich. 2017). Nor the nature and purpose of the federal regulatory scheme, its intended effect on state laws and regulations, or the potential for state-law claims to interfere with federal objectives—all which were key factors in *Ford*. Regardless, lack of express or field preemption does not nix consideration of conflict preemption.

Lastly, Plaintiffs say their claims do not hinge on any EPA findings, unlike those in *Ford*; they are based on the existence of defeat devices and public misrepresentations about them. ECF No. 489 at PageID.42724–31. But both are true here, as explained earlier. *See* discussion *supra* Section III.B, III.C.1. The alleged devices would defeat the EPA's emissions-output testing, which the EPA has the power "to punish and deter." *Ford*, 65 F.4th at 863. Thus, Plaintiffs' challenges to the figures that the EPA approved renders their claims impliedly preempted by the CAA.

### E.

In sum, the state-law claims that Plaintiffs have advanced here are preempted by the Clean Air Act. In all respects, they mirror the state-law claims that were preempted in *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851 (6th Cir. 2023), *en banc reh'g denied per curiam*, No. 22-1245, 2023 WL 4115991 (6th Cir. June 21, 2023). Both sets of claims (1) challenge the sufficiency of the manufacturer's testing and disclosures to the EPA, (2) would place juries in the EPA's regulatory shoes, (3) would disrupt the EPA's enforcement powers and could skew the EPA's required disclosures, and (4) could lead to disruptive practical consequences. For these reasons, this Court holds that Plaintiffs' state-law claims here are preempted by the Clean Air Act in the same way as the state-law fraud claims were preempted by the Energy Policy and Conservation Act in *Ford*.

### IV.

Accordingly, it is **ORDERED** that Plaintiffs' Amended Complaint, ECF No. 94, is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Plaintiffs' Motion to Certify Class, ECF No. 446, is **DENIED AS MOOT**.

**This is a final order and closes the above-captioned case**.

Dated: July 12, 2023                                     s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge